Not Reported in F.Supp.2d                                                                                                           Page 1
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Bowoto v. Chevron Corp.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Larry BOWOTO, et al., Plaintiffs,
v.
CHEVRON CORP., et al., Defendants.
**No. C 99-02506 SI.**

Aug. 22, 2006.

Michael S. Sorgen, Joshua Nathan Sondheimer, Law Offices of Michael Sorgen, Cindy Ann Cohn, Electronic Frontier Foundation, San Francisco, CA, Anne K. Richardson, Lauren Teukolsky, Hadsell & Stormer, Inc., Barbara Enloe Hadsell, Patrick Mark Dunlevy, Law Office of Hadsell & Stormer, Inc, Bert Voorhees, Jocelyn Sperling, Theresa M. Traber, Esq., Traber & Voorhees, Pasadena, CA, Jennifer M. Green, New York, NY, Jose Luis Fuentes, Siegel & Yee, Oakland, CA, Judith Brown Chomsky, Law Offices of Judith Brown Chomsky, Elkins Park, PA, Marco Simons, Richard Lawrence Herz, Earthrights International, Washington, DC, Robert Dexter Newman, Law Office of Robert D. Newman, Los Angeles, CA, for Plaintiffs.
Caroline N. Mitchell, Robert A. Mittelstaedt, Adam Richard Sand, Esq., David L. Wallach, Elaine Wallace, Katherine S. Ritchey, Natausha A. Wilson, Jones Day, Eric Danoff, Emard Danoff Port Tamulski & Paetzold LLP, Jordan Cunningham, Martha A. Boersch, San Francisco, CA, David M. Bays, Huston, TX, Joseph P. Shereda, Chicago, IL, Lucas W. Andrews, Atlanta, GA, for Defendants.

SUSAN ILLSTON, District Judge.
*1 On March 24, 2006, the Court heard argument on defendants' motion to dismiss plaintiffs' claims under the Torture Victim Protection Act, 28 U.S.C. § 1350, note ("TVPA"), and the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). Having considered the arguments of counsel and the papers submitted, and for good cause appearing, the Court hereby GRANTS IN PART defendants' motion.

Defendant Chevron Corporation ("Chevron") is a corporation organized under the laws of Delaware and headquartered in San Francisco, California.[FN1] Seventh Am. Compl., ¶ 28. Through its wholly owned subsidiary, defendant Chevron Investments, Inc., Chevron owns a Nigerian subsidiary, Chevron Nigeria Limited ("CNL").*Id.* at ¶ 29.CNL operates a joint venture with the Nigerian National Petroleum Company, an entity owned by the Nigerian government, to exploit oil and gas reserves in the Niger delta region of Nigeria. *Id.* at ¶ 28.In connection with this joint venture, CNL hires Nigerian government security forces to protect its installations. *Id.* at ¶ 40.One such installation was the "Parabe platform," an oil platform located off the coast of Nigeria. *Id.* at ¶ 47.

> FN1. Because this is a motion to dismiss, the factual allegations from plaintiffs' complaint are taken as true and are construed in the light most favorable to the nonmoving party. *Watson v. Weeks,* 436 F.3d 1152, 1157 (9th Cir.2006).

On May 25, 1998, approximately 100 residents of nearby communities traveled to the Parabe platform to protest the environmental impact of Chevron's oil operations. *Id.* After the protesters had occupied the platform for two days, Chevron contacted the Nigerian military and requested that it intervene. *Id.* at ¶¶ 50-51.Chevron provided helicopters to transport its own security personnel and Nigerian government security forces to the platform. *Id.* When the security forces reached the platform, they began firing on the protestors, killing two and injuring others. *Id.* at ¶ 52.After the forces secured the platform, they seized a number of the protestors. *Id.* at 54.The complaint alleges that the security forces later tortured Bola Oyinbo by hanging him by his wrists from a ceiling fan. *Id.*

Approximately seven months after this incident, on January 4, 1999, Nigerian military forces attacked two small communities in the Niger delta located near Chevron's oil and gas operations. *Id.* at ¶

Not Reported in F.Supp.2d
Case 5:07-cv-03444-JF   Document 24-2   Filed 10/05/2007   Page 2 of 12
Page 2
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

56. The complaint alleges that Chevron provided the military forces with helicopters, sea trucks, pilots and other crew members that were used in the attacks. *Id.* at ¶ 57. At least four people were killed in the attacks, and the villages were burnt to the ground. *Id.* at ¶¶ 56, 60-64.

On May 27, 1999, individuals injured or killed in the incidents described above filed this lawsuit, seeking to hold Chevron liable for the actions of CNL and the Nigerian military. The original complaint included causes of action under the ATS for numerous violations of international law, including summary execution, crimes against humanity, and torture.[FN2] In 2001, Chevron moved to dismiss plaintiffs' second amended complaint, based in part on its assertion that it could not be held liable under the ATS for the international law violations that plaintiffs alleged. Then-presiding Judge Legge denied the motion. He found that the international law violations at issue only applied to official conduct, but that plaintiffs had adequately alleged that Chevron acted under color of law, and that it could therefore be held liable for the violations. Based on the Supreme Court's decision in *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004), defendants now request that the Court revisit this holding.[FN3]

> FN2. The complete list of plaintiffs' ATS claims now includes: summary execution; crimes against humanity; torture; cruel, inhuman, or degrading treatment; violation of the rights to life, liberty and security of person and peaceful assembly and association; and consistent pattern of gross violations of human rights.

> FN3. Chevron's prior argument was somewhat different from the argument presented here. Before Judge Legge, Chevron characterized plaintiffs' ATS claims as "excessive force" claims, and argued that there was no universally accepted international norm that prohibited the use of excessive force by government security personnel. Here, in contrast, defendants accept the characterization of plaintiffs' ATS claims as claims for torture and summary execution, but argue that they may not be held liable under a color of law analysis.

**\*2** Defendants move to dismiss plaintiffs' claims under the TVPA and ATS. This Court has already decided that plaintiffs' TVPA claims are barred because the TVPA applies only to natural persons, not corporations. Accordingly, the Court considers only whether plaintiffs' ATS claims must be dismissed.

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). In answering this question, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff." *McGary v. City of Portland,* 386 F.3d 1259, 1261 (9th Cir.2004). "Dismissal of the complaint is appropriate only if it appears beyond doubt that the claimant can prove no set of facts in support of the claim which would entitle him to relief." *ARC Ecology v. United States Dept. of the Air Force,* 411 F.3d 1092, 1096 (9th Cir.2005).

> FN4. Plaintiffs have moved to strike portions of the declaration of David Wallach, arguing that the declaration provides factual evidence that is inappropriate on a motion to dismiss. Defendants oppose this request, but acknowledge that their motion does not rely on the factual evidence in any way. Thus, the Court GRANTS plaintiffs' motion to strike and will not consider Exhibits 1, 2, 4-10, 14, and 26-34 of Wallach's declaration.
> Defendants have requested that the Court take judicial notice of *amicus* briefs filed by the United States government in cases involving the ATS. The Court GRANTS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-2   Filed 10/05/2007   Page 3 of 12

Not Reported in F.Supp.2d  Page 3
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

that request.

The ATS gives aliens a federal cause of action for violations of international law. *See Kadic,* 70 F.3d 232, 238 (2d Cir.1995) ("[The ATS] confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law)."). Not all violations of international law are actionable under the ATS, however; in order to state a claim under the ATS, a party must allege a violation of a definite and accepted norm of international law. *See Sosa v. Alvarez-Machain,* 542 U.S. 692, 732, 738, 124 S.Ct. 2739 (2004) ("[W]e are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted."); *see also Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 781 (D.C.Cir.1984) (Edwards, J., concurring). Thus, courts have rejected claims brought under the ATS involving allegations that a defendant violated such norms as "right to life," "right to health," or "intranational pollution." *See Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 254-65 (2d Cir.2003); *see also Sosa,* 542 U.S. at 735-38 (finding that arbitrary arrest and detention was not an actionable international norm). Courts have recognized causes of action under the ATS, however, for "definite and accepted" violations of international law such as genocide and war crimes. *See, e.g., Kadic,* 70 F.3d at 241-43.

In addition to the requirement that an ATS suit must be based on a sufficiently well-defined norm of international law, parties suing under the ATS must also bring their suit against a proper defendant. *See Sosa,* 542 U.S. at 732 n. 20 ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."). Indeed, because of the peculiar underpinnings of international law, who an ATS claim may be brought against is almost as important a question as what international norm the claim is based on. Customary international law has historically only applied to states, *see Kadic,* 70 F.3d at 240, but over the past half century it has evolved to place liability on private parties for violations of the most serious international norms. *See id.* at 241-244. These extensions cover such crimes as slave trading, war crimes, and genocide. *Id.* at 239 ("[W]e hold that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals."); *Tel-Oren,* 726 F.2d at 795 (Edwards, J., concurring) (stating that there exists a "handful of crimes to which the law of nations attributes individual responsibility"); *see also* Restatement (Third) of Foreign Relations § 404 (identifying "certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism").

**\*3** With these principles in mind, the Court turns to the specific violations of international law that plaintiffs have alleged: crimes against humanity; summary execution; torture; cruel, inhuman, or degrading treatment; violation of the rights to life, liberty, and security of person and peaceful assembly and association; and consistent pattern of gross violations of human rights.

### I. Crimes Against Humanity

The only international law norm included in plaintiffs' complaint that is applicable to private actors is crimes against humanity.[FN5] *See Kadic,* 70 F.3d at 236 ("[W]e hold that ... Karadzic may be found liable for genocide, war crimes, and crimes against humanity in his private capacity."); *see also United States v. Yousef,* 327 F.3d 56, 105 & n. 40 (2d Cir.2003) ("Following the Second World War, the United States and other nations recognized 'war crimes' and 'crimes against humanity,' including 'genocide,' as crimes for which international law permits the exercise of universal jurisdiction."); *Flores,* 414 F.3d 233, 244 n. 18 ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-2   Filed 10/05/2007   Page 4 of 12

Not Reported in F.Supp.2d								Page 4
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

been enforceable against individuals since World War II."). Plaintiffs allege that the crimes against humanity here were committed by the Nigerian military, but argue that defendants may be held liable under a number of theories of indirect liability.

> FN5. Neither party has provided the Court with the definition of "crimes against humanity," although other courts have found that such a cause of action requires proof of "a widespread or systematic attack directed against any civilian population."*See Cabello v. Fernandez-Larios,* 402 F.3d 1148, 1161 (11th Cir.2005); *see also Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1247 (11th Cir.2005); Statute of the International Tribunal for Rwanda (adopted November 8, 1994, by United Nations Resolution 955) ("The International Tribunal for Rwanda shall have the power to prosecute persons responsible for [crimes including murder, enslavement, deportation, imprisonment, torture, and rape] when committed as part of a widespread or systematic attack against any civilian population on national, political, ethnic, racial or religious grounds.").*But see* Statute of the International Criminal Tribunal for the Former Yugoslavia (adopted May 25, 1993, by United Nations Resolution 827) (no "widespread or systematic" requirement, but requiring crimes to be committed "in armed conflict"). While the Court questions whether plaintiffs' complaint alleges a "widespread and systematic attack" by the Nigerian military, defendants have not provided any argument on the subject and have therefore failed to meet their burden.

Defendants challenge plaintiffs' ability to impose liability based upon an aiding and abetting theory, arguing that they may not be held liable under an aiding and abetting theory because such liability is not available under customary international law.FN6 The Court disagrees. Since the early days of this country, courts have recognized that private individuals may be held liable for aiding and abetting violations of international law. *See Breach of Neutrality,* 1 Op. Att'y Gen. 57, 59 (1795) (finding that individuals could be liable under international law for "committing, aiding, or abetting" violations of the laws of war); *Talbot v. Jansen,* 3 U.S. (3 Dall.) 133 (1795) (holding that French citizen who aided U.S. citizen in unlawfully capturing Dutch ship was civilly liable for the value of the captured assets). This international law principle has continued through modern times. In the criminal context, private persons can be held liable for aiding and abetting, as demonstrated by the International Criminal Tribunal for the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR").*See* Steinhardt Decl., ¶ 24. Further, legal systems around the world recognize civil aiding and abetting liability. *Id.* at ¶¶ 30-31.

> FN6. Defendants do not discuss plaintiffs' other theories of liability, which include agency, ratification, and conspiracy. Because plaintiffs seek to hold defendants liable for crimes against humanity, a violation of an international law norm that is binding on private parties, their other theories of liability also survive defendants' challenge. *See Sarei v. Rio Tinto, PLC,* 456 F.3d 1069, 2006 WL 2242146 (9th Cir. Aug. 7, 2006) ("Courts applying the [ATS] draw on federal common law, and there are well settled theories of vicarious liability under federal common law.").

Indeed, the vast majority of courts to have considered the issue have found that aiding and abetting liability is available under the ATS. *See, e.g., Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir.1996) (affirming aiding and abetting jury instruction); *Presbyterian Church of Sudan v. Talisman Energy,* 244 F.Supp.2d 289, 321-24 (S.D.N.Y.2003) (*"Presbyterian Church I"*) (finding that corporation could be held liable for aiding and abetting foreign government); *Burnett v. Al Baraka Inv. & Dev. Corp.,* 274 F.Supp.2d 86, 100 (D.D.C.2003) (allowing aiding and abetting liability for airplane hijacking); *Cabello v. Fernan-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*dez-Larios,* 402 F.3d 1148 (11th Cir.2005). This trend has survived *Sosa.*Since *Sosa* was decided, at least three district courts have discussed whether aiding and abetting liability is available under the ATS. Two have concluded that aiding and abetting liability was sufficiently well established in international law to apply in suits under the ATS. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 374 F.Supp.2d 331, 341 (S.D.N.Y.2005) (*"Presbyterian Church II"* ) (finding that aiding and abetting was one of the "core principles that form the foundation of customary international legal norms-principles about which there is no disagreement"); *In re Agent Orange Product Liability Litig.,* 373 F.Supp.2d 7, 53 (E.D.N.Y 2005) (agreeing with plaintiffs that "[t]here is simply no question that the ATS provides for aiding and abetting liability").

**\*4** The final case disagreed with the previous two. The court in *In re South African Apartheid Litig.,* 346 F.Supp.2d 538 (S.D.N .Y.2004), concluded that aiding and abetting liability was not available under international law. In reaching this conclusion, the court found that the international authority other cases had relied on was taken from the criminal, not the civil, context. In the civil context, the court believed that the Supreme Court's holding in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164 (1994), demonstrated that civil aiding and abetting liability was "at best uncertain in application." *Id.* at 181;*see also In re South African Apartheid Litig.,* 346 F.Supp.2d at 550 ("[In *Central Bank* ] the Court held that where Congress has not explicitly provided for aider and abettor liability in civil causes of action, it should not be inferred.").

The Court finds the former two cases more convincing. *Central Bank* concerned whether aiding and abetting was available for a violation of § 10(b) of the Securities Exchange Act, and the Supreme Court's decision was based upon the specific language of the act. *See Central Bank,* 511 U.S. at 173 ("With respect, however, to the first issue, the scope of conduct prohibited by § 10(b), the text of the statute controls our decision."). Indeed, the Court specifically noted that its discussion applied to statutorily created remedies. *Id.* at 182 ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."). Because the ATS specifically invokes international common law, *Central Bank* is not particularly persuasive. *Cf. Sosa,* 542 U.S. at 732 n. 20 ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued....").

Thus, the Court concludes that defendants may be held liable under international law for aiding and abetting the Nigerian military in the commission of "crimes against humanity." In order to be held liable, plaintiffs must show 1) that defendants provided "practical assistance, encouragement, or moral support which ha[d] a substantial effect on the perpetration of the crime,"*see* Wallach Decl., Exh. 39 (*Aleksovski,* IT-95-14/1 -A (March 24, 2000)), and 2) that defendants knew that the Nigerian military intended to commit the crime, *see id;* Wallach Decl., Exh. 38 (*Prosecutor v. Semanza,* Case No. ICTR-97-20-T (May 15, 2003)); *see also Presbyterian Church II,* 374 F.Supp.2d at 340 (referencing "settled, core notion of aider and abettor liability in international law 'for knowing practical assistance or encouragement which has a substantial effect on the perpetration of the crime' ") (quoting *Doe v. Unocal,* 395 F.3d 932, 951 (9th Cir.2002), *vacated by*395 F.3d 978 (9th Cir.2003)); *In re Agent Orange Product Liability Litig.,* 373 F.Supp.2d 7, 54 (E.D.N.Y.2005) (concluding that "the actus reas of aiding and abetting consists of 'practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime,' and that the mens rea required is the knowledge that these acts assist the commission of the offence; the accomplice need not share the principal's wrongful intent"); *Doe v. Saravia,* 348 F.Supp.2d 1112, 1148-49 (E.D.Cal.2004) (finding that "those who assist in the commission of acts prohibited by international law may be held individually responsible" where they know[ ] that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-2   Filed 10/05/2007   Page 6 of 12

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

[their] actions will assist the perpetrator in the commission of the crime").

### II. Remaining International Law Violations

**\*5** The remaining violations of international law alleged in plaintiffs' complaint do not involve those norms of customary international law that apply to private parties.[FN7] *See, e.g.,* Restatement (Third) of Foreign Relations § 404. Thus, state action is required for plaintiffs to pursue those claims under the ATS. *See Kadic,* 70 F.3d at 243 ("[T]orture and summary execution-when not perpetrated in the course of genocide or war crimes-are proscribed by international law only when committed by state officials or under color of law."); *Tel-Oren,* 726 F.2d at 795 (Edwards, J., concurring) (declining to read "section 1350 to cover torture by non-state actors"). As above, plaintiffs seek to hold defendants liable for the acts of the Nigerian military, either directly under a "color of law" analysis or indirectly under a number of theories, including aiding and abetting. The Court does not believe that defendants can be held liable either directly or indirectly.

> FN7. The parties agree that at least two of these norms, torture and extrajudicial killing, are sufficiently well-defined to support a cause of action under the ATS. *See Kadic,* 70 F.3d at 243.

### A. Direct Liability

Prior to the Supreme Court's decision in *Sosa,* there was a general consensus among courts that color of law jurisprudence derived from 42 U.S.C. § 1983 could be used to hold a private party liable under the ATS. *See, e.g., Kadic,* 70 F.3d at 245 ("The 'color of law' jurisprudence of 42 U.S.C. § 1983 is a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Act."); *Estate of Rodriguez v. Drummond Co., Inc.,* 256 F.Supp.2d 1250, 1264 (N.D.Ala.2003) ("In assessing whether a plaintiff has adequately alleged state action, courts generally look to the standards developed under 42 U.S.C. § 1983."); *Sinitrainal v. Coca-Cola Co.,* 256 F.Supp.2d 1345, 1353 (S.D.Fla.2003) ("[I]f the complaint alleges that the Defendants murdered Gil by acting together with the paramilitary unit who acted under color of law by acting in concert with Colombian officials or with significant aid from the Colombian government, then an international law violation is sufficiently stated for purposes of subject matter jurisdiction.").[FN8] Based on the Supreme Court's interpretation of the ATS in *Sosa,* however, defendants argue that these decisions must be reexamined.

> FN8. The Ninth Circuit also adopted this view in *Doe v. Unocal Corp.,* 395 F.3d 932 (9th Cir.2002), although technically "color of law" was unnecessary to its holding because the acts alleged were committed in furtherance of forced labor, which is an international law violation that can be committed by private parties. *See id.* at 954 ("[U]nder *Kadic,* state action is also not required for the acts of murder, rape, and torture which allegedly occurred in furtherance of the forced labor program."); *see also Kadic,* 70 F.3d at 243-44 (torture and summary execution were actionable under ATS "to the extent they were committed in pursuit of genocide or war crimes"). The Ninth Circuit's opinion in *Doe* was later vacated when the court took the case *en banc. See Doe v. Unocal Corp.,* 395 F.3d 978 (9th Cir.2003). The case later settled, so no *en banc* opinion was ever produced. *Doe v.. Unocal Corp.,* 403 F.3d 708 (9th Cir.2005).
> At least three courts have continued to apply "color of law" jurisprudence following *Sosa,* although none have considered the impact of *Sosa* on the viability of the practice. *See Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1247 (11th Cir.2005) ("In construing this state action requirement, we look to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983."); *Chavez v. Carranza,* 413 F.Supp.2d 891, 899 (W.D.Tenn.2005) ("When persons who are not government officials 'act[ ] together with state officials'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF    Document 24-2    Filed 10/05/2007    Page 7 of 12

Not Reported in F.Supp.2d                                                                                     Page 7
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

or act with 'significant state aid[,]' they are deemed governmental actors for the purposes of the state action requirement under the TVPA and the ATCA."); *Doe v. Saravia,* 348 F.Supp.2d 1112, 1150 (E.D.Cal.2004) (In bench trial following entry of default against individual defendants: "Courts have looked to the jurisprudence of 42 U.S.C. § 1983 as a guide to determine when persons who are not themselves government officials, nonetheless act under apparent authority or color of law."); *but see Doe v. Exxon Mobil,* 393 F.Supp.2d 20, 26 (D.D.C.2005) ("Grafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states .").

In *Sosa,* the Supreme Court engaged in a comprehensive examination of the ATS in an effort to determine the statute's reach. The Court first considered two competing visions of the statute: whether the ATS "does no more than vest federal courts with jurisdiction, neither creating nor authorizing the courts to recognize any particular right of action without further congressional action,"*Sosa,* 542 U.S. at 712; or whether the ATS allows courts to hear "claims in a very limited category defined by the law of nations and recognized at common law."*Id.; see also Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir.1984) (opinions of Edwards, J., concurring, and Bork, J., dissenting). The Court found the latter approach to be more sensible. In doing so, however, the Court was careful to narrowly circumscribe the limits of the ATS:

**\*6** [T]here are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind. Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.

*Sosa,* 542 U.S. at 725.

The Supreme Court articulated five reasons for the "judicial caution" that it found appropriate. The first reason was a desire to limit judicial discretion. Second, in light of federal courts' "general practice" of looking "for legislative guidance before exercising innovative authority over substantive law," the Court found that "[i]t would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in the shadow for much of the prior two centuries."*Id.* at 726.Third, the Court believed that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases."*Id.* at 727.Fourth, the Court cited concerns over the impact on foreign relations of expanding the reach of the ATS. *Id.* ("[T]he potential implications for the foreign relations of the United States of recognizing such causes of action should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."). The final reason was the lack of a "congressional mandate to seek out and define new and debatable violations of the law of nations...."*Id.* at 728.

After discussing the above reasons for judicial restraint, the Supreme Court held that courts could recognize civil actions based upon violations of recognized international norms, provided that the exercise of judicial authority was "subject to vigilant doorkeeping ." *Id.* at 729.It concluded that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted."*Id.* at 732.

Based on the Supreme Court's restrictive view of the ATS, defendants argue that it would be inappropriate to import "color of law" jurisprudence from § 1983 to expand the statute's reach. The Court agrees. *Sosa* requires that an international law norm be definite and accepted before a court may recognize a cause of action under the ATS. Because an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

integral feature of international law is that it is only binding on specific defendants, allowing a private party to be held liable based upon notions of "color of law" developed in this country would blur the applicability of the obligations that international law imposes. Expanding the reach of the ATS in this way would be inconsistent with the Supreme Court's repeated calls for judicial restraint. *See Doe v. Exxon Mobil Corp.,* 393 F.Supp.2d 20, 26 (D.D.C.2005) ("Grafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states."). Indeed, the Supreme Court appears to have endorsed this view by stating that the determination whether liability extends to private actors is a factor of international law:

**\*7** A related consideration is *whether international law* extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. Compare *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 791-795 (C.A.D.C.1984) (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), with *Kadic v. Karadzic,* 70 F .3d 232, 239-241 (C.A.2 1995) (sufficient consensus in 1995 that genocide by private actors violates international law).

*Sosa,* 542 U.S. at 732 n. 20 (emphasis added); *cf. Presbyterian Church I,* 244 F.Supp.2d at 320 ("Thus, whether or not aiding and abetting and complicity are recognized with respect to charges of genocide, enslavement, war crimes, and the like is a question that *must be answered by consulting international law.*") (emphasis added).

In this case, the "color of law" jurisprudence developed under § 1983 is not a well developed international norm. Indeed, plaintiffs cite no authority for their assertion that a private party may be held liable for conduct "sufficiently infused with or related to state action as to engage international standards."*See* Decl. of Prof. Ralph G. Steinhardt in Support of Pl. Oppo. Br., ¶ 14. Further, in their entire discussion about the propriety of importing § 1983 standards into the ATS, plaintiffs cite only to American cases that predate *Sosa.*In short, plaintiffs have not provided any international authority for the prospect that a private actor may be found to have acted "under color of law" in cases involving violations of international law norms.[FN9]

FN9. Of course, to a certain degree, both international law and § 1983 have aspects of "color of law" jurisprudence in common; there is no dispute that foreign officials may be held individually liable for their official actions. *See Sosa,* 542 U.S. at 727 (stating that violations of international law are cognizable against "a foreign government or its agent"). But placing liability on an individual operating as the agent of a foreign government is a far cry from finding a private party liable for participating in or conducting a violation of an international law norm that only applies to states. Indeed, plaintiffs' theory of the case is unique in that it does not allege that defendants acted as agents of the Nigerian government; to the contrary, it alleges that the Nigerian military acted as defendants' agent.

The rarity with which this color of law theory has occurred under § 1983 further convinces the Court that it would be inappropriate to apply it to the international realm. That plaintiffs' case lies at the fringe of § 1983 color of law jurisprudence is evidenced by the fact that plaintiffs cite only a single case in which a private actor has been held liable in similar circumstances under U.S. law. In *Groom v. Safeway, Inc.,* 973 F.Supp. 987 (W.D.Wash.1997), the court held that a Safeway store could be held liable under § 1983 for the conduct of an off-duty police officer that it hired for store security based on a theory of inadequate training.*Id.* at 992.Other courts in analogous circumstances have recognized the possibility of § 1983 liability if a private defendant controlled state authority, but have not actually found liability.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*See, e.g., Arnold v. Int'l Bus. Machines Corp.,* 637 F.2d 1350, 1356 (9th Cir.1981) ("If Arnold could point to any fact that would tend to show that defendants had some control or power over the Task Force, and that defendants directed the Task Force to take action against Arnold, there would certainly be a dispute of material fact on the issue of proximate cause sufficient to reverse the summary judgment."); *Mann v. City of Tucson,* 782 F.2d 790 (9th Cir.1985) ("[I]n order to establish the requisite proximate cause between the conduct of private persons and searches in violation of section 1983, a plaintiff must prove the private individuals exercised control over the decision making in a police investigation."); *Alexis v. McDonald's Restaurants of Mass., Inc.,* 67 F.3d 341, 351-52 (1st Cir.1995) (stating that to find private party liable plaintiff would have to establish "concerted action tantamount to substituting the judgment of a private party for that of the police or allowing the private party to exercise state power").

Plaintiffs' primary argument in support of applying § 1983 color of law jurisprudence to this case is that *Sosa* stands for the proposition that the "ATS requires only that the tort be committed in violation of a specific, universal, and obligatory norm of international law," and that federal common law thereafter governs ancillary legal issues.[FN10] Pl. Oppo. Br. at 3. Plaintiffs base this argument on the following sentence from *Sosa:* "The jurisdictional grant is best read as having been enacted on the understanding that *the common law* would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Sosa,* 542 U.S. at 724 (emphasis added).[FN11] Thus, plaintiffs argue, because international law recognizes their claims for official torture, American common law principles of liability derived from § 1983 determine the reach of those claims.

FN10. This is the view advanced by Judge Reinhardt in his *Doe* concurrence. *See Doe v. Unocal,* 395 F.3d 932, 963-78 (9th Cir.2002) (Reinhardt, J., concurring), *vacated on rehearing en banc by Doe v. Unocal,* 395 F.3d 978 (9th Cir.2003).

FN11. Plaintiffs also base their argument on a statement from a footnote in the Supreme Court's recent decision in *Hamdan v. Rumsfeld,* 548 U.S.---, 126 S.Ct. 2749 (2006). The footnote plaintiffs rely on is found in a discussion in Justice Stevens' opinion of whether "conspiracy to commit war crimes" is a violation of the laws of war. *Id.* at 2784-85. The footnote distinguishes conspiracy, which is "a crime on its own," from aiding and abetting, which it describes as a "theory of liability." *Id.* at 2785 n. 40. Plaintiffs argue that this brief footnote supports their argument that theories of liability under the ATS are determined by federal common law.

The Court finds no such support in the footnote plaintiffs cite. As an initial matter, the footnote is found in a section of Justice Stevens' opinion in which only three other justices joined, and is therefore not part of the majority opinion. More importantly, while the footnote is consistent with plaintiffs' theory, it contains no language, either express or implicit, that affirmatively supports plaintiffs' interpretation of the ATS.

The Court does not find this argument convincing. As discussed above, the Supreme Court clearly stated that the scope of liability under the ATS was to be decided by international law. *Sosa,* 542 U.S. at 732 n. 20 ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."). This view makes sense; given that international law norms are only binding on specific entities, the applicability of the international law norm can hardly be deemed ancillary. Thus, while American common law may play

Not Reported in F.Supp.2d                Case 5:07-cv-03444-JF    Document 24-2    Filed 10/05/2007    Page 10 of 12    Page 10
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

some role in determining the contours of an ATS claim, the Court believes that international law should determine whether a given defendant may be held liable for a particular international law violation. *Cf. Presbyterian Church I,* 244 F.Supp.2d at 320 ("In order to determine whether a cause of action exists under the ATCA, courts must look to international law.").

**\*8** The Ninth Circuit's recent decision in *Sarei v. Rio Tinto, PLC,* 456F.3d 1069, 2006 WL 2242146 (9th Cir. Aug. 7, 2006), does not change this analysis. There, the Ninth Circuit briefly considered whether Rio Tinto, a private mining group, could be held vicariously liable for "alleged war crimes and crimes against humanity committed at its behest by the [Papua New Guinea] army."*Id.* at \*5. In a short paragraph, the court concluded that Rio Tinto could be held vicariously liable for the army's actions: "A predicate question is whether, post *Sosa,* claims for *vicarious liability* for violations of jus cogens [FN12] norms are actionable under the [ATS]. We conclude that they are. Courts applying the [ATS] draw on federal common law, and there are well settled theories of vicarious liability under federal common law."*Id.* (emphasis in original). While the Ninth Circuit's statement provides some support for plaintiffs' argument, it is far too brief to be of much use. Indeed, the Ninth Circuit's opinion does not discuss color of law jurisprudence, and certainly does not consider importing color of law jurisprudence into ATS claims. More importantly, the only norms that the plaintiffs sought to enforce against Rio Tinto were war crimes and crimes against humanity, international law norms that are binding on private actors.*Id.* Thus, the Ninth Circuit did not address the question whether federal common law could be used to "bootstrap" a claim that is only actionable against government actors into a claim against private parties.

> FN12."As defined in the Vienna Convention on the Law of Treaties, a jus cogens norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.' " *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 714 (9th Cir.1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332,8 I.L.M. 679).

Plaintiffs' theory of liability is far removed from the core of color of law jurisprudence. Without evidence from the international arena that demonstrates that defendants may be considered state actors by hiring Nigerian government security forces, the Court believes it inappropriate to apply American color of law principles to the case at hand. Accordingly, the Court finds that plaintiffs may not proceed with their theory that defendants can be held liable because they acted under color of law.

### B. Indirect Liability

As discussed above, based upon its review of the materials, the Court agrees with plaintiffs that aiding and abetting liability is generally available under international law.[FN13] It cannot agree, however, that such liability is appropriate here. The problem with plaintiffs' argument is that it attempts to hold defendants, who are private actors, accountable for aiding and abetting violations of international law that can only be committed by state officials. Because the international law norms that plaintiffs invoke place no obligation on the defendants, allowing aiding and abetting liability would be inappropriate. Defendants could not be held liable for directly committing the offenses; it therefore makes little sense to find them liable for lesser conduct.

> FN13. The discussion below addresses only plaintiffs' aiding and abetting theory of liability. The Court believes, however, that it applies with equal force to all of plaintiffs' theories of liability that would expose a private party to liability for the violation of an international law norm that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Case 5:07-cv-03444-JF   Document 24-2   Filed 10/05/2007   Page 11 of 12

Page 11

is only binding on state actors, including the "joint criminal enterprise" liability that plaintiffs reference in a recent letter brief.

The history of aiding and abetting liability supports this analysis. Plaintiffs seek to incorporate aiding and abetting liability from international criminal law norms. From Blackstone's time, however, courts have treated those guilty of aiding and abetting a crime as a principal. *See* William Blackstone, Commentaries on the Laws of England, Book IV, Chap. 5 (1769) ("[A]nd all accessories to piracy, are declared to be principal pirates ...."); *see also* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); U.S. Dep't of Defense, *Military Commission Instruction No. 2,* Art. 6(c), at 16 (April 30, 2003) ("A person is criminally liable as a principal for a completed substantive offense if that person ... aids or abets the commission of the offense."); Allied Control Council Law No. 10, Punishment of Persons Guilty of War Crimes, Crimes Against Peace and Against Humanity, 20 Dec. 1945, Art. II.2 ("Any person without regard to nationality or the capacity in which he acted, is deemed to have committed [crimes against peace, war crimes, crimes against humanity, or membership in a criminal group], if he was ... (b) was an accessory to the commission of any such crime or ordered or abetted the same."). Defendants, however, cannot be held liable as a principal for the offenses in question.

*\*9* Indeed, none of the authorities plaintiffs cite involve a private party being held liable for aiding and abetting conduct that violates an international law norm that only applies to states. For example, plaintiffs rely on the recognition of aiding and abetting liability in the International Criminal Tribunal for the former Yugoslavia ("ICTY"). That tribunal, however, prosecuted war crimes and genocide, crimes for which individuals may be held liable. *See* Statute of the International Criminal Tribunal for the Former Yugoslavia (adopted May 25, 1993, by United Nations Resolution 827); *see also* Statute of the International Tribunal for Rwanda (adopted November 8, 1994, by United Nations Resolution 955). Other authorities plaintiffs rely on similarly involve aiding and abetting liability for private parties where private parties could be held liable for the underlying conduct. *See, e.g., The Amiable Nancy,* 16 U.S. 546, 559 (1818) (shipowners could be held liable for piracy committed by officers and crew).[FN14]

> FN14. The cases from this country that plaintiffs cite similarly either involve aiding and abetting by government officials or by private parties for crimes for which private parties may be held liable. *See, e.g., Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir.1996) (affirming aiding and abetting jury instruction for torture and summary execution in case against former government official); *Presbyterian Church I,* 244 F.Supp.2d at 321-24 (finding that corporation could be held liable for aiding and abetting foreign government with enslavement, war crimes, and genocide); *Presbyterian Church II,* 374 F.Supp.2d at 337-41 (same); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322 (N.D.Ga.2002) (finding that defendant could be held liable for aiding and abetting genocide, war crimes, and torture); *Burnett v. Al Baraka Inv. & Dev. Corp.,* 274 F.Supp.2d 86, 100 (D.D.C.2003) (allowing aiding and abetting liability for airplane hijacking, which is "generally recognized as a violation of international law of the type that gives rise to individual liability"); *Bodner v. Banque Paribas,* 114 F.Supp.2d 117 (E.D.N.Y.2000) (allowing aiding and abetting liability for facilitating Nazi genocide); *Cabello v. Fernandez-Larios,* 402 F.3d 1148 (11th Cir.2005) (allowing aiding and abetting liability for acts of Chilean military officer); *Doe v. Saravia,* 348 F.Supp.2d 1112 (E.D.Cal.2004) (finding that head of former paramilitary group constituted a state official and could be held liable for aiding and abetting an assassination); *Doe v. Qi,* 349 F.Supp.2d 1258

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF    Document 24-2    Filed 10/05/2007    Page 12 of 12

Not Reported in F.Supp.2d                                                                                               Page 12
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

(N.D.Cal.2004) (finding that local government officials of the People's Republic of China could be held liable for aiding and abetting torture); *but see Aldana v. Fresh Del Monte Produce, N.A., Inc.,* 416 F.3d 1242 (11th Cir.2005) (finding that corporation could be held liable for torture by its private security force if government official's participation in torture was sufficient to create state action); *Mujica v. Occidental Petroleum Corp.,* 381 F.Supp.2d 1164, 1173 n. 6 (C.D.Cal.2005) (stating in dicta that ATS allows for aiding and abetting liability in claims for torture against private party).

Because defendants are private actors, they may not be held liable for aiding and abetting violations of international law that only apply to official conduct. Accordingly, defendants' motion to dismiss is GRANTED with respect to plaintiffs' theories of aiding and abetting liability as to the claimed violations of international law, with the exception of crimes against humanity, discussed above in Part I.

### III. Corporate Liability

Defendants' final argument is that international law does not extend to corporations, and that corporations therefore cannot be held liable under the ATS. The Court disagrees. The dividing line for international law has traditionally fallen between states and private actors. Once this line has been crossed and an international norm has become sufficiently well established to reach private actors, there is very little reason to differentiate between corporations and individuals. Defendants certainly provide no such reason in their briefs.

Both before and after *Sosa,* courts have concluded that corporations may be held liable under the ATS. *See, e.g., Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424 (D.N.J.1999) (finding that private individuals and corporations could be held liable for use of slave labor); *Presbyterian Church I,* 244 F.Supp.2d at 308-319 ("Given that private individuals are liable for violations of international law in

certain circumstances, there is no logical reason why corporations should not be held liable, at least in cases of *jus cogens* violations."); *In re Agent Orange Product Liability Litig.,* 373 F.Supp.2d at 58 ("Limiting civil liability to individuals while exonerating the corporation directing the individual's action through its complex operations and changing personnel makes little sense in today's world."); *Presbyterian Church II,* 374 F.Supp.2d at 339. The Court agrees with these decisions, and therefore holds that defendants may be held liable for the violation of any international law norm that is binding on private entities.

**\*10** For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART defendants' motion to dismiss (Docket No. 1072).

**IT IS SO ORDERED.**

N.D.Cal.,2006.
Bowoto v. Chevron Corp.
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.