51 S.E.C. 1305, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

Page 1

51 S.E.C. 1305, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

S.E.C. Release No.
*1 Securities Act of 1933
Securities Exchange Act of 1934
Accounting and Auditing Enforcement Act
IN THE MATTER OF MERIS LABORATORIES, INC., STEPHEN B. KASS, AND JOHN J. DIPIETRO, RESPONDENTS

Administrative Proceeding File No. 3-8484

September 26, 1994

ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND CEASE AND DESIST ORDER

I.

The Commission deems it appropriate and in the public interest that proceedings be, and they hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C(a) of the Securities Exchange Act of 1934 ("Exchange Act") to determine whether Meris Laboratories, Inc. ("Meris") has violated Sections 17(a)(2) and (3) of the Securities Act, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder; whether Stephen B. Kass ("Kass") has caused violations of Sections 17(a)(2) and (3) of the Securities Act, Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder; and whether John J. DiPietro ("DiPietro") has caused violations of Sections 17(a)(2) and (3) of the Securities Act, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

II.

In anticipation of the institution of these administrative proceedings, the respondents have submitted Offers of Settlement that the Commission has determined to accept. Solely for the purposes of these proceedings and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, prior to hearing and without admitting or denying the findings set forth herein, the respondents consent to the entry of this Order Instituting Proceedings Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act of 1934, Making Findings, and Cease and Desist Order ("Order"). The Commission has determined that it is appropriate and in the public interest to accept Respondents' Offers and, accordingly, is issuing this Order.

III.

The Commission makes the following findings:

A. Summary

This matter involves the omission of audited financial statements, pro forma financial statements, and other accurate disclosures relating to an acquired subsidiary in a registration statement and prospectus filed by Meris with the Commission and distributed to investors in connection with a public offering of Meris common stock that was commenced on February 28, 1992, and inaccurate and incomplete disclosures in the narrative portions of its Annual Report on Form 10-K for the year ended December 31, 1991. The acquisition of the subsidiary was structured so as to create the appearance that the cost of the acquisition was less than 10% of the value of the assets of Meris. In substance, the total consideration paid in connection with the acquisition exceeded the 10% threshold at which Meris was required to include audited financial statements for the subsidiary and pro forma financial statements in its registration statement. Additionally, Meris incorrectly accounted for certain expenses incurred in connection with the public offering and incorrectly capitalized certain costs incurred in connection with acquisitions that occurred during 1992. As a result, Meris's income during the year ended December 31, 1992 was materially misstated.

B. Respondents

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 S.E.C. 1303, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

Case 5:07-cv-03444-JF    Document 24-5    Filed 10/05/2007    Page 2 of 9

Page 2

1. Meris

**\*2** Meris is an independent clinical laboratory incorporated and conducting business solely in California. Meris was incorporated on November 15, 1990. Meris conducted an initial public offering of common stock in July 1991 in which it raised approximately $15 million. Since that time, the common stock of Meris has been registered under Section 12(g) of the Exchange Act, and its common shares have been traded on the NASDAQ National Market System under the symbol "MERS." As of December 31, 1992, Meris had approximately 7.8 million shares outstanding.

2. Stephen B. Kass

Kass became a director of Meris in October 1991 and in December 1991 joined the company as Executive Vice President and Chief Operating Officer. Kass continued in this capacity until May 27, 1993, when he became President and Chief Executive Officer. Prior to becoming an officer of the company, Kass was Executive Vice President and Managing Director of the Clinical Laboratory Group of Harmet Associates, Inc., a management consulting firm he founded in 1977. Harmet provided analytical, valuation and negotiation services for Meris between November 1989 and December 1991. Kass holds an M.B.A. and a J.D.

3. John J. DiPietro

DiPietro joined the company as Vice President, Finance in June 1991 and became Chief Financial Officer and Secretary in January 1992. DiPietro is a Certified Public Accountant and served in various positions at a national accounting firm during the periods 1980 through 1983 and 1986 through 1991, reaching the level of Senior Manager.

C. Inadequate Disclosure of the Acquisition of Fong Diagnostic Laboratory

1. Background of the Transaction

During February and March 1992, Meris engaged in two significant transactions. First, it initiated a public offering of $28.5 million of its common stock. Second, during the time in which the registration statement for the offering was being finalized, Meris acquired Fong Diagnostic Laboratory ("Fong").

The sequence of relevant events began on February 4, 1992, when Meris's independent auditor issued its report on Meris's financial statements for the year ended December 31, 1991. On the following day, Meris filed a registration statement on Form S-1 with the Commission for the common stock offering. On or about February 10, 1992, before the registration statement had been declared effective, Kass, in his capacity as Executive Vice-President and Chief Operating Officer of Meris, began negotiating the transaction with Fong. The final terms of the acquisition were agreed to, and the transaction was consummated, on February 18, 1992.

As a result of negotiations with the principals of Fong, Meris agreed to pay a total of $3.5 million in cash at the closing of the Fong transaction. The transaction was structured to include three payment provisions. First, Meris agreed to pay $2.35 million to the principals of Fong at closing for the Fong customer list. Second, also at closing, Meris agreed to pay a total of $1.15 million under consulting agreements; the consulting agreements had no provision requiring the return of this money in the event the consultants failed to provide any services for Meris after the acquisition. Third, further pursuant to the consulting agreements, the consultants were to earn an additional amount of up to $1.55 million over as many as five years; however, they were entitled to these payments only to the extent they continued to work for Meris.[FN1]

2. Disclosure in the Registration Statement

**\*3** On February 27, 1992, Meris's registration statement was declared effective. The final version of the registration statement was filed with the Commission on March 2, 1992. The financial statements included in the registration statement contained an unaudited note describing the Fong acquisition, and a brief description of the transaction was set out in the Management's Discussion and Analysis section of the narrative text of the filing. No audited financial statements of Fong or pro forma financial statements for Meris reflecting the Fong acquisition were included in the final prospectus. With regard to the registration statement, both the unaudited

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 S.E.C. 1303, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

Page 3

note to the financial statements and the description of the transaction under Management's Discussion and Analysis stated that Meris acquired certain assets from Fong for $2.35 million in cash, plus approximately $200,000 in estimated expenses. While the discussion included reference to the consulting agreements, the registration statement did not disclose the various payments under the consulting agreements, which could have amounted to approximately $2.7 million.[FN2]

Item 3-05 of Regulation S-X, entitled "Financial Statements of Businesses Acquired or to be Acquired," requires that audited financial statements of acquired businesses be presented in registration statements when investments in or advances to an acquired business exceed 10% of the registrant's total assets. As of December 31, 1991, Meris had assets of approximately $26.5 million. The actual purchase price of Fong was, in substance, $3.5 million, approximately $1 million more than the above-noted 10% threshold.[FN3]

Further, Item 11-01(a)(2) of Regulation S-X, entitled "Pro Forma Financial Information," requires the inclusion in a registration statement of pro forma financial statements for the combined entity resulting after a "significant business combination." A significant business combination is defined in Item 1-02 of Regulation S-X to include a transaction satisfying the 10% threshold discussed in the previous paragraph. Meris failed to comply with that requirement.

Additionally, Item 303(a)(1) of Regulation S-K, entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," requires registrants to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way" in registration statements. Meris failed to disclose the amount, approximately $2.7 million, of cash commitment arising out of the consulting agreements in its registration statement. The amount of the cash commitment was in excess of 10% of the total assets of Meris as of December 31, 1991, and as such was material.

Meris's conduct resulted in (i) the omission of required audited and pro forma financial statements from Meris's registration statement, and (ii) an inaccurate description of the Fong transaction in the financial statement note and the narrative contained in the Management's Discussion and Analysis portion of the registration statement.

3. Disclosures in Meris's Annual Report for the Year Ended December 31, 1991

**\*4** Meris filed an Annual Report on Form 10-K for the year ended December 31, 1991 with the Commission on March 30, 1992.. In that Form 10-K, Meris made the same disclosure of the transaction in the textual portions of the filing as it had made in the public offering registration statement.

Item 303(a)(1) of Regulation S-K, pertaining to Management's Discussion and Analysis, applies to annual reports on Form 10-K and, as noted above, requires the disclosure in the textual portion of the filing of all known demands, commitments, or uncertainties which would affect the company's liquidity. Meris, however, failed to include complete and accurate disclosure of the Fong transaction in the textual portions of its Annual Report on Form 10-K. Like the registration statement, the Annual Report on Form 10-K inaccurately described the amounts to be paid with respect to the Fong transaction, and failed to discuss the material cash commitments arising out of the Fong consulting contracts. The total cash commitment relating to such consulting arrangements amounted to approximately $2.7 million, more than 10% of Meris's balance sheet as of December 31, 1991. Thus, the disclosures in the Annual Report on Form 10-K were materially false and misleading.

D. Meris's Incorrect Accounting for Costs During 1992

1. Accounting Issues and Relevant Generally Accepted Accounting Principles [FN4]

During fiscal 1992, Meris incorrectly accounted for approximately $1.12 million of costs. It thereby understated its expenses and overstated income, resulting in the issuance of false and misleading financial statements. The improper accounting resulted from the capitalization of certain costs related to acquisitions as well as the incorrect charging of certain costs against the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 S.E.C. 1503, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

Case 5:07-cv-03444-JF    Document 24-5    Filed 10/05/2007    Page 4 of 9

Page 4

proceeds of Meris's public offering.[FN5]

a. Acquisition-related Costs

Under Paragraph 76 of Accounting Principles Board ("APB") Opinion No. 16, entitled "Business Combinations," an entity that makes an acquisition may include certain of the costs of such acquisition in the acquisition price and thereby capitalize such costs rather than deduct them from income as expenses in the current period. As stated in APB 16: "The cost of a company acquired in a business combination accounted for by the purchase method includes the direct costs of acquisition. However, indirect and general expenses related to acquisitions are deducted as incurred in determining net income." Moreover, pursuant to Accounting Interpretation #33 ("AIN #33") of APB 16, companies such as Meris that engage in recurring acquisition activity, and perform much of the acquisition-related work in-house, must expense "all 'internal' costs associated with a business combination." AIN #33 further explains that the types of direct costs which may be capitalized under paragraph 76 of APB 16 as "direct costs" are " 'out-of-pocket' or incremental costs rather than recurring internal costs which may be directly related to an acquisition."

**\*5** Meris capitalized costs that were incurred as a result of acquisitions, but that were not actual costs of the acquisitions. Instead, they should have been treated as "recurring internal costs ... directly related to an acquisition," as set forth below.

"To-Be-Terminated" Employees. Meris improperly capitalized approximately $412,600 in payroll costs of employees of acquired companies who Meris intended to terminate subsequent to the acquisitions and who, for various periods of time following the acquisitions performed certain functions necessary to integrate the acquired operations or maintain customer goodwill. However, while most were terminated following the integration of their functions into Meris's ongoing operations, some of these employees were never in fact terminated,[FN6] and some received overtime pay. Further, although some of the specific job functions performed by the to-be-terminated employees were ultimately discontinued following the acquisitions, the activities for which these employees continued to be paid were part of Meris's normal, recurring, revenue-generating activities, including performing tests, collecting samples, and billing customers.[FN7]

Accounts Receivable Write-offs. Meris capitalized approximately $120,000 in write-offs which resulted from its determination that certain receivables recorded as a result of various business combinations were uncollectible. Capitalization of those amounts was improper. Most of the written-off receivables were not considered uncollectible at the time Meris entered into the acquisitions, but rather were determined to be uncollectible the following fiscal year. Accounting guidance with respect to the write-off of acquired accounts receivable is provided by the closely analogous principles established for acquired loan reserves set out in Staff Accounting Bulletin Topic 2.A.5., "Adjustments to Allowances for Loan Losses in Connection with Business Combinations," which states that "[n]eeded changes in allowances for loan losses are ordinarily to be made through provisions for loan losses rather than through purchase accounting adjustments." In addition, certain of the receivables were earned after the combinations and not acquired from other entities, and therefore should not have been accounted for as part of the combinations.

Sales Commissions Paid in Error. The company capitalized sales commissions of approximately $97,000 that had been paid during 1992 to Meris's sales personnel in the mistaken belief that the business had been generated by Meris's sales staff. The sales were actually attributable to customers acquired through Meris's business combinations, not to the business generated by Meris's sales personnel. Instead of rescinding the payments, Meris improperly capitalized them as part of the purchase price of the combinations although the erroneously paid commissions were not "costs" of the acquisitions.

Internal Costs from Integration and New Business. Meris capitalized $62,000 in costs for in-house employees' overtime incurred in connection with the collection of accounts receivable, the entry into Meris's computer system of billing codes for newly-acquired customers, and work performed in newly-acquired laboratories. Meris also capitalized $72,000 paid to an accountant to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 S.E.C. 1303, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

Page 5

supervise the integration of Fong's billing system into Meris's billing system, as well to a part-time medical director hired to supervise laboratory tests at another of the acquired laboratories. Finally, Meris capitalized $65,000 for part of the costs of referrals of tests that newly-acquired laboratories could not yet perform in-house, but that Meris expected to be able to perform in the future. These costs were all "recurring internal costs" or other costs resulting from the expansion of Meris's business operations, not costs of its acquisitions.

**\*6** Fong Consulting Fees. Meris capitalized approximately $123,000 of ongoing payments on consulting contracts for pathologists from Fong whose services were retained after the Fong acquisition. This compensation should have been treated by Meris as regular ongoing salary expenses, not as payments made as part of the Fong acquisition.

Other Miscellaneous Costs. In addition to the above-noted items, Meris improperly capitalized approximately $57,400 in other expenses that were actually indirect and general costs that should have been accounted for as period expenses, such as costs for obsolete documents and other materials, moving of acquired equipment, and employment advertisements.

b. Public offering costs

Staff Accounting Bulletin Topic 5.A, entitled "Expenses of Offering," contains the Commission staff's guidance on accounting for costs associated with a public offering. It states that while specific incremental costs directly attributable to an offering may be capitalized, "management salaries or other general and administrative expenses may not be allocated as costs of [[[[[an offering]."

Meris charged approximately $109,000 of general and administrative expenses as offering costs. The Meris accounting department improperly recorded bonuses for in-house accounting staff, payments for overtime, payments to an in-house employee for assisting the billing department, and payments to consultants who helped prepare the 1991 annual report as capitalizable costs incurred in connection with the February 1992 offering.

2. Materiality

The cumulative effect of Meris's improper capitalizations was material to its year-end financial statements filed with the Commission for fiscal year 1992, as well as to the financial statements in each quarterly report filed with the Commission during 1992, as set forth in the tabulation below:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 S.E.C. 1303, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

Case 5:07-cv-03444-JF    Document 24-5    Filed 10/05/2007    Page 6 of 9

Page 6

|  | Pre-Tax Income (Loss) Reported | Adjustment for Amount Improperly Capitalized [FN8] | Adjusted Pre-Tax Income (Loss) | Percentage of Actual Income Misstated |
|---|---|---|---|---|
| 1992 |  |  |  |  |
| 1st Quarter | 1,390,000 | 308,000 | 1,082,000 | 28% |
| 2nd Quarter | 1,649,000 | 356,000 | 1,293,000 | 28% |
| 3rd Quarter | (2,314,000) | 133,000 | (2,447,000) | 5% |
| 4th Quarter | 1,784,000 | 321,000 | 1,463,000 | 22% |
| Year | 2,509,000 | 1,118,000 | 1,391,000 | 80% |

FN8 This column represents the net amount of the adjustment for the period resulting from the improper capitalization-i.e., the amount by which the total amount capitalized exceeded the amount of affected expense actually amortized by Meris during the period.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 S.E.C. 1303, Release No. 7095, Release No. 34-722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

Case 5:07-cv-03444-JF    Document 24-5    Filed 10/05/2007    Page 7 of 9

Page 7

E. Violations

1. Sections 17(a)(2) and (3) of the Securities Act

**\*7** Sections 17(a)(2) and (3) of the Securities Act prohibit, in the offer or sale of securities, the making of untrue statements of material fact and the omission of material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, and engaging in conduct which operates as a fraud or deceit upon purchasers.

As set forth above, Meris's registration statement failed to include financial statements relating to Meris's acquisition of Fong as required by Items 3-05 and 11-01(a)(2) of Regulation S-X. Additionally, the registration statement, in both the unaudited financial statement note and in the Management's Discussion and Analysis section, inaccurately described the cost of the transaction. Finally, the registration statement failed to disclose the approximately $2.7 million in cash obligations arising out of consulting agreements executed in connection with the Fong transaction as required by Item 303(a)(1) of Regulation S-K. These cash commitments were in excess of 10% of Meris's total assets as of the year ended December 31, 1991, and as such were material. In failing to accurately provide such material information, Meris violated Sections 17(a)(2) and (3) of the Securities Act.

Due to his role in the negotiation and documentation of the Fong transaction and the promulgation of the registration statement, his awareness of the actual components of the Fong transaction, his awareness of the applicable criteria for disclosure under Regulations S-X and S-K, and his responsibilities as Executive Vice-President and Chief Operating Officer, Kass was a cause of Meris's violations. Due to his execution of the documentation setting forth the terms of the Fong acquisition, his awareness of the substantial nature of the acquisition, his signing of the registration statement, his awareness of the applicable criteria for disclosure under Regulations S-X and S-K, and his responsibilities as Chief Financial Officer, DiPietro was also a cause of Meris's violations.

2. Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13

Section 13(a) of the Exchange Act requires all issuers of securities registered pursuant to Section 12 of the Exchange Act to file periodic and other reports with the Commission containing such information as the Commission prescribes by its rules and regulations. Rules 13a-1 and 13a-13 of the Exchange Act require issuers to file annual and quarterly reports on Forms 10-K and 10-Q, respectively, with the Commission. These reports must contain disclosures concerning an issuer's periodic revenues, income and net earnings.

The Exchange Act's reporting requirements necessarily include the requirement of supplying accurate information. SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1165 (D.C.Cir.1978), cert. denied, 440 U.S. 913 (1979). A violation of Section 13(a) is established if a quarterly or annual report contains materially false and misleading statements or fails to state material information necessary to make the statements not misleading. SEC v. Falstaff Brewing Corp., [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,584 (D.D.C.1978), aff'd, 629 F.2d 62 (D.C.Cir.1980); SEC v. Great American Ind., 404 F.2d 453 (2d Cir.1968), cert. denied, 395 U.S. 920 (1969). Pursuant to the instructions applicable to Form 10-Q and 10-K, the financial statements must conform to Regulation S-X, which requires conformity with Generally Accepted Accounting Principles. 17 C.F.R. § 210.4-01(a)(1). Information is material in a reasonable investor would consider it important in making an investment decision. Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988). Additionally, Rule 12b-20 requires that these reports contain any material information even if not expressly required in the Commission's regulations if such information is necessary to make the required reports not misleading.

**\*8** Because Meris improperly capitalized costs relating to its acquisitions and its public offering, and failed to treat them as expenses, it failed to report its earnings on a basis consistent with Generally Accepted Accounting Principles. Thus, Meris's Forms 10-Q for quarters ended March 31, 1992, June 30, 1992, and September 30,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 S.E.C. 1303, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

Page 8

1992, and its Form 10-K for the year ended December 31, 1992, included financial statements that materially overstated earnings for each period during the year in violation of Section 13(a) and Rules 13a-1 and 13a-13 thereunder. By virtue of his duties as Chief Financial Officer, which included signing the periodic reports at issue, and his involvement in the decision to capitalize certain of the expenses described above, DiPietro was a cause of these violations.

In addition, Meris's Form 10-K for the year ended December 31, 1991 failed to include accurate textual disclosures relating to the Fong acquisition. Both the purchase price and the commitments under the consulting agreements were material to an analysis of the acquisition and the company's financial position after the acquisition. As a result of the foregoing, Meris violated Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder. Both DiPietro and Kass, who were responsible for the execution and promulgation of the reports at issue and were aware of the factors that required the inclusion of the omitted disclosures as well as the inaccuracy of the reported information, were causes of Meris's violations of these provisions.

IV.

FINDINGS

Based on the above, the Commission finds that:

A. Meris violated Sections 17(a)(2) and (3) of the Securities Act, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 promulgated thereunder;

B. Kass was a cause of Meris's violation of Sections 17(a)(2) and (3) of the Securities Act, Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder; and

C. DiPietro was a cause of Meris's violation of Sections 17(a)(2) and (3) of the Securities Act, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

V.

ORDER

Accordingly, the Commission hereby orders, pursuant to Section 8A of the Securities Act and 21C of the Exchange Act that:

A. Meris cease and desist from committing or causing any violation, and any future violation, of Sections 17(a)(2) and (3) of the Securities Act, and of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder;

C. Kass cease and desist from committing or causing any violation, and any future violation, of Sections 17(a)(2) and (3) of the Securities Act, Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder; and

D. DiPietro cease and desist from committing or causing any violation, and any future violation, of Sections 17(a)(2) and (3) of the Securities Act, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

*9 By the Commission.

Jonathan G. Katz
Secretary

FN1 The payments called for under this third provision resulted in annual income to the former principals of Fong in an amount roughly equal to what they had paid themselves prior to the transaction with Meris.

FN2 On July 6, 1992, Meris filed with the Commission a Form 8-K disclosing three acquisitions, including the Fong transaction. The Form 8-K included, as Exhibit 2.5, the agreements documenting the Fong transaction. The Fong agreements disclosed all of the terms of the transaction, including the full amount of the payments made at the closing of the transaction, as well as the additional amounts that could be required during the term of the consulting agreements. Thereafter, Meris filed a Form 8 dated September 4, 1992 (Amendment No. 1 to the Form 8-K) which included, as Items 7(a) and 7(b), respectively, the requisite audited financial statements for Fong and pro forma financial statements reflecting the three acquisitions, including that of Fong.

FN3 Ultimately, Meris accounted for portions of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 S.E.C. 1305, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)

Page 9

consulting contract amounts as part of the purchase price for Fong and reflected that treatment in its Annual Report for the year ended December 31, 1992.

FN4 On August 22, 1994, while this investigation was pending, Meris filed amended Forms 10-K for the years ended December 31, 1992, and December 31, 1993, and Forms 10-Q for the quarters during those years, which amendments reflected restated quarterly and annual financial results and made amended textual disclosures in accordance with the Commission's findings reflected in this Order.

FN5 Meris received an unqualified opinion from its independent auditor on its financial statements for the year ended December 31, 1992.

FN6 Total capitalized salaries for individuals who were never terminated amounted to approximately $194,000.

FN7 Meris also justified this accounting treatment, in part, on the basis that the temporary post-acquisition work performed by certain of the to-be-terminated employees was duplicative of work performed by existing Meris personnel. The Commission finds such treatment improper because the work performed by the to-be-terminated employees, although duplicative, was part of Meris's revenue generating activities.

51 S.E.C. 1305, Release No. 7095, Release No. 34722, Release No. 33-7095, Release No. 34-34722, Release No. AE - 598, 57 S.E.C. Docket 1684, 1994 WL 523841 (S.E.C. Release No.)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.