Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**

In re Metricom Securities Litigation
N.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re METRICOM SECURITIES LITIGATION
**No. C 01-4085 PJH.**

April 29, 2004.

Merrick Scott Rayle, Lovell Stewart Halebian LLP, San Francisco, CA, Christopher Lovell, Lovell Stewart Halebian LLP, New York, NY, Jeffrey S. Nobel, Patrick A. Klingman, Andrew M. Schatz, Schatz & Nobel PC, Hartford, CT, for Plaintiff. Elizabeth Walsh Walker, Ronald K. Giller, Dewey Ballantine LLP, Los Angeles, CA, Christian A. Hatfield, Laura Caldera Taylor, Mark E. Friedman, Garvey Shubert & Barer, Portland, OR, Samuel Ray Miller, Folger Levin & Kahn LLP, San Francisco, CA, Daniel P. Lefler, David Siegel, Richard H. Zelichov, Irell & Manella LLP, Los Angeles, CA, William F. Alderman, Peter Edward Root, Orrick Herrington & Sutcliffe LLP, San Francisco, CA, for Defendants.

ORDER RE MOTION TO DISMISS
HAMILTON, J.

*1 THIS DOCUMENT RELATES TO: ALL ACTIONS

Defendants' motion for an order dismissing the second amended complaint came on for hearing on February 25, 2004, before this court. Plaintiffs appeared by their counsel Merrick Scott Rayle; defendant Timothy A. Dreisbach appeared by his counsel Elizabeth Walker; defendant Ralph Derrickson appeared by his counsel Mark Friedman; defendants William Savoy and Vulcan Ventures appeared by their counsel Daniel Lefler; and defendants Lehman Brothers, Inc., Solomon Smith Barney, Inc., Merrill Lynch Pierce Fenner & Smith, Chase H & Q, and J.P. Morgan Securities, Inc., appeared by their counsel William F. Alderman. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

INTRODUCTION

This is a consolidated proposed class action alleging violations of federal securities laws. Plaintiffs "purchased or otherwise acquired shares" of stock in Metricom, Inc. ("Metricom") in Metricom's February 4, 2000, public offering, or "traceable to [the public offering] in the open market or otherwise," during the class period, June 21, 1999, to July 2, 2001. Plaintiffs allege claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, and claims under §§ 11(a), 12(a)(2), and 15 of the Securities Act of 1933.

Defendants are Timothy Dreisbach ("Dreisbach")-President, CEO, and a director of Metricom from May 1996 to February 2001; Ralph Derrickson ("Derrickson")-a director of Metricom from April 1998 through the end of the proposed class period, and CEO of Metricom from February 2001 to July 2001; Vulcan Ventures-a venture capital company that was Metricom's largest shareholder; William Savoy ("Savoy")-a director of Metricom from April 1998 through the end of the propsed class period, and a director of Vulcan Ventures from November 1990 to the present; FN1 and Lehman Brothers, Inc.; Solomon Smith Barney, Inc.; Merrill Lynch Pierce Fenner & Smith; J.P. Morgan Securities, Inc., each of which served as an underwriter on Metricom's February 2000 public stock offering ("the underwriter defendants").

> FN1. Dreisbach, Derrickson, and Savoy are referred to herein as "the individual defendants." Plaintiffs also refer to Vulcan, Dreisbach, Derrickson, and Savoy in the SAC as "the Vulcan defendants."

In the second amended complaint ("SAC"), plaintiffs assert claims under § 11(a) of the 1933 Act against the individual defendants and the un-

derwriter defendants, under § 12(a)(2) of the 1933 Act against the underwriter defendants, under § 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder against the individual defendants, and under § 15(a) of the 1933 Act and § 20(a) of the 1934 act against the individual defendants and Vulcan Ventures for control-person liability.[FN2] Defendants now seek an order dismissing the SAC for failure to state a claim.

> [FN2.] Plaintiffs have dropped the 1934 Act claim against the underwriter defendants alleged in the first amended complaint.

### BACKGROUND

The factual background is as set forth in the Order re Motions to Dismiss, filed herein on May 28, 2003. *See* May 28, 2003, Order at 3-22. Briefly, Metricom, which filed for bankruptcy protection in July 2001, was a publicly-traded company offering a wireless access data service under the brand name "Ricochet." In 1998, Metricom began developing and testing technology to be used in a new high-speed wireless service called "Ricochet[2]," which Metricom anticipated launching in mid-2000.

**\*2** On June 20, 1999, Metricom entered into a Preferred Stock Purchase Agreement with MCI World Communications, Inc. ("WorldCom"), a major telecommunications company, and defendant Vulcan Ventures, pursuant to which WorldCom and Vulcan each agreed to purchase $300 million in shares of newly-issued Metricom preferred stock. Also on June 20, 1999, WorldCom entered into an agreement with Metricom to sell subscriptions to the Ricochet[2] service to WorldCom's customers ("the Reseller Agreement"). Under this agreement, WorldCom agreed to register a certain number of subscribers each year and pay Metricom at least $388 million in subscriber fees over the five years following the launch of the Ricochet[2] service.

WorldCom's obligation to pay the guaranteed minimum subscriber fees was subject to three conditions. First, WorldCom's obligation would terminate if the deployment schedule was delayed more than 12 months. Second, if Metricom failed to

provide the service to at least 85% of WorldCom's subscribers in accordance with certain "quality of service" performance standards, WorldCom's obligation to make the minimum payments would be suspended. Third, if the number of WorldCom subscribers exceeded 50% of the total number of Ricochet[2] subscribers, WorldCom's payment obligation would be reduced.

Metricom announced the Preferred Stock Purchase Agreement and the Ricochet[2] Reseller Agreement in a press release on June 21, 1999, stating that Metricom had entered into a "strategic relationship" with WorldCom pursuant to a "five-year, non-exclusive wholesale agreement valued at $350 million," which included national distribution of the high-speed Ricochet[2] service. On July 9, 1999, Metricom filed a Form 8-K with the Securities and Exchange Commission, describing the Preferred Stock Purchase and Reseller Agreements, and attaching a copy of the Stock Purchase Agreement, which was finalized in November 1999, following a vote by the Metricom shareholders. On November 5, 1999, Metricom filed a copy of the Reseller Agreement as part of an amendment to the July 9, 1999 Form 8-K.

Certain technical details of the Reseller Agreement were redacted in the publicly filed copy, pursuant to 17 C.F.R. §§ 200.80(b)(4), 200.83, and 240.24b-2. However, the publicly-filed portions reflected the limitations on WorldCom's obligations to perform, and also noted that either party would have the right to terminate the agreement if the other party breached its material obligations and failed to cure the breach within 30 days. On November 12, 1999, Metricom and WorldCom amended the Reseller Agreement. Copies of the Reseller Agreement (including some of the previously-redacted portions) and the November 12, 1999, Amendment were attached to Metricom's December 20, 1999, 8-K/A.

The Amendment deleted a section of the original Reseller Agreement, and added several new provisions. Under the amended Reseller Agreement, WorldCom agreed to be responsible for all pre-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

commercially-ready, pre-light-up non-recurring costs (including installation costs and fees, circuit provisioning costs and fees, co-location costs and fees, turn-up fees, and power installation costs). Metricom agreed to be responsible for all pre-light-up recurring costs, both pre-commercially-ready and post-commercially-ready (including all shared network circuit costs, network management circuit costs, dial-up circuit costs, and recurring co-location costs). WorldCom also agreed, "regardless of whether MCI WorldCom or some other party provides the services/facilities," that it would "reimburse Metricom for forty percent (40%) of such costs" (referring to the pre-light-up recurring costs for which Metricom had agreed to be responsible).

**\*3** On February 1, 2000, Metricom issued a Prospectus Supplement, pursuant to a Form F-3 Shelf Registration Statement previously filed on November 19, 1999. The February 1, 2000 Prospectus related to a public offering of 5 million shares of Metricom common stock, and a separate offering of debt securities and warrants to purchase shares of common stock. The Prospectus detailed Metricom's relationship with Metricom and the contingent nature of the Ricochet[2] Reseller Agreement, and included 15 pages of detailed risk disclosures.

Some months after the February 2000 public offering, Metricom and WorldCom entered into certain "collocation agreements." These were licensing agreements that allowed Metricom to physically co-locate" equipment on WorldCom's premises, for the purpose of purchasing telecommuncations services from WorldCom and interconnecting with WorldCom's data network.

During the period from late 1999 through the third quarter of 2000, Metricom and WorldCom negotiated the terms and exchanged drafts of a "Global Services Agreement" or "GSA," which was executed by Metricom on August 28, 2000 (the "contract date") and executed by WorldCom on October 3, 2000 (the "effective date"). The term of this agreement was 60 months, commencing nine months after the effective date. Under the GSA,

WorldCom agreed to provide telecommunication services and access to Internet facilities in exchange for payment of "usage charges," which the GSA defined as "recurring usage charges for one or more Services" provided under the GSA and the attached schedules, and as *not* including, among other things, "charges for equipment."

As executed, the GSA provided that these usage charges would equal or exceed $20 million in the first contract year, $30 million in the second contract year, $60 million in the third contract year, and $120 million in both the fourth and fifth contract years, for a total of $350 million. If Metricom failed to meet the applicable annual minimum, it would pay all accrued but unpaid usage charges as well as an "underutilization" charge equal to 50% of the difference between the applicable annual minimum and the total usage charges during that contract year.

The GSA also specified that WorldCom could terminate the agreement if Metricom failed to pay an invoice for services under the GSA within 30 days after the date of the invoice, and that either party could terminate "for cause," defined as "a failure to perform a material obligation under [the] GSA which failure is not remedied within thirty (30) days of the defaulting party's receipt of written notice thereof."If WorldCom terminated the GSA because Metricom failed to cure a material breach within 30 days, Metricom would be liable for all accrued usage charges incurred through the date of termination, an amount equal to the aggregate of the annual minimums and a pro rata portion of the annual minimum for any partial contract year that would have been applicable for the remaining unexpired portion of the term as of the date of termination.

**\*4** The first of the three cases that comprise this consolidated action was filed on November 1, 2001.[FN3]In the original complaint, plaintiffs alleged that WorldCom and Vulcan Ventures had announced in June 1999 that each intended to purchase of $300 million of Metricom preferred stock, and that "as a material part of these transactions"

(presumably referring to the actual purchase of Metricom stock by WorldCom and Vulcan Ventures), WorldCom had entered into "three separate and significant transactions" with Metricom.

> FN3. The allegations in the three complaints (Nos. C-01-4085 PJH, C-01-4463 PJH, and C-01-4709 PJH) were substantially similar.

These three "separate transactions" were a) "[a] Reseller Agreement, executed on June 20, 1999, and amended on November 12, 1999," pursuant to which WorldCom would become a " 'non-exclusive' reseller of subscriptions to Metricom's Ricochet service;" b) "[a] Global Services Agreement, and related schedules, amendments, and co-location agreements, executed October 3, 2000, which required Metricom to pay to WorldCom substantial 'termination' fees on cancellation or breach;" and c) "[a]n agreement whereby WorldCom was to supply selected telecommunication equipment, office equipment, and related office products to Metricom."Plaintiffs alleged that neither the second nor the third of these "separate transactions" was disclosed to the public, and pleaded claims under the 1933 Securities Act and the 1934 Exchange Act based on this asserted failure to disclose.

The court related case Nos. C-01-4463 and C-01-4709 with the present action, and consolidated the three cases. On July 19, 2002, plaintiffs filed a consolidated amended complaint (the "FAC"), with a "corrected copy" filed September 13, 2002. In the FAC, plaintiffs alleged that Metricom and WorldCom had entered into a "three-part agreement"-which plaintiffs termed "the June 1999 agreement"-consisting of a) the Vulcan/WorldCom Preferred Stock Purchase Agreement, finalized in November 1999; b) the June 21, 1999, Ricochet[2] Reseller Agreement; and c) a "guarantee" by Metricom to pay back to WorldCom its $300 million investment plus $50 million interest.

The $350 million "guarantee" by Metricom allegedly took the form of an agreement that Met-

ricom would buy "circuits, pole top locations, and related goods and services" from WorldCom, and that WorldCom would not be obligated to "resell" Ricochet[2] subscriptions to its subscribers until Metricom was "substantially satisfying its guaranteed paybacks to WorldCom."Plaintiffs asserted that this "guaranteed" payback was a precondition both to WorldCom's $300 million investment in Metricom (WorldCom's purchase of stock under the Preferred Stock Purchase Agreement) and to WorldCom's obligations under the Reseller Agreement.

Metricom and WorldCom personnel allegedly "implement[ed] and provide[d] the details of" the "June 1999 agreement" in a series of communications, mostly e-mails and meetings, between July 19, 1999, and January 5, 2000. Plaintiffs claimed that those "details" were "embod[ied]" in three "written memorializations"-a) the "Termination Liability" and "Annual Minimum" provisions of the Global Services Agreement ("GSA") (referring to an unexecuted draft of the GSA dated December 8, 1999); b) the agreement relating to pole top and other locations (referring to the December 1999 unexecuted draft Master Collocation Agreement); and c) the amendment to the June 21, 1999, Reseller Agreement, signed on November 12, 1999.

**\*5** The FAC repeatedly referred to these three "written memorializations" as constituting "one integrated agreement," despite the fact that they were executed at different times, if at all. The FAC also alleged that according to senior Metricom personnel, the GSA-which incorporated the first of these "written memorializations"-was executed by mid-January 2000, and the parties began performing "the agreement which this contract memorialized" during October 1999 when Metricom placed "circuit orders" with WorldCom. The second "written memorialization"-the agreement for pole-top locations-was supposedly executed, pursuant to a series of contracts, by April 23, 2000.

The third of these "memorializations" purportedly "reflected the meetings and [e-mail] communications ... during which the parties correlated the guaranteed payment obligations, circuit provision-

ing, and location agreements with the re-selling obligations" (referring to the Reseller Agreement). The FAC omitted any reference to the third "separate and significant" transaction between Worldcom and Metricom, referenced in the original complaint, whereby WorldCom was to supply telecommunications equipment, office equipment, and office products to Metricom.

The FAC asserted that defendants had violated both the 1933 Act and the 1934 Act by failing to disclose the details of the GSA in public statements issued a) between June 21, 1999, and Metricom's February 2000 public offering; b) in the Registration Statement issued pursuant to the February 2000 public offering; and c) in public statements issued after the public offering and up to December 2000. The FAC also alleged that defendants had wrongfully failed to disclose delays in the schedule of deployment of the Ricochet[2] build-out, and "impossible-to-meet" performance standards in the Reseller Agreement.

On May 27, 2003, the court issued a 63-page order dismissing the FAC with leave to amend. Among other things, the court found that plaintiffs had not alleged fraud with particularity, and that plaintiffs could not state a claim of material omissions based on the existence of the GSA, which was not executed until October 2000, and which was under negotiation during the period that plaintiffs alleged it should have been disclosed. The court found further that the GSA did not contain a provision imposing a "repayment obligation" on Metricom, and that the facts as pled showed multiple contractual relationships between Metricom and WorldCom, not a single "integrated agreement."

Plaintiffs filed the second amended complaint ("SAC") on July 28, 2003. The SAC is 93 pages long and has 10 exhibits (compared with the FAC, at 44 pages with 4 exhibits). The SAC alleges that Vulcan Ventures, WorldCom, and Metricom entered into a "three-part strategic relationship" in June 1999.[FN4] The three parts of this "strategic relationship" were a) the Vulcan/WorldCom stock purchase agreement; b) the Reseller Agreement,

which had a duration of five years (and to which Vulcan was not a party); and c) "an arrangement obligating Metricom to purchase circuits and related telecommunications services from WorldCom for a total guaranteed revenue commitment of $350 million from MetriCom to WorldCom over the same five-year term" (referring to the GSA, to which Vulcan was not a party).

> FN4. When the parties announced the Preferred Stock Purchase Agreement and the Ricochet[2] Reseller Agreement in a press release in June 1999, they stated that Metricom had entered into a "strategic relationship" with WorldCom pursuant to a "five-year, non-exclusive wholesale agreement valued at $350 million," which included national distribution of the Ricochet high-speed service.

**\*6** The SAC asserts that the "third part" of this "strategic relationship" was "an essential quid pro quo" for the first two parts, and "ultimately rendered Metricom unable to raise capital and forced it to file for bankruptcy protection."While plaintiffs concede that the GSA was executed by Metricom on August 28, 2000, and by WorldCom on October 3, 2000, they assert nonetheless that the parties began performing under the GSA as early as November 1999, when Metricom began ordering "circuits" pursuant to the GSA and WorldCom began provisioning "circuits," and that this purchase of "circuits" by Metricom continued on into June 2000. Alternatively, plaintiffs claim that the third part of the strategic relationship "always existed," and was "memorialized" through "discussions," including on September 29, 1999; in "pricing models" circulated on October 13 and 26, 1999, and on November 26, 1999; and in assorted draft versions of the GSA, circulated on November 26, 1999, December 8, 1999, December 16, 1999, February 13, 2000, March 6, 2000, March 13, 2000, April 12, 2000, and April 28, 2000.

Plaintiffs maintain that defendants made public misrepresentations by failing to disclose that Metricom had agreed to "repay" WorldCom for its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$300 million investment by purchasing some $350 million in "circuits" and "services" from World-Com (the alleged "guaranteed revenue commitment") before WorldCom was obligated to fulfill its obligations under the Reseller Agreement. FN5 Thus, the SAC focuses on the third part of the purported strategic relationship-the alleged "guarantee" by Metricom to pay $350 to WorldCom, which agreement the SAC claims was "referred to in and contemplated by" the Reseller Agreement, "reflected in" a "draft memorialization" in November 1999, and "memorialized" in various drafts of the GSA. The SAC also asserts, for the first time, that defendants' alleged failure to describe the GSA in detail in the Prospectus Supplement violated various Generally Accepted Accounting Principles ("GAAP") FN6 -specifically AICPA Statement of Position 94-6 ("SOP 94-6") and Statement of Financial Accounting Standards 47 ("SFAS 47")-as well as Items 303 and 404 of SEC Regulation S-K, and Rule 10-01 of SEC Regulation S-X.

> FN5. In the FAC, plaintiffs also asserted that defendants failed to disclose that the build-out of the Ricochet[2] network was behind schedule; and that the "quality of performance" standards set forth in the Reseller Agreement were impossible to meet, with the result that WorldCom would never be obligated to comply with its obligations under the Reseller Agreement. However, the claims regarding the alleged deployment delays and failure to disclose the "quality of performance" standards are de-emphasized in the SAC. Nor does the SAC mention the Master Collocation Agreement, or the series or communications (chiefly e-mails) that supposedly "implement[ed]" and "provid[ed] the details of" the three-part agreement.

> FN6. GAAP, a technical term in financial accounting, encompasses the authoritative "conventions, rules, and procedures necessary to define accepted accounting practice at a particular time," and includes broad

guidelines of general application as well as detailed practices and procedures. Accounting Principles Board, APB Opinion No. 4; see *United States v. Arthur Young & Co.,* 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984); *see also* *Providence Hosp. of Toppenish v. Shalala,* 52 F.3d 213, 218 n. 7 (9th Cir.1995). An accounting procedure that accords with a Statement of Financial Accounting Standards (SFAS) pronouncement by the Financial Accounting Standards Board (FASB) is by definition a "generally accepted accounting principle." *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1304 (C.D.Cal.1996).

Thus, with each iteration of the complaint, plaintiffs have reshaped their theory of liability and the alleged scheme to defraud. In the original complaint, as a "material part" of the purchase of Metricom stock by Vulcan Ventures and WorldCom, Metricom and WorldCom entered into three "separate and significant transactions"-the June 20, 1999, Reseller Agreement, with its November 12, 1999 amendment; the GSA, executed on October 3, 2000; and an agreement whereby WorldCom would provide Metricom with telecommunications equipment, office equipment, and related office products. Plaintiffs alleged securities law violations based on defendants' failure to disclose the second and third of those three "separate" transactions.

**\*7** In the FAC, Metricom and WorldCom allegedly entered into a "three-part agreement," consisting of the WorldCom/Vulcan stock purchase agreement; the June 20, 1999, Reseller Agreement; and a "guarantee" by Metricom to "pay back" to World-Com its $300 million investment plus $50 million in interest. The "details" of this "three-part agreement" were "embodied" in "three separate written memorializations"-in an unexecuted draft of the GSA; in an "agreement relating to pole-top and other locations" found in an unexecuted draft of the Master Collocation Agreement; and in the amendment to the Reseller Agreement. Metricom and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

WorldCom employees "implemente[d]" and "provide[d] the details of" the three-part agreement in a series of e-mails and meetings. Plaintiffs asserted securities law violations based on defendants' alleged failure to disclose details of the "quality of service" performance standards in the Reseller Agreement, their alleged failure to disclose the delays in completion of the build-out of the Ricochet[2] network, and their alleged failure to disclose Metricom's agreement to "repay" WorldCom's investment in Metricom by purchasing $350 million in "circuits" and "services" before WorldCom would be obligated to deliver on obligations under the Reseller Agreement.

In the SAC, Metricom, WorldCom, and Vulcan Ventures were allegedly involved in a "three-part strategic relationship," consisting of the World-Com/Vulcan stock purchase agreement; the June 21, 1999, Reseller Agreement, an agreement with a five-year term; and "an arrangement obligating Metricom to purchase circuits and related telecommunication services" from WorldCom, with a "guaranteed revenue commitment" from Metricom to WorldCom over "the same five-year term." The first two parts of the strategic relationship were "prominently disclosed," but the third part-which was "an essential quid pro quo" for the first two parts-was never disclosed. Plaintiffs assert securities law violations based almost entirely on the defendants' alleged failure to disclose the provisions in the GSA, not executed until October 2000.

Put another way, plaintiffs alleged in the original complaint that the GSA was executed on October 3, 2000; they claimed in the FAC that it was executed in January 2000-or, at any rate, that senior Metricom personnel "believed" it was executed in January 2000; and they assert in the SAC that although WorldCom may not have signed the GSA until October 2000, the agreement had "always existed" and the parties had agreed to its essential terms and had begun performing under it by mid-November 1999.

### DISCUSSION

### A. Legal Standard

1. Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).

A court should dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim only where it appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Williamson v. Gen'l Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.), *cert. denied,*531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 247 (2000). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Smith v. Jackson,* 84 F.3d 1213, 1217 (9th Cir.1996).

**\*8** Review is generally limited to the contents of the complaint.*Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). However, material that is properly presented to the court as part of the complaint may be considered as part of a motion to dismiss. *Lee v. City of Los Angeles,* 250 F.3d 668, 688-89 (9th Cir.2001). If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a Rule 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim. *Id.* In addition, whether requested or not, the court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. *See*Fed.R.Evid. 201; *see also*In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 986 (9th Cir.1999) (SEC filings); *Bryant v. Avedo Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999) (same); *Ravens v. Iftikar,* 174 F.R.D. 651, 660 (N.D.Cal.1997) (closing stock prices).

2. Federal Rule of Civil Procedure 9(b)

Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice.Fed.R.Civ.P. 8. In actions alleging fraud, however, "the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b). Under Rule 9(b),

the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud. *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1547-49 (9th Cir.1994). Because the plaintiff must set forth what is false or misleading about a particular statement, he must do more than simply allege the neutral facts necessary to identify the transaction; he must also explain why the disputed statement was untrue or misleading at the time it was made. *Yourish v. California Amplifier,* 191 F.3d 983, 992-93 (9th Cir.1999).

### 3. Claims under the 1933 Act

Under § 11(a) of the 1933 Securities Act, any purchaser of a security covered by a registration statement may sue based on material omissions or misrepresentations in that statement. 15 U.S.C. § 77k(a). Persons liable under § 11(a) are those who signed the registration statement, directors of or partners in the issuer, professionals who participated in the preparation of the registration statement, and underwriters of the security. *Id.* In order to plead a § 11(a) claim, a plaintiff must allege that the registration statement contained an omission or misrepresentation, and that the omission or misrepresentation was material-that is, that it would have misled a reasonable investor about the nature of his or her investment. *In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1403-04 (9th Cir.1996).

**\*9** Section 12(a)(2) of the 1933 Act makes it unlawful for any person to use any instrumentality of interstate commerce to offer or sell securities by means of a prospectus or oral communication that includes "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). To establish liability under § 12(a)(2), plaintiffs must allege that the defendants actively solicited purchase of the securities for "their own financial motives." *In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1120

(D.Nev.1998) (citing *Pinter v. Dahl,* 486 U.S. 622, 646-48, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)).

To plead a claim under § 12(a)(2) of the 1933 Act, a plaintiff must allege that a person who offered or sold a security by means of a prospectus made misstatements or omissions in the prospectus. 15 U.S.C. § 77l(a)(2).Sections 11(a) and 12(a)(2) apply only to material misrepresentations or omissions within the four corners of a registration statement or prospectus.*Gustafson v. Alloyd,* 513 U.S. 561, 571, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995).

Section 15(a) imposes joint and several liability upon every person who controls any person liable under § 11 or § 12. 15 U.S.C. § 77o. Thus, violation of § 15(a) is predicated upon violation of § 11 or § 12. To state a claim for control person liability under § 15(a), a plaintiff must allege that the individual defendants had the power to control or influence the company, and that the individual defendants were culpable participants in the company's alleged illegal activity. *Durham v. Kelly,* 810 F.2d 1500, 1503 (9th Cir.1987).

### 4. Claims under the 1934 Act

Section 10(b) of the Securities Exchange Act of 1934 provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."15 U.S.C. § 78j(b).

Rule 10b-5 makes it unlawful for any person to use interstate commerce
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim under § 10(b) and Rule 10b-5, the plaintiff must allege 1) a misrepresentation or omission 2) of material fact 3) made with scienter 4) on which the plaintiff justifiably relied 5) that proximately caused the alleged loss. *Binder v. Gillespie,* 184 F.3d 1059, 1063 (9th Cir.1999). A presumption of reliance is available to plaintiffs alleging violations of § 10(b) based primarily on omissions of material fact, but not in cases alleging significant misrepresentations in addition to omissions, or alleging only misrepresentations. *Id.,* at 1063-64.A presumption of reliance is also available in a "fraud on the market" case, where the plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an "efficient market." *Id.* at 1064 (citing *Basic, Inc. v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

**\*10** Under § 20(a) of the 1934 Act, joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). Violation of § 20(a) is predicated on a primary violation under the 1934 Act. *Heliotrope Gen., Inc. v. Ford Motor Co.,* 189 F.3d 971, 978 (9th Cir.2000). Plaintiffs alleging a claim that individual defendants are "controlling persons" of a company must allege 1) that the individual defendants had the power to control or influence the company, 2) that the individual defendants were culpable participants in the company's alleged illegal activity, and 3) that the company violated the federal securities laws. *Durham v. Kelly,* 810 F.2d at 1503-04;*see also*Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000).

5. The Private Securities Litigation Reform Act

The Private Securities Litigation Reform Act ("PSLRA") was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and "to put an end to the practice of pleading 'fraud by hindsight.' " *In re Silicon Graphics,* 183 F.3d 970, 958 (9th Cir.1999).

The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity. *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084 (9th Cir.2002). If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

Under the PSLRA-whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"-the complaint must now specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1).[FN7] If the challenged statement is not false or misleading, it does not become actionable merely because it is incomplete. *In re Vantive,* 283 F.3d at 1085;*Brody v. Transitional Hosp. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002).

> FN7. Matters that are not alleged on personal knowledge are considered to be alleged on information and belief. *See*In re Vantive,* 283 F.3d at 1085 n. 3.

In addition-whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact"-the complaint must now, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2). In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness." *In re Silicon Graphics,* 183 F.3d at 979. If the challenged act is a forward-looking statement, the required state of mind is "actual knowledge ... that the statement was false or misleading."15 U.S.C. § 78u-5(c)(1); *see*No. 84 Employer-Teamster Joint Council Pension Trust Fund

*v. America West Holding Co.,* 320 F.3d 920, 931 (9th Cir.2003). Because falsity and scienter in securities fraud cases are generally strongly inferred from the same set of facts, the Ninth Circuit has incorporated the falsity and scienter requirements into a single inquiry. *Id.* at 932.

**\*11** On a Rule 12(b)(6) motion to dismiss a complaint brought under the PSLRA, when considering whether plaintiffs have shown a strong inference of scienter, "the district court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002) (noting the "inevitable tension ... between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to dismiss ... and the heightened pleading standard set forth under the PSLRA). In other words, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter. *Id.*

### B. Defendants' Motion to Dismiss

As in the motions to dismiss the FAC, the central issue in the present motion is whether defendants violated federal securities laws by failing to disclose that Metricom and WorldCom were negotiating the terms of the Global Services Agreement, while those terms were being negotiated, and before the agreement was executed in October 2000. In the order dismissing the FAC, the court rejected plaintiffs' central hypothesis that there was a three-part "June 1999 agreement" between Metricom and WorldCom. Defendants argue that the revised hypothesis-that Vulcan, Metricom, and WorldCom agreed upon a three-part "strategic relationship" in June 1999-does not improve on what the court previously rejected in the FAC. Indeed, defendants assert that the three-part "strategic relationship" alleged in the SAC is essentially the same as the "three-part agreement" alleged in the FAC.

Defendants contend that the claims under both the 1933 Act and the 1934 Act must be dismissed because they are premised on this already-rejected hy-

pothesis. Defendants also assert that the SAC and its exhibits contradict plaintiffs' claims of falsity and misrepresentation. With regard to the claims under the 1934 Act, defendants contend that plaintiffs do not allege that Metricom issued any false statements, either before the February 2000 offering, in the offering documents, or after the offering; and that plaintiffs do not allege that Savoy or Derrickson made any false statements at any time. Defendants also assert that plaintiffs fail to allege with particularity facts that give rise to a strong inference of scienter. Finally, defendants contend that plaintiffs fail to state a claim for control person liability because they do not adequately plead a primary violation, or allege facts showing that Vulcan, Savoy, or Derrickson were active in Metricom's day-to-day affairs.

### 1. The Alleged Misleading Statements

The SAC divides the alleged false and misleading statements into four categories-statements issued prior to the February 2000 public offering, statements made in analysts research reports, statements made in the offering documents, and statements issued after the public offering. In the first category are statements made in the June 21, 1999, press release announcing the Preferred Stock Purchase Agreement and the Reseller Agreement; in Metricom's July 9, 1999, Form 8-K, relating to the Stock Purchase Agreement and the Reseller Agreement; in the proxy solicitation issued September 14, 1999, soliciting shareholder approval for the issuance and sale of stock to WorldCom and Vulcan pursuant to the Stock Purchase Agreement; and in three amendments to the July 9, 1999, Form 8-K, filed as the November 5, 1999, 8-K/A, the November 25, 1999, 8-K/A, and the December 21 8-K/A. In the second category are statements in analysts research reports issued November 9, 1999; February 4, 9, 15, and 17, 2000; March 8, 2000; and December 11, 2000. In the third category are two statements in the February 1, 2000, Prospectus Supplement. In the fourth category are press releases issued by Metricom on February 20, 2000 and October 3 and 19, 2000; and two "Letters to Stakeholders" issued by Driesbach in September and Decem-

ber 2000.

**\*12** Plaintiffs do not allege that any of these statements were objectively false. Rather, they claim that all the above-described press releases, SEC filings, research reports, and other public statements were misleading because they omitted crucial material information. With minor exceptions, however, the only information the SAC asserts was omitted was the information about the "third part of the strategic relationship" or the terms and provisions of the GSA.

The allegations of misleading statements prior to the offering and in the offering documents claim only that the defendants failed to disclose the existence and/or terms of the GSA. The allegations with regard to the underwriter research reports also claim only that defendants failed to disclose the GSA, with the exception of the December 11, 2000, Lehman Brothers research report, which is also alleged to have been misleading because it did not disclose that "installation of Circuits" was incomplete for cities in Phase I and Phase II of the Ricochet[2] build-out. The allegations with regard to the statements made after the February 2000 public offering (three press releases and the two "Letters to Stakeholders") also assert the material omission of information regarding alleged delays in the build-out, in addition to the omission of information regarding the GSA.

### 2. The Global Services Agreement

Plaintiffs claim that defendants misled investors throughout the proposed class period by not disclosing the alleged existence of the GSA and its terms. Thus, the GSA remains the central focus of plaintiffs' case. As in the FAC, plaintiffs maintain that the alleged "guarantee" to "repay" $350 million to WorldCom was embodied in the GSA. They now assert, however, that despite the fact that the GSA was not executed until October 2000, it became "effective" months earlier because WorldCom and Metricom began performing it in November 1999.

Plaintiffs base this claim on information allegedly obtained from four sources: a) Metricom and WorldCom employees (Mike Daniel ("Daniel") of Metricom, Juan Herrera ("Herrera") of WorldCom, and Jeff King-Warfel ("King-Warfel") of World-Com);[FN8] b) Metricom's internal business records (including "Circuit Provisioning Summaries" and "Circuit Tracking Reports"); c) WorldCom's Proof of Claim filed October 17, 2001, in the Metricom bankruptcy, seeking "recovery of unpaid amounts due on account of telecommunication services provided," charges that "arise out of, or are covered by, the Global Services Agreement," showing invoices issued by WorldCom to Metricom starting on February 1, 2000, and continuing to July 1, 2001;[FN9] and d) reporter Denise Pappalardo, who allegedly attributed to an unidentified source at Metricom the information repeated in her June 28, 1999, article in *Network World,* where she wrote that WorldCom was giving Metricom cash to build out its network, and that "Metricom will return the favor by giving MCI WorldCom $350 million over five years to use MCI WorldCom's various data networks to expand Metricom's service footprint."

> **FN8.** The SAC attributes numerous factual allegations to these three sources. Daniel is described variously as "Metricom's principal negotiator of the Global Services Agreement, SAC ¶ 47 n. 2; a "Metricom employee," SAC ¶ 52; Metricom's Ricochet[2] Network Architect from September 1999 through November 2000, and one of two Metricom employees charged with negotiating the GSA with Metricom's prime negotiator, SAC ¶ 61. Herrera is described as WorldCom's "prime negotiator," SAC ¶ n.2; SAC ¶ 52; and King-Warfel is described as "one of WorldCom's Circuit Provisioners assigned to the Metricom account to provision circuits for the Ricochet2 build-out," SAC ¶ 61.
> Plaintiffs also claim that the negotiations culminating in the memorialization of the "third part" of the "strategic relationship" began in June 1999 and were conducted for Metricom by the individual defendants and Metricom employees Daniel, and Robert

H. Schellman, Jr.; and by Herrera, as the prime negotiator for WorldCom. SAC ¶ 52. Schellman reported directly to Driesbach. SAC ¶ 54. Herrera was WorldCom's sales executive for the Metricom account. SAC ¶ 61. Mark Guvernator, Metricom's Manager of Circuit Provisioning, provided plaintiffs with copies of various "Circuit Provisioning Summaries" he prepared for Metricom. SAC ¶¶ 113-115.

> FN9. Plaintiffs claim that WorldCom's Proof of Claim filed in Metricom's bankruptcy action indicates that WorldCom began invoicing Metricom for "circuits" and related telecommunication services provided by WorldCom under the GSA for the Ricochet[2] network February 1, 2000, and did so each month until July 1, 2001. Plaintiffs assert that Daniel, King-Werfel, and Herrera each agree that the charges invoiced on WorldCom's Proof of Claim encompass charges for "circuits" ordered pursuant to the GSA during November and December 1999.

**\*13** Plaintiffs allege that, according to Daniel, Herrera, and King-Warfel, it was necessary for Metricom and WorldCom to begin performance of the GSA immediately after the June 20, 1999, execution of the Reseller Agreement in order to meet the June 30, 2000, commercially-ready deadline for the 11 specified "Phase I Cities" under the Reseller Agreement. Plaintiffs assert that the actual execution date of the GSA is irrelevant because the parties had agreed to the "core structure" of the GSA by November 1999, and had established the "essential price terms" of the GSA as of mid-December 1999, with changes to the pricing structure after that date relating only to "discounts." According to the SAC, Herrera stated that "[w]e knew that it [the GSA] was an agreement in principle and that it was going to get done," and Daniel stated that it was "commercially impossible" to separate the Reseller Agreement from the GSA. Plaintiffs allege that in failing to publicly disclose the existence of this "agreement in principle," defendants violated both the 1933 Act and the 1934 Act.

As further support for their claim that the GSA became effective before its execution date, plaintiffs allege that the Reseller Agreement and the GSA were "inextricably linked and intertwined" by the reference in the Reseller Agreement to the parties' intent (at some unspecified future date) to make a "separate agreement" for the provisioning of circuits for the build-out of the Ricochet network.FN10Plaintiffs also claim that the repayment "guarantee" was reflected in a November 1999 draft of the GSA; and was contained in a "form" of the GSA allegedly signed by Schellman of Metricom on or about December 19, 1999.

> FN10. This provision was eliminated from the Reseller Agreement by the November 12, 1999, amendment.

Defendants argue that both the 1933 Act claims and the 1934 Act claims must be dismissed because they are based on the untenable hypothesis that the October 2000 GSA was part of a June 1999 "strategic relationship" involving Metricom, WorldCom, and Vulcan. Defendants contend that the GSA was not, and could not have been, part of a June 1999 "strategic relationship," because the documents attached to the SAC show that the GSA remained under negotiation until well after Metricom's February 2000 offering, and was not finally executed until October 2000. Plaintiffs do not dispute that the executed version of the GSA, attached to the SAC as Exhibit B, states that it was executed by WorldCom on October 3, 2000.

Defendants also argue that the documents attached as exhibits to the SAC (and other judicially noticeable documents) contradict plaintiffs' claims. Defendants assert further that they were under no obligation to disclose the negotiations and discussion of the GSA prior to the date it was executed by WorldCom and Metricom. Alternatively, they contend that any nondisclosure was nonactionable because they had previously disclosed relevant and material information.

a. Conflict between plaintiffs' claims and judicially-

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

noticeable documents

**\*14** Defendants argue that the documents attached to the SAC (or otherwise judicially noticeable) do not support plaintiffs' claims regarding the GSA. While the court is required, in ruling on a 12(b)(6) motion to dismiss, to accept as true all material allegations in the complaint, the court may disregard factual allegations that are contradicted by facts that may be judicially noticed by the court, such as facts established by reference to documents attached as exhibits to the complaint. See *Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.2001); Schwarz v. United States, 234 F.3d 428, 435 (9th Cir.2000); Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir.1987).* The court may also disregard allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. See *Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir.1994).*

Here, plaintiffs' contention-that there existed in 1999 a three-part "strategic relationship," of which the GSA comprised the "third part"-is contradicted by the drafts of the GSA attached to the SAC. First, the GSA was, by its terms, not effective until October 3, 2000. The GSA plainly provided that the "effective date" was the date as of which the agreement had received a satisfactory credit review by WorldCom's credit department, had been executed by Metricom, and had been executed by World-Com.[FN11] The documents reflect, and plaintiffs concede, that the GSA was not executed by World-Com until October 3, 2000.

> [FN11.] Moreover, even if, as plaintiffs contend, WorldCom and Metricom were engaged in the selling and buying of "circuits" as early as November 15, 1999, the claim that this translates into a form of "performance" of the GSA is disproved by the definition of "services" in the GSA as "excluding equipment" and by the "Acceptance Deadline" provision in the various drafts of the GSA.

Second, and even more significant, the underutiliz-

ation and termination provisions of the GSA-the provisions that plaintiffs claim were so favorable to WorldCom and so detrimental to Metricom-could not, by their terms, have become applicable until well after the GSA had been executed by both parties. According to the GSA, the "effective date" of the agreement was the date by which (i) the agreement was approved by WorldCom's credit department, (ii) WorldCom had received all required security documentation, (iii) Metricom had signed the agreement, and (iv) WorldCom had signed the agreement.

The "effective date" triggered the "minimum requirements" provision, because the "applicable annual minimum" was set for each of the five "contract years" following the expiration of the "ramp period"-the nine-month period following the effective date. In other words, the "minimum requirements" clock did not begin to tick until the beginning of the first "contract year" of the five-year term, and the first "contract year" could not begin until the expiration of the "ramp period," which, in turn, could not begin until WorldCom had executed the agreement. This "minimum requirements" provision triggered the "underutilization" provision, as payment for underutilization was required only if Metricom failed to meet the "applicable annual minimum" for any given "contract year."[FN12]

> [FN12.] This also discredits plaintiffs' claim that the GSA rendered Metricom unable to raise capital and forced it to file for bankruptcy protection. As explained above, Metricom's first annual payment under the GSA was not due until July 2002, well over a year after Metricom declared bankruptcy. At most, under the terms of the GSA, Metricom could have been subject to an "underutilization" charge of only $10 million in July 2002, which Metricom could have covered from its assets at the time it filed for bankruptcy.

Similarly, the termination liability provision was triggered only by performance after the effective date. By the terms of the GSA, termination liability

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would apply either if Metricom terminated the agreement during the five-year term (that is, after the end of the "ramp period" and the commencement of the first "contract year") for reasons other than for cause; or if WorldCom terminated the agreement because Metricom failed to perform a material obligation under the GSA or failed to pay an invoice for usage charges under the GSA within thirty days after the invoice date. Under either scenario, Metricom would be required to pay, in addition to all accrued but unpaid usage charges, an amount equal to the aggregate of the "annual minimums" and a pro rata portion thereof for any partial contract year that would have been applicable for the remaining unexpired portion of the term. However, until the GSA had been executed by both parties, this termination liability provision was entirely speculative.

*15 Plaintiffs' assertion that Metricom began purchasing circuits for the build-out of the Ricochet[2] network from WorldCom pursuant to the GSA in November 1999 is also contradicted by the documents attached to the SAC. The court agrees with defendants that plaintiffs appear to have confused the one-time non-recurring provisioning of physical circuits (which the GSA did not cover) with the recurring usage of those circuits for the carriage of electronic data traffic (which the GSA did cover). By its terms, the GSA's provision for "usage charges" included only Metricom's "recurring usage charges"-the utilization of MCI WorldCom's communications network to connect to the Internet once the build-out was complete-and specifically excluded fixed charges that might relate to the build-out, such as charges for equipment or standard non-recurring charges. Moreover, under the Reseller Agreement, WorldCom and not Metricom would bear the cost of those non-recurring charges.

Plaintiffs maintain that Daniel, Herrera, King-Warfel, and Schellman all "believed" that the GSA covered the provisioning of physical circuits, and that the GSA therefore did in fact cover such charges. Plaintiffs also assert that WorldCom itself recognized that the parties' "circuit-provisioning relations" were governed by the GSA from November

1999-forward when it began issuing invoices in February 2000 for "telecommunications services provided and related charges incurred" for the period November 15, 1999, through July 1, 2001 (citing to the WorldCom Proof of Claim). Plaintiffs submit that the question of what the GSA did cover-given the parties' competing views-cannot be decided on a [Rule 12(b)(6)] motion because it requires resort to extrinsic evidence.

Nevertheless, the court is not required to accept factual allegations that are contradicted by the very documents plaintiffs attach to the complaint. Regardless of whether or not one characterizes Metricom's purchase of "circuits" as somehow related or connected to the provision of telecommunication services under the GSA, and regardless of whether Daniel, Herrera, and King-Warfel "believed" that the GSA became effective in November or December 1999, the documents attached to the SAC establish that the underutilization and termination liability provisions of the GSA-along with the GSA's other provisions-did not become effective or operational until the agreement had been executed by both Metricom and WorldCom.

Nor does the Proof of Claim support plaintiffs' assertion that the GSA was in existence as early as November 1999 and that Metricom was purchasing circuits from WorldCom in November and December 1999 for the build-out of the Ricochet[2] network. As defendants argue in their papers, the fact that Metricom received and paid certain invoices does not translate into performance of the GSA in November or December 1999. It is apparent from the exhibits to the SAC that the parties had not reached agreement on the terms of the GSA as of the time of the public offering, that they continued to negotiate the terms for some months thereafter, and that the GSA did not become effective until after WorldCom had executed it in October 2000. Moreover, the Proof of Claim states that the basis for the claim was "Services performed." There is no indication in the Proof of Claim that WorldCom was seeking recovery of payment for the provisioning of physical circuits for the build-out of the high-speed network, and plaintiffs plead no facts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 15
Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

with particularity to support their claim that their sources at Metricom or WorldCom possessed any contrary knowledge with regard to the Proof of Claim.

**\*16** Indeed, the claim that Metricom and World-Com commenced performance of the GSA by virtue of the purchase and sale of "circuits" in 1999 (even though the agreement was not executed until October 2000) is something of a red herring. Plaintiffs do not assert that defendants were required to disclose the substance of every contract for the purchase of hardware or equipment required to build out the network. Even were it true that the GSA related to the provisioning of physical circuits, plaintiffs cite no authority to support the proposition that defendants were under any obligation to disclose such contracts. Rather, the basis of plaintiffs' claim of securities fraud is that defendants misled investors by not disclosing the GSA's termination liability and underutilization provisions. And, as explained above, those provisions had no existence or effect until after the GSA had been executed by both Metricom and WorldCom.

Further, plaintiffs' claim that the GSA "diluted" the value of the Reseller Agreement-and that defendants misled investors as to the real value of the Reseller Agreement by failing to disclose the GSA-is contradicted by Metricom's repeated public statements that it needed additional financing in order to execute its business plan and that there would be costs associated with the build-out of the network, and by the specific warnings that the company could not guarantee that financing would be available in the future. As the court explained in some detail in the May 28, 2000, order, Metricom publicly disclosed, as early as July 9, 1999, in its Form 8-K, that it had suffered recurring losses from operations and had a "net capital deficiency that raises substantial doubt about our ability to continue as a going concern;" that it might have "difficulty obtaining additional capital" and expected to "incur significant operating losses and to generate negative cash flow from operations during the next several years;" and that because of numerous variables outside the company's control, "the timing or extent

of the deployment" of Ricochet[2] was "uncertain."

Similarly, in the February 2000 Prospectus Supplement, Metricom disclosed that it had a history of losses, with cumulative net losses of $282 million as of September 30, 1999; that the company would require additional cash resources of approximately $1 billion to complete the planned three-phase deployment of the high-speed network, but might not be able to obtain sufficient funding; that Ricochet[2] might not be commercially successful; and that WorldCom might terminate the Reseller Agreement if Metricom failed to meet performance standards or deployment schedules.

Any investor who read Metricom's SEC filings would have known both that Metricom would incur substantial expenses in the deployment and operation of its network, and that the Reseller Agreement revenue stream was contingent upon the successful completion of the network build-out. Metricom's public filings made it absolutely clear that Metricom would not receive any money from World-Com under the Reseller Agreement until after the network was built and had met certain performance standards.

**\*17** Nor do the judicially noticeable documents support plaintiffs' assertion that because Metricom was "unconditionally" obligated to make $350 million in payments to WorldCom under the GSA, WorldCom's $300 million investment was "secured." Neither the Preferred Stock Purchase Agreement nor the GSA contains any provision purporting to create a security interest for the benefit of WorldCom.[FN13] Furthermore, while World-Com committed to its $300 million investment in June 1999 and finalized the investment in November 1999, Metricom's first possible annual minimum payment was due only in July 2002, one year and nine months after the October 3, 2000, effective date of the GSA, and almost three years after WorldCom's original $300 million investment.

> FN13. Moreover, contrary to plaintiffs' repeated assertions that that the GSA "guaranteed" a transfer of $350 million

**(Cite as: Not Reported in F.Supp.2d)**

from Metricom to WorldCom, Metricom's total "guaranteed" obligation over the five-year term was $175 million, not $350 million, as the underutilization provision of the executed GSA required Metricom to pay 50% of the difference between the total usage charge and the applicable annual minimum. Thus, the maximum Metricom might have to pay under this provision was $175 million, not $350 million.

Finally, the documents do not support plaintiffs' allegation that the Reseller Agreement and the GSA were "linked inextricably," [FN14] and that this "secret inextricable link" allowed WorldCom to control, through the GSA, the flow of revenue due under the Reseller Agreement, by withholding from Metricom the "circuits" necessary to build out the high-speed network. Metricom's statement that the GSA and the Reseller Agreement were "intertwined" was made in the context of a statement that the Reseller Agreement impacted the pricing and commitments that WorldCom could charge Metricom under the GSA. Under the Reseller Agreement, WorldCom agreed to pay for normal, pre-light up, non-recurring charges, such as initial fees and costs of installing the circuits. At the time of the bankruptcy filing, WorldCom owed Metricom $20 million in non-recurring charges, and WorldCom was obligated to reimburse 40% of Metricom's normal post-light up recurring circuit costs.

> **FN14.** Plaintiffs claim that the Reseller Agreement and GSA were "linked inextricably" and that it was "commercially impracticable" to separate them, citing to language in a motion filed by Metricom in the Bankruptcy Court.

Moreover, as defendants note, the fact that WorldCom owed Metricom in excess of $20 million for non-recurring costs can mean only that Metricom used vendors in addition to WorldCom for the provisioning of physical circuits for the Ricochet[2] build-out, because WorldCom would not have owed any amount to Metricom if it had been the "sole outsource vendor," as plaintiffs claim. This fact re-

futes plaintiffs' argument that WorldCom somehow had the power to prevent Metricom from completing the build-out of the Ricochet[2] network by withholding the provisioning of physical circuits.

Plaintiffs' claim that Metricom would not be entitled to any reimbursement from WorldCom under § 6.3 of the amended Reseller Agreement-which required WorldCom to reimburse 40% of the post-light up recurring costs incurred by Metricom-unless Metricom first paid the "full amount" of the GSA, is refuted by the express terms of § 6.3, which states that WorldCom would be obligated to refund those costs "regardless of whether MCI WorldCom or some other party provides the services/facilities."The GSA, which was executed in October 2000, related to the provision of the telecommunication services contemplated by § 6.3. Section 6.3 was added to the Reseller Agreement in November 1999, almost one year before the execution of the GSA, and impacted what WorldCom could charge under the later GSA because Metricom was entitled to what was effectively a 40% discount on those services. However, this connection between the two agreements does not turn them into a single, "integrated" agreement.

### b. Obligation to disclose

**\*18** Defendants contend that as a matter of law, Metricom had no obligation to disclose non-finalized vendor contracts that remained under negotiation. Plaintiffs respond that the law does not require that a contract be finalized in order for it to be material. They assert that they have adequately alleged violations of various SEC disclosure rules and GAAP, based on defendants' alleged failure to disclose, among other things, the likely impact on Metricom's liquidity and financial condition of the "agreement" between Metricom and WorldCom which ultimately became known as the GSA.

As stated above, the GSA did not become effective until after it had been fully executed. Moreover, each of the drafts of the GSA exchanged between the parties explicitly stated that it was only an offer from WorldCom that required Metricom's accept-

ance before an agreement between the parties would be formed.[FN15] The drafts of the GSA attached to the SAC do not support plaintiffs' assertion that the "core" or "essential" terms of the agreement were settled by mid-December 1999. As defendants correctly note, the drafts circulated before the February 2000 offering set the annual minimum usage charge at $60 million for each of the five contract years, whereas the GSA as executed had a graduated payment schedule. The underutilization provision in the drafts prior to the February 2000 offering required payment of the full difference between the total usage charges and the applicable annual minimum, while the executed GSA required payment of only 50% of the difference. Defendants' failure to state with precision what provisions the GSA would incorporate many months in the future is not actionable as a material omission.

> FN15. Every draft of the GSA attached to the SAC, including the copy of the executed agreement, contains a provision stating that the agreement "shall be of no force and effect" and that "the offer" contained therein would be withdrawn unless the agreement was executed by Metricom and delivered to WorldCom by a stated deadline. The space for the deadline was left blank in the draft identified by plaintiffs as the one circulated November 26, 1999. The deadline set in the December 8, and December 16, 1999, drafts was December 30, 1999. The deadline set in the February 13, 2000, draft was March 31, 2000. The deadline set in the executed agreement was September 5, 2000.

Metricom's non-disclosure of the GSA prior to its effective date is also non-actionable because Metricom disclosed (in, among other places, the June 21, 1999 press release, and the Reseller Agreement) that it expected to pay WorldCom to use its data communications network, although the actual terms had not been finalized. Metricom emphasized in the Prospectus for the February 2000 offering that the high-speed network was not yet built and that the company would generate losses for the next several

years-completion of the build-out requiring a billion dollars in additional financing-and included 15 pages of detailed risk disclosures regarding the expenses Metricom expected to incur and the losses Metricom expected to suffer for the next several years. Similarly, in the 1999 Form 10-K, filed on March 24, 2000, Metricom included a lengthy particularized discussion of risk disclosures, reiterating that it would require additional cash resources of approximately $1 billion to complete the three-phase deployment of the high-speed network, and that WorldCom could terminate the Reseller Agreement if Metricom breached its material obligations thereunder.

Contrary to plaintiffs' contentions, defendants were not obligated by SEC disclosure rules or by GAAP to disclose the negotiations over Metricom's acquisition of telecommunication services from World-Com or from any vendor. Nor do the particular violations alleged in the SAC provide any support for such a theory. Plaintiffs assert four violations of SEC rules: First, they claim that defendants had an obligation under Item 404 of Regulation S-K, 17 C.F.R. § 229.404,[FN16] to disclose in the Prospectus "all material facts pertaining to" the GSA, because WorldCom, a "related party" under § 229.404(a)(3), had a direct material interest in it.[FN17] However, for the reasons stated above, defendants were under no obligation to disclose WorldCom's interest in the GSA at that time because the GSA was not effective as of February 2000.[FN18]

> FN16. Part 229 of 17 C.F.R., or Regulation S-K, comprises the standard instructions applicable to the content of the non-financial statement portions of forms required to be filed under the 1933 Securities Act and the 1934 Securities Exchange Act. Subpart 229.300 provides instructions regarding "financial information," with § 229.303 (Item 303) relating specifically to the section entitled "Management's discussion and analysis of financial condition and results of operations," which is required by certain forms, and § 229.404

(Item 404) relating specifically to the re-
porting of transactions with management
and other "related" parties. *See*17 C.F.R.
§§ 229.303, 229.404.

FN17. Plaintiffs also assert in the opposi-
tion to the motion that defendants violated
SFAS No. 57 by failing to disclose the
GSA, a "transaction" with a "related
party." The court does not consider this
claim as it is not included in the SAC.

FN18. Moreover, the SEC filings did in
fact disclose that Metricom and WorldCom
were related parties, that Metricom had
paid WorldCom $2.9 million for telecom-
munication services in 1999 and $11.9 for
telecommunication. Metricom also dis-
closed that Metricom and WorldCom
would be entering into a "separate" agree-
ment regarding the provision of telecom-
munications services.

**\*19** Second, plaintiffs allege that defendants had an
obligation under Rule 10.01 of Regulation
S-X,FN1917 C.F.R. § 210.4-01, to disclose in the
Prospectus "the complete status of the third part of
the strategic relationship, the Reseller Agreement,
and the Global Services Agreement then being per-
formed by the parties."SAC ¶ 168. Rule 10.01
provides, in part, that "[f]inancial statements filed
with the [SEC] which are not prepared in accord-
ance with generally accepted accounting principles
will be presumed to be misleading or inaccur-
ate."As plaintiffs have not alleged misstatements or
material omissions in financial statements, Rule 10
.01 of Regulation S-X is not relevant here.
Moreover, for the reason stated above with regard
to Item 404 of Regulation S-K, plaintiffs were not
required to disclose the GSA in the Prospectus.

FN19. Part 210 of 17 C.F.R., or Regulation
S-X, describes the form and content of and
requirements for financial statements filed
as part of, among other things, registration
statements under the 1933 Act. Subpart
210.4 is entitled "Rules of General Applic-

ation." Section § 210.4-01 provides, in
part, that financial statements filed with
the SEC which are not prepared in accord-
ance with GAAP will be presumed to be
misleading or inaccurate. *See*C.F.R. §
210.4-01(a)(1).

Third, plaintiffs assert that defendants had an obli-
gation under Regulation S-X to "supply the required
information reporting the status of the Reseller and
Global Services Agreements" in the October 19,
2000, press release discussing Metricom's financial
results for the third quarter of 2000. SAC ¶ 172(c).
Part 210, or Regulation S-X, of 17 C.F.R., relates to
the form and content of and requirements for finan-
cial statements required to be filed as a part of re-
gistration statements. 17 C.F.R. § 210.1-01. Thus,
Regulation S-X is inapplicable to press releases.
*See*Wietschner v. Monterey Pasta Co., 294
F.Supp.2d 1102, 1117-18 (N.D.Cal.2003).

Fourth, plaintiffs allege that defendants had an ob-
ligation under Item 303 of Regulation S-K to dis-
close in Driesbach's December 2000 "Letter to
Stakeholders" that Metricom had not then met
WorldCom's "Quality of Service" standards, and
was experiencing delays in the build-out of the net-
work. SAC ¶ 173(c). Plaintiffs quote from subsec-
tion (a)(3)(ii) of Item 303, which requires the regis-
trant to "[d]escribe any known trends or uncertain-
ties that have had or that the registrant reasonably
expects will have a material favorable or unfavor-
able impact on net sales or revenues or income
from continuing operations."*See*17 C.F.R. §
229.303(a)(3)(ii), Note. This requirement applies to
the "Management's Discussion and Analysis of Fin-
ancial Condition and Results of Operation" section
of reports for full fiscal years. *See*id.§ 229.303(a).
It is not applicable to interim reports, to press re-
leases, or to other communications with sharehold-
ers.

The SAC alleges two violations of GAAP. First,
plaintiffs assert that the Prospectus contains an
"actionable omission" under AICPA Statement of
Position 94-6 ("SOP 94-6") because it fails to dis-
close "Metricom's vulnerability caused by its com-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plete dependence on WorldCom for Circuits and related telecommunications services to be supplied by Metricom" under the GSA. SAC ¶ 166. Generally Accepted Accounting Principles are the conventions, rules, and procedures that constitute the professional standards of the accounting profession. *Arthur Young & Co.,* 465 U.S. at 811 n. 7. In other words, they are applicable to financial statements or statements of audits. Here, however, plaintiffs do not allege that any of Metricom's financial statements were misleading or inaccurate. Nor do they claim that defendants overstated Metricom's revenues or improperly recognized revenues, or that they published inaccurate accounting figures. For this reason, the alleged omissions cannot be viewed as violations of GAAP, and the court need not consider further whether plaintiffs have established an actionable duty to disclose based on this alleged violation of SOP 94-6.

**\*20** Second, plaintiffs claim that the parties' decision, during the course of negotiating the terms of the GSA, to increase in the total "annual minimums" from $300 million to $350 million over the five-year period of the agreement, resulted in the assessment of a $50 million "interest" charge on Metricom, for purposes of SFAS No. 47. SAC ¶ 102. This allegation is not tied specifically to a claim of misleading investors. Instead, in appears as part of a paragraph asserting that the total "annual minimum" increased by $50 million "because Metricom knew it could not afford to pay $60 million in each of the first two contract years due to the Network build-out."As with the allegation that defendants violated SOP 94-6, the claim with regard to SFAS No. 47 does not relate to any claim of accounting irregularities or any claim that Metricom issued misleading or inaccurate financial statements.FN20

> FN20. In the opposition to the motion, though not in the SAC, plaintiffs also contend that defendants violated SFAS 47 by failing to disclose in public filings that Metricom had incurred long-term noncancellable (without substantial penalties) purchase commitments from a related party,

WorldCom. This is apparently intended as a reference to the "annual minimum" and "termination" provisions of the GSA.

### 3. The 1933 Act Claims

Plaintiffs contend that by failing to disclose the existence and performance of the GSA in the Prospectus and Registration Statement, defendants misled investors and violated §§ 11(a) and 12(a)(2) of the 1933 Securities Act. Plaintiffs assert claims under § 11(a) against the individual defendants and against the underwriter defendants, under § 12(a)(2) against the underwriter defendants, and under § 15(a) for control person liability against the individual defendants and Vulcan Ventures.

Plaintiffs assert that the offering documents were false and misleading because they did not disclose that WorldCom and Metricom had begun performing the GSA on November 15, 1999; did not disclose that WorldCom had delivered invoices to Metricom arising out of the GSA beginning February 1, 2000; did not disclose that the GSA involved substantial commitments by Metricom to WorldCom that could cause Metricom to be unable to raise further funds from the public; did not disclose that the GSA's termination liability clause meant that Metricom was potentially liable for $350 million in WorldCom terminated the GSA; and did not disclose that Metricom was obligated to pay WorldCom under the GSA even if Metricom never received any revenues under the Reseller Agreement.

Plaintiffs allege further that defendants failed to disclose that Metricom had outsourced solely to WorldCom (through the GSA) the provisioning of all circuits required for the Ricochet[2] network to connect to the Internet or other corporate networks, which, in conjunction with WorldCom's duties under the Reseller Agreement, allowed WorldCom to determine the extent to which it would be required to pay Reseller revenue to Metricom. Plaintiffs also claim that the Prospectus falsely stated that all material risks were disclosed in the Prospectus Supplement, and was misleading in failing to state that WorldCom's $300 million investment in Metricom

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was prompted not by the attractiveness of the Ricochet[2] technology, but rather by WorldCom's desire to protect or hedge its investment through Metricom's guaranteed revenue commitment of $350 million represented by the GSA.

**\*21** Defendants seek dismissal of the 1933 Act claims on the grounds that the SAC does not plead any false or misleading statements in the Prospectus or Registration Statement for the February 2000 offering. As discussed above, defendants claim that plaintiffs' assertion that the offering documents were misleading because they did not disclose the existence of the GSA does not state an actionable claim, because the GSA was not effective at the time of offering, and because defendants had no duty to disclose the negotiations over the terms of the GSA while it was being negotiated. Defendants also assert that the claims sound in fraud, and that plaintiffs have failed to plead fraud with particularity.

Plaintiffs contend that they have adequately stated a claim for violation of the 1933 Act simply by alleging that defendants failed to disclose "the third part of the strategic relationship, the parties' ongoing performance thereunder, the draft memorializations thereof, [and] the basic agreement and certitude that WorldCom was to receive total guaranteed revenue of $350 million under the Global Services Agreement, even if WorldCom paid no Reseller revenue to Metricom."Plaintiffs also claim that the Prospectus Supplement "artificially inflated" the $388 million projected value of the Reseller Agreement by approximately 46%.

The SAC lists two statements from the Prospectus alleged to be misleading. The first appears in the "Risk Disclosures" section:
Currently, we have agreements with UUNet, a subsidiary of MCI WorldCom, and others to support the exchange of traffic between our wired access points, our network interface facilities, the telecommunications infrastructure and corporate networks and the Internet.

Plaintiffs claim that this statement was misleading

for two reasons. First, they maintain that Daniel and King-Warfel stated that this disclosure pertained exclusively to agreements concerning the original Ricochet for UUNet T-1 Internet service, and thus had nothing to do with Ricochet[2]-which plaintiffs claim was the "whole focus" of the Prospectus Supplement. Second, they claim that the disclosure was incomplete because it did not state that Metricom had been performing the GSA with WorldCom since November 15, 1999, and had a strategic relationship with WorldCom that was significantly more important than the UUNet agreement; because it did not disclose the "potentially lethal consequences" of the GSA, and did not disclose that, according to Metricom's internal records, Metricom had ordered 882 circuits for the Ricochet[2] network during the period November 15, 1999, through January 31, 2000.

The second statement is the following: "MCI WorldCom may reduce or cancel its obligations to us if we fail to meet certain performance thresholds."Plaintiffs claim that this statement was false and misleading because Metricom was not able to satisfy any "commercially ready" standard, and there was no disclosure that Metricom's failure to fully perform its $350 million purchase obligations under the GSA could place Metricom in default and "trigger the penal clause" for the full amount of the GSA.

**\*22** The court finds that the SAC does not state a claim for material misrepresentations because, as explained above, the GSA did not become effective until after it had been executed by both WorldCom and Metricom and defendants were under no obligation at the time of the public offering to disclose the status of the ongoing negotiations regarding the GSA's terms and provisions. In addition, as in the order dismissing the FAC, the court finds that plaintiffs have failed to plead the 1933 Act claims with particularity, as required by Rule 9(b).

The court noted in the May 28, 2003, order that under the law of the Ninth Circuit, the particularity rules of Federal Rule of Civil Procedure 9(b) apply to claims of misstatements in a prospectus or regis-

Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

tration statement if the allegations sound in fraud, even if the complaint states otherwise. *See In re Stac,* 89 F.3d at 1404-05. Adoption of the Rule 9(b) pleading standard is appropriate "where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims." *Id.* at 1405 n. 2.

In dismissing the FAC, the court found it impossible to separate the factual allegations relating to the 1934 Act claims from those relating to the 1933 Act claims, and found moreover that the allegations throughout the FAC were reflective of claims of intentional misrepresentation. The court described the similar language used to characterize the claims under both statutory schemes, and noted that the § 11(a) and § 12(a)(2) causes of action incorporated by reference all the allegations relating to the alleged knowing misrepresentations. The court also noted that the allegations regarding the defendants alleged public material misrepresentations and omissions were incorporated by reference into every cause of action, and that the allegations of failure to disclose were essentially identical with regard to the claims asserted under both the 1933 Act and the 1934 Act.

In the SAC, plaintiffs have attempted to remedy this problem by eliminating some of the cross-references, and by adding the following language: Lead plaintiffs repeat and re-allege each and every allegation set forth above [referring to the totality of the factual allegations] as if set forth fully herein, except that [the claims alleged under §§ 11(a), 12(a)(2), and 15 do] not sound in fraud, and Lead Plaintiffs do not incorporate herein any allegations of fraud in connection with [these claims] for relief.

SAC ¶¶ 201, 211, 222. Nevertheless, this attempt to separate the 1933 Act claims from the 1934 Act claims is futile, as the entire SAC asserts a unified course of conduct, involving the alleged failure to disclose the so-called "third part" of the "strategic relationship and the $350 million "guaranteed revenue commitment" from Metricom to WorldCom, which allegedly resulted in an inflated price for

Metricom common stock.

In their opposition to defendants' motion to dismiss, plaintiffs argue that the SAC alleges that the 1933 Act claims do not sound in fraud, and that they therefore are not required to allege the § 11(a) and § 12(a)(2) claims with particularity. They claim that the United States Supreme Court decision of *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) establishes that Rule 8 provides the correct standard of pleading their 1933 Act claims. They also submit that the Ninth Circuit in its recent decision of *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097 (9th Cir.2003), moved away from the position it set forth in *In re Stac,* and that all that is now required is to "disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been made." *Id.* at 1105. Alternatively, plaintiffs suggest that they should perhaps be permitted to file two separate complaints in this action, one alleging claims under the 1933 Act, and a second alleging claims under the 1934 Act.

**\*23** Rule 9(b) "provides for greater particularity in all averments of fraud or mistake." *Swierkiewicz,* 534 U.S. at 513. The issue in *Swierkiewicz,* a employment discrimination case alleging claims under Title VII of the Civil Rights Act of 1964, was whether on a Rule 12(b)(6) motion to dismiss, a complaint can survive only if it pleads specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Swierkiewicz,* 534 U.S. at 508. The Court held that under Rule 8(a), an employment discrimination complaint need only allege the elements of the claim so as to give the defendant "fair notice of the basis for" the suit. *Id.* at 524-25. The Court did not address the distinction between Rule 8 and Rule 9 in the pleading of a claim that sounds in fraud.

*Vess* was a diversity action alleging that the defendants-psychiatric associations and pharmaceutical manufacturers-had acted illegally to increase sales of a particular drug. Plaintiff alleged violations of

Case 5:07-cv-03444-JF     Document 24-6     Filed 10/05/2007     Page 22 of 35

Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

California statutes, including the California Unfair Business Practices Act, Cal. Bus. & Prof.Code § 17200. Section 17200 prohibits, among other things, "unlawful, unfair, or fraudulent business act[s] or practice[s]" and "unfair, deceptive, untrue, or misleading advertising."The district court dismissed the complaint for failure to allege fraud with particularity under Rule 9(b). The Ninth Circuit confirmed that Rule 9(b)'s particularity requirement applies to state-law causes of action, and that it applies to any claim that "sounds in fraud," regardless of whether fraud is an essential element of the claim. *Vess,* 317 F.3d at 1103.

In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

*Id.* at 1103-04 (citing *In re Stac,* 89 F.3d 1399, 1404-05 (9th Cir.1996); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1223 (1st Cir.1996); *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994); and *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 288 (3rd Cir.1992) for the proposition that where claims under §§ 11(a) and 12(a)(2) of the 1933 Securities Act sound in fraud, they are subject to the heightened pleading standard of Rule 9(b)).

The Ninth Circuit went on to add that where a plaintiff chooses "not to allege a unified course of fraudulent conduct in support of a claim, but rather to allege some fraudulent and some non-fraudulent conduct ... only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements.*Vess,* 317 F.3d at 1104. The court concluded that where fraud is not an essential element of a claim, only the allegations of fraud must satisfy Rule 9(b), and where particular averments of fraud are insufficiently pled under Rule 9(b), "a district court should 'disregard' those averments, or 'strip' them from the claim," and then "examine the

allegations that remain to determine whether they state a claim."*Id.* at 1105.

**\*24** Plaintiffs focus on the second part of the *Vess* court's holding, but ignore the first. Plaintiffs' argument that they need not plead the 1933 Act claims with particularity in the present case because the SAC disclaims any intention to allege fraud with regard to the statements in the Prospectus is without merit, as the central hypothesis of this action is, and always has been, that defendants deliberately concealed the material details of the GSA from Metricom's shareholders. The allegations with regard to the statements in the Prospectus Supplement (the §§ 11(a) and 12(a)(2) claims) are based on the same unified course of conduct as the allegations with regard to the pre-and post-offering statements-the "three-part strategic relationship," which plaintiffs claim commenced in June 1999. The "undisclosed third part" of this three-part relationship-the GSA-was, according to plaintiffs, being performed by Metricom and WorldCom as early as mid-November 1999. This claim, of a unified course of conduct that began with the issuance of the June 21, 1999, press release, sounds in fraud.

Plaintiffs cannot allege fraud based on a series of events occurring before the offering and on essentially identical events continuing after the offering, and then scissor out a non-fraud claim from the center of that unified course of conduct in order to evade the Rule 9(b) requirement. The claims under the 1933 Act must be dismissed because plaintiffs do not plead with particularity any reason that the statements in the Prospectus and Registration Statement were false or misleading. The only stated reason-that defendants did not disclose the existence of the GSA-is contradicted by the judicially noticeable documents, including the exhibits to the SAC.

4. Claims under the 1934 Act

Plaintiffs allege that the individual defendants violated § 10(b) of the 1934 Act and SEC Rule 10b-5 by making false or misleading statements during the period that preceded the February 2000 public

offering, during the period following the public of-
fering, and in certain analysts research reports is-
sued by the underwriter defendants. Plaintiffs also
assert claims under § 20(a) against the individual
defendants and against Vulcan Ventures for control
person liability.

Defendants argue that the claims under § 10(b) and
Rule 10b-5 should be dismissed because plaintiffs
fail to plead particularized facts showing that de-
fendants issued any false or misleading statements,
and fail to allege scienter against any of the indi-
vidual defendants. They contend that the claims of
falsity with regard to the documents issued by Met-
ricom between June and December 1999 are all
premised on the alleged failure to disclose that Met-
ricom had agreed to a 3-part "strategic relationship"
in June 1999, which included the GSA, and that the
allegations with respect to the documents issued
after the February 2000 offering do not state a
claim because plaintiffs do not allege that any of the
documents was materially misleading.

### a. Falsity

i. statements issued prior to the public offering

**\*25** Plaintiffs claim that defendants made false or
misleading statements in the June 21, 1999, press
release; the July 9, 1999, Form 8-K; the proxy soli-
citation issued September 14, 1999; and in three
amendments to the July 9, 1999, Form 8-K-filed as
the November 5, 1999 Form 8-K/A, the November
25, 1999 Form 8-K/A, and the December 21, 1999
Form 8-K/A. Of this group, only the June 21, 1999,
press release was mentioned in the FAC.

Defendants argue that plaintiffs' falsity theory for
the pre-offering statements fails for the same reason
that the 1933 Act claims fail-the hypothesis that the
GSA was the undisclosed "third part" of a three-
part strategic relationship is rebutted by facts
plaintiffs have put in the record, including drafts of
the GSA showing that material terms of the agree-
ment were still under negotiation well into 2000.

Metricom announced the Preferred Stock Purchase
Agreement and the Ricochet[2] Reseller Agreement

in a press release issued on June 21, 1999. In the
FAC, plaintiffs quoted two passages from that press
release, which they characterized as an announce-
ment by Metricom of the "strategic relationship"
with WorldCom "which includes national distribu-
tion of Ricochet."
Included in this strategic agreement, MCI World-
Com has signed a five-year, non-exclusive whole-
sale agreement valued at $350 million with Met-
ricom for its Ricochet services. Metricom will util-
ize MCI WorldCom's high-speed data and Internet
network and support operations as it expands na-
tionally.
By teaming with Vulcan Ventures, Inc. and a stra-
tegic partner with the national presence and reputa-
tion of MCI WorldCom, we gain the resources and
expertise to accelerate the availability and adoption
of our Ricochet service on a nationwide basis.

The FAC alleged that this press release was false
and misleading because the individual defendants
failed to disclose that "Metricom could only gain
the substantial revenues over five years described
in the Ricochet Reseller Agreement after Metricom
had fully performed on two other, undisclosed
agreements with WorldCom and purchased $350
million in circuits and other services from World-
Com."In the order dismissing the FAC, the court
found that the FAC pleaded no facts showing that
the statements in the press release were false when
made-specifically, that the FAC pleaded no facts
showing that the $350 million agreement with
Worldcom was not worth $350 million in June
1999, and did not explain how information regard-
ing the purchase agreements and the performance
standards could make the statement about the Re-
seller Agreement misleading. The court also noted
that the press release was issued more than a year
before Metricom and WorldCom entered into the
GSA.

In the SAC, plaintiffs quote the same two passages
from the June 1999 press release that they quoted in
the FAC, this time attributing the first statement to
"Dreisbach and the Vulcan defendants," [FN21] and
the second statement to Dreisbach. Plaintiffs in-
clude a third passage, which they attribute to Sa-

Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

voy:

> FN21. In ¶ 34 of the SAC, plaintiffs identi-
> fy the "Vulcan defendants" as Dreisbach,
> Derrickson, Savoy, and Vulcan." Later in
> the SAC, as in the allegations relating to
> the June 21, 1999, press release, SAC ¶
> 131, plaintiffs refer to "Dreisbach and the
> Vulcan defendants."

**\*26** We have been impressed with the management,
focus, and technology advancement made by Met-
ricom over the past year. By adding a world-class
partner like MCI WorldCom, we expect to acceler-
ate the availability and adoption of Ricochet by mo-
bile professionals who want fully functional access
to applications and data on LABS, Intranets and the
Internet anywhere, anytime.

Plaintiffs allege that "each of these statements" was
false and misleading because Dreisbach and the
Vulcan defendants had omitted to disclose the
"third part of the strategic relationship and that ap-
proximately $350 Million Metricom had agreed to
purchase circuits and services from WorldCom;"
had omitted to disclose "Metricom's actual, expec-
ted, or potential liability ($350 million) to
'world-class partner' WorldCom under the third
part of the strategic relationship and that sole out-
source contract for Circuits and related telecommu-
nications services, without which the Ricochet[2]
Network could not function;" had omitted to dis-
close "the actual, expected, or potential offset of
the costs entailed in the Global Services Agreement
against the 'non-exclusive wholesale agreement'
valued at $388 million."SAC ¶ 131. Plaintiffs assert
that the "covert revenue commitment" from Met-
ricom to WorldCom represented by the GSA
"created a starkly different reality for the projected
Reseller revenue stream," and that the disclosure of
this "revenue commitment" would have importantly
altered the total mix of available information." *Id.*

Apart from the increased verbosity and confusing
syntax, there is little to distinguish the allegations
in the FAC regarding the June 1999 press release
from those in the SAC. Plaintiffs still plead no facts

showing that the $350 agreement with WorldCom
was not worth $350 million at the time the press re-
lease was issued. Plaintiffs assert that the telecom-
munications services that Metricom would agree to
purchase-more than 15 months later-from World-
Com should have been deducted from the stated
value of the Reseller Agreement. However, as the
court explained above in the section on the GSA,
that agreement, by its terms, did not become effect-
ive until it was executed, and plaintiffs' claim that
the parties were performing the GSA as early as
November 1999 is not supported by the judicially
noticeable documents.[FN22]

> FN22. Even if plaintiffs had stated facts
> supporting this claim of performance of the
> GSA in November 1999-which they did
> not-they would still not have stated facts
> establishing an obligation on Metricom's
> part to disclose the alleged existence of the
> GSA in June 1999.

Metricom filed the July 9, 1999, Form 8-K as part
of its disclosure of the June 20, 1999, Preferred
Stock Purchase Agreement and Reseller Agree-
ment. Plaintiffs allege that the July 9, 1999, Form
8-K, "signed by Dreisbach and the Vulcan defend-
ants,"[FN23] was misleading because it failed to in-
clude in the "Risk Factors" section a statement that,
"pursuant to Section 6.2 of the Reseller Agreement,
the actual, expected, and potential consequences of
the third part of the strategic relationship contem-
plated agreement with WorldCom was a liability of
$350 million."SAC ¶ 132. Based on information
from journalist Denise Pappalardo that the source
of her report in the June 28, 1999, edition of *Net-
work World* was "definitely Metricom," plaintiffs
assert that Dreisbach and "the Vulcan defendants"
knew the terms of the "covert" GSA as early as
June 28, 1999. *Id.*

> FN23. The Form 8-K was signed by Dreis-
> bach. The Preferred Stock Purchase Agree-
> ment, a copy of which was attached to the
> Form 8-K, was signed by Dreisbach, for
> Metricom; John W. Sidgmore, for World-
> Com; and Savoy, for Vulcan.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*27** Again, plaintiffs' claim of falsity with regard to the July 9, 1999 8-K is premised on defendants' alleged failure to disclose the "third part" of the "strategic relationship." As with the June 21, 1999, press release, plaintiffs fail to state a claim because the documents attached to the SAC contradict the claim that the GSA was in effect at the time plaintiffs released the information about the Preferred Stock Purchase Agreement and the Reseller Agreement.

On September 14, 1999, Metricom filed a proxy statement pursuant to § 14(a) of the 1934 Securities Act, seeking shareholder approval for the issuance and sale of 60 million shares of Preferred Stock to WorldCom and Vulcan, pursuant to the Preferred Stock Purchase Agreement, to be voted on at a shareholder's meeting on October 15, 1999. Appended to the proxy statement was a copy of a letter from J.P. Morgan Securities, Inc., stating, based on its review of Metricom's financial statements and other information provided by the company, that the proposed issuance and sale of stock to WorldCom and Vulcan was fair, from a financial point of view, to the company's shareholders. Plaintiffs allege that the statements made to solicit shareholder approval were false and misleading because shareholders were not told to consider that WorldCom's $300 million investment "was secured (or protected) by the third part of the strategic relationship, which provided that WorldCom would receive approximately $350 million if the Agreement [presumably referring to the GSA] was terminated due to Metricom's default."SAC ¶ 133. Plaintiffs assert that, having chosen to extol the positive aspects of the Preferred Stock Purchase Agreement, defendants were obligated to disclose its "material negatives" as well.[FN24]*Id.*

> [FN24.] Claims of false or misleading statements in proxy statements are generally brought under § 14(a) of the 1934 Act, not § 10(b). However, the SAC does not allege a claim under § 14(a).

Apart from the vague reference to the J.P. Morgan fairness opinion, plaintiffs have not identified any statements in the proxy statement, let alone identified any that were false or misleading. The proxy statement clearly indicated that Metricom would be unable to continue with the development and build-out of the high-speed network without the substantial financial boost it was to receive from the $600 million investment by WorldCom and Vulcan. Plaintiffs have not alleged any facts supporting their claim that defendants omitted to state some "material negatives" in the proxy statement. As discussed above, neither the Preferred Stock Purchase Agreement nor the GSA contains any provision purporting to create a security interest for the benefit of WorldCom.

Moreover, plaintiffs' claim that WorldCom would receive $350 million if Metricom defaulted under the GSA is not supported by the documents. The GSA did not become effective until more than a year after the shareholders voted to approve the Preferred Stock Purchase Agreement. Under the final, executed version of the GSA, Metricom's total "guaranteed" obligation over the five-year term was $175 million, not $350 million, and Metricom's first possible annual minimum payment was due only in July 2002, one year and nine months after the October 3, 2000, effective date of the GSA, and almost three years after WorldCom's original $300 million investment.

**\*28** Equally deficient are the allegations with regard to the three amendments to Metricom's July 9, 1999, Form 8-K. Amendment No. 1, Form 8-K/A, was filed on November 5, 1999. Plaintiffs assert that Amendment No. 1 was false and misleading because, in disclosing that, pursuant to the Reseller Agreement, "Metricom would enter into a 'separate agreement' with WorldCom for the provision of services to be supplied by the [GSA], Dreisbach and the Vulcan defendants omitted to disclose the actual, expected, and potential consequences of that arrangement."[FN25]SAC ¶ 134. In other words, plaintiffs claim that the statement that Metricom and WorldCom would, in the future, enter into an agreement regarding the provision of telecommunications services, was misleading because it did not also state that this speculative future agreement

would include a termination liability provision.

> FN25. The reference is to ¶ 6.2 of the Reseller Agreement, which states,
> MCI WorldCom will lease to Metricom, at MCI WorldCom's competitive wholesale rates appropriate to Metricom's volume of use and length of commitment, communications capacity for data traffic generated by Subscribers other than MCI WorldCom Subscribers in connection with the [high-speed] Service. The Parties will execute a separate agreement for the provision of such services by MCI WorldCom.

Amendment No. 2, Form 8-K/A, was filed on November 24, 1999. This 8-K/A included the November 12, 1999, Amendment to the Ricochet[2] Reseller Agreement. Plaintiffs allege that Amendment No. 2 was false and misleading because "it omitted to disclose that the $350 million in cash payments Metricom had to make to WorldCom under the third part of the strategic relationship the draft of the Global Services Agreement then extent."SAC ¶ 135. In other words, the 8-K/A was misleading because it did not disclose an unexecuted draft of an agreement-the GSA-the terms of which were still being negotiated. Plaintiffs assert that "[t]his substantially would dilute the expected $388 million revenue stream from the Reseller Agreement."*Id.*

Amendment No. 3, Form 8-K/A, was filed on December 21, 1999. Plaintiffs allege that Amendment No. 3 was false and misleading because it omitted to disclose "the third part of the strategic relationship that Metricom had begun its performance of the Global Services Agreement by ordering Channelized DS-3 Circuits for the Ricochet[2] Network, that the pricing of the Circuits and related telecommunications services covered by the Global Services Agreement had become fixed and determinable, and that drafts to memorialize the Agreement had been exchanged."SAC ¶ 136. Plaintiffs assert that these "omitted facts" of contract performance and materially adverse potential liability would have significantly altered the total mix of in

formation available to investors concerning the Reseller Agreement and the GSA.

Each of these statements is alleged to have been misleading because defendants did not disclose the existence of the GSA and/or the asserted "performance" of the GSA by Metricom and WorldCom. For the reasons stated above with regard to the other pre-offering statements, and those stated in the section discussing the GSA, the court finds that the SAC does not plead any material omissions by defendants with regard to the amended 8-K/As.

### ii. statements issued after the public offering

Plaintiffs allege that defendants made misleading statements in a press release issued on February 20, 2000; in the September 2000 "Letter to Stakeholders;" in press releases issued on October 3 and 19, 2000; and in the December 2000 "Letter to Stakeholders." Plaintiffs claim that the statements were misleading because plaintiffs did not disclose the GSA, and did not disclose that deployment of the high-speed network was behind schedule.

**\*29** In the FAC, plaintiffs alleged the same false and misleading statements, with the exception of the October 3, 2000, press release. In the February 20, 2000, press release, according to plaintiffs, "Dreisbach and the Vulcan defendants" reported that Metricom had signed numerous deployment contracts with various providers and suppliers during the fourth quarter of 1999, adding that Metricom had begun "ordering the circuits needed in the underlying backbone."Plaintiffs claim that this press release was false and misleading because it omitted to disclose that Metricom had commenced performance of the GSA as early as November 1999.

Neither of the statements in the February 20, 2000, press release-that Metricom had signed certain contracts for the deployment of its network and that Metricom had begun ordering circuits-was misleading for failing to disclose the GSA as "the third part of the strategic relationship," as there was no third part of the strategic relationship to disclose.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs allege no facts supporting their claim that the press release created a materially false impression of Metricom's business.

In the September 2000 "Letter to Stakeholders," Dreisbach stated that Metricom had launched the first Ricochet[2] markets "ahead of schedule." Plaintiffs allege that this statement was false and misleading because this launch pertained solely to resellers other than WorldCom, resellers that did not require achievement of the same performance standards. Plaintiffs claim that defendants also omitted to disclose that service in some markets was available only in limited areas, and that some areas had not been certified as "commercially-ready;" and omitted to disclose that deployment was behind schedule and that Metricom's failure to comply with the deployment schedule could put Metricom in material breach of the Reseller Agreement and the GSA

In the October 3, 2000, press release, Metricom announced that "contracts with four companies for the physical deployment of key components for its Ricochet 128 Kbps mobile access network in markets now scheduled for construction."Plaintiffs claim that this statement was false and misleading because it omitted to disclose the "contract" with WorldCom representing a total guaranteed revenue commitment of $350 million from Metricom to WorldCom, which Metricom had been performing since November 1999. Plaintiffs also assert that the press release was misleading because it failed to disclose that Metricom was significantly behind in the "installation of Circuits." Plaintiffs claim that Metricom's internal "Circuit Provisioning Summaries" showed that Metricom was behind schedule and could not possibly complete deployment in the 11 specified "Phase I Cities" before mid-February 2001.

In the October 19, 2000, press release, Metricom discussed its results for the third quarter of 2000. The press release quotes Dreisbach as stating:
Our rapid deployment of Ricochet across multiple markets simultaneously was very successful, and conducted in a relatively short time frame. We plan to continue this aggressive pace until service is delivered to all major markets in our target footprint.

**\*30** Plaintiffs claim that this statement was false and misleading because as of October 19, Metricom had not satisfied the "Quality of Service" criteria set out in the Reseller Agreement and had not been certified by WorldCom as "commercially ready in a single city.In December 2000, Dreisbach issued another "Letter to Stakeholders," stating, We have launched the Ricochet network at a tremendous pace, opening 14 markets that cover over 400 individual towns and municipalities. Millions of people now live and work under the Ricochet network, and it continues to expand every week. Our roll-out plan is unmatched and represents a major success both for Metricom and its partners.

Plaintiffs claim that the above-described statements were false and misleading because Metricom had not then met the "Quality of Service" criteria set out in the Reseller Agreement and had not been certified as "commercially ready" in a single city. Plaintiffs claim that defendants were aware of these problems. Plaintiffs also claim that defendants failed to disclose that Metricom had installed only 46% of the Circuits ordered under the GSA for the "Phase I Cities" and 30% of the Circuits ordered for the "Phase II Cities."

In the order dismissing the FAC, the court found that the statements made in the September "Letter to Stakeholders," the October 19 press release, the December "Letter to Stakeholders," and a December 18, 2000, statement by Metricom's Chief Operating Officer (not mentioned in the SAC) could not provide a basis for a claim of securities fraud because the FAC did not plead with particularity any facts supporting the claim that the statements were false, and did not plead the basis for the statements made on information and belief. In particular, the court found that plaintiffs had not alleged particularized facts sufficient to support their claim that the statements were misleading because Metricom was "behind schedule."

With regard to this claim that defendants misled

Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

shareholders by failing to disclose the delays in the build-out, the court reviewed Metricom's SEC filings, and noted that Metricom had repeatedly disclosed that it had modified the deployment schedule originally agreed to by the parties and set forth in the Reseller Agreement. The court advised plaintiffs that if they intended to allege a failure to disclose delays in any amended complaint, they must state the details of the applicable published timetable, state when or where the applicable timetable was published, state what stage of development and/or deployment Metricom was in as of the date of the challenged public statement, and explain how the challenged public statement was misleading in light of the other factors listed.

The court also noted that statements such as, "We have launched the Ricochet network at a tremendous pace" or "Our roll-out plan is unmatched," or "2000 has been a tremendous year for Ricochet growth," or references to "our rapid deployment of Ricochet" were little more than vague statements of corporate optimism. General statements of optimism and "puffing" about a company or a product are not actionable. *See,e.g.,Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1245 (N.D.Cal.1998); *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217, 1236 (N.D.Cal.1994). Such vague statements cannot be said to "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) (citation omitted).

**\*31** The SAC does not plead particularized facts indicating that defendants made false or misleading statements during the post-offering period, and does not eliminate the problems that the court identified in the FAC. The court finds that the September 2000 Letter to Stakeholders, the two October 2000 press releases, and the December 2000 Letter to Stakeholders were not misleading for the reasons alleged by plaintiffs in the SAC (failing to disclose that the build-out was behind schedule, and failing to indicate that Metricom could not comply with the terms of the Reseller Agreement). The SAC does not state when or where the applicable

timetables were published, does not explain what state of development and/or deployment Metricom was in as of the date of each of the challenged public statements, and does not articulate how the challenged public statements were misleading.[FN26]

> [FN26.] Plaintiffs claim that three internal Metricom reports known as "Circuit Provisioning Summaries," prepared on September 5, 2000, on October 3, 2000, and in December 2000, establish that only a small percentage of the "Circuits" required for the build-out had been installed. Plaintiffs assert that defendants misled shareholders by failing to disclose that Metricom was "significantly behind" in the "installation of Circuits" throughout this period. As previously noted, however, Metricom was not required to disclose every fact, including the exact number of circuits ordered, related to the build-out, simply because the company provided on-going disclosures regarding the status of the build-out. For an omission to be misleading, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."*Brody, 280 F.3d at 1006.* Plaintiffs have not identified any statement that affirmatively created such a materially misleading impression.

Indeed, it appears that the SAC relies on the original deployment schedule filed as an exhibit to the Amended Reseller Agreement in November 1999, and that plaintiffs have ignored the various published changes to that schedule, detailed by the court in the order dismissing the FAC. Plaintiffs have also ignored the court's finding in the order dismissing the FAC that a number of the challenged statements in the September, October, and December 2000 releases were merely inactionable, vague statements of corporate optimism.

    iii. statements in the analysts research reports

Finally, plaintiffs allege misleading statements in the November 9, 1999 Lehman Brothers research

Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

report; the February 4, 2000 Salomon research re-
port; the February 9, 2000 H & Q research report;
the February 15 and 17, 2000 Lehman Brothers re-
search reports; the March 8, 2000 Merrill Lynch re-
search report; and the December 11, 2000 Lehman
Brothers research report. The allegations in the
SAC regarding the analysts reports are essentially
the same as the allegations in the FAC, except that
plaintiffs asserted in the FAC that the individual de-
fendants "were aware of" the various reports and
did nothing to correct the purported misrepresenta-
tions," while the SAC does not include such an al-
legation; and the SAC includes claims that the re-
lease of the various reports had "an upward effect
on prices," while the FAC did not. The SAC also
asserts generally that the reports were misleading
because they did not mention the "third part of the
strategic relationship."

In its November 9, 1999, research report, Lehman
Brothers issued a "Buy" recommendation on Met-
ricom stock, describing Metricom as "an undis-
covered jewel that plays right into the sweet spot of
Internet and wireless convergence."The report
stated further that
Metricom has strong financial and strategic backing
from Paul Allen (Vulcan Ventures) and WorldCom,
which together will inject some $600 million in
equity this quarter. This, combined with Allen's
previous ownership of common, brings his owner-
ship to 48% and WorldCom's ownership to 37%.
WorldCom has further signed on as a reseller, and
contracted for $350 million worth of wholesale
time. This is a take or pay contract.

**\*32** Plaintiffs claim that this research report was
false and misleading because it did not disclose
"the third part of the strategic relationship that Met-
ricom would pay WorldCom $350 million over five
years to WorldCom for circuits and services."SAC
¶ 141. Plaintiffs assert that "[t]hat commercial real-
ity substantially reduced the Reseller revenue
stream and further eliminated any element of "take
or pay" on the estimated Revenue stream.

In its February 4, 2000, research report, Salomon
Smith Barney issued a "Buy" recommendation on

Metricom stock, stating its 18-month target price as
$121 per share, with "upside potential of 35%."
The Salomon report stated that the Ricochet high-
speed service "will be distributed under a wholesale
business model with MCI WorldCom, a 32% stra-
tegic equity investor, already signed up to distribute
the service."The report also stated
MCI WorldCom also has entered into an agreement
to become a channel partner, guaranteeing $388
million in revenue to Metricom over five years. The
marketing relationship is non-exclusive on both
sides. Additionally, MCI WorldCom will provide
circuit capacity and collocation services to the com-
pany on very favorable terms.

Plaintiffs allege that his report was false and mis-
leading because "there were no guaranteed revenu-
es to Metricom."SAC ¶ 142. They assert that the
referenced "circuit capacity" was being provided
under the third part of the strategic relationship and
the draft of the GSA, which was then being per-
formed. *Id.* They assert further that the GSA repres-
ented a guaranteed revenue commitment of $388
million from Metricom to WorldCom over the same
five-year term as the Reseller Agreement, even if
Metricom received no Reseller revenue from
WorldCom.

In its February 9, 2000, research report, Chase H &
Q issued a "Buy" recommendation on Metricom
stock. The report stated that Metricom "has a distri-
bution agreement with MCI WorldCom, which
owns 32% of Metricom. MCI WorldCom has guar-
anteed Metricom over $350 in sales over five
years."Plaintiffs allege that this statement was false
and misleading because "there were no guaranteed
revenues" and because the report did not disclose
"the third part of the strategic relationship," and
that Metricom and WorldCom, as of February 9,
2000, "are performing the [GSA], which represents
a total and guaranteed revenue commitment of $350
million from Metricom to WorldCom even if Met-
ricom received no Reseller revenue from
WorldCom."SAC ¶ 143.

In its February 15 and 17, 2000, research reports,
Lehman Brothers issued a "Buy" recommendation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for Metricom stock, raising its target price for $127 a share, and stating that the Reseller Agreement was a "take or pay contract." Plaintiffs allege that these reports were false and misleading because they omitted to disclose "the material facts of the third part of the strategic relationship," and did not state that "Metricom and WorldCom then were performing same under the drafts of the [GSA], which represented a total and guaranteed revenue commitment of $350 million from Metricom to WorldCom, even if Metricom received no Reseller revenue from WorldCom."

**\*33** In its March 8, 2000, research report, Merrill Lynch issued a "long-term Accumulate" and a "long-term Buy" recommendation, and set a 12- to 18-month target price of $100 per share. The report also described the Reseller Agreement as a "take or pay contract." SAC ¶ 145. Plaintiffs allege that this report was false and misleading because it omitted to disclose "the third part of the strategic relationship, and that Metricom and WorldCom were then performing same, under the drafts of the [GSA], which represented a total and guaranteed revenue commitment of $350 million from Metricom to WorldCom, even if Metricom received no Reseller revenue from WorldCom."SAC ¶ 146.

In its December 11, 2000, research report, Lehman Brothers stated that Metricom was "on track" for a move to faster modem speeds. SAC ¶ 146. Plaintiffs allege that this report was false and misleading because it omitted to disclose that "Metricom then was performing the [GSA], which represented a total and guaranteed revenue commitment of $350 million from Metricom to WorldCom, even if Metricom received no Reseller revenue from WorldCom."*Id.* Plaintiffs also assert that the report was misleading because it failed to disclose that, according to Metricom's internal business records, "installation of Circuits was 54% incomplete for the 11 specified 'Phase I Cities,' and 70% incomplete for the 10 specified 'Phase II Cities' as of December 14, 2000."*Id.*

In dismissing the FAC, the court found that the assertions that the analysts reports were false and

misleading were not sufficient to allege liability under the PSLRA, because the FAC did not plead particularized facts showing that the reports contained false or misleading statements. Specifically, the court noted that plaintiffs had pleaded no facts showing that the statement that WorldCom had "guaranteed" Metricom sales in excess of $350 was false, and had not adequately alleged the existence of a "repayment precondition" to WorldCom's obligation to perform under the Reseller Agreement. The court found further that the FAC did not allege with particularity any representations made by any Metricom defendant to any analyst, any entanglement between any Metricom defendant and any of the analysts or their reports, or any specific interaction between any Metricom defendant and any analyst.

The same deficiencies exist in the SAC. Plaintiffs allege no facts showing "entanglement" between the analysts and the individual defendants, apart from the claim that the underwriter defendants were responsible for the alleged misleading statements in the Prospectus Supplement. Plaintiffs allege no facts showing that the statements regarding WorldCom's agreement to resell $350 million in subscriptions to Metricom's high-speed service were false at the time they were made. Plaintiffs allege no facts showing that the GSA was in effect at the time the pre-October 2000 research reports were issued.

With regard to the December 2000 research report, plaintiffs have not explained what is false or misleading about the statement Metricom was "on track" to faster modem speeds. Plaintiffs assert that "internal business records contemporaneously created by Ms. Lilly" show that "installation of Circuits" was behind schedule. However, they plead no facts indicating that the Lehman Brothers analyst knew about this alleged delay, do not articulate any connection or communication between any individual defendant and any Lehman Brothers analyst, and do not provide any details of the Metricom internal documents that purport to reflect this delay (or even allege that any Lehman Brothers analyst had access to these documents).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF    Document 24-6    Filed 10/05/2007    Page 31 of 35

Not Reported in F.Supp.2d                                                    Page 31
Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

### b. Scienter

**\*34** Defendants argue that plaintiffs fail to plead with particularity facts giving rise to a strong inference of scienter, and that the allegations of scienter in the SAC consist almost entirely of boilerplate and conclusory allegations of intent to defraud aimed at the individual defendants as a group. To state a claim for securities fraud under the PSLRA, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *In re Vantive., 283 F.3d at 1085.*

Specifically, the complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness.*Id. at 1085.*Facts showing mere recklessness or a motive and opportunity to commit fraud are not sufficient to establish a strong inference of deliberate recklessness. Plaintiffs must come closer to alleging intent, as opposed to mere motive and opportunity. *In re Silicon Graphics, 183 F.3d at 974.* On a motion to dismiss, the court is also required to consider whether the totality of the plaintiffs' scienter allegations, even though individually lacking, are sufficient to create a strong inference that the defendants acted with deliberate or conscious recklessness, if not actual knowledge. *Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir.2002).*

Here, neither the allegations specifically relating to scienter nor the allegations taken in their totality are sufficient to plead that defendants had the state of mind required to establish securities fraud. First, defendants do not allege scienter as to each defendant individually.FN27Instead, scienter is asserted collectively as to "Dreisbach and the Vulcan defendants." For example, plaintiffs allege that Dreisbach and the Vulcan defendants "had a strong motive to suppress the truth about the lethal consequences of the Global Services Agreement" and "needed to keep Metricom's stock price trading as high as possible, SAC ¶ 177; that Dreisbach and the Vulcan defendants "were insiders who were engaged in active daily roles at Metricom" and who were "directly involved" in the negotiation and performance of the Stock Purchase Agreement, the Reseller Agreement, and the GSA, SAC ¶ 178; that Dreisbach and the Vulcan defendants "enjoyed complete access to the adverse non-public information about Metricom's on-going relationships with WorldCom," SAC ¶ 179; that Dreisbach and the Vulcan defendants "exercised plenary control over the receipt modification, and dissemination of all corporate information" concerning the Stock Purchase Agreement, the Reseller Agreement, and the GSA, SAC ¶ 180; and that Dreisbach and the Vulcan defendants "oversaw all of Metricom's commercial activity touching all matters concerning the development and deployment of Ricochet[2]," SAC ¶ 182.

> FN27. Indeed, the SAC does not attribute a single false or misleading statement to Savoy or Derrickson.

Plaintiffs also assert that Dreisbach and the Vulcan defendants "knew" that the reference in the June 21, 1999, press release to Metricom's plan to utilize WorldCom's high-speed data network referred to the GSA, SAC ¶ 184; "knew" that Metricom was the source of the information in Denise Pappalardo's June 28, 1999, article in "Network World," SAC ¶ 185; "knew" that the "Circuits and related telecommunications services covered by the [GSA]" were "needed urgently and instantly," SAC ¶ 186; "knew" that Metricom began ordering "Circuits" under the GSA beginning November 15, 1999, SAC ¶ 187; and "knew" that the charges on invoices Metricom began receiving in February 2000 "arose out of" the GSA, SAC ¶ 188.

**\*35** In the order dismissing the FAC, the court reminded plaintiffs that the PSLRA requires that the complaint allege, with respect to each alleged false or misleading statement, particularized facts creating a strong inference of deliberate or conscious recklessness as to each defendant. *See* 15 U.S.C. § 78u-4(b)(1), (2). The court found that the FAC did not allege facts which, taken as a whole, raised a strong inference that any single defendant "intentionally or with deliberate recklessness made false or misleading statements to investors."*Ron-*

*coni v. Larkin,* 253 F.3d 423, 437 (9th Cir.2001). The court noted, for example, that plaintiffs did not allege that any individual defendant ever made any inconsistent statements or had access to specific documents with information that was inconsistent with that defendant's public statements. The court also emphasized that conclusory assertions of actual knowledge are insufficient to satisfy the requirements of the PSLRA. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 539 (3d Cir.1999).

Nevertheless, in amending their complaint, plaintiffs in the SAC still plead no specific allegations of intentional conduct or deliberate recklessness as to *any individual defendant.* Nor do they allege that any individual defendant personally profited from Metricom's stock price, or even sold any shares of Metricom stock either on the open market or in the February offering. Moreover, they allege no contemporaneous statements or conditions that demonstrate the intentional or deliberately reckless false or misleading nature of the statements at the time they were made. Plaintiffs allege generally that the individual defendants had access to Metricom's internal records, but do not allege that any individual defendant received, reviewed, or had knowledge of any specific internal record that demonstrates that Dreisbach, Derrickson, or Savoy knew that any statement he made was false when made. The court finds that plaintiffs fail to allege specific facts giving rise to a strong inference that any of the individual defendants made a misleading statement knowing of its falsity.

Second, taken in their totality, the allegations do not create a strong inference of the requisite mental state. This is not surprising, as the SAC fails completely to allege that any defendant made a false or misleading statement. Plaintiffs claim that "Dreisbach and the Vulcan defendants" were motivated to "conceal" the GSA in order to keep the price of Metricom's stock as high as possible, because Metricom and Vulcan needed to raise huge amounts of additional capital. Under the law of the Ninth Circuit, however, mere "motive and opportunity" are insufficient to establish scienter. *Lipton,* 284 F.3d at 1034-35; *In re Silicon Graphics,* 183

F.3d at 974.

Moreover, as defendants correctly note, this theory makes no sense as applied to Vulcan, because Vulcan increased its exposure to Metricom during the proposed class period by investing $300 million, which negates, rather than raises, an inference of scienter. As numerous courts have recognized, the desire to raise capital is a generic motive held by all companies, and is therefore insufficient to establish scienter. *See, e.g., Lipton,* 284 F.3d at 1038 (routine business objective, such as desire to obtain favorable financing and to expand company, cannot normally be alleged as motivation for fraud); *see also In re PETsMART, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 998-99 (D.Ariz.1999).

#### 4. Claims of control-person violations

**\*36** The Ninth Circuit applies the same test for control person liability for purposes of § 15(a) of the 1933 Act as it does for § 20(a) of the 1934 Act. *See Durham,* 810 F.2d at 1503-04. The court finds that the claims for control-person liability, alleged against Vulcan, Savoy, Derrickson, and Dreisbach under § 15(a) of the 1933 Act and § 20(a) of the 1934 Act must be dismissed because the SAC does not state a claim for any primary violation.

### CONCLUSION

The SAC does not resolve the deficiencies inherent in the claims asserted by plaintiffs under the 1933 and 1934 Acts-specifically with regard to their allegation that defendants were required to disclose the GSA before its terms were finalized and/or before it was executed. With regard to the few statements that are not alleged to have been misleading because of lack of reference to the GSA-those that are alleged to have been misleading because they omitted to state that the build-out was behind schedule-plaintiffs have not pleaded fraud with particularity for the reasons stated in the order dismissing the FAC.

The court finds, taking the allegations in the SAC as a whole, that plaintiffs have failed to adequately allege that defendants made any false or misleading

Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

statements, have failed to plead violations of the 1933 Securities Act or the 1934 Securities Exchange Act with the requisite particularity, and have failed to plead factual allegations necessary to establish that defendants acted with the required state of mind. The motion to dismiss the SAC is GRANTED.

The court expended a great deal of time and effort on the motions to dismiss the FAC, carefully examining the FAC itself, reading and considering the four sets of motion papers-*twelve* memoranda of points and authorities-in addition to the extensive body of SEC filings, and researching the applicable statutes and regulations as well as numerous judicial opinions interpreting federal securities law. Based on this review, the court found that the FAC should be dismissed for failure to state a claim. The court then wrote a 63-page opinion, explaining in detail the reasons for its decision, and giving plaintiffs leave to amend. While plaintiffs made some attempt to comply with the court's instructions in drafting the SAC, they have also in large part simply repackaged the same objectionable allegations.

The SAC remains deficient for many of the same reasons as the FAC. In addition, plaintiffs' new theory-that the GSA, executed in October 1999, was the "third part" of a three-part "strategic relationship," and that WorldCom and Metricom began performing the GSA in November 1999-finds no support in the documents attached to the SAC and does not bear consideration. The court can only conclude that plaintiffs are incapable of stating a claim of violation of the securities laws with regard to their purchase of Metricom stock. Because the court finds that further amendment would be futile, the dismissal is WITH PREJUDICE.

**\*37** IT IS SO ORDERED.

### JUDGMENT

The court having granted the motions to dismiss the second amended complaint filed by defendants Timothy A. Dreisbach; Ralph Derrickson; William Savoy; Vulcan Ventures; Lehman Brothers, Inc.;

Solomon Smith Barney, Inc.; Merrill Lynch Pierce Fenner & Smith; Chase H & Q; and J.P. Morgan Securities, Inc.; and having dismissed the second amended complaint with prejudice,

It is Ordered and Adjudged that plaintiffs take nothing, and that the action be dismissed on the merits.

### CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on April 29, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Andrew M. Schatz

Schatz & Nobel PC

330 Main Street

2nd Floor

Hartford, CT 06106-1851

Christian A. Hatfield

Garvey Shubert & Barer

121 SW Morrison Street

11th Floor

Portland, OR 97204-3141

Christopher Lovell

Lovell Stewart Halebian LLP

500 Fifth Avenue

New York, N.Y. 10110

Daniel P. Lefler

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Irell & Manella LLP

1800 Avenue of the Stars

Suite 900

Los Angeles, CA 90067

David Siegel

Irell & Manella LLP

1800 Avenue of the Stars

Suite 900

Los Angeles, CA 90067

Elizabeth Walsh Walker

Dewey Ballantine LLP

333 S. Grand Avenue

Los Angeles, CA 90071

Jeffrey S. Nobel

Schatz & Nobel PC

330 Main Street

2nd Floor

Hartford, CT 06106-1851

Laura Caldera Taylor

Garvey Schubert Barer

121 S.W. Morrison Street

Portland, OR 97204-3141

Mark E. Friedman

Garvey Shubert & Barer

121 SW Morrison Street

11th Floor

Portland, OR 97204-3141

Merrick Scott Rayle

Lovell Stewart Halebian LLP

505 Montgomery Street

Suite 1138

San Francisco, CA 94111

Patrick A. Klingman

Schatz & Nobel PC

330 Main Street

2nd Floor

Hartford, CT 06106-1851

Peter Edward Root

Orrick Herrington & Sutcliffe LLP

Old Federal Reserve Bank Building

400 Sansome Street

San Francisco, CA 94111

Richard H. Zelichov

Irell & Manella LLP

1800 Avenue of the Stars

Suite 900

Los Angeles, CA 90067

Ronald K. Giller

Dewey Ballantine LLP

333 South Grand Avenue

26th Floor

Los Angeles, CA 90071-1530

Samuel Ray Miller

Folger Levin & Kahn LLP

Not Reported in F.Supp.2d, 2004 WL 966291 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

275 Battery Street

23rd Floor

San Francisco, CA 94111

William F. Alderman

Orrick Herrington & Sutcliffe

400 Sansome Street

San Francisco, CA 94111-3143

N.D.Cal.,2004.
In re Metricom Securities Litigation
Not Reported in F.Supp.2d, 2004 WL 966291
(N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.