LEXSEE 2007 U.S. DIST. LEXIS 27389

IN RE REDBACK NETWORKS, INC. SECURITIES LITIGATION. THIS DOCUMENT RELATES TO ALL ACTIONS.

Case Number C 03-5642 JF (HRL)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

2007 U.S. Dist. LEXIS 27389

**March 30, 2007, Decided**
**March 30, 2007, Filed**

**NOTICE:** [*1] NOT FOR CITATION

**COUNSEL:** For Robert W. Baker, Jr., individually and on behalf of all others similarly situated, Plaintiff: Robert A. Jigarjian, LEAD ATTORNEY, Robert S. Green, Green Welling LLP, San Francisco, CA; Charles H. Dufresne, Mark C. Gardy, Abbey Gardy, LLP, New York, NY; John P. Stigi, III, Sheppard, Mullin, Richter & Hampton LLP, Los Angeles, CA; Luke O Brooks, San Francisco, CA.

For Connecticut Retirement Plans and Trust Funds, Plaintiff: Lauren E. Wagner, LEAD ATTORNEY, John C. Kairis, Kimberly L. Wierzel, Stuart M. Grant, Marlon Quintanilla Paz, Grant & Eisenhofer, P.A., Wilmington, DE; Merrill G. Emerick, Anderlini, Finkelstein & Emerick, San Mateo, CA.

For Richard Wimble, Plaintiff: Robert S. Green, Green Welling LLP, San Francisco, CA.

For Prena Smajlaj, Plaintiff: Eric J. Belfi, LEAD ATTORNEY, Labaton Sucharow & Rudoff LLP, New York, NY; Marc Lawrence Godino, Glancy Binkow & Goldberg LLP, Los Angeles, CA.

For Bartnik Group, Plaintiff: Betsy C. Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA.

For Central States, Southeast and Southwest Areas Pension Fund, [*2] Plaintiff: Darren J. Robbins, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, CA; Luke O Brooks, San Francisco, CA.

For Thomas L. Cronan, Kevin A. DeNuccio, Pierre R. Lamond, Vinod Khosla, Vivek Ragavan, Dennis P. Wolf, William H. Kurtz, Dennis L. Barsema, Gaurav Garg, Craig M. Gentner, Promod Haque, Defendants: John P. Stigi, III, Sheppard, Mullin, Richter & Hampton LLP, Los Angeles, CA; Cameron Powers Hoffman, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For PricewaterhouseCoopers LLP, Defendant: Clinton Lynn Todd, Frederick Sexton Fields, Coblentz Patch Duffy & Bass, LLP, San Francisco, CA; LaShann M. DeArcy, Cravath Swaine & Moore LLP, New York, NY.

For Randall J. Kruep, Kruep, Randall J. Kruep, Randall J. Kruep, Randall J. Kruep, Defendants: Cameron Powers Hoffman, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For David Garden, Tom Gordon, Movants: Marc Lawrence Godino, Glancy Binkow & Goldberg LLP, Los Angeles, CA.

For Nimesh Patel, Movant: Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA.

**JUDGES:** JEREMY FOGEL, United States District Judge.

**OPINION BY:** JEREMY FOGEL

**OPINION**

ORDER [1] (1) GRANTING PWC'S MOTION TO

Case 5:07-cv-03444-JF   Document 24-7   Filed 10/05/2007   Page 2 of 7

Page 2
2007 U.S. Dist. LEXIS 27389, *2

DISMISS WITHOUT LEAVE TO [*3] AMEND; AND (2) GRANTING REDBACK DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

1   This disposition is not designated for publication and may not be cited.

[Doc. Nos. 232, 235]

In this securities fraud class action, Plaintiffs are suing a number of individual officers and directors of Redback Networks, Inc. (collectively, "the Redback Defendants") [2] and Redback's outside auditor, PricewaterhouseCoopers LLP ("PWC"). Both PWC and the Redback Defendants move to dismiss the operative fourth amended consolidated complaint ("FAC"). The Court has considered the briefing of the parties as well as the oral arguments presented at the hearing on September 15, 2006. For the reasons discussed below, the Court will grant PWC's motion without leave to amend and will grant the Redback Defendants' motion with leave to amend.

2   The Redback Defendants are Kevin DeNuccio, Pierre Lamond, Thomas Cronan III, Vinod Khosla, Dennis Wolf, Vivek Ragavan, Dennis Barsema, Gaurav Garg, William Kurtz, Craig Gentner, Promod Haque and Randall Kruep.

[*4] **I. BACKGROUND**

This is a securities class action suit brought by purchasers of stock in Redback Networks, Inc. ("Redback"), a telecommunications equipment provider headquartered in San Jose, California. Several parallel class actions have been consolidated into the instant action, and the Court has appointed the Connecticut Retirement Fund as lead plaintiff. Plaintiffs allege that Defendants engaged in a scheme to defraud the market that injured persons who purchased Redback stock during a four-year class period from November 27, 1999 through October 10, 2003.

The alleged scheme is described in great detail in this Court's prior order of March 20, 2006 ("March 2006 Order"), dismissing Plaintiffs' third amended consolidated complaint, and need not be set forth with particularity again here. *See* Order of 3/20/06, pp. 2-7. In brief, Plaintiffs allege that starting even before Redback's initial public offering, Redback in essence bought revenues from Qwest Communications International, Inc. ("Qwest") and others through bribery and *quid pro quo* arrangements and thus caused Redback's financial picture to look far better than it otherwise would have looked had Redback reported [*5] only revenues legitimately obtained. While Plaintiffs characterize the revenues resulting from the alleged bribery and *quid pro quo* arrangements as "improper" and "illegitimate," it is clear that the revenues were real in the sense that Redback actually sold products to Qwest and others and actually received the revenues stated in return. Plaintiffs' theory is that Redback's recognition of these revenues created a false impression that Redback was doing well financially, which impression caused the stock price to rise. Plaintiffs allege that class members purchased Redback stock at resulting inflated prices - the stock traded at well over $ 150 per share for most of the first year of the class period.

Plaintiffs allege that in June 2001 the improper sales to Qwest and others began to dry up, and "the truth started to become known regarding Redback's stagnant sales, lack of hard sales to back up previously-announced multi-million dollar agreements with Qwest and Williams, excess equipment and declining revenues." FAC P 234; *see also* P 452. Plaintiffs allege that as a result Redback's stock price fell from $ 11.31 per share to $ 8.64 per share. Based upon Plaintiff's own allegations, [*6] then, it appears that the vast majority of the stock's ultimate fall from the $ 150 per share at which it traded for the first year of the class period was *not* due to a cessation of the improper sales or to the "truth" beginning to come out. The stock already was trading at less than $ 12 per share when the improper sales that had allegedly been propping up the price started to dry up and when the "truth" started coming out.

Plaintiffs allege that Redback continued to announce lower revenues and lower expected revenues in July 2001 and thereafter, and that by September 2001 the stock price had dropped below $ 2 per share. FAC P 452. The stock price rallied up to approximately $ 4 per share in March 2002. However, that same month Qwest issued a press release announcing that it was under SEC investigation. FAC P 454. Qwest thereafter could not engage in further improper transactions with Redback, which caused Redback's sales to fall by more than 50% from Q1 2000. FAC P 456. Because of Redback's enormous decline in revenue, due in large part to the loss of Qwest sales, as well as the publicity surrounding the criminal investigation into Qwest, Redback's stock continued to slide until [*7] it fell below $ 1 in August

2002. FAC PP 457, 458.

Throughout the stock slide, Redback continually attributed its decline in revenues to "a current downturn in economic activity," and concealed the fact that the real reason for the decline was the loss of improper revenues from Qwest and others. FAC P 458. The truth of Redback's fraud was not revealed until October 2003. FAC P 462. It appears from the FAC that Redback's stock was trading below $ 1 a share in October 2003; Plaintiffs do not allege that the stock fell further upon the revelation of the "true extent of the fraud." *Id.* Redback filed a pre-packaged bankruptcy plan of reorganization under Chapter 11 in November 2003.

Plaintiffs assert the following claims against individual officers and directors of Redback and against Redback's outside auditor, PWC: (1) violation of *§ 10(b)* of the Securities and Exchange Act of 1934 ("Exchange Act") and *Rule 10b-5* promulgated thereunder; (2) violation of *§ 10(b)* of the Exchange Act and *Rule 10b-5(a)* and *(c)* promulgated thereunder; (3) violation of *§ 10(b)* of the Exchange Act and *Rule 10b-5* by means of insider trading; (4) violation of *§ 20A* of the Exchange Act by insider trading; [*8] (5) violation of *§ 18(a)* of the Exchange Act; and (6) control person liability under *§ 20(a)* of the Exchange Act.

## II. SECTION 10(b) CLAIMS

### A. PWC

PWC is named as a defendant only with respect to the § 10(b) claims. In its March 2006 Order, the Court concluded that Plaintiffs had failed to state a claim upon which relief may be granted with respect to PWC. March 2006 Order pp. 10-11. The Court set forth the standards applicable to claims against outside auditors under *§ 10(b)* and concluded as follows:

> Here, although Plaintiffs allege that PWC's audits of Redback's financial statements during the class period were not completed in accordance with generally accepted auditing standards ("GAAS") or generally accepted accounting principles ("GAAP"), it is clear from the face of the complaint that all of the sales at issue actually took place. This is not a case in which revenue was realized improperly or in which accounts had to be restated. To the extent that sales to Qwest should have been offset by purchases from Qwest, which seems to be Plaintiffs' primary contention *vis a vis* PWC, Plaintiffs fail to set forth facts giving rise to a strong inference [*9] that this or any other accounting violations were the result of intent or deliberate recklessness rather than negligence.

March 2006 Order p. 11. As far as the Court can discern, Plaintiffs have not amended their allegations against PWC at all. Plaintiffs appear to concede as much, and in essence request that the Court reconsider its prior ruling. Opp. p. 4. The Court declines to reconsider its prior ruling, and therefore will dismiss Plaintiffs' § 10(b) claims against PWC without leave to amend.

### B. Redback Defendants

*Section 10(b)* of the Exchange Act makes it unlawful for any person, by means of any instrumentality of interstate commerce, the mails, or any facility of any national securities exchange, to use or employ "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe" in connection with the purchase or sale of any security registered on a national securities exchange. *15 U.S.C. § 78j(b)*. *Rule 10b-5*, promulgated by the Securities and Exchange Commission ("SEC") under *§ 10(b)*, makes it unlawful to: (a) "employ any device, scheme or artifice to defraud"; (b) [*10] "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading"; or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." *17 C.F.R. § 240.10b-5*.

The United States Supreme Court has held that these provisions give rise to liability for two types of conduct: (1) the making of a material misstatement or omission or (2) the commission of a manipulative act. *Central Bank of Denver v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994)*. Plaintiffs allege a "fraud on the market" claim based upon Defendants' alleged material misstatements and omissions (first claim); a claim that Defendants

committed manipulative acts for which they are independently liable even absent misstatements and omissions (second claim); and a claim that Defendants committed manipulative acts by insider trading (third claim).

In its March 2006 Order, the Court concluded that a § 10(b) "manipulative [*11] act" claim cannot be asserted separately from a § 10(b) misstatements and omissions claim merely because the alleged misstatements and omissions were made in the context of an organized "scheme" to defraud. March 2006 Order p. 8. The Court stated that the thrust of Plaintiffs' § 10(b) claims is that the market was deceived into believing that Redback's revenues reflected the quality of Redback's products when in fact those successes were "bought" by means of bribes and *quid pro quo* arrangements. *Id.* The Court held that such claims properly are characterized as claims based upon misstatements or omissions under the "fraud on the market" theory. [3] Accordingly, despite Plaintiffs' attempt to characterize their second claim as a manipulative act claim rather than a misstatements and omissions claim, the Court concluded that claim 2 is duplicative of claim 1.

> 3  Under the fraud on the market theory, it is assumed that an investor who buys or sells stock at the price set by an efficient market does so in reliance on the integrity of that price. *Basic, Inc. v. Levinson, 485 U.S. 224, 247, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*. Because publicly available information is reflected in the market price, an investor's reliance on the price necessarily means that the investor is relying upon any public material misrepresentations or omissions. *Id.*

[*12] With respect to claim 3, alleging a § 10(b) claim based upon insider trading, the Court noted that insider trading may constitute a manipulative act for purposes of § 10(b) liability. *See United States v. O'Hagan, 521 U.S. 642, 652, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997)* (holding that an insider who trades on material, non-public information in breach of a fiduciary duty to the corporation may be held liable under *§ 10(b)* and *Rule 10b-5*). While the cases addressing insider trading sometimes refer to a "deceptive device" rather than a "manipulative act," *see id.,* liability under this theory is not based upon the making of a material misstatement or omission but upon the breach of the relationship of trust and confidence existing between a corporation's shareholders and persons who have obtained confidential information by reason of their position within that corporation, *id.*

The Court dismissed all three claims after concluding that they did not adequately allege loss causation as required under *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*. Specifically, the Court noted that the third amended complaint alleged that at the time the Qwest revenues dried up -- [*13] the occurrence that allegedly caused Redback's stock to drop more precipitously than it otherwise would have dropped as a result of the general market downturn when the dot.com bubble burst -- Redback's stock was trading at approximately $ 4 per share. March 2006 Order p. 10. The stock allegedly dropped below $ 1 per share based upon the loss of the Qwest revenues. *Id.* The Court concluded as follows:

> While Plaintiffs' allegations might support a claim that class members were injured by the drop from $ 4 to $ 1 per share, this does not appear to be the claim that Plaintiffs are making here. Based upon the extremely lengthy four-year class period, the chart depicting the stock price over that class period, and the arguments presented by Plaintiffs, it appears that Plaintiffs are claiming injury based upon the fact that class members purchased Redback stock at inflated prices well over $ 100 per share throughout the class period. The Court is at a loss to understand how Plaintiffs' injury for such purchases was *caused by* the alleged fraud when the stock price already had fallen to $ 4 per share before the Qwest revenues dried up and before the truth about the Qwest transactions [*14] were made public. *See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627, 1633, 161 L. Ed. 2d 577 (2005)* (holding that it is insufficient to allege that plaintiffs purchased stock at prices that were inflated as a result of defendants' fraud, and that plaintiffs must demonstrate loss causation, i.e., a causal connection between the material misrepresentation and the loss).

*Id.*

Plaintiffs have amended their complaint in an attempt to address the Court's concerns and, it seems, in an attempt to expand recoverable damages beyond the drop from $ 4 to $ 1 referenced by the Court in its prior order. As noted above, Plaintiffs now allege that the "truth" began coming out in June 2001, at which time Redback's stock was trading at a little more than $ 11 per share. FAC PP 234, 452. What is confusing about Plaintiff's allegations is that they simultaneously allege that Defendants *concealed* the true cause of Redback's revenue drop, i.e., the loss of Qwest revenues. FAC P 452(d). It appears that Plaintiffs are both trying to capture more damages by alleging that the "truth" began coming out at an earlier date than previously alleged, and trying to avoid [*15] the statute of limitations bar that would apply if Plaintiffs' claims accrued in June 2001. A claim under *Rule 10b-5* must be brought within two years after the discovery of facts constituting the violation. *28 U.S.C. § 1658(b)*. Plaintiffs cannot have it both ways. If the "truth" began coming out in 2001, Plaintiffs' § 10(b) claims appear to be time-barred. If the "truth" did not come out until later, as originally alleged, Plaintiff cannot capture damages for the greater stock drop.

The Court concludes that there are more fundamental problems with Plaintiffs' § 10(b) claims that warrant dismissal, however. Stripping away the bells and whistles of Plaintiffs' FAC, of which there are many (the FAC includes 533 paragraphs set forth over 192 pages), what Plaintiffs ultimately are alleging is that Redback's reporting of revenues from "improper" sales misled investors into believing that Redback stock was a better investment than it really was. However, although Plaintiffs characterize the sales in question as "improper" and "illegitimate," it is clear on the face of the complaint that the sales in question, and the resulting revenues, were *real.* However it [*16] obtained business from Qwest and other companies, Redback sold real products for real money. Plaintiffs have not cited, and the Court has not discovered, any cases holding that the accurate reporting of revenues can constitute the basis of a securities fraud claim. In all of the cases in which the reporting of revenues gave rise to a viable § 10(b) claim, there was either a restatement of revenues or the court determined that fraudulent revenue recognition had been pled. *See, e.g., In re AOL Time Warner, Inc. Sec. and ERISA Litig., 381 F.Supp.2d 192, 202 (S.D.N.Y. 2004)* (restatement); *In re Homestore.com, Inc. Sec. Litig., 252 F.Supp.2d 1018, 1020 (C.D. Cal. 2003)* (restatement); *In re Northpoint Communs. Group, Inc., Secs. Litig. & Consol. Cases, 221 F. Supp. 2d 1090, 1102 (N.D. Cal. 2002)* (fraudulent revenue recognition adequately alleged). In fact, at least one district court has held expressly that plaintiffs failed to state a claim for securities fraud based upon corporate defendants' accurate reporting of revenues while failing to disclose that those revenues were "boosted" by large one-time sales that would not recur, such that the future [*17] would not be as bright as the past. *In re Verifone Sec. Litig., 784 F.Supp. 1471, 1485 (N.D. Cal. 1992)*. In light of these decisions, and absent any decisions holding that the accurate reporting of revenues can give rise to a § 10(b) claim, the Court is not persuaded that Plaintiffs can state a viable claim based upon the facts alleged.

Even assuming that Plaintiffs could state a claim based upon the failure to disclose that certain revenues were the result of improper sales, the Court concludes that Plaintiffs again have failed to allege loss causation, at least with respect to the vast bulk of the damages they claim. In *Dura Pharmaceuticals,* the Supreme Court discussed the requirement that the alleged fraud *cause* the loss in the following passage:

> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward [*18] a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new

> industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

*Dura Pharmaceuticals, 544 U.S. at 342-43*. As discussed above, Plaintiffs allege that class members purchased Redback stock at prices as high as $ 150 per share during the first year of the class period, and that these prices were misleadingly "inflated" because the market did not know that Redback in effect was buying its revenues from Qwest and others through bribery and *quid pro quo* arrangements. Plaintiffs allege that the stock price began to fall in June [*19] 2001 when the "truth" began coming out. FAC PP 234, 452. However, at that time the stock *already had fallen to less than $ 12 per share*. Based upon Plaintiffs' own allegations, the fall from $ 150 to $ 12 cannot be attributed to the alleged fraud. Moreover, while they allege that the "truth" began coming out in June 2001, Plaintiffs clearly do not mean the "truth" about the allegedly improper sales to Qwest and others, because Plaintiffs simultaneously allege that Defendants *concealed* that the true cause of Redback's revenue drop was the loss of Qwest revenues. FAC P 452(d). Plaintiffs allege that concealed facts -- that is, the improper nature of the sales to Qwest and others -- did not come out until October 2003. At that time Redback's stock was trading below $ 1 per share. Accordingly, it appears that only a negligible portion of the dramatic stock drop described in the FAC was *caused* by the alleged fraud.

Given these defects in Plaintiffs' TAC, the Court will dismiss the § 10(b) claims against the Redback Defendants once again. As the Redback Defendants point out, Plaintiffs have been afforded numerous opportunities to allege a viable § 10(b) claim and have failed [*20] to do so. However, in light of the liberal standard for amendment in securities fraud cases, *see Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*, and the complexity of the issues presented by Plaintiffs' theory of liability, the Court will grant Plaintiffs one final opportunity to allege a viable § 10(b) claim. The Court emphasizes that further leave to amend these allegations will not be granted. It would be helpful to the Court's understanding of Plaintiffs' theory if they would clearly allege what portion of the stock drop they believe was caused by the alleged fraud. It also would be helpful if Plaintiffs would streamline their amended pleading by omitting their second claim, which the Court has found duplicative of their first claim, and by shortening the amended pleading in any other manner that may be appropriate. [4]

> 4  In light of the Court's disposition of the Redback Defendants' motion, the Court need not reach additional issues raised by the motion regarding the adequacy of Plaintiffs' scienter allegations and the viability of the group pleading doctrine.

[*21] **III. SECTION 20A CLAIM**

Plaintiffs' fourth claim is asserted under *§ 20A* of the Exchange Act, which imposes liability on any person who violates the Act or the rules and regulations promulgated thereunder by trading on securities while in possession of material, non-public information. *15 U.S.C. § 78t-1(a)*. A § 20A claim may be brought by any person who traded contemporaneously with the person possessing material, non-public information. *15 U.S.C. § 78t-1(a)*. Claims under *§ 20A* are derivative, and require proof of a separate underlying violation (a "predicate violation") of the Exchange Act. *In re VeriFone Sec. Litig., 11 F.3d 865, 872 (9th Cir. 1993)*.

As discussed above, Plaintiffs have failed to allege a predicate violation of the Exchange Act, and thus their § 20A claim is subject to dismissal. Because the § 20A claim is subject to dismissal on other grounds, the Court defers consideration of the contemporaneous trading requirement and other issues raised by Defendants' motion.

**IV. SECTION 18 CLAIM**

Plaintiffs' fifth claim is asserted under *§ 18* of the Exchange Act. The elements of a *§ 18* claim [*22] are: (1) a misrepresentation or omission (2) of a material fact (3) contained in an SEC filing (4) upon which the plaintiff relied in the purchase of a security. *15 U.S.C. § 78r(a)*. Scienter is not an element of a *§ 18* claim. *See Howard v. Everex Systems, Inc., 228 F.3d 1057, 1062 (9th Cir. 2000)* (discussing differences between claims under *§ 10(b)* and *§ 18*). Nonetheless, the heightened pleading standard applicable to alleging a material misrepresentation or omission must be met in § 18 cases. *Cyber Media Group, Inc. v. Island Mortgage Network, Inc., 183 F.Supp.2d 559, 577 (E.D.N.Y. 2002)*. Moreover, a plaintiff suing under *§ 18* must demonstrate *actual* reliance on the fraudulent statement, and may not rely upon the "fraud on the market" theory that is available

under *§ 10(b). Howard, 228 F.3d at 1062*.

Plaintiffs' § 18 claim is based upon the same theory as their § 10(b) claim, with the exception that the alleged misrepresentations and omissions regarding Redback's revenues are limited to those statements set forth in Redback's SEC filings. The Court will dismiss the § 18 claim with leave to amend [*23] for the reasons set forth in section II above. [5]

> 5   The Court once again defers the question of whether a § 18 claim may be maintained as a class claim until such time as Plaintiffs otherwise allege a viable § 18 claim.

### V. SECTION 20(a) CLAIM

Finally, Plaintiffs allege that a number of the Redback Defendants are control persons under *§ 20(a)* of the Exchange Act. That section imposes joint and several liability on any "person who, directly or indirectly, controls any person liable" for securities fraud, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violations. *15 U.S.C. § 78t(a)*. Because Plaintiffs have failed to allege a viable claim of securities fraud, there is no basis for asserting controlling person liability under *§ 20(a)*.

### IV. ORDER

(1) PWC's motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND;

(2) The Redback Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND;

(3) Any amended class [*24] action complaint shall be filed and served within sixty (60) days after service of this order. In light of the numerous opportunities Plaintiffs have been afforded to plead a viable claim, further leave to amend the allegations regarding loss causation and other aspects of the claims addressed in this order will not be granted.

DATED: 3/30/07

JEREMY FOGEL

United States District Judge