Not Reported in F.Supp.  Page 1
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

May v. Borick
C.D.Cal.,1997.

United States District Court,C.D. California.
MAY
v.
BORICK
**No. CV 95-8407 LGB (EX).**

March 3, 1997.
BAIRD.

### I. INTRODUCTION

**\*1** Defendants' Motion to Dismiss Amended Complaint came on regularly for hearing on February 24, 1997. Having reviewed all pertinent papers on file and considered the oral argument of counsel, the Court hereby GRANTS Defendants' Motion and DISMISSES the First Amended Complaint WITH PREJUDICE for the reasons set forth below.

### II. PROCEDURAL HISTORY

Named plaintiff Barry May brings this class action on behalf of himself and all other purchasers of Superior Industries International, Inc. ("Superior") common stock between March 31, 1995 and September 7, 1995 (the "Class Period"). He alleges that Superior and its senior officers and directors defrauded purchasers of Superior's stock by making false statements about Superior's business. Plaintiff brings this action pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a). He names as defendants Louis Borick, Steven Borick, Raymond Brown, R. Jeffrey Ornstein, Henry C. Maldini, Charles Barrantes, Morris Herstein, and Superior.

Louis Borick, Brown, Ornstein, Maldini, Dryden, Barrantes, Herstein and Superior filed a motion to dismiss the initial Complaint. Former defendants Juanita Borick, Steven Borick, and Iftikhar Kazmi joined in the first motion to dismiss and filed a separate motion to dismiss. Both motions were made pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), for failure to state a claim upon which relief may be granted, and, alternatively, pursuant to Rule 9(b) for failure to plead fraud with particularity. By Order entered June 3, 1996, the Court dismissed the Complaint without prejudice pursuant to Rule 9(b). The Court gave Plaintiff thirty days to file an Amended Complaint.

On June 10, 1996, Defendants moved to stay discovery and for a protective order.

On July 1, 1996, Plaintiff timely filed a First Amended Complaint.[FN1] Therein, Plaintiff alleges one count of violations of Sections 19(b) and 20(a) of the Exchange Act and Rule 10b-5 against all defendants. (First Am.Compl. ¶¶ 73-79.) Plaintiff seeks a declaration that his action is a class action, compensatory damages and interest, attorney's fees and costs, and the imposition of a constructive trust on the proceeds of Defendants' trading activities. (*Id.* Prayer for Relief, at 74-75.)

On July 9, 1996, the Court granted the motion for stay, staying discovery until thirty days after the answer was filed.

Currently before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6) or, in the alternative, Rule 9(b), filed on August 9, 1996. The motion is fully briefed.

### III. FACTUAL BACKGROUND

The following acts are alleged in the Complaint or are established in documents which the Court may consider under Rule 12(b)(6).[FN2]

Superior manufactures cast aluminum road wheels for vehicles for original equipment manufacturers ("OEM"). (App.Ex. 1 at 2.) In 1994, cast aluminum wheels accounted for 91.4% of Superior's net sales, and "aftermarket" products (custom road wheels and accessories) accounted for 8.6% of net sales. (*Id.*) Approximately 88% of Superior's 1994 sales were made to Ford and General Motors, Inc. ( *Id.* at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

Case 5:07-cv-03444-JF   Document 24-9   Filed 10/05/2007   Page 2 of 14

3.) Superior operates six OEM manufacturing facilities in Fayetteville and Rogers, Arkansas; California; Kansas; Tennessee; and Chihuahua, Mexico. (*Id.* at 6.)

**\*2** Louis Borick is President and Chairman of the Board of Directors of Superior. (First Am.Compl. ¶ 16(a).) Steven Borick is the son of Louis Borick and a director of Superior. (*Id.* ¶ 16(b).) Brown is Senior Vice-President and a member of its Board of Directors. (*Id.* ¶ 16(c).) Ornstein is Vice-President and Chief Financial Officer and a member of the Board of Directors. (*Id.* ¶ 16(d).) Maldini is Vice President for Engineering. (*Id.* ¶ 16(e).) Dryden Vice-President for International Business development. (*Id.* ¶ 16(f).) Hernstein is Vice President for Services. (*Id.* ¶ 16(h).) Barrantes is Controller. (*Id.* ¶ 16(g).)

During 1993 and 1994, Superior reported quarterly earnings that showed increases sequentially and when compared to like period in the prior year. (First Am.Compl. ¶ 2.)

Nevertheless, Superior's stock price fell from a high of $46 1/4 in January 1994 to $23 3/4 in mid-March 1995. (First Am.Compl. ¶ 2.) Plaintiff alleges that this decrease in stock price eroded the value of Superior stock held by insiders and threatened to eliminate the value of stock options they held.[FN3] (*Id.*) Plaintiff claims that Defendants were determined to raise the value of Superior stock. (*Id.*)

Initially, Plaintiff claims, Defendants attempted to stem the decline in Superior's stock by using Superior's corporate funds to engage in a massive open-market buy-back of Superior stock, hoping this would support the stock. (First Am.Compl. ¶ 3.) However, Defendants had to abandon the effort because Superior did not have sufficient cash to permit it to continue to buy back large amounts of its common stock on the open market. (*Id.*)

Allegedly, in order to drive up the value of Superior stock, Defendants made a series of false statements regarding (1) Superior's business; (2) Superior's plant utilization rate; (3) the start-up of Superior's chrome-plating facility in Arkansas; (4) the demand and orders for Superior's products; (5) the quality of its management team; and (6) its future business and earnings prospects. (First Am.Compl. ¶ 3.)[FN4]

On February 3, 1995, Superior issued a press release which reflected its strong performance in 1994 and mentioned that Superior's "backlog of orders gives us confidence in our growth momentum through 1995." (First Am.Compl. ¶ 28.)

On March 31, 1995, Superior filed its 1994 10-K and issued its 1994 annual Report to Shareholders. (*See* First Am.Compl. ¶¶ 31-35.) Superior stated in the 10-K that its new chrome-plating facility was "now ramping-up production." (*Id.* ¶ 31.) In the 1994 Annual Report, Chairman Louis Borick stated that Superior was "poised for continued growth." (*Id.* ¶ 33.) He stated that "[o]ur operations in Mexico will be at full capacity." (*Id.*) He also stated that Superior's management team had done an excellent job of improving manufacturing efficiency and plaint utilization. (*Id.*)

**\*3** From April 3-7, 1995, a number of analysts published articles in which they repeated similar allegedly misleading statements made by various defendants regarding Superior. (First Am.Compl. ¶¶ 36-38.)

On April 11, 1995, Superior reported strong earnings for the first quarter of 1995. (First Am.Compl. ¶ 39.) The company reported increases over the first quarter of 1994 of 26% in income and 29% in earnings per share. (*Id.*) The Chairman stated that order levels for cast-aluminum wheels remained "at a good pace." (*Id.*) Shortly thereafter, Superior delivered its first quarter Report to Shareholders, in which Louis Borick stated that orders for aluminum wheels continued at an "Excellent" pace. (*Id.* ¶ 47.)

Following the report of the first quarter results, Superior officers held a conference call and follow up conversations with securities analysts in which the officers made positive statements about Superior's prospects. (First Am.Compl. ¶ 40.) From April 11-25, 1995, several securities analysts issued favorable reports on Superior based on the conference

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-9   Filed 10/05/2007   Page 3 of 14

Page 3

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

call and follow up conversations. (*Id.* ¶ 41.)

In mid-May 1995, certain analysts lowered their forecasts of Superior's earnings by about 5-6 cents per share due to weaker than anticipated sales of cars in the North American market. (First Am.Compl. ¶ 48.)

On May 19, 1995, Superior issued a press release announcing an increase in its cash dividend. (First Am.Compl. ¶ 49.) Therein, Louis Borick stated: "These actions demonstrate our confidence in Superior's fundamental strength, unparalleled infrastructure, and continued growth." (*Id.*)

During June 1995, several analysts issued positive forecasts for Superior. (First Am.Compl. ¶¶ 50-52.)

On July 6, 1995, Plaintiff purchased 100 shares of Superior common stock at $32 3/8 per share. (First Am.Compl. ¶ 14.)

On July 13, 1995, Superior reported strong second quarter results, with net income and earnings per share increasing. (First Am.Compl. ¶ 53.) In the press release, the Chairman described "consistent order levels." (*Id.*)

Following the report on the second quarter of 1995, Superior officers held a conference call and follow up conversations with securities analysts in which the officers made positive statements about Superior's prospects. (First Am.Compl. ¶ 54.) On July 14, 1995, several analysts issued favorable reports on Superior based on the conference call and follow up conversations. (*Id.* ¶¶ 55.) The reports included earnings per share predictions for the third and fourth quarters of 1995, all of 1995, and 1996. (*Id.*)

Shortly after the release of the results for the second quarter of 1995, Superior reported the results to shareholders. (First Am.Compl. ¶ 56.) In the accompanying letter, the Chairman referred to orders as continuing at a good rate despite some softening of auto sales, and to "anticipated progress" in the production capabilities of the chrome-plating facility. (*Id.*) The Chairman stated that he "believe[d] that the Company will have a solid second half resulting in another record year in 1995." (*Id.*)

**\*4** On July 19, 1995, one securities analyst issued a report which forecast increased earnings in the third quarter of 1995, but noted that the forecasts had been adjusted downward from earlier predictions of larger increases due to "a delay in beginning volume production of chrome plated wheels." (First Am.Compl. ¶ 57.) On July 20, 1995, another analyst issued a positive report on Superior's prospects. (*Id.* ¶ 58.)

These allegedly misleading positive statements drove Superior's stock to a Class Period high of $35 1/2 per share on July 26, 1995. (First Am.Compl. ¶ 4.) Defendants took advantage of the rise in Superior stock prices, which resulted from the above-described misrepresentations, to sell Superior stock. (*Id.* ¶ 5.)

In late July and August 1995, superior stock prices declined. (First Am.Compl. ¶¶ 6, 61.) Plaintiff alleges that the cause of the decline was concerns in the investment community that a general slowing of production of automobiles in North America would affect Superior because of the failure of Superior's Arkansas chrome-plating facility to come on line as promised. (*Id.* ¶ 6.) Plaintiff also alleges that the ''decline in demand for United States automobile sales" had a "significant and material adverse impact on Superior." (*Id.* ¶ 65.) However, Plaintiff claims, despite this decline, Superior's stock continued to trade at artificially inflated levels throughout the balance of the Class Period because of Defendant's statements as described above. (*Id.* ¶¶ 6, 61.)

On August 7, 1995, one securities firm reported that "[a]fter a slower than expected ramp-up, Superior's brand new chrome-plating facility appears to be on track to make significant contribution to earnings beginning in 1996. (First Am.Compl. ¶ 59.) On August 9, 1995, another firm lowered its forecasts for Superior's 1995 and 1996 earnings per share becaue of concerns that the overall vehicle build rate had decreased from prior estimates. (*Id.* ¶ 60.) That firm also indicated that the chrome-plat-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-9   Filed 10/05/2007   Page 4 of 14

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

ing facility "should begin operating in the late 1995." (*Id.*)

During the second half of August 1995, information reached the marketplace that Superior's third and fourth quarter earnings per share would be less than anticipated due to soft automobile production and continued start-up costs at its chrome-plating facility. (First Am.Compl. ¶ 61.)

On September 7 or 8, 1995,[FN5] prior to the end of the third quarter, Superior announced that it expected its third quarter 1995, fourth quarter 1995, and 1996 earnings to be well below the levels previously forecast for and by it. (First Am.Compl. ¶ 6) Superior also announced that it would have to lay-off 10% of its workforce, its first layoff ever. (*Id.*.)

Later, Superior reported third quarter 1995 earnings per share far below the levels earlier forecast, and indicated that demand for its products remained soft and that production in its chrome-plating facility continued to be delayed. (First Am.Compl. ¶ 7.)

**\*5** During the Class Period, various individual defendants old share of Superior stock. (First Am.Compl. ¶ 64.) These insiders engaged in the majority of their sales in August and September 1995 prior to the disclosure of adverse information about Superior. (*Id.* ¶¶ 64, 69.)[FN6]

The positive statements made by Defendants during the Class Period described above were misleading when made because they failed to disclose that:
(1) Superior's plant utilization rate was declining due to weakening demand for its products and slowing orders from its customers, resulting in operational and production inefficiencies;
(2) Demand for Superior's products was softening, and Superior had received indications from certain of its large customers that they intended to defer, stretch out, or cancel certain orders for Superior's products;
(3) As a result of slowing orders, Superior's backlog of orders was shrinking, and Superior's plant utilization rate was declining, adversely affecting its profit margins and results from operation;
(4) Superior was encountering persistent problems with computer hardware and software at its Arkansas facility which controlled the production of aluminum wheels, and these problems were contributing to a declining utilization rate of that facility;
(5) Superior was encountering persistent problems with the waste treatment facility at its aluminum wheel chrome-plating facility in Arkansas, and these unremediable problems were preventing the facility from commencing production, and would ultimately necessitate the ordering of a new waste treatment facility which delayed the start of production at the chrome-plating facility well into 1996;
(6) Because of softening demand and declining orders, Superior was accumulating excess inventory of chrome wheels for the OEM market, which would require it to cut prices in order to sell off the excessive inventory;
(7) Superior was suffering from serious management incompetence in several parts of its operations, including the Arkansas facility;
(8) Due to problems with the Mexican peso, Superior's Mexico plant had suffered a sharp decline in demand for the product it produced, and this decline was not surmounted by attempts to shift production of items usually made in Superior's U.S. plants to the Mexico plant. This resulted in significant operational inefficiencies and low utilization rates of the Mexico plant.

(First Am.Compl. ¶¶ 4, 71.)

### IV. ANALYSIS

Defendants move to dismiss the First Amended Complaint pursuant to Rule 12(b)(6) and Rule 9(b). When a fraud is pled with particularity as required by Rule 9(b), analysis of the sufficiency of the complaint for purposes of Rule 12(b)(6) becomes simpler. Thus, the Court first addresses the sufficiency of the complaint under Rule 9(b).

#### A. The requirements of Rule 9(b) and Securities Fraud Claims

Rule 9(b) provides:
Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or shall be stated with particularity.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF     Document 24-9     Filed 10/05/2007     Page 5 of 14

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

**\*6** Fed.R.Civ.P. 9(b). Rule 9(b) requires particularized allegations of the circumstances constituting fraud. *In re Glenfed, Inc. Sec.Lit.,* 42 F.3d 1541, 1547 (9th Cir.1994) (en banc).

To state a securities fraud claim under Section 10(b) of the Securities Exchange Act and rule 10b-5 promulgated thereunder, a plaintiff must allege that the defendants made (1) a misstatement or omission of material fact, (2) with scienter, (3) upon which plaintiff relied, and (4) which caused injury to the plaintiff. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231 (1988).[FN7]

The mere fact that an optimistic prediction is not borne out over time does not suffice to establish securities fraud:

What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating drop in stock price). Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product, a shift in consumer demand, the appearance of a new competitor, or a major lawsuit. When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood. In the face of such intervening events, *a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made.* This can be done most directly by pointing to inconsistent contemporaneous statements of information (such as internal reports) which were made by or available to the defendants....

... There may be situations in which what separates the allegedly fraudulent statement and the later, apparently inconsistent statement is an event internal to the company, such as the revaluation of assets, or the recalculation of loan loss reserves. In such a situation, explanation as to why the statements were false when made might be provided simply by pointing to the later statement-but without additional explanation the mere existence of the later statements might not be enough ...*[The] plaintiff would generally be required to elaborate circumstances contemporary to the alleged false statement to explain how and why the statement was misleading when made.*The fact than an allegedly fraudulent statement and a later statement are *different* does not necessarily amount to an explanation as to why the earlier statement was false.

*Glenfed,* 42 F.3d at 1549 (first emphasis added, except for ''when made''; second emphasis added; third emphasis in original; footnote omitted).

**\*7** "For purposes of Rule 9(b), allegations of specific problems undermining a defendant's optimistic claims suffice to explain *how* the claims were false." *Fecht v. The Price Co.,* 70 F.3d 1078, 1083 (9th Cir.1995), *cert. denied,* 517 U.S. 1136, 116 S.Ct. 1422 (1996) (emphasis in original). Nevertheless, securities fraud pleadings must make specific allegations demonstrating that the defendants' statements were fraudulent when made:

In a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer. This notice requirement is satisfied by allegations of time, place, and nature of the alleged fraudulent activities. When a fraudulent statement is alleged, the plaintiff must set forth what is false or misleading about the statement and why it is false. In other words, the plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made.*

Id. at 1082 (citations and quotations marks omitted) (emphasis in original). "The time, place, and con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-9   Filed 10/05/2007   Page 6 of 14

Not Reported in F.Supp. Page 6
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

tent of an alleged misrepresentation may identify the statement or the omission complaint of, but these circumstances do not 'constitute fraud.' " *Glenfed,* 42 F.3d at 1547-48. Contradictory contemporaneous statements provide the "most direct [ ]" means to satisfy the requirements of Rule 9(b). *Glenfed,* 42 F.3d at 1549; *Zeid v. Kimberley,* 930 F.Supp. 431, 434 (N.D.Cal.1996) (citing *Glenfed*).FN8

To satisfy Rule 9(b), a plaintiff must plead "evidentiary facts," and the court must then consider what inferences these facts will support-despite the pitfalls and inefficiencies of such an analysis at the pleading stage. *Fecht,* 70 F.3d at 1083. A plaintiff may satisfy Rule 9(b) with allegations of circumstantial evidence if the circumstantial evidence alleged explains how and why the statement was misleading when made. *Id.* However, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Syntex Corp. Sec.Litig.,* 95 F.3d 922, 926 (9th Cir.1996).

### C. Application

#### 1. Order Dismissing Initial Complaint

In its Order dismissing the initial Complaint, the Court made clear why the Complaint failed to satisfy Rule 9(b) and indicated how an amended pleading could rectify the Complaint's shortcomings:

[T]he Complaint's organization compounds its Rule 9(b) failings. Plaintiff provides twenty five pages of statements made over more than a year on a variety of topics, followed by the infamous paragraph 61. In *Glenfed,* the court stated:

These various discrete deficiencies are not the only problems with the complaint. The complaint is unwieldy in the extreme. It is 113 pages long, and often rambles through long stretches of material quoted from defendant's public statements (many of which seem innocuous enough even by plaintiff's recounting) unpunctuated by any specific ''reasons for falsity"-which, indeed, prove difficult to locate in the surrounding area. This is, in the very least, poor draftsmanship. It is impossible to overlook the fact that the organization of the complaint often makes the nature of the fraud difficult to divine, and certainly makes the complaint difficult to respond to.... A complaint is not a puzzle ... and we are loathe to allow plaintiffs to tax defendants, against whom they have levelled very serious charges, with the burden of solving puzzles in addition to the burden of formulating an answer to their complaint.

***8** ....

We see nothing to prevent the district court, on remand, from requiring as a matter of prudent case management that plaintiff streamline and reorganize the complaint ...*Glenfed.* 42 F.3d at 1554. While the Complaint before the Court is not 113 pages long, and seems to be drafted thoughtfully, its organization obfuscates rather than clarifies. Plaintiff's failure to address defendants' allegedly misleading statements individually, or even by category, and to state why each statement, or category of statements is misleading, renders this Court's task, and the task of the defendants, excessively difficult.

(Order entered June 3, 1996 at 18-20).

#### Failure to Plead Adequately in the First Amended Complaint

In the First Amended Complaint, Plaintiff has added fourteen pages to the initial Complaint, bringing the total to 76. However, Plaintiff has made only marginal improvements, if any.

As he did in his initial Complaint, Plaintiff, in the First Amended Complaint, merely sets out separate lists of the allegedly false or misleading statements, made by analysts as well as Defendants, (First Am.Compl. ¶¶ 3, 27-41, 49, 53, 54), and of the information whose omission allegedly rendered the statements false or misleading, (*id.* ¶¶ 4, 6, 42, 62). He then, as before, claims, in a conclusory fasion, that Defendants committed securities fraud. The only real change is that Plaintiff repeats each list several times, and repeats a list of subjects about which Defendants made allegedly false or misleading statements, (*Id.* ¶¶ 46, 63, 71). Plaintiff again

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-9   Filed 10/05/2007   Page 7 of 14

Not Reported in F.Supp. Page 7
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

fails to specify, for any individual statement, how and why it was fraudulent or misleading *at the time it was made,* leaving Defendants and the Court to piece together Plaintiff's claims with regard to particular statements.[FN9]

In *In re Syntex Corp. Sec.Litig., 95 F.3d 922 (9th Cir.1996),* the Ninth Circuit described the complaint as follows:
Many of the allegations in the 103 page Complaint were stated (and repeated) in general terms. However, the challenged statements must be examined in light of when they were made, what knowledge the company had at that particular time, who made the statement, etc. Plaintiffs make this an almost impossible task by repeating general allegations, mixing together allegations about Defendants' statements and analysts' statements, and omitting pertinent parts of the challenged statements. We note that this litigation tactic, which makes it difficult for courts to sort through and determine the merits of a claim, affronts Rule 8's mandate of a "short and plain statement of the claim."

*Id.* at 932 n. 9. That exactly describes the Complaint and First Amended Complaint in this case.

In its Order dismissing the initial Complaint, the Court pointed out to Plaintiff the shortcomings of the Complaint regarding the pleading of dates. Nevertheless, Plaintiff has not, presumably because he cannot, alleged contemporaneous contradictory statements. Plaintiff has responded merely by repeating, like a mantra, that Defendants knew negative "inside" information as of March 31, 1995. That, of course, is the date on which Superior filed its 10-K and made its Annual Report to Shareholders. Plaintiff does not allege in the First Amended Complaint that on March 31, 1995, or on any specified date prior to that date, any particular negative circumstance arise or Superior or its officers learned of any particular negative date concerning Superior's financial health. Yet, it is the only date Plaintiff alleges in relation to the timing of Defendants made their earliest optimistic public statement, that is the date by which they already knew negative information." By working backwards from the date of a public statement to the alleged acquisition of relevant negative information, Plaintiff seeks to avoid the specificity requirements for pleading securities fraud.

**\*9** In the First Amended Complaint, Plaintiff fails to allege with any specificity when any undisclosed negative development or circumstance began and when Defendants learned of the development or circumstance, including the delays in ramping up at the chrome-plating facility, the decline in demand, the underutilisation of the Mexican plant, and others.[FN10] Because of that failing, Plaintiff appears simply to be pleading with hindsight, affixing the date of the 10-K and the Annual Report as the date on which Defendants knew information that rendered those documents false and misleading.[FN11] The failing is highlighted by the fact that the March 31, 1995 statements came in reports on a record year (1994) for Superior and at the end of a positive first quarter of 1995, in which the company's income and earnings both increased over the first quarter of 1994.

In addition, the allegation that certain statements were false and misleading is undercut by the context in which those statements appeared. For example, Plaintiff alleges that Superior reported significant growth in earnings for 1994 and for the first and second quarters of 1995, and Plaintiff does not dispute the truth of those reports. (First Am.Compl. ¶¶ 2, 39, 52.) Nevertheless, Plaintiff includes in the litany of allegedly actionable statements positive comments made in and around those quarters. The following are samples:
(1) a prediction of an annual growth rate of "15% to perhaps 20% in good years over the next three to five years," in November 14, 1994 *Dow Jones Newswire* story, (First Am.Compl. ¶ 27);
(2) the statement that "our backlog of orders gives us confidence in our growth momentum through 1995," in a February 3, 1995 press release from Superior and at a subsequent conference call with securities analysts, (*id.* ¶ 28);
(3) favorable comments to securities analysts at a conference call and follow-up conversations held later on February 3, 1996, (*id.* ¶ 29);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-9   Filed 10/05/2007   Page 8 of 14

Not Reported in F.Supp. Page 8
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

(4) Superior's 1994 Form 10-K, filed March 31, 1995, in which Superior touted its new chrome-plating facility, (*id.* ¶ 31); and

(5) Superior's 1994 Annual Report to Shareholders, issued March 31, 1995, in which the company reported continuous growth in revenues, net income, and earnings per share over the previous years, (*id.* ¶ 32).

Plaintiff fails to refute Defendants' legal argument, supported by case law, that optimistic forecasts that accompany accurate historical data cannot alone support a claim for securities fraud. *See Siegel, 1996 WL 438793, at \*7* (optimistic statements expressing pleasure with company's performance made in press releases that also disclosed actual financial results experienced by company did not have serious potential to mislead investing public and so were not actionable as securities fraud). Here, Plaintiff acknowledges that 1994 was a ''record'' year for Superior. (Pl.'s Opp. at 17.) Absent specific allegations of the dates on which Defendants learned of the negative information and allegations that those dates preceded the dates of the allegedly actionable statements, even a generous reading of the First Amended Complaint points only to the conclusion that these statements were optimistic predictions accompanying positive data, which predictions were later not borne out. *See GlenFed, 42 F.3d at 1549.*[FN12]

**\*10** As Defendants point out, Plaintiff alleges, in essence, that Defendants failed to "disclose," prior to the third quarter of 1995, that the profitability of Superior's cast-aluminum wheel business would decline severely in the third quarter. That, however, amounts to an allegation that Defendant failed, during a time of strong earnings, to forecast that the company's prospects for the future might be worse. The Ninth Circuit has held that such a failing does not amount to securities fraud. *In re VeriFone Sec. Litig., 11 F.3d 865, 869 (9th Cir.1993)* (" [T]he failure to disclose non-existing internal forecasts is not a material omission that renders forward-looking statements misleading."); *see also Syntex, 95 F.3d at 928, 934; In re Stac Elec. Sec. Litig., 89 F.3d 1399, 1406-07 (9th Cir.1996); In re Lyondell Petro-chemical Co. Sec. Litig., 984 F.2d 1050, 1053 (9th Cir.1993)* (no duty to disclose internal projections that are not based on negative factors known only to the company).

As well, Plaintiff fails to explain away the occurrence of a general drop in automobile sales prior to and during the decline in Superior's share price near the end of the Class Period, a matter of public knowledge. At one point in the First Amended Complaint, Plaintiff alleges that the "decline in demand for United States automobile sales" had a "significant and material adverse impact on Superior." (First Am.Compl. ¶ 65.) Yet, elsewhere Plaintiff argues that "[t]here was *no* catastrophic event in this case." (Pl.'s Opp. at 8.) *Glenfed,* however, includes in the category of "catastrophic events" both "a decline in other markets affecting the company's product" and "a shift in consumer demand." *Glenfed, 42 F.3d at 1548.* Thus, Plaintiff's own pleadings at least undercut a claim for securities fraud based upon a decline in share prices due to undisclosed negative information. *See Stac Elec., 89 F.3d at 1409* ("If ... the information that defendants are alleged to have withheld from or misrepresented to the market has entered the market through other channels, the market will not have been misled, and plaintiff's claims will fail.") (citations, internal ellipses, and quotation marks omitted).[FN13]

Thus, Plaintiff has failed to plead fully the elements of a securities fraud claim in the First Amended Complaint.[FN14] Dismissal pursuant to Rule 9(b) is appropriate, and the Court does not reach the Rule 12(b)(6) argument. Based on the allegations in the First Amended Complaint, and the history of his case, the dismissal should be WITH PREJUDICE.[FN15]

3. Allegations Raised at Oral Argument

At oral argument, however, counsel for Plaintiff asked that the dismissal be without prejudice and that Plaintiff be granted leave to amend. In support of that request, he referred to two pieces of information not pleaded in the First Amended Complaint:

(1) Superior's fourth quarter 1995 and 1996 results; and (2) information from the Arkansas Department of Pollution Control allegedly showing that before or by March 31, 1995, Defendants were aware of serious, persistent and unremediable problems with the waste treatment facility for the Fayetteville, Arkansas chrome-plating plant. (Tr. of Hearing held Feb. 24, 1997 at 45.) Nevertheless, after consideration of that information, the Court concludes that the addition of such allegations would not cure the defects in Plaintiff's pleading.

Superior's Fourth Quarter 1995 and 1996 Results

**\*11** First, Plaintiff's counsel conceded that most of this financial information has been available for some time. (*Id.* at 5.) The fourth quarter 1995 results have been available for close to one year, and were thus available long before the filing of the First Amended Complaint in July 1996. The results for the first quarter of 1996 were available prior to the filing of the First Amended Complaint, and the result from the second quarter were available prior to the filing of Plaintiff's Opposition to Defendant's Motion on September 27, 1996.

Moreover, the allegedly false statements in this case all occurred before or on September 8, 1995. The results from late 1995 and particularly those from 1996 appear to have little if any relevance to what Defendants knew at the times that they made those statements.

b. Arkansas Department of Pollution Control Information on the Chrome-Plating Facility

Plaintiff's counsel made a better, but still ultimately unconvincing, argument with regard to documents allegedly obtained from the Arkansas government concerning the new chrome-plating facility.

i. Information Allegedly Known by Defendants

Plaintiff's counsel identified the source of this information as being documents, discovered by Plaintiff's investigators, flowing between Superior and the Arkansas pollution control agency. (*Id.* at 15.) The documents allegedly reveal that Superior had knowledge prior to March 31, 1995 of serious deficiencies in the waste treatment facility that rendered the chrome-plating plant unable to operate at full capacity. (*Id.*)

Defendants' Statements About the Facility

Plaintiff points to a number of statements regarding the status of the chrome-plating facility.[FN16] Plaintiff includes several statements made by securities analysts, allegedly following information provided by Superior and its officers. Assuming, without deciding, that Defendants are liable for these statements as well as their own direct statements, the Court still concludes that Plaintiff has not alleged facts sufficient to establish liability on the part of Defendants.

In its 1994 Form 10-K filed on March 31, 1995, Superior stated that in 1994, it had "completed construction of a new chrome-plating wheel facility," and that "[t]his facility is now *ramping-up production*" and is "in the *qualifying phase.*" (First Am.Compl. ¶ 31 (emphasis added).) The company also stated that "[t]his facility is *currently in a start-up mode* and initial shipments are scheduled to commence in the second quarter of 1995." (*Id.* (emphasis added).) Superior described the new plant as "state-of-the art." (*Id.*)

Additionally, in its 1994 Annual Report to Shareholders issued on March 31, 1995, Superior stated, in reference to the new chrome-plating facility, that the company had "beg[un] limited shipping of chrome-plated wheels." (First Am.Compl. ¶ 33.) Noting that "[t]his is a new product line and growth opportunity," the company forecast that it "could add over $100 million in additional annual sales over the next three years." (*Id.*) Later in the Report, Superior stated that "[w]e have also seen a substantial increase in demand for chrome wheels and are *ramping up production* at our new chrome-plating facility." (*Id.* (emphasis added).) Again noting increases in demand for chrome wheels, the company stated that, at the new chrome-plating facility, it was "*gearing up its operations* for 1995 to serve this growing market." (*Id.* (emphasis added).)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-9   Filed 10/05/2007   Page 10 of 14

Not Reported in F.Supp. Page 10
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

**\*12** On April 3, 1995, an analyst reported that "SUP says that its chrome-wheel plant has *moved out of start-up* and is *now in the production phase.*"(*Id.* ¶ 36 (emphasis added).)

On April 11, 1995, Superior issued a press release in which appeared the following: "The new chrome-plating facility, which recently completed its first phase construction, has been *showing progress in its production capabilities* for the second quarter." (*Id.* ¶ 39 (emphasis added).) Plaintiff alleges that, in a conference call with unspecified analysts on an unspecified date and follow-up conversations, Superior officers referred to a successful start-up at the Fayetteville chrome-plating facility. (*Id.* ¶ 40.)

On April 11, 1995, one analyst referred to chrome-plating orders as "ramping up," with volume expected to accelerate in 90 days." (*Id.* ¶ 4(a). On April 12, 1995, another analyst reported that "SUP says it has *moved out of the startup phase* of [the chrome-plating facility) and *into production;* the company's contracts call for volume shipments to begin in about 90 days." (*Id.* ¶ 41(b).) A different report issued on April 12, 1995 indicated that "[t]he company's chrome-plating facility in Fayetteville, Arkansas *continues to ramp-up slowly* .... Superior expects orders to accelerate in about 90 days or by the beginning of the third quarter." (*Id.* ¶ 41(c) (emphasis added).) Other analysts made similar statements later in April 1995. (*Id.* ¶¶ 41(d), (f)-(g).)

In its Report to Shareholder for the first quarter of 1995, Superior reported pre-production costs at the facility of $600,000. The company also stated that "[t]he recently completed first phase construction of our fully automated plant has been *showing progress in its production capabilities,"* and that "[w]e look forward to reporting this new business development throughout the year." (*Id.* ¶ 47 (emphasis added).) Superior also indicated that "production at our expanding Fayetteville plant *continues to step up to meet ... demand.*" (*Id.* ¶ 47 (emphasis added).)

On June 1, 1995, an analyst reported that "the company is expected to meaningfully increase production at its chrome-plating facility (*tentatively* slated for 3Q95), which *could* contribute roughly $20 million in revenue in 1995." (*Id.* ¶ 50 (emphasis added).) Other analysts also reported that the facility was expected to "begin ramping up in Q3,"(*id.* ¶ 51), begin "volume production" in the third quarter, (*Id.* ¶ 52), or, "tentatively," "increase production ... [in] 3Q95,"(*id.* ¶ 55(d)). Still others referred to "anticipated progress in the production capabilities." (*Id.* ¶ 56.)

In a press release reporting its second quarter 1995 results, Superior reported pre-production costs at the facility of $1 million for the quarter and $1.6 million for the first half of the year. The company referred to the "impact" of the startup of the facility as a negative development that was "more than offset" by other, positive developments. (*Id.* ¶ 53.)

**\*13** An August 7, 1995 analyst report referred to a *"slower than expected ramp-up"* at the facility, but added that the facility "appear[ed] to be on tract to make a significant contribution to earnings beginning in 1996,"(*Id.* ¶ 59 (emphasis added).)

iii. Discussion

The statements cited above do not specifically describe problems with waste treatment at the Fayetteville chrome-plating facility. They are consistent, however, in suggesting that the facility was not yet fully operational. Phrases like "ramping up" or "moving into production" or "stepping up to meet demand" do not indicate a plant that has actually reached anything but the initial stages of production. The indefinite, tentative, and sometimes even negative statements simply do not contradict or sufficiently conceal the information that Plaintiff now alleges Defendants possessed. At most, the statements reveal a series of changes in forecasts for the new facility, reflecting a dampening of optimism. The evidence Plaintiff proposes to plead in another amended pleading would not, even if taken as true, render Defendants' statements or omissions fraudulent. As a result, they do not support claims for securities fraud.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Case 5:07-cv-03444-JF   Document 24-9   Filed 10/05/2007   Page 11 of 14   Page 11
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

c. Predictions about the Impact of New Developments

Moreover, the chrome-plating plant, including its waste treatment component, was a state-of-the-art-facility, which Plaintiff does not deny. In addition, the information Plaintiff proposes to add, as Plaintiff's counsel represented it at oral argument, reflects the impact of government regulation on the new facility operations. The Ninth Circuit has held that predictions regarding government regulation of a new product or of the new product's impact on the producer's business are not necessarily actionable even when they turn out to be mistaken.

In *In re Syntax Corp. Sec. Litig.,* 95 F.3d 922 (9th Cir.1996), the defendant pharmaceutical company predicted in 1992 that by the time the patent on a certain drug expired roughly two years later, the Food and Drug Administration ("FDA") would already have approved an over-the-counter version. *Id.* at 930. The plaintiffs claimed that the statement was misleading because the defendants knew of problems with the company's testing procedures that might slow FDA approval. *Id.* The Ninth Circuit disagreed.

The *Syntex* court noted that the statement "forecast[ ] a future event," "an approval decision that lies in the hands of a regulatory body." *Id.* The court found that "[a]ny alleged deficiencies in the testing procedures [did] not indicate that [the company's] prediction of an FDA approval date was false when made." *Id.* In other words, the mere existence of problems did not automatically make the prediction of a future approval misleading." Nothing in this case indicates that the company had knowledge contradicting its ability to achieve FDA approval within two years and prior to the expiration of the ... patent." *Id.* Problems may well not be intractable, and predicting a date of solution does not automatically constitute fraud.FN17

**\*14** The *Syntex* court also did not find that optimistic statements about the potential success of certain new drug products were fraudulent. *Id.* at 933. Those statements, said the court, were "merely forecasts, optimistic speculations as to how the market would react to the new product."

Similarly, the statements Defendants made in the case at bar were speculation about the success of a new kind of facility. Here, as in *Syntex,* knowledge of problems does not make predicting an end to those problems fraud. *See Syntex,* 95 F.3d at 993 (distinguishing predictions with some basis from optimistic statements made when defendants "already had knowledge of contradictory facts and facts that they did not disclose to investors") (emphasis added).

V. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS Defendants' Motion to Dismiss and DISMISSES the First Amended Complaint WITH PREJUDICE.

IT IS SO ORDERED.

> FN1. In the First Amended Complaint, Plaintiff has dropped from the caption two of the defendants named in the initial Complaint, Juanita Borick and Kazmi. Oddly, the First Amended Complaint still contains allegations particular to those persons. (First Am.Compl. ¶¶ 16(a), (i).) Nevertheless, the Court assumes that Plaintiff has voluntarily dismissed those two defendants.

> FN2. Defendants submitted an Appendix of Documents cited in Plaintiff's initial Complaint, and they re-submit that Appendix by reference with the current motion to dismiss. The Court may consider the complete text of documents referenced in the First Amended Complaint without converting the 12(b)(6) motion to one for summary judgment. *See Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704 (1994).

> FN3. The options were $19 to $31 per

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF     Document 24-9     Filed 10/05/2007     Page 12 of 14

Not Reported in F.Supp.                                                                                                         Page 12
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

share. (*Id.*)

FN4. The First Amended Complaint contains approximately 15 pages of allegedly misleading statements made by the defendants. (*See id.* ¶¶ 27-41.)

FN5. Plaintiff appears to be unsure of the exact date, as he alleges both at different points in the First Amended Complaint. (*Compare* First Am.Compl. ¶ 6 *with id.* ¶ 66.)

FN6. It should be noted, that, overall, the insiders' sales took place throughout the nearly 6-month Class Period. The sales took place both before and after alleged fraudulent or misleading statements and omissions, and both during times when the price of Superior shares were rising and during times when the price were declining.

FN7. Section 10(b) of the Exchange Act of 1934 makes it unlawful "for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules or regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated under the authority of Section 10(b), provides that:
It shall be unlawful for any person ...
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading, or,
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the sale or purchase of any security.

17 C.F.R. § 240.10(b)(5).

FN8. The Ninth Circuit stated in *Glenfed* that such contemporaneous statements are not required to establish in inference of scienter. *Id.* However, the court had earlier noted that scienter need not be alleged with the specificity that Rule 9(b) requires for allegations of "the circumstances constituting fraud." *Id.* at 1545-47. The court drew on the express language of Rule 9(b) in drawing that distinction. *Id.* That is not to say that inconsistent contemporaneous statements are required in order to state a claim for securities fraud, but that where such statements are absent other allegations must specifically demonstrate that the allegedly fraudulent statements were false at the time that they were made. In *GlenFed,* where the court found that the complaint just barely satisfied Rule 9(b), *id.* at 1549, one of the factors on which the court based its decision was the pleading of contradictory contemporaneous statements, *id.* at 1551.

FN9. In dismissing the initial Complaint, the Court found Plaintiff's reliance on *Fecht* unavailing because the initial complaint reflected a "scattershot" pleading style and made largely non-specific allegations. (Order entered June 3, 1996 at 17-18.) In the First Amended Complaint, Plaintiff has not significantly improved his pleading, particularly with regard to the critical issue of the timing of various financially detrimental developments in relation to Defendants' allegedly fraudulent statements. In addition, the excessively long document has become, if anything, more difficult to proceed through because of its poor organization and frequent repetition of nearly identical passages of text.

FN10. Plaintiff does not plead some chronology for the alleged build up of inventory, a development that Plaintiff claims re-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 24-9   Filed 10/05/2007   Page 13 of 14

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
(Cite as: Not Reported in F.Supp.)

Page 13

flected a decline in demand and so was an indication of potentially difficult times ahead. Plaintiff claims that "Superior's excess inventory had increased significantly as of the end of the first quarter, March 31, 1995 (increasing 27% from 37.8 million at September 30, 1994 to $48.1 million at March 31, 1995) which would cause Superior to incur storage and associated costs ... and would require price reductions to liquidate and would reduce plant capacity utilization." (First Am.Compl. ¶ 42(d).) However, Defendants point out that the inventory figures were made public in quarterly SEC filings. (Defs' Mem. at 18 & n. 10; Defs' Request for Judicial Notice Ex. A at 2 (SEC Form 10Q for first quarter of 1995); *id.*Ex. B at 2 (SEC Form 10Q for first quarter of 1995); *id.*Ex. B at 2 (SEC Form 10-Q for second quarter of 1995).) Clearly, Defendants cannot have misleadingly or fraudulently failed to disclose information that was already publicly known. See [Siegel v. Lyons, No. C-95-3588 DLJ, 1996 WL 438793, at *4 (N.D.Cal. April 26, 1996)](#) ("Where SEC filings actually disclose allegedly omitted information, dismissal of a claim premised upon nondisclosure is proper.").

Plaintiff's response, in its Opposition, is to claim that it meant to focus on profit margin rather than inventory, and that Superior's profit margins could not have been known without access to other allegedly inside information. (Pl.'s Opp. at 8.) In the First Amended Complaint, Plaintiff does attribute the alleged falsity of Defendants' earnings predictions to overstated gross margins. (First Am.Compl. ¶ 42(d).) However, the only stated basis for Plaintiff's claim that the margins were overstated is the allegedly high level of inventory: "[T]he Defendants knew such a high gross margin had become impossible at this time because of the accumulation of excess inventory that Superior was experi-

encing." (*Id.*) The only stated basis, in other words, was publicly available information.

[FN11.](#) In his Opposition, Plaintiff refers several times to "Internal" Superior reports that Plaintiff seems to claim contained information that Defendants should have disclosed. (Pl.'s Opp. at 13, 18.) Plaintiff does not, however, refer to such reports in the First Amended Complaint. Moreover, even in his Opposition, Plaintiff fails to identify any such report with any specificity, and fails to allege when any such report was made.

[FN12.](#) It should also be noted that Plaintiff repeatedly falls back on the argument that Defendants were under a duty later in the Class Period to correct positive forecasts made in the 10-K and Annual Report on March 31, 1995. (Pl.'s Opp. at 17.) Plaintiff thus appears to be tacitly admitting that those optimistic forecasts were not "false or misleading" when made, but rather became so later.

[FN13.](#) The same reasoning applies to undercut Plaintiff's allegations of fraudulent statements made in mid August 1995. (First Am.Compl. ¶ 61; Pl's Opp. at 18, n. 18.) Plaintiff admits that "[d]uring the last half of August 1995, information began to leak into the marketplace that Superior's third- and fourth-quarter earnings would be slightly less than anticipated due to soft automobile production." (First Am.Compl. ¶ 61; Pl.'s Opp. at 18, n. 18.)

[FN14.](#) Because the Court concludes that Plaintiff has failed to plead essential elements of a securities fraud claim, the Court does not reach the alterative grounds for and issues raised in Defendants' Motion to Dismiss: the "bespeaks caution" doctrine: Defendants' liability for statements made by securities analysts; and Plaintiff's al-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 14
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438
**(Cite as: Not Reported in F.Supp.)**

Case 5:07-cv-03444-JF     Document 24-9     Filed 10/05/2007     Page 14 of 14

leged failure to state a claim against defendant Steve Borick, an outside director.

FN15. Generally, inadequate claims of a party who has already had opportunities to amend the complaint are subject to dismissal without leave to amend. *See Fidelity Financial Corp. v. Fed. Home Loan Bank,* 792 F.2d 1431, 1438 (9th Cir.1986) ("The district court's discretion to deny leave to amend is particularly broad where the court has already given the plaintiff an opportunity to amend this complaint."), *cert. denied,* 479 U.S. 1064 (1987); *Mir. v. Fosburg,* 646 F.2d 343, 347 (9th Cir.1980).

FN16. Defendants have submitted copies of the following with their moving papers: Superior's 1994 Form 10-K; 1994 Annual Report to Shareholders: April 11, 1995, May 19, 1995, and July 13, 1995 press releases; and First and Second Quarter 1995 Report to Shareholders.

FN17. The *Syntex* court distinguished *Warsaw v. Xoma Corp.,* 74 F.3d 955 (9th Cir.1996), in which a company predicted that FDA approval was imminent while knowing that approval was unlikely. *Syntex,* 95 F.3d at 930.

C.D.Cal.,1997.
May v. Borick
Not Reported in F.Supp., 1997 WL 314166 (C.D.Cal.), Fed. Sec. L. Rep. P 99,438

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.