# EXHIBIT A

| | |
|---|---|
| **From:** | Mark Leslie |
| **Sent:** | Monday, October 02, 2000 10:04 PM |
| **To:** | Bill Janeway (E-mail); Fred van den Bosch; Geoff Squire; Greg Kerfoot (E-mail); Joe & Liz Rizzi (E-mail); Mark Leslie; Steve Luczo (E-mail); Steven Brooks (E-mail) |
| **Subject:** | Quarter wrap up |

Well, it has been an interesting quarter. The channels business continues to fall behind plan as the overall market for NT continues to be soft. We have hard and convincing evidence that we are doing exceedingly well in the channel, continuing to aggressively take market share from CA. But in this soft market, it is not enough. Between last quarter and this, we are adding six new products to the channel including full VM and Remote Storage for Exchange. In addition, industry forecasters have the NT market picking up Q4 and next year. We are hopeful that between the two elements we will see strong uptake in the channel.

The UNIX business continued to strongly exceed expectations. We closed the quarter with overall business at 320.7 against an upwardly revised Q3 number of 309. Sales believes that there might be another $10 million that will ultimately be added to that number, so it could be as high as 330 million, or 21 over plan. Pls note that the channels business was 14 million under a mid-year downwardly revised number, so that the real unix overperform is probably closer to 35 million, of which 5 million is attributable to OEM and the remainder to the field. We believe that we will be reporting about 314 million, and anything over that will go to replenish backlog that has been taken down earlier this year.

In addition the above great performance, we had one elephant come home. We never include these in our forecasts, and run the business so if they happen they are gravy. We closed a $30 million deal with AOL (which will be taken to revenue in Q4). However, at the eleventh hour we got a request from AOL to gross up the deal by $20 million and take back an equal amount of dollars in paid advertising to AOL. The advertising will be consumed over five quarters, 1/3 in Q4, and 1/6 in each of Q1 – Q4 next year. So, bottom line is a $50 million deal on top of a $20 million or so over-perform on standard business (plus the compensating 14 million against the weak channel).

Notwithstanding the good news, Paul reports that the quarter was a tough one to make. We believe that Q4, with the end of commission year effect, should have a lot of momentum. We have numerous large deals teed up, some of which should close in the quarter. With the $50 million jump start, we expect to pack a lot away in backlog for next year. At this time we are planning to budget 2001 at the +50% or so level to be conservative.

VAOL 0010365

1

CONFIDENTIAL TREATMENT REQUESTED BY VERITAS

# EXHIBIT B

From:           Steven Brooks/BCP

To:             Mark Leslie <mleslie@veritas.com> @ BCP_EXTERNAL

CC:             Bill Janeway (E-mail)
<bjaneway@warburgpincus.com>@BCP
                EXTERNAL; Fred van den Bosch
<fred@veritas.com>@BCP
                EXTERNAL; Geoff Squire
<geoff@veritas.com>@BCP_EXTERNAL;
                Greg Kerfoot (E-mail)
<gregk@img.seagatesoftware.com>@BCP
                EXTERNAL; Joe & Liz Rizzi (E-mail)
<rizzi@ix.netcom.com>
                BCP_EXTERNAL; Mark Leslie
<mleslie@veritas.com>@BCP
                EXTERNAL; Steve Luczo (E-mail)
<stephen_j_luczo@notes
                seagate.com>@BCP_EXTERNAL

BC:             Outgoing Security; Outgoing Security@Broadview

Subject:        Re: Quarter wrap up

Date:           10/03/2000 03:38:14 PM EST

congratulations. appreciate the news. excellent generally, but with
enough texture and challenge to reflect a slightly tougher business
climate...the new products in the channel are nice to see. should
help. on the aol deal, can we make doubly sure that EY are on board
with our revenue recognition in the barter context?  a fair amount of
current SEC controversy surrounds the topic, and I would appreciate the
reassurance when we book the transaction in Q4.
Congratulations to all who made this happen, again and again.




Mark Leslie <mleslie@veritas.com> on 10/02/2000 10:04:21 PM
To:   "Bill Janeway (E-mail)" <bjaneway@warburgpincus.com>, Fred van
den Bosch <fred@veritas.com>, Geoff Squire <geoff@veritas.com>, "Greg
Kerfoot (E-mail)" <gregk@img.seagatesoftware.com>, "Joe & Liz Rizzi (E-
mail)" <rizzi@ix.netcom.com>, Mark Leslie <mleslie@veritas.com>, "Steve
Luczo (E-mail)" <stephen_j_luczo@notes.seagate.com>, Steven
Brooks/BCP@BCP
cc:
Subject:   Quarter wrap up


Well, it has been an interesting quarter.  The channels business
continues

Confidential Treatment Requested by Veritas

to fall behind plan as the overall market for NT continues to be soft. We
have hard and convincing evidence that we are doing exceedingly well in the
channel, continuing to aggressively take market share from CA.  But in this
soft market, it is not enough.  Between last quarter and this, we are adding
six new products to the channel including full VM and Remote Storage for
Exchange.  In addition, industry forecasters have the NT market picking up
Q4 and next year.  We are hopeful that between the two elements we will see
strong uptake in the channel.

The UNIX business continued to strongly exceed expectations.  We closed the
quarter with overall business at 320.7 against an upwardly revised Q3 number
of 309.  Sales believes that there might be another $10 million that will
ultimately be added to that number, so it could be as high as 330 million,
or 21 over plan.  Pls note that the channels business was 14 million under a
mid-year downwardly revised number, so that the real unix overperform is
probably closer to 35 million, of which 5 million is attributable to OEM and
the remainder to the field.  We believe that we will be reporting about 314
million, and anything over that will go to replenish backlog that has been
taken down earlier this year.

In addition the above great performance, we had one elephant come home. We
never include these in our forecasts, and run the business so if they happen
they are gravy.  We closed a $30 million deal with AOL (which will be taken
to revenue in Q4).  However, at the eleventh hour we got a request from AOL
to gross up the deal by $20 million and take back an  equal amount of
dollars in paid advertising to AOL.  The advertising will be consumed over
five quarters, 1/3 in Q4, and 1/6 in each of Q1 - Q4 next year.  So, bottom
line is a $50 million deal on top of a $20 million or so over-perform on
standard business (plus the compensating 14 million against the weak
channel).

Notwithstanding the good news, Paul reports that the quarter was a
tough one

Confidential Treatment Requested by Veritas

to make.  We believe that Q4, with the end of commission year effect, should
have a lot of momentum.  We have numerous large deals teed up, some of which
should close in the quarter.  With the $50 million jump start, we expect to
pack a lot away in backlog for next year.  At this time we are planning to
budget 2001 at the +50% or so level to be conservative.

Confidential Treatment Requested by Veritas

VAOL 0060209

# EXHIBIT C

1

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
------------------------

FORM 10-K
------------------------

(MARK ONE)

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
      SECURITIES EXCHANGE ACT OF 1934

          FOR THE FISCAL YEAR ENDED DECEMBER 31, 2000

                            OR

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
      SECURITIES EXCHANGE ACT OF 1934

      FOR THE TRANSITION PERIOD FROM _____ TO _____ .

                COMMISSION FILE NUMBER 0-26247

                VERITAS SOFTWARE CORPORATION
       (EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)


          DELAWARE                              77-0507675
  (STATE OR OTHER JURISDICTION OF            (I.R.S. EMPLOYER
   INCORPORATION OR ORGANIZATION)           IDENTIFICATION NO.)

    1600 PLYMOUTH STREET
  MOUNTAIN VIEW, CALIFORNIA                        94043
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES)        (ZIP CODE)

   REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (650) 527-8000

   SECURITIES TO BE REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT: NONE

 SECURITIES TO BE REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: COMMON STOCK

    Indicate by check mark whether the Registrant: (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days.  Yes [X]  No [ ]

    Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained to the
best of the Registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K. [ ]

    As of February 28, 2001, 395,793,187 shares of the Registrant's common
stock were outstanding. The aggregate market value of the common stock held by
non-affiliates of the Registrant as of February 28, 2001 was approximately $25.5
billion.

                DOCUMENTS INCORPORATED BY REFERENCE

    Portions of Registrant's definitive proxy statement, to be delivered to
stockholders in connection with the Registrant's Annual Meeting of Stockholders,
are incorporated by reference into Part III of this Form 10-K.

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

TABLE OF CONTENTS

PAGE
----

PART I
Item 1.    Business...................................................  1
Item 2.    Properties................................................ 13
Item 3.    Legal Proceedings......................................... 14
Item 4.    Submission of Matters to a Vote of Security Holders
           Matters................................................... 15

PART II
Item 5.    Market for the Registrant's Common Equity and Related
           Stockholder Matters....................................... 16
Item 6.    Selected Financial Data................................... 17
Item 7.    Management's Discussion and Analysis of Financial Condition
           and
           Results of Operations..................................... 18
Item 7A.   Quantitative and Qualitative Disclosures About Market
           Risk...................................................... 38
Item 8.    Financial Statements and Supplementary Data............... 41
Item 9.    Changes in and Disagreements with Accountants on Accounting
           and
           Financial Disclosure..................................... 43

PART III
Item 10.   Directors and Executive Officers of the Registrant........ 43
Item 11.   Executive Compensation.................................... 43
Item 12.   Security Ownership of Certain Beneficial Owners and
           Management................................................ 43
Item 13.   Certain Relationships and Related Transactions............ 43

PART IV
Item 14.   Exhibits, Financial Statement Schedules, and Reports on Form
           8-K....................................................... 44
Signatures............................................................ 49
Financial Statements................................................. 50
Financial Statement Schedule......................................... 75
</TABLE>

    VERITAS, VERITAS Software, the VERITAS logo and other product names are
trademarks or registered trademarks of VERITAS Software Corporation in the
United States and other countries. Other product names mentioned herein may be
trademarks and/or registered trademarks of their respective companies.

                                    i

PART I

ITEM 1. BUSINESS

This annual report on Form 10-K contains forward-looking statements, within the meaning of the Securities Exchange Act of 1934 and of the Securities Act of 1933, that involve risks and uncertainties. These forward-looking statements include statements regarding our expectations, beliefs, intentions or strategies regarding the future. All these forward-looking statements are based on information available to us at this time, and we assume no obligation to update any of these statements. Actual results could differ from those projected in these forward-looking statements as a result of many factors, including those identified in the section titled "Factors That May Affect Future Results" under Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations. We urge you to review and consider the various disclosures made by us in this report, and those detailed from time to time in our reports and filings with the SEC, that attempt to advise you of the risks and factors that may affect our future results.

OVERVIEW

VERITAS is a leading independent supplier of data availability software products. Data availability software includes storage management and data protection software as well as clustering, replication and storage area networking software. Data availability software has grown significantly in importance during the last few years, and has become a critical component in the success of a business enterprise. A key competitive factor for businesses today is whether their critical data and related applications are available without interruption 24 hours a day, seven days a week. Our products are designed to enable continuous productivity for computing environments ranging from the desktop computer to the large enterprise data center, including storage area networks. VERITAS products assist businesses by helping to make sure that their data is protected, can be accessed at all times, and can be managed and used in compliance with business policies.

Demand for data availability products and services is fueled by many factors. These factors include the rapid increase in the number of internet users and the number of businesses doing business online, as well as the continuing automation of traditional business processes. The widespread use of business computer applications, coupled with the growth of corporate data, has exceeded the ability of current computing architectures to handle availability, scalability and manageability issues. A new storage-centric architecture, called storage area networking, or SAN, has emerged to handle these issues. A SAN is a high-speed computing network that directly connects storage hardware devices, such as storage arrays, clustered servers, disk drives and tape drives, to client and server computers. The typical SAN infrastructure is capable of handling more data and transactions faster than a traditional network, can grow along with a business' needs, and is more cost-effective than traditional network architectures. We are a leading innovator in developing SAN technology and taking our SAN-capable products to businesses that can benefit from them.

Our products help to improve the levels of centralization, control, automation and manageability in computing environments, which allows information technology, or IT, managers to be significantly more effective with constrained resources and limited budgets. More specifically, our products offer protection against data loss and file corruption, allow rapid recovery after disk or computer system failure, enable IT managers to work efficiently with large numbers of files, and make it possible to manage data distributed on large networks of computer systems without harming productivity or interrupting users. In addition, our products provide continuous availability of data in clustered computer systems that share disk resources to maintain smooth business operations. Our products are highly scalable in order to allow our customers to keep up with the growth of data and technologies deployed in their businesses. In summary, our products help our customers manage their data storage in complex and diverse computing environments efficiently and cost-effectively.

We develop products for most popular operating systems, including versions of UNIX, Windows NT and Linux. Our software solutions are used by customers across a broad spectrum of industries, including many leading global corporations and e-commerce businesses. We also provide a full range of services to assist our customers in planning and implementing their data availability solutions.

We market our products and services to end users either directly or through original equipment manufacturers and indirect sales channels such as resellers, value-added resellers, hardware distributors, application software vendors and systems integrators. Some of our customers include:

| ORIGINAL EQUIPMENT MANUFACTURERS | INDIRECT SALES CHANNELS | DIRECT SALES |
| ------------------ | ----------------------- | ------------ |
| Compaq | Ingram Micro | Amazon.com |
| Dell | Tech Data | American Airlines |
| EMC Corporation | | AT&T |
| Fujitsu-Siemens | | Bank of America |
| Hewlett-Packard | | British Telecom |
| Hitachi | | eBay |
| IBM Corporation | | E*Trade |
| Microsoft | | Ford Motor Company |
| NEC | | GTE |
| SGI | | Lucent |
| StorageTek | | Morgan Stanley & Co. |
| Sun Microsystems | | Oracle |
| | | Yahoo! |

PRODUCTS

We offer a wide range of leading data availability software products to manage the rapid growth of available data and the growing complexity and size of networked environments that our customers face. Our products allow businesses to improve the management of their data, to protect their data and to increase the availability of their data.

File and volume management

We offer products designed to improve the manageability and performance of business critical data. Our principal management and performance products include:

| PRODUCT | DESCRIPTION |
| ------- | ----------- |
| VERITAS Volume Manager.................... | VERITAS Volume Manager allows for online disk storage management for business computing environments. It provides tools to protect against data loss due to hardware failure, to accelerate system performance by allowing files to be spread across multiple disks and to allow IT managers to reconfigure data locations without interrupting users. |
| VERITAS File System...................... | VERITAS File System is designed to enable fast system recovery, generally within seconds, from operating system failure or disruption. It gives mission-critical servers mainframe-level capabilities by providing superior performance, data integrity, high availability and online manageability. |
| VERITAS Foundation Suite................. | VERITAS Foundation Suite combines VERITAS Volume Manager and VERITAS File System. These two products together are intended to improve performance, availability and manageability. |

5

Data protection

We offer products designed to back up and restore data. Our leading data protection products include:

| PRODUCT | DESCRIPTION |
| ------- | ----------- |
| VERITAS NetBackup........................ | VERITAS NetBackup is designed to protect data of medium to large businesses. It provides centralized backup scheduling, user-directed backups and restores, and automated distribution and installation of client software over a network. It supports all major platforms, including UNIX, Windows NT, Novell NetWare and Linux, and includes support for storage area networks. |
| VERITAS NetBackup........................ BusinesServer | VERITAS NetBackup BusinesServer is a backup and recovery solution designed for small to mid-size UNIX and high-end Windows NT installations, and for the many IT operations that run a combination of the two. |
| VERITAS Backup Exec...................... | VERITAS Backup Exec is designed to provide backup and restore functions for smaller business, including scheduled automated data backup operations. It supports Windows NT, Windows 2000 and Windows 95/98, and has an array of options designed to protect data contained in applications such as Microsoft Outlook and Novell NetWare. |
| VERITAS Global Data Manager.............. | VERITAS Global Data Manager centrally manages VERITAS NetBackup, VERITAS NetBackup BusinesServer and VERITAS Backup Exec servers at different geographic locations that are part of a business' intranet or wide area network. Its intended benefits include increased flexibility and control, global scalability, uninterrupted global operations and reduced management costs. |
| VERITAS Storage Migrator................. | VERITAS Storage Migrator is designed to increase the availability of critical business data by ensuring that only frequently used information is kept online. It migrates infrequently-used data from online devices to lower cost secondary storage, and recalls migrated data to primary online storage when it is accessed by users or applications. |
| VERITAS Remote Storage for............... Microsoft Exchange | VERITAS Remote Storage for Microsoft Exchange is an e-mail space management application that moves older e-mail message attachments from Microsoft Exchange onto a secondary storage device, such as a tape drive, but still allows users access to their attachments. |

Clustering and replication

We offer products that improve availability of key applications in complex computing environments. These products include:

| PRODUCT | DESCRIPTION |
| ------- | ----------- |
| VERITAS Cluster Server................... | VERITAS Cluster Server, or VCS, is an availability management solution designed to maximize data and application availability through proactive management of planned and unplanned downtime. It is also useful in storage area networks. |

3

6

| PRODUCT | DESCRIPTION |
| ------- | ----------- |
| VERITAS ClusterX for...................... Microsoft Cluster Service | VERITAS ClusterX for Microsoft Cluster Service, or MSCS, addresses the management and deployment of multiple distributed Windows NT clustered computers. It is designed to provide failover support for applications such as databases, messaging systems, and file and print services. |
| VERITAS ClusterX for WLBS................ | VERITAS ClusterX for WLBS focuses on managing Windows NT Load Balancing Service servers and is designed to improve their availability, reliability, scalability and performance It is designed to enhance both the availability and scalability of internet server-based programs such as web servers and streaming media servers. |
| VERITAS Global Cluster Manager........... | VERITAS Global Cluster Manager is a cluster management product designed to monitor multiple geographically distributed VCS clustered computers and to manage failover of an entire cluster from one site to another. |
| VERITAS File Replicator.................. | VERITAS File Replicator is a general purpose data replication tool designed for use in enterprise environments. It ensures that data written to one server is reliably replicated to other participating servers, so that all updates are available for use in active file systems across all servers. |
| VERITAS Storage Replicator............... | VERITAS Storage Replicator delivers data replication for Windows NT environments. It can duplicate files or file systems at multiple locations for complete data protection or information distribution. It offers centralized management, high replication performance, minimal system requirements, both real-time and schedule-based replication, and selectable bandwidth usage. |
| VERITAS Volume Replicator................ | VERITAS Volume Replicator helps businesses ensure that current data is available at multiple global locations. It is a robust, flexible, multi-purpose data replication tool designed for enterprise environments. |

Desktop and mobile

   VERITAS has product solutions designed for personal data availability for a
wide range of devices in the home, small office and mobile business
environments. These products include:

| PRODUCT | DESCRIPTION |
| ------- | ----------- |
| VERITAS Simple Backup.................... | VERITAS Simple Backup provides basic data protection for novice computer users and supports a wide range of compact disc devices. |
| VERITAS BackupExec Desktop............... | VERITAS BackupExec Desktop is designed for the home office or small business computer user who has knowledge of data protection and requires a variety of advanced, versatile features for protection of a single computer. |
| VERITAS BackupExec Desktop Pro........... | VERITAS BackupExec Desktop Pro is designed for the small business and corporate computer user who has advanced knowledge of data protection and needs a wide range of features for protection of one or more computers. It also includes a disaster recovery function designed to restore an entire system in the event of disaster. |

| PRODUCT | DESCRIPTION |
| ------- | ----------- |
| VERITAS NetBackup Pro..................... | VERITAS NetBackup Pro is a backup and disaster recovery tool for portable and desktop computers in remote offices and telecommuting work locations. |
| VERITAS MyCD.............................. | VERITAS MyCD provides basic music and data storage on compact disc. |
| VERITAS MyCD Pro.......................... | VERITAS MyCD Pro provides high performance compact disc recording for music enthusiasts and professionals. |

Application solutions

    Businesses need integrated solutions to optimize their data availability strategies. Our principal products offering these integrated solutions include:

| PRODUCT | DESCRIPTION |
| ------- | ----------- |
| VERITAS Database Edition for Oracle | VERITAS Database Edition for Oracle is an integrated suite of several VERITAS products designed to deliver improved performance, enhanced manageability and continuous database access to support the complex and demanding work of database administrators operating Oracle servers. |
| VERITAS Database Replication Option for Oracle | VERITAS Database Replication Option for Oracle maintains a replicated database designed to enable easier ongoing administrative tasks, such as backups, reporting and data extraction, on large Oracle databases. |
| VERITAS Database Edition for Sybase | VERITAS Edition for Sybase is an integrated suite of several VERITAS solutions combined with specialized software agents designed to increase system performance and manageability in Sybase database environments. |
| VERITAS Edition for NFS................... | VERITAS Edition for Network File System, or NFS, is designed to deliver superior performance and higher availability for SPARC/Solaris servers in computing environments that run both UNIX and Windows. It also meets the demand for improved manageability of these complex networks, and helps to ensure efficient workflow for users. |
| VERITAS Edition for Web................... | VERITAS Edition for Web is designed to optimize the availability, performance and manageability of web servers, particularly for internet service providers, or ISPs, and corporate web server administrators. |
| VERITAS File Server Edition............... | VERITAS File Server Edition is an integrated suite of VERITAS storage management products designed to improve the performance, availability, and manageability of heterogeneous file system environments. |

SAN Products

    VERITAS is a leader in developing storage area networking products designed to reduce the cost and complexity of managing expanding networked storage environments. These products include:

| PRODUCT | DESCRIPTION |
| ------- | ----------- |
| VERITAS SANPoint Control.................. | VERITAS SANPoint Control is a centralized management tool to help administer SAN-connected devices. |

| PRODUCT | DESCRIPTION |
| ------- | ----------- |
| VERITAS SANPoint Direct................... | VERITAS SANPoint Direct file access is designed to bring increased performance and scalability to SAN environments by allowing computing nodes to access data directly at faster SAN speeds. |
| VERITAS SANPoint Foundation.............. Suite HA | VERITAS SANPoint Foundation Suite HA is designed to extend VERITAS File System and VERITAS Volume Manager to support shared data in a SAN environment. With the software, multiple servers can access shared storage and files, transparently to the applications and concurrently with each other. |
| VERITAS SANPoint Storage................. Appliance | VERITAS SANPoint Storage Appliance is designed to enable a standard computer server to become a high performance and high availability storage server. |

SERVICES

    Our customer service and support organization provides customers with maintenance, technical support, consulting and training services. We believe that providing a high level of customer service and technical support is critical to customer satisfaction and our success. Most of our customers have support agreements with us that provide for fixed fee, renewable annual maintenance consisting of technical and emergency support, and minor when-and-if available product upgrades free of charge. Our service group provides the following services:

    Maintenance and technical support

    We offer seven day-a-week, 24-hour telephone support, as well as electronic mail and fax customer support. Our customers can choose from a variety of support packages to address their specific needs, ranging from one-time incident charges to comprehensive support services with a dedicated single point of contact at VERITAS for some of our applications. Additional customer support is provided by some of our value-added resellers, system integrators and original equipment manufacturers.

    Consulting

    We believe that most customers need assistance before product selection and not just for the implementation of purchased products. Therefore, we offer strategy and analysis consulting services for planning the management and control of enterprise computing in specific customer environments, including SAN environments. In addition, we offer services to assist customers with product implementation. As part of our broad range of services, we believe we offer particular expertise in analyzing network security threats and security policy integrity.

    Training

    We have a worldwide customer education and training organization. We offer training that enables customers to utilize our products, reduces the need for technical support and provides customers with a means to optimize their personnel investment by allowing their technical staff access to high quality, comprehensive instruction. The focus of this organization is aligned with our strategy to offer end-to-end data availability solutions by providing instruction from highly-experienced training professionals either at the customer's location or at one of our multi-platform classrooms.

MARKETING, SALES AND DISTRIBUTION

    We market our products and related services through original equipment manufacturers and a combination of other distribution channels such as direct sales, resellers, value-added resellers, hardware distributors, application software vendors and systems integrators. Original equipment manufacturers incorporate our

products into their operating systems on a bundled basis or license them to third parties as an optional product. In most cases, we receive a user license fee for each copy of our software sublicensed by the original equipment manufacturer to third parties. We provide our software products to customers under non-exclusive license agreements, including shrink-wrap licenses for some products. As is customary in the software industry, in order to protect our intellectual property rights, we do not sell or transfer title to our software products to customers. We enter into both object-code only and source-code licenses of our products.

Our principal original manufacturer relationships are with Hewlett-Packard, IBM, Microsoft and Sun Microsystems.

- Hewlett-Packard. In November 1997, we entered into an agreement with Hewlett-Packard under which Hewlett-Packard offers some functional components of VERITAS NetBackup, VERITAS Volume Manager and VERITAS File System with the HP-UX operating system. We receive no royalties with respect to the version of the VERITAS File System embedded in the HP-UX operating system. Hewlett-Packard has become our reseller with respect to some of our products, including full feature versions of our products, and we have offered full feature products and value-added products to the HP-UX installed customer base. Hewlett-Packard is not obligated to sell our products under this agreement. In the fourth quarter of 1999, we dedicated personnel to define and build versions of our products that meet the needs specific to the Hewlett-Packard marketplace, and to further focus our sales and marketing efforts on the Hewlett-Packard sales channel. We cannot assure you that this strategy will be successful.

- IBM. In April 2000, we entered into an agreement with IBM under which we will port and optimize our complete set of data availability solutions, including VERITAS Volume Manager and VERITAS File System, to AIX/Monterey for IBM POWER and Intel IA-64 processor-based systems. This relationship is designed to augment solutions already available from VERITAS for the IBM platform. We have not recognized any significant revenue under this agreement to date, and IBM is not obligated to sell any of our products under this agreement.

- Microsoft. In August 1996, we entered into an agreement with Microsoft under which we agreed to develop a version of VERITAS Volume Manager, which Microsoft has called Logical Disk Manager, to be ported to and embedded in version 5.0 of Microsoft's Windows NT operating system, which now has been released as Windows 2000. We do not receive royalties with respect to sales of the embedded product by Microsoft. Our products may not become available for use in, and Microsoft is not required to use our products in, future versions of Windows NT. We cannot assure you that we will realize any benefits from the inclusion of this embedded product in Windows 2000 or future versions of Windows NT. In addition, we authored several other customized versions of our products that are packaged with Windows 2000.

- Sun Microsystems. In January 1997, we entered into an agreement with Sun Microsystems under which we bundle a version of VERITAS Volume Manager with some of Sun Microsystems' storage technologies. The agreement also provided for the license of full versions of some of our products and add-on modules to Sun Microsystems for bundling with some Sun Microsystems products. In August 1998, we amended the agreement and granted Sun Microsystems a license to distribute and sub-license VERITAS NetBackup, VERITAS Storage Migrator and some of the VERITAS Editions. This license is non-exclusive except with respect to certain named resellers for which Sun Microsystems retained exclusive distribution rights. Sun Microsystems is not obligated to sell any of our products under this agreement. In November 1999, we announced that Sun Professional Services would be providing our packaged professional services as well as our custom consulting. This is designed to enable Sun Microsystems' customers and our customers to maximize their system availability through optimal configurations and reliable installations. We cannot assure you that this arrangement will be successful.

Sales, marketing and support organization

    During 2000, we continued to build our sales, marketing and customer
support organization with a focus on delivering our products to resellers,
integrators and end users and integrating the sales force of the Network &
Storage Management Group business, or NSMG. We have sales subsidiaries and
direct sales personnel in North America, South America, Europe and Asia-Pacific.
We also have resellers located in North America, South America, Europe,
Asia-Pacific and the Middle East.

    We expect to increase the number of our sales, marketing and customer
support employees in the future to expand our direct sales efforts to resellers
and end users. We may not have the necessary resources to accomplish this. It is
also possible that we will not be able to establish and expand these new
distribution channels successfully or complete the integration of our sales and
marketing efforts successfully. We expect to hire additional sales employees in
all regions during 2001. Competition for qualified sales, technical and other
personnel is intense, and we may not be able to attract, assimilate or retain
additional highly qualified employees in the future. We also may not be able to
manage our growth effectively.

Concentration of customers

    In 2000 and 1999, no customer accounted for more than 10% of our net
revenue. Revenue from Sun Microsystems accounted for 12% of our net revenue in
1998.

COMPETITION

    The markets in which we compete are intensely competitive and rapidly
changing. Our principal competitors are:

        - internal development groups within our original equipment manufacturer
          customers that provide data availability functions to support their
          systems;

        - hardware and software vendors that offer data protection and file and
          volume management products;

        - hardware and software vendors that offer clustering and replication
          products; and

        - hardware and software vendors that offer storage area networking
          management solutions.

    These internal development groups have the resources and capability to
develop their own data availability solutions. Some original equipment
manufacturer customers are also our competitors, including Compaq Computer, EMC,
Hewlett-Packard, IBM, Microsoft and Sun Microsystems. Relationships between us
and these competitors are complex. While we may compete with them for a share of
the market, they also resell our products. We also may be involved in
collaborative efforts to address interoperability issues and to set standards
for evolving technology.

    The principal markets in which we compete are the markets for data
protection, file and volume management, clustering, replication and storage area
networking management solutions. Our principal competitors in each of these
areas, including the original equipment manufacturer customers listed above,
include:

        - Data protection and file and volume management. Computer Associates, EMC,
          Hewlett-Packard, IBM, Legato, Microsoft and Sun Microsystems.

        - Clustering and replication. Compaq Computer, EMC, Hewlett-Packard,
          Hitachi Data Systems, IBM, Legato, Microsoft and Sun Microsystems.

        - Storage area networking management. Compaq Computer, Computer Associates,
          EMC, IBM and network switch vendors.

    The principal competitive factors in our industry include price, product
functionality, product integration, platform coverage, ability to scale,
worldwide sales infrastructure and global technical support. Although many of
our competitors have greater financial, technical, sales, marketing and other
resources than we do, as well as greater name recognition and a larger installed
customer base, we believe we compete favorably on the basis of each of these
competitive factors relative to our competitors.

Our future anticipated growth and success will depend on our ability to develop superior products more rapidly and less expensively than our competitors, and to educate potential customers as to the benefits of licensing our products rather than developing their own products. Our future and existing competitors could introduce products with superior features, scalability and functionality at lower prices than our products, and could also bundle existing or new products with other more established products in order to compete with us. Our competitors could also gain market share by acquiring or forming strategic alliances with our other competitors. Finally, because new distribution methods offered by the Internet and electronic commerce have removed many of the barriers to entry historically faced by start-up companies in the software industry, we expect to face additional competition from these companies in the future. Increased competition is likely to result in price reductions, reduced gross margins and loss of market share, any of which could adversely affect our business and operating results.

RESEARCH AND DEVELOPMENT

Our research and development efforts have been directed toward developing new products for UNIX and Windows NT, developing new features and functionality for existing products, integrating products in the existing product line and porting new and existing products to different operating systems.

Our major research and development initiatives include:

- Additional integration of the full family of data availability products, including further integration of VERITAS Volume Manager, VERITAS File System and VERITAS NetBackup;

- Development of additional Linux versions of our products;

- Development of additional clustering products; and

- Development of additional storage area network products.

Each of these initiatives involves technical and competitive challenges, which we may not be able to overcome successfully.

Development work under original equipment manufacturer agreements

We devote a substantial amount of development effort to making sure that our products work on our original equipment manufacturer customer's platforms. This is technically challenging, and we may not succeed in our effort.

We have contractual development obligations with some of our original equipment manufacturer customers. Our agreement with Microsoft requires us to develop a disk management graphical user interface designed specifically for Windows NT. Microsoft is providing funding for a significant portion of the development expenses for this product payable in quarterly increments. In order to perform under the agreement, we have hired additional personnel with expertise in the Windows NT operating system environment and are devoting capital investment and resources to complete this project successfully. In addition, our agreements with Sun Microsystems and Hewlett-Packard require us to commit staffing to our projects with them. We may not have the resources necessary to perform our obligations under these agreements.

Size and location of research and development group

As of December 31, 2000, our research and development staff consisted of 1,330 employees located mainly at our Mountain View, California headquarters and in Pune, India.

Research and development expenditures

We had research and development expenses of $175.9 million in 2000, $94.5 million in 1999 and $40.2 million in 1998. These amounts exclude $104.2 million in 1999 and $0.6 million in 1998 for in-process research and development charges in connection with acquisitions. We believe that technical leadership is essential to our success and expect to continue to commit substantial resources to research and development.

Our future success will depend in large part on our ability to enhance existing products, respond to changing customer requirements and develop and introduce new products in a timely manner that keep pace with technological developments and emerging industry standards. We continue to make substantial investments in undisclosed new products, which may or may not be successful. We may not complete these research and development efforts successfully and therefore, future products may not be available on a timely basis or achieve market acceptance.

Need to hire research and development personnel

    We need to hire additional research and development personnel to complete new products on a timely basis, including the adaptation of our products to Windows NT and performance of obligations to key original equipment manufacturer partners. The market for these personnel is very competitive and we cannot assure you that we can hire them on a timely basis or at all. We may consider acquiring and purchasing technology to achieve some of our objectives, but we may not be able to accomplish this successfully.

Effect of technological advances

    From time to time, we or our competitors may announce new products, capabilities or technologies that have the potential to replace or shorten the life cycles of our existing products. Announcements of currently planned or other new products could cause customers to defer purchasing our existing products. We have from time to time in the past experienced delays of up to several months due to the complex nature of software developed by us and other software developers for whose systems or applications we offer products. We could experience delays in connection with our current or future product development activities. Any of these delays could harm our business.

PROPRIETARY RIGHTS

Measures we take to protect our intellectual property

    We regard some of the features of our internal operations, software and documentation as proprietary and rely on copyright, patent, trademark and trade secret laws, confidentiality procedures, contractual and other measures to protect our proprietary information.

    As part of our confidentiality procedures, we generally enter into non-disclosure agreements with our employees, distributors and corporate partners, and license agreements with respect to our software, documentation and other proprietary information. These licenses are generally non-transferable and have a perpetual term.

Trademarks

    VERITAS is a registered trademark in the United States. VERITAS Software and the VERITAS logo are trademarks or registered trademarks in the United States and other countries. Our other trademarks include:

- VERITAS BackupExec
- VERITAS BackupExec Desktop
- VERITAS BackupExec Desktop Pro
- VERITAS Cluster Server
- VERITAS ClusterX
- VERITAS Database Edition
- VERITAS Database Replication Option
- VERITAS Edition
- VERITAS File Replicator
- VERITAS File Server Edition
- VERITAS File System
- VERITAS Foundation Suite
- VERITAS Global Cluster Manager
- VERITAS Global Data Manager
- VERITAS MyCD

- VERITAS MyCD Pro
- VERITAS NetBackup
- VERITAS NetBackup BusinesServer
- VERITAS NetBackup Pro
- VERITAS Remote Storage
- VERITAS SANPoint Control
- VERITAS SANPoint Direct
- VERITAS SANPoint Foundation Suite HA
- VERITAS SANPoint Storage Appliance
- VERITAS Simple Backup
- VERITAS Storage Migrator
- VERITAS Storage Replicator
- VERITAS Volume Manager
- VERITAS Volume Replicator

Patents and patent applications

We have 22 United States issued patents and 8 pending patent applications, including patents and rights to patent applications acquired from the NSMG business, TeleBackup Systems, Inc. and NuView, Inc. Any patents obtained may not provide substantial protection or be of commercial benefit to us. It is also possible that their validity will be challenged.

EMPLOYEES

As of December 31, 2000, we had 4,784 full-time employees, including 1,330 in research and development, 2,840 in sales, marketing, consulting, customer support and strategic initiatives and 614 in finance and administrative services. We expect to hire a significant number of new employees in 2001, particularly in research and development and in sales, marketing, consulting and customer support. We have not entered into any collective bargaining agreement with our employees, and believe that our relations with our employees are good. We believe that our future success will depend in part upon the continued service of our key employees and on our continued ability to hire and retain qualified personnel. We may not be able to retain our key employees and may not be successful in attracting and retaining sufficient numbers of qualified personnel to conduct our business in the future.

EXECUTIVE OFFICERS

    The names of our executive officers, their ages as of December 31, 2000, their positions and other information about them are shown below. The dates given for time of service with VERITAS include time, where applicable, served by each individual with one of our principal predecessor companies.

| NAME | AGE | POSITIONS |
| ---- | --- | --------- |
| Gary L. Bloom..................... | 40 | President and Chief Executive Officer |
| Mark Leslie........................ | 55 | Chairman of the Board |
| Geoffrey W. Squire................. | 53 | Executive Vice President and Vice-Chairman of the Board |
| Fred van den Bosch................. | 53 | Executive Vice President, Engineering |
| Peter J. Levine.................... | 40 | Executive Vice President, Strategic Operations |
| Paul A. Sallaberry................. | 44 | Executive Vice President, Worldwide Field Operations |
| Kenneth E. Lonchar................. | 42 | Senior Vice President, Finance and Chief Financial Officer |
| Michael Wentz...................... | 48 | Senior Vice President, Tech Support |
| Jay A. Jones....................... | 46 | Senior Vice President, Chief Administrative Officer and Secretary |

    Mr. Bloom has served as our President and Chief Executive Officer since November 2000. Mr. Bloom joined us after a 14-year career with Oracle Corporation, where he served as Executive Vice President responsible for server development, platform technologies, marketing, education, customer support and corporate development from May 1999 to November 2000, as Executive Vice President of the systems product division from March 1998 to May 1999, as Senior Vice President of the system products division from November 1997 to March 1998, as Senior Vice President of the worldwide alliances and technologies division from May 1997 to October 1997, as Senior Vice President of the product and platform technologies division from May 1996 to May 1997, and as Vice President of the mainframe and integration technology division and Vice President of the massively parallel computing division from 1992 to May 1996. Before joining Oracle Corporation in 1986, Mr. Bloom held technical positions in the mainframe area at both IBM Corporation and Chevron Corporation. Mr. Bloom serves on the board of directors of Virata Corporation, a supplier of communications software and semiconductors.

    Mr. Leslie has served as our Chairman of the Board since 1990 and served as our Chief Executive Officer from 1990 to November 2000. Mr. Leslie serves on the boards of directors of Brocade Communications Systems, Inc., a supplier of storage area network software, and Keynote Systems, Inc., a supplier of Internet performance measurement and diagnostic services.

    Mr. Squire has served as our Executive Vice President and Vice Chairman of the Board since April 1997, when we merged with OpenVision Technologies, Inc. Mr. Squire became a director of OpenVision in 1994 and was appointed Chief Executive Officer of OpenVision in 1995, after serving as its President and Chief Operating Officer from 1994 to 1995. Mr. Squire was President of the U.K. Computing Services and Software Association in 1994 and, in 1995, was elected as the founding President of the European Information Services Association. Mr. Squire also serves on the board of directors of Industri-Mathematik International Corp., a provider of supply chain and customer service software.

    Mr. van den Bosch has served as our Executive Vice President, Engineering since July 1997. Mr. van den Bosch served as our Senior Vice President, Engineering from 1991 to July 1997 and was appointed as a director in 1996. From 1970 until 1990, he served in various positions with Philips Information Systems, including Director of Technology.

    Mr. Levine has served as our Executive Vice President, Strategic Operations since December 1999, after serving as our Senior Vice President, Strategic Operations from January 1999 to December 1999 and Senior Vice President, OEM Sales from December 1997 to December 1998. Mr. Levine served as a senior executive of VERITAS from 1995 to December 1997.

    Mr. Sallaberry has served as our Executive Vice President, Worldwide Field Operations since December 1999 after serving as our Senior Vice President, Worldwide Sales from July 1999 to December 1999, and Vice

President, Worldwide Sales from April 1997 to July 1999. Mr. Sallaberry was OpenVision's Senior Vice President of North American Operations from 1995 until the merger with VERITAS in April 1997.

Mr. Lonchar has served as our Chief Financial Officer since April 1997 and as our Senior Vice President, Finance since January 1999. Mr. Lonchar served as our Vice President, Finance from April 1997 until January 1999. Mr. Lonchar was Chief Financial Officer and Senior Vice President of OpenVision from 1995 until the merger with VERITAS in April 1997. Mr. Lonchar is a certified public accountant. Mr. Lonchar also serves on the board of directors of Geoworks Corporation, a provider of mobile e-commerce and information services and software.

Mr. Wentz has served as our Senior Vice President, Tech Support since March 2000 and as our Vice President, Technical Services from May 1999 to March 2000. Mr. Wentz was Vice President, Technical Support of the Network & Storage Management Group of Seagate Software, Inc. from 1996 to until its acquisition by VERITAS in May 1999, and was Vice President of Technical Support Services of Arcada Software, Inc. from 1994 until its acquisition by Seagate Software in 1996.

Mr. Jones has served as our Senior Vice President, Chief Administrative Officer and Secretary since January 1999. Mr. Jones served as our Vice President, General Counsel and Secretary from April 1997 to January 1999. Mr. Jones joined OpenVision as General Counsel in 1993 and was appointed Vice President, General Counsel and Secretary in 1994 and served in those capacities until the merger with VERITAS in April 1997. Mr. Jones is a member of the California Bar Association.

ITEM 2. PROPERTIES

Our executive offices are located in Mountain View, California. Our principal facilities are located in Mountain View, California and Heathrow, Florida. All of our facilities are suitable for general office purposes. Large portions of our facilities are occupied under leases that expire at various times through 2012. The table below shows the approximate square footage of the premises that we lease as of December 31, 2000, excluding approximately 34 executive suites in the Americas, 12 in Europe and two in Asia.

| LOCATION | APPROXIMATE SQUARE FOOTAGE |
|----------|---------------------------|
| Americas | |
| California........................................... | 482,511 |
| Colorado............................................. | 27,256 |
| Connecticut.......................................... | 3,585 |
| Florida.............................................. | 228,694 |
| Georgia.............................................. | 16,270 |
| Illinois............................................. | 24,710 |
| Maryland............................................. | 4,685 |
| Massachusetts........................................ | 37,769 |
| Michigan............................................. | 16,613 |
| Minnesota............................................ | 73,274 |
| New Jersey........................................... | 17,473 |
| New York............................................. | 16,801 |
| North Carolina....................................... | 16,570 |
| Oregon............................................... | 10,425 |
| Pennsylvania......................................... | 6,410 |
| Texas................................................ | 28,557 |
| Virginia............................................. | 20,539 |

| LOCATION | APPROXIMATE SQUARE FOOTAGE |
|----------|---------------------------|
| Washington | 35,364 |
| Canada | 16,337 |
| Argentina | 3,013 |
| Brazil | 2,152 |
| Total Americas | 1,089,008 |
| Europe | |
| France | 29,795 |
| Germany | 44,339 |
| Holland | 10,764 |
| Ireland | 10,342 |
| Norway | 3,003 |
| Scotland | 700 |
| Spain | 5,490 |
| Sweden | 8,310 |
| United Kingdom | 70,682 |
| Total Europe | 183,425 |
| Asia | |
| Australia | 42,375 |
| China | 11,694 |
| Hong Kong | 2,580 |
| India | 33,229 |
| Japan | 3,462 |
| Korea | 1,800 |
| Malaysia | 10,281 |
| Singapore | 6,139 |
| Total Asia | 111,560 |
| Total | 1,383,993 |

   Illinois facilities exclude approximately 17,135 square feet and Washington facilities exclude 2,925 square feet of space that we sublease to third parties. Facilities in Australia exclude approximately 1,949 square feet of space we sublease to third parties. Facilities in the United Kingdom exclude approximately 20,508 square feet of space that we sublease to third parties.

   In 1999, we amended and revised our operating lease arrangement for a new 425,000 square foot campus facility in Mountain View, California. We expect to occupy this facility beginning in the second quarter of 2001. In 1999, we also entered into an operating lease arrangement for our existing facilities in Roseville, Minnesota. We expect to improve and expand our existing facilities of approximately 62,000 square feet and to develop adjacent property adding approximately 260,000 square feet to the campus. We expect the first phase of approximately 142,000 square feet to be completed in the second quarter of 2001. In 2000, we entered into an operating lease arrangement for a new 999,990 square foot facility in Milpitas, California. We expect to occupy this facility in phases commencing in the second quarter of 2002 through the second quarter of 2003. Additionally, there is approximately 150,000 square feet of space currently under construction in Reading, UK. We believe our existing and planned facilities will be suitable for our needs.

ITEM 3. LEGAL PROCEEDINGS

   The following discussion contains forward-looking statements, within the meaning of the Securities Exchange Act of 1934 and the Securities Act of 1933, that involve risks and uncertainties. These statements relate to VERITAS' legal proceedings described below. Litigation is inherently uncertain and may result in

adverse rulings or decisions. Additionally, we may enter into settlements or be
subject to judgments that may, individually or in the aggregate, have a material
adverse effect on our operating results. Accordingly, actual results could
differ materially from those projected in the forward-looking statements. The
following discussion relates to the multi-party transaction involving primarily
us, VERITAS Software Technology Corporation, formerly known as Seagate
Technology, Inc. ("Seagate") and Suez Acquisition Company (Cayman) Limited
("SAC"), a company formed by a group of private equity firms led by Silver Lake
Partners, that is described more fully under Item 7, Management's Discussion and
Analysis of Financial Condition and Results of Operations.

    In that transaction, Seagate sold all of its property and assets and the
property and assets of its consolidated subsidiaries, other than certain
designated assets, to Suez Acquisition Company (Cayman) Limited, which we refer
to as the leveraged buyout, and merged a wholly owned subsidiary of VERITAS with
and into Seagate, following which Seagate became VERITAS' wholly owned
subsidiary, which we refer to as the merger.

    Following the announcement of the transaction on March 29, 2000, Seagate
stockholders filed 17 lawsuits in Delaware and five lawsuits in California
against Seagate, the individual members of Seagate's board of directors, certain
executive officers of Seagate, Silver Lake Partners, LP, and VERITAS. Between
April 18, 2000 and October 13, 2000, the Delaware Chancery Court consolidated
the 17 lawsuits into a single action captioned In Re Seagate Technology, Inc.
Shareholders Litigation and certified the class action, and the plaintiffs filed
two amended complaints and a motion for a preliminary injunction to enjoin the
closing of the proposed transaction. The plaintiffs' second amended complaint
alleged that Seagate's board of directors breached their fiduciary duties to
their stockholders by entering into the leveraged buyout and merger agreements
and that they did not secure the highest possible price for Seagate's shares,
and alleged that VERITAS aided and abetted that alleged breach. The plaintiffs
sought unspecified damages and an injunction of the closing of the transaction.
On September 28, 2000, the five California complaints were coordinated, with
venue in Santa Clara County. All five of the California complaints have been
voluntarily dismissed.

    On October 13, 2000, the parties to the Delaware lawsuit entered into a
Memorandum of Understanding to settle the action. On January 22, 2001, the
parties filed a Stipulation of Settlement in the Court of Chancery of the State
of Delaware in and for New Castle County outlining the terms of the settlement
pursuant to the Memorandum of Understanding. A hearing is scheduled on April 9,
2001 to determine whether the proposed settlement is fair and reasonable and
should be approved by the Court, and whether plaintiffs' counsels' award for
fees and expenses should be paid pursuant to the terms set out in the
Stipulation. The settlement is conditioned on, among other things, the
consummation of the leveraged buyout and the merger and final court approval of
the settlement.

    Although VERITAS expects final court approval of the Delaware settlement to
occur during the first half of 2001, it is possible that final approval of the
settlement will be denied or delayed. While the outcome of these matters is
currently not determinable, we believe that the ultimate resolution of these
matters will not have a material adverse effect on our consolidated financial
position, results of operations or cash flows.

ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

    At a special meeting of stockholders held by VERITAS on November 21, 2000,
our stockholders approved the issuance by VERITAS of new shares of our common
stock to stockholders of Seagate Technology, Inc. in connection with a merger
between Seagate Technology, Inc. and a subsidiary of ours. The issuance was
approved by the following vote:

| FOR | AGAINST | ABSTAIN |
|-----------|---------|---------|
| 324,236,711 | 1,159,377 | 1,558,381 |

PART II

ITEM 5. MARKET FOR THE REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER
MATTERS

PRICE RANGE OF COMMON STOCK

    Our common stock is listed on the Nasdaq National Market under the symbol
"VRTS." The table below shows the range of high and low reported sale prices on
the Nasdaq National Market for our common stock, including our predecessor
corporation, for the periods indicated.

|  | HIGH | LOW |
|---|---|---|
| 1999 | | |
| First Quarter........................................ | $ 19.89 | $12.89 |
| Second Quarter....................................... | 22.17 | 13.56 |
| Third Quarter........................................ | 36.22 | 20.64 |
| Fourth Quarter....................................... | 98.58 | 32.39 |
| 2000 | | |
| First Quarter........................................ | $174.00 | $72.42 |
| Second Quarter....................................... | 140.50 | 75.31 |
| Third Quarter........................................ | 149.81 | 87.50 |
| Fourth Quarter....................................... | 166.88 | 79.25 |

    As of February 28, 2001, there were approximately 3,800 holders of record
of our common stock. Brokers and other institutions hold many of such shares on
behalf of stockholders. We estimate the total number of stockholders represented
by these record holders to be approximately 266,000.

DIVIDEND POLICY

    We have never declared or paid any cash dividends on our capital stock. We
currently anticipate that we will retain future earnings, if any, to fund
development and growth of our business and do not anticipate paying any cash
dividends in the foreseeable future.

19

ITEM 6. SELECTED FINANCIAL DATA

    The following selected consolidated financial data are derived from our
consolidated financial statements. This data should be read in conjunction with
the consolidated financial statements and notes thereto, and Item 7,
Management's Discussion and Analysis of Financial Condition and Results of
Operations.

|  | YEARS ENDED DECEMBER 31, | | | | |
|---|---|---|---|---|---|
|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | |
| CONSOLIDATED STATEMENT OF OPERATIONS DATA: |  |  |  |  |  |
| Total net revenue...................... | $ 1,207,328 | $ 596,112 | $210,865 | $121,125 | $ 72,746 |
| Amortization of developed technology... | 62,054 | 35,659 | -- | -- | -- |
| Amortization of goodwill and other intangibles.......................... | 879,032 | 510,943 | -- | -- | -- |
| Acquisition and restructuring costs (reversals).......................... | (4,260) | 11,000 | -- | 8,490 | -- |
| In-process research and development.... | -- | 104,200 | 600 | -- | 2,200 |
| Income (loss) from operations.......... | (553,880) | (475,237) | 53,668 | 20,076 | 11,858 |
| Net income (loss)...................... | (619,792) | (502,958) | 51,648 | 22,749 | 12,129 |
| Net income (loss) per share -- basic... | $ (1.55) | $ (1.59) | $ 0.24 | $ 0.11 | $ 0.06 |
| Net income (loss) per share -- diluted..................... | $ (1.55) | $ (1.59) | $ 0.22 | $ 0.10 | $ 0.06 |
| Number of shares used in computing per share amounts -- basic.............. | 400,034 | 316,892 | 211,558 | 205,300 | 193,617 |
| Number of shares used in computing per share amounts -- diluted............ | 400,034 | 316,892 | 232,519 | 222,716 | 209,228 |

|  | DECEMBER 31, | | | | |
|---|---|---|---|---|---|
|  | 2000 | 1999 | 1998 | 1997 | 1996 |
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | |
| CONSOLIDATED BALANCE SHEET DATA: |  |  |  |  |  |
| Working capital........................ | $ 924,677 | $ 630,440 | $198,069 | $187,667 | $ 66,408 |
| Total assets........................... | 4,082,834 | 4,233,277 | 349,117 | 241,880 | 94,524 |
| Long-term obligations.................. | 429,176 | 451,044 | 100,000 | 100,000 | 463 |
| Accumulated deficit.................... | (1,152,166) | (532,374) | (29,416) | (81,064) | (103,813) |
| Stockholders' equity................... | 2,982,571 | 3,393,061 | 169,854 | 104,193 | 74,955 |

    In 1999, we acquired the NSMG business, TeleBackup and NuView. Because we
accounted for these acquisitions using the purchase method of accounting, we
recorded developed technology, goodwill and other intangible assets of
approximately $3,754.9 million in total. These assets are being amortized over
their estimated useful life of four years, and result in charges to operations
of approximately $234.8 million per quarter. We recorded one-time non-cash
charges of $104.2 million in our statements of operations in 1999, related to
the write-off of in-process research and development. We also recorded a
one-time restructuring charge in 1999 of $11.0 million related primarily to
costs for our duplicative facilities that we planned to vacate, of which $4.3
million was reversed in 2000 as a result of lower actual exit costs than
originally estimated with respect to our duplicative facilities.

17

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
OF OPERATIONS

This annual report on Form 10-K contains forward-looking statements that
involve numerous risks and uncertainties. These forward-looking statements
include statements regarding our expectations, beliefs, intentions or strategies
regarding the future. All these forward-looking statements are based on
information available to us at this time, and we assume no obligation to update
any of these statements. The actual results that we achieve may differ
materially from those anticipated by any forward-looking statement due to risks
and uncertainties including those described below under "Factors That May Affect
Future Results."

OVERVIEW

VERITAS is a leading independent supplier of data availability software
products. Data availability software includes storage management and data
protection software as well as clustering, replication and storage area
networking software.

We develop products for most popular operating systems, including versions
of UNIX, Windows NT and Linux. We market our products and services to original
equipment manufacturers and end user customers through a combination of direct
sales and indirect sales channels such as resellers, value-added resellers,
hardware distributors, application software vendors and systems integrators.

We derive user license fee revenue from shipments of our software products
to end-user customers through direct sales channels, indirect sales channels and
original equipment manufacturer customers. Our original equipment manufacturer
customers either bundle our products with the products licensed by the original
equipment manufacturers or offer them as options. Some original equipment
manufacturers also resell our products. We receive a royalty each time the
original equipment manufacturer licenses to a customer a copy of the original
equipment manufacturer's products that incorporates one or more of our products.
Our license agreements with our original equipment manufacturer customers
generally contain no minimum sales requirements. We cannot assure you that any
original equipment manufacturer will either commence or continue shipping
operating systems incorporating our products in the future. When we enter into
new agreements with original equipment manufacturer customers and resellers, a
significant period of time may elapse before we realize any associated revenue,
due to development work that we must generally undertake under these agreements
and the time needed for the sales and marketing organizations within these
customers and distributors to become familiar with and gain confidence in our
products.

Our services revenue consists of fees derived mainly from annual
maintenance agreements, as well as fees from consulting and training services.
Original equipment manufacturer maintenance agreements covering our products
provide for technical and emergency support and minor unspecified product
upgrades for a fixed annual fee. Maintenance agreements covering products that
are licensed through channels other than original equipment manufacturers
provide for technical support and unspecified product upgrades for an annual fee
based on the number of user licenses purchased and the level of service
subscribed.

INTERNATIONAL SALES AND OPERATIONS

Our international sales are generated primarily through our international
sales subsidiaries. International revenue, most of which is collectible in
foreign currencies, accounted for approximately 24% of our total revenue in
2000, 24% of our total revenue in 1999 and 26% of our total revenue in 1998. Our
international revenue increased 103% to $294.4 million in 2000 from $144.9
million in 1999, and 167% in 1999 from $54.2 million in 1998.

We believe that our success depends upon continued expansion of our
international operations. We currently have sales and service offices and
resellers located in North America, Europe, Asia-Pacific, South America and the
Middle East, and a development center in India. International expansion will
require us to establish additional foreign offices, hire more personnel and
recruit new international resellers, resulting in the diversion of significant
management attention and the expenditure of financial resources. To the extent
that we are unable to meet these additional requirements, growth in
international sales will be limited, which would have an adverse effect on our
business, operating results and financial condition. International operations
also

subject us to a number of risks inherent in developing and selling products
outside the United States, including potential loss of developed technology,
limited protection of intellectual property rights, imposition of government
regulation, imposition of export duties and restrictions, cultural differences
in the conduct of business, and political and economic instability.

SEAGATE TECHNOLOGY TRANSACTION

    On November 22, 2000, we completed a multi-party transaction with Seagate
Technology, Inc. ("Seagate") and Suez Acquisition Company (Cayman) Limited
("SAC"), a company formed by a group of private equity firms led by Silver Lake
Partners. The transaction was structured as a leveraged buyout of Seagate
pursuant to which Seagate sold all of its operating assets to SAC, and SAC
assumed and indemnified Seagate and us for substantially all liabilities arising
in connection with those operating assets. At the closing, and after the
operating assets and liabilities of Seagate had been transferred to SAC, a
wholly-owned subsidiary of ours merged with and into Seagate, following which
Seagate became our wholly-owned subsidiary and was renamed VERITAS Software
Technology Corporation. We issued approximately 109.4 million shares of our
common stock to the Seagate stockholders in exchange for approximately 128.1
million shares of our common stock and equity securities in Gadzoox Networks,
Inc. held by Seagate. We recorded the equity securities in Gadzoox and other
assets and liabilities assumed from Seagate at their fair values. In addition,
we accrued $40 million of direct transaction costs, of which $9 million was paid
as of December 31, 2000. We did not acquire Seagate's disc drive business or any
other Seagate operating business.

    The transaction had no impact on our consolidated statement of operations.
The impact of the decrease of approximately 18.7 million of shares our common
stock outstanding was a reduction of approximately 2.0 million shares used in
computing net loss per share for the year ended December 31, 2000, resulting in
an incremental net loss per share of $0.01.

    The transaction had impacts on our consolidated balance sheet. As of
December 31, 2000, our other assets included $70 million of indemnification
receivable from SAC and $4 million for our ownership in Gadzoox Networks, Inc,
our accrued acquisition and restructuring costs included $31 million of direct
transaction costs, which was net of $9 million paid in 2000, and our deferred
and other income taxes included an additional $132 million, which is net of a
deferred tax asset of $3 million related to our ownership in Gadzoox Networks,
Inc.

BUSINESS COMBINATIONS

    On May 28, 1999, we acquired the Network & Storage Management Group
business of Seagate Software, Inc., which we refer to as NSMG. On June 1, 1999
we acquired TeleBackup Systems, Inc., which we refer to as TeleBackup. On August
10, 1999, we acquired certain assets of NuView, Inc., which we refer to as
NuView.

    NSMG acquisition

    The NSMG business developed and marketed software products and provided
related services enabling information technology professionals to manage
distributed network resources and to secure and protect enterprise data. In
connection with the NSMG acquisition, we issued 155,583,486 shares of our common
stock to Seagate Software and issued options to purchase 15,626,358 shares of
our common stock to our employees who were former NSMG employees. We accounted
for the NSMG acquisition using the purchase method of accounting, and we are
incurring charges of $221.5 million per quarter primarily related to the
amortization of developed technology, goodwill and other intangibles over their
estimated useful life of four years. The total NSMG purchase price was $3,464.5
million and included $3,151.4 million for the issuance of our common stock,
$269.7 million for the exchange of options to purchase our common stock and
$43.4 million of acquisition-related costs. The purchase price was allocated,
based on an independent valuation, to goodwill of $3,015.8 million, distribution
channels of $233.8 million, original equipment manufacturer agreements of $23.4
million, developed technology of $233.7 million, assembled workforce of $12.8
million, trademarks of

$22.8 million, in-process research and development of $101.2 million, net deferred tax liabilities of $179.5 million, other intangibles of $1.5 million and tangible net liabilities assumed of $1.0 million. For 2000, we recorded $827.6 million for the amortization of goodwill and other intangibles, and $58.4 million for the amortization of developed technology related to this acquisition and for 1999, we recorded $482.5 million for the amortization of goodwill and other intangibles, and $34.1 for the amortization of developed technology related to this acquisition.

Acquisition-related costs consisted of direct transaction costs of $20.0 million, operating lease commitments on duplicative facilities of $8.2 million and involuntary termination benefits of $15.2 million. Non-cash charges included in the acquisition-related costs approximated $11.7 million.

Acquisition-related costs are summarized below (in millions):

|  | DIRECT TRANSACTION COSTS | OPERATING LEASE COMMITMENTS ON DUPLICATIVE FACILITIES | INVOLUNTARY TERMINATION BENEFITS | TOTAL |
|---|---|---|---|---|
| Provision accrued at acquisition date................................ | $ 20.0 | $ 8.2 | $ 15.2 | $ 43.4 |
| Cash payments......................... | (17.4) | (0.3) | (1.8) | (19.5) |
| Non-cash charges...................... | -- | -- | (11.7) | (11.7) |
| Balance at December 31, 1999.......... | 2.6 | 7.9 | 1.7 | 12.2 |
| Cash payments......................... | (1.9) | (1.9) | (0.9) | (4.7) |
| Balance at December 31, 2000.......... | $ 0.7 | $ 6.0 | $ 0.8 | $ 7.5 |

The remaining acquisition-related costs accrual of $7.5 million is anticipated to be utilized primarily for servicing operating lease payments or negotiated buyout of operating lease commitments, the lease terms of which will expire at various times through the year 2013.

In addition, we recorded a restructuring charge of $11.0 million in 1999 as a result of the NSMG acquisition. This restructuring charge related to exit costs with respect to duplicative facilities that we planned to vacate, which include $0.9 million of write-off of redundant equipment and leasehold improvements, and involuntary termination benefits. Involuntary termination benefits relate to the salary and fringe benefit expense for terminated employees in research and development. The involuntarily terminated employees represented 2% of the global workforce. In the fourth quarter of 2000, as a result of lower actual exit costs than originally estimated with respect to duplicative facilities, we reversed $4.3 million of the restructuring charge.

Restructuring costs are summarized below (in millions):

|  | CANCELLATION OF FACILITIES LEASES AND OTHER CONTRACTS | INVOLUNTARY TERMINATION BENEFITS | WRITE OFF OF REDUNDANT EQUIPMENT AND LEASEHOLD IMPROVEMENTS | TOTAL |
|---|---|---|---|---|
| Provision accrued at acquisition date............................ | $ 8.8 | $ 1.3 | $ 0.9 | $ 11.0 |
| Cash payments.................... | -- | (0.9) | -- | (0.9) |
| Non-cash charges................. | -- | -- | (0.9) | (0.9) |
| Balance at December 31, 1999...... | 8.8 | 0.4 | -- | 9.2 |
| Cash payments.................... | (0.2) | -- | -- | (0.2) |
| Reversal......................... | (3.9) | (0.4) | -- | (4.3) |
| Balance at December 31, 2000...... | $ 4.7 | $ -- | $ -- | $ 4.7 |

The remaining restructuring charge accrual of $4.7 million is anticipated to be utilized for servicing operating lease payments or negotiated buyout of operating lease commitments, the lease terms of which will expire at various times through the year 2012.

TeleBackup acquisition

    TeleBackup designed, developed and marketed software products for local and
remote backup and recovery of electronic information stored on networked, remote
and mobile personal computers. TeleBackup became our wholly-owned subsidiary in
exchange for the issuance of 6,842,795 shares of either our common stock or
exchangeable shares exchangeable into our common stock to the holders of
TeleBackup common shares, and the exchange of options to purchase 154,706 shares
of our common stock to our employees who were former employees of TeleBackup. We
accounted for the TeleBackup acquisition using the purchase method of
accounting, and we are incurring charges of $9.0 million per quarter, primarily
related to the amortization of developed technology, goodwill and other
intangibles over their estimated useful life of four years. The total purchase
price for TeleBackup was $143.1 million and included $134.1 million related to
the issuance of our common stock, $2.8 million for the issuance of options to
purchase our common stock and $6.2 million in acquisition-related costs. The
purchase price was allocated, based on an independent valuation, to goodwill of
$133.1 million, distribution channels of $1.0 million, original equipment
manufacturer agreements of $2.1 million, developed technology of $6.6 million,
assembled workforce of $0.3 million, trademarks of $1.3 million, in-process
research and development of $1.9 million, net deferred tax liabilities of $3.0
million and tangible net liabilities assumed of $0.2 million. For 2000, we
recorded $34.5 million for amortization of goodwill and other intangibles, and
$1.7 million for the amortization of developed technology related to this
acquisition and for 1999, we recorded $20.1 million for amortization of goodwill
and other intangibles, and $1.0 for the amortization of developed technology
related to this acquisition.

    The acquisition costs of $6.2 million consist primarily of direct
transaction costs and involuntary termination benefits.

    Acquisition-related costs are summarized below (in millions):

|  | DIRECT TRANSACTION COSTS | INVOLUNTARY TERMINATION BENEFITS | TOTAL |
|---|---|---|---|
| Provision accrued at acquisition date.................. | $ 5.6 | 0.6 | $ 6.2 |
| Cash payments......................................... | (5.1) | (0.2) | (5.3) |
| Balance at December 31, 1999.......................... | 0.5 | 0.4 | 0.9 |
| Cash payments......................................... | (0.2) | (0.4) | (0.6) |
| Balance at December 31, 2000.......................... | $ 0.3 | $ -- | $ 0.3 |

    The remaining $0.3 million is anticipated to be utilized in 2001.

NuView acquisition

    Under an asset purchase agreement, we acquired certain assets of NuView for
a total cost of approximately $67.9 million. We accounted for the acquisition
using the purchase method of accounting, and we are incurring charges of $4.3
million per quarter primarily related to the amortization of developed
technology, goodwill and other intangibles over their estimated useful life of
four years. The purchase price included $47.7 million related to the issuance of
our common stock, $0.8 million for the issuance of options to purchase our
common stock to former NuView employees, $0.2 million in acquisition-related
costs and $19.2 million paid in cash. The purchase price was allocated, based on
an independent valuation, to goodwill of $62.6 million, developed technology of
$2.4 million, assembled workforce of $0.6 million, trademarks of $0.3 million,
covenant-not-to-compete of $0.9 million and in-process research and development
of $1.1 million. For 2000, we recorded $16.5 million for amortization of
goodwill and other intangibles, and $0.6 million for the amortization of
developed technology related to this acquisition and for 1999, we recorded $8.1
million for amortization of goodwill and other intangibles, and $0.3 million for
the amortization of developed technology related to this acquisition.

    For the years ended December 31, 1999 and 2000, we incurred net losses due
to the amortization of developed technology, goodwill and other intangibles
related to the acquisitions of the NSMG business,

TeleBackup and NuView. Because of these acquisitions, we will incur total
charges of $234.8 million per quarter until the second quarter of 2003 related
to the amortization of developed technology, goodwill and other intangibles.
Because of these significant quarterly charges it is likely that we will remain
unprofitable at least through the second quarter of 2003.

RESULTS OF OPERATIONS

     The following table sets forth, for the periods indicated, selected items
in our statements of operations expressed as a percentage of total revenue.

|  | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
| Net revenue: |  |  |  |
|   User license fees...................................... | 82% | 84% | 80% |
|   Services.............................................. | 18 | 16 | 20 |
|      Total net revenue............................ | 100 | 100 | 100 |
| Cost of revenue: |  |  |  |
|   User license fees...................................... | 4 | 4 | 4 |
|   Services.............................................. | 7 | 6 | 10 |
|   Amortization of developed technology.................... | 5 | 6 | -- |
|      Total cost of revenue........................ | 16 | 16 | 14 |
| Gross profit.......................................... | 84 | 84 | 86 |
| Operating expenses: |  |  |  |
|   Selling and marketing................................. | 37 | 37 | 36 |
|   Research and development.............................. | 15 | 16 | 19 |
|   General and administrative............................ | 6 | 6 | 5 |
|   Amortization of goodwill and other intangibles.......... | 73 | 86 | -- |
|   Acquisition and restructuring costs................... | (1) | 2 | -- |
|   In-process research and development..................... | -- | 17 | -- |
|      Total operating expenses..................... | 130 | 164 | 60 |
| Income from operations............................... | (46) | (80) | 26 |
| Interest and other income, net....................... | 5 | 4 | 6 |
| Interest expense..................................... | (2) | (2) | (3) |
| Income before income taxes........................... | (43) | (78) | 29 |
| Provision for income taxes........................... | 8 | 6 | 4 |
| Net income........................................... | (51)% | (84)% | 25% |

     Net Revenue

     Net revenue increased 103% to $1,207.3 million in 2000 from $596.1 million
in 1999, when it increased 183% from $210.9 million in 1998. While we believe
that the percentage increases in net revenue achieved in these periods are not
necessarily indicative of future results, we expect net revenue to continue to
grow in 2001. Our revenue comprises user license fees and service revenue.

     User License Fees. User license fees increased 98% to $987.4 million in
2000 from $498.0 million in 1999, when it increased 197% from $167.7 million in
1998. The increases in 2000 and 1999 were primarily the result of the continued
growth in market acceptance of our software products, introduction of new
products, a greater volume of large end-user transactions, and increased revenue
from original equipment manufacturers. In particular, our license fees from our
data protection, file and volume management and application solutions products
increased 91% to $848.4 million in 2000 from $443.6 million in 1999, when it
increased 194% from $150.7 million in 1998. The user license fees from our data
protection, file and volume management and application solutions products
accounted for 86% of user license fees in 2000, 89% in 1999 and 90% in 1998.

Our user license fees from our newer clustering and replication products increased 155% to $139.0 million in 2000 from $54.4 million in 1999, when it increased 220% from $17.0 in million in 1998. In 2000 and 1999, we also recorded a greater volume of large end-user transactions. For end-user transactions valued at $250,000 or more, our user license fees increased 284% to $216.3 million in 2000 from $56.4 million in 1999, when it increased 165% from $21.3 million in 1998. Our user license fees from original equipment manufacturers increased 76% to $169.1 million in 2000 from $95.9 million in 1999, when it increased 11% from $86.3 million in 1998. The user license fees from original equipment manufacturers accounted for 17% of user license fees in 2000, 19% in 1999 and 51% in 1998. The increases in user license fees in 2000 and 1999 were also the result of the acquisition of NSMG in May 1999.

Service Revenue. We derive our service revenue primarily from contracts for software maintenance and technical support and, to a lesser extent, consulting and training services. Service revenue increased 124% to $220.0 million in 2000, from $98.1 million in 1999, when it increased 127% from $43.2 million in 1998. These increases were primarily due to increased sales of service and support contracts on new licenses, renewal of service and support contracts on existing licenses and, to a lesser extent, an increase in demand for consulting and training services. The increase in 2000 was also attributable to the acquisition of NSMG. Service revenue represented 18% of total revenue in 2000 and is expected to continue to grow as a percentage of total revenue.

Cost of Revenue

Cost of revenue increased 100% to $188.8 million in 2000 from $94.6 million in 1999, when it increased 221% from $29.5 million in 1998. Gross margin on user license fees is substantially higher than gross margin on service revenue, reflecting the low materials, packaging and other costs of software products compared with the relatively high personnel costs associated with providing maintenance, technical support, consulting, training services and development efforts. Cost of service revenue varies depending upon the mix of maintenance, technical support, consulting and training services. We expect gross margin to fluctuate in the future, reflecting this mix and the timing differences between increasing our organizational investments and the recognition of revenue that we expect as a result of these investments.

Cost of User License Fees (including amortization of developed technology). Cost of user license fees consists primarily of royalties, media, manuals and distribution costs. Also included in the cost of revenue is the amortization of developed technology acquired in the NSMG, TeleBackup and NuView acquisitions in 1999. Cost of user license fees increased 82% to $102.8 million in 2000 from $56.4 million in 1999, and increased 541% in 1999 from $8.8 million in 1998. The increases in 2000 and 1999 were primarily the result of the amortization of developed technology. Gross margin on user license fees was 90% in 2000, 89% in 1999 and 95% in 1998. The increase in gross margin on user license fees in 2000 was due to a combination of an increase in user license fees and the stability of the amortization of developed technology. If we excluded the amortization of developed technology from the cost of user license fees, the gross margin on user license fees would have been 96% in both 2000 and 1999. The gross margin on user license fees may vary from period to period based on the license revenue mix, because some products carry higher royalty rates than others. We do not expect gross margin on user license fees to increase significantly in the future.

Cost of Service Revenue. Cost of service revenue consists primarily of personnel-related costs in providing maintenance, technical support, consulting and training to customers. Cost of service revenue increased 125% to $86.0 million in 2000 from $38.2 million in 1999, and increased 85% in 1999 from $20.7 million in 1998. Gross margin on service revenue was 61% in 2000, 61% in 1999, and 52% in 1998. The gross margin improvement in 1999 was the result of increased productivity and higher service revenue growth due to support fees from a larger installed customer base and we maintained the same percentage of gross margin in 2000. We expect the costs of service revenue to continue to increase in absolute dollars in future periods and we expect the gross margin on service revenue to increase slightly as a percentage.

Amortization of Developed Technology. Amortization of developed technology was $62.1 million in 2000 and $35.7 million in 1999. These amounts mainly represent the amortization of the developed technology recorded upon the acquisition of NSMG, TeleBackup and NuView in 1999. The useful life of the developed

technology acquired is four years and we expect the amortization to be approximately $15.6 million per quarter.

Operating Expenses

The NSMG and TeleBackup acquisitions that occurred during 1999 have contributed to increases in all operating expense categories. Although the increases relating to the acquisitions are most notable from 1998 to 1999, the impact of acquisitions is still evident in 2000 since this was the first full year that both NSMG and TeleBackup were reflected in our results. However, due to the integration that has taken place to date, it is not possible to quantify the portion of the increase that is related directly to these acquisitions.

Selling and Marketing. Selling and marketing expenses consist primarily of salaries, related benefits, commissions, consultant fees and other costs associated with our sales and marketing efforts. Selling and marketing expenses increased 100% to $443.8 million in 2000 from $222.0 million in 1999, and increased 191% in 1999 from $76.4 million in 1998. As a percentage of net revenue, selling and marketing expenses remained consistent at 37% in 2000 and 1999, only up slightly from 36% in 1998. The increase in absolute dollars is primarily attributable to increased sales and marketing staffing and, to a lesser extent, increased costs associated with new marketing programs. We intend to continue to expand our global sales and marketing infrastructure, and accordingly, we expect our selling and marketing expenses to increase in absolute dollars but not to change significantly as a percentage of total revenue in the future.

Research and Development. Research and development expenses consist primarily of salaries, related benefits, third-party consultant fees and other engineering related costs. Research and development expenses increased 86% to $175.9 million in 2000 from $94.5 million in 1999, and increased 135% in 1998 from $40.2 million in 1998. The increases were due primarily to increased staffing levels associated with new hires and our acquisitions and expansion of development efforts for new technology. As a percentage of net revenue, research and development expenses were 15% in 2000, 16% in 1999 and 19% in 1998. We believe that a significant level of research and development investment is required to remain competitive, and expect these expenses will continue to increase in absolute dollars in future periods and may increase slightly as a percentage of net revenue. We expect research and development expenses to fluctuate from time to time to the extent that we make periodic incremental investments in research and development.

General and Administrative. General and administrative expenses consist primarily of salaries, related benefits and fees for professional services, such as legal and accounting services. General and administrative expenses increased 128% to $77.9 million in 2000 from $34.2 million in 1999, and increased 225% in 1999 from $10.5 million in 1998. As a percentage of net revenue, general and administrative expenses were 6% in 2000, 6% in 1999 and 5% in 1998. The increases in absolute dollars in 2000 and 1999 were due to additional personnel costs, including additional personnel related to the acquisitions in the second quarter of 1999, and, to a lesser extent, to an increase in other expenses associated with enhancing our infrastructure to support expansion of our operations. We expect general and administrative expenses to increase in absolute dollars, but not to change significantly as a percentage of net revenue, as we expand our operations.

Amortization of Goodwill and Other Intangibles. Amortization of goodwill and other intangibles increased 73% to $879.0 million in 2000 from $510.9 million in 1999. This amount represents amortization of goodwill, distribution channels, trademarks and other intangibles assets recorded upon the acquisitions of NSMG, TeleBackup and NuView in 1999. The estimated useful life of the goodwill and the other intangibles is four years and we expect the amortization to be approximately $219.7 million per quarter through 2003.

In-Process Research and Development. Upon the acquisition of NSMG, TeleBackup and NuView in 1999, we recorded one-time charges to in-process research and development totaling $104.2 million. We obtained outside valuations for these acquisitions, and values were assigned to developed technology, in-process research and development and other intangibles. The fair value of the in-process research and development for each of the acquisitions was determined using the income approach, which discounts expected future cash flows from projects under development to their net present value. Each project was analyzed to determine the characteristics and applications of the technology; the complexity, cost and time to complete the remaining development efforts; any alternative future use or current technological feasibility; and

the stage of completion. The projected future cash flows from the projects under development were based on management's estimates of revenues and operating profits related to the projects. Revenues on the projects related to in-process research and development were estimated to begin in 1999 through 2003, with the majority of the revenues occurring between 2000 and 2002. The risk-adjusted discount rate applied to after-tax cash flows was 20%, compared to an estimated weighted-average cost of capital of 15%. We believe the amounts determined for in-process research and development are representative of fair value and do not exceed the amounts an independent third party would pay for the projects assumed.

The total charge for in-process research and development was estimated to be $101.2 million for the NSMG acquisition. Seven in-process research and development projects were identified and valued, with two projects under the data protection product group that accounted for approximately 71% of the value assigned to in-process research and development. The data protection software products provide backup and restore functions, including scheduled automated unattended data backup operations. The remaining products identified and valued were under the application solutions and replication product groups. The application solutions software provides scaleable solution for managing the behavior of different types of networks worldwide from one central location and the replication software products deliver flexible and intelligent data replication for Windows NT environments. Costs to complete all of the NSMG in-process research and development projects were estimated to be $6.0 million. At the date of acquisition, the development of all products ranged from 48% to 90% complete and averaged approximately 76% complete, with expected completion dates through December 1999. At December 31, 2000, all in-process research and development projects related to the NSMG acquisition were completed or abandoned.

All in-process research and development projects related to the TeleBackup and NuView acquisitions were individually insignificant and were completed or abandoned as of December 31, 1999.

Acquisition and restructuring costs. In connection with the NSMG acquisition, we recorded a one-time charge to acquisition and restructuring costs of $11.0 million, which included approximately $9.7 million in exit costs with respect to duplicative facilities that we planned to vacate and approximately $1.3 million in severance benefits. In the fourth quarter of 2000, mainly as a result of lower actual exit costs than originally estimated with respect to duplicative facilities, we reversed $4.3 million of the restructuring charge.

Interest and Other Income, Net. Interest and other income, net increased 156% to $59.6 million in 2000 from $23.3 million in 1999, and 97% from $11.8 million in 1998. The increases were due primarily to increased amounts of interest income attributable to the higher level of funds available for investment, primarily from the issuance of the convertible subordinated notes in October 1997 and August 1999 and from the net cash provided by operating activities. Foreign exchange transaction gains and losses that are included in other income, net, have not had a significant effect on our results of operations.

Interest Expense. Interest expense increased to $31.6 million in 2000 from $15.7 million in 1999 and $5.7 million in 1998. Interest expense in 2000, 1999 and 1998 consisted primarily of interest recorded under the 1.856% convertible subordinated notes due 2006 issued in August 1999 and the 5.25% convertible subordinated notes due 2004 issued in October 1997.

Income Taxes. We had effective tax rates of negative 18% in 2000, negative 8% in 1999 and positive 14% in 1998. Our 2000 and 1999 effective tax rates were negative and differed from the combined federal and state statutory rates primarily due to acquisition related charges that were non-deductible for tax purposes. Our 1998 effective tax rate was lower than the combined federal and state statutory rates primarily due to the utilization of federal net operating loss carryforwards, other credit carryforwards and reduction of the valuation allowance on deferred income taxes, offset by the impact of state and foreign taxes.

New Accounting Pronouncements. In June 1998, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards, or SFAS, No. 133, Accounting for Derivative Instruments and Hedging Activities. SFAS No. 133, as amended by SFAS No. 137 and 138, establishes methods of accounting for derivative financial instruments and hedging activities related to those instruments as well as other hedging activities. We will be required to implement SFAS No. 133 as of the beginning of our fiscal year 2001. The implementation of SFAS No. 133 will not have a material impact on our financial position, results of operations or cash flows.

In December 1999, the SEC issued Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" or SAB 101. SAB 101 provides guidance on the recognition, presentation and disclosure of revenue in financial statements. The required implementation date for us was the fourth quarter of 2000, retroactive to the beginning of the fiscal year. The implementation of SAB 101 did not have a material impact on our financial position, results of operations or cash flows for the year ended December 31, 2000.

LIQUIDITY AND CAPITAL RESOURCES

Our cash, cash equivalents and short-term investments totaled $1,119.4 million at December 31, 2000 and represented 62% of our net tangible assets. Cash and cash equivalents are highly liquid with original maturities of ninety days or less. Short-term investments consist mainly of investment grade commercial paper, medium-term notes, corporate notes, government securities and market auction preferreds. At December 31, 2000, we had $429.2 million of long-term obligations and stockholders' equity was approximately $2,982.6 million.

Net cash provided from operating activities was $546.8 million in 2000, $207.4 million in 1999 and $62.8 million in 1998. The increase in 2000 cash provided by operating activities resulted primarily from income after adjustments to exclude non-cash charges, including amortization of intangibles related to acquisition activities, tax benefits from stock plans and an increase in deferred revenue partially offset by an increase in account receivable and other assets, as a result of our overall revenue growth. The increase in 1999 cash provided by operating activities resulted primarily from income after adjustments to exclude non-cash charges, including amortization of intangibles related to acquisition activities, and tax benefits from stock plans partially offset by an increase in accounts receivable, as a result of our overall revenue growth.

Our investing activities provided cash of $81.0 million in 2000 due to the net decrease in short-term and long-term investments of $240.2 million, partially offset by purchases of property and equipment of $134.7 million and strategic investments of $22.0 million. Our investing activities used cash of $577.0 million in 1999 primarily due to the net increase in short-term and long-term investments of $505.2 million, purchases of property and equipment of $59.7 million and purchase of certain assets of NuView. Our investing activities used cash of $13.4 million in 1998 primarily due to capital expenditures of $23.4 million.

Financing activities provided cash of $119.5 million in 2000 from the issuance of common stock under our employee stock plans. Financing activities provided cash of $379.6 million in 1999 from the net proceeds of $334.1 million related to the issuance of the 1.856% convertible subordinated notes in August 1999 and $45.5 million from the issuance of common stock under our employee stock plans. Financing activities

provided cash of $14.0 million in 1998, arising from the issuance of common stock under our employee stock plans.

In October 1997, we issued $100.0 million of 5.25% convertible subordinated notes due 2004 (the "5.25% notes"), for which we received net proceeds of $97.5 million. We and our wholly-owned subsidiary, VERITAS Operating Corporation, are co-obligors on the 5.25% notes and are unconditionally, jointly and severally liable for all payments under the notes. During 2000, a total principal amount at maturity of $35.5 million was converted into approximately 3.7 million shares of our common stock. Based on the aggregate principal amount at maturity of $64.5 million outstanding as of December 31, 2000, the 5.25% notes provide for semi-annual interest payments of $1.7 million each May 1 and November 1. The 5.25% notes are convertible into shares of our common stock at any time prior to the close of business on the maturity date, unless previously redeemed or repurchased, at a conversion price of $9.56 per share, subject to adjustment in certain events, equivalent to a conversion rate of 104.65 shares of common stock per $1,000 principal amount at maturity. On or after November 5, 2002, the 5.25% notes will be redeemable over a period of time until maturity at our option at declining premiums to par. The debt issuance costs are being amortized over the term of the 5.25% notes using the interest method.

In August 1999, we and our wholly-owned subsidiary, VERITAS Operating Corporation, issued $465.8 million, aggregate principal amount at maturity, of 1.856% convertible subordinated notes due 2006 (the "1.856% notes") for which we received net proceeds of approximately $334.1 million. The interest rate of 1.856%, together with the accrual of original issue discount, represent a yield to maturity of 6.5%. We and VERITAS Operating Corporation are co-obligors on the 1.856% notes and are unconditionally, jointly and severally liable for all payments under the notes. During 2000, a total principal amount at maturity of $1.0 million was converted into approximately 28,000 shares of our common stock. Based on the aggregate principal amount at maturity of $464.7 million outstanding as of December 31, 2000, the 1.856% notes provide for semi-annual interest payments of $4.3 million each February 13 and August 13. The 1.856% notes are convertible into shares of our common stock at any time prior to the close of business on the maturity date, unless previously redeemed or repurchased, at a conversion price of $35.80 per share, subject to adjustment in certain events, equivalent to a conversion rate of 27.934 shares of common stock per $1,000 principal amount at maturity. On or after August 16, 2002, the 1.856% notes will be redeemable over a period of time until maturity at our option at the issuance price plus accrued original issue discount and any accrued interest. The debt issuance costs are being amortized over the term of the 1.856% notes using the interest method.

At December 31, 2000, we have a ratio of long-term debt to total capitalization of approximately 13%. The degree to which we will be leveraged could materially and adversely affect our ability to obtain financing for working capital, acquisitions or other purposes and could make us more vulnerable to industry downturns and competitive pressures. We will require substantial amounts of cash to fund scheduled payments of principal and interest on our indebtedness, including the 5.25% notes and the 1.856% notes, future capital expenditures and any increased working capital requirements. If we are unable to meet our cash requirements out of cash flow from operations, we cannot assure you that we will be able to obtain alternative financing.

During the third quarter of 2000, we signed a $50.0 million unsecured credit facility with a syndicate of financial institutions. At December 31, 2000, no amount was outstanding. The credit facility is due to expire in September 2001. Borrowings under the credit facility bear interest at 1.0% to 1.5% over LIBOR, and are subject to our compliance with financial and other covenants. The credit agreement requires us to maintain specified financial covenants such as earnings before interest, taxes, depreciation and amortization ("EBITDA"), debt on EBITDA and quick ratio, all of which we were in compliance with as of December 31, 2000.

During the first quarter of 2000, we revised our existing lease agreement for new corporate campus facilities in Mountain View, California. These facilities will replace certain facilities we currently lease in Mountain View. The new corporate campus facilities will be developed in one phase for a total of 425,000 square feet and will provide space for sales, marketing, administration and research and development functions. The lease term for these facilities is five years beginning in March 2000, with an option to extend the lease term for two successive periods of one year each. We have an option to purchase the property (land

30

and facilities) for $139.4 million or, at the end of the lease, to arrange for the sale of the property to a third party with us retaining an obligation to the owner for the difference between the sale price and the guaranteed residual value up to $123.8 million if the sales price is less than this amount, subject to certain provisions of the lease. We anticipate occupying the new corporate campus facilities and beginning the lease payments in the second quarter of 2001.

During the first quarter of 2000, we signed a lease agreement for our existing facilities in Roseville, Minnesota. We will improve and expand our existing facilities of approximately 62,000 square feet and will develop adjacent property adding approximately 260,000 square feet to the campus, with the first phase of approximately 142,000 square feet being completed in the second quarter of 2001. The facilities will provide space for research and development functions. The lease term for these facilities is five years beginning in March 2000, with an option to extend the lease term for two successive periods of one year each. We have an option to purchase the property (land and facilities) for $40 million or, at the end of the lease, to arrange for the sale of the property to a third party with us retaining an obligation to the owner for the difference between the sale price and the guaranteed residual value up to $34.3 million if the sales price is less than this amount, subject to certain provisions of the lease. We anticipate occupying the new campus facilities and beginning the lease payments in the second quarter of 2001.

During the third quarter of 2000, we signed a lease agreement for the lease of 65 acres of land and subsequent improvements for new research and development campus facilities in Milpitas, California. We will develop the site in two phases, adding a total of 990,990 square feet, with the first phase of 466,000 square feet being completed in the fourth quarter of 2002. We expect to complete the second phase of 524,990 square feet in the third quarter of 2003. The facilities will provide space for research and development functions. The lease term for the first phase is five years beginning in July 2000, with an option to extend the lease term for two successive periods of one year each. We have an option to purchase the property (land and first phase facilities) for $243 million or, at the end of the lease, to arrange for the sale of the property to a third party with us retaining an obligation to the owner for the difference between the sales price and the guaranteed residual value up to $220 million if the sales price is less than this amount, subject to certain provisions of the lease. We anticipate occupying the new campus facilities and beginning the lease payments in the second quarter of 2002 for the first phase and second quarter of 2003 for the second phase. We expect to start negotiating the financing terms of the second phase in the third quarter of 2001.

The three lease agreements listed above require us to maintain specified financial covenants such as EBITDA, debt on EBITDA and quick ratio, all of which we were in compliance with as of December 31, 2000.

We believe that our current cash, cash equivalents and short-term investment balances and cash flow from operations will be sufficient to meet our working capital and capital expenditure requirements for at least the next 12 months. After that time, we may require additional funds to support our working capital requirements or for other purposes and may seek to raise such additional funds through public or private equity financing or from other sources. We cannot assure you that additional financing will be available at all or that if available, we will be able to obtain it on terms favorable to us.

FACTORS THAT MAY AFFECT FUTURE RESULTS

In addition to other information in this annual report on Form 10-K, you should consider carefully the following factors in evaluating VERITAS and our business.

Our revenue may fluctuate significantly, which could cause the market price of our securities to decline

We may experience a shortfall in revenue in any given quarter. Any such shortfall in revenue could cause the market price of securities to fall substantially. Our revenue in general, and our license revenue in particular, are difficult to forecast and are likely to fluctuate from quarter to quarter due to a number of factors, many of which are outside of our control. These factors include:

- the timing and magnitude of sales through our original equipment manufacturer customers, including Hewlett-Packard, IBM, Microsoft, Oracle and Sun Microsystems;

28

- the possibility that a slowdown in sales by our original equipment manufacturer customers could result in reduced demand for our products;

- the unpredictability of the timing and magnitude of sales to the retail channel by our resellers and by our direct sales force, which tend to generate sales later in our quarters than original equipment manufacturer sales;

- the timing and magnitude of direct sales to end-user customers;

- the timing of revenue recognition for sales of software products and services;

- the introduction, timing and market acceptance of new products;

- changes in data storage and networking technology or introduction of new operating system upgrades by our original equipment manufacturer customers, which could require us to modify our products or to develop new products;

- the relative growth rates of the Windows NT, UNIX and Linux markets;

- the rate of adoption of storage area networks and the timing and magnitude of sales of our storage area networking products and services;

- the rate of adoption of network attached storage appliance technology and the timing and magnitude of sales of our network attached storage appliance products and services;

- the extent to which our customers renew their maintenance contracts with us;

- the timing and amount of revenue attributable to our end-user customers whose businesses are substantially dependent on the Internet or the telecommunications markets, whose ability to purchase our products may be adversely affected by their inability to raise additional capital or to meet their business objectives;

- the possibility that our customers may cancel or defer purchases as a result of reduced information technology budgets;

- the possibility that our customers may defer purchases in anticipation of new products or product updates by us our by our competitors;

- the overall demand for data availability products and services, which is likely to be lower in weak or uncertain general economic and industry conditions;

- the possibility of an economic slowdown generally; and

- changes in our pricing policies and distribution terms.

You should not rely on the results of any prior periods as an indication of our future performance. If we have a shortfall in revenue in any given quarter, we probably will not be able to reduce our operating expenses quickly in response. Therefore, any significant shortfall in revenue could have an immediate adverse effect on our operating results for that quarter.

Our revenue may fluctuate because we depend on large orders from end-user customers for a significant portion of our revenue

We depend for a significant portion of our revenue on large orders, which include lengthy sales cycles from end-user customers. Our revenue for a quarter could fluctuate significantly based on whether a large sale near the end of a quarter is closed or delayed. Our end-user customer sales generally range in value from a few thousand to several million dollars. In recent quarters, increases in revenue were partially attributable to a greater number of these large end-user transactions. This trend may not continue. The effort to close these large sales is typically complex and lengthy. Therefore, our revenue for a given period is likely to be affected by

the timing of these large orders, which makes it difficult for us to predict
that revenue. The factors that could delay these large orders include:

- time needed for end-user customers to evaluate our software;

- customer budget restrictions, particularly in weak or uncertain general
  economic and industry conditions;

- customer internal review and testing procedures; and

- engineering work needed to integrate our software with customers'
  systems.

Our business could be adversely affected if we fail to manage our growth
effectively

If we fail to manage our growth effectively, our business and operating
results could be adversely affected, which could cause the market price of our
securities to fall. We expect to continue to grow our operations domestically
and internationally, and to increase our headcount. The growth in our operations
and headcount has placed, and will continue to place, a significant strain on
our management systems and resources. If we fail to manage this growth and our
future anticipated growth, we may experience higher operating expenses, and we
may be unable to meet the expectations of securities analysts or investors with
respect to future operating results. To manage this growth we must continue to:

- improve our financial and management controls, reporting systems and
  procedures;

- continue to add and integrate new senior management personnel;

- improve our licensing models and procedures;

- hire, train and retain qualified employees;

- control expenses;

- integrate geographically dispersed operations; and

- invest in our internal networking infrastructure and facilities.

We have committed a significant amount of money to obtaining additional
systems and facilities to accommodate our current and future anticipated growth.
To the extent that this future growth does not occur or occurs more slowly that
we anticipate, we may not be able to reduce these expenses. If we incur
operating expenses out of proportion to revenue in any given quarter, our
operating results could be adversely impacted.

We may be unable to hire and retain qualified employees

Our future growth and success depends on our ability to hire and retain
qualified employees. If we are unable to hire and retain qualified employees,
our business and operating results could be adversely affected. Our personnel
needs are more acute than those facing most companies. We need to hire
additional sales, technical, and senior management personnel to support the
planned expansion of our business and to meet the anticipated increased customer
demand for our products and services. Competition for people with the skills we
require is intense, particularly in the area around our headquarters in Mountain
View, California, and the high cost of living in this area make recruiting and
compensation costs higher. As a result, we expect to continue to experience
increases in compensation costs. In addition, the exercise of stock options in
the U.S. and certain foreign jurisdictions may result in substantial increases
in employer payroll tax liabilities. We cannot assure you that we will be
successful in hiring or retaining new personnel. Even if we are successful in
hiring and retaining new personnel, the resulting growth is likely to be
disruptive to our business and could have an adverse effect on our ability to
maintain our anticipated growth.

The loss of key personnel could adversely affect our business

Our future anticipated growth and success depends on the continued service
of our key sales, technical and senior management personnel. Many of our senior
personnel have been with the company or its

predecessors for a number of years, and we cannot assure you that we will be able to retain them. The loss of senior personnel can result in significant disruption to our ongoing operations, and new senior personnel must spend a significant amount of time learning our business and our systems in addition to performing their regular duties. Even though we have entered into employment agreements with some key management personnel, these agreements cannot prevent their departure. We do not have key person life insurance covering any of our personnel, nor do we currently intend to obtain any of this insurance.

We distribute our products through multiple distribution channels, each of which is subject to risks

Historically, we sold our products through original equipment manufacturers and through direct sales. However, as a result of the NSMG and TeleBackup acquisitions in 1999, we now have an established retail distribution channel as well. If we fail to manage our distribution channels successfully, they may conflict with one another or otherwise not function as we anticipate, and our business and operating results could be adversely affected.

Retail distribution. Some of our software products are sold primarily in the retail channel, posing different challenges than we face in selling most of our products. For example:

- the VERITAS brand does not have high recognition in the retail channel;

- retail distribution typically involves shorter product life cycles; and

- the retail channel has higher risks of product returns, higher marketing expenses and less predictable market demand.

Moreover, our retail distributors have no obligation to continue selling our products and may terminate their relationships with us at any time.

Direct sales. We also depend on our direct sales force to sell our products. This involves a number of risks, including:

- longer sales cycles for direct sales efforts;

- our need to hire, train, retain and motivate our sales force; and

- the length of time it takes our new sales representatives to become productive.

Original equipment manufacturers. A portion of our revenue is expected to come from our original equipment manufacturer customers that incorporate our data availability software into systems they sell. Risks associated with our original equipment manufacturer customers include:

- we have no control over the shipping dates or volumes of systems they ship;

- they have no obligation to recommend or offer our software products;

- they have no minimum sales requirements and can terminate our relationship at any time;

- they could choose to develop their own data availability products and incorporate those products into their systems instead of our products;

- they could develop enhancements to and derivative products from our products; and

- they could change their own base products, which could make it difficult for us to adapt our products to theirs.

Finally, our original equipment manufacturer customers compete with one another. If one of our original equipment manufacturer customers views the products we have developed for another original equipment manufacturer as competing with its products, it might decide to stop doing business with us, which could adversely affect our business and our operating results.

Some of our original equipment manufacturer agreements may not result in increased product sales

We have important original equipment manufacturer agreements with Hewlett-Packard, IBM, Microsoft and Sun Microsystems. Unlike some of our other original equipment manufacturer agreements under which we sell off-the-shelf versions of our products, under these agreements we develop unique or "lite" versions of our products to be included in these original equipment manufacturers' systems software and products. If we are unable to leverage these relationships to increase product sales, we will have expended significant resources without generating corresponding revenue, which could adversely affect our business and our operating results. We expect to leverage the inclusion of our products in these systems software and products to generate sales of additional products to the customers of the original equipment manufacturers. These relationships require our personnel to develop expertise with respect to the original equipment manufacturers' products and markets and to cooperate closely with their personnel. We cannot assure you that we will be able to attract and retain qualified employees to work with our original equipment manufacturer customers or to develop and improve the products designed for these customers.

We face uncertainties porting products to new operating systems and developing new products

Many of our products operate primarily on the UNIX computer operating system. We are currently redesigning, or porting, these products to operate on the Windows NT operating system. We are also developing new products for UNIX and for Windows NT. In addition, we entered into an agreement with IBM under which we will port our complete set of data availability products to AIX/Monterey for IBM POWER and the Intel IA-64 processor-system. We may not be able to accomplish any of this work quickly or cost-effectively. These activities require substantial capital investment, the devotion of substantial employee resources and the cooperation of the owners of the operating systems to or for which the products are being ported or developed. For example, our porting and development work for the Windows NT market has required us to hire additional personnel with expertise on these platforms and to devote engineering resources to these projects. For certain operating systems, we must obtain from the operating system owners a source code license to portions of the operating system software to port some of our products to or develop products for the operating system. Operating system owners have no obligation to assist in these porting or development efforts. If they do not grant us a license or if they do not renew our license, we may not be able to expand our product line into other areas.

Sales of a small number of product lines make up a substantial portion of our revenue

We derive and expect to derive a substantial majority of our revenue from a limited number of software products. If many customers do not purchase these products as a result of competition, technological change, budget constraints or other factors, our revenue would decrease and our business and operating results would be adversely affected. For the year ended December 31, 2000, we derived approximately $828.7 million, or 84%, of our license revenue from storage management products, including VERITAS Volume Manager, VERITAS File System, VERITAS NetBackup and VERITAS Backup Exec.

We derive a significant amount of revenue from only a few customers

Although in 2000 and 1999 no single customer accounted for greater than 10% of our total net revenue, we still derive significant revenue from a small number of customers. If any of them were to reduce purchases from us, our business would be adversely affected unless we were able to increase sales to other customers substantially. Many of these customers have recently announced that their own businesses are slowing, which could adversely affect their demand for our products. We do not have a contract with any of these customers that requires the customer to purchase any specified number of software licenses from us. Therefore, we cannot be sure that these customers will continue to purchase our products at current levels.

Our success depends on our ability to develop new and enhanced products that achieve widespread market acceptance

Our future success depends on our ability to address the rapidly changing needs of our customers by developing and introducing new products, product updates and services on a timely basis, by extending the operation of our products on new platforms and by keeping pace with technological developments and emerging industry standards. In order to grow our business, we are committing substantial resources to developing software products and services for the storage area networking market and the network attached storage appliance market. Each of these markets is new and unproven, and industry standards for these markets are evolving and changing. If these markets do not develop as anticipated, or demand for our products in these markets does not materialize or occurs more slowly than we expect, we will have expended substantial resources and capital without realizing sufficient revenue, and our business and operating results could be adversely affected.

We face intense competition on several fronts

We have a number of competitors in the markets for our products. If existing or new competitors gain market share, our business and operating results could be adversely affected. Our principal competitors are internal development groups with original equipment manufacturers that provide data availability functions to support their systems, as well as and hardware and software vendors that offer backup and file and volume management, clustering and replication, and storage area networking products.

Many of our competitors have greater financial, technical sales, marketing and other resources than we do. Our future and existing competitors could introduce products with superior features, scalability and functionality at lower prices than our products, and could also bundle existing or new products with other more established products in order to compete with us. Our competitors could also gain market share by acquiring or forming strategic alliances with our other competitors. Finally, because new distribution methods offered by the Internet and electronic commerce have removed many of the barriers to entry historically faced by start-up companies in the software industry, we expect to face additional competition from these companies in the future.

Our foreign operations and sales create special problems that could adversely affect our operating results

An investment in our securities is riskier than an investment in many businesses because we have significant operations outside of the U.S., including engineering, sales, customer support and production operations, and we plan to expand our international operations. As of December 31, 2000, we had approximately 809 employees in Europe, 468 employees in the Asia-Pacific region, and 66 employees in Japan. Our foreign operations are subject to risks, including:

- potential loss of proprietary information due to piracy, misappropriation
  or weaker laws regarding intellectual property protection;

- imposition of foreign laws and other governmental controls, including
  trade restrictions;

- fluctuations in currency exchange rates and economic instability such as
  higher interest rates and inflation, which could reduce our customers'
  ability to obtain financing for software products or which could make our
  products more expensive in those countries;

- difficulties in hedging foreign currency transaction exposures;

- longer payment cycles for sales in foreign countries and difficulties in
  collecting accounts receivable;

- difficulties in staffing and managing our foreign operations, including
  difficulties related to administering our stock option plan in foreign
  countries and difficulties related to the new organizational structure in
  Europe that we implemented in 2001;

- difficulties in coordinating the activities of our geographically
  dispersed and culturally diverse operations;

- seasonal reductions in business activity in the summer months in Europe
  and other countries;

- costs and delays associated with developing software in multiple
  languages; and

- political unrest, particularly in areas in which we have facilities.

In addition, our foreign sales are denominated in local currency, creating
risk of foreign currency translation gains and losses that could adversely
affect our business and operating results. We receive significant tax benefits
from sales to our non-U.S. customers. These benefits are contingent upon
existing tax regulations in both the U.S. and in the countries in which our
international customers are located. Future changes in domestic or international
tax regulations could affect our anticipated ability to continue to realize
these tax benefits.

Our growth strategy is riskier than others because it is based upon
acquisitions of other businesses

An investment in our securities is riskier than investments in many other
companies because we plan to continue to pursue our strategy of growth through
acquisition. We have grown through acquisitions in the past and expect to pursue
acquisitions in the future.

Acquisitions involve a number of special risks and challenges, including:

- diversion of management attention from our core business;

- integration of acquired company operations and employees with our
  existing business, including coordination of geographically dispersed
  operations;

- incorporation of acquired company technology into our existing product
  lines, including consolidating technology with duplicative functionality
  or designed on different technological architecture;

- loss or termination of employees, including costly litigation resulting
  from the termination of those employees;

- dilution of our then-current stockholders' percentage ownership;

- assumption of liabilities of the acquired company, including costly
  litigation related to alleged liabilities of the acquired company; and

- presentation of a unified corporate image to our customers and our
  employees.

In the past, our integration of the operations of acquired companies took
longer and was more difficult than we anticipated.

Our subsidiary following the Seagate Technology leveraged buyout and merger
transaction will remain liable to third parties after the leveraged buyout and
the merger

In November 2000, in the leveraged buyout and merger transaction involving
VERITAS and Seagate Technology, Seagate Technology sold all of its operating
assets to Suez Acquisition (Cayman) Company, and Seagate Technology became our
subsidiary. As part of the transaction, Suez Acquisition Company assumed and
agreed to indemnify our subsidiary and us for substantially all liabilities
arising in connection with Seagate's operations prior to the transaction.
However, governmental organizations or other third parties may seek recourse
against our subsidiary or us for these liabilities. Prior to the transaction,
Seagate was a large, multinational enterprise that owned or leased facilities
and offices in numerous states and foreign countries and employed over 60,000
persons worldwide. As a result, our subsidiary could receive claims related to a
wide range of possible liabilities. Some areas of potential liability include:

- environmental cleanup costs and liabilities for claims made under
  federal, state or foreign environmental laws;

- tax liabilities;

- obligations under federal, state and foreign pension and retirement
  benefit laws;

- existing or future litigation relating to the leveraged buyout or the merger transaction;

- existing and future litigation arising from the restructuring that Seagate commenced last year, including litigation initiated by terminated employees; and

- existing and future patent litigation.

Any such claim, with or without merit, could be time consuming to defend, result in costly litigation and divert management attention from our core business. Moreover, if Suez Acquisition Company is unable to or is unwilling to indemnify our subsidiary or us under the indemnification agreement for any of these liabilities, we could experience a material adverse effect on our business and operating results.

The Seagate merger consideration may be subject to recovery under fraudulent conveyance laws

The leveraged buyout and merger transaction involving VERITAS and Seagate Technology may be subject to review under state or federal fraudulent transfer laws in the event that a bankruptcy case or lawsuit is commenced by or on behalf of unpaid creditors of Suez Acquisition Company or any of its affiliates. Under bankruptcy laws, a court could attempt to proceed against the consideration paid to Seagate's stockholders in the merger, or direct that amounts deposited with the trustee administering the distributions of Seagate's tax refunds and credits be held for the benefit of creditors. A court might take one or more of these actions if it determined that when the leveraged buyout was completed, Seagate's operating assets were sold for less then fair value and at that time Seagate, Suez Acquisitions Company and their affiliates:

- were or became insolvent;

- were engaged in a business or transaction for which their unencumbered assets constituted unreasonably small capital; or

- intended to incur or reasonably should have believed that they would incur debts beyond their ability to repay as those debts matured.

A court could also proceed against the consideration paid to Seagate's stockholders in the merger, or against Seagate's tax refunds and credits otherwise payable to Seagate's former stockholders following the merger, if the court found that Seagate effected the leveraged buyout with an actual intent to hinder, delay or defraud its creditors.

Our effective tax rate may increase

Our effective tax rate could be adversely affected by several factors, many of which are outside of our control. Our effective tax rate is directly affected by the relative proportions of domestic and international revenue and income before taxes. We are also subject to changing tax laws in multiple jurisdictions in which we operate. We do not have a history of audit activity from various taxing authorities and while we believe we are in compliance with all federal, state and international tax laws, there are various interpretations of their application that could result in additional tax assessments. In addition, in November 2000, we acquired Seagate Technology, which has significant tax audit and tax litigation activity. We believe that we have meritorious defense against asserted deficiencies and that the likely outcome of a re-determination of these asserted deficiencies by the United States Tax Court and tax settlement authorities will not result in an additional provision for income taxes. We have an indemnification agreement with Suez Acquisition (Cayman) Company for these deficiencies. If Suez Acquisition (Cayman) Company is unable to or is unwilling to indemnify our subsidiary or us under the indemnification agreement for any of these deficiencies, we could experience a material adverse effect on our business and operating results.

Our strategy of investing in development-stage companies involves a number of risks and uncertainties

An investment in our securities is riskier than investments in many other companies because we plan to pursue our strategy of investing in development-stage companies. Each of these investments involves risks and uncertainties, including:

- diversion of management attention from our core business;

- failure to leverage our relationship with these companies to access new technologies and new markets;

- inability to value investments appropriately or to predict changes to the future value of investments;

- inability to manage investments effectively; and

- loss of cash invested.

We are incurring significant accounting charges in connection with our acquisitions that are creating net losses immediately and in the future

The significant costs of integration associated with the NSMG, TeleBackup and NuView acquisitions in 1999 increase the risk that we will not realize the anticipated benefits of those acquisitions. Because we accounted for these acquisitions using the purchase method of accounting, we recorded goodwill and other intangible assets of approximately $3,754.9 million in 1999. This amount is being amortized over four years, and is resulting in charges to operations of approximately $234.8 million per quarter. As a result of these charges, we expect to continue to have net losses for the foreseeable future.

We have a significant amount of debt that we may be unable to service or repay

In October 1997, we issued $100.0 million in aggregate principal amount of 5.25% convertible subordinated notes due 2004, of which $64.5 million was outstanding as of December 31, 2000. In August 1999, we issued $465.8 million aggregate principal amount at maturity of 1.856% convertible subordinated notes due 2006, of which $464.7 million was outstanding as of December 31, 2000. As of December 31, 2000, the annual interest payments on our outstanding 5.25% notes were $3.4 million and the annual interest payments on our outstanding 1.856% notes were $8.6 million, all of which we plan to fund from cash flows from operations. We will need to generate substantial amounts of cash from our operations to fund interest payments and to repay the principal amount of debt when it matures, while at the same time funding capital expenditures and our other working capital needs. If we do not have sufficient cash to pay our debts as they come due, we could be in default of those debts. For example, the notes could be declared immediately due and payable if we do not make timely payments. Our substantial leverage could also increase our vulnerability to general adverse economic and industry conditions because it makes it more difficult for us to raise capital if needed.

We may not be able to protect our proprietary information

We rely on a combination of copyright, patent, trademark and trade secret laws, confidentiality procedures, contractual provisions and other measures to protect our proprietary information. All of these measures afford only limited protection. These measures may be invalidated, circumvented or challenged, and others may develop technologies or processes that are similar or superior to our technology. Because we license the source code for some of our products, there is a higher likelihood of misappropriation or other misuse of our intellectual property. We also license some of our products under shrink wrap license agreements that are not signed by licensees and therefore may be unenforceable under the laws of some jurisdictions. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy our products or to obtain or use information that we regard a proprietary.

Third parties may claim that we infringe their proprietary rights

We may from time to time receive claims that we have infringed the intellectual property rights of others. As the number of products in the software industry increases and the functionality of these products further

overlap, we believe that we may become increasingly subject to infringement claims, including patent and copyright infringement claims. We have received several trademark claims in the past and may receive more claims in the future based on the name VERITAS, which is a word commonly used in trade names throughout Europe and the western hemisphere. In addition, former employers of our former, current or future employees may assert claims that such employees have improperly disclosed to us the confidential or proprietary information of these former employers. Any such claim, with or without merit, could:

- be time consuming to defend;

- result in costly litigation;

- divert management's attention from our core business;

- require us to stop selling, to delay shipping or to redesign our product; and

- require us to pay monetary amounts as damages, for royalty or licensing arrangements, or to satisfy indemnification obligations that we have with some of our customers.

    In addition, we license and use software from third parties in our business. These third party software licenses may not continue to be available to us on acceptable terms. Our inability to use any of this third party software could result in shipment delays or other disruptions in our business, which could materially and adversely affect our operating results.

We might experience significant defects in our products

    Software products frequently contain errors or failures, especially when first introduced or when new versions are released. We might experience significant errors or failures in our products, or they might not work with other hardware or software as expected, which could delay the development or release of new products or new versions of products, or which could adversely affect market acceptance of our products. Our end-user customers use our products for applications that are critical to their businesses, and they have a greater sensitivity to product defects than the market for software products generally. If we were to experience significant delays in the release of new products or new versions of products, or if customers were dissatisfied with product functionality or performance, we could lose revenue or be subject to liability for service or warranty costs, and our business and operating results could be adversely affected.

Natural disasters or power outages could disrupt our business

    We must protect our business and our network infrastructure against damage from earthquake, flood, hurricane and similar events, as well as from power outages. A substantial portion of our operations are subject to these risks, particularly our operations located in California. We have already experienced temporary power losses in our California facilities due to power shortages that have disrupted our operations, and we expect in the future to experience additional power losses that could disrupt our operations. While the impact to our business and operating results has not been material, we cannot assure you that power losses will not adversely affect our business in the future, or that the cost of acquiring sufficient power to run our business will not increase significantly. Since we do not have sufficient redundancy in our networking infrastructure, a natural disaster or other unanticipated problem at our primary data center could have an adverse effect on our business, including both our internal operations and our ability to communicate with our customers or sell our products over the Internet.

40

Some provisions in our charter documents may prevent or deter certain corporate actions

Some of the provisions in our charter documents may deter or prevent certain corporate actions, such as a merger, tender offer or proxy contest, which could affect the market value of our securities. These provisions include:

- our board of directors is authorized to issue preferred stock with any rights it may determine;

- our board of directors is classified into three groups, with each group of directors to hold office for three years;

- our stockholders are not entitled to cumulate votes for directors and may not take any action by written consent without a meeting; and

- special meetings of our stockholders may be called only by our board of directors, by the chairman of the board or by our chief executive officer, and may not be called by our stockholders.

We also have in place a stockholder rights plan that is designed to discourage coercive takeover offers.

Our stock price may be volatile in the future, and you could lose the value of your investment

The market price of our common stock has experienced significant fluctuations and may continue to fluctuate significantly, and you could lose the value of your investment. The market price of our common stock may be adversely affected by a number of factors, including:

- announcements of our quarterly operating results or those of our competitors or our original equipment manufacturer customers;

- changes in earnings estimates by securities analysts;

- announcements of planned acquisitions by us or by our competitors;

- the gain or loss of a significant customer;

- announcements of new products by us, our competitors or our original equipment manufacturer customers; and

- slowdowns in the economy generally.

The stock market in general, and the market prices of stocks of other technology companies in particular, have experienced extreme price volatility, which has adversely affected and may continue to adversely affect the market price of our common stock for reasons unrelated to our business or operating results.

ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

FOREIGN CURRENCY RISK

We transact business in various foreign currencies and we have established a foreign currency hedging program, utilizing foreign currency forward exchange contracts ("forward contracts") to hedge certain foreign currency transaction exposures. Under this program, increases or decreases in our foreign currency transactions are offset by gains and losses on the forward contracts, so as to mitigate the possibility of foreign currency transaction gains and losses. We do not use forward contracts for speculative trading purposes. All foreign currency transactions and all outstanding forward contracts are marked-to-market at the end of the period with unrealized gains and losses included in other income (expense). The unrealized gain (loss) on the outstanding forward contracts at December 31, 2000 was immaterial to our consolidated financial statements.

38

41

Our outstanding forward contracts as of December 31, 2000 are presented in
the table below. This table presents the notional amounts using December 31,
2000 exchange rates and the weighted average contractual foreign currency
exchange rates. Notional weighted average exchange rates are quoted using market
conventions where the currency is expressed in currency units per U.S. dollar,
except for the Australian dollar, the Euro and the British pound. All of these
forward contracts mature in 31 days or less as of December 31, 2000 (dollars in
thousands):

| FUNCTIONAL CURRENCY -- U.S. DOLLAR | NOTIONAL AMOUNT | NOTIONAL WEIGHTED AVERAGE EXCHANGE RATE |
|---|---|---|
| Australian dollar............................ | $    6,932 | 0.558 |
| Brazilian real.............................. | $      612 | 1.975 |
| British pound............................... | $   37,280 | 1.494 |
| Danish krona................................ | $       87 | 8.003 |
| Dutch guilder............................... | $      971 | 2.363 |
| Euro........................................ | $   58,894 | 0.933 |
| French francs............................... | $    3,801 | 7.027 |
| German mark................................. | $   12,701 | 2.098 |
| Japanese yen................................ | $    3,695 | 113.680 |
| Norwegian kroner............................ | $      338 | 8.865 |
| Swedish krone............................... | $    1,254 | 9.529 |
| Swiss franc................................. | $      487 | 1.638 |
| | ---------- | |
| Total............................ | $  127,052 | |
| FUNCTIONAL CURRENCY -- EURO | | |
| British pound............................... | $   49,508 | 1.494 |
| Swiss franc................................. | $    2,373 | 1.638 |
| | ---------- | |
| Total............................ | $   51,881 | |
| | ---------- | |
| Grand total........................ | $  178,933 | |
| | ========== | |

INTEREST RATE RISK

Our exposure to market risk for changes in interest rates relates primarily
to our investment portfolio and long-term debt obligations. Our primary
investment objective is to preserve principal while at the same time maximizing
yields without significantly increasing risk. Our portfolio includes money
markets funds, commercial paper, medium-term notes, corporate notes, government
securities and market auction preferreds. The diversity of our portfolio helps
us to achieve our investment objective. As of December 31, 2000, approximately
65% of our investment portfolio is composed of investments with original
maturities of one year or less and approximately 14% of our investment portfolio
matures less than 90 days from the date of purchase.

Long-term debt of $429.2 million consists of 5.25% convertible subordinated
notes due 2004 of $64.5 million (the "5.25% notes") and 1.856% convertible
subordinated notes due 2006 of $364.6 million (the "1.856% notes"). The interest
rate of 1.856% on the 1.856% notes together with the accrual of original issue
discount represent a yield to maturity of 6.5%. The nominal interest rate on
these notes is fixed and the notes provide for semi-annual interest payments of
approximately $1.7 million each May 1 and November 1 for the 5.25% notes and
approximately $4.3 million each February 13 and August 13 for the 1.856% notes.
The notes are convertible into our common stock at any time prior to the close
of business on the maturity date, unless previously redeemed or repurchased,
subject to adjustment in certain events.

The following table presents the amounts of our cash equivalents,
investments and long-term debt that may be subject to interest rate risk and the
average interest rates as of December 31, 2000 by year of maturity.

39

42

At December 31, 2000, amortized cost approximated fair value for all cash
equivalents and investments (dollars in thousands):

|  | 2001 | 2002 AND THEREAFTER | 2000 TOTAL | FAIR VALUE TOTAL 2000 | TOTAL 1999 |
|---|---|---|---|---|---|
| Cash equivalents and short-term Investments: |  |  |  |  |  |
| Fixed rate...................... | $288,322 | -- | $288,322 | $ 288,322 | $625,435 |
| Average fixed rate.............. | 6.70% | -- | 6.70% | 6.70% | 5.82% |
| Variable rate.................. | $  5,400 | -- | $  5,400 | $   5,400 | $ 11,713 |
| Average variable rate........... | 6.56% | -- | 6.56% | 6.56% | 5.87% |
| Total cash equivalents and short-term investments: |  |  |  |  |  |
| Investments.................... | $293,722 | -- | $293,722 | $ 293,722 | $637,148 |
| Average rate................... | 6.69% | -- | 6.69% | 6.69% | 5.82% |
| Long-term investments: |  |  |  |  |  |
| Fixed rate...................... | -- | $136,111 | $136,111 | $ 136,111 | $ 65,036 |
| Average fixed rate.............. | -- | 6.82% | 6.82% | 6.82% | 5.33% |
| Long-term debt: |  |  |  |  |  |
| Fixed rate...................... | -- | $429,176 | $429,176 | $1,750,132 | $451,044 |
| Average fixed rate.............. | -- | 6.31% | 6.31% | 6.31% | 6.22% |

In September 2000, we have entered into a three year cross currency
interest rate swap transaction for the purpose of hedging fixed interest rate,
foreign currency denominated cash flows under an inter-company loan receivable.
Under the terms of this derivative financial instrument, EURO denominated fixed
principal and interest payments to be received under the inter-company loan will
be swapped for U.S. dollar fixed principal and interest payments. As a result of
entering into the cross currency interest rate swap, we have mitigated our
exposure to foreign currency exchange rate fluctuations. The gains or losses on
the foreign currency loan receivable will be offset by the gains or losses on
the cross currency interest rate swap. Because we are receiving fixed interest
payments under the cross currency interest rate swap transaction, we are still
subject to fluctuations in U.S. dollar interest rates. As of December 31, 2000
the impact of these fluctuations was not significant.

EQUITY PRICE RISK

We are exposed to equity price risk on the marketable portion of our
portfolio of equity securities investments. We typically do not attempt to
reduce or eliminate our market exposure on these equity securities. These
investments are in companies in the high-technology industry. As of December 31,
2000, we had marketable equity securities in two companies, representing a total
market value of $9.8 million. Assuming a 10% adverse change, our marketable
equity securities investments would decrease in value by approximately $1.0
million. Subsequent to December 31, 2000, many high-technology stocks
experienced a significant decrease in value. If our marketable equity security
investments as of December 31, 2000 had been valued using prices as of March 27,
2001, the value of these securities would have decreased by approximately $3.5
million, or 36%. This estimate is not necessarily indicative of future
performance and actual results may differ materially. We also have begun to make
investments in development-stage companies that we believe provide strategic
opportunities for us. We intend that these investments will complement our own
research and development efforts, provide access to new technologies and
emerging markets, and create opportunities for additional sales of our products
and services. We cannot assure you that this initiative will have the above
mentioned desired results, or even that we will not lose all or any part of
these investments.

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

   Annual Financial Statements

      Our financial statements required by this item are submitted as a separate
section of the Form 10-K. See Item 14(a)(1) for a listing of financial
statements provided in the section titled "Financial Statements."

   Selected Quarterly Results of Operations

      The following selected quarterly data should be read in conjunction with
the Consolidated Financial Statements and notes thereto and "Management's
Discussion and Analysis of Financial Condition and Results of Operations"
appearing elsewhere in this Form 10-K. This information has been derived from
unaudited consolidated financial statements of VERITAS that, in our opinion,
reflect all recurring adjustments necessary to fairly present this information
when read in conjunction with our Consolidated Financial Statements and Notes
thereto appearing in the section titled "Financial Statements." The results of
operations for any quarter are not necessarily indicative of the results to be
expected for any future period.

| | FIRST QUARTER | SECOND QUARTER | THIRD QUARTER | FOURTH QUARTER | FISCAL YEAR |
|---|---|---|---|---|---|
| | | (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) | | | |
| FISCAL 2000 | | | | | |
| Total net revenue....................... | $ 244,640 | $ 275,436 | $ 317,171 | $ 370,081 | $1,207,328 |
| Gross profit............................ | 199,168 | 231,519 | 270,641 | 317,199 | 1,018,527 |
| Loss before income taxes................ | (154,458) | (145,896) | (125,464) | (100,010) | (525,828) |
| Net loss................................ | (174,383) | (172,341) | (148,106) | (124,962) | (619,792) |
| Net loss per share -- basic............. | $ (0.44) | $ (0.43) | $ (0.37) | $ (0.31) | $ (1.55) |
| Net loss per share -- diluted........... | $ (0.44) | $ (0.43) | $ (0.37) | $ (0.31) | $ (1.55) |
| Number of shares used in computing per share amounts basic.................. | 394,471 | 400,787 | 403,613 | 401,209 | 400,034 |
| Number of shares used in computing per share amounts diluted................ | 394,471 | 400,787 | 403,613 | 401,209 | 400,034 |
| FISCAL 1999 | | | | | |
| Total net revenue....................... | $ 71,904 | $ 114,648 | $ 183,401 | $ 226,159 | $ 596,112 |
| Gross profit............................ | 63,422 | 98,561 | 151,465 | 188,109 | 501,557 |
| Income before income taxes............. | 21,092 | (157,601) | (175,135) | (155,924) | (467,568) |
| Net income (loss)...................... | 13,583 | (162,329) | (183,576) | (170,636) | (502,958) |
| Net income (loss) per share -- basic... | $ 0.06 | $ (0.59) | $ (0.48) | $ (0.44) | $ (1.59) |
| Net income (loss) per share -- diluted..................... | $ 0.06 | $ (0.59) | $ (0.48) | $ (0.44) | $ (1.59) |
| Number of shares used in computing per share amounts -- basic............... | 215,199 | 275,467 | 384,846 | 389,410 | 316,892 |
| Number of shares used in computing per share amounts -- diluted............ | 239,111 | 275,467 | 384,846 | 389,410 | 316,892 |

      In the second quarter of 1999, we acquired the NSMG business and
TeleBackup. In the third quarter of 1999, we acquired NuView. Because we
accounted for these acquisitions using the purchase method of accounting, we
recorded developed technology, goodwill and other intangible assets of
approximately $3,754.9 million in total. These assets are amortized over their
estimated useful life of four years, and result in charges to operations of
approximately $234.8 million per quarter. As a result of these acquisitions, in
the second quarter of 1999 we recorded approximately $76.6 million of
amortization of developed technology, goodwill and other intangibles, one-time
non-cash charges of $103.1 million related to the write-off of in-process
research and development, and a one-time restructuring charge of $11.0 million
related primarily to costs for our duplicative facilities that we plan to
vacate. In the third quarter of 1999 we recorded a one-time non-cash charges of
$1.1 million related to the write-off of in-process research and development. In
the fourth quarter of 2000, we reversed $4.3 million of one-time restructuring
charge as a result of lower actual exit costs than originally estimated with
respect to duplicative facilities.

Our operating results have fluctuated in the past, and may fluctuate significantly in the future, depending on a number of factors, including the timing and magnitude of sales of our products through original equipment manufacturers, investment in new products and new distribution channels, the timing and level of sales to resellers and direct end-users, the introduction, timing and market acceptance of new products, the timing of license fee payments and other factors. For further background on fluctuating operating results, see "Factors That May Affect Future Results -- Our revenue may fluctuate significantly, which could cause the market price of our securities to decline."

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

Not applicable.

PART III

ITEM 10. DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

DIRECTORS

Information with respect to directors may be found in the section captioned "Election of Directors" appearing in the definitive proxy statement to be delivered to stockholders in connection with the 2001 Annual Meeting of Stockholders. Such information is incorporated herein by reference.

EXECUTIVE OFFICERS

Information with respect to executive officers may be found in Item 1. Business.

ITEM 11. EXECUTIVE COMPENSATION

Information with respect to this item may be found in the section captioned "Executive Compensation" appearing in the definitive proxy statement to be delivered to stockholders in connection with the 2001 Annual Meeting of Stockholders. Such information is incorporated herein by reference.

ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

Information with respect to this item may be found in the section captioned "Security Ownership of Certain Beneficial Owners and Management" appearing in the definitive proxy statement to be delivered to stockholders in connection with the 2001 Annual Meeting of Stockholders. Such information is incorporated herein by reference.

ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Information with respect to this item may be found in the section captioned "Related Party Transactions" appearing in the definitive proxy statement to be delivered to stockholders in connection with the 2001 Annual Meeting of Stockholders. Such information is incorporated herein by reference.

PART IV

ITEM 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

     (a) The following documents are filed as part of this report:

         1. FINANCIAL STATEMENTS

         The following are included in item 8 and are filed as part of this
     Annual Report on Form 10-K:

         - Consolidated Balance Sheets as of December 31, 2000 and 1999

         - Consolidated Statements of Operations for the years ended December 31,
           2000, 1999 and 1998

         - Consolidated Statements of Stockholders' Equity for the years ended
           December 31, 2000, 1999 and 1998

         - Consolidated Statements of Cash Flows for the years ended December 31,
           2000, 1999 and 1998

         - Notes to Consolidated Financial Statements

         - Report of Ernst & Young LLP, Independent Auditors

         2. FINANCIAL STATEMENT SCHEDULES

         The following financial statement schedule for the years ended
     December 31, 2000, 1999 and 1998 should be read in conjunction with the
     consolidated financial statements of VERITAS Software Corporation filed as
     part of this Annual Report on Form 10-K:

         - Schedule II -- Valuation and Qualifying Accounts

         Schedules other than that listed above have been omitted since they
     are either not required, not applicable, or because the information
     required is included in the consolidated financial statements or the notes
     thereto.

         3. EXHIBITS

| | | INCORPORATED BY REFERENCE | | | FILED |
| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | FORM | DATE | NUMBER | HEREWITH |
| ------- | ------------------ | ----- | -------- | ------ | -------- |
| 2.01 | Agreement and Plan of Merger and Reorganization, dated as of March 29, 2000, by and among VERITAS Software Corporation ("VERITAS"), Victory Merger Sub, Inc. and Seagate Technology, Inc. ("Seagate") | 8-K | 04/05/00 | 2.01 | |
| 2.02 | Stock Purchase Agreement, dated as of March 29, 2000, by and among Suez Acquisition Company (Cayman) Limited ("Suez"), Seagate and Seagate Software Holdings, Inc. | 8-K | 04/05/00 | 2.02 | |
| 2.03 | Consolidated Amendment to Stock Purchase Agreement, Agreement and Plan of Merger and Reorganization and Indemnification Agreement, and Consent, dated as of August 29, 2000, by and among VERITAS, Victory Merger Sub, Inc., Seagate, Seagate Software Holdings, Inc. and Suez | S-4/A | 08/30/00 | 2.05 | |
| 2.04 | Consolidated Amendment No. 2 to Stock Purchase Agreement, Agreement and Plan of Merger and Reorganization and Indemnification Agreement, and Consent, dated October 17, 2000, by and among VERITAS, Victory Merger Sub, Inc., Seagate, Seagate Software Holdings, Inc. and Suez | S-4/A | 10/19/00 | 2.04 | |
| 2.05 | Amended and Restated Agreement and Plan of Reorganization by and among VERITAS, VERITAS Operating Corporation ("VOC"), Seagate, Seagate Software, Inc. ("Seagate Software") and Seagate Software Network & Storage Management Group, Inc. | S-4 | 04/19/99 | 2.01 | |

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | INCORPORATED BY REFERENCE | | | FILED HEREWITH |
|---|---|---|---|---|---|
| | | FORM | DATE | NUMBER | |
| 2.06 | Amended and Restated Combination Agreement by and between VOC and TeleBackup Systems, Inc. | S-4 | 4/19/99 | 2.02 | |
| 3.01 | Amended and Restated Certificate of Incorporation of VERITAS | 8-A | 6/2/99 | 3.01 | |
| 3.02 | Certificate of Amendment of Amended and Restated Certificate of Incorporation of VERITAS | 8-A | 6/2/99 | 3.02 | |
| 3.03 | Certificate of Amendment of Amended and Restated Certificate of Incorporation of VERITAS | S-8 | 6/2/00 | 3.03 | |
| 3.04 | Amended and Restated Bylaws of VERITAS | S-4 | 9/28/00 | 3.04 | |
| 4.01 | Indenture dated as of October 1, 1997 between VOC and State Street Bank and Trust Company of California, N.A. | 10-Q | 6/30/99 | 4.03 | |
| 4.02 | Amended and Restated First Supplemental Indenture dated July 30, 1999 by and among VERITAS, VOC and State Street Bank and Trust of California, N.A. | S-1 | 7/27/99 | 4.04 | |
| 4.03 | Registration Rights Agreement dated as of October 1, 1997 between VOC and UBS Securities LLC | 10-Q | 9/30/99 | 4.07 | |
| 4.04 | Form of Rights Agreement between VERITAS and the Right Agent, which includes as Exhibit A the forms of Certificate of Designations of Series A Junior Participating Preferred Stock, as Exhibit B the Form of Right Certificate and as Exhibit C the Summary of Rights to Purchase Preferred Shares | S-4 | 4/19/99 | 4.06 | |
| 4.05 | Form of Registration Rights Agreement between VERITAS and Seagate Software | S-4 | 4/19/99 | 4.07 | |
| 4.06 | Form of Stockholder Agreement between VERITAS, VOC, Seagate Software and Seagate | S-4 | 4/19/99 | 4.08 | |
| 4.07 | Form of Specimen Stock Certificate | S-1 | 10/22/93 | 4.01 | |
| 4.08 | Form of Indenture among VERITAS, VOC State Street Bank and Trust Company of California, N.A., as Trustee | S-1 | 7/27/99 | 4.10 | |
| 10.01 | Indemnification Agreement, dated as of March 29, 2000, by and among VERITAS, Seagate, Suez and certain other parties | 8-K | 04/5/00 | 2.3 | |
| 10.02+ | Development and License Agreement between Seagate and VERITAS | S-4 | 04/19/99 | 10.01 | |
| 10.03+ | Cross License Agreement and OEM Agreement between Seagate Software Information Management Group, Inc. and VERITAS | S-4 | 04/19/99 | 10.02 | |
| 10.04* | VERITAS 1993 Equity Incentive Plan, as amended | S-8 | 03/29/01 | 4.01 | |
| 10.05* | VERITAS 1993 Employee Stock Purchase Plan, as amended | S-8 | 03/29/01 | 4.02 | |
| 10.06* | VERITAS 1993 Directors Stock Option Plan, as amended | 10-K | 12/31/99 | 10.04 | |
| 10.07* | OpenVision Technologies, Inc. 1996 Employee Stock Purchase Plan, as amended | S-4 | 03/24/97 | 10.19 | |
| 10.08 | Office building sublease dated February 27, 1998, by and between VOC and Space Systems/Loral, Inc. | 10-Q | 09/30/98 | 10.14 | |
| 10.09 | Office building lease dated April 30, 1998, by and between VOC and Ryan Companies US, Inc. | 10-Q | 09/30/98 | 10.15 | |
| 10.10 | Form of Key Employee Agreement | S-4 | 04/19/99 | 10.11 | |
| 10.11 | Office Building Lease, dated September 2, 1994, as amended, by and between VOC and John Arriliaga and Richard T. Peery regarding property located in Mountain View, California | 10-K | 12/31/94 | 10.09 | |
| 10.12 | Amendment No 1. to Office Building Lease dated May 28, 1997 by and between VOC and John Arriliaga and Richard T. Peery | 10-K | 12/31/97 | 10.12 | |
| 10.13 | Agreement dated November 7, 1996 between VERITAS Software India Pvt. Ltd. and Talwalkar & Talwalkar and Mr. Rajendra Dattatraya Pathak, Mrs. Kamal Trimbak Nighojkar, Mrs. Bakul Prabhakar Pathak, Mrs. Nalini Manohar Saraf, Mr. Narhar Vaman Pandit, Mr. Madhav Narhar Pandit, Ms. Madhavi Damodar Thite, and Ms. Medha Narhar Pandit relating to the development of certain premises in Pune, India | S-4 | 03/24/97 | 10.12 | |

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | INCORPORATED BY REFERENCE | | | FILED HEREWITH |
|---|---|---|---|---|---|
| | | FORM | DATE | NUMBER | |
| 10.14 | Form of Indemnification Agreement entered into between VERITAS and each of its directors and executive officers | S-4 | 04/19/99 | 10.15 | |
| 10.15 | Amendment No. 1 to Cross-License and OEM Agreement between Seagate Software Information Management Group, Inc. and VERITAS | S-4 | 04/19/99 | 10.16 | |
| 10.16 | Participation Agreement dated April 23, 1999 by and among VOC, First Security Bank, National Association, as "Owner Trustee," various banks and other lending institutions which are parties thereto from time to time as "Holders," various banks and other lending institutions which are parties thereto from time to time as "Lenders," NationsBank, N.A., as "Agent" for the Lenders and the Holders, and various parties thereto from time to time as "Guarantors" | S-1 | 07/27/99 | 10.17 | |
| 10.17 | Grant Deed dated April 23, 1999 recording grant of real property to First Security Bank, National Association as "Owner Trustee" by Fairchild Semiconductor Corporation of California | S-1 | 07/27/99 | 10.20 | |
| 10.18 | Memorandum of Lease Agreement and Lease Supplement No. 1 and Deed of Trust dated April 23, 1999 among VOC, First Security Bank, National Association and Chicago Title Company | S-1 | 07/27/99 | 10.21 | |
| 10.19 | Memorandum of Lease Agreement and Lease Supplement No. 2 and Deed of Trust dated April 23, 1999 among VOC, First Security Bank, National Association and Chicago Title Company | S-1 | 07/27/99 | 10.22 | |
| 10.20 | Collateral Assignment of Sublease dated April 23, 1999 made by VOC to First Security Bank, National Association | S-1 | 07/27/99 | 10.23 | |
| 10.21 | Sublease Agreement dated April 23, 1999 by and between VOC and Fairchild Semiconductor Corporation of California | S-1 | 07/27/99 | 10.24 | |
| 10.22 | Certificate re: Representations and Warranties dated April 20, 1999 by Fairchild Semiconductor Corporation of California and addressed to VOC | S-1 | 07/27/99 | 10.25 | |
| 10.23 | Security Agreement dated April 23, 1999 between First Security Bank, National Bank, as "Owner Trustee" and NationsBank, N.A., as Agent for the "Lenders" and the "Holders". | S-1 | 07/27/99 | 10.26 | |
| 10.24 | Form of Agreement of Purchase and Sale by and between Fairchild Semiconductor Corporation of California and VOC | S-1 | 07/27/99 | 10.27 | |
| 10.25 | First Amendment dated April 14, 1999 and Agreement of Purchase and Sale dated March 29, 1999 by and between Fairchild Semiconductor Corporation of California and VOC | S-1 | 07/27/99 | 10.28 | |
| 10.26 | Agency Agreement between VOC and First Security Bank, National Association, as "Owner Trustee" | S-1 | 07/27/99 | 10.29 | |
| 10.27 | Master Lease Agreement dated April 23, 1999 between First Security Bank, National Association and VOC | S-1 | 07/27/99 | 10.30 | |
| 10.28 | First Amendment and Restatement of Certain Operative Agreements and Other Agreements dated March 3, 2000 among VOC, the various parties to the participation agreement and other operative agreements from time to time, as the "Guarantors," First Security Bank, National Association, as "Owner Trustee," the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time, as the "Holders," and Bank of America, N.A., as successor to NationsBank, N.A. | 10-K | 12/31/99 | 10.29 | |
| 10.29 | Joinder Agreement dated March 3, 2000 by and between VERITAS and Bank of America, N.A. | 10-K | 12/31/99 | 10.30 | |
| 10.30 | Joinder Agreement dated March 3, 2000 by and between OpenVision International, Ltd. and Bank of America, N.A. | 10-K | 12/31/99 | 10.31 | |

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | INCORPORATED BY REFERENCE | | | FILED HEREWITH |
|---|---|---|---|---|---|
| ------- | ------------------- | FORM ----- | DATE -------- | NUMBER ------ | -------- |
| 10.31 | Joinder Agreement dated March 3, 2000 by and between VERITAS Software Global Corporation (formerly known as Seagate Software Network & Storage Management Group, Inc.) and Bank of America, N.A. | 10-K | 12/31/99 | 10.32 | |
| 10.32 | Participation Agreement dated March 9, 2000 by and among VOC, various parties thereto from time to time as "Guarantors," First Security Bank, National Association, as "Owner Trustee," various banks and other lending institutions which are parties thereto from time to time as "Holders," various banks and other lending institutions which are parties thereto from time to time as "Lenders," and Bank of America, N.A. as "Agent" for the Lenders and the Holders | 10-K | 12/31/99 | 10.33 | |
| 10.33 | Master Lease Agreement dated March 9, 2000 between First Security Bank, National Association, and VOC | 10-K | 12/31/99 | 10.34 | |
| 10.34 | Construction Agency Agreement dated March 9, 2000 between VOC and First Security Bank, National Association | 10-K | 12/31/99 | 10.35 | |
| 10.35 | Trust Agreement dated March 9, 2000 between the several holders from time to time as parties thereto, as "Holders," and First Security Bank, National Association, as "Owner Trustee" | 10-K | 12/31/99 | 10.36 | |
| 10.36 | Credit Agreement dated March 9, 2000 among First Security Bank, National Association, as "Owner Trustee," the several lenders from time to time as parties thereto, and Bank of America, N.A. | 10-K | 12/31/99 | 10.37 | |
| 10.37 | Security Agreement dated March 9, 2000 between First Security Bank, National Association, as "Owner Trustee," and Bank of America, N.A., accepted and agreed to by VOC | 10-K | 12/31/99 | 10.38 | |
| 10.38 | Second Amendment, Assignment and Assumption and Restatement of Certain Operative Agreements and Other Agreements dated July 28, 2000 among VOC, VSGC, the various parties to the participation agreement and other operative agreements from time to time, First Security Bank, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Lenders", and Bank of America, N.A., as the "Agent" for the secured parties | S-4 | 09/28/00 | 10.41 | |
| 10.39 | First Amendment, Assignment and Assumption and Restatement of Certain Operative Agreements and Other Agreements dated July 28, 2000 among VOC, VSGC, the various parties to the participation agreement and other operative agreements from time to time, First Security Bank, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Lenders", and Bank of America, N.A., as the "Agent" for the secured parties | S-4 | 09/28/00 | 10.42 | |

|  |  | INCORPORATED BY REFERENCE | | | |
| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | FORM | DATE | NUMBER | FILED HEREWITH |
| ------- | ------------------ | ----- | -------- | ------ | -------- |
| 10.40 | Participation Agreement dated July 28, 2000 among the various parties thereto from time to time, VSGC, First Security Bank, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties thereto from time to time as "Holders", the various banks and other lending institutions which are parties thereto from time to time as "Lenders", ABN AMRO Bank N.V., Credit Suisse First Boston and Credit Lyonnais Los Angeles Branch | S-4 | 09/28/00 | 10.43 | |
| 10.41 | Credit Agreement dated July 28, 2000 among First Security Bank, National Association as "Owner Trustee", the several lenders from time to time, ABN AMRO Bank, N.V., Credit Suisse First Boston, and Credit Lyonnais Los Angeles Branch | S-4 | 09/28/00 | 10.44 | |
| 10.42 | Trust Agreement dated July 28, 2000 between the several holders from time to time parties thereto as "Holders" and First Security Bank, National Association, as "Owner Trustee" | S-4 | 09/28/00 | 10.45 | |
| 10.43 | Security Agreement dated July 28, 2000 between First Security Bank, National Association, as "Owner Trustee" and ABN AMRO Bank N.V., and accepted and agreed to by VSGC | S-4 | 09/28/00 | 10.46 | |
| 10.44 | Master Lease Agreement dated as of July 28, 2000 between First Security Bank, National Association, as "Owner Trustee" and VSGC | S-4 | 09/28/00 | 10.47 | |
| 10.45 | Construction Agency Agreement dated July 28, 2000 between VSGC and First Security Bank, National Association, as "Owner Trustee' | S-4 | 09/28/00 | 10.48 | |
| 10.46 | Credit Agreement dated September 1, 2000 among VSGC, the various parties thereto from time to time as "Guarantors", ABN AMRO Bank N.V., as "Administrative Agent" for "Lenders", Credit Suisse First Boston, as "Documentation Agent", and Credit Lyonnais Los Angeles Branch, as "Syndication Agent". | 10-Q | 09/30/00 | 10.11 | |
| 10.47* | Employment Agreement dated November 17, 2000 between VERITAS and Gary L. Bloom | | | | X |
| 10.48* | VERITAS 2001 Chief Executive Officer Compensation Plan | | | | X |
| 10.49* | Form of VERITAS 2001 Executive Officer Compensation Plan | | | | X |
| 10.50* | VERITAS Non-Qualified Deferred Compensation Plan | | | | X |
| 21.01 | Subsidiaries of the Registrant | | | | X |
| 23.03 | Consent of Independent Auditors | | | | X |

--------------

* Management contract, compensatory plan or arrangement.

+ Confidential treatment has been granted with respect to certain portions of this document.

   (b) Reports on Form 8-K

| DATE OF REPORT | ITEM(S) | DESCRIPTION |
| -------------- | ------- | ----------- |
| 10/13/00 | 5, 7 | VERITAS announced financial results for its third quarter ended September 30, 2000 and included the press release. |
| 11/17/00 | 5, 7 | VERITAS announced that it named Gary L. Bloom as president and chief executive officer and included the press release. |
| 11/30/00 | 5 | VERITAS announced that it chose not to make a cash election under the transaction involving Seagate Technology, Inc. |
| 12/07/00 | 5 | VERITAS announced the consummation of the transaction involving Seagate Technology, Inc. |

SIGNATURES

    Pursuant to the requirements of the Securities Exchange Act of 1934, the
Registrant has duly caused this report to be signed on its behalf by the
undersigned, thereunto duly authorized, in the City of Mountain View, State of
California, on the 29th day of March 2001.

                          VERITAS Software Corporation
                          Registrant

                          /s/ KENNETH E. LONCHAR
                          ---------------------------------------
                               Kenneth E. Lonchar
                          Senior Vice President, Finance

    Pursuant to the requirements of the Securities Exchange Act of 1934, this
report has been signed below by the following persons on behalf of the
Registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
| --------- | ----- | ---- |
| PRINCIPAL EXECUTIVE OFFICER AND DIRECTOR: | | |
| /s/ GARY L. BLOOM<br>-----------------------------------------------------<br>Gary L. Bloom | President and Chief Executive Officer | March 29, 2001 |
| PRINCIPAL FINANCIAL OFFICER AND PRINCIPAL<br>ACCOUNTING OFFICER: | | |
| /s/ KENNETH E. LONCHAR<br>-----------------------------------------------------<br>Kenneth E. Lonchar | Senior Vice President, Finance and Chief Financial Officer | March 29, 2001 |
| ADDITIONAL DIRECTORS: | | |
| /s/ MARK LESLIE<br>-----------------------------------------------------<br>Mark Leslie | Chairman of the Board | March 29, 2001 |
| <br>-----------------------------------------------------<br>Geoffrey W. Squire | Vice Chairman of the Board | |
| /s/ FRED VAN DEN BOSCH<br>-----------------------------------------------------<br>Fred van den Bosch | Director | March 29, 2001 |
| /s/ STEVEN BROOKS<br>-----------------------------------------------------<br>Steven Brooks | Director | March 29, 2001 |
| /s/ WILLIAM H. JANEWAY<br>-----------------------------------------------------<br>William H. Janeway | Director | March 29, 2001 |
| /s/ JOSEPH D. RIZZI<br>-----------------------------------------------------<br>Joseph D. Rizzi | Director | March 29, 2001 |
| /s/ STEPHEN J. LUCZO<br>-----------------------------------------------------<br>Stephen J. Luczo | Director | March 29, 2001 |

FINANCIAL STATEMENTS

    As required under Item 8. Financial Statements and Supplementary Data, the consolidated financial statements of the Company are provided in this separate section. The consolidated financial statements included in this section are as follows:

```
          FINANCIAL STATEMENT DESCRIPTION              PAGE
          -------------------------------              ----

Consolidated Balance Sheets As of December 31, 2000 and
   1999.....................................................   51
Consolidated Statements of Operations -- Years Ended
   December 31, 2000, 1999 and 1998...........................   52
Consolidated Statements of Stockholders' Equity -- Years
   Ended December 31, 2000, 1999 and 1998...................   53
Consolidated Statements of Cash Flows -- Years Ended
   December 31, 2000, 1999 and 1998...........................   54
Notes to Consolidated Financial Statements...................   55

Report of Ernst & Young LLP, Independent Auditors...........   74
```
</TABLE>

VERITAS SOFTWARE CORPORATION

CONSOLIDATED BALANCE SHEETS
(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

ASSETS

|  | DECEMBER 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Current assets: | | |
| Cash and cash equivalents................................ | $ 886,558 | $ 148,244 |
| Short-term investments.................................... | 232,891 | 544,137 |
| Accounts receivable, net of allowance for doubtful | | |
| accounts of $7,810 and $5,693, respectively............ | 186,863 | 132,180 |
| Deferred income taxes.................................... | 38,017 | 23,803 |
| Other current assets..................................... | 38,303 | 13,381 |
| Total current assets............................ | 1,382,632 | 861,745 |
| Long-term investments........................................ | 136,111 | 65,036 |
| Property and equipment, net.................................. | 168,389 | 76,958 |
| Goodwill and other intangibles, net......................... | 2,285,320 | 3,226,749 |
| Other assets................................................ | 110,382 | 2,789 |
|  | $ 4,082,834 | $4,233,277 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| Current liabilities: | | |
|---|---|---|
| Accounts payable......................................... | $ 45,250 | $ 30,229 |
| Accrued compensation and benefits........................ | 63,838 | 35,560 |
| Accrued acquisition and restructuring costs.............. | 44,123 | 24,202 |
| Other accrued liabilities................................ | 69,289 | 47,531 |
| Income taxes payable..................................... | 34,454 | 6,804 |
| Deferred revenue......................................... | 201,001 | 86,979 |
| Total current liabilities........................ | 457,955 | 231,305 |
| Convertible subordinated notes.............................. | 429,176 | 451,044 |
| Deferred and other income taxes............................. | 213,132 | 157,867 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $.001 par value: | | |
| 10,000 shares authorized: none issued and | | |
| outstanding............................................ | -- | -- |
| Common stock, $.001 par value: | | |
| 2,000,000 shares authorized; 411,565 and 390,898 shares | | |
| issued at December 31, 2000 and 1999; 392,890 and | | |
| 390,898 outstanding at December 31, 2000 and 1999..... | 412 | 391 |
| Additional paid-in capital............................... | 5,847,844 | 3,926,554 |
| Accumulated deficit...................................... | (1,152,166) | (532,374) |
| Accumulated other comprehensive loss..................... | (11,455) | (1,510) |
| Treasury stock, at cost; 18,675 shares at December 31, | | |
| 2000................................................... | (1,702,064) | -- |
| Total stockholders' equity........................ | 2,982,571 | 3,393,061 |
|  | $ 4,082,834 | $4,233,277 |

See accompanying notes to consolidated financial statements.

VERITAS SOFTWARE CORPORATION

CONSOLIDATED STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

| | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| | 2000 | 1999 | 1998 |
| Net revenue: | | | |
| User license fees | $ 987,363 | $ 498,014 | $167,703 |
| Services | 219,965 | 98,098 | 43,162 |
| Total net revenue | 1,207,328 | 596,112 | 210,865 |
| Cost of revenue: | | | |
| User license fees | 40,779 | 20,735 | 8,798 |
| Services | 85,968 | 38,161 | 20,663 |
| Amortization of developed technology | 62,054 | 35,659 | -- |
| Total cost of revenue | 188,801 | 94,555 | 29,461 |
| Gross profit | 1,018,527 | 501,557 | 181,404 |
| Operating expenses: | | | |
| Selling and marketing | 443,834 | 221,989 | 76,392 |
| Research and development | 175,901 | 94,477 | 40,239 |
| General and administrative | 77,900 | 34,185 | 10,505 |
| Amortization of goodwill and other intangibles | 879,032 | 510,943 | -- |
| Acquisition and restructuring costs (reversals) | (4,260) | 11,000 | -- |
| In-process research and development | -- | 104,200 | 600 |
| Total operating expenses | 1,572,407 | 976,794 | 127,736 |
| Income (loss) from operations | (553,880) | (475,237) | 53,668 |
| Interest and other income, net | 59,619 | 23,328 | 11,821 |
| Interest expense | (31,567) | (15,659) | (5,700) |
| Income (loss) before income taxes | (525,828) | (467,568) | 59,789 |
| Provision for income taxes | 93,964 | 35,390 | 8,141 |
| Net income (loss) | $ (619,792) | $(502,958) | $ 51,648 |
| Net income (loss) per share -- basic | $ (1.55) | $ (1.59) | $ 0.24 |
| Net income (loss) per share -- diluted | $ (1.55) | $ (1.59) | $ 0.22 |
| Number of shares used in computing per share amounts -- basic | 400,034 | 316,892 | 211,558 |
| Number of shares used in computing per share amounts -- diluted | 400,034 | 316,892 | 232,519 |

See accompanying notes to consolidated financial statements.
52

55

VERITAS SOFTWARE CORPORATION

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(IN THOUSANDS)

| | COMMON STOCK | | ADDITIONAL PAID-IN CAPITAL | ACCUMULATED DEFICIT | ACCUMULATED OTHER COMPREHENSIVE LOSS | DEFERRED COMPENSATION |
|---|---|---|---|---|---|---|
| | SHARES | AMOUNT | | | | |
| BALANCE AT DECEMBER 31, 1997.............. | 207,573 | 208 | 185,679 | (81,064) | (566) | (64) |
| Components of comprehensive income (loss): | | | | | | |
| Net income (loss)...................... | -- | -- | -- | 51,648 | -- | -- |
| Foreign currency translation adjustment........................... | -- | -- | -- | -- | 10 | -- |
| Total comprehensive income (loss)........................... | | | | | | |
| Exercise of stock options............. | 5,547 | 5 | 10,398 | -- | -- | -- |
| Issuance of common stock under employee stock purchase plan................... | 1,209 | 1 | 3,567 | -- | -- | -- |
| Amortization of deferred compensation.... | -- | -- | -- | -- | -- | 32 |
| BALANCE AT DECEMBER 31, 1998.............. | 214,329 | 214 | 199,644 | (29,416) | (556) | (32) |
| Components of comprehensive income (loss): | | | | | | |
| Net income (loss)...................... | -- | -- | -- | (502,958) | -- | -- |
| Foreign currency translation adjustment........................... | -- | -- | -- | -- | (954) | -- |
| Total comprehensive income (loss)........................... | | | | | | |
| Exercise of stock options............. | 11,909 | 12 | 38,521 | -- | -- | -- |
| Issuance of common stock under employee stock purchase plan................... | 799 | 1 | 6,973 | -- | -- | -- |
| Tax benefits from stock plans............ | -- | -- | 63,419 | -- | -- | -- |
| Issuance of common stock related to the NSMG acquisition...................... | 155,583 | 156 | 3,151,196 | -- | -- | -- |
| Issuance of options to purchase shares of common stock related to the NSMG acquisition........................... | -- | -- | 281,418 | -- | -- | -- |
| Issuance of common stock related to the TeleBackup acquisition................. | 6,842 | 7 | 134,095 | -- | -- | -- |
| Issuance of options to purchase shares of common stock related to the TeleBackup acquisition........................... | -- | -- | 2,762 | -- | -- | -- |
| Issuance of common stock related to the NuView acquisition.................... | 1,436 | 1 | 48,526 | -- | -- | -- |
| Amortization of deferred compensation.... | -- | -- | -- | -- | -- | 32 |
| BALANCE AT DECEMBER 31, 1999.............. | 390,898 | 391 | 3,926,554 | (532,374) | (1,510) | -- |
| Components of comprehensive income (loss): | | | | | | |
| Net income (loss)...................... | -- | -- | -- | (619,792) | -- | -- |
| Foreign currency translation adjustment........................... | -- | -- | -- | -- | (9,001) | -- |
| Change in unrealized loss on available-for-sale investments, net of tax of $629..................... | -- | -- | -- | -- | (944) | -- |
| Total comprehensive income (loss)........................... | | | | | | |
| Exercise of stock options............. | 15,806 | 16 | 101,423 | -- | -- | -- |
| Issuance of common stock under employee stock purchase plan................... | 1,126 | 1 | 18,064 | -- | -- | -- |
| Tax benefits from stock plans............ | -- | -- | 160,786 | -- | -- | -- |
| Purchase of treasury stock related to the Seagate acquisition................... | -- | -- | -- | -- | -- | -- |
| Reissuance of treasury stock related to the Seagate acquisition................ | -- | -- | 1,603,380 | -- | -- | -- |
| Conversion of convertible subordinated notes................................. | 3,735 | 4 | 37,637 | -- | -- | -- |
| BALANCE AT DECEMBER 31, 2000.............. | 411,565 | $412 | $5,847,844 | $(1,152,166) | $(11,455) | $ -- |

| | TREASURY STOCK | | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|---|
| | SHARES | AMOUNT | |
| BALANCE AT DECEMBER 31, 1997.............. | -- | -- | 104,193 |
| Components of comprehensive income (loss): | | | |
| Net income (loss)...................... | -- | -- | 51,648 |
| Foreign currency translation adjustment........................... | -- | -- | 10 |
| Total comprehensive income | | | |

| | (loss) | | |
|---|---|---|---|
| Exercise of stock options............... | -- | -- | 10,403 |
| Issuance of common stock under employee stock purchase plan.................... | -- | -- | 3,568 |
| Amortization of deferred compensation.... | -- | -- | 32 |
| | -------- | ------------ | ------------ |
| BALANCE AT DECEMBER 31, 1998.............. | -- | -- | 169,854 |
| Components of comprehensive income (loss): | | | |
| Net income (loss)...................... | -- | -- | (502,958) |
| Foreign currency translation adjustment............................ | -- | -- | (954) |
| | | | ------------ |
| Total comprehensive income (loss)............................ | | | (503,912) |
| Exercise of stock options............... | -- | -- | 38,533 |
| Issuance of common stock under employee stock purchase plan.................... | -- | -- | 6,974 |
| Tax benefits from stock plans............ | -- | -- | 63,419 |
| Issuance of common stock related to the NSMG acquisition...................... | -- | -- | 3,151,352 |
| Issuance of options to purchase shares of common stock related to the NSMG acquisition............................ | -- | -- | 281,418 |
| Issuance of common stock related to the TeleBackup acquisition................. | -- | -- | 134,102 |
| Issuance of options to purchase shares of common stock related to the TeleBackup acquisition............................ | -- | -- | 2,762 |
| Issuance of common stock related to the NuView acquisition.................... | -- | -- | 48,527 |
| Amortization of deferred compensation.... | -- | -- | 32 |
| | -------- | ------------ | ------------ |
| BALANCE AT DECEMBER 31, 1999.............. | -- | -- | 3,393,061 |
| Components of comprehensive income (loss): | | | |
| Net income (loss)...................... | -- | -- | (619,792) |
| Foreign currency translation adjustment............................ | -- | -- | (9,001) |
| Change in unrealized loss on available-for-sale investments, net of tax of $629...................... | -- | -- | (944) |
| | | | ------------ |
| Total comprehensive income (loss)............................ | | | (629,737) |
| Exercise of stock options............... | -- | -- | 101,439 |
| Issuance of common stock under employee stock purchase plan.................... | -- | -- | 18,065 |
| Tax benefits from stock plans............ | -- | -- | 160,786 |
| Purchase of treasury stock related to the Seagate acquisition.................... | (128,060) | (11,671,708) | (11,671,708) |
| Reissuance of treasury stock related to the Seagate acquisition................. | 109,385 | 9,969,644 | 11,573,024 |
| Conversion of convertible subordinated notes................................... | -- | -- | 37,641 |
| | -------- | ------------ | ------------ |
| BALANCE AT DECEMBER 31, 2000.............. | (18,675) | $ (1,702,064) | $ 2,982,571 |
| | ======== | ============ | ============ |

See accompanying notes to consolidated financial statements.

53

VERITAS SOFTWARE CORPORATION

CONSOLIDATED STATEMENTS OF CASH FLOWS
(IN THOUSANDS)

| | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| | 2000 | 1999 | 1998 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net income (loss)......................................... | $ (619,792) | $ (502,958) | $ 51,648 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization............................ | 46,097 | 24,126 | 7,346 |
| Amortization of goodwill and other intangibles.......... | 879,032 | 510,943 | -- |
| Amortization of developed technology.................... | 62,054 | 35,659 | -- |
| In-process research and development..................... | -- | 104,200 | 600 |
| Acquisition and restructuring costs..................... | (4,260) | 948 | -- |
| Amortization of original issue discount on convertible notes................................................. | 15,773 | 5,402 | -- |
| Deferred income taxes................................... | (90,827) | (36,775) | (8,000) |
| Changes in operating assets and liabilities, net of effects of business acquisitions: | | | |
| Accounts receivable................................... | (54,683) | (77,174) | (22,127) |
| Other receivable...................................... | -- | 22,935 | -- |
| Other assets.......................................... | (35,681) | (3,367) | (8,136) |
| Accounts payable...................................... | 15,021 | 19,389 | 3,469 |
| Accrued compensation and benefits..................... | 28,278 | 17,539 | 4,611 |
| Accrued acquisition and restructuring costs........... | (15,819) | (15,269) | -- |
| Other accrued liabilities............................. | 19,174 | 10,169 | 2,525 |
| Income taxes payable.................................. | 27,650 | (8,956) | 10,694 |
| Tax benefits from stock plans......................... | 160,786 | 63,419 | -- |
| Deferred revenue...................................... | 114,022 | 37,203 | 20,167 |
| Net cash provided by operating activities.......... | 546,825 | 207,433 | 62,797 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Purchases of held-to-maturity investments................ | (836,897) | (764,097) | (284,819) |
| Held-to-maturity investment maturities.................. | 846,119 | 258,891 | 296,048 |
| Sale of held-to-maturity investments.................... | 230,949 | -- | -- |
| Purchase of property and equipment...................... | (134,665) | (59,611) | (23,424) |
| Cash acquired from Seagate Technology................... | 2,294,301 | -- | -- |
| Payments to former Seagate Technology stockholders........ | (2,294,301) | -- | -- |
| Cash acquired from Seagate Software..................... | -- | 1,044 | -- |
| Cash acquired from TeleBackup........................... | -- | 1,493 | -- |
| Strategic investments in businesses.................... | (22,000) | -- | -- |
| Purchase of other businesses and technologies.......... | (2,520) | (14,625) | (1,250) |
| Net cash provided by (used for) investing activities.......................................... | 80,986 | (576,965) | (13,445) |
| FINANCING ACTIVITIES: | | | |
| Proceeds from short-term borrowings...................... | 465,000 | -- | -- |
| Repayments of short-term borrowings...................... | (465,000) | -- | -- |
| Proceeds from issuance of common stock.................. | 119,504 | 45,507 | 13,971 |
| Net proceeds from issuance of convertible debt........... | -- | 334,137 | -- |
| Net cash provided by financing activities.......... | 119,504 | 379,644 | 13,971 |
| Effect of exchange rate changes......................... | (9,001) | (954) | 134 |
| Net increase in cash and cash equivalents................ | 738,314 | 9,158 | 63,457 |
| Cash and cash equivalents at beginning of year.......... | 148,244 | 139,086 | 75,629 |
| Cash and cash equivalents at end of year................ | $ 886,558 | $ 148,244 | $ 139,086 |
| SUPPLEMENTAL DISCLOSURES: | | | |
| Cash paid for interest.................................. | $ 14,926 | $ 5,300 | $ 5,521 |
| Cash paid for (refund) income taxes..................... | $ (3,403) | $ 15,834 | $ 6,245 |
| SUPPLEMENTAL SCHEDULE OF NONCASH INVESTING AND FINANCING TRANSACTIONS: | | | |
| Issuance of common stock and options for business acquisitions........................................... | $ -- | $3,618,161 | $ -- |
| Issuance of common stock for conversion of notes.......... | $ 36,245 | $ -- | $ -- |
| Purchase of treasury stock related to the Seagate transaction............................................ | $(11,671,708) | $ -- | $ -- |

Reissuance of treasury stock related to compensatory transaction........................................... $ 11,573,024   $     --   $     --
                                                                                    ============   ==========   =========

See accompanying notes to consolidated financial statements.

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

VERITAS Software Corporation (the "Company"), a Delaware corporation, is a leading independent supplier of data availability software. Data availability software includes storage management and data protection software as well as clustering, replication and storage area networking software. The Company develops and sells products for most popular operating systems, including versions of UNIX, Windows NT and Linux. The Company also provides a full range of services to assist its customers in planning and implementing their data availability solutions. The Company markets its products and services to original equipment manufacturers ("OEM") and end user customers through a combination of direct sales and indirect sales channels such as resellers, value-added resellers, hardware distributors, application software vendors and systems integrators.

Basis of Presentation

The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All significant intercompany transactions and balances have been eliminated in consolidation.

Stock splits

On June 7, 1999, the Company announced a two-for-one stock split in the form of a stock dividend paid on July 8, 1999 to stockholders of record on June 18, 1999. On October 14, 1999, the Company announced a three-for-two split in the form of a stock dividend paid on November 19, 1999 to stockholders of record on November 2, 1999. On January 27, 2000, the Company announced a three-for-two split in the form of a stock dividend paid on March 3, 2000 to stockholders of record on February 18, 2000. All share and per share data have been restated to give retroactive effect to these stock splits.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates.

Cash, Cash Equivalents and Short-Term Investments

Cash and cash equivalents include cash and highly liquid investments with insignificant interest rate risk and with original maturities of three months or less. The Company invests its excess cash in diversified instruments maintained primarily in U.S. financial institutions in an effort to preserve principal and to maintain safety and liquidity.

Short-term investments include investments with original maturities greater than three months and remaining maturities of less than one year as of the balance sheet date. The Company accounts for its short-term investments in accordance with Statement of Financial Accounting Standards No. 115, Accounting for Certain Investments in Debt and Equity Securities, ("SFAS No. 115") and these short-term investments are classified as held to maturity as of the balance sheet date. At December 31, 2000, amortized cost approximated fair value for all cash equivalents and short-term investments. To date, there have been no significant realized or unrealized gains or losses on the short-term investments.

In the fourth quarter of 2000, the Company conducted a selected liquidation of approximately $397.0 million of its cash equivalents and short-term investments to facilitate the Seagate Technology transaction (see Note 2). The isolated, nonrecurring and unusual nature of the transaction does not change the Company's intent to hold the other investments to maturity. The realized gain or loss on the liquidated investments was not significant.

58

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Long-Term Investments

    Investments with remaining maturities greater than one year as of the balance sheet date are classified as long-term. The Company accounts for its long-term investments in accordance with SFAS No. 115 and these investments are classified as held to maturity as of the balance sheet date. At December 31, 2000, amortized cost approximated fair value for all long-term investments and, to date, there have been no significant realized or unrealized gains or losses on the Company's long-term investments.

Investments in Equity Securities

    The Company accounts for its investments in equity securities in accordance with SFAS No. 115 and these investments are classified as available-for-sale. Investments in equity securities are included in other assets in the Company's consolidated balance sheet. These investments are carried at fair value, with unrealized gains or losses, net of tax, included in accumulated other comprehensive income or loss as a separate component of stockholders' equity. In 2000, the Company recorded an unrealized loss of $0.9 million, net of tax of $0.6 million.

Derivative Financial Instruments

    The Company transacts business in various foreign currencies and primarily utilizes foreign currency forward exchange contracts ("forward contracts"), to hedge certain foreign currency transaction exposures. The Company does not use forward contracts or any other hedging instruments for speculative trading purposes.

    As of December 31, 2000, the total gross notional amount of the Company's forward contracts was approximately $178.9 million, all hedging intercompany accounts of certain of its international subsidiaries. The forward contracts had a term of thirty one days or less and settled immediately after the end of 2000. The fair value of the forward contracts is based on quoted market prices. The carrying amount and fair value of the forward contracts was not significant as of December 31, 2000. The gains and losses associated with currency rate changes on forward contracts are recorded in other income (expense), as they generally offset corresponding gains and losses on the foreign currency denominated assets or liabilities being hedged.

    In September 2000, the Company entered into a three year cross currency interest rate swap ("swap") transaction for the purpose of hedging fixed interest rate, foreign currency denominated cash flows under an intercompany loan receivable. Under the terms of the swap, monthly EURO denominated fixed principal and interest payments received under the intercompany loan are swapped for monthly U.S. dollar fixed principal and interest payments. As of December 31, 2000, the notional amount and the fair value of the swap were approximately $126.9 million and $7.1 million, respectively. The gains and losses on the swap are recorded in the same period as losses and gains on the underlying transaction are recorded and generally offset.

Property and Equipment

    Property and equipment are recorded at cost. Depreciation and amortization are calculated using the straight-line method over the estimated useful lives or, in the case of leasehold improvements, the term of the related lease, if shorter. The estimated useful lives of furniture and equipment and computer equipment is generally three to five years. The Company also depreciates a building located in India over fifteen years. Depreciation and amortization of property and equipment charged to costs and expenses was approximately

56

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

$43.2 million for the year ended December 31, 2000, $23.1 million for the year ended December 31, 1999 and $6.9 million for the year ended December 31,1998.

Goodwill and other intangibles

Goodwill represents the excess of the purchase price of net tangible and intangible assets acquired in business combinations over their estimated fair value. Other intangibles mainly represent distribution channels, original equipment manufacturer agreements, developed technology, assembled workforce and trademarks acquired in business combinations. Goodwill and other intangibles are being amortized on a straight-line basis over their estimated useful life of four years. The Company periodically reviews goodwill and other intangibles for recoverability or whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. The carrying amount is compared to the undiscounted cash flows of future operations. In management's opinion, no material impairment exists at December 31, 2000. Accumulated amortization of goodwill and other intangibles was $1,492.6 million as of December 31, 2000, $548.6 million as of December 31, 1999 and $0.5 million as of December 31, 1998.

Revenue Recognition

In October of 1997 the Accounting Standards Executive Committee issued Statement of Position ("SOP") 97-2 Software Revenue Recognition, which has been amended by SOP 98-9. These statements set forth generally accepted accounting principles for recognizing revenue on software transactions. SOP 97-2, as amended by SOP 98-4, was effective for revenue recognized under software license and service arrangements beginning January 1, 1998. SOP 98-9 amended SOP 97-2 and requires recognition of revenue using the "residual method" when certain criteria are met.

The Company derives revenue from software licenses and customer support and other services. Service revenue includes contracts for software maintenance and technical support, consulting and training. In software arrangements that include rights to multiple software products and/or services, the Company allocates and defers revenue for the undelivered items, based on vendor-specific objective evidence of fair value, and recognizes the difference between the total arrangement fee and the amount deferred for the undelivered items as revenue.

The Company recognizes revenue from licensing of software products to an end user upon delivery of the software product to the customer, unless the fee is not fixed or determinable, or collectibility is not considered probable. For licensing of the Company's software to OEMs, revenue is not recognized until the software is sold by the OEM to an end-user customer. For licensing of the Company's software through its indirect sales channels, revenue is recognized when the software is sold by the reseller, value-added reseller or distributor to an end-user customer. The Company considers all arrangements with payment terms extending beyond twelve months and other arrangements with payment terms longer than its normal business practice not to be fixed or determinable and revenue is recognized when the fee becomes due. If collectibility is not considered probable for reasons other than extended payment terms, revenue is recognized when the fee is collected.

Customer support revenue is recognized on a straight-line basis over the period that the support is provided. Other software service arrangements are evaluated to determine whether those services are essential to the functionality of the other elements of the arrangement. When software services are considered essential, revenue under the arrangement is recognized using contract accounting. When software services are not considered essential, the revenue allocable to the software services is recognized as the services are performed, assuming all other criteria for revenue recognition have been met.

Revenue is recognized using contract accounting for arrangements involving customization or modification of the software or where software services are considered essential to the functionality of the software.

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Revenue from these software arrangements is recognized using the percentage-of-completion method with progress-to-completion measured using labor cost inputs.

Software Development Costs

Under Statement of Financial Accounting Standards No. 86 Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed, certain software development costs incurred subsequent to the establishment of technological feasibility are capitalized and amortized over the estimated lives of the related products. Technological feasibility is established upon completion of a working model, which is typically demonstrated by initial beta shipment. The period between the achievement of technological feasibility and the general release of the Company's products has been of short duration. As of December 31, 2000 such capitalizable software development costs were insignificant and all software development costs have been charged to research and development expense in the accompanying consolidated statements of operations.

Concentrations of Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of investments in debt securities, trade receivables and financial instruments used on hedging activities. The Company primarily invests its excess cash in commercial paper rated A-1/P-1, medium-term notes, corporate notes, government securities, market auction preferreds with approved financial institutions, and other specific money market instruments of similar liquidity and credit quality. The Company is exposed to credit risks in the event of default by the financial institutions or issuers of investments to the extent recorded on the balance sheet. The Company generally does not require collateral. The Company maintains allowances for credit losses, and such losses have been within management's expectations. For the years ended December 31, 2000 and 1999, no customer accounted for greater than 10% of revenues. For the year ended December 31, 1998, one customer accounted for approximately 12% or $25.8 million of the Company's revenue. The counterparties to the agreements relating to the Company's financial instruments used on hedging activities consist of four major, multinational, high credit quality, financial institutions. The amounts potentially subject to credit risk arising from the possible inability of counterparties to meet the terms of their contracts are generally limited to the amounts, if any, by which a counterparty's obligations exceed the obligations of the Company with that counterparty.

Net Income Per Share

Basic earnings per share is computed using the weighted average number of common shares outstanding during the period. Diluted earnings per share is computed using the weighted average number of common shares and dilutive potential common shares outstanding during the period. Dilutive common shares consist of employee stock options using the treasury stock method and common shares issued assuming conversion of the convertible subordinated notes, if dilutive.

Accounting for Stock-Based Compensation

The Company accounts for employee stock-based compensation in accordance with APB Opinion No. 25, Accounting for Stock Issued to Employees and related interpretations. Pro forma net income and net income per share disclosures required by Statement of Financial Accounting Standards No. 123, Accounting for Stock Based Compensation, are included in Note 12.

Translation of Foreign Currencies

Assets and liabilities of certain foreign subsidiaries, whose functional currency is the local currency, are translated at year-end exchange rates. Income and expense items are translated at the average rates of

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

exchange prevailing during the year. The adjustment resulting from translating the financial statements of such foreign subsidiaries is reflected as a separate component of stockholder's equity. Foreign currency transaction gains or losses are reported in results of operations.

Impairment of Long-Lived Assets

The Company reviews the assets for impairment and determines whether an event or change in facts and circumstances indicates that the carrying amount of property and equipment or other long-lived assets may not be recoverable. The Company determines recoverability of the assets by comparing the carrying amount of the asset to net future undiscounted cash flows that the asset is expected to generate. The impairment recognized is the amount by which the carrying amount exceeds the fair market value of the asset. No events or changes in facts and circumstances occurred during the year that would indicate that any impairment of assets existed.

Advertising Costs

Advertising costs are expensed as incurred. Advertising expense was $36.4 million, $10.5 million and $1.3 million for the years ended December 31, 2000, 1999 and 1998, respectively.

Reclassifications

Certain amounts reported in previous years have been reclassified to conform to the 2000 presentation.

Recent Accounting Pronouncements

In June 1998, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards ("SFAS") No. 133, Accounting for Derivative Instruments and Hedging Activities. SFAS No. 133, as amended by SFAS No. 137 and 138, establishes methods of accounting for derivative financial instruments and hedging activities related to those instruments as well as other hedging activities. The Company will be required to implement SFAS No. 133 as of the beginning of its fiscal year 2001. The implementation of SFAS No. 133 will not have a material impact on the Company's financial position, results of operations or cash flows.

In December 1999, the SEC issued Staff Accounting Bulletin ("SAB") No. 101, Revenue Recognition in Financial Statements. SAB No. 101 provides guidance on the recognition, presentation and disclosure of revenue in financial statements. The required implementation date for the Company was the fourth quarter of 2000, retroactive to the beginning of its fiscal year. The implementation of SAB No. 101 did not have a material impact on the Company's financial position, results of operations or cash flows for the year ended December 31, 2000.

NOTE 2. SEAGATE TECHNOLOGY TRANSACTION

On November 22, 2000, the Company completed a multi-party transaction with Seagate Technology, Inc. and Suez Acquisition Company (Cayman) Limited ("SAC"), a company formed by a group of private equity firms led by Silver Lake Partners. The transaction was structured as a leveraged buyout of Seagate Technology pursuant to which Seagate Technology sold all of its operating assets to SAC, and SAC assumed and indemnified Seagate Technology and the Company for substantially all liabilities arising in connection with those operating assets. At the closing, and after the operating assets and liabilities of Seagate Technology had been transferred to SAC, a wholly-owned subsidiary of the Company merged with and into Seagate Technology, following which Seagate Technology became a wholly-owned subsidiary of the Company. The merger was accounted for by the Company at the estimated fair value of the assets and liabilities remaining in Seagate Technology, immediately prior to the merger. The Company issued approximately 109.4 million shares of its common stock to the Seagate Technology stockholders in exchange for approximately

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

128.1 million shares of its common stock and equity securities in Gadzoox
Networks, Inc. held by Seagate Technology. The Company recorded the equity
securities in Gadzoox and the other assets and liabilities assumed from Seagate
Technology at their fair values. In addition, the Company accrued $40 million of
direct transaction costs, of which $9 million was paid as of December 31, 2000.
The Company did not acquire Seagate Technology's disc drive business or any
other Seagate Technology operating business.

     The transaction had no impact on the Company's consolidated statement of
operations. The impact of the decrease of approximately 18.7 million of shares
its common stock outstanding was a reduction of approximately 2.0 million shares
used in computing net loss per share for the year ended December 31, 2000,
resulting in an incremental net loss per share of $0.01.

     The transaction had impacts on the Company's consolidated balance sheet. As
of December 31, 2000, the Company's other assets included $70 million of
indemnification receivable from SAC and $4 million for its ownership in Gadzoox
Networks, Inc, its accrued acquisition and restructuring costs included $31
million of direct transaction costs, which was net of $9 million paid in 2000,
and its deferred and other income taxes include an additional $132 million,
which was net of a deferred tax asset of $3 million related to the Company's
ownership in Gadzoox Networks, Inc.

NOTE 3. BUSINESS COMBINATIONS

  NSMG acquisition

     On May 28, 1999, the Company acquired the Network & Storage Management
Group business of Seagate Software, Inc., which the Company refers to as "NSMG."
The NSMG business developed and marketed software products and provided related
services enabling information technology professionals to manage distributed
network resources and to secure and protect enterprise data. In connection with
the NSMG acquisition, the Company issued 155,583,486 shares of its common stock
to Seagate Software, Inc. and issued options to purchase 15,626,358 shares of
its common stock to its employees who were former NSMG employees. The Company
accounted for the NSMG acquisition using the purchase method of accounting, and
incurs charges of $221.5 million per quarter primarily related to the
amortization of developed technology, goodwill and other intangibles over their
estimated useful life of four years. The total NSMG purchase price was $3,464.5
million and included $3,151.4 million for the issuance of our common stock,
$269.7 million for the exchange of options to purchase our common stock and
$43.4 million of acquisition-related costs. The purchase price was allocated,
based on an independent valuation, to goodwill of $3,015.8 million, distribution
channels of $233.8 million, original equipment manufacturer agreements of $23.4
million, developed technology of $233.7 million, assembled workforce of $12.8
million, trademarks of $22.8 million, in-process research and development of
$101.2 million, net deferred tax liabilities of $179.5 million, other
intangibles of $1.5 million and tangible net liabilities assumed of $1.0
million. For 2000, the Company recorded $827.6 million for the amortization of
goodwill and other intangibles, and $58.4 million for the amortization of
developed technology related to this acquisition.

     Acquisition-related costs consisted of direct transaction costs of $20.0
million, operating lease commitments on duplicative facilities of $8.2 million
and involuntary termination benefits of $15.2 million. Non-cash charges included
in the acquisition-related costs approximated $11.7 million.

63

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Acquisition-related costs are summarized below (in millions):

|  | DIRECT TRANSACTION COSTS | OPERATING LEASE COMMITMENTS ON DUPLICATIVE FACILITIES | INVOLUNTARY TERMINATION BENEFITS | TOTAL |
|---|---|---|---|---|
| Provision accrued at acquisition date................................ | $ 20.0 | $ 8.2 | $ 15.2 | $ 43.4 |
| Cash payments......................... | (17.4) | (0.3) | (1.8) | (19.5) |
| Non-cash charges...................... | -- | -- | (11.7) | (11.7) |
| Balance at December 31, 1999.......... | 2.6 | 7.9 | 1.7 | 12.2 |
| Cash payments......................... | (1.9) | (1.9) | (0.9) | (4.7) |
| Balance at December 31, 2000.......... | $ 0.7 | $ 6.0 | $ 0.8 | $ 7.5 |

The remaining acquisition-related costs accrual of $7.5 million is anticipated to be utilized primarily for servicing operating lease payments or negotiated buyout of operating lease commitments, the lease terms of which will expire at various times through the year 2013.

In addition, the Company recorded a restructuring charge of $11.0 million in 1999 as a result of the NSMG acquisition. This restructuring charge related to exit costs with respect to duplicative facilities that the Company plans to vacate, which include $0.9 million of write-off of redundant equipment and leasehold improvements, and involuntary termination benefits. Involuntary termination benefits related to the salary and fringe benefit expense for terminated employees in research and development. Involuntarily terminated employees represented approximately 2% of the global workforce. In the fourth quarter of 2000, as a result of lower exit costs than originally estimated with respect to duplicative facilities, the Company reversed $4.3 million of restructuring charge.

Restructuring costs are summarized below (in millions):

|  | CANCELLATION OF FACILITIES LEASES AND OTHER CONTRACTS | INVOLUNTARY TERMINATION BENEFITS | WRITE OFF OF REDUNDANT EQUIPMENT AND LEASEHOLD IMPROVEMENTS | TOTAL |
|---|---|---|---|---|
| Provision accrued at acquisition date........................... | $ 8.8 | $ 1.3 | $ 0.9 | $ 11.0 |
| Cash payments.................... | -- | (0.9) | -- | (0.9) |
| Non-cash charges................. | -- | -- | (0.9) | (0.9) |
| Balance at December 31, 1999...... | 8.8 | 0.4 | -- | 9.2 |
| Cash payments.................... | (0.2) | -- | -- | (0.2) |
| Reversal......................... | (3.9) | (0.4) | -- | (4.3) |
| Balance at December 31, 2000...... | $ 4.7 | $ -- | $ -- | $ 4.7 |

The remaining restructuring charge accrual of $4.7 million is anticipated to be utilized for servicing operating lease payments or negotiated buyout of operating lease commitments, the lease terms of which will expire at various times through the year 2012.

TeleBackup acquisition

On June 1, 1999 the Company acquired TeleBackup Systems, Inc., which the Company refers to as "TeleBackup." TeleBackup designed, developed and marketed software solutions for local and remote backup and recovery of electronic information stored on networked, remote and mobile personal computers. TeleBackup became a wholly owned subsidiary of the Company in exchange for the issuance of 6,842,795 shares of either its common stock or exchangeable shares to the holders of TeleBackup common shares and the exchange of options to purchase 154,706 shares of its common stock to its employees who were former

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

employees of TeleBackup. The Company accounted for the TeleBackup acquisition using the purchase method of accounting, and incurs charges of $9.0 million per quarter primarily related to the amortization of developed technology, goodwill and other intangibles over their estimated useful life of four years. The total purchase price for TeleBackup was $143.1 million and included $134.1 million related to the issuance of our common stock, $2.8 million for the issuance of options to purchase our common stock and $6.2 million in acquisition-related costs. The purchase price was allocated, based on an independent valuation, to goodwill of $133.1 million, distribution channels of $1.0 million, original equipment manufacturer agreements of $2.1 million, developed technology of $6.6 million, assembled workforce of $0.3 million, trademarks of $1.3 million, in-process research and development of $1.9 million, net deferred tax liabilities of $3.0 million and tangible net liabilities assumed of $0.2 million. For 2000, the Company recorded $34.5 million for amortization of goodwill and other intangibles, and $1.7 million for the amortization of developed technology related to this acquisition.

The acquisition costs of $6.2 million consist primarily of direct transaction costs and involuntary termination benefits.

Acquisition-related costs are summarized below (in millions):

|  | DIRECT TRANSACTION COSTS | INVOLUNTARY TERMINATION BENEFITS | TOTAL |
| --- | --- | --- | --- |
| Provision accrued at acquisition date................. | $ 5.6 | $ 0.6 | $ 6.2 |
| Cash payments........................................ | (5.1) | (0.2) | (5.3) |
| Balance at December 31, 1999.......................... | 0.5 | 0.4 | 0.9 |
| Cash payments........................................ | (0.2) | (0.4) | (0.6) |
| Balance at December 31, 2000.......................... | $ 0.3 | $ -- | $ 0.3 |

The remaining $0.3 million is anticipated to be utilized in 2001.

NuView acquisition

On August 10, 1999, the Company acquired certain assets of NuView, Inc., which the Company refers to as "NuView". Under an asset purchase agreement, the Company acquired certain assets of NuView, including its Windows NT cluster management solution, Cluster X, for a total cost of approximately $67.9 million. The Company accounted for the acquisition using the purchase method of accounting, and incurs charges of $4.3 million per quarter primarily related to the amortization of developed technology, goodwill and other intangibles over their estimated useful life of four years. The purchase price included $47.7 million related to the issuance of the Company's common stock, $0.8 million for the issuance of options to purchase the Company's common stock to former NuView employees, $0.2 million in acquisition-related costs and $19.2 million paid in cash. The purchase price was allocated, based on an independent valuation, to goodwill of $62.6 million, developed technology of $2.4 million, assembled workforce of $0.6 million, trademarks of $0.3 million, covenant-not-to-compete of $0.9 million and in-process research and development of $1.1 million. For 2000, the Company recorded $16.5 million for amortization of goodwill and other intangibles, and $0.6 million for the amortization of developed technology related to this acquisition.

Unaudited pro forma summary results of operations

The following unaudited pro forma summary results of operations data have been prepared assuming that the NSMG, TeleBackup and NuView acquisitions had occurred at the beginning of the periods presented. The consolidated results are not necessarily indicative of results of future operations nor of results that would have occurred had the acquisitions been consummated as of the beginning of the periods presented. The pro

65

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

forma information excludes the impact of the one-time charges related to
in-process research and development costs of $104.2 million and the
restructuring charges of $11.0 million recorded in 1999 (in thousands, except
per share amounts):

|  | 1999 | 1998 |
|---|---|---|
| Net revenue......................................... | $ 700,027 | $ 409,998 |
| Net loss............................................. | $(738,049) | $(814,993) |
| Basic and diluted net loss per share................. | $   (2.03) | $   (2.29) |

NOTE 4. CASH, CASH EQUIVALENTS AND INVESTMENTS

Cash, cash equivalents and short-term investments consist of the following.
At December 31, 2000, amortized cost approximated fair value for all cash
equivalents and short-term investments (in thousands):

|  | DECEMBER 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Cash and cash equivalents: |  |  |
| Cash............................................... | $  825,727 | $ 55,233 |
| Money market funds................................. | 38,416 | 5,234 |
| Commercial paper................................... | 22,415 | 77,771 |
| Corporate notes.................................... | -- | 10,006 |
| Cash and cash equivalents............................ | 886,558 | 148,244 |
| Short-term investments: |  |  |
| Commercial paper................................... | 113 | 207,465 |
| Market auction preferreds.......................... | 5,400 | 11,713 |
| Government securities.............................. | 45,995 | 91,599 |
| Corporate notes................................... | 181,383 | 233,360 |
| Short-term investments............................... | 232,891 | 544,137 |
| Cash, cash equivalents and short-term investments.... | $1,119,449 | $692,381 |

Long-term investments consist of the following. At December 31, 2000,
amortized cost approximated fair value for all long-term investments (in
thousands):

|  | DECEMBER 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Long-term investments: |  |  |
| Government securities............................... | $ 44,006 | $18,838 |
| Medium-term corporate notes......................... | 92,105 | 46,198 |
| Long-term investments................................ | $136,111 | $65,036 |

The following table represents the maturities of investments in debt
securities, which do not include cash and market auction preferreds (in
thousands):

|  | DECEMBER 31, 2000 |
|---|---|
| Due in less than one year............................ | $288,322 |
| Due between one and two years........................ | 136,111 |
| Total......................................... | $424,433 |

63

66

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

NOTE 5. PROPERTY AND EQUIPMENT

    Property and equipment is stated at cost and consisted of the following (in thousands):

|  | DECEMBER 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Building.......................................... | $    916 | $  1,445 |
| Computer equipment................................ | 172,269 | 89,219 |
| Furniture and equipment........................... | 31,649 | 23,058 |
| Leasehold improvements............................ | 36,101 | 17,266 |
| Construction in Process........................... | 33,445 | 8,727 |
|  | 274,380 | 139,715 |
| Less -- accumulated depreciation and amortization..... | (105,991) | (62,757) |
| Property and equipment, net........................ | $ 168,389 | $ 76,958 |

NOTE 6. CONVERTIBLE SUBORDINATED NOTES

    In October 1997, the Company issued $100.0 million of 5.25% convertible subordinated notes due 2004 (the "5.25% notes"), for which the Company received net proceeds of $97.5 million. The Company and its wholly-owned subsidiary, VERITAS Operating Corporation, are co-obligors on the 5.25% notes and are unconditionally, jointly and severally liable for all payments under the notes. During 2000, a total principal amount at maturity of $35.5 million was converted into approximately 3.7 million shares of the Company's common stock. Based on the aggregate principal amount at maturity of $64.5 million outstanding as of December 31, 2000, the 5.25% notes provide for semi-annual interest payments of $1.7 million each May 1 and November 1. The 5.25% notes are convertible into shares of the Company's common stock at any time prior to the close of business on the maturity date, unless previously redeemed or repurchased, at a conversion price of $9.56 per share, subject to adjustment in certain events, equivalent to a conversion rate of 104.65 shares of common stock per $1,000 principal amount at maturity. On or after November 5, 2002, the 5.25% notes will be redeemable over the period of time until maturity at our option at declining premiums to par. The debt issuance costs are being amortized over the term of the 5.25% notes using the interest method. The fair value of the 5.25% notes as of December 31, 2000 and 1999 was $591.5 million and $1,000.9 million based on the quoted value on the convertible debt market.

    In August 1999, the Company and its wholly-owned subsidiary, VERITAS Operating Corporation, issued $465.8 million, aggregate principal amount at maturity, of 1.856% convertible subordinated notes due 2006 (the "1.856% notes") for which the Company received net proceeds of approximately $334.1 million. The interest rate of 1.856%, together with the accrual of original issue discount, represent a yield to maturity of 6.5%. VERITAS and VERITAS Operating Corporation are co-obligors on the 1.856% notes and are unconditionally, jointly and severally liable for all payments under the notes. During 2000, a total principal amount at maturity of $1.0 million was converted into approximately 28,000 shares of the Company's common stock. Based on the aggregate principal amount at maturity of $464.7 million outstanding as of December 31, 2000, the 1.856% notes provide for semi-annual interest payments of $4.3 million each February 13 and August 13. The 1.856% notes are convertible into shares of the Company's common stock at any time prior to the close of business on the maturity date, unless previously redeemed or repurchased, at a conversion price of $35.80 per share, subject to adjustment in certain events, equivalent to a conversion rate of 27.934 shares of common stock per $1,000 principal amount at maturity. On or after August 16, 2002, the 1.856% notes will be redeemable over the period of time until maturity at the Company's option at issuance price plus accrued original issue discount and any accrued interest. The debt issuance costs are being amortized over the term of the 1.856% notes using the interest method. The fair value of the 1.856% notes as of December 31, 2000 and 1999 was $1,158.6 million and $1,259.3 million based on the quoted value on the convertible debt market.

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

NOTE 7. SUMMARY FINANCIAL INFORMATION OF SUBSIDIARY

VERITAS and its wholly-owned subsidiary, VERITAS Operating Corporation, are co-obligators on VERITAS' 5.25% convertible subordinated notes due 2004 and 1.856% convertible subordinated notes due 2006. VERITAS and VERITAS Operating Corporation are unconditionally, jointly and severally liable for all payments under the notes. On June 30, 2000, VERITAS reorganized its corporate structure that resulted in the elimination of differences in the consolidated financial position and operating results of the parent company and VERITAS Operating Corporation. Consequently, separate summarized financial information of VERITAS and VERITAS Operating Corporation, previously presented pursuant to Staff Accounting Bulletin No. 53, Financial Statement Requirements in Filings Involving the Guarantee of Securities by the Parent, are no longer presented since such information is now the same as the consolidated financial statements presented elsewhere herein. No other subsidiaries of VERITAS are co-obligators or guarantors of the convertible subordinated notes.

NOTE 8. CREDIT FACILITY

During 2000, the Company signed a $50.0 million unsecured credit facility with a syndicate of financial institutions. At December 31, 2000, no amount was outstanding. The credit facility is due to expire in September 2001. Borrowings under the credit facility bear interest at 1.0% to 1.5% over LIBOR, and are subject to VERITAS' compliance with financial and other covenants. The credit agreement requires the Company to maintain specified financial covenants such as earnings before interest, taxes, depreciation and amortization ("EBITDA"), debt on EBITDA and quick ratio, all of which the Company was in compliance with as of December 31, 2000.

NOTE 9. COMMITMENTS

The Company currently has operating leases for its facilities through 2021. Rental expense under operating leases was approximately $32.1 million, $15.6 million and $6.1 million for the years ended December 31, 2000, 1999 and 1998, respectively. In addition to the basic rent, the Company is responsible for all taxes, insurance and utilities related to the facilities. The approximate minimum lease payments as of December 31, 2000 are as follows (in thousands):

| | |
|---|---|
| 2001................................................. | $ 51,528 |
| 2002................................................. | 62,925 |
| 2003................................................. | 68,804 |
| 2004................................................. | 68,267 |
| 2005................................................. | 46,808 |
| Thereafter........................................... | 225,841 |
| | --------- |
| Minimum lease payments............................... | $524,173 |
| | ========= |

Facilities lease commitments

During the first quarter of 2000, the Company amended its existing lease agreement, originally signed in the second quarter of 1999, for new corporate campus facilities in Mountain View, California. These facilities will replace certain facilities that the Company currently leases in Mountain View. The new corporate campus facilities will be developed in one phase for a total of 425,000 square feet and will provide space for sales, marketing, administration and research and development functions. The lease term for these facilities is five years beginning in March 2000, with an option to extend the lease term for two successive periods of one year each. The Company has an option to purchase the property (land and facilities) for $139.4 million or, at the end of the lease, to arrange for the sale of the property to a third party with the Company retaining an obligation to the owner for the difference between the sales price and the guaranteed residual value up to

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

$123.8 million if the sales price is less than this amount, subject to certain provisions of the lease. The Company anticipates occupying the new corporate campus facilities and beginning the lease payments in the second quarter of 2001.

During the first quarter of 2000, the Company signed a lease agreement for its existing facilities in Roseville, Minnesota. The Company will improve and expand its existing facilities of 62,000 square feet and will develop adjacent property adding 260,000 square feet to the campus, with the first phase of 142,000 square feet being completed in the second quarter of 2001. The facilities will provide space for research and development functions. The lease term for these facilities is five years beginning in March 2000, with an option to extend the lease term for two successive periods of one year each. The Company has an option to purchase the property (land and facilities) for $40 million or, at the end of the lease, to arrange for the sale of the property to a third party with the Company retaining an obligation to the owner for the difference between the sales price and the guaranteed residual value up to $34.3 million if the sales price is less than this amount, subject to certain provisions of the lease. The Company anticipates occupying the new campus facilities and beginning the lease payments in the second quarter of 2001.

During the third quarter of 2000, the Company signed a lease agreement for the lease of 65 acres of land and subsequent improvements for new research and development campus facilities in Milpitas, California. The Company will develop the site in two phases, adding a total of 990,990 square feet, with the first phase of 466,000 square feet being completed in the fourth quarter of 2002. The Company expects to complete the second phase of 524,990 square feet in the third quarter of 2003. The facilities will provide space for research and development functions. The lease term for the first phase is five years beginning in July 2000, with an option to extend the lease term for two successive periods of one year each. The Company has an option to purchase the property (land and first phase facilities) for $243 million or, at the end of the lease, to arrange for the sale of the property to a third party with the Company retaining an obligation to the owner for the difference between the sales price and the guaranteed residual value up to $220 million if the sales price is less than this amount, subject to certain provisions of the lease. The Company anticipates occupying the new campus facilities and beginning the lease payments in the second quarter of 2002 for the first phase and second quarter of 2003 for the second phase. The Company expects to start negotiating the financing terms of the second phase in the third quarter of 2001.

The three lease agreements listed above requires the Company to maintain specified financial covenants such as earnings before interest, taxes, depreciation and amortization ("EBITDA"), debt on EBITDA and quick ratio, all of which the Company was in compliance with as of December 31, 2000.

NOTE 10. CONTINGENCIES

The following discussion relates to the multi-party transaction involving the Company, Seagate Technology, Inc. and Suez Acquisition Company (Cayman) Limited, a company formed by a group of private equity firms led by Silver Lake Partners (see Note 2).

Following the announcement of this transaction on March 29, 2000, Seagate Technology stockholders filed 17 lawsuits in Delaware and five lawsuits in California against Seagate Technology, the individual members of Seagate Technology's board of directors, certain executive officers of Seagate Technology, Silver Lake Partners, LP, and the Company. Between April 18, 2000 and October 13, 2000, the Delaware Chancery Court consolidated the 17 lawsuits into a single action captioned "In Re Seagate Technology, Inc. Shareholders Litigation" and certified the class action, and the plaintiffs filed two amended complaints and a motion for a preliminary injunction to enjoin the closing of the proposed transaction. The plaintiffs' second amended complaint alleged that Seagate Technology's board of directors breached their fiduciary duties to their stockholders by entering into the leveraged buyout and merger agreements and that they did not secure the highest possible price for Seagate Technology's shares, and alleged that the Company aided and abetted that alleged breach. The plaintiffs sought unspecified damages and an injunction of the closing of the

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

transaction. On September 28, 2000, the five California complaints were coordinated, with venue in Santa Clara County. All five of the California complaints have been voluntarily dismissed.

On October 13, 2000, the parties to the Delaware lawsuit entered into a Memorandum of Understanding to settle the action. On January 28, 2001, the parties filed a Stipulation of Settlement in the Court of Chancery of the State of Delaware in and for New Castle County outlining the terms of the settlement pursuant to the Memorandum of Understanding. A hearing is scheduled on April 9, 2001 to determine whether the proposed settlement is fair and reasonable and should be approved by the Court, and whether plaintiffs' counsels' award for fees and expenses should be paid pursuant to the terms set out in the Stipulation.

The settlement is conditioned on, among other things, the consummation of the leveraged buyout and the merger and final court approval of the settlement.

Although the Company expects final court approval of the Delaware settlement to occur during the first half of 2001, it is possible that final approval of the settlement will be denied or delayed.

Also, in the ordinary course of business, various lawsuits and claims have been filed against the Company.

While the outcome of these matters is currently not determinable, management believes that the ultimate resolution of these matters will not have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

NOTE 11. BENEFIT PLANS

The Company has adopted a retirement savings plan qualified under Section 401(k) of the Internal Revenue Code, which is a pretax savings plan covering substantially all United States employees. Under the plan, employees may contribute up to 20% of their pretax salary, subject to certain limitations. Employees are eligible to participate beginning the first day of the month following their date of hire. The Company matches approximately 50% of the employee contributions up to $2,500 per year and contributed approximately $5.3 million in 2000, compared to $3.1 million in 1999. For 1998, the Company matched approximately 25% of the employee contributions up to $1,200 per year and contributed approximately $0.6 million.

NOTE 12. STOCK COMPENSATION PLANS

At December 31, 2000, the Company had three stock-based compensation plans, which are described below. The Company applies APB Opinion No. 25 and related interpretations in accounting for its plans. Since the exercise price of options granted under such plans is generally equal to the market value on the date of grant, no compensation cost has been recognized for grants under its stock option plans and stock purchase plans. If compensation cost for the Company's stock-based compensation plans had been determined consistent with SFAS No. 123, the Company's net income (loss) and income (loss) per share would have been reduced to the pro forma amounts indicated below (in thousands, except per share amounts):

|  | 2000 | 1999 | 1998 |
|---|---|---|---|
| Net income (loss) |  |  |  |
| As reported..................................... | $(619,792) | $(502,958) | $51,648 |
| Pro forma...................................... | $(771,255) | $(540,474) | $32,102 |
| Basic earnings (loss) per share |  |  |  |
| As reported..................................... | $  (1.55) | $  (1.59) | $  0.24 |
| Pro forma...................................... | $  (1.93) | $  (1.71) | $  0.15 |
| Diluted earnings (loss) per share |  |  |  |
| As reported..................................... | $  (1.55) | $  (1.59) | $  0.22 |
| Pro forma...................................... | $  (1.93) | $  (1.71) | $  0.14 |

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

SFAS No. 123 is only applicable to options granted subsequent to January 1, 1995. As a result, its pro forma effect was not fully reflected in fiscal years prior to 1999.

Stock Option Plans

The Company has two stock option plans. The Company's 1993 Equity Incentive Plan (the "1993 Plan") provides for the issuance of either incentive or nonstatutory stock options to employees and consultants of the Company. The options generally are granted at the fair market value of the Company's common stock at the date of grant, expire ten years from the date of grant, vest over a four-year period and are exercisable immediately upon vesting. As of December 31, 2000, the Company has reserved 89.6 million shares of common stock for issuance under the 1993 Plan. The Company has also reserved 2.5 million shares for issuance under the Company's 1993 Directors Stock Option Plan. Generally options expire ten years from date of grant, vest over the term of each director's board membership and are exercisable immediately upon vesting. As of December 31, 2000, 25.2 million shares were available for future grant under the plans.

For the pro forma amounts determined under SFAS No. 123, as set forth above, the fair value of each option grant is estimated on the date of grant using the Black-Scholes option-pricing model with the following weighted-average assumptions used for grants in 2000, 1999 and 1998: risk-free interest rates averaging 6.16% in 2000, 5.55% in 1999 and 5.15% in 1998; a dividend yield of 0.0% for all years; a weighted-average expected life of 5 years for all years; and a volatility factor of the expected market price of the Company's common stock of 0.70 for 2000, 0.65 for 1999 and 0.65 for 1998.

A summary of the status of the Company's stock option plans as of December 31, 2000, 1999 and 1998 and changes during the years ended on those dates is presented below (number of shares in thousands):

|  | 2000 | | 1999 | | 1998 | |
|---|---|---|---|---|---|---|
|  | NUMBER OF SHARES | WEIGHTED-AVERAGE EXERCISE PRICE | NUMBER OF SHARES | WEIGHTED-AVERAGE EXERCISE PRICE | NUMBER OF SHARES | WEIGHTED-AVERAGE EXERCISE PRICE |
| Outstanding at beginning of year..... | 54,422 | $ 10.28 | 36,948 | $ 4.88 | 34,601 | $2.86 |
| Granted.............................. | 19,024 | $100.76 | 16,717 | $23.36 | 10,469 | $9.76 |
| Assumed in business combinations..... | -- | $   -- | 15,896 | $ 3.40 | -- | $  -- |
| Exercised............................ | (15,806) | $  6.47 | (11,909) | $ 3.21 | (5,547) | $1.88 |
| Forfeited............................ | (2,823) | $ 31.29 | (3,230) | $ 9.07 | (2,575) | $4.03 |
| Outstanding at end of year........... | 54,817 | $ 41.73 | 54,422 | $10.28 | 36,948 | $4.88 |
| Options exercisable at year end...... |  |  | 22,625 |  | 15,201 |  |
| Weighted-average fair value of options Granted during the year.... | $  63.42 |  | $  13.93 |  | $  5.75 |  |

68

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

The following table summarizes information about stock options outstanding at December 31, 2000 (number of shares in thousands):

| RANGE OF EXERCISE PRICES | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| | NUMBER OUTSTANDING AT DECEMBER 31, 2000 | WEIGHTED-AVERAGE REMAINING CONTRACTUAL LIFE | WEIGHTED-AVERAGE EXERCISE PRICE | NUMBER EXERCISABLE AT DECEMBER 31, 2000 | WEIGHTED-AVERAGE EXERCISE PRICE |
| $  0.02 - $  2.03 | 5,756 | 5.32 | $  1.61 | 5,338 | $  1.59 |
| $  2.04 - $  4.79 | 7,824 | 6.51 | $  3.80 | 5,419 | $  3.68 |
| $  4.84 - $  8.70 | 6,078 | 7.01 | $  7.02 | 3,753 | $  6.82 |
| $  8.88 - $ 17.56 | 7,951 | 8.04 | $ 14.52 | 3,039 | $ 14.13 |
| $ 17.94 - $ 21.81 | 6,040 | 8.51 | $ 20.75 | 1,697 | $ 20.66 |
| $ 23.33 - $ 88.00 | 5,675 | 9.32 | $ 64.86 | 768 | $ 45.64 |
| $ 91.69 - $ 97.00 | 8,536 | 9.46 | $ 94.35 | 849 | $ 93.82 |
| $ 97.61 - $127.44 | 5,535 | 9.48 | $108.94 | 524 | $106.33 |
| $128.75 - $134.17 | 1,422 | 9.31 | $132.42 | 234 | $133.16 |
| $  0.02 - $134.17 | 54,817 | 8.01 | $ 41.73 | 21,621 | $ 15.43 |

EMPLOYEE STOCK PURCHASE PLANS

As of December 31, 2000, under the Company's 1993 Employee Stock Purchase Plan (the "1993 Purchase Plan"), the Company is authorized to issue up to 21.9 million shares of common stock to its full-time employees, nearly all of whom are eligible to participate. Under the terms of the 1993 Purchase Plan, employees can choose to have up to 10% of their wages withheld to purchase the Company's common stock. The purchase price of the stock is 85% of the lower of the subscription date fair market value and the purchase date fair market value.

Substantially all of the eligible employees have participated in the 1993 Purchase Plan in 2000, 1999 and 1998. Under the 1993 Purchase Plan, the Company issued 1.1 million shares to employees in 2000, 0.8 million shares in 1999, and 0.8 million shares in 1998.

In accordance with APB 25, the Company does not recognize compensation cost related to employee purchase rights under the Plan. To comply with the pro forma reporting requirements of SFAS No. 123, compensation cost is estimated for the fair value of the employees' purchase rights using the Black-Scholes option-pricing model with the following assumptions for these rights granted in 2000, 1999 and 1998: a dividend yield of 0.0% for all years; an expected life ranging up to 2 years for all years; an expected volatility factor of 0.70 in 2000, 0.65 in 1999 and 0.65 in 1998; and risk-free interest rates ranging from 6.02% to 6.65% in 2000, from 4.57% to 5.77% in 1999 and from 5.14% to 5.39% in 1998. The weighted-average fair value of the purchase rights granted was $16.11 in 2000, $8.70 in 1999 and $3.15 in 1998.

NOTE 13. STOCKHOLDERS' EQUITY

On October 4, 1998, the Board of Directors of the Company adopted a Stockholder Rights Plan, declaring a dividend of one preferred share purchase right for each outstanding share of common stock, par value $0.001 per share, of VERITAS. The rights are initially attached to the Company's common stock and will not trade separately. If a person or group acquires 20 percent or more of the Company's common stock, or announces an intention to make a tender offer for the Company's common stock the consummation of which would result in acquiring 20 percent or more of the Company's common stock, then the rights will be distributed and will then trade separately from the common stock. Each right entitles the registered holder to purchase from the Company one one-hundredth of a share of Series A Junior Participating Preferred Stock,

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

par value $0.001 per share, of the Company. The rights expire October 5, 2008, unless the expiration date is extended or unless the rights are earlier redeemed or exchanged by the Company.

The Company is authorized to issue up to 10,000,000 shares of undesignated preferred stock. No such preferred shares have been issued to date.

Total common shares reserved for issuance at December 31, 2000 under all stock compensation plans are 114.0 million shares (see Note 12).

NOTE 14. INCOME TAXES

Income before provision for income taxes consisted of (in thousands):

|  | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | 1998 |
| United States.................................... | $(310,529) | $(455,404) | $57,777 |
| International.................................... | (215,299) | (12,164) | 2,012 |
|  | $(525,828) | $(467,568) | $59,789 |

The provision for income taxes consists of the following (in thousands):

|  | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | 1998 |
| Federal |  |  |  |
| Current......................................... | $165,686 | $ 64,452 | $11,858 |
| Deferred........................................ | (81,317) | (35,245) | (8,075) |
| State |  |  |  |
| Current......................................... | 14,862 | 9,340 | 2,514 |
| Deferred........................................ | (9,329) | (5,077) | 75 |
| Foreign......................................... | 4,062 | 1,920 | 1,769 |
| Total..................................... | $ 93,964 | $ 35,390 | $ 8,141 |

The tax benefits associated with employee stock option activity or employee stock purchase plan shares reduced taxes currently payable by $160.8 million for 2000 and $63.4 million for 1999.

The provision for income taxes differed from the amount computed by applying the federal statutory rate as follows:

|  | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | 1998 |
| Federal tax at statutory rate............................... | 35.0% | 35.0% | 35.0% |
| Benefit of loss carryforwards............................... | -- | -- | (9.3) |
| State taxes................................................. | (1.1) | (0.9) | 4.2 |
| Impact of foreign taxes..................................... | (1.7) | (0.4) | 3.0 |
| Change in valuation allowance............................... | -- | -- | (13.4) |
| In-process research and development charge and non-deductible goodwill..................................... | (52.4) | (42.2) | -- |
| Tax credits................................................. | 0.7 | 0.5 | (7.1) |
| Other....................................................... | 1.6 | 0.4 | 1.2 |
| Total..................................................... | (17.9)% | (7.6)% | 13.6% |

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Significant components of the Company's deferred tax assets and liabilities are as follows (in thousands):

| | YEARS ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| | 2000 | 1999 | 1998 |
| Deferred tax assets: | | | |
| Net operating loss carryforwards............... | $ 161,966 | $ 26,946 | $ 23,276 |
| Reserves and accruals not currently deductible.................................. | 43,091 | 28,315 | 6,146 |
| Acquired intangibles........................... | 17,898 | 12,521 | 1,895 |
| Tax credit carryforwards....................... | 20,070 | 2,861 | -- |
| Other.......................................... | 9,519 | 2,170 | 1,655 |
| Total.................................. | 252,544 | 72,813 | 32,972 |
| Valuation allowance............................. | (162,319) | (11,602) | (20,772) |
| Net deferred tax assets........................ | 90,225 | 61,211 | 12,200 |
| Deferred tax liabilities: | | | |
| Acquired intangibles........................... | (130,340) | (195,275) | -- |
| Net deferred tax assets (liabilities)........... | $ (40,115) | $(134,064) | $ 12,200 |

As of December 31, 2000, $135.0 million of deferred and other income taxes was recorded with the Seagate Technology transaction and relates to certain tax liabilities that are expected to be paid by the Company after the merger (see Note 2). Certain of Seagate Technology's federal and state tax returns for various fiscal years are under examination by taxing authorities. The Company believes that adequate amounts of tax have been provided for any final assessments that may result from these examinations.

The valuation allowance increased by $150.7 million in 2000 and decreased by $9.2 million in 1999 and $5.0 million in 1998. As of December 31, 2000, the Company has provided a valuation allowance on certain deferred tax assets that has two main components. Approximately $11.6 million of the valuation allowance relates to the tax benefits of certain assets acquired with the acquisition of NSMG and will be credited to goodwill when realized. The Company has also provided a valuation allowance on certain of its deferred tax assets because of uncertainty regarding their realizability due to the expectation of future employee stock option activity. When recognized, the tax benefit of these deferred tax assets will be accounted for as a credit to stockholders' equity rather than as a reduction of the income tax provision.

As of December 31, 2000, the Company had federal tax loss carryforwards of approximately $350 million and federal tax credit carryforwards of approximately $20 million. The federal tax loss carryforwards will expire in 2008 through 2020, and the federal tax credit carryforwards will expire in 2003 through 2020, if not utilized. Because of the change in ownership provisions of the Internal Revenue Code, a portion of the Company's net operating loss and tax credit carryforwards may be subject to an annual limitation. The annual limitation may result in the expiration of net operating loss and tax credit carryforwards before utilization. In addition, certain foreign net operating losses have been recorded as deferred tax assets with a full valuation allowance.

71

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

NOTE 15. NET INCOME (LOSS) PER SHARE

The following table sets forth the computation of basic and diluted net income (loss) per share (in thousands, except per share amounts):

|  | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 2000 | 1999 | 1998 |
| Numerator: |  |  |  |
| Net income (loss)............................ | $(619,792) | $(502,958) | $ 51,648 |
| Denominator: |  |  |  |
| Denominator for basic net income (loss) per share -- Weighted-average shares............ | 400,034 | 316,892 | 211,558 |
| Potential common shares........................ | -- | -- | 20,961 |
| Denominator for diluted net income (loss) per share...................................... | 400,034 | 316,892 | 232,519 |
| Basic net income (loss) per share............... | $   (1.55) | $   (1.59) | $   0.24 |
| Diluted net income (loss) per share............. | $   (1.55) | $   (1.59) | $   0.22 |

Common stock equivalents included in the denominator for purposes of computing diluted net income (loss) per share do not include 6,753,035 shares issuable upon conversion of the 5.25% convertible subordinated notes and 12,972,191 shares issuable upon conversion of the 1.856% convertible subordinated notes, as their effect would be anti-dilutive for all periods presented. In 2000 and 1999, potential common shares included in the denominator for purposes of computing diluted net income (loss) per share do not include 36,766,246 and 39,406,524 potential common shares respectively, all related to employee stock options, as their effect would be anti-dilutive.

NOTE 16. SEGMENT INFORMATION

The Company adopted Statement of Financial Accounting Standards No. 131, Disclosures about Segments of an Enterprise and Related Information (SFAS No. 131), in 1998. SFAS No. 131 supersedes Statement of Financial Accounting Standards No. 14, Financial Reporting for Segments of a Business Enterprise and establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or group, in deciding how to allocate resources and in assessing performance.

The Company operates in one segment, data availability solutions. The Company's products and services are sold throughout the world, through direct, OEM, reseller and distributor channels. The Company's chief operating decision maker, the chief executive officer, evaluates the performance of the Company based upon stand-alone revenue of product channels and the geographic regions of the segment and does not receive discrete financial information about asset allocation, expense allocation or profitability from the Company's storage products or services.

75

VERITAS SOFTWARE CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

Geographic information (in thousands):

|  | YEARS ENDED DECEMBER 31, | | |
|--|------|------|------|
|  | 2000 | 1999 | 1998 |
| **User license fees(1):** | | | |
| United States.................................. | $ 733,729 | $372,485 | $121,910 |
| Europe(2).................................. | 175,945 | 94,986 | 33,172 |
| Other(3).................................. | 77,689 | 30,543 | 12,621 |
| Total.................................. | $ 987,363 | $498,014 | $167,703 |
| **Services(1):** | | | |
| United States.................................. | $ 179,185 | $ 78,756 | $ 34,759 |
| Europe(2).................................. | 31,646 | 15,450 | 7,869 |
| Other(3).................................. | 9,134 | 3,892 | 534 |
| Total.................................. | $ 219,965 | $ 98,098 | $ 43,162 |
| Total net revenue...................... | $1,207,328 | $596,112 | $210,865 |

|  | AS OF DECEMBER 31, | | |
|--|------|------|------|
|  | 2000 | 1999 | 1998 |
| **Long-lived assets(4):** | | | |
| United States.................................. | $2,423,292 | $3,289,545 | $25,202 |
| Europe(2).................................. | 22,212 | 11,918 | 3,644 |
| Other(3).................................. | 8,205 | 2,244 | 380 |
| Total.................................. | $2,453,709 | $3,303,707 | $29,226 |

---------------

(1) License and Service revenues are attributed to geographic regions based on
    location of customers.

(2) Europe includes the Middle East and Africa.

(3) Other consists of Canada, Latin America, Japan and the Asia Pacific region.

(4) Long-lived assets include all long-term assets except those specifically
    excluded under SFAS No. 131, such as deferred income taxes and financial
    instruments. Reconciliation to total assets reported (in thousands):

|  | AS OF DECEMBER 31, | | |
|--|------|------|------|
|  | 2000 | 1999 | 1998 |
| Total long-lived assets........................... | $2,453,709 | $3,303,707 | $ 29,226 |
| Other assets, including current.................... | 1,629,125 | 929,570 | 319,891 |
| Total consolidated assets................ | $4,082,834 | $4,233,277 | $349,117 |

No customer represented 10% or more of the Company's net revenue in 2000 or
1999. One customer represented approximately 12% or $25.8 million of the
Company's net revenue in 1998.

NOTE 17. RELATED PARTY TRANSACTIONS

The Company paid $0.8 million in 1998 and $6.7 million in 1999 in service
fees related to the acquisition of NSMG to Donaldson, Lufkin & Jenrette ("DLJ"),
a company affiliated with a director of the Company until February 1999. The

Company had assets in cash or liquid securities with maturity as of December 31, 2000.

73

REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

The Stockholders and Board of Directors
VERITAS Software Corporation

     We have audited the accompanying consolidated balance sheets of VERITAS
Software Corporation as of December 31, 2000 and 1999, and the related
consolidated statements of operations, stockholders' equity, and cash flows for
each of the three years in the period ended December 31, 2000. Our audits also
included the financial statement schedule listed in the index at Item 14(a).
These financial statements and schedule are the responsibility of the Company's
management. Our responsibility is to express an opinion on these financial
statements and schedule based on our audits.

     We conducted our audits in accordance with auditing standards generally
accepted in the United States. Those standards require that we plan and perform
the audit to obtain reasonable assurance about whether the financial statements
are free of material misstatement. An audit includes examining, on a test basis,
evidence supporting the amounts and disclosures in the financial statements. An
audit also includes assessing the accounting principles used and significant
estimates made by management, as well as evaluating the overall financial
statement presentation. We believe that our audits provide a reasonable basis
for our opinion.

     In our opinion, the financial statements referred to above present fairly,
in all material respects, the consolidated financial position of VERITAS
Software Corporation at December 31, 2000 and 1999, and the consolidated results
of its operations and its cash flows for each of the three years in the period
ended December 31, 2000, in conformity with accounting principles generally
accepted in the United States. Also, in our opinion, the related financial
statement schedule, when considered in relation to the basic financial
statements taken as a whole, presents fairly, in all material respects, the
information set forth therein.

                              /s/ ERNST & YOUNG LLP

San Jose, California
January 23, 2001

                              74

VERITAS SOFTWARE CORPORATION

SCHEDULE II -- VALUATION AND QUALIFYING ACCOUNTS

| | BALANCE AT BEGINNING OF YEAR | PROVISION FROM BUSINESSES ACQUIRED | CHARGED TO OPERATING EXPENSES | DEDUCTIONS(1) | BALANCE AT END OF YEAR |
|---|---|---|---|---|---|
| | | | (IN THOUSANDS) | | |
| Allowance for doubtful accounts: | | | | | |
| Year ended December 31, 2000...... | $5,693 | $ -- | $4,585 | $2,468 | $7,810 |
| Year ended December 31, 1999...... | $2,572 | $1,477 | $2,425 | $ 781 | $5,693 |
| Year ended December 31, 1998...... | $1,597 | $ -- | $1,032 | $ 57 | $2,572 |

---------------
(1) Deductions related to the allowance for doubtful accounts represent amounts
    written off against the allowance.

75

EXHIBIT INDEX

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | INCORPORATED BY REFERENCE | | | FILED HEREWITH |
|------|------|------|------|------|------|
| | | FORM | DATE | NUMBER | |
| ------- | ------------------ | ----- | ------ | ------- | -------- |
| 10.47* | Employment Agreement dated November 17, 2000 between VERITAS and Gary L. Bloom | | | | X |
| 10.48* | VERITAS 2001 Chief Executive Officer Compensation Plan | | | | X |
| 10.49* | Form of VERITAS 2001 Executive Officer Compensation Plan | | | | X |
| 10.50* | VERITAS Non-Qualified Deferred Compensation Plan | | | | X |
| 21.01 | Subsidiaries of the Registrant | | | | X |
| 23.01 | Consent of Independent Auditors | | | | X |

--------------

* Management contract, compensatory plan or arrangement.

1

EXHIBIT 10.47

November 16, 2000

Gary L. Bloom

EMPLOYMENT AGREEMENT

Dear Gary:

On behalf of the Board of Directors of Veritas Software Corporation ("Veritas"), I am pleased to offer you the position of President and Chief Executive Officer of Veritas on the terms set forth below.

1)    Position. You will be employed by Veritas as its President and Chief Executive Officer commencing upon the date specified at the end of this letter below the signature line (the "Commencement Date") and continuing thereafter until termination pursuant to Section 6. You will have overall responsibility for the management of Veritas and will report directly to its Board of Directors. During your term of employment, you will also be appointed to the Board of Directors. You will be expected to devote your full working time and attention to the business of Veritas, and you will not render services to any other business without the prior approval of the Board of Directors or, directly or indirectly, engage or participate in any business that is competitive in any manner with the business of Veritas, except for current board memberships with AppWorx, Virata, Mediasnap, and current advisory board memberships for Diamondhead Ventures, Arcot, and the President's Advisory Council for Cal Poly San Luis Obispo. You will also be expected to comply with and be bound by the Company's operating policies, procedures and practices that are from time to time in effect during the term of your employment.

2)    Cash Compensation. Your annual base salary from the Commencement Date through December 31, 2001 will be $1,000,000, and your bonus for 2001 will be targeted at $800,000 for a total target annual compensation of $1,800,000. In subsequent years of employment the Compensation Committee of the Board of Directors, at its own discretion, will determine your compensation.

     a)    Base Salary. Your base annual salary will be payable in accordance with Veritas' normal payroll practices with such payroll deductions and withholdings as are required by law. Your base salary will be reviewed on an annual basis by the Compensation Committee of the Board of Directors and may be increased from time to time, in the discretion of the Compensation Committee.

     b)    Bonus. You will be eligible to receive a target bonus payable based on Veritas' EPS Bonus Plan for the year beginning January 1, 2001, a copy of which is attached to this letter as Exhibit A, titled "Veritas 2001 Chief Executive Compensation Plan".

3)    Vacation: It is understood that after commencing employment for Veritas for one week you will be taking four weeks of vacation, such vacation days to be in addition to any vacation days that are earned in the normal course of employment. Further, during the first two years of employment, you will be eligible for three weeks of vacation annually.

2

4)  Other Benefits. You will be eligible for the normal health insurance, 401(k), employee stock purchase plan and other benefits offered to all Veritas senior executives of similar rank and status.

5)  Stock Options. Within 30 days of the Commencement Date, the Compensation Committee of the Board of Directors shall grant you incentive stock options (to the maximum allowed under the IRS regulations) and nonqualified stock options (for the balance) to purchase a total of 2,500,000 shares of Veritas common stock at an exercise price equal to the fair market value of Veritas common stock on the date of grant ("Initial Option Price").

    a)  These options will vest and become exercisable over a four-year period, in 48 equal monthly installments. Except as otherwise indicated in this agreement, the vested portion of such options may be exercised at any time until the earlier of 90 days after the termination of your employment or ten years after the grant of such options. The unvested shares may be exercised early coincident with entering into a company repurchase agreement mirroring your vesting schedule. You should consult a tax advisor concerning your income tax consequences before exercising any of the options.

    b)  Notwithstanding any other provision of this Section 5 to the contrary, upon "Involuntary Termination," "Termination without Cause," or "Termination for Death or Disability," a portion of the unvested options shall immediately vest as provided in Section 8 below.

    c)  Veritas shall register the shares issuable under the option on a Form S-8 registration statement and shall keep such registration statement in effect for the entire period the options remain outstanding.

    d)  In order to assure the consistency of the goals of its executives with its shareholders, Veritas is committed to providing substantial stock option incentive to its executives. During your first year of employment with Veritas, in the event that your initial stock options are priced materially above the market (that your options are "under water"), the Veritas board of directors agrees to meet, to deliberate, and, if and as it deems appropriate, to grant additional options.

6)  Employment and Termination. Your employment with Veritas will be at-will and may be terminated by you or by Veritas at any time for any reason as follows:

    a)  You may terminate your employment upon written notice to the Board of Directors at any time for "Good Reason," as defined below (an "Involuntary Termination");

    b)  You may terminate your employment upon written notice to the Board of Directors at any time in your discretion without Good Reason ("Voluntary Termination");

    c)  Veritas may terminate your employment upon written notice to you at any time following a determination by two-thirds (2/3) vote of the entire Board of Directors that there is "Cause," as defined below, for such termination ("Termination for Cause");

    d)  Veritas may terminate your employment upon written notice to you at any time in the sole discretion of the Board of Directors without a determination that there is Cause for such termination ("Termination without Cause");

    e)  Your employment will automatically terminate upon your death or upon your disability as determined by the Board of Directors ("Termination for Death or Disability"); provided that "disability" shall mean your complete inability to perform your job responsibilities for a period of 180 consecutive days or 180 days in the aggregate in any 12-month period.

7)  Definitions. As used in this agreement, the following terms have the following meanings:

    a)  "Good Reason" means (i) a material reduction in your duties that is inconsistent with your position as President and Chief Executive Officer of Veritas or a change in your reporting

3

that you no longer report directly to the Board of Directors; (ii) your no longer being President and Chief Executive Officer of Veritas or, in the case of a Change in Control, of the surviving entity or acquiror that results from any Change in Control; (iii) any reduction in your base annual salary or target quarterly or annual bonus (other than in connection with a general decrease in the salary or target bonuses for all officers of Veritas) without your consent; or (iv) material breach by Veritas of any of its obligations hereunder after providing Veritas with written notice and an opportunity to cure within seven days; (v) a requirement by Veritas that you relocate your principal office to a facility more than 50 miles from Veritas' current headquarters; or (vi) failure of any successor to assume this agreement pursuant to Section 14(d) below.

b)    "Cause" means (i) gross negligence or willful misconduct in the performance of your duties to Veritas (other than as a result of a disability) that has resulted or is likely to result in substantial and material damage to Veritas, after a written demand for substantial performance is delivered to you by the Board of Directors which specifically identifies the manner in which the Board believes you have not substantially performed your duties and you have been provided with a reasonable opportunity, of not less than 60 days, to cure any alleged gross negligence or willful misconduct; (ii) commission of any act of fraud with respect to Veritas; or (iii) conviction of a felony or a crime involving moral turpitude either of which causes material harm to the business and affairs of Veritas. No act or failure to act by you shall be considered "willful" if done or omitted by you in good faith with reasonable belief that your action or omission was in the best interests of Veritas.

c)    "Change in Control" means (i) The acquisition (other than from the Company) by any person, entity or "group", within the meaning of section 13(d) (3) or 14 (d) (2) of the Securities and Exchange Act of 1934 (the "Exchange Act"), (excluding, for this purpose, Veritas or its subsidiaries, (or any employee benefit plan of Veritas or its subsidiaries which acquires beneficial ownership of voting securities of Veritas) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of either the then outstanding shares of common stock or the combined voting power of the Veritas' then outstanding voting securities entitled to vote generally in the election of directors; or (ii) Individuals who, as of the date hereof, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board, provided that any person becoming a director subsequent to the date hereof whose election, or nomination for election by Veritas' shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board (other than an election or nomination of an individual whose initial assumption of the office is in connection with an actual or threatened election contest relating to the election of the directors of Veritas, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act) shall be, for the purposes of this Agreement, considered as though such person were a member of the Incumbent Board; or (iii) Approval of the stockholders of Veritas of a reorganization, merger or consolidation, in each case, with respect to which persons who were the stockholders of Veritas immediately prior to such reorganization, merger or consolidation do not, immediately thereafter, own more than 50% of the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated company's then outstanding voting securities, or a liquidation or dissolution of Veritas or of the sale of all or substantially all of the assets of Veritas.

8)    Separation Benefits. Upon termination of your employment with Veritas for any reason, you will receive payment for all unpaid salary and vacation accrued to the date of your termination of employment; and your benefits will be continued under Veritas' then existing benefit plans and policies for so long as provided under the terms of such plans and policies and as required by applicable law. Under certain circumstances, subject to your execution of a termination and general release agreement, you will also be entitled to receive severance benefits as set forth below. Veritas' termination and general release agreement will contain provisions specifying that you will not compete with Veritas while you are receiving such severance benefits, nor will you solicit employees for a period of two years after any final payment, that neither you nor Veritas shall disparage the other party, and that neither party shall have claims that

4

a)    In the event of your Voluntary Termination or Termination for Cause, you will not be entitled to any cash severance benefits or additional vesting of shares of options.

b)    In the event of your Involuntary Termination or Termination without Cause within one year of the Commencement Date, you will be entitled to

   i)    a severance payment equal to twelve months of your current annual base salary plus full target bonus, payable over twelve months in accordance with Veritas' normal payroll practices with such payroll deductions and withholdings as are required by law, provided, that you provide Veritas with consulting services during such period after the date of termination (the "CONSULTING SERVICES"); and

   ii)    accelerated vesting and exercisability of that portion of your outstanding unvested options to purchase Veritas common stock that would have vested within two years from the date of the Involuntary Termination or Termination without Cause, with all vested options exercisable for a period of 90 days from the later of:

      (1)    the date of your Involuntary Termination or Termination without Cause; or

      (2)    the date you cease providing Consulting Services to Veritas.

c)    In the event of your Involuntary Termination or Termination without Cause within two years of the Commencement Date, you will be entitled to:

   i)    a severance payment equal to six months of your current annual base salary plus one-half of your target bonus, payable over twelve months in accordance with Veritas's normal payroll practices with such payroll deductions and withholdings as are required by law, provided, that you provide Veritas with Consulting Services; and

   ii)    accelerated vesting and exercisability of that portion of your outstanding unvested options to purchase Veritas common stock that would have vested within one year from the Involuntary Termination or Termination without Cause, with all vested options exercisable for a period of 90 days from the later of:

      (1)    the date of your Involuntary Termination or Termination without Cause; or

      (2)    the date you cease providing Consulting Services to Veritas.

d)    In the event of your Involuntary Termination or Termination without Cause on or after two years of the Commencement Date, you will not be entitled to any severance payments or accelerated vesting of your outstanding unvested options.

e)    In the event of your Involuntary Termination or Termination without Cause within one year of a Change in Control, provided the change of control occurs within two years of the Commencement Date, you will be entitled to the following: a lump sum payment equal to twelve months of your current annual base salary and full target bonus (less applicable deductions and withholding) payable within 30 days after the date of termination; and accelerated vesting of fifty percent (50%) of your outstanding unvested options to purchase Veritas common stock, with all vested options exercisable for a period of 90 days from the date of your Involuntary Termination or Termination without Cause. This section 8.e shall survive for twelve months beyond the term noted in Section 13.

5

f)    For the purpose of this agreement, Termination by Death or
      Disability shall be treated as Involuntary Termination.

g)    If your severance and other benefits provided for in this Section
      8 constitute "parachute payments" within the meaning of Section
      280G of the Code and, but for this subsection, would be subject to
      the excise tax imposed by Section 4999 of the Internal Revenue
      Code, then your severance and other benefits under this Section 8
      will be payable, at your election, either in full or in such
      lesser amount as would result, after taking into account the
      applicable federal, state and local income taxes and the excise
      tax imposed by Section 4999, in your receipt on an after-tax basis
      of the greatest amount of severance and other benefits.

h)    No payments due you hereunder shall be subject to mitigation or
      offset.

9)    Indemnification Agreement. Upon your commencement of employment with
      Veritas, Veritas will enter into its standard form of indemnification
      agreement for officers and directors (which can be viewed in our most
      recent published proxy statement) to indemnify you against certain
      liabilities you may incur as an officer or director of Veritas.

10)   Confidential Information and Invention Assignment Agreement. Upon your
      commencement of employment with Veritas, you will be required to sign its
      standard form of Employee Agreement, a copy of which is attached to this
      letter as Exhibit B, to protect Veritas' confidential information and
      intellectual property.

11)   No Solicitation. During the term of your employment with Veritas and for
      two years thereafter, you will not, on behalf of yourself or any third
      party, solicit or attempt to induce any employee of Veritas to terminate
      his or her employment with Veritas.

12)   Arbitration. The parties agree that any dispute regarding the
      interpretation or enforcement of this agreement shall be decided by
      confidential, final and binding arbitration conducted by Judicial
      Arbitration and Mediation Services ("JAMS") under the then existing JAMS
      rules rather than by litigation in court, trial by jury, administrative
      proceeding or in any other forum. The filing fees and arbitrator's fees
      and costs in such arbitration will be borne by Veritas. The parties will
      be entitled to reasonable discovery of essential matters as determined by
      the arbitrator. In the arbitration, the parties will be entitled to all
      remedies that would have been available if the matter were litigated in a
      court of law.

13)   Term. This agreement shall be in effect upon the signing by both parties,
      and shall expire two years after the commencement date, at which time
      your employment with Veritas will be treated no less favorably than the
      policies in effect at the time for other senior executives of Veritas.

14)   Miscellaneous.

      a)    Authority to Enter into Agreement. Veritas represents that Mark
            Leslie, its Chairman of the Board, has due authority to execute
            and deliver this agreement on behalf of Veritas.

      b)    Absence of Conflicts. You represent that upon the Commencement
            Date your performance of your duties under this agreement will not
            breach any other agreement as to which you are a party.

      c)    Attorneys Fees. If a legal action or other proceeding is brought
            for enforcement of this agreement because of an alleged dispute,
            breach, default, or misrepresentation in connection with any of
            the provisions of this agreement, the prevailing party shall be
            entitled to recover reasonable attorneys' fees and costs incurred,
            both before and after judgment, in addition to any other relief to
            which they may be entitled.

d)   Successors. This agreement is binding on and may be enforced by
     Veritas and its successors and assigns and is binding on and may
     be enforced by you and your heirs and legal representatives. Any
     successor to Veritas or substantially all of its business (whether
     by purchase, merger, consolidation or otherwise) will in advance
     assume in writing and be bound by all of Veritas's obligations
     under this agreement.

e)   Notices. Notices under this agreement must be in writing and will
     be deemed to have been given when personally delivered or two days
     after mailed by U.S. registered or certified mail, return receipt
     requested and postage prepaid. Mailed notices to you will be
     addressed to you at the home address which you have most recently
     communicated to Veritas in writing. Notices to Veritas will be
     addressed to its General Counsel at Veritas's corporate
     headquarters.

f)   Waiver. No provision of this agreement will be modified or waived
     except in writing signed by you and an officer of Veritas duly
     authorized by its Board of Directors. No waiver by either party of
     any breach of this agreement by the other party will be considered
     a waiver of any other breach of this agreement.

g)   Entire Agreement. This agreement, including the attached exhibits,
     represents the entire agreement between us concerning the subject
     matter of your employment by Veritas.

h)   Governing Law. This agreement will be governed by the laws of the
     State of California without reference to conflict of laws
     provisions.

Gary, we are very pleased to extend this offer of employment to you and look
forward to your joining Veritas as its President and Chief Executive Officer.
This offer of employment is effective through November 17, 2000, after which it
will expire. Please indicate your acceptance of the terms of this agreement by
signing in the place indicated below.


Very truly yours,


 /s/ Mark Leslie
----------------------------------
Mark Leslie, Chairman and CEO
VERITAS Software Corporation


ACCEPTED:


 /s/ Gary L. Bloom              November 17, 2000
----------------------------------
Gary L. Bloom



Commencement Date:             November 17, 2000

7

Exhibit A

### VERITAS 2001 CHIEF EXECUTIVE OFFICER COMPENSATION PLAN

The 2001 CEO Annual Compensation Plan shall consist of two components, as follows:

| COMPONENT | AMOUNT | PAID |
|-----------|--------|------|
| Base Salary | $1,000,000 | Regular payroll |
| EPS Bonus | $800,000 | Annually |
| TOTAL | $1,800,000 | |

BASE SALARY

The Base Salary will be earned on a weekly basis. Additionally, the base salary shall be the basis for calculating life and disability benefits (and any other such benefits which are base salary driven) which shall be provided consistent with the standard company benefits policy.

EPS BONUS

The EPS Bonus shall be earned by achieving the earnings per share specified in the approved operating plan. Bonus shall be paid out in accordance with the following plan:

| PERFORMANCE | % OF EPS BONUS |
|-------------|----------------|
| <25% | 0 |
| 25% | 50% |
| 50% | 100% |
| 100% | 100% |
| 110% | 150% |
| 120% | 250% |
| >120% | 250% |

Any intermediate achievement between levels will earn a proportional amount (for example, earnings of 105% would earn 125% of bonus).

PAYMENTS

The CEO shall be responsible for assessing and recommending to the Compensation Committee payment for the EPS Bonus. Payment for the EPS Bonus shall be made not later than January 31, 2002.

ELIGIBILITY

In order to be eligible to receive a bonus, the individual must be employed by Veritas at the time of payment.

DISCRETION OF THE BOARD OF DIRECTORS

Notwithstanding the above, the Company's board of directors, at its sole discretion, may, for reasonable cause, modify or change this Plan or its implementation at any time.

------------------------  ----------    ------------------------    ------
for Veritas               Date          Gary Bloom, President & CEO  Date

8

EXHIBIT B

AGREEMENT CONCERNING
CERTAIN DUTIES OF VERITAS EMPLOYMENT:
INVENTIONS, TRADE SECRETS, AND DISCLOSURES

This EMPLOYEE AGREEMENT when signed below by me, an employee of VERITAS Software
Corporation ("VERITAS") is my agreement with VERITAS regarding inventions, trade
secrets, works of authorship, proprietary information, proprietary materials,
and other terms and conditions of employment (the "Agreement").

In consideration of my Employment or of my continued employment, with VERITAS, I
agree that:

1.  Either during or after my employment with VERITAS, I will not disclose to
    anyone outside of VERITAS, nor use in other than VERITAS' business,
    except with the prior written permission of an officer of the
    corporation, any invention, trade secret, work of authorship, proprietary
    information or proprietary materials that relates in any manner to any
    VERITAS actual or anticipated business, research, development, product,
    device, or activity, or that is received in confidence by or for VERITAS
    from any other person. "Proprietary Information" includes but is not
    limited to inventions, marketing plans, product plans, business
    strategies, financial information, forecasts, personnel information,
    customer lists and any other nonpublic technical or business information
    which I know or have reason to know VERITAS would like to treat as
    confidential for any purpose, such as maintaining a competitive advantage
    or avoiding undesirable publicity. Examples of "inventions" include, but
    are not limited to, original works of authorship, formulas, processes,
    computer programs, databases, trade secrets, mechanical and electronic
    hardware, computer languages, user interfaces, documentation, marketing
    and new product plans, production processes, advertising, packaging and
    marketing techniques, and improvements to anything. Upon termination of
    my employment with VERITAS, I will promptly deliver to VERITAS all
    documents and materials of any nature pertaining to my work with VERITAS
    and I will not take with me any documents or materials or copies thereof
    containing any Proprietary Information.

2.  I represent that my performance of all the terms of this Agreement and my
    duties as an employee of VERITAS will not breach any Proprietary
    Information, invention, assignment or similar agreement with any former
    employer or other party. I represent that I will not bring with me to
    VERITAS or use in the performance of my duties for VERITAS any documents
    or materials of a former employer or any other person that are not
    generally available to the public.

3.  During my employment with VERITAS, I will not engage in any other
    employment, occupation, consultation, or other activity relating to any
    actual or anticipated business, research, development, product, service
    or activity of VERITAS, or which otherwise conflicts with my obligations
    to VERITAS, without first informing an executive corporate officer of
    VERITAS about any such activity to ensure that all parties agree that no
    conflict exists. If new conflicts arise with respect to my obligations to
    VERITAS pursuant to Paragraph 10 (d) of this Agreement, then VERITAS
    agrees to advise me of those conflicts. The specific actions for
    resolving these new conflicts will be agreed upon after I have been
    advised of this conflict.

4.  I hereby assign and agree to assign to VERITAS my entire right, title,
    and interest in any Proprietary Information, invention, trade secret,
    work of authorship, or proprietary materials hereafter made or conceived
    solely by me or jointly with others and any associated patents, patent
    applications, copyrights, trade secret rights, mask work rights, rights
    of proprietary and other intellectual property rights which:

    a.  were developed while working for VERITAS in an executive,
        managerial, planning, technical, research, engineering,
        development, manufacturing, programming, sales, marketing, system
        service, repair, or other capacity, using equipment, supplies,
        facilities or trade secrets of VERITAS; and

b.  relates in any manner at the time of conception or reduction to practice to any VERITAS actual or anticipated business, research, development, product, service, or activity, or is suggested by or results from any task assigned to me or work performed by me for or on behalf of VERITAS, and

c.  was not developed entirely on my own time.

5.  I have been notified and understand that the provisions of Section 4 do not apply to any invention that qualifies fully under the provisions of Section 2870 of the California Labor Code, which states as follows:

a.  ANY PROVISIONS IN AN EMPLOYMENT AGREEMENT WHICH PROVIDE THAT AN EMPLOYEE SHALL ASSIGN, OR OFFER TO ASSIGN, ANY OF HIS OR HER RIGHTS IN AN INVENTION TO HIS OR HER EMPLOYER SHALL NOT APPLY TO AN INVENTION THAT THE EMPLOYEE DEVELOPED ENTIRELY ON HIS OR HER OWN TIME WITHOUT USING THE EMPLOYER'S EQUIPMENT, SUPPLIES, FACILITIES, OR TRADE SECRET INFORMATION EXCEPT FOR THOSE INVENTIONS THAT EITHER:

(i)  RELATE AT THE TIME OF CONCEPTION OR REDUCTION TO PRACTICE OF THE INVENTION TO THE EMPLOYER'S BUSINESS, OR ACTUAL OR DEMONSTRABLY ANTICIPATED RESEARCH OR DEVELOPMENT OF THE EMPLOYER; OR

(ii)  RESULT FROM ANY WORK PERFORMED BY THE EMPLOYEE FOR THE EMPLOYER.

b.  TO THE EXTENT A PROVISION IN AN EMPLOYMENT AGREEMENT PURPORTS TO REQUIRE AN EMPLOYEE TO ASSIGN AN INVENTION OTHERWISE EXCLUDED FROM BEING REQUIRED TO BE ASSIGNED UNDER SUBDIVISION (a), THE PROVISION IS AGAINST THE PUBLIC POLICY OF THIS STATE AND IS UNENFORCEABLE.

6.  In connection with any Proprietary Information, invention, trade secret, work of authorship and/or proprietary materials assigned or to be assigned to VERITAS pursuant to Paragraph 4 of this Agreement:

a.  I will, disclose promptly in writing all such Proprietary Information, inventions, trade secrets, works of authorship, or proprietary materials upon conception, creation, or my otherwise becoming aware thereof to my immediate superior, with copies to the Senior Vice President of Engineering and the legal department, whether or not they are patentable or copyrightable or protectable as trade secrets or mask works, that are made or conceived or first reduced to practice or created by me, either alone or jointly with others, during the period of my employment whether or not in the course of my employment.

b.  I will, at VERITAS' request, promptly execute a specific irrevocable assignment of title to VERITAS, and do whatever is deemed necessary or advisable by VERITAS to secure and maintain for VERITAS a patent, copyrights, or other proprietary interest in Proprietary Information, such invention, trade secret, work of authorship, or other proprietary interest in such Proprietary Information, invention, trade secret, work of authorship, or proprietary materials, and with respect to any associated patents, patent applications, copyrights, trade secret rights, mask work rights, rights of priority and other intellectual property rights, in the United States and in foreign countries both during and after my employment with VERITAS.

c.  I hereby irrevocably transfer and assign to VERITAS any and all "Moral Rights" (as defined below) that I may have in or with respect to any invention. I also hereby forever waive and agree never to assert any and all Moral Rights I may have in or with respect to any invention, even after termination of my work on behalf of VERITAS. "Moral Rights" means any rights of paternity or integrity, any right to claim authorship of any invention, to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, any invention, whether or not such would be prejudicial to my honor or reputation, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right".

10

d.    I acknowledge that any computer program, any programming
      documentation, and any other work of authorship that falls within
      the scope of sections (a) and (c) under paragraph 4 of this
      Agreement is a "work made for hire," and that VERITAS owns all the
      rights comprised in the copyrights for such work.

11

7.  I agree to make and maintain adequate and current written records, in a form specified by VERITAS, of all Proprietary Information inventions, trade secrets, works of authorship, proprietary information, and proprietary materials assigned or to be assigned to VERITAS pursuant to paragraph 4 of this Agreement; and upon the termination of my employment with VERITAS, I agree to surrender all such records and all other tangible items and evidence relating thereto.

8.  In further consideration of this Agreement, VERITAS hereby agrees that I may use VERITAS facilities, equipment and other resources for work on inventions and works of authorship, not coming within the provisions of paragraph 4, so long as these activities do not impact my work schedule, the work schedule of other employees, or otherwise amount to excessive use of such resources. VERITAS recognizes that my professional development and standing in the community of software developers is enhanced by such activity.

9.  I have attached (as Exhibit A hereto) a complete list of all inventions and works of authorship, if any, patented or unpatented, including a brief identification of all unpatented inventions and works of authorship that I made prior to my employment at VERITAS and which are to be excluded from assignment to VERITAS under this Agreement ("Prior Products"). I hereby certify that I have no continuing obligations with respect to assignment of such Prior Products to any previous employers, nor do I claim any previous unpatented inventions within the scope of this Agreement as my own, except those which I have listed below. I agree to not use VERITAS' Proprietary Information proprietary inventions, or works of authorship, or information in making future improvements or revisions to these Prior Products, without the express written approval of a corporate officer of VERITAS.

    I hereby grant to VERITAS a non-exclusive, perpetual, irrevocable, royalty-free, worldwide license, with rights to sublicense, to use modify, copy, prepare derivative works of and distribute any VERITAS products that contain all or any portion of such Prior Products(s). I further understand that any improvements, whether patentable or not, made on the listed inventions after commencement of my employment by VERITAS are assigned or are to be assigned to VERITAS to the extent that such improvements are covered by the provisions of paragraph 4 of this Agreement.

10. During my employment with VERITAS, I may add an invention to the invention list described in paragraph 9 in the following way:

    a.  I shall provide, in writing, a brief description and title of the new invention to a corporate officer of VERITAS. This description is hereafter called the NEW INVENTION NOTICE.

    b.  A review period shall be provided for a new invention. The review period shall start on the business day following the receipt of a NEW INVENTION NOTICE by a VERITAS corporate officer. This period is hereafter called the NEW INVENTION REVIEW PERIOD.

    c.  During the NEW INVENTION REVIEW PERIOD, VERITAS may ask questions, in writing, with regard to the new invention and the provisions of paragraph 3. I agree to respond, in writing, to all such questions. In addition, I agree that any delays introduced by my response shall be added to the length of the NEW INVENTION REVIEW PERIOD.

    d.  If a new invention comes within the provisions of paragraph 3, and VERITAS provides written notice thereof, along with an explanation, to me during the review period, then the new invention shall not be added to the list of inventions or works of authorship described by paragraph 7. If no such written notice regarding a new invention is received within thirty (30) days of the NEW INVENTION NOTICE, then the new invention or work of authorship shall be excluded from assignment to VERITAS under this Agreement.

11. I understand that VERITAS, from time to time, may have agreements with other persons, companies or with the United States Government or agencies thereof which impose obligations or restrictions on VERITAS regarding Proprietary Information inventions, trade secrets, works of authorship, and proprietary materials made during the course of work under such agreements or regarding the confidential nature of such work. I agree to be bound by all such obligations and any applicable United States laws or regulations.

12.    I hereby authorize VERITAS to notify others, including but not limited to customers of VERITAS, or my future employers, of the terms of this Agreement and my responsibilities hereunder.

13.    In the event of any violation of this Agreement by me, and in addition to any relief or remedies to which VERITAS is entitled, I agree that VERITAS shall have the right to an immediate injunction, and shall have the right to recover the reasonable attorney's fees and court costs expended in connection with any litigation instituted to enforce this Agreement. I agree that any dispute in the meaning, effect or validity of this Agreement shall be resolved in accordance with the laws of the State of California without regard to the conflict of laws provisions thereof. I further agree that if one or more provisions of this Agreement are held to be unenforceable under applicable California law, such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

14.    "VERITAS" as used in this Agreement includes any and all subsidiaries and affiliated companies of VERITAS Software Corporation, and this Agreement shall inure to the benefit of any successors in interest or of any assignees of VERITAS.

15.    During the term of my employment and for one (1) year thereafter, I will not encourage or solicit any employee of VERITAS to leave VERITAS for any reason. However, this obligation shall not affect any responsibility I may have as an employee of VERITAS with respect to the bona fide hiring and firing of Company personnel.

16.    Any dispute or claim, whether based on contract, tort, or otherwise, relating to or arising out of my employment by VERITAS shall be submitted by the parties to arbitration by the American Arbitration Association in the City of San Francisco, State of California and shall be subject to final and binding arbitration. The arbitrator shall have jurisdiction to determine any such claim, and may grant any relief authorized by law. The award rendered by the arbitrator shall include costs of arbitration, reasonable attorney's fees and reasonable costs for expert and other witnesses; provided however that nothing in this Agreement shall be deemed as preventing either party from seeking injunctive relief (or any other provisional remedy) from the courts as necessary. The parties shall be entitled to discovery as provided in the Code of Civil Procedure of the State of California, whether or not the California Arbitration Act is deemed to apply to said provision.

17.    I understand that this Agreement does not constitute a contract of employment or obligate VERITAS to employ me for any stated period of time. I understand that my employment with VERITAS is at will and may be terminated by VERITAS at any time and for any reason, with or without cause.

18.    I acknowledge receipt of a copy of this Agreement and agree that with respect to the subject matter hereof, it is my entire agreement with VERITAS, superseding any previous oral or written communications, representations, undertaking, or agreements with VERITAS or any official or representative thereof. This agreement may not be modified or changed except in a writing signed by the employee and an officer of the corporation.

IN WITNESS WHEREOF, the parties have entered into this Agreement on this _____ day of _____, 20___.

     VERITAS SOFTWARE CORPORATION                    EMPLOYEE


BY:
     --------------------------------    -----------------------------------
                                                      (SIGNATURE)


ITS:
     -------------------------------    -----------------------------------
                                                      (PRINT NAME)

13

EXHIBIT A

(AS REFERENCED IN PARAGRAPH 9)
DESCRIPTION OF INVENTIONS
BEFORE VERITAS SOFTWARE EMPLOYMENT

| TITLE OF DOCUMENT | DATE OF DOCUMENT | NAME OF WITNESS |
|---|---|---|
| ------------------------------------ | ------------------------ | --------------------------- |
| ------------------------------------ | ------------------------ | --------------------------- |
| ------------------------------------ | ------------------------ | --------------------------- |
| ------------------------------------ | ------------------------ | --------------------------- |
| ------------------------------------ | ------------------------ | --------------------------- |
| ------------------------------------ | ------------------------ | --------------------------- |
| ------------------------------------ | ------------------------ | --------------------------- |
| ------------------------------------ | ------------------------ | --------------------------- |

(IF "NONE", PLEASE SO STATE)

VERITAS SOFTWARE CORPORATION                    EMPLOYEE

BY:
    --------------------------------    ------------------------------------
                                                (SIGNATURE)

ITS:
    --------------------------------    ------------------------------------
                                                (PRINT NAME)

                                        ------------------------------------
                                                (DATE)

EXHIBIT 10.48

VERITAS 2001 CHIEF EXECUTIVE OFFICER COMPENSATION PLAN

The 2001 CEO Annual Compensation Plan shall consist of two components, as follows:

| COMPONENT | AMOUNT | PAID |
|-----------|--------|------|
| Base Salary | $1,000,000 | Regular payroll |
| EPS Bonus | $800,000 | Annually |
|           | ----------- | |
| TOTAL | $1,800,000 | |

BASE SALARY

The Base Salary will be earned on a weekly basis. Additionally, the base salary shall be the basis for calculating life and disability benefits (and any other such benefits which are base salary driven) which shall be provided consistent with the standard company benefits policy.

EPS BONUS

The EPS Bonus shall be earned by achieving the earnings per share specified in the approved operating plan. Bonus shall be paid out in accordance with the following plan:

| PERFORMANCE | % OF EPS BONUS |
|-------------|----------------|
| <25% | 0 |
| 25% | 50% |
| 50% | 100% |
| 100% | 100% |
| 110% | 150% |
| 120% | 250% |
| >120% | 250% |

Any intermediate achievement between levels will earn a proportional amount (for example, earnings of 105% would earn 125% of bonus).

PAYMENTS

The CEO shall be responsible for assessing and recommending to the Compensation Committee payment for the EPS Bonus. Payment for the EPS Bonus shall be made not later than January 31, 2002.

ELIGIBILITY

In order to be eligible to receive a bonus, the individual must be employed by Veritas at the time of payment.

DISCRETION OF THE BOARD OF DIRECTORS

Notwithstanding the above, the Company's board of directors, at its sole discretion, may, for reasonable cause, modify or change this Plan or its implementation at any time.

| /s/ Mark Leslie | 11/17/00 | /s/ Gary Bloom | 11/17/00 |
|-----------------|----------|----------------|----------|
| For Veritas | Date | Gary Bloom, President & CEO | Date |

1

EXHIBIT 10.49

VERITAS 2001 EXECUTIVE OFFICER COMPENSATION PLAN – NAME,
TITLE

The 2001 Executive Officer Annual Compensation Plan shall consist of the
following components:

| COMPONENT | | AMOUNT | PAID |
|---|---|---|---|
| Base Salary | | $0 | Regular payroll |
| EPS Bonus | | $0 | Annually |
| | | --------- | |
| | TOTAL | $0 | |

BASE SALARY

The Base Salary will be paid on a semi-monthly basis. Additionally, the base
salary (and bonus paid) shall be the basis for calculating life (up to a maximum
of $300,000) and disability benefits (and any other such benefits which are base
salary driven) which shall be provided consistent with the standard company
benefits policy.

EPS BONUS

The EPS Bonus shall be earned by achieving the earnings per share specified in
the approved operating plan. Bonus shall be paid out in accordance with the
following plan:

| PERFORMANCE | % OF EPS BONUS |
|---|---|
| <90% | 0 |
| 90% | 50% |
| 100% | 100% |
| 110% | 150% |
| 120% | 250% |
| >120% | 250% |

Any intermediate achievement between levels will earn a proportional amount (for
example, earnings of 105% would earn 125% of bonus).

PAYMENTS

The CEO shall be responsible for assessing and recommending to the Compensation
Committee payment for the EPS Bonus. Payment for the EPS Bonus shall be made not
later than January 31, 2002.

ELIGIBILITY

In order to be eligible to receive a bonus, the individual must be employed by
Veritas at the time of payment.

DISCRETION OF THE CEO AND BOARD OF DIRECTORS

Notwithstanding the above, the Company's CEO and/or board of directors, at
his/its sole discretion, may, for reasonable cause, modify or change this Plan
or its implementation at any time.

```
-------------------------    ----------    ----------------------------    -------
For Veritas                  Date          Mr. X, VP,                      Date
```

1

EXHIBIT 10.50

CPR SELECT

THE CORPORATEPLAN FOR RETIREMENT SELECT PLAN

ADOPTION AGREEMENT

IMPORTANT NOTE

THIS DOCUMENT IS NOT AN IRS APPROVED PROTOTYPE PLAN. AN ADOPTING EMPLOYER MAY
NOT RELY SOLELY ON THIS PLAN TO ENSURE THAT THE PLAN IS "UNFUNDED AND MAINTAINED
PRIMARILY FOR THE PURPOSE OF PROVIDING DEFERRED COMPENSATION TO A SELECT GROUP
OF MANAGEMENT OR HIGHLY COMPENSATED EMPLOYEES" AND EXEMPT FROM PARTS 2 THROUGH 4
OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 WITH RESPECT
TO THE EMPLOYER'S PARTICULAR SITUATION. FIDELITY MANAGEMENT TRUST COMPANY, ITS
AFFILIATES AND EMPLOYEES MAY NOT PROVIDE YOU WITH LEGAL ADVICE IN CONNECTION
WITH THE EXECUTION OF THIS DOCUMENT. THIS DOCUMENT SHOULD BE REVIEWED BY YOUR
ATTORNEY AND/OR ACCOUNTANT PRIOR TO EXECUTION.

```
                         ADOPTION AGREEMENT
                            ARTICLE 1


1.01   PLAN INFORMATION

       (a)    NAME OF PLAN:

              This is the VERITAS SOFTWARE MANAGEMENT DEFERRED COMPENSATION Plan
              (the "Plan").


       (b)    NAME OF PLAN ADMINISTRATOR, IF NOT THE EMPLOYER:

              N/A
              ----------------------------------------------------------------
              Address:
                           -------------------------------------------
              Phone Number:
                           -------------------------------------------

              The Plan Administrator is the agent for service of legal process
       for the Plan.


       (c)    THREE DIGIT PLAN NUMBER: 002

       (d)    PLAN YEAR END (month/day): December 31

       (e)    PLAN STATUS (check one):

              (1)    [X] Effective Date of new Plan: January 1, 2001

              (2)    [ ] Amendment Effective Date: _____.


                     The original effective date of the Plan: _____
```

                                      1

3

1.02    EMPLOYER

(a)    THE EMPLOYER IS: VERITAS Software Corporation

Address: 1600 Plymouth Street
         Mountain View, CA  94043

Contact's Name:    DON RATH           ROB ADAMS
                   ---------------------------------------------

Telephone Number:  650 527 4563       650 527 4032
                   ---------------------------------------------

(1)    Employer's Tax Identification Number: 77-0507675

(2)    Business form of Employer (check one):

       (A) [X]  Corporation

       (B) [ ]  Sole proprietor or partnership

       (C) [ ]  Subchapter S Corporation

(3)    Employer's fiscal year end: December 31

(b)    THE TERM "EMPLOYER" INCLUDES THE FOLLOWING RELATED EMPLOYER(s) (as
       defined in Section 2.01(a)(21)):

            VERITAS SOFTWARE CORPORATION          77-0507675
            VERITAS OPERATING CORPORATION         94-2823068
            VERITAS SOFTWARE GLOBAL CORPORATION   59-2878624
            VERITAS INVESTMENT CORPORATION        [TO BE FORMED]

            ---------------------------------------------------------

            ---------------------------------------------------------

            ---------------------------------------------------------

2

4

1.03    COVERAGE

    (a)    ONLY THOSE EMPLOYEES LISTED IN ATTACHMENT A WILL BE ELIGIBLE TO
           PARTICIPATE IN THE PLAN.

    (b)    THE ENTRY DATE(s) SHALL BE (check one):

        (1)    [ ]  the first day of each Plan Year.

        (2)    [ ]  the first day of each Plan Year and the date six months
                later.

        (3)    [ ]  the first day of each Plan Year and the first day of
                the fourth, seventh, and tenth months.

        (4)    [X]  the first day of each month.


1.04    COMPENSATION

    FOR PURPOSES OF DETERMINING CONTRIBUTIONS UNDER THE PLAN, COMPENSATION
    SHALL BE AS DEFINED IN SECTION 2.01(a)(6), BUT EXCLUDING (check the
    appropriate box(es)):

    (a)    [ ]  Overtime Pay.

    (b)    [ ]  Bonuses.

    (c)    [ ]  Commissions.

    (d)    [X]  The value of a qualified or a non-qualified stock option
           granted to an Employee by the Employer to the extent such
           value is includable in the Employee's taxable income.

    (e)    [ ]  No exclusions.

1.05    CONTRIBUTIONS

    (a)    DEFERRAL CONTRIBUTIONS THE EMPLOYER SHALL MAKE A DEFERRAL
           CONTRIBUTION IN ACCORDANCE WITH SECTION 4.01 ON BEHALF OF EACH
           PARTICIPANT WHO HAS AN EXECUTED SALARY REDUCTION AGREEMENT IN
           EFFECT WITH THE EMPLOYER FOR THE PLAN YEAR (OR PORTION OF THE PLAN
           YEAR) IN QUESTION, NOT TO EXCEED 75% OF BASE SALARY AND 100% OF
           ALL OTHER COMPENSATION FOR THAT PLAN YEAR.

```
(b)    [ ] MATCHING CONTRIBUTIONS - NOT APPLICABLE

       (1)    THE EMPLOYER SHALL MAKE A MATCHING CONTRIBUTION ON BEHALF
              OF EACH PARTICIPANT IN AN AMOUNT EQUAL TO THE FOLLOWING
              PERCENTAGE OF A PARTICIPANT'S DEFERRAL CONTRIBUTIONS DURING
              THE PLAN YEAR (check one):

              (A)    [ ]  50%

              (B)    [ ]  100%

              (C)    [ ]  ___%

              (D)    [ ]  (Tiered Match) ___% of the first ___% of the
                         Participant's Compensation contributed to the
                         Plan,

                         _____% of the next _____% of the
                         Participant's  Compensation contributed to the
                         Plan,

                         _____% of the next _____% of the
                         Participant's  Compensation contributed to the
                         Plan.

              (E)    [ ]  The percentage declared for the year, if any,
                         by a Board of Directors' resolution.

              (F)    [ ]  Other:
                         --------------------------------------------

                         --------------------------------------------

                         --------------------------------------------

                         --------------------------------------------

       (2) [ ] MATCHING CONTRIBUTION LIMITS (check the appropriate
box(es)):

              (A)    [ ] Deferral Contributions in excess of _____%
                        of the Participant's Compensation for the period
                        in question shall not be considered for Matching
                        Contributions.

                     Note:  If the Employer elects a percentage limit in
                            (A) above and requests the Trustee to account
                            separately for matched and unmatched Deferral
                            Contributions, the Matching Contributions
                            allocated to each Participant must be
                            computed, and the percentage limit applied,
                            based upon each period.

              (B)    [ ] Matching Contributions for each Participant for
                        each Plan Year shall be limited to $_____.
```

4

6

(3)   ELIGIBILITY REQUIREMENT(s) FOR MATCHING CONTRIBUTIONS

A Participant who makes Deferral Contributions during the Plan
Year under Section 1.05(a) shall be entitled to Matching
Contributions for that Plan Year if the Participant satisfies the
following requirement(s) (Check the appropriate box(es). Options
(B) and (C) may not be elected together):


(A) [ ] Is employed by the Employer on the last day of the Plan
        Year.

(B) [ ] Earns at least 500 Hours of Service during the Plan Year.

(C) [ ] Earns at least 1,000 Hours of Service during the Plan
        Year.

(D) [ ] No requirements.


NOTE:   If option (A), (B) or (C) above is selected then Matching
        Contributions can only be MADE by the Employer AFTER the
        Plan Year ends. Any Matching Contribution made before Plan
        Year end shall not be subject to the eligibility
        requirements of this Section 1.05(b)(3)).

1.06   DISTRIBUTION DATES

A Participant may elect to receive a distribution or commence
distributions from his Account pursuant to Section 8.02 upon the
following date(s) (check the appropriate box(es). If Option (c) is
elected, then options (a) and (b) may not be elected):


(a) [ ] ATTAINMENT OF NORMAL RETIREMENT AGE. NORMAL RETIREMENT
        AGE UNDER THE PLAN IS (check one):

        (1)  [ ]  age 65.

        (2)  [ ]  age _____ (specify from 55 through 64).

        (3)  [ ]  later of the age ___  (can not exceed 65)
                  or the fifth anniversary of the Participant's
                  Commencement Date.


(b) [ ] ATTAINMENT OF EARLY RETIREMENT AGE. EARLY RETIREMENT AGE
        IS THE FIRST DAY OF THE MONTH AFTER THE PARTICIPANT
        ATTAINS AGE _____ (SPECIFY 55 OR GREATER) AND COMPLETES
        _____ YEARS OF SERVICE FOR VESTING.

(c) [X] TERMINATION OF EMPLOYMENT WITH THE EMPLOYER.

5

1.07    VESTING SCHEDULE -- NOT APPLICABLE

    (a)    THE PARTICIPANT'S VESTED PERCENTAGE IN MATCHING CONTRIBUTIONS
           ELECTED IN SECTION 1.05(b) SHALL BE BASED UPON THE SCHEDULE(s)
           SELECTED BELOW.

           (1)    [ ]  N/A - No Matching Contributions
           (2)    [ ]  100% Vesting immediately
           (3)    [ ]  3 year cliff (see C below)
           (4)    [ ]  5 year cliff (see D below)
           (5)    [ ]  6 year graduated (see E below)
           (6)    [ ]  7 year graduated (see F below)
           (7)    [ ]  G below
           (8)    [ ]  Other (Attachment "B")

| YEARS OF SERVICE FOR VESTING | VESTING SCHEDULE | | | | |
|---|---|---|---|---|---|
| | C | D | E | F | G |
| ------- | - | - | - | - | - |
| 0 | 0% | 0% | 0% | 0% | ____ |
| 1 | 0% | 0% | 0% | 0% | ____ |
| 2 | 0% | 0% | 20% | 0% | ____ |
| 3 | 100% | 0% | 40% | 20% | ____ |
| 4 | 100% | 0% | 60% | 40% | ____ |
| 5 | 100% | 100% | 80% | 60% | ____ |
| 6 | 100% | 100% | 100% | 80% | ____ |
| 7 | 100% | 100% | 100% | 100% | 100% |

    (b) [ ] YEARS OF SERVICE FOR VESTING SHALL EXCLUDE (check one):

        (1) [ ] for new plans, service prior to the Effective Date as defined
            in Section 1.01(e)(1).

        (2) [ ] for existing plans converting from another plan document,
            service prior to the original Effective Date as defined in
            Section 1.01(e)(2).

    (c) [ ] A PARTICIPANT WILL FORFEIT HIS MATCHING CONTRIBUTIONS UPON THE
        OCCURRENCE OF THE FOLLOWING EVENT (s):

                            ----------------------------

                            ----------------------------

                            ----------------------------

(d)     A PARTICIPANT WILL BE 100% VESTED IN HIS MATCHING CONTRIBUTIONS
        UPON (CHECK THE APPROPRIATE BOX(es), IF ANY):

        (1) [ ] Normal Retirement Age (as defined in Section 1.06(a)).

        (2) [ ] Early Retirement Age (as defined in Section 1.06(b)).

        (3) [ ] Death


1.08    PREDECESSOR EMPLOYER SERVICE -- NOT APPLICABLE

        [ ]     SERVICE FOR PURPOSES OF VESTING IN SECTION 1.07(a) SHALL INCLUDE
                SERVICE WITH THE FOLLOWING EMPLOYER(s):

        (a)
                ------------------------------------------------------------

         (b)
                ------------------------------------------------------------

         (c)
                ------------------------------------------------------------

         (d)
                ------------------------------------------------------------


1.09    HARDSHIP WITHDRAWALS

        PARTICIPANT WITHDRAWALS FOR HARDSHIP PRIOR TO TERMINATION OF EMPLOYMENT
(check one):

        (a) [X] WILL BE ALLOWED IN ACCORDANCE WITH SECTION 7.07, SUBJECT TO A
                $1,000 MINIMUM AMOUNT. (MUST BE AT LEAST $1,000)

        (b) [ ]  WILL NOT BE ALLOWED.


1.10    DISTRIBUTIONS

        SUBJECT TO ARTICLES 7 AND 8, DISTRIBUTIONS UNDER THE PLAN WILL BE PAID
        (check the appropriate box(es)):

        (a) [X] AS A LUMP SUM.

        (b) [X] UNDER A SYSTEMATIC WITHDRAWAL PLAN (INSTALLMENTS) NOT TO EXCEED
                10 YEARS.

1.11   INVESTMENT DECISIONS

    (a)   INVESTMENT DIRECTIONS

        Investments in which the Accounts of Participants shall be treated as invested and reinvested shall be directed (check one):

        (1) [ ] by the Employer among the options listed in (b) below.

        (2) [X] by each Participant among the options listed in (b) below.

        (3) [ ] by each Participant with respect to Deferral Contributions and by the Employer with respect to Employer Matching Contributions. The Employer must direct the Employer Matching Contributions among the same investment options made available for Participant directed sources listed in (b) below.

    (b)   PLAN INVESTMENT OPTIONS

        Participant Accounts will be treated as invested among the Fidelity Funds listed below pursuant to Participant and/or Employer directions.

                    Fund Name                  Fund Number
                    ---------                  -----------

| FUND OPTION | FUND NAME | FUND NO. |
|---|---|---|
| 1 | FIDELITY RETIREMENT MONEY MARKET PORTFOLIO | 0630 |
| 2 | PIMCO LOW DURATION FUND (ADMINISTRATIVE CLASS) | OFP6 |
| 3 | FIDELITY PURITAN FUND | 0004 |
| 4 | FIDELITY EQUITY-INCOME FUND | 0023 |
| 5 | FIDELITY FUND | 0003 |
| 6 | FIDELITY BLUE CHIP GROWTH FUND | 0312 |
| 7 | FIDELITY CONTRAFUND | 0022 |
| 8 | FIDELITY GROWTH & INCOME PORTFOLIO | 0027 |
| 9 | FIDELITY LOW-PRICED STOCK FUND | 0316 |
| 10 | MAS VALUE PORTFOLIO | OFM6 |
| 11 | PIMCO MID CAP GROWTH FUND | OFP3 |
| 12 | FIDELITY EUROPE FUND | 0301 |
| 13 | TEMPLETON GROWTH FUND, INC. I | OFTG |
| 14 | FIDELITY MAGELLAN FUND | 0021 |

IN THE EVENT THE EMPLOYER CHANGES ANY 401(k) PLAN INVESTMENT OPTION, THE EMPLOYER MAY REQUEST, IN WRITING, A CORRESPONDING CHANGE TO THE PLAN INVESTMENT OPTIONS LISTED ABOVE, PROVIDED THAT SUCH OPTION IS GENERALLY MADE AVAILABLE TO PLANS SUCH AS THE PLAN.

10

NOTE:  An additional annual recordkeeping fee will be charged for
       each fund in excess of ten funds.

9

NOTE:  The method and frequency for change of investments will be
determined under the rules applicable to the selected
funds. Information will be provided regarding expenses, if
any, for changes in investment options.

1.12   RELIANCE ON PLAN

An adopting Employer may not rely solely on this Plan to ensure that the
Plan is "unfunded and maintained primarily for the purpose of providing
deferred compensation for a select group of management or highly
compensated employees" and exempt from Parts 2 through 4 of Title I of
the Employee Retirement Income Security Act of 1974 with respect to the
Employer's particular situation. This Agreement must be reviewed by your
attorney and/or accountant before it is executed.

This Adoption Agreement may be used only in conjunction with the
CORPORATEplan for Retirement Select Basic Plan Document.

```
                          EXECUTION PAGE
                        (FIDELITY'S COPY)


IN WITNESS WHEREOF, the Employer has caused this Adoption Agreement to be
executed this _____day of _____, 19_____.


              Employer  VERITAS SOFTWARE CORPORATION
                        ------------------------------------------

              By
                        ------------------------------------------

              Title     Kenneth Lonchar, Senior Vice President
                        ------------------------------------------
                        and Chief Financial Officer
                        ------------------------------------------


              Employer
                        ------------------------------------------

              By
                        ------------------------------------------

              Title
                        ------------------------------------------


                        11
```

```
                              EXECUTION PAGE
                            (EMPLOYER'S COPY)


IN WITNESS WHEREOF, the Employer has caused this Adoption Agreement to be
executed this _____day of _____, 19_____.


                    Employer  VERITAS SOFTWARE CORPORATION
                              ------------------------------------------

                    By        ------------------------------------------

                    Title     Kenneth Lonchar, Senior Vice President
                              ------------------------------------------
                              and Chief Financial Officer
                              ------------------------------------------


                    Employer  ------------------------------------------

                    By        ------------------------------------------

                    Title     ------------------------------------------


                                    12
```

14

ATTACHMENT A

PURSUANT TO SECTION 1.03(a), THE FOLLOWING ARE THE EMPLOYEES WHO ARE ELIGIBLE TO
PARTICIPATE IN THE PLAN:

```
        Employer  VERITAS SOFTWARE CORPORATION
                  ----------------------------------------

        By
                  ----------------------------------------

        Title     Kenneth Lonchar, Senior Vice President
                  and Chief Financial Officer
                  ----------------------------------------

        Date
                  ----------------------------------------
```

NOTE:  The Employer must revise Attachment A to add employees as they become
       eligible or delete employees who are no longer eligible.

13

THE CORPORATEPLAN FOR RETIREMENT SELECT PLAN

BASIC PLAN DOCUMENT

IMPORTANT NOTE

THIS DOCUMENT IS NOT AN IRS APPROVED PROTOTYPE PLAN. AN ADOPTING EMPLOYER MAY
NOT RELY SOLELY ON THIS PLAN TO ENSURE THAT THE PLAN IS "UNFUNDED AND MAINTAINED
PRIMARILY FOR THE PURPOSE OF PROVIDING DEFERRED COMPENSATION TO A SELECT GROUP
OF MANAGEMENT OR HIGHLY COMPENSATED EMPLOYEES" AND EXEMPT FROM PARTS 2 THROUGH 4
OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 WITH RESPECT
TO THE EMPLOYER'S PARTICULAR SITUATION. FIDELITY MANAGEMENT TRUST COMPANY, ITS
AFFILIATES AND EMPLOYEES MAY NOT PROVIDE YOU WITH LEGAL ADVICE IN CONNECTION
WITH THE EXECUTION OF THIS DOCUMENT. THIS DOCUMENT SHOULD BE REVIEWED BY YOUR
ATTORNEY AND/OR ACCOUNTANT PRIOR TO EXECUTION.


[NOTE: CUSTOMIZING CHANGES HAVE BEEN MADE TO THIS DOCUMENT FOR VERITAS SOFTWARE
CORPORATION. DELETIONS ARE INDICATED WITH A * OR TEXTUAL NOTE. INSERTIONS ARE
UNDERLINED.]

16

CPR SELECT
BASIC PLAN DOCUMENT

ARTICLE 1    ADOPTION AGREEMENT

ARTICLE 2    DEFINITIONS

    2.01 - Definitions

ARTICLE 3    PARTICIPATION

    3.01 - Date of Participation
    3.02 - Resumption of Participation Following Re employment
    3.03 - Cessation or Resumption of Participation Following a Change in Status

ARTICLE 4    CONTRIBUTIONS

    4.01 - Deferral Contributions
    4.02 - [Purposefully deleted]
    4.03 - Time of Making Employer Contributions

ARTICLE 5    PARTICIPANTS' ACCOUNTS

    5.01 - Individual Accounts

ARTICLE 6    INVESTMENT OF CONTRIBUTIONS

    6.01 - Manner of Investment
    6.02 - Investment Decisions

ARTICLE 7    RIGHT TO BENEFITS

    7.01 - Normal or Early Retirement
    7.02 - Death
    7.03 - Other Termination of Employment
    7.04 - [Purposefully deleted]
    7.05 - [Purposefully deleted]
    7.06 - Adjustment for Investment Experience
    7.07 - Hardship Withdrawals

ARTICLE 8    DISTRIBUTION OF BENEFITS PAYABLE AFTER TERMINATION OF SERVICE

    8.01 - Distribution of Benefits to Participants and Beneficiaries
    8.02 - Determination of Method of Distribution
    8.03 - Notice to Trustee
    8.04 - Time of Distribution

ARTICLE 9    AMENDMENT AND TERMINATION

    9.01 - Amendment by Employer
    9.02 - Retroactive Amendments
    9.03 - Termination
    9.04 - Distribution Upon Termination of the Plan

ARTICLE 10   MISCELLANEOUS

10.01 - Communication to Participants
10.02 - Limitation of Rights
10.03 - Nonalienability of Benefits
10.04 - Facility of Payment
10.05 - Information between Employer and Trustee
10.06 - Notices
10.07 - Governing Law

ARTICLE 11   PLAN ADMINISTRATION

11.01 - Powers and responsibilities of the Administrator
11.02 - Nondiscriminatory Exercise of Authority
11.03 - Claims and Review Procedures
11.04 - Cost of Administration

3

PREAMBLE


IT IS THE INTENTION OF THE EMPLOYER TO ESTABLISH HEREIN AN UNFUNDED PLAN
MAINTAINED SOLELY FOR THE PURPOSE OF PROVIDING DEFERRED COMPENSATION FOR A
SELECT GROUP OF MANAGEMENT OR HIGHLY COMPENSATED EMPLOYEES FOR PURPOSES OF TITLE
I OF ERISA.


ARTICLE 1.   ADOPTION AGREEMENT.


ARTICLE 2.   DEFINITIONS.


2.01.   DEFINITIONS.

      (a) Wherever used herein, the following terms have the meanings set forth
below, unless a different meaning is clearly required by the context:

           (1) "Account" means an account established on the books of the
Employer for the purpose of recording amounts credited on behalf
of a Participant and any income, expenses, gains or losses
included thereon.

           (2) "Administrator" means the Employer adopting this Plan, or
other person designated by the Employer in Section 1.01(b).

           (3) "Adoption Agreement" means Article 1 under which the Employer
establishes and adopts or amends the Plan and designates the
optional provisions selected by the Employer. The provisions of
the Adoption Agreement shall be an integral part of the Plan.

           (4) "Beneficiary" means the person or persons entitled under
Section 7.02 to receive benefits under the Plan upon the death of
a Participant.

           (5) "Code" means the Internal Revenue Code of 1986, as amended
from time to time.

           (6) "Compensation" shall mean for purposes of Article 4
(Contributions)wages as defined in Section 3401(a) of the Code and
all other payments of compensation to an employee by the employer
(in the course of the employers trade or business) for which the
employer is required to furnish the employee a written statement
under Section 6041(d) and 6051(a)(3) of the Code, excluding any
items elected by the Employer in Section 1.04, reimbursements or
other expense allowances, fringe benefits (cash and non-cash),
moving expenses, deferred compensation and welfare benefits, but
including amounts that are not includable in the gross income of
the Participant under a salary reduction agreement by reason of
the application of Sections 125, 402(a)(8), 402(h), or 403(b) of
the Code. Compensation must be determined without regard to any
rules under Section 3401(a) of the Code that limit the
remuneration included in wages based on the nature or location of
the employment or the services performed (such as the exception
for agricultural labor in Section 3401(a)(2) of the Code).
Included within Compensation shall be Base Salary, which is a
Participant's base salary before any reduction by reason of any
salary reduction agreement under Sections 125, 402(a)(8), 402(h),
or 403(b) of the Code.

Compensation and Base Salary shall generally be based on the amount that would have been actually paid to the Participant during the Plan Year but for an election under Section 4.01.

*

(7) [Purposefully deleted]

(8) "Employee" means any employee of the Employer *.

(9) "Employer" means the employer named in Section 1.02(a) and any Related Employers designated in Section 1.02(b).

(10) "Employment Commencement Date" means the date on which the Employee first performs an Hour of Service.

(11) "ERISA" means the Employee Retirement Income Security Act of 1974, as from time to time amended.

(12) "Fidelity Fund" means any Registered Investment Company which is made available to plans utilizing the CORPORATEplan for Retirement Select Plan.

(13) "Fund Share" means the share, unit, or other evidence of ownership in a Fidelity Fund.

(14) [Purposefully deleted].

(15) "Normal Retirement Age" means the normal retirement age specified in Section 1.06(a) of the Adoption Agreement.

(16) [Purposefully deleted]

(17) "Participant" means any Employee who participates in the Plan in accordance with Article 3 hereof.

(18) "Plan" means the plan established by the Employer as set forth herein as a new plan or as an amendment to an existing plan, by executing the Adoption Agreement, together with any and all amendments hereto.

(19) "Plan Year" means the 12-consecutive month period designated by the Employer in Section 1.01(d).

(20) "Registered Investment Company" means any one or more corporations, partnerships or trusts registered under the Investment Company Act of 1940 for which Fidelity Management and Research Company serves as investment advisor.

(21) "Related Employer" means any employer other than the Employer named in Section 1.02(a), if the Employer and such other employer are members of a controlled group of corporations (as defined in Section 414(b) of the Code) or an affiliated service group (as defined in Section 414(m)), or are trades or businesses (whether or not incorporated) which are under common control (as defined in Section 414(c)), or such other employer is required to be aggregated with the Employer pursuant to regulations issued under Section 414(o).

(22) [Purposefully deleted]

(23) "Trust" means the trust created by the Employer.

(24) "Trust Agreement" means the agreement between the Employer and the Trustee, as set forth in a separate agreement, under which assets are held, administered, and managed subject to the claims of the Employer's creditors in the event of the Employer's insolvency, until paid to Plan Participants and their Beneficiaries as specified in the Plan.

(25) "Trust Fund" means the property held in the Trust by the Trustee.

(26) "Trustee" means the corporation or individuals appointed by the Employer to administer the Trust in accordance with the Trust Agreement.

(27) [Purposefully deleted]

(b) Pronouns used in the Plan are in the masculine gender but include the feminine gender unless the context clearly indicates otherwise.


ARTICLE 3.  PARTICIPATION.

3.01. DATE OF PARTICIPATION. An eligible Employee (as set forth in Section 1.03(a)) will become a Participant in the Plan on the first Entry Date after which he becomes an eligible Employee if he has filed an election pursuant to Section 4.01. If the eligible Employee does not file an election pursuant to Section 4.01 prior to his first Entry Date, then the eligible Employee will become a Participant in the Plan as of the first day of a Plan Year for which he has filed an election.

3.02. RESUMPTION OF PARTICIPATION FOLLOWING RE EMPLOYMENT. If a Participant ceases to be an Employee and thereafter returns to the employ of the Employer he will again become a Participant as of an Entry Date following the date on which he completes an Hour of Service for the Employer following his re employment, if he is an eligible Employee as defined in Section 1.03(a), and has filed an election pursuant to Section 4.01.

3.03. CESSATION OR RESUMPTION OF PARTICIPATION FOLLOWING A CHANGE IN STATUS. If any Participant continues in the employ of the Employer or Related Employer but ceases to be an eligible Employee as defined in Section 1.03(a), the individual shall continue to be a Participant until the entire amount of his benefit is distributed; however, the individual shall not be entitled to make Deferral Contributions * during the period that he is not an eligible Employee. * In the event that the individual subsequently again becomes an eligible Employee, the individual shall resume full participation in accordance with Section 3.01.


ARTICLE 4.  CONTRIBUTIONS.

4.01. DEFERRAL CONTRIBUTIONS. Each Participant may elect to execute a salary reduction agreement with the Employer to reduce his * Base Salary by a specified percentage and to reduce his other Compensation by a specified percentage not exceeding the percentages set forth in Section 1.05(a) and equal to a whole number multiple of one (1) percent. Such agreement shall become effective on the first day of the period as set forth in the Participant's election. The election will be effective to defer Compensation relating to all services performed in a Plan Year subsequent to the filing of such an election. An election once made will remain in effect until a new election is made. A new election will be effective as of the first day of the following Plan Year and will apply only to Compensation payable with respect to services rendered after such date. Amounts credited to a Participant's account prior to the effective date of any new election will not be affected and will be paid in accordance with that prior election. The Employer shall credit an amount to the account maintained on behalf of the Participant corresponding to the amount of said reduction. Under no circumstances may a salary reduction agreement be adopted retroactively. A

Participant may not revoke a salary reduction agreement for a Plan year during
that year, except that, in the event of a Hardship (as defined in Section 7.07),
a Participant may cease ongoing deferrals under the Plan but may not thereafter
re-enroll in the Plan until the following Plan year.

4.02. [Purposefully deleted]

4.03. TIME OF MAKING EMPLOYER CONTRIBUTIONS. The Employer will from time to time
make a transfer of assets to the Trustee for each Plan Year. The Employer shall
provide the Trustee with information on the amount to be credited to the
separate account of each Participant maintained under the Trust.


ARTICLE 5.   PARTICIPANTS' ACCOUNTS.

5.01. INDIVIDUAL ACCOUNTS. The Administrator will establish and maintain an
Account for each Participant which will reflect Deferral Contributions credited
to the Account on behalf of the Participant and earnings, expenses, gains and
losses credited thereto, and deemed investments made with amounts in the
Participant's Account. The Administrator will establish and maintain such other
accounts and records as it decides in its discretion to be reasonably required
or appropriate in order to discharge its duties under the Plan. Participants
will be furnished statements of their Account values at least once each Plan
Year.


ARTICLE 6.   INVESTMENT OF CONTRIBUTIONS.

6.01. MANNER OF INVESTMENT. All amounts credited to the Accounts of Participants
shall be treated as though invested and reinvested only in eligible investments
selected by the Employer in Section 1.11(b).

6.02. INVESTMENT DECISIONS. Investments in which the Accounts of Participants
shall be treated as invested and reinvested shall be directed by the Employer or
by each Participant, or both, in accordance with the Employer's election in
Section 1.11(a).

        (a) All dividends, interest, gains and distributions of any nature earned
        in respect of Fund Shares in which the Account is treated as investing
        shall be credited to the Account as though reinvested in additional
        shares of that Fidelity Fund.

        (b) Expenses attributable to the acquisition of investments shall be
        charged to the Account of the Participant for which such investment is
        made.


ARTICLE 7.   RIGHT TO BENEFITS.

7.01. NORMAL OR EARLY RETIREMENT. * Each Participant who attains his Normal
Retirement Age or Early Retirement Age will have a nonforfeitable interest in
his Account . * If a Participant retires on or after attainment of Normal or
Early Retirement Age, such retirement is referred to as a normal retirement. On
or after his normal retirement, the balance of the Participant's Account, plus
any amounts thereafter credited to his Account, subject to the provisions of
Section 7.06, will be distributed to him in accordance with Article 8.

        *

7.02. DEATH. If a Participant dies before the distribution of his Account has
commenced, or before such distribution has been completed, his Account shall
become vested * and his designated Beneficiary or Beneficiaries will be entitled
to receive the balance or remaining balance of his Account, plus any amounts

4

thereafter credited to his Account, subject to the provisions of Section 7.06. Distribution to the Beneficiary or Beneficiaries will be made in accordance with Article 8.

A Participant may designate a Beneficiary or Beneficiaries, or change any prior designation of Beneficiary or Beneficiaries by giving notice to the Administrator on a form designated by the Administrator. If more than one person is designated as the Beneficiary, their respective interests shall be as indicated on the designation form.

A copy of the death notice or other sufficient documentation must be filed with and approved by the Administrator. If upon the death of the Participant there is, in the opinion of the Administrator, no designated Beneficiary for part or all of the Participant's Account, such amount will be paid to his surviving spouse or, if none, to his estate (such spouse or estate shall be deemed to be the Beneficiary for purposes of the Plan). If a Beneficiary dies after benefits to such Beneficiary have commenced, but before they have been completed, and, in the opinion of the Administrator, no person has been designated to receive such remaining benefits, then such benefits shall be paid to the deceased Beneficiary's estate.

7.03. OTHER TERMINATION OF EMPLOYMENT. If provided by the Employer in Section 1.06, if a Participant terminates his employment for any reason other than death or normal retirement, he will be entitled to a termination benefit equal to * the value of * his Account as adjusted for income, expense, gain or loss. The amount payable under this Section 7.03 will be subject to the provisions of Section 7.06 and will be distributed in accordance with Article 8.

7.04. [Purposefully deleted]

7.05. [Purposefully deleted]

7.06. ADJUSTMENT FOR INVESTMENT EXPERIENCE. If any distribution under this Article 7 is not made in a single payment, the amount remaining in the Account after the distribution will be subject to adjustment until distributed to reflect the income and gain or loss on the investments in which such amount is treated as invested and any expenses properly charged under the Plan and Trust to such amounts.

7.07. HARDSHIP WITHDRAWALS. Subject to the provisions of Article 8, a Participant shall not be permitted to withdraw his Account (and earnings thereon) prior to retirement or termination of employment, except as follows: If permitted under Section 1.09, a Participant may apply to the Administrator to withdraw some or all of his Account if such withdrawal is made on account of a hardship. * "Hardship" means an unanticipated emergency that is caused by an event beyond the control of the Participant and that would result in severe financial hardship to the Participant if early withdrawal were not permitted. The existence and extent of a hardship shall be determined by the Administrator, in its discretion, and any withdrawal shall be limited to the amount necessary to meet the financial need, as the Administrator determines. Absent a determination of hardship, a Participant may elect to receive 90% of his entire Account in an early distribution at any time upon 30 days written request, in which case the remaining 10% of the Participant's Account shall be permanently forfeited. A Participant electing to receive a forfeiture distribution may not re-enroll in the Plan until the next Plan year. Any amounts forfeited under this Section 7.07 will be applied first to pay administrative expenses and then reduce the contributions of the Employer under the Plan


ARTICLE 8.   DISTRIBUTION OF BENEFITS PAYABLE AFTER TERMINATION OF SERVICE.

8.01. DISTRIBUTION OF BENEFITS TO PARTICIPANTS AND BENEFICIARIES.

(a) Distributions under the Plan to a Participant or to the Beneficiary of the Participant shall be made in a lump sum in cash or, if elected by the Employer in Section 1.10 and specified in the

Participant's deferral election, under a systematic withdrawal plan (installment(s)) not exceeding 10 years upon retirement, death or other termination of employment.

(b) Distributions under a systematic withdrawal plan must be made in substantially equal annual, or more frequent, installments, in cash, over a period certain which does not extend 10 years. A Participant must make an election before the calendar year in which the Compensation is earned to receive distributions either in a lump sum in cash, or under a systematic withdrawal plan. A Participant may increase or decrease the number of installment distributions under a systematic withdrawal plan, provided such increase or decrease is made on or before the date one year prior to the Participant's termination or retirement.

8.02. DETERMINATION OF METHOD OF DISTRIBUTION. The Participant will determine the method of distribution of benefits to himself and the method of distribution to his Beneficiary. Such determination will be made at the time the Participant makes a deferral election. If the Participant does not determine the method of distribution to him or his Beneficiary, the method shall be a lump sum.

8.03. NOTICE TO TRUSTEE. The Administrator will notify the Trustee in writing whenever any Participant or Beneficiary is entitled to receive benefits under the Plan. The Administrator's notice shall indicate the form, amount and frequency of benefits that such Participant or Beneficiary shall receive.

8.04. TIME OF DISTRIBUTION. In no event will distribution to a Participant be made later than the date specified by the Participant in his salary reduction agreement.

ARTICLE 9.  AMENDMENT AND TERMINATION.

9.01 AMENDMENT BY EMPLOYER. The Employer reserves the authority to amend the Plan by filing with the Trustee an amended Adoption Agreement, executed by the Employer only, on which said Employer has indicated a change or changes in provisions previously elected by it. Such changes are to be effective on the effective date of such amended Adoption Agreement. Any such change notwithstanding, no Participant's Account shall be reduced by such change below the amount to which the Participant would have been entitled if he had voluntarily left the employ of the Employer immediately prior to the date of the change. The Employer may from time to time make any amendment to the Plan that may be necessary to satisfy the Code or ERISA. The Employer's board of directors or other individual specified in the resolution adopting this Plan shall act on behalf of the Employer for purposes of this Section 9.01.

9.02 RETROACTIVE AMENDMENTS. An amendment made by the Employer in accordance with Section 9.01 may be made effective on a date prior to the first day of the Plan Year in which it is adopted if such amendment is necessary or appropriate to enable the Plan and Trust to satisfy the applicable requirements of the Code or ERISA or to conform the Plan to any change in federal law or to any regulations or ruling thereunder. Any retroactive amendment by the Employer shall be subject to the provisions of Section 9.01.

9.03. TERMINATION. The Employer has adopted the Plan with the intention and expectation that contributions will be continued indefinitely. However, said Employer has no obligation or liability whatsoever to maintain the Plan for any length of time and may discontinue contributions under the Plan or terminate the Plan at any time by written notice delivered to the Trustee without any liability hereunder for any such discontinuance or termination.

9.04. DISTRIBUTION UPON TERMINATION OF THE PLAN. Upon termination of the Plan, no further Deferral Contributions Contributions shall be made under the Plan, but Accounts of Participants maintained under the Plan at the time of termination shall continue to be governed by the terms of the Plan until paid out in accordance with the terms of the Plan; provided that the Employer may, in its discretion, direct that all Accounts be distributed in a lump sum as soon as practicable following termination of the Plan..

24

ARTICLE 10.  MISCELLANEOUS.

10.01. COMMUNICATION TO PARTICIPANTS. The Plan will be communicated to all Participants by the Employer promptly after the Plan is adopted.

10 02. LIMITATION OF RIGHTS. Neither the establishment of the Plan and the Trust, nor any amendment thereof, nor the creation of any fund or account, nor the payment of any benefits, will be construed as giving to any Participant or other person any legal or equitable right against the Employer, Administrator or Trustee, except as provided herein; and in no event will the terms of employment or service of any Participant be modified or in any way affected hereby.

10.03. NONALIENABILITY OF BENEFITS. The benefits provided hereunder will not be subject to alienation, assignment, garnishment, attachment, execution or levy of any kind, either voluntarily or involuntarily, and any attempt to cause such benefits to be so subjected will not be recognized, except to such extent as may be required by law.

10 04. FACILITY OF PAYMENT. In the event the Administrator determines, on the basis of medical reports or other evidence satisfactory to the Administrator, that the recipient of any benefit payments under the Plan is incapable of handling his affairs by reason of minority, illness, infirmity or other incapacity, the Administrator may direct the Trustee to disburse such payments to a person or institution designated by a court which has jurisdiction over such recipient or a person or institution otherwise having the legal authority under State law for the care and control of such recipient. The receipt by such person or institution of any such payments shall be complete acquittance therefore, and any such payment to the extent thereof, shall discharge the liability of the Trust for the payment of benefits hereunder to such recipient.

10.05. INFORMATION BETWEEN EMPLOYER AND TRUSTEE. The Employer agrees to furnish the Trustee, and the Trustee agrees to furnish the Employer with such information relating to the Plan and Trust as may be required by the other in order to carry out their respective duties hereunder, including without limitation information required under the Code or ERISA and any regulations issued or forms adopted thereunder.

10.06. NOTICES. Any notice or other communication in connection with this Plan shall be deemed delivered in writing if addressed as provided below and if either actually delivered at said address or, in the case of a letter, three business days shall have elapsed after the same shall have been deposited in the United States mails, first-class postage prepaid and registered or certified:

> (a)If to the Employer or Administrator, to it at the address set forth in the Adoption Agreement, to the attention of the person specified to receive notice in the Adoption Agreement;

> (b)If to the Trustee, to it at the address set forth in the Trust Agreement;

or, in each case at such other address as the addressee shall have specified by written notice delivered in accordance with the foregoing to the addressor's then effective notice address.

10.07. GOVERNING LAW. The Plan and the accompanying Adoption Agreement will be construed, administered and enforced according to ERISA, and to the extent not preempted thereby, the laws of the Commonwealth of Massachusetts.


ARTICLE 11.  PLAN ADMINISTRATION.

11.01. POWERS AND RESPONSIBILITIES OF THE ADMINISTRATOR. The Administrator has the full power and the full responsibility to administer the Plan in all of its details, subject, however, to the applicable

25

requirements of ERISA. The Administrator's powers and responsibilities include, but are not limited to, the following:

(a) To make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan;

(b) To interpret the Plan, its interpretation thereof in good faith to be final and conclusive on all persons claiming benefits under the Plan;

(c) To decide all questions concerning the Plan and the eligibility of any person to participate in the Plan;

(d) To administer the claims and review procedures specified in Section 11.03;

(e) To compute the amount of benefits which will be payable to any Participant, former Participant or Beneficiary in accordance with the provisions of the Plan;

(f) To determine the person or persons to whom such benefits will be paid;

(g) To authorize the payment of benefits;

(h) To comply with the reporting and disclosure requirements of Part 1 of Subtitle B of Title I of ERISA;

(i) To appoint such agents, counsel, accountants, and consultants as may be required to assist in administering the Plan;

(j) By written instrument, to allocate and delegate its responsibilities, including the formation of an Administrative Committee to administer the Plan;

11.02. NONDISCRIMINATORY EXERCISE OF AUTHORITY. Whenever, in the administration of the Plan, any discretionary action by the Administrator is required, the Administrator shall exercise its authority in a nondiscriminatory manner so that all persons similarly situated will receive substantially the same treatment.

11.03.  CLAIMS AND REVIEW PROCEDURES.

(a)Claims Procedure. If any person believes he is being denied any rights or benefits under the Plan, such person may file a claim in writing with the Administrator. If any such claim is wholly or partially denied, the Administrator will notify such person of its decision in writing. Such notification will contain (i) specific reasons for the denial, (ii) specific reference to pertinent Plan provisions, (iii) a description of any additional material or information necessary for such person to perfect such claim and an explanation of why such material or information is necessary, and (iv) information as to the steps to be taken if the person wishes to submit a request for review. Such notification will be given within 90 days after the claim is received by the Administrator (or within 180 days, if special circumstances require an extension of time for processing the claim, and if written notice of such extension and circumstances is given to such person within the initial 90-day period). If such notification is not given within such period, the claim will be considered denied as of the last day of such period and such person may request a review of his claim.

(b)Review Procedure. Within 60 days after the date on which a person receives a written notice of a denied claim (or, if applicable, within 60 days after the date on which such denial is considered to have occurred), such person (or his duly authorized representative) may (i) file a written request with the Administrator for a review of his denied claim and of pertinent documents and (ii) submit

8

written issues and comments to the Administrator. The Administrator will
notify such person of its decision in writing. Such notification will be
written in a manner calculated to be understood by such person and will
contain specific reasons for the decision as well as specific references
to pertinent Plan provisions. The decision on review will be made within
60 days after the request for review is received by the Administrator (or
within 120 days, if special circumstances require an extension of time
for processing the request, such as an election by the Administrator to
hold a hearing, and if written notice of such extension and circumstances
is given to such person within the initial 60-day period). If the
decision on review is not made within such period, the claim will be
considered denied.


11.04. COSTS OF ADMINISTRATION. Unless some or all costs and expenses are paid
by the Employer, all reasonable costs and expenses (including legal, accounting,
and employee communication fees) incurred by the Administrator and the Trustee
in administering the Plan and Trust will be paid first from the forfeitures (if
any) resulting under Section 7.057, then from the remaining Trust Fund. All such
costs and expenses paid from the Trust Fund will, unless allocable to the
Accounts of particular Participants, be charged against the Accounts of all
Participants on a prorata basis or in such other reasonable manner as may be
directed by the Employer.

9

1

EXHIBIT 21.01

VERITAS SOFTWARE CORPORATION

SUBSIDIARIES OF THE REGISTRANT

| SUBSIDIARY LEGAL NAME | JURISDICTION OF INCORPORATION |
|---|---|
| VERITAS Operating Corporation ................................................ | Delaware |
|     VERITAS Software Investment Company ................................ | Delaware |
|     VERITAS Software Technology Corporation ........................... | Delaware |
|         VERITAS Software Technology Holding Corporation ........... | Delaware |
|     VERITAS Software SA ............................................... | France |
|     VERITAS Software Holdings Ltd. ..................................... | Ireland |
|         Armour Software Ltd. ...................................... | Cyprus |
|         VERITAS Software International Limited ..................... | Ireland |
|         VERITAS Software Limited .................................. | United Kingdom |
|     VERITAS Software Global Corporation ............................... | Delaware |
|         VERITAS Software Global Holdings LLC ...................... | Delaware |
|         TELEBACKUP HOLDINGS, INC. ................................. | Delaware |
|             TELEBACKUP EXCHANGECO INC. ........................ | Canada |
|             NEW TELEBACKUP SYSTEMS INC. ....................... | Canada |
|         VERITAS Software Argentina S.A. ........................... | Argentina |
|         VERITAS Software PTY Ltd. ................................. | Australia |
|         VERITAS FSC, INC. ........................................ | Barbados |
|         VERITAS Software Corporation Belgium S.A. ................. | Belgium |
|         VERITAS Software do Brasil Ltda .......................... | Brazil |
|         Seagate Software International Holdings Ltd. .............. | Caymans |
|         VERITAS Software (Canada) Inc. | |
|              - Logiciel VERITAS (Canada) Inc. ............. | Canada |
|         VERITAS Software Corporation ApS .......................... | Denmark |
|         Prassi Europe SAS ........................................ | France |
|         VERITAS Software GmbH ..................................... | Germany |
|         VERITAS Software Hong Kong Limited. ....................... | Hong Kong |
|         VERITAS Software India PVT. LTD. .......................... | India |
|         VERITAS Software Solutions Private Limited (India II) ...... | India |
|         VERITAS Software Corporation Italy S.R.L. ................. | Italy |
|         VERITAS Japan K.K. ....................................... | Japan |
|         VERITAS Software Korea Ltd ............................... | Korea |
|         VERITAS Software Malaysia SDN.BHD. ........................ | Malaysia |
|         VERITAS Software Mexico S.A. de C.V. ...................... | Mexico |
|         VERITAS Software Benelux B.V. ............................ | Netherlands |
|         VERITAS Software Corporation AS ........................... | Norway |
|         VERITAS Software Singapore ............................... | Singapore |
|         VERITAS Software Corporation S.L. ......................... | Spain |
|         VERITAS Software Corporation Sweden AB .................... | Sweden |
|         VERITAS Software GbmH .................................... | Switzerland |

</TABLE>

EXHIBIT 23.01

CONSENT OF INDEPENDENT AUDITORS

We consent to the incorporation by reference in the Registration Statements
(Form S-8 Nos. 333-25927, 333-79841, 333-86179, and 333-38460) pertaining to the
1985 Stock Option Plan, 1991 Executive Stock Option Plan, 1992 Stock Plan, 1993
Equity Incentive Plan, 1993 Directors Stock Option Plan, 1993 Employee Stock
Purchase Plan, 1996 Director Option Plan, 1996 Stock Option Plan, and 1996
Employee Stock Purchase Plan of VERITAS Software Corporation of our report dated
January 23, 2001, with respect to the consolidated financial statements and
schedule of VERITAS Software Corporation included in the Annual Report (Form
10-K) for the year ended December 31, 2000.

                                                    /s/ Ernst & Young LLP


San Jose, California
March 23, 2001

_____

# EXHIBIT D

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K/ A
## Amendment No. 1

(Mark One)

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2001**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____.

**Commission File Number 0-26247**

# VERITAS SOFTWARE CORPORATION
### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **77-0507675** |
| **(State or Other Jurisdiction of** | **(I.R.S. Employer** |
| **Incorporation or Organization)** | **Identification No.)** |

| | |
|---|---|
| **350 Ellis Street** | |
| **Mountain View, California** | **94043** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's Telephone Number, including Area Code: (650) 527-8000**

**Securities to be registered pursuant to Section 12(b) of the Act: None**

**Securities to be registered pursuant to Section 12(g) of the Act: Common Stock**

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes  ☒  No  ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained to the best of the Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

As of February 28, 2002, 406,738,273 shares of the Registrant's common stock were outstanding. The aggregate market value of the common stock held by non-affiliates of the Registrant as of February 28, 2002 was approximately $14.4 billion.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of Registrant's definitive proxy statement, delivered to stockholders in connection with the Registrant's Annual Meeting of Stockholders held on May 14, 2002, are incorporated by reference into Part III of this Form 10-K.

TABLE OF CONTENTS

EXPLANATORY NOTE

PART II

    Item 6. Selected Financial Data

    Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

    Item 8. Financial Statements and Supplementary Data

PART IV

    Item 14. Exhibits, Financial Statement Schedules and Reports on Form 8-K

SIGNATURES

FINANCIAL STATEMENTS

    CONSOLIDATED BALANCE SHEETS

    CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY AND COMPREHENSIVE LOSS

    CONSOLIDATED STATEMENTS OF CASH FLOWS

EXHIBIT 23.01

EXHIBIT 23.02

EXHIBIT 99.01

Table of Contents

**EXPLANATORY NOTE**

On January 17, 2003, VERITAS Software Corporation (the "Company") announced that it would restate its accounting for transactions with AOL Time Warner ("AOL") entered into in September 2000. The transactions involved a software and services purchase by AOL at a stated value of $50.0 million and the purchase by the Company of advertising services from AOL at a stated value of $20.0 million. The Company originally recorded $36.9 million of revenue in 2000 and has been recognizing the remaining $13.1 million in revenue over a three-year support period. The purchase of advertising services at a stated value of $20.0 million was recorded as an expense as the services were provided in 2000 and 2001.

The Company has conducted an internal review of the AOL transactions and other contemporaneous customer-vendor transactions to determine if the fair value of goods and services purchased and sold could be reasonably determined. The Company has determined that the fair value of the goods and services purchased and sold in the AOL transactions could not be reasonably determined and has accordingly restated its financial results to reflect a reduction in revenues and expenses of $20.0 million. The Company is also restating two additional contemporaneous transactions involving software licenses and the purchase of on-line advertising services entered into in 2000 to reflect an additional reduction in revenues and expenses of $977,000. The periods affected by the restatement include fiscal years ended December 31, 2000 and 2001. In fiscal year 2000, the restatement reduces revenue by $19.9 million and increases net loss and net loss per share by $8.6 million and $0.02, respectively. In fiscal year 2001, the restatement reduces revenue by $0.4 million and decreases net loss and net loss per share by $9.0 million and $0.02, respectively. Additionally, as of December 31, 2001, the deferred revenue balance was reduced by $0.7 million. The restated financial results for 2000 and 2001 are contained in this Amendment No. 1 to the Annual Report on Form 10-K for the fiscal year ended December 31, 2001. The Company has determined that the restatement described above does not affect the Company's previously filed quarterly reports on Form 10-Q for quarters ended March 31, 2002 through September 30, 2002.

This report is being filed to amend and restate the following items contained in our Annual Report on Form 10-K originally filed with the Securities and Exchange Commission on March 28, 2002:

- Item 6 (Selected Financial Data),

- Item 7 (Management's Discussion and Analysis of Financial Condition and Results of Operations),

- Item 8 (Financial Statements and Supplementary Data), and

- Item 14 (Exhibits, Financial Statement Schedules, and Reports on Form 8-K).

In order to preserve the nature and character of the disclosures set forth in such Items as originally filed, this report continues to speak as of the date of the original filing, and the Company has not updated the disclosures in this report to speak as of a later date. All information contained in this Amendment No. 1 is subject to updating and supplementing as provided in our reports filed with the Securities and Exchange Commission subsequent to the date of the original filing of the Annual Report on Form 10-K.

2

# TABLE OF CONTENTS

## PART II

| | | |
|---|---|---|
| Item 6. | Selected Financial Data | 3 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 4 |
| Item 8. | Financial Statements and Supplementary Data | 32 |

## PART IV

| | | |
|---|---|---|
| Item 14. | Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 35 |
| Signatures | | 44 |
| Financial Statements | | 47 |

**Item 6.** *Selected Financial Data*

The following selected consolidated financial data are derived from our consolidated financial statements. This data should be read in conjunction with the consolidated financial statements and notes thereto, and Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations. As described in Note 20 to our consolidated financial statements, we have restated our consolidated financial statements as of December 31, 2000 and 2001 and for the years ended December 31, 2000 and 2001.

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2000** | **1999** | **1998** | **1997** |
| | (As restated)(1) | (As restated)(1) | (In thousands, except per share data) | | |
| **Consolidated Statement of Operations Data:** | | | | | |
| Total net revenue | $ 1,491,928 | $ 1,187,441 | $ 596,112 | $ 210,865 | $ 121,125 |
| Amortization of developed technology | 63,086 | 62,054 | 35,659 | — | — |
| Amortization of goodwill and other intangibles | 886,651 | 879,032 | 510,943 | — | — |
| Stock-based compensation | 8,949 | — | — | — | — |
| Acquisition and restructuring costs (reversals) | (5,000) | (4,260) | 11,000 | — | 8,490 |
| In-process research and development | — | — | 104,200 | 600 | — |
| Income (loss) from operations | (548,053) | (567,100) | (475,237) | 53,668 | 20,076 |
| Net income (loss) | (642,329) | (628,385) | (502,958) | 51,648 | 22,749 |
| Net income (loss) per share — basic | $    (1.61) | $    (1.57) | $    (1.59) | $    0.24 | $    0.11 |
| Net income (loss) per share — diluted | $    (1.61) | $    (1.57) | $    (1.59) | $    0.22 | $    0.10 |
| Number of shares used in computing per share amounts — basic | 399,016 | 400,034 | 316,892 | 211,558 | 205,300 |
| Number of shares used in computing per share amounts — diluted | 399,016 | 400,034 | 316,892 | 232,519 | 222,716 |

3

Table of Contents

| | December 31, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2000** | **1999** | **1998** | **1997** |
| | (As restated)(1) | (As restated)(1) | | | |
| | | (In thousands, except per share data) | | | |
| **Consolidated Balance Sheet Data:** | | | | | |
| Working capital | $ 1,545,276 | $  916,084 | $  630,440 | $ 198,069 | $ 187,667 |
| Total assets | 3,798,376 | 4,073,278 | 4,233,277 | 349,117 | 241,880 |
| Long-term obligations | 444,408 | 429,176 | 451,044 | 100,000 | 100,000 |
| Accumulated deficit | (1,803,088) | (1,160,759) | (532,374) | (29,416) | (81,064) |
| Stockholders' equity | 2,723,893 | 2,973,978 | 3,393,061 | 169,854 | 104,193 |

(1)    See Note 20 to the consolidated financial statements.

In 1999, we acquired the Network & Storage Management Group business of Seagate Software, Inc., TeleBackup Systems, Inc. and NuView, Inc. Because we accounted for these three acquisitions using the purchase method of accounting, we recorded developed technology, goodwill and other intangible assets of approximately $3,754.9 million in total. Until December 31, 2001, these assets were being amortized over their estimated useful life of four years, and resulted in amortization charges of approximately $234.8 million per quarter. In 1999, we recorded one-time non-cash charges of $104.2 million related to the write-off of in-process research and development, and we also recorded a one-time restructuring charge of $11.0 million related primarily to costs for our duplicative facilities that we planned to vacate, of which $4.3 million was reversed in 2000 as a result of lower actual exit costs than originally estimated with respect to our duplicative facilities. In 2001, we recorded a stock-based compensation charge of $8.9 million mainly related to the acceleration of certain stock options held by our former chief executive officer and we reversed $5.0 million of net attorneys' fees originally accrued in relation to the Delaware lawsuit captioned  *In Re Seagate Technology, Inc. Shareholders Litigation* , which we will not have to pay as a result of a Delaware Chancery Court ruling that approved the settlement of the lawsuit.

**Item 7.** *Management's Discussion and Analysis of Financial Condition and Results of Operations*

*This annual report on Form 10-K, including the following sections, contains forward-looking statements that involve numerous risks and uncertainties, including effects of business combinations and acquisitions, new and critical accounting policies, products and services revenue, revenue mix, products and services gross margin, expense and amortization estimates, liquidity, and commitments under leases. In some cases, forward-looking statements are identified by words such as "believe," "anticipate," "expect," "intend," "plan," "will," "may" and similar expressions. In addition, these forward-looking statements include statements regarding our expectations, beliefs, plans, intentions or strategies regarding the future. All these forward-looking statements are based on information available to us at this time, and we assume no obligation to update any of these statements. The actual results that we achieve may differ materially from those anticipated by any forward-looking statement due to risks and uncertainties including those described below under "Factors That May Affect Future Results."*

*As described in Note 20 to our consolidated financial statements, we have restated our consolidated financial statements as of December 31, 2000 and 2001 and for the years ended December 31, 2000 and 2001.*

**Overview**

VERITAS is a leading independent supplier of storage software products and services. Storage software includes storage management and data protection software as well as clustering, replication and storage area networking software. We develop and sell products for most popular operating systems, including various versions of UNIX (including Linux) and Windows. We also develop and sell products that support a wide variety of servers, storage devices, databases and network solutions. Customers use our software solutions in a wide variety of industries, and include many leading global corporations and e-commerce businesses. We also provide a full range of services to assist our customers in assessing, architecting and implementing their storage software solutions.

4

Table of Contents

We derive user license fee revenue from shipments of our software products to end-user customers through a combination of original equipment manufacturers, direct sales channels and indirect sales channels such as resellers, value-added resellers, hardware distributors, application software vendors and systems integrators. Some original equipment manufacturers incorporate our products into their products, some bundle our products with their products and some license our products to third parties as optional products. In general, we receive a user license fee for each sublicense of our products granted by an original equipment manufacturer licenses to its customer.

Our services revenue consists of fees derived from maintenance, technical support, consulting and training services. Original equipment manufacturer maintenance agreements covering our products provide for technical and emergency support and minor unspecified product upgrades for a fixed annual fee. Maintenance agreements covering products that are licensed through channels other than original equipment manufacturers provide for technical support and unspecified product upgrades for an annual fee based on the number of user licenses purchased and the level of service subscribed.

**International sales and operations**

Our international sales are generated primarily through our international sales subsidiaries. International revenue, most of which is collectible in foreign currencies, accounted for approximately 29% of our total revenue in 2001, 25% of our total revenue in 2000 and 24% of our total revenue in 1999. Our international revenue increased 46% to $430.2 million in 2001 from $294.4 million in 2000, and 103% in 2000 from $144.9 million in 1999.

We believe that our success depends upon continued expansion of our international operations. We currently have sales and service offices and resellers located in North America, Europe, Asia-Pacific, South America and the Middle East, and a development center in India. International expansion will require us to establish additional foreign offices, hire additional personnel and recruit new international resellers, resulting in the diversion of significant management attention and the expenditure of financial resources. To the extent that we are unable to meet these additional requirements, growth in international sales will be limited, which would have an adverse effect on our business, operating results and financial condition.

**Seagate Technology transaction**

On November 22, 2000, we completed a multi-party transaction with Seagate Technology, which we refer to as Seagate, and Suez Acquisition Company (Cayman) Limited, which we refer to as SAC, a company formed by a group of private equity firms led by Silver Lake Partners. The transaction was structured as a leveraged buyout of Seagate pursuant to which Seagate sold all of its operating assets to SAC, and SAC assumed and indemnified Seagate and us for substantially all liabilities arising in connection with those operating assets. We did not acquire Seagate's disc drive business or any other Seagate operating business. At the closing, and after the operating assets and liabilities of Seagate had been transferred to SAC, a wholly-owned subsidiary of ours merged with and into Seagate, following which Seagate became our wholly-owned subsidiary and was renamed VERITAS Software Technology Corporation.

We issued approximately 109.4 million shares of our common stock to the Seagate stockholders in exchange for approximately 128.1 million shares of our common stock and certain non-operating assets and liabilities held by Seagate. The transaction resulted in a decrease of approximately 18.7 million shares of our outstanding common stock. At the closing of the transaction, we recorded the non-operating assets and liabilities assumed from Seagate at their fair values. In addition, we accrued $40.0 million of direct transaction costs.

5

Acquisition-related costs are summarized below (in millions):

|  | Direct Transaction Costs |
|---|---|
| Provision accrued at transaction date | $ 40.0 |
| Cash payments | (8.6) |
| Balance at December 31, 2000 | 31.4 |
| Cash payments | (26.0) |
| Reversals | (5.0) |
| Balance at December 31, 2001 | $ 0.4 |

In 2001, we reversed $5.0 million of net attorneys' fees originally accrued in relation to the Delaware lawsuit captioned *In re Seagate Technology, Inc. Shareholders Litigation* , which we will not have to pay as a result of a Delaware Chancery Court ruling that approved the settlement of the lawsuit and the subsequent distribution of $50.0 million of additional consideration to the former Seagate stockholders that was paid by SAC. We anticipate that the remaining $0.4 million of accrued acquisition-related costs will be utilized in 2002.

For the year ended December 31, 2000, the transaction had no impact on our consolidated statement of operations. For the year ended December 31, 2001, the transaction had the following significant impacts on our consolidated statement of operations:

- reversal of acquisition and restructuring costs of $5.0 million; and

- additional provision for income taxes of $30.1 million.

Considering the impacts on our consolidated statement of operations, net of tax, and the impacts of the decrease of approximately 18.7 million shares of our common stock outstanding on the number of shares used in computing the net loss per share, the transaction resulted in incremental net losses per share of $0.13 the year ended December 31, 2001 and $0.01 for the year ended 2000. We expect the transaction to be accretive when we reach profitability.

As of December 31, 2000 and 2001, the transaction had impacts on our consolidated balance sheet. The impacts on our assets and liabilities were:

As of December 31, 2000

- other non-current assets included $70.0 million of indemnification receivable from SAC and $4.0 million for our ownership in Gadzoox Networks, Inc.;

- accrued acquisition and restructuring costs included $31.4 million of direct transaction costs; and

- deferred and other income taxes included an additional $132.0 million, which was net of a deferred tax asset of $3.0 million related to our ownership in Gadzoox Networks, Inc.

As of December 31, 2001

- other current assets included $21.3 million of indemnification receivable from SAC;

- other non-current assets included $18.0 million of indemnification receivable from SAC;

- accrued acquisition and restructuring costs included $0.4 million of direct transaction costs;

- income taxes payable included an additional $21.3 million; and

- deferred and other income taxes included an additional $113.1 million.

As of December 31, 2001 and 2000, deferred and other income taxes payable recorded in connection with the Seagate transaction totaled $134.4 million and $135.0 million, respectively, and related to certain tax

6

Table of Contents

liabilities that we expect to pay after the merger. Certain of Seagate's federal and state tax returns for various fiscal years are under examination by tax authorities. In 2001, we recorded a reduction of $30.7 million in tax liabilities and indemnification receivable from SAC due to certain settlements entered into with tax authorities. Also, we recorded a provision for income taxes of $30.1 million due to changes in estimates of the amount and timing of other tax liabilities for years under examination. We believe that adequate amounts for tax liabilities have been provided for any final assessments that may result from these examinations.

**Business combinations**

*NSMG acquisition*

On May 28, 1999, we acquired the Network & Storage Management Group business of Seagate Software, Inc., which we refer to as NSMG. The NSMG business developed and marketed software products and provided related services enabling information technology professionals to manage distributed network resources and to secure and protect enterprise data. We accounted for the NSMG acquisition using the purchase method of accounting, and have been incurring charges of $221.5 million per quarter primarily related to the amortization of developed technology, goodwill and other intangibles over their estimated useful life of four years. The total NSMG purchase price was $3,464.5 million and included $3,151.4 million for the issuance of 155.6 million shares of our common stock, $269.7 million for the exchange of options to purchase 15.6 million shares of our common stock and $43.4 million of acquisition-related costs. The purchase price was allocated, based on an independent valuation, to goodwill of $3,015.8 million, distribution channels of $233.8 million, original equipment manufacturer agreements of $23.4 million, developed technology of $233.7 million, assembled workforce of $12.8 million, trademarks of $22.8 million, in-process research and development of $101.2 million, net deferred tax liabilities of $179.5 million, other intangibles of $1.5 million and tangible net liabilities assumed of $1.0 million. For each of 2001 and 2000, we recorded $827.6 million for the amortization of goodwill and other intangibles, and $58.4 million for the amortization of developed technology related to this acquisition. For 1999, we recorded $482.5 million for the amortization of goodwill and other intangibles, and $34.1 million for the amortization of developed technology related to this acquisition. The results of operations of the acquired business are included in our consolidated financial statements from the date of acquisition.

Acquisition-related costs consisted of direct transaction costs of $20.0 million, operating lease commitments on duplicative facilities of $8.2 million and involuntary termination benefits of $15.2 million. Non-cash charges included in the acquisition-related costs approximated $11.7 million.

Acquisition-related costs are summarized below (in millions):

| | Direct transaction costs | Operating lease commitments on duplicative facilities | Involuntary termination benefits | Total |
|---|---|---|---|---|
| Provision accrued at acquisition date | $ 20.0 | $ 8.2 | $ 15.2 | $ 43.4 |
| Cash payments | (17.4) | (0.3) | (1.8) | (19.5) |
| Non-cash charges | — | — | (11.7) | (11.7) |
| Balance at December 31, 1999. | 2.6 | 7.9 | 1.7 | 12.2 |
| Cash payments | (1.9) | (1.9) | (0.9) | (4.7) |
| Balance at December 31, 2000. | 0.7 | 6.0 | 0.8 | 7.5 |
| Cash payments | (0.7) | (0.2) | (0.3) | (1.2) |
| Balance at December 31, 2001. | $ — | $ 5.8 | $ 0.5 | $ 6.3 |

The remaining acquisition-related costs accrual of $6.3 million is anticipated to be utilized primarily for servicing operating lease payments or negotiated buyout of operating lease commitments, the lease terms of which will expire at various times through the year 2013.

7

Table of Contents

In addition, we recorded a restructuring charge of $11.0 million in 1999 as a result of the NSMG acquisition. This restructuring charge related to exit costs with respect to duplicative facilities that we planned to vacate, which include $0.9 million of write-off of redundant equipment and leasehold improvements, and involuntary termination benefits. Involuntary termination benefits relate to the salary and fringe benefit expense for terminated employees in research and development. The involuntarily terminated employees represented 2% of the global workforce. In the fourth quarter of 2000, as a result of lower actual exit costs than originally estimated with respect to duplicative facilities, we reversed $4.3 million of the restructuring charge.

Restructuring costs are summarized below (in millions):

| | Cancellation of facilities leases and other contracts | Involuntary termination benefits | Write off of redundant equipment and leasehold improvements | Total |
|---|---|---|---|---|
| Provision accrued at acquisition date | $ 8.8 | $ 1.3 | $ 0.9 | $ 11.0 |
| Cash payments | — | (0.9) | — | (0.9) |
| Non-cash charges | — | — | (0.9) | (0.9) |
| Balance at December 31, 1999 | 8.8 | 0.4 | — | 9.2 |
| Cash payments | (0.2) | — | — | (0.2) |
| Reversal | (3.9) | (0.4) | — | (4.3) |
| Balance at December 31, 2000 | $ 4.7 | $ — | $ — | $ 4.7 |
| Cash payments | — | — | — | — |
| Balance at December 31, 2001 | $ 4.7 | $ — | $ — | $ 4.7 |

The remaining restructuring charge accrual of $4.7 million is anticipated to be utilized for servicing operating lease payments or negotiated buyout of operating lease commitments, the lease terms of which will expire at various times through the year 2012.

*TeleBackup acquisition*

On June 1, 1999, we acquired TeleBackup Systems, Inc., which we refer to as TeleBackup. TeleBackup designed, developed and marketed software products for local and remote backup and recovery of electronic information stored on networked, remote and mobile personal computers. We accounted for the TeleBackup acquisition using the purchase method of accounting, and we have been incurring charges of $9.0 million per quarter, primarily related to the amortization of developed technology, goodwill and other intangibles over their estimated useful life of four years. The total purchase price for TeleBackup was $143.1 million and included $134.1 million related to the issuance of 6.8 million shares of our common stock, $2.8 million for the issuance of options to purchase 0.2 million shares of our common stock and $6.2 million in acquisition-related costs. The purchase price was allocated, based on an independent valuation, to goodwill of $133.1 million, distribution channels of $1.0 million, original equipment manufacturer agreements of $2.1 million, developed technology of $6.6 million, assembled workforce of $0.3 million, trademarks of $1.3 million, in-process research and development of $1.9 million, net deferred tax liabilities of $3.0 million and tangible net liabilities assumed of $0.2 million. For each of 2001 and 2000, we recorded $34.5 million for amortization of goodwill and other intangibles, and $1.7 million for the amortization of developed technology related to this acquisition. For 1999, we recorded $20.1 million for amortization of goodwill and other intangibles, and $1.0 million for the amortization of developed technology related to this acquisition. The results of operations of the acquired business are included in our consolidated financial statements from the date of acquisition.

The acquisition costs of $6.2 million consist primarily of direct transaction costs and involuntary termination benefits.

8

Acquisition-related costs are summarized below (in millions):

|  | Direct transaction costs | Involuntary termination benefits | Total |
|---|---|---|---|
| Provision accrued at acquisition date | $ 5.6 | $ 0.6 | $ 6.2 |
| Cash payments | (5.1) | (0.2) | (5.3) |
| Balance at December 31, 1999 | 0.5 | 0.4 | 0.9 |
| Cash payments | (0.2) | (0.4) | (0.6) |
| Balance at December 31, 2000 | 0.3 | — | 0.3 |
| Cash payments | (0.3) | — | (0.3) |
| Balance at December 31, 2001 | $ — | $ — | $ — |

*NuView acquisition*

On August 10, 1999, we acquired certain assets of NuView, Inc., which we refer to as NuView, for a total cost of approximately $67.9 million. We accounted for the acquisition using the purchase method of accounting, and we have been incurring charges of $4.3 million per quarter primarily related to the amortization of developed technology, goodwill and other intangibles over their estimated useful life of four years. The purchase price included $47.7 million related to the issuance of our common stock, $0.8 million for the issuance of options to purchase our common stock, $0.2 million in acquisition-related costs and $19.2 million paid in cash. The purchase price was allocated, based on an independent valuation, to goodwill of $62.6 million, developed technology of $2.4 million, assembled workforce of $0.6 million, trademarks of $0.3 million, covenant-not-to-compete of $0.9 million and in-process research and development of $1.1 million. For each of 2001 and 2000, we recorded $16.5 million for amortization of goodwill and other intangibles, and $0.6 million for the amortization of developed technology related to this acquisition. For 1999, we recorded $8.1 million for amortization of goodwill and other intangibles, and $0.3 million for the amortization of developed technology related to this acquisition. The results of operations of the acquired business are included in our consolidated financial statements from the date of acquisition.

*Other acquisitions*

In 2001, we completed three acquisitions of privately held companies for a total cost of approximately $78.2 million. We accounted for these acquisitions using the purchase method of accounting. The purchase price included $76.3 million payable in cash, of which $64.7 was paid as of December 31, 2001, and $1.9 million in acquisition-related costs, of which $1.1 million was paid at December 31, 2001. The remaining cash payments of $11.6 million will be made throughout March 2003 and the remaining acquisition-related costs accrual of $0.8 million in direct transaction costs is anticipated to be paid by the end of 2002. The purchase price was allocated to goodwill of $65.9 million, developed technology of $12.7 million, other intangibles of $1.7 million, and net of tangible liabilities assumed of $2.1 million. For 2001, we recorded $7.5 million for the amortization of goodwill and other intangibles, and $1.0 million for the amortization of developed technology. The identifiable intangible assets are amortized over their estimated useful lives of two to four years. The results of operations of the acquired businesses are included in our consolidated financial statements from the respective dates of acquisition.

*Accounting pronouncements affecting the accounting treatment of previous business combinations*

For the years ended December 31, 2001, 2000 and 1999 we incurred net losses due to the amortization of developed technology, goodwill and other intangibles mainly related to the acquisitions of the NSMG business, TeleBackup and NuView. From all of our acquisitions, we incurred charges of $949.7 million in 2001, $941.1 million in 2000 and $546.6 million in 1999 related to the amortization of developed technology, goodwill and other intangibles. On January 1, 2002, upon adoption of newly issued Statement of Financial Accounting Standards, or SFAS, 141, *Business Combinations,* and SFAS 142, *Goodwill and Other Intangible*

Table of Contents

*Assets*, the total quarterly charges related to the amortization of developed technology, goodwill and other intangibles has changed. Because of this change, we expect to become profitable in 2002. Refer to the "New Accounting Pronouncements" section for a discussion on the impacts of the adoption of SFAS 141 and SFAS 142 on our financial statements.

**Critical Accounting Policies**

We believe that there are several accounting policies that are critical to understanding our historical and future performance, as these policies affect the reported amounts of revenue and other significant areas that involve management's judgments and estimates. These significant accounting policies are:

- Revenue recognition;

- Impairment of long-lived assets;

- Accounting for income taxes; and

- Impairment of strategic investments.

These policies, and our procedures related to these policies, are described in detail below and under specific areas within the discussion and analysis of our financial condition and result of operations. In addition, please refer to Note 1 of the notes to the consolidated financial statements for further discussion of our accounting policies.

*Revenue Recognition.*

We derive revenue from primarily two sources: software licenses and services. Service revenue includes contracts for software maintenance and technical support, consulting and training.

We apply the provisions of Statement of Position ("SOP") 97-2, "Software Revenue Recognition" (as amended by SOP 98-4 and SOP 98-9) and related interpretations to all transactions to recognize revenue.

For software arrangements involving multiple elements, we allocate and defer revenue for the undelivered elements based on their relative fair value and recognize the difference between the total arrangement fee and the amount deferred for the undelivered elements as revenue. The determination of fair value of each undelivered element in multiple element arrangements is based on the price charged when the same element is sold separately. For the maintenance and technical support elements, we use historical renewal rates to determine the price when sold separately.

A typical arrangement includes software licenses, software media, and maintenance. Some arrangements include training and consulting. Software licenses are sold as site licenses or on a per copy basis. Site licenses give the customer the right to copy the software on a limited or unlimited basis during a specified term.

Maintenance includes updates (unspecified products upgrades and enhancements) on a when-and-if-available basis, telephone support, and bug fixes or patches. Maintenance revenue is recognized ratably over the maintenance term. Training consists of courses taught by our instructors at our facility or at the customer's site. Various courses are offered specific to the license products. Training fees are based on a per course basis and revenue is recognized when the customer has completed the course. Consulting consists primarily of product installation, which does not involve customization of the software. Installation services provided by us are not mandatory. Installation can be performed by us, the customer or a third party. Consulting fees are based on a daily rate.

We have analyzed all of the elements included in our multiple-element arrangements and determined that we have fair value to allocate revenue to the maintenance, training and consulting. Accordingly, assuming all other revenue recognition criteria are met, revenue from perpetual licenses is recognized upon delivery of the software license and media using the residual method in accordance with SOP 98-9. Revenue from maintenance is recognized ratably over the maintenance term. Revenue for consulting and training is recognized as the services are performed.

10

Table of Contents

We define revenue recognition criteria as follows:

*Persuasive Evidence of an Arrangement Exists.* It is our customary practice to have a written contract, which is signed by both the customer and us, or a purchase order or amendment to the written contract from those customers that have previously negotiated a standard end-user license arrangement or volume purchase agreement, prior to recognizing revenue on an arrangement.

*Delivery Has Occurred.* Our software is physically delivered to our customers, with standard transfer terms as FOB shipping point. If undelivered products or services exist that are essential to the functionality of the delivered product in an arrangement, delivery is not considered to have occurred.

*The Vendor's Fee is Fixed or Determinable.* The fee our customers pay for the products is negotiated at the outset of an arrangement, and is generally based on the specific volume of product to be delivered. Therefore, except in cases where we grant extended payment terms to a specific customer, the fees are considered to be fixed or determinable at the inception of the arrangement. Arrangements with payment terms extending beyond 90 days from the invoice date are not considered to be fixed or determinable. Revenue from such arrangements is recognized as the fees become due and payable.

*Collection is Probable.* Probability of collection is assessed on a customer-by-customer basis. We typically sell to customers where we have a history of successful collection. New customers are subjected to a credit review process that evaluates the customers' financial position and ultimately their ability to pay. If it is determined from the outset of an arrangement that collection is not probable based upon our review process, revenue is recognized on a cash-collected basis.

Additionally, we generally recognize revenue from licensing of software products through our indirect sales channel when the reseller, value added reseller, hardware distributor, application software vendor or system integrator sells the software products to its customers. For licensing of our software to original equipment manufacturers, royalty revenue is recognized when the original equipment manufacturer reports to us the sale of software to an end user customer. In addition to license royalties, some original equipment manufacturers pay an annual flat fee and/or support royalties for the right to sell maintenance to the end user. We recognize revenue from original equipment manufacturer support royalties/fees ratably over the term of the support agreement.

Our arrangements do not generally include acceptance clauses. However, if an arrangement includes an acceptance provision, we defer the revenue and recognize it upon acceptance, except for government contracts, as acceptance terms are standard. Acceptance occurs upon the earlier of receipt of a written customer acceptance or expiration of the acceptance period.

*Impairment of long-lived assets.*

We review our long-lived assets, including property and equipment, goodwill and other intangibles, for impairment when events or changes in facts and circumstances indicate that their carrying amount may not be recoverable. Events or changes in facts and circumstances that we consider as impairment indicators include the following:

- Significant underperformance of our corporation relative to expected operating results;

- Our net book value compared to our market capitalization;

- Significant adverse economic and industry trends;

- Significant decrease in the market value of the asset;

- The extent that we use an asset or changes in the manner that we use it; and

- Significant changes to the asset since we acquired it.

When we determine that one or more impairment indicators are present for our long-lived assets, excluding enterprise level goodwill, we compare the carrying amount of the asset to net future undiscounted cash flows that the asset is expected to generate. If the carrying amount of the asset is greater than the net

11

Table of Contents

future undiscounted cash flows that the asset is expected to generate, we would recognize an impairment loss. The impairment loss would be the excess of the carrying amount of the asset over its fair value.

When we determine that one or more impairment indicators are present for our enterprise level goodwill, we compare our net book value to our market capitalization. If our net book value was greater than our market capitalization, we would recognize an impairment loss. The impairment loss would be, at a minimum, the excess of our net book value over our market capitalization and could affect goodwill and other long-lived assets.

As of December 31, 2001, we had not recorded an impairment loss on our long-lived assets. We do not expect to record an impairment loss on our long-lived assets in the near future.

*Accounting for income taxes.*

We are required to estimate our income taxes in each federal, state and international jurisdiction in which we operate. This process requires that we estimate the current tax exposure as well as assess temporary differences between the accounting and tax treatment of assets and liabilities, including items such as reserves and accruals not currently deductible for tax purposes. The income tax effects of the differences we identify are classified as current or long-term deferred tax assets and liabilities in our consolidated balance sheets. We must also assess the likelihood that deferred tax assets will be realized from future taxable income and, based on this assessment, establish a valuation allowance if required. In 2001, we determined the valuation allowance to be $71.4 million based on uncertainties related to our ability to recover two main components of our deferred tax assets. These two components are tax benefits of certain assets acquired in the NSMG acquisition and tax benefits from employee stock option activity.

Future results may vary from these estimates, and at this time it is not practicable to determine if we will need to establish an additional valuation allowance and if it will have a material impact on our financial statements.

*Impairment of Strategic Investments.*

We hold investments in common and preferred stock of publicly traded and privately-held companies. We make investments in development-stage companies that we believe provide us with strategic opportunities, access to new technologies and emerging markets, and create opportunities for additional sales of our products and services. We review our strategic investments quarterly to determine if there is a decline in their fair value that is other than temporary. Elements we consider in our review include the following:

- Actual or up-coming rounds of financing of the investee, subsequent to our investment date;

- Cash position of the investee and its cash burn rate;

- Investee's ability to obtain additional financing;

- Investee's actual operating results compared to its forecasted results;

- Status of the investee's product development and its competitive position;

- Investee's management experience and employee headcount growths or reductions;

- Current industry and economic trends relevant to the business of the investee;

- If privately-held, the market value of common stock of the investee's publicly-traded competitors; and

- If publicly traded, the market value of the investee's common stock.

In the third quarter of 2001, we recognized impairment losses of $16.1 million on our strategic investments when we determined that there had been a decline in the fair value of our investments that was other than temporary.

12

Table of Contents

**Results of Operations**

The following table sets forth, for the periods indicated, selected items in our statements of operations expressed as a percentage of total revenue.

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2001** | **2000** | **1999** |
|  | (As restated)(1) | (As restated)(1) |  |
| Net revenue: |  |  |  |
|     User license fees | 74% | 81% | 84% |
|     Services | 26 | 19 | 16 |
|         Total net revenue | 100 | 100 | 100 |
| Cost of revenue: |  |  |  |
|     User license fees | 3 | 4 | 4 |
|     Services | 9 | 7 | 6 |
|     Amortization of developed technology | 4 | 5 | 6 |
|         Total cost of revenue | 16 | 16 | 16 |
| Gross profit | 84 | 84 | 84 |
| Operating expenses: |  |  |  |
|     Selling and marketing | 37 | 37 | 37 |
|     Research and development | 16 | 15 | 16 |
|     General and administrative | 8 | 6 | 6 |
|     Amortization of goodwill and other intangibles | 59 | 74 | 86 |
|     Stock-based compensation | 1 | — | — |
|     Acquisition and restructuring costs (reversals) | — | — | 2 |
|     In-process research and development | — | — | 17 |
|         Total operating expenses | 121 | 132 | 164 |
| Loss from operations | (37) | (48) | (80) |
| Interest and other income, net | 4 | 5 | 4 |
| Interest expense | (2) | (2) | (2) |
| Loss on strategic investments | (1) | — | — |
| Loss before income taxes | (36) | (45) | (78) |
| Provision for income taxes | 7 | 8 | 6 |
| Net loss | (43)% | (53)% | (84)% |

(1)    See Note 20 to the consolidated financial statements.

*Net Revenue*

Net revenue increased 26% to $1,491.9 million in 2001 from $1,187.4 million in 2000, when it increased 99% from $596.1 million in 1999. In 2001, our total net revenue increased more slowly than expected because of a reduction in capital spending by our customers due to weaker general economic and industry conditions and due to the events of September 11, 2001. This reduction in capital spending may stagnate or reduce the demand for our user licenses and services until the economic and industry conditions improve significantly. While we believe that the percentage increase in total revenue achieved in these periods is not necessarily indicative of future results, we expect total net revenue to continue to increase in 2002. Our revenue is comprised of user license fees and service revenue.

Table of Contents

*User License Fees.* User license fees increased 15% to $1,110.1 million in 2001 from $967.6 million in 2000, when it increased 94% from $498.0 million in 1999. These increases in 2001 and 2000 were primarily the result of continued growth in market acceptance of our software products, a greater volume of large end-user transactions, and increased revenue from original equipment manufacturers during the first half of 2001. The increase in 2000 was also attributable to the introduction of new products and to the acquisition of NSMG in May 1999.

We market and distribute our software products both as individual software products and as integrated products suites, also referred to as application solutions. We derive our user license fees from the sale of our core technologies, including data protection and file system and volume management products, from our emerging technologies, including cluster and replication and SAN products and from our application solutions, which include technologies from both our core and emerging technologies. The user license fees from our core technologies increased 14% to $951.1 million in 2001 from $830.7 million in 2000, when it increased 87% from $443.5 million in 1999. The user license fees from our core technologies accounted for 86% of user license fees in 2001, 86% in 2000 and 89% in 1999. The user license fees from our emerging technologies increased 16% to $159.0 million in 2001 from $136.9 million in 2000, when it increased 151% from $54.5 million in 1999. The user license fees from our emerging technologies accounted for 14% of user license fees in 2001, 14% in 2000 and 11% in 1999.

As a result of our research and development efforts to create additional integrated products suites and of our sales and marketing efforts to market and sell these integrated products suites, we expect the user license fees from our application solutions to increase in dollars and as a percentage of total user license fees. The user license fees from our application solutions decreased 3% to $228.1 million in 2001 from $236.1 million in 2000, when it increased 120% from $107.1 million in 1999. The user license fees generated by application solutions are allocated between core technology and emerging technology products. Most of our application solutions include a major component of emerging technologies. We also expect the user license fees from our emerging technology products to increase in dollars and as a percentage of total user license fees.

In 2001 and 2000, we recorded a greater volume of large end-user transactions. For end-user transactions valued at $250,000 or more, our user license fees increased 19% to $233.5 million in 2001 from $196.5 million in 2000, when it increased 248% from $56.4 million in 1999.

Our user license fees from original equipment manufacturers increased 8% to $181.9 million from $169.1 million in 2000, when it increased 76% from $95.9 million in 1999. The user license fees from original equipment manufacturers accounted for 16% of user license fees in 2001, 17% in 2000 and 19% in 1999.

*Service Revenue.* We derive our service revenue primarily from contracts for software maintenance and technical support and, to a lesser extent, consulting and training services. Service revenue increased 74% to $381.8 million in 2001 from $219.9 million in 2000, when it increased 124% from $98.1 million in 1999. These increases were due primarily to increased sales of service and support contracts on new licenses, renewal of service and support contracts on existing licenses and, to a lesser extent, an increase in demand for consulting and training services. Nevertheless, our service revenue was adversely affected during the third and fourth quarters of 2001 by the events of September 11, 2001, which caused air travel delays or cancellations and caused many companies to impose air travel restrictions, all of which resulted in our inability to visit customer sites and in our customers' inability to visit our offices. The increase in 2000 was also attributable to the acquisition of NSMG. Service revenue represented 26% of total revenue in 2001. We expect our service revenue to increase in absolute dollars and as a percentage of net revenue.

*Cost of Revenue*

Cost of revenue increased 28% to $242.4 million in 2001 from $188.8 million in 2000, when it increased 100% from $94.6 million in 1999. Gross margin on user license fees, excluding amortization of developed technology, is substantially higher than gross margin on service revenue, reflecting the low materials, packaging and other costs of software products compared with the relatively high personnel costs associated with providing maintenance, technical support, consulting and training services. Cost of service revenue varies depending upon the mix of maintenance, technical support, consulting and training services. We expect gross

14

Table of Contents

margin to fluctuate in the future, reflecting this mix and the timing differences between increasing our organizational investments and the recognition of revenue that we expect as a result of these investments.

Cost of User License Fees (including amortization of developed technology).Cost of user license fees consists primarily of amortization of developed technology, royalties, media, manuals and distribution costs. The amortization of developed technology is related primarily to the acquisitions of NSMG, TeleBackup and NuView in 1999. Cost of user license fees increased slightly to $104.0 million in 2001 from $102.8 million in 2000, and increased 82% in 2000 from $56.4 million in 1999. The increase in 2000 was primarily the result of the amortization of developed technology. Gross margin on user license fees was 91% in 2001, 89% in 2000, and 89% in 1999. The increase in gross margin on user license fees in 2001 was due to the stability of the amortization of developed technology. If we excluded the amortization of developed technology from the cost of user license fees, the gross margin on user license fees would have consistently been 96% in 2001, 2000 and 1999. The gross margin on user license fees may vary from period to period based on the license revenue mix, because some products carry higher royalty rates than others. We do not expect gross margin on user license fees to increase significantly in the future.

Cost of Service Revenue.Cost of service revenue consists primarily of personnel-related costs in providing maintenance, technical support, consulting and training to customers. Cost of service revenue increased 61% to $138.4 million in 2001 from $86.0 million in 2000, and increased 125% in 2000 from $38.2 million in 1999. Gross margin on service revenue was 64% in 2001, 61% in 2000 and 61% in 1999. The gross margin improvement in 2001 was the result of our increased productivity and higher service revenue growth due to support fees from a larger installed customer base. We expect the cost of service revenue to continue to increase in absolute dollars in future periods and we expect the gross margin on service revenue to remain stable as a percentage.

Amortization of Developed Technology.Amortization of developed technology was $63.1 million in 2001, $62.1 million in 2000 and $35.7 million in 1999. These amounts mainly represent the amortization of the developed technology recorded upon the acquisition of NSMG, TeleBackup and NuView in 1999. The useful life of the developed technology acquired is two to four years and we expect the amortization to be approximately $16.9 million per quarter.

*Operating Expenses*

Total operating expenses increased 15% to $1,797.6 million in 2001 from $1,565.7 million in 2000, and increased 60% in 2000 from $976.8 million in 1999. The 2001 and 2000 increases are explained in more details below. The significant increase in 2000 is due largely to the acquisitions of NSMG and TeleBackup in 1999. Because 2000 was the first full year that both acquisitions were reflected in our results and due to the integration that has taken place, it is not possible to quantify the portion of the increase in 2000 that is related directly to these acquisitions. We believe that the percentage increase in total operating expenses in these periods is not necessarily indicative of future results. Our operating expenses include selling and marketing expenses, research and development expenses, general and administrative expenses, and amortization of goodwill and other intangibles.

Selling and Marketing.Selling and marketing expenses consist primarily of salaries, related benefits, commissions, consultant fees and other costs associated with our sales and marketing efforts. Selling and marketing expenses increased 26% to $549.0 million in 2001 from $437.2 million in 2000, and increased 97% in 2000 from $222.0 million in 1999. As a percentage of net revenue, selling and marketing expenses remained consistent at 37% in 2001, 2000 and 1999. We intend to continue to expand our global sales and marketing infrastructure, and accordingly, we expect our selling and marketing expenses to increase in absolute dollars but to decrease slightly as a percentage of net revenue.

Research and Development.Research and development expenses consist primarily of salaries, related benefits, third-party consultant fees and other engineering related costs. Research and development expenses increased 37% to $241.2 million in 2001 from $175.9 million in 2000, and increased 86% in 2000 from $94.5 million in 1999. The 2001 and 2000 increases in absolute dollars were due primarily to increased staffing levels associated with new hires and, to a lesser extent, costs associated with depreciation and amortization of

15

Table of Contents

new equipment purchased for expansion and development efforts for new technology. As a percentage of net revenue, research and development expenses were 16% in 2001, 15% in 2000 and 16% in 1999. We believe that a significant level of research and development investment is required to remain competitive, and expect these expenses will continue to increase in absolute dollars in future periods and will increase slightly as a percentage of net revenue. We expect research and development expenses to fluctuate from time to time to the extent that we make periodic incremental investments in research and development.

*General and Administrative.* General and administrative expenses consist primarily of salaries, related benefits and fees for professional services, such as legal and accounting services. General and administrative expenses increased 50% to $116.8 million in 2001 from $77.9 million in 2000, and increased 128% in 2000 from $34.2 million in 1999. As a percentage of net revenue, general and administrative expenses were 8% in 2001, and 6% in both 2000 and 1999. The 2001 increase in absolute dollars was due primarily to increased staffing levels, and to a lesser extent, costs associated with fees for outside professional services. The 2000 increase in absolute dollars was due to additional personnel costs, including additional personnel related to the acquisitions in the second quarter of 1999, and, to a lesser extent, to an increase in other expenses associated with enhancing our infrastructure to support expansion of our operations. We expect general and administrative expenses to increase in absolute dollars and to increase slightly as a percentage of net revenue in the next few quarters.

*Amortization of Goodwill and Other Intangibles.* Amortization of goodwill and other intangibles increased 1% to $886.7 million in 2001 from $879.0 million in 2000, and increased 72% from $510.9 million in 1999. These amounts mainly represent amortization of goodwill, distribution channels, trademarks and other intangible assets recorded upon the acquisitions of NSMG, TeleBackup and NuView in 1999. The estimated useful life of the goodwill and the other intangibles is four years. Refer to the "New Accounting Pronouncements" section for a discussion on the impacts of the adoption of SFAS 141, *Business Combinations* , and SFAS 142, *Goodwill and Other Intangible Assets*  on our financial statements.

*Stock Based Compensation.* In 2001, we recorded $8.9 million related to stock based compensation. This charge relates primarily to the acceleration of certain stock options held by our former chief executive officer and chairman of the board, upon his resignation in 2001, and, to a lesser extent, to options issued in a 2001 business acquisition.

*Acquisition and Restructuring Costs (Reversals).* In 2000, in connection with the Seagate Technology transaction, we accrued $40.0 million of acquisition related costs. In 2001, we reversed $5.0 million of net attorneys' fees originally accrued in relation with the Delaware lawsuit captioned *In Re Seagate Technology, Inc. Shareholders Litigation* , which we will not have to pay as a result of a Delaware Chancery Court ruling that approved the settlement of the lawsuit and the subsequent distribution of $50.0 million of additional consideration to the former Seagate Technology stockholders originally paid by SAC. In 1999, in connection with the NSMG acquisition, we recorded a one-time charge to acquisition and restructuring costs of $11.0 million. In 2000, mainly as a result of lower actual exit costs than originally estimated with respect to duplicative facilities, we reversed $4.3 million of the restructuring charge.

*In-Process Research and Development.* Upon the acquisition of NSMG, TeleBackup and NuView in 1999, we recorded one-time charges to in-process research and development totaling $104.2 million. We obtained outside valuations for these acquisitions, and values were assigned to developed technology, in-process research and development and other intangibles. The fair value of the in-process research and development for each of the acquisitions was determined using the income approach, which discounts expected future cash flows from projects under development to their net present value. Each project was analyzed to determine the characteristics and applications of the technology; the complexity, cost and time to complete the remaining development efforts; any alternative future use or current technological feasibility; and the stage of completion. The projected future cash flows from the projects under development were based on management's estimates of revenues and operating profits related to the projects. Revenues on the projects related to in-process research and development were estimated to begin in 1999 through 2003, with the majority of the revenues occurring between 2000 and 2002. The risk-adjusted discount rate applied to after-tax cash flows was 20%, compared to an estimated weighted-average cost of capital of 15%. We believe the

16

Table of Contents

amounts determined for in-process research and development are representative of fair value and do not exceed the amounts an independent third party would pay for the projects assumed.

The total charge for in-process research and development was estimated to be $101.2 million for the NSMG acquisition. Seven in-process research and development projects were identified and valued, with two projects under the data protection product group that accounted for approximately 71% of the value assigned to in-process research and development. The data protection software products provide backup and restore functions, including scheduled automated unattended data backup operations. The remaining products identified and valued were under the application solutions and replication product groups. The application solutions software provides scaleable solutions for managing the behavior of different types of networks worldwide from one central location and the replication software products deliver flexible and intelligent data replication for Windows NT environments. Costs to complete all of the NSMG in-process research and development projects were estimated to be $6.0 million. At the date of acquisition, the development of all products ranged from 48% to 90% complete and averaged approximately 76% complete, with expected completion dates through December 1999. At December 31, 2000, all in-process research and development projects related to the NSMG acquisition were completed or abandoned.

All in-process research and development projects related to the TeleBackup and NuView acquisitions were individually insignificant and were completed or abandoned as of December 31, 1999.

*Interest and Other Income, Net.* Interest and other income, net increased 9% to $64.9 million in 2001 from $59.6 million in 2000, and 156% from $23.3 million in 1999. The 2001 increase was mainly due to increased amounts of interest income attributable to the higher level of funds available for investment, which were primarily from the net cash provided by operating activities, partially offset by a lower return on investment due to lower market interest rates in 2001. The 2000 increase was due primarily to increased amounts of interest income attributable to the higher level of funds available for investment, primarily from the issuance of the convertible subordinated notes in August 1999 and from the net cash provided by operating activities.

*Interest Expense.* Interest expense consisted primarily of interest recorded under the 1.856% convertible subordinated notes due 2006 issued in August 1999 and the 5.25% convertible subordinated notes due 2004 issued in October 1997. Interest expense decreased 7% to $29.4 million in 2001 from $31.6 million in 2000, and increased 102% in 2000 from $15.7 million in 1999. The decrease in 2001 was due primarily to the interest expense savings that has been realized from the conversion of approximately $35.5 million of the 5.25% convertible subordinated notes that occurred in the third quarter of 2000. The increase in 2000 was due primarily to interest recorded for the 1.856% convertible subordinated notes, since this was the first full year that these notes were outstanding.

*Loss on Strategic Investments.* With the decline in the economy in 2001, companies have experienced extreme volatility and instability in their business and operating results. In the third quarter of 2001, we recognized impairment losses of $16.1 million on our strategic investments when we determined that there had been a decline in the fair value of these investments that was other than temporary. These losses represented write-downs of the carrying amount of our investments and were determined by using, among other factors, a significant decline in an investee's stock value, its inability to obtain additional private financing, and the uncertainty of its financial condition.

*Income Taxes.* We had negative effective tax rates of 22% in 2001, 17% in 2000 and 8% in 1999. Our effective tax rates were negative and differed from the combined federal and state statutory rates due primarily to differences attributable to acquisition related charges that were non-deductible for tax purposes.

**New Accounting Pronouncements**

On January 2, 2001, we adopted SFAS 133, *Accounting for Derivative Instruments and Hedging Activities.* The adoption of this accounting standard did not have a material impact on our financial position or results of operations.

17

In July 2001, the Financial Accounting Standards Board, or FASB, issued SFAS 141, *Business Combinations,* and SFAS 142, *Goodwill and Other Intangible Assets.*

SFAS 141, effective in July 2001, requires that the purchase method of accounting be used for all business combinations initiated after June 30, 2001. SFAS 141 also specifies criteria that intangible assets acquired in a purchase method business combination must meet to be recognized and reported apart from goodwill, noting that any purchase price allocable to an assembled workforce may not be accounted for separately. Upon adoption of SFAS 142 on January 1, 2002, we evaluated our existing intangible assets and goodwill that were acquired in a prior purchase business combination, and made necessary reclassifications in order to conform with the new criteria in SFAS 141 for recognition apart from goodwill. Also, we reassessed the useful lives and residual values of all intangible assets acquired, and will make necessary amortization adjustments by March 31, 2002. In addition, to the extent an intangible asset is identified as having an indefinite useful life, we will test the intangible asset for impairment in accordance with the provisions of SFAS 142 by March 31, 2002. Any impairment loss will be measured as of the January 1, 2002 and recognized as the cumulative effect of a change in accounting principle in the first quarter of 2002. We do not believe that SFAS 141 will have a material impact on our financial position, results of operations or cash flows.

SFAS 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized, but instead be tested for impairment at least annually in accordance with the provisions of SFAS 142. SFAS 142 also requires that intangible assets with estimable useful lives be amortized over their respective estimated useful lives to their estimated residual values, and reviewed for impairment in accordance with SFAS 144, *Accounting for the Impairment or Disposal of Long-Lived Assets.*

In connection with SFAS 142's transitional goodwill impairment test, we intend to perform an assessment of whether there is an indication that goodwill is impaired as of the date of adoption in a two-step process as follows:

*Step 1.*We will identify our reporting units and determine the carrying value of each reporting unit by assigning the assets and liabilities, including the existing goodwill and intangible assets, to those reporting units as of January 1, 2002. We have until June 30, 2002 to determine the fair value of each reporting unit and compare it to the reporting unit's carrying amount. To the extent a reporting unit's carrying amount exceeds its fair value, an indication exists that the reporting unit's goodwill may be impaired, we will perform the second step of the transitional impairment test. If the reporting unit's fair value exceeds its carrying value, no further work is needed.

*Step 2.*We will compare the implied fair value of the reporting unit's goodwill, determined by allocating the reporting unit's fair value to all of its assets, both recognized and unrecognized, and liabilities in a manner similar to a purchase price allocation in accordance with SFAS 141, to its carrying amount, both of which would be measured as of January 1, 2002. This second step is required to be completed as soon as possible, but no later than December 31, 2002. Any transitional impairment loss will be recognized as the cumulative effect of a change in accounting principle in our statement of operations.

As of the date of adoption, January 1, 2002, we had unamortized goodwill in the amount of approximately $1,171.9 million and unamortized other intangible assets in the amount of approximately $240.6 million, all of which are subject to the transition provisions of SFAS 141 and 142. We expect to complete the transitional goodwill impairment test by June 30, 2002. We do not expect to record an impairment charge upon completion of the test, but there can be no assurance that at the time the test is completed a significant impairment charge may not be recorded. The amortization of goodwill represented approximately $202.9 million per quarter prior to the adoption of SFAS 142. We do not believe that SFAS 141 and SFAS 142 will have a material impact on our financial position or cash flows. However, because of the implementation of SFAS 141 and SFAS 142, we expect to become profitable in 2002.

In August 2001, FASB issued SFAS 144, *Accounting for the Impairment or Disposal of Long-Lived Assets.* SFAS 144 supersedes SFAS 121 and APB Opinion No. 30, *Reporting the Results of Operation-Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions .* SFAS 144 establishes a single accounting model for long-lived assets to

18

Table of Contents

be disposed of by sale, whether they were previously held and used or newly acquired, and it also broadens the presentation of discontinued operations to include more disposal transactions. We will be required to implement the provisions of SFAS 144 as of January 1, 2002. We do not believe that SFAS 144 will have a material impact on our financial position, results of operations or cash flows.

In December 2001, the FASB staff issued Topic No. D-103, *Income Statement Characterization of Reimbursements Received for 'Out-of-Pocket' Expenses Incurred* ("Topic D-103"). Topic D-103 requires companies to record certain reimbursements received for out-of-pocket expenses as revenue instead of an offset to the related expense. Upon application of Topic D-103, comparative financial statements for prior periods must be reclassified to comply with the guidance in this announcement. We will be required to implement the provisions of Topic D-103 as of January 1, 2002. We do not believe that Topic D-103 will have a material impact on our financial position, results of operations or cash flows.

**Liquidity and Capital Resources**

*Cash Flows*

Our cash, cash equivalents and short-term investments totaled $1,694.9 million at December 31, 2001 and represented 71% of our net tangible assets. Our cash, cash equivalents and short-term investments totaled $1,119.4 million at December 31, 2000 and represented 63% of our net tangible assets. Cash and cash equivalents are highly liquid with original maturities of ninety days or less. Short-term and long-term investments consist mainly of investment grade commercial paper, medium-term notes, corporate notes, government securities (taxable and non-taxable), asset-backed securities and market auction preferreds.

Operating activities provided cash of $560.4 million in 2001, primarily from income after adjustments to exclude non-cash charges, including amortization of intangibles related to acquisition activities, tax benefits from stock plans and an increase in deferred revenue, decrease in other assets, partially offset by an increase in accrued acquisition costs. Operating activities provided cash of $546.8 million in 2000, primarily from income after adjustments to exclude non-cash charges, including amortization of intangibles related to acquisition activities, tax benefits from stock plans and an increase in deferred revenue partially offset by an increase in accounts receivable and other assets, as a result of our overall revenue growth. Operating activities provided cash of $207.4 million in 1999, primarily from income after adjustments to exclude non-cash charges, including amortization of intangibles related to acquisition activities, and tax benefits from stock plans partially offset by an increase in account receivable, as a result of our overall revenue growth.

Investing activities used cash of $1,015.0 million in 2001, due primarily to the net increase in short-term investments of $787.4 million and purchases of property and equipment of $145.7 million. Investing activities provided cash of $81.0 million in 2000 due to the net decrease in short-term and long-term investments of $240.2 million, partially offset by purchases of property and equipment of $134.7 million and strategic investments of $22.0 million. Investing activities used cash of $577.0 million in 1999 primarily due to the net increase in short-term and long-term investments of $505.2 million, purchases of property and equipment of $59.7 million and the purchase of certain assets of NuView.

Financing activities provided cash of $102.4 million in 2001, arising primarily from the issuance of common stock under our employee stock plans. Financing activities provided cash of $119.5 million in 2000 from the issuance of common stock under our employee stock plans. Financing activities provided cash of $379.6 million in 1999 from the net proceeds of $334.1 million related to the issuance of the 1.856% convertible subordinated notes in August 1999 and $45.5 million from the issuance of common stock under our employee stock plans.

*Convertible Subordinated Notes*

In October 1997, we issued $100.0 million of 5.25% convertible subordinated notes due in 2004 (the "5.25% notes"), for which we received net proceeds of $97.5 million. We and our wholly-owned subsidiary, VERITAS Operating Corporation, are co-obligors on the 5.25% notes and are unconditionally, jointly and severally liable for all payments under the notes. As of December 31, 2001, a total principal amount of

19

**Table of Contents**

$35.5 million had been converted into approximately 3.7 million shares of our common stock. Based on the aggregate principal amount at maturity of $64.5 million outstanding as of December 31, 2001, the 5.25% notes provide for semi-annual interest payments of $1.7 million each May 1 and November 1. The 5.25% notes are convertible into shares of our common stock at any time prior to the close of business on the maturity date, unless previously redeemed or repurchased, at a conversion price of $9.56 per share, subject to adjustment in certain events, equivalent to a conversion rate of 104.65 shares of common stock per $1,000 principal amount at maturity. On or after November 5, 2002, the 5.25% notes will be redeemable over a period of time until maturity at our option at declining premiums to par. The debt issuance costs are being amortized over the term of the 5.25% notes using the interest method.

In August 1999, we and our wholly-owned subsidiary, VERITAS Operating Corporation, issued $465.8 million, aggregate principal amount at maturity, of 1.856% convertible subordinated notes due in 2006 (the "1.856% notes") for which we received net proceeds of approximately $334.1 million. The interest rate of 1.856%, together with the accrual of original issue discount, represent a yield to maturity of 6.5%. We and VERITAS Operating Corporation are co-obligors on the 1.856% notes and are unconditionally, jointly and severally liable for all payments under the notes. As of December 31, 2001, a total principal amount of $1.1 million had been converted into approximately 29,400 shares of our common stock. Based on the aggregate principal amount of $464.7 million outstanding as of December 31, 2001, the 1.856% notes provide for semi-annual interest payments of $4.3 million each February 13 and August 13. The 1.856% notes are convertible into shares of our common stock at any time prior to the close of business on the maturity date, unless previously redeemed or repurchased, at a conversion price of $35.80 per share, subject to adjustment in certain events, equivalent to a conversion rate of 27.934 shares of common stock per $1,000 principal amount at maturity. On or after August 16, 2002, the 1.856% notes will be redeemable over a period of time until maturity at our option at the issuance price plus accrued original issue discount and any accrued interest. The debt issuance costs are being amortized over the term of the 1.856% notes using the interest method.

At December 31, 2001, we had a ratio of long-term debt to total capitalization of approximately 14%. The degree to which we will be leveraged could materially and adversely affect our ability to obtain financing for working capital, acquisitions or other purposes and could make us more vulnerable to industry downturns and competitive pressures. We will require substantial amounts of cash to fund scheduled payments of principal and interest on our indebtedness, including the 5.25% notes and the 1.856% notes, future capital expenditures and any increased working capital requirements. If we are unable to meet our cash requirements out of cash flow from operations, we cannot assure you that we will be able to obtain alternative financing.

*Commitments*

During the third and fourth quarters of 2001, we extended and amended the term of our $50.0 million unsecured credit facility, which we hold with a syndicate of financial institutions. At December 31, 2001, no amount was outstanding and the credit facility is due to expire in September 2002. Borrowings under the credit facility bear interest at 1.0% to 1.5% over LIBOR, and are subject to our compliance with financial and other covenants. The credit agreement requires us to maintain specified financial covenants such as earnings before interest, taxes, depreciation and amortization ("EBITDA"), debt on EBITDA and quick ratio, all of which we were in compliance with as of December 31, 2001.

In 1999 and 2000, we entered into three build-to-suit lease agreements for office buildings in Mountain View, California, Roseville, Minnesota and Milpitas, California. We began occupying the Roseville and Mountain View facilities in May and June 2001 respectively. The development and acquisition of the properties have been financed by a third party through financial institutions. We have accounted for these agreements as operating leases in accordance with SFAS 13, *Accounting for Leases* , as amended.

During the first, third and fourth quarters of 2001, we amended our existing lease agreement, originally signed in the second quarter of 1999, for new corporate campus facilities in Mountain View, California. The facilities, of 425,000 square feet, provide space for sales, marketing, administration and research and development functions. The lease term for these facilities is five years beginning in March 2000, with an option

20

Table of Contents

to extend the lease term for two successive periods of one year each, if agreed to by the financial institutions. We have the option to purchase the property (land and facilities) for the termination value of $146.2 million or, at the end of the lease, to arrange for the sale of the property to a third party while we retain an obligation to the owner for the difference between the sales price and the guaranteed residual value up to $129.6 million if the sales price is less than this amount, subject to certain provisions of the lease. In addition, we are entitled to any proceeds from a sale of the property in excess of the termination value. We now occupy the new corporate campus facilities and began making lease payments in the second quarter of 2001. Monthly lease payments under this operating lease are based on LIBOR using 30-day to 180-day LIBOR contracts. Future minimum lease payments under this lease are included in the table below.

During the first, third and fourth quarters of 2001, we amended our existing lease agreement, originally signed in the first quarter of 2000, for our existing facilities in Roseville, Minnesota. We improved and expanded our existing facilities of 62,000 square feet and developed adjacent property adding 142,000 square feet completed in the second quarter of 2001. The facilities provide space for technical support and research and development functions. The lease term for these facilities is five years beginning in March 2000, with an option to extend the lease term for two successive periods of one year each, if agreed to by the financial institutions. We have the option to purchase the property (land and facilities) for the termination value of $41.3 million or, at the end of the lease, to arrange for the sale of the property to a third party while we retain an obligation to the owner for the difference between the sales price and the guaranteed residual value up to $35.1 million if the sales price is less than this amount, subject to certain provisions of the lease. In addition, we are entitled to any proceeds from a sale of the property in excess of the termination value. We now occupy the new campus facilities and began making lease payments in the second quarter of 2001. Monthly lease payments under this operating lease are based on LIBOR using 30-day to 180-day LIBOR contracts. Future minimum lease payments under this lease are included in the table below.

During the third and fourth quarters of 2001, we amended our existing lease agreement, originally signed in the third quarter of 2000, for the lease of 65 acres of land and subsequent improvements for new research and development campus facilities in Milpitas, California. We plan to develop the site in two phases, with the first phase of 466,000 square feet being completed in the fourth quarter of 2002. The facilities will provide space for research and development and general corporate functions. The lease term for the first phase is five years beginning in July 2000, with an option to extend the lease term for two successive periods of one year each, if agreed to by the financial institutions. We have the option to purchase the property (land and first phase facilities) for the termination value of $243.0 million or, at the end of the lease, to arrange for the sale of the property to a third party while we retain an obligation to the owner for the difference between the sales price and the guaranteed residual value up to $220.0 million if the sales price is less than this amount, subject to certain provisions of the lease. In addition, we are entitled to any proceeds from a sale of the property in excess of the termination value. We anticipate to begin the lease payments in the third quarter of 2002 for the first phase and to commence occupying the new campus facilities in the fourth quarter of 2002. Monthly lease payments under this operating lease are based on LIBOR using 30-day to 180-day LIBOR contracts. Future minimum lease payments under this lease are included in the table below. We are currently analyzing our construction schedule for the second phase of the campus, but at this time no commitments have been made with respect to the start of construction.

We have evaluated the expected fair value of the properties at the end of the lease terms by reviewing current real estate market conditions and indicators of expectations for the market in the future. In the event that we determine it is probable that the expected fair value of any of the properties at the end of the lease terms will be less than the respective termination values, we will accrue the expected loss on a straight-line basis over the remaining lease term. Currently, we do not believe it is probable that the fair market value of the properties at the end of the lease terms will be less than the termination values.

The three lease agreements listed above require that we maintain specified financial covenants such as EBITDA, debt on EBITDA and quick ratio, all of which we were in compliance with as of December 31, 2001. In addition, all the properties covered by the leases, are subject to a deed of trust in favor of the lessor in order to secure our obligations under the leases.

21

Table of Contents

The future payments due under debt and the future minimum lease payments for facilities and rental equipment as of December 31, 2001 are:

| | 5.25%<br>Notes | 1.856%<br>Notes | Operating<br>Lease<br>Commitments | Total |
|---|---|---|---|---|
| 2002 | $ — | $ — | $ 75,350 | $ 75,350 |
| 2003 | — | — | 74,972 | 74,972 |
| 2004 | 64,479 | — | 71,993 | 136,472 |
| 2005 | — | — | 45,179 | 45,179 |
| 2006 | — | 464,699 | 34,197 | 498,896 |
| 2007 and thereafter | — | — | 198,320 | 198,320 |
| Balance at December 31, 2001 | $ 64,479 | $ 464,699 | $ 500,011 | $ 1,029,189 |

We believe that our current cash, cash equivalents and short-term investment balances and cash flow from operations will be sufficient to meet our working capital and capital expenditure requirements for at least the next 12 months. After that time, we may require additional funds to support our working capital requirements or for other purposes and may seek to raise such additional funds through public or private equity financing or from other sources. We cannot assure you that additional financing will be available at all or that if available, we will be able to obtain it on terms favorable to us.

**Factors That May Affect Future Results**

In addition to other information in this annual report on Form 10-K, you should consider carefully the following factors in evaluating VERITAS and our business.

*Our revenue may fluctuate significantly, which could cause the market price of our securities to decline*

We may experience a shortfall in revenue in any given quarter. Any such shortfall in revenue could cause the market price of securities to fall substantially. Our revenue in general, and our license revenue in particular, are difficult to forecast and are likely to fluctuate significantly from quarter to quarter due to a number of factors, many of which are outside of our control. These factors include:

- the possibility that our customers may cancel, defer or limit purchases as a result of reduced information technology budgets or the current weak or uncertain general economic and industry conditions;

- the timing and magnitude of sales through our original equipment manufacturer customers, including Hewlett-Packard, IBM, Microsoft, Oracle and Sun Microsystems;

- the possibility that a slowdown in sales by our original equipment manufacturer customers could result in reduced demand for our products and services;

- the unpredictability of the timing and magnitude of sales to the retail channel by our resellers and sales by our direct sales force, both of which tend to generate sales later in a quarter than original equipment manufacturer sales;

- the timing of revenue recognition for sales of software products and services;

- the introduction, timing and market acceptance of new products and services;

- changes in data storage and networking technology or introduction of new operating system upgrades by our original equipment manufacturer customers, which could require us to modify our products and services or to develop new products or services;

- the relative growth rates of the Windows NT, UNIX and Linux markets;

22

Table of Contents

- the rate of adoption of storage area networks and network attached storage appliance technology and the timing and magnitude of sales of our storage area networking products and services that incorporate these;

- the rate of adoption of network attached storage appliance technology and the timing and magnitude of sales of our network attached storage appliance products and services;

- the extent to which our customers renew their service and maintenance contracts with us;

- changes in our pricing policies and distribution terms;

- the timing and amount of revenue attributable to our end-user customers whose businesses are substantially dependent on the Internet or the telecommunications markets, whose ability to purchase our products may be adversely affected by their inability to raise additional capital or to meet their business objectives;

- the possibility that our customers may defer purchases in anticipation of new products or product updates by us or by our competitors;

- the possibility that our customers may cancel, defer or limit purchases as a result of the threat of terrorism or military actions taken by the United States or its allies in reaction to that threat;

- the possibility that air travel delays or cancellations and air travel restrictions imposed by many companies could adversely affect our licensing efforts or our services revenue, as they result in our inability to visit customer sites and result in our customers' inability to visit our offices;

- the overall demand for data availability products and services, which is likely to be lower in weak or uncertain general economic and industry conditions; and

- the possibility of a worsening of weak economic and industry conditions.

In the current uncertain economic environment, our revenue, and our license revenue in particular, are extremely difficult to forecast and will likely be less predictable from quarter to quarter. You should not rely on the results of any prior periods as an indication of our future performance. If we have a shortfall in revenue in any given quarter, we probably will not be able to reduce our operating expenses quickly in response. Therefore, any significant shortfall in revenue could have an immediate adverse effect on our operating results for that quarter. In addition, it is possible that in some future periods our operating results may be below the expectations of securities analysts or investors. If this occurs, the price of our common stock may decline.

*Our revenue may fluctuate because we depend on large orders from end-user customers for a significant portion of our revenue*

We depend on large orders from end-user customers, which entail lengthy sales cycles, for a significant portion of our revenue. Our revenue for a quarter could fluctuate significantly based on whether a large sale near the end of a quarter is completed or delayed. Sales to our end-user customers generally range in value from a few thousand to several million dollars. In recent quarters, increases in revenue were partially attributable to a greater number of these large end-user transactions. This trend may not continue. The effort to close these large sales is typically complex and lengthy. Therefore, our revenue for a given period is likely to be affected by the timing of these large orders, which makes it difficult for us to predict that revenue. The factors that could delay these large orders include:

- time needed for end-user customers to evaluate our software;

- customer budget restrictions or more lengthy approval processes, particularly in uncertain general economic and industry conditions;

- customer internal review and testing procedures; and

- engineering work needed to integrate our software with customers' systems.

23

*Our business could be adversely affected if we fail to manage our growth effectively*

If we fail to manage our growth effectively, our business and operating results could be adversely affected, which could cause the market price of our securities to fall. We expect to continue to grow our operations domestically and internationally, and to increase our headcount. The growth in our operations and headcount has placed, and will continue to place, a significant strain on our management systems and resources. If we fail to manage this growth and our future anticipated growth, we may experience higher operating expenses, and we may be unable to meet the expectations of securities analysts or investors with respect to future operating results. To manage this growth we must continue to:

- improve our financial and management controls, reporting systems and procedures and proprietary information control procedures;

- continue to add and integrate new senior management personnel;

- improve our licensing models and procedures;

- hire and train qualified employees;

- retain qualified employees and manage employee performance;

- control expenses;

- integrate geographically dispersed operations; and

- invest in our internal networking, data center, applications, infrastructure and facilities.

We have committed a significant amount of money to obtaining additional facilities to accommodate our current and future anticipated growth. To the extent that this anticipated growth does not occur or occurs more slowly than we anticipate, we may not be able to reduce expenses to the same degree. If we incur operating expenses out of proportion to revenue in any given quarter, our operating results could be adversely impacted.

*To grow our business, we need to attract and retain qualified employees*

Our future growth and success depends on our ability to hire and retain qualified employees, as needed, and to manage our employee base effectively. If we are unable to hire and retain qualified employees, our business and operating results could be adversely affected. Conversely, if we fail to manage employee performance or reduce staffing levels when necessary, our costs would be excessive and our business and operating results could be adversely affected. We need to hire additional sales, technical, and senior management personnel to support the planned expansion of our business and to meet the anticipated increased customer demand for our products and services. Competition for people with the skills we require is intense, particularly in the San Francisco Bay Area where our headquarters are located, and the high cost of living in this area makes our recruiting and compensation costs higher. As a result, we expect to continue to experience increases in compensation costs. In addition, the exercise of stock options in the U.S. and certain foreign jurisdictions may result in substantial increases in employer payroll tax liabilities. We cannot assure you that we will be successful in hiring or retaining new personnel. Even if we are successful in hiring and retaining new personnel, the resulting growth is likely to be disruptive to our business and could have an adverse effect on our ability to maintain our anticipated growth.

*The loss of key personnel could adversely affect our business*

Our future anticipated growth and success depends on the continued service of our key sales, technical and senior management personnel. Many of our senior personnel have been with us for a number of years, and we cannot assure you that we will be able to retain them. The loss of senior personnel can result in significant disruption to our ongoing operations, and new senior personnel must spend a significant amount of time learning our business and our systems in addition to performing their regular duties. Even though we have entered into employment agreements with some key management personnel, these agreements cannot prevent

24

Table of Contents

their departure. We do not have nor do we intend to obtain key person life insurance covering any of our personnel.

*We face intense competition, which could cause us to lose market share*

We have a number of competitors in the markets for our various products. If existing or new competitors gain market share in any of these markets, our business and operating results could be adversely affected. Our principal competitors are internal development groups with original equipment manufacturers that provide data availability functions to support their systems, as well as hardware and software vendors that offer backup and file system and volume management, clustering and replication, and storage area networking products.

Many of our competitors have greater financial, technical sales, marketing and other resources than we do. Our future and existing competitors could introduce products with superior features, scalability and functionality at lower prices than our products, and could also bundle existing or new products with other more established products in order to compete with us. Our competitors could also gain market share by acquiring or forming strategic alliances with our other competitors. Finally, because new distribution methods offered by the Internet and electronic commerce have removed many of the barriers to entry historically faced by start-up companies in the software industry, we expect to face additional competition from these companies in the future.

*We distribute our products through multiple distribution channels, each of which is subject to risks*

We sell our products through original equipment manufacturers, through direct sales and through a retail distribution channel. If we fail to manage our distribution channels successfully, they may conflict with one another or otherwise not function as we anticipate, and our business and operating results could be adversely affected.

*Retail distribution.* Some of our software products are sold primarily in the retail channel, which poses different challenges than we face in selling most of our products, including:

- the VERITAS brand does not have high recognition in the retail channel;

- retail distribution typically involves shorter product life cycles;

- the retail channel has higher risks of product returns, higher marketing expenses and less predictable market demand; and

- our retail distributors have no obligation to continue selling our products and may terminate their relationships with us at any time.

*Direct sales.* We also depend on our direct sales force to sell our products. This involves a number of risks, including:

- longer sales cycles for direct sales efforts;

- our need to hire, train, retain and motivate our direct sales force; and

- the length of time it takes our new sales representatives to become productive.

*Original equipment manufacturers.* A portion of our revenue comes from our original equipment manufacturer customers that incorporate our data availability software into systems they sell. Risks associated with our original equipment manufacturer customers include:

- we have no control over the shipping dates or volumes of systems they ship;

- they have no obligation to recommend or offer our software products;

- they have no minimum sales requirements and can terminate our relationship at any time;

25

Table of Contents

- a significant period of time may elapse before we realize any associated revenue, due to development work that we must generally undertake under the agreement with our original equipment manufacture customers;

- significant time may be needed for the sales and marketing organizations within these customers and distributors to become familiar with and gain confidence in our products;

- they could choose to develop their own data availability products and incorporate those products into their systems instead of our products;

- they could develop enhancements to and derivative products from our products; and

- they could change their own base products, which could make it difficult for us to adapt our products to theirs.

Finally, our original equipment manufacturer customers compete with one another. If one of our original equipment manufacturer customers views the products we have developed for another original equipment manufacturer as competing with its products, it might decide to stop doing business with us, which could adversely affect our business and our operating results.

*Some of our original equipment manufacturer agreements may not result in increased product sales*

We have important original equipment manufacturer agreements with Hewlett-Packard, IBM, Microsoft and Sun Microsystems. Unlike some of our other original equipment manufacturer agreements under which we sell off-the-shelf versions of our products, under these agreements we develop unique or limited functionality versions of our products to be included in these original equipment manufacturers' systems software and products. If we are unable to leverage these relationships to increase product sales, we will have expended significant resources without generating corresponding revenue, which could adversely affect our business and our operating results. These relationships require our personnel to develop expertise with respect to the original equipment manufacturers' products and markets and to cooperate closely with their personnel. We cannot assure you that we will be able to attract and retain qualified employees to work with our original equipment manufacturer customers or to develop and improve the products designed for these customers.

*We face uncertainties porting products to new operating systems and developing new products*

Many of our products operate primarily on the UNIX computer operating system. We are currently redesigning, or porting, these products to operate on the Windows NT operating system. We are also developing new products for UNIX and for Windows NT. In addition, we entered into an agreement with IBM under which we will port our complete set of data availability products to AIX/ Monterey for IBM POWER PC and the Intel IA-64 processor-system. We may not be able to accomplish any of this work quickly or cost-effectively, and it is not clear what the relative growth rates of these operating systems are. These activities require substantial capital investment, the devotion of substantial employee resources and the cooperation of the owners of the operating systems to or for which the products are being ported or developed. For example, our porting and development work for the Windows NT market has required us to hire additional personnel with expertise on these platforms and to devote engineering resources to these projects. For some operating systems, we must obtain from the owner of the operating system a source code license to portions of the operating system software to port some of our products to or develop products for the operating system. Operating system owners have no obligation to assist in these porting or development efforts. If they do not grant us a license or if they do not renew our license, we may not be able to expand our product line into other areas.

*Sales of a small number of product lines make up a substantial portion of our revenue*

We derive and expect to derive a substantial majority of our revenue from a limited number of software products. For the year ended December 31, 2001, we derived approximately $951.1 million, or 86%, of our user license fees from our core technologies, including data protection and file system and volume management products. If our customers do not continue to purchase these products as a result of competition,

26

Table of Contents

technological change, budget constraints or other factors, our revenue would decrease and our business and operating results would be adversely affected.

*We derive a significant amount of revenue from only a few customers*

Although in 2001, 2000 and 1999 no single customer accounted for greater than 10% of our total net revenue, we typically derive significant revenue from a small number of customers, including our original equipment manufacturer customers. If any of them were to reduce purchases of products or services from us, our business would be adversely affected unless we were able to increase sales to other customers substantially. Many of these customers have recently announced that their own businesses are slowing, which could adversely affect their demand for our products and services. We do not have a contract with any of these customers that requires the customer to purchase any specified number of software licenses from us. Therefore, we cannot be sure that these customers will continue to purchase our products at current levels.

*Our success depends on our ability to develop new and enhanced products that achieve widespread market acceptance*

Our future success depends on our ability to address the rapidly changing needs of our customers by developing and introducing new products, product updates and services on a timely basis, by extending the operation of our products on new platforms and by keeping pace with technological developments and emerging industry standards. In order to grow our business, we are committing substantial resources to developing new software products and services, including software products and services for the storage area networking market and the network attached storage appliance market. Each of these markets is new and unproven, and industry standards for these markets are evolving and changing. If these markets do not develop as anticipated, or demand for our products and services in these markets does not materialize or occurs more slowly than we expect, we will have expended substantial resources and capital without realizing sufficient revenue, and our business and operating results could be adversely affected.

*Our international sales and operations create special problems that could adversely affect our operating results*

An investment in our securities may be riskier than an investment in other businesses because we expect to derive an increasing percentage of our revenue from customers located outside of the U.S. We have significant operations outside of the U.S., including engineering, sales, customer support and production operations, and we plan to expand our international operations. As of December 31, 2001, we had approximately 1,000 employees in Europe, 706 employees in the Asia-Pacific region, and 107 employees in Japan. Our foreign operations are subject to risks, including:

- potential loss of proprietary information due to piracy, misappropriation or weaker laws regarding intellectual property protection;

- imposition of foreign laws and other governmental controls, including trade restrictions;

- fluctuations in currency exchange rates and economic instability such as higher interest rates and inflation, which could reduce our customers' ability to obtain financing for software products or which could make our products more expensive in those countries;

- difficulties in hedging foreign currency transaction exposures;

- longer payment cycles for sales in foreign countries and difficulties in collecting accounts receivable;

- difficulties in staffing and managing our foreign operations, including difficulties related to administering our stock option plan in foreign countries and difficulties related to the new organizational structure in Europe that we implemented in 2001;

- difficulties in coordinating the activities of our geographically dispersed and culturally diverse operations;

27

Table of Contents

- seasonal reductions in business activity in the summer months in Europe and other countries;

- costs and delays associated with developing software in multiple languages; and

- political unrest or terrorism, particularly in areas in which we have facilities.

In addition, our foreign sales are denominated in local currency, creating risk of foreign currency translation gains and losses that could adversely affect our business and operating results. We receive significant tax benefits from sales to our non-U.S. customers. These benefits are contingent upon existing tax regulations in both the U.S. and in the countries in which our international customers are located. Future changes in domestic or international tax regulations could affect our anticipated ability to continue to realize these tax benefits.

*Our growth strategy is risky because it includes business acquisitions*

As part of our growth strategy, we have in the past and expect in the future to acquire other businesses, business units and technologies. Acquisitions involve a number of special risks and challenges, including:

- diversion of management's attention from our core business;

- integration of acquired business operations and employees with our existing business, including coordination of geographically dispersed operations;

- incorporation of acquired business technology into our existing product lines, including consolidating technology with duplicative functionality or designed on different technological architecture;

- loss or termination of employees, including costly litigation resulting from the termination of those employees;

- dilution of our then-current stockholders' percentage ownership;

- assumption of liabilities of the acquired business, including costly litigation related to alleged liabilities of the acquired business;

- presentation of a unified corporate image to our customers and our employees; and

- risk of impairment charges related to potential write-down of acquired assets in future acquisitions.

In the past, our integration of the operations of acquired businesses took longer and was more difficult than we anticipated.

*As a result of the Seagate Technology leveraged buyout and merger transaction, our subsidiary may be liable to third parties for liabilities resulting from Seagate's operations before the transaction*

In November 2000, in the leveraged buyout and merger transaction involving VERITAS and Seagate Technology, Seagate Technology sold all of its operating assets to Suez Acquisition (Cayman) Company, and Seagate Technology became our subsidiary. As part of the transaction, Suez Acquisition Company assumed and agreed to indemnify our subsidiary and us for substantially all liabilities arising in connection with Seagate's operations prior to the transaction. However, governmental organizations or other third parties may seek recourse against our subsidiary or us for these liabilities. Prior to the transaction, Seagate was a large, multinational enterprise that owned or leased facilities and offices in numerous states and foreign countries and employed over 60,000 people worldwide. As a result, our subsidiary could receive claims related to a wide range of possible liabilities. Some areas of potential liability include:

- environmental cleanup costs and liabilities for claims made under federal, state or foreign environmental laws;

- tax liabilities;

- obligations under federal, state and foreign pension and retirement benefit laws;

- existing or future litigation relating to the leveraged buyout or the merger transaction;

Table of Contents

- existing and future litigation arising from the restructuring that Seagate commenced last year, including litigation initiated by terminated employees; and

- existing and future patent litigation.

Any such claim, with or without merit, could be time consuming to defend, result in costly litigation and divert management attention from our core business. Moreover, if Suez Acquisition Company is unable or unwilling to indemnify our subsidiary or us under the indemnification agreement for any of these liabilities, we could experience a material adverse effect on our business and operating results.

*The Seagate merger consideration may be subject to recovery under fraudulent conveyance laws*

The leveraged buyout and merger transaction involving VERITAS and Seagate Technology may be subject to review under state or federal fraudulent transfer laws in the event that a bankruptcy case or lawsuit is commenced by or on behalf of unpaid creditors of Suez Acquisition Company or any of its affiliates. Under bankruptcy laws, a court could attempt to proceed against the consideration paid to Seagate's stockholders in the merger, or direct that amounts deposited with the trustee administering the distributions of Seagate's tax refunds and credits be held for the benefit of creditors. A court might take one or more of these actions if it determined that when the leveraged buyout was completed, Seagate's operating assets were sold for less then fair value and at that time Seagate, Suez Acquisition Company and their affiliates:

- were or became insolvent;

- were engaged in a business or transaction for which their unencumbered assets constituted unreasonably small capital; or

- intended to incur or reasonably should have believed that they would incur debts beyond their ability to repay as those debts matured.

A court could also proceed against the consideration paid to Seagate's stockholders in the merger, or against Seagate's tax refunds and credits otherwise payable to Seagate's former stockholders following the merger, if the court found that Seagate effected the leveraged buyout with an actual intent to hinder, delay or defraud its creditors.

*Our effective tax rate may increase*

Our effective tax rate could be adversely affected by several factors, many of which are outside of our control. Our effective tax rate is directly affected by the relative proportions of domestic and international revenue and income before taxes. We are also subject to changing tax laws in multiple jurisdictions in which we operate. We do not have a history of audit activity from various taxing authorities and while we believe we are in compliance with all federal, state and international tax laws, there are various interpretations of their application that could result in additional tax assessments. In addition, in November 2000, we acquired Seagate Technology, which has significant tax audit and tax litigation activity. We believe that we have meritorious defenses against asserted deficiencies and that the likely outcome of a re-determination of these asserted deficiencies by the tax settlement authorities will not result in an additional provision for income taxes. We have an indemnification agreement with Suez Acquisition Company for these deficiencies. If Suez Acquisition Company is unable to or is unwilling to indemnify our subsidiary or us under the indemnification agreement for any of these deficiencies, we could experience a material adverse effect on our business and operating results.

*Our strategy of investing in development-stage companies involves a number of risks and uncertainties*

We plan to pursue a strategy of investing in development-stage companies. Each of these investments involves risks and uncertainties, including:

- diversion of management's attention from our core business;

- failure to leverage our relationship with these companies to access new technologies and new markets;

Table of Contents

- • inability to value investments appropriately or to predict changes to the future value of investments;

- • inability to manage investments effectively; and

- • loss of cash invested.

*We are incurring significant accounting charges in connection with our acquisitions that created net losses in the past and could create net losses in the future*

The significant costs of integration associated with our acquisitions of NSMG, TeleBackup and NuView in 1999 increase the risk that we will not realize the anticipated benefits of those acquisitions. Because we accounted for these three acquisitions using the purchase method of accounting, we recorded goodwill and other intangible assets of approximately $3,754.9 million in 1999. This amount is being amortized over four years, and resulted in charges to operations of approximately $234.8 million per quarter. On January 1, 2002 upon adoption of newly issued SFAS 141, *Business Combinations*, and SFAS 142, *Goodwill and Other Intangible Assets*, the quarterly charges related to the amortization of developed technology, goodwill and other intangibles will decrease. Refer to the "New Accounting Pronouncements" section for a discussion on the impacts of the adoption of SFAS 141, *Business Combinations*, and SFAS 142, *Goodwill and Other Intangible Assets* on our financial statements.

*We have a significant amount of debt that we may be unable to service or repay*

In October 1997, we issued $100.0 million in aggregate principal amount of 5.25% convertible subordinated notes due 2004, of which $64.5 million was outstanding as of December 31, 2001. In August 1999, we issued $465.8 million in aggregate principal amount at maturity of 1.856% convertible subordinated notes due 2006, of which $464.7 million was outstanding as of December 31, 2001. As of December 31, 2001, the annual interest payments on our outstanding 5.25% notes were $3.4 million and the annual interest payments on our outstanding 1.856% notes were $8.6 million, all of which we plan to fund from cash flows from operations. We will need to generate substantial amounts of cash from our operations to fund interest payments and to repay the principal amount of debt when it matures, while at the same time funding capital expenditures and our other working capital needs. If we do not have sufficient cash to pay our debts as they come due, we could be in default of those debts. For example, if we do not make timely payments, the notes could be declared immediately due and payable. Our substantial leverage could also increase our vulnerability to adverse economic and industry conditions because it makes it more difficult for us to raise capital if needed. In addition, any changes in accounting rules regarding our operating leases and built-to-suit facilities may affect our debt levels and operating expenses in the future.

*We may not be able to protect our proprietary information*

We rely on a combination of copyright, patent, trademark and trade secret laws, confidentiality procedures, contractual provisions and other measures to protect our proprietary information. All of these measures afford only limited protection. These measures may be invalidated, circumvented or challenged, and others may develop technologies or processes that are similar or superior to our technology. We may not have the proprietary information controls and procedures in place that we need to protect our proprietary information adequately. In addition, because we license the source code for some of our products to third parties, there is a higher likelihood of misappropriation or other misuse of our intellectual property. We also license some of our products under shrink wrap license agreements that are not signed by licensees and therefore may be unenforceable under the laws of some jurisdictions. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy our products or to obtain or use information that we regard as proprietary.

*Third parties may claim that we infringe their proprietary rights*

We may from time to time receive claims that we have infringed the intellectual property rights of others. As the number of products in the software industry increases and the functionality of these products further overlap, we believe that we may become increasingly subject to infringement claims, including patent and

30

Table of Contents

copyright infringement claims. We have received several trademark claims in the past and may receive more claims in the future based on the name VERITAS, which is a word commonly used in trade names throughout Europe and the western hemisphere. In addition, former employers of our former, current or future employees may assert claims that such employees have improperly disclosed to us the confidential or proprietary information of these former employers. Any such claim, with or without merit, could:

- be time consuming to defend;

- result in costly litigation;

- divert management's attention from our core business;

- require us to stop selling, to delay shipping or to redesign our product; and

- require us to pay monetary amounts as damages, for royalty or licensing arrangements, or to satisfy indemnification obligations that we have with some of our customers.

In addition, we license and use software from third parties in our business. These third party software licenses may not continue to be available to us on acceptable terms. Also, these third parties may from time to time receive claims that they have infringed the intellectual property rights of others, including patent and copyright infringement claims, which may affect our ability to continue licensing this software. Our inability to use any of this third party software could result in shipment delays or other disruptions in our business, which could materially and adversely affect our operating results.

*We might experience significant defects in our products*

Software products frequently contain errors or failures, especially when first introduced or when new versions are released. We might experience significant errors or failures in our products, or they might not work with other hardware or software as expected, which could delay the development or release of new products or new versions of products, or which could adversely affect market acceptance of our products. Our end-user customers use our products for applications that are critical to their businesses, and they have a greater sensitivity to product defects than the market for software products generally. If we were to experience significant delays in the release of new products or new versions of products, or if customers were dissatisfied with product functionality or performance, we could lose revenue or be subject to liability for service or warranty costs, and our business and operating results could be adversely affected.

*Natural disasters or power outages could disrupt our business*

We must protect our business and our network infrastructure against damage from earthquake, flood, hurricane and similar events, as well as from power outages. Many of our operations are subject to these risks, particularly our operations located in California. We have already experienced temporary power losses in our California facilities due to power shortages that have disrupted our operations, and we may in the future experience additional power losses that could disrupt our operations. While the impact to our business and operating results has not been material, we cannot assure you that power losses will not adversely affect our business in the future, or that the cost of acquiring sufficient power to run our business will not increase significantly. A natural disaster or other unanticipated problem could adversely effect our business, including both our primary data center and other internal operations and our ability to communicate with our customers or sell our products over the Internet.

31

Table of Contents

*Some provisions in our charter documents may prevent or deter certain corporate actions*

Some of the provisions in our charter documents may deter or prevent certain corporate actions, such as a merger, tender offer or proxy contest, which could affect the market value of our securities. These provisions include:

- our board of directors is authorized to issue preferred stock with any rights it may determine;

- our board of directors is classified into three groups, with each group of directors to hold office for three years;

- our stockholders are not entitled to cumulate votes for directors and may not take any action by written consent without a meeting; and

- special meetings of our stockholders may be called only by our board of directors, by the chairman of the board or by our chief executive officer, and may not be called by our stockholders.

We also have in place a stockholder rights plan that is designed to discourage coercive takeover offers.

*Our stock price may be volatile in the future, and you could lose the value of your investment*

The market price of our common stock has experienced significant fluctuations and may continue to fluctuate significantly, and you could lose the value of your investment. The market price of our common stock may be adversely affected by a number of factors, including:

- announcements of our quarterly operating results or those of our competitors or our original equipment manufacturer customers;

- changes in earnings estimates by securities analysts;

- announcements of planned acquisitions by us or by our competitors;

- the gain or loss of a significant customer;

- announcements of new products by us, our competitors or our original equipment manufacturer customers; and

- slowdowns in the economy generally.

The stock market in general, and the market prices of stocks of other technology companies in particular, have experienced extreme price volatility, which has adversely affected and may continue to adversely affect the market price of our common stock for reasons unrelated to our business or operating results.

**Item 8.    *Financial Statements and Supplementary Data***

*Annual Financial Statements*

Our financial statements required by this item are submitted as a separate section of the Form 10-K. See Item 14(a)(1) for a listing of consolidated financial statements provided in the section titled "Financial Statements."

**Selected Quarterly Results of Operations**

The following selected quarterly data should be read in conjunction with the Consolidated Financial Statements and notes thereto and "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing elsewhere in this Form 10-K. This information has been derived from unaudited consolidated financial statements of VERITAS that, in our opinion, reflect all recurring adjustments necessary to fairly present this information when read in conjunction with our Consolidated Financial Statements and Notes thereto appearing in the section titled "Financial Statements." The results of operations for any quarter are not necessarily indicative of the results to be expected for any future period. As described in Note 20 to our

Table of Contents

consolidated financial statements, we have restated our consolidated financial statements as of December 31, 2000 and 2001 and for the years ended December 31, 2000 and 2001.

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Fiscal Year |
|---|---|---|---|---|---|
| | (In thousands, except per share amounts) (As previously reported) | | | | |
| **Fiscal 2001** | | | | | |
| Total net revenues | $ 387,441 | $ 390,223 | $ 340,231 | $ 374,446 | $ 1,492,341 |
| Gross profit | 329,312 | 330,438 | 282,569 | 307,604 | 1,249,923 |
| Loss before income taxes | (105,189) | (115,501) | (172,143) | (149,656) | (542,489) |
| Net loss | (156,098) | (128,976) | (161,986) | (204,302) | (651,362) |
| Net loss per share — basic and diluted | $ (0.40) | $ (0.32) | $ (0.40) | $ (0.51) | $ (1.63) |
| Number of shares used in computing per share amounts basic and diluted | 394,829 | 398,017 | 400,455 | 402,684 | 399,016 |
| | (As restated)(1) | | | | |
| Total net revenues | $ 387,291 | $ 390,090 | $ 340,222 | $ 374,325 | $ 1,491,928 |
| Gross profit | 329,162 | 330,305 | 282,560 | 307,483 | 1,249,510 |
| Loss before income taxes | (101,793) | (111,664) | (168,819) | (146,316) | (528,592) |
| Net loss | (153,890) | (126,482) | (159,825) | (202,132) | (642,329) |
| Net loss per share — basic and diluted | $ (0.39) | $ (0.32) | $ (0.40) | $ (0.50) | $ (1.61) |
| Number of shares used in computing per share amounts basic and diluted | 394,829 | 398,017 | 400,455 | 402,684 | 399,016 |

(1)     See Note 20 to the consolidated financial statements.

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Fiscal Year |
|---|---|---|---|---|---|
| | (In thousands, except per share amounts) (As previously reported) | | | | |
| **Fiscal 2000** | | | | | |
| Total net revenues | $ 244,640 | $ 275,436 | $ 317,171 | $ 370,081 | $ 1,207,328 |
| Gross profit | 199,168 | 231,519 | 270,641 | 317,199 | 1,018,527 |
| Loss before income taxes | (154,458) | (145,896) | (125,464) | (100,010) | (525,828) |
| Net loss | (174,383) | (172,341) | (148,106) | (124,962) | (619,792) |
| Net loss per share — basic and diluted | $ (0.44) | $ (0.43) | $ (0.37) | $ (0.31) | $ (1.55) |
| Number of shares used in computing per share amounts basic and diluted | 394,471 | 400,787 | 403,613 | 401,209 | 400,034 |
| | | | | (As restated) (1)(2) | (As restated) (2) |
| Total net revenues | $ 244,640 | $ 275,436 | $ 317,171 | $ 350,194 | $ 1,187,441 |
| Gross profit | 199,168 | 231,519 | 270,641 | 297,312 | 998,640 |
| Loss before income taxes | (154,458) | (145,896) | (125,464) | (113,230) | (539,048) |
| Net loss | (174,383) | (172,341) | (148,106) | (133,555) | (628,385) |
| Net loss per share — basic and diluted | $ (0.44) | $ (0.43) | $ (0.37) | $ (0.33) | $ (1.57) |
| Number of shares used in computing per share amounts basic and diluted | 394,471 | 400,787 | 403,613 | 401,209 | 400,034 |

(1)     For the year ended December 31, 2000, only the fourth quarter was restated.

(2)     See Note 20 to the consolidated financial statements.

33

Table of Contents

Our operating results have fluctuated in the past, and may fluctuate significantly in the future, depending on a number of factors, including the timing and magnitude of sales of our products through original equipment manufacturers, investment in new products and new distribution channels, the timing and level of sales to resellers and direct end-users, the introduction, timing and market acceptance of new products, the timing of license fee payments and other factors. For further background on fluctuating operating results, see "Factors That May Affect Future Results — Our revenue may fluctuate significantly, which could cause the market price of our securities to decline."

On January 1, 2002, upon adoption of newly issued SFAS 141, *Business Combinations*, and SFAS 142, *Goodwill and Other Intangible Assets*, the total quarterly charges related to the amortization of developed technology, goodwill and other intangibles will decrease. Refer to the "New Accounting Pronouncements" section in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" for a discussion on the impacts of the adoption of SFAS 141 and SFAS 142 on our financial statements.

34

PART IV

Item 14. *Exhibits, Financial Statement Schedules and Reports on Form 8-K*

(a) The following documents are filed as part of this report:

### 1. Financial Statements

As described in Note 20 to its consolidated financial statements, the Company has restated its consolidated financial statements as of December 31, 2000 and 2001 and for the years ended December 31, 2000 and 2001.

The following are included in Item 8 and are filed as part of Amendment No. 1 to this Annual Report on Form 10-K:

- Consolidated Balance Sheets as of December 31, 2001 (As restated) and 2000 (As restated)

- Consolidated Statements of Operations for the years ended December 31, 2001 (As restated), 2000 (As restated) and 1999

- Consolidated Statements of Stockholders' Equity and Comprehensive Loss for the years ended December 31, 2001 (As restated), 2000 (As restated) and 1999

- Consolidated Statements of Cash Flows for the years ended December 31, 2001 (As restated), 2000 (As restated) and 1999

- Notes to Consolidated Financial Statements

- Report of KPMG LLP, Independent Auditors

- Report of Ernst & Young LLP, Independent Auditors

### 2. Financial Statement Schedules

The following financial statement schedule for the years ended December 31, 2001, 2000 and 1999 should be read in conjunction with the consolidated financial statements of VERITAS Software Corporation filed as part of this Annual Report on Form 10-K/A:

- Schedule II — Valuation and Qualifying Accounts

Schedules other than that listed above have been omitted since they are either not required, not applicable, or because the information required is included in the consolidated financial statements or the notes thereto.

### 3. Exhibits

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- |
| | | Form | Date | Number | |
| 2.01 | Agreement and Plan of Merger and Reorganization, dated as of March 29, 2000, by and among VERITAS Software Corporation ("VERITAS"), Victory Merger Sub, Inc. and Seagate Technology, Inc. ("Seagate") | 8-K | 04/05/00 | 2.01 | |
| 2.02 | Stock Purchase Agreement, dated as of March 29, 2000, by and among Suez Acquisition Company (Cayman) Limited ("Suez"), Seagate and Seagate Software Holdings, Inc. | 8-K | 04/05/00 | 2.02 | |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 2.03 | Consolidated Amendment to Stock Purchase Agreement, Agreement and Plan of Merger and Reorganization and Indemnification Agreement, and Consent, dated as of August 29, 2000, by and among VERITAS, Victory Merger Sub, Inc., Seagate, Seagate Software Holdings, Inc. and Suez | S-4/A | 08/30/00 | 2.05 | |
| 2.04 | Consolidated Amendment No. 2 to Stock Purchase Agreement, Agreement and Plan of Merger and Reorganization and Indemnification Agreement, and Consent, dated October 17, 2000, by and among VERITAS, Victory Merger Sub, Inc., Seagate, Seagate Software Holdings, Inc. and Suez | S-4/A | 10/19/00 | 2.04 | |
| 2.05 | Amended and Restated Agreement and Plan of Reorganization by and among VERITAS, VERITAS Operating Corporation ("VOC"), Seagate, Seagate Software, Inc. ("Seagate Software") and Seagate Software Network & Storage Management Group, Inc. | S-4 | 04/19/99 | 2.01 | |
| 2.06 | Amended and Restated Combination Agreement by and between VOC and TeleBackup Systems, Inc. | S-4 | 4/19/99 | 2.02 | |
| 3.01 | Amended and Restated Certificate of Incorporation of VERITAS | 8-A | 6/2/99 | 3.01 | |
| 3.02 | Certificate of Amendment of Amended and Restated Certificate of Incorporation of VERITAS | 8-A | 6/2/99 | 3.02 | |
| 3.03 | Certificate of Amendment of Amended and Restated Certificate of Incorporation of VERITAS | S-8 | 6/2/00 | 3.03 | |
| 3.04 | Amended and Restated Bylaws of VERITAS | S-4 | 9/28/00 | 3.04 | |
| 4.01 | Indenture dated as of October 1, 1997 between VOC and State Street Bank and Trust Company of California, N.A. | 10-Q | 6/30/99 | 4.03 | |
| 4.02 | Amended and Restated First Supplemental Indenture dated July 30, 1999 by and among VERITAS, VOC and State Street Bank and Trust of California, N.A. | S-1 | 7/27/99 | 4.04 | |
| 4.03 | Registration Rights Agreement dated as of October 1, 1997 between VOC and UBS Securities LLC | 10-Q | 9/30/99 | 4.07 | |
| 4.04 | Form of Rights Agreement between VERITAS and the Right Agent, which includes as Exhibit A the forms of Certificate of Designations of Series A Junior Participating Preferred Stock, as Exhibit B the Form of Right Certificate and as Exhibit C the Summary of Rights to Purchase Preferred Shares | S-4 | 4/19/99 | 4.06 | |
| 4.05 | Form of Registration Rights Agreement between VERITAS and Seagate Software | S-4 | 4/19/99 | 4.07 | |
| 4.06 | Form of Stockholder Agreement between VERITAS, VOC, Seagate Software and Seagate | S-4 | 4/19/99 | 4.08 | |
| 4.07 | Form of Specimen Stock Certificate | S-1 | 10/22/93 | 4.01 | |

36

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 4.08 | Form of Indenture among VERITAS, VOC State Street Bank and Trust Company of California, N.A., as Trustee | S-1 | 7/27/99 | 4.10 | |
| 10.01 | Indemnification Agreement, dated as of March 29, 2000, by and among VERITAS, Seagate, Suez and certain other parties | 8-K | 04/5/00 | 2.3 | |
| 10.02† | Development and License Agreement between Seagate and VERITAS | S-4 | 04/19/99 | 10.01 | |
| 10.03† | Cross License Agreement and OEM Agreement between Seagate Software Information Management Group, Inc. and VERITAS | S-4 | 04/19/99 | 10.02 | |
| 10.04* | VERITAS 1993 Equity Incentive Plan, as amended | S-8 | 03/29/01 | 4.01 | |
| 10.05* | VERITAS 1993 Employee Stock Purchase Plan, as amended | S-8 | 03/29/01 | 4.02 | |
| 10.06* | VERITAS 1993 Directors Stock Option Plan, as amended | 10-K | 12/31/99 | 10.04 | |
| 10.07* | OpenVision Technologies, Inc. 1996 Employee Stock Purchase Plan, as amended | S-4 | 03/24/97 | 10.19 | |
| 10.08 | Office building sublease dated February 27, 1998, by and between VOC and Space Systems/ Loral, Inc. | 10-Q | 09/30/98 | 10.14 | |
| 10.09 | Office building lease dated April 30, 1998, by and between VOC and Ryan Companies US, Inc. | 10-Q | 09/30/98 | 10.15 | |
| 10.10 | Form of Key Employee Agreement | S-4 | 04/19/99 | 10.11 | |
| 10.11 | Office Building Lease, dated September 2, 1994, as amended, by and between VOC and John Arriliaga and Richard T. Peery regarding property located in Mountain View, California | 10-K | 12/31/94 | 10.09 | |
| 10.12 | Amendment No 1. to Office Building Lease dated May 28, 1997 by and between VOC and John Arriliaga and Richard T. Peery | 10-K | 12/31/97 | 10.12 | |
| 10.13 | Agreement dated November 7, 1996 between VERITAS Software India Pvt. Ltd. and Talwalkar & Talwalkar and Mr. Rajendra Dattatraya Pathak, Mrs. Kamal Trimbak Nighojkar, Mrs. Bakul Prabhakar Pathak, Mrs. Nalini Manohar Saraf, Mr. Narhar Vaman Pandit, Mr. Madhav Narhar Pandit, Ms. Madhavi Damodar Thite, and Ms. Medha Narhar Pandit relating to the development of certain premises in Pune, India | S-4 | 03/24/97 | 10.12 | |
| 10.14 | Form of Indemnification Agreement entered into between VERITAS and each of its directors and executive officers | S-4 | 04/19/99 | 10.15 | |
| 10.15 | Amendment No. 1 to Cross-License and OEM Agreement between Seagate Software Information Management Group, Inc. and VERITAS | S-4 | 04/19/99 | 10.16 | |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 10.16 | Participation Agreement dated April 23, 1999 by and among VOC, First Security Bank, National Association, as "Owner Trustee," various banks and other lending institutions which are parties thereto from time to time as "Holders," various banks and other lending institutions which are parties thereto from time to time as "Lenders," NationsBank, N.A., as "Agent" for the Lenders and the Holders, and various parties thereto from time to time as "Guarantors" | S-1 | 07/27/99 | 10.17 | |
| 10.17 | Grant Deed dated April 23, 1999 recording grant of real property to First Security Bank, National Association as "Owner Trustee" by Fairchild Semiconductor Corporation of California | S-1 | 07/27/99 | 10.20 | |
| 10.18 | Memorandum of Lease Agreement and Lease Supplement No. 1 and Deed of Trust dated April 23, 1999 among VOC, First Security Bank, National Association and Chicago Title Company | S-1 | 07/27/99 | 10.21 | |
| 10.19 | Memorandum of Lease Agreement and Lease Supplement No. 2 and Deed of Trust dated April 23, 1999 among VOC, First Security Bank, National Association and Chicago Title Company | S-1 | 07/27/99 | 10.22 | |
| 10.20 | Collateral Assignment of Sublease dated April 23, 1999 made by VOC to First Security Bank, National Association | S-1 | 07/27/99 | 10.23 | |
| 10.21 | Sublease Agreement dated April 23, 1999 by and between VOC and Fairchild Semiconductor Corporation of California | S-1 | 07/27/99 | 10.24 | |
| 10.22 | Certificate re: Representations and Warranties dated April 20, 1999 by Fairchild Semiconductor Corporation of California and addressed to VOC | S-1 | 07/27/99 | 10.25 | |
| 10.23 | Security Agreement dated April 23, 1999 between First Security Bank, National Bank, as "Owner Trustee" and NationsBank, N.A., as Agent for the "Lenders" and the "Holders". | S-1 | 07/27/99 | 10.26 | |
| 10.24 | Form of Agreement of Purchase and Sale by and between Fairchild Semiconductor Corporation of California and VOC | S-1 | 07/27/99 | 10.27 | |
| 10.25 | First Amendment dated April 14, 1999 and Agreement of Purchase and Sale dated March 29, 1999 by and between Fairchild Semiconductor Corporation of California and VOC | S-1 | 07/27/99 | 10.28 | |
| 10.26 | Agency Agreement between VOC and First Security Bank, National Association, as "Owner Trustee" | S-1 | 07/27/99 | 10.29 | |
| 10.27 | Master Lease Agreement dated April 23, 1999 between First Security Bank, National Association and VOC | S-1 | 07/27/99 | 10.30 | |

38

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 10.28 | First Amendment and Restatement of Certain Operative Agreements and Other Agreements dated March 3, 2000 among VOC, the various parties to the participation agreement and other operative agreements from time to time, as the "Guarantors," First Security Bank, National Association, as "Owner Trustee," the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time, as the "Holders," and Bank of America, N.A., as successor to NationsBank, N.A. | 10-K | 12/31/99 | 10.29 | |
| 10.29 | Joinder Agreement dated March 3, 2000 by and between VERITAS and Bank of America, N.A. | 10-K | 12/31/99 | 10.30 | |
| 10.30 | Joinder Agreement dated March 3, 2000 by and between OpenVision International, Ltd. and Bank of America, N.A. | 10-K | 12/31/99 | 10.31 | |
| 10.31 | Joinder Agreement dated March 3, 2000 by and between VERITAS Software Global Corporation (formerly known as Seagate Software Network & Storage Management Group, Inc.) and Bank of America, N.A. | 10-K | 12/31/99 | 10.32 | |
| 10.32 | Participation Agreement dated March 9, 2000 by and among VOC, various parties thereto from time to time as "Guarantors," First Security Bank, National Association, as "Owner Trustee," various banks and other lending institutions which are parties thereto from time to time as "Holders," various banks and other lending institutions which are parties thereto from time to time as "Lenders," and Bank of America, N.A. as "Agent" for the Lenders and the Holders | 10-K | 12/31/99 | 10.33 | |
| 10.33 | Master Lease Agreement dated March 9, 2000 between First Security Bank, National Association, and VOC | 10-K | 12/31/99 | 10.34 | |
| 10.34 | Construction Agency Agreement dated March 9, 2000 between VOC and First Security Bank, National Association | 10-K | 12/31/99 | 10.35 | |
| 10.35 | Trust Agreement dated March 9, 2000 between the several holders from time to time as parties thereto, as "Holders," and First Security Bank, National Association, as "Owner Trustee" | 10-K | 12/31/99 | 10.36 | |
| 10.36 | Credit Agreement dated March 9, 2000 among First Security Bank, National Association, as "Owner Trustee," the several lenders from time to time as parties thereto, and Bank of America, N.A. | 10-K | 12/31/99 | 10.37 | |
| 10.37 | Security Agreement dated March 9, 2000 between First Security Bank, National Association, as "Owner Trustee," and Bank of America, N.A., accepted and agreed to by VOC | 10-K | 12/31/99 | 10.38 | |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 10.38 | Second Amendment, Assignment and Assumption and Restatement of Certain Operative Agreements and Other Agreements dated July 28, 2000 among VOC, VERITAS Software Global Corporation ("VSGC"), the various parties to the participation agreement and other operative agreements from time to time, First Security Bank, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Lenders", and Bank of America, N.A., as the "Agent" for the secured parties | S-4 | 09/28/00 | 10.41 | |
| 10.39 | First Amendment, Assignment and Assumption and Restatement of Certain Operative Agreements and Other Agreements dated July 28, 2000 among VOC, VSGC, the various parties to the participation agreement and other operative agreements from time to time, First Security Bank, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Lenders", and Bank of America, N.A., as the "Agent" for the secured parties | S-4 | 09/28/00 | 10.42 | |
| 10.40 | Participation Agreement dated July 28, 2000 among the various parties thereto from time to time, VSGC, First Security Bank, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties thereto from time to time as "Holders", the various banks and other lending institutions which are parties thereto from time to time as "Lenders", ABN AMRO Bank N.V., Credit Suisse First Boston and Credit Lyonnais Los Angeles Branch | S-4 | 09/28/00 | 10.43 | |
| 10.41 | Credit Agreement dated July 28, 2000 among First Security Bank, National Association as "Owner Trustee", the several lenders from time to time, ABN AMRO Bank, N.V., Credit Suisse First Boston, and Credit Lyonnais Los Angeles Branch | S-4 | 09/28/00 | 10.44 | |
| 10.42 | Trust Agreement dated July 28, 2000 between the several holders from time to time parties thereto as "Holders" and First Security Bank, National Association, as "Owner Trustee" | S-4 | 09/28/00 | 10.45 | |
| 10.43 | Security Agreement dated July 28, 2000 between First Security Bank, National Association, as "Owner Trustee" and ABN AMRO Bank N.V., and accepted and agreed to by VSGC | S-4 | 09/28/00 | 10.46 | |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 10.44 | Master Lease Agreement dated as of July 28, 2000 between First Security Bank, National Association, as "Owner Trustee" and VSGC | S-4 | 09/28/00 | 10.47 | |
| 10.45 | Construction Agency Agreement dated July 28, 2000 between VSGC and First Security Bank, National Association, as "Owner Trustee" | S-4 | 09/28/00 | 10.48 | |
| 10.46 | Credit Agreement dated September 1, 2000 among VSGC, the various parties thereto from time to time as "Guarantors", ABN AMRO Bank N.V., as "Administrative Agent" for "Lenders", Credit Suisse First Boston, as "Documentation Agent", and Credit Lyonnais Los Angeles Branch, as "Syndication Agent". | 10-Q | 09/30/00 | 10.11 | |
| 10.47* | Employment Agreement dated November 17, 2000 between VERITAS and Gary L. Bloom | 10-K | 03/29/01 | 10.47 | |
| 10.48* | VERITAS 2001 Chief Executive Officer Compensation Plan | 10-K | 03/29/01 | 10.48 | |
| 10.49* | Form of VERITAS 2001 Executive Officer Compensation Plan | 10-K | 03/29/01 | 10.49 | |
| 10.50* | VERITAS Non-Qualified Deferred Compensation Plan | 10-K | 03/29/01 | 10.50 | |
| 10.51 | Second Amendment and Restatement of Certain Operative Agreements and Other Agreements dated April 5, 2001 among VSGC, the various parties to the participation agreement and other operative agreements from time to time, First Security Bank, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Lenders", and Bank of America, N.A., as the "Agent" for the secured parties (Roseville, MN) | 10-Q | 05/11/01 | 10.04 | |
| 10.52 | Third Amendment and Restatement of Certain Operative Agreements and Other Agreements dated April 5, 2001 among VSGC, the various parties to the participation agreement and other operative agreements from time to time, First Security Bank, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Lenders", and Bank of America, N.A., as the "Agent" for the secured parties (Mountain View, CA) | 10-Q | 05/11/01 | 10.03 | |

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 10.53 | Fourth Amendment and Restatement of Certain Operative Agreements dated as of September 26, 2001 among VSGC, the various parties to the participation agreement and other operative agreements from time to time, Wells Fargo Bank Northwest, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Lenders" and Bank of America, N.A., as the "Agent" for the secured parties. | 10-Q | 11/14/01 | 10.01 | |
| 10.54 | Third Amendment and Restatement of Certain Operative Agreements dated as of September 26, 2001 among VSGC, the various parties to the participation agreement and other operative agreements from time to time, Wells Fargo Bank Northwest, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Lenders" and Bank of America, N.A., as the "Agent" for the secured parties. | 10-Q | 11/14/01 | 10.02 | |
| 10.55 | VERITAS Participation Agreement First Amendment dated as of September 27, 2001 by and among VSGC, the various parties thereto from time to time, Wells Fargo Bank Northwest, National Association as "Owner Trustee", the various banks and other lending institutions which are parties thereto from time to time as "Holders" or "Lenders" and ABN Amro Bank N.V. as "Agent". | 10-Q | 11/14/01 | 10.03 | |
| 10.56 | Amended and Restated Credit Agreement dated as of September 27, 2001 among VSGC, the various parties thereto from time to time, ABN Amro Bank N.V., Credit Suisse First Boston and Credit Lyonnais Los Angeles Branch. | 10-Q | 11/14/01 | 10.04 | |
| 10.57 | Fifth Amendment and Restatement of Certain Operative Agreements, dated as of November 2, 2001 among VSGC, the various parties to the participation agreement and other operative agreements from time to time, Wells Fargo Bank Northwest, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as Lenders", and Bank of America, N.A., as the "Agent" for the secured parties. | 10-Q | 11/14/01 | 10.05 | |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
| --- | --- | --- | --- | --- | --- |
| | | Form | Date | Number | |
| 10.58 | Fourth Amendment and Restatement of Certain Operative agreements, dated as of November 2, 2001 among VSGC, the various parties to the participation agreement and other operative agreements from time to time, Wells Fargo Bank Northwest, National Association, as "Owner Trustee", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Holders", the various banks and other lending institutions which are parties to the participation agreement and other operative agreements from time to time as "Lenders", and Bank of America, N.A., as the "Agent" for the secured parties. | 10-Q | 11/14/01 | 10.06 | |
| 10.59 | VERITAS Participation Agreement Second Amendment dated as of November 7, 2001 by and among VSGC, the various parties thereto from time to time, Wells Fargo Bank Northwest, National Association as "Owner Trustee", the various banks and other lending institutions which are parties thereto from time to time as "Holders" or "Lenders" and ABN Amro Bank N.V. as "Agent". | 10-Q | 11/14/01 | 10.07 | |
| 10.60 | First Amendment to the Amended and Restated Credit Agreement dated as of November 7, 2001 by and among VSGC, the various parties thereto from time to time, each of the financial institutions from time to time listed in Schedule I thereto, as amended from time to time as "Lenders", Credit Suisse First Boston as "Documentation Agent", Credit Lyonnais Los Angeles Branch as "Syndication Agent", and ABN Amro Bank N.V. as "Administrative Agent". | 10-Q | 11/14/01 | 10.08 | |
| 10.61* | Separation Agreement dated November 27, 2001 by and between VERITAS and Mark Leslie | | | | |
| 10.62* | VERITAS 2002 Executive Officer Compensation Plan | | | | |
| 10.63* | Form of VERITAS 2002 VP Performance-based Employee Incentive Bonus Plan | | | | |
| 21.01 | Subsidiaries of the Registrant | | | | |
| 23.01 | Independent Auditors' consent | | | | X |
| 23.02 | Consent of Independent Auditors | | | | X |
| 99.01 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | X |

*   Management contract, compensatory plan or arrangement.

†    Confidential treatment has been granted with respect to certain portions of this document.

(b) *Reports on Form 8-K*

| Date of Report | Item(s) | Description |
| --- | --- | --- |
| 10/16/01 | 5, 7 | VERITAS announced financial results for its third quarter ended September 30, 2001 and included the press release. |

**Table of Contents**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Mountain View, State of California, on the 14th day of March 2003.

VERITAS SOFTWARE CORPORATION

Registrant

/s/ EDWIN J. GILLIS

Edwin J. Gillis

*Executive Vice President, Finance*

*and Chief Financial Officer*

44

**CERTIFICATIONS**

I, Gary L. Bloom, certify that:

     1. I have reviewed this amendment to the annual report on Form 10-K/ A of VERITAS Software Corporation;

     2. Based on my knowledge, this annual report, as amended, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report, as amended; and

     3. Based on my knowledge, the financial statements, and other financial information included in this annual report, as amended, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report, as amended.

Date: March 14, 2003
By:  /s/ GARY L. BLOOM

Name: Gary L. Bloom
Title:    Chairman of the Board, President and
         Chief Executive Officer

45

Table of Contents

I, Edwin J. Gillis, certify that:

      1. I have reviewed this amendment to the annual report on Form 10-K/ A of VERITAS Software Corporation;

      2. Based on my knowledge, this annual report, as amended, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report, as amended; and

      3. Based on my knowledge, the financial statements, and other financial information included in this annual report, as amended, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report, as amended.

Date: March 14, 2003
By:  /s/ EDWIN J. GILLIS

---

Name: Edwin J. Gillis
Title:    Executive Vice President, Finance and
Chief Financial Officer

**Table of Contents**

**FINANCIAL STATEMENTS**

As required under Item 8. Financial Statements and Supplementary Data, the consolidated financial statements of the Company are provided in this separate section. The consolidated financial statements included in this section are as follows:

| Financial Statement Description | Page |
|---|---|
| Consolidated Balance Sheets as of December 31, 2001 (As restated) and 2000 (As restated) | 48 |
| Consolidated Statements of Operations — Years Ended December 31, 2001 (As restated), 2000 (As restated) and 1999 | 49 |
| Consolidated Statements of Stockholders' Equity and Comprehensive Loss — Years Ended December 31, 2001 (As restated), 2000 (As restated) and 1999 | 50 |
| Consolidated Statements of Cash Flows — Years Ended December 31, 2001 (As restated), 2000 (As restated) and 1999 | 51 |
| Notes to Consolidated Financial Statements | 52 |
| Report of Independent Auditors | 82 |
| Report of Ernst & Young LLP, Independent Auditors | 83 |

### VERITAS SOFTWARE CORPORATION

### CONSOLIDATED BALANCE SHEETS
**(In thousands, except per share amounts)**

ASSETS

|  | December 31, | |
|---|---|---|
|  | **2001** (As restated) | **2000** (As restated) |
| Current assets: | | |
| Cash and cash equivalents | $ 538,419 | $ 886,558 |
| Short-term investments | 1,156,441 | 232,891 |
| Accounts receivable, net of allowance for doubtful accounts of $12,616 and $7,810, respectively | 176,635 | 186,013 |
| Deferred income taxes | 124,290 | 42,644 |
| Other current assets | 66,466 | 24,970 |
| Total current assets | 2,062,251 | 1,373,076 |
| Long-term investments | — | 136,111 |
| Property and equipment, net | 225,763 | 168,389 |
| Goodwill and other intangibles, net | 1,412,536 | 2,285,320 |
| Other non-current assets | 52,451 | 110,382 |
| Deferred income taxes | 45,375 | — |
|  | $ 3,798,376 | $ 4,073,278 |

LIABILITIES AND STOCKHOLDERS' EQUITY

|  | | |
|---|---|---|
| Current liabilities: | | |
| Accounts payable | $ 32,244 | $ 45,250 |
| Accrued compensation and benefits | 89,637 | 63,838 |
| Accrued acquisition and restructuring costs | 12,093 | 44,123 |
| Other accrued liabilities | 80,833 | 69,416 |
| Income taxes payable | 63,735 | 34,454 |
| Deferred revenue | 238,433 | 199,911 |
| Total current liabilities | 516,975 | 456,992 |
| Convertible subordinated notes | 444,408 | 429,176 |
| Deferred and other income taxes | 113,100 | 213,132 |
| Total liabilities | 1,074,483 | 1,099,300 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $.001 par value: | | |
| 10,000 shares authorized: none issued and outstanding | — | — |
| Common stock, $.001 par value: | | |
| 2,000,000 shares authorized; 423,178 and 411,565 shares issued at December 31, 2001 and 2000; 404,503 and 392,890 outstanding at December 31, 2001 and 2000 | 423 | 412 |
| Additional paid-in capital | 6,228,914 | 5,847,844 |
| Accumulated deficit | (1,803,088) | (1,160,759) |
| Accumulated other comprehensive loss | (292) | (11,455) |
| Treasury stock, at cost; 18,675 shares at December 31, 2001 and 2000 | (1,702,064) | (1,702,064) |
| Total stockholders' equity | 2,723,893 | 2,973,978 |
|  | $ 3,798,376 | $ 4,073,278 |

See accompanying notes to consolidated financial statements.

VERITAS SOFTWARE CORPORATION

CONSOLIDATED STATEMENTS OF OPERATIONS
(In thousands, except per share amounts)

| | Years Ended December 31, | | |
| | 2001 | 2000 | 1999 |
| --- | --- | --- | --- |
| | (As restated) | (As restated) | |
| Net revenue: | | | |
| User license fees | $ 1,110,126 | $ 967,565 | $ 498,014 |
| Services | 381,802 | 219,876 | 98,098 |
| Total net revenue | 1,491,928 | 1,187,441 | 596,112 |
| Cost of revenue: | | | |
| User license fees | 40,902 | 40,779 | 20,735 |
| Services | 138,430 | 85,968 | 38,161 |
| Amortization of developed technology | 63,086 | 62,054 | 35,659 |
| Total cost of revenue | 242,418 | 188,801 | 94,555 |
| Gross profit | 1,249,510 | 998,640 | 501,557 |
| Operating expenses: | | | |
| Selling and marketing | 548,973 | 437,167 | 221,989 |
| Research and development (excluding $870 related to stock-based compensation in 2001) | 241,197 | 175,901 | 94,477 |
| General and administrative (excluding $8,079 related to stock-based compensation in 2001) | 116,793 | 77,900 | 34,185 |
| Amortization of goodwill and other intangibles | 886,651 | 879,032 | 510,943 |
| Stock-based compensation | 8,949 | — | — |
| Acquisition and restructuring costs (reversals) | (5,000) | (4,260) | 11,000 |
| In-process research and development | — | — | 104,200 |
| Total operating expenses | 1,797,563 | 1,565,740 | 976,794 |
| Loss from operations | (548,053) | (567,100) | (475,237) |
| Interest and other income, net | 64,916 | 59,619 | 23,328 |
| Interest expense | (29,381) | (31,567) | (15,659) |
| Loss on strategic investments | (16,074) | — | — |
| Loss before income taxes | (528,592) | (539,048) | (467,568) |
| Provision for income taxes | 113,737 | 89,337 | 35,390 |
| Net loss | $ (642,329) | $ (628,385) | $ (502,958) |
| Net loss per share — basic and diluted | $ (1.61) | $ (1.57) | $ (1.59) |
| Number of shares used in computing per share amounts — basic and diluted | 399,016 | 400,034 | 316,892 |

See accompanying notes to consolidated financial statements.

49

Table of Contents

## VERITAS SOFTWARE CORPORATION

### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY AND COMPREHENSIVE LOSS
(In thousands)

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Deferred Compensation | Treasury Stock | | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | Shares | Amount | |
| **Balance at December 31, 1998.** | 214,329 | $ 214 | $ 199,644 | $ (29,416) | $ (556) | $ (32) | — | $ — | $ 169,854 |
| Components of comprehensive loss: | | | | | | | | | |
| Net loss | — | — | — | (502,958) | — | — | — | — | (502,958) |
| Foreign currency translation adjustment | — | — | — | — | (954) | — | — | — | (954) |
| Total comprehensive loss | | | | | | | | | (503,912) |
| Exercise of stock options | 11,909 | 12 | 38,521 | — | — | — | — | — | 38,533 |
| Issuance of common stock under employee stock purchase plan | 799 | 1 | 6,973 | — | — | — | — | — | 6,974 |
| Tax benefits from stock plans | — | — | 63,419 | — | — | — | — | — | 63,419 |
| Issuance of common stock related to the NSMG acquisition | 155,583 | 156 | 3,151,196 | — | — | — | — | — | 3,151,352 |
| Issuance of options to purchase shares of common stock related to the NSMG acquisition | — | — | 281,418 | — | — | — | — | — | 281,418 |
| Issuance of common stock related to the TeleBackup acquisition | 6,842 | 7 | 134,095 | — | — | — | — | — | 134,102 |
| Issuance of options to purchase shares of common stock related to the TeleBackup acquisition | — | — | 2,762 | — | — | — | — | — | 2,762 |
| Issuance of common stock related to the NuView acquisition | 1,436 | 1 | 48,526 | — | — | — | — | — | 48,527 |
| Amortization of deferred compensation | — | — | — | — | — | 32 | — | — | 32 |
| **Balance at December 31, 1999.** | 390,898 | 391 | 3,926,554 | (532,374) | (1,510) | — | — | — | 3,393,061 |
| Components of comprehensive loss: | | | | | | | | | |
| Net loss (As restated, see note 20) | — | — | — | (628,385) | — | — | — | — | (628,385) |
| Foreign currency translation adjustment | — | — | — | — | (9,001) | — | — | — | (9,001) |
| Change in unrealized loss on available-for-sale investments, net of tax of $629. | — | — | — | — | (944) | — | — | — | (944) |
| Total comprehensive loss | | | | | | | | | (638,330) |
| Exercise of stock options | 15,806 | 16 | 101,423 | — | — | — | — | — | 101,439 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Issuance of common stock under employee stock purchase plan | 1,126 | 1 | 18,064 | — | — | — | — | — | 18,065 |
| Tax benefits from stock plans | — | — | 160,786 | — | — | — | — | — | 160,786 |
| Purchase of treasury stock related to the Seagate acquisition | — | — | — | — | — | — | (128,060) | (11,671,708) | (11,671,708) |
| Reissuance of treasury stock related to the Seagate acquisition | — | — | 1,603,380 | — | — | — | 109,385 | 9,969,644 | 11,573,024 |
| Conversion of convertible subordinated notes | 3,735 | 4 | 37,637 | — | — | — | — | — | 37,641 |
| **Balance at December 31, 2000 (As restated)** | 411,565 | 412 | 5,847,844 | (1,160,759) | (11,455) | — | (18,675) | (1,702,064) | 2,973,978 |
| Components of comprehensive loss: | | | | | | | | | |
| Net loss(As restated, see note 20) | — | — | — | (642,329) | — | — | — | — | (642,329) |
| Foreign currency translation adjustment | — | — | — | — | 4,028 | — | — | — | 4,028 |
| Change in unrealized gain on available-for-sale investments, net of tax of $(707) | — | — | — | — | 7,135 | — | — | — | 7,135 |
| Total comprehensive loss | | | | | | | | | (631,166) |
| Exercise of stock options | 10,528 | 10 | 74,915 | — | — | — | — | — | 74,925 |
| Issuance of common stock under employee stock purchase plan | 1,079 | 1 | 29,281 | — | — | — | — | — | 29,282 |
| Tax benefits from stock plans | — | — | 267,705 | — | — | — | — | — | 267,705 |
| Conversion of convertible subordinated notes | 6 | — | 132 | — | — | — | — | — | 132 |
| Stock-based compensation | — | — | 9,037 | — | — | — | — | — | 9,037 |
| **Balance at December 31, 2001 (As restated)** | 423,178 | $ 423 | $ 6,228,914 | $ (1,803,088) | $ (292) | $ — | (18,675) | $ (1,702,064) | $ 2,723,893 |

See accompanying notes to consolidated financial statements.

VERITAS SOFTWARE CORPORATION

CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2001 | 2000 | 1999 |
| | (As restated) | (As restated) | |
| **Cash flows from operating activities:** | | | |
| Net loss | $ (642,329) | $ (628,385) | $ (502,958) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Depreciation and amortization | 91,552 | 46,097 | 24,126 |
| Amortization of goodwill and other intangibles | 886,651 | 879,032 | 510,943 |
| Amortization of developed technology | 63,086 | 62,054 | 35,659 |
| Amortization of original issue discount on convertible notes | 15,314 | 15,773 | 5,402 |
| Provision for allowance for doubtful accounts | 4,806 | 2,117 | 3,121 |
| Stock based compensation | 8,949 | — | — |
| Tax benefits from stock plans | 267,705 | 160,786 | 63,419 |
| Acquisition and restructuring costs | (5,000) | (4,260) | 948 |
| Loss on strategic investments | 16,074 | — | — |
| Gain on sale of assets | (1,027) | — | — |
| In-process research and development | — | — | 104,200 |
| Deferred income taxes | (205,859) | (95,454) | (36,775) |
| Changes in operating assets and liabilities, net of effects of business acquisitions: | | | |
| Accounts receivable | 4,981 | (55,950) | (80,295) |
| Other receivable | — | — | 22,935 |
| Other assets | 28,383 | (22,348) | (3,367) |
| Accounts payable | (13,305) | 15,021 | 19,389 |
| Accrued compensation and benefits | 25,799 | 28,278 | 17,539 |
| Accrued acquisition and restructuring costs | (27,077) | (15,819) | (15,269) |
| Other accrued liabilities | (3,392) | 19,301 | 10,169 |
| Income and other taxes payable | 7,261 | 27,650 | (8,956) |
| Deferred revenue | 37,856 | 112,932 | 37,203 |
| Net cash provided by operating activities | 560,428 | 546,825 | 207,433 |
| **Cash flows from investing activities:** | | | |
| Purchases of investments | (1,672,823) | (836,897) | (764,097) |
| Sales and maturities of investments | 885,384 | 1,077,068 | 258,891 |
| Purchase of property and equipment | (145,749) | (134,665) | (59,671) |
| Cash acquired from Seagate Technology | — | 2,294,301 | — |
| Payments to former Seagate Technology stockholders | — | (2,294,301) | — |
| Cash acquired from Seagate Software | — | — | 1,044 |
| Cash acquired from TeleBackup | — | — | 1,493 |
| Strategic investments in businesses | (17,110) | (22,000) | — |
| Purchase of other businesses and technologies | (64,661) | (2,520) | (14,625) |
| Net cash provided by (used for) investing activities | (1,014,959) | 80,986 | (576,965) |
| **Financing activities:** | | | |
| Proceeds from short-term borrowings | — | 465,000 | — |
| Repayments of short-term borrowings | — | (465,000) | — |
| Payments on revolving line of credit assumed | (1,892) | — | — |
| Proceeds from issuance of common stock | 104,256 | 119,504 | 45,507 |
| Net proceeds from issuance of convertible debt | — | — | 334,137 |
| Net cash provided by financing activities | 102,364 | 119,504 | 379,644 |
| Effect of exchange rate changes | 4,028 | (9,001) | (954) |
| Net increase (decrease) in cash and cash equivalents | (348,139) | 738,314 | 9,158 |
| Cash and cash equivalents at beginning of year | 886,558 | 148,244 | 139,086 |
| Cash and cash equivalents at end of year | $ 538,419 | $ 886,558 | $ 148,244 |
| **Supplemental disclosures:** | | | |
| Cash paid for interest | $ 12,010 | $ 14,926 | $ 5,300 |

| | | | | | |
|---|---|---|---|---|---|
| Cash paid for (refund) income taxes | $ | 19,165 | $ | (3,403) | $ | 15,834 |

**Supplemental schedule of noncash investing and financingtransactions:**

| | | | | | |
|---|---|---|---|---|---|
| Issuance of common stock and options for business acquisitions | $ | 958 | $ | — | $ 3,618,161 |
| Issuance of common stock for conversion of notes | $ | 82 | $ | 36,245 | $ | — |
| Strategic investment acquired in acquisition | $ | 3,028 | $ | — | $ | — |
| Purchase of treasury stock related to the Seagate transaction | $ | — | $ (11,671,708) | $ | — |
| Reissuance of treasury stock related to the Seagate transaction | $ | — | $ | 11,573,024 | $ | — |

See accompanying notes to consolidated financial statements.

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1. Organization and Summary of Significant Accounting Policies**

VERITAS Software Corporation (the "Company"), a Delaware corporation, is a leading independent supplier of storage software products and services. Storage software includes storage management and data protection software as well as clustering, replication and storage area networking software. The Company develops and sells products for most popular operating systems, including various versions of UNIX (including Linux) and Windows. The Company also provides a full range of services to assist its customers in assessing, architecting and implementing their storage software solutions. The Company markets its products and services through original equipment manufacturers ("OEM"), direct sales channels and indirect sales channels such as resellers, value-added resellers, hardware distributors, application software vendors and systems integrators.

*Basis of Presentation*

The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All significant intercompany transactions and balances have been eliminated in consolidation.

*Stock Splits*

On January 27, 2000, the Company announced a three-for-two split in the form of a stock dividend paid on March 3, 2000 to stockholders of record on February 18, 2000. All share and per share data have been restated to give retroactive effect to this stock split.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates.

*Cash and Cash Equivalents*

Cash and cash equivalents include cash and highly liquid investments with insignificant interest rate risk and with original maturities of three months or less. The Company invests its excess cash in diversified instruments maintained primarily in U.S. financial institutions in an effort to preserve principal and to maintain safety and liquidity.

*Short-Term and Long-term Investments*

The Company classifies all of its short-term and long-term investments in accordance with Statement of Financial Accounting Standards ("SFAS") 115, *Accounting for Certain Investments in Debt and Equity Securities* . The Company's short-term and long-term investments do not include strategic investments.

In the fourth quarter of 2001 the Company re-evaluated its investment policies and determined that its securities should be classified as available-for-sale. The Company's intent is to sell these securities within one year, regardless of the maturity date, therefore, all investments have been classified as short-term investments.

As of December 31, 2001, the Company classified its short-term investments as available-for-sale, and all short-term investments consisted of securities with original maturities in excess of 90 days. Available-for-sale securities are carried at fair value, with unrealized holding gains and losses reported in accumulated other comprehensive income, which is a separate component of stockholders' equity, net of tax. The amortization of premiums and discounts on the investments and realized gains and losses, determined on specific identification based on the trade date of the transaction, are included in interest and other income, net.

52

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

As of December 31, 2000, the Company had classified its investments as held-to-maturity, and the amortized cost of its short and long-term investments approximated the fair value. Investments with original maturities greater than 90 days and remaining maturities of less than one year as of the balance sheet date were classified as short-term investments. Investments with remaining maturities greater than one year as of the balance sheet date were classified as long-term investments.

*Fair Value of Financial Instruments*

The following methods are used to estimate the Company's financial instruments:

a)   Cash and cash equivalents, held-to-maturity securities accounts receivables, accounts payable and accrued liabilities approximate their fair value due to the short term nature of these instruments;

b)   Available-for-sale securities, equity securities in publicly traded companies and forward exchange contracts are recorded based on quoted market prices; and

c)   Convertible subordinated notes are recorded at their accreted values, which approximate the cash outlay that is due upon the note settlements.

*Property and Equipment*

Property and equipment are recorded at cost. Depreciation and amortization are calculated using the straight-line method over the estimated useful lives or, in the case of leasehold improvements, the term of the related lease, if shorter. The estimated useful lives of furniture and equipment and computer equipment is generally two to five years. The Company also depreciates a building located in India over fifteen years.

*Goodwill and Other intangibles*

Goodwill represents the excess of the purchase price of net tangible and intangible assets acquired in business combinations over their estimated fair value. Other intangibles mainly represent developed technology, distribution channels, original equipment manufacturer agreements, assembled workforce and trademarks acquired in business combinations. As described further under *"Recent Accounting Pronouncements"*, the Financial Accounting Standards Board ("FASB") issued SFAS 141, *Business Combinations* and SFAS 142, *Goodwill and Other Intangible Assets* in July 2001. In accordance with SFAS 142, the Company has continued to amortize goodwill related to acquisitions completed prior to July 1, 2001, with amortization ceasing on January 1, 2002. The goodwill balances associated with acquisitions completed prior to July 1, 2001 were amortized over four years using the straight-line method. Consistent with SFAS 142, the Company has not amortized goodwill related to acquisitions completed subsequent to June 30, 2001, but instead tested the balance for impairment. Identifiable intangibles, regardless of acquisition date, are currently amortized over a two to four year period using the straight-line method.

Goodwill, net of accumulated amortization, was $1,171.9 million and $1,941.8 million at December 31, 2001, and 2000, respectively. Other intangibles, net of accumulated amortization, was $240.6 million and $343.5 million at December 31, 2001 and 2000, respectively. Accumulated amortization of goodwill and other intangibles was $2,442.6 million as of December 31, 2001, and $1,492.6 million as of December 31, 2000 **.**

*Strategic Investments*

The Company holds investments in common and preferred stock in privately-held and publicly traded companies. Theses strategic investments do not represent a greater than 20% voting interest in any investee and the Company does not have the ability to significantly influence any investee's management. The investments are accounted for on a cost basis and are included in other non-current assets.

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company accounts for its strategic investments in publicly traded companies in accordance with SFAS 115 and these investments are classified as available-for-sale. These investments are carried at fair value, with unrealized gains or losses, net of tax, included in accumulated other comprehensive income or loss as a separate component of stockholders' equity.

Impairment losses are recognized on these strategic investments when the Company determines that there has been a decline in the fair value of the investment that is other than temporary.

*Income Taxes*

The Company accounts for income taxes in accordance with SFAS 109, *Accounting for Income Taxes*. SFAS 109 prescribes the use of the liability method. Deferred tax liabilities and assets are determined based on the difference between the financial statement carrying amounts and the tax basis of assets and liabilities and are measured using the enacted statutory tax rates in effect at the balance sheet date. The Company records a valuation allowance to reduce its deferred tax assets when uncertainty regarding their realizability exists.

*Derivative Financial Instruments*

On January 1, 2001, the Company adopted SFAS 133, *Accounting for Derivative Instruments and Hedging Activities*. SFAS 133 establishes accounting and reporting standards for derivative instruments and hedging activities and requires the Company to recognize these as either assets or liabilities on the balance sheet and measure them at fair value. If certain conditions are met, a derivative may be specifically designated and accounted for as (a) a hedge of the exposure to changes in the fair value of a recognized asset or liability or an unrecognized firm commitment, (b) a hedge of the exposure to variable cash flows of a forecasted transaction, or (c) a hedge of the foreign currency exposure of a net investment in a foreign operation, an unrecognized firm commitment, an available-for-sale security, or a foreign-currency-denominated forecasted transaction. Derivatives or portions of derivatives that are not designated as hedging instruments are adjusted to fair value through earnings in the period of change in their fair value. The adoption of this accounting standard did not have a material impact on the Company's financial position or results of operations.

The Company transacts business in various foreign currencies and has established a foreign currency hedging program, utilizing foreign currency forward exchange contracts ("forward contracts") to hedge certain foreign currency transaction exposures. The objective of these contracts is to neutralize the impact of currency exchange rate movements on the Company's operating results by offsetting gains and losses on the forward contracts with increases or decreases in foreign currency transactions. The Company does not designate its foreign exchange forward contracts as hedges, except for the cross currency interest rate swap discussed in Note 11. Accordingly, the Company adjusts these instruments to fair value through earnings. The Company does not use forward contracts for speculative or trading purposes.

*Revenue Recognition*

In October of 1997 the Accounting Standards Executive Committee issued Statement of Position ("SOP") 97-2 *Software Revenue Recognition* , which has been amended by SOP 98-9. These statements set forth generally accepted accounting principles for recognizing revenue on software transactions. SOP 97-2, as amended by SOP 98-4, was effective for revenue recognized under software license and service arrangements beginning January 1, 1998. SOP 98-9 amended SOP 97-2 and requires recognition of revenue using the "residual method" when certain criteria are met.

The Company derives revenue from software licenses and customer support and other services. Service revenue includes contracts for software maintenance and technical support, consulting and training. In software arrangements that include rights to multiple software products and/or services, the Company

54

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

allocates and defers revenue for the undelivered items, based on vendor-specific objective evidence of fair value, and recognizes the difference between the total arrangement fee and the amount deferred for the undelivered items as revenue.

The Company recognizes revenue from licensing of software products to an end user upon delivery of the software product to the customer, unless the fee is not fixed or determinable, or collectibility is not considered probable. For licensing of the Company's software to OEMs, revenue is not recognized until the software is sold by the OEM to an end-user customer. For licensing of the Company's software through its indirect sales channels, revenue is recognized when the reseller, value-added reseller, hardware distributor, application software vendor or system integrator sells the software to its customer. Arrangements with payment terms extending beyond 90 days from the invoice date are not considered to be fixed or determinable and revenue is recognized when the fee becomes due. If collectibility is not considered probable for reasons other than extended payment terms, revenue is recognized when the fee is collected.

Customer support revenue is recognized on a straight-line basis over the period that the support is provided. Other software service arrangements are evaluated to determine whether those services are essential to the functionality of the other elements of the arrangement. To date, software services have not been considered essential. Therefore, the revenue allocable to the software services is recognized as the services are performed, assuming all other criteria for revenue recognition have been met.

*Cost of Revenue*

Cost of revenue includes costs related to user license and service revenue and amortization of acquired developed technology. Cost of user license revenue includes material, packaging, shipping and other production costs, and third-party royalties. Cost of service revenue includes salaries, benefits and overhead costs associated with employees providing maintenance, support, training and consulting services. Third-party consultant fees are also included in cost of service revenue.

*Software Development Costs*

Under SFAS 86, *Accounting for the Costs of Computer Software to be Sold, Leased or Otherwise Marketed*, certain software development costs incurred subsequent to the establishment of technological feasibility are capitalized and amortized on a product-by-product basis. The annual amortization should be the greater amount of the amount calculated by using the ratio of the revenue generated by product or the amount calculated by amortizing the capitalized cost using the straight-line method over the estimated economic life of the product. Technological feasibility is established upon completion of a working model, which is typically demonstrated by initial beta shipment. The period between the achievement of technological feasibility and the general release of the Company's products has been of short duration. As of December 31, 2001 such capitalizable software development costs were insignificant and all software development costs have been charged to research and development expense in the accompanying consolidated statements of operations.

*Concentrations of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of investments in debt securities, trade receivables and financial instruments used in hedging activities. The Company primarily invests its excess cash in commercial paper rated A-1/P-1, medium-term notes, corporate notes, government securities (taxable and non-taxable), asset-backed securities, market auction preferreds with approved financial institutions, and other specific money market instruments of similar liquidity and credit quality. The Company is exposed to credit risks in the event of default by the financial institutions or issuers of investments to the extent recorded on the balance sheet. The Company generally does not require collateral. The Company maintains allowances for credit losses, and such losses have been within management's expectations. For the years ended December 31, 2001, 2000 and 1999 no customer accounted

55

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

for greater than 10% of revenues. The counterparties to the agreements relating to the Company's financial instruments used in hedging activities consist of four major, multinational, high credit quality, financial institutions. The amounts potentially subject to credit risk arising from the possible inability of counterparties to meet the terms of their contracts are generally limited to the amounts, if any, by which a counterparty's obligations exceed the obligations of the Company with that counterparty.

*Net Loss Per Share*

Basic earnings per share is computed using the weighted average number of common shares outstanding during the period. Diluted earnings per share is computed using the weighted average number of common shares and dilutive potential common shares outstanding during the period. Dilutive common shares consist of employee stock options using the treasury stock method and common shares issued assuming conversion of the convertible subordinated notes, if dilutive.

*Accounting for Stock-Based Compensation*

The Company accounts for employee stock-based compensation in accordance with Accounting Principles Board ("APB") Opinion 25, *Accounting for Stock Issued to Employees* and related interpretations. Pro forma net income and net income per share disclosures required by SFAS 123, *Accounting for Stock Based Compensation* , are included in Note 14.

*Translation of Foreign Currencies*

Assets and liabilities of foreign subsidiaries, whose functional currency is the local currency, are translated at year-end exchange rates. Income and expense items are translated at the average rates of exchange prevailing during the year. The adjustment resulting from translating the financial statements of such foreign subsidiaries is reflected as a separate component of stockholder's equity. Foreign currency transaction gains or losses are reported in results of operations.

*Impairment of Long-Lived Assets*

The Company reviews its long-lived assets, including property and equipment, goodwill and other intangibles, for impairment and determines whether an event or change in facts and circumstances indicates that their carrying amount may not be recoverable. The Company assesses impairment in accordance with the requirements of SFAS 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed of* . The Company assesses the impairment of enterprise level goodwill periodically in accordance with the provisions of APB 17, *Intangible Assets* . The Company determines recoverability of the assets by comparing the carrying amount of the asset to net future undiscounted cash flows that the asset is expected to generate. The impairment recognized is the amount by which the carrying amount exceeds the fair market value of the asset. No impairment was recognized in 2001, 2000 and 1999.

*Advertising Costs (As restated)*

Advertising costs are expensed as incurred. Advertising expense was $32.4 million, $29.7 million and $10.5 million for the years ended December 31, 2001, 2000 and 1999, respectively.

*Reclassifications*

Certain amounts reported in previous years have been reclassified to conform to the 2001 presentation.

56

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Recent Accounting Pronouncements*

In July 2001, the FASB issued SFAS 141, *Business Combinations*, and SFAS 142, *Goodwill and Other Intangible Assets*.

SFAS 141, effective in July 2001, requires that the purchase method of accounting be used for all business combinations initiated after June 30, 2001. SFAS 141 also specifies criteria that intangible assets acquired in a purchase method business combination must meet to be recognized and reported apart from goodwill, noting that any purchase price allocable to an assembled workforce may not be accounted for separately. Upon adoption of SFAS 142, on January 1, 2002, the Company had to evaluate its existing intangible assets and goodwill that were acquired in a prior purchase business combination, and to make any necessary reclassifications in order to conform with the new criteria in SFAS 141 for recognition apart from goodwill. Also, the Company is required to reassess the useful lives and residual values of all intangible assets acquired, and make any necessary amortization period adjustments by March 31, 2002. In addition, to the extent an intangible asset is identified as having an indefinite useful life, the Company is required to test the intangible asset for impairment in accordance with the provisions of SFAS 142 by March 31, 2002. Any impairment loss will be measured as of the January 1, 2002 and recognized as the cumulative effect of a change in accounting principle.

SFAS 142 requires that goodwill and intangible assets with indefinite useful lives no longer be amortized, but instead be tested for impairment at least annually in accordance with the provisions of SFAS 142. SFAS 142 also requires that intangible assets with estimable useful lives be amortized over their respective estimated useful lives to their estimated residual values, and reviewed for impairment in accordance with SFAS 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* .

In accordance with SFAS 142, the Company will perform an evaluation of the Company's identifiable intangible assets and goodwill as of January 1, 2002 to reassess the lives of identifiable intangible assets and to determine whether any of the Company's goodwill is impaired. If the Company determines that a portion of the goodwill is impaired as of the date of adoption, the impairment will be recorded as a "cumulative effect of a change in accounting principle." Upon adoption of SFAS 142 on January 1, 2002, the Company will no longer be required to amortize goodwill related to acquisitions completed prior to July 1, 2001 and, accordingly, the Company will not incur any future amortization expense related to goodwill. Goodwill amortization expense totaled approximately $810.5 million during the year ended December 31, 2001. As of the date of adoption, January 1, 2002, the Company had unamortized goodwill in the amount of approximately $1,171.9 million and unamortized other identifiable intangible assets in the amount of approximately $240.6 million, all of which are subject to the transition provisions of SFAS 141 and 142. The Company expects to complete the transitional goodwill impairment test by June 30, 2002. The Company does not expect to record an impairment charge upon completion of the test, but there can be no assurance that at the time the test is completed a significant impairment charge may not be recorded. The Company does not believe that SFAS 141 and SFAS 142 will have a material impact on its financial position or cash flows. However, because of the implementation of SFAS 141 and SFAS 142, the Company expects to become profitable in 2002.

In August 2001, FASB issued SFAS 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*. SFAS 144 supersedes SFAS 121 and APB Opinion No. 30, *Reporting the Results of Operation-Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions* . SFAS 144 establishes a single accounting model for long-lived assets to be disposed of (by sale, abandonment or in a distribution to owners), whether they were previously held and used or newly acquired, and it also broadens the presentation of discontinued operations to include more disposal transactions. The Company will be required to implement the provisions of SFAS 144 as of January 1, 2002. The Company does not believe that SFAS 144 will have a material impact on its financial position, results of operations or cash flows.

57

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

In December 2001, the FASB staff issued Topic No. D-103, *Income Statement Characterization of Reimbursements Received for 'Out-of-Pocket' Expenses Incurred* . Topic D-103 requires companies to record certain reimbursements received for out-of-pocket expenses as revenue instead of an offset to the related expense. Upon application of Topic D-103, comparative financial statements for prior periods must be reclassified to comply with the guidance in this announcement. The Company will be required to implement the provisions of Topic D-103 as of January 1, 2002. The Company does not believe that Topic D-103 will have a material impact on its financial position, results of operations or cash flows.

**Note 2. Seagate Technology Transaction**

On November 22, 2000, the Company completed a multi-party transaction with Seagate Technology ("Seagate") and Suez Acquisition Company (Cayman) Limited ("SAC"), a company formed by a group of private equity firms led by Silver Lake Partners. The transaction was structured as a leveraged buyout of Seagate pursuant to which Seagate sold all of its operating assets to SAC, and SAC assumed and indemnified Seagate and us for substantially all liabilities arising in connection with those operating assets. The Company did not acquire Seagate's disc drive business or any other Seagate operating business. At the closing, and after the operating assets and liabilities of Seagate had been transferred to SAC, a wholly-owned subsidiary of the Company merged with and into Seagate, following which Seagate became its wholly-owned subsidiary and was renamed VERITAS Software Technology Corporation.

The Company issued approximately 109.4 million shares of our common stock to the Seagate stockholders in exchange for approximately 128.1 million shares of its common stock and certain non-operating assets and liabilities held by Seagate. The transaction resulted in a decrease of approximately 18.7 million shares of the Company's outstanding common stock. At the closing of the transaction the Company recorded the non-operating assets and liabilities assumed from Seagate at their fair values. In addition, the Company accrued $40.0 million of direct transaction costs.

Acquisition-related costs are summarized below (in millions):

|  | Direct Transaction Costs |
|---|---|
| Provision accrued at transaction date | $  40.0 |
| Cash payments | (8.6) |
| Balance at December 31, 2000 | 31.4 |
| Cash payments | (26.0) |
| Reversals | (5.0) |
| Balance at December 31, 2001 | $   0.4 |

In 2001, the Company reversed $5.0 million of net attorneys' fees originally accrued in relation to the Delaware lawsuit captioned *In re Seagate Technology, Inc. Shareholders Litigation,* which the Company will not have to pay as a result of a Delaware Chancery Court ruling that approved the settlement of the lawsuit and the subsequent distribution of $50.0 million of additional consideration to the former Seagate stockholders that was paid by SAC. The Company anticipates that the remaining $0.4 million of acquisition-related costs will be utilized in 2002.

For the year ended December 31, 2000, the transaction had no impact on the Company's consolidated statement of operations. For the year ended December 31, 2001, the transaction had the following significant impacts on its consolidated statement of operations:

•       reversal of acquisition and restructuring costs of $5.0 million; and

•       additional provision for income taxes of $30.1 million.

58

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Considering the impacts on its consolidated statement of operations, net of tax, and the impacts of the decrease of approximately 18.7 million shares of its common stock outstanding on the number of shares used in computing the net loss per share, the transaction resulted in an incremental net loss per share of $0.01 for both years ended December 31, 2000 and 2001. The Company expects the transaction to be accretive when it reaches profitability.

As of December 31, 2000 and 2001, the transaction had impacts on the Company's consolidated balance sheet. The impacts on its assets and liabilities were:

As of December 31, 2000

- other non-current assets included $70.0 million of indemnification receivable from SAC and $4.0 million for its ownership in Gadzoox Networks, Inc.;

- accrued acquisition and restructuring costs included $31.4 million of direct transaction costs; and

- deferred and other income taxes included an additional $132.0 million, which was net of a deferred tax asset of $3.0 million related to our ownership in Gadzoox Networks, Inc.

As of December 31, 2001

- other current assets included $21.3 million of indemnification receivable from SAC;

- other non-current assets included $18.0 million of indemnification receivable from SAC;

- accrued acquisition and restructuring costs included $0.4 million of direct transaction costs;

- income taxes payable included an additional $21.3 million; and

- deferred and other income taxes included an additional $113.1 million.

As of December 31, 2001 and 2000, deferred and other income taxes payable recorded in connection with the Seagate transaction totaled $134.4 million and $135.0 million respectively, and related to certain tax liabilities that the Company expects to pay after the merger. Certain of Seagate's federal and state tax returns for various fiscal years are under examination by tax authorities. In 2001, the Company recorded a reduction of $30.7 million in tax liabilities and indemnification receivable from SAC due to certain settlements entered into with tax authorities. Also, the Company recorded a provision for income taxes of $30.1 million due to changes in estimates of the amount and timing of other tax liabilities for years under examination. The Company believes that adequate amounts for tax liabilities have been provided for any final assessments that may result from these examinations.

**Note 3. Business Combinations**

*NSMG acquisition*

On May 28, 1999, the Company acquired the Network & Storage Management Group business of Seagate Software, Inc. ("NSMG"). The NSMG business developed and marketed software products and provided related services enabling information technology professionals to manage distributed network resources and to secure and protect enterprise data. The NSMG acquisition was accounted for using the purchase method, and the Company has been incurring charges of $221.5 million per quarter primarily related to the amortization of developed technology, goodwill and other intangibles over their estimated useful life of four years. The total NSMG purchase price was $3,464.5 million and included $3,151.4 million for the issuance of 155.6 million shares of the Company's common stock, $269.7 million for the exchange of options to purchase 15.6 million shares of its common stock and $43.4 million of acquisition-related costs. The purchase price was allocated, based on an independent valuation, to goodwill of $3,015.8 million, distribution channels of $233.8 million, original equipment manufacturer agreements of $23.4 million, developed

59

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

technology of $233.7 million, assembled workforce of $12.8 million, trademarks of $22.8 million, in-process research and development of $101.2 million, net deferred tax liabilities of $179.5 million, other intangibles of $1.5 million and tangible net liabilities assumed of $1.0 million. For each of 2001 and 2000, the Company recorded $827.6 million for the amortization of goodwill and other intangibles, and $58.4 million for the amortization of developed technology related to this acquisition. The results of operations of the acquired business are included in the Company's consolidated financial statements from the date of acquisition.

Acquisition-related costs consisted of direct transaction costs of $20.0 million, operating lease commitments on duplicative facilities of $8.2 million and involuntary termination benefits of $15.2 million. Non-cash charges included in the acquisition-related costs approximated $11.7 million.

Acquisition-related costs are summarized below (in millions):

| | Direct transaction costs | Operating lease commitments on duplicative facilities | Involuntary termination benefits | Total |
|---|---|---|---|---|
| Provision accrued at acquisition date | $ 20.0 | $ 8.2 | $ 15.2 | $ 43.4 |
| Cash payments | (17.4) | (0.3) | (1.8) | (19.5) |
| Non-cash charges | — | — | (11.7) | (11.7) |
| Balance at December 31, 1999 | 2.6 | 7.9 | 1.7 | 12.2 |
| Cash payments | (1.9) | (1.9) | (0.9) | (4.7) |
| Balance at December 31, 2000 | 0.7 | 6.0 | 0.8 | 7.5 |
| Cash payments | (0.7) | (0.2) | (0.3) | (1.2) |
| Balance at December 31, 2001 | $ — | $ 5.8 | $ 0.5 | $ 6.3 |

The remaining acquisition-related costs accrual of $6.3 million is anticipated to be utilized primarily for servicing operating lease payments or negotiated buyout of operating lease commitments, the lease terms of which will expire at various times through the year 2013.

In addition, the Company recorded a restructuring charge of $11.0 million in 1999 as a result of the NSMG acquisition. This restructuring charge related to exit costs with respect to duplicative facilities that it plans to vacate, which include $0.9 million of write-off of redundant equipment and leasehold improvements, and involuntary termination benefits. Involuntary termination benefits relate to the salary and fringe benefit expense for terminated employees in research and development. The involuntarily terminated employees represented 2% of the global workforce. In the fourth quarter of 2000, as a result of lower actual exit costs than originally estimated with respect to duplicative facilities, $4.3 million of the restructuring charge was reversed.

60

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Restructuring costs are summarized below (in millions):

|  | Cancellation of facilities leases and other contracts | Involuntary termination benefits | Write off of redundant equipment and leasehold improvements | Total |
|---|---|---|---|---|
| Provision accrued at acquisition date | $   8.8 | $   1.3 | $   0.9 | $   11.0 |
| Cash payments | — | (0.9) | — | (0.9) |
| Non-cash charges | — | — | (0.9) | (0.9) |
| Balance at December 31, 1999 | 8.8 | 0.4 | — | 9.2 |
| Cash payments | (0.2) | — | — | (0.2) |
| Reversal | (3.9) | (0.4) | — | (4.3) |
| Balance at December 31, 2000 | $   4.7 | $   — | $   — | $   4.7 |
| Cash payments | — | — | — | — |
| Balance at December 31, 2001 | $   4.7 | $   — | $   — | $   4.7 |

The remaining restructuring charge accrual of $4.7 million is anticipated to be utilized for servicing operating lease payments or negotiated buyout of operating lease commitments, the lease terms of which will expire at various times through the year 2012.

*TeleBackup acquisition*

On June 1, 1999 the Company acquired TeleBackup Systems, Inc. ("TeleBackup"). TeleBackup designed, developed and marketed software products for local and remote backup and recovery of electronic information stored on networked, remote and mobile personal computers. The TeleBackup acquisition was accounted for using the purchase method, and has been incurring charges of $9.0 million per quarter, primarily related to the amortization of developed technology, goodwill and other intangibles over their estimated useful life of four years. The total purchase price for TeleBackup was $143.1 million and included $134.1 million related to the issuance of 6.8 million shares of the Company's common stock, $2.8 million for the issuance of options to purchase 0.2 million shares of its common stock and $6.2 million in acquisition-related costs. The purchase price was allocated, based on an independent valuation, to goodwill of $133.1 million, distribution channels of $1.0 million, original equipment manufacturer agreements of $2.1 million, developed technology of $6.6 million, assembled workforce of $0.3 million, trademarks of $1.3 million, in-process research and development of $1.9 million, net deferred tax liabilities of $3.0 million and tangible net liabilities assumed of $0.2 million. For each of 2001 and 2000, the Company recorded $34.5 million for amortization of goodwill and other intangibles, and $1.7 million for the amortization of developed technology related to this acquisition. The results of operations of the acquired business are included in the Company's consolidated financial statements from the date of acquisition.

The acquisition costs of $6.2 million consist primarily of direct transaction costs and involuntary termination benefits.

61

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Acquisition-related costs are summarized below (in millions):

| | Direct transaction costs | Involuntary termination benefits | Total |
|---|---|---|---|
| Provision accrued at acquisition date | $ 5.6 | $ 0.6 | $ 6.2 |
| Cash payments | (5.1) | (0.2) | (5.3) |
| Balance at December 31, 1999 | 0.5 | 0.4 | 0.9 |
| Cash payments | (0.2) | (0.4) | (0.6) |
| Balance at December 31, 2000 | 0.3 | — | 0.3 |
| Cash payments | (0.3) | — | (0.3) |
| Balance at December 31, 2001 | $ — | $ — | $ — |

*NuView acquisition*

On August 10, 1999, under an asset purchase agreement the Company acquired certain assets of NuView, Inc.("NuView"), for a total cost of approximately $67.9 million. The acquisition was accounted for using the purchase method, and the Company has been incurring charges of $4.3 million per quarter primarily related to the amortization of developed technology, goodwill and other intangibles over their estimated useful life of four years. The purchase price included $47.7 million related to the issuance of the Company's common stock, $0.8 million for the issuance of options to purchase its common stock to former NuView employees, $0.2 million in acquisition-related costs and $19.2 million paid in cash. The purchase price was allocated, based on an independent valuation, to goodwill of $62.6 million, developed technology of $2.4 million, assembled workforce of $0.6 million, trademarks of $0.3 million, covenant-not-to-compete of $0.9 million and in-process research and development of $1.1 million. For each of 2001 and 2000, the Company recorded $16.5 million for amortization of goodwill and other intangibles, and $0.6 million for the amortization of developed technology related to this acquisition. The results of operations of the acquired business are included in the Company's consolidated financial statements from the date of acquisition.

*Unaudited pro forma summary results of operations related to the NSMG, TeleBackup and NuView acquisitions*

The following unaudited pro forma summary results of operations data have been prepared assuming that the NSMG, TeleBackup and NuView acquisitions had occurred at the beginning of the period presented. The consolidated results are not necessarily indicative of results of future operations nor of results that would have occurred had the acquisitions been consummated as of the beginning of the periods presented. The pro forma information excludes the impact of the one-time charges related to in-process research and development costs of $104.2 million and the restructuring charges of $11.0 million recorded in 1999 (in thousands, except per share amounts):

| | 1999 |
|---|---|
| Net revenue | $ 700,027 |
| Net loss | $ (738,049) |
| Basic and diluted net loss per share | $ (2.03) |

*Other acquisitions*

In 2001, the Company completed three acquisitions of privately held companies for a total cost of approximately $78.2 million. These acquisitions were accounted for using the purchase method. The purchase price included $76.3 million payable in cash, of which $64.7 was paid as of December 31, 2001, and

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

$1.9 million in acquisition-related costs, of which $1.1 million was paid at December 31, 2001. The remaining cash payments of $11.6 million will be made throughout March 2003 and the remaining acquisition-related costs accrual of $0.8 million in direct transaction costs is anticipated to be paid in 2002. The purchase price was allocated to goodwill of $65.9 million, developed technology of $12.7 million, other intangibles of $1.7 million, and net of tangible liabilities assumed of $2.1 million. For 2001, the Company recorded $7.5 million for the amortization of goodwill and other intangibles, and $1.0 million for the amortization of developed technology. The identifiable intangible assets are amortized over their estimated useful lives of two to four years. The results of operations of the acquired businesses are included in the Company's consolidated financial statements from the respective dates of acquisition.

*Unaudited pro forma summary results of operations related to other acquisitions*

The following unaudited pro forma summary results of operations data have been prepared assuming that the other acquisitions had occurred at the beginning of the period presented. The consolidated results are not necessarily indicative of results of future operations nor of results that would have occurred had the acquisitions been consummated as of the beginning of the periods presented (in thousands, except per share amounts):

|  | 2001 | 2000 |
|---|---|---|
|  | (As restated) | (As restated) |
| Net revenue | $ 1,496,231 | $ 1,200,219 |
| Net loss | $ (663,827) | $ (656,834) |
| Basic and diluted net loss per share | $ (1.66) | $ (1.64) |

**Note 4. Cash, Cash Equivalents and Investments**

In the fourth quarter of 2001 the Company re-evaluated its investment policies and determined that its securities should be classified as available-for-sale. Effective October 1, 2001 all investments previously classified as held-to-maturity were classified as available-for-sale. The following table details the value of the investments at October 1, 2001 as if they had being classified as available-for-sale (in thousands):

|  | October 1, 2001 | | | |
|---|---|---|---|---|
|  | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Cash and cash equivalents: |  |  |  |  |
| Cash | $ 302,216 | $ — | $ — | $ 302,216 |
| Money market funds | 264,056 | 2 | — | 264,058 |
| Commercial paper | 37,084 | — | (115) | 36,969 |
| Corporate notes | — | — | — | — |
| Cash and cash equivalents | $ 603,356 | $ 2 | $ (115) | $ 603,243 |
| Short-term investments: |  |  |  |  |
| Commercial paper | $ 44,776 | $ — | $ — | $ 44,776 |
| Market auction preferreds | 177,830 | — | — | 177,830 |
| Government securities | 164,861 | 1,750 | — | 166,611 |
| Corporate notes | 597,847 | 3,678 | — | 601,525 |
| Short-term investments | $ 985,314 | $ 5,428 | $ — | $ 990,742 |

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The Company's cash, cash equivalents and investments consist of the following at December 31, 2001 and December 31, 2000 (in thousands):

|  | December 31, 2001 | | | |
| --- | --- | --- | --- | --- |
|  | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Cash and cash equivalents: | | | | |
| Cash | $ 390,068 | $ — | $ — | $ 390,068 |
| Money market funds | 125,383 | — | — | 125,383 |
| Commercial paper | 22,968 | — | — | 22,968 |
| Corporate notes | — | — | — | — |
| Cash and cash equivalents | $ 538,419 | $ — | $ — | $ 538,419 |
| Short-term investments: | | | | |
| Commercial paper | $ 99,491 | $ — | $ — | $ 99,491 |
| Market auction preferreds | 202,574 | — | — | 202,574 |
| Government securities | 133,098 | 1,654 | (4) | 134,748 |
| Corporate notes | 715,203 | 5,633 | (1,208) | 719,628 |
| Short-term investments | $ 1,150,366 | $ 7,287 | $ (1,212) | $ 1,156,441 |

|  | December 31, 2000 | | | |
| --- | --- | --- | --- | --- |
|  | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| Cash and cash equivalents: | | | | |
| Cash | $ 825,727 | $ — | $ — | $ 825,727 |
| Money market funds | 38,416 | — | — | 38,416 |
| Commercial paper | 22,415 | — | — | 22,415 |
| Corporate notes | — | — | — | — |
| Cash and cash equivalents | $ 886,558 | $ — | $ — | $ 886,558 |
| Short-term investments: | | | | |
| Commercial paper | $ 113 | $ — | $ — | $ 113 |
| Market auction preferreds | 5,400 | — | — | 5,400 |
| Government securities | 45,995 | — | — | 45,995 |
| Corporate notes | 181,383 | — | — | 181,383 |
| Short-term investments | $ 232,891 | $ — | $ — | $ 232,891 |
| Long-term investments: | | | | |
| Government securities | $ 44,006 | $ — | $ — | $ 44,006 |
| Medium-term corporate notes | 92,105 | — | — | 92,105 |
| Long-term investments | $ 136,111 | $ — | $ — | $ 136,111 |

The Company recorded gross realized gains (losses) from the sale of available-for-sale investments for the year ended December 31, 2001 of $0.2 million. The realized gains (losses) are included in interest and other income, net in the consolidated statements of operations.

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The amortized cost and estimated fair value of the Company's investments, as of December 31, 2001, shown by contractual maturity date, are included in the following table:

|  | December 31, 2001 | |
|---|---|---|
|  | Amortized Cost | Fair Value |
| Due in less than one year | $ 1,314,277 | $ 1,317,646 |
| Due between one and five years | 374,508 | 377,214 |
| Total | $ 1,688,785 | $ 1,694,860 |

**Note 5. Property and Equipment**

Property and equipment is stated at cost and consisted of the following (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2001 | 2000 |
| Building | $       888 | $       916 |
| Computer equipment | 280,638 | 172,269 |
| Furniture and equipment | 57,216 | 31,649 |
| Leasehold improvements | 69,856 | 36,101 |
| Construction in Process | 13,624 | 33,445 |
|  | 422,222 | 274,380 |
| Less — accumulated depreciation and amortization | (196,459) | (105,991) |
| Property and equipment, net | $   225,763 | $   168,389 |

Depreciation and amortization of property and equipment charged to costs and expenses was approximately $84.4 million for the year ended December 31, 2001, $43.2 million for the year ended December 31, 2000 and $23.1 million for the year ended December 31, 1999.

**Note 6. Strategic Investments**

The Company holds investments in common and preferred stock of several privately-held and publicly traded companies. These strategic investments are included in other non-current assets. In the third quarter of 2001, the Company recorded impairment losses on strategic investments of $16.1 million. The losses represented write-downs of the Company's carrying amount of the investments and were determined by using, among other factors, an investee's significant decline in stock value, its inability to obtain additional private financing, its cash position and current burn rate, and the uncertainty of its financial conditions. At December 31, 2001 the Company had evaluated its remaining investments and currently believes that the carrying values are recoverable.

**Note 7. Convertible Subordinated Notes**

In October 1997, the Company issued $100.0 million of 5.25% convertible subordinated notes due 2004 (the "5.25% notes"), for which the Company received net proceeds of $97.5 million. The Company and its wholly-owned subsidiary, VERITAS Operating Corporation, are co-obligors on the 5.25% notes and are unconditionally, jointly and severally liable for all payments under the notes. As of December 31, 2001, a total principal amount of $35.5 million had been converted into approximately 3.7 million shares of the Company's common stock. Based on the aggregate principal amount at maturity of $64.5 million outstanding as of December 31, 2001, the 5.25% notes provide for semi-annual interest payments of $1.7 million each May 1 and November 1. The 5.25% notes are convertible into shares of the Company's common stock at any time prior to the close of business on the maturity date, unless previously redeemed or repurchased, at a conversion

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

price of $9.56 per share, subject to adjustment in certain events, equivalent to a conversion rate of 104.65 shares of common stock per $1,000 principal amount at maturity. On or after November 5, 2002, the 5.25% notes will be redeemable over a period of time until maturity at our option at declining premiums to par. The debt issuance costs are being amortized over the term of the 5.25% notes using the interest method.

In August 1999, the Company and its wholly-owned subsidiary, VERITAS Operating Corporation, issued $465.8 million, aggregate principal amount at maturity, of 1.856% convertible subordinated notes due 2006 (the "1.856% notes") for which the Company received net proceeds of approximately $334.1 million. The interest rate of 1.856%, together with the accrual of original issue discount, represent a yield to maturity of 6.5%. The Company and VERITAS Operating Corporation are co-obligors on the 1.856% notes and are unconditionally, jointly and severally liable for all payments under the notes. As of December 31, 2001, a total principal amount of $1.1 million had been converted into approximately 29,400 shares of the Company's common stock. Based on the aggregate principal amount at maturity of $464.7 million outstanding as of December 31, 2001, the 1.856% notes provide for semi-annual interest payments of $4.3 million each February 13 and August 13. The 1.856% notes are convertible into shares of the Company's common stock at any time prior to the close of business on the maturity date, unless previously redeemed or repurchased, at a conversion price of $35.80 per share, subject to adjustment in certain events, equivalent to a conversion rate of 27.934 shares of common stock per $1,000 principal amount at maturity. On or after August 16, 2002, the 1.856% notes will be redeemable over a period of time until maturity at our option at the issuance price plus accrued original issue discount and any accrued interest. The debt issuance costs are being amortized over the term of the 1.856% notes using the interest method.

**Note 8. Summary Financial Information of Subsidiary**

VERITAS and its wholly-owned subsidiary, VERITAS Operating Corporation, are co-obligors on VERITAS' 5.25% convertible subordinated notes due 2004 and 1.856% convertible subordinated notes due 2006. VERITAS and VERITAS Operating Corporation are unconditionally, jointly and severally liable for all payments under the notes. On June 30, 2000, VERITAS reorganized its corporate structure that resulted in the elimination of differences in the consolidated financial position and operating results of the parent company and VERITAS Operating Corporation. Consequently, separate summarized financial information of VERITAS and VERITAS Operating Corporation, previously presented pursuant to Staff Accounting Bulletin No. 53, *Financial Statement Requirements in Filings Involving the Guarantee of Securities by the Parent,* are no longer presented since such information is now the same as the consolidated financial statements presented elsewhere herein. No other subsidiaries of VERITAS are co-obligors or guarantors of the convertible subordinated notes.

**Note 9. Credit facility**

During 2001, the Company extended the term of its $50.0 million unsecured credit facility, which the Company holds with a syndicate of financial institutions. At December 31, 2001, no amount was outstanding. The credit facility is due to expire in September 2002. Borrowings under the credit facility bear interest at 1.0% to 1.5% over LIBOR, and are subject to VERITAS' compliance with financial and other covenants. The credit agreement requires the Company to maintain specified financial covenants such as earnings before interest, taxes, depreciation and amortization ("EBITDA"), debt on EBITDA and quick ratio, all of which the Company was in compliance with as of December 31, 2001.

**Note 10. Commitments**

The Company currently has operating leases for its facilities and rental equipment through 2023. Rental expense under operating leases was approximately $54.0 million, $32.1 million and $15.6 million for the years ended December 31, 2001, 2000 and 1999, respectively. In addition to the basic rent, the Company is

66

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

responsible for all taxes, insurance and utilities related to the facilities. The table below shows the Company's commitments related to its convertible subordinated notes discussed in Note 7 and to its approximate minimum lease payments for its facilities and rental equipment as of December 31, 2001 (in thousands):

|  | 5.25% Notes | 1.856% Notes | Operating Lease Commitments | Total |
|---|---|---|---|---|
| 2002 | $ — | $ — | $ 75,350 | $ 75,350 |
| 2003 | — | — | 74,972 | 74,972 |
| 2004 | 64,479 | — | 71,993 | 136,472 |
| 2005 | — | — | 45,179 | 45,179 |
| 2006 | — | 464,699 | 34,197 | 498,896 |
| 2007 and thereafter | — | — | 198,320 | 198,320 |
| Total commitments | $ 64,479 | $ 464,699 | $ 500,011 | $ 1,029,189 |

*Facilities lease commitments*

In 1999 and 2000, the Company entered into three build-to-suit lease agreements for office buildings in Mountain View, California, Roseville, Minnesota and Milpitas, California. The Company began occupying the Roseville and Mountain View facilities in May and June 2001 respectively. The development and acquisition of the properties have been financed by a third party through financial institutions. The Company has accounted for these agreements as operating leases in accordance with SFAS 13, *Accounting for Leases,* as amended.

During the first, third and fourth quarters of 2001, the Company amended its existing lease agreement, originally signed in the second quarter of 1999, for new corporate campus facilities in Mountain View, California. The facilities, of 425,000 square feet, provide space for sales, marketing, administration and research and development functions. The lease term for these facilities is five years beginning in March 2000, with an option to extend the lease term for two successive periods of one year each, if agreed to by the financial institutions. The Company has the option to purchase the property (land and facilities) for the termination value of $146.2 million or, at the end of the lease, to arrange for the sale of the property to a third party while the Company retains an obligation to the owner for the difference between the sales price and the guaranteed residual value up to $129.6 million if the sales price is less than this amount, subject to certain provisions of the lease. In addition, the Company is entitled to any proceeds from a sale of the property in excess of the termination value. The Company now occupies the new corporate campus facilities and began making lease payments in the second quarter of 2001. Monthly lease payments under this operating lease are based on LIBOR using 30-day to 180-day LIBOR contracts. Future minimum lease payments under this lease are included in the table above.

During the first, third and fourth quarters of 2001, the Company amended its existing lease agreement, originally signed in the first quarter of 2000, for our existing facilities in Roseville, Minnesota. The Company improved and expanded our existing facilities of 62,000 square feet and developed adjacent property adding 142,000 square feet completed in the second quarter of 2001. The facilities provide space for technical support and research and development functions. The lease term for these facilities is five years beginning in March 2000, with an option to extend the lease term for two successive periods of one year each, if agreed to by the financial institutions. The Company has the option to purchase the property (land and facilities) for the termination value of $41.3 million or, at the end of the lease, to arrange for the sale of the property to a third party while the Company retains an obligation to the owner for the difference between the sales price and the guaranteed residual value up to $35.1 million if the sales price is less than this amount, subject to certain provisions of the lease. In addition, the Company is entitled to any proceeds from a sale of the property in

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

excess of the termination value. The Company now occupies the new campus facilities and began making lease payments in the second quarter of 2001. Monthly lease payments under this operating lease are based on LIBOR using 30-day to 180-day LIBOR contracts. Future minimum lease payments under this lease are included in the table above.

During the third and fourth quarters of 2001, the Company amended its existing lease agreement, originally signed in the third quarter of 2000, for the lease of 65 acres of land and subsequent improvements for new research and development campus facilities in Milpitas, California. The Company plans to develop the site in two phases, with the first phase of 466,000 square feet being completed in the fourth quarter of 2002. The facilities will provide space for research and development and general corporate functions. The lease term for the first phase is five years beginning in July 2000, with an option to extend the lease term for two successive periods of one year each, if agreed to by the financial institutions. The Company has the option to purchase the property (land and first phase facilities) for the termination value of $243.0 million or, at the end of the lease, to arrange for the sale of the property to a third party while the Company retains an obligation to the owner for the difference between the sales price and the guaranteed residual value up to $220.0 million if the sales price is less than this amount, subject to certain provisions of the lease. In addition, the Company is entitled to any proceeds from a sale of the property in excess of the termination value. The Company anticipates beginning the lease payments in the third quarter of 2002 for the first phase and to commence occupying the new campus facilities in the fourth quarter of 2002. Monthly lease payments under this operating lease are based on LIBOR using 30-day to 180-day LIBOR contracts. Future minimum lease payments under this lease are included in the table above. The Company is currently analyzing our construction schedule for the second phase of the campus, but at this time no commitments have been made with respect to the start of construction.

The Company has evaluated the expected fair value of the properties at the end of the lease terms by reviewing current real estate market conditions and indicators of expectations for the market in the future. In the event that the Company determines it is probable that the expected fair value of any of the properties at the end of the lease terms will be less than the respective termination values, the Company will accrue the expected loss on a straight-line basis over the remaining lease term. Currently, the Company does not believe it is probable that the fair market value of the properties at the end of the lease terms will be less than the termination values.

**Note 11. Derivative Financial Instruments**

In September 2000, the Company entered into a three year cross currency interest rate swap transaction ("swap") for the purpose of hedging fixed interest rate, foreign currency denominated cash flows under an inter-company loan receivable. Under the terms of this derivative financial instrument, EURO denominated fixed principal and interest payments to be received under the inter-company loan will be swapped for U.S. dollar fixed principal and interest payments. As of December 31, 2001, twenty-one monthly payments of EUR 4.3 million remained to be swapped at a forward exchange rate of 0.89070 U.S. dollar per Euro. The fair market value of the swap at December 31, 2001 was $0.7 million. As a result of entering into the swap, the Company has mitigated its exposure to foreign currency exchange rate fluctuations. The gains or losses on the foreign currency loan receivable will be offset by the gains or losses on the swap. Because the Company is receiving fixed interest payments under the swap, it is still subject to fluctuations in value due to changes in U.S. dollar interest rates. As of December 31, 2001 the impact of these fluctuations was not significant. This hedge was deemed to be perfectly effective as of December 31, 2001.

As of December 31, 2001, the total gross notional amount of the Company's forward contracts was approximately $186.6 million, all hedging intercompany accounts of certain of its international subsidiaries. The forward contracts had a term of thirty-five days or less and settled immediately after the end of 2001. All foreign currency transactions and all outstanding forward contracts are marked-to-market at the end of the

68

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

period with unrealized gains and losses included in other income. The unrealized gain (loss) on the outstanding forward contracts at December 31, 2001 was immaterial to our consolidated financial statements.

**Note 12. Contingencies**

In the ordinary course of business, various lawsuits and claims have been filed against the Company.

While the outcome of these matters is currently not determinable, management believes that the ultimate resolution of these matters will not have a material adverse effect on the Company's consolidated financial position, results of operations or cash flows.

**Note 13. Benefit Plans**

The Company has adopted a retirement savings plan qualified under Section 401(k) of the Internal Revenue Code, which is a pretax savings plan covering substantially all United States employees. Under the plan, employees may contribute up to 20% of their pretax salary, subject to certain limitations. Employees are eligible to participate beginning the first day of the month following their date of hire. The Company matches approximately 50% of the employee contributions up to $2,500 per year and contributed approximately $6.9 million in 2001, compared to $5.3 million in 2000 and $3.1 million in 1999.

**Note 14. Stockholders' Equity and Stock Compensation Plans**

*Stockholder Rights Plan*

On October 4, 1998, the Board of Directors of the Company adopted a Stockholder Rights Plan, declaring a dividend of one preferred share purchase right for each outstanding share of common stock, par value $0.001 per share, of VERITAS. The rights are initially attached to the Company's common stock and will not trade separately. If a person or group acquires 20 percent or more of the Company's common stock, or announces an intention to make a tender offer for the Company's common stock the consummation of which would result in acquiring 20 percent or more of the Company's common stock, then the rights will be distributed and will then trade separately from the common stock. Each right entitles the registered holder to purchase from the Company one one-hundredth of a share of Series A Junior Participating Preferred Stock, par value $0.001 per share, of the Company. The rights expire October 5, 2008, unless the expiration date is extended or unless the rights are earlier redeemed or exchanged by the Company.

The Company is authorized to issue up to 10,000,000 shares of undesignated preferred stock. No such preferred shares have been issued to date.

*Stock Option Plans*

The Company has two stock option plans. The Company's 1993 Equity Incentive Plan provides for the issuance of either incentive or nonstatutory stock options to employees and consultants of the Company. These options generally are granted at the fair market value of the Company's common stock at the date of grant, expire ten years from the date of grant, vest over a four-year period and are exercisable immediately upon vesting. The Company's 1993 Directors Stock Option Plan provides for the issuance of stock options to directors of the Company. These options generally are granted at the fair market value of the Company's common stock at the date of grant, expire ten years from the date of grant, vest over the term of each director's board membership and are exercisable immediately upon vesting. As of December 31, 2001, the Company had reserved 107.2 million shares of common stock for issuance under the 1993 Equity Incentive Plan and 2.5 million shares for issuance under the Company's 1993 Directors Stock Option Plan. As of December 31, 2001, 27.4 million shares were available for future grant under the plans.

69

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

A summary of the status of the Company's stock option plans as of December 31, 2001, 2000 and 1999 and changes during the years ended on those dates is presented below (number of shares in thousands):

| | 2001 | | 2000 | | 1999 | |
|---|---|---|---|---|---|---|
| | Number of Shares | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price | Number of Shares | Weighted-Average Exercise Price |
| Outstanding at beginning of year | 54,817 | $ 41.73 | 54,422 | $ 10.28 | 36,948 | $ 4.88 |
| Granted | 21,263 | $ 39.72 | 19,024 | $ 100.76 | 16,717 | $ 23.36 |
| Assumed in business combinations | 28 | $ 13.08 | — | $ — | 15,896 | $ 3.40 |
| Exercised | (10,528) | $ 6.96 | (15,806) | $ 6.47 | (11,909) | $ 3.21 |
| Forfeited | (5,959) | $ 62.18 | (2,823) | $ 31.29 | (3,230) | $ 9.07 |
| Outstanding at end of year | 59,621 | $ 45.09 | 54,817 | $ 41.73 | 54,422 | $ 10.28 |
| Options exercisable at year end | 26,235 | | 21,621 | | 22,625 | |
| Weighted-average fair value of options granted during the year | $ 28.58 | | $ 63.42 | | $ 13.93 | |

The following table summarizes information about stock options outstanding at December 31, 2001 (number of shares in thousands):

| | Options Exercisable | | | Options Outstanding | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Number Outstanding at December 31, 2001 | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Number Exercisable at December 31, 2001 | Weighted-Average Exercise Price |
| $ 0.03 — $ 4.79 | 6,665 | 4.59 | $ 3.08 | 6,320 | $ 3.03 |
| $ 4.96 — $ 11.33 | 6,230 | 5.74 | $ 8.37 | 5,429 | $ 8.17 |
| $12.00 — $ 19.89 | 7,231 | 7.15 | $ 17.49 | 3,756 | $ 17.27 |
| $20.86 — $ 27.55 | 4,027 | 7.95 | $ 23.12 | 1,710 | $ 22.59 |
| $28.72 — $ 28.72 | 7,663 | 9.67 | $ 28.72 | 605 | $ 28.72 |
| $30.96 — $ 39.45 | 6,177 | 9.13 | $ 38.53 | 1,148 | $ 38.47 |
| $39.57 — $ 88.00 | 8,221 | 9.01 | $ 68.74 | 1,991 | $ 70.83 |
| $90.38 — $ 97.00 | 7,789 | 8.08 | $ 94.09 | 3,075 | $ 93.75 |
| $97.61 — $134.17 | 5,618 | 8.44 | $ 113.95 | 2,201 | $ 114.08 |
| $ 0.03 — $134.17 | 59,621 | 7.80 | $ 45.09 | 26,235 | $ 34.65 |

*Employee Stock Purchase Plan*

As of December 31, 2001, under the Company's 1993 Employee Stock Purchase Plan, the Company is authorized to issue up to 25.8 million shares of common stock to its full-time employees, nearly all of whom are eligible to participate. Under the terms of the 1993 Employee Stock Purchase Plan, employees can choose to have up to 10% of their wages withheld to purchase the Company's common stock. The 1993 Employee Stock Purchase Plan consists of two-year offerings with four 6-month purchase periods in each offering period. The purchase price of the stock is 85% of the lower of the subscription date fair market value or the end of the purchase period fair market value.

Substantially all of the eligible employees have participated in the 1993 Employee Stock Purchase Plan in 2001, 2000 and 1999. Under the 1993 Employee Stock Purchase Plan, the Company issued 1.1 million shares to employees in 2001, 1.1 million shares in 2000, and 0.8 million shares in 1999. The weighted-average purchase price of these shares was $27.30 in 2001, $16.11 in 2000 and $8.70 in 1999.

70

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

*Stock-based Compensation*

The Company applies APB Opinion No. 25 and related interpretations in accounting for its stock option plans. Since the exercise price of options granted under such plans is generally equal to the market value on the date of grant, no compensation cost has been recognized for grants under its stock option plans and stock purchase plans. In accordance with APB 25, the Company does not recognize compensation cost related to its employee stock purchase plan. If compensation cost for the Company's stock-based compensation plans had been determined consistent with SFAS No. 123, the Company's net loss and net loss per share would have been reduced to the pro forma amounts indicated below (in thousands, except per share amounts):

|  | 2001 | 2000 | 1999 |
|---|---|---|---|
|  | (As restated) | (As restated) |  |
| Net loss |  |  |  |
| As reported | $ (642,329) | $ (628,385) | $ (502,958) |
| Pro forma | $ (932,714) | $ (779,848) | $ (540,474) |
| Basic and diluted loss per share |  |  |  |
| As reported | $    (1.61) | $    (1.57) | $    (1.59) |
| Pro forma | $    (2.34) | $    (1.95) | $    (1.71) |

For the pro forma amounts determined under SFAS No. 123, as set forth above, the fair value of each stock option grant under the stock option plans is estimated on the date of grant using the Black-Scholes option-pricing model with the following weighted-average assumptions used for grants in 2001, 2000 and 1999: risk-free interest rates averaging 4.56% in 2001, 6.16% in 2000 and 5.55% in 1999; a dividend yield of 0.0% for all years; a weighted-average expected life of 5 years for all years; and a volatility factor of the expected market price of the Company's common stock of 0.90 for 2001, 0.70 for 2000 and 0.65 for 1999.

The fair value of the employees' purchase rights under the employee purchase plan is estimated on the date of grant using the Black-Scholes option-pricing model with the following assumptions for these rights granted in 2001, 2000 and 1999: a dividend yield of 0.0% for all years; an expected life ranging up to 2 years for all years; an expected volatility factor of 0.90 in 2001, 0.70 in 2000 and 0.65 in 1999; and risk-free interest rates ranging from 3.37% to 4.99% in 2001, from 6.02% to 6.65% in 2000 and from 4.57% to 5.77% in 1999.

**Note 15. Income Taxes**

Income before provision for income taxes consisted of (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
|  | (As restated) | (As restated) |  |
| United States | $ (468,863) | $ (323,749) | $ (455,404) |
| International | (59,729) | (215,299) | (12,164) |
|  | $ (528,592) | $ (539,048) | $ (467,568) |

71

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The provision for income taxes consists of the following (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2001** | **2000** | **1999** |
|  | **(As restated)** | **(As restated)** |  |
| Federal |  |  |  |
| Current | $ 277,449 | $ 165,686 | $ 64,452 |
| Deferred | (167,716) | (85,944) | (35,245) |
| State |  |  |  |
| Current | 35,990 | 14,862 | 9,340 |
| Deferred | (32,228) | (9,329) | (5,077) |
| Foreign |  |  |  |
| Current | 5,451 | 4,062 | 1,920 |
| Deferred | (5,209) | — | — |
| Total | $ 113,737 | $ 89,337 | $ 35,390 |

The tax benefits associated with employee stock option activity or employee stock purchase plan shares reduced taxes currently payable by $267.7 million for 2001, $160.8 million for 2000, and $63.4 million for 1999.

The provision for income taxes differed from the amount computed by applying the federal statutory rate as follows:

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2001** | **2000** | **1999** |
|  | **(As restated)** | **(As restated)** |  |
| Federal tax at statutory rate | 35.0% | 35.0% | 35.0% |
| State taxes | (0.5) | (1.0) | (0.9) |
| Impact of foreign taxes | 1.3 | (0.7) | (0.4) |
| In-process research and development charge and non-deductible goodwill | (52.4) | (51.1) | (42.2) |
| Tax credits | 0.4 | 0.7 | 0.5 |
| Adjustment to merger related tax liability | (5.1) | — | — |
| Other | (0.2) | 0.5 | 0.4 |
| Total | (21.5)% | (16.6)% | (7.6)% |

72

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

Significant components of the Company's deferred tax assets and liabilities are as follows (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2001** | **2000** | **1999** |
|  | **(As restated)** | **(As restated)** |  |
| Deferred tax assets: |  |  |  |
| Net operating loss carryforwards | $ 42,724 | $ 161,966 | $ 26,946 |
| Deferred revenue and reserve accruals not currently deductible | 175,773 | 47,718 | 28,315 |
| Acquired intangibles | 35,599 | 17,898 | 12,521 |
| Tax credit carryforwards | 40,245 | 20,070 | 2,861 |
| Foreign | 5,209 | — | — |
| Other | 10,040 | 9,519 | 2,170 |
| Total | 309,590 | 257,171 | 72,813 |
| Valuation allowance | (71,385) | (162,319) | (11,602) |
| Net deferred tax assets | 238,205 | 94,852 | 61,211 |
| Deferred tax liabilities: |  |  |  |
| Acquired intangibles | (68,540) | (130,340) | (195,275) |
| Net deferred tax assets (liabilities) | $ 169,665 | $ (35,488) | $ (134,064) |

As of December 31, 2001 and 2000, deferred and other income taxes payable recorded in connection with the Seagate transaction totaled $134.4 million and $135.0 million, respectively and related to certain tax liabilities that are expected to be paid by the Company after the merger (See Note 2). Certain of Seagate's federal and state tax returns for various fiscal years are under examination by taxing authorities. A decrease in the indemnification receivable from SAC of $30.7 million and a provision for income taxes of $30.1 million have been recorded in 2001 due to certain settlements entered into with tax authorities as well as the Company's changes in estimates of the amount and timing of other tax liabilities for years under examination. The Company believes that adequate amounts for tax have been provided for any final assessments that may result from these examinations.

The valuation allowance decreased by $90.9 million in 2001, increased by $150.7 million in 2000 and decreased by $9.2 million in 1999. As of December 31, 2001 the Company has provided a valuation allowance on certain deferred tax assets that has two main components. Approximately $11.6 million of the valuation allowance relates to the tax benefits of certain assets acquired with the acquisition of NSMG and will be credited to goodwill when realized. The Company has also provided $59.8 million of valuation allowance that relates to certain of its deferred tax assets because of uncertainty regarding their realizability due to the expectation of future employee stock option activity. When recognized, most of the tax benefit of these deferred tax assets will be accounted for as a credit to stockholders' equity rather than as a reduction of the income tax provision.

As of December 31, 2001, the Company had federal tax loss carryforwards of approximately $34.9 million and federal tax credit carryforwards of approximately $21.3 million. The federal tax loss carryforwards will expire in 2002 through 2009, and the federal tax credit carryforwards will expire in 2003 through 2021, if not utilized. The Company had state tax loss carryforwards of approximately $77.7 million and state tax credit carryforwards of approximately $18.9 million. The state tax loss carryforwards will expire in 2002 through 2009, and of the state tax credit carryforwards $3.4 million will expire in 2002 through 2007, if not utilized, and $15.5 million may be carried forward indefinitely. Because of the change in ownership provisions of the Internal Revenue Code, a portion of the Company's net operating loss and tax credit carryforwards may be subject to annual limitation. The annual limitation may result in the expiration of net operating loss and tax

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

credit carryforwards before utilization. In addition, the Company had foreign net operating loss carryforwards of approximately $270.0 million that may be carried forward indefinitely.

As of December 31, 2001, the Company believes that it is more likely than not that the results of future operations will generate sufficient taxable income to realize the net deferred tax assets.

**Note 16. Net Loss Per Share**

The following table sets forth the computation of basic and diluted net loss per share (in thousands, except per share amounts):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | 2001 | 2000 | 1999 |
|  | (As restated) | (As restated) |  |
| Numerator: |  |  |  |
| Net loss | $ (642,329) | $ (628,385) | $ (502,958) |
| Denominator: |  |  |  |
| Denominator for basic net loss per share — weighted-average shares | 399,016 | 400,034 | 316,892 |
| Potential common shares | — | — | — |
| Denominator for diluted net loss per share | 399,016 | 400,034 | 316,892 |
| Basic and diluted net loss per share | $ (1.61) | $ (1.57) | $ (1.59) |

Common stock equivalents included in the denominator for purposes of computing diluted net loss per share do not include shares related to employee stock options, shares issuable upon conversion of the outstanding 5.25% convertible subordinated notes or shares issuable upon conversion of the outstanding 1.856% convertible subordinated notes, as their effect would be anti-dilutive for all periods presented. The following table sets forth the common stock equivalents that were excluded from the net loss per share computations (in thousands):

|  | 2001 | 2000 | 1999 |
|---|---|---|---|
| Employee stock options outstanding | 59,621 | 54,817 | 54,422 |
| 5.25% convertible subordinated notes | 6,749 | 6,753 | 10,465 |
| 1.856% convertible subordinated notes | 12,981 | 12,982 | 13,010 |

The weighted average exercise prices of the employee stock options with exercise prices exceeding the average fair value of the Company's common stock for December 31, 2001, 2000 and 1999 are $45.09, $41.73 and $10.28 per share, respectively.

On January 1, 2002, the Company adopted SFAS 142, *Goodwill and Other Intangible Assets*. As a result, the Company no longer amortizes goodwill, but will test it for impairment annually or whenever events or

74

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

changes in circumstances suggest that the carrying amount may not be recoverable. The adjusted net income per share excluding amortization of goodwill is as follows (in thousands):

|  | December 31, | | |
|---|---|---|---|
|  | **2001** | **2000** | **1999** |
|  | (As restated) | (As restated) |  |
| Net loss | $ (642,329) | $ (628,385) | $ (502,958) |
| Add back: |  |  |  |
| Amortization of goodwill | 814,390 | 807,137 | 469,103 |
| Adjusted net income | $ 172,061 | $ 178,752 | $ (33,855) |
| Basic net income (loss) per share | $    (1.61) | $    (1.57) | $    (1.59) |
| Add back: |  |  |  |
| Amortization of goodwill | 2.04 | 2.02 | 1.48 |
| Adjusted basic net income per share | $    0.43 | $    0.45 | $    (0.11) |
| Diluted net loss per share | $    (1.53) | $    (1.44) | $    (1.41) |
| Add back: |  |  |  |
| Amortization of goodwill | 1.94 | 1.85 | 1.32 |
| Adjusted diluted net income (loss) per share | $    0.41 | $    0.41 | $    (0.09) |

**Note 17. Segment Information**

The Company operates in one segment, data availability solutions. The Company's products and services are sold throughout the world, through OEM, direct sales channels and indirect sales channels. The Company's chief operating decision maker, the chief executive officer, evaluates the performance of the Company based upon stand-alone revenue of product channels and the geographic regions of the segment and does not receive discrete financial information about asset allocation, expense allocation or profitability from the Company's storage products or services.

Geographic information (in thousands):

|  | Years Ended December 31, | | |
|---|---|---|---|
|  | **2001** | **2000** | **1999** |
|  | (As restated) | (As restated) |  |
| User license fees(1): |  |  |  |
| United States | $    759,649 | $    713,931 | $ 372,485 |
| Europe(2) | 238,076 | 175,945 | 94,986 |
| Other(3) | 112,401 | 77,689 | 30,543 |
| Total | $ 1,110,126 | $    967,565 | $ 498,014 |
| Services(1): |  |  |  |
| United States | $    302,117 | $    179,096 | $  78,756 |
| Europe(2) | 56,807 | 31,646 | 15,450 |
| Other(3) | 22,878 | 9,134 | 3,892 |
| Total | $    381,802 | $    219,876 | $  98,098 |
| Total net revenue | $ 1,491,928 | $ 1,187,441 | $ 596,112 |

75

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

| | As of December 31, | | |
|---|---|---|---|
| | **2001** | **2000** | **1999** |
| Long-lived assets(4): | | | |
| United States | $ 1,592,060 | $ 2,423,292 | $ 3,289,545 |
| Europe(2) | 33,945 | 22,212 | 11,918 |
| Other(3) | 12,294 | 8,205 | 2,244 |
| Total | $ 1,638,299 | $ 2,453,709 | $ 3,303,707 |

(1)    License and service revenues are attributed to geographic regions based on location of customers.

(2)    Europe includes the Middle East and Africa.

(3)    Other consists of Canada, Latin America, Japan and the Asia Pacific region.

(4)    Long-lived assets include all long-term assets except those specifically excluded under SFAS No. 131, such as deferred income taxes and financial instruments. Reconciliation to total assets reported (in thousands):

| | As of December 31, | |
|---|---|---|
| | **2001** | **2000** |
| | **(As restated)** | **(As restated)** |
| Total long-lived assets | $ 1,638,299 | $ 2,453,709 |
| Other assets, including current | 2,160,077 | 1,619,569 |
| Total consolidated assets | $ 3,798,376 | $ 4,073,278 |

No customer represented 10% or more of the Company's net revenue in 2001, 2000 or 1999.

User license fees information (in thousands):

The Company markets and distributes its software products both as individual software products and as integrated products suites, also referred to as application solutions. The Company derives our user license fees from the sale of its core technologies, including data protection and file system and volume management products, from its emerging technologies, including cluster and replication and SAN products and from its application solutions, which include technologies from both its core and emerging technologies. The user license fees from its core technologies were $951.1 million in 2001, $830.7 million in 2000 and $443.6 million in 1999. The user license fees from its emerging technologies were $159.0 million in 2001, $136.9 million in 2000 and $54.5 million in 1999.

The user license fees from its application solutions, as stand-alone products, were $228.1 million in 2001, $ 236.1 million in 2000 and $107.1 million in 1999. The user license fees generated by application solutions are allocated between core technology products and emerging technology products.

**Note 18. Related Party Transactions**

In 1999, the Company paid $6.7 million in service fees related to the acquisition of NSMG to Donaldson, Lufkin & Jenrette ("DLJ"), a company affiliated with a director of the Company until February 1999. The Company had no outstanding receivable or payable balance with DLJ at December 31, 2001.

In 2001, the Company accelerated the vesting of certain stock options held by its former chief executive officer and chairman of the board, resulting in a one-time stock-based compensation charge of $8.1 million.

Certain of the Company's customers are also its suppliers. Occasionally, in the normal course of business, the Company has purchased goods or services for its operations from these suppliers at or about the same

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

time the Company has licensed its software to them. These transactions are separately negotiated and recorded at terms the Company considers to be arm's-length.

**Note 19. Subsequent Events**

In January 2002, the Company entered into two three-year pay fixed, receive floating, interest rate swaps ("interest rate swaps") for the purpose of hedging variable interest rate debt of its built-to-suit lease agreements. Under the terms of the interest rate swaps, the Company makes payments based on the fixed rate and will receive interest payment based on the 3-month LIBOR. The interest rate swaps settles the first day of January, April, July and October until expiration. As a result of entering into the interest rate swaps, the Company has mitigated its exposure to interest rate fluctuations. As the rental payments on the leases are based on the 3-month LIBOR and the Company receives 3-month LIBOR from the interest rate swap counter-party, the Company has eliminated any impact to raising interest rates related to its rent payments under the built-to-suit lease agreements.

**Note 20. Restatement of Financial Statements**

On January 17, 2003, the Company announced that it would restate its accounting for transactions with AOL Time Warner (AOL) entered into in September 2000. The transactions involved a software and services purchase by AOL at a stated value of $50.0 million and the purchase by the Company of advertising services from AOL at a stated value of $20.0 million. The Company originally recorded $36.9 million of revenue in 2000 and has been recognizing the remaining $13.1 million in revenue over a three-year support period. The purchase of advertising services at a stated value of $20.0 million was recorded as an expense as the services were provided in 2000 and 2001.

The Company has conducted an internal review of the AOL transactions and other contemporaneous customer-vendor transactions to determine if the fair value of goods and services purchased and sold could be reasonably determined. The Company has determined that the fair value of the goods and services purchased and sold in the AOL transactions could not be reasonably determined and has accordingly restated its financial results to reflect a reduction in revenues and expenses of $20.0 million. The Company is also restating two additional contemporaneous transactions involving software licenses and the purchase of on-line advertising services entered into in 2000 to reflect an additional reduction in revenues and expenses of $977,000. The periods affected by the restatement include fiscal years ended December 31, 2000 and 2001. In fiscal 2000, the restatement reduces revenue by $19.9 million and increases net loss and net loss per share by $8.6 million and $0.02, respectively. In fiscal 2001, the restatement reduces revenue by $0.4 million and decreases net loss and net loss per share by $9.0 million and $0.02, respectively. Additionally, as of December 31, 2001, the deferred revenue balance was reduced by $0.7 million.

The restatement has no impact on the Company's net cash flows from operating activities or on the Company's cash and cash equivalents in the consolidated statements of cash flows for the years ended December 31, 2000 and 2001.

77

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

The following tables show the impacts of the restatement on the Company's consolidated statements of operations for the years ended December 2001 and 2000 and on the Company's consolidated balance sheets as of December 31, 2001 and 2000 (in thousands, except per share amounts):

|  | Year Ended December 31, 2001 | |
|---|---|---|
|  | (As originally reported) | (As restated) |
| Net revenue: | | |
| User license fees | $ 1,110,400 | $ 1,110,126 |
| Services | 381,941 | 381,802 |
| Total net revenue | 1,492,341 | 1,491,928 |
| Cost of revenue: | | |
| User license fees | 40,902 | 40,902 |
| Services | 138,430 | 138,430 |
| Amortization of developed technology | 63,086 | 63,086 |
| Total cost of revenue | 242,418 | 242,418 |
| Gross profit | 1,249,923 | 1,249,510 |
| Operating expenses: | | |
| Selling and marketing | 563,283 | 548,973 |
| Research and development (excluding $870 related to stock-based compensation in 2001) | 241,197 | 241,197 |
| General and administrative (excluding $8,079 related to stock-based compensation in 2001) | 116,793 | 116,793 |
| Amortization of goodwill and other intangibles | 886,651 | 886,651 |
| Stock-based compensation | 8,949 | 8,949 |
| Acquisition and restructuring reversals | (5,000) | (5,000) |
| Total operating expenses | 1,811,873 | 1,797,563 |
| Loss from operations | (561,950) | (548,053) |
| Interest and other income, net | 64,916 | 64,916 |
| Interest expense | (29,381) | (29,381) |
| Loss on strategic investments | (16,074) | (16,074) |
| Loss before income taxes | (542,489) | (528,592) |
| Provision for income taxes | 108,873 | 113,737 |
| Net loss | $ (651,362) | $ (642,329) |
| Net loss per share — basic and diluted | $ (1.63) | $ (1.61) |
| Number of shares used in computing per share amounts — basic and diluted | 399,016 | 399,016 |

|  | Year Ended December 31, 2000 | |
|---|---|---|
|  | (As originally reported) | (As restated) |
| Net revenue: | | |
| User license fees | $ 987,363 | $ 967,565 |
| Services | 219,965 | 219,876 |
| Total net revenue | 1,207,328 | 1,187,441 |
| Cost of revenue: | | |
| User license fees | 40,779 | 40,779 |

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

| | Year Ended December 31, 2000 | |
| --- | --- | --- |
| | (As originally reported) | (As restated) |
| Services | 85,968 | 85,968 |
| Amortization of developed technology | 62,054 | 62,054 |
| Total cost of revenue | 188,801 | 188,801 |
| Gross profit | 1,018,527 | 998,640 |
| Operating expenses: | | |
| Selling and marketing | 443,834 | 437,167 |
| Research and development | 175,901 | 175,901 |
| General and administrative | 77,900 | 77,900 |
| Amortization of goodwill and other intangibles | 879,032 | 879,032 |
| Acquisition and restructuring reversals | (4,260) | (4,260) |
| Total operating expenses | 1,572,407 | 1,565,740 |
| Loss from operations | (553,880) | (567,100) |
| Interest and other income, net | 59,619 | 59,619 |
| Interest expense | (31,567) | (31,567) |
| Loss before income taxes | (525,828) | (539,048) |
| Provision for income taxes | 93,964 | 89,337 |
| Net loss | $ (619,792) | $ (628,385) |
| Net loss per share — basic and diluted | $ (1.55) | $ (1.57) |
| Number of shares used in computing per share amounts — basic and diluted | 400,034 | 400,034 |

| | December 31, 2001 | |
| --- | --- | --- |
| | (As originally reported) | (As restated) |
| Current assets: | | |
| Cash and cash equivalents | $ 538,419 | $ 538,419 |
| Short-term investments | 1,156,441 | 1,156,441 |
| Accounts receivable, net of allowance for doubtful accounts of $12,616 | 176,635 | 176,635 |
| Deferred income taxes | 124,527 | 124,290 |
| Other current assets | 66,466 | 66,466 |
| Total current assets | 2,062,488 | 2,062,251 |
| Property and equipment, net | 225,763 | 225,763 |
| Goodwill and other intangibles, net | 1,412,536 | 1,412,536 |
| Other non-current assets | 52,451 | 52,451 |
| Deferred income taxes | 45,375 | 45,375 |
| | $ 3,798,613 | $ 3,798,376 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
| --- | --- | --- |
| Current liabilities: | | |
| Accounts payable | $ 32,244 | $ 32,244 |
| Accrued compensation and benefits | 89,637 | 89,637 |
| Accrued acquisition and restructuring costs | 12,093 | 12,093 |
| Other accrued liabilities | 80,833 | 80,833 |

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

|  | December 31, 2001 | |
| --- | --- | --- |
|  | (As originally reported) | (As restated) |
| Income taxes payable | 63,735 | 63,735 |
| Deferred revenue | 239,110 | 238,433 |
| Total current liabilities | 517,652 | 516,975 |
| Convertible subordinated notes | 444,408 | 444,408 |
| Deferred and other income taxes | 113,100 | 113,100 |
| Total liabilities | 1,075,160 | 1,074,483 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $.001 par value: | | |
| 10,000 shares authorized: none issued and outstanding | — | — |
| Common stock, $.001 par value: | | |
| 2,000,000 shares authorized; 423,178 shares issued at December 31, 2001; 404,503 outstanding at December 31, 2001 | 423 | 423 |
| Additional paid-in capital | 6,228,914 | 6,228,914 |
| Accumulated deficit | (1,803,528) | (1,803,088) |
| Accumulated other comprehensive loss | (292) | (292) |
| Treasury stock, at cost; 18,675 shares at December 31, 2001 | (1,702,064) | (1,702,064) |
| Total stockholders' equity | 2,723,453 | 2,723,893 |
|  | $ 3,798,613 | $ 3,798,376 |

|  | December 31, 2000 | |
| --- | --- | --- |
|  | (As originally reported) | (As restated) |
| Current assets: | | |
| Cash and cash equivalents | $ 886,558 | $ 886,558 |
| Short-term investments | 232,891 | 232,891 |
| Accounts receivable, net of allowance for doubtful accounts of $7,810 | 186,863 | 186,013 |
| Deferred income taxes | 38,017 | 42,644 |
| Other current assets | 38,303 | 24,970 |
| Total current assets | 1,382,632 | 1,373,076 |
| Long-term investments | 136,111 | 136,111 |
| Property and equipment, net | 168,389 | 168,389 |
| Goodwill and other intangibles, net | 2,285,320 | 2,285,320 |
| Other non-current assets | 110,382 | 110,382 |
|  | $ 4,082,834 | $ 4,073,278 |

LIABILITIES AND STOCKHOLDERS' EQUITY

|  | | |
| --- | --- | --- |
| Current liabilities: | | |
| Accounts payable | $ 45,250 | $ 45,250 |
| Accrued compensation and benefits | 63,838 | 63,838 |
| Accrued acquisition and restructuring costs | 44,123 | 44,123 |
| Other accrued liabilities | 69,289 | 69,416 |

80

Table of Contents

**VERITAS SOFTWARE CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

| | December 31, 2000 | |
|---|---|---|
| | (As originally reported) | (As restated) |
| Income taxes payable | 34,454 | 34,454 |
| Deferred revenue | 201,001 | 199,911 |
| Total current liabilities | 457,955 | 456,992 |
| Convertible subordinated notes | 429,176 | 429,176 |
| Deferred and other income taxes | 213,132 | 213,132 |
| Total liabilities | 1,100,263 | 1,099,300 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, $.001 par value: | | |
| 10,000 shares authorized: none issued and outstanding | — | — |
| Common stock, $.001 par value: | | |
| 2,000,000 shares authorized; 411,565 shares issued at December 31, 2000; 392,890 outstanding at December 31, 2000 | 412 | 412 |
| Additional paid-in capital | 5,847,844 | 5,847,844 |
| Accumulated deficit | (1,152,166) | (1,160,759) |
| Accumulated other comprehensive loss | (11,455) | (11,455) |
| Treasury stock, at cost; 18,675 shares at December 31, 2000 | (1,702,064) | (1,702,064) |
| Total stockholders' equity | 2,982,571 | 2,973,978 |
| | $ 4,082,834 | $ 4,073,278 |

81

**REPORT OF INDEPENDENT AUDITORS**

The Stockholders and Board of Directors
VERITAS Software Corporation

We have audited the accompanying consolidated balance sheet of VERITAS Software Corporation and subsidiaries as of December 31, 2001 and the related consolidated statement of operations, stockholders' equity and comprehensive loss, and cash flows for the year ended December 31, 2001. Our audit also included the financial statement schedule listed in the index at Item 14(a). These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of VERITAS Software Corporation and subsidiaries as of December 31, 2001, and the consolidated results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 20 to the consolidated financial statements, VERITAS Software Corporation has restated its consolidated financial statements as of and for the year ended December 31, 2001.

/s/    KPMG LLP

Mountain View, California
January 25, 2002, except for Note 20,
which is as of March 14, 2003

82

**REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS**

The Stockholders and Board of Directors
VERITAS Software Corporation

We have audited the accompanying consolidated balance sheet of VERITAS Software Corporation as of December 31, 2000, and the related consolidated statements of operations, stockholders' equity and comprehensive loss, and cash flows for each of the two years in the period ended December 31, 2000. Our audits also included the financial statement schedule listed in the index at Item 14(a). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and schedule based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of VERITAS Software Corporation at December 31, 2000, and the consolidated results of its operations and its cash flows for each of the two years in the period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 20 to the accompanying consolidated financial statements, VERITAS Software Corporation has restated its financial statements for the year ended December 31, 2000.

/s/ ERNST & YOUNG LLP

San Jose, California
January 23, 2001,
except for Note 20, insofar as it relates to the year 2000,
as to which the date is March 14, 2003.

**SCHEDULE II — VALUATION AND QUALIFYING ACCOUNTS**

| | Balance at Beginning of Year | Provision From Businesses Acquired | Charged to Operating Expenses | Deductions(1) | Balance at End of Year |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| Allowance for doubtful accounts: | | | | | |
| Year ended December 31, 2001 | $ 7,810 | $    220 | $ 5,136 | $    550 | $ 12,616 |
| Year ended December 31, 2000 | $ 5,693 | $    — | $ 4,585 | $ 2,468 | $  7,810 |
| Year ended December 31, 1999 | $ 2,572 | $  1,477 | $ 2,425 | $    781 | $  5,693 |

(1)    Deductions related to the allowance for doubtful accounts represent amounts written off against the allowance.

Table of Contents

**EXHIBIT INDEX**

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | Filed Herewith |
|---|---|---|---|---|---|
| | | Form | Date | Number | |
| 23.01 | Independent Auditors' consent | | | | X |
| 23.02 | Consent of Independent Auditors | | | | X |
| 99.01 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | | | | X |

85

EXHIBIT 23.01

INDEPENDENT AUDITORS' CONSENT

The Board of Directors
VERITAS Software Corporation:

We consent to incorporation by reference in the registration statements (Nos. 333-89258, 333-89252, 333-76822, 333-68422, 333-57882, 333-38460, 333-86179, 333-79841, and 333-25927) on Form S-8 and in the registration statement (No. 333-80851) on Form S-3 of VERITAS Software Corporation and subsidiaries of our report dated January 25, 2002, except as to Note 20, which is as of March 14, 2003, with respect to the consolidated balance sheet of VERITAS Software Corporation and subsidiaries as of December 31, 2001, and the related consolidated statement of operations, stockholders' equity and comprehensive loss, and cash flows for the year then ended, and the related financial statement schedule, which report appears in the December 31, 2001, annual report on Form 10-K/A of VERITAS Software Corporation.

Our report dated January 25, 2002, except as to Note 20, which is as of March 14, 2003, contains an explanatory paragraph that refers to a restatement of the consolidated financial statements as of and for the year ended December 31, 2001.

                                        /s/ KPMG LLP

Mountain View, California
March 14, 2003

Exhibit 23.02

CONSENT OF INDEPENDENT AUDITORS

We consent to the incorporation by reference in the Registration Statement (Form S-3 No. 333-80851) and related Prospectus and Registration Statements (Form S-8 Nos. 333-25927, 333-79841, 333-86179, 333-38460, 333-57882, 333-68422, 333-76822, 333-89258, and 333-89252) pertaining to the 1985 Stock Option Plan, 1992 Stock Plan, 1993 Directors Stock Option Plan, 1993 Employee Stock Purchase Plan, 1996 Director Option Plan, 1996 Employee Stock Purchase Plan, Options to Purchase Common Stock Assumed by Registrant Pursuant to an Asset Purchase Agreement with Nuview, 1993 Equity Incentive Plan and 1993 Employee Stock Purchase Plan, Stock Option Agreement, 1997 Equity Incentive Plan of the Kernel Group Incorporated, 2002 Employee Stock Purchase Plan, 2002 International Employee Stock Purchase Plan, and 2002 Directors Stock Option Plan of VERITAS Software Corporation of our report dated January 23, 2001, except for Note 20, insofar as it relates to the year 2000, as to which the date is March 14, 2003, with respect to the consolidated financial statements and schedule of VERITAS Software Corporation for the year ended December 31, 2000, included in the Annual Report, as amended, on Form 10-K/A of VERITAS Software Corporation for the year ended December 31, 2001.

/s/ Ernst & Young LLP

San Jose, California
March 14, 2003

Exhibit 99.01

```
                Certification Pursuant to 18 U.S.C. Section 1350,
                             As Adopted Pursuant To
                  Section 906 of the Sarbanes-Oxley Act of 2002


      In connection with Amendment No. 1 to the Annual Report on Form 10-K of
VERITAS Software Corporation (the "Company") for the period ended
December 31, 2001, as filed with the Securities and Exchange Commission on the
date hereof (the "Report"), each of the undersigned officers of the Company
certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section
906 of the Sarbanes-Oxley Act of 2002, that, to his respective knowledge:
      (1) the Report, as amended, fully complies with the requirements of
section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
      (2) the information contained in the Report, as amended, fairly presents,
in all material respects, the financial condition and results of operations of
the Company.
```

```
Date:  March 14, 2003                       /s/ Gary L. Bloom
                                    -------------------------------
                                    Name:   Gary L. Bloom
                                    Title:  Chief Executive Officer


Date:  March 14, 2003                       /s/ Edwin J. Gillis
                                    -------------------------------
                                    Name:   Edwin J. Gillis
                                    Title:  Chief Financial Officer
```

_____
  Created by 10KWizard    www.10KWizard.comSource: VERITAS SOFTWARE COR, 10-K/A, March 17, 2003

# EXHIBIT E

1

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (date of earliest event reported) October 12, 2000

-------------------------------

VERITAS SOFTWARE CORPORATION
--------------------------------------------------------------------------------
(Exact name of registrant as specified in its charter)

|          Delaware          |    000-26247    |   77-0507675   |
|----------------------------|-----------------|----------------|
| (State or other jurisdiction | (Commission   | (I.R.S. Employer |
|      of incorporation)     |  File Number)   | Identification No.) |

1600 Plymouth Street
Mountain View, California 94043
---------------------------------------------------------
(Address of principal executive offices including Zip Code)

Registrant's telephone number, including area code: (650) 335-8000

-------------------------------

Item 5: Other Events

    On October 12, 2000, VERITAS Software Corporation announced financial
results for its third quarter ended September 30, 2000. The press release is
attached to this Current Report as Exhibit 99.1 and is incorporated herein by
this reference.

Item 7: Financial Statements and Exhibits.

    (c)  Exhibits

    99.1 Press release dated October 12, 2000.

3

SIGNATURE

     Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated:  October 13, 2000

                    VERITAS SOFTWARE CORPORATION


                    By: /s/ Jay A. Jones
                        ------------------------------------------
                        Jay A. Jones
                        Senior Vice President,
                        Chief Administrative Officer & Secretary


                         3

4

EXHIBIT INDEX

99.1     Press release of the registrant dated October 12, 2000.

4

1

EXHIBIT 99.1

[VERITAS LETTERHEAD]                                        NEWS

VERITAS Software
1600 Plymouth Street
Mountain View, CA 94043
650.335.8000

FOR IMMEDIATE RELEASE

           VERITAS(R) SOFTWARE REPORTS RECORD THIRD QUARTER RESULTS;
                 REVENUE UP 73% TO $317.2 MILLION FOR THE QUARTER

            Earnings Increase by 81%, Sequential Revenue Grows by 15%

MOUNTAIN VIEW, CALIF. -- OCTOBER 12, 2000 -- VERITAS Software Corporation
(Nasdaq: VRTS), the Data Availability Company, today announced record financial
results for its third quarter ended September 30, 2000. The Company achieved
third quarter revenue of $317.2 million, an increase of 73% over last year's
third quarter revenue of $183.4 million. Pro forma net income, which excludes
purchase accounting adjustments, increased to $70.3 million in the third quarter
from $38.9 million for the same period in the prior year, an 81% increase.
Diluted pro forma net income per share for the third quarter was a record $0.16,
up 78% from $0.09 for the same period last year.

For the third quarter, on an as-reported basis, VERITAS Software reported a net
loss of $148.1 million, or $0.37 per share, compared with a net loss of $183.6
million, or $0.48 per share for the prior year. Included in the current period's
net loss is $235.3 million of purchase accounting amortization. Included in the
prior period's net loss is $234.9 million of purchase accounting amortization
and a one-time charge of $1.1 million for the write-off of in-process research
and development.

"Third quarter 2000 has been another landmark quarter for VERITAS Software,"
said Mark Leslie, chairman and CEO of VERITAS Software. "We continue to see
strong product demand across all channels and geographies for all of our data
availability product lines including data protection, file and volume
management, clustering and replication. As a result, VERITAS Software is now
operating at an annualized revenue run-rate in excess of $1.2 billion and has
generated over $1 billion in revenue in the trailing four quarters."

On a pro forma basis for the nine-month periods ended September 30, 2000 and
1999, VERITAS Software had revenue of $837.2 million and $473.9 million,
respectively, a 77% year-over-year increase. Net income increased to $179.2
million from pro forma net income of $96.0 million in the prior period, an 87%
increase. Pro forma diluted net income per share was $0.41, compared with $0.23
for the same period last year, a 78% increase.

The Company's as-reported revenue for the nine-month period ended September 30,
2000 was $837.2 million, compared with $370.0 million for the same period last
year. For the nine-month period, VERITAS Software

2
VERITAS Software Q3'00 Earnings Release
Page 2 of 5

reported a net loss of $494.8 million, or $1.24 per share, compared with a net
loss of $332.3 million, or $1.14 per share for the same period in the prior
year.

"Our third quarter results were exceptional by all financial measures," said Ken
Lonchar, senior vice president and CFO, VERITAS Software. "Along with the
continued strength in our international regions, this quarter has been marked by
the expansion of our UNIX business as well as steady revenue and market share
growth in the Windows NT space. Moving into next quarter, we are continuing to
see a sound ramp-up in our Hewlett-Packard business and the rising adoption of
storage area network (SAN) technology that should continue to drive the market's
acceptance of our innovative products and strategies."

The Company has added an additional financial table to its earnings releases:
"Pro forma Statements of Operations." These pro forma statements are intended to
present the Company's operating results excluding purchase accounting
adjustments. For 1999, the Company's operating results include the results of
Seagate Software NSMG and TeleBackup Systems effective at the beginning of the
period.

The Company will host a conference call on Friday, October 13 at 5:30 a.m.
Pacific Time, 8:30 a.m. Eastern Time, to discuss its results. The conference
call will be broadcast live via the Internet at www.nasdaq.com. The replay
number for the call is 800-633-8284 or 858-812-6440 (#16485732).

ABOUT VERITAS SOFTWARE THE DATA AVAILABILITY COMPANY(TM)

VERITAS Software Corporation (Nasdaq:VRTS) provides essential data availability
software solutions that enable customers to protect and access their
business-critical data for Business Without Interruption(TM). The Company's
corporate headquarters is located at 1600 Plymouth Street, Mountain View, CA
94043. Telephone: (650) 335-8000. Fax: (650) 335-8050. Email:
vx-sales@veritas.com. WWW site: http://www.veritas.com.


                                   ###

FOR FURTHER INFORMATION CONTACT:

Ken Lonchar, Senior Vice President and CFO, VERITAS Software
(650) 526-2501, ken.lonchar@veritas.com

Dave Galiotto, Vice President of Finance/Investor Relations, VERITAS Software
(650) 318-4047, dave.galiotto@veritas.com

Erin Jones, Public Relations Director, VERITAS Software
(805) 783-4528, erin.jones@veritas.com

This press release may include estimates and forward-looking statements within
the meaning of Section 27A of the Securities Act of 1933 and 21E of the
Securities Exchange Act of 1934. These forward-looking statements involve a
number of risks and uncertainties, including the timely development and market
acceptance of our products and services, our ability to maintain the quality of
our end-user customer and partnering relationships, and our ability to manage
our business effectively, that could cause the actual results we achieve to
differ materially from such forward-looking statements. For more information
regarding potential risks, see the "Factors That May Affect Future Results"
section of our most recent reports on Form 10-K and Form 10-Q on file with the
SEC.

VERITAS, VERITAS Software, the VERITAS logo, Business Without Interruption and
other product names are trademarks or registered trademarks of VERITAS Software
Corporation in the US and other countries. Other product names mentioned herein
may be trademarks and/or registered trademarks of their respective companies.

3
VERITAS Software Q3'00 Earnings Release
Page 3 of 5

VERITAS SOFTWARE CORPORATION
PRO FORMA STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE DATA)
(UNAUDITED)

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| NET REVENUE: | | | | |
| User license fees | $ 256,925 | $ 157,643 | $ 686,092 | $ 405,719 |
| Services | 60,246 | 25,758 | 151,155 | 68,149 |
| TOTAL NET REVENUE | 317,171 | 183,401 | 837,247 | 473,868 |
| COST OF REVENUE: | | | | |
| User license fees | 9,270 | 5,891 | 29,247 | 16,311 |
| Services | 21,707 | 10,787 | 60,171 | 27,013 |
| TOTAL COST OF REVENUE | 30,977 | 16,678 | 89,418 | 43,324 |
| GROSS PROFIT | 286,194 | 166,723 | 747,829 | 430,544 |
| OPERATING EXPENSES: | | | | |
| Selling and marketing | 116,936 | 67,895 | 310,628 | 178,390 |
| Research and development | 46,328 | 28,924 | 120,646 | 78,352 |
| General and administrative | 20,465 | 11,020 | 52,971 | 30,496 |
| TOTAL OPERATING EXPENSES | 183,729 | 107,839 | 484,245 | 287,238 |
| Income from operations | 102,465 | 58,884 | 263,584 | 143,306 |
| Interest and other income, net | 15,648 | 7,266 | 39,688 | 14,840 |
| Interest expense | (8,266) | (5,301) | (23,314) | (8,148) |
| Income before income taxes | 109,847 | 60,849 | 279,958 | 149,998 |
| Provision for income taxes | 39,545 | 21,906 | 100,785 | 54,000 |
| PRO FORMA NET INCOME | $ 70,302 | $ 38,943 | $ 179,173 | $ 95,998 |
| PRO FORMA NET INCOME PER SHARE - BASIC | $ 0.17 | $ 0.10 | $ 0.45 | $ 0.25 |
| PRO FORMA NET INCOME PER SHARE - DILUTED | $ 0.16 | $ 0.09 | $ 0.41 | $ 0.23 |
| SHARES USED IN PER SHARE CALCULATION - BASIC | 403,613 | 384,847 | 399,655 | 380,864 |
| SHARES USED IN PER SHARE CALCULATION - DILUTED | 438,541 | 422,033 | 437,740 | 416,848 |

The pro forma statements of operations are intended to present the Company's
operating results excluding purchase accounting adjustments. For 1999, the
Company's operating results include the results of NSMG and TeleBackup assuming
the companies had been combined at the beginning of the period.
Purchase accounting adjustments would include amortization of developed
technology, amortization of goodwill and intangibles, restructuring and other
merger costs, in-process research and development costs, and related adjustments
for income tax provisions.

4
VERITAS Software Q3'00 Earnings Release
Page 4 of 5

VERITAS SOFTWARE CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE DATA)
(UNAUDITED)

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2000 | 1999 | 2000 | 1999 |
| NET REVENUE: | | | | |
| User license fees ............................... | $  256,925 | $  157,643 | $  686,092 | $  306,725 |
| Services ........................................ | 60,246 | 25,758 | 151,155 | 63,228 |
| TOTAL NET REVENUE ........................... | 317,171 | 183,401 | 837,247 | 369,953 |
| COST OF REVENUE: | | | | |
| User license fees ............................... | 9,270 | 5,891 | 29,247 | 10,673 |
| Services ........................................ | 21,707 | 10,787 | 60,171 | 25,568 |
| Amortization of developed technology ............ | 15,553 | 15,258 | 46,501 | 20,264 |
| TOTAL COST OF REVENUE ....................... | 46,530 | 31,936 | 135,919 | 56,505 |
| GROSS PROFIT ....................................... | 270,641 | 151,465 | 701,328 | 313,448 |
| OPERATING EXPENSES: | | | | |
| Selling and marketing ........................... | 116,936 | 67,895 | 310,628 | 139,290 |
| Research and development ........................ | 46,328 | 28,924 | 120,646 | 63,290 |
| General and administrative ...................... | 20,465 | 11,020 | 52,971 | 21,431 |
| Amortization of goodwill and other intangible | 219,758 | 219,626 | 659,275 | 291,183 |
| In-Process research and development ............. | -- | 1,100 | -- | 104,200 |
| Acquisition and restructuring costs ............. | -- | -- | -- | 11,000 |
| TOTAL OPERATING EXPENSES ..................... | 403,487 | 328,565 | 1,143,520 | 630,394 |
| Loss from operations ............................. | (132,846) | (177,100) | (442,192) | (316,946) |
| Interest and other income, net .................. | 15,648 | 7,266 | 39,688 | 13,445 |
| Interest expense ................................. | (8,266) | (5,301) | (23,314) | (8,143) |
| Loss before income taxes ......................... | (125,464) | (175,135) | (425,818) | (311,644) |
| Provision for income taxes ....................... | 22,642 | 8,441 | 69,012 | 20,678 |
| NET LOSS ......................................... | $ (148,106) | $ (183,576) | $ (494,830) | $ (332,322) |
| NET LOSS PER SHARE - BASIC ....................... | $    (0.37) | $    (0.48) | $    (1.24) | $    (1.14) |
| NET LOSS PER SHARE - DILUTED ..................... | $    (0.37) | $    (0.48) | $    (1.24) | $    (1.14) |
| SHARES USED IN PER SHARE CALCULATION - BASIC ...... | 403,613 | 384,847 | 399,655 | 292,115 |
| SHARES USED IN PER SHARE CALCULATION - DILUTED .... | 403,613 | 384,847 | 399,655 | 292,115 |

VERITAS Software Q3'00 Earnings Release
Page 5 of 5

VERITAS SOFTWARE CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS
(IN THOUSANDS)

| | SEPTEMBER 30, 2000 | DECEMBER 31, 1999 |
|---|---|---|
| | (UNAUDITED) | |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and short-term investments | $ 948,578 | $ 692,381 |
| Accounts receivable, net | 169,115 | 132,180 |
| Deferred income taxes | 23,803 | 23,803 |
| Other current assets | 32,334 | 13,381 |
| TOTAL CURRENT ASSETS | 1,173,830 | 861,745 |
| Long-term investments | 127,466 | 65,036 |
| Property and equipment | 130,163 | 76,958 |
| Goodwill and other intangibles | 2,521,759 | 3,226,749 |
| Other non-current assets | 45,513 | 2,789 |
| TOTAL ASSETS | $3,998,731 | $4,233,277 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 33,287 | $ 30,229 |
| Accrued compensation and benefits | 59,480 | 35,560 |
| Accrued acquisition and restructuring costs | 18,087 | 24,202 |
| Other accrued liabilities | 57,655 | 47,531 |
| Income taxes payable | 8,433 | 6,804 |
| Deferred revenue | 138,456 | 86,979 |
| TOTAL CURRENT LIABILITIES | 315,398 | 231,305 |
| **NON-CURRENT LIABILITIES:** | | |
| Convertible subordinated notes | 459,812 | 451,044 |
| Deferred income taxes | 124,405 | 157,867 |
| TOTAL NON-CURRENT LIABILITIES | 584,217 | 608,911 |
| Stockholders' equity | 3,099,116 | 3,393,061 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $3,998,731 | $4,233,277 |

Created by 10KWizard    www.10KWizard.comSource: VERITAS SOFTWARE COR, 8-K, October 13, 2000

# EXHIBIT F

1

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549


FORM 8-K


CURRENT REPORT


Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934


Date of Report (date of earliest event reported) January 24, 2001
                        -------------------------------


VERITAS SOFTWARE CORPORATION
--------------------------------------------------------------------------------
(Exact name of registrant as specified in its charter)


|       Delaware        |    000-26247    |    77-0507675    |
|-----------------------|-----------------|------------------|
| (State or other jurisdiction | (Commission | (I.R.S. Employer |
|   of incorporation)   |  File Number)   | Identification No.) |


1600 Plymouth Street
Mountain View, California 94043
----------------------------------------------------------
(Address of principal executive offices including Zip Code)


Registrant's telephone number, including area code: (650) 527-8000
                    ----------------------------

Item 5: Other Events

    On January 24, 2001, VERITAS Software Corporation announced financial results for its fourth quarter ended December 31, 2000. The press release is attached to this Current Report as Exhibit 99.1 and is incorporated herein by this reference.

Item 7: Financial Statements and Exhibits.

    (c) Exhibits

    99.1 Press release dated January 24, 2001.

3

SIGNATURE

     Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.

Dated:  January 24, 2001

                         VERITAS SOFTWARE CORPORATION

                         By: /s/ Jay A. Jones
                            ----------------------------------------
                            Jay A. Jones
                            Senior Vice President,
                            Chief Administrative Officer & Secretary

4

EXHIBIT INDEX

99.1    Press release of the registrant dated January 24, 2001.

3

EXHIBIT 99.1


[VERITAS LETTERHEAD]

VERITAS Software
1600 Plymouth Street
Mountain View, CA 94043
650.527.8000

FOR IMMEDIATE RELEASE

           VERITAS(R) SOFTWARE REPORTS RECORD FOURTH QUARTER RESULTS;
                 REVENUE UP 64% TO $370.1 MILLION FOR THE QUARTER

                        Sequential Revenue Grows by 17%

MOUNTAIN VIEW, CALIF. - JANUARY 24, 2001 - VERITAS Software Corporation (Nasdaq:
VRTS), The Data Availability Company, today announced record financial results
for its fourth quarter ended December 31, 2000. The Company achieved fourth
quarter revenue of $370.1 million, an increase of 64% over last year's fourth
quarter revenue of $226.2 million. Pro forma net income, excluding purchase
accounting adjustments, increased to $83.9 million in the fourth quarter from
$50.7 million for the same period in the prior year, a 65% increase. Diluted pro
forma net income per share for the fourth quarter was a record $0.19, up 58%
from $0.12 for the same period last year.

For the fourth quarter, on an as-reported basis with purchase accounting
adjustments for acquisitions, VERITAS Software reported a net loss of $125.0
million, or $0.31 per share, compared with a net loss of $170.6 million, or
$0.44 per share for the prior period. Included in the current period's net loss
is a reversal of $4.3 million of previously recorded acquisition and
restructuring costs. Purchase accounting amortization amounted to $235.3 million
in the current quarter and $235.2 million in last year's fourth quarter.

"We concluded the year with record revenue and we are very optimistic about our
growth potential for 2001," said Gary Bloom, chief executive officer and
president, VERITAS Software. "Data is a critical business imperative, and
VERITAS Software has established itself as the de facto industry standard for
continuous data availability. We continue to see strong demand for VERITAS
Software technology and with our expanding products and platforms we are well
prepared to be the leading strategic supplier of solutions to protect our
customers' vital business information."

On a pro forma basis for the years ended December 31, 2000 and 1999, VERITAS
Software had revenue of $1,207 million and $700 million, respectively, a 72%
year-over-year increase. Pro forma net income increased to $263 million from pro
forma net income of $147 million in the prior year, a 79% increase. Pro forma
diluted net income per share was $0.60, compared with $0.35 for the prior year,
a 71% increase.

The Company's as-reported revenue for the year ended December 31, 2000 was
$1,207 million, compared with $596 million for the prior year. For the year,
VERITAS Software reported a net loss of $620 million, or $1.55 per share,
compared with a net loss of $503 million, or $1.59 per share for the prior year.

                                    -more-

2
VERITAS Software Q4'00 Earnings Release
Page 2 of 5


"Our exceptional results for the fourth quarter again demonstrated balanced
growth, with significant contributions coming from all channels, regions and
product lines," said Ken Lonchar, senior vice president and chief financial
officer, VERITAS Software. "We also demonstrated great cash flow during the
quarter, with our December 31, 2000 cash and long term investments balance at
$1.3 billion. The Company added almost 50% to its deferred revenue balance in
the quarter, and ended the year at $201 million. Financially, we are extremely
well positioned entering 2001."

The Company has added an additional financial table to its earnings releases:
"Pro forma Statements of Operations." These pro forma statements are intended to
present the Company's operating results excluding purchase accounting
adjustments. For 1999, the Company's operating results include the results of
Seagate Software NSMG and TeleBackup Systems assuming the companies had been
combined at the beginning of the period.

The Company will host a conference call on Wednesday, January 24 at 2:00 p.m.
Pacific Time, 5:00 p.m. Eastern Time, to discuss its results. The conference
call will be broadcast live via the Internet at www.nasdaq.com. The conference
call will also be available live in a listen-only format at 212-271-4601 or
416-641-6446. The replay number for the call is 800-633-8284 or 858-812-6440
(#17493420).

ABOUT VERITAS SOFTWARE THE DATA AVAILABILITY COMPANY(TM)

VERITAS Software Corporation (Nasdaq:VRTS) provides essential data availability
software solutions that enable customers to protect and access their
business-critical data for Business Without Interruption(TM). The Company's
corporate headquarters is located at 1600 Plymouth Street, Mountain View, CA
94043. Telephone: (650) 527-8000. Fax: (650) 527-8050. Email:
vx-sales@veritas.com. WWW site: http://www.veritas.com.


                                   ###


FOR FURTHER INFORMATION CONTACT:

Ken Lonchar, Senior Vice President and CFO, VERITAS Software
(650) 527-2501, ken.lonchar@veritas.com

Dave Galiotto, Vice President of Finance/Investor Relations, VERITAS Software
(650) 527-4047, dave.galiotto@veritas.com

Erin Jones, Public Relations Director, VERITAS Software
(805) 783-4528, erin.jones@veritas.com


This press release may include estimates and forward-looking statements within
the meaning of Section 27A of the Securities Act of 1933 and 21E of the
Securities Exchange Act of 1934. These forward-looking statements involve a
number of risks and uncertainties, including the timely development and market
acceptance of our products and services, our ability to maintain the quality of
our end-user customer and partnering relationships, and our ability to manage
our business effectively, that could cause the actual results we achieve to
differ materially from such forward-looking statements. For more information
regarding potential risks, see the "Factors That May Affect Future Results"
section of our most recent reports on Form 10-K and Form 10-Q on file with the
SEC. We undertake no obligation to update any forward-looking statement to
reflect events or circumstances after the date hereof.

VERITAS, VERITAS Software, the VERITAS logo, Business Without Interruption and
other product names are trademarks or registered trademarks of VERITAS Software
Corporation in the US and other countries. Other product names mentioned herein
may be trademarks and/or registered trademarks of their respective companies.

3
VERITAS Software Q4'00 Earnings Release
Page 3 of 5

VERITAS SOFTWARE CORPORATION
PRO FORMA STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE DATA)
(UNAUDITED)

|  | THREE MONTHS ENDED DECEMBER 31, | | TWELVE MONTHS ENDED DECEMBER 31, | |
|---|---|---|---|---|
|  | 2000 | 1999 | 2000 | 1999 |
| Net revenue: | | | | |
| User license fees | $ 301,271 | $ 191,289 | $ 987,363 | $ 597,008 |
| Services | 68,810 | 34,870 | 219,965 | 103,019 |
| TOTAL NET REVENUE | 370,081 | 226,159 | 1,207,328 | 700,027 |
| COST OF REVENUE: | | | | |
| User license fees | 11,532 | 10,062 | 40,779 | 26,373 |
| Services | 25,797 | 12,593 | 85,968 | 39,606 |
| TOTAL COST OF REVENUE | 37,329 | 22,655 | 126,747 | 65,979 |
| GROSS PROFIT | 332,752 | 203,504 | 1,080,581 | 634,048 |
| OPERATING EXPENSES: | | | | |
| Selling and marketing | 133,206 | 82,699 | 443,834 | 261,089 |
| Research and development | 55,255 | 31,187 | 175,901 | 109,539 |
| General and administrative | 24,929 | 12,754 | 77,900 | 43,250 |
| TOTAL OPERATING EXPENSES | 213,390 | 126,640 | 697,635 | 413,878 |
| Income from operations | 119,362 | 76,864 | 382,946 | 220,170 |
| Interest and other income, net | 19,931 | 9,883 | 59,619 | 24,723 |
| Interest expense | (8,253) | (7,516) | (31,567) | (15,664) |
| Income before income taxes | 131,040 | 79,231 | 410,998 | 229,229 |
| Provision for income taxes | 47,174 | 28,523 | 147,959 | 82,523 |
| PRO FORMA NET INCOME | $ 83,866 | $ 50,708 | $ 263,039 | $ 146,706 |
| PRO FORMA NET INCOME PER SHARE - BASIC | $ 0.21 | $ 0.13 | $ 0.66 | $ 0.38 |
| PRO FORMA NET INCOME PER SHARE - DILUTED | $ 0.19 | $ 0.12 | $ 0.60 | $ 0.35 |
| SHARES USED IN PER SHARE CALCULATION - BASIC | 401,209 | 389,410 | 400,034 | 383,029 |
| SHARES USED IN PER SHARE CALCULATION - DILUTED | 434,305 | 432,436 | 436,801 | 422,436 |

The pro forma statements of operations are intended to present the Company's
operating results excluding purchase accounting adjustments. For 1999, the
Company's operating results include the results of NSMG and TeleBackup assuming
the companies had been combined at the beginning of the period. Purchase
accounting adjustments would include amortization of developed technology,
amortization of goodwill and intangibles, in-process research and development
costs, acquisition and restructuring costs, and related adjustments for income
tax provisions.

4
VERITAS Software Q4'00 Earnings Release
Page 4 of 5

VERITAS SOFTWARE CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE DATA)

|  | THREE MONTHS ENDED DECEMBER 31, | | TWELVE MONTHS ENDED DECEMBER 31, | |
|---|---|---|---|---|
|  | 2000 | 1999 | 2000 | 1999 |
|  | (UNAUDITED) | | | |
| Net revenue: | | | | |
| User license fees | $ 301,271 | $ 191,289 | $ 987,363 | $ 498,014 |
| Services | 68,810 | 34,870 | 219,965 | 98,098 |
| TOTAL NET REVENUE | 370,081 | 226,159 | 1,207,328 | 596,112 |
| COST OF REVENUE: | | | | |
| User license fees | 11,532 | 10,062 | 40,779 | 20,735 |
| Services | 25,797 | 12,593 | 85,968 | 38,161 |
| Amortization of developed technology | 15,553 | 15,395 | 62,054 | 35,659 |
| TOTAL COST OF REVENUE | 52,882 | 38,050 | 188,801 | 94,555 |
| GROSS PROFIT | 317,199 | 188,109 | 1,018,527 | 501,557 |
| OPERATING EXPENSES: | | | | |
| Selling and marketing | 133,206 | 82,699 | 443,834 | 221,989 |
| Research and development | 55,255 | 31,187 | 175,901 | 94,477 |
| General and administrative | 24,929 | 12,754 | 77,900 | 34,185 |
| Amortization of goodwill and other intangibles | 219,757 | 219,760 | 879,032 | 510,943 |
| In-Process research and development | -- | -- | -- | 104,200 |
| Acquisition and restructuring costs | (4,260) | -- | (4,260) | 11,000 |
| TOTAL OPERATING EXPENSES | 428,887 | 346,400 | 1,572,407 | 976,794 |
| Loss from operations | (111,688) | (158,291) | (553,880) | (475,237) |
| Interest and other income, net | 19,931 | 9,883 | 59,619 | 23,328 |
| Interest expense | (8,253) | (7,516) | (31,567) | (15,659) |
| Loss before income taxes | (100,010) | (155,924) | (525,828) | (467,568) |
| Provision for income taxes | 24,952 | 14,712 | 93,964 | 35,390 |
| NET LOSS | $(124,962) | $(170,636) | $ (619,792) | $(502,958) |
| NET LOSS PER SHARE - BASIC | $ (0.31) | $ (0.44) | $ (1.55) | $ (1.59) |
| NET LOSS PER SHARE - DILUTED | $ (0.31) | $ (0.44) | $ (1.55) | $ (1.59) |
| SHARES USED IN PER SHARE CALCULATION - BASIC | 401,209 | 389,410 | 400,034 | 316,892 |
| SHARES USED IN PER SHARE CALCULATION - DILUTED | 401,209 | 389,410 | 400,034 | 316,892 |

5
VERITAS Software Q4'00 Earnings Release
Page 5 of 5

VERITAS SOFTWARE CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS
(IN THOUSANDS)

|  | DECEMBER 31, 2000 | DECEMBER 31, 1999 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and short-term investments | $1,119,449 | $ 692,381 |
| Accounts receivable, net | 186,863 | 132,180 |
| Deferred income taxes | 38,017 | 23,803 |
| Other current assets | 38,303 | 13,381 |
| TOTAL CURRENT ASSETS | 1,382,632 | 861,745 |
| Long-term investments | 136,111 | 65,036 |
| Property and equipment | 168,389 | 76,958 |
| Goodwill and other intangibles | 2,285,320 | 3,226,749 |
| Other non-current assets | 110,382 | 2,789 |
| TOTAL ASSETS | $4,082,834 | $4,233,277 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 45,250 | $ 30,229 |
| Accrued compensation and benefits | 63,838 | 35,560 |
| Accrued acquisition and restructuring costs | 44,123 | 24,202 |
| Other accrued liabilities | 69,289 | 47,531 |
| Income taxes payable | 34,454 | 6,804 |
| Deferred revenue | 201,001 | 86,979 |
| TOTAL CURRENT LIABILITIES | 457,955 | 231,305 |
| NON-CURRENT LIABILITIES: | | |
| Convertible subordinated notes | 429,176 | 451,044 |
| Deferred and other income taxes | 213,132 | 157,867 |
| TOTAL NON-CURRENT LIABILITIES | 642,308 | 608,911 |
| Stockholders' equity | 2,982,571 | 3,393,061 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $4,082,834 | $4,233,277 |

Created by 10KWizard    www.10KWizard.comSource: VERITAS SOFTWARE COR, 8-K, January 24, 2001