*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number 5:07-cv-03444-JF

# TAB A

LEXSEE 2006 U.S. DIST. LEXIS 17588



Caution
As of: Oct 04, 2007

## IN RE AOL TIME WARNER, INC. SECURITIES AND "ERISA" LITIGATION

### MDL Docket No. 1500, 02 Civ. 5575 (SWK)

### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

### *2006 U.S. Dist. LEXIS 17588*

**April 6, 2006, Decided**
**April 6, 2006, Filed**

**SUBSEQUENT HISTORY:** Stay lifted by, Objection denied by *In re Aol Time Warner, Inc. Secs. Litig., 2006 U.S. Dist. LEXIS 49162 (S.D.N.Y., July 13, 2006)*

**PRIOR HISTORY:** *In re AOL Time Warner, Inc., Sec. & ERISA Litig., 2005 U.S. Dist. LEXIS 3715 (S.D.N.Y., Mar. 9, 2005)*

**COUNSEL:** [*1] For Minnesota State Board of Investments, Lead Plaintiff: Robert Andrew Skirnick, Meredith Cohen Greenfogel & Skirnick, New York, NY; Samuel D. Heins, Heins Mills & Olson, P.L.C., Minneapolis, MN.

For Jennifer J. Fadem, on behalf of herself and all others similarly situated, Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Edward J. Mills, Stull, Stull & Brody, New York, NY; Christopher J. Gray, Law Office of Christopher J. Gray, P.C, New York, NY; Brian Philip Murray, Murray, Frank & Sailer, LLP, New York, NY.

For Salomon Hami, Plaintiff: Aaron Lee Brody, Edward J. Mills, Stull Stull & Brody, New York, NY; Brian Philip Murray, Murray, Frank & Sailer, LLP, New York, NY.

For Dominic F. Amarosa, Plaintiff: Edward J. Mills, Stull, Stull & Brody, New York, NY; Christopher J. Gray, Law Office of Christopher J. Gray, P.C, New York, NY.

For Cynthia R. Levin Moulton, Petitioner: Jeffrey D. Meyer, Moulton & Meyer, L.L.P., Houston, TX.

For AOL Time Warner, Inc., Defendant: Rachel G Skaistis, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For Stephen M. Case, Defendant: Robert M. Stern, O'Melveny & Myers LLP, Washington, DC.

For [*2] Steven Rindner, Defendant: Brian M. Heberlig, Edward R. Mackiewicz, Mark J. Hulkower, Steptoe & Johnson, L.L.P., Washington, DC; John D. Lovi, Steptone & Johnson LLP, New York, NY.

For Paul T. Cappuccio, Kenneth J. Novack, Joseph A. Ripp, Defendants: Evan R. Chesler, Boies, Schiller & Flexner, LLP, Albany, NY; Peter T. Barbur, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For Ernst & Young LLP, Defendant: Holly K. Kulka, Michael L. Rugen, Heller Ehrman White & McAuliffe, LLP, New York, NY; Jack G. Stern, Boies, Schiller & Flexner, LLP, New York, NY; Jeremy N. Kudon, Heller Ehrman LLP, Los Angeles, CA; Timothy Philip Wei, Securities & Exchange Commission, New York, NY.

For Eric Keller, Defendant: Blair G. Connelly, Latham & Watkins, LLP, New York, NY.

For StoneRidge Investment Partners LLC, John C. Turner, Movants: Linda P. Nussbaum, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, NY.

For Time Warner Inc., Movant: Evan R. Chesler, Boies, Schiller & Flexner, LLP, Albany, NY; Peter T. Barbur, Rachel G Skaistis, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For Daniel F. Akerson, James W. Barge, Stephen F. Bollenbach, Frank [*3] J. Caufield, Miles R. Gilburne, Franklin D. Raines, Barry Schuler, Movants: Evan R. Chesler, Boies, Schiller & Flexner, LLP, Albany, NY; Peter T. Barbur, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For Minnesota State Board of Investments, Movant: Robert Andrew Skirnick, Meredith Cohen Greenfogel & Skirnick, New York, NY.

For Louisiana School Employees Retirement System, Municipal Police Employees Retirement System of Louisiana, Movants: Stanley Merrill Grossman, Pomerantz Haudek Block Grossman & Gross LLP, New York, NY.

For McClure Family Trust, Gary J. Tweed, Arlene Swenson, Thomas Cerchia, Movants: Richard A. Adams, Patton, Haltom, Roberts, McWilliams & Greer, LLP, Texarkana, TX.

For Steven Schmalz, Delbert Currens, Consolidated Plaintiffs: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP(LIs), Melville, NY.

For Mariam Antin, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Marian Probst Rosner, Wolf, Popper, L.L.P., New York, NY.

For Mark Bluestein, Consolidated Plaintiff: Brian Philip Murray, Murray, Frank & Sailer, [*4] LLP, New York, NY; Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA.

For Malka Birnbaum, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Gregory M. Egleston, Bernstein Liebhard & Lifshitz, LLP, New York, NY.

For Ernest Hack, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Robert I. Harwood, Wechsler Harwood LLP, New York, NY.

For Harvey Matcovsky, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Jules Brody, Stull Stull & Brody, New York, NY.

For Howard Rosengarten, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Jill Sharyn Abrams, Abbey Spanier Rodd Abrams & Paradis, LLP, New York, NY US.

For Alan Russo, Harriet Goldstein, Consolidated Plaintiffs: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Menachem E. Lifshitz, Bernstein, Liebhard & Lifshitz, L.L.P., New York, NY.

For Barbara Dietel, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Frederic Scott Fox, Kaplan, Fox & Kilsheimer, L.L.P., New York, NY.

For Earl Bennett, Consolidated Plaintiff: Aaron Lee Brody, Stull [*5] Stull & Brody, New York, NY; Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA.

For Jack L. McBride, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Thomas H. Burt, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY.

For Vardan Sarkisov, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Ira M. Press, Kirby McInerney & Squire, LLP, New York, NY.

For Sherry Weindorf, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; James V. Bashian, Law Offices of James V. Bashian, P.C., New York, NY.

For Earl Mikolitch, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Patrick Anthony Klingman, Shepherd, Finkelman, Miller & Shah, LLC, Chester, CT.

For John Pleggenkuhle, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Frederick Taylor Isquith, Sr, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY.

For Prena Smajlaj, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Nadeem Faruqi, Faruqi & Faruqi, LLP, New York, NY.

For American Online, Inc. [*6] , Consolidated Defendant: Rachel G Skaistis, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For David M. Colburn, Consolidated Defendant: Carl S. Kravitz, Zuckerman Spaeder LLP, Washington, DC.

For John D. Beeson, Sr., Robert C. Daniels, Adnan Elassir, James Belmont, Movants: Brian Philip Murray, Murray, Frank & Sailer, LLP, New York, NY.

For Ontario Teachers' Pension Plan Board, Movant: Avi Josefson, Gerald H. Silk, Bernstein, Litowitz, Berger & Grossman, LLP, New York, NY.

For The Minnesota State Board of Investment, Movant: Samuel D. Heins, Heins Mills & Olson, P.L.C., Minneapolis, MN.

**JUDGES:** SHIRLEY WOHL KRAM, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SHIRLEY WOHL KRAM

**OPINION**

*OPINION & ORDER*

**SHIRLEY WOHL KRAM, U.S.D.J.**

This Opinion considers the fairness of a $ 2.65 billon class action settlement (the "Settlement") reached in the securities litigation arising from America Online, Inc. ("AOL") and AOL Time Warner, Inc.'s ("AOLTW") allegedly fraudulent accounting of advertising revenue during, and in the years immediately preceding, AOL's merger with Time Warner, Inc. ("Time Warner"). [1] Coming on the heels of AOLTW's $ 150 million settlement [*7] with the Department of Justice ("DOJ") [2] and its $ 300 million settlement with the Securities and Exchange Commission ("SEC"), this Settlement marks the conclusion of the primary shareholder lawsuit against the Company.

> 1  Although Defendant AOLTW has changed its name to Time Warner, Inc., for clarity, the Court will continue to refer to the merged entity as AOLTW, or the Company.

> 2  The DOJ directed that the $ 150 million fund established by its settlement with the Company be used for AOLTW's settlement of securities litigation. AOLTW allocated that entire sum to the instant Settlement, in addition to the $ 2.4 billion provided by AOLTW and the $ 100 million provided by AOLTW's auditor, Ernst & Young LLP ("Ernst & Young"), under the terms of the Settlement. The Settlement's inclusion of the entire $ 150 million from the DOJ settlement is the basis of one of the objections discussed below. *See infra* Part II.E.1.

Although Lead Plaintiff's Counsel distributed approximately 4.7 million Settlement notifications [*8] to putative Class Members, the Court has received only six objections to various facets of the Settlement, one of which was withdrawn prior to the fairness hearing. [3] Of the remaining objections, two contest the reasonableness of the Settlement amount, and there are individual objections to the adequacy of the Class representative, the Settlement Notice, and the Plan of Allocation. After briefly commenting on the Court's earlier certification of the Settlement Class, reviewing the standards for the approval of class action settlements, and addressing the aforementioned objections, the Court grants Lead Plaintiff's petition for approval of the Settlement.

> 3  As explained in greater detail below, two of the six objections were filed by parties acknowledging that they are not members of the Class, including the party that withdrew its objection. *See infra* Parts I.C & II.E. Plaintiffs allege that two of the other objectors also lack standing to object to the Settlement.

**I. Background**

This Settlement is [*9] the culmination of over three years of litigation and seven months of mediation with a Court-appointed special master. The relevant history of the litigation through May 5, 2004 is described in the Court's Opinion considering Defendants' motions to dismiss. *See In re AOL Time Warner Sec. & "ERISA" Litig., 381 F. Supp. 2d 192 (S.D.N.Y. 2004).* The Court presumes familiarity with that Opinion.

**A. The Fraudulent Accounting Allegations**

In brief, Plaintiffs allege that AOL and AOLTW improperly accounted for dozens of advertising transactions, inflating revenue for fifteen quarters between 1998 and 2002. These transactions were allegedly designed to create the appearance that they were generating revenue, despite providing completely illusory benefits to the Company.

Plaintiffs describe myriad sham transactions between AOLTW and over a dozen separate companies. For example, Plaintiffs allege that AOLTW engaged in a number of three-legged "round-trip" transactions with the internet vendor Homestore. In the first "leg" of such transactions, Homestore would pay a third party for services and products that it did not need. In the second leg, the third party would [*10] purchase advertising from AOLTW with the money it received from Homestore. Finally, AOLTW would purchase advertising from Homestore in substantially the same amount as the third-party's purchase of advertising from AOLTW. While capital flowed to each of the parties and appeared to in-

crease AOLTW's advertising revenue, the parties received no real benefits apart from their inflated earnings statements. *See In re AOL Time Warner, 381 F. Supp. 2d at 226.* These round-trip transactions are representative, but hardly exhaustive, of Plaintiffs' allegations. [4]

> 4   AOLTW is also alleged to have employed such techniques as "jackpotting" (repetitive display of an advertising partner's advertisements immediately before a reporting period), the conversion of non-advertising proceeds into advertising revenues, and the impermissible double-booking of valid advertising revenue. (Second Am. Compl. P15.)

Ultimately, Plaintiffs allege that these fraudulent schemes resulted in AOLTW's overstatement of revenue by [*11] at least $ 1.7 billion, inflating the value of AOLTW stock and causing billions of dollars in damage to investors, in violation of the federal securities laws.

## B. Motion Practice

The Court evaluated Defendants' motions to dismiss the Complaint, and, on May 5, 2004, issued an opinion denying the motions in large part and preserving a wide variety of claims against AOLTW, Ernst & Young, and a half dozen individual defendants. Shortly thereafter, the Court granted Plaintiffs leave to amend their Complaint. Plaintiffs filed a Second Amended Complaint on August 23, 2004.

Subsequent to the Court's denial of Defendants' motions to dismiss, Plaintiffs initiated formal discovery and began reviewing over 15.5 million documents turned over by AOLTW. (Heins Decl. P7, Dec. 2, 2005.) In addition, Plaintiffs responded to Defendants' substantial document requests and interrogatories, battled over various aspects of their and Defendants' discovery requests, and engaged in extensive negotiations to address Defendants' claims to privileged documents. (Heins Decl. PP65-69.) On the basis of relevant discovered materials, Plaintiffs not only supplemented their existing claims, but eventually drafted [*12] a Third Amended Complaint and petitioned the Court for leave to amend. Plaintiffs later indicated that they had identified "over 100 separate transactions which [they] thought were material to their allegations." (Final Approval Hr'g Tr. 4-5, Feb. 22, 2006.) By the time they entered into the Settlement, Plaintiffs had laid "the groundwork to prepare for hundreds of merits and expert depositions to occur in the fall and spring of 2005-2006." (Heins Decl. P37.)

Meanwhile, Defendants drafted a motion for summary judgment, alleging that Plaintiffs failed to establish loss causation as a matter of law. The standard for loss causation has been the subject of substantial litigation

over the past several years. In the interval between the filing of the motion to dismiss and the instant Settlement, the Second Circuit and Supreme Court have weighed in with a number of influential opinions, altering the relevant legal standards for active securities lawsuits. The most recent Supreme Court precedent addressing loss causation, *Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005),* was argued and decided in the months immediately following the final briefing of Defendants' motion [*13] for summary judgment. With a decision on that motion pending, the parties entered a phase of intense and protracted settlement discussions.

## C. The Settlement

In late 2004, the Court appointed Paul D. Wachter as special master for discovery in this litigation. Special Master Wachter proceeded to play a prominent role mediating settlement negotiations between the parties. During the mediation sessions before Special Master Wachter, the parties discussed the viability of their respective claims and defenses, the role of emerging securities law precedent, and their widely divergent views of potential outcomes.

Plaintiffs relied on their Complaint, a variety of economic experts, and the results of their massive discovery operation to buttress their claims that the Class sustained extensive damages. On the other hand, Defendants insisted, and continue to insist, that their accounting statements were not fraudulent and that, even if such allegations could be proved, such fraud did not cause the declining price of AOLTW stock. After nearly seven months of involved settlement negotiations overseen by Special Master Wachter, the parties entered into a Memorandum of Understanding on [*14] July 29, 2005, and began preparing a Stipulation of Settlement.

The Stipulation of Settlement resulted from a second round of negotiations between Lead Plaintiff's Counsel and representatives of the nine firms representing Defendants. The parties negotiated a number of complex issues essential to the Settlement, including the Defendants' right to termination of the Settlement, the scope of releases, and the specific language of the Stipulation. At the same time, Lead Plaintiff's Counsel drafted supplemental documents, including the Notice to the Class, the Proof of Claim and Release, and the Plan of Allocation. After finalizing the drafts of all relevant documents, the parties petitioned the Court for preliminary approval of the Settlement.

On September 28, 2005, the Court held a preliminary approval hearing to address the Settlement materials provided by the parties. After reviewing those materials (including the Stipulation of Settlement, draft notice ma-

terial, the Plan of Allocation, and supporting memoranda) and considering the issues raised at the preliminary approval hearing, the Court provided the parties an opportunity to modify the notice procedures and opt-out requirements. [*15] On September 30, 2005, the Court issued Orders certifying the Class for settlement purposes and preliminarily approving the Settlement. Upon receiving preliminary approval of the Settlement, Plaintiffs commenced the mailing and publication of the Settlement Notice. [5]

> 5    A short time later, in compliance with the terms of the Stipulation of Settlement, Defendants deposited the $ 2.65 billion Settlement Fund into an escrow account. The Fund has earned approximately $ 303,000 a day for the benefit of the Settlement Class since its deposit. (Pls.' Br. In Support of Final Approval 1, Jan. 30, 2006.)

Lead Plaintiffs' Counsel retained Gilardi & Co., LLC (the "Settlement Administrator" or "Gilardi") to administer the Settlement. The Settlement Administrator initially mailed 115,080 "Notice Packages" to the names and addresses provided by AOLTW's transfer agent. [6] The Settlement Administrator also contacted the brokerage houses that hold securities in "street name" for beneficial owners, giving those institutions the [*16] option to mail Notice Packages directly to the beneficial owners or to provide Gilardi with a list of those owners' addresses. (Forrest Decl. P5, Jan. 1, 2006.) In addition, summary notices were published over the course of two weeks on separate weekdays in the New York Times, Wall Street Journal, Financial Times, and USA Today. (Forrest Decl. P7.) The Settlement Administrator has mailed more than four and a half million more Notice Packages in response to requests from putative Class Members. (Forrest Decl. P6.)

> 6    Each Notice Package included a "true and correct copy of the Notice, including the Proof of Claim and Release, the Plan of Allocation, and the Request for Exclusion from Securities Class." (Forrest Decl. P2, Jan. 1, 2006.) These materials were also available at the website maintained throughout the course of this Settlement. See AOL Time Warner Securities Litigation Settlement, http://www.aoltimewarnersettlement.com (last visited March 20, 2006.)

The Settlement Administrator initiated its mailing [*17] in early October, shortly after the Court's preliminary approval of the Settlement. The Notice set two important deadlines for responses to the Settlement: (1) objections to the Settlement and requests to opt out of the Settlement were to be filed by January 9, 2006, while (2)

Settlement claims were to be submitted by February 21, 2006. By the January 9 objection deadline, the Court had received four objections from putative Class Members, and two motions to intervene and object to the Settlement, one of which was withdrawn shortly thereafter. [7]

> 7    Plaintiffs in the ERISA action stemming from the same operative facts as the instant lawsuit initially submitted a motion to intervene and object to the Settlement on January 7, 2006, but voluntarily withdrew their motion on January 27, 2006. Accordingly, the Court declines to address their objection.

On February 22, 2006, the Court conducted the final approval hearing. At the hearing, both Lead Plaintiffs' Counsel and defense counsel for AOLTW were given the opportunity [*18] to make final remarks supporting the fairness of the Settlement. At that time, Lead Plaintiffs' Counsel reported that almost all significant holders of affected stock had filed claims to the Settlement and noted the lack of significant opposition or adverse comment by institutional investors with Settlement claims. Not one of the formal objectors attended or spoke at the hearing, each of them resting on her papers. Further, nobody attending the hearing contested the fairness of the Settlement. The Court reserved judgment, pending this written Opinion.

## II. Discussion

### A. Certification of the Settlement Class

On September 30, 2005, the Court certified the Class for settlement purposes. This section briefly supplements that Order with the facts supporting class certification under *Federal Rule of Civil Procedure 23.*

### 1. Numerosity

To qualify for certification, a class must be "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1).* Here, more than 4.7 million Settlement Notices have been mailed to putative Class Members and the Settlement Administrator [*19] has received approximately 600,000 claims. Hence, the numerosity requirement is clearly satisfied.

### 2. Commonality

*Rule 23(a)(2)* requires that "there are questions of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2).* "Where putative class members have been injured by similar misrepresentations and omissions, the commonality requirement is satisfied." *Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 180 (S.D.N.Y. 2005)* (citations omitted). Plaintiffs allege that the Class suf-

fered damages as a result of three and a half years of AOLTW's misrepresentations about the Company's financial condition and its fraudulent accounting practices. Due to the public nature of Defendants' financial statements and the breadth of the alleged fraud, the issues of law and fact underlying this litigation are common to the Class.

### 3. Typicality

Under *Rule 23(a)(3)*, the interests of the class representatives must be "typical of the claims . . . of the class." *Fed. R. Civ. P. 23(a)(3)*. This requirement is satisfied if "each class member's claim arises from the same course of events, and [*20] each class member makes similar legal arguments to prove the defendant's liability." *Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001)* (citation omitted). Further, a class representative's claims "are not typical if that representative is subject to unique defenses." *Fogarazzo, 232 F.R.D. at 180* (citation omitted).

Here, Lead Plaintiff, like all Class members, claims damages allegedly caused by Defendants' misrepresentation of AOL's financial health, including the overstatement of advertising revenues to artificially inflate the stock of AOL and AOLTW. The legal theories pleaded by Lead Plaintiff, numerous violations of the federal securities laws, are shared by all Class Members. Furthermore, no unique defenses may be asserted against Lead Plaintiff that would make its claims atypical. As such, the typicality requirement is satisfied.

### 4. Adequacy

*Rule 23(a)(4)* requires that the class representatives "fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. In considering a class representative's adequacy, the court asks whether the representative [*21] (1) has any interests that conflict with the rest of the class, and (2) is represented by qualified and capable legal counsel. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)* (citation omitted).

On several occasions throughout the course of this litigation the Court has commented favorably on Lead Plaintiff's representation of the Class. *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 2003 U.S. Dist. LEXIS 145, No. MDL 1500, 2003 WL 102806, at *2 (S.D.N.Y. Jan. 10, 2003); In re AOL Time Warner, 381 F. Supp. 2d at 208 n.8.* Lead Plaintiff's conduct during the Settlement has not altered the Court's earlier findings. All Class Members, including Lead Plaintiff, seek to obtain the largest possible recovery for losses resulting from Defendants' alleged misconduct. Lead Plaintiff has successfully prosecuted the claims it shares with the rest

of the Class, resulting in the $ 2.65 billion Settlement at issue. There is no evidence that Lead Plaintiff's interests conflict with the rest of the Class. Similarly, the Court continues to be impressed with the quality of representation provided by Lead Plaintiff's Counsel, its prosecution [*22] of the lawsuit, and its negotiation of the Settlement. *See also In re AOL Time Warner, 2003 U.S. Dist. LEXIS 145, 2003 WL 102806, at *2; infra* Part II.C. Both Lead Plaintiff and its choice of counsel satisfy the adequacy requirement of *Rule 23(a)(4)*.

### 5. Maintainability

In addition to finding that a class meets the requirements of *Rule 23(a)*, courts must ascertain whether the class is maintainable under one of the *Rule 23(b)* criteria. One commonly applied criterion requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Fed. R. Civ. P. 23(b)(3)*.

With respect to the first *Rule 23(b)(3)* prong, the Supreme Court has noted that predominance is "readily met in certain cases alleging . . . securities fraud . . . ." *Amchem Prods. v. Windsor, 521 U.S. 591, 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*. This case readily illustrates that principle. Allegations of Defendants' misrepresentations and the improper inflation of AOL's accounting revenues underlie [*23] the factual and legal claims of every Class Member. *See supra* Part II.A.2. The Court is satisfied that common questions of law and fact are predominant.

With respect to the second *Rule 23(b)(3)* prong--the superiority of the class action to other methods of adjudicating the controversy--securities cases like this one "easily satisfy" that requirement. *In re Blech Sec. Litig., 187 F.R.D. 97, 107 (S.D.N.Y. 1999)*. The Settlement provides a vehicle of recovery for individuals that would find the cost of individual litigation prohibitive, yet allows anyone wishing to initiate her own lawsuit to opt out of the Settlement. The Court's previous decision to consolidate this litigation is also consistent with the Settlement. The Settlement offers a single forum to resolve the common claims of millions of potential Class Members and prevents the initiation of countless claims in state and federal courts throughout the nation. Finally, at this stage, the risk of encountering any serious difficulty in managing the Class is negligible. Maintainability is satisfied here.

### B. Standard for Final Approval of Class Action Settlements

*Federal Rule of Civil Procedure 23(e)* [*24] governs the settlement of class action litigation. Courts may approve class action settlements after proponents of the settlement have distributed adequate notice of the proposed settlement and the settlement has been the subject of a fairness hearing. *Fed. R. Civ. P. 23(e)(1)*. The touchstone for court approval is that the settlement be "fair, reasonable, and adequate," *Fed. R. Civ. P. 23(e)(1)(C)*, and "not a product of collusion." *D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001)* (citing *Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000))*; *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005), cert denied, 544 U.S. 1044, 125 S. Ct. 2277, 161 L. Ed. 2d 1080 (2005)*.

Courts analyze a settlement's fairness, reasonableness and adequacy with reference to both "the negotiating process leading up to settlement as well as the settlement's substantive terms." *D'Amato, 236 F.3d at 85*. The court may not engage in mere "rubber stamp approval" of the settlement, yet it must "stop short of the detailed and thorough investigation [*25] that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974)*.

Further, courts should be "mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'" *Wal-Mart, at 116* (quoting *In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998))*. As the Second Circuit has long recognized, "there are weighty justifications, such as the reduction of litigation and related expenses, for the general public policy favoring the settlement of litigation." *Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982)*. This concern is reinforced by the Court's analysis of both the procedural and substantive fairness of the Settlement.

**C. Procedural Fairness: The Negotiation Process**

"A court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that the settlement resulted from 'arms-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests.'" *D'Amato, 236 F.3d at 85* [*26] (quoting *Weinberger, 698 F.2d at 74*). This inquiry into a settlement's procedural fairness helps to ensure that the settlement is not the product of collusion. Evidence of arms-length negotiation between experienced counsel that have engaged in meaningful discovery may give rise to a presumption of fairness. *Wal-Mart, 396 F.3d at 117* (citation omitted).

In evaluating a settlement's procedural fairness, the Second Circuit has noted that that "a court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato, 236 F.3d at 85* (citing *County of Suffolk v. Long Island Lighting, 907 F.2d 1295, 1323 (2d Cir. 1990))*. Courts in this District have also commented on the procedural safeguards inherent in cases subject to the PSLRA, wherein the lawyers are not "mere entrepreneurs acting on behalf of purely nominal plaintiffs," but are "selected by court-appointed Lead Plaintiffs who are substantial and sophisticated institutional investors with access to independent legal and financial specialists and a huge stake in the [*27] litigation." *In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 462 (S.D.N.Y. 2004)*.

This Settlement is the product of seven months of intense arms-length negotiations, overseen and assisted by a court-appointed special master, between major financial entities, both of whom are represented by experienced, highly regarded counsel. Lead Plaintiff, the Minnesota State Board of Investment ("MSBI"), "manages the investment of retirement fund assets of the Minnesota State Retirement System, Teachers Retirement Association, and the Public Employees Retirement Association, as well as idle cash of other state agencies," with total assets exceeding $ 50 billion. Minnesota Office of the Legislative Auditor, Report Summary: Minnesota State Board of Investment, http://www.auditor.leg.state.mn.us/FAD/2006/f0604.htm (released Feb. 15, 2006). Upon assigning MSBI lead plaintiff status, this Court noted that MSBI had sustained an estimated loss of $ 249 million, thus had the largest financial stake in the litigation. *See In re AOL Time Warner, 2003 U.S. Dist. LEXIS 145, 2003 WL 102806, at *2.* [8] Lead Plaintiff's public mission, financial experience, and vested interest in obtaining the [*28] best terms for the Settlement Class reflect favorably on its selection of counsel here.

8    MSBI's loss was calculated on the basis of a class period nearly two years shorter than the Class Period ultimately defined in the Settlement. Accordingly, its loss is presumably greater than $ 249 million.

Indeed, Lead Plaintiff's Counsel, Heins, Mills & Olson, PLC, is a respected class action litigator, with considerable experience in major securities and antitrust class action lawsuits. *See, e.g., In re Monosodium Glutamate Antitrust Litigation, MDL 00-1328 (D. Minn.); In re Broadcom Corp. Sec. Litig., SA CV 01-0275 (C.D. Cal.).* Lead Plaintiff's Counsel has garnered judicial praise for its representation in previous actions, and has continued to show its client commitment and exceptional lawyering in this case. On the other side of the table, AOLTW's counsel, Cravath, Swaine & Moore LLP ("Cravath") is generally regarded as one of the country's premier law firms. Cravath has extensive experience in

the defense [*29] of major class action lawsuits and has vigorously defended Plaintiffs' allegations throughout this litigation. At the fairness hearing, counsel for both parties noted their continuing disagreement about Plaintiffs' allegations. With the mediation of Special Master Wachter, however, both parties concluded that the Settlement was the best and most efficient outcome for their clients in light of the costs of litigation and mutability of applicable legal standards.

Special Master Wachter assumed his role during the early stages of discovery, overseeing the terms of the discovery process before playing a vital role in the settlement negotiations between the parties. Special Master Wachter fulfilled his assignment with considerable skill and diligence, remaining in close contact with both parties and mediating dozens of face-to-face and remote meetings between them over the course of seven months. Special Master Wachter's oversight of the process lends considerable support to the Court's finding of procedural fairness.

In light of the substantial evidence that settlement negotiations were conducted at arms-length without the slightest hint of collusion, the Court credits the Settlement [*30] with a presumption of fairness. This presumption is supported by the fairness of the Settlement terms.

### D. Substantive Fairness: The Settlement Terms

In evaluating the fairness, reasonableness, and adequacy of a settlement, the court is primarily concerned with the "substantive terms of the settlement compared to the likely result of a trial." *Malchman v. Davis, 706 F.2d 426, 433 (2d Cir. 1983)* (citations omitted). In order to make this evaluation, courts in this Circuit have consistently employed the *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation;
>
> (2) the reaction of the class to the settlement;
>
> (3) the stage of the proceedings and the amount of discovery completed;
>
> (4) the risks of establishing liability;
>
> (5) the risks of establishing damages;
>
> (6) the risks of maintaining the class action through the trial;
>
> (7) the ability of the defendants to withstand a greater judgment;

> (8) the range of reasonableness of the settlement fund in light of the best possible recovery;
>
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

[*31] *Wal-Mart, 396 F.3d at 117* (quoting *Grinnell, 495 F.2d at 463* (citations omitted)).

### 1. Complexity, Expense and Likely Duration of the Litigation

Due to its notorious complexity, securities class action litigation is often resolved by settlement, which circumvents the difficulty and uncertainty inherent in long, costly trials. *See, e.g., Hicks v. Morgan Stanley & Co., 2005 U.S. Dist. LEXIS 24890, No. 01 Civ. 10071, 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005); In re American Bank Note Holographics, Inc., 127 F. Supp. 2d 418, 424 (S.D.N.Y. 2001); In re Sumitomo Copper Litig., 189 F.R.D. 274, 281 (S.D.N.Y. 1999).* This notoriety is amply illustrated by the instant case, which is particularly conducive to settlement.

Plaintiffs allege wrongdoing by one of the largest companies in the world, during the largest corporate merger in history. Plaintiffs' allegations span more than three and a half years and implicate financial statements filed over fifteen consecutive quarters. Plaintiffs point to hundreds of fraudulent transactions carried out over multiple years, employing diverse accounting techniques, and often including multiple, interrelated [*32] revenue components. These sophisticated and complex transactions shared just one common characteristic: their allegedly inappropriate inflation of revenue. There is no question that the presentation of these transactions, and the conflicting interpretations which they would be subject to, would stretch the patience, attention, and understanding of even the most exemplary jury.

Since the denial of Defendants' motions to dismiss and the commencement of formal discovery, Plaintiffs have pored over millions of documents, employed nine experts, added six defendants, and laid the groundwork for dozens of depositions. (Heins Decl. PP4, 7, 70, 77.) The breadth of resources dedicated to the prosecution of this lawsuit reflects the complexity of the issues involved and the expenses that lie ahead. Shortly after the denial of their motions to dismiss, Defendants initiated an extensive round of deposition and document requests and negotiated with Plaintiffs over the scope of discovery. Defendants continue to deny liability and have been subject to only limited criminal prosecution for their alleged

wrongdoing. Defense counsel's vigorous defense of this lawsuit indicates Defendants' continued [*33] willingness to defend the allegations in the absence of the Settlement.

In addition to the complex issues of fact involved in this case, the legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages. These challenges are exacerbated here, where a number of controlling decisions have recently shed new light on the standard for loss causation. *See, e.g., Dura Pharms., 544 U.S. at 336; Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005).* If Defendants' pending motion for summary judgment on the issue of loss causation did not prove dispositive, it would continue to be the subject of profound dispute throughout the litigation.

In the absence of the Settlement, this litigation could very well last for several more years. The parties have not yet finished discovery. At a minimum, months of depositions would precede trial. A presumably lengthy trial would then be followed by years of inevitable appeals. Each step of the way, expenses would continue to accumulate, further decreasing the funds available to Class Members. Conversely, [*34] the $ 2.65 billion Settlement under consideration here "results in a substantial and tangible present recovery, without the attendant risk and delay of trial." *Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002).*

After careful consideration of the circumstances of this litigation, the Court finds that a trial would be long, complex, and costly. This factor strongly favors the Settlement.

### 2. Reaction of the Class to the Settlement

The reaction of the class is generally gauged by reference to the extent of objection to the settlement. Courts in this Circuit have noted that "the lack of objections may well evidence the fairness of the Settlement." *In re American Bank Note Holographics, 127 F. Supp. 2d at 425.* Courts have also commented favorably on settlements that are not contested by institutional investors and class representatives. *In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 479 (S.D.N.Y. 1998).*

Here, the Settlement Administrator mailed over 4.7 million Notice Packages to putative Class Members and has received an estimated 600,000 proofs of claim. Only four such individuals filed an [*35] objection to any aspect of the Settlement, and just two dispute the reasonableness of the Settlement Fund. [9] Further, not a single institutional Class Member objected to the Settlement. [10] The relative lack of dissent here compares favorably with settlements previously approved in this District. *See, e.g.,*

*D'Amato, 236 F.3d at 86-87* (eighteen objectors out of 27,883 notices); *Hicks, 2005 U.S. Dist. LEXIS 24890, 2005 WL 2757792, at *6* (three objectors out of approximately 100,000 potential members of the class); *In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 337-338 (S.D.N.Y. 2005)* (seven objectors out of 4,000,000 potential class members and 830,000 claimants).

> 9 Moreover, Plaintiffs argue that two of the four objectors lack standing to object to the Settlement. The Court addresses all objections in considerably more detail below. *See infra* Part II.E.

> 10 One institutional investor seeks to intervene in order to file an objection, *see infra* Part II.E.1, but by exercising its right to opt out of the Class, that entity is protected from the binding legal effect of this Settlement.

[*36] The Settlement Administrator also noted that 10,082 persons and entities filed valid requests for exclusion from the Class. (Forrest Decl. P3, Feb. 21, 2006.) Although a large number at first glance, these opt-outs amount to less than 0.2% of the 4.7 million putative Class Members. [11] Comparably small percentages of opt-outs have favored settlement in the past. *See In re Sumitomo, 189 F.R.D. at 281* (finding that fewer than 1% of class members requesting exclusion "strongly favored approval of the proposed settlement[]"). The small number of objections and low percentage of opt-outs here strongly favor the Settlement.

> 11 Additionally, as opt-outs were not required to submit transactional information in order to file a valid request for exclusion, it is impossible to ascertain what percentage of the opt-outs would have had valid claims to the Settlement.

### 3. Stage of Proceedings and Amount of Discovery Completed

Courts have approved settlements at all stages of the proceedings. The relevant [*37] inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement. The parties need not "have engaged in extensive discovery" as long as "they have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the settlement." *In re Austrian & German Holocaust Litig., 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000)* (quoting *Plummer v Chemical Bank, 668 F.2d 654, 660 (2d Cir. 1982))*; *see also Maley, 186 F. Supp. 2d at 363; In re American Bank Note Holographics, 127 F. Supp. 2d at 425-26.*

At the time of the Stipulation of Settlement, this litigation had reached an advanced stage of discovery. Even prior to formal discovery, Plaintiffs reviewed the relevant public facts pertaining to this litigation, with their review culminating in the 300 page Amended Complaint. Upon commencing formal discovery, Plaintiffs reviewed over 15 million documents, consulted with nine different economic and accounting experts, briefed numerous motions, and laid the foundation [*38] for hundreds of depositions. Although the final stages of discovery, including depositions, were not yet complete, it is not certain that Plaintiffs would have been able to maintain this action long enough to reach that stage of discovery. Defendants' motion for summary judgment was pending before the Court, and presented a difficult question that, if decided in favor of Defendants, may have resulted in dismissal of the lawsuit. The thorough briefing of this and other motions prior to settlement supplemented Plaintiffs' consideration of the strengths of their claims and the defenses they were likely to face at trial.

Although discovery had not been completed prior to the Settlement, Plaintiffs had conducted meaningful pretrial discovery and had engaged in sufficient trial preparation to appraise their likelihood of success. Accordingly, the third *Grinnell* factor also weighs in favor of the Settlement.

### 4. Risks of Class Prevailing (Establishing Liability and Damages, and of Maintaining the Class through Trial)

One of the Court's central inquiries when appraising a settlement is the likelihood that the class would prevail at trial in the face of the risks presented by further [*39] litigation. *Grinnell* specifically advises courts to consider the risks of establishing liability and damages, and of maintaining the class through trial. *495 F.2d at 463.* This inquiry requires courts to consider legal theories and factual situations without the benefit of a fully developed record, thus courts must heed the Supreme Court's admonition not to "decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc., 450 U.S. 79, 88 n.14, 101 S. Ct. 993, 67 L. Ed. 2d 59 (1981).* Rather, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Global Crossing, 225 F.R.D. at 459* (citing *In re Holocaust Litig., 80 F. Supp. 2d at 177*).

The difficulty of establishing liability is a common risk of securities litigation. *Maley, 186 F. Supp. 2d at 364.* In this case, Plaintiffs were not only challenged to establish a valid theory of loss causation, *see supra* Parts I.B & II.D.1, they also faced the risk of being unable to establish scienter for a number of the defendants. In its consideration of Defendants' motions to dismiss, the

[*40] Court closely reviewed Plaintiffs' allegations of scienter, dismissing claims against several individual defendants while finding other allegations adequate to avoid dismissal. *See In re AOL Time Warner, 381 F. Supp. 2d at 219-31.* Of course, avoiding dismissal at the pleading stage does not guarantee that scienter will be adequately proven at trial.

The risk of establishing damages here was equally daunting. The decline in AOL and AOLTW stock prices spanned several years. Defendants argue that this decline was the result of a number of factors--including the general decline in Internet stock values--unrelated to the allegations of fraud. Plaintiffs hired a team of experts to estimate damages and would likely face a conflicting panel of experts retained by Defendants for trial. The risk of establishing damages would be further exacerbated by the difficulty of educating the jury on abstruse economic concepts necessary to the calculation of damages.

Further, Plaintiffs would have faced a considerable challenge explaining the transactions underlying the alleged fraud. The complexity and opacity of these transactions would likely hinder Plaintiffs' ability to present [*41] the jury with a coherent explanation of Defendants' misconduct. As their expert, Professor John C. Coffee, Jr., noted, Plaintiffs faced a serious issue "as to whether a jury could understand the convoluted 'round robin' advertising games that had been played" by Defendants. (Coffee Decl. P30, Dec. 2, 2005.)

The Court certified this Class for settlement purposes only. Plaintiffs report that they had drafted a motion for class certification prior to the Settlement and had fully anticipated that Defendants would oppose class certification as vigorously as it had contested Plaintiffs' allegations and discovery requests. As such, even the process of class certification would have subjected Plaintiffs to considerably more risk than the unopposed certification that was ordered for the sole purpose of the Settlement.

In summary, the *Grinnell* "risk factors" also favor the Settlement.

### 5. Ability of Defendants to Withstand a Greater Judgment

This factor typically weighs in favor of settlement where a greater judgment would put the defendant at risk of bankruptcy or other severe economic hardship. *See, e.g., In re Warner Comms. Sec. Litig., 618 F. Supp. 735, 746 (S.D.N.Y. 1985).* [*42] Here, AOLTW remains a solvent, highly capitalized company, with assets greatly exceeding its $ 2.4 billion contribution to the Settlement. Neither party contends that Defendants are incapable of withstanding a greater judgment. However, the mere ability to withstand a greater judgment does not suggest

that the Settlement is unfair. *See, e.g., D'Amato,* 236 F.3d at 86; *In re NASDAQ Market-Makers,* 187 F.R.D. at 477-78. This factor must be weighed in conjunction with all of the *Grinnell* factors; most notably the risk of the class prevailing and the reasonableness of the settlement fund.

### 6. Range of Reasonableness of the Settlement Fund

The final two *Grinnell* factors constitute an inquiry into the settlement fund's range of reasonableness (1) in light of the best possible recovery and (2) to a possible recovery in light of all the attendant risks of litigation. *495 F.2d at 463.* Though courts are encouraged to consider the best possible recovery, the range of reasonableness inquiry is tightly bound to the risks of litigation, which have been developed in greater detail above. *See supra* Part II.D.4. As such, the following [*43] discussion must be tempered by the Court's earlier finding that continued litigation would proceed with a high degree of risk.

Plaintiffs have not provided a specific estimate of the total damages sustained by the Class, in large part, no doubt, due to the difficulty of distinguishing the decline in share price attributable to fraud from the decline attributable to general market forces. In light of the steep decline during the Class Period and the Settlement's estimated recovery per share, however, it seems clear that Class Members will not recover their entire loss. This consideration alone does not undermine my finding that the $ 2.65 billion Settlement Fund is reasonable in light of the difficulty of establishing damages here. "The settlement amount's ratio to the maximum potential recovery need not be the sole, or even the dominant, consideration when assessing the settlement's fairness." *In re Global Crossing,* 225 F.R.D. at 460-61. Indeed, damages are of such a speculative and contested nature here that the ratio of the settlement amount to a hypothetical maximum recovery would not be dispositive of the Settlement's fairness.

Not only do the parties dispute [*44] the amount of damages sustained by the Class, they continue to dispute the very existence of damages. In light of this fundamental disagreement, the $ 2.65 billion Settlement secured by Plaintiffs is all the more impressive. Plaintiffs have secured a substantial, immediate recovery for the Plaintiff Class that ranks among the five largest securities settlements in history (Coffee Decl. P2), and is the second largest settlement ever reached with an issuer of securities. (Heins Decl. P83.) [12] In addition, the Settlement Fund is currently in escrow, earning approximately $ 303,000 a day for the Class. In this sense, the benefit of the Settlement will not only be realized far earlier than a hypothetical post-trial recovery, but dates back to October 7, 2005, when the funds were deposited in the escrow

account. The concrete benefits of this Settlement outweigh the possibility of a higher recovery after trial. Under the circumstances of this case, the Settlement Fund is within the range of reasonableness.

> 12   In the early stages of this litigation, legal experts estimated "a payout of $ 1 billion" in the event of a settlement. (Heins Decl. Ex. 40.) Though this figure represents an estimated settlement amount rather than a full recovery, it provides some indication of the legal community's expectations. The Settlement reached here far exceeds those prognostications.

[*45]   After carefully considering the *Grinnell* factors, most of which weigh in favor of the Settlement, I find the substantive terms of the Settlement fair, reasonable, and adequate.

### E. Objections

The Court received a handful of objections to the Settlement prior to the deadline. [13] I will address each objection in the context of the aspect of the Settlement that is disputed.

> 13   Several of the persons objecting to the Settlement also object to Class Counsel's application for attorney's fees. The Court reserves judgment on the issue of attorney's fees at this time and will address the objections to fees in a separate ruling.

### 1. Stichting's Objection to the Settlement's Handling of the DOJ and SEC Funds

Stichting Pensioenfonds ABP ("Stichting") filed a motion to intervene, objecting to the Settlement's handling of funds set aside by AOLTW subsequent to the Company's settlements with the DOJ and SEC. [14] Stichting's objection to the Settlement's inclusion of the DOJ funds and AOLTW's decision to [*46] use its "best efforts" to include the SEC funds are without merit. Because the right of intervention is inessential to my disposition of Stichting's objection, the validity of its intervention is assumed for the purpose of this Opinion. [15]

> 14   Stichting is a putative Class Member but has chosen to opt out of the instant Settlement, hence the necessity of its motion to intervene. Stichting has filed a separate lawsuit, which is pending in this Court.

> 15   Stichting's right of intervention is by no means assured under the circumstances of this case. I am particularly troubled by the objector's argument that its intervention in this dispute is timely. Though Stichting filed its motion on the

January 9, 2006 deadline for objections, it made no attempt to alert the Court to its objection at the preliminary fairness hearing on September 28, 2004, or at any time prior to January 9, 2006. By the time Stichting objected, the Settlement Administrator had mailed millions of Notice Packages and hundreds of thousands of putative Class Members had filed claims. If Stichting's requested relief were granted, these costs would be duplicated by a second round of Notice.

Although Stichting waited until the last possible minute to bring their objection to the Court's attention, the exhibits to its motion indicate that Stichting was aware of the content of its objection well before the preliminary fairness hearing. (Kairis Decl. Ex. L; Letter from John C. Kairis to Samuel D. Heins and Peter T. Barbur (Aug. 17, 2005).) At that hearing, the Court heard argument from individuals objecting to certain conditions of the Notice, and, where appropriate, suggested that the Plaintiffs modify their proposal. Stichting's grievance is precisely the type of objection that would have been beneficially brought to the Court's attention at the preliminary fairness hearing. *See* Manual for Complex Litigation (Third) § 30.41, at 265 (2000) ("The court may want to hear not only from counsel but also from named plaintiffs, from other parties, and from attorneys who did not participate in the negotiations.").

[*47]  Stichting requests that the Court strike the terms of the Settlement that refer to the DOJ and SEC funds, order that those funds be distributed pro rata to all aggrieved shareholders regardless of their participation in the instant Settlement, and order that a modified Notice and Plan of Allocation be published and distributed. Because the DOJ and SEC funds were established under different conditions and the Settlement handles the funds dissimilarly, each fund will be considered in turn.

#### i. The DOJ Funds

Prior to the instant Settlement, AOLTW entered into a Deferred Prosecution Agreement with the DOJ (the "DPA"). In accordance with the DPA, AOLTW agreed to pay $ 150 million into a "fund to be established under *its direction and control* to be used for either the settlement of shareholder securities law litigation or for purposes of any compensation fund" related to the transactions underlying the DPA. (Karis Decl. Ex. C; *United States v. America Online, Inc.,* No. 1:04 M 1133, at P9 (E.D. Va. Dec. 14, 2004) (emphasis added).) Stichting argues that the inclusion of the DOJ funds in the Settlement will preclude them from obtaining their pro rata share of the money provided [*48] by the DPA, thus unfairly benefiting the Settlement claimants to the detriment of share-

holders who have opted out of the Settlement. (Stichting Obj. 23.)

Stichting's objection to the Settlement's inclusion of the DOJ funds is undermined by the DOJ's directions for the distribution of those funds. Under the DPA, the DOJ funds are put under AOLTW's "direction and control" for "the settlement of shareholder securities law litigation." In its discretion, AOLTW has chosen to distribute those funds by means of the primary class action Settlement, benefiting hundreds of thousands of aggrieved shareholders and eliminating the costs associated with a separate distribution mechanism. Stichting's protestations notwithstanding, the DPA does not expressly indicate that the funds must be distributed pro rata to all harmed investors. Prior to filing their objection, Stichting wrote a letter to the DOJ, submitting their concern to that agency. (Kairis Decl. Ex. M; Letter from John C. Kairis to Paul J. McNulty, Esq., U.S. Dep't of Justice (Dec. 16, 2005).) There is no record of a reply. Without some indication that AOLTW's distribution of the funds is contrary to the Company's agreement with the DOJ, [*49] the Court will not disturb an agreement within the jurisdiction of another federal district court by reading conditions absent from the DPA into that agreement.

Stichting has not demonstrated that the Settlement's inclusion of the DOJ funds was improper. Consequently, the Settlement terms including those funds need not be stricken, nor must Plaintiffs distribute a modified Notice and Plan of Allocation on that basis.

#### ii. The SEC Funds

Following an SEC investigation into AOL's allegedly fraudulent accounting and Time Warner's alleged violation of a cease-and-desist order, AOLTW entered into an agreement with the SEC. Under the terms of a consensual judgment, AOLTW agreed to pay "$ 300 million in civil penalties, which the Commission will request be distributed to harmed investors." (Kairis Decl. Ex. F; SEC Litigation Release No. 2215 (March 21, 2005).)

In all of the materials announcing and describing the Settlement, the parties have referred to a $ 2.65 billion Settlement Fund. The $ 2.65 billion figure does not include the SEC funds. The first mention of the SEC funds is on page six of the sixteen-page Notice. The Notice states that the SEC has not determined how those funds [*50] will be distributed, but that AOLTW has requested that the SEC make those funds, or a portion thereof, available for distribution with the Settlement. The settling parties have twice updated the Settlement website to indicate that the SEC has not made a final decision regarding those funds. In short, the Settlement does *not* include the SEC funds. Consequently, the Court will not require the parties to remove wholly aspirational lan-

guage regarding the mechanism by which those funds may be distributed.

Furthermore, intermittent references to the SEC funds make neither the Notice nor the Plan of Allocation defective. Each of the Notice's references to the SEC funds is accompanied by a disclosure that those funds are not a part of the Settlement, but that AOLTW will make its best efforts to distribute those funds, or a portion thereof, through the class action mechanism. All estimates of per share recovery clearly indicate that the recovery is based on the $ 2.65 billion figure, which does not include the SEC funds. Providing a second set of figures including the SEC funds in the estimated per share recovery would not only be misleading, but potentially inaccurate, because there is [*51] no indication of whether the SEC will elect to distribute none of the SEC funds, all of the SEC funds, or a portion thereof, through the Settlement. It cannot be said that the Notice fails to fairly apprise the putative Class Members of the terms of the Settlement. [16] To the contrary, the Notice explains the status of the SEC funds as clearly and simply as possible in light of the SEC's indecision with respect to how those funds will be distributed.

   16   See infra Part II.E.4 for an elaboration on the relevant standards for settlement notice.

Along these lines, the Plan of Allocation never mentions the amount of money that will be distributed. It merely states that the "Settlement monies will be distributed on a pro rata basis" under the terms of the Plan. (Plan of Allocation 1.) Stichting fails to explain how the Plan of Allocation would need to be altered to incorporate the greater amount of Settlement monies. If the SEC consented to distributing the $ 300 million via the Settlement, that money would simply [*52] be added to the $ 2.65 billion Settlement Fund already being distributed. Each claimant's pro rata share would net a greater per share recovery, but the Plan of Allocation itself would not require modification.

In short, references to SEC funds that are not included in the Settlement amount, but that AOLTW will make its "best efforts" to distribute through the class action mechanism do not make the Stipulation of Settlement, Notice, or Plan of Allocation defective. Stichting's objection is overruled.

**2. Objections to the Reasonableness of the Settlement**

Two individuals filed formal objections to the reasonableness of the Settlement. Margaret M. Keffer ("Keffer") argues that the Settlement provides inadequate compensation for her loss, suggesting instead that a settlement leading to the recovery of one-third of her losses might be adequate. Paul Heyburn ("Heyburn") argues

that, considering the serious allegations against Defendants, the estimated recovery per share simply does not provide a substantial benefit. [17]

   17   Plaintiffs argue that Heyburn does not have standing to object to the Settlement. Indeed, the transaction records attached to Heyburn's objection indicate that he profited from his AOL investment. (Heyburn Obj. Ex 1.) Consequently, he does not have a claim under the Plan of Allocation, which limits recovery to those shareholders that suffered a loss. Without an injury, Heyburn does not have standing to object. *New York v. Reebok Int'l Ltd., 96 F.3d 44, 47 (2d Cir. 1996).* Nevertheless, in order to dispel any perceived unreasonableness of the Settlement, I will briefly address Heyburn's concerns regarding the reasonableness of the Settlement and adequacy of representation. *See infra* Part II.E.3.

[*53]   Courts routinely approve settlements over conclusory objections. *See, e.g., In re Prudential Sec. Inc., Ltd. P'Ships Litig., 1995 U.S. Dist. LEXIS 22103, MDL No. 1005, 1995 WL 798907, at *13 (S.D.N.Y. Nov. 20, 1995); Saylor v. Bastedo, 594 F. Supp. 371, 373-74 (S.D.N.Y. 1984).* Neither Heyburn's nor Keffer's objection provides a legal or factual basis for the alleged insufficiency of the Settlement, nor do they consider the legal or factual context in which the Settlement was reached. Consequently, the objectors' unsupported allegations of unreasonableness do not alter my appraisal of the Settlement's fairness.

**3. Objection to Lead Plaintiff's Adequacy of Representation**

Heyburn also questions the adequacy of representation. He argues that Lead Plaintiff has failed to adequately protect the interests of Class Members by neglecting to analyze whether "certain class members in certain states would fare better than in others" on the basis of state securities laws. (Heyburn Obj. P3.) This objection is without merit.

Heyburn overlooks the provisions of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). SLUSA amended the federal securities laws to preempt state [*54] securities laws in certain class actions. [18] In relevant part, SLUSA directs that:

   No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal Court by any private party alleging--

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

*15 U.S.C. § 78bb(f)(1).* [19]

18    As the Supreme Court recently noted, SLUSA amends the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act") "in substantially similar ways." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, U.S. , 126 S. Ct. 1503, 164 L. Ed. 2d 179, 2006 WL 694137, at *7 n.6 (March 21, 2006).* Plaintiffs' claims are almost evenly divided between the 1933 Act and the 1934 Act. For ease of reference to the Supreme Court's analysis in *Dabit,* I will quote the amendments to the 1934 Act.

[*55]

19    The analogous provision in the 1933 Act is found at *15 U.S.C. § 77p(b).*

Because the instant action is a "covered class action," [20] alleging materially false and misleading statements or omissions of material fact (Second Am. Compl. PP240-432) in connection with the purchase or sale of "covered securit[ies]," [21] claims under state securities laws are preempted. Consequently, Lead Plaintiff had no duty to consider, and in fact was prohibited from considering, state securities laws in the context of this class action. *See Dabit, 164 L. Ed. 2d 179, 2006 WL 694137, at *9; see also Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 108-10 (2d Cir. 2001)* (reaching the same conclusion in the context of the 1933 Act). As such, Heyburn's objection to the adequacy of Lead Plaintiff's representation is overruled.

20    SLUSA defines a "covered class action" as:

any single lawsuit in which . . . damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class . . . predominate over any questions affecting only individual persons or members . . .

*15 U.S.C. § 78bb(f)(5)(B).* The instant class action clearly falls within this definition.

[*56]

21    "A 'covered security' is one traded nationally and listed on a regulated national exchange." *Dabit, 164 L. Ed. 2d 179, 2006 WL 694137, at *7 & n.9 (citing 15 U.S.C. §§ 78bb(f)(5)(E) & 77r(b)).* Both AOL (prior to the merger) and AOLTW stock traded on the New York Stock Exchange during the Class Period.

**4. Objection to the Notice**

"The adequacy of a settlement notice in a class action under either the *Due Process Clause* or the Federal Rules is measured by reasonableness." *Wal-Mart, 396 F.3d at 113-14* (citations omitted). Reasonableness refers to the understanding of the average class member; "the settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options which are open to them in connection with the proceedings.'" *Id. at 114* (quoting *Weinberger, 698 F.2d at 70).*

Cynthia R. Levin Moulton ("Moulton") objects to the Class Definition contained in the Notice, arguing that it "is defective and fails to satisfy the minimal [*57] requirements of due process" because the definition "only includes those security owners 'who were injured thereby,'" and the "class notice provides nothing by way of guidance concerning what it means to be injured thereby." (Moulton Obj. 2.) Moulton proceeds to describe a number of hypothetical situations in which the "injured thereby" definition may be unclear, as when a putative Class Member realizes gains offsetting her losses or has divergent results stemming from the ownership of distinct investment vehicles.

Moulton made an almost identical objection to the *WorldCom* settlement approved in this District just six months ago. In that case, Moulton argued that the class definition, which contained a similar "injured thereby" clause, "might be confusing to a person who had isolated losses but net gains from securities purchased during the Class Period, or who faced divergent results from purchases of different types of securities." *In re WorldCom, 388 F. Supp. 2d at 340.* Judge Cote's well-reasoned analysis of Moulton's objection in that case applies equally here:

A purchaser of [AOLTW] securities who believed that she had a legally cognizable injury [*58] attributable to those purchases would have been on notice that she was included in the Class. It is sufficient that the Class Definition gave puta-

tive Class Members who believed they had colorable claims arising from purchases of [AOLTW] securities enough information to alert them that they needed to opt out of the Class if they wished to pursue their claims separately.

*In re WorldCom, 388 F. Supp. 2d at 340-41.* Furthermore, the Plan of Allocation provides instructions for the calculation of recovery in many of the allegedly problematic scenarios proposed by Moulton. As in *WorldCom,* Moulton's objection is overruled.

## 5. Objection to the Plan of Allocation

A plan of allocation is evaluated by the same standards applied to the settlement as a whole: fairness, reasonableness, and adequacy. *See Maley, 186 F. Supp. 2d at 367* (citations omitted). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." *Id.* (citations omitted). Despite the existence of one objection here, the Plan of Allocation readily satisfies these standards.

I have already commented [*59] on Lead Plaintiff's Counsel's experience and competency. *See supra* Part II.C. Lead Plaintiff's Counsel prepared the Plan of Allocation in consultation with Scott D. Hakala, Ph.D., CPA ("Hakala"), an economics expert who has prepared court-approved plans of allocation in over a dozen securities settlements across the nation. (Hakala Decl. P1, Jan. 25, 2006.) Hakala designed the Plan of Allocation to provide recovery to damaged investors on a pro rata basis according to their recognized claims of damages. The Plan of Allocation presents clearly defined formulas for calculating claims by reference to a schedule with measures of artificial inflation for all relevant time periods and types of securities. Plans of allocation similarly calculating claims according to inflationary loss have recently been approved as a reasonable approach to the calculation of damages. *See Maley, 186 F. Supp. 2d at 367; In re Lucent Techs., Inc., Sec. Litig., 307 F. Supp. 2d 633, 649 (D.N.J. 2004).*

In his declaration, Hakala explains the methodology used to prepare the Plan of Allocation and asserts that the Plan is "fair and reasonable from an economic perspective." (Hakala [*60] Decl. P28.) While the estimates of damages and methodologies used to produce the Plan are necessarily complex due to the various types of securities involved in the AOLTW merger, the Court agrees with Hakala's assessment.

Pat L. Canada ("Canada") objects to the Plan of Allocation to the extent that it provides for the calculation

of damages by the first-in/first-out accounting method ("FIFO"), rather than the last-in/first-out method ("LIFO"). Canada argues that courts prefer LIFO and only reluctantly permit the use of FIFO, thus the Plan of Allocation should be modified to calculate damages using LIFO. [22]

22 In addition to their substantive disagreement with Canada's objection, Plaintiffs attack the objection on two procedural grounds. First, they argue that Canada does not have standing, because he did not submit adequate proof of his membership in the Class. Indeed, Canada's non-notarized certification that he purchased 200 shares of AOL stock is not a valid proof of purchase. Second, they argue that Canada's lawyer, Nicholas M. Fausto, Esq. ("Fausto"), is in the practice of submitting "canned objections," thus the Court should be wary of his objection. On this latter point too, Plaintiffs may be correct.

Much of the language in Fausto's brief attacking the use of FIFO is taken directly from Judge Schiendlin's opinion in *In re Espeed, Inc. Secs. Litig., 232 F.R.D. 95 (S.D.N.Y. 2005).* Despite the fact that it is the most comprehensive authority from this District supporting his argument, Fausto fails to cite the case, choosing instead to lift whole sentences from that opinion without attribution. *Compare* Canada Obj. 7-8, *with In re eSpeed, 232 F.R.D. at 101-02* & nn.35-36. None of his arguments are original, nor are they made in the context of the specific factual circumstances of this case. Although I am wary of the Canada objection, I will briefly address the thrust of its argument.

[*61] In the context of a securities class action, FIFO and LIFO refer to methods used for matching purchases and sales of stock during the class period in order to measure a class member's damages. Under FIFO, a class member's damages are calculated by matching her first purchases during the class period with her first sales during the class period. Under LIFO, a class member's damages are calculated by matching the class member's last purchases during the class period with the first sales made during the period. Calculating recovery by means of these different methods can affect the measure of a class members' injury. Depending on the trajectory of a stock's percentage of artificial inflation and the sale of shares during the class period, use of FIFO may result in damages where LIFO would not, and vice versa.

The method used to match purchases and sales when calculating damages in a securities action has only recently been the subject of judicial scrutiny and has more commonly arisen in the context of a court's assignment

of lead plaintiff status. In this District, both FIFO and LIFO have been used to calculate the financial stake of movants for lead plaintiff status in securities class [*62] actions. *Compare In re Veeco Instruments Inc. Sec. Litig.*, 233 F.R.D. 330, 333 (S.D.N.Y. 2005) (concluding that FIFO is "the appropriate methodology . . . for the purpose of considering the financial stake of the movant for lead plaintiff status"), *with In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 100-02 (S.D.N.Y. 2005) (concluding that lead plaintiff movant's "loss as calculated by the [movant] demonstrates why FIFO (as applied by the [movant]) is inferior to LIFO"). Determining the method of analysis is especially important in the context of lead plaintiff selection because prospective lead plaintiffs may manipulate their analysis in order to inflate their measure of damages, giving them an advantage over movants that calculate damages according to a different methodology. [23]

> 23    The method of analysis was not contested during the selection of lead plaintiff in this case. Without any objection, FIFO was used to calculate the damages in movants' applications for lead plaintiff. (Crawford Aff. Ex. B, Oct. 15, 2002.) Furthermore, the more than half million claimants to this Settlement have submitted their claims on the basis of the Plan of Allocation as presented here.

[*63] The LIFO/FIFO debate has not arisen in the context of a plan of allocation anywhere in this Circuit, [24] and Canada's conclusory objection fails to raise the slightest inference of how the Plan of Allocation's use of FIFO is unfair here. *Cf. In re eSpeed*, 232 F.R.D. at 101 (finding FIFO unfair in movant's application for lead plaintiff status in light of the movant's specific, manipulative application of FIFO in that case). Nor can Canada explain how the method of analysis would affect his recovery, as he claims to have made only a single purchase of stock and LIFO/FIFO is necessarily concerned with the matching of multiple stock purchases. Here, the Plan of Allocation is careful to limit a claimant's recovery to shares sold at a loss. Moreover, Plaintiff's economic expert affirms that "the overall effect of using the LIFO method instead of FIFO is not significant in this case." (Hakala Decl. P27.) Ultimately, there is no evidence that the method of analysis used in this case would result in an unfair distribution of the Settlement Fund. [25]

> 24    One court in this District recently approved a Plan of Allocation using LIFO, but did not elaborate on the choice of methodology, nor is their any evidence that the method of analysis was contested in that case. *See SEC v. Bear, Stearns & Co.*, 2005 U.S. Dist. LEXIS 6683, No. 03 Civ. 2937, 2005 WL 217018, at *7 (S.D.N.Y. Jan. 31, 2005). The unelaborated use of LIFO in one case does not compel the use of that method of analysis in all cases. Both Hakala and the Settlement Administrator affirm that FIFO has been used in the great majority of the plans of allocation that they have prepared and administrated in the past. (Hakala Decl. P22; Forrest Decl. P12.)

[*64]

> 25    This Opinion should not be read as an unconditional endorsement of FIFO as the method for matching purchases and sales for the calculation of damages in securities fraud litigation. Rather, the insignificance of the methodology applied in this case makes it counter-productive to require Plaintiffs to revise the Plan of Allocation and reinitiate the Notice period in order to calculate damages according to LIFO.

In light of overwhelming support for the Plan of Allocation by nearly all of the estimated 600,000 claimants to the Settlement, and the insignificance of the method of matching sales with purchases in the context of this case, I find the Plan of Allocation fair, reasonable, and adequate.

### III. Conclusion

For the foregoing reasons, Lead Plaintiff's petition for approval of the Settlement and Plan of Allocation is granted. A separate opinion establishing attorney's fees and expenses will follow.

SO ORDERED.

SHIRLEY WOHL KRAM

UNITED STATES DISTRICT JUDGE

Dated: New York, New York

April 6, 2006

*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number  5:07-cv-03444-JF

# TAB B

LEXSEE 2007 U.S. DIST. LEXIS 54058



Cited
As of: Oct 04, 2007

### IN RE ATMEL CORPORATION DERIVATIVE LITIGATION

### Case Number C 06-4592 JF (HRL)

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

### *2007 U.S. Dist. LEXIS 54058*

### July 16, 2007, Decided
### July 16, 2007, Filed

**NOTICE:** NOT FOR CITATION

**COUNSEL:** [*1] For James Juengling, Derivatively on Behalf of Nominal Defendant Atmel Corporation, Plaintiff: Alan R Plutzik, LEAD ATTORNEY, Kathryn Anne Schofield, Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Walnut Creek, CA; Alan Roth Plutzik, Lawrence Timothy Fisher, Schiffrin Barroway Topaz & Kessler LLP, Walnut Creek, CA; Betsy Carol Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Emanuel Shachmurove, Schiffrin Barroway Topaz & Kessler, Radnor, PA; Eric L. Zagar, Schiffrin Barroway Topaz & Kessler LLP, Radnor, PA; Marisa C. Livesay, Rachele R. Rickert, Wolf Haldenstein Freeman & Herz LLP, San Diego, CA; Tara Puhua Kao, Radnor, PA.

For Anthony Noble, Plaintiff: Betsy Carol Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Emanuel Shachmurove, Schiffrin Barroway Topaz & Kessler, Radnor, PA; Eric L. Zagar, Schiffrin Barroway Topaz & Kessler LLP, Radnor, PA; Marisa C. Livesay, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA; Tara Puhua Kao, Radnor, PA.

For George Perlegos, Gust Perlegos, Defendants: Jessica Koren Nall, John L. Cooper, Farella Braun & Martel LLP, San Francisco, CA.

For Tsung-Ching Wu, Kris Chellam, Jack Peckham, Donald [*2] Colvin, B. Jeffrey Katz, Francis Barton, T. Peter Thomas, Chaiho Kim, David Sugushita, Pierre Fougere, Steven Laub, Graham Turner, Norman T. Hall, Bernard Pruniaux, Steven Schumann, Defendants: Brian Lawrence Levine, Palo Alto, CA; Darryl Paul Rains, Morrison & Foerster LLP, Palo Alto, CA; Todd L. Burlingame, Morrison & Foerster LLP, Walnut Creek, CA.

For Mikes N. Sisois, Defendant: James Lawrence Pagano, Law Offices of James L. Pagano, San Jose, CA.

For Atmel Corporation, Defendant: Todd L. Burlingame, LEAD ATTORNEY, Morrison & Foerster LLP, Walnut Creek, CA; Darryl Paul Rains, Morrison & Foerster LLP, Palo Alto, CA.

For Mikes N. Sisois, Defendant: James Lawrence Pagano, Law Offices of James L. Pagano, San Jose, CA.

For Kenneth Kelley, Movant: Betsy Carol Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Kathryn Anne Schofield, Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Walnut Creek, CA; Marisa C. Livesay, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA.

**JUDGES:** JEREMY FOGEL, United States District Judge.

**OPINION BY:** JEREMY FOGEL

**OPINION**

ORDER [1] (1) GRANTING WITH LEAVE TO AMEND MOTIONS TO DISMISS FOR FAILURE TO

STATE A CLAIM; (2) DEFERRING MOTION TO DISMISS FOR FAILURE TO [*3] MAKE DEMAND

1 This disposition is not designated for publication and may not be cited.

[re: docket nos. 52, 53, 54, 58]

## I. BACKGROUND

### 1. Procedural Background

On July 27, 2006, Plaintiff James Juengling filed a shareholder derivative complaint against a number of the directors and officers of nominal defendant Atmel Corporation ("Atmel" or "the Company"), which designs, develops, manufactures and sells a wide variety of integrated circuit products, including microcontrollers, advanced logic, mixed-signal, non-volatile memory, and radio frequency components. The complaint alleged improper backdating of stock options and asserted three claims: (1) breach of fiduciary duty; (2) violation of *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5* promulgated thereunder; and (3) restitution/unjust enrichment. On October 4, 2006, the Court consolidated the Juengling action with two other derivative actions [2] and appointed a leadership structure for the consolidated action ("the Consolidated Plaintiffs").

2 The plaintiff in *Noble v. Perlegos, et al.,* Case No. C 06-4973 JF brought claims for: (1) violation of *Section 14(a) of the Exchange Act*; (2) breach of fiduciary duty; (3) gross mismanagement; [*4] (4) waste of corporate assets; and (5) unjust enrichment and breach of the duty of loyalty.

The plaintiff in *Kelley v. Perlegos, et al.,* Case No. C 06-4680 JF brought claims for: (1) breach of fiduciary duty; (2) violation of *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5* promulgated thereunder; and (3) restitution/unjust enrichment.

On November 3, 2006, the instant consolidated complaint ("the Complaint") was filed. The Complaint names eighteen individual defendants ("the Individual Defendants") who served as officers or directors of Atmel. The Complaint separates those eighteen defendants into two categories: the "Option Recipient Defendants" (Gust Perlegos, Tsung-Ching Wu ("Wu"), Kris Chellam ("Chellam"), Jack Peckham ("Peckham"), Donald Colvin ("Colvin"), Mike Sisois ("Sisois"), B. Jeffrey Katz ("Katz"), Francis Barton ("Barton"), Graham Turner ("Turner"), Bernard Pruniaux ("Pruniaux"), and Steven Schumann ("Schumann")) and the "Director Defendants" (George Perlegos, T. Peter Thomas ("Thomas"), Chaiho Kim ("Kim"), Pierre Fougere ("Fougere"), Norman Hall ("Hall"), David Sugishita ("Sugishita"), and Steven Laub ("Laub")). It asserts eleven claims: (1) violation of *§ 10(b)* [*5] and *Rule 10b-5 of the Securities Exchange Act*; [3] (2) violation of *§ 14(a) of the Securities Exchange Act*; (3) violation of *§ 20(a) of the Securities Exchange Act* (against Chellam, Barton, Wu and the Director Defendants); (4) accounting; (5) breach of fiduciary duty and/or aiding and abetting; (6) unjust enrichment (against the Option Recipient Defendants); (7) rescission (against the Option Recipient Defendants); (8) constructive fraud; (9) corporate waste; (10) breach of contract (against the Option Recipient Defendants); and (11) violation of *California Corporation Code § 25402* (against the Individual Defendants, with the exception of Barton, Fougere, Kim, Laub and Sugishita). No demand has been made upon Atmel's Board of Directors ("the Board"). The Consolidated Plaintiffs allege that such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. Complaint P 153.

3 Those claims without notation as to specific defendants are asserted against all the Individual Defendants.

On January 29, 2007, three motions to dismiss were filed. Fifteen of the Individual Defendants moved [*6] to dismiss for failure to state a claim upon which relief may be granted ("the Barton Motion"). Defendants Gust Perlegos and George Perlegos also moved to dismiss, joining the Barton Motion with limited exceptions. Atmel moved to dismiss for failure to make demand. On January 30, 2007, defendant Sisois moved to dismiss, joining the Barton Motion with limited exceptions. The Consolidated Plaintiffs have filed an omnibus opposition to the four motions to dismiss. The Court heard oral argument on April 27, 2007.

### 2. Factual Allegations

The Complaint alleges that the Individual Defendants had the following relationships with Atmel:

| Defendant | Role with Atmel |
| --- | --- |
| George | President, CEO, [4] & director from Atmel's inception in 1984 |

2007 U.S. Dist. LEXIS 54058, *

| Defendant | Role with Atmel |
|---|---|
| Perlegos | to August 2006. |
| | |
| Gust Perlegos | Executive VP Office of the President, 2001 to August 2006. |
| | Director, January 1985 to August 2006. |
| | Executive VP & GM, January 1996 to 2001. |
| | VP, GM, January 1985 to January 1996. |
| | |
| Wu | Executive VP, Office of the President since 2001. |
| | Director since 1985. |
| | Executive VP & GM, January 1996 to 2001. |
| | VP, Technology, January 1986 to January 1996. |
| | |
| Thomas | Director since December 1987. |
| | Member of the Compensation Committee & the Audit Committee |
| | since at least 1996. |
| | |
| Hall | Director from August 1992 until in or about 2005. Member of |
| | the Compensation Committee from 1997 to 2004, & member of the |
| | Audit Committee from 1997 to 2003. |
| | |
| Fougere | Director, member of the Audit Committee, & member of the |
| | Compensation Committee since February 2001. |
| | |
| Kim | Director & member of the Audit Committee since September |
| | 2002. Member of the Compensation Committee from September |
| | 2002 through 2003. |
| | |
| Sugishita | Director, Chairman of Audit Committee, & Chairman of |
| | Corporate Governance & Nominating Committee, February 2004 to |
| | present. |
| | |
| Laub | Director since February 10, 2006. |
| | Appointed President & CEO in August 2006. |
| | |
| Chellam | Chief Financial Officer & VP, Finance & Administration, |
| | September 1991 to July 1998. |
| | |
| Peckham | GM, ASIC Operations, January 1992 to 1998. |
| | VP, Sales, January 1986 to January 1992. |
| | Director of Sales, June 1985 to January 1986. |
| | |
| Colvin | Chief Financial Officer, & VP, Finance, March 1998 to January |
| | 2003. Chief Financial Officer, Atmel Rousset S.A. 1995 to |
| | 1998. |
| | |
| Sisois | VP, Planning & Information Systems, 1986 to August 2006. |
| | Director of Information Systems, February 1985 to 1986. |
| | |
| Katz | VP, Marketing, November 1998 to about 2005. |
| | |
| Barton | Executive VP & Chief Financial Officer, May 2003 to July |

2007 U.S. Dist. LEXIS 54058, *

| Defendant | Role with Atmel |
| --- | --- |
| | 2005. |
| Turner | VP and GM, Microcontroller Segment since October 2001. Joined the Company in 1989. |
| Pruniaux | VP and GM, ASIC Segment since November 2001. CEO of Atmel Rousset S.A., May 1995 to November 2001. |
| Schumann | VP and GM, Non-Volatile Memory Segment since January 2002. Joined the Company in 1985. |

Complaint [*7] PP 22-76.

4  CEO refers to Chief Executive Officer, VP refers to Vice President, and GM refers to General Manager.

As summarized below, the Complaint alleges that the Option Recipient Defendants received twenty-one backdated option grants on eleven dates.

| Recipient | Purported Grant Date | Shares | Share Price |
| --- | --- | --- | --- |
| Turner | February 4, 1994 | 160,000* [5] | $ 2.29 |
| Schumann | February 22, 1994 | 192,000* | $ 3.8516 |
| Gust Perlegos | April 11, 1997 | 40,000 | $ 6.0938 |
| Wu | April 11, 1997 | 40,000 | $ 6.0938 |
| Chellam | April 11, 1997 | 40,000 | $ 6.0938 |
| Peckham | April 11, 1997 | 40,000 | $ 6.0938 |
| Turner | October 9, 1998 | 100,000* | $ 1.9844 |
| Pruniaux | October 9, 1998 | 200,000* | $ 1.9844 |
| Schumann | October 9, 1998 | 192,000* | $ 1.9844 |
| Colvin | February 12, 1999 | 20,000 | $ 3.6719 |
| Sisois | June 11, 1999 | 40,000 | $ 5.9063 |
| Colvin | July 16, 1999 | 40,000 | $ 7.8281 |
| Katz | July 16, 1999 | 10,000 | $ 7.8281 |
| Turner | July 16, 1999 | 40,000* | $ 7.8281 |
| Colvin | November 17, 2000 | 40,000 | $ 12.125 |

2007 U.S. Dist. LEXIS 54058, *

| Recipient | Purported Grant Date | Shares | Share Price |
|-----------|---------------------|--------|-------------|
| Colvin | September 17, 2001 | 100,000 | $ 7.12 |
| Gust Perlegos | November 14, 2002 | 50,000 | $ 2.11 |
| Wu | November 14, 2002 | 100,000 | $ 2.11 |
| Colvin | November 14, 2002 | 50,000 | $ 2.11 |
| Sisois | November 14, 2002 | 40,000 | $ 2.11 |
| Barton | April 30, 2003 | 500,000 | $ 1.81 |

Complaint PP 24-62, 103.

5   An asterisk indicates that the option grant was "At least" the number stated here.

The Complaint alleges the following: The Company's [*8] stock option plans require that the exercise price of an option be no less than the fair market value on the date of the grant. Complaint P 91. However, in "a striking pattern that could not have been the result of chance," all the grants listed above purportedly were granted at some of the lowest prices of the year in which they fell. Complaint P 109. The purported grant dates were not the actual grant dates. Complaint P 110. "Rather, at the behest of the Option Recipient Defendants, the Director Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Atmel stock was lower than the market price on the actual grant dates." Id. "From 1994 to 2003, the Compensation Committee granted . . . backdated Atmel stock options to the Option Recipient Defendants . . . ." Complaint P 103. After the Sarabanes-Oxley Act became effective, the Compensation Committee granted backdated options to Gust Perlegos, Wu, Colvin, Sisois, and Barton. Complaint PP 114-15. "From 1998 to 2003, the Company, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing [*9] the improper option back-dating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Option Recipient Defendants . . . ." Complaint P 126.

The Complaint alleges the following with respect to Atmel's announced discovery of backdating: On July 25, 2006, Atmel issued a press release announcing that the Audit Committee was reviewing the Company's practices relating to its stock options grants with the assistance of independent legal counsel and independent accountants. Complaint P 96. The Company failed to file a timely Form 10-Q for the quarter ending June 30, 2006. Complaint P 97. On August 15, 2006, the Company announced that it had received a request for information from the SEC relating to its past stock option grants. Id. On August 17, 2006, Atmel issued a press release announcing that its investigation was ongoing and that it was still unable to provide financial information for the quarter ending June 30, 2006. Complaint P 98. On October 30, 2006, the Company issued a press release reporting the Audit Committee's preliminary conclusion that "the actual measurement dates for certain stock options [*10] differed from the recorded measurement dates for such stock options." Complaint P 99. The release stated that the Company's prior financial statements could not be relied upon. Id. As of the filing of the Complaint, the Company had yet to issue its Form 10-Q for the quarter ending June 30, 2006, and faced possible delisting by NASDAQ. Complaint P 101.

The Complaint also alleges the following: On August 6, 2006, Laub, Fougere, Thomas, Kim, and Sugishita elected Sugishita as Chairman and canceled the stockholders' meeting George Perlegos had called for the day before, which had sought their removal. Complaint P 92. The Board then fired George and Gust Perlegos, as well as two other executives, citing misuse of corporate travel funds. Id. On August 25, 2006, George Perlegos submitted a letter of resignation to the Board. Complaint P 95. On August 28, 2006, the Company announced that it had received a notice from NASDAQ that it was not in compliance with the director independence listing requirement, but that it had come back into compliance with the requirement after the resignation of George Perlegos. Id.

## II. LEGAL STANDARD

### 1. Motion to Dismiss

For purposes of a motion to dismiss, the plaintiff's [*11] allegations are taken as true, and the Court must

construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969).* Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections, 66 F.3d 245, 248 (9th Cir. 1995).* When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp, 90 F.3d 386, 393 (9th Cir. 1996).* On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *North Star Int'l v. Arizona Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983); MGIC Indemnity Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986); Beliveau v. Caras, 873 F.Supp. 1393, 1395 (C.D. Cal. 1995).* However, under the "incorporation by reference" doctrine, the Court also may consider documents that are referenced extensively in the complaint and are accepted by all parties as authentic, even though the documents are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970 (9th Cir. 1999).*

## 2. Demand Requirement

A derivative [*12] complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *Fed. R. Civ. P. 23.1.* The existence and satisfaction of a demand requirement is a substantive issue governed by state law. *See Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 96-97, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991).* [6] When the challenged decision is that of the board in place at the time of the filing of the complaint, failure to make demand may be excused if a plaintiff can raise a reason to doubt that a majority of the board is disinterested or independent or that the challenged acts were the product of the board's valid exercise of business judgment. *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984); see also Ryan v. Gifford, 918 A.2d 341, 352 (Del. Ch. 2007)* (discussing *Aronson*). However, "[w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application." *Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993);* [*13] *see also Ryan, 918 A.2d at 352* (discussing *Rales*). In such a situation, demand may be excused only if a plaintiff "can create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id. at 353* (citing *Rales, 634 A.2d at 933-34*).

[6] The parties agree that Delaware law applies to the instant action because Ditech is incorporated in Delaware.

## III. DISCUSSION

### 1. The Barton Motion to Dismiss for Failure to State a Claim

a. Claim One: Violation of *Section 10(b)* and *Rule 10b-5*

i. Sufficiency of the Allegations

The Consolidated Plaintiffs allege securities fraud in violation of *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5* promulgated thereunder. *Section 10(b)* makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C. § 78j(b).* [*14] *Rule 10b-5* makes it unlawful for any person to use interstate commerce

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5.* In cases involving publicly-traded securities and purchases or sales in public securities markets, the elements of an action under *Section 10(b)* and *Rule 10b-5* are: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc.*

*v. Broudo*, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).

The Consolidated Plaintiffs must meet two heightened pleading standards. *Fed. R. Civ. P. 9(b)* requires that "the circumstances constituting fraud . . . be stated with particularity." The Ninth Circuit has explained that a "plaintiff must include [*15] statements regarding the time, place, and nature of the alleged fraudulent activities, and that mere conclusory allegations of fraud are insufficient." *In re GlenFed, Inc. Securities Litigation, 42 F.3d 1541, 1548 (9th Cir. 1994).* A plaintiff asserting fraud "must set forth an explanation as to why the statement or omission complained of was false or misleading." *Id.* (internal quotation marks omitted); *see also Yourish v. California Amplifier, 191 F.3d 983, 992-93 (9th Cir. 1999).* The Private Securities Litigation Reform Act ("PSLRA") raises the pleading standard further:

> (1) Misleading statements and omissions
>
> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all [*16] facts on which that belief is formed.
>
> (2) Required state of mind
>
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4(b)(1)-(2).*

The Consolidated Plaintiffs allege the following with respect to the *Section 10(b)* claim:

> 159. Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.
>
> 160. The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and/or directors in the Company, [*17] each of the Individual Defendants was able to and did control the conduct complained of herein.
>
> 161. The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.
>
> 162. The Company relied upon the Individual Defendants' fraud in granting the Option Recipient Defendants options to purchase shares of the Company's common stock, as alleged herein.
>
> 163. As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, the costs associated with the Company's internal investigation, the loss of funds paid to the Company upon the exercise of stock options, costs and expenses incurred in connection with the Company's restatement of historical [*18] financial results, and costs and expenses incurred in connection with the SEC investigation of the Company.

Complaint PP 159-163.

These allegations do not satisfy the specificity requirement of *Rule 9(b)* or of the PSLRA. They neither identify what roles each defendant played in the alleged back-dating scheme nor allege facts giving rise to a strong inference of scienter on the part of each defendant. In light of the public statement by Atmel, it appears almost certain that some of the options at issue here were backdated. However, that apparent fact does not permit the Consolidated Plaintiffs to name any number of individual defendants without providing adequate detail regarding their role and knowledge of the alleged backdating. [7] This is not a case in which requiring further detailed allegations of the roles played by individual defendants would lead to an unreasonably cumbersome complaint. *See In re Washington Public Power Supply System Securities Litigation, 623 F.Supp. 1466, 1472 (W.D.Wash. 1985)*. Accordingly, this claim will be dismissed with leave to amend to the extent that it is not time-barred.

---

7 Nor are the Consolidated Plaintiffs relieved of the requirement that they allege [*19] facts raising an inference that a particular option grant was backdated. While the Court need not decide the sufficiency of such allegations in the instant complaint, it notes that other courts within this district have considered the presence or absence of a pattern of backdating, primarily in the context of the demand futility requirement. *See e.g. In re Zoran Corp. Deriv. Litig., 2007 U.S. Dist. LEXIS 43402, 2007 WL 1650948 (N.D.Cal. June 5, 2007); In re Openwave Systems Inc. Deriv. Litig., 2007 U.S. Dist. LEXIS 36517, 2007 WL 1456039 (N.D.Cal., May 17, 2007); In re CNET Networks, Inc. Deriv. Litig., 483 F.Supp.2d 947 (N.D.Cal. 2007); In re Linear Tech. Corp. Deriv. Litig., 2006 U.S. Dist. LEXIS 90986, 2006 WL 3533024 (N.D.Cal. Dec. 7, 2006)*. This Court also has provided a non-exclusive list of facts that, if alleged, would strengthen allegations that a grant was backdated. *See Order Re Motions to Dismiss 11-12, In re Ditech Derivative Litigation, Case No. C 06-5157 JF* (listing the following factors: "the degree to which the options were granted at the discretion of the compensation committee or the board, versus at fixed, preestablished times; the actual grant dates of the options and the appropriate price of the options; the date that the options were exercised; [*20] whether required performance goals were met before the options were granted; the presence or absence of other major corporate events, such as an acquisition, at the time of the grants; and the results of any requests by Plaintiff for information.").

ii. Statute of Limitations

[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 *(15 U.S.C. § 78c(a)(47))*, may be brought not later than the earlier of --

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

*28 U.S.C. § 1658(b); see e.g. In re Heritage Bond Litig., 289 F.Supp.2d 1132, 1147-48 (C.D.Cal. 2003)*. This statute of limitations is not subject to equitable tolling. *Durning v. Citibank, Int'l, 990 F.2d 1133, 1136-37 (9th Cir. 1993)*.

The parties agree that the five-year period of repose [8] applies to the first claim for violations of *Section 10(b)* and *Rule 10b-5 of the Securities and Exchange Act*. The Consolidated Plaintiffs argue that their claims fall within the five-year period of repose. While [*21] only a limited number of the alleged stock grant dates fall within this period, the Consolidated Plaintiffs do allege a series of false financial statements within the five-year period and argue that the period of repose begins no earlier than the latest such financial statement, which was filed on March 15, 2003. This argument raises the question as to whether such subsequent false financial statements preserve claims for options manipulation that occurred outside the five-year period of repose. The Court concludes that in light of the statute's focus on the "violation," the Court must consider the statute of limitations in terms of the specific violations alleged. To the extent that the claim is based upon the backdating itself, the period of repose starts on the date that the option grant was made. *See Durning, 990 F.2d at 1136* (noting that the federal rule is that a cause of action accrues at the completion of the sale of the instrument); *Falkowski v. Imation Corp., 309 F.3d 1123, 1130 (9th Cir. 2002)* (describing the grant of an option as "a purchase or sale" under the Securities Litigation Uniform Standards Act). The Consolidated Plaintiffs may be able to state a claim under *Section 10(b)* [*22] and *Rule 10b-5* for dissemination of

fraudulent financial statements, but such statements must fall within the five-year period of repose. [9] The Consolidated Plaintiffs may not avoid the effect of the statute of limitations by combining allegations of recent financial statements and time-barred option back-dating. Because the first claim, as currently pled, depends upon such a combination, it will be dismissed. The Court will grant leave to amend so that the Consolidated Plaintiffs may allege independent wrongful acts that occurred on or after July 27, 2001.

> [8]  "A statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation." *Munoz v. Ashcroft*, 339 F.3d 950, 957 (9th Cir. 2003) (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991)).

> [9]  The Court is skeptical of a continuing wrong theory that would create liability under *Section 10(b)* upon the issuance of a financial statement that merely fails to correct a prior false statement. Such a theory appears to approximate the effects of the fraudulent concealment doctrine in relation to equitable tolling, a doctrine that does not apply [*23] in the *Section 10(b)* context.

b. Claim Two: Violation of *Section 14(a)*

*Rule 14a-9* provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a). To state a claim under *Rule 14a-9* and *Section 14(a)*, a plaintiff must allege a false or misleading statement or omission of material fact; that the misstatement or omission was made with the requisite level of culpability; and that it was an essential link

in the accomplishment of the transaction. *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).

The Individual Defendants argue that the *Section 14(a)* claim is time-barred because it must be [*24] filed within one year after discovery of the facts constituting the violation, and in no event more than three years following publication of the proxy statement. Barton Motion 23. The Consolidated Plaintiffs argue that *Section 14(a)* claims fall within the two-year/five-year scheme that applies to a *Section 10(b)* claim. See Opposition 18. The Court concludes that the one-year/three-year scheme applies to the *Section 14(a)* claim because such a claim does not sound in fraud. *See In re Exxon Mobil Corp. Sec. Litig.*, 387 F.Supp.2d 407, 424 (D.N.J. 2005); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F.Supp.2d 189, 196-97 (S.D.N.Y. 2003); *In re Zoran Corp. Derivative Litig.*, 2007 U.S. Dist. LEXIS 43402, 2007 WL 1650948 *24. As currently pled, the *Section 14(a)* claim alleges false statements made more than three years prior to the filing of this action. Accordingly, the claim will be dismissed with leave to amend. Any amended claim must allege wrongful acts that occurred on or after July 27, 2003 and not later than one year after discovery of the violation.

In light of the foregoing discussion, the Court need not reach the challenges to the sufficiency of the allegations. However, assuming without deciding that the PSLRA [*25] also applies to *Section 14(a)* claims, *see e.g. In re Textainer Partnership Securities Litig.*, 2005 WL 3801596 (N.D.Cal. March 8, 2005), *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D.Cal. 2000)., greater specificity likely would strengthen this claim considerably. [10]

> [10]  This Court has held in another action that the PSLRA has foreclosed the application of the "group published pleading" doctrine, which provides that when false or misleading information is conveyed in group published statements, it is reasonable to presume that the statements are the result of the collective actions of the company's officers. *In re Nextcard, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 16156, 2006 WL 708663 *2-3 (N.D.Cal. March 20, 2006). This holding likely will be relevant to the sufficiency of an amended claim under *Section 14(a)*.

c. Claim Three: Violation of *Section 20(a)*

*Section 20(a)* provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable

jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person [*26] acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t(a).* "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996).* As discussed above, the Consolidated Plaintiffs have failed to state a claim for a primary violation of the securities laws. However, it is possible that they may be able to do so in an amended pleading. Accordingly, the *Section 20(a)* claim will be dismissed with leave to amend. [11]

> 11  The parties agree that the statute of limitations analysis for claim three is the same as for claim one. *See also In re Heritage Bond Litigation, 289 F.Supp.2d at 1148.* Accordingly, amendment of claim three should comply with the limitations articulated in the Court's analysis of claim one.

### d. Claims Four to Eleven: The State Law Claims

#### i. Claims Under Delaware Law (Claims Four to Eleven)

##### (1) Statute of Limitations

The parties agree that a three-year statute of limitations applies to each claim under [*27] Delaware law. *See 10 Del. C. § 8106 (2006).* The Consolidated Plaintiffs contend that the statute was tolled in the instant case "based upon the doctrines of inherently unknowable injuries and fraudulent concealment." Opposition 20. "Fraudulent concealment requires an affirmative act of concealment by a defendant-an actual artifice that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry." *Ryan, 918 A.2d 341, 360, 2007 WL 1018208 *13* (quotation marks omitted). "Inaccurate public representations as to whether directors are in compliance with shareholder-approved stock option plans constitute fraudulent concealment of wrongdoing sufficient to toll the statute of limitations." *Id.* Because the Consolidated Plaintiffs allege such inaccurate public representations, *see* Complaint P 126, the three-year statute of limitations is tolled as to the Delaware state law claims.

##### (2) Claim Five: Breach of Fiduciary Duty

The Consolidated Plaintiffs allege the following:

> 179. As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other [*28] Company insiders at the expense of the Company.

> 180. As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

> 181. In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

> 182. The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to and did, unduly benefit the Option Recipient Defendants at the expense of the Company.

Complaint PP179-82.

The Individual Defendants argue that their actions are protected by the business judgment rule. However, where a defendant acts in bad faith and commits a breach of loyalty, the business judgment rule does not apply. *See Ryan, 918 A.2d 341, 2007 WL 1018208 *11.* The Individual Defendants also argue that the fiduciary duty claim is not stated with sufficient [*29] particularity. This argument is well taken, as the Complaint does not put the Individual Defendants, and particularly the non-officer defendants, on notice as to how they are alleged to have violated their fiduciary duties. *See York Linings v. Roach, 1999 Del. Ch. LEXIS 160, 1999 WL 608850 *2 (Del. Ch. July 28, 1999)* (unpublished). The Consolidated Plaintiffs refer to detailed allegations elsewhere in the Complaint, but, as discussed above, necessary detail is largely absent. Accordingly, this claim will be dismissed with leave to amend.

##### (3) Claim Six: Unjust Enrichment

The Individual Defendants move to dismiss the unjust enrichment claim on a number of bases. The Consolidated Plaintiffs respond by citing to *Ryan, 918 A.2d 341, 2007 WL 1018208 *14*, in which the Delaware Chancery indicated that an unjust enrichment claim may be viable in the context of options backdating. The Court need not resolve the legal challenges to this claim, as amendment of the complaint is required on other bases. The Court notes that more detailed allegations of options backdating will strengthen any claim that the recipients of such options were unjustly enriched.

(4) Claims Four and Seven: Remedies Pled as Claims

The Individual Defendants move to [*30] dismiss the claims for accounting and rescission on the basis that accounting and rescission are remedies, not separate claims for relief. The Consolidated Plaintiffs effectively concede as much, but argue that it is inconsequential whether accounting and rescission are pled as remedies or claims for relief. Opposition 48. The Court concludes that the Consolidated Plaintiffs should include accounting and rescission as remedies sought in any amended complaint.

(5) Claims Eight and Nine: Constructive Fraud and Corporate Waste

The Individual Defendants argue that constructive fraud and corporate waste are merely types of breaches of fiduciary duty, not separate torts. Barton Motion 17 n.10. The Consolidated Plaintiffs do not respond to this specific argument, which is well taken as to the constructive fraud claim. The Court will dismiss that claim, which should be restated in any amended complaint as a "straightforward fiduciary duty claim[]." *See Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1236 (Del. Ch. 2001)* ("[Plaintiff] should amend the complaint to transform its derivative constructive fraud counts into straightforward breach of fiduciary duty counts.").

The corporate [*31] waste claim also will be dismissed. "To support a claim [for corporate waste], a shareholder must demonstrate that the transaction in question either served no purpose or was so completely bereft of consideration that the transfer is in effect a gift." *Lewis v. Vogelstein, Del. Ch., 699 A.2d 327, 336 (1997)*. A plaintiff must allege facts that, if true, establish that the defendant directors "authorize[d] an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Glazer v. Zapata Corp., Del. Ch., 658 A.2d 176, 183 (1993)*. The Consolidated Plaintiffs have not alleged such facts here; instead, they have alleged a grant of equity-compensation. As the Individual Defendants assert, these grants may well have

been in consideration for the recipients remaining in Atmel's employ. Accordingly, the claim will be dismissed with leave to amend.

(6) Claim Ten: Breach of Contract

The Individual Defendants move to dismiss the breach of contract claim on the grounds that it is not pled with sufficient particularity, that no employment agreements existed between Atmel and the "option recipient defendants," [*32] that the Consolidated Plaintiffs have not alleged any act of breach, and that the directors ratified any breach. The Consolidated Plaintiffs respond briefly that "[t]he terms of the Atmel stock option plans were blatantly violated when the Director Defendants approved backdated stock option grants." Opposition 47. However, the Consolidated Plaintiffs have not alleged which, if any, of the defendants entered into a binding contract that incorporates the terms of an option plan. Accordingly, this claim will be dismissed with leave to amend.

ii. Claim Eleven: Insider Trading Under California Law

(1) Statute of Limitations

A *Section 25402* claim must be brought "before the expiration of five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire." *Cal. Corp. Code § 25506(b)*. While the Consolidated Plaintiffs argue that this period should be equitably tolled, the Court concludes that the five-year period since the violation is a strict limit that may not be tolled. *See SEC v. Seaboard Corp., 677 F.2d 1301, 1308 (9th Cir. 1982)* (concluding that the [*33] four-year bar under an earlier version of the statute was a strict limit). The insider trading allegations refer to sales as early as 1997. Accordingly, portions of the claim are barred as currently pled. Any amended claim should allege violations that occurred on or after July 27, 2001 and discovery of which occurred on or after July 27, 2004.

(2) Sufficiency of the Allegations

*Cal. Corp. Code § 25402* provides that

> [i]t is unlawful for an issuer or any person who is an officer, director or controlling person of an issuer or any other person whose relationship to the issuer gives him access, directly or indirectly, to material information about the issuer not generally available to the public, to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from

such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information.

A claim under *Section 25402* must be pled with particularity [*34] under *Rule 9(b)*. *In re RasterOps Corp. Sec. Litig., 1993 U.S. Dist. LEXIS 14266, 1993 WL 476651 *5 (N.D.Cal. Sep. 10, 1993).*

The Consolidated Plaintiffs allege the following:

> 202. At the time that the Insider Selling Defendants sold their Atmel common stock as set forth herein at PP 135-49, by reason of their high executive and/or directorial positions with Atmel, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of Atmel's option backdating, improper accounting, and false financial statements.

> 203. At the time of such sales, that information was not generally available to the public of the securities markets. Had such information been generally available, it would have significantly reduced the market price of Atmel shares at the time.

> 204. The Insider Selling Defendants had actual knowledge of material, adverse non-public information and thus sold their Atmel common stock in California in violation of *California Corporations Code § 25402.*

Complaint PP 202-04. The Court concludes that like the other claims, the insider trading claim is not pled with sufficient particularity and should be dismissed [*35] with leave to amend. An amended claim should allege facts specific to each of the Individual Defendants.

### e. Motions to Dismiss Joining in the Barton Motion

The Court has reviewed the two additional motions to dismiss that join in the Barton Motion. The Court concludes that the dismissal of the claims on the basis of the arguments made in the Barton Motion renders it unnecessary to address the separate arguments asserted in the Sisois and Perlegos motions.

### 2. The Atmel Motion to Dismiss for Failure to Make Demand

The Delaware Court of Chancery [12] recently explained:

> [I]n an effort to balance the interest of preventing strike suits motivated by the hope of creating settlement leverage through the prospect of expensive and time-consuming litigation discovery [with the interest of encouraging] suits reflecting a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf, Delaware law recognizes two instances where a plaintiff is excused from making demand. Failure to make demand may be excused if a plaintiff can raise a reason to doubt that: (1) a majority of the board is disinterested or independent [*36] or (2) the challenged acts were the product of the board's valid exercise of business judgment.

> The analysis differs, however, where the challenged decision is not a decision of the board in place at the time the complaint is filed. In *Rales v. Blasband[, 634 A.2d 927 (Del. 1993)]*, the Supreme Court of Delaware held that [w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application. Stated differently, the absence of board action . . . makes it impossible to perform the essential inquiry contemplated by *Aronson [v. Lewis, 473 A.2d 805, 812 (Del. 1984)].*

> Accordingly, where the challenged transaction was not a decision of the board upon which plaintiff must seek demand, plaintiff must create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.

> . . . .

> Where at least one half or more of the board in place at the time the complaint was filed approved the underlying challenged transactions, which approval may

be imputed to the entire board for purposes of proving [*37] demand futility, the *Aronson* test applies.

*Ryan v. Gifford, 918 A.2d 341, 352-53(Del. Ch. 2007)* (citations and quotation marks omitted).

12  The parties agree that Delaware law governs the instant dispute. Because California courts follow Delaware law in demand futility cases, this is true even if California law applies due to Atmel's asserted prior incorporation in California. *See Oakland Raiders v. National Football League, 93 Cal.App.4th 572, 586 n.5, 113 Cal. Rptr. 2d 255 (2001)* ("The parties agree that we may properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes.").

The parties dispute whether the Court should consider the eight-member Board that was in place at the time that the initial complaint was filed [13] or the six-member Board that was in place at the time that the Complaint was filed. [14]

[W]hen an amended derivative complaint is filed, the existence of a new independent board of directors is relevant to a *Rule 23.1* demand inquiry only as to derivative claims in the amended complaint that are not already validly in litigation. Three circumstances must exist to excuse a plaintiff from making demand under *Rule 23.1* [*38] when a complaint is amended after a new board of directors is in place: first, the original complaint was well pleaded as a derivative action; second, the original complaint satisfied the legal test for demand excusal; and third, the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint.

*Braddock v. Zimmerman, 906 A.2d 776, 786 (Del. 2006);* see also *Harris v. Carter, 582 A.2d 222, 228 (Del. Ch. 1990)* ("Demand futility is assessed as of the time that the original complaint was filed, not as of the filing of an amended complaint containing further factual allegations in support of the same claims."). However, Delaware courts have not explained whether the three circumstances for excuse of a new demand requirement apply to a *consolidated* complaint.

13    George & Gust Perlegos, Wu, Fougere, Thomas, Kim, Laub, and Sugishita.

14    The original eight-person Board, less George and Gust Perlegos.

In light of the dismissal for failure to state a claim, the Court concludes that it is premature to resolve this question, or the subsequent questions as to whether *Aronson* or *Rales* applies, and what result the appropriate test [*39] dictates. Accordingly, the motion to dismiss for failure to make demand will be deferred.

**IV. ORDER**

Good cause therefor appearing, IT IS HEREBY ORDERED that the motions to dismiss for failure to state a claim are GRANTED with leave to amend and that the motion to dismiss for failure to make demand is DEFERRED.

DATED: July 16, 2007.

JEREMY FOGEL

United States District Judge

*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number  5:07-cv-03444-JF

# TAB C

LEXSEE 1992 U.S. DIST. LEXIS 3648



Cited
As of: Oct 04, 2007

**FREDRICK H. BADGER, RICHARD R. BRUCE, JEAN-LOUISE GASSEE, DAVID W. PIDWELL, DONALD SCHAFFER, MICHAEL SPINDLER, and DON-ALD C. ANDERSON, individually and on behalf of all others similarly situated, Plaintiffs, -vs.- GRUBB & ELLIS COMPANY, et al., Defendants.**

**NO. C-90-1550 MHP**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1992 U.S. Dist. LEXIS 3648*

**March 13, 1992, Decided**
**March 13, 1992, Filed; March 16, 1992, Entered**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, partnerships and law firm, filed a motion for dismissal or, in the alternative, for summary adjudication of the issues raised by plaintiff investors' second amended complaint alleging violations of § 10(b) of the Securities Exchange Act of 1934 (Act), *15 U.S.C.S. § 78j(b)*, violations of *§ 1962* of the Racketeering Influenced Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1962*, and a variety of state law causes of action.

**OVERVIEW:** The investors alleged that the partnerships engaged in deceptive and illegal acts under both the Act and RICO related to the sale of limited partnership interests. The investors also alleged state law claims for breach of contract, breach of fiduciary duties, and malpractice as to the partnerships and its law firm. The court first considered the claims based on RICO and concluded that the "enterprises" and "defendants" in the RICO causes of action were indistinguishable. The court noted that, within the Ninth Circuit, an alleged RICO enterprise could not simultaneously be the alleged RICO defendant, and the RICO causes of action had to be dismissed. The court then considered the claims under the Act and concluded that reliance was an essential element of these claims. The court found that the investors failed to plead any specific reliance. Although the court observed that reliance could be presumed in some circumstances, the

court found that the investors failed to plead the necessary facts to allow the presumption of reliance under any of the alternative approaches. As a result, the court found that the investors' claims under the Act had to be dismissed.

**OUTCOME:** The motion filed by the partnerships and law firm to dismiss for failure to state a cause of action was granted as to the federal claims in the investors' complaint, and the court dismissed the investors' remaining state claims under its discretionary authority.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
*Evidence > Inferences & Presumptions > General Overview*
[HN1] A motion to dismiss for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)* will be denied unless it appears that the plaintiff can prove no set of facts which would entitle him or her to relief. All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompa-

nied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a *rule 12(b)(6)* motion.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
*Securities Law > Liability > RICO Actions > General Overview*
[HN2] *18 U.S.C.S. § 1962(c)* provides that it shall be unlawful for any person employed by or associated with any enterprise engaged in interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. *18 U.S.C.S. § 1962(d)* provides that it shall be unlawful for any person to conspire to violate any of the provisions of *18 U.S.C.S. § 1962(a), 18 U.S.C.S. § 1962(b),* or *18 U.S.C.S. § 1962(c).*

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements*
*Securities Law > Liability > RICO Actions > General Overview*
[HN3] Within the Ninth Circuit and under *18 U.S.C.S. § 1962(c),* an enterprise cannot also be the Racketeering Influenced and Corrupt Organizations Act defendant.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN4] In order to state a claim of conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act under *18 U.S.C.S. § 1962(d),* a plaintiff must allege an agreement to commit a pattern of racketeering activity in violation of one of the substantive provisions of *18 U.S.C.S. § 1962(a), 18 U.S.C.S. § 1962(b),* or *18 U.S.C.S. § 1962(c).*

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Reliance > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN5] Reliance is an essential element of a claim under § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b). 15 U.S.C. § 78r(a).* Reliance is specifically required for a claim under S.E.C. *Rule 10b-5* and, in light of the *15 U.S.C.S. § 78r(a)* requirement of reliance for *15 U.S.C.S. § 78j(b)* actions in general, reliance is an essential element of a S.E.C. Rule 10(b)-9 action.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > Elements*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN6] Reliance may be presumed in a fraud-on-the-market situation. This theory assumes that in an open and developed securities market, the material information available on a security is sifted and digested by the market to determine an accurate value for the security. Thus misleading statements will defraud purchasers of stock even if they have not directly relied on the misstatements, since the purchasers are presumed to rely on the integrity of the market's "invisible hand" to set a fair price for the security. However, this theory applies only in an open and developed market.

*Energy & Utilities Law > Federal Oil & Gas Leases > Assignments & Transfers*
*Energy & Utilities Law > Oil Industry > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN7] The fraud-created-the-market theory may be viewed as substituting reliance on governmental regulatory process for reliance on open market process. Just as the open market purchaser relies on the integrity of the market to reflect the true value of securities, so the purchaser of an original issue security relies, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN8] Reliance in securities cases under § 19(b) of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78j(b)*, may be presumed in cases involving material omissions.

**JUDGES:** [*1] PATEL

**OPINION BY:** MARILYN HALL PATEL

**OPINION**

*MEMORANDUM AND ORDER*

Plaintiffs, Frederick H. Badger, Richard R. Bruce, Jean-Louise Gassee, David W. Pidwell, Donald Schaffer, Michael Spindler and Donald Schaffer, bring this action against defendants, Grubb & Ellis Co., 222 Sutter Street Partners, Ltd., Grubb & Ellis Securities Co., G & E Investors Associates IV, Ltd., G & E Investor Properties I, Inc., Grubb & Ellis Real Estate Investment Banking Group, Grubb & Ellis Realty Advisors (collectively "Grubb & Ellis"), and defendant Morrison & Foerster. [1] In their second amended complaint, plaintiffs allege 1) violations of section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j(b)* and the rules promulgated thereunder; 2) Racketeering Influenced Corrupt Organizations Act ("RICO") *section 1962(c),(d), 18 U.S.C. § 1962 (c),(d)*, violations; 3) breach of contract; 4) breach of fiduciary duty; 5) violation of *California Corporations Code § 25401*; and, 6) legal malpractice.

> 1    Plaintiffs allege that defendants' relationships are as follows: G&E Investor Associates IV, Ltd. is a limited partnership that acts as the general partner of 222 Sutter Street Partners, Ltd.; G&E Investor Properties I, Inc. is the general partner of G&E Investor Associates IV, and a subsidiary of Grubb & Ellis Company; Grubb & Ellis Securities Company is the registered broker/dealer through which the limited partnership units were sold; Grubb & Ellis Real Estate Investment Banking Group and Grubb & Ellis Realty Associates controlled the other Grubb & Ellis defendants in some manner. Plaintiffs allege that Morrison & Foerster is a law firm which performed legal work for the Grubb & Ellis defendants regarding the limited partnership offering. See Second Amended Complaint, attached as Ex. A to McCormick Decl., PP9-17.

[*2] Defendants bring the instant motion for dismissal of plaintiffs' second amended complaint, or, in the alternative, for summary adjudication of issues. For the reasons discussed below, the court GRANTS defendants' motion to dismiss plaintiffs' second amended complaint.

BACKGROUND

This lawsuit arises from the offering of 157 limited partnership interests in defendant 222 Sutter Street Partners, Ltd., a California limited partnership (the "partnership"). The significant facts are as follows.

1. The partnership was formed in September 1985 for the purpose of acquiring, owning, and managing a commercial office and retail building in San Francisco. See Confidential Private Offering Memorandum ("POM"), attached as Ex. 1 to McCormick Decl. in Support of Opposition to Motion to Dismiss or for Summary Adjudication of Issues, at A-7.

2. Limited partnership units were sold through a private offering memorandum, the POM, dated November 1, 1985. Id. at i.

3. The POM provided that all 157 units were to be sold by May 31, 1986, the "termination date"; if all 157 units had not been sold by the termination date, the limited partners' investments would be returned. Id. at C-6.

4. If [*3] all the units had not been sold by May 31, 1986, a "closing date" had occurred, then the general partner, G & E Investor Associates IV, Ltd., would be required to purchase the remaining units. Id. at 8. A "closing date" was generally defined as the purchase of eighty units. Id. at 110.

5. All of the named plaintiffs had signed their respective subscription agreements and tendered their settlement checks by February 22, 1986. See Bruno Decl., P4, Ex. B.

6. All 157 units were not sold by May 31, 1986; only 129 units had been sold as of May 30, 1986. See June 3, 1986, Letters from Grubb & Ellis, attached as Ex. A to Bruno Decl.

7. Instead of purchasing the remaining unsold units on May 31, 1986, the Grubb & Ellis defendants extended the termination date until September 30, 1986. Id.; Grubb & Ellis Defendants' Statement of Undisputed Material Facts at No. 2; Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts at No. 2.

8. Plaintiffs filed this action on May 29, 1990.

LEGAL STANDARD

[HN1] A motion to dismiss for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*

will be denied unless it appears that the plaintiff can prove [*4] no set of facts which would entitle him or her to relief. *Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Fidelity Financial Corp. v. Federal Home Loan Bank of San Francisco, 792 F.2d 1432, 1435 (9th Cir. 1986),* cert. denied, *479 U.S. 1064 (1987).* All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).* Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a *Rule 12(b)(6)* motion. *Durning v. First Boston Corp., 815 F.2d 1265, 1267* (9th Cir.), cert. denied sub nom., *Wyoming Community Dev. Auth. v. Durning, 484 U.S. 944 (1987).*

DISCUSSION

1. RICO

Plaintiffs' third, fourth and fifth causes of action allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1962(c)* and *(d),* against the Grubb & Ellis [*5] defendants. Morrison & Foerster is not alleged to be a defendant in these three causes of action. [HN2] RICO *section 1962(c)* provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." RICO *section 1962(d)* provides that "it shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." These causes of action must be dismissed.

Though artfully pleaded, these three causes of action cannot escape the fatal flaw that the alleged RICO enterprise is simultaneously the [HN3] defendant. The Ninth Circuit has held that under *section 1962(c)* an "enterprise . . . cannot also be the RICO defendant." *Rae v. Union Bank, 725 F.2d 478, 481 (9th Cir. 1984);* see also *Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1396 n.2 (9th Cir. 1986)* (courts have "consistently held" to the distinction between enterprise and defendant); *Bishop v. Corbitt Marine Ways, Inc., 802 F.2d 122, 123 (5th Cir. 1986)* [*6] (noting that all circuits but the Eleventh Circuit require distinction between "enterprise" and "defendant" and enumerating cases so holding); *Buran Equipment Co. v Hydro Elec. Constructors, 656 F. Supp. 864, 865 (N.D. Cal. 1987)* (alleged *section 1962(c)* action against a closely related group of entities involved in construction of a dam failed to state a claim against the related entities, since it alleged they were both defendants and the RICO enterprise).

In their third cause of action, plaintiffs allege that all Grubb & Ellis defendants except G&E Co. have participated in an unlawful pattern of racketeering activity. In this cause of action, G&E Co. is alleged to be the enterprise, but there is no indication of how it differs from the other Grubb & Ellis defendants and becomes the enterprise. The complaint merely states "as an enterprise, G&E Co. is not a Defendant in this Count Three." Second Amended Complaint for Damages, P71.

Similarly, in the fourth cause of action, the Grubb & Ellis defendants, including G&E Co. but now excluding 222 Sutter Street, are the alleged racketeers. 222 Sutter Street is alleged to be the enterprise, again without any allegations [*7] as to how it is distinguishable from the remaining Grubb & Ellis defendants. The complaint simply asserts that "as an enterprise, 222 Sutter Street is not a Defendant in this Fourth Count." *Id. P80.* Based on the lack of allegations or supporting evidence which would tend to show that either G&E Co. or 222 Sutter Street differ from the other Grubb & Ellis defendants in any relevant respect, it appears that plaintiffs have arbitrarily picked one defendant out of the Grubb & Ellis group and labeled that defendant the "enterprise" for these two causes of action.

Closer scrutiny of the second amended complaint further illustrates that the alleged "enterprises" and "defendants" in these causes of action are not distinguishable. In their complaint, plaintiffs expend considerable effort alleging that the Grubb & Ellis defendants are, in the words of one court, "a monolithic enterprise whose sole purpose was to separate plaintiffs from their money." *Bruns v. Ledbetter, 583 F. Supp. 1050, 1051 (S.D. Cal. 1984).* Plaintiffs' third and fourth RICO causes of action fully incorporate by reference "paragraphs 1 through 69 inclusive" of the complaint. *Id., PP70, 79.* Plaintiffs' [*8] complaint also asserts that "at all material times. . . . There existed a unity of control, interest and ownership among the Grubb & Ellis defendants such that any individuality and separateness of such entities may be disregarded by the Court. . . ." Id. P16. This united posture is abandoned only when it becomes necessary to allege the existence of an enterprise for purposes of the RICO actions.

Given plaintiffs' allegations that the Grubb & Ellis defendants are indistinguishable from one another, and the lack of any evidence that either G&E Co. or 222 Sutter Street is distinct from the other Grubb & Ellis defendants for purposes of constituting a RICO enterprise, the court concludes that plaintiffs are alleging that the Grubb & Ellis defendants are at once defendants and the RICO enterprise. This does not state a claim under *section*

*1962(c)*. The court therefore dismisses plaintiffs' third and fourth causes of action.

Plaintiffs' fifth cause of action alleges that two or more of the Grubb & Ellis defendants conspired to commit acts which are unlawful under sections 1961(c) and 1961(d) of RICO. Second Amended Complaint, P90. [HN4] In order to state a claim of conspiracy to violate RICO [*9] under *section 1962(d)*, plaintiffs must allege an agreement to commit a pattern of racketeering activity in violation of one of the substantive provisions of *section 1962*, i.e. *section 1962(a), 1962(b),* or *1962(c)*. See *Rose v. Bartle, 871 F.2d 331, 366 (3rd Cir. 1989)* (citing cases); *Frymire v. Peat, Marwick, Mitchell & Co., 657 F. Supp. 889, 895-96 (N.D. Ill. 1987)* (cited approvingly in Farlow v. Peat, Marwick, & Mitchell & Co., No. 89-6310, 1992 WL 24185 at *6 (10th Cir. Feb. 13, 1992). Since plaintiffs' fifth cause of action does not allege any distinct enterprise which the Grubb & Ellis defendants conspired to affect, but only incorporates the *section 1962(c)* causes of action which erroneously portray G&E Co. and 222 Sutter Street as "enterprises," plaintiffs' fifth cause of action is deficient. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 n.1 (3rd Cir. 1991)*; see also *Satellite Financial Planning v. First Nat. Bank, 633 F. Supp. 386, 405 n.23 (D.Del. 1986)* (closely related entities cannot conspire to violate RICO). The court therefore dismisses plaintiffs' fifth cause of action.

[*10]  **2. Securities 10(b) Claims**

Plaintiffs' first and second causes of action allege violations of section 10(b) of the Securities and Exchange Act of 1934, *15 U.S.C. § 78j(b)*, and *Rules 10b-5* and *10b-9* promulgated thereunder, against the Grubb & Ellis defendants and defendant Morrison & Foerster. Alternatively, plaintiffs allege that defendants aided and abetted securities violations. Defendants claim that these claims are deficient, due to failure to plead reliance.

[HN5] Reliance is an essential element of a 10(b) claim. *15. U.S.C. § 78r(a); Basic, Inc. v. Levinson, 485 U.S. 224, 243 (1988)* (reliance is specifically required for a 10(b)-5 claim). [2] Plaintiffs have not pleaded reliance specifically; they claim that in this case reliance may be presumed on two alternative grounds, the "fraud-created-the-market" theory or the theory outlined in *Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972)*.

2  The court is unaware of any case specifically holding that reliance is an element of a Rule 10(b)-9 claim; however, in light of *15 U.S.C. § 78r(a)'s* requirement of reliance for 10(b) actions in general, and the reasoning outlined in *Basic, 485 U.S. at 243*, the court finds that reliance is an essential element of a Rule 10(b)-9 action.

[*11]  **A. Fraud-Created-the-Market**

The Supreme Court has affirmed that [HN6] reliance may be presumed in a fraud-on-the-market situation. See *Basic Inc., 485 U.S. at 245-47*; see also *Blackie v. Barrack, 524 F.2d 891, 905-08 (9th Cir. 1975)*, cert. denied, *429 U.S. 816 (1976)* (articulating the fraud-on-the-market theory in the Ninth Circuit). This theory assumes that in an open and developed securities market, the material information available on a security is sifted and digested by the market to determine an accurate value for the security. Thus misleading statements will defraud purchasers of stock even if they have not directly relied on the misstatements, since the purchasers are presumed to rely on the integrity of the market's "invisible hand" to set a fair price for the security.

However, this theory applies only in an open and developed market. In the case at bar, the limited partnership interests were clearly not issued on an open and developed market. See, e.g., POM at ii ("no market exists for the Units and it is unlikely that a market will exist at any future time"), and the fraud-on-the-market presumption of reliance [*12] is inapplicable. Plaintiffs therefore allege a variation of the fraud-on-the-market theory, namely, the fraud-created-the-market theory. *Shores v. Sklar, 647 F.2d 462 (5th Cir. 1981)* (en banc), cert. denied, *459 U.S. 1102 (1983)*. See also *Arthur Young & Co. v. United States District Court, 549 F.2d 686, 695 (9th Cir.)*, cert. denied, *434 U.S. 829 (1977)* (implicitly endorsing a Shores-type variation of the fraud-on-the-market theory).

The Shores case involved the original issue of revenue bonds by a municipal development board. The court held that the alleged fraud was so pervasive that "without [the fraud] . . . these Bonds . . . would not have been offered on the market at any price." *Shores, 647 F.2d at 464 n.2*. Thus, even in an original issue situation, if fraud is so pervasive that without it the securities would not have been marketed, reliance can be presumed.

[HN7] The fraud-created-the-market theory may be viewed as substituting reliance on governmental regulatory process for reliance on open market process. The pertinent case in the Ninth Circuit is Arthur Young, where reliance [*13] was presumed in connection with the sale of interests in several oil exploration joint ventures. See *Arthur Young, 549 F.2d at 688, 695*. These joint venture interests had been marketed by defendants pursuant to registration statements and prospectuses filed with the Securities Exchange Commission. *Id. at 695*. The Arthur Young court concluded that just as the open market purchaser relies on the integrity of the market to reflect the true value of securities, "so the purchaser of an original issue security relies, at least indirectly, on the

integrity of the regulatory process and the truth of any representations made to the appropriate agencies . . . ." Id.; see also *Lubin v. Sybedon Corp., 688 F. Supp. 1425, 1447 (S.D. Cal. 1988)* ("even under *Shores* an investor must show that he relied to some extent upon either the pricing mechanisms of a securities exchange or the registration procedures of the Securities Exchange Commission."). *Shores* may thus be interpreted consistently with *Arthur Young.* [3]

       3     In *Shores,* Alabama law required that the bonds in question could only be issued by an Industrial Development Board incorporated by a municipality. *Shores, 647 F.2d at 465.* It is likely that the *Shores* plaintiffs relied upon this governmental procedure to assure the genuineness of the bonds.

[*14] In this case, plaintiffs have not pleaded reliance of SEC registration procedures or any other regulatory mechanisms that would warrant a presumption of reliance under the fraud-created-the-market theory. Nor have plaintiffs alleged or provided any supplemental evidence which suggests that any exchange commission certified the limited partnerships. Indeed, the POM is replete with prominent disclaimers disavowing any such regulatory oversight of the privately-offered limited partnership units. See, e.g., POM at iii ("THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING MEMORANDUM") (capital letters in original); POM at C-13 ("NO STATE SECURITY COMMISSIONERS OR STATE REGULATORY AGENCIES HAVE PASSED UPON THE VALUE OF THE SECURITIES, NOR HAVE THEY APPROVED OR DISAPPROVED THE OFFERING") (capital letters in original).

Plaintiffs have failed to allege or demonstrate that they relied upon any regulatory process in conjunction with the purchase of the limited partnership units. Therefore, the court finds that reliance may not be presumed in this case.

B. Affiliated [*15] Ute

The Supreme Court has held that [HN8] reliance in 10(b) securities cases may be presumed in cases involving material omissions. *Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972).* On its face, the Affiliated Ute presumption applies only in those cases "involving primarily a failure to disclose." Id.; see also *Lubin, 688 F. Supp. at 1446* (Affiliated Ute presumption applies "only in cases based upon omissions, and not in cases based upon misrepresentations."). The Ninth Circuit has reserved the question of whether the Affiliated Ute presumption of reliance should be extended to cases based primarily on misrepresentations rather than omissions. See *Kramas v. Security Gas & Oil Inc., 672 F.2d 766, 769 n.2 (9th Cir. 1982).*

In the instant case, plaintiffs' allegations consist almost entirely of misrepresentations. See Second Amended Complaint at PP43(a)-(s), 44(a)-(c) (listing alleged omissions and misrepresentations). By emphasizing facts that the misrepresentations did not state, plaintiffs attempt to characterize these misrepresentations as omissions. For example, plaintiffs allege that [*16] "the POM represents . . . that the project is part of both San Francisco's Financial and Union Square retail districts. . . . Defendants knew and failed to disclose . . . that the property was West of the Financial District and Southeast of the Union Square retail district." *Id. at P43*(b). The supposed omission, that the property was West of the financial district and Southeast of the retail district, does not carry any weight by itself; it is material only in relationship to defendants' statement, that the property was part of both areas, which it potentially makes inaccurate. Similarly, plaintiffs allege that "the POM represents . . . that the partnership obtained an appraisal . . . [that] determined the value of the building to be [$ 38.1 million]. Defendants knew and failed to disclose . . . that the appraisal assumed an [unrealistic] 2% vacancy ratio factor. . . ." *Id. at P43*(p). The asserted omission, that the assumed 2% vacancy ratio factor should have been disclosed, is of no relevance of itself; it is significant only in interpreting the POM's statement that an assessment had determined a certain value for the building.

The court finds that plaintiffs' allegations [*17] in this case involve chiefly misrepresentations. The Affiliated Ute presumption of reliance does not on its face extend to misrepresentation cases, and the Ninth Circuit has not extended the presumption to misrepresentation cases; the court declines to so extend it in this case. Plaintiffs, therefore, may not rely on a presumption of reliance based upon Affiliated Ute.

Plaintiffs' have not alleged reliance, a necessary element for their 10(b) claims. Nor is any presumption of reliance, applicable to plaintiffs under either a fraud-created-the-market theory or an Affiliated Ute theory. The court therefore dismisses plaintiffs' first and second causes of action. [4]

       4     Since the time the parties' submissions in this case were filed, and oral argument was heard, the Supreme Court has held that securities actions brought under Section 10(b) must be commenced within one year of discovery of the facts constituting the violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 111 S. Ct. 2773*

*(1991)*. The parties have submitted letters discussing the possible retroactive application of Lampf to this case. Since the court finds that plaintiffs' Section 10(b) claims are deficient on other grounds, it need not address the retroactivity of Lampf. Similarly, the court need not address the additional question of whether Section 476 of the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub. L. No. 102-242, which eliminates the retroactive application of Lampf, is unconstitutional.

[*18] 3. Remaining State Claims

Because plaintiffs' RICO and securities claims are dismissed, no further federal claims remain in plaintiffs' second amended complaint. The court therefore dismisses plaintiffs' remaining claims under its discretionary authority. *United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).* [5]

5 Since this action was filed before the adoption of *28 U.S.C. § 1367*, which provides for supplemental jurisdiction, supplemental jurisdiction does not apply. Even if the statute were applicable, however, the result would be the same under subparagraph (c)(3) of *28 U.S.C. § 1367*.

CONCLUSION

Having read the parties' papers and heard oral argument, and for the reasons discussed above, the court finds:

1. That plaintiffs have failed to allege a RICO enterprise distinct and separate from the alleged defendants for purposes of plaintiffs' third, fourth and fifth causes of action;

2. That plaintiffs have failed to plead reliance or to demonstrate that reliance should be presumed [*19] for purposes of their first and second causes of action,; and,

3. That plaintiffs have no federal claims other than their RICO and securities claims.

Therefore, the court GRANTS defendants' motion to dismiss plaintiffs' second amended complaint.

IT IS SO ORDERED.

Dated: MAR 13 1992

MARILYN HALL PATEL

United States District Judge

*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number  5:07-cv-03444-JF

# TAB D

Not Reported in F.Supp.
(Cite as: 1990 WL 606271 (N.D.Cal.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.

**In re CONVERGENT TECHNOLOGIES
SECOND HALF 1984 SECURITIES
LITIGATION.
This Document Applies To All Actions.**

**C-85-20130-SW.**

Jan. 10, 1990.

Josef D. Cooper, Law Offices of Josef D. Cooper, San Francisco, CA, Jules Brody, Stull, Stull & Brody, New York City, Michael S. Glassman, Clemens, Glassman & Clemens, Los Angeles, CA, Robert N. Kaplan, Frederic S. Fox, Kaplan & Kilsheimer, New York City, for plaintiffs.

Steven M. Schatz, Terry T. Johnson, David S. Steuer, Laurie B. Smilan, Wilson, Sonsini, Goodrich & Rosati, A Professional Corp Palo Alto, CA, Michael F. Perlis, Stroock & Stroock & Lavan, Los Angeles, CA, Philip F. Atkins-Pattenson, Daniel T. Bernhard, Pettit & Martin, San Francisco, CA, Douglas M. Schwab, Michael L. Charlson, Heller, Ehrman, White & McAuliffe, San Francisco, CA, for defendants.

ORDER GRANTING THE CONVERGENT
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

SPENCER WILLIAMS, District Judge.

**\*1** This matter came on for hearing on November 17, 1989, in Honolulu, Hawaii. Plaintiffs, the Convergent defendants and the outside director defendants cross-move for summary judgment. The defendants jointly move to decertify the class with respect to the state law claims. Having considered all papers filed herein and the oral argument of counsel, this court makes the following rulings.

BACKGROUND

This is a class action brought on behalf of all persons who purchased the stock of Convergent Technologies, Inc. ("Convergent") between July 27 and October 18, 1984. Plaintiffs claim that certain financial statements regarding second quarter business operations of 1984 and press releases concerning business operations in the third quarter of 1984 constituted federal securities fraud and common-law fraud and negligent misrepresentation under state law.

Convergent manufactures and sells computer systems, hardware and software to companies as varied as AT&T and Burroughs. The "Convergent defendants" consist of several company officers: the president, Michels, and various vice-presidents such as Willits, Wegbreit and Newman. The "outside directors" are Towbin, Cable and Rollnick, underwriters of the offering in question. Subsequent to the November 17, 1989 hearing, the parties stipulated and this court approved the dismissal of all claims against two of the outside directors, Cable and Rollnick.

The gravamen of plaintiffs' complaint is that the defendants engaged in a scheme to artificially inflate the value of Convergent stock in connection with a $50,000,000.00 subordinated debenture offering. Plaintiffs proceed on a "fraud on the market theory," where plaintiffs' reliance on the alleged false or misleading statements consisted of their reliance on the supposedly overvalued stock price. Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988).

The debenture offering was to take place late in the third quarter or early in the fourth quarter, but defendants eventually dropped the offering. In order to enhance stock value, plaintiffs claim that defendants overstated revenue and understated expenses in financial statements for the second quarter of 1984 and in press releases misrepresented the company's potential earnings for the third quarter. However, defendants never bought stock in the company during the period in question. In fact, stock value fell after each press release was made public.

Second Quarter Financial Statements

Plaintiffs allege that defendants improperly assigned revenue earned in the third quarter to the second quarter and underestimated reserves for the second quarter in financial statements submitted to the SEC. The method defendants allegedly used in making these misleading statements to the SEC was

© 2007 Thomson/West. No Claim to Orig. US Gov. Works



Not Reported in F.Supp.                                    Page 1061
(Cite as: 1990 WL 606271, *1 (N.D.Cal.))

"Meise magic." Meise was a financial officer who employed accounting devices to meet financial targets Convergent set for itself. Plaintiffs claim that the net effect of these intentional or negligent accounting errors was to inflate earnings per share.

Third Quarter Press Releases

**\*2** Plaintiffs challenge press releases issued on September 18, 1984, September 19, 1984 and October 4, 1984. These releases concerned the debenture offering and the profitability of the company in the third quarter. According to plaintiffs, an examination of Convergent's internal estimates of its third quarter profitability made at the time of the press releases render those releases misleading. Internal company forecasts as to profitability are evidenced by statements of individual company officers and by official company "plans" or "replans."

DISCUSSION

I. THE CONVERGENT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A. Legal Standards

1. Federal Securities Fraud

No representation or omission is materially misleading unless there was "a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to sell his shares." Grigsby v. CMI Corp., 765 F.2d 561, 564 (9th Cir. 1985). The Grigsby court relied on the landmark decision of TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976). In TSC Industries, the Court stated that "there must be a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available." TSC Industries, 426 U.S. at 449 (footnote omitted).

A prediction of a future event is not actionable if "it represents management's view ... it was reached in a rational fashion and ... it is a sincere view." Marx v. Computer Sciences Corp., 507 F.2d 485, 490 & n.7 (9th Cir. 1974). Moreover, there is no cause of action under the federal securities laws without a showing of scienter. Ernst & Ernst v.

Hochfelder, 425 U.S. 185, 206 (1976). Scienter is knowing, intentional or reckless conduct. Nelson v. Serwold, 576 F.2d 1332 (9th Cir.), cert. denied, 439 U.S. 970 (1978).

2. Summary Judgment

Upon motion for summary judgment, the moving party bears "the initial responsibility of informing the district court of the basis for its motion ... " Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In meeting this burden, the moving party need not affirmatively negate the opponent's claims. Id. Once the moving party meets this burden, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

To make a sufficient showing, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial... "' Id. at 324. Summary judgment is proper where a jury could not "reasonably find ... that the plaintiff proved his case by the quality and quantity of evidence required by the governing law ... " Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

B. Analysis

1. Third Quarter Press Releases

September Press Releases

**\*3** The first press release in question was issued September 18, 1984, and read as follows:
Convergent Technologies, Inc. announced today that it intended to go forward with its $50,000,000 Subordinated Debenture offering although the offering was being delayed temporarily. Allen Michels, Convergent's President, state that "As in recent quarters, the earnings for the current quarter will be significantly influenced by shipments in the final month of the quarter. For this reason, it has been decided to make the offering after the results for the quarter have been made public. Based upon information currently available to it, management believes there is no basis for any significant change in the Company's expectations for the quarter."
Defts. Exh. 12. On the next day, the following

Westlaw.

Not Reported in F.Supp.                                Page 1062
(Cite as: 1990 WL 606271, *3 (N.D.Cal.))

article appeared in the Wall Street Journal:

> Convergent Technologies, Inc. said it will delay its proposed $50 million offering of subordinated debentures until it makes public its third-quarter results next month.
>
> A spokesman said the delay was requested by L.F. Rothschild, Unterberg, Towbin, the lead underwriter for the offering.
>
> Despite the delay, "Management believes there is no basis for any significant change in the Company's expectations for the quarter," said Allen Michels, Convergent's President. A company spokesman said the company's profit expectations for the quarter were "very much in line" with those of security analysts, whose estimates range from $5.7 million, or 15 cents a share, to $7.6 million, or 20 cents a share.

Defts. Exh. 116. Plaintiffs contend that these statements were misleading because in the first two months of the third quarter Convergent had losses of $0.09 per share, even though the Company's "Replan" budgeted a profit of $0.06 per share.

In further support of their contentions, plaintiffs refer to several statements made by one defendant, Convergent's CEO Michels, to defendant Towbin, one of the principal underwriters. Mr. Michels remarked that he was unable to give "assurances" that Convergent would make a profit for the third quarter. Kaplan Decl. Exh. 1, Michels Tr. 143. In further talks with the underwriters, Michels was "not willing to express a certainty as to whether [[the] company" [would] "make a profit during the third quarter." Kaplan Decl. Exh. 2. Defendant Michels could not "guarantee a profit." Kaplan Decl. Exh. 27, Conway Tr. 83-84.

Convergent's press releases stated that the company expected profits between 15 and 20 cents per share, not that they could guarantee a profit. Convergent routinely sustained heavy losses in the first two months of a given quarter, but recouped those losses and generated a profit in the last month of the quarter. Michels Decl. ¶ 10; Wegbreit Decl. ¶ 10; Fischer Decl. ¶¶ 20-21. For example, Convergent lost 6 cents per share in the first two months of the second quarter. Convergent not only made up these losses, but concluded the second quarter with an 11 cents per share profit from continuing operations.

*4 Defendants' internal forecasts at the start of the

third quarter foresaw a $0.23 per share profit in the third quarter. Willits Decl. ¶ 25. This forecast was based on operating profits of $16.3 million, $2.8 million of which included high risk items. Defts. Exh. 20 at 1. After the third quarter initial losses were discovered to be higher than previous initial losses, defendants downgraded their internal estimate to $0.19 per share -- exactly the forecast disclosed in the September 18, 1984 press release. Defts. Exh. 39 at 2.

As the facts stand, defendants in the September 18, 1984 press release carefully stated that earnings for the third quarter would be "significantly influenced" by final month orders. Defendants explicitly stated that due to this uncertainty, the offering would be postponed until the final third quarter results. Although management believed that there would be no significant change in the company's expectations for the third quarter, the September 18, 1984 made it clear that third quarter profitability in the final analysis hinged upon shipments in the final month of the quarter.

Plaintiffs have adduced no evidence which tends to vitiate the basis of management's expectations for per share profits that quarter. Michel's refusal to guarantee a profit for the third quarter is in accord with management's statements that earnings for the third quarter would be "significantly influenced" by shipments in the final month. The term "significantly influenced" connotes apprehension as to future events and an unwillingness to ensure the outcome of present circumstances.

Moreover, words of expectation "bespeak caution in outlook and fall far short of the assurances required for a finding of falsity and fraud. Language of expectation ... recognizes the imponderable influence of complex variables in a fast-changing field." Polin v. Conductron Corp., 552 F.2d 797, 806 n.28 (8th Cir.), cert. denied, 434 U.S. 857 (1977); accord, Daisy Systems Corp. v. Finegold, [Current Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,520 at 93,312 (N.D. Cal. 1988) (Williams, J.). As this court has found, defendants had sound reasons for their expectations. Plaintiff can point to no language in the alleged misstatements that indicated defendants were certain about their expectations.

As it turned out, certain high profit margin products such as the more complex NGEN line did

© 2007 Thomson/West. No Claim to Orig. US Gov. Works



Not Reported in F.Supp.                                                    **Page 1063**
**(Cite as: 1990 WL 606271, \*4 (N.D.Cal.))**

not sell as well, even though Convergent often by contract required its purchasers to forecast their needs. Also, Burroughs, a large Convergent customer, began to internally develop products it previously bought from Convergent without notifying Convergent of this fact. Convergent defendants did not know of these quarterly results until after the quarter. Michels Decl. ¶¶ 32-33; Wegbreit Decl. ¶¶ 18-19, Willits Decl. ¶¶ 28-29; Fischer Decl. ¶ 23.

The outside directors who were also the underwriters lost their big underwriter fees. The Convergent defendants lost investment from the cancelled offering, did not purchase Convergent stock, and in fact devalued the stock after every public disclosure. Where the economic context makes the fraud implausible, plaintiffs "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1470 (9th Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

**\*5** Plaintiffs continue by pointing out that Convergent's outside accountants reported delay of the offering due to potentially unfavorable results. Fox Decl. Exh. 20. However, the releases explicitly stated that the offering was delayed because shipments in the final month of the quarter could significantly influence earnings. The release is therefore not misleading with respect to the opinion of the outside accountants because quarterly earnings clearly could be "significantly influenced" by unfavorable results in the final month shipments.

Also, plaintiffs would find a misstatement where Convergent management knew that the investment community was concerned that problems would surface. Fox Decl. Exh. 76. What the investment community believed is irrelevant. The issue is whether defendants had a reasonable belief for their projections.

October Press Releases

In late September it became apparent that revenues were down, so Convergent made the following press release:

Convergent Technologies announced today that

based on preliminary indications it's [sic] revenues for the third quarter ended September 30, 1984 will be substantially higher than those for the second quarter but that earnings from continuing operations in the third quarter will be approximately the same as earnings from continuing operations in the second quarter.

Third quarter earnings which reflect a shortfall relative to the Company's expectations are due principally to slightly lower than planned shipments which included a lower than planned proportion of high margin products.

Defts. Exh. 12. Even though the final results of the third quarter were due in a few weeks, Convergent in this press release revised the company's earnings estimates from the 15 to 20 cents per share range to 11 cents per share.

Plaintiffs challenge this release on the grounds that Convergent staff before the release estimated that the earnings per share would be $0.07. The earnings per share eventually proved to be $0.07. From these facts plaintiffs infer that the October 4th release was misleading and that the defendants knew it was misleading.

Defendants said that on the basis of "preliminary indications," not on the basis solely of one preliminary report, that earnings would be "approximately the same" as the last quarter. There are many qualifications in this release which plaintiffs attempt to gloss over.

The fact of the matter is that the October 4th report was a second downward revision of the company's estimates. The earnings did indeed turn out to be lower due to the very reasons contained in that report. The value of Convergent's stock dropped. Plaintiffs would impose liability for any estimate which did not materialize.

The preliminary worksheet on which plaintiffs rely turned out to be incorrect even though it comported with the final figures. It is uncontroverted that the tax liability was overstated because that worksheet based tax liability on a higher estimate of revenue. The worksheet also included one million dollars of employee bonuses which were erroneously added.

**\*6** Plaintiffs rely on possible inferences to be drawn from the coincidence of the preliminary and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works



Not Reported in F.Supp.
(Cite as: 1990 WL 606271, *6 (N.D.Cal.))

Page 1064

final figures. Plaintiffs do not dispute the fact that one day after the release, the same Convergent staff revised the earnings figure upward to eight cents per share. Equally undisputed is that the acknowledged errors would have resulted in a profit of 11 cents per share. Despite plaintiffs' reliance on a declaration which indicated the Chief Financial Officer believed the figure should be 8 cents, the declarant later stated that the best view of Convergent management was the 11 cents figure. Defts. Exh. 105, Dunmire Depo. at 21-24, 166-67.

Conclusion

The press releases at issue involved statements of expectation. As this court has noted, words of expectation generally fall short of assurances required for fraud. Plaintiffs simply have not produced evidence which specifically attack the basis of management's expectations disclosed in the context of these press releases, but rather rely on innuendo and conjecture.

Such innuendo and conjecture will not suffice to withstand a motion for summary judgment where the economic context makes the fraud implausible. It is unclear why management would repeatedly delay and ultimately cancel the offering if it truly intended to inflate stock price in connection with the offering. The foregoing reasons lead this court to conclude as a matter of law that any facts supposedly omitted by management in the press releases would not have significantly altered the total mix of information available to potential investors.

2. Second Quarter Financial Statements

Introduction

Plaintiffs challenge a significant number of Convergent transactions totalling approximately $9 million. For the reasons given below, $7.8 million of those transactions were not misleading or do not exhibit the requisite scienter to sustain liability under the federal securities laws. The remaining $1.2 million of transactions is immaterial. Because there are therefore no remaining federal causes of action, this court declines to exercise its pendent jurisdiction over plaintiffs' state law claims. See United Mine Workers v. Gibbs, 383 U.S. 715 (1966).

Alleged Understatement of Reserves

Plaintiffs must prove that the reserves were erroneously understated at the time those accounting decisions were made. GAAP, APB Opinion 20 ¶¶ 13, 31, 36; Schneider Decl. ¶ 5 (Defts. Ex. 118). Plaintiff's primary evidence is one of Convergent's unaudited preliminary year-end reports which supposedly indicates by asterisks which reserves are attributable to which quarter. Kaplan Decl. Ex. 20 at 20361225. However, the accountant who prepared that document, Richard Fischer, has stated in his declaration that all adjustments to this preliminary report related to the fourth quarter. Second Supp. Fischer Decl. ¶¶ 5, 6. Plaintiffs have produced no specific facts which challenge Mr. Fischer's declaration.

*7 It is also important to note that two sets of accountants, Price Waterhouse and Coopers & Lybrand, went through the books and concluded that at the time the accounting decisions were made, Convergent's reserves for the second quarter were adequate. In the face of this unrebutted evidence, any reserve challenged on the basis of this preliminary report must fall. Schneider Decl. ¶¶4, 13; Fischer Decl. ¶37; Second Supp. Fischer Decl. ¶ 7.

1) Accounts Receivable/Bad Debts

Of the additional $7 million allocated to this category at year's end, Convergent's auditors found that only $600,000.00 was due to error at the time. Defts. Exh. 56 at 28302-03. The auditors nevertheless concluded that the reserves were adequate because this amount was immaterial. In any event, there is no federal cause of action with respect to this transaction because plaintiffs have adduced no evidence as to scienter.

2) Warranty Reserves

Plaintiffs challenge an additional reserve of $300,000 for this item. However, they have not rebutted Convergent's contentions that Convergent's auditors ascribed this amount to "new warranty repair issues" for the fourth quarter. Defts. Exh. 152 at 026505 (emphasis added); Supp. Schneider Decl. ¶ 2. Despite this evidence, plaintiffs would infer that this may have been related to second quarter refit problems associated with the



Not Reported in F.Supp.
(Cite as: 1990 WL 606271, *7 (N.D.Cal.))

Megaframe product. However, plaintiffs have not rebutted defendants' evidence that this refit or "retrofit" was due to circumstances which developed after the second quarter. See Plaintiffs' Opp. at 32.

### 3) WorkSlate Division Sale

Here, Convergent originally estimated that final losses would be $15 million. At the time this decision was made, Convergent recognized that potential losses could total an additional $15 million. The only unrebutted specific fact is that the Convergent internal auditors believed these reserves were adequate at the time the accounting decision was made. Defts. Exh. 56 at 28304-305; Schneider Decl. ¶ 13.

### 4) Inventory Reserves

A May 4, 1984 Convergent memorandum stated that these reserves were "lean." Plaintiffs have produced no specific evidence that Convergent believed these reserves should be increased. Again, internal auditing at year's end determined that the reserves were proper. Plaintiffs' attempts to second guess why some companies returned equipment in subsequent quarters, why Convergent gave price decreases, and why Convergent should have known that its AWS/IWS line was obsolete fail for vagueness and speculation.

### 5) Administrative and Manufacturing Reserves

Plaintiffs' only evidence here relates to the unaudited preliminary year's end report. As noted above, the unrebutted Fischer declaration specifically stated that none of these reserves related to the second quarter.

### Alleged Overstatement of Revenue

### 1) Introduction

In general, plaintiffs' evidence amounts to no more than negative inferences concerning some of Convergent's business practices, practices which in one case are sanctioned by the California Commercial Code. For example, Convergent recognizes revenue when title passes to the buyer. Generally under California law, title to goods may pass "on any condition explicitly agreed on by the parties." Cal. Comm. Code § 2401(1).

*8 Plaintiffs claim that some goods sold to the Prime Corp. were shipped after the third quarter and hence were improperly recognized as revenue in the second quarter. Plaintiffs do not dispute the fact that Convergent and Prime agreed that title would pass on June 30, 1984 in the second quarter, and that title did pass under the Commercial Code. To challenge the propriety of recognizing second quarter revenue in this instance, plaintiffs' expert Bildstein identifies some factors which he claims demonstrates that the transaction was form over substance. However, plaintiffs have failed to produce any argument in law or fact why the Prime transaction was contrary to the Commercial Code.

### 2) Defendants' Objections to Certain Declarations

Plaintiffs have included five declarations of former Convergent employees who claim that Convergent recorded third quarter revenues in the second quarter. See declarations of Petit, Gervin, Carlson, Durden, Edelheit; see also plaintiffs' experts Torkelson and Bildstein. According to defendants, this court should strike these declarations because they were based on personal knowledge and on information and belief. This court agrees with defendants to the extent that the declarations were either hearsay, were not related to specific transactions, or do not indicate that they were based on the personal knowledge of the declarant.

Plaintiffs' argument that all of these declarations are relevant and are not hearsay fails. For example, Edelheit's declaration testifies that customers had received improperly functioning equipment, that they could return products if they so chose, or that the systems were incomplete. Plaintiffs argue that this is not hearsay because Edelheit had personal knowledge of why he could not collect receivables.

Why Edelheit could not collect receivables is irrelevant to the issue of whether Convergent shipped faulty equipment or whether Convergent was assigning revenue to the second quarter when Convergent and its customers in fact concluded no sale. Edelheit's declaration is hearsay because plaintiffs adduce it for the truth of the matter asserted -- whether Convergent created false sales and thus false revenue in the second quarter in order to inflate the stock price. Alternatively, Edelheit's declaration fails to link any alleged improper

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Westlaw.

Not Reported in F.Supp.                                                    Page 1066
**(Cite as: 1990 WL 606271, *8 (N.D.Cal.))**

revenue assignment with specific transactions.

Other declarations pertaining to shipment in the third quarter are not connected with any specific transaction. For example, the declarations of Gervin and Petit state that they saw workers loading product onto trucks the day after the second quarter. Petit testifies to back dating unspecified shipping documents. Durden stated that poorly trained quality assurance personnel resulted in the shipment of product which did not function properly.

However, these declarants either did not identify a particular product or failed to connect their allegations with specific transactions which plaintiffs challenge. Furthermore, it is not clear at all whether portions of these declarations were based on the personal knowledge of the declarant. In the language of Federal Rule of Civil Procedure 56(e), affidavits supporting summary judgment must be made on personal knowledge, must be admissible as evidence, and must "show affirmatively that the affiant is competent to testify to the matters therein."

**\*9** Carlson's declaration relates to generating unidentified invoices where purchase orders had not been received. While Carlson does refer to the AWS transaction, Carlson does not state that the shipment of those computers to salesmen was in any way connected with a specific instance of improper recognition of revenue.

### 3) Backdating of Shipping Documents

Plaintiffs challenge $811,005 worth of transactions which were invoiced on July 1, 1984, the day after the end of the second quarter, but were shipped on the last day of the second quarter, June 30, 1984. The premise of defendants' argument is that the shipping date was the proper date for revenue. In support of their contention that the shipping date fell within the second quarter, defendants note that records of third-party carriers show a shipping date of June 30th, that hand-written shipping invoices reveal a June 30th shipping date, and that outside accountants confirmed this fact.

This is a genuine issue of material fact. However, there is no scienter here sufficient for a federal cause of action. At most, plaintiffs could show that defendants were negligent regarding this transaction.

### 4) Requested Delivery Dates

In their opposition to Convergent defendants' motion for summary judgment, plaintiffs discovered an additional amount of revenue recognition totalling $3.8 million. These transactions were improperly recognized, so plaintiffs argue, because the shipping dates were earlier than the invoice dates. However, Convergent had arrangements with many customers whereby Convergent would ship goods as far as two weeks ahead of the date the customers originally requested the goods. Supp. Harris Decl. ¶ 3; Supp. Newman Decl. ¶ 7; Pond Decl. ¶ 4.

This is a legitimate practice. Second Supp. Fischer Decl. ¶ 5. As is the case with many of these transactions, it is telling that plaintiffs did not offer affidavits from specific customers to substantiate the claim that those customers did not order the product or that the product ordered and received was defective. Plaintiffs merely rely on innuendo and speculation to argue that this revenue recognition was improper. Plaintiffs have not come forward with any specific evidence from which a reasonable jury could conclude that these transactions were not part of Convergent's practice of shipping goods first and then invoicing them at a later date.

### 5) Gould

This transaction was invoiced in the second quarter, but was recognized in the third quarter. Defts. Exh. 101. Although plaintiffs aver that this information was produced for litigation, plaintiffs have produced no specific facts which indicate that this information was not registered in Convergent's data base at the time of the transaction.

### 6) Burroughs Shipment

Plaintiffs claim that defendants can not link this transaction to the third quarter, as defendants claim. However, the summary judgment standards require plaintiffs to come forward with facts specific enough to link this transaction to the second quarter.

### 7) NCR

**\*10** This transaction involved defective keyboards. Because plaintiffs' only evidence is the Gervin declaration, plaintiffs' challenge to this

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works



Not Reported in F.Supp.
(Cite as: 1990 WL 606271, *10 (N.D.Cal.))

transaction is not well taken. Mr. Gervin's declaration is framed in general terms, and does not specifically link his allegations to any transaction involving NCR.

8) Burroughs Premium

Normally, Burroughs would send Convergent a premium if Convergent shipped a certain number of goods within the quarter. The parties disagreed over the number of goods shipped to qualify Convergent for the premium, but later settled their differences. Harris Decl. ¶ 7. Plaintiffs have no evidence to rebut defendants' contentions that this was nothing other than a legitimate business dispute rather than Convergent's attempt at claiming premium payments to which it was not entitled in the second quarter.

9) Sigma Data

Plaintiffs claim that this is a sham transaction where the goods were never shipped. However, there is a shipping date on the invoices, and the shipping documents are dated. Defts. Exh. 157.

10) AT&T

After the second quarter, Convergent retroactively reduced its revenues from this transaction because AT&T opted instead for less expensive licenses. Plaintiffs have failed to rebut defendants' evidence that this downgrade was due to changes after the second quarter. Defts. Exh. 70 at 025185-87.

11) Repairs in the Field

Plaintiffs contend that sales to ADP, Alanthus and CPT were overstated because defendants knew the equipment was defective and that part of the revenue would be reduced by the cost to Convergent of repair. Apart from these general allegations, the defects were latent, i.e., unknown to Convergent at the time; in fact, the goods had passed internal testing. Calmes Decl. ¶¶ 4-5; Willits Decl. ¶ 14.

12) Remaining Transactions

This court dismisses plaintiffs' contentions regarding the above $7.8 million in transactions because the statements were not misleading and/or because there is no evidence of scienter. The remaining transactions which plaintiffs challenge are

relatively small and total approximately $1.2 million. Defendants claim that this amount is immaterial because it is a little under one and one-half percent of net operating revenues for that quarter. One court has found that an impact on revenues of less than 1% is immaterial. Pavlidis v. New England Patriots Football Club, Inc., 675 F.Supp. 688 (D. Mass. 1986).

The Ninth Circuit has ruled that courts may make such materiality determinations as a matter of law. In re Apple Computer Securities Litigation, [[[Current Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,714 (9th Cir. 1989). This court agrees with defendants that this amount is immaterial. The second quarter earnings per share of 11 cents was 4 cents above market expectations and the overall loss of 28 cents was not really expected by anyone. In this context of meeting net current operations well above market expectations and then recognizing a huge one time loss, a difference of a cent or two per share is not material.

*11 Despite plaintiffs' number crunching to the effect that this difference is almost ten percent of earnings per share for that quarter, this difference would not amount to a "substantial likelihood" that it would have "significantly altered" the investment decision of potential investors in the context of the second quarter earnings pattern. As noted above, Convergent exceeded the market's prediction of the company's earnings per share for the second quarter by 4 cents a share, after which Convergent took a huge, twenty-eight cent per share loss due to the sale of the WorkSlate division.

3. Remaining State Law Claims

While plaintiffs's state law claims may remain, this court declines to exercise its pendent jurisdiction over them in accordance with United Mine Workers v. Gibbs, supra. State law is sufficiently unresolved regarding certain aspects of the fraud and negligent misrepresentation claims such that these matters are best left to determination by the state courts.

II. OTHER MOTIONS

Because this court has found that there are no federal causes of action and has declined to exercise jurisdiction over the remaining state law claims,

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works



Not Reported in F.Supp.                                    **Page 1068**
**(Cite as: 1990 WL 606271, \*11 (N.D.Cal.))**

plaintiffs' motion for partial summary judgment, the
outside director defendants' motion for summary
judgment and defendants' motion to decertify the
class are moot.

Accordingly, the Convergent defendants' motion
for summary judgment is hereby GRANTED with
respect to the federal causes of action. Plaintiffs'
state law claims are hereby DISMISSED WITHOUT
PREJUDICE. The remaining motions are moot.

IT IS SO ORDERED.

1990 WL 606271 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number  5:07-cv-03444-JF

# TAB E

LEXSEE 1994 U.S. DIST. LEXIS 7895



Positive
As of: Oct 04, 2007

**CAROL MATHEWS, on behalf of herself and all others similarly situated, Plaintiffs, v. CENTEX TELEMANAGEMENT, INC., PETER A. HOWLEY and HENRY P. HUFF, III, Defendants.**

**No. C-92-1837-CAL**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1994 U.S. Dist. LEXIS 7895; Fed. Sec. L. Rep. (CCH) P98,440*

**June 8, 1994, Decided**
**June 8, 1994, Filed; June 9, 1994, Entered**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs filed a securities action against defendant corporation that included claims under *Rule 10b-5* of the Securities and Exchange Act of 1934 and state common law fraud claims. Defendant filed a motion for summary judgment.

**OVERVIEW:** Plaintiffs brought a securities action against defendant alleging that the corporation failed to account for uncollectible receivables in its financial statements and failed to maintain adequate loss reserves for bad debts. The court awarded summary judgment to defendant. The court held that the issues raised by plaintiffs were claims about what defendant should have done and did not establish anything more than differences in judgment and criticism by hindsight. Plaintiffs' contentions did not show misstatements or material omissions and did not demonstrate knowingly false statements. The evidence was not sufficient to create a genuine issue of fact as to materiality, scienter, fraud, or loss causation, and without proof of reliance, the fraud claims under state common law were also inadequate.

**OUTCOME:** The court granted defendant's motion for summary judgment in plaintiffs' securities fraud action.

**LexisNexis(R) Headnotes**

*Securities Law > Liability > Remedies > Actual Damages*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN1] To establish a claim under *Rule 10b-5* of the Securities and Exchange Act of 1934, plaintiffs must prove (1) a false statement or an omission that rendered another statement misleading; (2) materiality; (3) scienter; and (4) loss causation.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Materiality > Predictions of Future Performance*
[HN2] Inadequate loss reserves can be the basis for a *Rule 10b-5* suit if the necessary elements of such a cause of action are present. Reserves for bad debts are essentially predictions about the future. The fact that a future prediction turns out to be wrong does not mean it was fraudulent when made. Because reserves are meant to be estimates or predictions of collectibility, they are fraudulent only if, when they were established, the responsible

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Definitions > General Overview*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Proxies > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
[HN3] Materiality in the context of a false proxy statement under the Securities and Exchange Act of 1934 is defined by the U.S. Supreme Court as a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Courts can and do grant summary judgment on the grounds that a given statement or omission was not material. Courts also find that allegedly fraudulent transactions which are under one or two percent of net operating revenues are immaterial.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Recklessness*
[HN4] Scienter is a necessary element in any 10b-5 claim. Scienter is a mental state embracing intent to deceive, manipulate, or defraud. To prove scienter, plaintiffs must show, at the least, that defendants acted recklessly, as defined by the Ninth Circuit Court of Appeals: a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actors must have been aware of it. A defendant may not be found liable under 10b-5 unless he acted other than in good faith. Although scienter often is a fact specific issue to be determined by the trier of fact, in appropriate cases it can be decided on summary judgment.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Reliance > Fraud on the Market*
*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > General Overview*
[HN5] The "fraud on the market" theory does not apply to common law fraud claims. Plaintiffs must prove actual reliance on the allegedly misleading statement.

JUDGES: [*1] LEGGE

OPINION BY: CHARLES A. LEGGE

OPINION

*ORDER FOR SUMMARY JUDGMENT*

The case is now before this court on defendants' motion for summary judgment. The motion was opposed, briefed, argued and submitted for decision. The court has reviewed the moving and opposing papers, the arguments of counsel, the voluminous record of the motion and opposition, and the applicable authorities. For the reasons stated below, the court concludes that there are no genuine issues of material fact and that defendants' summary judgment motion should be granted.

I.

A brief recitation of the history of the case, leading to this motion and decision, is appropriate in order to define the present record.

The action was filed May 19, 1992. In September 1992, there was a hearing on defendants' motion to dismiss, which raised many of the same issues which defendants urge in this summary judgment motion. The motion to dismiss was denied without prejudice. At the same time, the court attempted to identify the key issues in the case and direct discovery on those issues.

Following that discovery, defendants made this summary judgment motion, which was opposed and set for hearing in July 1993. After reviewing the moving and opposing [*2] papers at that time, this court continued defendants' motion. The court was concerned that its earlier attempt to manage the discovery might have had the result of precluding plaintiffs from obtaining discovery which might be necessary for them to resist the summary judgment motion. The court therefore set another date for the completion of discovery, the filing of supplemental material in connection with this motion, and the hearing of the motion. The parties then completed that discovery, filed supplemental material, and

Case 5:07-cv-03444-JF    Document 30-2    Filed 10/05/2007    Page 53 of 100

Page 3

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

the motion was argued and submitted for decision. All other proceedings in the case have been stayed pending the court's resolution of this motion.

II.

This is a securities action brought under *Rule 10b-5* of the Securities and Exchange Act of 1934, and state common law fraud claims. The allegations are that Centex failed to adequately account for uncollectible receivables in its financial statements.

Plaintiffs also allege that defendants made false and misleading statements in a press release on October 21, 1991, commenting on Centex's third quarter results, and in its annual report for 1991, issued on March 30, 1992. Plaintiffs allege generally that defendants [*3] painted a falsely optimistic picture by indicating that Centex was a growth company which could withstand recession. However, that claim is too general and amorphous to base a cause of action upon, and is answered by the actual statements which Centex made in its releases and filings.

The real claim is that Centex had increasing difficulty in collecting its accounts receivable during the period October 31, 1991 to May 1, 1992, and that Centex did not record adequate reserves for its bad debts during the third and fourth quarters of 1991. Plaintiffs claim that this had the effect of artificially inflating the company's income and net worth until a May 1, 1992 press release. At that time, Centex announced that it would write off $ 850,000 of its earnings to a reserve for bad debts. Centex also announced relatively flat earnings for the first quarter of 1992. Centex's stock prices fell from $ 13.75 on May 1 to $ 12 on May 2, on trading of over two million shares.

It is obvious from Centex's public filings during late 1991 and early 1992 that there were disclosures made to the public of collection and bad debt problems, and that increases were made by Centex to its reserves for bad debts. [*4] The central issues are therefore the adequacy of the bad debt reserves -- a subject on which reasonable business, accounting and legal minds differ constantly -- and the adequacy of Centex's disclosures about its collection and bad debt problems.

III.

Defendants' summary judgment motion is based upon the following assertions from the record: Defendants disclosed the material information. Any statements that were allegedly misstatements were not material. There is insufficient evidence to show that defendants' setting of Centex's reserves for bad debts was fraudulent or was with scienter, but rather the reserves were good faith efforts by management to maintain adequate reserves based on Centex's prior collection experience.

There is no other evidence of scienter, because defendants relied in good faith on their accountants in setting the reserves and they purchased more stock than they sold during the relevant time period. There is no showing of loss causation. And plaintiffs' state law claims do not show the reliance and *scienter* required by the recent California Supreme Court case *Mirkin v. Wasserman, 5 Cal. 4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993).* [*5]

IV.

Having reviewed the extensive record and briefs, the court concludes that there are no genuine issues about the material facts. Those facts, together with the applicable law, compel that judgment be entered in favor of defendants.

In summary, the major points are: Debt collection problems and the increases of bad debt reserves were disclosed in Centex's 10Q report for the third quarter of 1991 and in its 1991 year end reports. The necessity for an even larger increase in the bad debt reserves was not known until April 1992, in response to 1992 events. There is not evidence sufficient to create a genuine issue of fact on misrepresentation, omission, materiality, scienter, fraud or loss causation.

The record of what was done and what was not done is not really in dispute. The issues raised by plaintiffs are claims about what defendants *should* have done. They do not establish anything more than differences in judgment and criticism by hindsight. The court does not believe that plaintiffs' contentions are enough to create genuine issues of material fact, particularly in the face of the record of the undisputed facts.

V.

Because of the nature of plaintiffs' claims, the defenses, [*6] and this court's conclusions, it is necessary to recite the record in some detail:

Defendant Centex offers telecommunications management and services to other companies. It is a service business and it bills its customers for its services.

As stated, plaintiffs allege that defendants touted Centex as a growth company which would continue to grow despite a bad economy. The complaint cites statements dated August 1, 1991, February 7, 1991, and October 31, 1991 in which defendant Howley proclaimed that the company was doing well "particularly in light of the weakness in the national economy" or "despite the poor national economy." However, these statements made no commitments for the future, and were in any event before the debt collection problems of 1992. While such statements may form a general background for

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

plaintiffs' specific claims, they are not themselves actionable as misstatements or omissions of material facts. Plaintiffs' real claims are based upon Centex's receivables and reserves for bad debts.

The declaration of defendant Huff, the former Chief Financial Officer of Centex, defined Centex's billing and collection procedures: Centex generally billed customers 15-20 days [*7] after the end of each month. Billings were recognized as revenue in the month in which Centex had a non-contingent right to receive the money. Because Centex knew that not all bills would be paid, each month Centex provided for possible bad debts with a monthly bad debt expense (an addition to its doubtful accounts reserve), which was an estimate of the amount that would turn out to be uncollectible. When a particular receivable was determined to be uncollectible, it was written off against the reserve, and that write-off did not itself affect net income during that month.

Huff stated that the monthly bad debt reserve was an estimate of future uncollectible invoices, which was based on business judgment and was necessarily subjective. He based his reserve decisions on Centex's past collection history, the aging of the accounts receivable, and general business conditions. An important factor was the "days outstanding;" that is, the ratio of total accounts receivable to average billings per day.

The declaration of defendant Howley explained how bad debts were written off. When a collector believed that a receivable was uncollectible, he proposed the write-off. Various management levels [*8] had to review the proposed write-off; and Howley himself had to approve amounts over $ 5000.

In the third quarter of 1991, a sluggish economy made collections more difficult. Huff therefore decided to increase the bad debt reserve for Centex's third quarter to $ 516,000 -- a 249% increase over the third quarter of 1990, and a 145% increase over the second quarter of 1991. This information was disclosed in the 10-Q report filed with the Securities and Exchange Commission on November 14, 1991. The report specifically stated that, "The Company increased its bad debt expenses to $ 516 as compared to $ 148 for the corresponding period of 1990. These increases are due to increased write-offs of doubtful receivables reflecting the current recessionary forces in the national economy." The report also stated that "The national economy has resulted in increases in the Company's receivables days outstanding."

KPMG Peat Marwick served as Centex's independent auditor. Huff and KPMG decided together that the reserve balance at the end of the third quarter of 1991 was adequate. KPMG did not advise him that reserves needed to be greater to comply with Generally Accepted Accounting Principles, even [*9] if KPMG might have

initially believed that some higher reserve was warranted. Huff decided not to increase reserves further because Centex's aging of accounts receivable over 90 days had improved, from 8.02% in the second quarter to 6.89% in the third quarter. Although Huff knew that as a percentage of accounts receivable the reserve had decreased from 1.35% during the second quarter of 1991 to 1.01% in the third quarter, he considered that adequate because Centex normally had higher reserves than necessary and usually had uncollectibles of only .6% to .7%. Huff also believed that unpaid receivables on September 30, 1991 were higher than normal because Centex's bills had gone out late in the past two months as a result of technical problems.

At year end, the level of accounts receivable over 90 days increased from 6.89% in the third quarter to 7.22% in the fourth quarter. Huff then increased bad debt expenses to $ 688,000, 33% more than in the third quarter. This was disclosed in the 10-K report filed with the SEC on March 30, 1992. Centex also set up a new reserve of $ 225,000 for disputed billings, so the total addition to the company's reserves was $ 913,000.

In February 1992, [*10] KPMG conducted its year end audit of Centex's financial statements. Although KPMG did some original test work which suggested that the reserve levels might be higher, it later agreed with Huff that the company's reserves were adequate. KPMG's original tests were conservative, because it recommended reserves between 3 and 4% of accounts receivable (rather than Centex's historical 1-2%), and because Huff had already increased reserves to 2.43% of accounts receivable.

KPMG finally recommended that the reserve should be increased by $ 100,180 pre-tax. The KPMG representative stated in his deposition that the $ 100,000 change was not material, because it was such a small percentage of billings (less than one percent), and also less than one percent of after-tax income. Huff relied on KPMG's opinion that the financial statements were fair and accurate, and if KPMG had concluded that the reserves were inadequate Huff would have raised them.

In the first quarter of 1992, there was a substantial increase in bankruptcies and delinquencies among Centex's clients. The company was adversely impacted because many of its clients were in California, which had a particularly bad economy. The aging [*11] of its accounts receivable deteriorated rapidly. By the end of the first quarter, March 1992, the percentage of accounts receivable over 90 days old was 11.54% compared to an average in the prior quarter of 7.22%.

In response to those events, a finance group within Centex performed a detailed review of each of Centex's accounts receivable, to decide if the doubtful accounts

Case 5:07-cv-03444-JF    Document 30-2    Filed 10/05/2007    Page 55 of 100

Page 5

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

reserve was adequate. As a result of that research and in consultation with KPMG, the reserve was increased by $ 853,000. That more than doubled the then existing reserve of $ 779,000. The increase was necessary because of events of which Centex became aware in the first quarter of 1992, and there is not sufficient evidence to create a genuine issue of fact that such an increase was necessary earlier. The increased reserve was announced in a press release dated May 1, 1992. The release also announced that earnings were reduced by over $ 500,000 and that earnings per share were 14 cents, a two cent decrease from the previous quarter.

VI.

Plaintiffs contend that Centex's collections did not suddenly deteriorate in first quarter of 1992, but that the large increase then was due to the failure to maintain adequate reserves [*12] in the last two quarters of 1991. But plaintiffs' contentions only show a difference in judgment, and not misstatements or material omissions. Plaintiffs point to certain evidence in the record, and to certain discussions within the company and with KPMG, which could lead to a conclusion that the reserves might have been higher. And plaintiffs point to certain write-off requests that were not acted upon immediately and to changes in the aging of certain of the receivables. While plaintiffs may be correct as a matter of hindsight -- that is, that the receivable reserve might have been increased earlier -- those differences of opinion do not rise to the level of misstatements or material omissions, for the reasons discussed in Section VII below.

Plaintiffs' expert, Mr. Gavron, explained how he arrived at a higher calculation of reserve requirements. First, he stated that defendants should have written off certain accounts receivable as uncollectible much earlier. Because the write-offs would have been against the reserve, the reserve would have had to correspondingly increase. He based his determination of which accounts should have been written off sooner on certain accounts which [*13] were disconnected. He assumed in his analysis that these bills were probably already 30 days old on the date of disconnection. Second, he also stated that Centex did not adequately account for "credits in the pipeline;" that is, amounts which defendants improperly charged to customers and which would have to be credited to them. He also stated that management delayed writing off bad debts which had been approved by regional directors. Defendants contend that Mr. Gavron relied on faulty assumptions. Specifically (1) not all disconnected lines are disconnected for failure to pay (e.g., a customer may go out of business or switch to a competitor), and even as to those lines, not all accounts were uncollectible; (2) the decision to issue business credits also takes a long time, and might not have been deter-

mined at the end of 1991, even if it resulted from a 1991 transaction. And two documents on which Mr. Gavron relied (Exhibits F and H), were prepared in April 1992 and contained information not known earlier to Centex. This court need not reconcile those differences of opinion, because they are just that; that is, differences of opinion. They are not evidence of misstatements or material [*14] omissions.

VII.

[HN1] To establish a *Rule 10b-5* claim, plaintiffs must prove (1) a false statement or an omission that rendered another statement misleading; (2) materiality; (3) scienter; and (4) loss causation. *In re Apple Computer Security Litigation, 886 F.2d 1109, 1113 (9th Cir. 1989); McGonigle v. Combs, 968 F.2d 810, 817, 819 (9th Cir. 1992).*

A.

The company's collection problems, and the necessity for increases to its reserves, were publicly disclosed as they became apparent. Defendants did increase Centex's bad debt reserves in late 1991, and stated in public filings that the company was having increasing difficulty in collections. The 10-Q for the third quarter, filed with the SEC on November 14, 1991 and quoted above, stated that the company had increased its bad debt expenses and that the increases were due to increased write-offs because of the current state of the national economy and to increased aging of receivables. Additionally, a table in the allegedly misleading year end reports disclosed that the provision for bad debts had increased from $ 951,000 in 1990 to $ 1,678,000 for 1991. The necessity for larger [*15] reserves and write offs of accounts did not become known to defendants until 1992.

Plaintiffs' arguments about what should have been known or done in 1991 are only differences in business judgment viewed from hindsight, and do not demonstrate knowingly false statements or [HN2] omissions. Inadequate loss reserves *can* be the basis for a *Rule 10b-5* suit if the necessary elements of such a cause of action are present. *See In re Wells Fargo Securities Litigation, 12 F.3d 922, 926 (9th Cir. 1993)* (reviewing dismissal under *F.R.C.P. 12 (b)(6)*, and not a summary judgment based on a fact record). But the necessary elements are not present here.

Reserves for bad debts are essentially predictions about the future. The fact that a future prediction turns out to be wrong does not mean it was fraudulent when made. *Marx v. Computer Sciences Corp., 507 F.2d 485, 489, 490 (9th Cir. 1974).* Because reserves are meant to be estimates or predictions of collectibility, they are fraudulent only "if, when they were established, the responsible parties knew or should have known that they

Case 5:07-cv-03444-JF    Document 30-2    Filed 10/05/2007    Page 56 of 100

Page 6

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

were derived in a manner inconsistent with reasonable accounting [*16] practices." *Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96, 100 (3rd Cir. 1983); *see also DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) and *In re Convergent Technologies Second Half 1984 Securities Litigation*, No. C-85-20130-SW, 1988 U.S. Dist. Lexis 18658, AT *5(N.D.Cal. May 23, 1988). In *In re Adobe Systems, Inc. Securities Litigation*, 787 F. Supp. 912, 919 (N.D.Cal. 1992), the court held that if the defendants' method of projection was reasonable, summary judgment is appropriate. The jury need not be given the task of deciding whose proffered method is more reasonable. *Adobe* at 920.

It is also obvious that a dramatic change occurred in the first quarter of 1992. The number of accounts receivable over 90 days old went up from the 7-8% range to 11.54% at the end of the first quarter of 1992. In that same quarter, California bankruptcies were up 37%. This lends credence to defendants' contention that the 1992 increase in reserves was due to newly changed circumstances, not to prior fraudulent understatements.

There is simply not sufficient [*17] evidence of any misstatement or material omission.

B.

Plaintiffs' 10b-5 claim also fails for lack of materiality and lack of loss causation. Even if the company had increased its reserves as contended by plaintiffs, such increases would not have had a material impact on Centex's financial statements, and are therefore not actionable.

Revenues, as defined by billings in accrual accounting, would not have changed at all had the reserves been increased. If the reserves had been increased by $ 382,000 in the third quarter, net income would have been $ 2,647,000 rather than $ 2,888,000, resulting in earnings per share of 14 rather than 15 cents. If the reserves had been increased by $ 277,000 in the fourth quarter, net income would have been $ 2,514,000 rather than $ 2,682,000, and earnings per share would have been 13 rather than 14 cents. If the reserves had been increased by $ 100,180 (the final difference between defendants' reserves and those recommended by KPMG), the difference in income would have been only $ 60,642. Net income figures fluctuated in 1990 and 1991 from $ 2,055,000 in the first quarter of 1990 to a high of 2,944,000 in the second quarter of 1991.

[HN3] Materiality in the [*18] context of a false proxy statement under the 1934 Act has been defined by the U.S. Supreme Court as "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976). Courts can and do grant summary judgment on the grounds that a given statement or omission was not material. *E.g. Apple*, 886 F.2d at 1116.

Courts have also found that allegedly fraudulent transactions which are under one or two percent of net operating revenues are immaterial. *See In re Convergent Technologies Second Half 1984 Sec. Litig.*, No. C-85-20130-SW, slip op. at 22-23 (N.D.Cal. Jan. 10, 1990). In *Convergent*, the court held that "in this context of meeting net current operations well above market [*19] expectations and then recognizing a huge one time loss, a difference of a cent or two per share is not material." Thus, transactions amounting to $ 1.2 million, but which accounted for one and one half percent of revenue, were not material. In considering whether a proxy statement was false or misleading, another district court held that a failure to disclose an increase in revenue of less than 1% was immaterial. *Pavlidis v. New England Patriots Football Club*, 675 F. Supp. 688, 692 (D.Mass. 1986).

Plaintiffs argue that the drop in stock price on May 2, 1991 indicates materiality. When defendants announced flat earnings for the first quarter of 1992 and the $ 853,000 increase in the bad debt reserve, the stock price fell $ 1.75, from $ 13.75 to $ 12. Stock prices may sometimes indicate materiality, depending on the circumstances of a particular case. *Apple*, 886 F.2d at 1116. However, three days later the price of the stock rebounded to $ 13.75, suggesting that investors did not believe the change was really material. And investors were also reacting to the first quarter 1992 addition of $ 853,000 to reserves; not to the proposed [*20] addition of $ 100,000 to $ 300,000 for the fourth quarter of 1991.

Looking at the total mix of information available to investors, the increase in reserves would not have been material. Earnings per share and net income was basically flat through 1990-91, so that one cent would not have made a material difference.

C.

Plaintiffs have also failed to show [HN4] *scienter*, which is a necessary element in any 10b-5 claim. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst*, 425 U.S. at 1993-94 n. 12. To prove *scienter*, plaintiffs must show, at the least, that defendants acted recklessly, as defined by the Ninth Circuit: "a highly unreasonable omission, involving not merely simple, or even inexcus-

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

able negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actors must have been aware of it. [citations omitted]." *Hollinger v. Titan Capital, 914 F.2d 1564 (9th Cir. 1990)*. [*21] A defendant may not be found liable under 10b-5 unless he acted other than in good faith. *Ernst, 425 U.S. at 206*. Although *scienter* often is a fact specific issue to be determined by the trier of fact, in appropriate cases it can be decided on summary judgment. *Apple, 886 F.2d at 1113*. Here, plaintiffs have shown no more than a difference in the business judgment exercised by the defendants. Defendants also conferred with and relied in good faith on their outside auditor.

Further, Centex bought 209,500 shares of its own stock in the open market, at a total price of almost four million dollars. It would have made no sense to purchase that stock if defendants knew the prices to be inflated.

Defendants' overall conduct shows no intent to defraud. In late 1991 Centex's reserves were increased and the company disclosed its collection problems. In the first quarter of 1992, voluntarily and on its own initiative, Centex began reviewing all of its accounts receivable to insure that its reserves were adequate. When it discovered that the accounts were inadequate it immediately raised reserves and [*22] announced this in a press release.

Plaintiffs appear to have abandoned their claim of scienter based on the individual defendants' selling Centex stock. This is because defendants had a consistent pattern of selling stock for several years: Since the company went public in 1987, Huff had a practice of selling Centex stock to diversify his stock into cash. He sold about 20,000 shares each in 1989 and 1990. In the second quarter of 1991 he sold 135,888 shares; in the third quarter 1991 sold 5,600 shares, and in the fourth quarter 1991 9,400 shares. Howley sold some stock each quarter, depending on the amount of money he needed. He sold

about 73,000 shares held by himself and his children in 1989 and 115,600 shares in 1990. In 1991 he sold 16,000 shares the first quarter, 6,000 the second, 8,000 the third, and 19,175 shares the fourth quarter. In the first quarter of 1992 he sold 18,333 shares.

VIII.

Plaintiffs' claims under California law also fail for two reasons. First is the absence of *scienter,* as discussed above. Second, the California Supreme Court has recently held that [HN5] the "fraud on the market" theory does not apply to common law fraud claims. *Mirkin, 23 Cal.Rptr.2d at 101*. [*23] Plaintiffs must prove actual reliance on the allegedly misleading statement. In this case, the class representative has not submitted a declaration or other showing that she read the allegedly false materials and relied upon them. And under *Mirkin* even her reliance would not establish reliance by the class.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment is granted.

Dated: June 8, 1994.

CHARLES A. LEGGE

UNITED STATES DISTRICT JUDGE

*JUDGMENT*

For the reasons set forth in the Order for Summary Judgment signed and filed this date, judgment is hereby entered in favor of defendants Centex Telemanagement, Inc., Peter A. Howley, and Henry P. Huff III, and against Carol Mathews, on behalf of herself and all others similarly situated.

Dated: June 8, 1994.

CHARLES A. LEGGE

UNITED STATES DISTRICT JUDGE

*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number  5:07-cv-03444-JF

# TAB F

**Westlaw.**

Slip Copy                                                                              Page 1
Slip Copy, 2007 WL 858804 (E.D.Tex.)
**(Cite as: Slip Copy)**

**H**PYR Energy Corp. v. Samson Resources Co.
E.D.Tex.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Texas,Beaumont
Division.
PYR ENERGY CORPORATION
v.
SAMSON RESOURCES COMPANY and Samson
Lone Star Limited Partnership.
No. 1:05-CV-530.

March 19, 2007.

Robert Paul Thibault, Marci M. Fulton, Patton Boggs
LLP, Denver, CO, Jesse R. Pierce, King & Spalding,
Jessica Paige Wannemacher, Howrey LLP, Houston,
TX, for PYR Energy Corporation.
Morris C. Carrington, Mehaffy & Weber, Beaumont,
TX, Dick Watt, Watt Beckworth Thompson &
Henneman, Houston, TX, for Samson Resources
Company and Samson Lone Star Limited
Partnership.

EARL S. HINES, United States Magistrate Judge.
*1 PYR Energy Corporation (PYR) moves to dismiss
Samson Resources Company and Samson Lone Star
Limited Partnership's (collectively referred to as
Samson) alternative counterclaim for reformation.

Samson asserts a claim for reformation, arguing that
if a Samson-Venus Purchase Sale Agreement (PSA)
does not expressly provide Samson authority to
independently pool Venus's (now PYR's) interests,
that contract should be reformed to reflect the actual
pooling agreement between Venus and Samson.
Samson bases its claim for reformation on either a
mutual mistake, or a unilateral mistake accompanied
by fraud.

PYR argues that Samson's counterclaim should be
dismissed for either failure to state a claim, or for
failure to plead fraud or mistake with particularity.
SeeFed. R. Civ. Pro. 12(b)(6) and 9(b). Specifically,
PYR argues that the counterclaim fails to state a
cognizable claim because-notwithstanding a prior
court order requiring Samson to file a more definite
statement of its counterclaim-Samson failed to 1)
allege that there was a prior agreement between
Samson and Venus that Samson would have pooling

authority; 2) allege any facts that would permit an
inference of mutual mistake; and 3) plead fraud with
particularity as there are no allegations establishing
the elements of fraud.

**A. Reformation of a Contract**

Under Texas law, judicially-imposed reformation of
an existing contract is appropriate only when the
party seeking to reform the contract can prove the
facts and circumstances warranting reformation by
clear and convincing evidence. See Howard v. INA
County Mut. Ins. Co., 933 S.W.2d 212, 222
(Tex.App.-Dallas, 1996, writ denied). Reformation is
appropriate based on a mutual mistake of the
contracting parties when there was 1) a prior
agreement between the parties, and 2) a mutual
mistake in reducing that agreement to writing. See
Cherokee Water Co. v. Forderhause, 741 S.W.2d
377, 379 (Tex.1987); Estate of Hearn v. Hearn, 101
S.W.3d 657, 662 (Tex.App.-Houston [1st Dist.],
2003, pet. denied).

Reformation also is available based on a unilateral
mistake accompanied by fraud. See Cardenas v.
Varner, 182 S.W.3d 380, 382 (Tex.App.-Amarillo,
2005)aff'd,--- S.W.3d ----, 2007 WL 624074
(Tex.2007). Fraud can be based either on affirmative
misrepresentations, or in some instances, on failure to
disclose a material fact. The elements of fraud based
on affirmative representations are: 1) a material
representation was made, 2) the representation was
false, 3) the speaker knew the representation was
false, or the speaker made it recklessly without any
knowledge of the truth and as a positive assertion, 4)
the speaker intended the other party act on the
representation, 5) the other party in fact acted in
reliance upon the representation, and 6) the other
party suffered injury. See Johnson & Higgins of
Texas, Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507,
524 (Tex.1998).

*2 Fraud based on silence requires a threshold
showing of a fiduciary or confidential relationship
giving rise to a duty to speak on the part of the silent
party.[FN1]See Bradford v. Vento, 48 S.W.3d 749, 755
(Tex.2001) ("As a general rule, a failure to disclose
information does not constitute fraud unless there is a
duty to disclose the information ... [and] ... the party

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 2
Slip Copy, 2007 WL 858804 (E.D.Tex.)
(Cite as: Slip Copy)

... deliberately remains silent."). The remaining elements of fraud based on silence are: (1) a party fails to disclose a material fact within the knowledge of that party; (2) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action by failing to disclose that fact; and (4) the other party suffers injury as result of acting without knowledge of the undisclosed fact. See *Daugherty v. Jacobs,* 187 S.W.3d 607, 618 n. 3 (Tex.App.-Houston [14th Dist], 2006, no pet.).

> FN1. A duty to disclose information arises only when the parties are in a fiduciary or confidential relationship. See *Ins. Co. of N. America v. Morris,* 981 S.W.2d 667, 674 (Tex.1998) ("no duty of disclosure arises without evidence of a confidential or fiduciary relationship"). A fiduciary or confidential relationship is not formed merely because two parties engage in a business transaction. See *Swinehart v. Stubbeman, McRaie, Sealy, Laughlin & Browder, Inc.,* 48 S.W.3d 865, 880 (Tex.App.-Houston [14th Dist.], 2001, pet. denied) ("To impose an informal fiduciary duty in a business transaction, the requisite special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit.").

**B. Pleading Fraud or Mistake with Particularity**

Both mistake and fraud must be plead with particularity. See*Fed. R. Civ. Pro. 9(b)* ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").Rule 9(b)'s requirement of particularity differs with the facts in each case.*Tuchman v. DSC Communications Corp., et al.,* 14 F.3d 1061, 1067-68 (5th Cir.1994).

As to fraud, although an ironclad and rigid analytical framework does not exist when assessing particularity, general guidelines aid courts in determining the issue. *Id.* First, and at a minimum, the rule requires a plaintiff to set forth the "who, what, when, where, how" of the alleged fraud.*Williams v. Bell Helicopter Textron Inc.,* 417 F.3d 450, 453 (5th Cir.2005). More specifically, Rule 9(b) requires "the particulars of time, place, and contents of false representations as well as the

identity of the person making the misrepresentation and what [that person] obtained thereby."*Tuchman,* 14 F.3d at 1068;*Tel-Phonic Services, Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992). Second, although the rule allows *scienter* to be pled generally,[FN2] the rule still requires "specific facts to support an inference of fraud."*Tuchman,* 14 F.3d at 1068.

> FN2."Malice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b).

Few federal courts have addressed the requirements for pleading mistake with particularity. It appears, however, that at a minimum, a party must aver what was intended, what was done, and how the mistake came to be made. See Wright & Miller, 5A Federal Practice & Procedure § 1299 (3d Edition).[FN3]

> FN3. Wright & Miller observe that the inclusion of "mistake" in Rule 9(b) is an unexplained mystery. See5A Federal Practice & Procedure § 1299 (3d Edition) ("one of the most important justifications for the first sentence of Rule 9(b), the protection of the reputation of the party to be charged, simply does not apply to an allegation of mistake, making the rule's application to mistake something of a mystery.").

**C. Dismissals Based on Failure to State a Claim**

Rule 12(b) (6), Federal Rules of Civil Procedure, permits a party to assert by motion to dismiss a defense of "failure to state a claim upon which relief can be granted."On a Rule 12(b)(6) motion, the court must decide whether the facts alleged, if true, would entitle the claimant to some legal remedy. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Dismissal is proper only if there is either: (1) "the lack of a cognizable legal theory," or (2) "the absence of sufficient facts alleged under a cognizable legal theory."*Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988)."Normally, in deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to facts stated in the complaint and the documents either attached to or incorporated in the complaint."*Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996). The court also may "consider matters of which [it] may take judicial notice."*Id.* at 1017-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                   Page 3
Slip Copy, 2007 WL 858804 (E.D.Tex.)
**(Cite as: Slip Copy)**

18;*see*Fed.R.Evid. 201(f). Matters of public record, items appearing in the record of the case, and exhibits attached to the complaint also may be considered. *See*5A Charles Alan Wright et al., Federal Practice And Procedure § 1357 (2d ed.).

**\*3** The court must accept as true all material allegations in the complaint as well as any reasonable inferences to be drawn from them. *See Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982). Moreover, well-pleaded facts must be reviewed in the light most favorable to the claimant. *See Piotrowski v. City of Houston,* 51 F.3d 512, 514 (5th Cir.1995). A claimant, however, must allege specific facts, not conclusory allegations. *See Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989). Conclusory allegations and unwarranted deductions of fact are not admitted as true. *See Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992).

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley,* 355 U.S. at 45-46."The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."*Kaiser Aluminum,* 677 F.2d at 1050. However, "[d]ismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." 2A Moore's Federal Practice ¶ 12.07 [2.-5] at 12-91. 2 Moore's Federal Practice 3d ¶ 12.34(4)(a) at 12-72.7. Finally, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."*Fernandez-Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993).

**A. Does the Counterclaim Allege a Prior Agreement?**

Existence of a prior agreement is a critical element of a claim for reformation based on mutual mistake. Throughout its counterclaim and briefs on the motion to dismiss, Samson uses the words "intent" and "agreement" interchangeably. While this is perhaps poor and imprecise use of language, it does not doom Samson's counterclaim *a priori* because Samson is entitled to all reasonable inferences and to liberal construction of its pleadings in the light most favorable to Samson. With that in mind, Samson's counterclaim alleges: *"It was the parties' intention ... that Samson ... would have the ability to pool or*

*unitize Venus' reserved interests ..."* (Samson's Answer to Amended Complaint Counterclaims at ¶ 102). One can reasonably view this allegation as asserting Samson's and Venus's agreement, as joint intent can be formed by and reflective of an agreement. At this procedural stage, it is a reasonable inference that Samson's counterclaim alleges that Venus and Samson agreed that Samson would have authority to pool.[FN4]

> FN4. The court finds it unnecessary to address Samson's alternative argument that industry custom of pooling authority always being granted absent an express provision to the contrary can satisfy the "agreement" element of a reformation claim. In passing, the court notes that while industry custom generally can be used to fill in terms of a contract when the contract is silent as to the issue, it is not likely that industry custom can fulfill this same function when state law explicitly requires an expressly stated agreement.

**B. Does the Counterclaim Allege Mistake?**

The second element of a reformation claim is that through a mutual mistake in reducing the parties' agreement to writing, the contract fails to reflect the actual agreement of the parties. In this alternative counterclaim, Samson argues that Venus and Samson agreed that Samson would have pooling authority, but-as the court has now determined-the PSA's terms regarding pooling were inadequate to grant this authority.[FN5]Although Samson's briefing on this point has waffled somewhat, Samson on the whole alleges that the PSA's failure to grant pooling authority expressly was due to mutual mistake as to the legal sufficiency of the language actually used in the contract. This adequately alleges that the failure of the contract to embody the parties' agreement was due to a mutual mistake as to the legal effect of the contract language.

> FN5. The court recognizes that Samson maintains its claims that the PSA *does* grant it pooling authority. Samson's counterclaim is presented in the alternative, and is premised on the court's finding that the PSA *does not* authorize pooling.

**\*4** Further, Samson's pleading meets the heightened

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4
Slip Copy, 2007 WL 858804 (E.D.Tex.)
**(Cite as: Slip Copy)**

pleading requirements of <u>Rule 9(b)</u>. Samson alleges what was intended: that the Venus-Samson PSA grant Samson authority to pool. Next, Samson alleges what was done: the parties inserted two provisions of the PSA the parties mistakenly believed sufficient to grant pooling authority. Finally, Samson alleges how the mistake came to be made: the provisions of the PSA and alleged industry custom led both parties to erroneously believe that the PSA granted Samson pooling authority.

### C. Does the Counterclaim Allege Fraud?

Samson presents a moving target with its allegations of fraud. In its counterclaim, Samson alleges that "Venus' *silence* under these circumstances is tantamount to ... fraud."(Samson's Answer to Amended Complaint and Counterclaims at ¶ 104) (Italics supplied). In its supplemental briefings however, Samson states that its claims are *not* based on fraud, i.e., "Samson bases its alternative reformation claim on a mutual mistake, and *does not allege fraud.*"(Samson's Supplemental Briefing, at ¶ 6) (Italics supplied). Then, Samson shifts its position again by purporting to explain that "it intended to say that the claim was not based on fraud *by silence alone.*"(Samson's Response to Supplemental Briefing, at ¶ 14) (Italics supplied).

Given Samson's artful dodging on this issue, the court must determine for itself whether Samson's counterclaim at any point alleges facts that would support a finding on the elements of fraud.

#### 1. Fraud based on misrepresentations

Samson claims that Venus's representations to a bankruptcy court (that Samson would have authority to pool) constitute fraud if-as the court has determined-the contract did not actually provide for this authority. Samson fails to allege, however, that Venus knew the representation was false. Statements can be *inaccurate* without being fraudulent. Fraud requires more than a showing of a false statement; it requires a showing that the party making the statement *knew* it was false. Also missing is an allegation that Venus intended for Samson to rely on the statements made to the bankruptcy court. Samson alleges that it did in fact rely on them, but actual reliance is a separate element. In short, Samson could prove every factual allegation in its counterclaim, and it would not have proven a case for fraud based on

misrepresentation.

#### 2. Fraud based on Venus's silence

An essential element for a claim of fraud based on silence is the existence of a fiduciary or confidential relationship between the parties. A party must have a duty to speak or make a disclosure before it will be held liable for its silence. Samson alleges no facts that would support a finding of a fiduciary or confidential relationship between Venus and Samson. There is nothing to indicate that the parties were engaging in anything other than a standard business transaction which, as Samson has repeatedly argued, does not give rise to a fiduciary relationship.

#### 3. Request to Amend

**\*5** Samson requests permission to replead if the court concludes that its counterclaim does not allege a cognizable claim or fails to plead with particularity. Given Samson's previous opportunity to replead its counterclaim with a more definite statement, the court assumes that Samson already has pleaded its counterclaim as best it can. Further, the court must avoid any appearance of partiality by permitting Samson to further amend when the only purpose therefor would be a tactical ploy to cure pleading deficiencies determined by the court. Therefore, the court declines Samson's request.

Samson has stated a valid claim for reformation based on mutual mistake. It has alleged facts that, if true, would support a finding of a prior agreement and a mutual mistake in reducing that agreement to writing. The circumstances of the mistake have been pleaded with sufficient particularity to meet <u>Rule 9(b)</u>'s requirements. Samson has not, however, stated a valid claim for reformation based on fraud. Absent from Samson's allegations are facts that would support a finding that Venus's representations were knowingly false when made, or that Venus and Samson were in a fiduciary or confidential relationship. An order will be entered separately.

E.D.Tex.,2007.
PYR Energy Corp. v. Samson Resources Co.
Slip Copy, 2007 WL 858804 (E.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**H**In re Silicon Storage Technology, Inc.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re SILICON STORAGE TECHNOLOGY, INC.,
SECURITIES LITIGATION.
No. C 05-0295 PJH.

March 10, 2006.

Patrick J. Coughlin, Azra Z. Mehdi, Darren J.
Robbins, William S. Lerach, Lerach Coughlin Stoia
Geller Rudman & Robbins LLP, Christopher T.
Heffelfinger, Julie Juhyun Bai, Berman Devalerio
Pease & Tabacco, P.C., Joseph J. Tabacco, Jr., Nicole
Lavallee, Berman Devalerio Pease Tabacco Burt &
Pu, San Francisco, CA, Jason S. Cowart, Marc I.
Gross, Stanley M. Grossman, Patrick V. Dahlstrom,
Pomerantz Haudek Block Grossman & Gross LLP,
New York, NY, for James M. Baker on Behalf of
Himself and all others Similarly Situated, Louisiana
District Attorneys' Retirement System.
Eunice Jooyoun Lee, Jonathan B. Gaskin, Robert P.
Varian, Orrick, Herrington & Sutcliffe LLP, San
Francisco, CA, for Silicon Storage Technology Inc.

ORDER GRANTING MOTION TO DISMISS
PHYLLIS J. HAMILTON, J.
*1 THIS ORDER RELATES TO: ALL ACTIONS

Defendants' motion to dismiss the consolidated
amended complaint came on for hearing before this
court on January 18, 2006. Plaintiffs appeared by
their counsel Jason S. Cowart, and defendants
appeared by their counsel Robert P. Varian and
Jonathan B. Gaskin. Having read the parties' papers
and carefully considered their arguments, and good
cause appearing, the court hereby GRANTS the
motion as follows

INTRODUCTION

This is a proposed class action alleging violations of
the federal securities laws. The plaintiff class consists
of all those who purchased shares of common stock
in defendant Silicon Storage Technology, Inc. (SST)
from April 21, 2004, to December 20, 2004.

Plaintiffs allege that SST and six of its officers or
former officers-defendants Bing Yeh, Yaw Wen Hu,
Jack K. Lai, Yasushi Chikagami, Isao Nojima, and
Derek Best-misled investors by overstating SST's
inventory value, by making false statements about the
company's sales prices, and by failing to disclose that
the company lacked adequate internal controls to
ensure that inventory was properly valued. Plaintiffs
assert that they were harmed when SST's stock price
fell more than 22.5%, following an announcement
that SST would write down the value of a portion of
its inventory.

The consolidated amended class action complaint
("CAC") alleges a cause of action for violation of §
10(b) of the Securities Exchange Act of 1934, 15
U.S.C. § 78j(b), and related Rule 10b-5, 17 C.F.R. §
240.10b-5, against all defendants; and for violation of
§ 20(a) of the Exchange Act, 15 U.S.C. § 78t(a),
against the six individual defendants.

BACKGROUND

SST is based in Sunnyvale, California, where it
operates three major facilities. According to periodic
reports filed by SST with the SEC, the company is a
leading supplier of "flash memory" semiconductor
devices for the digital consumer, including
networking, wireless communications, and Internet
computing markets. SST offers over 90 products
based on its "Super-Flash" design and manufacturing
process technology, and also licenses its technology
to leading semiconductor companies for use in
various applications. Revenue from the sale of these
products contributed approximately 50% of the
company's revenue during the proposed class period.

During the proposed class period, defendant Bing
Yeh ("Yeh") was SST's President and Chief
Executive Officer; defendant Yah Wen Hu ("Hu")
was SST's Executive Vice President and Chief
Operating Officer; defendant Derek Best ("Best")
was Senior Vice President for Sales and Marketing;
defendant Yasushi Chikagami ("Chikagami") was an
outside director; defendant Isao Nojima ("Nojima")
was Senior Vice President, Standard Memory
Product Group; and defendant Jack K. Lai ("Lai")
was Chief Financial Officer.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Plaintiffs allege that throughout the class period, defendants made materially misleading statements concerning the value of SST's inventory, which in turn caused the company's statements of gross profit, net income, and total assets to be materially misleading. Plaintiffs claim that defendants knew or should have known that prices of competing flash memory products sold by Intel and AMD had been declining during the class period, that SST's inventory should have been valued at levels well below those reported by defendants, and that the company's gross profits, net income, and total assets were therefore overstated.

**\*2** Plaintiffs allege that defendants failed to disclose that SST's valuation system lacked sufficient controls to ensure accuracy, and that its valuation process was completely arbitrary. Plaintiffs assert that "the truth began to emerge" after the market closed on December 20, 2004, at which point SST announced it would write down the value of its inventory by $20-$25 million. On this news, the price of the company's shares, which had closed at $7.01 before the announcement, fell to a low of $5.43 the following day, a drop of 22 .5%.

DISCUSSION

A. Legal Standard

A court should dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim only where it appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Williamson v. Gen'l Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.2000). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Gompper v. VISX. Inc.,* 298 F.3d 893, 895 (9th Cir.2002).

Review is generally limited to the contents of the complaint. *Allarcom Pay Television. Ltd. v. Gen. Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). However, material that is properly presented to the court as part of the complaint may be considered as part of a motion to dismiss. *Lee v. City of Los Angeles,* 250 F.3d 668, 688-89 (9th Cir.2001). If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a Rule 12(b)(6) motion the documents referred to

in the complaint to show that they do not support plaintiff's claim. *Id.* In addition, whether requested or not, the court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. *See* Fed.R.Evid. 201; *see also* *In re Silicon Graphics, Inc., Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999).

B. Defendants' Motion to Dismiss

Defendants seek an order dismissing the CAC for failure to state a claim. Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

SEC Rule 10b-5, promulgated under the authority of § 10(b), makes it unlawful for any person to use interstate commerce
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**\*3** 17 C.F.R. § 240.10b-5.

To plead securities fraud under Section 10(b) of the 1934 Act, plaintiffs must allege (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiffs relied (5) which proximately caused the plaintiffs' injury. *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 388 (9th Cir.2002). Similarly, the elements of a Rule 10b-5 claim are (1) a material misrepresentation (2) made with scienter (3) in connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Sys., Inc., Sec. Litig.,* 411 F.3d 1006, 1014 (9th Cir.2005).

Under § 20(a) of the 1934 Act, joint and several liability can be imposed on persons who directly or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). Violation of § 20(a) is predicated on a primary violation under the 1934 Act. *Heliotrope Gen'l, Inc. v. Ford Motor Co.,* 189 F.3d 971, 978 (9th Cir.1999). Plaintiffs alleging a claim that individual defendants are "controlling persons" of a company must allege 1) that the individual defendants had the power to control or influence the company, 2) that the individual defendants were culpable participants in the company's alleged illegal activity, and 3) that the company violated the federal securities laws. *Durham v. Kelly,* 810 F.2d 1500, 1503-04 (9th Cir.1987); *see also Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000).

Defendants argue that the § 10-b claim should be dismissed for failure to allege fraud with particularity, and that the § 20 claim should be dismissed because plaintiffs fail to state a claim for primary liability. Defendants also contend that dismissal is required because the facts before the court demonstrate that the inventory write-down could not have taken place prior to the fourth quarter of 2004, because the demand for and pricing of flash memory had been increasing, and while SST's cost had been declining. Defendants assert the fact that the write-down was appropriate in 4Q 2004 but not before is also confirmed by an audit completed by PricewaterhouseCoopers after the December 20, 2004, announcement.

Generally, the Federal Rules of Civil Procedure require that a plaintiff in federal court give a short, plain statement of the claim sufficient to put the defendant on notice. *See* Fed.R.Civ.P. 8(a). However, Rule 9 imposes a particularized pleading requirement on a plaintiff alleging fraud or any claim premised on fraud. *See* Fed.R.Civ.P. 9(b) (in actions alleging fraud, "the circumstances constituting fraud or mistake shall be stated with particularity").

Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud. *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1547-49 (9th Cir.1994). Because the plaintiff must set forth what is false or misleading about a particular statement, he must do more than simply allege the neutral facts necessary to identify the transaction; he must also explain why the disputed statement was untrue or

misleading at the time it was made. *Yourish v. California Amplifier,* 191 F.3d 983, 992-93 (9th Cir.1999).

**\*4** This case is also controlled by the provisions of the Private Securities Litigation Reform Act ("PSLRA"), which was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and "to put an end to the practice of pleading 'fraud by hindsight.'" *In re Silicon Graphics,* 183 F.3d at 958. The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity. *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1084 (9th Cir.2002); *see also In re Daou Sys.,* 411 F.3d at 1014. If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

### 1. Falsity

Defendants argue that the CAC does not adequately allege falsity because it does not plead facts showing that the alleged false statements were false when made. Under the PSLRA-whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"-the complaint must specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1).

Plaintiffs allege that defendants made false and misleading statements concerning SST's sales prices, inventory values, and accounting controls during the class period, in connection with the release of SST's quarterly financial returns for the first, second, and third quarters of fiscal year 2004, as follows: On April 21, 2004, the first day of the class period, SST stated in a press release that its inventory was worth $69.9 million as of the end of the first quarter of 2004.[FN1] On May 7, 2004, SST filed its Form 10-Q for 1Q 2004 with the SEC. The Form 10-Q, which was signed by Yeh and Lai, repeated the statement that SST's inventory was worth $69.9 million as of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

end of 1Q 2004. The 10-Q also stated that the company's gross profit in the first quarter had been $38.1 million, that its net income had been $14.2 million, and that its total assets were $435 million. *See* CAC ¶ 53.

> FN1. The CAC alleges that Yeh also held a conference call on April 21, 2004, in which he stated that SST had experienced "firming" sales prices in the first quarter of 2004 and that the company expected SST's average selling prices to "continue to improve" in the second quarter. However, at the hearing, plaintiffs' counsel indicated that plaintiffs did not include this statement as one of the allegedly false and misleading statements.

On July 21, 2004, defendants allegedly announced in a press release that average selling prices were "firming" in 2Q 2004, and that the value of SST's inventory had increased from $69.9 million in 1Q 2004 to $91 million in 2Q 2004. On August 5, 2004, SST filed its Form 10-Q for 2Q 2004 with the SEC. The Form 10-Q, which was signed by Yeh and Lai, repeated the statement that the value of SST's inventory was $91 million as of the end of 2Q 2004. The 10-Q also stated that SST's gross profit in 2Q 2004 had been $48.7 million, that its net income had been $22 million, and that its total assets were $466 million. *See* CAC ¶ 58.

**\*5** On October 20, 2004, SST issued a press release announcing its results for 3Q 2004. The company stated that revenue had decreased to $112.2 and that average sales prices had declined by 7 per cent. It also stated that the value of SST's inventory was $138 million. In a conference call held the same day, Yeh allegedly stated that SST had no intention of writing down its inventory for the fourth quarter of 2004. On November 15, 2004, SST filed its Form 10-Q for 3Q 2004 with the SEC. The Form 10-Q, which was signed by Yeh and Lai, repeated the statements that revenue had decreased to $112.2 million, that average sales prices had declined by 7 per cent, and that SST's inventory was valued at $138 million. The 10-Q also stated that SST's gross profit in 3Q 2004 had been $39.5 million, that its net income had been $14.5 million, and that its total assets were $482.2 million. *See* CAC ¶¶ 67, 69, 73.

Plaintiffs allege that these statements were false and misleading because the value of SST's inventory was

actually less than the amounts stated-$69.9 million in 1Q 2004, $91 million in 2Q 2004, and $138 million in 3Q 2004-and that consequently, SST's gross profit, net income, and total assets were less than the amounts stated. CAC ¶¶ 54, 59, 70. They also assert that the statement that SST did not plan to write down its inventory in 4Q 2004 was false and misleading because defendants knew or should have known that the prices of flash memory manufactured by SST's competitors AMD and Intel had been declining during the first three quarters of 2004, that the value that was assigned to SST's flash memory was inflated, and that SST would soon have to write down the value of its inventory. CAC ¶ 74.

In the present motion, defendants assert that the claim of fraud alleged in the CAC-that defendants defrauded investors by not announcing the intended write-down earlier than they did-was based solely on SST's announcement in December 2004 that it would take an inventory write-down due to changed market conditions, and provides a classic example of pleading "fraud by hindsight." Defendants contend that the CAC fails to allege falsity because it does not specify why, how, or by how much the inventory valuations allegedly exceeded the "correct" valuations; does not indicate what valuation might have been required at a given time; does not identify any product, or class of products or components in SST's inventory; provides no allegations as to the cost or market price at which any product or component was, or should have been, carried on SST's books; and alleges no contemporaneous facts demonstrating why the statements were false or misleading at the time they were made.

Defendants also argue that the CAC is deficient because it is largely pled on information and belief, but fails to include a statement of "all facts" on which that belief is based, in contravention of the requirements of the PSLRA. In addition, defendants assert that other than the allegations that Yeh made two statements in conference calls, and that Yeh and Lai signed SST's Form 10-Qs, the CAC does not allege that any particular defendant made any of the statements at issue.

**\*6** In opposition, plaintiffs argue that the CAC adequately pleads falsity. They contend that the CAC identifies material misstatements relating to SST's flash memory inventory values in the first, second, and third quarters of 2004 (citing to CAC ¶¶ 53, 58, 67, 69, 73). They maintain that the CAC explains

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

why these statements were false, based on contemporaneous facts-including allegations that SST's inventory valuation system lacked sufficient controls to ensure accuracy, that defendants were told that this system was overstating value, that defendants stated that market prices were rising or stabilizing at a time that such prices were in fact plummeting, and that defendants made these statements without also disclosing that their inventory valuation process was "completely arbitrary."

Plaintiffs also point to SST's 2004 Form 10-K, filed with the SEC on March 31, 2005, in which both SST and its outside auditors stated,
As of December 31, 2004, [SST] did not maintain effective controls over accounting for and review of the valuation of inventory, the income tax provision and related balance sheet accounts and licensing revenue because [SST] lacked a sufficient complement of personnel and a level of accounting expertise that is commensurate with [SST's] financial reporting requirements. Specifically, [SST] lacked sufficient controls over the write down of inventory to the lower of cost or market, accounting for complex licensing contracts with multiple elements, and processes and procedures related to the determination and review of the quarterly and annual tax provisions in accordance with generally acceptable accounting principles in the United States.... [T]his deficiency could result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, that this control deficiency constitutes a material weakness.

Plaintiffs assert that there is no requirement that the CAC specify SST's sales prices or inventory valuations on a product-by-product basis. They claim that the cases cited by defendants say only that such information is but one way to establish falsity. They argue that when contemporaneous facts are cited with sufficient specificity to demonstrate that the statements at issue were false, it is not necessary to also include details about specific products in the inventory valuation.

The court finds that the CAC fails to allege falsity with particularity as required by the PSLRA and Rule 9(b). While plaintiffs have identified each statement alleged to be false or misleading, they have not stated with particularity why each statement was false at the time it was made.

Plaintiffs allege that the statements about SST's inventory were false because the market price for various types of flash memory was declining during the period between April and December 2004. Plaintiffs assert that from March 2004 through April 21, 2004, the price for which AMD was selling one type of 32-megabyte flash memory, which competed with products sold by SST, steadily declined from $12.50 to just over $10.00, while another type of AMD's 32-megabyte flash memory declined from $16.50 to under $8.00. During the same period, the price of one type of 32-megabyte flash memory sold by Intel, which competed with products sold by SST, steadily declined from $21.50 to under $15.00.

*7 Plaintiffs allege further that the average sales price of flash memory fell for every week during the period June 13, 2004, through July 31, 2004, and continued to fall for every week thereafter until at least August 31, 2004. Plaintiffs assert that defendants knew or should have known that the prices of various types of flash memory sold by AMD and Intel, which competed with products sold by SST, from April through July 2004-specifically, that the price for which AMD was selling one type of 4-megabyte flash memory declined from $1.50 to less than $1.35; the price of one type of AMD's 8-megabyte flash memory declined from $3.38 to $1.75; the price of two types of AMD's 16-megabyte flash memory declined from around $3.75 to around $2.75; and the price of one type of 32-megabyte flash memory sold by Intel steadily declined from over $19.00 to under $7.50.

Finally, plaintiffs allege that the prices of flash memory sold by AMD and Intel, which competed with products sold by SST, declined from April through October 2004-specifically, that the price for which AMD was selling one type of 1-megabyte flash memory declined from $1.63 to under $1.00; the price of one type of AMD's 4-megabyte flash memory declined from $1.50 to $1.15; the price of one type of AMD's 8-megabyte flash memory declined from $3.38 to $1.50; the price of two types of AMD's 16-megabyte flash memory declined from over $3.75 to under $2.48; the price of one type of AMD's 32-megabyte flash memory declined from over $10.00 to less than $5.00. Plaintiffs also assert that when Intel announced its 3Q 2004 results on October 12, 2004, the company indicated that because flash memory sales prices had fallen, and there was no reason to believe they would increase, it

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

would write down the value of its flash memory inventory. *See* CAC ¶ 72.

However, the CAC states no facts regarding comparable products in SST's inventory or the cost or market price of those products.[FN2]Nor does the CAC state the reasons that the values stated at the time of the quarterly reports for 1Q 2004, 2Q 2004, and 3Q 2004 were inaccurate. For example, the CAC contains no allegations of contemporaneous conditions or statements by defendants that contradict SST's statements regarding inventory valuations, and identifies no internal report that contradicts the valuations or suggests that they might be fraudulent.

> FN2. Stating the cost or market value of the products in SST's inventory would be one way-though not the only way-to allege contemporaneous facts showing that the statements regarding inventory valuation were false when made.

Plaintiffs simply allege, in essence, that because SST wrote down its inventory in December 2004, the statements about inventory made prior to that time must have been false because the inventory turned out not to be worth what SST had previously said it was worth. This is, as defendants argue, a classic example of pleading fraud by hindsight-a type of pleading that the PLSRA was specifically enacted to eliminate.

The allegations in the CAC regarding the decline in prices for flash memory produced by AMD and Intel do not support the claim that defendants made false statements regarding SST's financial results during the first three quarters of 2004, for the reason that the SST documents referenced in the CAC indicate that most of the inventory charge was taken on SST's 8-megabit and 16-megabit flash memory, while the AMD and Intel products at issue were 4-megabyte, 8-megabyte, 16-megabyte, and 32-megabyte flash memory. Thus, the AMD and Intel flash memory was not, as the CAC alleges, a type of flash memory that "competed with" products sold by SST.[FN3]

> FN3. Moreover, the October 12, 2004, Intel earnings release cited in CAC ¶ 65, a copy of which is attached to defendants' Supplemental Request for Judicial Notice, says nothing about flash memory prices, about any decline in such prices, or about

any inventory write-down pertaining to flash memory products.

*8 The allegations in the CAC that SST's inventory valuation system lacked sufficient controls to ensure accuracy and that its inventory valuation process was "completely arbitrary," and that defendants were told that this system was overstating value, are based on two sources-first, on information allegedly obtained by plaintiffs from their "confidential informants," and second, on a statement in SST's 2004 Form 10-K that SST had not maintained effective controls over accounting for and review of the valuation of inventory, and a statement by SST to the same effect in the same Form 10-K.

The allegations relating to information obtained from plaintiffs' confidential informants do not plead particularized facts showing that the statements regarding the value of SST's inventory were false when made because, as explained more fully below in the discussion of scienter, the informants were not employed at SST during the proposed class period, and because the CAC does not allege particularized facts indicating that the informants had personal knowledge regarding the truth or falsity of the statements made in 2004 regarding the valuation of SST's inventory. *SeeIn re Daou Sys.,* 411 F.3d at 1015. Under the PSLRA, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."*Ronconi v. Larkin,* 253 F.3d 423, 432 (9th Cir.2001). The allegations relating to information obtained from the confidential informants does not meet this standard.

The statements concerning internal controls made by SST and SST's external auditors PricewaterhouseCoopers in SST's 2004 10-K do not support plaintiffs' claim that defendants made materially false statements during the proposed class period. First, as defendants note, this same boilerplate language is used in internal control review reports filed by numerous other technology companies, as such review is mandated by Section 404 of Sarbanes-Oxley. In the present case, SST and its auditors used what appears to be standard phrasing, noting that in the future, the control deficiency "could" result in a material misstatement to the company's financial statements. This is not a contemporaneous fact that shows that the statements about SST's inventory

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

valuation were false when made in connection with the release of financial results for the first three quarters of 2004. Moreover, SST's auditor PricewaterhouseCoopers issued an unqualified audit opinion, identified no errors in the interim financials, and did not require SST to restate any of the quarters prior to 4Q 2004.

### 2. Scienter

Defendants argue that the CAC should be dismissed because it fails to plead particularized facts that strongly suggest actual intent to deceive, manipulate, or defraud. Under the PSLRA, whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact," the complaint must, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see also In re Vantive, 283 F.3d at 1084. By requiring particularized, detailed allegations showing a strong inference of scienter, the PSLRA was intended to "eliminate abusive and opportunistic securities litigation." Gompper, 298 F.3d at 897.

*9 In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness." In re Silicon Graphics, 183 F.3d at 979. Mere motive and opportunity are not sufficient. Id. Recklessness satisfies scienter under § 10(b) "only ... to the extent that it reflects some degree of intentional or conscious misconduct." Id. at 977. In assessing whether plaintiffs have sufficiently pled scienter, the court should consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 938 (9th Cir.2003) (citation and quotation omitted); see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 948-49 (9th Cir.2005) (district court should evaluate scienter based on "totality of the allegations").

On a Rule 12(b)(6) motion to dismiss a complaint brought under the PSLRA, when considering whether plaintiffs have shown a strong inference of scienter, the district court must also consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." Gompper, 298 F.3d at 897 (noting the "inevitable tension ... between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to dismiss ... and the heightened pleading standard set forth under the PSLRA). In other words, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter. Id.

Plaintiffs assert that the "totality of the allegations" set forth in the CAC establish that defendants knowingly overvalued SST's inventory. First, plaintiffs contend that the allegations in the CAC regarding information obtained from six informants establish scienter because those allegations show the personal involvement and "hands-on" management of the individual defendants. Second, plaintiffs argue that the CAC pleads facts showing that defendants knew, or had access to facts that should have made them aware, that the price of flash memory was declining in the industry generally, and that the value assigned to flash memory in SST's inventory should therefore have been reduced. Third, plaintiffs assert that scienter is shown by allegations of defendants' motive to keep the price of SST's stock high, reflected in insider sales of stock during the class period, the SST board of directors' authorization of a stock repurchase program in July 2004, and SST's acquisition of another company in October 2004. Finally, plaintiffs argue that defendants' scienter is also shown by the allegations that defendants violated Generally Accepted Accounting Principles (GAAP) and various unspecified SEC regulations, regulations of national stock exchanges, and customary business practices.

#### a. confidential informants

*10 The CAC alleges that the information provided by five confidential informants, and a sixth identified informant, shows the individual defendants' personal involvement in, and "hands-on" management of, SST's business. In pleading fraud under the PSLRA, plaintiffs may rely on anonymous sources for information, so long as they plead "corroborating details" when allegations are based on non-public information. In re Silicon Graphics, 183 F.3d at 985; see also In re SeeBeyond Techs. Corp. Sec. Litig., 266 F.Supp.2d 1150, 1159 (C.D.Cal.2003). "[P]ersonal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by

Not Reported in F.Supp.2d                                                                                  Page 8
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

the source would possess the information alleged." ' *Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1233 (9th Cir.2004) (quoting *Novak v. Kasaks,* 216 F.3d 300, 314 (2nd Cir.2000)). When plaintiffs rely on facts beyond the information provided by the confidential witnesses, they need not name their sources as long as the additional facts provide an adequate basis for believing that the defendants' statements were false. *Id.*

Defendants argue that the information provided by the six informants adds nothing to support the claims in the CAC, because no informant worked at SST during the class period, because the informants were all low-level employees far removed from management decisions, and because the informants report guesses, opinions, and suppositions instead of facts. Defendants also contend that plaintiffs fail to allege particularized facts showing that each individual source occupied a position such that he or she would possess the information alleged.

Plaintiffs respond that the proposed class period simply functions to define the plaintiff class, but does not restrict the universe of relevant or actionable facts in the case. They contend that while scienter itself must always be contemporaneous with the alleged misstatements, the facts supporting an inference of scienter will not always be. In other words, plaintiffs argue that the fact that none of the informants worked at SST during the proposed class period is not significant, because pre-class period awareness of events can be relevant to show awareness of certain facts and therefore to demonstrate scienter.

The court finds that the allegations regarding the six informants do not create a strong inference that defendants acted with deliberate or conscious recklessness with regard to the alleged false statements concerning SST's inventory valuations and financial performance during the first three quarters of 2004. The court first notes three ways in which the allegations are generally insufficient.

First, the CAC fails to plead with particularity that each individual informant occupied a position such that he or she would possess the information alleged, and the allegations regarding such information are therefore insufficiently reliable.

\*11 Second, none of the six informants was employed at SST during the proposed class period;

and the only one of the six who worked at the company at all in 2004 admittedly did not know what SST was reporting as inventory. Thus, none of the informants was in a position to know whether defendants overstated the value of SST's inventory when the company's financial results were reported for the first three quarters of 2004. The statements regarding events that occurred during the period 2000 through 2003 cannot substitute for the required particularized showing of scienter in 2004.

While it is true that facts relating to pre-class period events may in certain circumstances contribute to the creation of an inference of scienter, *see,e.g., Zelman v. JDS Uniphase Corp.,* 376 F.Supp.2d 956, 970 (N.D.Cal.2005), there must be some connection between that scienter and the earlier events. Here, the issue is not pre-class period statements made by defendants, which can be said to create a strong inference of scienter in connection with false or misleading statements made during the class period, but rather a number of largely irrelevant statements by informants who were not present at SST at the time of the alleged misrepresentations, and who appear to have little information regarding either the valuation of the inventory or the defendants' alleged "scheme" to misstate the value of the inventory. The information provided by these informants concerns events that predated and had no apparent connection with the alleged misstatements regarding the valuation of SST's inventory.

Finally, the CAC alleges that one of the informants provided at least two of the defendants with "excess inventory reports," and that at least two of the informants attended "meetings" at which the participants discussed issues relating to the amount and type of products held in inventory, and to the valuation of inventory. These allegations are insufficient in light of the Ninth Circuit's decisions in *In re Silicon Graphics, In re Vantive,* and *In re Daou Sys..*

In *In re Silicon Graphics,* the court rejected the plaintiff's attempt to establish scienter through general allegations that the defendants had received internal reports, including daily reports, monthly financial reports, "Stop Ship" reports, and "Flash Reports." *Id.* at 984-98 & n. 14.The court held a plaintiff can rely on the existence of reports as a means of establishing knowledge only if the complaint includes "adequate corroborating details"-such as plaintiff's sources of information with respect

Not Reported in F.Supp.2d                                                                                               Page 9
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

to the reports, how the plaintiff learned of the reports, who drafted the reports, and which officers at the company received them, in addition to "an adequate description of their contents."*Id.* at 985.

In *In re* Vantive, the plaintiffs attempted to establish such scienter by adverting to the defendants' "hands-on" management style, their "interaction with other corporate officers and employees, their attendance at management and board meetings, and reports generated on a weekly and monthly basis. Relying on *In re Silicon Graphics,* the Ninth Circuit held that such allegations did not adequately establish that the defendants had knowledge of the supposedly "true but concealed" circumstances. *In re Vantive,* 283 F.3d at 1087-88.

*12 As in *Silicon Graphics* and *In re Vantive,* plaintiffs in the present case have failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports. The allegations are similarly deficient, for the same reasons, with respect to the defendants' attendance at meetings and their "hands-on" managerial style. *Seealso*In re Daou Sys., 411 F.3d at 1022.

The court will now discuss each of the informants. Plaintiffs identify Confidential Informant No. 1 (CI # 1) as a "business control analyst" employed at SST from February 2000 through April 2004, who was "part of a team that monitored inventory on a daily basis."According to CI # 1, SST had "a poor and unreliable system in place for managing and monitoring inventory."He/she asserts that defendants Yeh, Hu, and Tsai [FN4] "called the shots" and micro-managed the system, including issues related to inventory valuation, and that Hu created his own databases and spreadsheets to track and value inventory on a daily basis, even though SST kept track of inventory in a separate software application. With regard to inventory, this informant believed that *"whatever it was that the company was reporting* was way off the mark" (emphasis added). He/she indicated that SST continued to manufacture large amounts of flash memory, even though there were "no buyers" because the company's officers and directors feared the company would lose its manufacturing vendors to competitors if they slowed down their production lines. CAC ¶ 46-47

    FN4. The CAC does not assert a claim against a defendant "Tsai."

The CAC provides only a sketchy description of CI # 1's job duties, claiming that he/she was "part of a team that monitored inventory on a daily basis."However, plaintiffs do not identify the other members of this "team," and, more significantly, do not explain what they mean by "monitored inventory." Such a job description could include anything from counting widgets in a box, to moving inventory from place to place in a warehouse, to filling customer orders, to preparing spread sheets showing the types and amount of product in inventory. It is apparent from the allegations that CI # 1 had no personal knowledge of what SST was reporting as inventory, but the CAC does not even provide particularized detail sufficient to show what this informant knew with regard to inventory management.

Moreover, in view of CI # 1's claim that SST had a "poor and unreliable system in place for managing and monitoring inventory," it is difficult to see how any job relating to monitoring inventory would have provided CI # 1 with knowledge of facts creating a strong inference that defendants acted with deliberate or conscious recklessness. It is also not clear how Yeh, Hu, and Tsai could have "micro-managed" a "poor and unreliable" system. Finally, plaintiffs provide no basis for CI # 1's opinion that SST continued to manufacture large amounts of flash memory, despite the alleged absence of buyers, because "officials" feared that SST would otherwise lose its manufacturing vendors to competitors. Plaintiffs do not explain how CI # 1 learned about the alleged fears of these officials, or even who the officials were.

*13 Plaintiffs identify Confidential Informant No. 2 (CI # 2) as an "inventory control analyst" employed at SST from February 2000 through August 2002. CI # 2 reported to the director of manufacturing systems, and was responsible for receiving inventory shipments, tracking inventory locations, and ensuring that the actual products in inventory matched those identified in SST's databases. According to CI # 2, the Finance Department at SST was excluded from the inventory valuation process. Instead, "the vice presidents of the individual units (and in particular [d]efendant Hu)," made the inventory valuation decisions. CI # 2 claimed that these valuations were made "regardless of actual price" and that the overall valuation process was "arbitrary, with only some relation to reality."In this informant's opinion, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 10
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

defendants were "unwilling to decrease the value assigned to inventory" because doing so would be an admission of their own "engineering mistakes" or "business errors." He/she considered it was a "pride issue"-that defendants created a culture of "hear-no-evil-see-no-evil." CAC ¶ 48.

The CAC provides some description of CI # 2's duties, although in vague terminology ("receiving shipments," "tracking inventory location") suggesting that CI # 2 functioned more as a warehouse or manufacturing plant clerk than as an employee with some personal knowledge of inventory valuation. However, this informant left SST in August 2002, and the CAC alleges no facts showing a basis for any personal knowledge regarding the valuation of inventory during the proposed class period. In particular, the CAC provides no connection between CI # 2's assertion that the inventory valuation process was "arbitrary" between February 2000 and August 2002, and plaintiffs claims that defendants knowingly misrepresented the value of SST's inventory during the period between April and December 2004.

CI # 2's statement that the Finance Department was excluded from the valuation process is contradicted by CI # 4's statement that former CFO Jeff Garon ("Garon") was involved in the decisions regarding valuation, and is further contradicted by the allegation in the CAC that defendant Lai, CFO during the proposed class period, was a participant in the alleged fraudulent misstatement of inventory values. In addition, CI # 2's claim that the valuations were made by "the vice presidents of the individual business units" and "in particular [d]efendant Hu" does not provide sufficient detail regarding who actually made the valuation decisions, how CI # 2 knows who made the decisions, or how he/she knows that the decisions were made "regardless of actual price." Finally, plaintiffs provide no basis for CI # 2's opinion that defendants would not decrease the value assigned to inventory because they were unwilling to admit their own engineering mistakes or business errors. Indeed, the CAC states no facts showing that CI # 2 was qualified to psychoanalyze defendants' motivations with regard to inventory valuation.

**\*14** Plaintiffs identify Confidential Informant No. 3 (CI # 3) as an individual employed at SST from 2000 through June 2003, who was also employed as a "production control manager" from 1997 through 2000.[FN5] At SST, CI # 3 was responsible for "tracking shipments and inventory." He/she is "certain" that

"the vice presidents" were intimately aware of the amount and type of products held in inventory because he "participated in" twice-monthly meetings with "these individuals" concerning this subject. CAC ¶ 49.

> FN5. It is not clear from the CAC whether CI# 3 worked at SSI during the entire period from 1997 through 2003, or whether he/she was a production control manager at some other company during the period 1997 through 2000, and began working at SST in 2000.

Plaintiffs describe this informant's duties only briefly, without any indication of what is meant by "production control" or "tracking shipments and inventory." From plaintiffs' description, it is impossible to tell whether CI # 3 was employed, for example, as an inventory clerk, entering data regarding products placed in inventory and shipped out to customers; or as a shipping or mailroom clerk, simply packaging products removed from inventory and shipping them to customers; or in some other capacity. Thus, it is impossible to tell whether this informant has any relevant personal knowledge.

Moreover, CI # 3 left his/her employment at SST in June 2003, and the CAC states no facts showing a basis for any personal knowledge regarding the valuation of inventory during the proposed class period. In addition, the allegations regarding CI # 3's participation in meetings with "vice-presidents" lack sufficient particularized detail to provide a basis for attributing to CI # 3 any personal knowledge regarding inventory or inventory valuation. The CAC does not provide the dates of the meetings, or identify the attendees or the substance of the matters discussed. Nor does the CAC identify the "vice-presidents" whom CI # 3 believed were "aware" of the amount and type of products held in inventory, or provide any facts showing a basis for CI # 3's belief that these individuals had this knowledge.

Plaintiffs identify Confidential Informant No. 4 (CI # 4) as a "controller" employed at SST from October 1995 through April 2003. This informant worked directly for Garon, the then-CFO. CI # 4 is "certain" that defendant Yeh and defendant Hu reviewed and monitored the inventory numbers "very, very carefully" and that defendant Hu and "defendant Garon" (actually not a defendant) were responsible for "the final decision about what value to place on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

products held in inventory."CI # 4 "participated in" monthly and quarterly meetings where inventory valuation "was discussed" with Yeh, Garon, Hu, and defendant Best, plus "a former cost accountant" and "business unit managers," and claims that participants in these meetings would "go back and forth and argue" over whether certain products held in inventory were sellable, and if so, for what amount of money. According to this informant, there were a "ton of red flags" where inventory was concerned, as warnings were frequently raised within the company that products held in inventory were out-of-date or overvalued. CAC ¶ 50.

*15 Plaintiffs do not describe this informant's job duties, simply stating that he/she was a "controller" who worked with SST's former CFO. From this description, it is impossible to tell whether CI # 4 had a basis for personal knowledge of the facts alleged. Moreover, CI # 4 left his/her employment at SST in April 2003, and the CAC alleges no facts showing any basis for personal knowledge regarding the valuation of inventory during the proposed class period. Nor does the CAC provide any particularized facts showing that CI # 4 had any basis for the opinion that defendants Yeh and Hu reviewed and monitored the inventory numbers "very, very carefully" or that Hu and CFO Garon were responsible for decisions regarding inventory valuation. The CAC asserts that CI # 4 participated in monthly and quarterly meetings in which inventory valuation was discussed, but does not provide the dates of any meetings, or identify the attendees (apart from Yeh, Garon, Best, and Hu) or any details of the matters discussed, or of the alleged arguments among the meeting participants regarding inventory valuation.

Plaintiffs identify Confidential Informant No. 5 as employed at SST "through 2003" (no indication of starting date) as an operations analyst, responsible for "tracking and locating excess inventory." In CI # 5's opinion, SST "often manufactured excess products" because the executives wanted to build up inventory, not because there was any actual market demand for those products. He/she recalled that the operations department repeatedly told upper management that products held in inventory were "not moving." He/she claims to have provided Yeh and Best with excess inventory reports that included recommendations concerning the likelihood that products held in inventory could actually be sold. CAC ¶ 51.

Plaintiffs describe this informant's duties only briefly, without any indication of what is meant by "tracking and locating excess inventory." Moreover, CI # 5 left his/her employment at SST at the end of 2003, and the CAC alleges no facts showing any basis for personal knowledge regarding events that occurred during the proposed class period. CI# 5 refers to "excess inventory reports" that he/she allegedly provided to Yeh and Best, but the CAC provides no details regarding the author of the reports, or the dates or contents of the reports, other than as stated above. In addition, plaintiffs provide no particularized facts showing that CI # 5 had any basis for his/her opinion that SST manufactured excess products because SST's "executives" wanted to build up inventory. With regard to the claim that the "operations department" repeatedly communicated to "upper management" that products in inventory could not be sold, the CAC does not provide any details regarding the identity of the employees in the operations department, the identity of the individuals in upper management, the dates of these alleged communications, or any details concerning the inventory at issue.

*16 Informant Brian Thiemer was employed at SST from 2001 through 2003 as a "quality assurance engineer" in the company's "inventory control" department. He was responsible for "a variety of issues related to the [c]ompany's inventory, including inventory valuation."He claimed that he regularly informed his manager Andy Arata (then-director of quality assurance) and unidentified "senior management" that the company needed to decrease the value it was placing on its inventory because such values did not reflect actual market prices. He believed that "some inventory" was obsolete and worth only 10% to 20% of its accounted-for value. He indicated that his recommendations were consistently and systematically ignored and rejected by "senior management" and/or Arata, and that his frustration concerning the company's unwillingness to accurately and truthfully value its inventory led him to quit SST in 2004. CAC ¶ 52.

Plaintiffs describe Thiemer's job duties only briefly, stating only that he was responsible for a "variety of issues" related to inventory, including inventory valuation. However, plaintiffs do not explain Thiemer's role in the valuation of inventory, or provide any particularized facts that would provide a basis for creating a strong inference that defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

acted with deliberate indifference. Moreover, Thiemer left his employment at SST at the end of 2003, and the CAC alleges no facts showing any basis for personal knowledge regarding inventory valuation during the proposed class period.

Thiemer claims to have "regularly" communicated to his manager and unidentified "senior management" that SST's inventory was overvalued, but as with CI # 5, the CAC does not provide the dates of these alleged communications, or any details concerning the inventory at issue. In addition, there is no indication as to who is meant by "senior management." Thiemer also claims that "some inventory" was obsolete, but plaintiffs provide no detail about this allegedly obsolete product-not the type, the quantity, or the value.

The allegations regarding these confidential informants do not, as plaintiffs contend, show defendants' personal involvement in, and "hands-on" management of, inventory valuation or any other particular aspect of SST's business, and do not plead the particularized facts required to show scienter under the PSLRA.

b. knowledge of general decline in prices of flash memory

Plaintiffs contend that defendants' knowledge that SST's inventory should have been written down earlier than it was is shown by the fact that they knew, or should have been aware, that the selling prices of flash memory were declining in the industry during the class period. With regard to 1Q 2004, the CAC asserts that defendants knew or should have been aware that from March 2004 through April 21, 2004, the selling prices of AMD's and Intel's 32-megabyte flash memory had declined. The CAC also alleges that defendants knew or should have known that *Forbes* reported on May 24, 2004, that the prices of flash memory had declined because manufacturers such as Intel and Samsung were offering price reductions in order to win customers; and that *CBS News* reported on June 3, 2004, that while Intel's flash memory sales had suffered in 2003, its sales were increasing in 2004 and Intel was winning market share. *See* CAC ¶ 56.

*17 With regard to 2Q 2004, the CAC asserts that defendants knew or should have been aware that the average sales price of various types of flash memory

sold by AMD and Intel fell for every week during the period June 13, 2004, through July 31, 2004, and continued to fall thereafter until at least August 31, 2004. Plaintiffs also claim that defendants knew or should have known that financial analyst WR Hambrecht reported on June 8, 2004, that flash memory prices in 2Q 2004 were 5 per cent lower than they had been in 1Q 2004 and were likely to continue to decline in 3Q 2004. Plaintiffs assert that in response to competition in the flash memory market, SST was forced, by July 2004, to lower its prices on some types of flash memory by as much as 4 per cent. *See* CAC ¶ 61.

With regard to 3Q 2004, the CAC asserts that defendants knew or should have been aware that the price of various types of flash memory sold by AMD was declining, and that the value assigned to flash memory in SST's inventory should therefore have been reduced. Plaintiffs also allege that defendants knew or should have known that when Intel announced its 3Q 2004 results on October 12, 2004, it also indicated that because flash memory sales prices had fallen, and there was no reason to believe they would increase, it would write down the value of its flash memory inventory. *See* CAC ¶ 72.

Defendants argue that this market pricing information is irrelevant, as the details do not concern SST products or prices, and do not even involve products that competed with the 8-megabit SST products that were the focus of the write-down. They also assert that the October 12, 2004, Intel earnings release cited in the CAC says nothing whatsoever about flash memory prices or any purported decline in prices, or any inventory write-down pertaining to flash memory prices, but rather reports an inventory write-down as a result of "lower chipset unit costs," having nothing to do with the selling prices of flash memory.

The court finds that the allegations regarding a decline in prices for AMD and Intel flash memory do not create a strong inference of scienter. The CAC does not plead particularized facts showing that defendants did in fact know these details of industry prices, news reports, and financial analysts' reports. Moreover, as previously indicated, the flash memory produced by AMD and Intel did not have the same capacity as the flash memory produced by SST, and the products therefore were not competitive. The CAC does not explain the relevance of a drop in price of 8-megabyte, 16-megabyte, and 32-megabyte flash memory to the valuation of SST's inventory of 8-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 13
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

megabit flash memory.

### c. motive to inflate price of stock

The CAC alleges that defendants' scienter is shown by their motive to inflate the price of SST's stock, and that this motive is shown by defendants' insider trading, by SST's announcement of a stock repurchase in July 2004, and by SST's announcement of its acquisition of another company in October 2004. In the Ninth Circuit, motive and opportunity, standing alone, are not sufficient to establish scienter. See In re Silicon Graphics, 183 F.3d at 974 (facts that indicate a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, but they are not sufficient to establish a strong inference of deliberate recklessness). However, motive can be considered as part of the "totality of the allegations" regarding scienter.

### i. insider trading

*18 The CAC alleges that defendants motive to keep price of stock high, as shown by insider sales of stock, by Nojima on June 2, 2004, on November 17, 2004, and on December 8, 2004; by Best on August 12, 2004; and by Chikagami on December 14, 15, and 16, 2004. Plaintiffs assert that the timing of the November and December 2004 stock sales was suspicious in view of the fact that the company announced on December 20, 2004, that it expected to take a $20-$25 million inventory charge and write down the value of certain products held in inventory to their estimated market value, and that the gross margin for 4Q 2004 was expected to be in the range of 1% to 3%, compared with previous estimates of between 25% and 32%.

The PSLRA "neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence meet the 'strong inference' standard." In re Daou Sys., 411 F.3d at 1022 (citation and quotation omitted). Stock trades are only suspicious when "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." In re Silicon Graphics, 183 F.3d at 986. To evaluate suspiciousness of stock sales, the court should consider the amount and percentage of shares sold, the timing of the sales, and whether the sales were consistent with prior trading history. Nursing Home, 380 F.3d at 1232.

Here, it appears that most of SST's officers and directors sold no stock during the proposed class period, and that just as many insiders purchased stock as sold. Yeh and Lai-the only defendants specifically alleged to have made false or misleading statements are not alleged to have sold any stock. Best sold no shares, but rather transferred some previously pledged stock as collateral for a loan. Lai and Hu purchased-not sold-stock during the class period. Collectively, defendants sold less than 2% of their total holdings, and SST itself purchased $15 million worth of its own stock during the class period, at prices plaintiffs allege were inflated by its own fraud.

Only Nojima and Chikagami sold stock. Nojima's sales were not out of the ordinary, as those sales were consistent with his trading pattern and sales for the preceding seven years. Although Nojima sold no shares in 2003, he did sell shares every other year starting in 1998, as shown by his Form 4s filed with the SEC. Thus, Nojima's sales are insufficient to create a strong inference of scienter.

Foreign-based outside director Chikagami, who is not alleged to have personally made any false statement, did sell a substantial amount of his holdings (total of 66%), and he is the only officer or director whose stock sales are even marginally suspicious under the Silicon Graphics standard. However, in view of the fact that he owned a relatively small number of shares compared with the officers of the company, the fact that he did not sell all his shares, the fact that no one else's sales appear suspicious, and the fact that other insiders actually purchased shares during the proposed class period, the court finds that Chikagami's sales are insufficient to creating a strong inference of scienter.

*19 Moreover, even if the court were to find that the timing or amount of the stock sales was suspicious, "stock sales are helpful only in demonstrating that certain statements were misleading and made with knowledge or deliberate recklessness when those sales are able to be related to the challenged statements." In re Vantive Corp., 283 F.3d at 1093. Because the CAC fails to plead particularized facts showing that defendants made false or misleading statements, such "insufficient allegations of fraud ... have a spillover effect" on an analysis of insider sales. Id.

Not Reported in F.Supp.2d                                                                                   Page 14
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

#### ii. SST's stock repurchase

The CAC alleges that defendants' motive to keep the price of SST's stock high is also shown by the announcement on July 29, 2004, that SST's board of directors had authorized a stock repurchase program of up to $15 million worth of the company's common stock. The CAC does not explain how either this announcement or the repurchase program creates a strong inference of scienter.

#### iii. SST's acquisition of G-Plus

The CAC alleges that defendants' motive to keep the price of SST's stock high is further shown by the announcement on October 18, 2004, that SST had signed an agreement to acquire substantially all the assets of privately-owned G-Plus, Inc., pursuant to which SST agreed to issue approximately $26 million in SST stock to G-Plus. The deal closed on November 5, 2004. Plaintiffs claim that it was in the interest of the company to keep its share price higher in order to facilitate this stock-financed transaction.

Allegations that defendants engaged in routine business activities or were motivated by concerns that are shared by all companies and executives is not sufficient to establish scienter. See *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir.2002) ("[i]f scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"). SST's acquisition of G-Plus is an example of the type of routine activity and generic motive that cannot serve as a basis for alleging securities fraud.

The fact of this merger or buy-out, standing alone, is insufficient to create a strong inference of scienter. Moreover, even if the court were to find that this acquisition provides some small support for an inference of fraud, the fact of the buy-out would have to be considered in the context of the fact that SST and several of its officers purchased millions of dollars of SST stock during the class period, at prices that plaintiffs claim were inflated by fraud.

#### d. alleged violations of GAAP

The CAC alleges that defendants' scienter is shown

by their violation of Generally Accepted Accounting Principles (GAAP)-specifically, certain principles set forth in FASB Statement of Concepts Nos. 1 and 2[FN6]-and also by their violation of the requirements of unidentified "SEC regulations, regulations of the national stock exchanges and customary business practices" to disclose the sort of adverse information that was allegedly concealed by defendants during the class period.

> FN6. As alleged in the CAC, these are (a) the principle that interim financial reporting should be based on the same accounting principles used to prepare annual financial statements; (b) the principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions; (c) the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources; (d) the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources trusted to it was violated; (e) the principle that reporting should provide information about an enterprise's financial performance during a period; (f) the principle that financial reporting should be reliable in that it represents what it purports to represent was violated; (g) the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions; (h) the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. CAC ¶ 94.

**\*20** Violation of GAAP standards can provide evidence of scienter. *In re Daou Sys.*, 411 F.3d at 1016. However, "[t]o support even a reasonable inference of scienter, much less a strong inference, the complaint must describe the violations with sufficient particularity: a general allegation that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation."*Id.* (citations and quotations omitted). Put another way, simple allegations of failure to follow GAAP do not establish scienter, because scienter requires more than a misapplication of accounting principles. *See,e.g.,In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994)). In order to distinguish "deliberate recklessness" from "ordinary carelessness," allegations of GAAP violations must be augmented by facts that shed light on the mental state of the defendants, rather than conclusory allegations that defendants must have known of the accounting failures because of the degree of departure from established accounting principles. *SeeDSAM,* 288 F.3d at 390-91.

The CAC alleges that "[i]n order to inflate the price of [SST] stock, [d]efendants intentionally and/or with deliberate recklessness overstated the value of flash memory held in inventory in violation of [GAAP]," and then simply proceeds to list a number of accounting principles that were allegedly violated by this overvaluation. CAC ¶¶ 91-94. However, the GAAP allegations contain no facts that shed light on the mental state of the defendants, and as the CAC fails generally to allege scienter, the allegations of GAAP violations contribute nothing. In order to plead facts showing a strong inference of fraud, plaintiffs must provide detail-not merely, as here, simply recite various GAAP provisions and allege in general terms that the defendants failed to comply with them.

The CAC does not identify any transaction by name or date, does not specify any dollar amounts, does not identify any product or class or products that should have been written down sooner under these various accounting principles, does not state what the appropriate write-down would have been, or when it should have been taken, or why a write-down should have been taken in that amount at that time. Although the CAC refers to the GAAP provision requiring that inventory be carried on the balance sheet at the lower of "cost" or "market value," the CAC says nothing about either the cost or the market value of SST's inventory, and says nothing about how or when the defendants purportedly became aware of the allegedly improper accounting practices, but rather simply refers to general declines in market prices of flash memory products throughout the industry.[FN7]

FN7. Plaintiffs acknowledge that "GAAP, as set forth in Accounting Research Bulletin ('ARB') No. 43, Chapter 4, Inventory Pricing, requires that inventories be recorded at the lower of cost or market ."CAC ¶ 93. At the hearing, however, plaintiff's counsel conceded that plaintiffs were unable to provide any information regarding the cost or market value of SST's inventory. As explained above, that deficiency is one reason that plaintiffs' allegations of GAAP violations are insufficient to create a strong inference of scienter. That is not to say that plaintiffs would not theoretically be able to plead facts sufficient to create a strong inference of intent or deliberate recklessness in the absence of details regarding cost or market value, just that the facts as pled are not adequate to show GAAP violations as circumstantial evidence of scienter, under applicable Ninth Circuit authority. *See,e.g.,DSAM,* 288 F.3d at 390-91.

In *In re Daou Sys.,* the Ninth Circuit relied on the combination of "widespread and significant" inflation of revenue and "specific allegations of [top executives'] direct involvement in the production of false accounting statements" to find the complaint raised a strong inference of scienter. *In re Daou Sys.,* 411 F.3d at 1016, 1020, 1023. By contrast, the CAC makes no specific allegations of defendants' direct involvement, and instead relies on their general involvement in the management of SST and their alleged knowledge that the inventory valuation was "arbitrary ."

### e. group pleading

**\*21** As a final basis for dismissal, the court finds that the claims against the individual defendants fail because the CAC pleads no facts showing that any individual defendant made any statement with scienter. The CAC does not allege that defendants Hu, Chikagami, Nojima, or Best made any false statements at all, and does not plead facts sufficient to create a strong inference that defendants Yeh and Lai made false statements with scienter. As a defendant corporation can be deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, the claims against SST also fail on this basis.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 16
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs contend that the CAC establishes the individual defendants' scienter regarding inventory valuation, citing to ¶¶ 46-52 of the CAC (the "confidential informant" allegations), where plaintiffs argue, they have alleged that Yeh, Lai, Hum Nojima, and Best were "participating in monthly and quarterly meetings in which inventory valuations were determined;" and where they have also alleged that defendants "excluded the finance department from the valuation process" and that Hu created his own database and spreadsheet to track and value inventory.

Plaintiffs assert that allegations of a "detail-oriented management style" make it reasonable to infer that the individual defendants became aware of the falsity of statements related to critical business functions. They note that Yeh and Lai signed the 10-Qs for 1Q 2004, 2Q 2004, and 3Q 2004, that Yeh made all false oral statements (referring to the October 20, 2004, conference call), and that the CAC alleges that the other defendants played active roles in the inventory valuation process. Thus, they argue, all defendants are therefore liable for the false statements regarding the inventory valuations under the group pleading doctrine, which holds that there is a presumption that allegedly false and misleading group published information is "the collective action of officers and directors."

The PSLRA requires, with regard to each false or misleading statement or material omission, that the complaint "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). While the Ninth Circuit did rule in a pre-PSRLA case, *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir.1987), that "it is reasonable to presume" that false or misleading information contained in prospectuses, registration statements, annual reports, press releases, or other "group-published information" can be attributed to the "collective actions of the officers" of the corporation, and that a securities fraud plaintiff "fulfills the particularity requirements of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations," *id.* at 1440, the Ninth Circuit has not spoken in any officially published opinion on the question whether the "group pleading" doctrine applies to allegations of scienter in a case governed by the PSLRA.[FN8]

FN8. Other circuits have spoken on this issue, notably the Fifth Circuit in *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 364-65 (5th Cir.2004) (noting conflict among the courts, and holding that "[t]he 'group pleading' doctrine conflicts with the scienter requirement of the PSLRA"); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 602-03 (7th Cir.2006); *Phillips v. Scientific-Atlanta, Inc.,* 374 F.3d 1015, 1017-18 (11th Cir.2004).

**\*22** The court is aware that some judges in this district have either applied the group-published presumption without substantive analysis in cases controlled by the PSLRA, or have found that the presumption has survived the enactment of the PSLRA. *See,e.g.,In re Omnivision Techs., Inc.,* 2005 WL 1867717 at \*5 (N.D.Cal., July 29, 2005); *In re Adaptive Broadband Sec. Litig.,* 2002 WL 989478 at \*52-53 (N.D.Cal., April 2, 2002); *In re Secure Computing Corp. Sec. Litig.,* 120 F.Supp.2d 810, 821 (N.D.Cal.2000). Other judges, however, have concluded that plaintiffs must state with particularity facts indicating that an individual defendant was directly involved in the preparation of allegedly misleading statements published by an organization, and have found the group-published presumption inappropriate in light of the pleading standards imposed by the PSLRA. *See,e.g.,In re Netopia, Inc., Sec. Litig.,* 2005 WL 3445631 at \*5-6 (N.D.Cal., Dec.15, 2005); *In re ESS Technology, Inc. Sec. Litig.,* 2004 WL 3030058 at \*12 (N.D.Cal.2004). Until such time as the Ninth Circuit does speak on this issue, this court interprets the above-cited provision of the PSLRA as requiring that plaintiffs plead facts showing scienter as to each defendant individually. In other words, plaintiffs must allege the required state of mind as to each defendant who made an allegedly misleading statement.

### 3. Loss Causation

Defendants argue that the CAC fails to plead loss causation, asserting that the boilerplate language in the CAC is substantially identical to the language found inadequate by the Supreme Court in *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1630, 161 L.Ed.2d 577 (2005). The CAC alleges that the overvaluation of inventory and later disclosure of the lack of internal controls that led to the overvaluation caused a 22.5% decline in the price

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of SST's stock price. The court finds that the allegations in the CAC do meet the requirements of *Dura.*

### 4. Control Person Liability

Adequate pleading of a primary violation of § 10(b) is required for a plaintiff to adequately plead control liability under § 20(a).*See*15 U.S.C. § 78t. Because the CAC fails to state a claim for primary liability under § 10(b) or Rule 10b-5, the court finds that the claim for control person liability must be dismissed.

### CONCLUSION

In accordance with the foregoing, the motion to dismiss the consolidated amended complaint is GRANTED, for failure to allege falsity with particularity, and for failure to allege scienter as to any defendant. The totality of plaintiffs' allegations are insufficient under the heightened pleading standard of the PSLRA to raise a strong inference that defendants acted with deliberate or conscious recklessness in issuing statements regarding the value of SST's inventory or in failing to disclose that SST lacked adequate internal controls to ensure that inventory was properly valued. The dismissal is WITH LEAVE TO AMEND, and any amended complaint shall be filed no later than April 14, 2006.

**\*23** Notwithstanding the fact that the dismissal is with leave to amend, the court questions whether plaintiffs will be able to state a claim. The gravamen of plaintiffs' complaint as presented in the CAC is that SST mismanaged the valuation of its inventory, and then failed to disclose that mismanagement. The allegation that defendants should have written down the inventory earlier than they did, or should have disclosed that SST's valuation system was "arbitrary," is essentially a claim that there were material deficiencies in SST's inventory control procedures. Generally speaking, incidents of fiduciary misconduct and internal mismanagement are not by themselves sufficient to trigger liability under the Exchange Act. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 478-80, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

IT IS SO ORDERED.

N.D.Cal.,2006.
In re Silicon Storage Technology, Inc.

Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)

END OF DOCUMENT

*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number  5:07-cv-03444-JF

# TAB G

Not Reported in F.Supp.2d                                                   **Page 873**
**(Cite as: 2005 WL 2000665 (S.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas, Houston Division.

**SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,**
v.
**Gary V. MORRIS, Defendant.**

**No. Civ.A. H-04-3096.**

Aug. 18, 2005.

Stephen J. Korotash, Ft. Worth, TX, for Plaintiff.

Timothy R. McCormick, Thompson & Knight, Dallas, TX, for Defendant.

MEMORANDUM AND ORDER

ROSENTHAL, J.

*1 The Securities and Exchange Commission sued Gary V. Morris, former Chief Financial Officer of Halliburton Company, for violating sections 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2)-(a)(3), and section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), as well as Exchange Act Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240-13a-1, 13a-13, and 12b-2a. The allegations arise from Halliburton's alleged change in the second quarter of 1998 in its accounting treatment of claims for additional compensation for contracts, without an accompanying disclosure of the change in periodic reports and other public statements. The SEC alleges that Morris was "responsible" for ensuring that the periodic reports he reviewed and signed and the earnings releases and analyst statements he reviewed were accurate and complied with Generally Accepted Accounting Principles. (Docket Entry No. 1). Morris moved to dismiss both the section 17(a) and 13(a) claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Docket Entry Nos. 6-7). The SEC responded and filed an amended complaint. (Docket Entry Nos. 14, 15). Morris then moved to dismiss the amended complaint. (Docket Entry No. 18-20). The SEC again responded, (Docket Entry No. 23), and Morris replied. (Docket Entry No. 25).

Based on the pleadings; the motions, responses,

and reply; and the applicable law, this court grants the motion to dismiss the section 13(a) claim; denies the motion to dismiss the section 17(a) claim, and sets a status conference for September 12, 2005, at 8:45 a.m., in Courtroom 11-B. The reasons for the ruling on the motion to dismiss are set out below.

I. Background

Morris served as Halliburton's Chief Financial Officer during 1998 and 1999, the period relevant to the SEC's allegations. (Docket Entry No. 14, Amended Complaint, ¶ 1). Halliburton's securities are registered under section 12(b) of the Exchange Act and traded on the New York Stock Exchange. Halliburton offered and sold securities under registration statements filed in June 1998 and October 1998 and a supplement filed in November 1998. In the amended complaint, the SEC alleges that as CFO, Morris signed these registration statements--Forms S-8 and S-3--on Halliburton's behalf. (Id., ¶ 10-11). Morris also "reviewed, edited, and signed" the periodic reports Halliburton filed annually (Form 10-K) and quarterly (Form 10-Q). (Id., ¶ 25). Morris also "directed others to prepare Halliburton's earnings releases and analyst teleconference scripts, which he reviewed." (Id., ¶ 26). The SEC alleges that because "[e]ach of Halliburton's registration statements incorporated future filings of the company ... Halliburton's material misleading statements and omissions were made in the offer or sale" of securities. (Id., ¶ 11).

The basis for the SEC's complaint is an accounting change it alleges Halliburton adopted in the second quarter of 1998. The change affected Brown and Root Energy Services (BRES), a business unit of the Energy Services Group, one of Halliburton's two primary reporting segments. [FN1] The accounting issue is when to recognize as revenues claims for additional compensation on construction contracts. The SEC alleges that from at least 1993 through the first quarter of 1998, Halliburton had recognized claims for additional compensation on contracts "during the period such claims are resolved." The SEC alleges that Halliburton stated that it followed this approach in its annual Form 10-K reports. In the second quarter of 1998, however, Halliburton began recognizing as revenue claims for additional contract compensation arising from cost overruns that Halliburton had not resolved with its customers. The SEC alleges that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works



Not Reported in F.Supp.2d
(Cite as: 2005 WL 2000665, *1 (S.D.Tex.))

Halliburton did not report this accounting change until March 2000, in its 1999 Form 10-K. The SEC alleges that the failure to disclose this change for eighteen months, over six reporting periods, made the periodic reports and other public statements issued during those periods materially misleading.

> FN1. The other reporting unit is the Engineering & Construction Group.

*2 In mid-1997, Brown & Root began several large engineering, procurement, and construction (EPC) projects, that incurred large cost overruns. (Id., ¶¶ 12-14). The SEC alleges that in the second quarter of 1998, Halliburton changed its accounting treatment:

> by offsetting cost overruns on the BRES EPC contracts with estimated recoveries on claims that had not been resolved with customers. Although permitted under Generally Accepted Accounting Principles ("GAAP") in appropriate circumstances, this practice deviated from Halliburton's longstanding conservative practice of recognizing income only from resolved claims. As a result of the accounting change, losses from cost overruns on several EPC contracts in the BRES business unit were reduced or eliminated.

(Id., ¶¶ 16-17). The SEC also alleges Halliburton omitted from its 1998 Form 10-K the claims recognition statement that had appeared in previous Forms 10-K, but did not explain the change. [FN2] (Id., ¶ 21).

> FN2. The SEC alleges that Halliburton compounded the problem by "incorporating by reference" its historical claims recognition practice statement in its Forms 10-Q filings for the second and third quarters of 1998. (Id., ¶ 22).

The SEC does not allege that Halliburton violated GAAP or the securities laws in the change in accounting treatment. Rather, the SEC alleges that the failure to disclose the change, which increased reported income and made quarter-to-quarter income comparisons between 1997 and 1998 more favorable, violated GAAP and the SEC's Regulation S-X and made the public reports materially misleading. [FN3] According to the amended complaint, Morris knew of Halliburton's accounting change and its impact on Halliburton's income, but "failed to ensure that Halliburton disclosed the accounting change and its impact on Halliburton's income." Morris also "failed to ensure" that Halliburton did not incorporate by reference its former claims recognition policy in the second and third quarter Forms 10-Q, when that policy was no longer in effect. (Id., ¶ 23). As a result, the SEC asserts that Morris is responsible for a material misrepresentation that the second and third quarter 1998 Forms 10-Q, the 1998 Form 10-K, and the 1999 Forms 10-Q, were prepared in accordance with GAAP and Commission Regulation S-X, which allegedly required disclosure of the accounting change. (Id., ¶ 25).

> FN3. The SEC alleges that the increases in pretax income attributable to the accounting change ranged from a high of approximately $87 million reported in the 1998 Form 10-K (a 46 percent increase from $191 million to the reported $279 million) to $36 million in the third quarter of 1998 (when Halliburton reported a loss of $610 million, but omitting the unapproved claims would have increased the loss by 5.7 percent to $646 million). The amended complaint sets out the comparisons alleged to be misleading. In the second quarter of 1998, Halliburton's reported pretax income of $229 million would have been $184 million without including revenues from unresolved claims for additional compensation, a difference of $45 million or 24.8 percent. In the first quarter of 1999, Halliburton reported pretax income of $149 million, but without including the unresolved claims for additional compensation in the revenue amount, its income would have been $130 million, a difference of $19 million or 14.8 percent. In the second quarter of 1999, Halliburton reported pretax income of $146 million, but without the unresolved claims for additional compensation, its income would have been $136 million, a difference of $10 million, or 7.5 percent. In the third quarter of 1999, Halliburton reported a pretax income of $103 million, while its income without the additional compensation claimed but not yet resolved with its customers would have been $92 million, a difference of about $11 million, or 11.6 percent. (Docket Entry No. 14, p. 5).

The SEC also alleges that Morris is responsible for his failure to correct materially misleading information in earnings releases and analyst teleconference scripts that he reviewed in the second and third quarters of 1998. Morris allegedly attended the teleconferences as Halliburton's

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works

president "read aloud the misleading information in the scripts regarding the company's income. Morris never cautioned the president about the misleading statements." (Id., ¶ 26). Finally, the SEC's complaint lists the specific misleading statements in each periodic filing, earnings release, and analyst teleconference over the relevant six quarters. (Id., ¶¶ 27-43).

The SEC asserts two claims against Morris. First, Morris violated sections 17(a)(2) and 17(a)(3) of the Securities Act by making untrue statements of material facts or omissions of material facts necessary in order to make the statements made not misleading in the offer or sale of securities. (Id., ¶¶ 46-49). The SEC alleges that Morris negligently engaged in this conduct. Second, the SEC alleges that Morris aided and abetted Halliburton's violations of section 13(a) of the Exchange Act and related rules, by knowingly providing substantial assistance to Halliburton in filing materially misleading annual and quarterly reports. (Id., ¶¶ 50-53). The SEC seeks a permanent injunction and a civil money penalty.

**\*3** Morris has moved to dismiss the SEC's amended complaint. [FN4] The first issue is whether Morris is subject to liability under section 17(a) of the Securities Act in the absence of allegations that he either owned or directly and actively participated in offering or selling Halliburton securities. The second issue is whether the SEC has alleged facts that, if proven, could meet the scienter requirements of aiding and abetting liability under section 13(a). Morris also claims that the disclosures at issue were not misleading as a matter of law. (Docket Entry No. 19, at 21). Morris argues that what the SEC characterizes as a change in accounting policy or principle was instead the application of an accepted accounting rule to certain "qualifying contracts." Morris argues that the change in accounting treatment corresponds to a change in the type of contract Brown & Root used, moving from "cost-plus" construction contracts to "fixed-fee" projects, rather than a change in accounting principle that would require disclosure. Under GAAP, Halliburton was permitted to recognize as revenues unresolved claims against customers for cost overruns on fixed-fee contracts when it was "probable that the claim will result in additional contract revenue" and the "amount can be reliably estimated." American Institute of Certified Public Accountants' Statement

of Position 81-1(.65). Morris emphasizes that the recognition of revenue was proper under GAAP and that the SEC has never claimed that Halliburton had to restate its revenues. Morris challenges the SEC's assertion that there was a change in accounting principle under GAAP or that any change in accounting treatment was material so as to require disclosure.

FN4. The SEC also filed civil enforcement actions against Halliburton and its controller, Robert Muchmore, Jr., containing substantially identical allegations. Both defendants settled and entered agreed final judgments. Without admitting or denying the complaint's allegations, Halliburton paid a $7.5 million civil penalty and Muchmore paid a $50,000 penalty. SEC v. Halliburton Co ., No. 04-CV-3097 (S.D.Tex. Aug. 25, 2004) (Atlas, J.). The same defendants also consented to cease and desist orders barring future violations of Securities Act Section 17(a) and Exchange Act Section 13(a) and related rules. In re Halliburton Co., 2004 WL 1737425, at \*1 (Aug. 3, 2004).

II. The Legal Standard for a Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) dismissal is appropriate only if there is no set of facts that could be proven consistent with the complaint allegations that would entitle the plaintiff to relief. Scanlan v. Texas A & M Univ., 343 F.3d 533, 536 (5th Cir.2003). The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. Id. In order to avoid dismissal, however, a court need not "accept as true conclusory allegations or unwarranted deductions of fact." Id. (quoting Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir.2000)).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with one important exception. In Collins, 224 F.3d at 498-99, the Fifth Circuit approved the district court's consideration of documents the defendant attached to a motion to dismiss. In Collins and later in Scanlan, the Fifth Circuit made it clear that "such consideration is limited to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." 343 F.3d at 536, citing Collins, 224 F.3d at 498-99. Other courts

Westlaw.

Not Reported in F.Supp.2d                                                    **Page 876**
**(Cite as: 2005 WL 2000665, \*3 (S.D.Tex.))**

approve the same practice, stating that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir.1993); see also Field v. Trump, 850 F.2d 938, 949 (2d Cir.1998); Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir.1994).

III. The Claim Under Section 17(a) of the Securities Act

**\*4** In his motion to dismiss the amended complaint, Morris argues that he was neither an "offeror" nor a "seller" under section 17(a) of the Securities Act, which states in part:

It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C.A. § 77q(a) (West 2005). Morris argues that the § does not allege facts that, if proven, would show that he was involved in "the offer or sale" of Halliburton securities because the amended complaint does not allege that he either owned the securities offered for sale or sold or directly and actively participated in their offer or sale. (Docket Entry No. 19, at 11). Morris points to the Securities Act's definition of "offer" and "sale" in section 2(a)(3) for support: "The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value. The term 'offer to sell', 'offer for sale', or 'offer' shall include every attempt to offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." 15 U.S.C. § 77b(a)(3). Acknowledging that "few courts have interpreted the terms 'offer' and 'sale' in the context of § 17(a)," Morris argues that the Fifth Circuit's decision in Meadows v. § , 119 F.3d 1219, 1225 n. 9 (5th

Cir.1997), "confirmed" that these words are interpreted consistently under section 12 and section 17 of the Securities Act. Morris cites several cases holding that one is not a buyer or seller of a security under section 12 unless he directly and actively participates in soliciting a sale and is motivated in part by a desire to serve personal interests or those of the securities owner. See Meadows, 119 F.3d at 1225; Spiegel v. Tenfold Corp., 192 F.Supp.2d 1261, 12169 (D.Utah 2002); VT Investors v. R & D Funding Corp., 733 F.Supp. 823, 839 (D.N.J.1990).

The question is whether the consonant definitions of "offer" and "sale" in sections 12 and 17 also restrict liability for section 17 claims to the same individuals and entities who could be found liable under section 12. In Meadows, the Fifth Circuit expressly avoided this "interpretive issue." 119 F.3d at 1224 ("The Division disputes Meadow's interpretation of § 17(a), arguing that § 17(a) encompasses more than just 'offerors' or 'sellers' because it applies to 'any person in the offer or sale of any security (emphasis added). We need not resolve this interpretive issue."). The Meadows court noted that its own research found no case on point, but "recognize[d] the Supreme Court has stated that the language of § 17(a) 'does not require that the fraud occur in any particular phase of the selling transaction,' and 'that '[t]he statutory terms [offer and sale] ... are expansive enough to encompass the entire selling process, including the seller/agent transaction." ' Id. at 1224 n. 8 (alterations in original) (citing United States v. Naftalin, 441 U.S. 768, 773, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624 (1979)).

**\*5** The statutes imposing liability under sections 12 and 17 are not identical. Section 12(2) of the Securities Act, 15 U.S.C. § 77l(2), states:

"Any person who--

(2) offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ... shall be liable ... to the person purchasing such security from him....

15 U.S.C. § 77l(2) (West 2005). Liability attaches to "any person" who "offers or sells a security." By contrast, in section 17, liability

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Westlaw.

Not Reported in F.Supp.2d                                            Page 877
(Cite as: 2005 WL 2000665, *5 (S.D.Tex.))

attaches to "any person in the offer or sale of any securities." That section states:

> It shall be unlawful for any person in the offer or sale of any securities ... (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C.A. § 77q(a) (West 2005).

The SEC cites several cases in which individuals who make, create, or assist in the preparation or dissemination of material misrepresentations or omissions in the offer or sale of securities are subjected to liability under section 17(a). See SEC v. First Jersey Secs. Inc., 101 F.3d 1050, 1467 (2d Cir.1996); SEC v. Softpoint, Inc., 958 F.Supp. 846, 862 (S.D.N.Y.1997); SEC v. Whitworth Energy Res. Ltd., 2000 U.S.App. Lexis 31237, at *6 (9th Cir. Dec. 1, 2000) (affirming partial summary judgment against individual and corporate defendants for failing to disclose source of investor distributions); SEC v. Buntrock, 2004 WL 1179423, at *10 (N.D.Ill. May 25, 2004) (denying corporate officers' motion to dismiss control person liability claim under § 17(a)). In several of these cases, courts found section 17(a) liability without analyzing the extent to which the defendants were involved in the offer or sale of securities and whether they would benefit from the offer or sale. In Softpoint, 958 F.Supp. at 846, a district court granted summary judgment against a former officer and director of a corporation for violating, among other things, section 17(a) of the Securities Act. The former officer, Stoeckline, prepared and disseminated press releases, periodic SEC reports, and registration statements. Stoeckline also received Softpoint stock as compensation, which he sold through his codefendant company, and received the proceeds from the sale of Softpoint stock that had been issued to another codefendant. Id. at 852. The court held that because Stoeckline had signed public filings containing material misrepresentations and participated in schemes to inflate his company's income through unlawful stock sales, his "activities fall unmistakably within the broad scope of conduct prohibited by Sections 17(a) and 10(b) and Rule

10b-5." Id. at 862.

*6 In SEC v. Whitworth Energy Resources, an unpublished decision, the Ninth Circuit upheld a district court's grant of summary judgment against three individuals and three corporate defendants for violating section 17(a). 2000 U.S.App. Lexis. 31237, at *1. The defendants operated an oil and gas syndication business. Two of the corporate entities, owned and controlled by two individual defendants, raised several million dollars from investors in securities offerings. All three individual defendants "shared duties in drafting, selecting and reviewing the offering materials" for the public offering. The defendants "violated securities law when they failed to disclose the source of their distributions to investors" and failed to disclose a related entity's debt. Citing section 17(a), with other sections of the Securities Act, the court stated that "liability arises where offering materials to prospective investors contain materially false or misleading statements, including omissions of material facts." Id. at *7.

Morris notes that in most of these cases, the defendants participated in offering or selling securities to a greater degree than "merely signing public filings," which he asserts is the extent of the SEC's allegations as to his role in the asserted misrepresentations. (Docket Entry No. 19, p. 14). Morris both understates the SEC's allegations as to his involvement and overstates the conclusions that can be gleaned from the sparse case law on the subject.

The SEC does not merely allege that Morris "signed" periodic public reports and registration statements incorporating those public reports. The SEC alleges that Morris reviewed and edited these reports before signing them, with knowledge of the change in the accounting treatment as to when to recognize unresolved claims from contract cost overruns as revenue, and with knowledge of the impact of that change on earnings. As to the cases under section 17(a), they do not specifically hold that a defendant must either own the security offered or sold or actively participate in the offer or sale. To the contrary, most of the cases do not analyze the defendants' degree of involvement in selling or offering securities. See, e.g., Softpoint, 958 F.Supp. at 862 (noting that signing public filings, preparing and disseminating press releases and

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works

Westlaw.

Page 878

reports "fall unmistakably within the broad scope" of 17(a) and other antifraud provisions); Whitworth, 2000 U.S.App. Lexis, at *6 ("Defendants violated securities laws when they failed to disclose the source for their distributions to investors and Condor's claimed debt. Under section 17(a) [and other antifraud provisions], liability arises where offering materials to prospective investors contain materially false or misleading statements, including omission of material facts.").

Morris identifies one case from outside the jurisdiction that appears to limit section 17(a) to defendants directly and actively involved in selling or offering securities for sale. In Buford White Lumber Co. Profit Sharing and Savings Plan & Trust v. Octagon Properties, Ltd., 740 F.Supp. 1553, 1569 (W.D.Okla.1989), a private plaintiff who had purchased securities sued a law firm that had prepared prospectuses and offering circulars on behalf of a client for the sale of those securities. The plaintiff alleged that the documents contained false and misleading statements that violated sections 12 and 17(a) and other antifraud provisions. The court granted the defendant law firm's motion to dismiss the section 17(a) claim, finding that "no private cause of action lies for violations of section 17(a)." Id. at 1568. The court then added that, alternatively, "section 17(a), as Defendant notes, applies to those who offer or sell securities.... Plaintiffs have failed to allege facts showing that the Defendant was an offeror or seller for purposes of section 17(a)." Id. at 1569-70.

*7 The Buford court did not analyze the statutory language of section 17(a). As noted, that section attaches liability to "any person in the offer or sale of any securities," while section 12 applies to "[a]ny person who--(2) offers or sells a security." The court did not distinguish between the two sections. The Buford case is also distinguishable in that the defendant was a law firm whose involvement in selling securities was limited to preparing offering materials for the issuer. Morris, as alleged in the amended complaint, served as chief financial officer for the entity offering its own securities for sale, and Morris signed the SEC reports and registration statements accompanying those offerings.

Although little case law exists on this precise question, the Supreme Court's unanimous decision in Naftalin interpreted section 17(a) expansively.

See 441 U.S. at 778 ("Unlike much of the rest of the [Securities] Act, [section 17(a) ] was intended to cover any fraudulent scheme in an offer or sale or securities, whether in the course of an initial distribution or in the course of ordinary market trading."); id. at 773 ("The statutory terms, which Congress expressly intended to define broadly, are expansive enough to encompass the entire selling process, including the seller/agent transaction.") (citations omitted). In Meadows, the Fifth Circuit interpreted section 17(a) broadly, consistent with the only Supreme Court guidance available. See Meadows, 119 F.3d at 1224 n. 8; see also Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 573, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (approving of and relying on Naftalin' s broad interpretation of section 17(a)). In denying defendant's motion to dismiss, this court follows the direction provided by Naftalin and Meadows.

The motion to dismiss based on the argument that Morris is not a person alleged to have violated the statute "in the offer or sale of a security" is denied.

IV. The Claim Under Section 13(a) of the Exchange Act

The SEC alleges that Halliburton violated section 13(a) of the Exchange Act, 15 U.S.C.A. § 78m(a) (West 2005), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. § 240.12b-20, 240.13a-1, and 240.13a-13, by filing materially misleading financial reports, and that Morris knowingly aided and abetted Halliburton's violations. To establish aider and abettor liability for securities violations, the plaintiff must show that: (1) a primary violator committed a securities violation; (2) the alleged aider and abettor had a general awareness of his role in the violation; and (3) the aider and abettor knowingly rendered substantial assistance in furtherance of it. See Abbott v. Equity Group, Inc., 2 F.3d 613, 621 (5th Cir.1993).

Morris argues that the SEC's amended complaint does not allege facts that, if proven, would support an inference that Morris knowingly aided and abetted Halliburton's alleged section 13 and rules violations. Morris argues that Fifth Circuit authority interprets the "knowingly" requirement to require "both 'general awareness that [the defendant's] role was part of an overall activity that is improper' and knowing assistance in the violation." (Docket Entry

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works



Not Reported in F.Supp.2d
(Cite as: 2005 WL 2000665, *7 (S.D.Tex.))

No. 19, p. 16) (emphasis and alterations in original). The SEC responds that Morris seeks "to superimpose on the plain language of section 20(e) an additional requirement that Morris knew his actions were improper and that he knew of his assistance in the violation." [FN5]

> FN5. Section 20(e), "Prosecution of persons who aid and abet violations," states: For purposes of any action brought by the Commission under paragraph (1) or (3) of Section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided. 15 U.S.C.A. 78t(e) (West 2005).

**\*8** The Fifth Circuit addressed the scienter requirement for aiding and abetting securities violations in Woodward v. Metro Bank of Dallas, stating as follows:

> Without meaning to set forth an inflexible definition of aiding and abetting, we find that a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation.

522 F.2d 84, 94 (5th Cir.1975) (quoting SEC v. Coffey, 493 F.2d 1304 (6th Cir.1974)). In Woodward, the court stated that it would "assume ... the existence of a securities act violation" by the primary violator, and then determine the second element, whether an alleged aider and abetter had "general awareness that one's role was part of an overall activity that is improper." Id. at 95. In analyzing this second element, "the surrounding circumstances and expectations of the parties are critical. If the alleged aider and abettor conducts what appears to be a transaction in the ordinary course of his business, more evidence of his complicity is essential." Id. For the third element, knowing and substantial assistance, the Woodward court blended approaches from two other circuits:

> When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high "conscious intent" variety can be proved. Where some special

duty of disclosure exists, then liability should be possible with a lesser degree of scienter. In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b-5 liability without clear proof of intent to violate the Securities laws.

Id. at 97 (citations and footnotes omitted); see also Abell v. Potomac Ins. Co., 858 F.2d 1104, 1126 (5th Cir.1988), vacated on other grounds sub nom Fryar v. Abell, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989).

The SEC "disagrees that the knowledge standard articulated in Woodward and Howard are consistent with the plain language of Section 20(e)" and argues that "the allegations in [the] Amended Complaint clearly meet the 'knowledge' standard advocated by Morris." (Docket Entry No. 23, p. 21). The SEC understates the legal standard for knowledge under section 13(a) and overstates what it alleged in the amended complaint.

The case law supports Morris's argument that Woodward is still applicable law. To state a claim for aiding and abetting, the plaintiff must allege facts that, if true, demonstrate: (1) a securities violation by a primary party; (2) that the aider and abettor had a general awareness of its role in the violation; and (3) that the aider and abettor knowingly rendered substantial assistance in that violation. Abell, 858 F.2d at 1126. "General awareness means knowledge which, though it may be adduced from reckless conduct, means actual awareness.... [H]ow 'knowing' an abettor must be depends upon how substantial the abettor's assistance is." Id. As the Fifth Circuit stated:

> **\*9** Underlying the other two elements--"general awareness" and "knowing substantial assistance"-- is a single scienter requirement that varies on a sliding scale from "recklessness" to "conscious intent." The plaintiff must show conscious intent, unless there is some special duty of disclosure, or evidence that the assistance to the violator was unusual in character and degree. In the latter two instances, a recklessness standard applies.

Abbott, 2 F.3d at 621 (citations and footnotes omitted); see also Howard v. SEC, 376 F.3d 1136, 1143 (D.C.Cir.2004); Southwest Realty Ltd. v.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 880
(Cite as: 2005 WL 2000665, *9 (S.D.Tex.))

Daseke, 1992 WL 373166, at *11 (N.D.Tex. May 21, 1992) (stating that Woodward "divided the scienter requirement into two parts: knowledge of one's role in a fraud and commitment (or intent) to aid in the fraud's success"). A plaintiff can state a claim for aiding and abetting securities fraud by showing "severe" or "extreme" recklessness, but that requires allegations that the alleged aider and abettor "encountered 'red flags' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct of the primary violators." See Howard, 376 F.3d at 1143; see also Nathenson v. Zonagen, Inc., 267 F.3d 400, 408 (5th Cir.2001) (finding company president and CEO's "severe recklessness" provided the scienter necessary to prove securities fraud under Rule 10b-5).

   The SEC's amended complaint states that "Morris, acting alone or in concert or others, in the manner set forth above, knowingly provided substantial assistance to Halliburton in its violations...." (Docket Entry No. 14, ¶ 53). The SEC argues that the following facts demonstrate that Morris had a general awareness that his conduct was part of an overall activity that was improper: (1) "Morris was CFO and a licensed CPA who reviewed, signed and was responsible for the public filings of a prominent NYSE-traded company"; (2) "Morris knew that in 1998 the company implemented an accounting change that enhanced pre-tax income by as much as 46.1%"; (3) "Morris knew that Halliburton disclosed its accounting for unapproved claims in prior annual reports, omitted any disclosure relating to the accounting of unapproved claims in its 1998 Annual Report, and disclosed a new standard in its 1999 Annual Report which Morris knew was adopted during the previous fiscal year"; (4) "Morris violated multiple GAAP provision by failing to inform the investing public of the accounting change"; (6) "When Morris finally decided to disclose the change, it was misleading". (Docket Entry No. 23, pp. 21-22). None of these allegations concern or establish Morris's knowledge of wrongdoing. See Woodward, 522 F.2d at 97 (stating "the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved"). Instead, the SEC's allegations relate to ordinary business activities, without specifying facts that would show Morris's

knowledge of participation in improper activity. See id. (stating "[i]f the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find [aiding and abetting] liability without clear proof of intent to violate the securities laws.").

   *10 Although the SEC also argues that the allegations would, if proven, establish that Morris was reckless, it points to neither "red flags" or "suspicious events" that should have put Morris on notice of Halliburton's improper conduct. See, e.g., SEC v. Lucent Techs., Inc., 363 F.Supp.2d 708 (D.N.J.2005). In Lucent, the SEC alleged that the defendant corporation fraudulently and improperly recognized revenue and pre-tax income in violation of GAAP during fiscal year 2000. Id. at 711. That year, Lucent and its customer, AT & T Wireless Services (AWS) began to negotiate a new pricing regime that priced its equipment sales to AWS differently. The companies did not implement the new pricing until August 2000, several months after the new regime's anticipated April 2000 implementation date. One Lucent executive, Carter, authorized his subordinates to enter into an oral agreement with their AWS counterparts that the new pricing structure would apply retroactively to all products purchased after April 1, 2000. Id. During this interim period, Lucent provided equipment valued at $53 million to AWS that had not been invoiced, and sought to recognize revenue from the sale. AWS provided a purchase order priced under the old regime, with the express understanding that Lucent would provide a credit for that invoiced amount and AWS would ultimately pay only the price calculated under the new pricing structure. The SEC alleged that Lucent's recognition of revenue and operating income in the amount of $53 million violated GAAP and that individual officers aided and abetted Lucent's violations of Securities Act section 10(b), Exchange Act sections 13(a) & (b), and associated SEC rules. An individual defendant officer, Hayes-Bullock, moved to dismiss three counts of aiding and abetting Lucent's securities law violations, arguing that the SEC had failed to plead any allegations that would support either an inference that she knew or was reckless in not knowing that Lucent's revenue recognition violated GAAP. The SEC alleged that Hayes-Bullock knew of the oral side agreement, was responsible for ensuring that all transactions were GAAP-compliant, and personally drafted letters to the chief accountant

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works

Not Reported in F.Supp.2d                                          Page 881
(Cite as: 2005 WL 2000665, *10 (S.D.Tex.))

that were misleading as to the side agreement's existence. Id. at 725. Because the SEC failed to allege when Hayes-Bullock knew of the alleged side agreement, the court dismissed the claim, stating that "the timing of this disclosure is critical because if [Hayes-Bullock] were not made aware of the side agreement until after the revenue was recognized, this allegation would be irrelevant." Id. The court dismissed the aiding and abetting claims against this defendant. [FN6] In this case, as in Lucent, the SEC has alleged no facts showing that the defendant knew or was severely reckless in not knowing of his participation in a fraudulent scheme.

> FN6. The Lucent court also analyzed whether the SEC had properly stated the third aiding and abetting element--that Hayes-Bullock knowingly provided substantial assistance. Because the complaint alleged that she was responsible for ensuring that Lucent's financial statements complied with GAAP, [t]he Court can infer from this allegation that part of Hayes-Bullock's job entailed reviewing each transaction, including the transaction at issue here, to ensure that it was accounted for in accordance with GAAP, and that Hayes-Bullock was familiar with GAAP. The Court cannot think of a better example of substantially assisting another to commit fraud than exists here. If Hayes-Bullock knew of the side agreement, signed-off on the revenue recognition anyway in violation of GAAP, and then assisted in drafting letters to the Chief accountant that suggested that there was no side agreement, this would satisfy the "substantial assistance" element of an aiding and abetting claim. Id. at 726.

Morris's motion to dismiss the SEC's aiding and abetting claim is granted. Because the SEC has already amended and does not argue that, if allowed to amend, it would be able to plead additional facts showing that Morris had the requisite knowledge, the dismissal is with prejudice.

### V. The Claim That There Is No Underlying Violation by Halliburton

**\*11** Morris moves to dismiss on the basis that as a matter of law, Halliburton's disclosures were not misleading because: (1) GAAP did not require Halliburton to disclose its accounting judgment as to when claims against customers for contract cost overruns are recognized as revenues; and (2)

Halliburton had no duty to qualify its disclosures of true information about its accounting and finances. The SEC alleged in its amended complaint that Morris was responsible for the material misrepresentation that certain periodic reports were prepared in accordance with GAAP and Regulation S-X. [FN7] Specifically, the SEC points "without limitation" to disclosure requirements contained in Statement of Position (SOP) 81-1(.65) of the American Institute of Certified Public Accountants; Accounting Principles Board Opinion ("APB") No. 20; and Rules 4-01(a)(1), 10-01(a)(5), and 10-01(b)(6) of Regulation S-X. Morris argues that the SEC bases its entire amended complaint on GAAP violations, specifically APB 20, because the Regulation S-X rule violations all "depend on whether the Company failed to comply with GAAP." (Docket Entry No. 19, p. 2 n. 24).

> FN7. Regulation S-X is the Commission's regulation that, the SEC argues, required the disclosure of Halliburton's accounting change.

Morris attached APB 20 to his motion to dismiss the amended complaint. (Docket Entry No. 20. att. 1). Morris argues that its accounting change does not require disclosure. According to APB 20:

A characteristic of a change in accounting principle is that it concerns a choice from among two or more generally accepted accounting principles. However, neither (a) initial adoption of an accounting principle in recognition of events or transactions occurring for the first time or that previously were immaterial in effect nor (b) adoption or modification of an accounting principle necessitated by transactions or events that are clearly different in substance from those previously occurring is a change in accounting principle.

3 Original Pronouncements: Accounting Standards APB Opinion No. 20, ¶ 8 (Financial Accounting Standards Board 2002/2003). Morris contends that the "SEC cannot meet either standard" because Halliburton clearly disclosed that it was "using estimating procedures as permitted under GAAP and, as the record will reflect, no such change in accounting principle occurred at all under APB 20." (Docket Entry No. 19, p. 9). Morris argues that "[s]ince APB 20 is the only GAAP provision that Halliburton allegedly violated, the SEC must prove that a change in accounting principle occurred to show that Halliburton's disclosures were

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works

Not Reported in F.Supp.2d                                    **Page 882**
**(Cite as: 2005 WL 2000665, \*11 (S.D.Tex.))**

misleading." (Id., p. 21). According to Morris, no change in accounting principle occurred because Halliburton "adopted the use of SOP 81-1 to account for transactions that were previously immaterial in their effect and clearly differed in substance from their predecessors." [FN8] Morris argues that the SEC's amended complaint points out that BRES entered into fixed-price EPC contracts during the relevant period. (Docket Entry No. 14, ¶¶ 12-13).

> FN8. SOP 81-1 is entitled "Accounting for Performance of Construction-Type and Certain Production-Type Contracts." (Docket Entry No. 20, att. 2). This statement of position contains the FASB's guidance on GAAP for these type of contracts. The SEC acknowledges that Halliburton's alleged accounting change is "permitted under [GAAP] in appropriate circumstances," but argues that Halliburton's decision that "deviated" from its "longstanding conservative practice of recognizing income only from resolved claims" had to be disclosed to avoid misrepresentation. (Docket Entry No. 14, ¶ 16).

**\*12** The SEC complaint does not allege that BRES entered fixed-price EPC contracts for the first time in mid-1997. The amended complaint alleges that during the "relevant period BRES conducted a substantial portion of its business" using these contracts and that by mid-1997, BRES had "commenced several large fixed-fee" EPC projects. (Id.). At this motion to dismiss stage, this court cannot conclude that, as a matter of law, the accounting treatment for the claims for additional compensation from contracts "were previously immaterial in their effect and clearly different in substance from their predecessors."

Morris argues that even if Halliburton had a duty to disclose its use of SOP 81-1, "there is no legal basis justifying the SEC's claims that the disclosure should have included more than a statement that the change had been made." (Docket Entry No. 19, p. 22). For example, the SEC's amended complaint alleges that Halliburton's second quarter 1998 Form 10-Q did not disclose that without the accounting change, its reported income 24 percent increase in operating income would have in fact decreased 4.5 percent. (Docket Entry No. 14, ¶ 27). The SEC responds that Rule 12b-20 under the Exchange Act requires public companies to include in public reports "such further material information, if any, as

may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." 17 C.F.R. § 240.12b-20. Regulation S-X states in part:

> The interim financial information shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading.... [D]isclosure shall be provided where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant. Disclosures should encompass for example, significant changes since the end of the most recently completed fiscal year in such items as: accounting principles and practices....

17 C.F.R. § 210.10-01(a)(5). Regulation S-X also states:

> [T]he registrant shall state the date of any material accounting change and the reasons for making it. In addition, for filings on Form 10-Q and Form 10-QSB, a letter from the registrant's independent accountant shall be filed as an exhibit ... in the first Form 10-Q and Form 10-QSB subsequent to the date of an accounting change indicating whether or not the change is to an alternative principle which in his judgment is preferable under the circumstances; except that no letter from the accountant need be filed when the change is made in response to a standard adopted by the Financial Accounting Standards Board which requires such change.

17 C.F.R. § 210.10-01(b)(6). The SEC alleges that because investors did not know that Halliburton had changed its "historic accounting policy," the company's quarter-to-quarter comparisons were materially misleading and violated section 17(a), Rule 12b-20, and Regulation S-X. According to the SEC, the accounting principles on which Halliburton relied also require disclosure of accounting changes. APB 20 states that "[t]he nature and justification for a change in accounting principle and its effect on income should be disclosed in the financial statement of the period in which the change is made. The justification for the change should explain clearly why the newly adopted accounting principle is preferable." (Docket Entry No. 23, att. A (APB No. 20) n. 17). Similarly, SOP 81-1, which applies to accounting of construction contracts, states that amounts of unapproved claims "if material, should be disclosed in the notes to the financial statements." (Docket Entry No. 20, att. 2

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Westlaw.

Not Reported in F.Supp.2d

**(Cite as: 2005 WL 2000665, \*12 (S.D.Tex.))**

(SOP 81-1(.65)).

**\*13** Compliance with GAAP is a fact-specific issue. Fine v. Am. Solar King Corp., 919 F.2d 290, 298 (5th Cir.1990); In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1421 (3d Cir.1997) ("assuming that consistency with GAAP is enough to preclude liability, it is a factual question whether BCF's accounting practices were consistent with GAAP"); SEC v. Caserta, 75 F.Supp.2d 79, 91 (E.D.N.Y.1999). Neither compliance with GAAP nor the materiality of omitted disclosures can be resolved on a motion to dismiss. Morris's motion to dismiss on the grounds that GAAP did not require Halliburton to disclose its change in accounting treatment and that any failure to disclose was immaterial is denied, without prejudice to reasserting these arguments as the basis for a motion for summary judgment.

IV. Conclusion and Order

Morris's motion to dismiss is granted as to the aiding and abetting claim under section 13(a) and denied as to the negligence claim under section 17(a). A status conference is set for September 12, 2005, at 8:45 a.m., in Courtroom 11-B.

2005 WL 2000665 (S.D.Tex.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Westlaw.

*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number 5:07-cv-03444-JF

# TAB H

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 91,678
(Cite as: 2001 WL 1658275 (S.D.N.Y.))

United States District Court, S.D. New York.

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**
v.
**ARI PARNES, Adar Equities, LLC, Shauel Seitler, Jacob Herman, Yezhak Dov Knoll, and Myron Raisman, Defendants.**

**No. 01 CIV 0763 LLS THK.**

Dec. 26, 2001.

Opinion and Order

STANTON, D.J.

**\*1** This is a civil enforcement and disgorgement action brought by the Securities and Exchange Commission against six defendants who move to dismiss the complaint's major claims. (A single remaining claim, that some defendants were not properly registered as brokers or dealers, is not involved in the pending motions.)

THE COMPLAINT

As far as relevant here, the complaint alleges two fraudulent schemes.

1. The Immunogen Scheme

The first, called the Immunogen scheme (Compl.¶¶ 16-42), involves five of the defendants. Defendant Ari Parnes, the president and managing director of defendant Adar Equities, was the principal architect of the defendants' fraudulent scheme. (Compl.¶ 8.) Parnes effectively controls Adar Equities, a limited liability New York company based in Brooklyn, New York. Adar Equities serves as a placement agent for private placements of securities. (Compl.¶ 9.) Adar Equities employed defendants Shauel Seitler and Jacob Herman. (Compl.¶¶ 10-11.) The complaint frequently refers to Parnes, Adar Equities, Seitler and Herman collectively as "the ADAR Defendants." Also charged in the Immunogen scheme, defendant Yeshak Dov Knoll was "at all relevant times a registered representative at Datek Securities Corp., a registered broker-dealer." (Compl. ¶ 12 .)

The complaint describes three phases in the Immunogen scheme. In the first phase Parnes, Seitler and Herman, on behalf of Adar Equities, met with officers of ImmunoGen, Inc., a publicly held biotechnology company, and arranged to place $3.6 million in ImmunoGen convertible debentures with five Panamanian corporate subscribers. (Compl.¶¶ 2, 17, 18.) The debentures were to be issued pursuant to SEC Regulation S, 17 C.F.R. §§ 230.901-905, which at the time provided that certain offers and sales need not be registered with the SEC because they were deemed to occur outside the United States. (Compl.¶ 2.) Regulation S also provided that Regulation S securities could not be re-sold to U.S. purchasers during the 40 days following their issuance. For re-sales in the U.S. after the restricted period, Regulation S required either registration or exemption from registration. (Compl.¶ 16.) However, even if a transaction technically complied with Regulation S, the exemption was not available for transactions that were part of a scheme to evade the registration requirements of the Securities Act. Id. In this case, the ImmunoGen debentures were convertible after 45 days into shares of ImmunoGen common stock at a 25 percent discount from the market price (closing inside bid) on the trading day before conversion. (Compl.¶ 19.) The complaint alleges that the debentures were nominally placed with the Panamanian subscribers but were purchased through an ADAR escrow account controlled by Parnes and held by Parnes' attorney in New York. (Compl.¶¶ 2, 20.)

In the second phase of the scheme, the ADAR Defendants illegally sold short approximately 1.7 million shares of ImmunoGen common stock in the U.S. market. (Compl.¶ 22.) These short sales began in August 1995--eight days before Immunogen issued the convertible debentures--and continued through December 22, 1995. Id. According to the complaint, the short sales were designed to evade the legal restrictions on sales of unregistered securities to U.S. purchasers, to drive down ImmunoGen's stock price, and to generate substantial trading profits for the ADAR Defendants. Id. They took place in two cash brokerage accounts at Datek Securities in the names of two of the Panamanian subscribers to the ImmunoGen issuance. (Compl.¶ 23.) The SEC claims Parnes and his employees at ADAR

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1658275, *1 (S.D.N.Y.))

controlled both accounts and that the ADAR Defendants effected these short sales. Id. Defendant Knoll, the broker on these accounts, knew or recklessly ignored that the short sales he executed were intended to manipulate the market for ImmunoGen stock. (Compl.¶ 23.) The complaint recites regulatory violations by Knoll in executing these trades (Compl.24-41), including "pre-arranged trading, 'marking the close,' and 'piling on,' to drive the company's stock down." (Compl.¶ 3.) Knoll executed the short sales in cash, rather than margin, accounts (Compl.¶ 24.) These short sales locked in a sale price for the ImmunoGen stock that was higher than the price the defendants would later pay for 'covering' shares obtained from the Panamanian subscribers. (Compl.¶ 34.)

*2 In the third phase of the scheme, the ADAR Defendants delivered to ImmunoGen notices of conversion on behalf of the Panamanian subscribers, entitling them to convert a portion of the debentures, upon which Immunogen delivered the stock certificate to ADAR's escrow agent, a lawyer for Parnes in Manhattan. (Compl.¶ 39, 40.) In one instance, Seitler picked up the stock certificate and delivered it to Knoll at Datek, which was located directly across the street from ADAR's office in Brooklyn, New York. Id. Knoll deposited the shares in an account for one of the Panamanian subscribers, FTS Worldwide Corporation ("FTS"), and then immediately used them to cover FTS's short position. Id.

The SEC claims the scheme continued between October 6, 1995, and December 22, 1995. During that period, the ADAR Defendants directed Knoll to execute illegal short sales and caused the Reg. S subscribers to convert all of their debentures into common stock. (Compl.¶ 40.) According to the complaint, the ADAR Defendants and Knoll profited from their illegal short sales by depressing the stock price, thereby increasing the number of shares issued upon conversion, which then permitted them to cover earlier short sales made at higher prices. (Compl.¶ 35.) The trading profits from the Datek accounts were wired to bank accounts in Switzerland, from which $2.3 million was later transferred back to accounts controlled by, or for the benefit of, defendant Parnes. (Compl.¶ 42.)

2. The Bank Stock Frauds

The bank stock frauds involved the conversions of two banks, BostonFed Bancorp and Roslyn Bancorp, Inc., from mutual to stock form. (Compl.¶¶ 45-46.) Parnes and defendant Raisman, an attorney and accountant licensed in New York, schemed to purchase stock illegally pursuant to non-transferable subscription rights in the initial public offerings of the two banks, Parnes acting alone in one scheme, and with Raisman in the other. (Compl.¶¶ 45-52.) That violated a regulation promulgated by the Office of Thrift Supervision, 12 C.F.R. § 563b.3(i), which prohibits the transfer of a bank depositor's subscription rights. (Compl.¶ 46.)

In the first scheme, involving BostonFed Bancorp, Parnes provided funds to bank depositors, who were eligible for subscription rights, and caused subscription agreements to misrepresent to the bank that the depositors (rather than Parnes) were the true purchasers of stock and had not transferred their subscription rights. (Compl.¶ 47.) One depositor received funds from Parnes to purchase stock, submitted those funds to the bank along with a subscription agreement, took delivery of the shares, and then transferred profits, presumably from the sale of those shares, into an account for an entity controlled by Parnes. (Compl.¶ 48.) A second depositor used funds drawn from the account of an entity controlled by Parnes, submitted them with a subscription agreement to the bank, took delivery of the shares, and then transferred the shares into an account held by Parnes' nephew, where they were sold for a profit. (Compl.¶ 49.)

*3 In the second scheme, involving Roslyn Bancorp, Inc., Parnes and Raisman purchased the subscription rights of two of Raisman's elderly clients. (Compl.¶ 50.) One of Parnes' Regulation S clients transferred funds to an ADAR escrow account held by a law firm, which then issued checks payable to Roslyn Bancorp. The depositors submitted personal checks and Parnes' checks together with subscription forms to the bank. Roslyn Bancorp then delivered stock certificates to Raisman. The shares were later transferred to Parnes' nephew's account and sold for a profit. (Compl.¶ 51.) Raisman also provided another client with funds to purchase stock from the same bank. Parnes and Raisman then caused the depositor to misrepresent himself to the bank as a true purchaser who had not transferred his rights. The depositor subsequently transferred shares received from the

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works

bank into Parnes' nephew's account, where they were sold for a profit. (Compl.¶ 52.)

For the purposes of these motions to dismiss, all these factual allegations in the complaint are presumed to be true. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993); Luce v.. Edelstein, 802 F.2d 49, 52 (2d Cir.1986). All reasonable inferences are drawn in favor of the plaintiff. See Mills, 12 F.3d at 1174; Murray v. Milford, 380 F.2d 468, 470 (2d Cir.1967).

## STATUTORY VIOLATIONS

The first claim of the complaint alleges violations of Section 10(b) of the Exchange Act of 1933, 15 U.S.C. § 78j(b), SEC Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and the second claim alleges violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), by the Immunogen market manipulation scheme involving the convertible debentures. The third claim alleges violations of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, by the sale of unregistered stock in the United States. The fifth [FN1] claim alleges violations of Section 7(f) of the Exchange Act of 1934, 15 U.S.C. § 78g(f), by the execution of short sales in cash rather than margin accounts.

> FN1. The fourth claim alleges failure to register as brokers or dealers and is not at issue on this motion.

The sixth and seventh claims of the complaint allege violations of Section 10(b) and Rule 10b-5 by the schemes to fraudulently purchase bank stock pursuant to depositors' non-transferable subscription rights.

## DISCUSSION

### I. First and Second Claims

Parnes, Adar Equities, Herman, and Seitler move pursuant to Fed.R .Civ.P. 9(b) to dismiss the market manipulation claims for failure to plead fraud with particularity. Dismissal is warranted only where it "appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Although under Fed.R.Civ.P. 8 a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Rule 9(b) requires more for allegations of fraud. Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The heightened standard is meant to " 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." ' Shields v. Cititrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir.1994), quoting O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991).

*4 Courts in this circuit have distinguished between the pleading requirements for market manipulation and fraudulent misrepresentation claims. For market manipulation claims:

> [A]llegations may not even need to reach the level of specificity ordinarily required by Rule 9(b) because details regarding the workings of a market manipulation scheme are often known only by the defendants. Nevertheless, a complaint based on such allegations must still specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.

Baxter v. A.R. Baron & Co., No. 94 Civ. 3913, 1995 WL 600720, at *6 (S.D.N.Y. Oct.12, 1995) (citations omitted); see also SEC v. U.S. Environmental, Inc., 82 F.Supp.2d 237, 240 (S.D.N.Y.2000); In re Blech Securities Litigation, 961 F.Supp. 569, 580 (S.D.N.Y.1997).

The defendants argue that claims one and two of the complaint are deficient in three respects.

First, the defendants argue that the complaint impermissibly lumps defendants together without distinguishing amongst them. A complaint "may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged." In re Blech Securities Litigation, 928 F.Supp. 1279, 1292-3 (S.D.N.Y.1996), citing Jacobson v. Peat,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Westlaw.

Not Reported in F.Supp.2d                                                Page 564
(Cite as: 2001 WL 1658275, *4 (S.D.N.Y.))

Marwick, Mitchell & Co., 445 F.Supp. 518, 522 n. 7 (S.D.N.Y.1977); see also Red Ball Interior Demolition Corp. v. Palmadessa, 908 F.Supp. 1226, 1238 (S.D.N.Y.1995)(holding the same); O & G Carriers, Inc. v. Smith, 799 F.Supp. 1528, 1538 (S.D.N.Y.1992)(dismissing claims because there was "repeated undifferentiated grouping of defendants so that it is impossible to tell what each individual defendant is accused of doing").

The SEC's complaint in this case makes undifferentiated references to defendants Parnes, Adar Equities, Herman and Seitler as the "ADAR Defendants." It alleges that the "ADAR Defendants" directed Knoll to execute short sales and marking-the-close, cross-trade, and covering transactions without specifying the role each particular defendant played. (Compl.¶¶ 22, 23, 36, 37, 40.) In another paragraph, the complaint does not specify which of the "Adar Defendants" delivered notices of conversion. (Compl.¶ 39.) In this respect, it fails to satisfy one of the principal purposes of Rule 9(b): to provide each defendant with "fair notice of the claim to enable preparation of a reasonable defense." Spear, Leeds & Kellog v. Public Service Co., 700 F.Supp. 791, 793 (S.D.N.Y.1988).

In cases cited by the SEC where grouping was excused, the fraud involved misrepresentations and omissions in corporate documents that could be characterized as "the collective product of the group" of directors, officers and other insiders. Corcoran v. America Plan Corporation, Civ. 86-1729(CPS), 1987 WL 4448, at *4-5 (E.D.N.Y. Feb. 6, 1987)(documents were created by the collective action of directors and other members of a conspiracy); see also Walltree Ltd. v. ING Furman Selz LLC, 97 F.Supp.2d 464, 469 n. 6 (S.D.N.Y.2000) (complaint referred to two corporations as one entity where those corporations issued and placed notes, while concealing the material terms of those notes); Seagoing Uniform Corp. v. Texaco, Inc., 705 F.Supp. 918, 933-34 (S.D.N.Y.1989)(misleading SEC filings). The complaint in this case, in contrast, charges overt conduct by individuals.

*5 Furthermore, here the SEC has had three years' discovery and access to records and documents. It cannot dispense, merely because a defendant invoked the Fifth Amendment privilege during the investigation, with the obligation to

provide each defendant with fair notice of the specific conduct with which he is charged.

As to Knoll, however, the complaint has described his role in considerable detail. Knoll executed the illegal short sales in several Datek cash accounts; he also misrepresented the sales as long sales, failed to meet settlement date requirements, sold short in a declining market, and failed to report those trades to the market. (Comp.¶¶ 23-40).

Accordingly, in this respect the complaint is inadequate as against the Adar defendants and it is sufficient as against Knoll.

Second, the defendants argue that the complaint is deficient because it details only one particular covering transaction and then generally alleges that between October 6, 1995, and December 22, 1995, "Parnes and his employees continued to effect illegal short sales of ImmunoGen common stock in the United States and cover those short sales with stock issued to the Reg. S subscribers in exchange for their Reg. S debentures." (Compl. at ¶ 40.) Descriptions of market manipulation schemes which "provide detailed descriptions of a few sample trades," and allege more generally that the activity continued during a particular time frame and had an effect on the market, have been found to satisfy 9(b). U.S. Environmental, Inc., 82 F.Supp.2d at 240. "The SEC is simply not required at the pleading stage to list each and every specific trade," to satisfy Rule 9(b). SEC v. Blech, 99 Civ. 4770(RWS), 2000 WL 288263, at *3 (S.D.N.Y. March 20, 2000)(also finding complaint sufficient where specific stocks, methods of manipulation, the time frame, the effect on the market, and direct participation by defendants were set forth with specificity). The complaint in this case satisfies Rule 9(b) by its description of a particular trade and the mechanics of the scheme, including a time frame and the scheme's effect on the market.

Finally, the defendants argue that the complaint fails to allege scienter with the particularity required for claims under Section 10(b) and Section 17(a)(1) [FN2]. Although Rule 9(b) provides that in allegations of fraud, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," the Second Circuit sets a higher standard for securities fraud and requires the SEC to "allege facts giving rise to a strong inference of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1658275, *5 (S.D.N.Y.))

fraudulent intent." Blech, 2000 WL 288263, at *3; see also Press v. Chemical Investment Services Corp., 166 F.3d 529, 538 (2d Cir.1999); Acito v. Imcera Group, Inc., 47 F.3d 47, 52 (2d Cir.1995); Shields, 25 F.3d at 1128. " '[F]acts establishing motive to commit fraud and an opportunity to do so," ' or alternatively, " 'facts constituting circumstantial evidence of either reckless or conscious misbehavior," ' give rise to a strong inference of fraudulent intent. Acito, 47 F.3d at 53, quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir.1993); see also Press, 166 F.3d at 538, citing Shields, 25 F.3d at 1128.

> FN2. Claims under Section 17(a)(2) or 17(a)(3) do not require a showing of scienter. See Aaron v. SEC, 446 U.S. 680, 100 S.Ct. 1945, 1955-56, 64 L.Ed.2d 611 (1980) (holding that 17(a)(1) required showing of scienter, but 17(a)(2) and 17(a)(3) did not).

*6 To the degree that the complaint does not distinguish between the roles of certain defendants, one cannot evaluate whether the facts give rise to a strong inference of their individual fraudulent intent. As to Knoll, the only defendant whose role has been sufficiently described, the allegations of scienter suffice.

Defendants, relying on Shields, also argue that the short-sale scheme described by the SEC cannot support an inference of fraudulent intent because it defies economic reason. See 25 F.3d at 1130, quoting Atlantic Gypsum Co. v. Lloyds International Corp., 753 F.Supp. 505, 514 (S.D.N.Y.1990)( "Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent."). They claim that a downward manipulation of stock price would be adverse to their economic interests as beneficial owners of the convertible debentures. The argument is unpersuasive because the value of the debentures at issue here was not tied to the stock price: the terms of the debentures guaranteed a 25% discount upon conversion whether the stock price was high or low, and as the stock price fell, the number of shares obtained upon conversion increased, so the holder's economic interest remained the same. (Compl. ¶¶ 19, 36.) Meanwhile, short sales of ImmunoGen stock in a declining market created additional profits, when cheaply acquired Regulation S shares were used to cover

sales made at a higher price. The scheme, as described, indicates that the defendants stood to gain; it therefore supports an inference of fraudulent intent.

In sum, as to defendants Parnes, Adar Equities, Seitler and Herman, claims one and two of the complaint are dismissed for failure to plead fraud with particularity, without prejudice and with leave to the SEC to amend the complaint. "Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b)." Acito, 47 F.3d at 55. As to defendant Knoll, the motion to dismiss claims one and two is denied.

II. Third Claim

Defendants Parnes, Adar Equities, Herman, Seitler and Knoll move to dismiss the third claim of the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim under Section 5 of the Securities Act of 1933. They argue that the securities used to cover short sales were exempt from registration under the safe harbors of SEC Regulation S and therefore did not violate Section 5 and that denial of the exemption would violate Due Process.

Section 5 prohibits " 'any person' from directly or indirectly using the mails or the means of interstate commerce to offer or sell a security unless it is registered with the SEC or is exempt from registration.". See SEC v. Softpoint, 958 F.Supp. 846, 859 (S.D.N.Y.1997)(construing 15 U.S.C. §§ 77e(a), (c)). In order to state a claim under Section 5, a plaintiff must allege "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." Europe and Overseas Commodity Traders, S.A. v. Bangue Paribas London, 147 F.3d 118, 124 n. 4 (2nd Cir.1998). A plaintiff need not plead scienter as it is not an element of a Section 5 claim. See SEC v. Cavanagh, 1 F.Supp.2d 337, 361 (S.D.N.Y.), aff'd, 155 F.3d 129 (2d Cir.1998); Softpoint, 958 F.Supp. at 859-60 (S.D.N.Y.1997). Furthermore, a plaintiff need not plead the inapplicability of an exemption, as the party claiming exemption from registration requirements bears the burden of proving that the exemption applies. See SEC v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 985, 97 L.Ed. 1494

Westlaw®

Not Reported in F.Supp.2d                                                    Page 566
(Cite as: 2001 WL 1658275, *6 (S.D.N.Y.))

(1953); Byrnes v. Faulkner, Dawkins & Sullivan, 550 F.2d 1303, 1311 (2d Cir.1977).

**\*7** In addition to claiming exemption, however, the defendants argue that denial of the exemption would violate Due Process, because the transactions at issue here were in technical compliance with Regulation S, which at the time provided safe-harbor for re-sales of unregistered securities in the United States after the 40-day restricted period. But Regulation S did in fact provide notice that exemption would not be available "with respect to any transactions or series of transactions that, although in technical compliance with these rules, was part of a plan or scheme to evade the registration provisions of the Act." 17 C.F.R. § 230.901-905, Preliminary Note 2.

Here, in addition to alleging that defendants sold unregistered ImmunoGen securities in the U.S. market using the means of interstate commerce, the complaint describes a scheme "designed to evade the legal restrictions on sales of ImmunoGen's Reg. S securities to U.S. purchasers" (Compl.¶ 22), where defendants "nominally placed" (Compl.¶ 2) convertible debentures with Panamanian corporations, then effected unreported short sales in the United States in violation of securities regulations (Compl.¶¶ 32, 33), where these sales represented at least in one instance "three and a half times the total reported trading volume for ImmunoGen stock for that day" (Compl.¶ 33), and where 2.4 million of the issued shares were promptly transferred to U.S. accounts of the Panamanians, of which 1.7 million shares were then used to cover prior short sales made in the U.S. market (Compl.¶ 41). This is sufficient, at least for pleading purposes. Whether the proof is sufficient to establish a scheme to evade registration requirements and preclude application of the exemption is a question for trial.

### III. Fifth Claim

Defendants Parnes, Seitler and Herman move to dismiss the fifth claim pursuant to 12(b)(6) for failure to state a claim under Section 7(f) of the Exchange Act [FN3], because the SEC has not alleged that their violations were willful. The defendants are accused of violating Regulation X, which implements Section 7(f) and which imposes (by reference to another regulation, Regulation T)

initial margin requirements on certain securities transactions. See Regulation X, 12 C.F.R. § 224, and Regulation T, 12 C.F.R. § 220. The defendants allegedly violated these margin requirements by directing the execution of short sales in cash accounts rather than margin accounts. (Com pl.¶ ¶ 67-69.) Defendants argue, however, that willfulness must be pleaded because Regulation X exempts non-willful violations from its purview. Regulation X states, in relevant part: "The following borrowers are exempt from the Act and this part: (1) Any borrower who obtains purpose credit within the United States, unless the borrower willfully causes the credit to be extended in contravention of Regulations T or U." 12 C.F.R. § 224.1(b)(1) [FN4]. To the extent that willfulness must be pleaded to demonstrate the inapplicability of the exemption, the complaint alleges facts sufficient to support a finding that the violations were willful. The complaint states that the Adar defendants "directed Knoll to execute illegal short sales in Hoxton and ACM's cash accounts." (Compl.¶ 40.) Drawing all inferences in favor of the plaintiff, this allegation supports the inference of willfulness: that the defendants knew their deliberate behavior was illegal.

FN3. Section 7(f) provides in relevant part: It is unlawful for any United States person...to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender...for the purpose of (A) purchasing or carrying United States securities...if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited or would be prohibited if it had been made or the transaction had otherwise occurred in a lender's office or other place of business in a State. 15 U.S.C. § 78g(f).

FN4. "Purpose credit" is credit "extended for the purpose of purchasing or carrying margin stock...without collateral or on collateral other than stock." 12 C.F.R. § 221.120.

### IV. Sixth and Seventh Claims

**\*8** Defendant Parnes moves to dismiss claims six and seven, and defendant Raisman moves to dismiss claim seven, for failure to state a claim under Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 thereunder. They argue that the allegations in claims six and seven fail to allege fraud "in

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1658275, *8 (S.D.N.Y.))

connection with" the purchase or sale of securities.

Section 10(b) makes it unlawful to:
use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. 78j(b). SEC Rule 10b-5 thereunder makes it unlawful, "in connection with the purchase or sale of any security:"
(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person...

17 C.F.R. § 240.10b-5. To state a claim under § 10(b), a plaintiff must allege fraud in connection with the purchase or sale of any security. See O & G Carriers, Inc. v. Smith, 799 F.Supp. 1528, 1539 (S.D.N.Y.1992).

The Second Circuit has recognized that Section 10(b) "must be read flexibly, not technically and restrictively." See Press v. Chemical Investment Services Corp., 166 F.3d 529, 537 (2d Cir.1999), quoting Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). As stated in Press, this Circuit "has broadly construed the phrase 'in connection with,' interpreting the Congressional intent underlying the phrase to mandate only that the act complained of somehow induced the purchaser to purchase the security at issue." 166 F.3d at 537, citing SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 860-61 (2d Cir.1968)(en banc).

In this case, allegations in the complaint make it clear that the banks were tricked into parting with bank stock to an ineligible purchaser. Had the bank known that the subscription rights had been transferred, the consideration for the stock would not have been accepted, for the transaction violated an Office of Thrift Supervision regulation.

In Manela v. Garantia Banking Ltd., 5 F.Supp.2d 165 (S.D.N.Y.1998), the plaintiffs were deceived as to the identity of the seller of bonds, but the court held that because there was "no evidence supporting the possibility that knowledge of the seller's identity was relevant to the value of the securities or the consideration paid," the deception could not support a claim under Rule 10b-5. Id. at 175. Here, unlike Manela, the identity of the buyer was material to whether the consideration would be accepted.

*9 The motions to dismiss claims six and seven for failure to state a claim under Section 10(b) and Rule 10b-5 are denied.

V. Motion to Sever and Change Venue

Defendant Raisman moves pursuant to Fed.R.Civ.P. 21 to sever the seventh claim and transfer it to the Eastern District of New York. The seventh claim, the only claim against Raisman, charges both Parnes and Raisman with the illegal purchase of stock by use of depositors' subscription rights to the initial public offering of Roslyn Bancorp.

Fed.R.Civ.P. 21 "permits a court to add or drop parties to an action when doing so would serve the ends of justice and further the prompt and efficient disposition of the litigation." German v. Federal Home Loan Mortgage Corp., 896 F.Supp. 1385, 1400 (S.D.N.Y.1995), citing E.I. Du Pont De Nemours & Co. v. Fine Arts Reproduction Co., No. 93 Civ. 2462(KMW), 1995 WL 312505, at *1-2 (S.D.N.Y. May 22, 1995). Rule 21 provides:
Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.
Furthermore, "[t]he decision whether to grant a severance motion is committed to the sound discretion of the trial court." New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1082 (2d Cir.1988). In deciding a severance motion, a court considers: "(1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

Not Reported in F.Supp.2d
**(Cite as: 2001 WL 1658275, \*9 (S.D.N.Y.))**

(4) whether the party requesting the severance will be prejudiced if it is not granted." German, 896 F.Supp. at 1400.

Raisman argues that the claim against him is improperly joined with the other claims in the complaint because it is wholly unrelated and dissimilar to claims one through six. In the alternative, he argues that severance would still be proper here to avoid the prejudice inherent in trying the claim against him, for accessorial conduct, with the many and more sophisticated claims against other defendants.

The claim against Raisman meets the minimum requirements for joinder and none of the above factors mandates its severance. The sixth and seventh claims allege substantially similar schemes to purchase shares in the initial public offerings of banks using the depositors' subscription rights. Thus, there is economy in trying both claims to the same jury, which would in any event hear claim six. While they involve different witnesses and documents, the claims relate to the other claims in the complaint to the extent that Parnes is claimed to have used the proceeds from the Immunogen Scheme to fund both bank frauds. (Compl.¶ 45.) On the whole, severance would be more prejudicial to the SEC (which would have to try one of its claims against Parnes in a separate proceeding) than denial of severance is to Raisman.

**\*10** Since severance would neither serve the interests of justice nor the prompt and efficient resolution of the claims, Raisman's motion to sever is denied.

### CONCLUSION

Claims one and two against Parnes, Adar Equities, Herman and Seitler are dismissed for failure to plead fraud with particularity, without prejudice and with leave to replead. The motion to dismiss claims one and two against Knoll is denied. The motions to dismiss claims three, five, six and seven for failure to state a claim are denied. Raisman's motion to sever and transfer claim seven against him is also denied.

So ordered.

2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep.

P 91,678

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works

