*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number  5:07-cv-03444-JF

# TAB I

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**In re Silicon Storage Technology, Inc.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re SILICON STORAGE TECHNOLOGY, INC.,
SECURITIES LITIGATION.
**No. C 05-0295 PJH.**

March 10, 2006.

Patrick J. Coughlin, Azra Z. Mehdi, Darren J.
Robbins, William S. Lerach, Lerach Coughlin Stoia
Geller Rudman & Robbins LLP, Christopher T.
Heffelfinger, Julie Juhyun Bai, Berman Devalerio
Pease & Tabacco, P.C., Joseph J. Tabacco, Jr., Nicole
Lavallee, Berman Devalerio Pease Tabacco Burt &
Pu, San Francisco, CA, Jason S. Cowart, Marc I.
Gross, Stanley M. Grossman, Patrick V. Dahlstrom,
Pomerantz Haudek Block Grossman & Gross LLP,
New York, NY, for James M. Baker on Behalf of
Himself and all others Similarly Situated, Louisiana
District Attorneys' Retirement System.
Eunice Jooyoun Lee, Jonathan B. Gaskin, Robert P.
Varian, Orrick, Herrington & Sutcliffe LLP, San
Francisco, CA, for Silicon Storage Technology Inc.

ORDER GRANTING MOTION TO DISMISS
PHYLLIS J. HAMILTON, J.
**\*1** THIS ORDER RELATES TO: ALL ACTIONS

Defendants' motion to dismiss the consolidated
amended complaint came on for hearing before this
court on January 18, 2006. Plaintiffs appeared by
their counsel Jason S. Cowart, and defendants
appeared by their counsel Robert P. Varian and
Jonathan B. Gaskin. Having read the parties' papers
and carefully considered their arguments, and good
cause appearing, the court hereby GRANTS the
motion as follows

INTRODUCTION

This is a proposed class action alleging violations of
the federal securities laws. The plaintiff class consists
of all those who purchased shares of common stock
in defendant Silicon Storage Technology, Inc. (SST)
from April 21, 2004, to December 20, 2004.

Plaintiffs allege that SST and six of its officers or
former officers-defendants Bing Yeh, Yaw Wen Hu,
Jack K. Lai, Yasushi Chikagami, Isao Nojima, and
Derek Best-misled investors by overstating SST's
inventory value, by making false statements about the
company's sales prices, and by failing to disclose that
the company lacked adequate internal controls to
ensure that inventory was properly valued. Plaintiffs
assert that they were harmed when SST's stock price
fell more than 22.5%, following an announcement
that SST would write down the value of a portion of
its inventory.

The consolidated amended class action complaint
("CAC") alleges a cause of action for violation of §
10(b) of the Securities Exchange Act of 1934, 15
U.S.C. § 78j(b), and related Rule 10b-5, 17 C.F.R. §
240.10b-5, against all defendants; and for violation of
§ 20(a) of the Exchange Act, 15 U.S.C. § 78t(a),
against the six individual defendants.

BACKGROUND

SST is based in Sunnyvale, California, where it
operates three major facilities. According to periodic
reports filed by SST with the SEC, the company is a
leading supplier of "flash memory" semiconductor
devices for the digital consumer, including
networking, wireless communications, and Internet
computing markets. SST offers over 90 products
based on its "Super-Flash" design and manufacturing
process technology, and also licenses its technology
to leading semiconductor companies for use in
various applications. Revenue from the sale of these
products contributed approximately 50% of the
company's revenue during the proposed class period.

During the proposed class period, defendant Bing
Yeh ("Yeh") was SST's President and Chief
Executive Officer; defendant Yah Wen Hu ("Hu")
was SST's Executive Vice President and Chief
Operating Officer; defendant Derek Best ("Best")
was Senior Vice President for Sales and Marketing;
defendant Yasushi Chikagami ("Chikagami") was an
outside director; defendant Isao Nojima ("Nojima")
was Senior Vice President, Standard Memory
Product Group; and defendant Jack K. Lai ("Lai")
was Chief Financial Officer.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs allege that throughout the class period, defendants made materially misleading statements concerning the value of SST's inventory, which in turn caused the company's statements of gross profit, net income, and total assets to be materially misleading. Plaintiffs claim that defendants knew or should have known that prices of competing flash memory products sold by Intel and AMD had been declining during the class period, that SST's inventory should have been valued at levels well below those reported by defendants, and that the company's gross profits, net income, and total assets were therefore overstated.

**\*2** Plaintiffs allege that defendants failed to disclose that SST's valuation system lacked sufficient controls to ensure accuracy, and that its valuation process was completely arbitrary. Plaintiffs assert that "the truth began to emerge" after the market closed on December 20, 2004, at which point SST announced it would write down the value of its inventory by $20-$25 million. On this news, the price of the company's shares, which had closed at $7.01 before the announcement, fell to a low of $5.43 the following day, a drop of 22 .5%.

### DISCUSSION

#### A. Legal Standard

A court should dismiss under <u>Federal Rule of Civil Procedure 12(b)(6)</u> for failure to state a claim only where it appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief. <u>Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Williamson v. Gen'l Dynamics Corp., 208 F.3d 1144, 1149 (9th Cir.2000).</u> All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. <u>Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir.2002).</u>

Review is generally limited to the contents of the complaint. <u>Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir.1995).</u> However, material that is properly presented to the court as part of the complaint may be considered as part of a motion to dismiss. <u>Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir.2001).</u> If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a <u>Rule 12(b)(6)</u> motion the documents referred to

in the complaint to show that they do not support plaintiff's claim. <u>Id.</u> In addition, whether requested or not, the court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. <u>See</u><u>Fed.R.Evid. 201</u>; <u>see also</u><u>In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 986 (9th Cir.1999).</u>

#### B. Defendants' Motion to Dismiss

Defendants seek an order dismissing the CAC for failure to state a claim. Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."<u>15 U.S.C. § 78j(b).</u>

SEC Rule 10b-5, promulgated under the authority of § 10(b), makes it unlawful for any person to use interstate commerce
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**\*3**<u>17 C.F.R. § 240.10b-5.</u>

To plead securities fraud under Section 10(b) of the 1934 Act, plaintiffs must allege (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiffs relied (5) which proximately caused the plaintiffs' injury. <u>DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388 (9th Cir.2002).</u> Similarly, the elements of a Rule 10b-5 claim are (1) a material misrepresentation (2) made with scienter (3) in connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. <u>In re Daou Sys., Inc., Sec. Litig., 411 F.3d 1006, 1014 (9th Cir.2005).</u>

Under § 20(a) of the 1934 Act, joint and several liability can be imposed on persons who directly or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 3
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a). Violation of § 20(a) is predicated on a primary violation under the 1934 Act. *Heliotrope Gen'l, Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir.1999). Plaintiffs alleging a claim that individual defendants are "controlling persons" of a company must allege 1) that the individual defendants had the power to control or influence the company, 2) that the individual defendants were culpable participants in the company's alleged illegal activity, and 3) that the company violated the federal securities laws. *Durham v. Kelly*, 810 F.2d 1500, 1503-04 (9th Cir.1987); *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000).

Defendants argue that the § 10-b claim should be dismissed for failure to allege fraud with particularity, and that the § 20 claim should be dismissed because plaintiffs fail to state a claim for primary liability. Defendants also contend that dismissal is required because the facts before the court demonstrate that the inventory write-down could not have taken place prior to the fourth quarter of 2004, because the demand for and pricing of flash memory had been increasing, while SST's cost had been declining. Defendants assert the fact that the write-down was appropriate in 4Q 2004 but not before is also confirmed by an audit completed by PricewaterhouseCoopers after the December 20, 2004, announcement.

Generally, the Federal Rules of Civil Procedure require that a plaintiff in federal court give a short, plain statement of the claim sufficient to put the defendant on notice. *See* Fed.R.Civ.P. 8(a). However, Rule 9 imposes a particularized pleading requirement on a plaintiff alleging fraud or any claim premised on fraud. *See* Fed.R.Civ.P. 9(b) (in actions alleging fraud, "the circumstances constituting fraud or mistake shall be stated with particularity").

Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud. *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547-49 (9th Cir.1994). Because the plaintiff must set forth what is false or misleading about a particular statement, he must do more than simply allege the neutral facts necessary to identify the transaction; he must also explain why the disputed statement was untrue or

misleading at the time it was made. *Yourish v. California Amplifier*, 191 F.3d 983, 992-93 (9th Cir.1999).

**\*4** This case is also controlled by the provisions of the Private Securities Litigation Reform Act ("PSLRA"), which was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and "to put an end to the practice of pleading 'fraud by hindsight." *In re Silicon Graphics*, 183 F.3d at 958. The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.2002); *see also In re Daou Sys.*, 411 F.3d at 1014. If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

### 1. Falsity

Defendants argue that the CAC does not adequately allege falsity because it does not plead facts showing that the alleged false statements were false when made. Under the PSLRA-whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"-the complaint must specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1).

Plaintiffs allege that defendants made false and misleading statements concerning SST's sales prices, inventory values, and accounting controls during the class period, in connection with the release of SST's quarterly financial returns for the first, second, and third quarters of fiscal year 2004, as follows: On April 21, 2004, the first day of the class period, SST stated in a press release that its inventory was worth $69.9 million as of the end of the first quarter of 2004.[FN1] On May 7, 2004, SST filed its Form 10-Q for 1Q 2004 with the SEC. The Form 10-Q, which was signed by Yeh and Lai, repeated the statement that SST's inventory was worth $69.9 million as of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

end of 1Q 2004. The 10-Q also stated that the company's gross profit in the first quarter had been $38.1 million, that its net income had been $14.2 million, and that its total assets were $435 million. *See* CAC ¶ 53.

> FN1. The CAC alleges that Yeh also held a conference call on April 21, 2004, in which he stated that SST had experienced "firming" sales prices in the first quarter of 2004 and that the company expected SST's average selling prices to "continue to improve" in the second quarter. However, at the hearing, plaintiffs' counsel indicated that plaintiffs did not include this statement as one of the allegedly false and misleading statements.

On July 21, 2004, defendants allegedly announced in a press release that average selling prices were "firming" in 2Q 2004, and that the value of SST's inventory had increased from $69.9 million in 1Q 2004 to $91 million in 2Q 2004. On August 5, 2004, SST filed its Form 10-Q for 2Q 2004 with the SEC. The Form 10-Q, which was signed by Yeh and Lai, repeated the statement that the value of SST's inventory was $91 million as of the end of 2Q 2004. The 10-Q also stated that SST's gross profit in 2Q 2004 had been $48.7 million, that its net income had been $22 million, and that its total assets were $466 million. *See* CAC ¶ 58.

**\*5** On October 20, 2004, SST issued a press release announcing its results for 3Q 2004. The company stated that revenue had decreased to $112.2 and that average sales prices had declined by 7 per cent. It also stated that the value of SST's inventory was $138 million. In a conference call held the same day, Yeh allegedly stated that SST had no intention of writing down its inventory for the fourth quarter of 2004. On November 15, 2004, SST filed its Form 10-Q for 3Q 2004 with the SEC. The Form 10-Q, which was signed by Yeh and Lai, repeated the statements that revenue had decreased to $112.2 million, that average sales prices had declined by 7 per cent, and that SST's inventory was valued at $138 million. The 10-Q also stated that SST's gross profit in 3Q 2004 had been $39.5 million, that its net income had been $14.5 million, and that its total assets were $482.2 million. *See* CAC ¶¶ 67, 69, 73.

Plaintiffs allege that these statements were false and misleading because the value of SST's inventory was actually less than the amounts stated-$69.9 million in 1Q 2004, $91 million in 2Q 2004, and $138 million in 3Q 2004-and that consequently, SST's gross profit, net income, and total assets were less than the amounts stated. CAC ¶¶ 54, 59, 70. They also assert that the statement that SST did not plan to write down its inventory in 4Q 2004 was false and misleading because defendants knew or should have known that the prices of flash memory manufactured by SST's competitors AMD and Intel had been declining during the first three quarters of 2004, that the value that was assigned to SST's flash memory was inflated, and that SST would soon have to write down the value of its inventory. CAC ¶ 74.

In the present motion, defendants assert that the claim of fraud alleged in the CAC-that defendants defrauded investors by not announcing the intended write-down earlier than they did-was based solely on SST's announcement in December 2004 that it would take an inventory write-down due to changed market conditions, and provides a classic example of pleading "fraud by hindsight." Defendants contend that the CAC fails to allege falsity because it does not specify why, how, or by how much the inventory valuations allegedly exceeded the "correct" valuations; does not indicate what valuation might have been required at a given time; does not identify any product, or class of products or components in SST's inventory; provides no allegations as to the cost or market price at which any product or component was, or should have been, carried on SST's books; and alleges no contemporaneous facts demonstrating why the statements were false or misleading at the time they were made.

Defendants also argue that the CAC is deficient because it is largely pled on information and belief, but fails to include a statement of "all facts" on which that belief is based, in contravention of the requirements of the PSLRA. In addition, defendants assert that other than the allegations that Yeh made two statements in conference calls, and that Yeh and Lai signed SST's Form 10-Qs, the CAC does not allege that any particular defendant made any of the statements at issue.

**\*6** In opposition, plaintiffs argue that the CAC adequately pleads falsity. They contend that the CAC identifies material misstatements relating to SST's flash memory inventory values in the first, second, and third quarters of 2004 (citing to CAC ¶¶ 53, 58, 67, 69, 73). They maintain that the CAC explains

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

why these statements were false, based on contemporaneous facts-including allegations that SST's inventory valuation system lacked sufficient controls to ensure accuracy, that defendants were told that this system was overstating value, that defendants stated that market prices were rising or stabilizing at a time that such prices were in fact plummeting, and that defendants made these statements without also disclosing that their inventory valuation process was "completely arbitrary."

Plaintiffs also point to SST's 2004 Form 10-K, filed with the SEC on March 31, 2005, in which both SST and its outside auditors stated,
As of December 31, 2004, [SST] did not maintain effective controls over accounting for and review of the valuation of inventory, the income tax provision and related balance sheet accounts and licensing revenue because [SST] lacked a sufficient complement of personnel and a level of accounting expertise that is commensurate with [SST's] financial reporting requirements. Specifically, [SST] lacked sufficient controls over the write down of inventory to the lower of cost or market, accounting for complex licensing contracts with multiple elements, and processes and procedures related to the determination and review of the quarterly and annual tax provisions in accordance with generally acceptable accounting principles in the United States.... [T]his deficiency could result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, that this control deficiency constitutes a material weakness.

Plaintiffs assert that there is no requirement that the CAC specify SST's sales prices or inventory valuations on a product-by-product basis. They claim that the cases cited by defendants say only that such information is but one way to establish falsity. They argue that when contemporaneous facts are cited with sufficient specificity to demonstrate that the statements at issue were false, it is not necessary to also include details about specific products in the inventory valuation.

The court finds that the CAC fails to allege falsity with particularity as required by the PSLRA and Rule 9(b). While plaintiffs have identified each statement alleged to be false or misleading, they have not stated with particularity why each statement was false at the time it was made.

Plaintiffs allege that the statements about SST's inventory were false because the market price for various types of flash memory was declining during the period between April and December 2004. Plaintiffs assert that from March 2004 through April 21, 2004, the price for which AMD was selling one type of 32-megabyte flash memory, which competed with products sold by SST, steadily declined from $12.50 to just over $10.00, while another type of AMD's 32-megabyte flash memory declined from $16.50 to under $8.00. During the same period, the price of one type of 32-megabyte flash memory sold by Intel, which competed with products sold by SST, steadily declined from $21.50 to under $15.00.

*7 Plaintiffs allege further that the average sales price of flash memory fell for every week during the period June 13, 2004, through July 31, 2004, and continued to fall for every week thereafter until at least August 31, 2004. Plaintiffs assert that defendants knew or should have known that the prices of various types of flash memory sold by AMD and Intel, which competed with products sold by SST, from April through July 2004-specifically, that the price for which AMD was selling one type of 4-megabyte flash memory declined from $1.50 to less than $1.35; the price of one type of AMD's 8-megabyte flash memory declined from $3.38 to $1.75; the price of two types of AMD's 16-megabyte flash memory declined from around $3.75 to around $2.75; and the price of one type of 32-megabyte flash memory sold by Intel steadily declined from over $19.00 to under $7.50.

Finally, plaintiffs allege that the prices of flash memory sold by AMD and Intel, which competed with products sold by SST, declined from April through October 2004-specifically, that the price for which AMD was selling one type of 1-megabyte flash memory declined from $1.63 to under $1.00; the price of one type of AMD's 4-megabyte flash memory declined from $1.50 to $1.15; the price of one type of AMD's 8-megabyte flash memory declined from $3.38 to $1.50; the price of two types of AMD's 16-megabyte flash memory declined from over $3.75 to under $2.48; the price of one type of AMD's 32-megabyte flash memory declined from over $10.00 to less than $5.00. Plaintiffs also assert that when Intel announced its 3Q 2004 results on October 12, 2004, the company indicated that because flash memory sales prices had fallen, and there was no reason to believe they would increase, it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

would write down the value of its flash memory inventory. *See* CAC ¶ 72.

However, the CAC states no facts regarding comparable products in SST's inventory or the cost or market price of those products.[FN2]Nor does the CAC state the reasons that the values stated at the time of the quarterly reports for 1Q 2004, 2Q 2004, and 3Q 2004 were inaccurate. For example, the CAC contains no allegations of contemporaneous conditions or statements by defendants that contradict SST's statements regarding inventory valuations, and identifies no internal report that contradicts the valuations or suggests that they might be fraudulent.

> FN2. Stating the cost or market value of the products in SST's inventory would be one way-though not the only way-to allege contemporaneous facts showing that the statements regarding inventory valuation were false when made.

Plaintiffs simply allege, in essence, that because SST wrote down its inventory in December 2004, the statements about inventory made prior to that time must have been false because the inventory turned out not to be worth what SST had previously said it was worth. This is, as defendants argue, a classic example of pleading fraud by hindsight-a type of pleading that the PLSRA was specifically enacted to eliminate.

The allegations in the CAC regarding the decline in prices for flash memory produced by AMD and Intel do not support the claim that defendants made false statements regarding SST's financial results during the first three quarters of 2004, for the reason that the SST documents referenced in the CAC indicate that most of the inventory charge was taken on SST's 8-megabit and 16-megabit flash memory, while the AMD and Intel products at issue were 4-megabyte, 8-megabyte, 16-megabyte, and 32-megabyte flash memory. Thus, the AMD and Intel flash memory was not, as the CAC alleges, a type of flash memory that "competed with" products sold by SST.[FN3]

> FN3. Moreover, the October 12, 2004, Intel earnings release cited in CAC ¶ 65, a copy of which is attached to defendants' Supplemental Request for Judicial Notice, says nothing about flash memory prices, about any decline in such prices, or about

any inventory write-down pertaining to flash memory products.

*8 The allegations in the CAC that SST's inventory valuation system lacked sufficient controls to ensure accuracy and that its inventory valuation process was "completely arbitrary," and that defendants were told that this system was overstating value, are based on two sources-first, on information allegedly obtained by plaintiffs from their "confidential informants," and second, on a statement in SST's 2004 Form 10-K that SST had not maintained effective controls over accounting for and review of the valuation of inventory, and a statement by SST to the same effect in the same Form 10-K.

The allegations relating to information obtained from plaintiffs' confidential informants do not plead particularized facts showing that the statements regarding the value of SST's inventory were false when made because, as explained more fully below in the discussion of scienter, the informants were not employed at SST during the proposed class period, and because the CAC does not allege particularized facts indicating that the informants had personal knowledge regarding the truth or falsity of the statements made in 2004 regarding the valuation of SST's inventory. *See* *In re Daou Sys.,* 411 F.3d at 1015. Under the PSLRA, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin,* 253 F.3d 423, 432 (9th Cir.2001). The allegations relating to information obtained from the confidential informants does not meet this standard.

The statements concerning internal controls made by SST and SST's external auditors PricewaterhouseCoopers in SST's 2004 10-K do not support plaintiffs' claim that defendants made materially false statements during the proposed class period. First, as defendants note, this same boilerplate language is used in internal control review reports filed by numerous other technology companies, as such review is mandated by Section 404 of Sarbanes-Oxley. In the present case, SST and its auditors used what appears to be standard phrasing, noting that in the future, the control deficiency "could" result in a material misstatement to the company's financial statements. This is not a contemporaneous fact that shows that the statements about SST's inventory

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

valuation were false when made in connection with the release of financial results for the first three quarters of 2004. Moreover, SST's auditor PricewaterhouseCoopers issued an unqualified audit opinion, identified no errors in the interim financials, and did not require SST to restate any of the quarters prior to 4Q 2004.

2. Scienter

Defendants argue that the CAC should be dismissed because it fails to plead particularized facts that strongly suggest actual intent to deceive, manipulate, or defraud. Under the PSLRA, whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact," the complaint must, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see also In re Vantive, 283 F.3d at 1084. By requiring particularized, detailed allegations showing a strong inference of scienter, the PSLRA was intended to "eliminate abusive and opportunistic securities litigation." Gompper, 298 F.3d at 897.

*9 In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness." In re Silicon Graphics, 183 F.3d at 979. Mere motive and opportunity are not sufficient. Id. Recklessness satisfies scienter under § 10(b) "only ... to the extent that it reflects some degree of intentional or conscious misconduct." Id. at 977.In assessing whether plaintiffs have sufficiently pled scienter, the court should consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 938 (9th Cir.2003) (citation and quotation omitted); see also Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 948-49 (9th Cir.2005) (district court should evaluate scienter based on "totality of the allegations").

On a Rule 12(b)(6) motion to dismiss a complaint brought under the PSLRA, when considering whether plaintiffs have shown a strong inference of scienter, the district court must also consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." Gompper, 298 F.3d at 897 (noting the "inevitable tension ... between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to dismiss ... and the heightened pleading standard set forth under the PSLRA). In other words, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter. Id.

Plaintiffs assert that the "totality of the allegations" set forth in the CAC establish that defendants knowingly overvalued SST's inventory. First, plaintiffs contend that the allegations in the CAC regarding information obtained from six informants establish scienter because those allegations show the personal involvement and "hands-on" management of the individual defendants. Second, plaintiffs argue that the CAC pleads facts showing that defendants knew, or had access to facts that should have made them aware, that the price of flash memory was declining in the industry generally, and that the value assigned to flash memory in SST's inventory should therefore have been reduced. Third, plaintiffs assert that scienter is shown by allegations of defendants' motive to keep the price of SST's stock high, reflected in insider sales of stock during the class period, the SST board of directors' authorization of a stock repurchase program in July 2004, and SST's acquisition of another company in October 2004. Finally, plaintiffs argue that defendants' scienter is also shown by the allegations that defendants violated Generally Accepted Accounting Principles (GAAP) and various unspecified SEC regulations, regulations of national stock exchanges, and customary business practices.

a. confidential informants

*10 The CAC alleges that the information provided by five confidential informants, and a sixth identified informant, shows the individual defendants' personal involvement in, and "hands-on" management of, SST's business. In pleading fraud under the PSLRA, plaintiffs may rely on anonymous sources for information, so long as they plead "corroborating details" when allegations are based on non-public information. In re Silicon Graphics, 183 F.3d at 985;see also In re SeeBeyond Techs. Corp. Sec. Litig., 266 F.Supp.2d 1150, 1159 (C.D.Cal.2003)."[P]ersonal sources of information relied upon in a complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

the source would possess the information alleged." '
*Nursing Home Pension Fund, Local 144 v. Oracle
Corp.*, 380 F.3d 1226, 1233 (9th Cir.2004) (quoting
*Novak v. Kasaks*, 216 F.3d 300, 314 (2nd Cir.2000)).
When plaintiffs rely on facts beyond the information
provided by the confidential witnesses, they need not
name their sources as long as the additional facts
provide an adequate basis for believing that the
defendants' statements were false. *Id.*

Defendants argue that the information provided by
the six informants adds nothing to support the claims
in the CAC, because no informant worked at SST
during the class period, because the informants were
all low-level employees far removed from
management decisions, and because the informants
report guesses, opinions, and suppositions instead of
facts. Defendants also contend that plaintiffs fail to
allege particularized facts showing that each
individual source occupied a position such that he or
she would possess the information alleged.

Plaintiffs respond that the proposed class period
simply functions to define the plaintiff class, but does
not restrict the universe of relevant or actionable facts
in the case. They contend that while scienter itself
must always be contemporaneous with the alleged
misstatements, the facts supporting an inference of
scienter will not always be. In other words, plaintiffs
argue that the fact that none of the informants worked
at SST during the proposed class period is not
significant, because pre-class period awareness of
events can be relevant to show awareness of certain
facts and therefore to demonstrate scienter.

The court finds that the allegations regarding the six
informants do not create a strong inference that
defendants acted with deliberate or conscious
recklessness with regard to the alleged false
statements concerning SST's inventory valuations and
financial performance during the first three quarters
of 2004. The court first notes three ways in which the
allegations are generally insufficient.

First, the CAC fails to plead with particularity that
each individual informant occupied a position such
that he or she would possess the information alleged,
and the allegations regarding such information are
therefore insufficiently reliable.

*11 Second, none of the six informants was
employed at SST during the proposed class period;

and the only one of the six who worked at the
company at all in 2004 admittedly did not know what
SST was reporting as inventory. Thus, none of the
informants was in a position to know whether
defendants overstated the value of SST's inventory
when the company's financial results were reported
for the first three quarters of 2004. The statements
regarding events that occurred during the period 2000
through 2003 cannot substitute for the required
particularized showing of scienter in 2004.

While it is true that facts relating to pre-class period
events may in certain circumstances contribute to the
creation of an inference of scienter, *see,e.g.,Zelman v.
JDS Uniphase Corp.*, 376 F.Supp.2d 956, 970
(N.D.Cal.2005), there must be some connection
between that scienter and the earlier events. Here, the
issue is not pre-class period statements made by
defendants, which can be said to create a strong
inference of scienter in connection with false or
misleading statements made during the class period,
but rather a number of largely irrelevant statements
by informants who were not present at SST at the
time of the alleged misrepresentations, and who
appear to have little information regarding either the
valuation of the inventory or the defendants' alleged
"scheme" to misstate the value of the inventory. The
information provided by these informants concerns
events that predated and had no apparent connection
with the alleged misstatements regarding the
valuation of SST's inventory.

Finally, the CAC alleges that one of the informants
provided at least two of the defendants with "excess
inventory reports," and that at least two of the
informants attended "meetings" at which the
participants discussed issues relating to the amount
and type of products held in inventory, and to the
valuation of inventory. These allegations are
insufficient in light of the Ninth Circuit's decisions in
*In re Silicon Graphics,In re Vantive,* and *In re Daou
Sys.*.

In *In re Silicon Graphics,* the court rejected the
plaintiff's attempt to establish scienter through
general allegations that the defendants had received
internal reports, including daily reports, monthly
financial reports, "Stop Ship" reports, and "Flash
Reports." *Id.* at 984-98 & n. 14.The court held a
plaintiff can rely on the existence of reports as a
means of establishing knowledge only if the
complaint includes "adequate corroborating details"-
such as plaintiff's sources of information with respect

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

to the reports, how the plaintiff learned of the reports, who drafted the reports, and which officers at the company received them, in addition to "an adequate description of their contents."*Id.* at 985.

In *In re Vantive*, the plaintiffs attempted to establish such scienter by adverting to the defendants' "hands-on" management style, their "interaction with other corporate officers and employees, their attendance at management and board meetings, and reports generated on a weekly and monthly basis. Relying on *In re Silicon Graphics,* the Ninth Circuit held that such allegations did not adequately establish that the defendants had knowledge of the supposedly "true but concealed" circumstances. *In re Vantive, 283 F.3d at 1087-88.*

**\*12** As in *Silicon Graphics* and *In re Vantive,* plaintiffs in the present case have failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports. The allegations are similarly deficient, for the same reasons, with respect to the defendants' attendance at meetings and their "hands-on" managerial style. *Seealso*In re Daou Sys., 411 F.3d at 1022.

The court will now discuss each of the informants. Plaintiffs identify Confidential Informant No. 1 (CI # 1) as a "business control analyst" employed at SST from February 2000 through April 2004, who was "part of a team that monitored inventory on a daily basis."According to CI # 1, SST had "a poor and unreliable system in place for managing and monitoring inventory."He/she asserts that defendants Yeh, Hu, and Tsai [FN4] "called the shots" and micro-managed the system, including issues related to inventory valuation, and that Hu created his own databases and spreadsheets to track and value inventory on a daily basis, even though SST kept track of inventory in a separate software application. With regard to inventory, this informant believed that *"whatever it was that the company was reporting* was way off the mark" (emphasis added). He/she indicated that SST continued to manufacture large amounts of flash memory, even though there were "no buyers" because the company's officers and directors feared the company would lose its manufacturing vendors to competitors if they slowed down their production lines. CAC ¶ 46-47

FN4. The CAC does not assert a claim against a defendant "Tsai."

The CAC provides only a sketchy description of CI # 1's job duties, claiming that he/she was "part of a team that monitored inventory on a daily basis."However, plaintiffs do not identify the other members of this "team," and, more significantly, do not explain what they mean by "monitored inventory." Such a job description could include anything from counting widgets in a box, to moving inventory from place to place in a warehouse, to filling customer orders, to preparing spread sheets showing the types and amount of product in inventory. It is apparent from the allegations that CI # 1 had no personal knowledge of what SST was reporting as inventory, but the CAC does not even provide particularized detail sufficient to show what this informant knew with regard to inventory management.

Moreover, in view of CI # 1's claim that SST had a "poor and unreliable system in place for managing and monitoring inventory," it is difficult to see how any job relating to monitoring inventory would have provided CI # 1 with knowledge of facts creating a strong inference that defendants acted with deliberate or conscious recklessness. It is also not clear how Yeh, Hu, and Tsai could have "micro-managed" a "poor and unreliable" system. Finally, plaintiffs provide no basis for CI # 1's opinion that SST continued to manufacture large amounts of flash memory, despite the alleged absence of buyers, because "officials" feared that SST would otherwise lose its manufacturing vendors to competitors. Plaintiffs do not explain how CI # 1 learned about the alleged fears of these officials, or even who the officials were.

**\*13** Plaintiffs identify Confidential Informant No. 2 (CI # 2) as an "inventory control analyst" employed at SST from February 2000 through August 2002. CI # 2 reported to the director of manufacturing systems, and was responsible for receiving inventory shipments, tracking inventory locations, and ensuring that the actual products in inventory matched those identified in SST's databases. According to CI # 2, the Finance Department at SST was excluded from the inventory valuation process. Instead, "the vice presidents of the individual units (and in particular [d]efendant Hu)," made the inventory valuation decisions. CI # 2 claimed that these valuations were made "regardless of actual price" and that the overall valuation process was "arbitrary, with only some relation to reality."In this informant's opinion, the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

defendants were "unwilling to decrease the value assigned to inventory" because doing so would be an admission of their own "engineering mistakes" or "business errors." He/she considered it was a "pride issue"-that defendants created a culture of "hear-no-evil-see-no-evil." CAC ¶ 48.

The CAC provides some description of CI # 2's duties, although in vague terminology ("receiving shipments," "tracking inventory location") suggesting that CI # 2 functioned more as a warehouse or manufacturing plant clerk than as an employee with some personal knowledge of inventory valuation. However, this informant left SST in August 2002, and the CAC alleges no facts showing a basis for any personal knowledge regarding the valuation of inventory during the proposed class period. In particular, the CAC provides no connection between CI # 2's assertion that the inventory valuation process was "arbitrary" between February 2000 and August 2002, and plaintiffs claims that defendants knowingly misrepresented the value of SST's inventory during the period between April and December 2004.

CI # 2's statement that the Finance Department was excluded from the valuation process is contradicted by CI # 4's statement that former CFO Jeff Garon ("Garon") was involved in the decisions regarding valuation, and is further contradicted by the allegation in the CAC that defendant Lai, CFO during the proposed class period, was a participant in the alleged fraudulent misstatement of inventory values. In addition, CI # 2's claim that the valuations were made by "the vice presidents of the individual business units" and "in particular [d]efendant Hu" does not provide sufficient detail regarding who actually made the valuation decisions, how CI # 2 knows who made the decisions, or how he/she knows that the decisions were made "regardless of actual price." Finally, plaintiffs provide no basis for CI # 2's opinion that defendants would not decrease the value assigned to inventory because they were unwilling to admit their own engineering mistakes or business errors. Indeed, the CAC states no facts showing that CI # 2 was qualified to psychoanalyze defendants' motivations with regard to inventory valuation.

**\*14** Plaintiffs identify Confidential Informant No. 3 (CI # 3) as an individual employed at SST from 2000 through June 2003, who was also employed as a "production control manager" from 1997 through 2000.[FN5] At SST, CI # 3 was responsible for "tracking shipments and inventory." He/she is "certain" that

"the vice presidents" were intimately aware of the amount and type of products held in inventory because he "participated in" twice-monthly meetings with "these individuals" concerning this subject. CAC ¶ 49.

> FN5. It is not clear from the CAC whether CI# 3 worked at SSI during the entire period from 1997 through 2003, or whether he/she was a production control manager at some other company during the period 1997 through 2000, and began working at SST in 2000.

Plaintiffs describe this informant's duties only briefly, without any indication of what is meant by "production control" or "tracking shipments and inventory." From plaintiffs' description, it is impossible to tell whether CI # 3 was employed, for example, as an inventory clerk, entering data regarding products placed in inventory and shipped out to customers; or as a shipping or mailroom clerk, simply packaging products removed from inventory and shipping them to customers; or in some other capacity. Thus, it is impossible to tell whether this informant has any relevant personal knowledge.

Moreover, CI # 3 left his/her employment at SST in June 2003, and the CAC states no facts showing a basis for any personal knowledge regarding the valuation of inventory during the proposed class period. In addition, the allegations regarding CI # 3's participation in meetings with "vice-presidents" lack sufficient particularized detail to provide a basis for attributing to CI # 3 any personal knowledge regarding inventory or inventory valuation. The CAC does not provide the dates of the meetings, or identify the attendees or the substance of the matters discussed. Nor does the CAC identify the "vice-presidents" whom CI # 3 believed were "aware" of the amount and type of products held in inventory, or provide any facts showing a basis for CI # 3's belief that these individuals had this knowledge.

Plaintiffs identify Confidential Informant No. 4 (CI # 4) as a "controller" employed at SST from October 1995 through April 2003. This informant worked directly for Garon, the then-CFO. CI # 4 is "certain" that defendant Yeh and defendant Hu reviewed and monitored the inventory numbers "very, very carefully" and that defendant Hu and "defendant Garon" (actually not a defendant) were responsible for "the final decision about what value to place on

Not Reported in F.Supp.2d                                                                                        Page 11
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

products held in inventory."CI # 4 "participated in" monthly and quarterly meetings where inventory valuation "was discussed" with Yeh, Garon, Hu, and defendant Best, plus "a former cost accountant" and "business unit managers," and claims that participants in these meetings would "go back and forth and argue" over whether certain products held in inventory were sellable, and if so, for what amount of money. According to this informant, there were a "ton of red flags" where inventory was concerned, as warnings were frequently raised within the company that products held in inventory were out-of-date or overvalued. CAC ¶ 50.

*15 Plaintiffs do not describe this informant's job duties, simply stating that he/she was a "controller" who worked with SST's former CFO. From this description, it is impossible to tell whether CI # 4 had a basis for personal knowledge of the facts alleged. Moreover, CI # 4 left his/her employment at SST in April 2003, and the CAC alleges no facts showing any basis for personal knowledge regarding the valuation of inventory during the proposed class period. Nor does the CAC provide any particularized facts showing that CI # 4 had any basis for the opinion that defendants Yeh and Hu reviewed and monitored the inventory numbers "very, very carefully" or that Hu and CFO Garon were responsible for decisions regarding inventory valuation. The CAC asserts that CI # 4 participated in monthly and quarterly meetings in which inventory valuation was discussed, but does not provide the dates of any meetings, or identify the attendees (apart from Yeh, Garon, Best, and Hu) or any details of the matters discussed, or of the alleged arguments among the meeting participants regarding inventory valuation.

Plaintiffs identify Confidential Informant No. 5 as employed at SST "through 2003" (no indication of starting date) as an operations analyst, responsible for "tracking and locating excess inventory." In CI # 5's opinion, SST "often manufactured excess products" because the executives wanted to build up inventory, not because there was any actual market demand for those products. He/she recalled that the operations department repeatedly told upper management that products held in inventory were "not moving." He/she claims to have provided Yeh and Best with excess inventory reports that included recommendations concerning the likelihood that products held in inventory could actually be sold. CAC ¶ 51.

Plaintiffs describe this informant's duties only briefly, without any indication of what is meant by "tracking and locating excess inventory." Moreover, CI # 5 left his/her employment at SST at the end of 2003, and the CAC alleges no facts showing any basis for personal knowledge regarding events that occurred during the proposed class period. CI# 5 refers to "excess inventory reports" that he/she allegedly provided to Yeh and Best, but the CAC provides no details regarding the author of the reports, or the dates or contents of the reports, other than as stated above. In addition, plaintiffs provide no particularized facts showing that CI # 5 had any basis for his/her opinion that SST manufactured excess products because SST's "executives" wanted to build up inventory. With regard to the claim that the "operations department" repeatedly communicated to "upper management" that products in inventory could not be sold, the CAC does not provide any details regarding the identity of the employees in the operations department, the identity of the individuals in upper management, the dates of these alleged communications, or any details concerning the inventory at issue.

*16 Informant Brian Thiemer was employed at SST from 2001 through 2003 as a "quality assurance engineer" in the company's "inventory control" department. He was responsible for "a variety of issues related to the [c]ompany's inventory, including inventory valuation."He claimed that he regularly informed his manager Andy Arata (then-director of quality assurance) and unidentified "senior management" that the company needed to decrease the value it was placing on its inventory because such values did not reflect actual market prices. He believed that "some inventory" was obsolete and worth only 10% to 20% of its accounted-for value. He indicated that his recommendations were consistently and systematically ignored and rejected by "senior management" and/or Arata, and that his frustration concerning the company's unwillingness to accurately and truthfully value its inventory led him to quit SST in 2004. CAC ¶ 52.

Plaintiffs describe Thiemer's job duties only briefly, stating only that he was responsible for a "variety of issues" related to inventory, including inventory valuation. However, plaintiffs do not explain Thiemer's role in the valuation of inventory, or provide any particularized facts that would provide a basis for creating a strong inference that defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

acted with deliberate indifference. Moreover, Thiemer left his employment at SST at the end of 2003, and the CAC alleges no facts showing any basis for personal knowledge regarding inventory valuation during the proposed class period.

Thiemer claims to have "regularly" communicated to his manager and unidentified "senior management" that SST's inventory was overvalued, but as with CI # 5, the CAC does not provide the dates of these alleged communications, or any details concerning the inventory at issue. In addition, there is no indication as to who is meant by "senior management." Thiemer also claims that "some inventory" was obsolete, but plaintiffs provide no detail about this allegedly obsolete product-not the type, the quantity, or the value.

The allegations regarding these confidential informants do not, as plaintiffs contend, show defendants' personal involvement in, and "hands-on" management of, inventory valuation or any other particular aspect of SST's business, and do not plead the particularized facts required to show scienter under the PSLRA.

b. knowledge of general decline in prices of flash memory

Plaintiffs contend that defendants' knowledge that SST's inventory should have been written down earlier than it was is shown by the fact that they knew, or should have been aware, that the selling prices of flash memory were declining in the industry during the class period. With regard to 1Q 2004, the CAC asserts that defendants knew or should have been aware that from March 2004 through April 21, 2004, the selling prices of AMD's and Intel's 32-megabyte flash memory had declined. The CAC also alleges that defendants knew or should have known that *Forbes* reported on May 24, 2004, that the prices of flash memory had declined because manufacturers such as Intel and Samsung were offering price reductions in order to win customers; and that *CBS News* reported on June 3, 2004, that while Intel's flash memory sales had suffered in 2003, its sales were increasing in 2004 and Intel was winning market share. *See* CAC ¶ 56.

*17 With regard to 2Q 2004, the CAC asserts that defendants knew or should have been aware that the average sales price of various types of flash memory

sold by AMD and Intel fell for every week during the period June 13, 2004, through July 31, 2004, and continued to fall thereafter until at least August 31, 2004. Plaintiffs also claim that defendants knew or should have known that financial analyst WR Hambrecht reported on June 8, 2004, that flash memory prices in 2Q 2004 were 5 per cent lower than they had been in 1Q 2004 and were likely to continue to decline in 3Q 2004. Plaintiffs assert that in response to competition in the flash memory market, SST was forced, by July 2004, to lower its prices on some types of flash memory by as much as 4 per cent. *See* CAC ¶ 61.

With regard to 3Q 2004, the CAC asserts that defendants knew or should have been aware that the price of various types of flash memory sold by AMD was declining, and that the value assigned to flash memory in SST's inventory should therefore have been reduced. Plaintiffs also allege that defendants knew or should have known that when Intel announced its 3Q 2004 results on October 12, 2004, it also indicated that because flash memory sales prices had fallen, and there was no reason to believe they would increase, it would write down the value of its flash memory inventory. *See* CAC ¶ 72.

Defendants argue that this market pricing information is irrelevant, as the details do not concern SST products or prices, and do not even involve products that competed with the 8-megabit SST products that were the focus of the write-down. They also assert that the October 12, 2004, Intel earnings release cited in the CAC says nothing whatsoever about flash memory prices or any purported decline in prices, or any inventory write-down pertaining to flash memory prices, but rather reports an inventory write-down as a result of "lower chipset unit costs," having nothing to do with the selling prices of flash memory.

The court finds that the allegations regarding a decline in prices for AMD and Intel flash memory do not create a strong inference of scienter. The CAC does not plead particularized facts showing that defendants did in fact know these details of industry prices, news reports, and financial analysts' reports. Moreover, as previously indicated, the flash memory produced by AMD and Intel did not have the same capacity as the flash memory produced by SST, and the products therefore were not competitive. The CAC does not explain the relevance of a drop in price of 8-megabyte, 16-megabyte, and 32-megabyte flash memory to the valuation of SST's inventory of 8-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

megabit flash memory.

### c. motive to inflate price of stock

The CAC alleges that defendants' scienter is shown by their motive to inflate the price of SST's stock, and that this motive is shown by defendants' insider trading, by SST's announcement of a stock repurchase in July 2004, and by SST's announcement of its acquisition of another company in October 2004. In the Ninth Circuit, motive and opportunity, standing alone, are not sufficient to establish scienter. See *In re Silicon Graphics,* 183 F.3d at 974 (facts that indicate a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, but they are not sufficient to establish a strong inference of deliberate recklessness). However, motive can be considered as part of the "totality of the allegations" regarding scienter.

### i. insider trading

**\*18** The CAC alleges that defendants motive to keep price of stock high, as shown by insider sales of stock, by Nojima on June 2, 2004, on November 17, 2004, and on December 8, 2004; by Best on August 12, 2004; and by Chikagami on December 14, 15, and 16, 2004. Plaintiffs assert that the timing of the November and December 2004 stock sales was suspicious in view of the fact that the company announced on December 20, 2004, that it expected to take a $20-$25 million inventory charge and write down the value of certain products held in inventory to their estimated market value, and that the gross margin for 4Q 2004 was expected to be in the range of 1% to 3%, compared with previous estimates of between 25% and 32%.

The PSLRA "neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence meet the 'strong inference' standard." *In re Daou Sys.,* 411 F.3d at 1022 (citation and quotation omitted). Stock trades are only suspicious when "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics,* 183 F.3d at 986. To evaluate suspiciousness of stock sales, the court should consider the amount and percentage of shares sold, the timing of the sales, and whether the sales were consistent with prior trading history. *Nursing Home,* 380 F.3d at 1232.

Here, it appears that most of SST's officers and directors sold no stock during the proposed class period, and that just as many insiders purchased stock as sold. Yeh and Lai-the only defendants specifically alleged to have made false or misleading statements are not alleged to have sold any stock. Best sold no shares, but rather transferred some previously pledged stock as collateral for a loan. Lai and Hu purchased-not sold-stock during the class period. Collectively, defendants sold less than 2% of their total holdings, and SST itself purchased $15 million worth of its own stock during the class period, at prices plaintiffs allege were inflated by its own fraud.

Only Nojima and Chikagami sold stock. Nojima's sales were not out of the ordinary, as those sales were consistent with his trading pattern and sales for the preceding seven years. Although Nojima sold no shares in 2003, he did sell shares every other year starting in 1998, as shown by his Form 4s filed with the SEC. Thus, Nojima's sales are insufficient to create a strong inference of scienter.

Foreign-based outside director Chikagami, who is not alleged to have personally made any false statement, did sell a substantial amount of his holdings (total of 66%), and he is the only officer or director whose stock sales are even marginally suspicious under the *Silicon Graphics* standard. However, in view of the fact that he owned a relatively small number of shares compared with the officers of the company, the fact that he did not sell all his shares, the fact that no one else's sales appear suspicious, and the fact that other insiders actually purchased shares during the proposed class period, the court finds that Chikagami's sales are insufficient to creating a strong inference of scienter.

**\*19** Moreover, even if the court were to find that the timing or amount of the stock sales was suspicious, "stock sales are helpful only in demonstrating that certain statements were misleading and made with knowledge or deliberate recklessness when those sales are able to be related to the challenged statements." *In re Vantive Corp.,* 283 F.3d at 1093. Because the CAC fails to plead particularized facts showing that defendants made false or misleading statements, such "insufficient allegations of fraud ... have a spillover effect" on an analysis of insider sales. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 14
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

#### ii. SST's stock repurchase

The CAC alleges that defendants' motive to keep the price of SST's stock high is also shown by the announcement on July 29, 2004, that SST's board of directors had authorized a stock repurchase program of up to $15 million worth of the company's common stock. The CAC does not explain how either this announcement or the repurchase program creates a strong inference of scienter.

#### iii. SST's acquisition of G-Plus

The CAC alleges that defendants' motive to keep the price of SST's stock high is further shown by the announcement on October 18, 2004, that SST had signed an agreement to acquire substantially all the assets of privately-owned G-Plus, Inc., pursuant to which SST agreed to issue approximately $26 million in SST stock to G-Plus. The deal closed on November 5, 2004. Plaintiffs claim that it was in the interest of the company to keep its share price higher in order to facilitate this stock-financed transaction.

Allegations that defendants engaged in routine business activities or were motivated by concerns that are shared by all companies and executives is not sufficient to establish scienter. See Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir.2002) ("[i]f scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"). SST's acquisition of G-Plus is an example of the type of routine activity and generic motive that cannot serve as a basis for alleging securities fraud.

The fact of this merger or buy-out, standing alone, is insufficient to create a strong inference of scienter. Moreover, even if the court were to find that this acquisition provides some small support for an inference of fraud, the fact of the buy-out would have to be considered in the context of the fact that SST and several of its officers purchased millions of dollars of SST stock during the class period, at prices that plaintiffs claim were inflated by fraud.

#### d. alleged violations of GAAP

The CAC alleges that defendants' scienter is shown

by their violation of Generally Accepted Accounting Principles (GAAP)-specifically, certain principles set forth in FASB Statement of Concepts Nos. 1 and 2[FN6]-and also by their violation of the requirements of unidentified "SEC regulations, regulations of the national stock exchanges and customary business practices" to disclose the sort of adverse information that was allegedly concealed by defendants during the class period.

> FN6. As alleged in the CAC, these are (a) the principle that interim financial reporting should be based on the same accounting principles used to prepare annual financial statements; (b) the principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions; (c) the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources; (d) the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources trusted to it was violated; (e) the principle that reporting should provide information about an enterprise's financial performance during a period; (f) the principle that financial reporting should be reliable in that it represents what it purports to represent was violated; (g) the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions; (h) the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. CAC ¶ 94.

*20 Violation of GAAP standards can provide evidence of scienter. In re Daou Sys., 411 F.3d at 1016. However, "[t]o support even a reasonable inference of scienter, much less a strong inference, the complaint must describe the violations with sufficient particularity: a general allegation that the

Not Reported in F.Supp.2d                                                    Page 15
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation."*Id.* (citations and quotations omitted). Put another way, simple allegations of failure to follow GAAP do not establish scienter, because scienter requires more than a misapplication of accounting principles. *See,e.g.,In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994)). In order to distinguish "deliberate recklessness" from "ordinary carelessness," allegations of GAAP violations must be augmented by facts that shed light on the mental state of the defendants, rather than conclusory allegations that defendants must have known of the accounting failures because of the degree of departure from established accounting principles. *SeeDSAM,* 288 F.3d at 390-91.

The CAC alleges that "[i]n order to inflate the price of [SST] stock, [d]efendants intentionally and/or with deliberate recklessness overstated the value of flash memory held in inventory in violation of [GAAP]," and then simply proceeds to list a number of accounting principles that were allegedly violated by this overvaluation. CAC ¶¶ 91-94. However, the GAAP allegations contain no facts that shed light on the mental state of the defendants, and as the CAC fails generally to allege scienter, the allegations of GAAP violations contribute nothing. In order to plead facts showing a strong inference of fraud, plaintiffs must provide detail-not merely, as here, simply recite various GAAP provisions and allege in general terms that the defendants failed to comply with them.

The CAC does not identify any transaction by name or date, does not specify any dollar amounts, does not identify any product or class or products that should have been written down sooner under these various accounting principles, does not state what the appropriate write-down would have been, or when it should have been taken, or why a write-down should have been taken in that amount at that time. Although the CAC refers to the GAAP provision requiring that inventory be carried on the balance sheet at the lower of "cost" or "market value," the CAC says nothing about either the cost or the market value of SST's inventory, and says nothing about how or when the defendants purportedly became aware of the allegedly improper accounting practices, but rather simply refers to general declines in market prices of flash memory products throughout the industry.[FN7]

FN7. Plaintiffs acknowledge that "GAAP, as set forth in Accounting Research Bulletin ('ARB') No. 43, Chapter 4, Inventory Pricing, requires that inventories be recorded at the lower of cost or market ."CAC ¶ 93. At the hearing, however, plaintiff's counsel conceded that plaintiffs were unable to provide any information regarding the cost or market value of SST's inventory. As explained above, that deficiency is one reason that plaintiffs' allegations of GAAP violations are insufficient to create a strong inference of scienter. That is not to say that plaintiffs would not theoretically be able to plead facts sufficient to create a strong inference of intent or deliberate recklessness in the absence of details regarding cost or market value, just that the facts as pled are not adequate to show GAAP violations as circumstantial evidence of scienter, under applicable Ninth Circuit authority. *See,e.g.,DSAM,* 288 F.3d at 390-91.

In *In re Daou Sys.,* the Ninth Circuit relied on the combination of "widespread and significant" inflation of revenue and "specific allegations of [top executives'] direct involvement in the production of false accounting statements" to find the complaint raised a strong inference of scienter. *In re Daou Sys.,* 411 F.3d at 1016, 1020, 1023. By contrast, the CAC makes no specific allegations of defendants' direct involvement, and instead relies on their general involvement in the management of SST and their alleged knowledge that the inventory valuation was "arbitrary ."

e. group pleading

*21 As a final basis for dismissal, the court finds that the claims against the individual defendants fail because the CAC pleads no facts showing that any individual defendant made any statement with scienter. The CAC does not allege that defendants Hu, Chikagami, Nojima, or Best made any false statements at all, and does not plead facts sufficient to create a strong inference that defendants Yeh and Lai made false statements with scienter. As a defendant corporation can be deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, the claims against SST also fail on this basis.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Plaintiffs contend that the CAC establishes the individual defendants' scienter regarding inventory valuation, citing to ¶¶ 46-52 of the CAC (the "confidential informant" allegations), where plaintiffs argue, they have alleged that Yeh, Lai, Hum Nojima, and Best were "participating in monthly and quarterly meetings in which inventory valuations were determined;" and where they have also alleged that defendants "excluded the finance department from the valuation process" and that Hu created his own database and spreadsheet to track and value inventory.

Plaintiffs assert that allegations of a "detail-oriented management style" make it reasonable to infer that the individual defendants became aware of the falsity of statements related to critical business functions. They note that Yeh and Lai signed the 10-Qs for 1Q 2004, 2Q 2004, and 3Q 2004, that Yeh made all false oral statements (referring to the October 20, 2004, conference call), and that the CAC alleges that the other defendants played active roles in the inventory valuation process. Thus, they argue, all defendants are therefore liable for the false statements regarding the inventory valuations under the group pleading doctrine, which holds that there is a presumption that allegedly false and misleading group published information is "the collective action of officers and directors."

The PSLRA requires, with regard to each false or misleading statement or material omission, that the complaint "state with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). While the Ninth Circuit did rule in a pre-PSRLA case, *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir.1987), that "it is reasonable to presume" that false or misleading information contained in prospectuses, registration statements, annual reports, press releases, or other "group-published information" can be attributed to the "collective actions of the officers" of the corporation, and that a securities fraud plaintiff "fulfills the particularity requirements of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations," *id.* at 1440, the Ninth Circuit has not spoken in any officially published opinion on the question whether the "group pleading" doctrine applies to allegations of scienter in a case governed by the PSLRA.[FN8]

FN8. Other circuits have spoken on this issue, notably the Fifth Circuit in *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 364-65 (5th Cir.2004) (noting conflict among the courts, and holding that "[t]he 'group pleading' doctrine conflicts with the scienter requirement of the PSLRA"); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 602-03 (7th Cir.2006); *Phillips v. Scientific-Atlanta, Inc.,* 374 F.3d 1015, 1017-18 (11th Cir.2004).

*22 The court is aware that some judges in this district have either applied the group-published presumption without substantive analysis in cases controlled by the PSLRA, or have found that the presumption has survived the enactment of the PSLRA. *See,e.g.,In re Omnivision Techs., Inc.,* 2005 WL 1867717 at *5 (N.D.Cal., July 29, 2005); *In re Adaptive Broadband Sec. Litig.,* 2002 WL 989478 at *52-53 (N.D.Cal., April 2, 2002); *In re Secure Computing Corp. Sec. Litig.,* 120 F.Supp.2d 810, 821 (N.D.Cal.2000). Other judges, however, have concluded that plaintiffs must state with particularity facts indicating that an individual defendant was directly involved in the preparation of allegedly misleading statements published by an organization, and have found the group-published presumption inappropriate in light of the pleading standards imposed by the PSLRA. *See,e.g.,In re Netopia, Inc., Sec. Litig.,* 2005 WL 3445631 at *5-6 (N.D.Cal., Dec.15, 2005); *In re ESS Technology, Inc. Sec. Litig.,* 2004 WL 3030058 at *12 (N.D.Cal.2004). Until such time as the Ninth Circuit does speak on this issue, this court interprets the above-cited provision of the PSLRA as requiring that plaintiffs plead facts showing scienter as to each defendant individually. In other words, plaintiffs must allege the required state of mind as to each defendant who made an allegedly misleading statement.

### 3. Loss Causation

Defendants argue that the CAC fails to plead loss causation, asserting that the boilerplate language in the CAC is substantially identical to the language found inadequate by the Supreme Court in *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1630, 161 L.Ed.2d 577 (2005). The CAC alleges that the overvaluation of inventory and later disclosure of the lack of internal controls that led to the overvaluation caused a 22.5% decline in the price

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

of SST's stock price. The court finds that the allegations in the CAC do meet the requirements of *Dura*.

### 4. Control Person Liability

Adequate pleading of a primary violation of § 10(b) is required for a plaintiff to adequately plead control liability under § 20(a).*See*15 U.S.C. § 78t. Because the CAC fails to state a claim for primary liability under § 10(b) or Rule 10b-5, the court finds that the claim for control person liability must be dismissed.

### CONCLUSION

In accordance with the foregoing, the motion to dismiss the consolidated amended complaint is GRANTED, for failure to allege falsity with particularity, and for failure to allege scienter as to any defendant. The totality of plaintiffs' allegations are insufficient under the heightened pleading standard of the PSLRA to raise a strong inference that defendants acted with deliberate or conscious recklessness in issuing statements regarding the value of SST's inventory or in failing to disclose that SST lacked adequate internal controls to ensure that inventory was properly valued. The dismissal is WITH LEAVE TO AMEND, and any amended complaint shall be filed no later than April 14, 2006.

**\*23** Notwithstanding the fact that the dismissal is with leave to amend, the court questions whether plaintiffs will be able to state a claim. The gravamen of plaintiffs' complaint as presented in the CAC is that SST mismanaged the valuation of its inventory, and then failed to disclose that mismanagement. The allegation that defendants should have written down the inventory earlier than they did, or should have disclosed that SST's valuation system was "arbitrary," is essentially a claim that there were material deficiencies in SST's inventory control procedures. Generally speaking, incidents of fiduciary misconduct and internal mismanagement are not by themselves sufficient to trigger liability under the Exchange Act. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 478-80, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

IT IS SO ORDERED.

N.D.Cal.,2006.
In re Silicon Storage Technology, Inc.

Not Reported in F.Supp.2d, 2006 WL 648683 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*S.E.C v. Mark Leslie, et al..*
United States District Court, Northern District, Case Number  5:07-cv-03444-JF

# TAB J

# Statement of Financial Accounting Concepts No. 2

<u>CON2 Status Page</u>

Qualitative Characteristics of
Accounting Information

May 1980



**Financial Accounting Standards Board**
of the Financial Accounting Foundation
401 MERRITT 7, P.O. BOX 5116, NORWALK, CONNECTICUT 06856-5116

Copyright © 1980 by Financial Accounting Standards Board.  All rights reserved.  No
part of this publication may be reproduced, stored in a retrieval system, or transmitted, in
any form or by any means, electronic, mechanical, photocopying, recording, or
otherwise, without the prior written permission of the Financial Accounting Standards
Board.

# CONTENTS

Paragraph
Numbers

Summary of Principal Conclusions
Glossary of Terms
Introduction..........................................................................................1–26
   The Nature of Accounting Choices............................................6–20
   The Objectives of Financial Reporting......................................21–26
The Central Role of Decision Making..........................................27–31
A Hierarchy of Accounting Qualities ..........................................32–45
   Features and Limitations of the Chart........................................33–35
   Decision Makers and Their Characteristics...............................36–39
   Understandability and Other User-Specific Qualities .............40–41
   Relative Importance and Trade-Offs .........................................42–45
Relevance....................................................................................46–57
   Feedback Value and Predictive Value as Components of Relevance..............51–55
   Timeliness ...........................................................................56–57
Reliability.....................................................................................58–97
   Representational Faithfulness ....................................................63–80
      Degrees of Representational Faithfulness.........................65–71
      Precision and Uncertainty..................................................72–76
      Effects of Bias ....................................................................77–78
      Completeness .....................................................................79–80
   Verifiability............................................................................81–89
   Reliability and Relevance .............................................................90
   Conservatism.......................................................................91–97
Neutrality ...................................................................................98–110
Comparability ...........................................................................111–122
   Consistency .........................................................................120–122
Materiality...................................................................................123–132
Costs and Benefits.....................................................................133–144
Appendix A:  Background Information .......................................145–151
Appendix B:  Principal Respects in Which This Statement Differs
  from the Exposure Draft and Other Responses to Letters of Comment
  on the Exposure Draft..............................................................152–160
Appendix C:  Quantitative Materiality Considerations ...........161–170

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

# CON 2:  Qualitative Characteristics of Accounting Information

## SUMMARY OF PRINCIPAL CONCLUSIONS

The purpose of this Statement is to examine the characteristics that make accounting information useful.  Those who prepare, audit, and use financial reports, as well as the Financial Accounting Standards Board, must often select or evaluate accounting alternatives.  The characteristics or qualities of information discussed in this Statement are the ingredients that make information useful and are the qualities to be sought when accounting choices are made.

All financial reporting is concerned in varying degrees with decision making (though decision makers also use information obtained from other sources).  The need for information on which to base investment, credit, and similar decisions underlies the objectives of financial reporting.  The usefulness of information must be evaluated in relation to the purposes to be served, and the objectives of financial reporting are focused on the use of accounting information in decision making.

The central role assigned to decision making leads straight to the overriding criterion by which all accounting choices must be judged.  The better choice is the one that, subject to considerations of cost, produces from among the available alternatives information that is most useful for decision making.

Even objectives that are oriented more towards stewardship are concerned with decisions. Stewardship deals with the efficiency, effectiveness, and integrity of the steward.  To say that stewardship reporting is an aspect of accounting's decision making role is simply to say that its purpose is to guide actions that may need to be taken in relation to the steward or in relation to the activity that is being monitored.

### A Hierarchy of Accounting Qualities

The characteristics of information that make it a desirable commodity can be viewed as a hierarchy of qualities, with usefulness for decision making of most importance.  Without usefulness, there would be no benefits from information to set against its costs.

### User-Specific Factors

In the last analysis, each decision maker judges what accounting information is useful, and that judgment is influenced by factors such as the decisions to be made, the methods of

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

decision making to be used, the information already possessed or obtainable from other sources, and the decision maker's capacity (alone or with professional help) to process the information. The optimal information for one user will not be optimal for another. Consequently, the Board, which must try to cater to many different users while considering the burdens placed on those who have to provide information, constantly treads a fine line between requiring disclosure of too much or too little information.

The hierarchy separates user-specific qualities, for example, understandability, from qualities inherent in information. Information cannot be useful to decision makers who cannot understand it, even though it may otherwise be relevant to a decision and be reliable. However, understandability of information is related to the characteristics of the decision maker as well as the characteristics of the information itself and, therefore, understandability cannot be evaluated in overall terms but must be judged in relation to a specific class of decision makers.

## Primary Decision-Specific Qualities

*Relevance* and *reliability* are the two primary qualities that make accounting information useful for decision making. Subject to constraints imposed by cost and materiality, increased relevance and increased reliability are the characteristics that make information a more desirable commodity—that is, one useful in making decisions. If either of those qualities is completely missing, the information will not be useful. Though, ideally, the choice of an accounting alternative should produce information that is both more reliable and more relevant, it may be necessary to sacrifice some of one quality for a gain in another.

To be relevant, information must be timely and it must have predictive value *or* feedback value or both. To be reliable, information must have representational faithfulness and it must be verifiable and neutral. Comparability, which includes consistency, is a secondary quality that interacts with relevance and reliability to contribute to the usefulness of information. Two constraints are included in the hierarchy, both primarily quantitative in character. Information can be useful and yet be too costly to justify providing it. To be useful *and* worth providing, the benefits of information should exceed its cost. All of the qualities of information shown are subject to a materiality threshold, and that is also shown as a constraint.

## Relevance

- Relevant accounting information is capable of making a difference in a decision by helping users to form predictions about the outcomes of past, present, and future events or to confirm or correct prior expectations. Information can make a difference to decisions by improving decision makers' capacities to predict or by providing feedback on earlier expectations. Usually, information does both at once, because knowledge about the outcomes of actions already taken will generally improve decision makers' abilities to predict the results of similar future actions. Without a knowledge of the past, the basis for a prediction will usually be lacking. Without an interest in the future, knowledge of the past is sterile.

- Timeliness, that is, having information available to decision makers before it loses its

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

capacity to influence decisions, is an ancillary aspect of relevance. If information is not available when it is needed or becomes available so long after the reported events that it has no value for future action, it lacks relevance and is of little or no use. Timeliness alone cannot make information relevant, but a lack of timeliness can rob information of relevance it might otherwise have had.

## Reliability

- The reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user that it has that representational quality. To be useful, information must be reliable as well as relevant. Degrees of reliability must be recognized. It is hardly ever a question of black or white, but rather of more reliability or less. Reliability rests upon the extent to which the accounting description or measurement is verifiable and representationally faithful. Neutrality of information also interacts with those two components of reliability to affect the usefulness of the information.

- Verifiability is a quality that may be demonstrated by securing a high degree of consensus among independent measurers using the same measurement methods. Representational faithfulness, on the other hand, refers to the correspondence or agreement between the accounting numbers and the resources or events those numbers purport to represent. A high degree of correspondence, however, does not guarantee that an accounting measurement will be relevant to the user's needs if the resources or events represented by the measurement are inappropriate to the purpose at hand.

- Neutrality means that, in formulating or implementing standards, the primary concern should be the relevance and reliability of the information that results, not the effect that the new rule may have on a particular interest. A neutral choice between accounting alternatives is free from bias towards a predetermined result. The objectives of financial reporting serve many different information users who have diverse interests, and no one predetermined result is likely to suit all interests.

## Comparability and Consistency

- Information about a particular enterprise gains greatly in usefulness if it can be compared with similar information about other enterprises and with similar information about the same enterprise for some other period or some other point in time. Comparability between enterprises and consistency in the application of methods over time increases the informational value of comparisons of relative economic opportunities or performance. The significance of information, especially quantitative information, depends to a great extent on the user's ability to relate it to some benchmark.

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

**Materiality**

- Materiality is a pervasive concept that relates to the qualitative characteristics, especially relevance and reliability. Materiality and relevance are both defined in terms of what influences or makes a difference to a decision maker, but the two terms can be distinguished. A decision not to disclose certain information may be made, say, because investors have no need for that kind of information (it is not relevant) or because the amounts involved are too small to make a difference (they are not material). Magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment. The Board's present position is that no general standards of materiality can be formulated to take into account all the considerations that enter into an experienced human judgment. Quantitative materiality criteria may be given by the Board in specific standards in the future, as in the past, as appropriate.

**Costs and Benefits**

- Each user of accounting information will uniquely perceive the relative value to be attached to each quality of that information. Ultimately, a standard-setting body has to do its best to meet the needs of society as a whole when it promulgates a standard that sacrifices one of those qualities for another; and it must also be aware constantly of the calculus of costs and benefits. In order to justify requiring a particular disclosure, the perceived benefits to be derived from that disclosure must exceed the perceived costs associated with it. However, to say anything precise about their incidence is difficult. There are costs of using information as well as of providing it; and the benefits from providing financial information accrue to preparers as well as users of that information.

- Though it is unlikely that significantly improved means of measuring benefits will become available in the foreseeable future, it seems possible that better ways of quantifying the incremental costs of regulations of all kinds may gradually be developed, and the Board will watch any such developments carefully to see whether they can be applied to financial accounting standards. The Board cannot cease to be concerned about the cost-effectiveness of its standards. To do so would be a dereliction of its duty and a disservice to its constituents.

**Statements of Financial Accounting Concepts**

This Statement of Financial Accounting Concepts is one of a series of publications in the Board's conceptual framework for financial accounting and reporting. Statements in the series are intended to set forth objectives and fundamentals that will be the basis for development of financial accounting and reporting standards. The objectives identify the goals and purposes of financial reporting. The fundamentals are the underlying concepts of financial

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

accounting—concepts that guide the selection of transactions, events, and circumstances to be accounted for, their recognition and measurement, and the means of summarizing and communicating them to interested parties. Concepts of that type are fundamental in the sense that other concepts flow from them and repeated reference to them will be necessary in establishing, interpreting, and applying accounting and reporting standards.

The conceptual framework is a coherent system of interrelated objectives and fundamentals that is expected to lead to consistent standards and that prescribes the nature, function, and limits of financial accounting and reporting. It is expected to serve the public interest by providing structure and direction to financial accounting and reporting to facilitate the provision of evenhanded financial and related information that is useful in assisting capital and other markets to function efficiently in allocating scarce resources in the economy.

Establishment of objectives and identification of fundamental concepts will not directly solve financial accounting and reporting problems. Rather, objectives give direction, and concepts are tools for solving problems.

The Board itself is likely to be the most direct beneficiary of the guidance provided by the Statements in this series. They will guide the Board in developing accounting and reporting standards by providing the Board with a common foundation and basic reasoning on which to consider merits of alternatives.

However, knowledge of the objectives and concepts the Board will use in developing standards should also enable those who are affected by or interested in financial accounting standards to understand better the purposes, content, and characteristics of information provided by financial accounting and reporting. That knowledge is expected to enhance the usefulness of, and confidence in, financial accounting and reporting. Careful use of the concepts may also provide guidance in resolving new or emerging problems of financial accounting and reporting in the absence of applicable authoritative pronouncements.

Statements of Financial Accounting Concepts do not establish standards prescribing accounting procedures or disclosure practices for particular items or events, which are issued by the Board as Statements of Financial Accounting Standards. Rather, Statements in this series describe concepts and relations that will underlie future financial accounting standards and practices and in due course serve as a basis for evaluating existing standards and practices.*

The Board recognizes that in certain respects current generally accepted accounting principles may be inconsistent with those that may derive from the objectives and concepts set forth in Statements in this series. However, a Statement of Financial Accounting Concepts does not (a) require a change in existing generally accepted accounting principles, (b) amend, modify, or interpret Statements of Financial Accounting Standards, Interpretations of the FASB, Opinions of the Accounting Principles Board, or Bulletins of the Committee on Accounting Procedure that are in effect, or (c) justify either changing existing generally accepted accounting and reporting practices or interpreting the pronouncements listed in item (b) based on personal interpretations of the objectives and concepts in the Statements of Financial Accounting Concepts.

Since a Statement of Financial Accounting Concepts does not establish generally accepted accounting principles or standards for the disclosure of financial information outside of financial statements in published financial reports, it is not intended to invoke application of Rule 203 or 204 of the Rules of Conduct of the Code of Professional Ethics of the American

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

Institute of Certified Public Accountants (or successor rules or arrangements of similar scope and intent).†

Like other pronouncements of the Board, a Statement of Financial Accounting Concepts may be amended, superseded, or withdrawn by appropriate action under the Board's *Rules of Procedure*.


## FASB PUBLICATIONS ON CONCEPTUAL FRAMEWORK

### Statements of Financial Accounting Concepts

No. 1, *Objectives of Financial Reporting by Business Enterprises* (November 1978)

### Exposure Drafts Being (or Yet to Be) Considered by the Board

*Elements of Financial Statements of Business Enterprises* (December 28, 1979)

*Objectives of Financial Reporting by Nonbusiness Organizations* (March 14, 1980)

### Discussion Memorandums and Invitations to Comment Having Issues Being Considered by the Board

*Reporting Earnings* (July 31, 1979)

*Financial Statements and Other Means of Financial Reporting* (May 12, 1980)

### Other Projects in Process

Accounting Recognition Criteria
Funds Flows and Liquidity


## GLOSSARY OF TERMS

### Bias
Bias in measurement is the tendency of a measure to fall more often on one side than the other of what is represents instead of being equally likely to fall on either side.  Bias in accounting measures means a tendency to be consistently too high or too low.

### Comparability
The quality of information that enables users to identify similarities in and differences between two sets of economic phenomena.

Copyright © 1980, Financial Accounting Standards Board                    Not for redistribution

**Completeness**
> The inclusion in reported information of everything material that is necessary for faithful representation of the relevant phenomena.

**Conservatism**
> A prudent reaction to uncertainty to try to ensure that uncertainty and risks inherent in business situations are adequately considered.

**Consistency**
> Conformity from period to period with unchanging policies and procedures.

**Feedback Value**
> The quality of information that enables users to confirm or correct prior expectations.

**Materiality**
> The magnitude of an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

**Neutrality**
> Absence in reported information of bias intended to attain a predetermined result or to induce a particular mode of behavior.

**Predictive Value**
> The quality of information that helps users to increase the likelihood of correctly forecasting the outcome of past or present events.

**Relevance**
> The capacity of information to make a difference in a decision by helping users to form predictions about the outcomes of past, present, and future events or to confirm or correct prior expectations.

**Reliability**
> The quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent.

**Representational Faithfulness**
> Correspondence or agreement between a measure or description and the phenomenon that it purports to represent (sometimes called validity).

**Timeliness**
> Having information available to a decision maker before it loses its capacity to influence

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

decisions.

**Understandability**

The quality of information that enables users to perceive its significance.

**Verifiability**

The ability through consensus among measurers to ensure that information represents what it purports to represent or that the chosen method of measurement has been used without error or bias.

## INTRODUCTION

1.    The purpose of this Statement is to examine the characteristics of accounting information [1] that make that information useful. This Statement is one of a planned series of publications in the Board's conceptual framework project. It should be seen as a bridge between FASB Concepts Statement No. 1, *Objectives of Financial Reporting by Business Enterprises*, and other Statements to be issued covering the elements of financial statements and their recognition, measurement, and display. The Statement on objectives was concerned with the *purposes* of financial reporting. Later Statements will be concerned with questions about *how* those purposes are to be attained; and the standards that the Board has issued and will issue from time to time are also intended to attain those purposes. The Board believes that, in between the "why" of objectives and the "how" of other Statements and standards, it is helpful to share with its constituents its thinking about the characteristics that the information called for in its standards should have. It is those characteristics that distinguish more useful accounting information from less useful information.

2.    Although those characteristics are expected to be stable, they are not immutable. They are affected by the economic, legal, political, and social environment in which financial reporting takes place and they may also change as new insights and new research results are obtained. Indeed, they ought to change if new knowledge shows present judgments to be outdated. If and when that happens, revised concepts Statements will need to be issued.

3.    Although conventionally referred to as qualitative characteristics, some of the more important of the characteristics of accounting information that make it useful, or whose absence limit its usefulness, turn out on closer inspection to be quantitative in nature (for example, costliness) or to be partly qualitative and partly quantitative (for example, **reliability** and **timeliness**). While it will sometimes be important to keep those distinctions in mind, it will usually be convenient, and not misleading, to refer to all of the characteristics of information discussed in this Statement as "qualities" of information.

4.    Although the discussion of the qualities of information and the related examples in this

Copyright © 1980, Financial Accounting Standards Board                        Not for redistribution

Statement refer primarily to business enterprises, the Board has tentatively concluded that similar qualities also apply to financial information reported by nonbusiness organizations. The Board intends to solicit views regarding its tentative conclusion. [2]

5.      To maximize the usefulness of accounting information, subject to considerations of the cost of providing it, entails choices between alternative accounting methods. Those choices will be made more wisely if the ingredients that contribute to "usefulness" are better understood. The characteristics or qualities of information discussed in this Statement are, indeed, the ingredients that make information useful. They are, therefore, the qualities to be sought when accounting choices are made. They are as near as one can come to a set of criteria for making those choices.

**The Nature of Accounting Choices**

6.      Accounting choices are made at two levels at least. At one level they are made by the Board or other agencies that have the power to require business enterprises to report in some particular way or, if exercised negatively, to prohibit a method that those agencies consider undesirable. An example of such a choice, made many years ago but still accepted as authoritative, is the pronouncement by the Committee on Accounting Procedure of the American Institute of Certified Public Accountants that ". . .the exclusion of all overheads from inventory costs does not constitute an accepted accounting procedure" [3] for general purpose external financial reporting.

7.      Accounting choices are also made at the level of the individual enterprise. As more accounting standards are issued, the scope for individual choice inevitably becomes circumscribed. But there are now and will always be many accounting decisions to be made by reporting enterprises involving a choice between alternatives for which no standard has been promulgated or a choice between ways of implementing a standard.

8.      Those who are unfamiliar with the nature of accounting are often surprised at the large number of choices that accountants are required to make. Yet choices arise at every turn. Decisions must first be made about the nature and definition of assets and liabilities, revenues and expenses, and the criteria by which they are to be recognized. Then a choice must be made of the attribute of assets to be measured—historical cost, current cost, current exit value, net realizable value, or present value of expected cash flows. If costs have to be allocated, either among time periods (for example, to compute depreciation) or among service beneficiaries (for example, industry segments), methods of allocation must be chosen. Further, choices must be made concerning the level of aggregation or disaggregation of the information to be disclosed in financial reports. Should a particular subsidiary company be consolidated or should its financial statements be presented separately? How many reportable segments should a company recognize? Still other choices concern the selection of the terminal date of an enterprise's financial year, the form of descriptive captions to be used in its financial statements, the selection of matters to be commented on in notes or in supplementary information, and the wording to be used.

Copyright © 1980, Financial Accounting Standards Board        Not for redistribution

9. That list of choices, which is by no means comprehensive, illustrates some of the more important choices that arise in financial reporting. References throughout this Statement to alternative accounting policies, methods, or choices refer to the kinds of alternatives illustrated above.

10. If alternative accounting methods could be given points for each ingredient of usefulness in a particular situation, it would be an easy matter to add up each method's points and select the one (subject to its cost) that scored highest—so long, of course, as there were general agreement on the scoring system and how points were to be awarded. There are some who seem to harbor the hope that somewhere waiting to be discovered there is a comprehensive scoring system that can provide the universal criterion for making accounting choices. Unfortunately, neither the Board nor anyone else has such a system at the present time, and there is little probability that one will be forthcoming in the foreseeable future. Consequently, those who must choose among alternatives are forced to fall back on human judgment to evaluate the relative merits of competing methods. If it were not so, there would be no need for a standard-setting authority; for by means of the comprehensive scoring system, agreement on the "best" methods would easily be secured.

11. That does not mean that nothing can be done to aid human judgment. By identifying and defining the qualities that make accounting information useful, this Statement develops a number of generalizations or guidelines for making accounting choices that are intended to be useful to the Board, to its staff, to preparers of financial statements, and to all others interested in financial reporting. For the Board and its staff, the qualities of useful accounting information should provide guidance in developing accounting standards that will be consistent with the objectives of financial reporting. This Statement also provides a terminology that should promote **consistency** in standard setting. For preparers of financial information, the qualities of useful accounting information should provide guidance in choosing between alternative ways of representing economic events, especially in dealing with situations not yet clearly covered by standards. This Statement also should be useful to those who use information provided by financial reporting. For them, its main value will be in increasing their understanding of both the usefulness and the limitations of the financial information that is provided by business enterprises and other organizations, either directly by financial reporting or indirectly through the commentaries of financial analysts and others. That increased understanding should be conducive to better-informed decisions.

12. The need for improved communication, especially between the Board and its constituents, provides much of the rationale for the whole conceptual framework project and particularly for this Statement. Indeed, improved communication may be the principal benefit to be gained from it. It is important that the concepts used by the Board in reaching its conclusions be understood by those who must apply its standards and those who use the results, for without understanding, standards become mere arbitrary edicts. Communication will also be facilitated if there is widespread use of a common terminology and a common set of definitions. The terminology

Copyright © 1980, Financial Accounting Standards Board Not for redistribution

used in this Statement is already widely, though not universally, used and its general adoption could help to eliminate many misunderstandings. The definitions of the principal terms used have been brought together in the glossary.

13.    It should perhaps be emphasized here that this Statement is not a standard. Its purpose is not to make rules but to provide part of the conceptual base on which rule making can stand. Unless that distinction is understood, this Statement may be invested with more authority than a discussion of concepts has a right to carry.

14.    Whether at the level of the Board or the individual preparer, the primary criterion of choice between two alternative accounting methods involves asking which method produces the better—that is, the more useful—information. If that question can be answered with reasonable assurance, it is then necessary to ask whether the value of the better information sufficiently exceeds that of the inferior information to justify its extra cost, if any. If a satisfactory answer can again be given, the choice between the alternative methods is clear.

15.    The qualities that distinguish "better" (more useful) information from "inferior" (less useful) information are primarily the qualities of **relevance** and reliability, with some other characteristics that those qualities imply. Subject to considerations of cost, the objective of accounting policy decisions is to produce accounting information that is relevant to the purposes to be served and is reliable. The meaning of those terms, the recognition that there are gradations of relevance and reliability, and the problems that arise if trade-offs between them are necessary all are matters discussed in later paragraphs of this Statement.

16.    Accounting choices made by the Board and those made by individual statement preparers have this in common: they both aim to produce information that satisfies those criteria. Yet, though the objectives of the Board and of individual preparers are alike in that respect, the Board does not expect all its policy decisions to accord exactly with the preferences of every one of its constituents. Indeed, they clearly cannot do so, for the preferences of its constituents do not accord with each other. Left to themselves, business enterprises, even in the same industry, would probably choose to adopt different reporting methods for similar circumstances. But in return for the sacrifice of some of that freedom, there is a gain from the greater **comparability** and consistency that adherence to externally imposed standards brings with it. There also is a gain in credibility. The public is naturally skeptical about the reliability of financial reporting if two enterprises account differently for the same economic phenomena.

17.    Throughout this Statement, readers should keep in mind the objectives of the Board in issuing accounting standards of widespread applicability and those of individual preparers who are concerned with the informational needs of a particular enterprise. Though the criteria by which information should be judged are the same whether the judgment is made by the Board or by a preparer, they cannot be expected always to produce agreement on a preferred choice of accounting method. The best accounting policies will provide information that best achieves the objectives of financial reporting. But whatever information is provided, it cannot be expected to

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

be equally useful to all preparers and users, for the simple reason that individual needs and objectives vary. The Board strives to serve the needs of all, knowing that in doing so some individual preferences are sacrificed. Like motorists who observe traffic laws in the interest of their own and general traffic safety, so long as others do the same, in general, those who have to subordinate their individual preferences to observe common accounting standards will, in the long run, gain more than they lose.

18.    The analogy between accounting standards and traffic laws merits closer examination. Traffic laws impose certain minima or maxima in regulating behavior but still permit considerable flexibility in driving habits. A speed limit leaves slow drivers to choose their speed below the maximum and does not prohibit passing by other drivers. Even a requirement to drive on the right allows a driver to choose and to change lanes on all but very narrow roads. The point is that in most respects the traffic laws allow for considerable variations within a framework of rules. In setting accounting standards, the Board also strives to leave as much room as possible for individual choices and preferences while securing the degree of conformity necessary to attain its objectives.

19.    This Statement must be seen as part of the larger conceptual framework, an important part of the foundations of which were laid with the publication of Concepts Statement 1. This Statement, with the proposed Statement on the elements of financial statements of business enterprises, is part of the second stage of the structure. With successive stages, the level of abstraction will give way to increasing specificity. The qualitative characteristics discussed in this document are formulated in rather general terms. As they are brought to bear on particular situations in subsequent pronouncements, however, those generalizations will give way to specific applications.

20.    While this Statement concentrates on guidelines for making accounting choices, either by the Board or by those who provide financial information, its function is not to make those choices. Insofar as those choices lie within the Board's responsibility, some of them (for example, those relating to the attributes of assets and liabilities that should be measured and presented in financial statements) will be made in other parts of the conceptual framework project. Other choices will be made in the standards to be issued by the Board from time to time. The qualitative characteristics put forward in this Statement are intended to facilitate those choices and to aid in making them consistent with one another.

### The Objectives of Financial Reporting

21.    The objectives of financial reporting underlie judgments about the qualities of financial information, for only when those objectives have been established can a start be made on defining the characteristics of the information needed to attain them. In Concepts Statement 1, the Board set out the objectives of financial reporting for business enterprises that will guide it. The information covered by that Statement was not limited to the contents of financial statements. "Financial reporting," the Statement said, "includes not only financial statements but

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

also other means of communicating information that relates, directly or indirectly, to the information provided by the accounting system—that is, information about an enterprise's resources, obligations, earnings, etc. [paragraph 7]."

22.    The objectives of financial reporting are summarized in the following excerpts from the Statement:

> Financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions. The information should be comprehensible to those who have a reasonable understanding of business and economic activities and are willing to study the information with reasonable diligence. [paragraph 34]
>
> Financial reporting should provide information to help present and potential investors and creditors and other users in assessing the amounts, timing, and uncertainty of prospective cash receipts from dividends or interest and the proceeds from the sale, redemption, or maturity of securities or loans.   The prospects for those cash receipts are affected by an enterprise's ability to generate enough cash to meet its obligations when due and its other cash operating needs, to reinvest in operations, and to pay cash dividends and may also be affected by perceptions of investors and creditors generally about that ability, which affect market prices of the enterprise's securities.   Thus, financial reporting should provide information to help investors, creditors, and others assess the amounts, timing, and uncertainty of prospective net cash inflows to the related enterprise. [paragraph 37]
>
> Financial reporting should provide information about the economic resources of an enterprise, the claims to those resources (obligations of the enterprise to transfer resources to other entities and owners' equity), and the effects of transactions, events, and circumstances that change resources and claims to those resources. [paragraph 40]
>
> Financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. [paragraph 42]
>
> The primary focus of financial reporting is information about an enterprise's performance provided by measures of earnings and its components.  [paragraph 43]
>
> Financial reporting should provide information about how an enterprise obtains and spends cash, about its borrowing and repayment of borrowing, about its capital transactions, including cash dividends and other distributions of enterprise resources to owners, and about other factors that may affect an enterprise's liquidity or solvency. [paragraph 49]

Copyright © 1980, Financial Accounting Standards Board                                    Not for redistribution

Financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. [paragraph 50]

Financial reporting should provide information that is useful to managers and directors in making decisions in the interests of owners. [paragraph 52]

23.    The Statement on objectives makes clear (paragraph 31) that *financial reporting* means *general purpose external financial reporting by business enterprises*. General purpose financial reporting attempts to meet "the informational needs of external users who lack the authority to prescribe the financial information they want from an enterprise and therefore must use the information that management communicates to them" (paragraph 28). General purpose statements are not all purpose statements, and never can be.

24.    An analogy with cartography has been used to convey some of the characteristics of financial reporting, and it may be useful here. A map represents the geographical features of the mapped area by using symbols bearing no resemblance to the actual countryside, yet they communicate a great deal of information about it. The captions and numbers in financial statements present a "picture" of a business enterprise and many of its external and internal relationships more rigorously—more informatively, in fact—than a simple description of it. There are, admittedly, important differences between geography and economic activity and, therefore, between maps and financial statements. But the similarities may, nevertheless, be illuminating.

25.    A "general purpose" map that tried to be "all purpose" would be unintelligible, once information about political boundaries, communications, physical features, geological structure, climate, economic activity, ethnic groupings, and all the other things that mapmakers can map were put on it. Even on a so-called general purpose map, therefore, the cartographer has to select the data to be presented. The cartographer, in fact, has to decide to serve some purposes and neglect others. The fact is that all maps are really special purpose maps, but some are more specialized than others. And so are financial statements. Some of the criticisms of financial statements derive from a failure to understand that even a general purpose statement can be relevant to and can, therefore, serve only a limited number of its users' needs.

26.    The objectives focus financial reporting on a particular kind of economic decision—committing (or continuing to commit) cash or other resources to a business enterprise with expectation of future compensation or return, usually in cash but sometimes in other goods or services. Suppliers, lenders, employees, owners, and, to a lesser extent, customers commonly make decisions of that kind, and managers continually make them about an enterprise's resources. Concepts Statement 1 uses investment and credit decisions as prototypes of the kind of decisions on which financial reporting focuses. Nevertheless, as just noted, the Board, in developing the qualities in this Statement, must be concerned with groups of users of financial information who have generally similar needs. Those qualities do not necessarily fit all users' needs equally well.

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

## THE CENTRAL ROLE OF DECISION MAKING

27.    All financial reporting is concerned in varying degrees with decision making (though decision makers also use information obtained from other sources). The need for information on which to base investment, credit, and similar decisions underlies the objectives of financial reporting cited earlier.

28.    Even objectives that are oriented more towards stewardship are concerned with decisions. The broader stewardship use of accounting, which is concerned with the efficiency, effectiveness, and integrity of the steward, helps stockholders or other financially interested parties (for example, bondholders) to evaluate the management of an enterprise. But that would be a pointless activity if there were no possibility of taking action based on the results. Management is accountable to stockholders through an elected board of directors, but stockholders are often passive and do not insist on major management changes as long as an enterprise is reasonably successful. Their appraisals of management's stewardship help them to assess prospects for their investments, and stockholders who are dissatisfied with management's stewardship of those investments commonly sell their stock in the enterprise. Bondholders are concerned with management's compliance with bond indentures and may take legal action if covenants are broken. Thus, decision making and stewardship are interrelated accounting objectives. Indeed, the stewardship role of accounting may be viewed as subordinate to and a part of the decision making role, which is virtually all encompassing.

29.    That view of the stewardship use of accounting in no way diminishes its importance, nor does it elevate the **predictive value** of accounting information above its confirmatory value. In its stewardship use, accounting compiles records of past transactions and events and uses those records to measure performance. The measurement confirms expectations or shows how far actual achievements diverged from them. The confirmation or divergence becomes the basis for a decision—which will often be a decision to leave things alone. To say that stewardship reporting is an aspect of accounting's decision making role is simply to say that its purpose is to guide actions that *may* need to be taken in relation to the steward or in relation to the activity that is being monitored.

30.    The central role assigned here to decision making leads straight to the overriding criterion by which all accounting choices must be judged. The better choice is the one that, subject to considerations of cost, produces from among the available alternatives information that is most useful for decision making.[4]

31.    So broad a generalization looks self-evident. Indeed, it says no more than the Board said in Concepts Statement 1 (paragraph 9): "Financial reporting is not an end in itself but is intended to provide information that is useful in making business and economic decisions. . . ." The

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

challenge is to define in more detail what makes accounting information useful for decision making. If there is a serious difference of opinion, it is not over the general nature of characteristics such as relevance and reliability, which clearly occupy important places in the hierarchy of qualities that make information useful. There may indeed be some disagreement about their relative importance. But more serious disagreement arises over the choice between two accounting methods (for example, methods of allocating costs or recognizing revenues) if the choice involves a judgment about which method will produce more relevant or more reliable results or a judgment about whether the superior relevance of the results of one method outweighs the superior reliability of the results of the other.

## A HIERARCHY OF ACCOUNTING QUALITIES

32.   The characteristics of information that make it a desirable commodity guide the selection of preferred accounting policies from among available alternatives. They can be viewed as a hierarchy of qualities, with usefulness for decision making of most importance. Without usefulness, there would be no benefits from information to set against its costs. The hierarchy is represented in Figure 1.

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

**FIGURE 1**

# A HIERARCHY OF ACCOUNTING QUALITIES



Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

**Features and Limitations of the Chart**

33.    Before discussing the informational characteristics shown on the chart, some words of explanation are offered about what the chart attempts to convey.  It is a limited device—limited, for example, by being in two dimensions only—for showing certain relationships among the qualities that make accounting information useful.  The primary qualities are that accounting information shall be relevant and reliable.  If either of those qualities is completely missing, the information will not be useful.  Relevance and reliability can be further analyzed into a number of components.  To be relevant, information must be timely and it must have predictive value *or* **feedback value** or both.  To be reliable, information must have **representational faithfulness** and it must be verifiable and neutral (the meaning of these terms, like all the other terms used in the chart, will be discussed later).  Comparability, including consistency, is a secondary quality that interacts with relevance and reliability to contribute to the usefulness of information. Finally, two constraints are shown on the chart, both primarily quantitative rather than qualitative in character.  Information can be useful and yet be too costly to justify providing it. To be useful and worth providing, the benefits of information should exceed its cost.  All of the qualities shown are subject to a **materiality** threshold, and that is also shown as a constraint. The requirement that information be reliable can still be met even though it may contain immaterial errors, for errors that are not material will not perceptibly diminish its usefulness. Similar considerations apply to the other characteristics of information shown on the chart.

34.    An important limitation of the hierarchy is that while it does distinguish between primary and other qualities, it does not assign priorities among qualities.  That limitation is a salutary one, however, for the relative weight to be given to different qualities must vary according to circumstances.  The hierarchy should be seen as no more than an explanatory device, the purpose of which is to clarify certain relationships rather than to assign relative weights.  To be useful, financial information must have each of the qualities shown to a minimum degree.  Beyond that, the rate at which one quality can be sacrificed in return for a gain in another quality without making the information less useful overall will be different in different situations.

35.    Several characteristics that some would wish to see included in the hierarchy are not shown there.  Rather than confuse a discussion of its positive features by explaining at this point why certain items have been excluded, discussion of that matter has been placed in Appendix B with other responses to comment letters that have been received by the Board.

**Decision Makers and Their Characteristics**

36.    In the last analysis, each decision maker judges what accounting information is useful, and that judgment is influenced by factors such as the decisions to be made, the methods of decision making to be used, the information already possessed or obtainable from other sources, and the decision maker's capacity (alone or with professional help) to process the information.  The optimal information for one user will not be optimal for another.  Consequently, the Board,

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

which must try to cater to many different users while considering the burdens placed on those who have to provide information, constantly treads a fine line between requiring disclosure of too much information and requiring too little.

37.    The better informed decision makers are, the less likely it is that any new information can add materially to what they already know. That may make the new information less useful, but it does not make it less relevant to the situation. If an item of information reaches a user and then, a little later, the user receives the same item from another source, it is not less relevant the second time, though it will have less value. For that reason, relevance has been defined in this Statement (paragraphs 46 and 47) in terms of the capacity of information to make a difference (to someone who does not already have it) rather than in terms of the difference it actually does make. The difference it actually does make may be more a function of how much is already known (a condition specific to a particular user) than of the content of the new messages themselves (decision-specific qualities of information).

38.    Thus, management in general and owners of small or closely held enterprises may find at least some information provided by external financial reporting to be less useful to them than it is to stockholders of large or publicly held enterprises. The latter must rely on financial reporting for information that the former has access to as a result of their intimate relationship to their enterprise.

39.    Similarly, information cannot be useful to a person who cannot understand it. However, information may be relevant to a situation even though it cannot be understood by the person who confronts the situation. Its relevance will depend on its capacity to reduce uncertainty about the situation, even though it may call for more understanding to interpret it than its prospective user can command. For example, a hungry vegetarian traveling in a foreign country may experience difficulty in obtaining acceptable food when ordering from a menu printed in an unfamiliar language. The listing of items on the menu is relevant to the decision to be made but the traveler cannot use that information unless it is translated into another (understandable) language. Thus, the information may not be useful to a particular user even though it is relevant to the situation that the user faces. Information that cannot be understood, like information that is not available, may be relevant, but its relevance will be wasted because its capacity to make a difference cannot be utilized.

## Understandability and Other User-Specific Qualities

40.    The Board said in Concepts Statement 1 (paragraph 34) that information provided by financial reporting should be comprehensible to those who have a reasonable understanding of business and economic activities and are willing to study the information with reasonable diligence. The Board elaborated as follows:

> Financial information is a tool and, like most tools, cannot be of much direct
> help to those who are unable or unwilling to use it or who misuse it. Its use can

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

be learned, however, and financial reporting should provide information that can be used by all—nonprofessionals as well as professionals—who are willing to learn to use it properly. Efforts may be needed to increase the understandability of financial information. Cost-benefit considerations may indicate that information understood or used by only a few should not be provided. Conversely, financial reporting should not exclude relevant information merely because it is difficult for some to understand or because some investors or creditors choose not to use it. [paragraph 36]

The benefits of information may be increased by making it more understandable and, hence, useful to a wider circle of users. **Understandability** of information is governed by a combination of user characteristics and characteristics inherent in the information, which is why understandability and other user-specific characteristics occupy a position in the hierarchy of qualities as a link between the characteristics of users (decision makers) and decision-specific qualities of information. Other parts of the conceptual framework project that will deal with displays of financial information will have a contribution to make to this matter.

41. Understandability and similar qualities of information, for example, newness, are closely related to the characteristics of *particular* decision makers as well as *classes* of decision makers. However, the Board is concerned with qualities of information that relate to broad classes of decision makers rather than to particular decision makers. Understandability can be classified as relating to particular decision makers (does the decision maker speak that language?) or relating to classes of decision makers (is the disclosure intelligible to the audience for which it is intended?). Newness of information can be classified similarly to understandability. The Board can influence the newness of information to broad classes of decision makers, for example, by requiring the disclosure of relevant information that was not previously available. However, the newness to a particular decision maker of generally available information depends largely on the timing of the receipt of that information by the decision maker, and that timing is subject to the effects of many variables extraneous to accounting and financial reporting. The Board establishes concepts and standards for general purpose external financial reporting by considering the needs of broad classes of decision makers and cannot base its decisions on the specific circumstances of individual decision makers.

**Relative Importance and Trade-Offs**

42. Although financial information must be both relevant and reliable to be useful, information may possess both characteristics to varying degrees. It may be possible to trade relevance for reliability or vice versa, though not to the point of dispensing with one of them altogether. Information may also have other characteristics shown on the chart to varying degrees, and other trade-offs between characteristics may be necessary or beneficial.

43. The question has been raised whether the relative importance to be attached to relevance and reliability should be different in financial statements and in other means of financial

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

reporting. The issuance in September 1979 of FASB Statement No. 33, *Financial Reporting and Changing Prices,* calling for reporting by certain enterprises of supplementary information on both constant dollar and current cost bases outside of the primary financial statements, has brought into prominence the question of whether information reported outside financial statements should be allowed to be less reliable than what is reported in them.

44.    Although there seems to be considerable support for the view that reliability should be the dominant quality in the information conveyed in financial statements, even at the expense of relevance, while the opposite is true of information conveyed outside the financial statements, that view has in it the seeds of danger.  Like most potentially harmful generalizations, it does contain a germ of truth: almost everyone agrees that criteria for formally recognizing elements in financial statements call for a minimum level or threshold of reliability of measurement that should be higher than is usually considered necessary for disclosing information outside financial statements.  But the remainder of the proposition does not follow.  If it were carried to its logical conclusion and resulted in a downgrading of relevance of information in financial statements, the end would be that most really useful information provided by financial reporting would be conveyed outside the financial statements, while the audited financial statements would increasingly convey highly reliable but largely irrelevant, and thus useless, information. Those matters are germane to another part of the conceptual framework, the project on financial statements and other means of financial reporting.

45.    This Statement discusses trade-offs between characteristics at several points.   Those discussions apply generally to kinds of decisions and to groups of users of accounting information but do not necessarily apply to individual users.  In a particular situation, the importance attached to relevance in relation to the importance of other decision specific qualities of accounting information (for example, reliability) will be different for different information users, and their willingness to trade one quality for another will also differ.  The same thing is true of other considerations such as timeliness.  That fact has an important bearing on the question of preferability, for it probably puts unanimity about preferences among accounting alternatives out of reach.  Even though considerable agreement exists about the qualitative characteristics that "good" accounting information should have, no consensus can be expected about their relative importance in a specific situation because different users have or perceive themselves to have different needs and, therefore, have different preferences.

## RELEVANCE

46.    In discussions of accounting criteria, relevance has usually been defined in the dictionary sense, as pertaining to or having a bearing on the matter in question.  That broad definition is satisfactory as far as it goes—information must, of course, be logically related to a decision in order to be relevant to it.  Mistaken attempts to base decisions on logically unrelated information cannot convert irrelevant information into relevant information [5] any more than ignoring

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

relevant information makes it irrelevant. However, the meaning of relevance for financial reporting needs to be made more explicit. Specifically, it is information's capacity to "make a difference" that identifies it as relevant to a decision.

47.    To be relevant to investors, creditors, and others for investment, credit, and similar decisions, accounting information must be capable of making a difference in a decision by helping users to form predictions about the outcomes of past, present, and future events or to confirm or correct expectations. "Event" is a happening of consequence to an enterprise (Exposure Draft on elements, paragraph 67), and in this context can mean, for example, the receipt of a sales order or a price change in something the enterprise buys or sells. "Outcome" is the effect or result of an event or series of events and in this context can mean, for example, that last year's profit was $X or the expectation that this year's profit will be $Y. The event in question may be a past event the outcome of which is not already known, or it may be a future event the outcome of which can only be predicted.

48.    Information need not itself be a prediction of future events or outcomes to be useful in forming, confirming, or changing expectations about future events or outcomes. Information about the present status of economic resources or obligations or about an enterprise's past performance is commonly a basis for expectations (Concepts Statement 1, paragraph 42).

49.    Information may confirm expectations or it may change them. If it confirms them, it increases the probability that the results will be as previously expected. If it changes them, it changes the perceived probabilities of the previous possible outcomes. Either way, it makes a difference to one who does not already have that information. Decisions already made need not be changed, nor need a course of action already embarked on be altered by the information. A decision to hold rather than to sell an investment is a decision, and information that supports holding can be as relevant as information that leads to a sale. Information is relevant if the degree of uncertainty about the result of a decision that has already been made is confirmed or altered by the new information; it need not alter the decision.

50.    One of the more fundamental questions raised by the search for relevance in accounting concerns the choice of attribute to be measured for financial reporting purposes. Will financial statements be more relevant if they are based on historical costs, current costs, or some other attribute? The question must be left for consideration in other parts of the conceptual framework project; but because of lack of experience with information providing measures of several of those attributes and differences of opinion about their relevance and reliability, it is not surprising that agreement on the question is so difficult to obtain.

**Feedback [6] Value and Predictive Value as Components of Relevance**

51.    Information can make a difference to decisions by improving decision makers' capacities to predict or by confirming or correcting their earlier expectations. Usually, information does both at once, because knowledge about the outcome of actions already taken will generally

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

improve decision makers' abilities to predict the results of similar future actions. Without a knowledge of the past, the basis for a prediction will usually be lacking. Without an interest in the future, knowledge of the past is sterile.

52.    The same point can be made by saying that information is relevant to a situation if it can reduce uncertainty about the situation. Information that was not known previously about a past activity clearly reduces uncertainty about its outcome, and information about past activities is usually an indispensable point of departure for attempts to foresee the consequences of related future activities. Disclosure requirements almost always have the dual purpose of helping to predict and confirming or correcting earlier predictions. The reporting of business results by segments is a good example of accounting reports whose relevance is believed to lie both in the information they convey about the past performance of segments and in their contribution to an investor's ability to predict the trend of earnings of a diversified company. Another example is to be found in interim earnings reports, which provide both feedback on past performance and a basis for prediction for anyone wishing to forecast annual earnings before the year-end.

53.    To say that accounting information has *predictive value* is not to say that it is itself a *prediction*. It may be useful here to draw an analogy between the financial information that analysts and others use in predicting earnings or financial position and the information that meteorologists use in forecasting weather. Meteorologists gather and chart information about actual conditions—temperatures, barometric pressures, wind velocities at various altitudes, and so on—and draw their conclusions from the relationships and patterns that they detect. Success in forecasting the weather has increased as new methods of gathering information have been developed. New kinds of information have become available, and with greater speed than was previously possible. To the simple sources of information available to our ancestors have been added satellite photographs, radar, and radiosondes to give information about the upper atmosphere. New information makes possible more sophisticated predictive models. When a meteorologist selects from among the alternative sources of information and methods of gathering information—about existing conditions, since future conditions cannot be known—those sources and methods that have the greatest predictive value can be expected to be favored. So it is with information about the existing financial state of a company and observed changes in that state from which predictions of success, failure, growth, or stagnation may be inferred. Users can be expected to favor those sources of information and analytical methods that have the greatest predictive value in achieving their specific objectives. Predictive value here means value as an *input* into a predictive process, not value directly as a prediction.

54.    An important similarity and an important difference between predicting the weather and predicting financial performance may be noted. The similarity is that the meteorologist's information and the information derived from financial reporting both have to be fed into a predictive model [7] before they can throw light on the future. Financial predictions, like weather forecasts, are the joint product of a model and the data that go into it. A choice between alternative accounting methods on the basis of their predictive value can be made only if the characteristics of the model to be used are generally known. For example, the econometric

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

models now used for economic forecasting are designed to use as data financial aggregates (among other things) as those aggregates are compiled at present. They might work less well if price-level adjusted data were used. However, it might be possible to revise the model for use with that kind of data so that even better predictions could be made. The point is that the predictive value of information cannot be assessed in the abstract. It has to be transformed into a prediction, and the nature of the transformation as well as the data used determine the outcome.

55.    The important difference between meteorological and financial predictions is that only exceptionally can meteorological predictions have an effect on the weather, but business or economic decision makers' predictions often affect their subjects. For example, the use of financial models to predict business failures looks quite successful judged in the light of hindsight by looking at the financial history of failed firms during their last declining years. But a prediction of failure can be self-fulfilling by restricting a company's access to credit. The prediction could also bring about a recovery by initiating action by managers or bankers to avert failure.   Because information affects human behavior and because different people react differently to it, financial information cannot be evaluated by means of a simple tally of the correct predictions that are based on it.   Nevertheless, predictive value is an important consideration in distinguishing relevant from irrelevant accounting information.

## Timeliness

56.    Timeliness is an ancillary aspect of relevance. If information is not available when it is needed or becomes available only so long after the reported events that it has no value for future action, it lacks relevance and is of little or no use. Timeliness in the present context means having information available to decision makers before it loses its capacity to influence decisions. Timeliness alone cannot make information relevant, but a lack of timeliness can rob information of relevance it might otherwise have had.

57.    Clearly, there are degrees of timeliness. In some situations, the capacity of information to influence decisions may evaporate quickly, as, for example, in a fast-moving situation such as a take-over bid or a strike, so that timeliness may have to be measured in days or perhaps hours. In other contexts, such as routine reports by an enterprise of its annual results, it may take a longer delay to diminish materially the relevance and, therefore, the usefulness of the information. But a gain in relevance that comes with increased timeliness may entail sacrifices of other desirable characteristics of information, and as a result there may be an overall gain or loss in usefulness. It may sometimes be desirable, for example, to sacrifice precision for timeliness, for an approximation produced quickly is often more useful than precise information that takes longer to get out. Of course, if, in the interest of timeliness, the reliability of the information is sacrificed to a material degree, the result may be to rob the information of much of its usefulness. What constitutes a material loss of reliability is discussed in later paragraphs. Yet, while every loss of reliability diminishes the usefulness of information, it will often be possible to approximate an accounting number to make it available more quickly without making it materially unreliable. As a result, its overall usefulness may be enhanced.

Copyright © 1980, Financial Accounting Standards Board          Not for redistribution

# RELIABILITY

58.    That information should be reliable as well as relevant is a notion that is central to accounting. It is, therefore, important to be clear about the nature of the claim that is being made for an accounting number that is described as reliable.

59.    The reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user, which comes through verification, that it has that representational quality. Of course, degrees of reliability must be recognized. It is hardly ever a question of black or white, but rather of more reliability or less.

60.    Two different meanings of reliability can be distinguished and illustrated by considering what might be meant by describing a drug as reliable. It could mean that the drug can be relied on to cure or alleviate the condition for which it was prescribed, or it could mean that a dose of the drug can be relied on to conform to the formula shown on the label. The first meaning implies that the drug is effective at doing what it is expected to do. The second meaning implies nothing about effectiveness but does imply a correspondence between what is represented on the label and what is contained in the bottle.[8]

61.    Effectiveness is indeed a quality that is necessary in information, but in an accounting context it goes by another name—relevance. It is not always easy to maintain a clear distinction between relevance and reliability, as in the drug illustration, yet it is important to try to keep the two concepts apart. Given at least a minimum acceptable level of reliability, the choice of a drug will depend on its effectiveness in treating the condition for which it is prescribed.

62.    Use of the term reliability in this Statement implies nothing about effectiveness. Accounting information is reliable to the extent that users can depend on it to represent the economic conditions or events that it purports to represent. As indicated in paragraph 59, reliability of accounting information stems from two characteristics that it is desirable to keep separate, representational faithfulness and **verifiability**. **Neutrality** of information also interacts with those two characteristics to affect its usefulness.

### Representational Faithfulness

63.    Representational faithfulness is correspondence or agreement between a measure or description and the phenomenon it purports to represent. In accounting, the phenomena to be represented are economic resources and obligations and the transactions and events that change those resources and obligations.[9]

64.    Clearly, much depends on the meaning of the words "purports to represent" in the

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

preceding paragraphs. Sometimes, but rarely, information is unreliable because of simple misrepresentation. Receivables, for example, may misrepresent large sums as collectible that, in fact, are uncollectible. Unreliability of that kind may not be easy to detect, but once detected its nature is not open to argument. More subtle is the information conveyed by an item such as "goodwill." Does a balance sheet that shows goodwill as an asset purport to represent the company as having no goodwill except what is shown? An uninformed reader may well think so, while one who is familiar with present generally accepted accounting principles will know that nonpurchased goodwill is not included. The discussion of reliability in this Statement assumes a reasonably informed user (paragraphs 36-41), for example, one who understands that the information provided by financial reporting often results from approximate, rather than exact, measures involving numerous estimates, classifications, summarizations, judgments, and allocations. The following paragraphs elaborate on and illustrate the concept of representational faithfulness used in this Statement, including the considerations noted in this and the preceding paragraphs.

### Degrees of Representational Faithfulness

65.    The cost of acquiring assets is more often than not capable of being determined unambiguously, but that is by no means always the case. Thus, if a collection of assets is bought for a specified amount, the cost attributable to each individual item may be impossible to ascertain. The acquisition cost may also be difficult to determine if assets are acquired in exchange for assets other than cash, by issuing stock, or in transactions with related parties. If assets are converted into other assets within an enterprise, as when raw materials are converted into finished products, or buildings or equipment are constructed by an enterprise for its own use, the multiplicity of costing conventions that can be used, all within the boundaries of present generally accepted accounting principles, make it impossible to attach a unique cost to the finished asset. Thus, it may not be certain that the cost for the asset in the enterprise's records does faithfully represent its cost.

66.    The problem of determining cost becomes more difficult if assets are fungible. If there have been several purchases at different prices and a number of disposals at different dates, only by the adoption of some convention (such as first-in, first-out) can a cost be attributed to the assets on hand at a particular date. Since what is shown as the assets' cost is only one of several alternatives, it is difficult to substantiate that the chosen amount does represent the economic phenomena in question.

67.    In the absence of market prices for the assets in question, representational faithfulness of amounts purporting to be current costs or fair values of assets also involves the same kinds of difficulties as those already described. For example, unless there are markets for used equipment or partially processed products, the current costs or fair values of those assets can be determined only by means such as deducting estimated depreciation from current costs or fair values of similar new assets, applying price indexes to past acquisition costs, or combining the current costs of the materials, labor, and overhead used. The allocations required by those procedures

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

inevitably cast at least some doubt on the representational faithfulness of the results.

68.    As accounting concepts become more complex, assessing the faithfulness of accounting representations of economic phenomena becomes increasingly difficult, and separating relevance or effectiveness from reliability becomes much more difficult than in the drug example used earlier (paragraphs 60 and 61).    Social scientists have much discussed the concept of representational faithfulness (which they call validity) in connection with educational testing, and though that field may seem remote from accounting, the difficulties that beset it in some respects bear a close resemblance to some of those encountered in accounting.  If two students score 640 and 580, respectively, in a scholastic aptitude test of verbal skills, it is inferred that the first student has more verbal aptitude than the second.  But does the test really measure verbal aptitude?  Is it, in other words, a valid test of verbal aptitude?  That is a very difficult question to answer, for what is verbal aptitude?  Without a definition of the quality to be measured, the validity of the test cannot be assessed.  The problem of defining intelligence and of judging whether intelligence tests validly measure it may be even more difficult because of the many different manifestations of intelligence, the problems of separating innate and acquired abilities, standardizing for differences in social conditions, and many other things.

69.    The nature of the problem just described can be clarified by means of an example.  A spelling test is administered orally to a group of students.  The words are read aloud by the tester, and the students are required to write down the test words.  Some students, though they can usually spell well, fail the test.  The reason, it turns out, is that they have hearing problems.  The test score purports to measure ability to spell, whereas it, in fact, is partly measuring aural acuity.  The test score lacks true representational faithfulness.

70.    Another example, perhaps more closely related to accounting, may serve to further highlight some possible ways in which a representation may not be faithful to the economic phenomena that it purports to represent.  The Consumer Price Index for All Urban Consumers (CPI-U) is an index of price level changes affecting consumers generally and is often used to measure changes in the general purchasing power of the monetary unit itself.  However, if it were used as a measure of the price change of a specific asset, a purchase of a specific consumer, or an acquisition of a specific enterprise, it would not likely provide a faithful representation.  The CPI-U is a "market basket" index, based on the average price a typical consumer would pay for a selection of consumer goods.  Specific price changes experienced by specific consumers will differ from the index to the extent their consumption patterns are different from the selection of goods in the index market basket if the price changes on the goods they purchase are not perfectly correlated to the changes in the index.  General price indexes, such as the CPI-U, cannot acknowledge individual differences, but they may provide a reasonable measure of the loss in the general purchasing power of the monetary unit.  The index must be interpreted in the context of what it was designed to do and in view of the limitations of any averaging process.

71.    The discussion in the preceding paragraph illustrates some of the problems that may arise when representations of economic phenomena are used in different contexts than those for which

Copyright © 1980, Financial Accounting Standards Board                    Not for redistribution

they were designed. Accounting information, for example, purports to reflect the activities of a particular enterprise. However, aggregating the amounts reported by all businesses may not result in a faithful representation of total activity in the business sector, for that is not the purpose for which the accounting information was intended. Information that is representationally faithful in the context for which it was designed, therefore, may not be reliable when used in other contexts.

**Precision and Uncertainty**

72.     Reliability does not imply certainty or precision. Indeed, any pretension to those qualities if they do not exist is a negation of reliability. Sometimes, a range within which an estimate may fall will convey information more reliably than can a single (point) estimate. In other cases, an indication of the probabilities attaching to different values of an attribute may be the best way of giving information reliably about the measure of the attribute and the uncertainty that surrounds it. Reporting accounting numbers as certain and precise if they are not is a negation of reliable reporting.

73.     Different uses of information may require different degrees of reliability and, consequently, what constitutes a material loss or gain in reliability may vary according to use. An error in timekeeping of a few seconds a day will usually be acceptable to the owner of an ordinary wristwatch, whereas the same error would normally cause a chronometer to be judged unreliable. The difference is linked to use—a wristwatch is used for purposes for which accuracy within a few seconds (or perhaps a few minutes) is satisfactory; a chronometer is used for navigation, scientific work, and the like, uses for which a high degree of accuracy is required because an error of a few seconds or a fraction of a second may have large consequences. In everyday language, both the wristwatch and the chronometer are said to be reliable. By the standard of the chronometer, the wristwatch, in fact, is unreliable. Yet the watch's owner does not perceive it to be unreliable, for it is not expected to have the accuracy of a chronometer.

74.     Fortunately, that is well understood by accountants. They recognize that a difference between an estimate and an accurate measurement may be material in one context and not material in another. The relationship between the concepts of reliability and materiality, including what constitutes *material* unreliability, will be discussed later in this Statement.

75.     Reliability as a quality of a predictor has a somewhat different meaning from reliability as a quality of a measure. The reliability of a barometer should be judged in terms of the accuracy with which it measures air pressure and changes in air pressure. That is all that a barometer is constructed to do. Yet questions about its reliability are more likely to be couched in terms of its accuracy as a predictor of the weather, even though weather conditions in any location are the result of many factors besides air pressure in that location. Though much of the relevance of accounting information may derive from its value as input to a prediction model, the probability that it will lead to correct predictions does not determine its reliability as a set of measurements. The correctness of predictions depends as much on the predictive model used as on the data that

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

go into the model. Thus, the result of a predictive process cannot be used to assess the reliability of the inputs into it any more than a run of successes by a barometer in forecasting the weather can tell us much about the accuracy with which it measures the pressure of the atmosphere.

76.    The financial statements of a business enterprise can be thought of as a representation of the resources and obligations of an enterprise and the financial flows into, out of, and within the enterprise—as a model of the enterprise.[10] Like all models, it must abstract from much that goes on in a real enterprise. No model, however sophisticated, can be expected to reflect all the functions and relationships that are found within a complex organization. To do so, the model would have to be virtually a reproduction of the original. In real life, it is necessary to accept a much smaller degree of correspondence between the model and the original than that. One can be satisfied if none of the important functions and relationships are lost. Before an accounting model—either the one now used or an alternative—can be judged to represent an enterprise reliably, it must be determined that none of the important financial functions of the enterprise or its relationships have been lost or distorted. The mere fact that model works—that when it receives inputs it produces outputs—gives no assurance that it faithfully represents the original. Just as a distorting mirror reflects a warped image of the person standing in front of it or just as an inexpensive loudspeaker fails to reproduce faithfully the sounds that went into the microphone or onto the phonograph records, so a bad model gives a distorted representation of the system that it models. The question that accountants must face continually is how much distortion is acceptable. The cost of a perfect sound reproduction system puts it out of reach of most people, and perfect reliability of accounting information is equally unattainable.

**Effects of Bias**

77.    **Bias** in measurement is the tendency of a measure to fall more often on one side than the other of what it represents instead of being equally likely to fall on either side. Bias in accounting measures means a tendency to be consistently too high or too low.

78.    Accounting information may not represent faithfully what it purports to represent because it has one or both of two kinds of bias. The measurement method may be biased, so that the resulting measurement fails to represent what it purports to represent. Alternatively, or additionally, the measurer, through lack of skill or lack of integrity, or both, may misapply the measurement method chosen. In other words, there may be bias, not necessarily intended, on the part of the measurer. Those two kinds of bias are further discussed in the following paragraphs and in the next section on "verifiability." Intentional bias introduced to attain a predetermined result or induce a particular mode of behavior is discussed under "neutrality" (paragraphs 98-110).

**Completeness**

79.    Freedom from bias, both in the measurer and the measurement method, implies that nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions. Reliability implies **completeness** of

Copyright © 1980, Financial Accounting Standards Board                                    Not for redistribution

information, at least within the bounds of what is material and feasible, considering the cost. A map that is 99 percent reliable but fails to show a bridge across a river where one exists can do much harm. Completeness, however, must always be relative, for neither maps nor financial reports can show everything.

80.    Completeness of information also affects its relevance. Relevance of information is adversely affected if a relevant piece of information is omitted, even if the omission does not falsify what is shown. For example, in a diversified enterprise a failure to disclose that one segment was consistently unprofitable would not, before the issuance of FASB Statement No. 14, *Accounting for Segments of a Business Enterprise*, have caused the financial reporting to be judged unreliable, but that financial reporting would have been (as it would now be) deficient in relevance. Thus, completeness, within the bounds of feasibility, is necessary to both of the primary qualities that make information useful.

**Verifiability**

81.    The quality of verifiability contributes to the usefulness of accounting information because the purpose of verification is to provide a significant degree of assurance that accounting measures represent what they purport to represent. Verification is more successful in minimizing measurer bias than measurement bias, and thus contributes in varying degrees toward assuring that particular measures represent faithfully the economic things or events that they purport to represent. Verification contributes little or nothing toward insuring that measures used are relevant to the decisions for which the information is intended to be useful.

82.    Measurer bias is a less complex concept than measurement bias. In its simplest form, it arises from intentional misrepresentation. But even honest measurers may get different results from applying the same measurement method, especially if it involves a prediction of the outcome of a future event, such as the realization of an asset. Measurer bias can be detected and eliminated by having the measurement repeated with the same result. It is, therefore, a desirable quality of an accounting measure that it should be capable of replication. The Accounting Principles Board (APB) called this characteristic verifiability, and defined it in APB Statement No. 4, *Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises:* "Verifiable financial accounting information provides results that would be substantially duplicated by independent measurers using the same measurement methods" (paragraph 90).

83.    The last five words of the APB's definition are significant for they imply that alternative methods may be available. Verification does not guarantee the appropriateness of the method used, much less the correctness of the resulting measure. It does carry some assurance that the measurement rule used, whatever it was, was applied carefully and without personal bias on the part of the measurer.

84.    Verification implies consensus. Verifiability can be measured by looking at the dispersion

Copyright © 1980, Financial Accounting Standards Board                                    Not for redistribution

of a number of independent measurements of some particular phenomenon. The more closely the measurements are likely to be clustered together, the greater the verifiability of the number used as a measure of the phenomenon.

85.    Some accounting measurements are more easily verified than others. Alternative measures of cash will be closely clustered together, with a consequently high level of verifiability. There will be less unanimity about receivables (especially their net value), still less about inventories, and least about depreciable assets, for there will be disagreements about depreciation methods to be used, predictions of asset lives, and (if book values are based on historical cost) even which expenditures should be included in the investment base. More than one empirical investigation has concluded that accountants may agree more about estimates of the market values of certain depreciable assets than about their carrying values. Hence, to the extent that verification depends on consensus, it may not always be those measurement methods widely regarded as "objective" that are most verifiable.

86.    The elimination of measurer bias alone from information does not insure that the information will be reliable. Even though several independent measurers may agree on a single measurement method and apply it honestly and skillfully, the result will not be reliable if the method used is such that the measure does not represent what it purports to represent. Representational faithfulness of reported measurements lies in the closeness of their correspondence with the economic transactions, events, or circumstances that they represent.

87.    Two further points about verifiability and representational faithfulness need to be emphasized. First, when accountants speak of verification they may mean either that an accounting measure itself has been verified or only that the procedures used to obtain the measure have been verified. For example, the price paid to acquire a block of marketable securities or a piece of land is normally directly verifiable, while the amount of depreciation for a period is normally only indirectly verifiable by verifying the depreciation method, calculations used, and consistency of application (paragraphs 65-67). Direct verification of accounting measures tends to minimize both personal bias introduced by a measurer (measurer bias) and bias inherent in measurement methods (measurement bias). Verification of only measurement methods tends to minimize measurer bias but usually preserves any bias there may be in the selection of measurement or allocation methods.

88.    Second, measurement or allocation methods are often verifiable even if the measures they produce result in a very low degree of representational faithfulness. For example, before FASB Statement No. 5, *Accounting for Contingencies*, some enterprises that were "self-insured" recorded as an expense a portion of expected future losses from fire, flood, or other casualties. If an enterprise had a large number of "self-insured" assets, expectations of future losses could be actuarially computed, and the methods of allocating expected losses to periods could be readily verified. However, since uninsured losses occurred only when a casualty damaged or destroyed a particular asset or particular assets, the representational faithfulness of the resulting allocated measures was very low. In years in which no casualties were suffered by an enterprise, the

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

allocated expenses or losses represented nonexistent transactions or events; while in years in which assets were actually damaged or destroyed, the allocated expenses or losses may have fallen far short of representing the losses.

89.    In summary, verifiability means no more than that several measurers are likely to obtain the same measure.  It is primarily a means of attempting to cope with measurement problems stemming from the uncertainty that surrounds accounting measures and is more successful in coping with some measurement problems than others.  Verification of accounting information does not guarantee that the information has a high degree of representational faithfulness, and a measure with a high degree of verifiability is not necessarily relevant to the decision for which it is intended to be useful.

## Reliability and Relevance

90.    Reliability and relevance often impinge on each other.  Reliability may suffer when an accounting method is changed to gain relevance, and vice versa.  Sometimes it may not be clear whether there has been a loss or gain either of relevance or of reliability.  The introduction of current cost accounting will illustrate the point.  Proponents of current cost accounting believe that current cost income from continuing operations is a more relevant measure of operating performance than is operating profit computed on the basis of historical costs.  They also believe that if holding gains and losses that may have accrued in past periods are separately displayed, current cost income from continuing operations better portrays operating performance.  The uncertainties surrounding the determination of current costs, however, are considerable, and variations among estimates of their magnitude can be expected.  Because of those variations, verifiability or representational faithfulness, components of reliability, might diminish.  Whether there is a net gain to users of the information obviously depends on the relative weights attached to relevance and reliability (assuming, of course, that the claims made for current cost accounting are accepted).

## Conservatism

91.    Nothing has yet been said about **conservatism**, a convention that many accountants believe to be appropriate in making accounting decisions.  To quote APB Statement 4:

> Frequently, assets and liabilities are measured in a context of significant uncertainties.  Historically, managers, investors, and accountants have generally preferred that possible errors in measurement be in the direction of understatement rather than overstatement of net income and net assets.  This has led to the convention of conservatism. . . [paragraph 171].

92.    There is a place for a convention such as conservatism—meaning prudence—in financial accounting and reporting, because business and economic activities are surrounded by uncertainty, but it needs to be applied with care.  Since a preference "that possible errors in

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

measurement be in the direction of understatement rather than overstatement of net income and net assets" introduces a bias into financial reporting, conservatism tends to conflict with significant qualitative characteristics, such as representational faithfulness, neutrality, and comparability (including consistency). To be clear about what conservatism does not mean may often be as important as to be clear about what it means.

93. Conservatism in financial reporting should no longer connote deliberate, consistent understatement of net assets and profits. The Board emphasizes that point because conservatism has long been identified with the idea that deliberate understatement is a virtue. That notion became deeply ingrained and is still in evidence despite efforts over the past 40 years to change it. The convention of conservatism, which was once commonly expressed in the admonition to "anticipate no profits but anticipate all losses," developed during a time when balance sheets were considered the primary (and often only) financial statement, and details of profits or other operating results were rarely provided outside business enterprises. To the bankers or other lenders who were the principal external users of financial statements, understatement for its own sake became widely considered to be desirable, since the greater the understatement of assets the greater the margin of safety the assets provided as security for loans or other debts.

94. Once the practice of providing information about periodic income as well as balance sheets became common, however, it also became evident that understated assets frequently led to overstated income in later periods. Perceptive accountants saw that consistent understatement was difficult to maintain over a lengthy period, and the Committee on Accounting Procedure began to say so, for example, in ARB No. 3, *Quasi-Reorganization or Corporate Readjustment—Amplification of Institute Rule No. 2 of 1934:* "Understatement as at the effective date of the readjustment of assets which are likely to be realized thereafter, though it may result in conservatism in the balance-sheet, may also result in overstatement of earnings or of earned surplus when the assets are subsequently realized. Therefore, in general, assets should be carried forward as of the date of readjustment at a fair and not unduly conservative value." The Committee also formulated the "cost or market rule" in ARB No. 29, *Inventory Pricing*, in such a way that decreases in replacement costs do not result in writing down inventory unless (a) the expected selling price also decreases or (b) costs to complete and sell inventory increase; unless those conditions are met, recognition of a loss by writing down inventory merely increases income in one or more later periods. (ARB 3 and 29 became, respectively, chapters 7A and 4 of ARB No. 43, *Restatement and Revision of Accounting Research Bulletins*). Among the most recent admonitions on the point is that of the International Accounting Standards Committee (IASC) in International Accounting Standard No. 1, *Disclosure of Accounting Policies*: "Uncertainties inevitably surround many transactions. This should be recognized by exercising prudence in preparing financial statements. Prudence does not, however, justify the creation of secret or hidden reserves."

95. Conservatism is a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. Thus, if two estimates of amounts to be received or paid in the future are about equally likely, conservatism dictates using

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

the less optimistic estimate; however, if two amounts are not equally likely, conservatism does not necessarily dictate using the more pessimistic amount rather than the more likely one. Conservatism no longer requires deferring recognition of income beyond the time that adequate evidence of its existence becomes available or justifies recognizing losses before there is adequate evidence that they have been incurred.

96.    The Board emphasizes that any attempt to understate results consistently is likely to raise questions about the reliability and the integrity of information about those results and will probably be self-defeating in the long run.  That kind of reporting, however well-intentioned, is not consistent with the desirable characteristics described in this Statement.  On the other hand, the Board also emphasizes that imprudent reporting, such as may be reflected, for example, in overly optimistic estimates of realization, is certainly no less inconsistent with those characteristics.  Bias in estimating components of earnings, whether overly conservative or unconservative, usually influences the timing of earnings or losses rather than their aggregate amount.  As a result, unjustified excesses in either direction may mislead one group of investors to the possible benefit or detriment of others.

97.    The best way to avoid the injury to investors that imprudent reporting creates is to try to ensure that what is reported represents what it purports to represent.  It has been pointed out in this Statement that the reliability of financial reporting may be enhanced by disclosing the nature and extent of the uncertainty surrounding events and transactions reported to stockholders and others.  In assessing the prospect that as yet uncompleted transactions will be concluded successfully, a degree of skepticism is often warranted.  The aim must be to put the users of financial information in the best possible position to form their own opinion of the probable outcome of the events reported.  Prudent reporting based on a healthy skepticism builds confidence in the results and, in the long run, best serves all of the divergent interests that are represented by the Board's constituents.

## NEUTRALITY

98.    Neutrality in accounting has a greater significance for those who set accounting standards than for those who have to apply those standards in preparing financial reports, but the concept has substantially the same meaning for the two groups, and both will maintain neutrality in the same way.  Neutrality means that either in formulating or implementing standards, the primary concern should be the relevance and reliability of the information that results, not the effect that the new rule may have on a particular interest.

99.    To say that information should be free from bias towards a predetermined result is not to say that standard setters or providers of information should not have a *purpose* in mind for financial reporting.  Of course, information must be purposeful.  But a predetermined purpose should not imply a predetermined result.  For one thing, the purpose may be to serve many

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

different information users who have diverse interests, and no one predetermined result is likely to suit them all.

100. Neutrality does not mean "without purpose," nor does it mean that accounting should be without influence on human behavior. Accounting information cannot avoid affecting behavior, nor should it. If it were otherwise, the information would be valueless—by definition, irrelevant—and the effort to produce it would be futile. It is, above all, the predetermination of a desired result, and the consequential selection of information to induce that result, that is the negation of neutrality in accounting. To be neutral, accounting information must report economic activity as faithfully as possible, without coloring the image it communicates for the purpose of influencing behavior in *some particular direction*.

101. Behavior will be influenced by financial information just as it is influenced and changed by the results of elections, college examinations, and sweepstakes. Elections, examinations, and sweepstakes are not unfair—nonneutral—merely because some people win and others lose. So it is with neutrality in accounting. The effect of "capitalization" of leases on enterprises in the leasing industry is a case in point. Recording of certain leases as assets and liabilities has been opposed by many of those enterprises on the grounds that, by making "off balance sheet" financing more difficult, it would make leasing less attractive to lessees, and that would have a detrimental effect on the business of lessors. Although it is at least debatable whether that kind of effect actually would result from lease capitalization, standard setters have not been indifferent to those fears. After carefully weighing the matter, various standard setters (including the Board) have generally concluded that those fears could not be allowed to stand in the way of what the Board and others considered to be a gain in the relevance and reliability of financial statements.

102. Some reject the notion of accounting neutrality because they think it is impossible to attain because of the "feedback effect." Information that reports on human activity itself influences that activity, so that an accountant is reporting not on some static phenomenon but on a dynamic situation that changes because of what is reported about it. But that is not an argument against neutrality in measurement. Many measurements relating to human beings—what they see when they step on a scale, what the speedometer registers when they drive a car, their performance in an athletic contest, or their academic performance, for example—have an impact on their behavior, for better or worse. No one argues that those measurements should be biased in order to influence behavior. Indeed, most people are repelled by the notion that some "big brother," whether government or private, would tamper with scales or speedometers surreptitiously to induce people to lose weight or obey speed limits or would slant the scoring of athletic events or examinations to enhance or decrease someone's chances of winning or graduating. There is no more reason to abandon neutrality in accounting measurement.

103. Another argument against the acceptance of neutrality as a necessary characteristic of accounting information is that it would inhibit the Board from working for the achievement of

Copyright © 1980, Financial Accounting Standards Board                    Not for redistribution

national goals. That view raises several issues. First, there would have to be agreement on national goals. For example, should the United States work to make energy cheap and plentiful or should it conserve natural resources for the benefit of posterity? Furthermore, governments come and go, and administrations change their political color and their policies. The Board concludes that it is not feasible to change financial accounting standards that accountants use every time governmental policy changes direction, even if it were desirable to do so. Moreover, only if accounting information is neutral can it safely be used to help guide those policies as well as to measure their results.

104. But more importantly, it is not desirable for the Board to tack with every change in the political wind, for politically motivated standards would quickly lose their credibility, and even standards that were defensible if judged against the criteria discussed in this Statement would come under suspicion because they would be tainted with guilt by association. The chairman of the SEC made the point in his statement on oil and gas accounting on August 29, 1978:

> If it becomes accepted or expected that accounting principles are determined or modified in order to secure purposes other than economic measurement—even such virtuous purposes as energy production—we assume a grave risk that confidence in the credibility of our financial information system will be undermined.[11]

105. For a standard to be neutral, it is not necessary that it treat everyone alike in all respects. A standard could require less disclosure from a small enterprise than it does from a large one without having its neutrality impugned, if the Board were satisfied that a requirement that was cost-effective if imposed on a large enterprise would be more burdensome than it was worth if imposed on a small one. Nevertheless, in general, standards that apply differentially need to be looked at carefully to ensure that the criterion of neutrality is not being transgressed.

106. While rejecting the view that financial accounting standards should be slanted for political reasons or to favor one economic interest or another, the Board recognizes that a standard-setting authority must be alert to the economic impact of the standards that it promulgates. The consequences of those standards will usually not be easy to isolate from the effects of other economic happenings, and they will be even harder to predict with confidence when a new standard is under consideration but before it has gone into effect. Nevertheless, the Board will consider the probable economic impact of its standards as best it can and will monitor that impact as best it can after a standard goes into effect. For one thing, a markedly unexpected effect on business behavior may point to an unforeseen deficiency in a standard in the sense that it does not result in the faithful representation of economic phenomena that was intended. It would then be necessary for the standard to be revised.

107. Neutrality in accounting is an important criterion by which to judge accounting policies, for information that is not neutral loses credibility. If information can be verified and can be relied on faithfully to represent what it purports to represent—*and if there is no bias in the*

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

*selection of what is reported*—it cannot be slanted to favor one set of interests over another. It may in fact favor certain interests, but only because the information points that way, much as a good examination grade favors a good student who has honestly earned it.

108. The italicized words deserve comment. It was noted earlier in this Statement that reliability implies completeness of information, at least within the bounds of what is material and feasible, considering the cost. An omission can rob information of its claim to neutrality if the omission is material and is intended to induce or inhibit some particular mode of behavior.

109. Though reliability and the absence of bias in what is to be reported bring neutrality as a by-product, the converse is not true. Information may be unreliable even though it is provided without any intention on the part of the provider to influence behavior in a particular direction. Good intentions alone do not guarantee representational faithfulness.

110. Can information that is undeniably reliable produce undesirable consequences? The answer must be another question—consequences for whom? The consequences may indeed be bad for some interests. But the dissemination of unreliable and potentially misleading information is, in the long run, bad for all interests. It may be the responsibility of other agencies to intervene to take care of special interests that they think might be injured by an accounting standard. The Board's responsibility is to the integrity of the financial reporting system, which it regards as its paramount concern.

## COMPARABILITY

111. Information about an enterprise gains greatly in usefulness if it can be compared with similar information about other enterprises and with similar information about the same enterprise for some other period or some other point in time. The significance of information, especially quantitative information, depends to a great extent on the user's ability to relate it to some benchmark. The comparative use of information is often intuitive, as when told that an enterprise has sales revenue of $1,000,000 a year, one forms a judgment of its size by ranking it with other enterprises that one knows. Investing and lending decisions essentially involve evaluations of alternative opportunities, and they cannot be made rationally if comparative information is not available.

112. The difficulty in making financial comparisons among enterprises because of the use of different accounting methods has been accepted for many years as the principal reason for the development of accounting standards. Indeed, the only other possible reason for wanting accounting standards would be a belief that there was one right method among the available alternatives, and few people, if any, hold any such belief.

113. The purpose of comparison is to detect and explain similarities and differences. But, in

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

comparing complex entities, such as human beings or business enterprises, it is useless to try to consider all similarities and differences at once, for to assess the significance of any one of them will then be impossible. Valid comparison, therefore, usually requires attention to be focused on one or two characteristics at a time. Other characteristics that are in no way correlated with those under inquiry can be ignored. Characteristics that are correlated with those under inquiry must be standardized to avoid affecting the comparison. For example, to find whether a man is overweight, one compares his weight with that of other men—not women—of the same height. That is, valid comparisons involve standardizing for gender and height because those characteristics are correlated with weight. It is not necessary to standardize for intelligence, for example, by comparing a man's weight with that of other males of similar height and intelligence because weight is not correlated with intelligence. Intelligence as a characteristic can be ignored.

114. Simple comparisons can often be made without the use of measurements expressed in units, but as the number of items to be compared increases, or if comparisons over an interval of time are desired, a unit of measure becomes indispensable. If valid comparisons are to be made over time, the unit of measurement used must be invariant. Units of money used in money measurement are not in one significant sense—their command over goods and services—invariant over time.

115. Defined in the broadest terms, comparability is the quality or state of having certain characteristics in common, and comparison is normally a quantitative assessment of the common characteristic. Clearly, valid comparison is possible only if the measurements used—the quantities or ratios—reliably represent the characteristic that is the subject of comparison. To cite a nonaccounting example, it may be desired to compare the fertility of land in Florida and Oregon. If that were done by comparing crop yields per acre, it should be obvious that crop yield is not a reliable representation of fertility. Many other factors, such as climate and human efficiency, help to determine yields, and to use too broad a gauge to measure the characteristic of fertility invalidates the comparison.

116. While a particular datum, in some appropriate context, can be said to be relevant or reliable, it cannot be said to be comparable. Comparability is not a quality of information in the same sense as relevance and reliability are, but is rather a quality of the relationship between two or more pieces of information. Improving comparability may destroy or weaken relevance or reliability if, to secure comparability between two measures, one of them has to be obtained by a method yielding less relevant or less reliable information. Historically, extreme examples of this have been provided in some European countries in which the use of standardized charts of accounts has been made mandatory in the interest of interfirm comparability but at the expense of relevance and often reliability as well. That kind of uniformity may even adversely affect comparability of information if it conceals real differences between enterprises.

117. Generally, noncomparability is thought to arise because business enterprises do not use similar inputs, do not apply similar procedures, or do not use the same systems of classification

Copyright © 1980, Financial Accounting Standards Board                                Not for redistribution

of costs and revenues or assets and liabilities, and it is usually assumed that removal of those inconsistencies will make the results comparable. Certainly, comparability cannot be achieved without consistency of inputs and classification. For example, comparing liquidity between two enterprises by comparing their current ratios would usually not be valid if one enterprise valued its inventory on a last-in, first-out basis while the other valued inventory on first-in, first-out. The difference in practice would affect the comparison adversely to the first company, but its appearance of inferior liquidity would result from an invalid comparison, for the current value of its inventory may not have been less than that of the other company.

118. That kind of noncomparability imposes costs on users of financial statements and is best avoided, but it is relatively easy to diagnose and, with sufficient disclosure, can be rectified by a user of the information. A more difficult kind of noncomparability to deal with is the kind that results when ill-chosen or incomplete data inputs are used to generate information that fails one test of reliability—it does not truly represent what it purports to represent. If data inputs are ill-chosen or incomplete, the measures that result will not be truly comparable no matter how consistent the procedures are that are applied to them. For example, suppose it is desired to compare the performance of two investment managers. Each starts with the same portfolio, but their portfolios at the end of the year are different as a result of trades during the year. Realized gains of the two managers are equal. The ending portfolio of one shows substantial unrealized gains, the other does not. To compare their performance by comparing only realized gains implies a definition of performance that many people would regard as incomplete and, therefore, as an unreliable representation.

119. To repeat what was said earlier, the purpose of comparison is to detect and explain similarities and differences. Comparability should not be confused with identity, and sometimes more can be learned from differences than from similarities if the differences can be explained. The ability to explain phenomena often depends on the diagnosis of the underlying causes of differences or the discovery that apparent differences are without significance. Much insight into the functioning of the capital market, for example, has been obtained from observing how market forces affect different stocks differently. Something has been learned, too, from observing that the market generally ignores apparent (cosmetic) differences among stocks that were formerly thought to be significant. Greater comparability of accounting information, which most people agree is a worthwhile aim, is not to be attained by making unlike things look alike any more than by making like things look different. The moral is that in seeking comparability accountants must not disguise real differences nor create false differences.

### Consistency

120. Consistency in applying accounting methods over a span of time has always been regarded as an important quality that makes accounting numbers more useful. The standard form of an auditor's report states that the financial statements have been prepared "in conformity with generally accepted accounting principles consistently applied." The Accounting Principles Board stated in APB Opinion No. 20, *Accounting Changes*, that ". . .in the preparation of financial

Copyright © 1980, Financial Accounting Standards Board    Not for redistribution

statements there is a presumption that an accounting principle once adopted should not be changed in accounting for events and transactions of a similar type.  Consistent use of accounting principles from one accounting period to another enhances the utility of financial statements to users by facilitating analysis and understanding of comparative accounting data [paragraph 15]."

121.   The same considerations apply whether comparisons involve time series data, with which discussions of consistency are mostly concerned, or cross-sectional data, which raise more general issues of comparability.  Like comparability, consistency is a quality of the relationship between two accounting numbers rather than a quality of the numbers themselves in the sense that relevance and reliability are.  The consistent use of accounting methods, whether from one period to another within a single firm, or within a single period across firms, is a necessary but not a sufficient condition of comparability.  Consistency without genuine comparability is illustrated by time series data using units of money during periods of inflation.  A 10-year summary of sales revenues covering a period when the purchasing power of the monetary unit has been declining may convey an exaggerated picture of growth unless the user of the information is accustomed to making purchasing power corrections.  As before, it is the representational faithfulness of the measurements used, rather than simply the unchanging nature of the measurement rules or the classification rules, that results in true comparability over time.

122.   Consistent use of accounting principles from one accounting period to another, if pushed too far, can inhibit accounting progress.  No change to a preferred accounting method can be made without sacrificing consistency, yet there is no way that accounting can develop without change.  Fortunately, it is possible to make the transition from a less preferred to a more preferred method of accounting and still retain the capacity to compare the periods before and after the change if the effects of the change of method are disclosed.  If a change will bring only a small improvement, the trade-off between the improvement and the loss of consistency may make it hard to judge where the advantage lies.  As in all trade-offs, it is a question of costs and benefits; and the costs include the psychological cost of adopting the change.  If the cost of the added disclosure that will enable the user of accounting information to compare the prechange and postchange results is less than the expected benefits from making the change, the change should be made.

## MATERIALITY

123.   Those who make accounting decisions and those who make judgments as auditors continually confront the need to make judgments about materiality.  Materiality judgments are primarily quantitative in nature.  They pose the question: Is this item large enough for users of the information to be influenced by it?  However, the answer to that question will usually be affected by the nature of the item; items too small to be thought material if they result from routine transactions may be considered material if they arise in abnormal circumstances.

Copyright © 1980, Financial Accounting Standards Board    Not for redistribution

124.   Throughout this Statement, emphasis has been placed on relevance and reliability as the primary qualitative characteristics that accounting information must have if it is to be useful. Materiality is not a primary characteristic of the same kind. In fact, the pervasive nature of materiality makes it difficult to consider the concept except as it relates to the other qualitative characteristics, especially relevance and reliability.

125.   Relevance and materiality have much in common—both are defined in terms of what influences or makes a difference to an investor or other decision maker. Yet the two concepts can be distinguished. A decision not to disclose certain information may be made, say, because investors have no interest in that kind of information (it is not relevant) or because the amounts involved are too small to make a difference (they are not material). But as was noted above, magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.

126.   Materiality judgments are concerned with screens or thresholds. Is an item, an error, or an omission large enough, considering its nature and the attendant circumstances, to pass over the threshold that separates material from immaterial items? An example of an applicant for employment who is negotiating with an employment agency will illustrate the relationship of the materiality concept to relevance and reliability. The agency has full information about a certain job for which the applicant is suited and will furnish any item of information about it. The applicant will certainly want information about the nature of the duties, the location of the job, the pay, the hours of work, and the fringe benefits. Information about vacations and job security may or may not be important enough to affect a decision concerning accepting the job. Further, the applicant may not be concerned at all with whether the office floor is carpeted or about the quality of the food in the cafeteria. All of those items are, in the broadest sense, relevant to an evaluation of the job. But some of them make no difference in a decision to accept it or not. The values placed on them by the applicant are too small for them to be material. They are not important enough to matter.

127.   The employment agency example can also help to explain what is meant by a materiality threshold for reliability. Salary information accurate only to the nearest thousand dollars might not be acceptable to an applicant for an $8,000 a year job, but will almost certainly be acceptable if the job pays $100,000 a year. An error of a percentage point in the employee's rate of pension contribution would rarely make information about fringe benefits unacceptable. An error of a year in the retirement date of someone who would block the applicant's advancement might be quite material. An error of a year in the applicant's mandatory retirement date will probably be immaterial to a person 20 years old, but quite material to a 63-year-old person.

128.   The more important a judgment item [12] is, the finer the screen should be that will be used to determine whether it is material. For example:

a.   An accounting change in circumstances that puts an enterprise in danger of being in breach

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

of covenant regarding its financial condition may justify a lower materiality threshold than if its position were stronger.

b.  A failure to disclose separately a nonrecurrent item of revenue may be material at a lower threshold than would otherwise be the case if the revenue turns a loss into a profit or reverses the trend of earnings from a downward to an upward trend.

c.  A misclassification of assets that would not be material in amount if it affected two categories of plant or equipment might be material if it changed the classification between a noncurrent and a current asset category.

d.  Amounts too small to warrant disclosure or correction in normal circumstances may be considered material if they arise from abnormal or unusual transactions or events.

129.  Almost always, the relative rather than the absolute size of a judgment item determines whether it should be considered material in a given situation.  Losses from bad debts or pilferage that could be shrugged off as routine by a large business may threaten the continued existence of a small one.  An error in inventory valuation may be material in a small enterprise for which it cut earnings in half but immaterial in an enterprise for which it might make a barely perceptible ripple in the earnings.  Some of the empirical investigations referred to in Appendix C throw light on the considerations that enter into materiality judgments.

130.  Another factor in materiality judgments is the degree of precision that is attainable in estimating the judgment item.  The amount of deviation that is considered immaterial may increase as the attainable degree of precision decreases.  For example, accounts payable usually can be estimated more accurately than can contingent liabilities arising from litigation or threats of it, and a deviation considered to be material in the first case may be quite trivial in the second.

131.  Some hold the view that the Board should promulgate a set of quantitative materiality guides or criteria covering a wide variety of situations that preparers could look to for authoritative support.  That appears to be a minority view, however, on the basis of representations made to the Board in response to the Discussion Memorandum, *Criteria for Determining Materiality.*  The predominant view is that materiality judgments can properly be made only by those who have all the facts.  The Board's present position is that no general standards of materiality could be formulated to take into account all the considerations that enter into an experienced human judgment.  However, that position is not intended to imply either that the Board may not in the future review that conclusion or that quantitative guidance on materiality of specific items may not appropriately be written into the Board's standards from time to time.  That has been done on occasion already (for example, in the Statement on financial reporting by segments of a business enterprise), and the Board recognizes that quantitative materiality guidance is sometimes needed.  Appendix C lists a number of examples of quantitative guidelines that have been applied both in the law and in the practice of accounting.  However, whenever the Board or any other authoritative body imposes materiality rules, it is substituting generalized collective judgments for specific individual judgments, and there is no reason to suppose that the collective judgments are always superior.  In any case, it must be borne in mind that if, to take one example, some minimum size is stipulated for recognition of a

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

material item (for example, a segment having revenue equal to or exceeding 10 percent of combined revenues shall be recognized as a reportable segment), the rule does not prohibit the recognition of a smaller segment. Quantitative materiality guidelines generally specify minima only. They, therefore, leave room for individual judgment in at least one direction.

132.    Individual judgments are required to assess materiality in the absence of authoritative criteria or to decide that minimum quantitative criteria are not appropriate in particular situations. The essence of the materiality concept is clear. The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

## COSTS AND BENEFITS [13]

133.    Accounting information must attain some minimum level of relevance and also some minimum level of reliability if it is to be useful. Beyond those minimum levels, sometimes users may gain by sacrificing relevance for added reliability or by sacrificing reliability for added relevance; and some accounting policy changes will bring gains in both. Each user will uniquely perceive the relative value to be attached to each quality. Ultimately, a standard-setting body has to do its best to meet the needs of society as a whole when it promulgates a standard that sacrifices one of those qualities for the other; and it must also be aware constantly of the calculus of costs and benefits.

134.    Unless the benefits to be derived from a commodity or service exceed the costs associated with it, it will not be sought after. When a decision to acquire a commodity is being considered, the prospective buyer will compare the costs of acquisition and maintenance with the benefits of owning the commodity. Once the purchase has been made, the owner must decide—continually, from day to day—whether the opportunity cost of ownership, the sacrifice of the sale price that cannot be realized so long as ownership continues, is less than the benefits of continued ownership. Thus, both before and after acquisition, costs and benefits must be compared, though the comparison takes a somewhat different form according to whether the acquisition has or has not been consummated.

135.    Financial information is unlike other commodities in certain important respects. While, in general, it will not be desired unless its benefits exceed its costs, what makes it different from other commodities, or at least from those that are traded in the marketplace, is that whereas those other commodities are private goods, to be enjoyed only by the buyer and those with whom the buyer chooses to share them, the benefits of information cannot always be confined to those who pay for it. If the whole government and private system by which the flow of financial information is regulated could now be dismantled, if information could be traded between buyers and sellers like other commodities and could be kept from those who did not pay for it, and if

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

consumers of information were willing to rely on their own inquiries, the balance of costs and benefits could be left to the market. But in the real world the market for information is less complete than most other markets, and a standard-setting authority must concern itself with the perceived costs and benefits of the standards it sets—costs and benefits to both users and preparers of such information, to others, like auditors, who are also concerned with it, and to anyone else in society who may be affected.

136. Most of the costs of providing financial information fall initially on the preparers, while the benefits are reaped by both preparers and users. Ultimately, the costs and benefits are diffused quite widely. The costs are mostly passed on to the users of information and to the consumers of goods and services. The benefits also are presumably passed on to consumers by assuring a steady supply of goods and services and more efficient functioning of the marketplace. But, even if the costs and benefits are not traced beyond the preparers and users of information, to say anything precise about their incidence is difficult. There are costs of using information as well as of preparing it, and much published information would be compiled for the preparer's own use even if providing it to stockholders and others were not required. The preparer enjoys other benefits also, such as improved access to capital markets, favorable impact on the enterprise's public relations, and so on.

137. The costs of providing information are of several kinds, including costs of collecting and processing the information, costs of audit if it is subject to audit, costs of disseminating it to those who must receive it, costs associated with the dangers of litigation, and in some instances costs of disclosure in the form of a loss of competitive advantages vis-a-vis trade competitors, labor unions (with a consequent effect on wage demands), or foreign enterprises. The costs to the users of information, over and above those costs that preparers pass on to them, are mainly the costs of analysis and interpretation and may include costs of rejecting information that is redundant, for the diagnosis of redundancy is not without its cost.

138. Society needs information to help allocate resources efficiently, but the benefit to any individual or company from that source is not measurable. Nor is the spur to efficiency that comes from making managers account to stockholders capable of evaluation, either at the level of the enterprise or the economy. It is impossible to imagine a highly developed economy without most of the financial information that it now generates and, for the most part, consumes; yet it is also impossible to place a value on that information.

139. From the point of view of society, the loss of competitive advantage that is said to result from some disclosure requirements is clearly in a different category from the other costs involved. Although the loss to one business enterprise may be a gain to another, the Board is aware of and concerned about the economic effects of the possible discouragement of initiative, innovation, and willingness to take risks if a reward to risk taking is denied. That is another cost that is impossible to begin to quantify.

140. The burden of the costs and the incidence of benefits fall quite unevenly throughout the

Copyright © 1980, Financial Accounting Standards Board   Not for redistribution

economy, and it has been rightly observed that "... the matter of establishing disclosure requirements becomes not only a matter of judgment but also a complex balancing of many factors so that all costs and benefits receive the consideration they merit. For example, a simple rule that any information useful in making investment decisions should be disclosed fails as completely as a rule that says disclosure should not be required if competitive disadvantage results." [14] The problem is to know how to accomplish that "complex balancing."

141.  The Board has watched with sympathetic interest the efforts of the Cost Accounting Standards Board (CASB) to come to grips with the task of comparing the costs and benefits of its standards.  The Report of the special group of consultants who were asked by the CASB to examine this matter was submitted on November 13, 1978.  The conclusions were quite negative.

> Our conclusion is that no objective cost benefit calculation in aggregate quantitative terms is possible for CASB standards as a whole or for any of them individually.  Reasonable people, with some experience in such matters, acting responsibly in a spirit of compromise, using such reliable information as can be gathered together, will make a "calculation," as they must if anything is to be done.  But the calculation will be in ordinal rather than cardinal terms; it will be rough rather than precise; it will always be subject to revision, rather than fixed in stone. The situation is not different from that concerning the merits of many other laws, rules, regulations, and administrative decisions.  Nor is our conclusion different from the conclusion reached by those concerned with the cost-benefit problem confronting the Paperwork Commission, for example.[15]

142.  As the CASB's consultants point out, the reasons for that negative conclusion can be simply stated.  The costs and benefits of a standard are both direct and indirect, immediate and deferred.  They may be affected by a change in circumstances not foreseen when the standard was promulgated.  There are wide variations in the estimates that different people make about the dollar values involved and the rate of discount to be used in reducing them to a present value. "For these reasons," the consultants conclude, "the merits of any Standard, or of the Standards as a whole, can be decided finally only by judgments that are largely subjective.  They cannot be decided by scientific test."

143.  Despite the difficulties, the Board does not conclude that it should turn its back on the matter, for there are some things that it can do to safeguard the cost-effectiveness of its standards.  Before a decision is made to develop a standard, the Board needs to satisfy itself that the matter to be ruled on represents a significant problem and that a standard that is promulgated will not impose costs on the many for the benefit of a few.  If the proposal passes that first test, a second test may subsequently be useful.  There are usually alternative ways of handling an issue. Is one of them less costly and only slightly less effective?  Even if absolute magnitudes cannot be attached to costs and benefits, a comparison between alternatives may yet be possible and useful.

Copyright © 1980, Financial Accounting Standards Board                    Not for redistribution

144. Though it is unlikely that significantly improved means of measuring benefits will become available in the foreseeable future, it seems possible that better ways of quantifying the incremental costs of regulations of all kinds may gradually be developed, and the Board will watch any such developments carefully to see whether they can be applied to financial accounting standards. Even if that hope proves to be a vain one, however, the Board cannot cease to be concerned about the cost-effectiveness of its standards. To do so would be a dereliction of its duty and a disservice to its constituents.

*This Statement was adopted by the unanimous vote of the seven members of the Financial Accounting Standards Board:*

> Donald J. Kirk, *Chairman*
> Frank E. Block
> John W. March
> Robert A. Morgan
> David Mosso
> Robert T. Sprouse
> Ralph E. Walters

# Appendix A:  BACKGROUND INFORMATION

145. The need for a conceptual framework for financial accounting and reporting, beginning with consideration of the objectives of financial reporting, is generally recognized. The Accounting Principles Board issued APB Statement No. 4 on basic concepts and accounting principles in 1970. When the Financial Accounting Standards Board came into existence, the Study Group on the Objectives of Financial Statements was at work, and its Report, *Objectives of Financial Statements*, was published in October 1973 by the American Institute of Certified Public Accountants. A chapter of that report briefly described "certain characteristics. . . [information should possess] to satisfy users' needs"—relevance and materiality, form and substance, reliability, freedom from bias, comparability, consistency, and understandability—which the Study Group called "qualitative characteristics of reporting."

146. The Financial Accounting Standards Board issued FASB Discussion Memorandum, *Conceptual Framework for Accounting and Reporting: Consideration of the Report of the Study Group on the Objectives of Financial Statements*, dated June 6, 1974, and held a public hearing on September 23 and 24, 1974 on the objectives of financial statements. The Discussion Memorandum and the hearing were based primarily on the Report of the Study Group on the Objectives of Financial Statements. The Discussion Memorandum asked respondents to comment on the acceptability of the seven qualitative characteristics in the Report and to suggest needed modifications. The Board received 95 written communications responding to the Discussion Memorandum, and 20 parties presented their views orally and answered Board

Copyright © 1980, Financial Accounting Standards Board                                    Not for redistribution

members' questions at the hearing.

147.   On December 2, 1976, the Board issued three documents:

*Tentative Conclusions on Objectives of Financial Statements of Business Enterprises,*

FASB Discussion Memorandum, *Conceptual Framework for Financial Accounting and Reporting:  Elements of Financial Statements and Their Measurement,* and

*Scope and Implications of the Conceptual Framework Project.*

One chapter of the Discussion Memorandum was entitled, "Qualities of Useful Financial Information."  Although it raised no specific issues, it asked respondents to explain what they meant by relevance, reliability, comparability, and other "qualitative characteristics" and to illustrate those meanings in responding to the issues about elements of financial statements and their measurement and by completing a set of matrixes designed to show trade-offs between various qualities or characteristics.  The same task force, with one membership change, provided counsel in preparing both Discussion Memorandums.   Eleven persons from academe, the financial community, industry, and public accounting served on the task force while the Discussion Memorandums were written.

148.   The Board held public hearings (a) August 1 and 2, 1977 on the *Tentative Conclusions on Objectives of Financial Statements of Business Enterprises* and Chapters 1-5 of the Discussion Memorandum (December 1976) concerning definitions of the elements of financial statements and (b) January 16-18, 1978 on the remaining chapters of that Discussion Memorandum concerning capital maintenance or cost recovery, qualities of useful financial information ("qualitative characteristics"), and measurement of the elements of financial statements.  The Board received 332 written communications on the Discussion Memorandum, of which 143 commented on the "qualitative characteristics." Twenty-seven parties presented their views orally and answered Board members' questions at the January 1978 hearing.

149.   The Board issued an Exposure Draft of a proposed Statement of Financial Accounting Concepts, *Objectives of Financial Reporting and Elements of Financial Statements of Business Enterprises,* dated December 29, 1977, which included a very brief discussion of some "characteristics or qualities that make financial information useful," noting that those characteristics were to be the subject of another phase of the conceptual framework project.  The Board received 135 letters of comment, of which 36 commented on the paragraphs discussing "qualitative characteristics." That discussion was not included in Concepts Statement 1.

150.  The Board also issued FASB Discussion Memorandum, *Criteria for Determining Materiality,* on March 21, 1975 and held public hearings on it May 20 and 21, 1976.  The Board received 96 written communications on the Discussion Memorandum, and 16 parties presented their views orally and answered Board members' questions at the hearing.  The Board explored incorporating the conceptual aspects of the materiality project into the qualitative characteristics

Copyright © 1980, Financial Accounting Standards Board    Not for redistribution

project during 1977 and 1978 and formally did so in October 1978.

151.  Professor David Solomons, the Arthur Young Professor of Accounting at the Wharton School of the University of Pennsylvania, served as consultant to the Board and staff on the qualitative characteristics project.

## Appendix B:  PRINCIPAL RESPECTS IN WHICH THIS STATEMENT DIFFERS FROM THE EXPOSURE DRAFT AND OTHER RESPONSES TO LETTERS OF COMMENT ON THE EXPOSURE DRAFT

152.  Of the changes made to the Exposure Draft that was issued on August 9, 1979, many were in response to suggestions that were made in the 89 comment letters received during the exposure period.  One suggestion was that the definitions that were scattered throughout the Exposure Draft should be brought together in a glossary.  That has now been done.

153.  The chart [This chart has been deleted in the electronic version of *Original Pronouncements*.  If there is a need to reference chart figure, please refer to the printed version of *Original Pronouncements*.] now distinguishes between primary qualities, ingredients of primary qualities, and secondary qualities that make information useful.  The chart also now explicitly introduces decision makers and their characteristics as factors that help to determine what information will be useful in particular situations.  Those characteristics include how much knowledge decision makers already have and how well they understand the significance of new information that comes to them.  That makes it possible to view relevance as a quality that information has in relation to a situation or a decision rather than as a quality that depends on the personal characteristics of the decision maker.  Thus, if information that is relevant to a decision were conveyed in a language that some decision makers did not understand, it would not be useful to them because of their lack of understanding.  However, understandability of information is a prerequisite to the information being useful to particular decision makers.

154.  The discussion of relevance has been further clarified by recognizing more explicitly the value of information about past activities as distinct from its value for predictive purposes.  Thus, predictive value and feedback value are shown as coequal ingredients of relevance.  To be relevant, information must have one of them or both, and it must be timely.

155.  A clearer distinction is now drawn between the degree of reliability that can be achieved in a particular situation and the perceived need for more reliability or less.  In terms of the chronometer-wristwatch analogy in paragraph 73, the wristwatch is not as reliable a timekeeper as the chronometer.  It does not need to be.  It is the perceived *need* for reliability that is different because of the different uses to which the two instruments are put.  That difference does not affect the *nature* of reliability but only the degree of reliability that may be needed for particular uses.

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

156.    The discussion of materiality has been considerably recast, with much of the detail moved into Appendix C.    Though the definition of materiality is not substantially changed, its quantitative character is now given a more central position, enabling the distinction between materiality and relevance to be stated more clearly.    Though both qualities are present in information only if it "can make a difference" to a decision, relevance stems from the *nature* of the information while materiality depends on the *size* of the judgment item in particular circumstances.

157.    Several of those who commented on the Exposure Draft doubted that the qualitative characteristics discussed in it were "operational" in the sense that they provided clear criteria for the selection of a preferred accounting method if two or more alternatives were available.    Only in a few cases were other methods of selection proposed that were claimed to be more operational, and after careful review by the Board's staff, those claims had to be rejected as being unrealistic.    The Board believes that the approach to preferability choices put forward in this Statement achieves as much operationality as is feasible in the present state of knowledge.    The true test will be in the contributions that the criteria discussed here can make to the formulation of future standards.    Unanimous acclaim for the Board's decisions is not to be expected; but the basis for those decisions should be better understood if they can be seen to be aimed at obtaining an optimal mix (as judged by the Board) of certain clearly defined informational characteristics.

158.    A number of respondents urged the Board to include additional qualitative characteristics in its "hierarchy."    All of the proposed additions had already been considered and excluded because they seemed to add little value to other characteristics that were already included.    The more items are added, the more the impact of each is diluted.    To earn a place, therefore, something really important must be added.    None of the new candidates passed that test.    For example, objectivity was mentioned by several respondents.    Yet, verifiability better expresses the quality that those respondents were concerned with preserving.    "Objective" means having an existence independent of the observer.    That does not fit accounting measurements at all well, especially measurements such as profit, depreciation and other cost allocations, earnings per share, and others of like kind.    Accounting terminology will be improved if verifiability, which reflects what accountants do, replaces objectivity in the accountant's lexicon.

159.    Feasibility was another candidate for inclusion in the hierarchy.    That has been excluded because it adds nothing to the cost-benefit constraint.    In accounting as in other fields, many things are feasible *at a cost*.    But an accounting method that, though feasible, yields information that is worth less than it costs is not a good one to choose.    For that reason, feasibility has not been included in the hierarchy.

160.    Substance over form is an idea that also has its proponents, but it is not included because it would be redundant.    The quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form.    Substance over form is, in any case, a rather vague idea that defies precise definition.

Copyright © 1980, Financial Accounting Standards Board                        Not for redistribution

## Appendix C:  QUANTITATIVE MATERIALITY CONSIDERATIONS

161. Each Statement of Financial Accounting Standards issued by the Board has concluded by stating that:  "The provisions of this Statement need not be applied to immaterial items." Rule 3-02 of the Securities and Exchange Commission's (SEC) Regulation S-X, "Form and Content of Financial Statements," states that if an "amount which would otherwise be required to be shown with respect to any item is not material, it need not be separately set forth."

162.  Those who turn to SEC Regulation S-X for help in understanding the concept of materiality learn that a material matter is one "about which an average prudent investor ought reasonably to be informed" (Rule 1-02) and that material information is "such . . . information as is necessary to make the required statements, in the light of the circumstances under which they are made not misleading" (Rule 3-06).  But those statements are not really definitions of materiality in that they provide only general guidance in distinguishing material from immaterial information.

163.  The courts have stepped in to fill the gap.  It is the impact of information on an investor's judgment that is at the heart of the distinction.  To quote the Tenth Circuit Court of Appeals, information is material if "... the trading judgment of reasonable investors would not have been left untouched upon receipt of such information."[16] That is very close to the definition of materiality adopted in the BarChris decision, in which the judge said that a material fact was one "which if it had been correctly stated or disclosed would have deterred or tended to deter the average prudent investor from purchasing the securities in question." [17] Both statements refer to one particular kind of user of information—a prudent investor—but, of course, the essential idea that they convey is applicable to other users also.

164. Statements by the Supreme Court have given added authority to that view of materiality. In the important case of *TSC Industries Inc.* v. *Northway Inc.*,[18] a case which concerned the omission of certain facts from a proxy statement, the Court held that:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.  This standard is fully consistent with the . . . general description of materiality as a requirement that "the defect have a significant propensity to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.  What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.  Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

165.   Until such time as the Supreme Court returns to this question, the Northway case provides the most authoritative judicial definition of what constitutes a material omitted fact. Examples, taken from earlier cases, of facts that have been held to be "material" are:[19]

1. Failure to disclose a greatly enhanced inventory value (carried on the corporation's financial statements at historical cost) and an intention to realize on it by liquidation. *Speed* v. *Transamerica Corp.*, 99 F. Supp. 808 (D. Del. 1951), *modified and aff'd.,* 235 F.2d 369 (3d Cir. 1956).

2. Failure to disclose pending negotiations to sell all of the assets of the corporation at a price per share substantially larger than that being paid to a selling shareholder. *Kardon* v. *National Gypsum Co.*, 69 F. Supp. 512 (E.D. Pa. 1946), *on the merits*, 73 F. Supp. 798 (E.D. Pa. 1947).

3. Failure to disclose the imminence of a highly profitable transaction by the corporation. *Northern Trust Co.* v. *Essaness Theatres Corp.*, 103 F. Supp. 954 (N.D. Ill. 1952).

4. Failure to disclose a readjustment of reported earnings from $.85 per share for the first five months of the fiscal year to $.12 per share for the first six months. *Financial Industrial Fund, Inc.* v. *McDonnell Douglas Corp.*, CCH Fed. Sec. L. Rep. ¶93,004 (D. Col. 1971).

5. Failure to disclose that investigations were pending by the SEC. *Hill York Corp.* v. *American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971).

6. Failure to disclose firm offers, in contrast to appraisals, greatly higher than the book value for the physical facilities of the acquired company which the acquiring company intended to liquidate as soon as possible. *Gerstle* v. *Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1295 (2d Cir. 1973).

7. Failure to disclose active negotiations by tender offeror to sell significant assets substantially below book value. *Chris Craft Industries, Inc.* v. *Piper Aircraft Corp.*, 480 F.2d 341, 367 (2d Cir. 1973).

166. The Discussion Memorandum on materiality cited some of the quantitative guides to materiality in authoritative statements issued by the SEC and other regulatory agencies and standard-setting bodies. It may be helpful to be reminded how certain specific situations have been dealt with in practice. Some of these examples of materiality are brought together again in Table 1.

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

Table 1

## EXAMPLES OF QUANTITATIVE MATERIALITY GUIDELINES

| Subject | Authority | Materiality Guidelines |
|---|---|---|
| Dilution of earnings per share (EPS) | APB Opinion No. 15 | Reduction of EPS of less than 3% in the aggregate not material. |
| Separate disclosure of balance sheet items | SEC Accounting Series Release No. 41 | If 10% or more of their immediatecategory or more than 5% of total assets. |
| Receivables from officers and stockholders | SEC Regulation S-X, Rule 5-04 | Disclose details of receivables from any officer or principal stockholder if it equals or exceeds $20,000 or 1% of total assets. |
| Segmental reporting: recognition of reportable segment | Statement of Financial Accounting Standards No. 14 | Revenue equals or exceeds 10% of combined revenues, etc. |
| Gross rental expense under leases | SEC Accounting Series Release No. 147 | Disclose total rental expense, etc., if gross rents exceed 1% of consolidated revenue. |
| Information on present value of lease commitments under non-capitalized financing leases | SEC Accounting Series Release No. 147 | Disclose if present value is 5% or more of total of long-term debt, stockholders' equity, and present value of commitments, or if impact of capitalization on income is 3% or more of average net income for most recent 3 years. |
| Proved oil and gas reserves | SEC Accounting Series Release No. 258 | Disclose quantities of proved oil and gas reserves and historical financial data unless, for each of the two most |

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

recent years, revenues and income from oil and gas producing activities and certain oil and gas capital values do not exceed 10% of the related company totals.

167. One approach in seeking guidance about what constitutes a material item or a material error is to examine current practice empirically. One study [20] investigated the factors that entered into judgments about the materiality of an error and found that the primary factor was the ratio of the error to current income before tax. The error took on special significance if it changed the trend in income. Another study [21] examined a sample of audit reports to try to determine the factors that caused auditors to render qualified opinions when there was an accounting change. The effect on net income (as a percentage) was found to be the only significant variable, but there was little uniformity among auditors about when an accounting change was material. A much more extensive study, conducted for the Financial Executives Research Foundation [22] examined several kinds of materiality judgments. Perhaps its principal conclusion was that a "rule of thumb" of 5-10 percent of net income is widely used as a general materiality criterion.

168. A different approach looks to security prices to determine materiality norms. According to that view, "an observed association between extant security prices and reported accounting data (or changes therein) provides prima facie evidence as to the informational content of accounting numbers." [23] That means that the materiality of information released to the market can be tested by observing its impact on security prices. Of course, that can only be done after the event, whereas preparers and auditors have to make materiality judgments before information is released to the market. Presumably they are to act in the light of market behavior observed in similar circumstances.

169. Without doubt, observations of market behavior can improve understanding of what constitutes material information. But the market's anticipation of accounting information months before it is released and the dilution of accounting influences on prices by other factors acting concurrently make price fluctuations, in the present state of knowledge, too blunt an instrument to be depended on to set materiality guidelines.

170. It is already possible to simulate some aspects of the decision making processes of auditors by constructing a model that will bring into play many of the decision variables that enter into materiality judgments.[24] Those variables would normally include the nature and size of the judgment item in question (for example, an accounting change or a contingent liability), the size of the enterprise, its financial condition and recent changes in condition, present and recent profitability, and as many as possible of the other significant factors that affect materiality

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

judgments. Further development of such models is perhaps the most promising line of research that needs to be pursued before accountants can hope to be relieved of the onerous duty of making materiality decisions. But, until further progress has been made, that duty must continue to be discharged by the exercise of judgment taking into account as many relevant considerations as possible.

Copyright © 1980, Financial Accounting Standards Board

## Footnotes

CON2, Footnote *--Pronouncements such as APB Statement No. 4, *Basic Concepts and Accounting Principles Underlying Financial Statements of Business Enterprises*, and the Accounting Terminology Bulletins will continue to serve their intended purpose--they describe objectives and concepts underlying standards and practices existing at the time of their issuance.

Footnote †--Rule 203 prohibits a member of the American Institute of Certified Public Accountants from expressing an opinion that financial statements conform with generally accepted accounting principles if those statements contain a material departure from an accounting principle promulgated by the Financial Accounting Standards Board, unless the member can demonstrate that because of unusual circumstances the financial statements otherwise would have been misleading. Rule 204 requires members of the Institute to justify departures from standards promulgated by the Financial Accounting Standards Board for the disclosure of information outside of financial statements in published financial reports.

CON2, Footnote 1--"Accounting information," "information provided by financial reporting," and variations on those descriptions are used interchangeably in this Statement.

CON2, Footnote 2--The Board's consideration of aspects of the conceptual framework that pertain to nonbusiness organizations began later than its consideration of aspects that pertain to business enterprises. To date, the Board has sponsored and published a research study on the objectives and basic concepts underlying financial reporting by organizations other than business enterprises: FASB Research Report, *Financial Accounting in Nonbusiness Organizations,* by Robert N. Anthony; issued a Discussion Memorandum, *Conceptual Framework for Financial Accounting and Reporting: Objectives of Financial Reporting by Nonbusiness Organizations;* held public hearings on the Discussion Memorandum; and issued an Exposure Draft, *Objectives of Financial Reporting by Nonbusiness Organizations.* At its May 7, 1980 meeting, the Board authorized the staff to proceed with the consideration of concepts and standards issues relating to nonbusiness organizations that are beyond the scope of the existing nonbusiness objectives project.

CON2, Footnote 3--Accounting Research Bulletin No. 43, *Restatement and Revision of Accounting Research Bulletins,* Chapter 4, par. 5.

CON2, Footnote 4--The divergence among individual needs was noted in paragraph 17. It needs to be considered here and throughout this Statement.

CON2, Footnote 5--Information theorists assert that "relevant" as an adjective qualifying "information" is redundant, for irrelevant information is mere data. This Statement does not follow that usage.

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution

CON2, Footnote 6--This inelegant term is used because no other single word has been found to comprehend both confirmation or corroboration and their opposites.

CON2, Footnote 7--A model is no more than a simplified, scaled-down representation of a situation that is to be analyzed. Typically, sophisticated models are expressed in terms of mathematical equations.

CON2, Footnote 8--Perhaps, more accurately, there is also a third meaning--that the drug does not have hidden undesirable side effects. The alleged undesirable economic impact of certain FASB standards is perhaps an accounting analogue to side effects of drugs, which are, in essence, costs to be considered in a cost-benefit analysis.

CON2, Footnote 9--Representational faithfulness is closely related to what behavioral scientists call "validity," as in the statement that intelligence quotients are (or are not) a valid measure of intelligence. Validity is a more convenient term than representational faithfulness, but out of its scientific context it has too broad a connotation for it to be an appropriate substitute.

CON2, Footnote 10--Nothing is implied here about the possible predictive uses of the model. While it is true that models are generally used to make predictions, they need not be so used. A model is no more than a representation of certain aspects of the real world.

CON2, Footnote 11--Harold M. Williams, Chairman, Securities and Exchange Commission, "Accounting Practices for Oil and Gas Producers" (Washington, D.C., 1978), p. 12.

CON2, Footnote 12--A judgment item is whatever has to be determined to be material or immaterial. It may be an asset or liability item, a transaction, an error, or any of a number of things.

CON2, Footnote 13--This section expands on the considerations mentioned in paragraph 23 of Concepts Statement 1.

CON2, Footnote 14--R.K. Mautz and William G. May, *Financial Disclosure in a Competitive Economy* (New York: Financial Executives Research Foundation, 1978), p. 6.

CON2, Footnote 15--Robert N. Anthony et al, "Report to the Cost Accounting Standards Board by a Special Group of Consultants to Consider Issues Relating to Comparing Costs with Benefits" (1978), p. 1.

CON2, Appendix C, Footnote 16--*Mitchell* v. *Texas Gulf Sulphur Co.*, 446 F.2D 90, at 99-100 (10th Circuit, 1971).

CON2, Appendix C, Footnote 17--*Escott et al.* v. *BarChris Construction Corporation et al.*, 283 Fed. Supp. (District Ct. S.D. New York, 1968), p. 681.

Copyright © 1980, Financial Accounting Standards Board     Not for redistribution

CON2, Appendix C, Footnote 18--CCH *Federal Securities Law Reports* ¶95,615 (US Sup Ct. June 14, 1976).

CON2, Appendix C, Footnote 19--The following list is taken from James O. Hewitt, "Developing Concepts of Materiality and Disclosure," *The Business Lawyer*, Vol. 32 (April 1977), pp. 910 and 911. A word of caution may be in order. The extreme brevity of the citations given here inevitably causes many important aspects of these cases to be omitted.

CON2, Appendix C, Footnote 20--Sam M. Woolsey, "Materiality Survey," *The Journal of Accountancy* (September 1973), pp. 91 and 92.

CON2, Appendix C, Footnote 21--Paul Frishkoff, "An Empirical Investigation of the Concept of Materiality in Accounting," *Empirical Research in Accounting: Selected Studies* (1970), pp. 116-129.

CON2, Appendix C, Footnote 22--James W. Pattillo, *The Concept of Materiality in Financial Reporting* (New York: Financial Executives Research Foundation, 1976).

CON2, Appendix C, Footnote 23--Melvin C. O'Connor and Daniel W. Collins, "Toward Establishing User-Oriented Materiality Standards," *The Journal of Accountancy* (December 1974), p. 70.

CON2, Appendix C, Footnote 24--For an example, see "Policy-Capturing on Selected Materiality Judgments," by James R. Boatsman and Jack C. Robertson (*Accounting Review*, April 1974, pp. 342-352).

Copyright © 1980, Financial Accounting Standards Board

Not for redistribution