1    entering into the advertising deal. Compl. ¶ 34. Lonchar accused the auditors of failing to trust him

2    enough to take him at his word. *Id.*

3          Lonchar also did not tell the outside auditors about the contingent nature of the contracts,

4    including the last-minute negotiations that resulted in the $20 million inflation of the License price

5    and $20 million advertising deal, or about the undocumented side agreement between Sallaberry and

6    AOL to pay simultaneously. Compl. ¶ 35. Instead, Lonchar participated in preparing and

7    submitting to Veritas' outside auditors documentation that justified the $50 million License price and

8
9    concealed the true nature of the AOL transaction. Compl. ¶ 36.

10         During the January 2001 audit committee meeting at which the AOL transaction was

11   discussed with the outside auditors, Lonchar again failed to inform the outside auditors of the

12
13   contingent nature of the software sale and advertising purchase and the last-minute negotiations that

14   resulted in the $20 million inflation of the License price and $20 million advertising deal as well as

15   Leslie's role in the negotiations. Compl. ¶ 46.

16       **d.**    **Leslie and Lonchar gave a materially misleading representation letter to the**

17   **auditors**: In January 2001, Lonchar and Leslie gave Veritas' outside auditors a materially

18   misleading representation letter, failing to disclose the contingent relationship of the parties' entry

19
20   into the License at a $50 million price and their entry into the advertising contract. Compl. ¶ 47.

21         Instead, Leslie and Lonchar represented that, with regard to all of its software transactions,

22   they had disclosed all sales terms to the Company's auditors and that the sales agreements

23   represented the entire arrangements and were not supplemented by other written or oral agreements

24   such as the oral agreement concerning the payment terms. Compl. ¶ 47. They also represented that

25   the AOL contracts had been recorded at fair value within reasonable limits. *Id.*

26
27         Also, Lonchar again failed to disclose the parties' oral agreement to modify the payment

28   terms under the contracts to require simultaneous wire transfers. Compl. ¶ 47.

PLAINTIFF SEC'S COMBINED OPPOSITION TO        11
DEFENDANTS' MOTIONS TO DISMISS AND/OR
MOTIONS TO STRIKE
Civil Action No. C 07-3444 -JF

3.    **The auditors issued an unqualified audit report based upon the false representations of Leslie, Lonchar, and Sallaberry**:  The outside auditors, based upon the false representations made by Leslie, Lonchar, and Sallaberry, ultimately issued an unqualified audit report on the 2000 financial statements.  Compl. ¶ 48.

4.    **Leslie and Lonchar approved the public disclosures of the false and misleading financial results**:  In 2001, Leslie and Lonchar approved the public disclosure of the false and misleading financial results, including approving and signing the 2000 10-K, which contained the artificially inflated results, filed with the Commission.  Compl. ¶ 49.  Leslie and Lonchar also approved false and misleading press releases and participated in earnings release teleconferences with analysts in which false and misleading disclosures were made.  *Id.*

5.    **The AOL round-trip transaction materially distorted Veritas' fourth quarter 2000 financial results**:  The inflated price of the License materially distorted Veritas' fourth quarter results of operations.  Compl. ¶ 50.  Fourth quarter revenues were inflated by $19.2 million, representing 5% of total revenues and 6% of license revenues for the quarter, and the net loss for the fourth quarter was improperly reduced by $8.1 million, representing a 6% understatement.  Booking the $20 million "gross up" caused a material effect:  it allowed Veritas to not only meet, but exceed, Wall Street earnings estimates by two cents, in keeping with Veritas' longstanding practice.  *Id.*

6.    **Lonchar, Sallaberry and Leslie participated or consulted in Veritas' effort to quash a news story about the AOL transaction**:  Prior to its August 2002 officers' certification of its financial statements, including its 2001 Form 10-K, Veritas began an internal review of the AOL transaction.  Compl. ¶ 77.  Shortly thereafter, a newspaper reporter called Veritas and asked it to comment on allegations the Company had a software deal with AOL that required Veritas to purchase advertising from AOL.  Compl. ¶ 78.  Lonchar, Sallaberry and Leslie were consulted in connection with the Company's efforts to avoid a story about the AOL transaction.  *Id.*  The

Company thereafter told the reporter that the software deal and advertising purchase were two distinct and different transactions and not part of the same deal. *Id.* Lonchar and Sallaberry knew this response was false and misleading. *Id.*

       7.    **Lonchar gave a false statement during an internal review of the AOL transaction**: During the internal review of the AOL transaction in 2002, Lonchar falsely claimed that Veritas' outside auditors were aware of the last minute-change in the price of the License from $30 million to $50 million. Compl. ¶¶ 77, 79.

       8.    **Veritas announced in 2003 that it would re-state to reverse the improperly recognized revenue from the AOL transaction**: On January 17, 2003, Veritas announced that it would restate its financial statements in order to reverse the $20 million of improperly recognized revenue from the AOL round-trip transaction and correct the related over-stated expenses (the "2003 Restatement"). Compl. ¶ 51.

**B.   The "Smoothing" of Veritas' Financial Results from 2000 through 2002**

      The Complaint alleges that beginning in at least 2000 until his termination in 2002, Lonchar knowingly directed a scheme consisting of three separate non-GAAP accounting practices that he used to manage Veritas' earnings and artificially "smooth" its financial results, thereby producing "museum quality" (and false) financial results. Compl. ¶¶ 1, 3-4, 52. Lonchar and his subordinates, Cully and Newton, who executed the non-GAAP practices at Lonchar's direction, concealed the accounting manipulations and distortions from Veritas' outside auditors. Compl. ¶ 3. As a result, Veritas' reported financial results for 2000 through 2003 were materially false. Compl. ¶ 52.

       1.    **Lonchar improperly recorded and maintained accrued liabilities**: Lonchar directed the recording, maintenance, and tracking of a variety of accrued liability balances (including a variety of compensation, bonus, and incentive accruals, fixed asset reserves and general reserves)

that were not in conformity with GAAP because they were excessive and/or unsubstantiated. Compl. ¶ 53. Lonchar, as Veritas' CFO and a CPA, knew these accruals were not in conformity with GAAP. Compl. ¶¶ 10, 55. As a result of Lonchar's actions, Veritas failed to accurately report its quarterly and annual financial results, causing overstatements of earnings in some quarters and understatements during other quarters, creating a false and misleading impression of the Company's financial performance through 2003. Compl. ¶ 4, 52-53.

This improper accounting practice was carried out as follows:

(1).    After properly-determined accruals had been made, and as part of its quarterly process of closing its books and preparing financial statements, Lonchar requested that Company analysts in finance and the operational units submit additional expenses for possible accrual in that period. Compl. ¶ 54. These proposed, non-GAAP accruals were kept on an "accrual wish list." *Id.*;

(2).    Lonchar and his subordinates then recorded a number of these accruals from the wish list without regard to GAAP. Compl. ¶ 55. They improperly evaluated the recording of these additional non-GAAP expenses from the wish list based primarily on whether: (a) there was room in the budget; (b) they could be taken as expenses without adversely impacting the desired financial results for the quarter, including the impact on earnings; and/or (c) they would benefit results in the subsequent quarter by recording such expenses in the current quarter. *Id.* Lonchar knew these accruals were not in conformity with GAAP because they were excessive and/or unsubstantiated. *Id.*;

(3).    Lonchar decided which accruals, and in what amounts, to add to the accrued liabilities in order to achieve desired financial results. Compl. ¶ 55. Lonchar directed his finance team to prepare "cushion schedules" prepared on a quarterly (and at times monthly) basis that reflected the improperly accrued liabilities. *Id.* The cushion schedules showed Lonchar and his subordinates the

PLAINTIFF SEC'S COMBINED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS AND/OR
MOTIONS TO STRIKE
Civil Action No. C 07-3444 -JF

14

1   value of improper accrued liabilities that were available to be released to offset new or unplanned

2   expenses without adversely impacting Veritas' planned earnings for a quarter. *Id.*; and

3       (4).    Lonchar and his subordinates concealed these improper accruals by spreading them

4   over many accounts and by concealing the cushion schedules from Veritas' internal auditors and

5   outside auditors. Compl. ¶ 57.

6
        In March 2004, Veritas announced a second restatement of its financial statements to disclose
7
    and correct, among other things, the foregoing improper accounting practice for accrued liabilities.
8
9   Compl. ¶ 58. The cumulative balances of over-stated accrued liabilities tracked on Veritas' cushion

10  schedules for each quarter from 2000 through 2002 ranged from approximately $10 million to $21

11  million. Compl. ¶ 56.

12
        **2.    Lonchar improperly cut off recognition of professional service revenue**:  At the
13
14  beginning of each quarter, Lonchar set targets for reported revenue. Compl. ¶ 60. In a number of

15  quarters, when the Company had reached its revenue targets, Lonchar instructed the finance

16  department to stop accruing and recognizing professional service revenue -- fees charged for

17  professional services related to the usage of its software (generally consulting and training) -- on

18  services that Veritas had delivered and therefore earned in the current quarter. Compl. ¶¶ 59, 60.
19
    Lonchar knew that Veritas' failure to recognize revenues when they were earned did not comply with
20
21  GAAP, which requires companies to recognize service fees at the time they are earned and

22  collectible. Compl. ¶ 61.

23      In certain quarter-end revenue meetings where Lonchar directed the improper revenue cut-

24  offs prior to the quarter end, Lonchar's subordinate (Newton) told Lonchar this practice was

25  improper and that he was uncomfortable with it. Compl. ¶ 62. In response, Lonchar claimed that it
26
    would be the last quarter the accruals would not be properly recorded. *Id.* Notwithstanding
27
28  Lonchar's claim and despite his knowledge of the practice's impropriety, Lonchar continued to

participate in this practice. *Id.*

Through this practice, Lonchar improperly managed Veritas' quarterly professional service revenues, pushed additional service revenues into the next quarter, and caused the percentage of reported revenues attributable to professional services to be smaller than it otherwise would be; and conversely, the ratio of reported license revenues was larger than it should have been. Compl. ¶ 63. Analysts tracked the license-to-service revenue mix as percentages of total revenues each quarter. Compl. ¶ 64. License revenue that constituted a larger percentage of total revenue was more desirable because of the higher margins earned on license revenue. *Id.*

By understating service revenue and overstating the ratio, Lonchar created false and misleading quarterly financial results. Compl. ¶ 65. Moreover, the practice resulted in "cookie jar" revenue reserves that were available in future quarters if performance fell short of budget. *Id.*

As part of its 2004 Restatement, Veritas corrected the accounting for the improper quarterly revenue cut-off practice. Compl. ¶ 66.

3.    **Lonchar improperly manipulated Veritas' deferred revenue balance**: Veritas, through Lonchar and his subordinate, also manipulated its financial reporting by improperly inflating its reported deferred revenue on its balance sheet for the second quarter of 2002 by approximately $7 million. Compl. ¶¶ 67, 68.

More specifically, during the end of the second quarter of 2002, Lonchar and his subordinate noticed that Veritas' deferred revenue balance was substantially lower than expected and less than it had been in the prior quarter. Compl. ¶ 68. Lonchar was concerned that a declining deferred revenue balance would be interpreted as an indication that Veritas' business was weakening and the Company was moving the deferred revenue to revenue. *Id.* In particular, Lonchar was concerned that analysts would view this declining deferred revenue balance negatively and interpret it as an indication that the amount of Veritas' new business had declined, possibly signaling a decline in

1  revenues for the next quarter, and so he and his subordinate devised a scheme to improperly inflate
2  the deferred revenue balance. Compl. ¶ 68.

3      This improper accounting practice was carried out as follows: Lonchar's subordinate,
4  following Lonchar's instructions, directed finance personnel to inflate the deferred revenue balance
5  in violation of GAAP; the subordinate told finance personnel not to subtract certain amounts from
6  the deferred revenue balance that were attributable to unpaid contracts – something Veritas normally
7  did in reporting its deferred revenues in its quarterly financial statements. Compl. ¶ 69. To conceal
8
9  this improper inflation of the quarter-end balance, Veritas' finance personnel provided Veritas'
10 outside auditors with a falsified account reconciliation schedule. Compl. ¶ 70. The schedule falsely
11 listed the status of certain licenses as "paid," when such items were known to have been unpaid, so
12 that the deferred revenues associated with those contracts would not be subtracted from the deferred
13
14 revenue balance. *Id.* When the auditors questioned the schedule and the inflated deferred revenue
15 balance, they were told that the errors in the schedule were inadvertent mistakes. *Id.*

16     At the quarterly review close meeting, the auditors asked Lonchar whether the Company
17 wanted to correct its books and financial statements for this purported accidental error. Compl. ¶ 71.
18 Lonchar said that the Company would not undertake to correct the error and instead would leave it
19 on the schedule of unadjusted audit differences. *Id.* Lonchar failed to advise the auditors that the
20
21 error was the result of intentional manipulation of the deferred revenue balance. *Id.*

22     As part of its 2004 Restatement, Veritas corrected its deferred revenue balance, which
23 reduced the reported deferred revenue balance by approximately $7 million for the second quarter of
24 2002. Compl. ¶ 72.

25     **4.    Lonchar signed false and misleading representation letters**: In 2001 and 2002,
26
27 Lonchar signed false and misleading representation letters and provided them to the Company's
28 outside auditors. Compl. ¶ 73. In these letters as well as in discussions with the Company's internal

1    and outside auditors, Lonchar failed to disclose the non-GAAP accounting practices concerning

2    Veritas' excess and unsubstantiated accruals, professional service revenues, and deferred revenues,

3    thus making false and misleading representations and omitting material information. Compl. ¶ 74.

4        For example, in a January 23, 2001 letter to the Company's outside auditors, Lonchar made

5    the following false and misleading representations: (a) the consolidated statements of financial

6    
7    position and results of operations were fairly presented in conformity with GAAP; (b) the un-audited

8    quarterly financial information to be included in the Annual Report to Stockholders was derived

9    from interim financial statements prepared in conformity with GAAP; (c) he provided the auditors

10   with all financial records and related data; (d) there are no material weaknesses in internal controls;

11   (e) the Company has accrued  $13,934,404, and $12,771,464  in  commissions  and  bonuses,

12   
13   respectively, as of December 31, 2000 based upon its best estimates of amounts earned in 2000 but

14   to be paid subsequent to December 31, 2000; (f) there are no material transactions that have not been

15   properly recorded in the accounting records underlying the financial statements; and (g) there has

16   been no fraud involving management or employees who have significant roles in internal control.

17   Compl. ¶ 75.

18       Likewise, in his January 25, 2002 letter to the company's outside auditors, Lonchar falsely

19   represented that:  (a) the consolidated financial statements are fairly presented in conformity with

20   GAAP; (b) he had made available to the outside auditors all financial records and related data; (c)

21   
22   there have been no: (i) instances of fraud involving management or employees who have significant

23   roles in internal control; (ii) allegations, either written or oral, of misstatements or other

24   misapplications of accounting principles in the company's consolidated financial statements that have

25   not been disclosed to the company's outside auditors in writing; (iii) allegations, either written or

26   
27   oral, of deficiencies in internal control that could have a material effect on the company's

28   consolidated financial statements that have not been disclosed to the company's outside auditors in

PLAINTIFF SEC'S COMBINED OPPOSITION TO               18
DEFENDANTS' MOTIONS TO DISMISS AND/OR
MOTIONS TO STRIKE
Civil Action No. C 07-3444 -JF

1  writing; and (iv) false statements affecting the company's consolidated financial statements made to

2  the company's outside auditors, the company's internal auditors, or other auditors who have audited

3  entities under their control upon whose work the company's outside auditors may be relying in

4  connection with its audits; (d) the unaudited interim financial information accompanying the

5  consolidated financial statements for the quarters ended March 31, June 30, September 30, and

6
7  December 31, 2001, was prepared in conformity with GAAP; and (e) the accrual of porting services

8  related to the Sun Microsystems OEM arrangement is a probable and estimable liability in

9  accordance with SFAS 5, Accounting for Contingencies and the assumptions used in developing the

10  accrual are management's best estimates based on the information available. Compl. ¶ 76.

11      **5.      Lonchar falsely certified Veritas' covered reports in August 2002**:  On August 13,

12  2002, Lonchar falsely certified the accuracy of Veritas' 2001 annual financial statements and its

13  interim financial statements for the quarter ended March 31, 2002, when he knew or was reckless in

14
15  not knowing that the Company's financial statements were not prepared in compliance with GAAP.

16  Compl. ¶ 80.  In addition, on August 14, 2002, Lonchar falsely certified the accuracy of Veritas'

17  interim financial statements for the quarter ended June 30, 2002, when he knew or was reckless in

18  not knowing that the Company's financial statements were not prepared in compliance with GAAP.

19  *Id.*
20

21      **III.      Violations Alleged Against Defendants Leslie, Lonchar and Sallaberry**

22      The Commission charged Leslie, Lonchar, and Sallaberry with federal securities violations in

23  the First, Second, Third, Fifth, and Sixth Claims in the Complaint.  Lonchar is also charged in the

24  Fourth Claim.  The Claims are as follows:

25      • The First Claim (Fraud Violations – Offer or Sale of Veritas Stock) alleges that

26
27      Leslie, Lonchar, and Sallaberry violated Section 17(a) of the Securities Act [15

28      U.S.C. § 78q(a)].  Compl. ¶¶ 86-88;

- The Second Claim (Fraud Violations – Purchase or Sale of Veritas Stock) alleges that Leslie, Lonchar, and Sallaberry violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §240.10b-5]. Compl. ¶¶ 89-91;

- The Third Claim (Record-Keeping Violations) alleges that Leslie, Lonchar, and Sallaberry directly or indirectly knowingly falsified or caused to be falsified books, records, and accounts of Veritas subject to Section 13(b)(2)(A) of the Exchange Act, in violation of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]. Compl. ¶¶ 92-94;

- The Fourth Claim (Internal Controls and Aiding and Abetting Violations) alleges that Lonchar knowingly circumvented or knowingly failed to implement a system of internal accounting controls at Veritas, in violation of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], and aided and abetted violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)]. Compl. ¶¶ 95-97;

- The Fifth Claim (Lying to Auditors Violations) alleges that Leslie, Lonchar, and Sallaberry made or caused to be made materially false or misleading statements or omissions to an accountant or auditor, in violation of Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2]. Compl. ¶¶ 98-100; and

- The Sixth Claim (Aiding and Abetting Violations) alleges that Leslie, Lonchar, and Sallaberry aided and abetted Veritas' violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13 and 240.13b2-1]. Compl. ¶¶ 101-102.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    Relief Sought Against Defendants Leslie, Lonchar and Sallaberry

The Commission seeks the following remedies against Leslie, Lonchar, and Sallaberry in the Complaint:  injunctive relief; disgorgement of ill-gotten gains, including pre-judgment and post-judgment interest; civil penalty; and an officer and director bar.  Compl. at 23-24 (Prayer for Relief section).

## ARGUMENT

### THERE IS NO BASIS FOR DISMISSING OR STRIKING ANY PART OF THE COMMISSION'S COMPLAINT

The Commission's well-pled Complaint has more than sufficiently alleged the federal securities claims against each of the defendants to withstand the defendants' Rule 12(b)(6)/Rule 9(b) motion to dismiss.  The defendants' violations, whether required or not by law, are alleged with particularity.  The Commission's Complaint identifies the circumstances of the fraud so that the defendants can prepare an adequate answer.

The Commission's remedies which the defendants challenge are also available as a matter of law and are not time-barred, thereby not subject to dismissal pursuant to a Rule 12(b)(6) motion to dismiss or Rule 12(f) motion to strike.  While the defendants raise factual issues on whether certain of the remedies are time-barred, those factual issues are not suitable for resolution at this pleading stage via a Rule 12(f) or Rule 12(b)(6) motion.

### I.    Standard of Review for a Rule 12(b)(6) Motion to Dismiss

As the Ninth Circuit has explained, "a court's role at the 12(b)(6) stage is not to decide winners and losers or evaluate the strength or weakness of claims.  Nor can a court resolve factual questions at the 12(b)(6) stage." *Jacobson v. Hughes Aircraft Co*, 105 F.3d 1288, 1292 (9th Cir. 1997), *rev'd on other grounds*, 525 U.S. 432 (1999).  Rather, at the 12(b)(6) stage, a court's role is to construe the complaint liberally  --  in the light most favorable to the plaintiff, accept all factual

allegations in the complaint as true, and draw all reasonable inferences in the light most favorable to

the plaintiff. *SEC v. ICN Pharmaceuticals, Inc.*, 84 F. Supp. 2d 1097, 1098 (C.D. Cal. 2000) (citing

*Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir. 1993); *NL Industries, Inc. v.*

*Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986); 5A Charles Alan Wright & Arthur R. Miller, *Federal*

*Practice and Procedure* § 1357 (2d ed. 1990)). *See also Adam v. Silicon Valley Bancshares*, 884

F.Supp. 1398, 1400 (N.D. Cal. 1995) (in ruling on a motion to dismiss, district courts must accept all

material allegations of fact alleged in the complaint as true, and resolve all doubts in favor of the

plaintiff"). Upon undertaking that liberal review, unless it appears beyond doubt that the plaintiff

can prove *no* set of facts in support of his claim which would entitle him to relief, a court should not

dismiss a complaint for failure to state a claim. *Conley v. Gibson*, 355 U.S. 41, 45-46

(1957)(emphasis supplied).[2]

## II. The *Scienter*-based Fraud Violations Against Leslie, Lonchar, and Sallaberry Meet the Applicable Pleading Standards under Fed. R. Civ. P.  9(b) and 12(b)(6)

Rule 9(b) of the Federal Rule of Civil Procedures provides that: "[i]n all averments of fraud

or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

The Ninth Circuit has explained the meaning of Rule 9(b) in the context of securities fraud

actions in *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541 (9th Cir. 1994) (*en banc*). The

Ninth Circuit first concluded that "plaintiffs may aver *scienter* generally, just as the rule states – that

is, simply saying that *scienter* existed." 42 F.3d at 1547. The Ninth Circuit added: "when a

complaint alleges with particularity the circumstances constituting fraud, as required by the rule, then

generally it will also have set forth facts from which an inference of *scienter* could be drawn." *Id.* at

---

[2] Even if dismissal is warranted, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).

1546. The Ninth Circuit, however, expressly rejected the Second Circuit's pleading view that plaintiffs in securities fraud cases must plead facts giving rise to a "strong inference of fraudulent intent." *Id.* at 1545-46.

Second, the Ninth Circuit explained that the plaintiffs must allege with particularity the circumstances constituting the fraud. *In re GlenFed*, 42 F.3d at 1547. That means that a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer. *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995). "This notice requirement is satisfied by the allegations of the 'time, place and nature of the alleged fraudulent activities.'" *Id.* (quoting *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir.1973)). In addition, the plaintiff "must set forth an explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed,* 42 F.3d at 1548. *See also Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996) (applying *In re GlenFed*).

Rule 9(b) does not require the pleading of detailed evidence concerning each and every fraudulent act committed by the defendants. *See, e.g., Walling*, 476 F.2d at 397 (quoting 2A James Wm. Moore et al., Moore Federal Practice ¶ 903, at 1930 (2d ed. 1972) ("Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter.") (emphasis supplied); *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (in a pre-PSLRA improper revenue recognition case, the Court holding that under Rule 9(b), "[i]t is not fatal to the complaint that it does not describe in detail a single specific transaction . . . by customer, amount, and precise method. Comparable precedent does not require greater detail.") (emphasis supplied). Finally, Rule 9(b) should be read in harmony with the Rule 8 requirement of a "short and plain statement of the claim." *In re GlenFed*, 42 F.3d at 1555-56.

The Commission's Complaint alleges violations of Section 17(a) of the Securities Act as the First Claim and violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 as the

PLAINTIFF SEC'S COMBINED OPPOSITION TO          23
DEFENDANTS' MOTIONS TO DISMISS AND/OR
MOTIONS TO STRIKE
Civil Action No. C 07-3444 -JF

1  Second Claim.  Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule

2  10b-5, prohibit fraudulent conduct or practices in connection with the offer or sale of securities.  *See*

3  *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001).  These antifraud provisions forbid

4  making a material misstatement or omission in connection with the offer or sale of a security by

5  means of interstate commerce.  *Id.* at 855-56.

6

7  In addition, violations of Section 17(a)(1), Section 10(b) and Rule 10b-5 require *scienter*.

8  *SEC v. Dain Rauscher*, 254 F.3d at 856.  *Scienter* is defined as a "mental state embracing intent to

9  deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

10  *Scienter* is satisfied by recklessness.[3]  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th

11  Cir.1990)(*en banc*).  Violations of Sections 17(a)(2) and (3), however, only require a showing of

12  negligence.  *SEC v. Dain Rauscher*, 254 F.3d at 855.[4]

13

14  Except for the materiality argument that only Leslie makes, which will be addressed below,

15  the defendants do not challenge any of the claims, including Section 17(a)(1), Section 10(b) and Rule

16  10b-5 violations, as being legally insufficient or not legally cognizable.  Defendants' singular focus

17  is on whether the Commission's Complaint alleges, with particularity, these violations to satisfy

18  Rule 9(b).  Each defendant appears to challenge whether the Complaint alleges that:  (a) each

19  defendant's fraudulent conduct or practices; (b) each defendant's making of material misstatement or

20  omission; and (c) each defendant's *scienter* with particularity.   Leslie Br. at 8-14; Lonchar Br. at 12-

21  19; Sallaberry at 7-12.  These challenges are without merit.

22

23

24  [3]  Reckless conduct is conduct that consists of a highly unreasonable act, or omission, that is an
25  extreme departure from the standards of ordinary care, and which presents a danger of misleading
    buyers or sellers that is either known to the defendant or is so obvious that the actor must have been
26  aware of it.  *Hollinger,* 914 F.2d at 1569.

27  [4]  Because violations of Sections 17(a)(2) and (3), do not require a showing of scienter, there are no
    Rule 9(b) issues associated with them.  In other words, the Complaint's 17(a)(2) and (3) violations
28  survive the defendants' motions to dismiss, without any Rule 9(b) scrutiny.

1    As detailed above, the allegations as to the AOL transaction and the "smoothing" of Veritas'

2    financial results in 2000-2002 more than sufficiently satisfy Rule 9(b) and *In re GlenFed*.  The

3    Complaint amply provides the circumstances of both fraudulent schemes -- time, place and nature of

4    the alleged fraudulent activities (including an explanation as to why the statement or omission

5    complained of was false or misleading) and alleges *scienter* (both generally and with particularity,

6    even though particularity is not required by *In re GlenFed* ) as to each defendant.

7

8    <u>For the AOL transaction</u>:  Starting in late September 2000, Leslie (first) and Sallaberry

9    (shortly thereafter) knowingly participated in a fraudulent scheme by agreeing to a round-trip

10   transaction[5] with AOL (where the original $30 million Licensing deal was "grossed up" $20 million

11   to $50 million only after AOL agreed to fund Veritas for its "purchase" of unwanted and unnecessary

12   advertising from AOL by inflating the original price of the License), where there would be, pursuant

13   to an oral side deal, simultaneous payments made by Veritas and AOL for the AOL transaction

14   (Compl. ¶¶ 1-2, 16-24, 28, 31).  Lonchar, knowing of the true nature of the transaction through his

15

16   consultation with Sallaberry, then told Sallaberry to document the transaction as if they were two

17   separately negotiated, *bona fide* contracts, not a round-trip transaction (Compl. ¶¶ 23, 25).  Lonchar

18   then improperly booked (in violation of GAAP) the revenue from the transaction in the fourth

19   quarter 2000 to artificially inflate Veritas' publicly reported revenues and earnings (Compl. ¶¶ 2, 30).

20

21   In early October 2000, Leslie revealed the true nature of the transaction in an e-mail

22   correspondence, and, in response, was warned, at least twice, about the "sensitive" accounting issues

23   arising from the AOL transaction, but Leslie, as well as Lonchar and Sallaberry, made false or

24   misleading statements or omissions about the true nature of the AOL transaction (that is, Veritas

25

26   _____

27   [5]  A round-trip transaction, which involves parties entering into a reciprocal deal to exchange similar
     amounts of money for services, "can be improper because the parties book revenues even though the
     transactions 'wash out' without any economic substance." *Teachers' Retirement Sys. v. Hunter*, 477

28   F.3d 162, 178 (4th Cir. 2007).

only agreed to enter into an unwanted and unnecessary advertising contract after AOL agreed to fund that "purchase" by inflating the price of the License) in multiple meetings with the outside auditors who specifically inquired of them about the true nature of the AOL transaction in December 2000 and/or January 2001 (Compl. ¶¶ 1-2, 27-28, 31-46). Leslie and Lonchar also signed and submitted a materially misleading representation letter, failing to disclose the true nature of the AOL transaction to the auditors in 2001 (Compl. ¶ 47). Leslie and Lonchar then approved the public disclosure of the false and misleading financial results, including approving and signing the 2000 10-K, which contained the artificially inflated results from the AOL round-trip transaction, filed with the Commission in 2001 (Compl. ¶ 49). Leslie and Lonchar similarly approved false and misleading press releases and participated in earnings release teleconferences with analysts in which false and misleading disclosures were made (Compl. ¶ 49).

As late as August 2002, Lonchar, Sallaberry, and Leslie participated or consulted in Veritas' effort to avoid a news story about the AOL transaction to avoid public disclosure (Compl. ¶¶ 77-78), and Lonchar falsely claimed, during the Company's internal review of the AOL transaction in 2002, that Veritas' outside auditors were aware of the last-minute change in the price of the License from $30 million to $50 million (Compl. ¶¶ 77, 79).

The AOL round-trip transaction materially distorted Veritas' 2000 fourth quarter results of operations by artificially inflating the fourth quarter revenues by $19.2 million, representing 5% of total revenues and 6% of license revenues for the quarter and improperly reducing the net loss for the fourth quarter by $8.1 million, representing a 6% understatement; and by allowing Veritas to not only meet, but exceed, Wall Street earnings estimates by two cents in keeping with Veritas' longstanding practice (Compl. ¶ 49).

1    Leslie, Lonchar, and Sallaberry also profited by selling Veritas stock at prices inflated by the

2  misstatement of the revenue related to the AOL transaction and by receiving a bonus from Veritas

3  based on its artificially inflated financial results (Compl. ¶¶ 81-83).

4    In January 2003, Veritas announced that it would restate its financial statements in order to

5  reverse the $20 million of improperly recognized revenue from the AOL round-trip transaction and

6
   correct the related over-stated expenses (Compl. ¶ 51).
7
8    For the "smoothing" of Veritas' financial results in 2000-2002:  Starting in at least 2000 until

9  2002, Lonchar knowingly directed his subordinates to carry out a fraudulent accounting manipulation

10  scheme consisting of three separate non-GAAP accounting practices that he used to manage Veritas'

11  earnings and artificially "smooth" its financial results, thereby producing false, "museum quality"

12  financial results.  (Compl. ¶¶ 3, 52-55, 57, 60-63, 65, 68-71).  As a result, Veritas' reported financial

13
   results for 2000 through 2003 were materially false (Compl. ¶ 52).
14
15    The first non-GAAP accounting practice involved improperly recording and maintaining

16  accrued liabilities (Compl. ¶ 53).  Lonchar, as Veritas' CFO and a CPA, knew these accruals were

17  not in conformity with GAAP (Compl. ¶¶ 10, 55).  Nonetheless, Lonchar was personally involved in

18  directing, carrying out, and concealing the improper accounting practice (Compl. ¶¶ 54-55, 57).  The

19
   cumulative balances of over-stated accrued liabilities tracked on Veritas' cushion schedules for each
20
21  quarter from 2000 through 2002 ranged from approximately $10 million to $21 million (Compl. ¶

22  56).  As a result of Lonchar's actions, Veritas failed to accurately report its quarterly and annual

23  financial results, causing overstatements of earnings in some quarters and understatements during

24  other quarters, creating a false and misleading impression of the Company's financial performance

25
   (Compl. ¶ 53).
26

27

28