# EXHIBIT 1

LexisNexis® *Total Research System*

Switch Client ┊ Preferences ┊ Sign Off ┊ ? Help

*My Lexis™* ╲ Search ╲ Research Tasks ╲ Get a Document ╲ *Shepard's®* ╲ Alerts ╲    Dossier ┊ History ┊

Service: **Get by LEXSEE®**
Citation: **2006 us dist lexis 17588**

*2006 U.S. Dist. LEXIS 17588, \**

EXHIBIT

⬥ View Available Briefs and Other Documents Related to this Case

IN RE AOL TIME WARNER, INC. SECURITIES AND "ERISA" LITIGATION

MDL Docket No. 1500, 02 Civ. 5575 (SWK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2006 U.S. Dist. LEXIS 17588

April 6, 2006, Decided
April 6, 2006, Filed

**SUBSEQUENT HISTORY:** Stay lifted by, Objection denied by In re Aol Time Warner, Inc. Secs. Litig., 2006 U.S. Dist. LEXIS 49162 (S.D.N.Y., July 13, 2006)

**PRIOR HISTORY:** In re AOL Time Warner, Inc., Sec. & ERISA Litig., 2005 U.S. Dist. LEXIS 3715 (S.D.N.Y., Mar. 9, 2005)

**CORE TERMS:** settlement, notice, class members, class action, discovery, reasonableness, billion, settlement fund, negotiation, adequacy, stock, distributed, putative, lawsuit, securities laws, advertising, special master, citations omitted, certification, accounting, movant's, estimated, objector's, investor, shareholder, fraudulent, causation, calculation, methodology, deposition

⮝**Available Briefs and Other Documents Related to this Case:**

U.S. District Court Motion(s)
U.S. District Court Pleading(s)

**COUNSEL: [\*1]** For Minnesota State Board of Investments, Lead Plaintiff: Robert Andrew Skirnick, Meredith Cohen Greenfogel & Skirnick, New York, NY; Samuel D. Heins, Heins Mills & Olson, P.L.C., Minneapolis, MN.

For Jennifer J. Fadem, on behalf of herself and all others similarly situated, Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Edward J. Mills, Stull, Stull & Brody, New York, NY; Christopher J. Gray, Law Office of Christopher J. Gray, P.C, New York, NY; Brian Philip Murray, Murray, Frank & Sailer, LLP, New York, NY.

For Salomon Hami, Plaintiff: Aaron Lee Brody, Edward J. Mills, Stull Stull & Brody, New York, NY; Brian Philip Murray, Murray, Frank & Sailer, LLP, New York, NY.

For Dominic F. Amarosa, Plaintiff: Edward J. Mills, Stull, Stull & Brody, New York, NY; Christopher J. Gray, Law Office of Christopher J. Gray, P.C, New York, NY.

For Cynthia R. Levin Moulton, Petitioner: Jeffrey D. Meyer, Moulton & Meyer, L.L.P., Houston,

TX.

For AOL Time Warner, Inc., Defendant: Rachel G Skaistis, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For Stephen M. Case, Defendant: Robert M. Stern, O'Melveny & Myers LLP, Washington, DC.

For **[*2]** Steven Rindner, Defendant: Brian M. Heberlig, Edward R. Mackiewicz, Mark J. Hulkower, Steptoe & Johnson, L.L.P., Washington, DC; John D. Lovi, Steptone & Johnson LLP, New York, NY.

For Paul T. Cappuccio, Kenneth J. Novack, Joseph A. Ripp, Defendants: Evan R. Chesler, Boies, Schiller & Flexner, LLP, Albany, NY; Peter T. Barbur, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For Ernst & Young LLP, Defendant: Holly K. Kulka, Michael L. Rugen, Heller Ehrman White & McAuliffe, LLP, New York, NY; Jack G. Stern, Boies, Schiller & Flexner, LLP, New York, NY; Jeremy N. Kudon, Heller Ehrman LLP, Los Angeles, CA; Timothy Philip Wei, Securities & Exchange Commission, New York, NY.

For Eric Keller, Defendant: Blair G. Connelly, Latham & Watkins, LLP, New York, NY.

For StoneRidge Investment Partners LLC, John C. Turner, Movants: Linda P. Nussbaum, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, NY.

For Time Warner Inc., Movant: Evan R. Chesler, Boies, Schiller & Flexner, LLP, Albany, NY; Peter T. Barbur, Rachel G Skaistis, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For Daniel F. Akerson, James W. Barge, Stephen F. Bollenbach, Frank **[*3]** J. Caufield, Miles R. Gilburne, Franklin D. Raines, Barry Schuler, Movants: Evan R. Chesler, Boies, Schiller & Flexner, LLP, Albany, NY; Peter T. Barbur, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For Minnesota State Board of Investments, Movant: Robert Andrew Skirnick, Meredith Cohen Greenfogel & Skirnick, New York, NY.

For Louisiana School Employees Retirement System, Municipal Police Employees Retirement System of Louisiana, Movants: Stanley Merrill Grossman, Pomerantz Haudek Block Grossman & Gross LLP, New York, NY.

For McClure Family Trust, Gary J. Tweed, Arlene Swenson, Thomas Cerchia, Movants: Richard A. Adams, Patton, Haltom, Roberts, McWilliams & Greer, LLP, Texarkana, TX.

For Steven Schmalz, Delbert Currens, Consolidated Plaintiffs: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP(LIs), Melville, NY.

For Mariam Antin, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Marian Probst Rosner, Wolf, Popper, L.L.P., New York, NY.

For Mark Bluestein, Consolidated Plaintiff: Brian Philip Murray, Murray, Frank & Sailer, **[*4]** LLP, New York, NY; Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA.

For Malka Birnbaum, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Gregory M. Egleston, Bernstein Liebhard & Lifshitz, LLP, New York, NY.

For Ernest Hack, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Robert I. Harwood, Wechsler Harwood LLP, New York, NY.

For Harvey Matcovsky, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Jules Brody, Stull Stull & Brody, New York, NY.

For Howard Rosengarten, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Jill Sharyn Abrams, Abbey Spanier Rodd Abrams & Paradis, LLP, New York, NY US.

For Alan Russo, Harriet Goldstein, Consolidated Plaintiffs: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Menachem E. Lifshitz, Bernstein, Liebhard & Lifshitz, L.L.P., New York, NY.

For Barbara Dietel, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Frederic Scott Fox, Kaplan, Fox & Kilsheimer, L.L.P., New York, NY.

For Earl Bennett, Consolidated Plaintiff: Aaron Lee Brody, Stull [*5] Stull & Brody, New York, NY; Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA.

For Jack L. McBride, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Thomas H. Burt, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY.

For Vardan Sarkisov, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Ira M. Press, Kirby McInerney & Squire, LLP, New York, NY.

For Sherry Weindorf, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; James V. Bashian, Law Offices of James V. Bashian, P.C., New York, NY.

For Earl Mikolitch, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Patrick Anthony Klingman, Shepherd, Finkelman, Miller & Shah, LLC, Chester, CT.

For John Pleggenkuhle, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Frederick Taylor Isquith, Sr, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY.

For Prena Smajlaj, Consolidated Plaintiff: Corey D. Holzer, Holzer Holzer & Cannon LLC, Atlanta, GA; Nadeem Faruqi, Faruqi & Faruqi, LLP, New York, NY.

For American Online, Inc. [*6] , Consolidated Defendant: Rachel G Skaistis, Robert D Joffe, Cravath, Swaine & Moore LLP, New York, NY.

For David M. Colburn, Consolidated Defendant: Carl S. Kravitz, Zuckerman Spaeder LLP, Washington, DC.

For John D. Beeson, Sr., Robert C. Daniels, Adnan Elassir, James Belmont, Movants: Brian Philip Murray, Murray, Frank & Sailer, LLP, New York, NY.

For Ontario Teachers' Pension Plan Board, Movant: Avi Josefson, Gerald H. Silk, Bernstein, Litowitz, Berger & Grossman, LLP, New York, NY.

For The Minnesota State Board of Investment, Movant: Samuel D. Heins, Heins Mills & Olson, P.L.C., Minneapolis, MN.

**JUDGES:** SHIRLEY WOHL KRAM, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SHIRLEY WOHL KRAM

OPINION

**OPINION & ORDER**

**SHIRLEY WOHL KRAM, U.S.D.J.**

This Opinion considers the fairness of a $ 2.65 billon class action settlement (the "Settlement") reached in the securities litigation arising from America Online, Inc. ▾ ("AOL") and AOL Time Warner, ▾Inc.'s ("AOLTW") allegedly fraudulent accounting of advertising revenue during, and in the years immediately preceding, AOL's merger with Time Warner, Inc. ▾ ("Time Warner"). [1] Coming on the heels of AOLTW's $ 150 million settlement **[\*7]** with the Department of Justice ("DOJ") [2] and its $ 300 million settlement with the Securities and Exchange Commission ("SEC"), this Settlement marks the conclusion of the primary shareholder lawsuit against the Company.

---

**FOOTNOTES**

[1] Although Defendant AOLTW has changed its name to Time Warner, Inc. ▾, for clarity, the Court will continue to refer to the merged entity as AOLTW, or the Company.

[2] The DOJ directed that the $ 150 million fund established by its settlement with the Company be used for AOLTW's settlement of securities litigation. AOLTW allocated that entire sum to the instant Settlement, in addition to the $ 2.4 billion provided by AOLTW and the $ 100 million provided by AOLTW's auditor, Ernst & Young LLP ("Ernst & Young"), under the terms of the Settlement. The Settlement's inclusion of the entire $ 150 million from the DOJ settlement is the basis of one of the objections discussed below. *See infra* Part II.E.1.

---

Although Lead Plaintiff's Counsel distributed approximately 4.7 million Settlement notifications **[\*8]** to putative Class Members, the Court has received only six objections to various facets of the Settlement, one of which was withdrawn prior to the fairness hearing. [3] Of the remaining objections, two contest the reasonableness of the Settlement amount, and there are individual objections to the adequacy of the Class representative, the Settlement Notice, and the Plan of Allocation. After briefly commenting on the Court's earlier certification of the Settlement Class, reviewing the standards for the approval of class action settlements, and addressing the aforementioned objections, the Court grants Lead Plaintiff's petition for approval of the Settlement.

---

**FOOTNOTES**

[3] As explained in greater detail below, two of the six objections were filed by parties acknowledging that they are not members of the Class, including the party that withdrew its objection. *See infra* Parts I.C & II.E. Plaintiffs allege that two of the other objectors also lack standing to object to the Settlement.

---

**I. Background**

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 27588    Page 6 of 25    Page 5 of 24

Case 5:07-cv-03444-JF    Document 43-2    Filed 12/03/2007    Page 6 of 25

This Settlement is **[\*9]** the culmination of over three years of litigation and seven months of mediation with a Court-appointed special master. The relevant history of the litigation through May 5, 2004 is described in the Court's Opinion considering Defendants' motions to dismiss. See *In re AOL Time Warner Sec. & "ERISA" Litig., 381 F. Supp. 2d 192 (S.D.N.Y. 2004)*. The Court presumes familiarity with that Opinion.

## A. The Fraudulent Accounting Allegations

In brief, Plaintiffs allege that AOL and AOLTW improperly accounted for dozens of advertising transactions, inflating revenue for fifteen quarters between 1998 and 2002. These transactions were allegedly designed to create the appearance that they were generating revenue, despite providing completely illusory benefits to the Company.

Plaintiffs describe myriad sham transactions between AOLTW and over a dozen separate companies. For example, Plaintiffs allege that AOLTW engaged in a number of three-legged "round-trip" transactions with the internet vendor Homestore. In the first "leg" of such transactions, Homestore would pay a third party for services and products that it did not need. In the second leg, the third party would **[\*10]** purchase advertising from AOLTW with the money it received from Homestore. Finally, AOLTW would purchase advertising from Homestore in substantially the same amount as the third-party's purchase of advertising from AOLTW. While capital flowed to each of the parties and appeared to increase AOLTW's advertising revenue, the parties received no real benefits apart from their inflated earnings statements. See *In re AOL Time Warner, 381 F. Supp. 2d at 226*. These round-trip transactions are representative, but hardly exhaustive, of Plaintiffs' allegations. [4]

---

**FOOTNOTES**

[4] AOLTW is also alleged to have employed such techniques as "jackpotting" (repetitive display of an advertising partner's advertisements immediately before a reporting period), the conversion of non-advertising proceeds into advertising revenues, and the impermissible double-booking of valid advertising revenue. (Second Am. Compl. P15.)

---

Ultimately, Plaintiffs allege that these fraudulent schemes resulted in AOLTW's overstatement of revenue by **[\*11]** at least $ 1.7 billion, inflating the value of AOLTW stock and causing billions of dollars in damage to investors, in violation of the federal securities laws.

## B. Motion Practice

The Court evaluated Defendants' motions to dismiss the Complaint, and, on May 5, 2004, issued an opinion denying the motions in large part and preserving a wide variety of claims against AOLTW, Ernst & Young, and a half dozen individual defendants. Shortly thereafter, the Court granted Plaintiffs leave to amend their Complaint. Plaintiffs filed a Second Amended Complaint on August 23, 2004.

Subsequent to the Court's denial of Defendants' motions to dismiss, Plaintiffs initiated formal discovery and began reviewing over 15.5 million documents turned over by AOLTW. (Heins Decl. P7, Dec. 2, 2005.) In addition, Plaintiffs responded to Defendants' substantial document requests and interrogatories, battled over various aspects of their and Defendants' discovery requests, and engaged in extensive negotiations to address Defendants' claims to privileged documents. (Heins Decl. PP65-69.) On the basis of relevant discovered materials, Plaintiffs not only supplemented their existing claims, but eventually drafted **[\*12]** a Third Amended Complaint and petitioned the Court for leave to amend. Plaintiffs later indicated that they had identified "over 100 separate transactions which [they] thought were material to their

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 17588                    Page 7 of 25

Case 5:07-cv-03444-JF   Document 47-2   Filed 12/03/2007   Page 6 of 24

allegations." (Final Approval Hr'g Tr. 4-5, Feb. 22, 2006.) By the time they entered into the Settlement, Plaintiffs had laid "the groundwork to prepare for hundreds of merits and expert depositions to occur in the fall and spring of 2005-2006." (Heins Decl. P37.)

Meanwhile, Defendants drafted a motion for summary judgment, alleging that Plaintiffs failed to establish loss causation as a matter of law. The standard for loss causation has been the subject of substantial litigation over the past several years. In the interval between the filing of the motion to dismiss and the instant Settlement, the Second Circuit and Supreme Court have weighed in with a number of influential opinions, altering the relevant legal standards for active securities lawsuits. The most recent Supreme Court precedent addressing loss causation, _Dura Pharm., Inc. v. Broudo_, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005), was argued and decided in the months immediately following the final briefing of Defendants' motion **[*13]** for summary judgment. With a decision on that motion pending, the parties entered a phase of intense and protracted settlement discussions.

## C. The Settlement

In late 2004, the Court appointed Paul D. Wachter as special master for discovery in this litigation. Special Master Wachter proceeded to play a prominent role mediating settlement negotiations between the parties. During the mediation sessions before Special Master Wachter, the parties discussed the viability of their respective claims and defenses, the role of emerging securities law precedent, and their widely divergent views of potential outcomes.

Plaintiffs relied on their Complaint, a variety of economic experts, and the results of their massive discovery operation to buttress their claims that the Class sustained extensive damages. On the other hand, Defendants insisted, and continue to insist, that their accounting statements were not fraudulent and that, even if such allegations could be proved, such fraud did not cause the declining price of AOLTW stock. After nearly seven months of involved settlement negotiations overseen by Special Master Wachter, the parties entered into a Memorandum of Understanding on **[*14]** July 29, 2005, and began preparing a Stipulation of Settlement.

The Stipulation of Settlement resulted from a second round of negotiations between Lead Plaintiff's Counsel and representatives of the nine firms representing Defendants. The parties negotiated a number of complex issues essential to the Settlement, including the Defendants' right to termination of the Settlement, the scope of releases, and the specific language of the Stipulation. At the same time, Lead Plaintiff's Counsel drafted supplemental documents, including the Notice to the Class, the Proof of Claim and Release, and the Plan of Allocation. After finalizing the drafts of all relevant documents, the parties petitioned the Court for preliminary approval of the Settlement.

On September 28, 2005, the Court held a preliminary approval hearing to address the Settlement materials provided by the parties. After reviewing those materials (including the Stipulation of Settlement, draft notice material, the Plan of Allocation, and supporting memoranda) and considering the issues raised at the preliminary approval hearing, the Court provided the parties an opportunity to modify the notice procedures and opt-out requirements. **[*15]** On September 30, 2005, the Court issued Orders certifying the Class for settlement purposes and preliminarily approving the Settlement. Upon receiving preliminary approval of the Settlement, Plaintiffs commenced the mailing and publication of the Settlement Notice. [5]

---

**FOOTNOTES**

[5] A short time later, in compliance with the terms of the Stipulation of Settlement, Defendants deposited the $ 2.65 billion Settlement Fund into an escrow account. The

Fund has earned approximately $ 303,000 a day for the benefit of the Settlement Class since its deposit. (Pls.' Br. In Support of Final Approval 1, Jan. 30, 2006.)

Lead Plaintiff's Counsel retained Gilardi & Co., LLC (the "Settlement Administrator" or "Gilardi") to administer the Settlement. The Settlement Administrator initially mailed 115,080 "Notice Packages" to the names and addresses provided by AOLTW's transfer agent. [6] The Settlement Administrator also contacted the brokerage houses that hold securities in "street name" for beneficial owners, giving those institutions the **[*16]** option to mail Notice Packages directly to the beneficial owners or to provide Gilardi with a list of those owners' addresses. (Forrest Decl. P5, Jan. 1, 2006.) In addition, summary notices were published over the course of two weeks on separate weekdays in the New York Times, Wall Street Journal, Financial Times, and USA Today. (Forrest Decl. P7.) The Settlement Administrator has mailed more than four and a half million more Notice Packages in response to requests from putative Class Members. (Forrest Decl. P6.)

**FOOTNOTES**

[6] Each Notice Package included a "true and correct copy of the Notice, including the Proof of Claim and Release, the Plan of Allocation, and the Request for Exclusion from Securities Class." (Forrest Decl. P2, Jan. 1, 2006.) These materials were also available at the website maintained throughout the course of this Settlement. *See* AOL Time Warner ⌄ Securities Litigation Settlement, http://www.aoltimewarnersettlement.com (last visited March 20, 2006).

The Settlement Administrator initiated its mailing **[*17]** in early October, shortly after the Court's preliminary approval of the Settlement. The Notice set two important deadlines for responses to the Settlement: (1) objections to the Settlement and requests to opt out of the Settlement were to be filed by January 9, 2006, while (2) Settlement claims were to be submitted by February 21, 2006. By the January 9 objection deadline, the Court had received four objections from putative Class Members, and two motions to intervene and object to the Settlement, one of which was withdrawn shortly thereafter. [7]

**FOOTNOTES**

[7] Plaintiffs in the ERISA action stemming from the same operative facts as the instant lawsuit initially submitted a motion to intervene and object to the Settlement on January 7, 2006, but voluntarily withdrew their motion on January 27, 2006. Accordingly, the Court declines to address their objection.

On February 22, 2006, the Court conducted the final approval hearing. At the hearing, both Lead Plaintiff's Counsel and defense counsel for AOLTW were given the opportunity **[*18]** to make final remarks supporting the fairness of the Settlement. At that time, Lead Plaintiff's Counsel reported that almost all significant holders of affected stock had filed claims to the Settlement and noted the lack of significant opposition or adverse comment by institutional investors with Settlement claims. Not one of the formal objectors attended or spoke at the hearing, each of them resting on her papers. Further, nobody attending the hearing contested the fairness of the Settlement. The Court reserved judgment, pending this written Opinion.

## II. Discussion

### A. Certification of the Settlement Class

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 27588    Page 9 of 25

Case 5:07-cv-03444-JF    Document 43-27    Filed 12/03/2007    Page 8 of 24

On September 30, 2005, the Court certified the Class for settlement purposes. This section briefly supplements that Order with the facts supporting class certification under Federal Rule of Civil Procedure 23.

## 1. Numerosity

To qualify for certification, a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, more than 4.7 million Settlement Notices have been mailed to putative Class Members and the Settlement Administrator [*19] has received approximately 600,000 claims. Hence, the numerosity requirement is clearly satisfied.

## 2. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Where putative class members have been injured by similar misrepresentations and omissions, the commonality requirement is satisfied." Fogarazzo v. Lehman Bros., Inc., 232 F.R.D. 176, 180 (S.D.N.Y. 2005) (citations omitted). Plaintiffs allege that the Class suffered damages as a result of three and a half years of AOLTW's misrepresentations about the Company's financial condition and its fraudulent accounting practices. Due to the public nature of Defendants' financial statements and the breadth of the alleged fraud, the issues of law and fact underlying this litigation are common to the Class.

## 3. Typicality

Under Rule 23(a)(3), the interests of the class representatives must be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). This requirement is satisfied if "each class member's claim arises from the same course of events, and [*20] each class member makes similar legal arguments to prove the defendant's liability." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001) (citation omitted). Further, a class representative's claims "are not typical if that representative is subject to unique defenses." Fogarazzo, 232 F.R.D. at 180 (citation omitted).

Here, Lead Plaintiff, like all Class members, claims damages allegedly caused by Defendants' misrepresentation of AOL's financial health, including the overstatement of advertising revenues to artificially inflate the stock of AOL and AOLTW. The legal theories pleaded by Lead Plaintiff, numerous violations of the federal securities laws, are shared by all Class Members. Furthermore, no unique defenses may be asserted against Lead Plaintiff that would make its claims atypical. As such, the typicality requirement is satisfied.

## 4. Adequacy

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In considering a class representative's adequacy, the court asks whether the representative [*21] (1) has any interests that conflict with the rest of the class, and (2) is represented by qualified and capable legal counsel. Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted).

On several occasions throughout the course of this litigation the Court has commented favorably on Lead Plaintiff's representation of the Class. See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 2003 U.S. Dist. LEXIS 145, No. MDL 1500, 2003 WL 102806, at *2 (S.D.N.Y. Jan. 10, 2003); In re AOL Time Warner, 381 F. Supp. 2d at 208 n.8. Lead Plaintiff's conduct during the Settlement has not altered the Court's earlier findings. All Class Members, including Lead Plaintiff, seek to obtain the largest possible recovery for losses resulting from

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 17585    Page 10 of 24

Case 5:07-cv-03444-JF    Document 21-5    Filed 12/03/2007    Page 10 of 24

Defendants' alleged misconduct. Lead Plaintiff has successfully prosecuted the claims it shares with the rest of the Class, resulting in the $ 2.65 billion Settlement at issue. There is no evidence that Lead Plaintiff's interests conflict with the rest of the Class. Similarly, the Court continues to be impressed with the quality of representation provided by Lead Plaintiff's Counsel, its prosecution [*22] of the lawsuit, and its negotiation of the Settlement. See also In re AOL Time Warner, 2003 U.S. Dist. LEXIS 145, 2003 WL 102806, at *2; infra Part II.C. Both Lead Plaintiff and its choice of counsel satisfy the adequacy requirement of Rule 23(a)(4).

**5. Maintainability**

In addition to finding that a class meets the requirements of Rule 23(a), courts must ascertain whether the class is maintainable under one of the Rule 23(b) criteria. One commonly applied criterion requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

With respect to the first Rule 23(b)(3) prong, the Supreme Court has noted that predominance is "readily met in certain cases alleging . . . securities fraud . . . ." Amchem Prods. v. Windsor, 521 U.S. 591, 625, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997). This case readily illustrates that principle. Allegations of Defendants' misrepresentations and the improper inflation of AOL's accounting revenues underlie [*23] the factual and legal claims of every Class Member. See supra Part II.A.2. The Court is satisfied that common questions of law and fact are predominant.

With respect to the second Rule 23(b)(3) prong--the superiority of the class action to other methods of adjudicating the controversy--securities cases like this one "easily satisfy" that requirement. In re Blech Sec. Litig., 187 F.R.D. 97, 107 (S.D.N.Y. 1999). The Settlement provides a vehicle of recovery for individuals that would find the cost of individual litigation prohibitive, yet allows anyone wishing to initiate her own lawsuit to opt out of the Settlement. The Court's previous decision to consolidate this litigation is also consistent with the Settlement. The Settlement offers a single forum to resolve the common claims of millions of potential Class Members and prevents the initiation of countless claims in state and federal courts throughout the nation. Finally, at this stage, the risk of encountering any serious difficulty in managing the Class is negligible. Maintainability is satisfied here.

**B. Standard for Final Approval of Class Action Settlements**

Federal Rule of Civil Procedure 23(e) [*24] governs the settlement of class action litigation. Courts may approve class action settlements after proponents of the settlement have distributed adequate notice of the proposed settlement and the settlement has been the subject of a fairness hearing. Fed. R. Civ. P. 23(e)(1). The touchstone for court approval is that the settlement be "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(1)(C), and "not a product of collusion." D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001) (citing Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000)); see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005), cert denied, 544 U.S. 1044, 125 S. Ct. 2277, 161 L. Ed. 2d 1080 (2005).

Courts analyze a settlement's fairness, reasonableness and adequacy with reference to both "the negotiating process leading up to settlement as well as the settlement's substantive terms." D'Amato, 236 F.3d at 85. The court may not engage in mere "rubber stamp approval" of the settlement, but it must "stop short of the detailed and thorough investigation [*25] that it would undertake if it were actually trying the case." City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974).

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 17588    Page 10 of 24

Case 5:07-cv-03444-JF    Document 47-2    Filed 12/03/2007    Page 11 of 25

Further, courts should be "mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'" *Wal-Mart, at 116* (quoting *In re PaineWebber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998)*). As the Second Circuit has long recognized, "there are weighty justifications, such as the reduction of litigation and related expenses, for the general public policy favoring the settlement of litigation." *Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982)*. This concern is reinforced by the Court's analysis of both the procedural and substantive fairness of the Settlement.

## C. Procedural Fairness: The Negotiation Process

"A court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that the settlement resulted from 'arms-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests.'" *D'Amato, 236 F.3d at 85* **[*26]** (quoting *Weinberger, 698 F.2d at 74*). This inquiry into a settlement's procedural fairness helps to ensure that the settlement is not the product of collusion. Evidence of arms-length negotiation between experienced counsel that have engaged in meaningful discovery may give rise to a presumption of fairness. *Wal-Mart, 396 F.3d at 117* (citation omitted).

In evaluating a settlement's procedural fairness, the Second Circuit has noted that that "a court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." *D'Amato, 236 F.3d at 85* (citing *County of Suffolk v. Long Island Lighting, 907 F.2d 1295, 1323 (2d Cir. 1990)*). Courts in this District have also commented on the procedural safeguards inherent in cases subject to the PSLRA, wherein the lawyers are not "mere entrepreneurs acting on behalf of purely nominal plaintiffs," but are "selected by court-appointed Lead Plaintiffs who are substantial and sophisticated institutional investors with access to independent legal and financial specialists and a huge stake in the **[*27]** litigation." *In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 462 (S.D.N.Y. 2004)*.

This Settlement is the product of seven months of intense arms-length negotiations, overseen and assisted by a court-appointed special master, between major financial entities, both of whom are represented by experienced, highly regarded counsel. Lead Plaintiff, the Minnesota State Board of Investment ("MSBI"), "manages the investment of retirement fund assets of the Minnesota State Retirement System, Teachers Retirement Association, and the Public Employees Retirement Association, as well as idle cash of other state agencies," with total assets exceeding $ 50 billion. Minnesota Office of the Legislative Auditor, Report Summary: Minnesota State Board of Investment, http://www.auditor.leg.state.mn.us/FAD/2006/f0604.htm (released Feb. 15, 2006). Upon assigning MSBI lead plaintiff status, this Court noted that MSBI had sustained an estimated loss of $ 249 million, thus had the largest financial stake in the litigation. *See In re AOL Time Warner, 2003 U.S. Dist. LEXIS 145, 2003 WL 102806, at *2*. [8] Lead Plaintiff's public mission, financial experience, and vested interest in obtaining the **[*28]** best terms for the Settlement Class reflect favorably on its selection of counsel here.

---

**FOOTNOTES**

[8] MSBI's loss was calculated on the basis of a class period nearly two years shorter than the Class Period ultimately defined in the Settlement. Accordingly, its loss is presumably greater than $ 249 million.

---

Indeed, Lead Plaintiff's Counsel, Heins, Mills & Olson, PLC, is a respected class action litigator, with considerable experience in major securities and antitrust class action lawsuits.

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 47588

Case 5:07-cv-03444-JF Document 47-2 Filed 12/03/2007 Page 12 of 25

Page 12 of 24

*See, e.g., In re Monosodium Glutamate Antitrust Litigation,* MDL 00-1328 (D. Minn.); *In re Broadcom Corp. Sec. Litig.,* SA CV 01-0275 (C.D. Cal.). Lead Plaintiff's Counsel has garnered judicial praise for its representation in previous actions, and has continued to show its client commitment and exceptional lawyering in this case. On the other side of the table, AOLTW's counsel, Cravath, Swaine & Moore LLP ("Cravath") is generally regarded as one of the country's premier law firms. Cravath has extensive experience in the defense **[*29]** of major class action lawsuits and has vigorously defended Plaintiffs' allegations throughout this litigation. At the fairness hearing, counsel for both parties noted their continuing disagreement about Plaintiffs' allegations. With the mediation of Special Master Wachter, however, both parties concluded that the Settlement was the best and most efficient outcome for their clients in light of the costs of litigation and mutability of applicable legal standards.

Special Master Wachter assumed his role during the early stages of discovery, overseeing the terms of the discovery process before playing a vital role in the settlement negotiations between the parties. Special Master Wachter fulfilled his assignment with considerable skill and diligence, remaining in close contact with both parties and mediating dozens of face-to-face and remote meetings between them over the course of seven months. Special Master Wachter's oversight of the process lends considerable support to the Court's finding of procedural fairness.

In light of the substantial evidence that settlement negotiations were conducted at arms-length without the slightest hint of collusion, the Court credits the Settlement **[*30]** with a presumption of fairness. This presumption is supported by the fairness of the Settlement terms.

### D. Substantive Fairness: The Settlement Terms

In evaluating the fairness, reasonableness, and adequacy of a settlement, the court is primarily concerned with the "substantive terms of the settlement compared to the likely result of a trial." *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir. 1983) (citations omitted). In order to make this evaluation, courts in this Circuit have consistently employed the *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation;
>
> (2) the reaction of the class to the settlement;
>
> (3) the stage of the proceedings and the amount of discovery completed;
>
> (4) the risks of establishing liability;
>
> (5) the risks of establishing damages;
>
> (6) the risks of maintaining the class action through the trial;
>
> (7) the ability of the defendants to withstand a greater judgment;
>
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery;
>
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

**[*31]** *Wal-Mart,* 396 F.3d at 117 (quoting *Grinnell,* 495 F.2d at 463 (citations omitted)).

## 1. Complexity, Expense and Likely Duration of the Litigation

Due to its notorious complexity, securities class action litigation is often resolved by settlement, which circumvents the difficulty and uncertainty inherent in long, costly trials. *See, e.g., Hicks v. Morgan Stanley & Co.,* 2005 U.S. Dist. LEXIS 24890, No. 01 Civ. 10071, 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005); *In re American Bank Note Holographics, Inc.,* 127 F. Supp. 2d 418, 424 (S.D.N.Y. 2001); *In re Sumitomo Copper Litig.,* 189 F.R.D. 274, 281 (S.D.N.Y. 1999). This notoriety is amply illustrated by the instant case, which is particularly conducive to settlement.

Plaintiffs allege wrongdoing by one of the largest companies in the world, during the largest corporate merger in history. Plaintiffs' allegations span more than three and a half years and implicate financial statements filed over fifteen consecutive quarters. Plaintiffs point to hundreds of fraudulent transactions carried out over multiple years, employing diverse accounting techniques, and often including multiple, interrelated **[*32]** revenue components. These sophisticated and complex transactions shared just one common characteristic: their allegedly inappropriate inflation of revenue. There is no question that the presentation of these transactions, and the conflicting interpretations which they would be subject to, would stretch the patience, attention, and understanding of even the most exemplary jury.

Since the denial of Defendants' motions to dismiss and the commencement of formal discovery, Plaintiffs have pored over millions of documents, employed nine experts, added six defendants, and laid the groundwork for dozens of depositions. (Heins Decl. PP4, 7, 70, 77.) The breadth of resources dedicated to the prosecution of this lawsuit reflects the complexity of the issues involved and the expenses that lie ahead. Shortly after the denial of their motions to dismiss, Defendants initiated an extensive round of deposition and document requests and negotiated with Plaintiffs over the scope of discovery. Defendants continue to deny liability and have been subject to only limited criminal prosecution for their alleged wrongdoing. Defense counsel's vigorous defense of this lawsuit indicates Defendants' continued **[*33]** willingness to defend the allegations in the absence of the Settlement.

In addition to the complex issues of fact involved in this case, the legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages. These challenges are exacerbated here, where a number of controlling decisions have recently shed new light on the standard for loss causation. *See, e.g., Dura Pharms.,* 544 U.S. at 336; *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir. 2005). If Defendants' pending motion for summary judgment on the issue of loss causation did not prove dispositive, it would continue to be the subject of profound dispute throughout the litigation.

In the absence of the Settlement, this litigation could very well last for several more years. The parties have not yet finished discovery. At a minimum, months of depositions would precede trial. A presumably lengthy trial would then be followed by years of inevitable appeals. Each step of the way, expenses would continue to accumulate, further decreasing the funds available to Class Members. Conversely, **[*34]** the $ 2.65 billion Settlement under consideration here "results in a substantial and tangible present recovery, without the attendant risk and delay of trial." *Maley v. Del Global Techs. Corp.,* 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002).

After careful consideration of the circumstances of this litigation, the Court finds that a trial would be long, complex, and costly. This factor strongly favors the Settlement.

## 2. Reaction of the Class to the Settlement

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 21758    Page 14  Page 13 of 24

Case 5:07-cv-03444-JF   Document 73-21   Filed 12/03/2007   Page 14 of 25

The reaction of the class is generally gauged by reference to the extent of objection to the settlement. Courts in this Circuit have noted that "the lack of objections may well evidence the fairness of the Settlement." *In re American Bank Note Holographics,* 127 F. Supp. 2d at 425. Courts have also commented favorably on settlements that are not contested by institutional investors and class representatives. *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 479 (S.D.N.Y. 1998).

Here, the Settlement Administrator mailed over 4.7 million Notice Packages to putative Class Members and has received an estimated 600,000 proofs of claim. Only four such individuals filed an **[*35]** objection to any aspect of the Settlement, and just two dispute the reasonableness of the Settlement Fund. [9] Further, not a single institutional Class Member objected to the Settlement. [10] The relative lack of dissent here compares favorably with settlements previously approved in this District. *See, e.g., D'Amato,* 236 F.3d at 86-87 (eighteen objectors out of 27,883 notices); *Hicks,* 2005 U.S. Dist. LEXIS 24890, 2005 WL 2757792, at *6 (three objectors out of approximately 100,000 potential members of the class); *In re WorldCom, Inc. Sec. Litig.,* 388 F. Supp. 2d 319, 337-338 (S.D.N.Y. 2005) (seven objectors out of 4,000,000 potential class members and 830,000 claimants).

### FOOTNOTES

[9] Moreover, Plaintiffs argue that two of the four objectors lack standing to object to the Settlement. The Court addresses all objections in considerably more detail below. *See infra* Part II.E.

[10] One institutional investor seeks to intervene in order to file an objection, *see infra* Part II.E.1, but by exercising its right to opt out of the Class, that entity is protected from the binding legal effect of this Settlement.

**[*36]** The Settlement Administrator also noted that 10,082 persons and entities filed valid requests for exclusion from the Class. (Forrest Decl. P3, Feb. 21, 2006.) Although a large number at first glance, these opt-outs amount to less than 0.2% of the 4.7 million putative Class Members. [11] Comparably small percentages of opt-outs have favored settlement in the past. *See In re Sumitomo,* 189 F.R.D. at 281 (finding that fewer than 1% of class members requesting exclusion "strongly favored approval of the proposed settlement[]"). The small number of objections and low percentage of opt-outs here strongly favor the Settlement.

### FOOTNOTES

[11] Additionally, as opt-outs were not required to submit transactional information in order to file a valid request for exclusion, it is impossible to ascertain what percentage of the opt-outs would have had valid claims to the Settlement.

### 3. Stage of Proceedings and Amount of Discovery Completed

Courts have approved settlements at all stages of the proceedings. The relevant **[*37]** inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement. The parties need not "have engaged in extensive discovery" as long as "they have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the settlement." *In re Austrian & German Holocaust Litig.,* 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2000) (quoting *Plummer v Chemical Bank,* 668 F.2d 654, 660 (2d Cir. 1982)); *see also Maley,* 186 F. Supp. 2d at 363; *In re American Bank Note*

*Holographics,* 127 F. Supp. 2d at 425-26.

At the time of the Stipulation of Settlement, this litigation had reached an advanced stage of discovery. Even prior to formal discovery, Plaintiffs reviewed the relevant public facts pertaining to this litigation, with their review culminating in the 300 page Amended Complaint. Upon commencing formal discovery, Plaintiffs reviewed over 15 million documents, consulted with nine different economic and accounting experts, briefed numerous motions, and laid the foundation **[*38]** for hundreds of depositions. Although the final stages of discovery, including depositions, were not yet complete, it is not certain that Plaintiffs would have been able to maintain this action long enough to reach that stage of discovery. Defendants' motion for summary judgment was pending before the Court, and presented a difficult question that, if decided in favor of Defendants, may have resulted in dismissal of the lawsuit. The thorough briefing of this and other motions prior to settlement supplemented Plaintiffs' consideration of the strengths of their claims and the defenses they were likely to face at trial.

Although discovery had not been completed prior to the Settlement, Plaintiffs had conducted meaningful pre-trial discovery and had engaged in sufficient trial preparation to appraise their likelihood of success. Accordingly, the third *Grinnell* factor also weighs in favor of the Settlement.

## 4. Risks of Class Prevailing (Establishing Liability and Damages, and of Maintaining the Class through Trial)

One of the Court's central inquiries when appraising a settlement is the likelihood that the class would prevail at trial in the face of the risks presented by further **[*39]** litigation. *Grinnell* specifically advises courts to consider the risks of establishing liability and damages, and of maintaining the class through trial. 495 F.2d at 463. This inquiry requires courts to consider legal theories and factual situations without the benefit of a fully developed record, thus courts must heed the Supreme Court's admonition not to "decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n.14, 101 S. Ct. 993, 67 L. Ed. 2d 59 (1981). Rather, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Global Crossing,* 225 F.R.D. at 459 (citing *In re Holocaust Litig.,* 80 F. Supp. 2d at 177).

The difficulty of establishing liability is a common risk of securities litigation. *Maley,* 186 F. Supp. 2d at 364. In this case, Plaintiffs were not only challenged to establish a valid theory of loss causation, *see supra* Parts I.B & II.D.1, they also faced the risk of being unable to establish scienter for a number of the defendants. In its consideration of Defendants' motions to dismiss, the **[*40]** Court closely reviewed Plaintiffs' allegations of scienter, dismissing claims against several individual defendants while finding other allegations adequate to avoid dismissal. *See In re AOL Time Warner,* 381 F. Supp. 2d at 219-31. Of course, avoiding dismissal at the pleading stage does not guarantee that scienter will be adequately proven at trial.

The risk of establishing damages here was equally daunting. The decline in AOL and AOLTW stock prices spanned several years. Defendants argue that this decline was the result of a number of factors--including the general decline in Internet stock values--unrelated to the allegations of fraud. Plaintiffs hired a team of experts to estimate damages and would likely face a conflicting panel of experts retained by Defendants for trial. The risk of establishing damages would be further exacerbated by the difficulty of educating the jury on abstruse economic concepts necessary to the calculation of damages.

Further, Plaintiffs would have faced a considerable challenge explaining the transactions underlying the alleged fraud. The complexity and opacity of these transactions would likely hinder Plaintiffs' ability to present **[*41]** the jury with a coherent explanation of Defendants'

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 21758

Case 5:07-cv-03444-J06 USDC LEXIS 21758 Filed 12/03/2007    Page 16 of 25    Page 15 of 24

misconduct. As their expert, Professor John C. Coffee, Jr., noted, Plaintiffs faced a serious issue "as to whether a jury could understand the convoluted 'round robin' advertising games that had been played" by Defendants. (Coffee Decl. P30, Dec. 2, 2005.)

The Court certified this Class for settlement purposes only. Plaintiffs report that they had drafted a motion for class certification prior to the Settlement and had fully anticipated that Defendants would oppose class certification as vigorously as it had contested Plaintiffs' allegations and discovery requests. As such, even the process of class certification would have subjected Plaintiffs to considerably more risk than the unopposed certification that was ordered for the sole purpose of the Settlement.

In summary, the _Grinnell_ "risk factors" also favor the Settlement.

### 5. Ability of Defendants to Withstand a Greater Judgment

This factor typically weighs in favor of settlement where a greater judgment would put the defendant at risk of bankruptcy or other severe economic hardship. _See, e.g., In re Warner Comms. Sec. Litig., 618 F. Supp. 735, 746 (S.D.N.Y. 1985)._ [*42] Here, AOLTW remains a solvent, highly capitalized company, with assets greatly exceeding its $ 2.4 billion contribution to the Settlement. Neither party contends that Defendants are incapable of withstanding a greater judgment. However, the mere ability to withstand a greater judgment does not suggest that the Settlement is unfair. _See, e.g., D'Amato, 236 F.3d at 86; In re NASDAQ Market-Makers, 187 F.R.D. at 477-78._ This factor must be weighed in conjunction with all of the _Grinnell_ factors; most notably the risk of the class prevailing and the reasonableness of the settlement fund.

### 6. Range of Reasonableness of the Settlement Fund

The final two _Grinnell_ factors constitute an inquiry into the settlement fund's range of reasonableness (1) in light of the best possible recovery and (2) to a possible recovery in light of all the attendant risks of litigation. _495 F.2d at 463._ Though courts are encouraged to consider the best possible recovery, the range of reasonableness inquiry is tightly bound to the risks of litigation, which have been developed in greater detail above. _See supra_ Part II.D.4. As such, the following [*43] discussion must be tempered by the Court's earlier finding that continued litigation would proceed with a high degree of risk.

Plaintiffs have not provided a specific estimate of the total damages sustained by the Class, in large part, no doubt, due to the difficulty of distinguishing the decline in share price attributable to fraud from the decline attributable to general market forces. In light of the steep decline during the Class Period and the Settlement's estimated recovery per share, however, it seems clear that Class Members will not recover their entire loss. This consideration alone does not undermine my finding that the $ 2.65 billion Settlement Fund is reasonable in light of the difficulty of establishing damages here. "The settlement amount's ratio to the maximum potential recovery need not be the sole, or even the dominant, consideration when assessing the settlement's fairness." _In re Global Crossing, 225 F.R.D. at 460-61._ Indeed, damages are of such a speculative and contested nature here that the ratio of the settlement amount to a hypothetical maximum recovery would not be dispositive of the Settlement's fairness.

Not only do the parties dispute [*44] the amount of damages sustained by the Class, they continue to dispute the very existence of damages. In light of this fundamental disagreement, the $ 2.65 billion Settlement secured by Plaintiffs is all the more impressive. Plaintiffs have secured a substantial, immediate recovery for the Plaintiff Class that ranks among the five largest securities settlements in history (Coffee Decl. P2), and is the second largest settlement ever reached with an issuer of securities. (Heins Decl. P83.) [12] In addition, the Settlement Fund is currently in escrow, earning approximately $ 303,000 a day for the

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 47588

Case 5:07-cv-03444-JF Document 47-2 Filed 12/03/2007 Page 17 Page 56 of 24

Class. In this sense, the benefit of the Settlement will not only be realized far earlier than a hypothetical post-trial recovery, but dates back to October 7, 2005, when the funds were deposited in the escrow account. The concrete benefits of this Settlement outweigh the possibility of a higher recovery after trial. Under the circumstances of this case, the Settlement Fund is within the range of reasonableness.

---

**FOOTNOTES**

12 In the early stages of this litigation, legal experts estimated "a payout of $ 1 billion" in the event of a settlement. (Heins Decl. Ex. 40.) Though this figure represents an estimated settlement amount rather than a full recovery, it provides some indication of the legal community's expectations. The Settlement reached here far exceeds those prognostications.

---

**[\*45]** After carefully considering the _Grinnell_ factors, most of which weigh in favor of the Settlement, I find the substantive terms of the Settlement fair, reasonable, and adequate.

### E. Objections

The Court received a handful of objections to the Settlement prior to the deadline. 13 I will address each objection in the context of the aspect of the Settlement that is disputed.

---

**FOOTNOTES**

13 Several of the persons objecting to the Settlement also object to Class Counsel's application for attorney's fees. The Court reserves judgment on the issue of attorney's fees at this time and will address the objections to fees in a separate ruling.

---

### 1. Stichting's Objection to the Settlement's Handling of the DOJ and SEC Funds

Stichting Pensioenfonds ABP ("Stichting") filed a motion to intervene, objecting to the Settlement's handling of funds set aside by AOLTW subsequent to the Company's settlements with the DOJ and SEC. 14 Stichting's objection to the Settlement's inclusion of the DOJ funds and AOLTW's decision to **[\*46]** use its "best efforts" to include the SEC funds are without merit. Because the right of intervention is inessential to my disposition of Stichting's objection, the validity of its intervention is assumed for the purpose of this Opinion. 15

---

**FOOTNOTES**

14 Stichting is a putative Class Member but has chosen to opt out of the instant Settlement, hence the necessity of its motion to intervene. Stichting has filed a separate lawsuit, which is pending in this Court.

15 Stichting's right of intervention is by no means assured under the circumstances of this case. I am particularly troubled by the objector's argument that its intervention in this dispute is timely. Though Stichting filed its motion on the January 9, 2006 deadline for objections, it made no attempt to alert the Court to its objection at the preliminary fairness hearing on September 28, 2004, or at any time prior to January 9, 2006. By the time Stichting objected, the Settlement Administrator had mailed millions of Notice Packages and hundreds of thousands of putative Class Members had filed claims. If Stichting's requested relief were granted, these costs would be duplicated by a second round of Notice.

---

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 17588

Case 5:07-cv-03444-JF    Document 47-2    Filed 12/03/2007    Page 18 of 25

Page 27 of 24

Although Stichting waited until the last possible minute to bring their objection to the Court's attention, the exhibits to its motion indicate that Stichting was aware of the content of its objection well before the preliminary fairness hearing. (Kairis Decl. Ex. L; Letter from John C. Kairis to Samuel D. Heins and Peter T. Barbur (Aug. 17, 2005).) At that hearing, the Court heard argument from individuals objecting to certain conditions of the Notice, and, where appropriate, suggested that the Plaintiffs modify their proposal. Stichting's grievance is precisely the type of objection that would have been beneficially brought to the Court's attention at the preliminary fairness hearing. *See* Manual for Complex Litigation (Third) § 30.41, at 265 (2000) ("The court may want to hear not only from counsel but also from named plaintiffs, from other parties, and from attorneys who did not participate in the negotiations.").

**[*47]** Stichting requests that the Court strike the terms of the Settlement that refer to the DOJ and SEC funds, order that those funds be distributed pro rata to all aggrieved shareholders regardless of their participation in the instant Settlement, and order that a modified Notice and Plan of Allocation be published and distributed. Because the DOJ and SEC funds were established under different conditions and the Settlement handles the funds dissimilarly, each fund will be considered in turn.

### i. The DOJ Funds

Prior to the instant Settlement, AOLTW entered into a Deferred Prosecution Agreement with the DOJ (the "DPA"). In accordance with the DPA, AOLTW agreed to pay $ 150 million into a "fund to be established under *its direction and control* to be used for either the settlement of shareholder securities law litigation or for purposes of any compensation fund" related to the transactions underlying the DPA. (Karis Decl. Ex. C; *United States v. America Online, Inc.,* No. 1:04 M 1133, at P9 (E.D. Va. Dec. 14, 2004) (emphasis added).) Stichting argues that the inclusion of the DOJ funds in the Settlement will preclude them from obtaining their pro rata share of the money provided **[*48]** by the DPA, thus unfairly benefiting the Settlement claimants to the detriment of shareholders who have opted out of the Settlement. (Stichting Obj. 23.)

Stichting's objection to the Settlement's inclusion of the DOJ funds is undermined by the DOJ's directions for the distribution of those funds. Under the DPA, the DOJ funds are put under AOLTW's "direction and control" for "the settlement of shareholder securities law litigation." In its discretion, AOLTW has chosen to distribute those funds by means of the primary class action Settlement, benefiting hundreds of thousands of aggrieved shareholders and eliminating the costs associated with a separate distribution mechanism. Stichting's protestations notwithstanding, the DPA does not expressly indicate that the funds must be distributed pro rata to all harmed investors. Prior to filing their objection, Stichting wrote a letter to the DOJ, submitting their concern to that agency. (Kairis Decl. Ex. M; Letter from John C. Kairis to Paul J. McNulty, Esq., U.S. Dep't of Justice (Dec. 16, 2005).) There is no record of a reply. Without some indication that AOLTW's distribution of the funds is contrary to the Company's agreement with the DOJ, **[*49]** the Court will not disturb an agreement within the jurisdiction of another federal district court by reading conditions absent from the DPA into that agreement.

Stichting has not demonstrated that the Settlement's inclusion of the DOJ funds was improper. Consequently, the Settlement terms including those funds need not be stricken, nor must Plaintiffs distribute a modified Notice and Plan of Allocation on that basis.

### ii. The SEC Funds

Case 5:07-cv-03444-JF   Document 47-2   Filed 12/03/2007    Page 19 of 25

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 47588                    Page 18 of 24

Following an SEC investigation into AOL's allegedly fraudulent accounting and Time Warner's alleged violation of a cease-and-desist order, AOLTW entered into an agreement with the SEC. Under the terms of a consensual judgment, AOLTW agreed to pay "$ 300 million in civil penalties, which the Commission will request be distributed to harmed investors." (Kairis Decl. Ex. F; SEC Litigation Release No. 2215 (March 21, 2005).)

In all of the materials announcing and describing the Settlement, the parties have referred to a $ 2.65 billion Settlement Fund. The $ 2.65 billion figure does not include the SEC funds. The first mention of the SEC funds is on page six of the sixteen-page Notice. The Notice states that the SEC has not determined how those funds [*50] will be distributed, but that AOLTW has requested that the SEC make those funds, or a portion thereof, available for distribution with the Settlement. The settling parties have twice updated the Settlement website to indicate that the SEC has not made a final decision regarding those funds. In short, the Settlement does *not* include the SEC funds. Consequently, the Court will not require the parties to remove wholly aspirational language regarding the mechanism by which those funds may be distributed.

Furthermore, intermittent references to the SEC funds make neither the Notice nor the Plan of Allocation defective. Each of the Notice's references to the SEC funds is accompanied by a disclosure that those funds are not a part of the Settlement, but that AOLTW will make its best efforts to distribute those funds, or a portion thereof, through the class action mechanism. All estimates of per share recovery clearly indicate that the recovery is based on the $ 2.65 billion figure, which does not include the SEC funds. Providing a second set of figures including the SEC funds in the estimated per share recovery would not only be misleading, but potentially inaccurate, because there is [*51] no indication of whether the SEC will elect to distribute none of the SEC funds, all of the SEC funds, or a portion thereof, through the Settlement. It cannot be said that the Notice fails to fairly apprise the putative Class Members of the terms of the Settlement. [16] To the contrary, the Notice explains the status of the SEC funds as clearly and simply as possible in light of the SEC's indecision with respect to how those funds will be distributed.

---

**FOOTNOTES**

[16] *See infra* Part II.E.4 for an elaboration on the relevant standards for settlement notice.

---

Along these lines, the Plan of Allocation never mentions the amount of money that will be distributed. It merely states that the "Settlement monies will be distributed on a pro rata basis" under the terms of the Plan. (Plan of Allocation 1.) Stichting fails to explain how the Plan of Allocation would need to be altered to incorporate the greater amount of Settlement monies. If the SEC consented to distributing the $ 300 million via the Settlement, that money would simply [*52] be added to the $ 2.65 billion Settlement Fund already being distributed. Each claimant's pro rata share would net a greater per share recovery, but the Plan of Allocation itself would not require modification.

In short, references to SEC funds that are not included in the Settlement amount, but that AOLTW will make its "best efforts" to distribute through the class action mechanism do not make the Stipulation of Settlement, Notice, or Plan of Allocation defective. Stichting's objection is overruled.

## 2. Objections to the Reasonableness of the Settlement

Two individuals filed formal objections to the reasonableness of the Settlement. Margaret M. Keffer ("Keffer") argues that the Settlement provides inadequate compensation for her loss, suggesting instead that a settlement leading to the recovery of one-third of her losses might

Case 5:07-cv-03444-JF    Document 47-2    Filed 12/03/2007    Page 20 of 25

be adequate. Paul Heyburn ("Heyburn") argues that, considering the serious allegations against Defendants, the estimated recovery per share simply does not provide a substantial benefit. [17]

---

**FOOTNOTES**

[17] Plaintiffs argue that Heyburn does not have standing to object to the Settlement. Indeed, the transaction records attached to Heyburn's objection indicate that he profited from his AOL investment. (Heyburn Obj. Ex 1.) Consequently, he does not have a claim under the Plan of Allocation, which limits recovery to those shareholders that suffered a loss. Without an injury, Heyburn does not have standing to object. *New York v. Reebok Int'l Ltd., 96 F.3d 44, 47 (2d Cir. 1996).* Nevertheless, in order to dispel any perceived unreasonableness of the Settlement, I will briefly address Heyburn's concerns regarding the reasonableness of the Settlement and adequacy of representation. *See infra* Part II.E.3.

---

**[*53]** Courts routinely approve settlements over conclusory objections. *See, e.g., In re Prudential Sec. Inc., Ltd. P'Ships Litig., 1995 U.S. Dist. LEXIS 22103, MDL No. 1005, 1995 WL 798907, at *13 (S.D.N.Y. Nov. 20, 1995); Saylor v. Bastedo, 594 F. Supp. 371, 373-74 (S.D.N.Y. 1984).* Neither Heyburn's nor Keffer's objection provides a legal or factual basis for the alleged insufficiency of the Settlement, nor do they consider the legal or factual context in which the Settlement was reached. Consequently, the objectors' unsupported allegations of unreasonableness do not alter my appraisal of the Settlement's fairness.

### 3. Objection to Lead Plaintiff's Adequacy of Representation

Heyburn also questions the adequacy of representation. He argues that Lead Plaintiff has failed to adequately protect the interests of Class Members by neglecting to analyze whether "certain class members in certain states would fare better than in others" on the basis of state securities laws. (Heyburn Obj. P3.) This objection is without merit.

Heyburn overlooks the provisions of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"). SLUSA amended the federal securities laws to preempt state **[*54]** securities laws in certain class actions. [18] In relevant part, SLUSA directs that:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal Court by any private party alleging--
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1). [19]

---

**FOOTNOTES**

[18] As the Supreme Court recently noted, SLUSA amends the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act") "in substantially similar ways." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, U.S. , 126 S. Ct. 1503, 164 L. Ed. 2d 179, 2006 WL 694137, at *7 n.6 (March 21, 2006).* Plaintiffs claims are

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 17588

Case 5:07-cv-03444-JF   Document 47-2   Filed 12/03/2007   Page 21 of 25   Page 20 of 24

almost evenly divided between the 1933 Act and the 1934 Act. For ease of reference to the Supreme Court's analysis in *Dabit,* I will quote the amendments to the 1934 Act. **[*55]**

**19** The analogous provision in the 1933 Act is found at 15 U.S.C. § 77p(b).

Because the instant action is a "covered class action," **20** alleging materially false and misleading statements or omissions of material fact (Second Am. Compl. PP240-432) in connection with the purchase or sale of "covered securit[ies]," **21** claims under state securities laws are preempted. Consequently, Lead Plaintiff had no duty to consider, and in fact was prohibited from considering, state securities laws in the context of this class action. *See Dabit,* 164 L. Ed. 2d 179, 2006 WL 694137, at *9; *see also Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 108-10 (2d Cir. 2001) (reaching the same conclusion in the context of the 1933 Act). As such, Heyburn's objection to the adequacy of Lead Plaintiff's representation is overruled.

**FOOTNOTES**

**20** SLUSA defines a "covered class action" as:

> any single lawsuit in which . . . damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class . . . predominate over any questions affecting only individual persons or members . . . .

15 U.S.C. § 78bb(f)(5)(B). The instant class action clearly falls within this definition. **[*56]**

**21** "A 'covered security' is one traded nationally and listed on a regulated national exchange." *Dabit,* 164 L. Ed. 2d 179, 2006 WL 694137, at *7 & n.9 (citing 15 U.S.C. §§ 78bb(f)(5)(E) & 77r(b)). Both AOL (prior to the merger) and AOLTW stock traded on the New York Stock Exchange during the Class Period.

## 4. Objection to the Notice

"The adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." *Wal-Mart,* 396 F.3d at 113-14 (citations omitted). Reasonableness refers to the understanding of the average class member; "the settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options which are open to them in connection with the proceedings.'" *Id.* at 114 (quoting *Weinberger,* 698 F.2d at 70).

Cynthia R. Levin Moulton ("Moulton") objects to the Class Definition contained in the Notice, arguing that it "is defective and fails to satisfy the minimal **[*57]** requirements of due process" because the definition "only includes those security owners 'who were injured thereby,'" and the "class notice provides nothing by way of guidance concerning what it means to be injured thereby." (Moulton Obj. 2.) Moulton proceeds to describe a number of hypothetical situations in which the "injured thereby" definition may be unclear, as when a putative Class Member realizes gains offsetting her losses or has divergent results stemming from the ownership of distinct investment vehicles.

Moulton made an almost identical objection to the *WorldCom* settlement approved in this

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 47588

Case 5:07-cv-03444-JF    Document 47-2    Filed 12/03/2007    Page 22 of 24    Page 23 of 24

District just six months ago. In that case, Moulton argued that the class definition, which contained a similar "injured thereby" clause, "might be confusing to a person who had isolated losses but net gains from securities purchased during the Class Period, or who faced divergent results from purchases of different types of securities." *In re WorldCom*, 388 F. Supp. 2d at 340. Judge Cote's well-reasoned analysis of Moulton's objection in that case applies equally here:

> A purchaser of [AOLTW] securities who believed that she had a legally cognizable injury **[*58]** attributable to those purchases would have been on notice that she was included in the Class. It is sufficient that the Class Definition gave putative Class Members who believed they had colorable claims arising from purchases of [AOLTW] securities enough information to alert them that they needed to opt out of the Class if they wished to pursue their claims separately.

*In re WorldCom*, 388 F. Supp. 2d at 340-41. Furthermore, the Plan of Allocation provides instructions for the calculation of recovery in many of the allegedly problematic scenarios proposed by Moulton. As in *WorldCom*, Moulton's objection is overruled.

## 5. Objection to the Plan of Allocation

A plan of allocation is evaluated by the same standards applied to the settlement as a whole: fairness, reasonableness, and adequacy. See *Maley*, 186 F. Supp. 2d at 367 (citations omitted). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." *Id.* (citations omitted). Despite the existence of one objection here, the Plan of Allocation readily satisfies these standards.

I have already commented **[*59]** on Lead Plaintiff's Counsel's experience and competency. *See supra* Part II.C. Lead Plaintiff's Counsel prepared the Plan of Allocation in consultation with Scott D. Hakala, Ph.D., CPA ("Hakala"), an economics expert who has prepared court-approved plans of allocation in over a dozen securities settlements across the nation. (Hakala Decl. P1, Jan. 25, 2006.) Hakala designed the Plan of Allocation to provide recovery to damaged investors on a pro rata basis according to their recognized losses of damages. The Plan of Allocation presents clearly defined formulas for calculating claims by reference to a schedule with measures of artificial inflation for all relevant time periods and types of securities. Plans of allocation similarly calculating claims according to inflationary loss have recently been approved as a reasonable approach to the calculation of damages. See *Maley*, 186 F. Supp. 2d at 367; *In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 649 (D.N.J. 2004).

In his declaration, Hakala explains the methodology used to prepare the Plan of Allocation and asserts that the Plan is "fair and reasonable from an economic perspective." (Hakala **[*60]** Decl. P28.) While the estimates of damages and methodologies used to produce the Plan are necessarily complex due to the various types of securities involved in the AOLTW merger, the Court agrees with Hakala's assessment.

Pat L. Canada ("Canada") objects to the Plan of Allocation to the extent that it provides for the calculation of damages by the first-in/first-out accounting method ("FIFO"), rather than the last-in/first-out method ("LIFO"). Canada argues that courts prefer LIFO and only reluctantly permit the use of FIFO, thus the Plan of Allocation should be modified to calculate damages using LIFO. [22]

## FOOTNOTES

22 In addition to their substantive disagreement with Canada's objection, Plaintiffs attack the objection on two procedural grounds. First, they argue that Canada does not have

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 17588

Case 5:07-cv-03444-JF   Document 47-2   Filed 12/03/2007   Page 23 of 24   Page 22 of 24

standing, because he did not submit adequate proof of his membership in the Class. Indeed, Canada's non-notarized certification that he purchased 200 shares of AOL stock is not a valid proof of purchase. Second, they argue that Canada's lawyer, Nicholas M. Fausto, Esq. ("Fausto"), is in the practice of submitting "canned objections," thus the Court should be wary of his objection. On this latter point too, Plaintiffs may be correct.

Much of the language in Fausto's brief attacking the use of FIFO is taken directly from Judge Schiendlin's opinion in *In re Espeed, Inc. Secs. Litig.,* 232 F.R.D. 95 (S.D.N.Y. 2005). Despite the fact that it is the most comprehensive authority from this District supporting his argument, Fausto fails to cite the case, choosing instead to lift whole sentences from that opinion without attribution. *Compare* Canada Obj. 7-8, *with In re eSpeed,* 232 F.R.D. at 101-02 & nn.35-36. None of his arguments are original, nor are they made in the context of the specific factual circumstances of this case. Although I am wary of the Canada objection, I will briefly address the thrust of its argument.

[*61]  In the context of a securities class action, FIFO and LIFO refer to methods used for matching purchases and sales of stock during the class period in order to measure a class member's damages. Under FIFO, a class member's damages are calculated by matching her first purchases during the class period with her first sales during the class period. Under LIFO, a class member's damages are calculated by matching the class member's last purchases during the class period with the first sales made during the period. Calculating recovery by means of these different methods can affect the measure of a class members' injury. Depending on the trajectory of a stock's percentage of artificial inflation and the sale of shares during the class period, use of FIFO may result in damages where LIFO would not, and vice versa.

The method used to match purchases and sales when calculating damages in a securities action has only recently been the subject of judicial scrutiny and has more commonly arisen in the context of a court's assignment of lead plaintiff status. In this District, both FIFO and LIFO have been used to calculate the financial stake of movants for lead plaintiff status in securities class [*62]  actions. *Compare In re Veeco Instruments Inc. Sec. Litig.,* 233 F.R.D. 330, 333 (S.D.N.Y. 2005) (concluding that FIFO is "the appropriate methodology . . . for the purpose of considering the financial stake of the movant for lead plaintiff status"), *with In re eSpeed, Inc. Sec. Litig.,* 232 F.R.D. 95, 100-02 (S.D.N.Y. 2005) (concluding that lead plaintiff movant's "loss as calculated by the [movant] demonstrates why FIFO (as applied by the [movant]) is inferior to LIFO"). Determining the method of analysis is especially important in the context of lead plaintiff selection because prospective lead plaintiffs may manipulate their analysis in order to inflate their measure of damages, giving them an advantage over movants that calculate damages according to a different methodology. [23]

### FOOTNOTES

[23] The method of analysis was not contested during the selection of lead plaintiff in this case. Without any objection, FIFO was used to calculate the damages in movants' applications for lead plaintiff. (Crawford Aff. Ex. B, Oct. 15, 2002.) Furthermore, the more than half million claimants to this Settlement have submitted their claims on the basis of the Plan of Allocation as presented here.

[*63]  The LIFO/FIFO debate has not arisen in the context of a plan of allocation anywhere in this Circuit, [24] and Canada's conclusory objection fails to raise the slightest inference of how the Plan of Allocation's use of FIFO is unfair here. *Cf. In re eSpeed,* 232 F.R.D. at 101 (finding FIFO unfair in movant's application for lead plaintiff status in light of the movant's specific, manipulative application of FIFO in that case). Nor can Canada explain how the

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 17588

Case 5:07-cv-03444-JF    Document 172    Filed 12/03/2007    Page 24 of 24

Page 23 of 24

method of analysis would affect his recovery, as he claims to have made only a single purchase of stock and LIFO/FIFO is necessarily concerned with the matching of multiple stock purchases. Here, the Plan of Allocation is careful to limit a claimant's recovery to shares sold at a loss. Moreover, Plaintiff's economic expert affirms that "the overall effect of using the LIFO method instead of FIFO is not significant in this case." (Hakala Decl. P27.) Ultimately, there is no evidence that the method of analysis used in this case would result in an unfair distribution of the Settlement Fund. [25]

---

**FOOTNOTES**

24 One court in this District recently approved a Plan of Allocation using LIFO, but did not elaborate on the choice of methodology, nor is their any evidence that the method of analysis was contested in that case. See _SEC v. Bear, Stearns & Co.,_ 2005 U.S. Dist. LEXIS 6683, No. 03 Civ. 2937, 2005 WL 217018, at *7 (S.D.N.Y. Jan. 31, 2005). The unelaborated use of LIFO in one case does not compel the use of that method of analysis in all cases. Both Hakala and the Settlement Administrator affirm that FIFO has been used in the great majority of the plans of allocation that they have prepared and administrated in the past. (Hakala Decl. P22; Forrest Decl. P12.) **[*64]**

25 This Opinion should not be read as an unconditional endorsement of FIFO as the method for matching purchases and sales for the calculation of damages in securities fraud litigation. Rather, the insignificance of the methodology applied in this case makes it counter-productive to require Plaintiffs to revise the Plan of Allocation and reinitiate the Notice period in order to calculate damages according to LIFO.

---

In light of overwhelming support for the Plan of Allocation by nearly all of the estimated 600,000 claimants to the Settlement, and the insignificance of the method of matching sales with purchases in the context of this case, I find the Plan of Allocation fair, reasonable, and adequate.

### III. Conclusion

For the foregoing reasons, Lead Plaintiff's petition for approval of the Settlement and Plan of Allocation is granted. A separate opinion establishing attorney's fees and expenses will follow.

SO ORDERED.

SHIRLEY WOHL KRAM

UNITED STATES DISTRICT JUDGE

Dated: New York, New York

April 6, 2006

Service: **Get by LEXSEE®**
Citation: **2006 us dist lexis 17588**
View: Full
Date/Time: Sunday, December 2, 2007 - 7:24 PM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 17588                                    Page 24 of 24

⚠ -  Caution: Possible negative treatment
✦ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
ⓘ -  Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

 **LexisNexis**®  About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.