# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)



Page 1

▷
In re Convergent Technologies Second Half 1984 Securities Litigation
N.D.Cal. 1990
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re CONVERGENT TECHNOLOGIES SECOND HALF 1984 SECURITIES LITIGATION.
This Document Applies To All Actions.
C-85-20130-SW.

Jan. 10, 1990.

Josef D. Cooper, Law Offices of Josef D. Cooper, San Francisco, CA, Jules Brody, Stull, Stull & Brody, New York City, Michael S. Glassman, Clemens, Glassman & Clemens, Los Angeles, CA, Robert N. Kaplan, Frederic S. Fox, Kaplan & Kilsheimer, New York City, for plaintiffs.
Steven M. Schatz, Terry T. Johnson, David S. Steuer, Laurie B. Smilan, Wilson, Sonsini, Goodrich & Rosati, A Professional Corp Palo Alto, CA, Michael F. Perlis, Stroock & Stroock & Lavan, Los Angeles, CA, Philip F. Atkins-Pattenson, Daniel T. Bernhard, Pettit & Martin, San Francisco, CA, Douglas M. Schwab, Michael L. Charlson, Heller, Ehrman, White & McAuliffe, San Francisco, CA, for defendants.

ORDER GRANTING THE CONVERGENT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
SPENCER WILLIAMS, District Judge.
*1 This matter came on for hearing on November 17, 1989, in Honolulu, Hawaii. Plaintiffs, the Convergent defendants and the outside director defendants cross-move for summary judgment. The defendants jointly move to decertify the class with respect to the state law claims. Having considered all papers filed herein and the oral argument of counsel, this court makes the following rulings.

BACKGROUND

This is a class action brought on behalf of all persons who purchased the stock of Convergent Technologies, Inc. ("Convergent") between July 27 and October 18, 1984. Plaintiffs claim that certain financial statements regarding second quarter business operations of 1984 and press releases concerning business operations in the third quarter of 1984 constituted federal securities fraud and common-law fraud and negligent misrepresentation under state law.

Convergent manufactures and sells computer systems, hardware and software to companies as varied as AT&T and Burroughs. The "Convergent defendants" consist of several company officers: the president, Michels, and various vice-presidents such as Willits, Wegbreit and Newman. The "outside directors" are Towbin, Cable and Rollnick, underwriters of the offering in question. Subsequent to the November 17, 1989 hearing, the parties stipulated and this court approved the dismissal of all claims against two of the outside directors, Cable and Rollnick.

The gravamen of plaintiffs' complaint is that the defendants engaged in a scheme to artificially inflate the value of Convergent stock in connection with a $50,000,000.00 subordinated debenture offering. Plaintiffs proceed on a "fraud on the market theory," where plaintiffs' reliance on the alleged false or misleading statements consisted of their reliance on the supposedly overvalued stock price. *Basic Inc. v. Levinson,* 485 U.S. 224, 241-42 (1988).

The debenture offering was to take place late in the third quarter or early in the fourth quarter, but defendants eventually dropped the offering. In order to enhance stock value, plaintiffs claim that defendants overstated revenue and understated expenses in financial statements for the second quarter of 1984 and in press releases misrepresented

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 2

Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

the company's potential earnings for the third quarter. However, defendants never bought stock in the company during the period in question. In fact, stock value fell after each press release was made public.

*Second Quarter Financial Statements*

Plaintiffs allege that defendants improperly assigned revenue earned in the third quarter to the second quarter and underestimated reserves for the second quarter in financial statements submitted to the SEC. The method defendants allegedly used in making these misleading statements to the SEC was "Meise magic." Meise was a financial officer who employed accounting devices to meet financial targets Convergent set for itself. Plaintiffs claim that the net effect of these intentional or negligent accounting errors was to inflate earnings per share.

*Third Quarter Press Releases*

**\*2** Plaintiffs challenge press releases issued on September 18, 1984, September 19, 1984 and October 4, 1984. These releases concerned the debenture offering and the profitability of the company in the third quarter. According to plaintiffs, an examination of Convergent's internal estimates of its third quarter profitability made at the time of the press releases render those releases misleading. Internal company forecasts as to profitability are evidenced by statements of individual company officers and by official company "plans" or "replans."

DISCUSSION

I. THE CONVERGENT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A. *Legal Standards*

1. Federal Securities Fraud

No representation or omission is materially misleading unless there was "a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to sell his shares."*Grigsby v. CMI Corp.,* 765 F.2d 561, 564 (9th Cir. 1985). The *Grigsby* court relied on the landmark decision of *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976). In *TSC Industries,* the Court stated that "there must be a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available."*TSC Industries,* 426 U.S. at 449 (footnote omitted).

A prediction of a future event is not actionable if "it represents management's view ... it was reached in a rational fashion and ... it is a sincere view."*Marx v. Computer Sciences Corp.,* 507 F.2d 485, 490 & n.7 (9th Cir. 1974). Moreover, there is no cause of action under the federal securities laws without a showing of scienter. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 206 (1976). Scienter is knowing, intentional or reckless conduct.*Nelson v. Serwold,* 576 F.2d 1332 (9th Cir.), *cert. denied,*439 U.S. 970 (1978).

2. Summary Judgment

Upon motion for summary judgment, the moving party bears "the initial responsibility of informing the district court of the basis for its motion ... " *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In meeting this burden, the moving party need not affirmatively negate the opponent's claims. *Id.* Once the moving party meets this burden, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."*Celotex,* 477 U.S. at 322.

To make a sufficient showing, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial... ' " *Id.* at 324.Summary judgment is proper where a jury could not " reasonably find ... that the plaintiff proved his case by the quality and quantity of evidence required by the governing law ... " *Anderson v. Liberty Lobby,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 3
Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

*Inc.*, 477 U.S. 242, 254 (1986).

B. *Analysis*

1. Third Quarter Press Releases

*September Press Releases*

**\*3** The first press release in question was issued September 18, 1984, and read as follows:
Convergent Technologies, Inc. announced today that it intended to go forward with its $50,000,000 Subordinated Debenture offering although the offering was being delayed temporarily. Allen Michels, Convergent's President, state that "As in recent quarters, the earnings for the current quarter will be significantly influenced by shipments in the final month of the quarter. For this reason, it has been decided to make the offering after the results for the quarter have been made public. Based upon information currently available to it, management believes there is no basis for any significant change in the Company's expectations for the quarter."

Defts. Exh. 12. On the next day, the following article appeared in the *Wall Street Journal:*
Convergent Technologies, Inc. said it will delay its proposed $50 million offering of subordinated debentures until it makes public its third-quarter results next month.
A spokesman said the delay was requested by L.F. Rothschild, Unterberg, Towbin, the lead underwriter for the offering.
Despite the delay, "Management believes there is no basis for any significant change in the Company's expectations for the quarter," said Allen Michels, Convergent's President. A company spokesman said the company's profit expectations for the quarter were "very much in line" with those of security analysts, whose estimates range from $5.7 million, or 15 cents a share, to $7.6 million, or 20 cents a share.

Defts. Exh. 116. Plaintiffs contend that these statements were misleading because in the first two months of the third quarter Convergent had losses of $0.09 per share, even though the Company's "Replan" budgeted a profit of $0.06 per share.

In further support of their contentions, plaintiffs refer to several statements made by one defendant, Convergent's CEO Michels, to defendant Towbin, one of the principal underwriters. Mr. Michels remarked that he was unable to give "assurances" that Convergent would make a profit for the third quarter. Kaplan Decl. Exh. 1, Michels Tr. 143. In further talks with the underwriters, Michels was "not willing to express a certainty as to whether [[[the] company" [would] "make a profit during the third quarter."Kaplan Decl. Exh. 2. Defendant Michels could not "guarantee a profit." Kaplan Decl. Exh. 27, Conway Tr. 83-84.

Convergent's press releases stated that the company expected profits between 15 and 20 cents per share, not that they could guarantee a profit. Convergent routinely sustained heavy losses in the first two months of a given quarter, but recouped those losses and generated a profit in the last month of the quarter. Michels Decl. ¶ 10; Wegbreit Decl. ¶ 10; Fischer Decl. ¶¶ 20-21. For example, Convergent lost 6 cents per share in the first two months of the second quarter. Convergent not only made up these losses, but concluded the second quarter with an 11 cents per share profit from continuing operations.

**\*4** Defendants' internal forecasts at the start of the third quarter foresaw a $0.23 per share profit in the third quarter. Willits Decl. ¶ 25. This forecast was based on operating profits of $16.3 million, $2.8 million of which included high risk items. Defts. Exh. 20 at 1. After the third quarter initial losses were discovered to be higher than previous initial losses, defendants downgraded their internal estimate to $0.19 per share -- exactly the forecast disclosed in the September 18, 1984 press release. Defts. Exh. 39 at 2.

As the facts stand, defendants in the September 18, 1984 press release carefully stated that earnings for the third quarter would be "significantly influenced" by final month orders. Defendants explicitly stated that due to this uncertainty, the offering would be postponed until the final third quarter results. Although management *believed* that there would be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Page 4

Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)  
**(Cite as: Not Reported in F.Supp.)**

no *significant* change in the company's expectations for the third quarter, the September 18, 1984 made it clear that third quarter profitability in the final analysis hinged upon shipments in the final month of the quarter.

Plaintiffs have adduced no evidence which tends to vitiate the basis of management's expectations for per share profits that quarter. Michel's refusal to guarantee a profit for the third quarter is in accord with management's statements that earnings for the third quarter would be "significantly influenced" by shipments in the final month. The term "significantly influenced" connotes apprehension as to future events and an unwillingness to ensure the outcome of present circumstances.

Moreover, words of expectation "bespeak caution in outlook and fall far short of the assurances required for a finding of falsity and fraud. Language of expectation ... recognizes the imponderable influence of complex variables in a fast-changing field."*Polin v. Conductron Corp.,* 552 F.2d 797, 806 n.28 (8th Cir.), *cert. denied,*434 U.S. 857 (1977); *accord, Daisy Systems Corp. v. Finegold,* [Current Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,520 at 93,312 (N.D. Cal. 1988) (Williams, J.). As this court has found, defendants had sound reasons for their expectations. Plaintiff can point to no language in the alleged misstatements that indicated defendants were certain about their expectations.

As it turned out, certain high profit margin products such as the more complex NGEN line did not sell as well, even though Convergent often by contract required its purchasers to forecast their needs. Also, Burroughs, a large Convergent customer, began to internally develop products it previously bought from Convergent without notifying Convergent of this fact. Convergent defendants did not know of these quarterly results until after the quarter. Michels Decl. ¶¶ 32-33; Wegbreit Decl. ¶¶ 18-19, Willits Decl. ¶¶ 28-29; Fischer Decl. ¶ 23.

The outside directors who were also the underwriters lost their big underwriter fees. The Convergent defendants lost investment from the cancelled offering, did not purchase Convergent stock, and in fact devalued the stock after every public disclosure. Where the economic context makes the fraud implausible, plaintiffs "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1470 (9th Cir. 1987) , *cert. denied,*486 U.S. 1006 (1988).

*5 Plaintiffs continue by pointing out that Convergent's outside accountants reported delay of the offering due to *potentially* unfavorable results. Fox Decl. Exh. 20. However, the releases explicitly stated that the offering was delayed because shipments in the final month of the quarter could significantly influence earnings. The release is therefore not misleading with respect to the opinion of the outside accountants because quarterly earnings clearly could be "significantly influenced" by unfavorable results in the final month shipments.

Also, plaintiffs would find a misstatement where Convergent management knew that the investment community was concerned that problems would surface. Fox Decl. Exh. 76. What the investment community believed is irrelevant. The issue is whether defendants had a reasonable belief for their projections.

*October Press Releases*

In late September it became apparent that revenues were down, so Convergent made the following press release:  
Convergent Technologies announced today that based on preliminary indications it's [sic] revenues for the third quarter ended September 30, 1984 will be substantially higher than those for the second quarter but that earnings from continuing operations in the third quarter will be approximately the same as earnings from continuing operations in the second quarter.  
Third quarter earnings which reflect a shortfall relative to the Company's expectations are due principally to slightly lower than planned shipments

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 5
Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

which included a lower than planned proportion of high margin products.

Defts. Exh. 12. Even though the final results of the third quarter were due in a few weeks, Convergent in this press release revised the company's earnings estimates from the 15 to 20 cents per share range to 11 cents per share.

Plaintiffs challenge this release on the grounds that Convergent staff before the release estimated that the earnings per share would be $0.07. The earnings per share eventually proved to be $0.07. From these facts plaintiffs infer that the October 4th release was misleading and that the defendants knew it was misleading.

Defendants said that on the basis of "preliminary indications," not on the basis solely of one preliminary report, that earnings would be " approximately the same" as the last quarter. There are many qualifications in this release which plaintiffs attempt to gloss over.

The fact of the matter is that the October 4th report was a second downward revision of the company's estimates. The earnings did indeed turn out to be lower due to the very reasons contained in that report. The value of Convergent's stock dropped. Plaintiffs would impose liability for any estimate which did not materialize.

The preliminary worksheet on which plaintiffs rely turned out to be incorrect even though it comported with the final figures. It is uncontroverted that the tax liability was overstated because that worksheet based tax liability on a higher estimate of revenue. The worksheet also included one million dollars of employee bonuses which were erroneously added.

*6 Plaintiffs rely on possible inferences to be drawn from the coincidence of the preliminary and final figures. Plaintiffs do not dispute the fact that one day after the release, the same Convergent staff revised the earnings figure upward to eight cents per share. Equally undisputed is that the acknowledged errors would have resulted in a profit of 11 cents per share. Despite plaintiffs' reliance on a declaration which indicated the Chief Financial Officer believed the figure should be 8 cents, the declarant later stated that the best view of Convergent management was the 11 cents figure. Defts. Exh. 105, Dunmire Depo. at 21-24, 166-67.

*Conclusion*

The press releases at issue involved statements of expectation. As this court has noted, words of expectation generally fall short of assurances required for fraud. Plaintiffs simply have not produced evidence which specifically attack the basis of management's expectations disclosed in the context of these press releases, but rather rely on innuendo and conjecture.

Such innuendo and conjecture will not suffice to withstand a motion for summary judgment where the economic context makes the fraud implausible. It is unclear why management would repeatedly delay and ultimately cancel the offering if it truly intended to inflate stock price in connection with the offering. The foregoing reasons lead this court to conclude as a matter of law that any facts supposedly omitted by management in the press releases would not have significantly altered the total mix of information available to potential investors.

2. Second Quarter Financial Statements

*Introduction*

Plaintiffs challenge a significant number of Convergent transactions totalling approximately $9 million. For the reasons given below, $7.8 million of those transactions were not misleading or do not exhibit the requisite scienter to sustain liability under the federal securities laws. The remaining $1.2 million of transactions is immaterial. Because there are therefore no remaining federal causes of action, this court declines to exercise its pendent jurisdiction over plaintiffs' state law claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 6

Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

*Alleged Understatement of Reserves*

Plaintiffs must prove that the reserves were erroneously understated *at the time* those accounting decisions were made. GAAP, APB Opinion 20 ¶¶ 13, 31, 36; Schneider Decl. ¶ 5 (Defts. Ex. 118). Plaintiff's primary evidence is one of Convergent's *unaudited* preliminary year-end reports which supposedly indicates by asterisks which reserves are attributable to which quarter. Kaplan Decl. Ex. 20 at 20361225. However, the accountant who prepared that document, Richard Fischer, has stated in his declaration that all adjustments to this preliminary report related to the fourth quarter. Second Supp. Fischer Decl. ¶¶ 5, 6. Plaintiffs have produced no specific facts which challenge Mr. Fischer's declaration.

*7 It is also important to note that two sets of accountants, Price Waterhouse and Coopers & Lybrand, went through the books and concluded that at the time the accounting decisions were made, Convergent's reserves for the second quarter were adequate. In the face of this unrebutted evidence, any reserve challenged on the basis of this preliminary report must fall. Schneider Decl. ¶¶ 4, 13; Fischer Decl. ¶ 37; Second Supp. Fischer Decl. ¶ 7.

1) Accounts Receivable/Bad Debts

Of the additional $7 million allocated to this category at year's end, Convergent's auditors found that only $600,000.00 was due to error at the time. Defts. Exh. 56 at 28302-03. The auditors nevertheless concluded that the reserves were adequate because this amount was immaterial. In any event, there is no federal cause of action with respect to this transaction because plaintiffs have adduced no evidence as to scienter.

2) Warranty Reserves

Plaintiffs challenge an additional reserve of $300,000 for this item. However, they have not rebutted Convergent's contentions that Convergent's auditors ascribed this amount to "*new* warranty repair issues" for the fourth quarter. Defts. Exh. 152 at 026505 (emphasis added); Supp. Schneider Decl. ¶ 2. Despite this evidence, plaintiffs would infer that this may have been related to second quarter refit problems associated with the Megaframe product. However, plaintiffs have not rebutted defendants' evidence that this refit or "retrofit" was due to circumstances which developed after the second quarter. *See* Plaintiffs' Opp. at 32.

3) WorkSlate Division Sale

Here, Convergent originally estimated that final losses would be $15 million. At the time this decision was made, Convergent recognized that potential losses could total an additional $15 million. The only unrebutted *specific fact* is that the Convergent internal auditors believed these reserves were adequate at the time the accounting decision was made. Defts. Exh. 56 at 28304-305; Schneider Decl. ¶ 13.

4) Inventory Reserves

A May 4, 1984 Convergent memorandum stated that these reserves were "lean." Plaintiffs have produced no specific evidence that Convergent believed these reserves should be *increased*. Again, internal auditing at year's end determined that the reserves were proper. Plaintiffs' attempts to second guess why some companies returned equipment in subsequent quarters, why Convergent gave price decreases, and why Convergent should have known that its AWS/IWS line was obsolete fail for vagueness and speculation.

5) Administrative and Manufacturing Reserves

Plaintiffs' only evidence here relates to the unaudited preliminary year's end report. As noted above, the unrebutted Fischer declaration specifically stated that none of these reserves related to the second quarter.

*Alleged Overstatement of Revenue*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                        Page 7

Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

### 1) Introduction

In general, plaintiffs' evidence amounts to no more than negative inferences concerning some of Convergent's business practices, practices which in one case are sanctioned by the California Commercial Code. For example, Convergent recognizes revenue when title passes to the buyer. Generally under California law, title to goods may pass "on any condition explicitly agreed on by the parties." Cal. Comm. Code § 2401(1).

*8 Plaintiffs claim that some goods sold to the Prime Corp. were shipped after the third quarter and hence were improperly recognized as revenue in the second quarter. Plaintiffs do not dispute the fact that Convergent and Prime agreed that title would pass on June 30, 1984 in the second quarter, and that title did pass under the Commercial Code. To challenge the propriety of recognizing second quarter revenue in this instance, plaintiffs' expert Bildstein identifies some factors which he claims demonstrates that the transaction was form over substance. However, plaintiffs have failed to produce any argument in law or fact why the Prime transaction was contrary to the Commercial Code.

### 2) Defendants' Objections to Certain Declarations

Plaintiffs have included five declarations of former Convergent employees who claim that Convergent recorded third quarter revenues in the second quarter. *See* declarations of Petit, Gervin, Carlson, Durden, Edelheit; *see also* plaintiffs' experts Torkelsen and Bildstein. According to defendants, this court should strike these declarations because they were based on personal knowledge *and* on information and belief. This court agrees with defendants to the extent that the declarations were either hearsay, were not related to specific transactions, or do not indicate that they were based on the personal knowledge of the declarant.

Plaintiffs' argument that all of these declarations are relevant and are not hearsay fails. For example, Edelheit's declaration testifies that customers had received improperly functioning equipment, that they could return products if they so chose, or that the systems were incomplete. Plaintiffs argue that this is not hearsay because Edelheit had personal knowledge of why he could not collect receivables.

Why Edelheit could not collect receivables is irrelevant to the issue of whether Convergent shipped faulty equipment or whether Convergent was assigning revenue to the second quarter when Convergent and its customers in fact concluded no sale. Edelheit's declaration is hearsay because plaintiffs adduce it for the truth of the matter asserted -- whether Convergent created false sales and thus false revenue in the second quarter in order to inflate the stock price. Alternatively, Edelheit's declaration fails to link any alleged improper revenue assignment with specific transactions.

Other declarations pertaining to shipment in the third quarter are not connected with any specific transaction. For example, the declarations of Gervin and Petit state that they saw workers loading product onto trucks the day after the second quarter. Petit testifies to back dating unspecified shipping documents. Durden stated that poorly trained quality assurance personnel resulted in the shipment of product which did not function properly.

However, these declarants either did not identify a particular product or failed to connect their allegations with specific transactions which plaintiffs challenge. Furthermore, it is not clear at all whether portions of these declarations were based on the personal knowledge of the declarant. In the language of Federal Rule of Civil Procedure 56(e), affidavits supporting summary judgment must be made on personal knowledge, must be admissible as evidence, and must "show affirmatively that the affiant is competent to testify to the matters therein."

*9 Carlson's declaration relates to generating unidentified invoices where purchase orders had not been received. While Carlson does refer to the AWS transaction, Carlson does not state that the shipment of those computers to salesmen was in any way connected with a specific instance of improper recognition of revenue.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 8
Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

### 3) Backdating of Shipping Documents

Plaintiffs challenge $811,005 worth of transactions which were invoiced on July 1, 1984, the day after the end of the second quarter, but were shipped on the last day of the second quarter, June 30, 1984. The premise of defendants' argument is that the shipping date was the proper date for revenue. In support of their contention that the shipping date fell within the second quarter, defendants note that records of third-party carriers show a shipping date of June 30th, that hand-written shipping invoices reveal a June 30th shipping date, and that outside accountants confirmed this fact.

This is a genuine issue of material fact. However, there is no scienter here sufficient for a federal cause of action. At most, plaintiffs could show that defendants were negligent regarding this transaction.

### 4) Requested Delivery Dates

In their opposition to Convergent defendants' motion for summary judgment, plaintiffs discovered an additional amount of revenue recognition totalling $3.8 million. These transactions were improperly recognized, so plaintiffs argue, because the shipping dates were earlier than the invoice dates. However, Convergent had arrangements with many customers whereby Convergent would ship goods as far as two weeks ahead of the date the customers originally requested the goods. Supp. Harris Decl. ¶ 3; Supp. Newman Decl. ¶ 7; Pond Decl. ¶ 4.

This is a legitimate practice. Second Supp. Fischer Decl. ¶ 5. As is the case with many of these transactions, it is telling that plaintiffs did not offer affidavits from specific customers to substantiate the claim that those customers did not order the product or that the product ordered and received was defective. Plaintiffs merely rely on innuendo and speculation to argue that this revenue recognition was improper. Plaintiffs have not come forward with any specific evidence from which a reasonable jury could conclude that these transactions were not part of Convergent's practice of shipping goods first and then invoicing them at a later date.

### 5) Gould

This transaction was invoiced in the second quarter, but was recognized in the third quarter. Defts. Exh. 101. Although plaintiffs aver that this information was produced for litigation, plaintiffs have produced no specific facts which indicate that this information was not registered in Convergent's data base at the time of the transaction.

### 6) Burroughs Shipment

Plaintiffs claim that defendants can not link this transaction to the third quarter, as defendants claim. However, the summary judgment standards require plaintiffs to come forward with facts specific enough to link this transaction to the second quarter.

### 7) NCR

*10 This transaction involved defective keyboards. Because plaintiffs' only evidence is the Gervin declaration, plaintiffs' challenge to this transaction is not well taken. Mr. Gervin's declaration is framed in general terms, and does not specifically link his allegations to any transaction involving NCR.

### 8) Burroughs Premium

Normally, Burroughs would send Convergent a premium if Convergent shipped a certain number of goods within the quarter. The parties disagreed over the number of goods shipped to qualify Convergent for the premium, but later settled their differences. Harris Decl. ¶ 7. Plaintiffs have no evidence to rebut defendants' contentions that this was nothing other than a legitimate business dispute rather than Convergent's attempt at claiming premium payments to which it was not entitled in the second quarter.

### 9) Sigma Data

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 9

Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

Plaintiffs claim that this is a sham transaction where the goods were never shipped. However, there is a shipping date on the invoices, and the shipping documents are dated. Defts. Exh. 157.

#### 10) AT&T

After the second quarter, Convergent retroactively reduced its revenues from this transaction because AT&T opted instead for less expensive licenses. Plaintiffs have failed to rebut defendants' evidence that this downgrade was due to changes after the second quarter. Defts. Exh. 70 at 025185-87.

#### 11) Repairs in the Field

Plaintiffs contend that sales to ADP, Alanthus and CPT were overstated because defendants knew the equipment was defective and that part of the revenue would be reduced by the cost to Convergent of repair. Apart from these general allegations, the defects were latent, i.e., unknown to Convergent at the time; in fact, the goods had passed internal testing. Calmes Decl. ¶¶ 4-5; Willits Decl. ¶ 14.

#### 12) Remaining Transactions

This court dismisses plaintiffs' contentions regarding the above $7.8 million in transactions because the statements were not misleading and/or because there is no evidence of scienter. The remaining transactions which plaintiffs challenge are relatively small and total approximately $1.2 million. Defendants claim that this amount is immaterial because it is a little under one and one-half percent of net operating revenues for that quarter. One court has found that an impact on revenues of less than 1% is immaterial. *Pavlidis v. New England Patriots Football Club, Inc.,* 675 F.Supp. 688 (D. Mass. 1986).

The Ninth Circuit has ruled that courts may make such materiality determinations as a matter of law. *In re Apple Computer Securities Litigation,* [[[Current Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,714 (9th Cir. 1989). This court agrees with defendants that this amount is immaterial. The second quarter earnings per share of 11 cents was 4 cents above market expectations and the overall loss of 28 cents was not really expected by anyone. In this context of meeting net current operations well above market expectations and then recognizing a huge one time loss, a difference of a cent or two per share is not material.

**\*11** Despite plaintiffs' number crunching to the effect that this difference is almost ten percent of earnings per share for that quarter, this difference would not amount to a "substantial likelihood" that it would have "significantly altered" the investment decision of potential investors in the context of the second quarter earnings pattern. As noted above, Convergent exceeded the market's prediction of the company's earnings per share for the second quarter by 4 cents a share, after which Convergent took a huge, twenty-eight cent per share loss due to the sale of the WorkSlate division.

#### 3. Remaining State Law Claims

While plaintiffs's state law claims may remain, this court declines to exercise its pendent jurisdiction over them in accordance with *United Mine Workers v. Gibbs, supra.* State law is sufficiently unresolved regarding certain aspects of the fraud and negligent misrepresentation claims such that these matters are best left to determination by the state courts.

#### II. OTHER MOTIONS

Because this court has found that there are no federal causes of action and has declined to exercise jurisdiction over the remaining state law claims, plaintiffs' motion for partial summary judgment, the outside director defendants' motion for summary judgment and defendants' motion to decertify the class are moot.

Accordingly, the Convergent defendants' motion for summary judgment is hereby GRANTED with respect to the federal causes of action. Plaintiffs' state law claims are hereby DISMISSED

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 10
Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

WITHOUT PREJUDICE. The remaining motions are moot.

IT IS SO ORDERED.

N.D.Cal. 1990
In re Convergent Technologies Second Half 1984 Securities Lititgation
Not Reported in F.Supp., 1990 WL 606271 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.