# EXHIBIT 11

Westlaw.



Slip Copy

Page 1

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

**H**
U.S. S.E.C. v. Cohen
E.D.Mo.,2007.

United States District Court,E.D. Missouri,Eastern
Division.
U.S. SECURITIES and EXCHANGE
COMMISSION, Plaintiff,
v.
Craig N. COHEN, Defendant.
**No. 4:05CV371-DJS.**

April 19, 2007.

Elizabeth E. Krupa, Leslie Hendrickson Hughes,
Teresa Thomson Walsh, Securities and Exchange
Commission, Denver, CO, for Plaintiff.
James E. Nesland, Jeffrey A. Smith, Cooley
Godward LLP, Broomfield, CO, for Defendant.

*MEMORANDUM OPINION*
DONALD J. STOHR, United States District Judge.
*1 In a four-day, non-jury trial, plaintiff Securities
and Exchange Commission ("SEC") presented its
securities fraud allegations against defendant Craig
N. Cohen. The SEC asserts that defendant, as the
Chief Financial Officer ("CFO") of TALX
Corporation ("TALX"), accelerated revenue to
meet earnings goals which resulted in material
misrepresentations in the reporting of TALX's
earnings. Specifically, the SEC's first amended
complaint asserts that defendant Cohen employed a
scheme to defraud investors (Count 1); obtained
money by making material misstatements both
negligently and with scienter (Counts 2 and 3);
knowingly falsified books and records and failed to
implement a sufficient system of internal controls
(Count 4); aided and abetted TALX in filing
materially misleading reports with the SEC (Count
5); aided and abetted TALX in failing to keep
accurate books and records and to implement a
sufficient system of internal controls (Count 6); and
made materially false statements to TALX's

independent auditors (Count 7).

The Court, sitting without a jury, tried the issues
between October 23 and October 26, 2006. Having
considered the pleadings, the testimony of the
witnesses, the documents in evidence, and the
stipulations of the parties, and being fully advised in
the premises, the Court hereby makes the following
findings of fact and conclusions of law, in
accordance with Fed.R.Civ.P. 52(a).[FN1]

> FN1. After the trial, the parties were
> ordered to submit proposed findings of fact
> and conclusions of law with pinpoint
> citations to the record, in addition to
> supplemental trial briefs. The SEC in
> particular repeatedly cites to unsupportive
> and multi-paged exhibits without pinpoint
> citations. The Court made clear that it will
> not "wade through and search the entire
> record for some specific facts that might
> support [a] party's claim."*See White v.
> McDonnell Douglas Corp.,* 904 F.2d 456,
> 458 (8th Cir.1990) (quoting *InterRoyal
> Corp. v. Sponseller,* 889 F.2d 108, 111
> (6th Cir.1989)). Even with proper
> citations, the SEC's claims are generally
> unsupported and conclusory in nature.

**I. FINDINGS OF FACT**

Defendant Craig Cohen is a resident of St. Louis,
Missouri, and was licensed in Missouri as a
certified public accountant from 1982 through
2005. TALX-a corporation with its principal place
of business in St. Louis, Missouri-provides
automated employment and income verification,
and outsourced unemployment cost-management
services. As a public company, TALX's common
stock has been traded on the NASDAQ National
Market System without interruption from 1996
through the present.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
(Cite as: Slip Copy)

As the CFO of TALX from 1994 through May 2003, defendant was responsible for all of the financial functions of the company including accounting and recording revenue. He monitored the company's performance and acted as a primary reporter to the financial public and investors by drafting all of the financial press releases.

During defendant's tenure as CFO, TALX had five different lines of business which included the Customer Premises Systems Division ("CPS") and the Human Resources and Benefits Application Services Division ("HRBAS"). Defendant was Vice President of TALX's CPS and HRBAS divisions from May 1999 to May 2003. As Vice President, defendant was responsible for the operations of the business, profit and loss, and personnel. After May 2003, when defendant relinquished his posts as Vice President and CFO, he served as the Executive Vice President of TALX until December 31, 2003, when he resigned.

### A. Organization and De-emphasis of the CPS Business

The CPS business has a three-level hierarchy of managers. At the top, the CPS team managers, Joyce Dear and Brian Bolle, reported directly to defendant. John Foley replaced Ms. Dear sometime after May 2000, and became team manager and a direct report to defendant. Under the team managers were the group managers who reported directly to Ms. Dear, and later to Mr. Foley. For example, during fiscal year 2001, Timothy Finnell and Jim McDonnell were the two CPS group managers. Mr. Finnell managed the group that implemented CPS upgrades sold to existing CPS customers; and Mr. McDonnell managed the group that implemented CPS systems sold to new customers. Mr. Finnell transitioned out of his position as CPS manager in December 2000, and Mr. McDonnell became manager of the upgrades and new systems groups. Underneath the CPS group managers were the CPS project managers and engineers who reported to Mr. Finnell and Mr. McDonnell. Overall, defendant was senior to the team, group, and project managers (collectively "the CPS managers").

*2 In 1998, William Canfield, TALX's Chief Executive Officer, decided that TALX would de-emphasize its CPS line of business. He did so because the CPS business revenues were inconsistent and he wanted to focus on businesses that generated recurring revenue. Mr. Canfield also believed that there was higher growth potential in TALX's The Work Number ("TWN") business because TALX was the only company providing that service. In 1998, TALX reduced commissions on CPS sales. In 2000, TALX announced it would discontinue sales to new customers. Later, TALX announced it would discontinue sales of CPS systems. Finally, in June 2003, TALX announced that it was discontinuing CPS maintenance and support-although to date TALX still provides that service. CPS revenues decreased each fiscal year from 35.0% of the total company revenue in 1999, to 30.1% in 2000, to 16.9% in 2001, to 7.7% in 2002, and then to 1.3% in 2003. During that time, TALX experienced growth in its other lines of business related to TWN and HRBAS, which were publicly announced to be where future earnings growth would occur. Mr. Canfield spoke with analysts during this time and emphasized that TALX was shifting away from the CPS line of business.

### B. Financial Reporting and Audits

In 1996, TALX filed with the SEC a registration statement for the initial public offering of its common stock under the provisions of § 12(g) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78l (g). As a public company which has registered its stock under § 12(g), TALX is required to file quarterly, annual, and current reports with the SEC on Forms 10-Q, 10-K, and 8-K, respectively. The quarterly and annual reports must contain financial statements prepared in accordance with generally accepted accounting principals ("GAAP"). Before participating in another stock offering, TALX is also required to file an S-3 registration statement. Defendant reviewed, approved, and signed TALX's S-3 registration statement in June 2001 and Forms 10-Q from November 1996 through January 2003 and 10-K for fiscal years 1997 through 2002.[FN2]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

FN2. TALX's fiscal years run from April 1 of the prior year to March 31 of the next calendar year. For example, TALX's fiscal year 1999 began April 1, 1998, and ended March 31, 1999.

During fiscal years 1999 through 2003, Keith Graves, as TALX's Controller, had direct day-to-day responsibility for managing the accounting department and constituted defendant's only direct report in the accounting department. Defendant made himself available to Mr. Graves whenever needed and had oversight responsibilities for TALX's monthly financial statements, which were prepared by Mr. Graves and accounting personnel from 1999 to 2003 as part of the fiscal year financial statements. Once prepared, the monthly financial statements were distributed to and reviewed by defendant and Mr. Canfield, who examined the statements for the whole company, and the various managers, including the CPS team managers, who examined the revenues and expenses associated with their particular group or department. The CPS and other business-line managers raised any questions with the accounting department. Defendant reviewed TALX's financial statements as a whole for any anomalies or unusual variances, which, when found, were assigned to Mr. Graves to research. As CFO, defendant wanted to know how business was going, particularly when TALX was closing any major transactions, and whether the transactions were correctly recorded.

**1. Quarterly Review**

*3 At the end of every quarter, the accounting department combined the monthly financial statements into quarterly financials. The combined information was reviewed by Mr. Canfield, Mr. Graves, and defendant to look for unexplained items. Next, a narrative of the financial information was put into the format required by Form 10-Q. During defendant's tenure as CFO, this process was done initially by defendant and then later by Mr. Graves. Defendant, Mr. Graves, KPMG International (TALX's auditors), and Bryan Cave LLP (TALX's outside securities counsel) reviewed both the financial statements and the narrative

information for accuracy and completion of all the Form 10-Q requirements. Like the monthly financial statements, quarterly financial statements were distributed to the CPS and other managers for their review.

TALX's Audit Committee reviewed the financial statements included in TALX's 10-Q filings. KPMG also spent several days every quarter conducting a review of TALX's quarterly financial statements included in TALX's 10-Q filings. While Mr. Graves was KPMG's primary contact person, defendant answered questions during KPMG's quarterly review and conducted an exit interview at its conclusion. After each quarterly review process was complete from fiscal year 1999 through 2003, Mr. Canfield and defendant signed TALX's Form 10-Q. Mr. Graves signed TALX's 10-Q in defendant's place for the first and second quarters of fiscal year 2004.

**2. Annual Review**

At the end of the fiscal year, the accounting department combined data for the year into an annual financial statement. As with monthly and quarterly financial statements, the year-end financial statements were initially reviewed by Mr. Canfield, defendant, Mr. Graves, and other senior members of TALX management. Just as with the 10-Qs, in later years Mr. Graves prepared the narrative portion of the Form 10-Ks instead of defendant. After management, including defendant, was satisfied with the draft of the 10-K, it was distributed to KPMG and Bryan Cave for their review. Next, the draft 10-K was circulated to TALX's Board of Directors for their review, thus completing the 10-K review process.[FN3] Every fiscal year from 1999 to 2003, defendant, Mr. Canfield, Mr. Graves, and TALX's Board members signed TALX's 10-Ks and defendant filed them with the SEC. In connection with TALX's year-end, KPMG conducted an audit of TALX's annual financial statements.

FN3. Defendant was not on TALX's Board of Directors.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
(Cite as: Slip Copy)

### 3. KPMG Annual Audits

TALX's audit team consisted of an audit partner
(Jerry Carlson in fiscal years 1999 and 2003, and
Joe Maloney in fiscal years 2000 to 2002), an audit
manager, a senior accountant, and two or three staff
accountants. As required by generally accepted
auditing standards ("GAAS"), the audit partner and
the KPMG audit team planned and conducted the
year-end audit to obtain reasonable assurances that
the audit would detect any material misstatements,
such as any fraud and other illegal acts that may
affect the financial statements. Each year, KPMG's
audit team spent one week of the audit before the
close of TALX's fiscal year-end and another three
weeks during March and April onsite at TALX
auditing, testing, and verifying TALX's financial
statements, including CPS revenues and earnings.
The audit team's primary contacts during the annual
audit were Mr. Graves and TALX's assistant
controllers. Defendant's involvement in the annual
audit normally consisted of two meetings with the
audit partner-one at the beginning and the other at
the conclusion of the audit. Defendant made himself
available if KPMG had questions during the audit.
The managers of CPS and other businesses were
made available to KPMG whenever a meeting was
requested. KPMG decided when and with whom it
would meet during each audit.

*4 After completion of the annual audit, KPMG
signed unqualified audit opinions which were
included in TALX's 10-K and which certified that
KPMG had planned and performed its audits to
obtain reasonable assurance that TALX's financial
statements were free of material errors; that the
audits included examination and testing of the
amounts and disclosures contained in the financial
statements; that TALX's financial statements fairly
presented in all material respects TALX's financial
position; and that TALX's financial statements were
prepared in accordance with GAAP. At the
conclusion of KPMG's review and audit process,
while defendant was CFO, KPMG prepared and
required defendant, Mr. Canfield, and Mr. Graves
to sign management representation letters attesting
that all the material transactions were done in
accordance with GAAP.

### C. Secondary Offering

TALX first began to seriously consider a secondary
offering in April or May of 2001. From December
2000 through May 2001, TALX met several times
with CIBC, one of the investment banking firms
that ultimately participated in TALX's secondary
offering. Defendant participated in some of those
meetings. CIBC suggested methods of raising
capital as early as February 2001. As of May 8,
2001, when Mr. Canfield informed defendant that
he was considering a secondary offering, the fiscal
2001 year-end financial statements were already
final, and KPMG had completed its audit and issued
its opinion, dated April 20, 2001. Additionally,
TALX had already released its press release of
April 25, 2001, drafted by defendant, announcing
that it had met its fourth quarter and fiscal year
2001 earnings per share ("EPS") targets, and that its
EPS had grown by more than 50 percent.

On June 22, 2001, TALX filed an S-3 registration
statement with the Commission to sell
approximately 2.74 million common shares in a
secondary offering to the public. On July 13, 2001,
TALX filed the first amendment to its registration
statement. On July 18, 2001, TALX reported first
quarter fiscal year 2002 earnings growth exceeding
50 percent. On July 31, 2001, TALX filed the third
amendment to its registration statement. Defendant
signed the registration statement and the
amendments as TALX's CFO. Defendant also
prepared and had final review and approval of
TALX's prospectus dated August 3, 2001, relating
to the secondary offering. On August 3, 2001,
TALX's registration statement became effective and
the company offered and sold to the public 2.95
million shares of common stock at the price of $32
per share. In the two quarters preceding the
secondary offering-the fourth quarter ending March
31, 2001, and the first quarter ending June 30,
2001-TALX understated CPS revenue and its
earnings.

### D. Revenue Recognition Policy and Internal Controls

When TALX entered into contracts with CPS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

customers, TALX normally recognized the following three types of revenue: (i) revenue from the sale of computer equipment; (ii) revenue from the sale of computer software; and (iii) revenue from the sale of implementation services, which included writing computer programs and installing upgrades or new CPS systems at customers' premises. TALX used the percentage-of-completion accounting method to recognize revenue on the portion of the contracts that provided for implementation services-meaning TALX would recognize a percentage of the total contract revenue according to the number of estimated project hours that were completed in the relevant period.

### 1. Managers' Role in the Revenue Recognition Process

**\*5** As the Vice President of CPS, the CFO, and the head of internal controls, defendant was responsible for supervision of the CPS managers and the revenue. TALX's CPS managers were delegated responsibility for revenue recognition and reporting on CPS contracts. On sales and implementations of new CPS systems and upgrades to existing CPS systems, the CPS managers were also responsible for estimating and tracking the percentage-of-completion and revenue recognition. The CPS managers were trained to estimate the months, quarters, and years when TALX would provide CPS implementation services to customers and recognize revenues for such services. After TALX entered into a CPS contract, group and project managers met with clients to prepare and agree upon an implementation schedule for the project. Based on the implementation schedule, group and project managers determined the months, quarters, and years during which TALX would recognize revenue on CPS contracts and projects they managed.

Team, group, and project managers were responsible for and did provide Beverly Lakebrink, a financial analyst in the accounting department, with revenue recognition and scheduling information. Ms. Lakebrink used the information to prepare detail sheets, which contained all pertinent information for each contract, and revenue reports.

Ms. Lakebrink circulated the revenue reports to defendant and the CPS managers on a bi-weekly basis. The CPS managers were delegated the responsibility to review, update, and make changes on the revenue reports to ensure the accuracy of the reports and particularly to reflect any amendments to the implementation schedule which delayed and changed revenue recognition. These changes were communicated to Ms. Lakebrink. In addition, the CPS managers were responsible for providing Ms. Lakebrink with immediate updates and changes to revenue recognition whenever they learned of a project delay or other schedule change.

Project managers prepared and provided weekly status reports to the team managers informing them of the status and actual percentage of completion of projects. Mr. Finnell, a CPS group manager, regularly reviewed the reports and met with the project managers in his group to discuss and compare the reports, the schedule for revenue recognition, and the status of each project reflected in the weekly status reports. Mr. Finnell did not meet with defendant on a regular basis to discuss changes made on the revenue reports, but did meet with him a couple of times to keep him apprised of the status of Finnell's projects. Mr. Finnell returned the revenue reports with his changes directly to Ms. Lakebrink.

### 2. Ms. Lakebrink's Role in the Revenue Recognition Process

Ms. Lakebrink reported directly to Mr. Graves, the Controller, and later Megan Sullivan when Graves was promoted to CFO after May 2003. One of Ms. Lakebrink's responsibilities was to track revenues and update revenue recognition for CPS contracts and projects. When TALX entered into a CPS contract, Ms. Lakebrink prepared a detail sheet which included the total revenue and a quarterly and monthly grid scheduling when and in what amounts revenue recognition was or would be recognized on CPS projects. In preparing the detail sheets, Ms. Lakebrink used information provided by the CPS managers. The sheets were linked to the bi-weekly revenue reports so that they included the same information.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

**\*6** If a revenue recognition schedule contained in a detail sheet and the bi-weekly revenue reports was or became erroneous for any reason, Ms. Lakebrink expected the CPS managers to correct or report the errors. Following the March 8, 2000, meeting discussed below, Ms. Lakebrink distributed over 40 bi-weekly revenue reports to the CPS managers and others, including defendant, each month. In addition to receiving changes made on the revenue reports, Ms. Lakebrink also received verbal and e-mail updates from the CPS managers and occasionally from defendant. Upon receipt of the changes, Ms. Lakebrink updated the revenue reports, reported the changes to the accounting department to adjust TALX's general ledger, and used the updated detail sheet to prepare and circulate the next bi-weekly revenue report. If Ms. Lakebrink did not receive changes and updates from a team, group, or project manager by the end of the month, she followed up and asked if they were aware of any changes that should be made.

Ms. Lakebrink met with defendant at each month-end and quarter-end to review copies of bi-weekly revenue reports Ms. Lakebrink previously had provided to defendant. The purpose of their meeting was to determine whether there were any anomalies in the revenue reports. If any existed, defendant or Ms. Lakebrink followed up with managers and obtained an explanation or additional information.

### 3. Defendant's Role in the Revenue Recognition Process

Overall, revenue recognition for each job was defendant's responsibility. Although defendant was the head of TALX's internal control function, he had delegated various responsibilities to the CPS managers, as discussed supra. Defendant did not do any of the following: participate in project planning meetings; prepare or review project plans; estimate and schedule revenue recognition on projects; prepare or review the project managers' weekly status reports; attend weekly status meetings of group and project managers; meet with group and project managers to review projects and revenue recognition on projects; review detail sheets

prepared by Ms. Lakebrink; provide Ms. Lakebrink with the estimated periods of time over which revenue was scheduled to be recognized on CPS contracts; review the CPS managers' changes to the revenue reports; or report or make changes to the general ledger. Additionally, defendant did not have access to the computer Ms. Lakebrink used to prepare detail sheets and revenue reports.

Defendant did have regular meetings with his direct reports twice a month for one to two hours to discuss any pertinent issues, which did at times include updates on the status of larger projects. Defendant reviewed the bi-weekly revenue reports circulated by Ms. Lakebrink at or near the end of each quarter. Additionally, he had access to the total budget for the jobs and the number of hours that were worked. When defendant noticed a problem, he reported it to the team managers. Defendant made changes on revenue reports on an infrequent basis and only when and because he personally learned of a project change or delay. When Ms. Lakebrink informed defendant that she was not receiving timely changes and updates from the CPS managers, defendant followed up and reminded them to report their changes, if any, to Ms. Lakebrink.

**\*7** Although defendant was effectively the last in line to review the changes Ms. Lakebrink made, defendant never took revenue reports and compared them to the original contracts. In reviewing the biweekly revenue reports, defendant did not use any documents to assist him or double check the reports with the project or team managers. Essentially, defendant relied on the CPS managers to record the revenue and come to defendant with any problems. As CFO, defendant did distribute the revenue results through earnings releases (such as the releases of April 25 and July 18, 2001), conference calls with the investment community (such as the one on April 26, 2001), and TALX's website.

### 4. Revenue Recognition Training

Defendant held a training session on March 8, 2000, for the purpose of training the project managers how to recognize revenue on the contracts and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

upgrades they managed. The March 8 training session was attended by all the CPS managers, Mr. Graves, and Ms. Lakebrink. Defendant explained and distributed a memorandum concerning the above-discussed revenue recognition process. Defendant explained that for hardware sales, TALX recognized revenue when the hardware shipped from TALX; and that for CPS services, TALX recognized revenue on a percentage of completion basis-with revenue to be recognized as a percentage of the total contract revenue commensurate with the number of hours employees spent working on that job.

Defendant held a second meeting on May 4, 2000, with all team and project managers to do a comprehensive review of their revenue recognition responsibilities. He prepared and distributed a memorandum specifically identifying and describing their duties and responsibilities, and reviewed with CPS team and group managers, among others, that they were directly responsible for CPS revenues, profitability, and billing CPS clients. Defendant also reviewed with the team, group, and project managers that they were responsible for scheduling projects, scheduling revenue recognition on the projects, reviewing bi-weekly revenue reports, making changes to the schedule for revenue recognition, and providing those changes to Ms. Lakebrink.

### E. The Kaiser Project

Mr. Finnell and Laura Ceretti were the respective group and project managers responsible for the CPS contracts with Kaiser Permanante between 2000 and 2001. Ms. Ceretti, with the assistance and supervision of Mr. Finnell, prepared the project plan that scheduled when TALX would perform the implementation services to upgrade Kaiser's CPS systems. Ms. Ceretti's preliminary project plan scheduled the upgrades to begin on July 14, 2000, and to be completed on September 24, 2001. This date was later extended to October 24, 2001.

The revenues for the CPS implementation services portion of the Kaiser project were scheduled for recognition and were recognized during the

six-month period from July through December 2000. Mr. Finnell and Ms. Ceretti had weekly status meetings to review the status of the Kaiser project. Ms. Ceretti prepared and Mr. Finnell reviewed weekly status reports which reflected the status and the actual percentage of completion of the Kaiser project. Mr. Finnell and Ms. Ceretti received and reviewed biweekly revenue reports that listed the Kaiser project and the schedule for revenue recognition of the CPS implementation services provided on the project. Three of the bi-weekly revenue reports which were circulated and reviewed during the six-month period are in evidence, namely: revenue reports dated October 20, 2000, November 17, 2000, and December 7, 2000. In each report, revenues for the CPS implementation services provided on the Kaiser project are scheduled for recognition in incremental amounts of $77,603 in October, $77, 603 in November, and $77, 603 in December 2000; and all revenue is scheduled to be recognized in full by December 31, 2000. In each of the three reports, Mr. Finnell changed revenue recognition on projects listed in the reports, but he made no changes on the Kaiser project. Consequently, Ms. Lakebrink made no changes to the revenue recognition schedule for the Kaiser project because no changes were provided or reported to her.

### F. Defendant's Knowledge of Misstatements

**\*8** As CFO during the period from 1999 to 2003, defendant reviewed TALX's monthly, quarterly, and year-end financial statements prepared by Mr. Graves and the accounting department. The CPS services revenues did not give rise to unusual or significant variances. As Vice President from May 1999 to May 2003, defendant also reviewed the financial statements from an operational perspective. CPS revenues were expected to and did vary from month to month, quarter to quarter, and year to year. Mr. Canfield, defendant, and the SEC's expert, Larry Barton, described CPS revenues as " lumpy" given the erratic and variable nature of CPS revenues during the period from 1999 through 2003.

Ms. Lakebrink and the team, group, and project managers were routinely scheduling revenue

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

recognition on projects, reviewing bi-weekly revenue reports, and making or reporting changes to the revenue recognition schedules on projects listed in the reports. There is no evidence that Ms. Lakebrink or the managers were concerned or expressed concerns that the CPS revenue recognition and reporting process was not functioning adequately or that managers were unable to adjust and were inadequately adjusting revenue recognition on projects that were delayed or disrupted.

Defendant received several emails sent intermittently from March through October 2001 concerning Kaiser's billing and refusal to pay its invoices on the Kaiser project in full. In three responses to the emails, defendant discussed billing matters. Kaiser's refusal to pay invoices timely was neither unusual nor unexpected. Its payment of the invoices on the project had only first become due at the end of February 2001. TALX employees knew Kaiser as a "slow-pay" customer, meaning its standard practice was to delay payment of invoices for at least six months.

### G. TALX's Discovery and Investigation of the CPS Errors

In November 2003, Mr. Graves initially discovered that revenue recognized in fiscal year 2001 on the CPS implementation services provided to Kaiser was inconsistent with actual hours employees had reported on the project. Following the initial discovery, Mr. Graves and accounting personnel undertook an internal investigation to determine the extent to which Kaiser and other CPS revenues were recognized erroneously on sales of CPS services. After Mr. Graves notified KPMG of the discovery and internal investigation, KPMG assembled a team and launched its own investigation and audit of TALX's CPS revenue recognition from 1999 through 2003. TALX also formed a special committee of TALX directors to investigate the potential CPS revenue recognition errors. To assist the committee, TALX engaged Glenn Davis and the Armstrong Teasdale law firm to conduct a special investigation. KPMG's team, which included three forensic accounting

specialists, planned and conducted its special audit to include procedures required by GAAS and § 10A of the Exchange Act to determine whether there was evidence or reason to believe that the CPS revenue recognition errors and misstatements were the result of illegal acts.

**\*9** As part of their investigations, KPMG and TALX reviewed 72 CPS contracts; compared the hours employees reported working on each CPS contract against the revenues recognized on each contract; and interviewed Ms. Lakebrink, project managers, and team managers regarding the CPS revenue recognition and reporting process. TALX and KPMG concluded and reported that the misstatements of CPS revenue discovered in 2003 and restated in January 2004 were the result of err ors in the application of accounting principles in the CPS business. KPMG concluded that CPS services revenue had been erroneously recognized before and during fiscal years 1999 through the second quarter of fiscal year 2004 because project managers were not adequately adjusting revenue recognition on revenue reports to account for changes and delays in completing CPS projects.

The Armstrong Teasdale investigation did not conclude any misstatements were the result of illegal acts. KPMG's special team of forensic auditors met and discussed the results of the Armstrong Teasdale investigation with Glenn Davis, and the team reviewed the investigation's written work product, findings, and conclusions. Based on KPMG's review and discussion with Armstrong Teasdale, KPMG also concluded that the misstatements did not result from illegal acts. Upon a recommendation of KPMG, TALX decided to restate its quarterly and year-end financial statements to correct the errors. TALX and KPMG opined that the misstatements when considered holistically were material enough to include in the restatement, but did not perform a SAB 99 materiality analysis, as discussed below, to determine whether the errors or misstatements in any particular fiscal quarter or fiscal year from 1999 through the second quarter of fiscal year 2004 were material.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

### H. TALX's Restatement of CPS Earnings

Mr. Graves sampled 300 contracts from the period between 2000 and 2003 and found that a majority of TALX's CPS contracts showed improperly accelerated revenue. TALX issued a press release on January 5, 2004, announcing the restatement. Consistent with the findings and conclusions TALX, KPMG, and Armstrong Teasdale reached in their investigations, TALX represented that the revenue and earnings misstatements corrected by the restatement were the result of errors-which are unintentional misstatements according to GAAP. The Court has created the table below using Defendant's Exhibit D.[FN4] The table compares each EPS as originally reported and as restated (originally stated/restated) and reflects the net EPS changes.[FN5]

> FN4. The Court recognizes that the sum of each quarterly EPS does not equal the year-end EPS in every fiscal year.

> FN5. A loss is reflected in parentheses.

**Table A: Quarterly EPS Misstatements**

|  | 1st Qtr EPS | 2nd Qtr EPS | 3rd Qtr EPS | 4th Qtr EPS | Year-End EPS | Net Change |
|---|---|---|---|---|---|---|
| **FISCAL 1999** |  |  |  |  | $0.04/$0.01 | $0.03 Overstatement |
| **FISCAL 2000** | $0.05/$0.04 | $0.07/$0.09 | $0.08/$0.11 | $0.07/$0.04 | $0.27/$0.28 | $0.01 Understatement |
| **FISCAL 2001** | $(0.15)/$(0.16) | $0.03/$0.01 | $0.20/$0.19 | $(0.04)/$(0.02) | $0.05/$0.03 | $0.02 Overstatement |
| **FISCAL 2002** | $0.05/$0.15 [6] | $(0.11)/$(0.10) | $0.23/$0.24 | $0.10/$0.11 | $0.29/$0.32 | $0.03 Understatement |

> FN6. Defendant asserts this amount is $0.05 in contradiction to Defendant's Exhibit D.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

| FISCAL 2003 | $0.14/$0.15 | $0.17/$0.18 | $0.30/$0.30 | $0.29/$0.29 | $0.90/$0.91 | $0.01 Understatement |
| FISCAL 2004 | $0.20/$0.20 | $0.23/$0.23 | | | | |

**\*10** The table below examines the misstatements as a percentage of the total revenue on an annual basis.

**Table B: Annual CPS Revenue Misstatements**

| | Restated CPS Revenue | Total Annual Revenue | Restated CPS Revenue as Percentage of Total Revenue |
| --- | --- | --- | --- |
| Fiscal 1999 | ($589,000) | 29,514,000 | 2.00% (overstatement) |
| Fiscal 2000 | ($8,000) | $36,024,000 | 0.02% (overstatement) |
| Fiscal 2001 | ($358,000) | $38,655,000 | 0.93% (overstatement) |
| Fiscal 2002 | $610,000 | $45,162,000 | 1.35% (understatement) |
| Fiscal 2003 | $384,000 | $126,114,000 | 0.30% (understatement) |
| Fiscal 2004 (Q1-Q2) | ($16,000) | | |

While income was over- and understated in many contracts each year, the net effect of the misstatements is reflected in Table B.

### I. Defendant's Dual Role as CFO and Vice President

From May 1999 to May 2003, defendant served both as TALX's CFO and as its Vice President of the CPS and HRBAS businesses. Defendant's dual roles were disclosed in TALX's SEC filings, and they were known to KPMG through its reviews of TALX's internal controls and to Bryan Cave (TALX's outside securities counsel) through its reviews of TALX's SEC filings. During its audit of fiscal years 1999 through 2003, KPMG never

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
(Cite as: Slip Copy)

Page 11

advised that defendant's dual roles as CFO and Vice President posed a conflict of interest or created an internal control weakness. Jerry Carlson, who was the KPMG audit partner in charge of the 1999 and 2003 fiscal year audits, testified that KPMG reached the conclusion that it was a conflict of interest in hindsight during KPMG's December 2003 audit and investigation of the CPS revenue misstatements.

## J. Revenue Recognition Errors on Sales of CPS Hardware

As discussed above, a majority of TALX's CPS contracts that were sampled showed improperly accelerated revenue. On several contracts, little or no work had been completed when revenue was recognized.[FN7]Exhibit 4 to Plaintiff's Exhibit 2a, which plots TALX's earnings and the amount of CPS misstatements in each quarter, does not demonstrate a significant correlation between the earning trends and the periods during which earnings were over- or understated. TALX's erroneous bill-and-hold revenue recognitions with respect to CPS hardware sales to Kaiser, Cuyahoga, and PS Technology, which are discussed below, only amount to fractions of a percent of each relevant quarter's total revenue.

> FN7. TALX recognized revenue on another contract with Kaiser using the percentage of the project's completion. By the end of the third quarter of fiscal year 2001 (December 31, 2000), all of the revenue for this second Kaiser job had been booked even though only about 11 percent of the hours had been worked. Defendant had the documentation revealing this misstatement at his disposal.

### 1. Kaiser Equipment Sale

When TALX announced in January 2000 that it would cease providing maintenance services for CPS systems owned by customers who did not upgrade systems by December 31, 2000, Kaiser requested that TALX upgrade 37 of its CPS systems

located in various hospitals and medical centers. Among other provisions, the June 27, 2000, contract between TALX and Kaiser provides that Kaiser would purchase CPS hardware, software, and software licenses to upgrade its 37 systems from TALX for $380,000. TALX and Kaiser agreed that TALX would build the hardware for all 37 systems during August and September of 2000, and that it would ship the hardware to Kaiser's Green Street Laboratory on October 2, 2000. TALX agreed to defer billing and collection until February 2001 to enable Kaiser to include the cost in its 2001 budget. As discussed above, Kaiser's standard policy was to delay and not pay invoices for at least six months.

*11 In August 2000, Kaiser requested that TALX ship hardware for 28 of the 37 systems and store the hardware for the remaining nine systems until Kaiser had space in its Green Street Lab. When defendant learned of Kaiser's request, he discussed with Mr. Graves whether Kaiser's request for TALX to store the unshipped hardware would qualify for bill-and-hold revenue recognition. Defendant was aware of the requirements to book a sale as a bill-and-hold and wanted to recognize the revenue. Mr. Graves discussed the circumstances with defendant and questioned whether the unshipped hardware would qualify.

Mr. Graves advised defendant that TALX should obtain a letter from Kaiser documenting that it was requesting bill-and-hold treatment. Defendant drafted a letter for Kaiser and reviewed it with Mr. Graves. After sending the draft letter to Kaiser, defendant pushed Kaiser to get the letter returned by the end of the second quarter of fiscal year 2001. Kaiser changed the terms in the letter and deleted provisions necessary to book the transaction as a bill-and-hold. Kaiser ultimately agreed to accept shipment of, and TALX shipped, hardware for 31 of the 37 systems by September 30, 2000. Defendant reviewed Kaiser's signed letter and discussed it with Mr. Graves, who concluded the Kaiser deal should not be booked because it did not meet the bill-and-hold requirements.

Defendant decided that TALX would recognize the full amount of $380,000 of revenue associated with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
(Cite as: Slip Copy)

the sale of hardware by finding that the approximately $79,500 worth of revenue associated with the six unshipped systems could be recognized as a bill-and-hold transaction. Mr. Graves analyzed the materiality of the $79,500 on TALX's second-quarter financial results, and determined that the revenues recognized on a bill-and-hold basis were immaterial.

The Kaiser transaction with TALX was booked as a bill-and-hold sale in TALX's Form 10-Q in the second quarter of fiscal year 2001, improperly recognizing $79,500 in revenues associated with the six CPS hardware units that did not ship until TALX's fourth quarter. Mr. Graves provided Kaiser's letter to KPMG in October 2000 during its quarterly review. KPMG reviewed Kaiser's letter, discussed the circumstances of the transaction with Mr. Graves, and informed Mr. Graves that KPMG concluded the sale did not qualify for such bill-and-hold revenue recognition. After performing a materiality analysis, TALX concluded that the $79,500, which represented less than 1 percent of gross revenues, was immaterial and would not result in a material misstatement of TALX's second-quarter financial results and earnings. KPMG did not post the $79,500 of revenue as an audit difference, and it did not discuss the error with TALX's Audit Committee.

In January 2004, TALX corrected the error and included the $79,500 of revenue as part of the restatement of CPS revenue. Neither TALX nor KPMG performed a materiality analysis in 2003 to determine if the error was material to TALX's fiscal 2001 second-quarter financial statements.

### 2. Cuyahoga Equipment Sale

*12 In the first quarter of fiscal year 2000, TALX erroneously recognized $32,909 of revenue on a sale of CPS hardware to Cuyahoga that TALX did not ship until the second quarter of fiscal year 2000. Prior to booking the transaction, Mr. Graves informed defendant that the sale did not qualify as a bill-and-hold. KPMG discussed the Cuyahoga transaction with defendant during its first-quarter review and concluded that the Cuyahoga transaction

should not have qualified for bill-and-hold revenue recognition. KPMG concluded that TALX's erroneous recognition of the revenue was immaterial and would not result in a material misstatement of TALX's first-quarter financial results. KPMG did not post the $32,909 of revenue as an audit difference. TALX corrected the error and included the $32,909 of revenue as part of the restatement of CPS revenue. Neither TALX nor KPMG performed a materiality analysis in 2003 to determine if the revenues recognized on the Cuyahoga transaction were material to TALX's fiscal year 2000 first-quarter financial statements.

### 3. PS Technology Equipment Sale

In the second quarter of fiscal year 2001, TALX erroneously recognized $27,710 of revenue on a sale of CPS hardware to PS Technology that did not ship until the third quarter. TALX corrected the error and included the $27,710 of revenue as part of TALX's restatement of CPS services revenues. Neither TALX nor KPMG performed a materiality analysis in 2003 to determine if the revenues erroneously recognized in the PS Technology transaction were material to TALX's fiscal 2001 second-quarter financial statements.

### K. Defendant's Incentives

### 1. Stock Sales

During the ten years defendant was employed by TALX from 1994 to 2003, he personally sold TALX stock once. In early May 2001, defendant sold 25,000 of the 70,000 shares of TALX stock he then owned for an average of $26.40 per share and realized a gain of $660,000. Defendant retained ownership of the 45,000 remaining shares of TALX stock and vested options he owned, as well as the 45,000 of shares he held in unvested options. Defendant did not sell stock after May 2001 despite TALX's share price rising its all-time high of $41-defendant could have sold his remaining 45,000 shares and realized $1,800,000. Defendant also elected not to sell shares in the secondary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

offering, where he could have realized $1,400,000 for his remaining shares.

Mr. Graves and another vice president sold between 10,000 and 15,000 shares during the same period as defendant, and Mr. Canfield sold 200,000 shares for $6,400,000 as part of the secondary offering. When defendant resigned from TALX in December 2003, he still owned the 45,000 shares. He also held 77,000 unexercised stock options which automatically terminated on resignation. Defendant sold his remaining shares in 2005.

### 2. TALX's Employee Stock Purchase Plan, Stock Option Program, and Incentive Compensation Plan

Defendant participated in TALX's voluntary employee stock purchase plan that provided all employees with the opportunity to have TALX automatically withhold compensation from their paychecks, which would then be used to purchase shares of TALX stock at the end of quarters. Defendant also participated in TALX's employee stock option program. Approximately 150 to 200 TALX employees, including defendant, were eligible to participate and receive stock options under the program. TALX's Compensation Committee, of which defendant was not a member, decided which employees were eligible to participate and how many stock options to award.

**\*13** TALX also had an incentive compensation program, in which defendant also participated, where almost all TALX employees were eligible for bonuses calculated as a percentage of each employee's base annual salary. The Compensation Committee, which determined the criteria and percentages for granting the annual bonuses, tied the bonuses to TALX's EPS. As defendant's entire bonus depended on TALX's EPS, defendant had to meet the annual EPS target to get his full bonus. Defendant received $1,200 in fiscal year 1999, $72,500 in fiscal year 2000, $80,000 in fiscal year 2001, and $45,000 in fiscal year 2002, for a total of $198,700 in bonuses from 1999 to 2002.

The misstatements discussed above in Table B

affected only defendant's fiscal year 2001 bonus-which should have been $48,000 instead of $80,000-and defendant's fiscal year 2002 bonus which should have been slightly higher than $45,000 due to the restated EPS, as shown in Table A. None of the restated EPS for any fiscal year would have affected defendant's award of stock options as those awards were not based on or tied to EPS. Similarly, none of the restated EPS would have affected defendant's salary increases from 1999 to 2003.

### II. CONCLUSIONS OF LAW

The Court has jurisdiction over this action pursuant to § 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v(a), and §§ 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa. As discussed below, of the seven counts, the Court finds only that defendant knowingly falsified books and records relating to the Kaiser and Cuyahoga transactions in violation of § 13(b)(5) of the Exchange Act and Rule 13b2-1 (Count 4). Consequently, the Court will impose a second-tier civil penalty of $5000. Otherwise, judgment will be entered on defendant's behalf on the remaining six counts and any further relief will be denied.

### A. Securities Fraud Allegations: Counts 1, 2, and 3

The first three counts of the SEC's first amended complaint assert that, in connection with the offer or sale of TALX securities, defendant: (1) with scienter, employed a scheme to defraud in violation of § 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1); (2) negligently obtained money by means of untrue statements of material facts or material omissions, or engaged in business practices operating as a fraud upon a purchaser or seller in violation of § 17(a)(2) & (3) of the Securities Act, 15 U.S.C. § 77q(a)(2) & (3); and (3) with scienter, employed a scheme to defraud, made an untrue statement of a material fact or a material omission, or engaged in business practices operating as a fraud upon a purchaser or seller in violation of § 10(b) of the Exchange Act and Rule 10b-5, 15

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 14

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.[FN8] *See In re K-tel Int' l, Inc. Sec. Litig.,* 300 F.3d 881, 888 (8th Cir.2002) (holding that a plaintiff must show both materiality and scienter to proceed on claims under § 10(b) of the Exchange Act); *Pagel, Inc. v. SEC,* 803 F.2d 942, 946 (8th Cir.1986) (citations omitted) ("[T]he SEC must prove scienter in actions under sections 10(b) and 17(a)(1), but ... it need only prove negligence in actions under sections 17(a)(2) or (3)."). As discussed below, because the SEC has not met its burden of proving the materiality requirement in Counts 2 and 3 and the scienter requirement in Counts 1 and 3, judgment will be entered for defendant on all three counts.

> FN8. Each of the three counts also requires that defendant knowingly used a means of interstate transportation or communication in furtherance of the fraudulent conduct.

### 1. Materiality

*14 To establish materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."*TSC Indus., Inc. v.. Northway, Inc.,* 426 U.S. 438, 449 (1976) (quotation omitted). For example, TALX's restatements are evidence of materiality. *See In re Peritus Software Services, Inc. Sec. Litig.,* 52 F.Supp.2d 211, 222-23 (D.Mass.1999). However, information that would not matter to a reasonable investor is immaterial. *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 547 (8th Cir.1997).

The SEC's Staff Accounting Bulletin No. 99 ("SAB 99") sets forth the policy that many qualitative factors may cause misstatements of quantitatively small amounts to be material. Securities and Exchange Commission Staff Accounting Bulletin No. 99, 64 Fed.Reg. 45,150, 45,151 (Aug. 19, 1999) . The Second Circuit in *Ganino v. Citizens Util. Co.,* 228 F.3d 162-63 (2d. Cir.2000), and a dissenting Eighth Circuit judge in *Romine v. Acxiom Corp.,* 296 F.3d 701, 710 (8th Cir.2002) (Bye, J., dissenting), have looked to SAB 99 as a persuasive authority. SAB 99 directs that both individual

misstatements and their aggregate effect should be considered when analyzing their materiality.Staff Accounting Bulletin No. 99, 64 Fed.Reg. at 45,153. Even the majority in *Romine* follows SAB 99's cumulative effect approach by holding that multiple potentially material misstatements may be addressed seriatim, "except to the extent their *cumulative* impact may become relevant."*Romine,* 296 F.3d at 705 (emphasis added).

Defendant continually relies on the Eighth Circuit's finding that a 2% overstatement of assets is immaterial. *See Parnes,* 122 F.3d at 547. However, defendant's proposed 2% litmus test for the materiality of an individual misstatement fails to address the cumulative effect of several misstatements."Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive."*See Basic Inc. v. Levinson,* 485 U.S. 224, 236 (1988).

In examining the "total mix" of information available, the SEC in SAB 99 recommends the examination of both quantitative and qualitative factors, which include the following non-exhaustive list:
(1) whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate, and, if so, the degree of imprecision inherent in the estimate; (2) whether the misstatement masks a change in earnings or other trends; (3) whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise; (4) whether the misstatement changes a loss into income or vice versa; (5) whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; (6) whether the misstatement affects the registrant's compliance with regulatory requirements; (7) whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements; (8) whether the misstatement has the effect of increasing management's compensation-for example, by satisfying requirements for the award of bonuses or other forms of incentive

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
(Cite as: Slip Copy)

compensation; and (9) whether the misstatement involves concealment of an unlawful transaction.

**\*15** Staff Accounting Bulletin No. 99, 64 Fed.Reg. at 45,152.

The SEC also notes that when "management or [an] independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material."Staff Accounting Bulletin No. 99, 64 Fed.Reg. at 45,152. SAB 99 indicates that the intent of management may evidence materiality where misstatements were made to manipulate reported earnings, and notes that "investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to 'manage' earnings."Staff Accounting Bulletin No. 99, 64 Fed.Reg. at 45,152. "A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important."Staff Accounting Bulletin No. 99, 64 Fed.Reg. at 45,152 (quotation and citation omitted). The Court should also consider whether the misstatements were made to meet earnings goals to boost public confidence in the stock, particularly before a stock offering.

After considering both the quantitative and qualitative factors discussed supra, the Court is unpersuaded that the misstatements were material, even in light of TALX's restatement. The SEC alleges that the misstatements were made to meet EPS targets, but the Court has not been presented with any evidence of what those targets were. The SEC alleges that the overstatements were made to boost confidence before a secondary offering, but in the two quarters before the secondary offering revenue was understated-potentially causing the opposite effect. The SEC alleges that the misstatements were attempts to "manage" earnings, but there has been no evidence that the

misstatements cumulatively or otherwise had a material impact on TALX's earnings, especially considering the fact that TALX was phasing out the CPS division. As discussed supra, the misstatements only constituted small, insignificant percentages of the revenue both quarterly and annually. The SEC's assertions of materiality have been utterly unsupported and conclusory in nature. There is not a substantial likelihood that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Consequently, the SEC has not met its burden on both Counts 2 and 3.

### 2. Scienter

To show that defendant acted with scienter, the SEC may offer evidence that defendant possessed "a mental state embracing intent to deceive, manipulate, or defraud," acted with severe recklessness, or had an unusually heightened motive and opportunity. *In re K-tel Int'l,* 300 F.3d at 893-94 (citations omitted). Severe recklessness involves " an extreme departure from the standards of ordinary care" which presents "a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."*K & S P'ship v. Cont'l Bank, N.A.,* 952 F.2d 971, 978 (8th Cir.1991) (citations and quotations omitted).

**\*16** "Proof of scienter need not be direct but may be 'a matter of inference from circumstantial evidence.'" *Pagel, Inc. v. SEC,* 803 F.2d 942, 946 (8th Cir.1986) (quoting *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n. 30 (1983)). However, "[g]eneralized imputations of knowledge do not suffice, regardless of defendant['s] position[ ] within the company."*City of Philadelphia v. Fleming Companies, Inc.,* 264 F.3d 1245, 1264 (10th Cir.2001) (quoting *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 539 (3d Cir.1999)). The SEC must offer evidence beyond a mere allegation that defendant must have known because he was the Vice President of the CPS division and the CFO.

The SEC must show that defendant's "judgment-at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 16

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
(Cite as: Slip Copy)

the moment exercised-was sufficiently egregious that a reasonable accountant reviewing the facts and figures should have concluded that the company's financial statements were misstated and that as a result the public was likely to be misled."*SEC v. Guenthner,* 395 F.Supp.2d 835, 845 (D.Neb.2005) (citing *In re IKON Office Solutions, Inc.,* 277 F.3d 658, 673 (3d Cir.2002)). Simply stated, a violation of GAAP is evidence of scienter.

### a. No Evidence of Scienter Under Either Billing Practice

The SEC has not shown that defendant possessed the requisite scienter when utilizing either of TALX's billing practices. With respect to the percentage-of-completion billing, the SEC argues that defendant knew TALX was prematurely recording revenue. However, there is no evidence that defendant knew the various managers assigned to properly report the revenue were not performing their jobs correctly. Defendant did not meet with the project and team managers to discuss the revenue reports and revenue recognition. Instead, defendant held two training meetings to ensure that the managers were properly recording and recognizing revenue. Furthermore, there was no evidence that the managers were pressured by defendant to accelerate revenue. The CPS division was being phased out during the years the misstatements occurred. Given the varying nature of the revenues, defendant had no reason to suspect that CPS revenues were not being recorded accurately. Here again, the SEC's blanket allegations are left unsupported.

Of the three bill-and-hold transactions, the SEC offered evidence of scienter only with respect to the Kaiser and Cuyahoga equipment sales.FN9 Defendant was told by Mr. Graves that the Kaiser and Cuyahoga transactions did not meet the requirements of a bill-and-hold. Subsequently, defendant reported the respective amounts of $79,500 and $32,909 of revenue after both Graves and KPMG determined that the amounts of prematurely recognized revenue were immaterial. FN10Upon review of the evidence of scienter, or lack thereof, the Court concludes that the de

minimis Kaiser and Cuyahoga misstatements are insufficient to evidence defendant's "intent to deceive" or "a danger of misleading buyers." Consequently, the circumstantial evidence indicates that defendant did not possess the requisite scienter with respect to those transactions.

> FN9. The SEC has not made any showing that defendant knew of the error concerning the PS Technology transaction until it was later discovered in November 2003.

> FN10. Defendant argues his good faith reliance on KPMG in deciding what to file with the SEC disproves scienter. However, an accountant's actions are not dispositive on the issue of whether a statement was made with the requisite intent. *See United States v.. Colasurdo,* 453 F.2d 585, 594 (3d Cir.1971) ("[W]hile reliance upon accountants' advice might be highly persuasive, although not conclusive, misleading accountants so as to cause them to omit material they would otherwise include is a strong indication of the falsity and misleading nature of the filing actually made."(quotation and citation omitted)).

### b. Assertions of Motive to Accelerate Revenue Unsupported

**\*17** The SEC further alleges that defendant was motivated to manipulate CPS revenues to inflate TALX's revenues and earnings, facilitate TALX's secondary offering in August 2001, and derive personal gain from annual bonuses and stock sales. The Eighth Circuit has recognized that "alleging the defendant [ ] misrepresented corporate performance in order to keep stock prices inflated while selling stock" is a sufficient alleged motive to establish scienter.*In re K-tel Int'l,* 300 F.3d at 894. Because the misstatements in revenues shift earnings from one quarter to another, TALX had both under- and overstatements. Upon a review of the misstatements, the Court cannot discern a pattern where CPS revenue was strategically shifted, especially considering that TALX was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 17

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
(Cite as: Slip Copy)

de-emphasizing the division. Even during the two quarters immediately preceding the secondary offering in August 2001, CPS earnings were *understated.*In fact, most of the revenue was erroneously recognized between April and December of 2000-well before TALX's Board of Directors began seriously considering the secondary offering in April 2001. The SEC continually asserts that the revenue was shifted to meet earnings goals, but neglects to adduce evidence of what those goals were and how the misstatements allowed TALX to meet them.

The misstatements only affected defendant's fiscal year 2001 bonus-which should have been $48,000 instead of $80,000-and defendant's fiscal year 2002 bonus which should have been slightly higher than the $45,000 defendant received. However, defendant's motive to increase his bonus is one common to all the TALX employees whose bonuses depended on the EPS targets. A common motive like this undercuts any suggestion of scienter. *See Kalnit v. Eichler,* 264 F.3d 131, 140 (2d Cir.2001) ( "[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers."); *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 690 (6th Cir.2004) ("[C]ourts distinguish motives common to corporations and executives generally from motives to commit fraud.").

Furthermore, defendant's single stock sale in May 2001 does not support a finding that he was motivated to manipulate CPS revenue recognition. Defendant's single sale at a price significantly below the all-time high and at a time months away from the secondary offering does not support an inference of motive to misstate earnings. *See In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 747 (8th Cir.2002) ("Insider stock sales are not inherently suspicious; they become so only when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."(citations and internal quotations omitted)). Notably, defendant elected not to sell his remaining shares for $1.8 million at the stock's all-time high and for $1.4 million during the

secondary offering. In view of the above, the SEC has failed to show that defendant possessed the scienter necessary to meet the its burden on Counts 1 and 3.

## B. Allegation of Insufficient Internal Controls: Count 4

**\*18** The Fourth Claim asserts that defendant knowingly circumvented or failed to implement a system of internal accounting controls or knowingly falsified books, records, or accounts described in § 13(b)(2) [FN11] of the Exchange Act in violation of § 13(b)(5) [FN12] of the Exchange Act and Rule 13b2-1.[FN13]Contrary to defendant's assertions, scienter is not an element of claims under § 13 of the Exchange Act. *See Ponce v. SEC,* 345 F.3d 722, 737 (9th Cir.2003); *SEC v. McNulty,* 137 F.3d 732, 740-41 (2d Cir.1998); *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1165 (D.C.Cir.1978). The SEC only needs to show that defendant acted knowingly for an alleged violation under § 13(b)(5).*See*15 U.S.C. § 78m(b)(5).

> FN11. Section 13(b)(2)(A) states that every § 12 registrant must "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."15 U.S.C. § 78m(b)(2)(A).

> FN12."No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in [§ 13(b)(2) ]."15 U.S.C. § 78m(b)(5).

> FN13. Similarly, Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act."17 C.F.R. § 240.13b2-1.

There is evidence that defendant knew he was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 18

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

falsely recording the Kaiser and Cuyahoga projects as bill-and-hold transactions. As discussed supra, defendant recorded the revenue even after he was told and did know that these transactions did not meet the requirements of a bill-and-hold. Contrary to Counts 1, 2, and 3, no showing of scienter or materiality is required for Count 4. Consequently, the Court finds that defendant's reporting of the Kaiser and Cuyahoga transactions as bill-and-holds violated § 13(b)(5) of the Exchange Act and Rule 13b2-1.

With respect to the remaining CPS revenue misstatements, the Court does not find any evidence that defendant knowingly falsified or directed someone else to falsify TALX's books and records by erroneously recognizing CPS revenues; nor is there any evidence that defendant knowingly circumvented or knowingly failed to implement a system of internal accounting controls that would prevent the erroneous recognition of CPS revenues. Once more, the SEC's briefing and argument on this issue has been highly conclusory and generally unsupported by its proof.

### C. Aiding and Abetting Allegations: Counts 5 and 6

Counts 5 and 6 respectively allege that defendant: (5) knowingly and substantially assisted TALX in filing materially misleading reports with the SEC and failed to file required documents and information in violation of § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13; and (6) knowingly and substantially assisted TALX's failure to keep accurate records of transactions and to devise and maintain adequate internal accounting controls in violation of § 13(b)(2) of the Exchange Act, 15 U.S.C. § 78m(b)(2).[FN14] In alleging that defendant aided and abetted TALX in filing materially misleading reports and failing to keep accurate records, the SEC must establish a securities laws violation by the primary party, which can be a corporation such as TALX. See Camp v. Dema, 948 F.2d 455, 459 (8th Cir.1991); see also Ponce v. SEC, 345 F.3d 722, 737 (9th Cir.2003)

(analyzing whether an independent auditor can aid and abet the corporation that hires him). As discussed supra, the Court does not find that any of TALX's filings were *materially* false or misleading. Furthermore, the Court does not find that the system of internal controls used by TALX was insufficient to permit preparation of financial statements in conformity with GAAP.

> FN14. Section 13(b)(2)(B) states that every § 12 registrant must "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that ... (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements...."15 U.S.C. § 78m(b)(2)(B).

**\*19** Assuming a primary violation, *arguendo*," aiding and abetting not only requires assistance, but also knowledge of a wrongful purpose."*Camp,* 948 F.2d at 459. "[A] bare inference that the defendant must have had knowledge of the primary violation is insufficient."*Id.* (quotations and citations omitted). "Some knowledge must be shown, but the exact level necessary for liability remains flexible and must be decided on a case-by-case basis. Negligence, however, is never sufficient."*Id.*

To meet its burden under Counts 5 and 6, the SEC must show that defendant provided TALX, the alleged primary violator, with substantial assistance in the violations. 15 U.S.C. § 78m (a), (b)(2). Substantial assistance requires culpable conduct that involves some element of blameworthiness. *Camp,* 948 F.2d at 459. The person whose actions caused the company to violate § 13(b) can be found to have aided and abetted the company in its violation. *See, e.g., SEC v. Intelliquis Int'l, Inc.,* Case No., 2:02-CV-674 PGC, 2003 U.S. Dist. LEXIS 27131, at \*40 (D.Utah December 11, 2003).

With respect to the above violations of § 13(b)(5) of the Exchange Act and Rule 13b2-1, the Court found that defendant acted as the primary violator,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

as opposed to the aider and abettor, when he reported the Kaiser and Cuyahoga transactions as bill-and-holds. Otherwise, the Court does not find that defendant knew of any other violation, such as the existence of a material error or an improper purpose on the part of TALX. Consequently, judgment will be entered in favor of defendant on Counts 5 and 6.

### D. Allegation of Misleading Auditors: Count 7

The SEC's seventh claim asserts that defendant made a materially false or misleading statement, or omitted a material fact, to TALX's independent auditors, KPMG, in violation of Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-1.[FN15]Here again, a finding of scienter is not required. The errors occurred because team and project managers were not performing their jobs within TALX's system of internal controls consistently or adequately. There is no evidence that defendant was aware of the failure, and thus defendant could not have misled KPMG concerning whether the managers were performing their jobs correctly. Furthermore, there is no evidence that, when defendant signed the management representation letters, he knew of the existence of material errors in TALX's revenue recognition for CPS implementation services or that he knew the system of internal controls was inadequate to detect that team and project managers were not carrying out their revenue recognition responsibilities. Consequently, judgment will be entered in favor of defendant on Count 7.

> FN15. Rule 13b2-2 prohibits an officer or director of an issuer from making materially false statements to an accountant in connection with an audit or in connection with the preparation of any document filed with the SEC. 17 C.F.R. § 240.13b2-2. The SEC alleges that the test for materiality under Rule 13b2-2 is whether the misstatement had the potential of keeping the auditor from discovering a false book or record. In support of the argument, the SEC cites to, but does not provide a copy of, Exchange Act Rel. No.

15570 (Feb. 15, 1979), which this Court has not been able to access.

### E. Relief

#### 1. Permanent Injunction

The SEC seeks a permanent injunction against defendant essentially for any future violations of the above statutes and rules. To obtain an injunction under either § 20(b) of the Securities Act or § 21(d) of the Exchange Act, the SEC must prove that, unless enjoined, there is a reasonable and substantial likelihood that defendant will commit future violations. *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir.1993). The Court considers the following non-exhaustive list of factors in determining the likelihood of future violations: "the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations, and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations." *Id.* The Court also considers the sum of the circumstances surrounding defendant and his past conduct in determining whether to grant injunctive relief. *See SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir.1981).

**\*20** Defendant is liable only for knowingly falsifying books and records in violation of § 13(b)(5) of the Exchange Act and Rule 13b2-1, which only required a finding that defendant acted knowingly, not with scienter. The misstatements associated with the falsified books and concerning the Kaiser and Cuyahoga transactions were immaterial. Currently, defendant works as a home builder and does not have any opportunities for future violations. In light of the above considerations, the Court will not grant a permanent injunction.

#### 2. Civil Penalties

The SEC seeks a third-tier civil penalty pursuant to § 21(d)(3) of the Exchange Act, which provides that, "Whenever it shall appear to the Commission

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

that any person has violated any provision of this chapter, ... the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. § 78u(d)(3). However, third-tier penalties are not available because the requisite finding that defendant's action directly or indirectly resulted in or created a significant risk of substantial losses to other persons has not been made. If the violation involved fraud or reckless disregard for a regulatory requirement, the amount of a lower second-tier penalty for each violation shall not exceed the greater of $50,000 [FN16] or "the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 78u (d)(3)(B)(ii).

> FN16. The SEC asserts that this amount should be increased to $55,000 to adjust for inflation pursuant to 17 C.F.R. § 201.1001.

In determining whether to assess civil penalties, the Court considers the following factors: "(1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the defendant's conduct; and (6) whether the defendant is employed in the securities industry." *SEC v. Sargent,* 329 F.3d 34, 42 (1st Cir.2003). As discussed supra, defendant's violation was done knowingly, not with scienter, and does not concern material misrepresentations. The violations were related to two reported bill-and-hold transactions. The matter was disclosed to KPMG and Mr. Graves, evidencing that defendant did not try to hide his actions. Furthermore, defendant no longer works in the securities industry. Accordingly, the Court finds that a second-tier civil monetary penalty of $5000 will achieve the goals of punishment and deterrence. *See SEC v. Moran,* 944 F.Supp. 286, 296 (S.D.N.Y.1996) ("By enacting the Penalty Act, Congress sought to achieve the dual goals of punishment of the individual violator and deterrence of future violations.").

**3. Officer and Director Injunction**

The Court may enjoin any person who violated § 78j (b) from "acting as an officer or director of any issuer" that is registered or required to file reports " if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer." 15 U.S.C. § 78u(d)(2). The Court does not find a violation of § 78j (b) as is alleged in Count 3. Even if such a violation were found, the Court has considered the factors discussed in *SEC v. First Pac. Bancorp,* 142 F.3d 1186, 1193-94 (9th Cir.1998), and finds that defendant's conduct as discussed above does not warrant this relief, which is accordingly denied.

**4. Disgorgement**

**\*21** "The SEC's power to obtain injunctive relief has been broadly read to include disgorgement of profits realized from violations of the securities laws." *SEC v. Clark,* 915 F.2d 439, 453 (9th Cir .1990); *see also SEC v. Fischbach Corp.,* 133 F.3d 170, 175 (2d Cir.1997) ("As an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits."). The Court recognizes that "[t]he deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1474 (2d Cir.1996) (quotation and citation omitted). However, "[t]he court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978).

As an equitable remedy, the Court is not required to grant disgorgement upon a finding that a defendant violated federal securities laws. *See First Jersey Sec.,* 101 F.3d at 1474-75. The SEC has not shown that defendant obtained any ill-gotten gains or unjust enrichment from his actions of falsifying the books and records concerning the Kaiser and Cuyahoga transactions. Furthermore, the Court is not persuaded that defendant benefitted through bonuses, salary, or stock sales from such insignificant and immaterial accelerations of revenue. Consequently, the Court will not order the disgorgement of any funds.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301
**(Cite as: Slip Copy)**

### III. CONCLUSION

A judgment will be entered herein this day finding in favor of defendant Cohen on Counts 1, 2, 3, 5, 6, and 7, and in favor of the SEC on Count 4. Based upon that finding, the Court will impose a civil penalty against defendant Cohen in the amount of $5,000.00.

E.D.Mo.,2007.
U.S. S.E.C. v. Cohen
Slip Copy, 2007 WL 1192438 (E.D.Mo.), Fed. Sec. L. Rep. P 94,301

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.