EXHIBIT 13



EXHIBIT
13

**Westlaw.**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

**C**
S.E.C. v. Hopper
S.D.Tex.,2006.

United States District Court,S.D. Texas, Houston
Division.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
Preston HOPPER, Tamela Pallas, and Terry
Woolley, Defendants.
**No. Civ.A. H-04-1054.**

March 24, 2006.

Toby Michael Galloway, US Securities & Exchange
Commission, Fort Worth, TX, for Plaintiff.
James K. Robinson, Cadwalader Wickersham et.
al., Washington, DC, James Gregory Waller,
Andrews & Kurth, James G. Munisteri, Orin H.
Lewis, Gardere Wynne et. al., Houston, TX, for
Defendants.

*MEMORANDUM AND ORDER*
WERLEIN, J.
**\*1** Pending are Defendant Tamela Pallas's Motion
to Dismiss First Amended Complaint (Document
No. 44) and Defendant Preston Hopper's Motion to
Dismiss Claims 1, 2, 4, 6, and 8 of the First
Amended Complaint (Document No. 45). After
having carefully considered the motions, response,
replies, and the applicable law, the Court concludes
that the motions should be denied.

*I. Background*

The Securities and Exchange Commission ("SEC")
brings this civil enforcement action against
Defendants Tamela Pallas ("Pallas"), Preston
Hopper ("Hopper"), and Terry Woolley ("Woolley"
) (collectively, "Defendants") for violations of
various federal securities laws. Specifically, the

SEC alleges that Defendants violated the antifraud
provisions of § 17(a) of the Securities Act of 1933 (
"Securities Act"), 15 U.S.C. § 77q(a) (Claim One),
and § 10(b) of the Securities Exchange Act of 1934 (
"Exchange Act"), 15 U.S.C. § 78j(b), and Rule
10b-5 thereunder, 17 C.F.R. § 240.10b-5 (Claim
Two).[FN1] The SEC further alleges that Defendants
aided and abetted CMS Energy Corporation ("CMS
")'s violations, and that Pallas aided and abetted
Reliant Resources, Inc. ("Reliant")'s violations, of
the following securities laws: (1) § 10(b) of the
Exchange Act and Rule 10b-5 thereunder (Claims
Four and Five); (2) § 13(a) of the Exchange Act, 15
U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and
13a-13 thereunder, 17 C.F.R. §§ 240.12b-20,
240.13a-1, 240.13a-13 (Claims Six and Seven); and
(3) § 13(b)(2)(A)-(B) of the Exchange Act, 15
U.S.C. § 78m(b)(2)(A)-(B) (Claims Eight and
Nine). The SEC therefore seeks (1) a permanent
injunction against Defendants, enjoining them from
further violations of the securities laws and barring
them from serving as officers or directors of any
public company, (2) disgorgement of ill-gotten
gains, and (3) payment of monetary penalties and
prejudgment interest.

FN1. Claim Three of the Complaint alleges
that Defendant Hopper violated § 13(b)(2)
of the Exchange Act and Rule 13b2-1
thereunder, but the sufficiency of this
claim is not challenged in Hopper's motion
to dismiss.

The enforcement action stems from certain "
round-trip" energy trades that Reliant's subsidiary
Reliant Energy Services, Inc. ("RES") conducted in
1999, and that CMS's subsidiary CMS Marketing
Services & Trading ("MST") conducted during the
period beginning in the third quarter of 2000 and
continuing through 2001. The SEC alleges that
these round-trip trades were sham transactions,
bogus trades portrayed as legitimate sales, that were
improperly accounted for and reported by Reliant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

and CMS respectively to present gross overstatements of the companies' true trading volumes, revenues, and financial conditions. Document No. 40 ¶¶ 1-4. According to the First Amended Complaint, taken as true for purposes of Defendants' motions, the facts are as follows:

### A. Round-Trip Trading at Reliant

Reliant, an energy company headquartered in Houston, Texas, builds and owns electric power plants that sell energy into unregulated markets. *Id.* ¶ 17.In October 1998, Pallas became Senior Vice President of Reliant's Wholesale Group and served as the chief executive of RES, the Wholesale Group's electricity and natural gas trading unit. *Id.* ¶¶ 17, 22.In that capacity, Pallas spearheaded Reliant's efforts to advance in the industry trading volume rankings known as the "league tables." *Id.* ¶ 21.FN2

> FN2. The SEC alleges that "[v]arious industry periodicals, such as *Power Markets Weekly* and *Gas Daily,* publish trading volumes reported by energy companies to the Federal Energy Regulatory Commission ("FERC") or directly to the periodicals. The periodicals rank the energy companies by the volume of energy bought and sold."Document No. 40 ¶ 21.

**\*2** In early 1999, Pallas convened a series of informal strategy meetings with her direct subordinates in the Wholesale Group at Reliant to find ways to boost trading volume in order to inflate Reliant's gas and power trading rankings. *Id.* ¶ 23.After rejecting transactional churning-frequent day trades in and out of power or gas positions-as cost-prohibitive, the group led by Pallas decided to engage in a series of round-trip trades. *Id.* These round-trip trades were massive, prearranged transactions each involving simultaneous purchases and sales of electric power or natural gas, between the same counterparties, for the same volume, at the same price, with no contemplation of delivery and no possibility of profit for either party. *Id.* ¶ 2. The

round-trip trades had no economic substance and no impact on net income; instead, their purpose was artificially to increase Reliant's reported trading volumes-and thereby propel Reliant into the "Top 20 " in the league tables-in hopes that such a ranking, however achieved, would attract more business. *Id.* ¶ 5.

At Pallas's direction, Reliant began round-trip trading in April 1999. *Id.* ¶ 27.FN3During 1999, Reliant conducted two round-trip gas trades, valued at a combined $859 million, with Cokinos Energy. *Id.* ¶¶ 27-28, 30.FN4In addition, Reliant executed five round-trip power trades with three counterparts: PanCanadian Energy Services, Inc., Merchant Energy Group of the Americas, Inc., and Public Service Company of Colorado. *Id.* ¶¶ 27, 30.In total, the 1999 gas and power round-trip trades added over $1.4 billion in offsetting gross revenue and expenses to Reliant's financial statements and represented 17.7% of Reliant's revenues, which were reported on a gross basis.*Id.* ¶¶ 27, 33.FN5This reporting of the round-trip trades conveyed an inaccurate picture of Reliant's revenues as well as its trading volumes, which Reliant published in its annual and quarterly reports filed with the SEC. *Id.* ¶ 33.Reliant also included the overstated revenues and trading volumes in registration statements filed with the SEC in September 1999 and October 2000, and in a prospectus filed with the SEC in April 2001, in anticipation of securities offerings. *Id.* ¶ 35.When Reliant's round-trip trading finally came to light on May 9, 2002, Reliant's stock opened at $15.10 and closed at $14.10. *Id.* ¶ 101.By market close on May 14, the stock price had plummeted to $9.50. *Id.*

> FN3. Pallas explicitly approved Reliant's round-trip trades without notifying or seeking permission from her supervisor, Wholesale Group President Joe Bob Perkins, or from any other superior, and without advising Reliant's internal accountants, legal staff, or external auditors. Document No. 40 ¶ 25.

> FN4. The inaugural round-trip trade with Cokinos Energy, which involved a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
(Cite as: Not Reported in F.Supp.2d)

Page 3

purported $364 million of natural gas to be delivered from April through June 1999, was entered into Reliant's computerized trading system or its accounting and general ledger system. Document No. 40 ¶ 28. Instead, Reliant entered the trade into its books after the close of the second quarter 1999 using a post-closing adjustment, of which Pallas was aware. *Id.* ¶¶ 28-29.

FN5. Over 90% of these trades, by value, were made before Pallas's October 1999 departure from Reliant. The Amended Complaint also details Reliant's round-trip trading activities during 2000 and 2001, after Pallas's departure. *See* Document No. 40 ¶¶ 31-33.

### B. *Round-Trip Trading at CMS*

CMS is a Michigan energy company that owns and operates the largest public utility company in Michigan and sells energy into various unregulated markets.*Id.* ¶ 19.Hopper was CMS's chief accounting officer during the relevant period, and was responsible for CMS's financial accounting and financial reporting. *Id.* ¶ 14.Based on Pallas's apparent success at Reliant, CMS recruited her in the fall of 1999 to lead and expand the business of MST, a subsidiary of CMS that was active in retailing its own electricity and in wholesale trading of electricity and natural gas. *Id.* at ¶¶ 1, 15, 17, 19, 36.From 1999 to 2002, Pallas served as Chief Operating Officer, and later Chief Executive Officer, of MST. *Id.* ¶ 15.

*3 In 1998, MST was ranked 36th among power traders, but by the second quarter of 2000, MST had dropped to 48th. *Id.* ¶ 38.Thus, beginning in the spring of 2000, Pallas, after discussions with a former subordinate at Reliant, instructed MST traders to begin round-trip trading with Reliant in order to manufacture trading volumes and foster the appearance of robust business activity. *Id.* ¶ 39.MST conducted its first round-trip trade with Reliant in July 2000, shortly after CMS and Reliant entered into a standard netting agreement that permitted the parties to offset wholesale

transactions on a net basis. *Id.* ¶¶ 39-41.This round-trip trade involved 10 million megawatt hours and $380 million and was approximately 1000 times larger than the typical MST power trade. *Id.* ¶ 41.MST calculated that the artificial trading volume produced by the transaction would propel MST into the Top 20 in the league tables. *Id.* Thereafter, in order to maintain a Top 20 ranking, MST and Reliant arranged round-trip trades of similar magnitude in each successive quarter. *Id.* ¶ 42.

In October 2000, shortly before the chairman of the audit committee of CMS's Board of Directors (the " Directors") conducted his customary quarterly conference call (for the third quarter) with Hopper and Arthur Andersen LLP's ("Andersen") Michigan-based audit engagement partner, a Houston-based Andersen staff accountant working on MST's quarterly review discovered the $380 million round-trip trade with Reliant and brought it to the attention of her supervisors in Houston and MST. *Id.* ¶ 47.She then relayed the information to the Andersen engagement partner, who raised the issue with CMS's audit committee chairman and Hopper during the conference call. *Id.* Hopper stated that MST conducted the trade to establish its trading business and increase its trading volumes, and that the trade was memorialized by all the necessary transaction documents, such as deal tickets and trade confirmations, and should therefore be deemed a legitimate sale of energy. *Id.* ¶ 48.Hopper assured Andersen and CMS's audit committee chairman that the transaction met the technical criteria for a sale and that he was comfortable with the accounting.*Id.* Hopper did not voluntarily consult with the audit team and audit committee chairman; rather, he vouched for round-trip trade upon questioning by Andersen and the CMS audit committee chairman. *Id.*

Because the round-trip trades were prearranged and lacked economic substance, MST beginning in the fourth quarter of 2000 "took pains to prevent embarrassing public detection" of the round-trip trading scheme. *Id.* ¶ 43.Specifically, in the fourth quarter of 2000, MST traders began disguising the trades by splitting them into multiple components, for delivery in different geographic regions, with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 4

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
(Cite as: Not Reported in F.Supp.2d)

slight price differentials. *Id.* When viewed as one linked transaction, however, the trades amounted to a round-trip trade, as neither payment nor delivery was contemplated. *Id.*[FN6] MST and Reliant continued to disguise their round-trip trades over the next two quarters.*Id.* ¶ 44.[FN7]

FN6. Andersen had been led to believe that the July, 2000 round-trip trade it discovered in October, 2000, was a one-time occurrence. Document No. 40 ¶ ¶ 49, 55. Neither Hopper nor Pallas disclosed the fourth-quarter trades to Andersen, and Andersen did not otherwise detect them. *Id.* ¶ 49.Thus, Andersen issued an audit report containing an unqualified opinion concerning CMS's 2000 financial statements. *Id.* Due largely to the round-trip trades, MST's reported revenues quadrupled in 2000-from $800 million in 1999 to $3.2 billion in 2000-and its parent company CMS reported a 47% increase over its 1999 revenues. *Id.* ¶ 50.CMS also reported a 919% increase in 2000 over its 1999 power trading volumes. *Id.*

FN7. In addition to artificial electric power trading, MST conducted a natural gas round-trip trade with Reliant on June 1, 2001. Document No. 40 ¶ 46. When Delbert Blom, head of MST's gas trading unit, had misgivings about the trade and declined to execute it, Pallas "personally directed" an MST trader to enter the trade with the transaction's terms, which called for the retroactive delivery of gas in April, May, and June 2001, "an obvious impossibility," into [MST]'s system. *Id.*

**\*4** In April 2001, CMS scheduled a special meeting of its Directors in Houston to showcase its operations there, including an informational session about MST to be presented by Pallas. *Id.* ¶ 51.Before the special meeting, Hopper participated in the first quarter conference call with the Andersen engagement partner and the CMS audit committee chairman. *Id.* An Andersen accountant's

notes reflect that the following points were discussed during the meeting:
• 1st Q revenues up from $0.4 billion in 2000 to $2.4 billion in 2001.
• $1.2 billion of "no-margin" deals done in the 1st Quarter.
• Half of the total revenue recorded in the quarter was for 3 power arrangements with Reliant where we agreed to sell to them and they agreed to sell to us under identical terms. Physical delivery will not occur and there is no margin on the deals.
• All of the legal documents support these trades (i.e., normal deal tickets, documentation the same as all other deals, confirmations are received for each transaction), but they appear to lack substance.
• We are continuing to discuss with our industry people to ensure this meets industry practice.

*Id.*[FN8] During the call, Hopper assured CMS's audit committee chairman that MST was following the proper accounting rules for the trades.*Id.* ¶ 52.

FN8. Upon learning of the additional $1.2 billion in round trip trades, Andersen's Houston-based audit partner requested that his staff research the appropriate accounting treatment for the trades. Document No. 40 ¶ 55. The audit partner also questioned Pallas about the trades, who falsely stated that such trades were common in the industry. *Id.* ¶ 56. Andersen's research resulted in a May 14, 2001, memorandum by the MST audit manager in Houston, who appropriately concluded that the revenues and expenses from the round-trip trades should be recorded on a net basis, contrary to MST's practice of recording them gross. *Id.* ¶ 57.Although Andersen informed Woolley, MST's comptroller, of this conclusion, Woolley failed to convey the information to his superiors at CMS in Detroit. *Id.* CMS therefore reported the revenues and expenses from the trades on a gross basis in its second quarter 2001 Form 10-Q. *Id.*

Later that day, Pallas gave her presentation about MST to the CMS Directors and members of CMS's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
(Cite as: Not Reported in F.Supp.2d)

Page 5

senior management, during which she briefly addressed the practice of round-trip trading. *Id.* ¶ 53.Using the terms "net zero" or "no margin" transactions, Pallas described the trades as an accommodation to trading counter-parties. *Id.* ¶ 54.She also stated that the trades were a marketing strategy that would enable MST to scale the industry rankings and attract more business and that such trades were common in the industry, which was not true. *Id.* Pallas omitted, however, the most troubling details about the round-trip trades, which only became apparent after CMS's internal investigation of the trades in May 2002. *Id.* ¶ 53.Specifically, Pallas did not disclose that the round-trip trades were prearranged and devoid of risk, nor did she explain the extent to which MST's trading volumes and revenues were generated by round-trip trading. *Id.* ¶ 54.Later-despite having misled the Directors-Pallas expressed relief and surprise that the Directors had not halted the round-trip trading scheme. *Id.*

In mid-2001, industry periodicals began to take notice of MST's increased trading volumes and trading relationship with Reliant. *Id.* ¶ 44.[FN9] Concerned that MST's "sham trading activity" might be exposed, Pallas directed her staff to locate a new round-trip trading partner. *Id.* ¶ 45.Thus, on November 15, 2001, MST made two huge round-trip power trades with Dynegy Inc. ("Dynegy "). *Id.* ¶¶ 45, 62.[FN10]MST conducted additional round-trip trades with Reliant in December 2001. *Id.* ¶ 62.

FN9. In June 2001, one industry periodical reported that "CMS and Reliant traded about 20 million Mwh, lifting CMS up from the rank of 56th one year ago to 18th for the first-quarter 2001," and in August 2001, a second industry publication reported that MST "has Reliant as a counterparty for about 90% of its power sales."Document No. 40 ¶ 44 (citations omitted).

FN10. The trades were so large that Dynegy had to override its trading platform's volume limits in order to

execute them. *Id.* ¶ 45.

*5 How properly to account for the round-trip trades came to a head in the third quarter of 2001. *Id.* ¶ 58.In October 2001, Andersen instructed CMS that energy trades could be recorded on a gross basis only if three criteria were satisfied: (1) the parties must be at risk for both credit and performance; (2) title to the related commodity must transfer; and (3) settlement must be for gross proceeds (checks must be exchanged and cashed for the gross amount of the transaction).*Id.* MST's round-trip trades did not satisfy these criteria. *Id.* ¶ 59.Hopper forwarded the criteria to Pallas and Wooley, stating, "Call if you want to discuss, or have a different idea about how to get credit for volumes without jeopardizing the fair presentation of the income statement."*Id.* Thereafter, Defendants agreed that Woolley would not record the trades on a gross basis in the financial statements, but that he would still recognize them in CMS's internal reports and report the volumes to industry publications and the Federal Energy Regulatory Commission ("FERC ").*Id.* ¶ 60.[FN11]Upon reflection, however, Pallas determined that the round-trip trades were no longer worthwhile and directed MST's traders to discontinue them. *Id.* ¶ 60.Her traders interpreted this instruction as a directive to complete the 2001 round-trip trades and then halt the practice at year end. *Id.*

FN11. Despite Andersen's criteria, Defendants failed to net the revenues and expenses from MST's third quarter 2001 round-trip trades, and hence, CMS reported the revenues and expenses from those trades on a gross basis, resulting in material financial misstatements. Document No. 40 ¶ 61. Hopper had previously argued to Andersen that the trades should not be netted in the third quarter. *Id.* In addition, Pallas's staff reported the volumes from the third-quarter round-trip trades to the league tables.*Id.*

In mid-March 2002, while performing CMS's audit, Andersen reiterated that revenues and expenses

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

from all third and fourth quarter 2001 round-trip trades would have to be recorded on a net basis. *Id.* ¶ 63.Shortly thereafter, Andersen instructed CMS that *all* round-trip trades would have to be reclassified on a net basis. *Id.* This decision disconcerted Hopper, who had previously reached an agreement with Andersen that the round-trip trades would be netted beginning in the third quarter 2001 but that the accounting for previous trades would remain unchanged. *Id.* After an internal debate about the change, Hopper agreed to net all 2001 trades in order to avoid large revenue and volume variances between consecutive quarters. *Id.* ¶ 64.Thus, all 2001 round-trip trades were reclassified. *Id.* However, Hopper failed to have CMS reclassify the $1.0 billion in revenues and expenses generated from round-trip trades in 2000, and Pallas did not alert anyone to those trades.*Id.* ¶ 64.As both Hopper and Pallas knew, reclassifying the 2000 trades likely would have required filing an amended 2000 Form 10-K, which would have required an explanation. *Id.*

In addition, Andersen instructed CMS to disclose the "zero margin" transactions. *Id.* ¶ 65.One day before the deadline for delivery of the draft Form 10-K to the printer and after the final review and approval of the report by its CMS management signatories, a footnote disclosure was prepared by an Andersen accountant working in concert with a CMS accountant who reported to Hopper but lacked detailed knowledge of the round-trip trading scheme. *Id.* ¶ ¶ 65, 67.[FN12]The footnote stated:

> FN12. Virtually all of the CMS officials who signed the report believed, when they executed the signature page, that they were approving the final version. Document No. 40 ¶ 67. Only CMS's audit committee chairman, en route to an overseas destination, understood that Hopper had not yet disclosed the round-trip trades in the report, and he admonished Hopper to do a "thorough job" making the disclosure. *Id.*

**\*6** Reclassification: During 2001, CMS Energy entered into several energy trading contracts with counterparties. The impact of these trades increased operating revenue with a corresponding increase in operating expenses. During the fourth quarter of 2001, it was determined that under SFAS No. 133 and related interpretations, these trades should have been recorded on a net basis. First, second, and third quarter operating revenue and operating expenses have been restated from the amounts previously reported to reflect these trades on a net basis. There was no impact on previously reported consolidated net income.

*Id.* ¶ 65.The footnote did not explain that the "trading contracts" were prearranged, that they lacked economic substance, or that their sole purpose was to inflate MST's trading volume rankings and create the appearance of legitimate business activity, nor did the footnote mention the staggering amounts of revenue that had been restated to correct the practice of recording the round-trip trades on a gross basis-$4.2 billion in 2001 alone. *Id.* ¶ 66.In fact, the only way an investor could have deduced the amount of the reclassified revenues for each quarter of 2001 would have been to compare the revenues and expenses from CMS's 2001 Form 10-K with the revenues and expenses from the preceding Forms 10-Q. *Id.* Alone among CMS's senior management, Hopper-acting with full knowledge of the pertinent facts but without having consulted with legal counsel-reviewed the footnote and personally approved its inclusion in CMS's 2001 Form 10-K. *Id.* ¶¶ 66, 68-69, 98.[FN13]

> FN13. Moreover, despite her acute awareness of the round-trip trades and the reclassification decision, Pallas took no steps, before or after the filing, to ensure meaningful disclosure, nor did she ever advise legal counsel of the obviously questionable practice of round-trip trading. Document No. 40 ¶¶ 68-69, 98.

*Public Touting of Volumes and Revenues and Market Reaction*

During the period of MST's round-trip trading-the third quarter of 2000 through the end of 2001-CMS released into the market false information stemming

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

from the trades. *Id.* ¶ 70.Not until the third quarter 2000 did CMS begin making references to its trading volumes in its SEC filings. Beginning then, however, CMS included MST's artificially inflated trading volumes and revenues and statistics inflated by the round-trip trading in CMS's periodic filings with the SEC, quarterly earnings press releases, investor presentations, FERC reports, and reports to industry publications for inclusion in the league tables. *Id.* ¶¶ 70-90.More specifically, the SEC alleges that during the relevant period, CMS:

1. recorded in its periodic filings with the SEC round-trip revenue on purported trades where no deliveries were contemplated or made, in violation of CMS's "Revenue Recognition Policy," which stated that CMS recorded revenue on delivery; Hopper was responsible for the misleading description of the revenue recognition policy, *id.* ¶ 71;

2. engaged in a pattern of misleading reporting of MST's trading volumes in CMS's quarterly Form 10-Q and annual Form 10-K reports by, for example, falsely stating in its 2000 Form 10-K that MST's trading volumes were partially offset by " lower power trading margins, primarily due to cooler than normal summer weather in Michigan," when the lower trading margins were primarily due to round-trip trades, *id.* ¶¶ 72-80;

*7 3. issued quarterly earnings releases that (a) reported CMS's gross revenues without disclosing the source of the soaring revenues (round trip trading) or the offsetting expenses associated with the revenues, (b) falsely attributed the increase in revenues to "lower-margin"-as opposed to " no-margin"-energy marketing and trading, and (c) due to the conduct of Hopper and Pallas, CMS reported trading volume increases without disclosing the round trip trades or quantifying the impact of the round trip trades on CMS's trading volumes, *id.* ¶¶ 81-87; and

4. during investor presentations and quarterly earnings web-cast conference calls, emphasized growth in MST's revenues and trading volumes without disclosing that the "growth" was directly attributable to round-trip trading, *id.* ¶¶ 88-90.

According to the SEC, these misstatements are attributable to the conduct of Hopper and Pallas. *Id.* ¶ 70.

In summing up the false and misleading statements filed with the SEC, the SEC alleges:

78. Hopper, Pallas and CMS made their misrepresentations and omissions in connection with purchases and sales of CMS securities on the secondary market. Those misrepresentations and omissions were contained in CMS's Forms 10-Q for the third quarter 2000 and first, second and third quarters 2001, as well as its 2000 and 2001 Forms 10-K, and were incorporated by reference in the registered securities offerings CMS was conducting during the period, and in the CMS financial statements distributed in connection with those offerings. Specifically, CMS filed the following registration statements during the relevant period; a Form S-3 on December 15, 2000, December 22, 2000, and December 12, 2001, and a Form S-8 on April 11, 2001.

79. Hopper was primarily responsible for preparing CMS's Commission filings. In addition, in preparing the filings, Hopper circulated drafts to each business unit within CMS, including MS & T. Pallas received drafts of the filings for the purpose of reviewing the accuracy of disclosures regarding MS & T. For example, Pallas received an e-mail on February 2, 2001 attaching a draft of the 2000 annual report on Form 10-K, filed March 23, 2001. She received similar drafts of the 2001 quarterly reports on Forms 10-Q for the first three quarters of 2001, (filed May 11, August 14 and November 14, 2001, respectively) and a draft of the 2001 Form 10-K (filed March 29, 2002).

80. Pallas did not comment on, much less seek to correct, the misreporting of MS & T's volumes or revenues in any of the Hopper-drafted filings forwarded to her. Instead, she approved each false and misleading public filing by CMS. These filings were false and misleading because the discussions of MS & T's operations-Pallas's responsibility-were replete with misinformation concerning false volumes and the causes of CMS's lower margins, as described in this Complaint.

Market analysts picked up on CMS's touting of MST's increased revenues and volumes and reacted favorably. *Id.* ¶¶ 91-94.When the truth about CMS's round-trip trading scheme trickled into the market over a 48-day period in the spring of 2002,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

however, CMS's stock price declined by 33%. *Id.* ¶
¶ 97-99.In May 2002, negative publicity from the
round-trip trading scandal enveloped CMS. *Id.* ¶
100.Under pressure from CMS, Pallas resigned
shortly there-after, taking with her a $2 million
settlement from the company. *Id.*

### The Motions to Dismiss

**\*8** Hopper and Pallas have filed separate motions to
dismiss the SEC's Amended Complaint, and the
SEC has filed a consolidated response that
addresses the arguments raised by both Defendants.
Because Defendants' motions and memoranda
advance similar arguments, they will be considered
together unless otherwise indicated.

### II. *Standard of Review*

### A. *Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) provides
for dismissal of an action for "failure to state a
claim upon which relief can be granted."FED. R.
CIV. P. 12(b)(6). When a district court reviews the
sufficiency of a complaint before it receives any
evidence either by affidavit or admission, its task is
inevitably a limited one. *Scheuer v. Rhodes,* 416
U.S. 232, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90
(1974). The issue is not whether the plaintiff will
ultimately prevail, but whether the plaintiff is
entitled to offer evidence to support the claims. *Id.*

In considering a motion to dismiss under Rule
12(b)(6), the district court should construe the
allegations in the complaint favorably to the pleader
and accept as true all well-pleaded facts in the
complaint. *La Porte Construction Co. v. Bayshore
Nat'l Bank of La Porte, Tex.,* 805 F.2d 1254, 1255
(5th Cir.1986); *Kaiser Aluminum & Chemical
Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d
1045, 1050 (5th Cir.1982), *cert. denied*459 U.S.
1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Mann
v. Adams Realty Co.,* 556 F.2d 288, 293 (5th
Cir.1977). Dismissal of a claim is improper unless it
appears beyond a doubt that the plaintiff can prove

no set of facts in support of his claim that would
entitle him to relief. *Hughes v. Rowe,* 449 U.S. 5,
101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980); *Conley
v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d
80 (1957); *Kaiser Aluminum,* 677 F.2d at 1050;
*Mann,* 556 F.2d at 293.

### B. *Particularity Required by Rule 9(b)*

Allegations of securities fraud may not be made
generally, and are subject to the pleading
requirements of Federal Rule of Civil Procedure
9(b), which provides: "In all averments of fraud or
mistake, the circumstances constituting fraud or
mistake shall be stated with particularity. Malice,
intent, knowledge, and other condition on mind of a
person may be averred generally."FED. R. CIV. P.
9(b). Although scienter may be averred generally,
Rule 9(b) requires more than a simple allegation
that a defendant had fraudulent intent. To plead
scienter adequately, the SEC must "set forth
specific facts that support an inference of fraud."
*Tuchman v. DSC Communications Corp.,* 14 F.3d
1061, 1068 (5th Cir.1994).[FN14]

FN14. Although securities fraud claims
brought by private parties are subject to
the additional heightened pleading
requirements of the Private Securities
Litigation Reform Act ("PSLRA"), the
PSLRA standard for pleading scienter does
*not* apply to the SEC. *See*15 U.S.C. §
78u-4(b) ("The provisions of this
subsection shall apply in each private
action arising under this title that is
brought as a plaintiff class action pursuant
to the Federal Rules of Civil Procedure.");
*SEC v. Prater,* 296 F.Supp.2d 210, 215-16
(D.Conn.2003) ("Since actions brought by
the SEC are not considered 'private
litigation,' the standard imposed in the
PSLRA for pleading scienter does not
apply to the SEC."); *accordSEC v.
Kornman,* 391 F.Supp.2d 477, 494
(N.D.Tex.2005); *SEC v. Lucent Techs.,
Inc.,* 363 F.Supp.2d 708, 717 (D.N.J.2005)
; *SEC v. ICN Pharms., Inc.,* 84 F.Supp.2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

1097, 1099 (C.D.Cal.2000); *SEC v. Dauplaise,* 2006 WL 449175, at *5 n. 15 (M.D.Fla. Feb.22, 2006); *SEC v. Levin,* 232 F.R.D. 619, 623 n. 1 (C.D.Cal. Aug.15, 2005); *SEC v. Yuen,* 221 F.R.D. 631, 634 (C.D.Cal. June 10, 2004); *SEC v. Guenthner,* 212 F.R.D. 531, 532 n. 1 (D.Neb. Feb.24, 2003); *SEC v. Blackman,* 2000 WL 868770, at *5 (M.D.Tenn. May 26, 2000).

### III. *Discussion*

#### A. *Primary Violations: Claims One and Two*

The SEC asserts violations by Pallas and Hopper of § 10(b) of the Exchange Act, and Rule 10b-5 thereunder, and § 17(a) of the Securities Act. Section 10(b) of the Exchange Act protects investors by making it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."15 U.S.C. § 78j(b); *see also Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000) ( "Section 10(b) of the Exchange Act bars conduct involving manipulation or deception, manipulation being practices that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive."). Rule 10b-5 implements this statute, making it unlawful for any person, directly or indirectly,
*9 (a) to employ any device, scheme or artifice to defraud,
(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstance under which they were made, not misleading, or
(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Thus, to state a claim under

section 10(b) and Rule 10b-5, the SEC must allege that Defendants: (1) used a fraudulent device, made a material misrepresentation or omission, or committed an act that operated as a fraud or deceit; (2) in connection with the purchase or sale of securities; and (3) acting with scienter. *SeeSEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999); *SEC v. Pimco Advisors Fund Mgmt. LLC,* 341 F.Supp.2d 454, 463-64 (S.D.N.Y.2004).
FN15

FN15. Unlike a private litigant, the SEC is not required to allege or prove that investors relied on the defendant's misrepresentations, or that specific investors suffered actual harm as a result of the defendant's misrepresentations. *See, e.g.,Lucent,* 363 F.Supp. at 714.

Section 17(a) of the Securities Act similarly makes it "unlawful for any person in the offer or sale of any securities," directly or indirectly:
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(1)-(3). With respect to § 17(a), essentially the same elements must be established as for § 10(b) and Rule 10b-5 liability. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996) . Scienter, however, is not an element of a claim under § 17(a)(2) or § 17(a)(3).*Meadows v. SEC,* 119 F.3d 1219, 1226 n. 15 (5th Cir.1997) (citing *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980)). Under these subsections, liability is established merely by a showing of negligence. *Seeid.*

#### 1. *Rule 10b-5(b): Misstatements and Omissions*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

Pallas first argues that the SEC has failed to plead that she made a false or misleading statement or actionable omission and insists that the SEC's attempt to hold her primarily liable for the misleading statements and omissions in this case runs afoul of the Supreme Court's mandate in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), that § 10(b) does not itself prohibit the aiding and abetting of a § 10(b) violation.[FN16]

FN16. In *Central Bank,* the Supreme Court held that § 10(b) does not proscribe " giving aid to a person who commits a manipulative or deceptive act" or makes a material misstatement or omission. *Central Bank,* 114 S.Ct. at 1448. The Supreme Court found confirmation for this conclusion from the fact that if aiding and abetting liability were permitted, a defendant could be found primarily liable under § 10(b) without proof of an element critical for recovery under § 10(b) in a private action: reliance. *Id.* at 1449-50.The Supreme Court did not, however, conclude that secondary actors are always shielded from § 10(b) liability:

Because the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b). The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under 10b-5 are met. *Id.* at 1455.Section 104 of the PSLRA codified the SEC's continuing right to bring aiding and abetting claims, providing that "any person that knowingly provides

substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."15 U.S.C. § 78t(e).

Whether conduct gives rise to primary liability or merely constitutes aiding and abetting is not always clear, and the Fifth Circuit has not defined a legal standard. In *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 235 F.Supp.2d 549, 583 (S.D.Tex.2002), after a detailed analysis of the primary liability issue, the court ultimately concluded that "when a person, acting alone or with others, creates a misrepresentation ..., the person can be liable as a primary violator ... if ... he acts with the requisite scienter."*Enron,* 235 F.Supp.2d at 588, 590-91. Under this test, a person who is not publicly associated with a misstatement can nevertheless be held liable as a primary violator if the person was involved in creating the misstatement.*Id.;see also*SEC v. *KPMG LLP,* 2006 WL 176956, at *23 (S.D.N.Y. Jan.13, 2006) ("[I]t appears that primary liability under Section 10(b) may attach in a discrete set of circumstances in which the defendant was not identified to the public as the speaker. The [relevant Second Circuit] decisions suggest that primary liability can attach to a corporate officer for a company's false statement where it can be shown that the officer was sufficiently responsible for making the false statement.") (citing *First Jersey,* 101 F.3d 1450;*In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63 (2d Cir.2001)).

**\*10** The SEC has alleged facts from which it is inferred that Pallas was actually responsible for the material misstatements and omissions regarding MST's volumes and revenues that were contained in CMS's filings with the SEC. According to the SEC, Hopper distributed drafts of CMS's SEC filings-which included MST's vastly inflated revenues and trading volumes and which misstated the causes of MST's so-called "lower" trade margins-to Pallas, the chief executive of MST, *"for the purpose of reviewing the accuracy of the disclosures regarding MST."* Document No. 40 ¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

79 (emphasis added). Instead of fulfilling her obligation to correct the false and misleading information, however, Pallas as MST's CEO approved the false and misleading documents without revision.*Id.* ¶ 80.Contrary to Pallas's contention, these allegations do not suggest that she merely reviewed and approved documents into which she had no input. Rather, they give rise to a reasonable inference that Pallas-as the person who conceived and orchestrated the fictitious trades, and who therefore generated the misleading data contained in CMS's filings, and as the person who was charged with ensuring that CMS's SEC filings accurately reported the operations of her company, MST-was the person responsible for formulating the misleading contents of the filings. To the extent Pallas suggests that her failure to comment on or correct these filings when they were given to her for her input,-*i.e.,* her failure to add any new content to the filings-relieves her of primary liability for the misleading nature of the filings, this argument is not persuasive. Because the SEC has provided specific factual allegations that Pallas was actually involved in creating the false and misleading data that went into CMS's SEC filings, and that she, as MST's CEO, was primarily responsible for those portions of CMS's SEC filings that contained the false and misleading statements related to MST, Pallas could be held liable as a primary violator.

### 2. Rule 10b-5(a) and (c): Fraudulent Scheme

The SEC has also charged Defendants with primary liability under subsections (a) and (c) of Rule 10b-5 for using a "device, scheme, or artifice to defraud" and engaging in an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(a), (c). Pallas argues that the Amended Complaint fails to state a claim under either subsection because (1) round-trip trading was permitted under the Commodities Act and the Federal Power Act ("FPA") and is therefore not actionable under the securities laws, and (2) even if the round-trip trading scheme constitutes a manipulative or fraudulent device, the scheme nevertheless fails to meet the "in connection with" requirement.

Pallas contends that round-trip trading is not itself illegal, and therefore the round-trip trading scheme alleged by the SEC cannot constitute a fraudulent scheme, practice, or course of business giving rise to liability under the securities laws. Pallas states that the Commodities Act vests the Commodities Futures Trading Commission ("CFTC") with exclusive jurisdiction to regulate commodities transactions, and that the FPA similarly vests the FERC with exclusive jurisdiction to regulate interstate wholesale electricity rates, and argues that permitting the SEC "to effectively prohibit round-trip energy trading by making such trades a violation of the securities laws" would interfere with the respective jurisdictions of the CFTC and the FERC and "would frustrate Congress'[s] intent to create a uniform regulatory scheme." Document No. 44 at 13-14.

**\*11** Pallas's characterization of the SEC's allegations is inaccurate. The SEC does not allege that round-trip trading violates the securities laws *per se,* nor does it seek to impose liability on Pallas merely for having engaged in round-trip trades. Rather, the SEC alleges that the particular round-trip trading scheme orchestrated and implemented by Pallas was fraudulent and/or deceptive because the trades were massive sham bookkeeping transactions, conducted not for a legitimate business purpose but instead to create a false picture to the industry, and concomitantly to the financial community and secondary markets through the companies' SEC filings, that Reliant and CMS were robust energy trading businesses with astonishing legitimate trading volumes and revenues, so large that CMS's putative revenues were even causing CMS rapidly to ascend the Fortune 500 list. The fact that individual round-trip trades may not have been proscribed by the regulatory scheme governing the electric power and natural gas markets-an issue not before this Court-does not mean that the series of huge bogus trades did not violate the securities laws' proscription against schemes to defraud and practices that operate as a fraud or deceit upon any person.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
(Cite as: Not Reported in F.Supp.2d)

Moreover, the SEC has not, as Pallas asserts, conceded that "investors would not have been misled but for the way the parent corporation characterized the trades in SEC filings"-that is, that the alleged fraud consists solely of misstatements about the round-trip trades and is therefore not separately actionable as a fraudulent scheme under subsections (a) and (c). Document No. 50 at 5. Rather, the SEC has alleged facts from which it could be inferred that the round-trip trading scheme was fraudulent apart from the manner in which the trades were characterized in the SEC filings, given that the trades themselves were sham transactions that generated massive volumes, which Pallas knew would be reported to the FERC and industry publications on a gross basis, and which catapulted the companies up the league tables, making the companies appear to the investing public to be robust traders of energy when, in fact, they were not. Because the round-trip trades were sham transactions, and therefore had an inherent tendency to deceive, it cannot be said that the alleged fraud or deception only occurred when the trades were misreported in the companies' SEC filings. *SeeIn re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 502-05 (S.D.N.Y.2005); *In re Lernout & Hauspie Sec. Litig.,* 236 F.Supp.2d 161, 174-76 (D.Mass.2003). Thus, the SEC has adequately alleged that Pallas's round-trip trading scheme was a "device" or "scheme" to defraud, or at least a "practice" or "course of business" which operated as a fraud or deceit upon the investing public, that encompassed conduct beyond mere misstatements.

Pallas also argues that even if the round-trip trading scheme was a fraudulent or deceptive scheme, the SEC has failed to allege that it occurred "in connection with" the purchase or sale of securities. [FN17]The Supreme Court has adopted a broad reading of the "in connection with" requirement, reasoning that "the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes."*SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 1903, 153 L.Ed.2d 1 (2002) (internal quotation marks and citations omitted). This flexibility is necessary to realize Congress's goal of "substitut[ing] a philosophy of full disclosure for the philosophy of *caveat emptor* and thus [achieving] a high standard of business

ethics in the securities industry."*Id.* (quoting *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972)). Thus, "[a] plaintiff makes out a sufficient nexus with the purchase or sale of securities when the defendants' deceptive conduct affects a market for securities."*Parmalat,* 376 F.Supp.2d at 505-06 (citing *In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319, 329 (S.D.N.Y.2004)); *see also Zandford,* 122 S.Ct. at 1904 ("It is enough that the scheme to defraud and the sale of securities coincide."); *In re Carter-Wallace, Inc. Sec. Litig.,* 150 F.3d 153, 156 (2d Cir.1998) ("We have broadly construed the phrase 'in connection with,' holding that Congress, in using the phrase 'intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities.' "); *SEC v. Terry's Tips, Inc.,* 409 F.Supp.2d 526, 533 (D.Vt.2006) ("The 'in connection with' element is satisfied when the misrepresentation or omission or use of a device would be the sort of conduct on which a reasonable investor would rely, and, so relying, would purchase or sell securities.").

> FN17. According to Pallas, "[n]o such connection exists when, as here, the alleged stock fraud arises from statements about the transaction and not the transactions themselves."Document No. 44 at 15. In support of this proposition, Pallas cites two cases, *In re Dynegy, Inc. Sec. Litig.,* 339 F.Supp.2d 804, 914-16 (S.D.Tex.2004) and *In re Homestore.com, Inc. Sec. Litig.,* 252 F.Supp.2d 1018, 1040-41 (C.D.Cal.2003), but neither of those cases directly addressed the "in connection with" requirement. At issue in the cited portions of those cases was whether, in light of the *Central Bank* decision, banks and other outside business partners could be primarily liable under subsections (a) and (c) of Rule 10b-5 for structuring or financing transactions that were the basis of misrepresentations in the subject corporations' financial statements.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 13

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

*Seeid.*

**\*12** Here, the Amended Complaint contains allegations from which it could be inferred that the round-trip trading scheme affected the markets for Reliant's and CMS's securities. Specifically, the SEC has alleged that the massive round-trip trades propelled Reliant and CMS up the Fortune 500 list and catapulted CMS up the Fortune 500 list (which is based on revenues); that during investor presentations CMS emphasized MST's "growth" -virtually all of which was attributable to the round-trip trading scheme-and forecasted that such "growth" would continue; that market analysts noticed and favorably reported on MST's increased volumes and revenues; and that once the round-trip trading scheme came to light, Reliant's and CMS's stock prices plummeted. These allegations support an inference that the round-trip trading scheme may have misled investors into purchasing or holding Reliant's and/or CMS's securities based on a mistaken belief that the companies' respective energy trading businesses were experiencing real and substantial growth when, in fact, they were not. Thus, the round-trip trading scheme may satisfy the "in connection with" requirement if the proof at trial establishes that investors considered information such as an energy trading company's trading volumes and revenues when deciding whether to purchase or sell that company's securities.[FN18]

FN18. *Cf.In re AOL Time Warner, Inc. Sec. & ERISA Litig.,* 381 F.Supp.2d 192, 217 (S.D.N.Y.2004) ("If, as the 308-page Amended Complaint alleges, the defendants in fact 'engaged in a systemic scheme for more than 3 1/2 years to inflate AOL's reported advertising revenue by at least $1.7 billion based on various sham transactions and accounting improprieties,' then there can be little doubt that investors have been very seriously misled by the defendants' acts. Accordingly, plaintiff is permitted to proceed under both Rules 10b-5(a) and (c). "); *Global Crossing,* 322 F.Supp.2d at 336-37 ("Schemes used to artificially

inflate the price of stocks by creating phantom revenue fall squarely within both the language of section 10(b) and its broad purpose, to 'prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded." ') (quoting *Sullivan & Long, Inc. v. Scattered Corp.,* 47 F.3d 857, 861 (7th Cir.1995)).

### 3. *Section 17(a)(2); Obtained Money or Property*

Pallas next asserts that the § 17(a)(2) claim against her must be dismissed because the SEC has not alleged that she obtained any money or property from the alleged fraud. Pallas concedes that the SEC has alleged that she received money consisting of a salary, bonus, stock options, and severance package, but argues that the "Amended Complaint makes no effort to explain how this compensation could properly be characterized as illegal profits or otherwise linked to the disputed energy trades." Document No. 44 at 19.

The plain language of § 17(a)(2) imposes liability on anyone who obtains money or property by means of false or misleading statements or omissions, not only on those who illegally profit from such activity. *SeeSEC v. Norton,* 21 F.Supp.2d 361, 365 (S.D.N.Y.1998) (citing *SEC v. Glantz,* 1995 WL 562180, at \*5 (S.D.N.Y. Sept.20, 1995)). Thus, the SEC need not have alleged that Pallas "illegally profited" from the round-trip trading scheme, only that she obtained money or property by means of it. The SEC has alleged that Pallas received a $345,000 bonus for her performance in 2000 and a $726,000 bonus for her performance in 2001. Document No. 40 ¶ 95. The large 2000 bonus and dramatic increase in her 2001 bonus are akin to MST's dramatic boosts in its reported volumes and revenues that included the sham round-trip trades. It is reasonable to infer that those inflated trading volumes and revenues factored into the calculation of her bonuses, and hence, that Pallas obtained all or part of those bonuses at least indirectly by means of the round-trip trading scheme in violation of §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
(Cite as: Not Reported in F.Supp.2d)

Page 14

17(a)(2).[FN19] At this stage, at least, it does not appear beyond a doubt that the SEC can prove no set of facts in support of its § 17(a)(2) claim against Pallas, and the claim cannot be dismissed.[FN20]

> FN19. Pallas cites *United States v. Miller*, 997 F.2d 1010, 1013-16, 1022-23 (2d Cir.1993), which discusses the "money or property" requirement of the federal mail fraud statute, 18 U.S.C. § 1341, for the proposition that § 17(a)(2) requires that money or property be "unlawfully acquired." In *Miller*, the court reversed the defendants' mail fraud convictions upon finding, *inter alia,* that the funds at issue were not obtained from defendants' clients by means of fraud, but rather constituted fees attributable to the defendants' legitimate work on behalf of their clients. *See* id. at 1022-23.Because it is reasonable to infer that some portion of Pallas's compensation was attributable to the round-trip trading scheme, however, *Miller* is inapposite.

> FN20. In his reply brief, Hopper adopts Pallas's argument and complains that the SEC fails to allege that he received any compensation directly or indirectly as a result of his alleged misconduct. The SEC alleges, however, that Hopper received a bonus of $185,629 in 2000 and, if any portion of this bonus was attributable to the round-trip trading scheme, the SEC may be able to prevail on its § 17(a)(2) claim against him. Thus, the claim cannot be dismissed at this stage.

### 4. Section 17(a)(3): Fraud on "Purchasers"

**\*13** Pallas further contends that the SEC fails to state a claim under § 17(a)(3), which prohibits transactions, practices, or courses of business that operate or would operate as a fraud or deceit "upon the purchaser," because "none of the conduct of which the SEC complains was directed at a specific purchaser of securities."Document Nos. 44 at 19 n. 18; 50 at 12-14. According to Pallas, use of the definite article in the phrase "upon *the* purchaser" means that the misconduct must have been directed toward and had an impact on a specific purchaser. *Id.* Pallas has cited, and the Court has located, no authority for this proposition.[FN21]Moreover, such a construction is undermined by the fact that the SEC need not prove actual reliance or injury in an enforcement action, as well as by the fact that the statute prohibits any transaction, practice, or course of business that "*would* operate" as a fraud or deceit upon the purchaser, which indicates that the transaction, practice, or course of business need not have actually operated as a fraud on any particular purchaser. Thus, contrary to Pallas's contention, the SEC has sufficiently stated a claim under § 17(a)(3) by alleging that Defendants engaged in conduct that would have operated as a fraud on the purchasers of Reliant's and/or CMS's securities.

> FN21. Pallas argues that *United States v. Naftalin,* 441 U.S. 768, 99 S.Ct. 2077, 2081-83, 60 L.Ed.2d 624 (1979) is on point. In that case, the defendant, who engaged in a short-selling scheme that defrauded the brokers who executed his sales, argued that his conduct was not actionable under § 17(a)(1) because his fraud injured only brokers and not investors. *See* id. at 2080-81.The Supreme Court disagreed, and upon analyzing the language of subsection (1), held that nothing in that subsection creates a requirement that injury occur to purchasers. *Id.* at 2082.The Supreme Court further rejected the defendant's argument that the phrase "upon the purchaser" in subsection (3) should be read into subsection (1), stating: "The short answer is that Congress did not write the statute that way. Indeed, the fact that it did not provides strong affirmative evidence that while impact upon a purchaser may be relevant to prosecutions brought under § 17(a)(3), it is not required for those brought under § 17(a)(1)."*Id.*Thus, while *Naftalin* supports the argument that § 17(a)(3) is limited to those practices or courses of business that operate or would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 15

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
(Cite as: Not Reported in F.Supp.2d)

operate as a fraud upon purchasers-as opposed to brokers or other non-investors-*Naftalin* does not stand for the proposition that the SEC must also prove that the practice or business was directed towards and injured a specific purchaser.

### 5. *Scienter*

Both Defendants contend that the Amended Complaint does not adequately allege scienter. To state a claim under § 10(b), and Rule 10b-5 thereunder, or § 17(a)(1), the SEC must plead facts indicating that the Defendants acted with scienter. *SeeAaron,* 100 S.Ct. at 1955-56;*SEC v. First Fin. Group of Tex.,* 645 F.2d 429, 435 (5th Cir.1981). [FN22] In relation to securities fraud, scienter is a mental state embracing an "intent to deceive, manipulate, or defraud."*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)."The Fifth Circuit has elaborated that scienter generally encompasses severe recklessness."*Plotkin v. IP Axess Inc.,* 407 F.3d 690, 697 (2005) (citing *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961-62 (5th Cir.1981) (en banc)); *see alsoMeadows,* 119 F.3d at 1226 (" Liability under § 17(a)(1) attaches only upon a showing of severe recklessness.")."Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."*Broad,* 642 F.2d at 961-62. Thus, the SEC must allege facts to show, at a minimum, that Defendants' conduct was so severely reckless that it demonstrates that Defendants must have been aware of the danger of misleading the investing public. *Plotkin,* 407 F.3d at 697 (citations omitted).

FN22. Because scienter is not an element of claims brought under § 17(a)(2) and § 17(a)(3), Hopper's contention that the § 17(a)(2) and § 17(a)(3) claims asserted against him fail as a matter of law because the SEC has not adequately pleaded that he

acted with scienter is without merit.

#### a. *Pallas*

Pallas contends that the SEC does not allege that she acted with the requisite scienter because, she asserts, the SEC fails to plead facts showing (1) that she had a motive to commit securities fraud, (2) that she consciously misbehaved, or (3) that she knew that CMS or Reliant misstated trading volumes and revenues in SEC filings and elsewhere. The allegations in the Amended Complaint, however, give rise to an inference that Pallas did know or should have known that her conduct presented a serious danger of misleading investors. The Amended Complaint alleges facts from which it can be inferred that Pallas, among other things, (1) orchestrated and implemented at Reliant and CMS a manipulative business practice involving massive ostensible energy trades without disclosing they had no economic substance in order fictitiously to increase Reliant's and CMS's reported trading volumes and, by inflating their apparent gas and power trading activity, propel Reliant and CMS up the league tables; (2) concealed from her superiors, legal staff, internal accountants, and external auditors at Reliant the fact that the round-trip trades were sham transactions; (3) personally entered a bogus trade that called for retroactive delivery of gas-which was physically impossible-into CMS's computer system; (4) acted to prevent the embarrassment of public detection of the practice by the use of sophisticated means to disguise the round-trip trades and to seek out new round-trip counterparties who would not be suspected of being involved in bogus trades; (5) knew that trading volumes produced from the sham trades would be reported to the FERC and industry publications on a gross basis, making it appear that companies were more robust energy traders than they actually were; (6) knew that the round-trip trades lacked economic substance but were being portrayed-with Pallas's active involvement-as legitimate sales of energy to industry publications and to the investing public through Reliant's and CMS's SEC filings; (7) upon learning that Andersen was requiring CMS to report the round-trip trades on a net basis, determined that the trades were no longer worthwhile; and (8) despite being given drafts of CMS's SEC filings to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 16

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
(Cite as: Not Reported in F.Supp.2d)

review for the accuracy of disclosures regarding MST, and despite knowing that the disclosures contained material misleading information and omissions about the round-trip trades, approved the false and misleading disclosures without revision. *See* Document No. 40 ¶¶ 2, 5-6, 21, 23, 25-26, 33-34, 39-40, 43-46, 59-60, 79-80.

**\*14** In sum, the SEC alleges facts giving rise to inferences that Pallas knew that the round-trip trades were sham transactions that lacked economic substance, knew that the trading volumes and revenues attributable to the trades were being reported to the public-via the industry periodicals, the Fortune 500 list, the reports of market analysts, the companies' SEC filings, CMS's quarterly earnings releases, etc.-and knew that the source of the soaring volumes and revenues (*i.e.,* non-economic round-trip trades) was not being disclosed. In light of this alleged knowledge, it can be inferred that Pallas, at a minimum, should have known that her round-trip trading scheme presented a serious danger of misleading the investing public. The fact that Pallas's original purpose in implementing the round-trip trading scheme was to mislead Reliant's and/or CMS's potential energy customers does not change the fact that her execution of the elaborate round-trip trading scheme created a foreseeable danger that the investing public would inevitably be deceived as well. The SEC has adequately pleaded that Pallas acted with scienter.

### b. *Hopper*

Hopper argues that the SEC has failed adequately to allege facts giving rise to an inference that he acted with the requisite scienter because the facts alleged (1) indicate that he "sought, received, and followed advice he received from Andersen, as to the appropriate treatment of the round-trip trades from an accounting perspective"; (2) do not indicate that he hid the trades from Andersen, failed to disclose any of CMS's financial information to Andersen, or otherwise impeded Andersen's audit efforts; (3) do not indicate that he "fully appreciated" the nature of the round-trip trades or that he oversaw, supervised, or was otherwise involved with the round-trip trades

themselves; and (4) do not indicate that he possessed any personal motive to commit the alleged fraud. *See* Document No. 46 at 4-7, 16-17, 18, 21. Hopper further contends that scienter cannot be inferred from the improper accounting treatment given to the round-trip trades, the massive nature of the round-trip trades, or Hopper's position as CMS's chief accounting officer. *Id.* at 17-18, 19-21.

After carefully reviewing the Amended Complaint, the Court concludes that it sufficiently alleges facts from which Hopper's scienter can be inferred. Specifically, the Amended Complaint contains numerous allegations from which it can be inferred that, among other things, Hopper (1) knew about the deceptive practice of round-trip trading at least as early as October 2000, but nonetheless included the revenues and trading volumes generated from the trades in CMS's filings with the SEC without attributing them to round-trip trading or otherwise disclosing their artificially inflated nature; (2) provided and confirmed the data for and approved CMS's quarterly earnings releases, in which the artificially inflated revenues and trading volumes were included but were not attributed to round-trip trading; (3) knowingly caused CMS to record round-trip revenues in violation of CMS's stated " Revenue Recognition Policy," for which Hopper was responsible; (4) falsely stated in CMS's 2000 Form 10-K: "The volumes of marketed natural gas and power traded increased 31 percent and 919 percent, respectively. Partially offsetting these increases were *lower* power trading margins, *primarily due to cooler than normal summer weather in Michigan,* and increased operating expenses as the business continues to expand its trading and marketing activities and increase its customer base."(emphasis added); (5) did not seek guidance from Andersen concerning the propriety of or the appropriate accounting treatment for the round-trip trades, but rather vouched for the trades as legitimate sales when confronted with Andersen's discovery of certain round-trip trades; (6) continued to report revenues from the round-trip trades on a gross basis even after Andersen instructed that such revenues must be reported on a net basis; and (7) despite having full knowledge of the pertinent facts, failed fully and accurately to disclose the round-trip trades when directed by Andersen to do so.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

Document No. 40 ¶¶ 47-48, 50-52, 58-61, 65-68, 71, 73-80, 81-86, 98. From these allegations, a reasonable factfinder could find, at a minimum, that Hopper's conduct amounted to an extreme departure from the standard of ordinary care and that he knew or should have known of the serious risk of misleading the investing public that the round-trip trading scheme posed. Therefore, the SEC has adequately pleaded that Hopper acted with scienter.

## B. *Secondary Violations: Claims Four through Nine*

**\*15** In Claims Four through Nine, the SEC alleges that Defendants aided and abetted the uncharged securities violations of CMS and Reliant. More specifically, (1) Claim Four alleges that Defendants aided and abetted CMS's violations of § 10(b) of the Exchange Act and Rule 10b-5 thereunder; (2) Claim Five alleges that Pallas aided and abetted Reliant's uncharged § 10(b) and Rule 10b-5 violations; (3) Claim Six alleges that CMS violated § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder by filing materially false and misleading financial reports, and that Defendants knowingly aided and abetted these uncharged violations of CMS; [FN23] (4) Claim Seven alleges that Pallas aided and abetted the same misconduct by Reliant; (5) Claim Eight alleges that Hopper aided and abetted CMS in violating § 13(b)(2)(A) and (B) of the Exchange Act by causing CMS's books and records to be inaccurate and by assisting in CMS's failure to maintain sufficient internal accounting controls; [FN24] and (6) Claim Nine alleges that Pallas aided and abetted the same misconduct by Reliant.

> FN23. Section 13(a) and Rules 13a-1 and 13a-13 require issuers of registered securities to file with the SEC annual and quarterly reports, and under Rule 12b-20, CMS and Reliant had a duty to correct any misstatements or omissions contained in the reports as necessary to ensure that they are not misleading. *See*15 U.S.C. § 78m(a) ; 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13.

> FN24. Section 13(b)(2) requires issuers of registered securities (A) to maintain books, records, and accounts that accurately and fairly reflect the companies' transactions and (B) to devise and maintain a system of internal accounting controls to ensure that the companies' financial records are sufficiently reliable for external reporting. *See*15 U.S.C. § 78m(b)(2).

To state a claim for aiding and abetting liability, the SEC must allege facts that, if true, establish: (1) that the primary party committed a securities violation; (2) that the defendant had a general awareness of his role in the violation; and (3) that the defendant knowingly rendered substantial assistance in the achievement of the primary violation. *SEC v. Morris,* 2005 WL 2000665 (S.D.Tex. Aug.18, 2005) (Rosenthal, J.) (citing *Abbott v. Equity Group, Inc.,* 2 F.3d 613, 621 (5th Cir.1993)).[FN25] With respect to the substantial assistance requirement, the SEC must allege facts showing that Defendants' conduct was a "substantial causal factor in the perpetration" of the primary party's fraud. *SEC v. DiBella,* 2005 WL 3215899, at \*10 (D.Conn. Nov.29, 2005) (citations omitted).

> FN25. The parties dispute the level of scienter required for aiding and abetting liability. The SEC contends that severe recklessness is sufficient. Defendants respond that recklessness is no longer sufficient because § 104 of the PSLRA-in which Congress, in light of the Supreme Court's holding in *Central Bank,* clarified the SEC's authority to bring enforcement actions against aiders and abettors of the securities laws-imposes aiding and abetting liability on those who "knowingly" provide substantial assistance to a primary violator. *See*15 U.S.C. § 78t(e). What is the minimum level of required scienter need not be considered here, however, because the SEC has pleaded facts giving rise to the more serious inference that Defendants had actual knowledge of their roles in CMS's and/or Reliant's violations and knew they were substantially assisting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
(Cite as: Not Reported in F.Supp.2d)

those violations.

Defendants do not seriously dispute that Reliant and CMS committed the alleged primary violations. FN26 The thrust of Defendants' argument is that the Amended Complaint fails adequately to allege that they were generally aware of their roles in the companies' improper activities or that they provided substantial assistance in the companies' violations.

FN26. In a footnote in his motion to dismiss, Hopper does complain that the Amended Complaint "fails to clearly plead the primary violation allegedly committed by another party and for which Mr. Hopper is alleged to have knowingly provided substantial assistance." *See* Document No. 46 at 22 n. 15. However, the Amended Complaint alleges that "CMS violated Section 10(b) of the Exchange Act and Rule 10b-5 by filing materially misleading annual and quarterly reports with the [SEC] and by making public misrepresentations resulting from the round-tripping scheme"; violated § 13(a) by failing to file accurate annual and quarterly reports with the SEC; and violated § 13(b)(2) by failing properly to record the round-trip trades in the companies' books and records and by failing to devise and maintain reasonable internal accounting controls. *See* Document No. 40 ¶¶ 114-15, 122-23, 130-32. In addition, the Amended Complaint details the numerous misleading statements about MST's trading volumes and revenues contained in CMS's SEC filings, which Hopper is alleged to have drafted and which he signed. Thus, the SEC has sufficiently pleaded CMS's primary violations.

### 1. *Pallas*

The SEC has adequately pleaded that Pallas was aware that her role was part of an overall activity that was improper and knowingly provided substantial assistance in CMS's alleged § 10(b) and

§ 13(a) violations. For example, the SEC alleges that Pallas-the person who orchestrated and directed the round-trip trading scheme-knew that CMS's SEC filings contained misleading information about MST's operations, but she, as MST's CEO, nonetheless approved the filings as accurate with respect to MST. Because Pallas is alleged to have been responsible for reviewing the SEC filings for accuracy with respect to MST, and because she failed to point out and correct the misstatements and material omissions that she knew were contained in the filings, the SEC has sufficiently alleged that she was aware of her role in CMS's violations and rendered the requisite "substantial assistance" to those violations.

*16 Moreover, drawing all inferences in the SEC's favor, the SEC has adequately pleaded that Pallas aided and abetted Reliant's § 10(b) and § 13(a) and (b) violations. The SEC has alleged that Pallas orchestrated and implemented the round-trip trading scheme at Reliant without notifying her supervisors or disclosing to Reliant's internal accountants, legal staff, or external auditors that the trades lacked economic substance; and that after the close of the second quarter of 1999, she received a "Revised Reporting Package" that included a revised income statement, gas sales volumes, and prior period adjustments-which included entries related to Pallas's second-quarter round-trip trade-for her trading group. Because she allegedly knew that she was generating artificial or fictitious revenues and trading volumes by conducting the sham round-trip trades, that Reliant was recording and reporting as accurate those fictitious revenues and volumes attributed to her bogus trades, and that the sham nature of the trades was not known to Reliant's accountants and auditors, it could be inferred that she was generally aware that her role was part of an overall activity that was improper and that she knowingly provided substantial and critical assistance in the commission of Reliant's violations.

### 2. *Hopper*

The SEC has pleaded facts from which it could be inferred that Hopper was generally aware of and knowingly provided substantial assistance to CMS's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 19

Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878
**(Cite as: Not Reported in F.Supp.2d)**

alleged § 10(b) and § 13(a) and (b) violations. The SEC alleges that Hopper, as CMS's chief accounting officer, was responsible for CMS's financial accounting and financial reporting. The SEC further alleges facts giving rise to an inference that CMS's SEC filings contained false and misleading information; that Hopper prepared those filings; that Hopper had knowledge of the misleading nature of the filings; that Hopper, when questioned about round-trip trades discovered by Andersen, vouched for the trades as genuine commercial transactions despite knowing that they were not; and that Hopper continued to report the trades on a gross basis even after Andersen instructed that the trades must be recorded on a net basis. The SEC's allegations are therefore sufficient to state a claim that Hopper knowingly caused CMS to violate the SEC's record keeping and reporting requirements and that he knowingly circumvented CMS's internal accounting controls.

### C. Remedies

Finally, Defendants seek to dismiss the Amended Complaint on the ground that the allegations therein, even if true, do not entitle the SEC to obtain any of the remedies it seeks. The SEC correctly responds that it would be premature to evaluate its requests for relief at this stage of the litigation. *Accord DiBella,* 409 F.Supp.2d at 135 ("[T]he parties may litigate this issue [of whether the facts support the SEC's request for disgorgement] later if the Defendants are found liable."); *SEC v. C. Jones & Co.,* 312 F.Supp.2d 1375, 1382 (D.Colo.2004) (" This issue [of whether the facts supported the SEC's request for injunctive relief] must await resolution until after the SEC has had the opportunity to present evidence supporting its claims.") (citing *SEC v. Fenster,* 929 F.Supp. 1346, 1349 (D.Colo.1996) (same); *SEC v. Buntrock,* 2004 WL 1179423, at *3 (N.D.Ill. May 25, 2004) ("[T]o the extent that the defendants challenge the SEC's ' pleading' of the disgorgement remedy, that challenge is rejected as untimely because none of the defendants have yet been found liable for any securities violation."). The Court cannot conclude at this stage that it appears beyond a doubt that the SEC can prove no set of facts in support of its

claims for relief.

### IV. *Order*

**\*17** For the reasons set forth, it is

ORDERED that Defendant Tamela Pallas's Motion to Dismiss First Amended Complaint (Document No. 44) and Defendant Preston Hopper's Motion to Dismiss Claims 1, 2, 4, 6 and 8 of the First Amended Complaint (Document No. 45) are DENIED.

The Clerk shall notify all parties and provide them with a true copy of this Order.

S.D.Tex.,2006.
S.E.C. v. Hopper
Not Reported in F.Supp.2d, 2006 WL 778640 (S.D.Tex.), Fed. Sec. L. Rep. P 93,878

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.