# EXHIBIT 14

Case 5:07-cv-03444-JF   Document 47-15   Filed 12/03/2007   Page 1 of 8

Westlaw.

EXHIBIT 14

Slip Copy

Page 1

Slip Copy, 2006 WL 1084276 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,855
(Cite as: Slip Copy)

S.E.C. v. Jones
S.D.N.Y.,2006.

United States District Court,S.D. New York.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
Thomas W. JONES and Lewis E. Daidone,
Defendants.
No. 05 Civ. 7044(RCC).

April 25, 2006.

OPINION & ORDER
CASEY, J.
*1 Defendants Thomas W. Jones ("Jones") and Lewis E. Daidone ("Daidone") (collectively "Defendants") move to dismiss the Securities and Exchanges Commission's ("SEC") First Amended Complaint ("Complaint") against them. For the reasons explained, Defendants' motions are denied.

I. BACKGROUND

Unless otherwise stated, the following facts reflect Plaintiff's version of events and are taken from the Complaint. This action arises from Defendants' employment with Citigroup Asset Management ("CAM"), a business unit of Citigroup, Inc. that provides investment services to Citigroup-sponsored mutual funds ("the Funds"). (Complaint ¶ 2.) Jones served as the chief executive officer of CAM from August 1997 until he resigned on October 20, 2004. (Id. ¶ 16.)While employed by CAM, Daidone served as its North American head of fund administration. (Id. ¶ 17.)

CAM's responsibilities included recommending a transfer agent for the Funds to the Funds' board of directors. (Id. ¶ 2.) The Funds used a transfer agent to process transactions; calculate daily net asset values, sales charges, and commissions; operate a customer service center; distribute proxy and other materials; and perform other accounting functions, including tax reporting.(Id.¶ 23.)Pursuant to a contract that was scheduled to expire in June 1999, the Funds employed First Data Investment Services Group ("First Data") as its transfer agent during the 1990s. (Id. ¶ 3.) In anticipation of the expiration, in July 1997, CAM hired Deloitte & Touche Consulting ("Deloite") to assist the CAM team's decisions regarding its next transfer agent contract.(Id. ¶ 28.)Daidone was a member of the CAM transfer agent team. (Id. ¶ 43.)After he became CAM's chief executive officer in August 1997, Jones received regular briefings on Deloitte's transfer agent project. (Id. ¶ 30.)The SEC claims Defendants knew First Data had been making a high profit from its role as the Funds' transfer agent and that Jones wanted CAM to capture and realize that profit. (Id. ¶¶ 3, 26, 30.)

In February 1998, Deloitte recommended that CAM create an affiliate to handle customer service inquiries and to contract with a company called DST to handle the transfer agent technology. (Id. ¶ 36). Deloitte projected the CAM affiliate would receive $40 million in annual profits under that structure.(Id.) To counter Deloitte's recommendation, First Data offered CAM deep discounts on its fees as a full-service transfer agent. (Id. ¶¶ 38, 41.)Despite First Data's attempts, the Deloitte and CAM team made a formal recommendation to Jones on April 2, 1998 that CAM create an internal transfer agent unit and sub-contract with DST for technology. (Id. ¶ 43.)The April 2 memo acknowledged the inherent risk in transferring the transfer agent function from First Data, including the possibility of $8 to $10 million in lost annual revenues to Citibank (then known as Travelers).(Id. ¶ 45.)

*2 Jones allegedly agreed with the April 2 memo, but the chairman of Travelers asked him to continue negotiations with First Data. (Id. ¶ 46.)Thereafter,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 2

Slip Copy, 2006 WL 1084276 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,855
**(Cite as: Slip Copy)**

Jones asked an unidentified executive vice president to resume negotiating with First Data. (*Id.*) On June 5, 1998, First Data presented an offer of discounts up to 60% off its normal fees. (*Id.* ¶ 47.) Deloitte allegedly took issue with First Data's June 5 proposal and raised its concerns with CAM representatives, including Daidone. (*Id.* ¶¶ 48-50.) The SEC claims CAM ignored Deloitte's concerns (*id.* ¶ 51), and that First Data "sweetened the pot" on July 14, 1998 (*id.* ¶ 53). First Data proposed deeper fee discounts, it promised to upgrade its technology services, and it offered Travelers a "basket of services" from which First Data would generate $8 million in annual revenue for Travelers. (*Id.* ¶ 53.) This revenue guarantee would benefit CAM and not the Funds, but the SEC claims Jones did not question its propriety. (*Id.* ¶ 54.)

Thereafter, the executive vice president wrote a memorandum to Jones on July 24, 1998 recommending that CAM establish an affiliate to act as a transfer agent customer service center and sub-contract with First Data for the bulk of the transfer agent services. (*Id.* ¶¶ 4, 55.) According to the SEC, Jones was focused on CAM's profit potential and approved the recommendation. (*Id.* ¶ 61.) Further, Jones allegedly "took no action to ensure that the independent directors of the Funds' boards were fully aware of the terms of the First Data proposal [or] to instruct anyone to make certain the Revenue Guarantee was fully disclosed to the Funds' boards."(*Id.* ¶ 61.) The SEC claims that by submitting the self-dealing proposal to the Funds' board, Defendants and CAM breached their fiduciary duty to the Funds in that the Funds, not CAM, should have realized the benefits of the renegotiated contract with First Data.(*Id.* ¶ 5.)

The SEC claims Daidone took the lead in preparing the board presentation in 1999 (*id.* ¶¶ 6, 12, 68-74), and that Jones approved it after only a cursory review (*id.* ¶¶ 6, 11, 94). Specifically, the SEC claims that Daidone was listed as one of the authors of the March 4, 1999 final board memo, which allegedly misleadingly emphasized the fee savings the Funds would receive and obscured the profits the CAM-affiliate transfer agent would receive. (*Id.* ¶ 75.) The SEC claims that Daidone knew the true nature of the arrangement, i.e., that the CAM-affiliate would do minimal work while First Data handled the bulk of the transfer agent responsibilities at a deep discount. (*Id.* ¶¶ 6, 77.) The board materials also did not accurately explain the other proposals the Deloitte team considered or that Deloitte had reservations about the First Data arrangement. (*Id.* ¶ 80-81, 83, 85.) The SEC claims that Defendants also did not disclose that CAM had entered into a side letter revenue guarantee agreement with First Data, in which First Data committed to providing millions of dollars of investment banking and asset management revenue to Citigroup.(*Id.* ¶ 7, 92, 95.)

\*3 The Funds' boards approved the transfer agent proposal at regularly-scheduled meetings throughout the first half of 1999. (*Id.* ¶¶ 96, 98.) Additionally, the SEC alleges that Defendants did not disclose the true nature of the transfer agent agreement to the Funds' boards that approved the same structure for newly-created funds in 2001 and 2002. (*Id.* ¶¶ 8, 103.) Four of the six board members of the newly-created funds were also members of the boards that voted to approve the transfer agent agreement in 1999. (*Id.* ¶ 103.) From October 1999 through September 2004, the CAM-affiliate transfer agent earned approximately $104 million from Fund business and $17 million under the revenue guarantee. (*Id.* ¶ 106.)

In September 2003, a former Citigroup employee informed the SEC of the true nature of the CAM transfer agent arrangement. (*Id.* ¶ 114.) The SEC and Defendants agreed to toll the statute of limitations from February 18, 2004 to February 17, 2005. (Daidone Mem. in Supp. of Mot. to Dismiss at 6; Jones Mem. in Supp. of Mot. to Dismiss at 3.) On May 31, 2005, the SEC entered an administrative order censuring Smith Barney Fund Management and Citigroup Global Markets for CAM's activities, and ordering, among other things, disgorgement of $109,004,551 plus pre-judgment interest and a civil penalty of $80,000,000. (May 31, 2005 Cease and Desist Order, at Jones Mem. in Supp. of Mot. to Dismiss at Ex. A.) The SEC now claims that Defendants aided and abetted violations of §§ 206(1) and 206(2) of the Investment Advisors Act by, in Jones' case, recommending the First Data

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 1084276 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,855
**(Cite as: Slip Copy)**

Page 3

proposal and approving the misleading board memorandum (Complaint ¶ 120), and, in Daidone's case, misleading the boards into thinking that the arrangement would benefit the Funds (*id.* ¶ 122-23).15 U.S.C. §§ 80b-6(1) and 80(b)-6(2). Defendants now move to dismiss the Complaint.

## II. DISCUSSION

Both Defendants submit that the action is time-barred. Additionally, Jones argues that the SEC has failed to state a claim of aiding and abetting liability against him and Daidone argues that it fails to plead aiding and abetting with sufficient particularity against him. Because the Court's general statute of limitations analysis applies to both Defendants, it begins there.

### A. The SEC's Action is Timely

The Investment Advisors Act does not contain its own limitations period, and, to the extent the SEC's claims are subject to a statute of limitations, 28 U.S.C. § 2462 applies. (*See* SEC Mem. in Opp'n to Mot. to Dismiss at 13.) Section 2462 instructs:
Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

*4 28 U.S.C. § 2462.

Defendants argue that the alleged violations at issue here accrued in June or July 1999, when Defendants approved or made the board presentations, making the SEC's complaint, filed on August 8, 2005, untimely. *See* 3M Co v. Browner, 17 F.3d 1453, 1462 (D.C.Cir.1994) (explaining, under § 2462, a claim accrues "at the moment a violation occurs"); *New York v. Niagara Mohawk Power Co.*, 263 F.Supp.2d 650, 660 (W.D.N.Y.2003) ("[U]nder § 2462, the limitations period begins to run on the date that the violation first occurs.").

Anticipating that the SEC will promote a continuing violation theory, Defendants submit that courts in this circuit have questioned the availability of such a theory to securities law claims. *See, e.g., de la Fuente v. DCI Telecom., Inc.*, 206 F.R.D. 369, 385-86 (S.D.N.Y.2002) (questioning applicability of continuing fraud doctrine in securities fraud cases); *SEC v. Caserta*, 75 F.Supp.2d 79, 80 (E.D.N.Y.1999) (noting it is unclear whether the doctrine applies to securities fraud claims); *SEC v. Schiffer*, No. 97 Civ. 5853(RO), 1998 WL 226101, at *3 (S.D.N.Y. May 5, 1998) (noting the Second Circuit has not ruled on the doctrine's applicability in the securities fraud context and declining to apply it on a motion to dismiss when fact issues remained to be determined). Even if the theory were available, Defendants assert it "requires ... the continuing violation be occasioned by continual unlawful acts, not continual ill effects from a single violation."*Niagara Mohawk*, 263 F.Supp.2d at 660.

The SEC argues *Browner* is inapplicable because it did not involve fraud, and submits that the discovery rule should apply here, i.e., that the statute of limitations did not begin to run until the whistleblower alerted it to Defendants' conduct in September 2003. *SeeCerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir.1985) ("[T]he statute does not begin to run until 'the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice.' ") (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir.1974)). The SEC submits that any other rule would reward Defendants for concealing their fraud. *In re Sumitomo Copper Litig*, 120 F.Supp.2d 328, 346 (S.D.N.Y.2000) ("The doctrine of fraudulent concealment was designed to prevent a party from 'concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.' " (quoting *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir.1988)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 4
Slip Copy, 2006 WL 1084276 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,855
**(Cite as: Slip Copy)**

While the SEC claims Defendants' actions were not a one-time violation, it does not argue for the application of a continuing violation rule. (*See* SEC Mem. in Opp'n to Mot. to Dismiss at n. 16.) Rather, it urges that each time CAM collected excessive fees without disclosing the true facts regarding the transfer agent arrangement, it breached its fiduciary duty and triggered a new statute of limitations. *Merine v. Prudential-Bache Utility Fund, Inc.,* 859 F.Supp. 715, 725 (S.D.N.Y.1994).

*5 The SEC cannot avoid its misplaced reliance on the continuing violation theory by labeling each collection of allegedly excessive fees by CAM a new breach by the Defendants. First, the case it relies on in support of its new cause of action theory was itself based on the continuing violation theory. *SeeMerine,* 859 F.Supp. at 725 (finding, under the "*continuing wrong doctrine,*" that a new cause of action arose each time defendants charged excessive fees) (emphasis added). And, as Defendants point out, courts in this circuit have questioned the applicability of the continuing violation doctrine to securities fraud actions. *See, e.g.,SEC v. Caserta,* 75 F.Supp.2d 79, 80 (E.D.N.Y.1999). Even if the doctrine were applied, Plaintiff does not allege how CAM's collection of fees is anything other than a continued ill effect of Defendants' alleged lack of disclosure in the early summer of 1999. *SeeNiagara Mohawk,* 263 F. Sup.2d at 660 (requiring "continual unlawful acts, not continual ill effects from a single violation"). Second, the Complaint's theory of liability against Defendants is based on their failure to disclose the nature of the transfer agent agreement to the Funds' boards (*see* Complaint ¶¶ 120-23), not CAM's collection of fees under the arrangement. In its claims for relief under §§ 206(1) and 206(2), the SEC cannot switch its basis of liability to excessive fees. The Second Circuit has rejected attempts to bring an excessive fee claim under any section of the Investment Advisors Act other than § 36(b).*See Krinsk v. Fund Asset Mgmt., Inc.,* 875 F.2d 404, 413 (2d Cir.1989) ("To allow this [reincarnation of an excessive fee argument] would be to allow circumvention of the ... specific procedural limitations of section 36(b)...."). The Court, therefore, will only consider the appropriateness of applying *Browner* or the discovery rule here.

In support of their arguments, the parties rely on opposing decisions by federal courts outside of this district, both of which relied on their own circuit's precedent. Plaintiff directs the Court's attention to *SEC v. Buntrock,* 2004 WL 1179423 (N.D.Ill. May 25, 2004), in which a Northern District of Illinois court was presented with the same question this Court faces: "when does a claim 'accrue' for purposes of a request for civil monetary penalties in a securities fraud case?"*Id.* at *11. The court relied on a Seventh Circuit decision to hold that the § 2462 limitations period starts running when the plaintiff learns of the violation. *Id.* at *12 (citing *Law v. Medco Research, Inc.,* 113 F.3d 781, 785 (7th Cir.1997) (adopting the discovery rule because it is often difficult for a plaintiff to know he or she has been victimized within Rule 10b-5's one-year statute of limitations)). The *Buntrock* court reasoned that the D.C. Circuit's decision in *Browner* was not applicable because it did not involve allegations of fraud. *Buntrock,* 2004 WL 1179423, at *12.

*6 Defendants urge the Court's reliance on a recent Northern District of Alabama case. In that securities fraud action, *SEC v. Scrushy,* 2005 WL 3279894 (N.D.Ala. Nov. 29, 2005), the court held that § 2462 does not incorporate the discovery rule. *Id.* at *2. In doing so, the court noted it was bound by an Eleventh Circuit decision that adopted the D.C. Circuit's decision in *Browner.Id.* at *3 (citing *Trawinski v. United Technologies,* 313 F.3d 1295, 1298 (11th Cir.2002) (holding the discovery rule " has no place in a proceeding to enforce a civil penalty under a federal statute")).

As the parties note, the Second Circuit has not adopted *Browner* or ruled on the applicability of the discovery rule to actions governed by § 2642 in the securities fraud context. The Court, however, finds *3M v. Browner* instructive. In *Browner,* the D.C. Circuit expressly rejected the discovery rule's application to cases governed by § 2462. The court reasoned that "[a]n agency's failure to detect violations, for whatever reasons, does not avoid the problems of faded memories, lost witnesses and discarded documents ... nothing in the language of § 2462 even arguably makes the running of the limitations period turn on the degree of difficulty an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 5

Slip Copy, 2006 WL 1084276 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,855
**(Cite as: Slip Copy)**

agency experiences in detecting violations." *Browner,* 17 F.3d at 1461; *see also id.* at 1462 ("We reject the discovery of violation rule ... as unworkable; outside the language of the statute; inconsistent with judicial interpretations of § 2462; unsupported by the discovery of the injury rule adopted in non-enforcement, remedial cases; and incompatible with the functions served by a statute of limitations in penalty cases.").

Although the court in *Browner* seemingly did not limit its holding to cases in which violations are undetected because of fraud, *see id.* at 1461 (noting an agency's inability to discover violations, *"for whatever reasons,"* does not avoid problems statutes of limitations were designed to cure) (emphasis added), it did recognize the possible applicability of the fraudulent concealment doctrine to toll the statute of limitations. *Id.* at 1461, n. 15. To toll the limitations period here, the SEC would have to plead (1) that the Defendants concealed the existence of the cause of action, (2) that it did not discover it until some point within five years of commencing this action, and (3) that its continuing ignorance was not attributable to lack of diligence on its part. *Hendrickson Bros.,* 840 F.2d at 1083.

Plaintiff can establish the concealment element by pleading "either that the [Defendants] took affirmative steps to prevent [discovery of the fraud] or that the wrong itself was ... self-concealing." *Id.* Normally, "a plaintiff seeking to toll the applicable statute of limitations due to fraudulent concealment ... must meet the particularity standard of Rule 9(b)." *In re Natural Gas Commodity Litig.,* 337 F.Supp.2d 498, 513-14 (S.D.N.Y.2004). "When an alleged violation is inherently self-concealing, [however,] an assertion of such a scheme is sufficient and a plaintiff need not plead any affirmative actions by a defendant." *Id.* at 514. Plaintiff's main allegations against Defendants here are that they did not disclose to the Funds' boards the benefits CAM would receive from the transfer agent arrangement or the revenue guarantee letter that allegedly motivated CAM to accept First Data's offer. The SEC asserts and the Court agrees, that at this stage in the litigation, this non-disclosure is inherently self-concealing. *Hendrickson,* 840 F.2d at 1084.

The SEC has also alleged that it did not discover the alleged fraud until September 2003 and that its actions were not due to lack of diligence. *Id.* at 1083. Accordingly, the Court finds that the statute of limitations was tolled while the alleged fraud remained concealed and that the SEC's action is timely.

### B. Sufficiency of Pleadings

#### 1. The Complaint States a Claim Against Jones

*7 Jones argues that the Complaint does not adequately allege that he aided and abetted CAM's violations of the IAA. In weighing the merits of Jones' motion, the Court will accept the Complaint's allegations as true and draw all reasonable inferences in favor of the SEC. *Twombly v. Bell Atlantic Corp.,* 425 F.3d 99, 106 (2d Cir.2005) ("At the pleading stage ... the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") (citations omitted).

The Second Circuit has articulated the following requirements for aiding and abetting liability in securities fraud actions: "(1) the existence of a securities law violation by the primary ... party; (2) ' knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985) (quoting *ITT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980)). To satisfy the scienter requirement, the SEC must allege facts showing motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001). The Complaint must also "allege that the acts of the aider and abettor proximately caused the harm ... on which the primary liability is predicated." *Bloor,* 754 at 62. Courts have suggested that "there may be a nexus between the degree of scienter and the requirement that the alleged aider and abettor render 'substantial assistance.' " *ITT,* 619 F.2d at 922. The Second Circuit has held that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2006 WL 1084276 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,855
**(Cite as: Slip Copy)**

where a defendant in a securities fraud case acts with reckless disregard, if the defendant does not owe the plaintiff a fiduciary duty, there must be a showing of the defendant's actual intent to defraud. *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990) (citing *ITT,* 619 F.2d at 925).

The Complaint alleges that Jones made CAM's transfer agent arrangement a priority (Complaint ¶¶ 26, 28), that he wanted to capture the profit that First Data had been enjoying at CAM's expense (*id.* ¶ 28), that he instructed the executive vice president to continue negotiations with First Data after April 2, 1998 (*id.* ¶ 46), and that he approved the ultimate CAM-affiliate arrangement and the allegedly misrepresenting board materials with the understanding that doing so would guarantee CAM $8 million in annual revenue from First Data (*id.* ¶¶ 54, 61, 94). Further, the Complaint alleges that he did so in disregard of his fiduciary responsibilities to the Funds and their shareholders. (*Id.* ¶ 61.)

The Court finds that the existence of a securities law violation by Citigroup and CAM has been established. (May 31, 2005 Cease and Desist Order.) With respect to the scienter requirement, the SEC claims that Jones knew that First Data was making large profits as CAM's transfer agent (Complaint ¶ 26), that First Data was willing to commit to providing a certain level of business to CAM's then-parent Travelers (*id.* ¶ 54), and that he "understood" that the true economics of the TA arrangement ultimately presented to the Funds' boards would not be disclosed (*id.* ¶ 58). Without addressing the question of whether Jones owed the Funds a fiduciary duty, the Court finds these claims, which still must be proven to the satisfaction of a jury, adequately allege Jones' knowledge of the underlying violation. Finally, despite Jones' protests that the SEC's theory of liability against him is based on mere inaction, Plaintiff does allege that Jones provided substantial assistance to the underlying fraud, most directly, by instructing the executive vice president to continue discussions with First Data and, in July 1998, to secure its revenue guarantee in writing. (Complaint ¶¶ 46, 54). In doing so, the SEC has adequately alleged that Jones "associate[d himself] with the venture, participated it in as something [he] wished to bring about, and sought by [his] action to make it succeed." *ITT,* 619 F.2d at 925. Accordingly, Jones' motion to dismiss the complaint for failure to state a claim is denied.

### 2. The Complaint's Allegations Against Daidone are Sufficient

*8 Daidone argues that the Complaint does not satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b) with respect to its allegations that he aided and abetted a securities fraud. He also contends that the SEC has not adequately plead scienter.

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Thus, the Complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004).

Plaintiffs allege Daidone aided and abetted CAM's fraud by not disclosing to the Funds' boards the true nature of the agreed upon transfer agent arrangement. In conformity with Rule 9(b), the Complaint alleges that Daidone led the Funds' boards to believe that the transfer agent arrangement involving the CAM-affiliate and First Data was in the Funds' best interests, when in reality it was supported by Defendants because it would result in profits to CAM and other Citigroup entities. (Complaint ¶ 96.) It identifies Daidone as the lead author of the board materials and the presentation given at the board meetings. (*Id.* ¶¶ 6, 68, 73-74, 96-97.)It also clearly identifies the dates on which Daidone made his presentations and distributed the board materials. (*Id.* ¶ 96.)Finally, it adequately explains why the board materials and Daidone's presentation were fraudulent. For example, it alleges that Daidone spun the facts to make it appear the Funds were getting the best transfer agent deal available (*id.* ¶¶ 6, 75, 78-9,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 7
Slip Copy, 2006 WL 1084276 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,855
**(Cite as: Slip Copy)**

81, 83, 86, 88, 93, 95); that he did not disclose the existence of the revenue guarantee from First Data that would benefit Citigroup entities (*id.* ¶ 7, 80, 97); and that he did not explain that the CAM-affiliate transfer agent would, in reality, be doing very little transfer agent work (*id.* ¶¶ 76-77, 90, 97). Accordingly, the Court finds Daidone's objection that the circumstances surrounding his participation in the alleged fraud have not be plead with sufficient specificity unavailing.

With respect to Daidone's intent, as the Court previously stated, the SEC must plead his knowledge of the securities law violation by the primary party.*Bloor,* 754 F.2d at 62. General allegations regarding his state of mind are sufficient. Fed.R.Civ.P. 9(b); *Ouaknine v. MacFarlane,* 897 F.2d 75, 81 (2d Cir.1990). The Complaint pleads Daidone's knowledge generally. ( *See, e.g.,* Complaint ¶ 5 "Defendants' intent from the beginning was to submit to the boards only the self-dealing proposal that allowed CAM to reap the enormous benefits. Defendants also understood or recklessly disregarded that if the full facts were candidly disclosed, no reasonable board could approve the proposal.")

*9 Thus, the SEC must provide "some factual basis for conclusory allegations of intent."*Ouaknine,* 897 F.2d at 80. Here, the Complaint alleges that Daidone knew that First Data had been making substantial profits from its role as CAM's transfer agent, which CAM intended to enjoy itself. (Complaint ¶¶ 3, 31.) The SEC claims Daidone was a member of CAM's transfer agent team, was privy to Deloitte's concerns about the CAM-affiliate proposal, understood CAM's desire to press ahead with the CAM-affiliate and First Data deal and the negotiations leading to the ultimate arrangement, including First Data's revenue guarantee. (*Id.* ¶¶ 29, 50, 63, 65.)Further, Daidone allegedly instructed the Deloitte representative charged with preparing the first draft of the board materials to describe the arrangement in a way that would be attractive to the Funds' boards without clearly identifying the profit that CAM would enjoy. (*Id.* ¶¶ 70-71, 75.)Finally, the SEC claims Daidone was well aware of the revenue guarantee, as he signed the document himself (*id.* ¶ 65), but never disclosed its existence to the boards in the materials he prepared or the presentations he made (*id.* ¶ 97). Accordingly, the Court finds that the Complaint presents a sufficient factual basis to support its allegations of scienter against Daidone.

### III. CONCLUSION

For the reasons explained above, Defendants' motions to dismiss the complaint are denied. The parties are directed to advise the Court of any needed modifications to the case management plan by May 15, 2006.

So Ordered:

S.D.N.Y.,2006.
S.E.C. v. Jones
Slip Copy, 2006 WL 1084276 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,855

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.