# EXHIBIT 16



Westlaw.

Not Reported in F.Supp.2d                                                                                     Page 1

Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678
**(Cite as: Not Reported in F.Supp.2d)**

C
S.E.C. v. Parnes
S.D.N.Y.,2001.

United States District Court, S.D. New York.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
ARI PARNES, Adar Equities, LLC, Shauel Seitler,
Jacob Herman, Yezhak Dov Knoll, and Myron
Raisman, Defendants.
**No. 01 CIV 0763 LLS THK.**

Dec. 26, 2001.

Opinion and Order
STANTON, D.J.
*1 This is a civil enforcement and disgorgement action brought by the Securities and Exchange Commission against six defendants who move to dismiss the complaint's major claims. (A single remaining claim, that some defendants were not properly registered as brokers or dealers, is not involved in the pending motions.)

THE COMPLAINT

As far as relevant here, the complaint alleges two fraudulent schemes.

1. The Immunogen Scheme

The first, called the Immunogen scheme (Compl.¶¶ 16-42), involves five of the defendants. Defendant Ari Parnes, the president and managing director of defendant Adar Equities, was the principal architect of the defendants' fraudulent scheme. (Compl.¶ 8.) Parnes effectively controls Adar Equities, a limited liability New York company based in Brooklyn, New York. Adar Equities serves as a placement agent for private placements of securities. (Compl.¶ 9.) Adar Equities employed defendants Shauel Seitler and Jacob Herman. (Compl.¶¶ 10-11.) The complaint frequently refers to Parnes, Adar Equities, Seitler and Herman collectively as "the ADAR Defendants." Also charged in the Immunogen scheme, defendant Yeshak Dov Knoll was "at all relevant times a registered representative at Datek Securities Corp., a registered broker-dealer."(Compl. ¶ 12 .)

The complaint describes three phases in the Immunogen scheme. In the first phase Parnes, Seitler and Herman, on behalf of Adar Equities, met with officers of ImmunoGen, Inc., a publicly held biotechnology company, and arranged to place $3.6 million in ImmunoGen convertible debentures with five Panamanian corporate subscribers. (Compl.¶¶ 2, 17, 18.) The debentures were to be issued pursuant to SEC Regulation S, 17 C.F.R. §§ 230.901 -905, which at the time provided that certain offers and sales need not be registered with the SEC because they were deemed to occur outside the United States. (Compl.¶ 2.) Regulation S also provided that Regulation S securities could not be re-sold to U.S. purchasers during the 40 days following their issuance. For re-sales in the U.S. after the restricted period, Regulation S required either registration or exemption from registration. (Compl.¶ 16.) However, even if a transaction technically complied with Regulation S, the exemption was not available for transactions that were part of a scheme to evade the registration requirements of the Securities Act. *Id.* In this case, the ImmunoGen debentures were convertible after 45 days into shares of ImmunoGen common stock at a 25 percent discount from the market price (closing inside bid) on the trading day before conversion. (Compl.¶ 19.) The complaint alleges that the debentures were nominally placed with the Panamanian subscribers but were purchased through an ADAR escrow account controlled by Parnes and held by Parnes' attorney in New York. (Compl.¶¶ 2, 20.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF    Document 47-17    Filed 12/03/2007    Page 3 of 10

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678
**(Cite as: Not Reported in F.Supp.2d)**

In the second phase of the scheme, the ADAR Defendants illegally sold short approximately 1.7 million shares of ImmunoGen common stock in the U.S. market. (Compl.¶ 22.) These short sales began in August 1995-eight days before Immunogen issued the convertible debentures-and continued through December 22, 1995. *Id.* According to the complaint, the short sales were designed to evade the legal restrictions on sales of unregistered securities to U.S. purchasers, to drive down ImmunoGen's stock price, and to generate substantial trading profits for the ADAR Defendants. *Id.* They took place in two cash brokerage accounts at Datek Securities in the names of two of the Panamanian subscribers to the ImmunoGen issuance. (Compl.¶ 23.) The SEC claims Parnes and his employees at ADAR controlled both accounts and that the ADAR Defendants effected these short sales. *Id.* Defendant Knoll, the broker on these accounts, knew or recklessly ignored that the short sales he executed were intended to manipulate the market for ImmunoGen stock. (Compl.¶ 23.) The complaint recites regulatory violations by Knoll in executing these trades (Compl.24-41), including " pre-arranged trading, 'marking the close,' and ' piling on,' to drive the company's stock down." (Compl.¶ 3.) Knoll executed the short sales in cash, rather than margin, accounts (Compl.¶ 24). These short sales locked in a sale price for the ImmunoGen stock that was higher than the price the defendants would later pay for 'covering' shares obtained from the Panamanian subscribers. (Compl. ¶ 34.)

*2 In the third phase of the scheme, the ADAR Defendants delivered to ImmunoGen notices of conversion on behalf of the Panamanian subscribers, entitling them to convert a portion of the debentures, upon which Immunogen delivered the stock certificate to ADAR's escrow agent, a lawyer for Parnes in Manhattan. (Compl.¶ 39, 40.) In one instance, Seitler picked up the stock certificate and delivered it to Knoll at Datek, which was located directly across the street from ADAR's office in Brooklyn, New York. *Id.* Knoll deposited the shares in an account for one of the Panamanian subscribers, FTS Worldwide Corporation ("FTS"), and then immediately used them to cover FTS's short position. *Id.*

The SEC claims the scheme continued between October 6, 1995, and December 22, 1995. During that period, the ADAR Defendants directed Knoll to execute illegal short sales and caused the Reg. S subscribers to convert all of their debentures into common stock. (Compl.¶ 40.) According to the complaint, the ADAR Defendants and Knoll profited from their illegal short sales by depressing the stock price, thereby increasing the number of shares issued upon conversion, which then permitted them to cover earlier short sales made at higher prices. (Compl.¶ 35.) The trading profits from the Datek accounts were wired to bank accounts in Switzerland, from which $2.3 million was later transferred back to accounts controlled by, or for the benefit of, defendant Parnes. (Compl.¶ 42.)

2. The Bank Stock Frauds

The bank stock frauds involved the conversions of two banks, BostonFed Bancorp and Roslyn Bancorp, Inc., from mutual to stock form. (Compl.¶ ¶ 45-46.) Parnes and defendant Raisman, an attorney and accountant licensed in New York, schemed to purchase stock illegally pursuant to non-transferable subscription rights in the initial public offerings of the two banks, Parnes acting alone in one scheme, and with Raisman in the other. (Compl.¶¶ 45-52.) That violated a regulation promulgated by the Office of Thrift Supervision, 12 C.F.R. § 563b.3(i), which prohibits the transfer of a bank depositor's subscription rights. (Compl.¶ 46.)

In the first scheme, involving BostonFed Bancorp, Parnes provided funds to bank depositors, who were eligible for subscription rights, and caused subscription agreements to misrepresent to the bank that the depositors (rather than Parnes) were the true purchasers of stock and had not transferred their subscription rights. (Compl.¶ 47.) One depositor received funds from Parnes to purchase stock, submitted those funds to the bank along with a subscription agreement, took delivery of the shares, and then transferred profits, presumably from the sale of those shares, into an account for an entity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF  Document 47-17  Filed 12/03/2007  Page 4 of 10

Not Reported in F.Supp.2d  Page 3
Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678
(Cite as: Not Reported in F.Supp.2d)

controlled by Parnes. (Compl.¶ 48.) A second depositor used funds drawn from the account of an entity controlled by Parnes, submitted them with a subscription agreement to the bank, took delivery of the shares, and then transferred the shares into an account held by Parnes' nephew, where they were sold for a profit. (Compl.¶ 49.)

*3 In the second scheme, involving Roslyn Bancorp, Inc., Parnes and Raisman purchased the subscription rights of two of Raisman's elderly clients. (Compl.¶ 50.) One of Parnes' Regulation S clients transferred funds to an ADAR escrow account held by a law firm, which then issued checks payable to Roslyn Bancorp. The depositors submitted personal checks and Parnes' checks together with subscription forms to the bank. Roslyn Bancorp then delivered stock certificates to Raisman. The shares were later transferred to Parnes' nephew's account and sold for a profit. (Compl.¶ 51.) Raisman also provided another client with funds to purchase stock from the same bank. Parnes and Raisman then caused the depositor to misrepresent himself to the bank as a true purchaser who had not transferred his rights. The depositor subsequently transferred shares received from the bank into Parnes' nephew's account, where they were sold for a profit. (Compl.¶ 52.)

For the purposes of these motions to dismiss, all these factual allegations in the complaint are presumed to be true. See *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993); *Luce v.. Edelstein,* 802 F.2d 49, 52 (2d Cir.1986). All reasonable inferences are drawn in favor of the plaintiff. See *Mills,* 12 F.3d at 1174; *Murray v. Milford,* 380 F.2d 468, 470 (2d Cir.1967).

### STATUTORY VIOLATIONS

The first claim of the complaint alleges violations of Section 10(b) of the Exchange Act of 1933, 15 U.S.C. § 78j(b), SEC Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and the second claim alleges violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), by the Immunogen market manipulation scheme involving the convertible debentures. The third claim alleges violations of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, by the sale of unregistered stock in the United States. The fifth [FN1] claim alleges violations of Section 7(f) of the Exchange Act of 1934, 15 U.S.C. § 78g(f), by the execution of short sales in cash rather than margin accounts.

> FN1. The fourth claim alleges failure to register as brokers or dealers and is not at issue on this motion.

The sixth and seventh claims of the complaint allege violations of Section 10(b) and Rule 10b-5 by the schemes to fraudulently purchase bank stock pursuant to depositors' non-transferable subscription rights.

### DISCUSSION

*I. First and Second Claims*

Parnes, Adar Equities, Herman, and Seitler move pursuant to Fed.R.Civ.P. 9(b) to dismiss the market manipulation claims for failure to plead fraud with particularity. Dismissal is warranted only where it " appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Although under Fed.R.Civ.P. 8 a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Rule 9(b) requires more for allegations of fraud. Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The heightened standard is meant to " 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." ' *Shields v. Citritrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994), quoting *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

*4 Courts in this circuit have distinguished between the pleading requirements for market manipulation and fraudulent misrepresentation claims. For market manipulation claims:

[A]llegations may not even need to reach the level of specificity ordinarily required by Rule 9(b) because details regarding the workings of a market manipulation scheme are often known only by the defendants. Nevertheless, a complaint based on such allegations must still specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.

*Baxter v. A.R. Baron & Co.,* No. 94 Civ. 3913, 1995 WL 600720, at *6 (S.D.N.Y. Oct.12, 1995) (citations omitted); *see also SEC v. U.S. Environmental, Inc.,* 82 F.Supp.2d 237, 240 (S.D.N.Y.2000); *In re Blech Securities Litigation,* 961 F.Supp. 569, 580 (S.D.N.Y.1997).

The defendants argue that claims one and two of the complaint are deficient in three respects.

First, the defendants argue that the complaint impermissibly lumps defendants together without distinguishing amongst them. A complaint "may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged."*In re Blech Securities Litigation,* 928 F.Supp. 1279, 1292-3 (S.D.N.Y.1996), citing *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 n. 7 (S.D.N.Y.1977); *see also Red Ball Interior Demolition Corp. v. Palmadessa,* 908 F.Supp. 1226, 1238 (S.D.N.Y.1995)(holding the same); *O & G Carriers, Inc. v. Smith,* 799 F.Supp. 1528, 1538 (S.D.N.Y.1992)(dismissing claims because there was "repeated undifferentiated grouping of defendants so that it is impossible to tell what each individual defendant is accused of doing").

The SEC's complaint in this case makes undifferentiated references to defendants Parnes, Adar Equities, Herman and Seitler as the "ADAR Defendants." It alleges that the "ADAR Defendants" directed Knoll to execute short sales and marking-the-close, cross-trade, and covering transactions without specifying the role each particular defendant played. (Compl.¶¶ 22, 23, 36, 37, 40.) In another paragraph, the complaint does not specify which of the "Adar Defendants" delivered notices of conversion. (Compl.¶ 39.) In this respect, it fails to satisfy one of the principal purposes of Rule 9(b): to provide each defendant with "fair notice of the claim to enable preparation of a reasonable defense."*Spear, Leeds & Kellog v. Public Service Co.,* 700 F.Supp. 791, 793 (S.D.N.Y.1988).

In cases cited by the SEC where grouping was excused, the fraud involved misrepresentations and omissions in corporate documents that could be characterized as "the collective product of the group" of directors, officers and other insiders. *Corcoran v. America Plan Corporation,* Civ. 86-1729(CPS), 1987 WL 4448, at *4-5 (E.D.N.Y. Feb. 6, 1987) (documents were created by the collective action of directors and other members of a conspiracy); *see also Walltree Ltd. v. ING Furman Selz LLC,* 97 F.Supp.2d 464, 469 n. 6 (S.D.N.Y.2000) (complaint referred to two corporations as one entity where those corporations issued and placed notes, while concealing the material terms of those notes); *Seagoing Uniform Corp. v. Texaco, Inc.,* 705 F.Supp. 918, 933-34 (S.D.N.Y.1989)(misleading SEC filings). The complaint in this case, in contrast, charges overt conduct by individuals.

*5 Furthermore, here the SEC has had three years' discovery and access to records and documents. It cannot dispense, merely because a defendant invoked the Fifth Amendment privilege during the investigation, with the obligation to provide each defendant with fair notice of the specific conduct with which he is charged.

As to Knoll, however, the complaint has described his role in considerable detail. Knoll executed the illegal short sales in several Datek cash accounts; he also misrepresented the sales as long sales, failed to meet settlement date requirements, sold short in a declining market, and failed to report those trades to the market. (Comp.¶¶ 23-40).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678
**(Cite as: Not Reported in F.Supp.2d)**

Accordingly, in this respect the complaint is inadequate as against the Adar defendants and it is sufficient as against Knoll.

Second, the defendants argue that the complaint is deficient because it details only one particular covering transaction and then generally alleges that between October 6, 1995, and December 22, 1995, " Parnes and his employees continued to effect illegal short sales of ImmunoGen common stock in the United States and cover those short sales with stock issued to the Reg. S subscribers in exchange for their Reg. S debentures."(Compl. at ¶ 40.) Descriptions of market manipulation schemes which "provide detailed descriptions of a few sample trades," and allege more generally that the activity continued during a particular time frame and had an effect on the market, have been found to satisfy 9(b). *U.S. Environmental, Inc.,* 82 F.Supp.2d at 240. " The SEC is simply not required at the pleading stage to list each and every specific trade," to satisfy Rule 9(b).*SEC v. Blech,* 99 Civ. 4770 (RWS), 2000 WL 288263, at *3 (S.D.N.Y. March 20, 2000)(also finding complaint sufficient where specific stocks, methods of manipulation, the time frame, the effect on the market, and direct participation by defendants were set forth with specificity). The complaint in this case satisfies Rule 9(b) by its description of a particular trade and the mechanics of the scheme, including a time frame and the scheme's effect on the market.

Finally, the defendants argue that the complaint fails to allege scienter with the particularity required for claims under Section 10(b) and Section 17(a)(1) [FN2]. Although Rule 9(b) provides that in allegations of fraud, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," the Second Circuit sets a higher standard for securities fraud and requires the SEC to "allege facts giving rise to a strong inference of fraudulent intent."*Blech,* 2000 WL 288263, at *3; *see also Press v. Chemical Investment Services Corp.,* 166 F.3d 529, 538 (2d Cir.1999); *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995); *Shields,* 25 F.3d at 1128. " '[F]acts establishing motive to commit fraud and an opportunity to do so, " ' or alternatively, " 'facts constituting circumstantial evidence of either reckless or conscious misbehavior," ' give rise to a strong inference of fraudulent intent. *Acito,* 47 F.3d at 53, quoting *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 268 (2d Cir.1993); *see also Press,* 166 F.3d at 538, citing *Shields,* 25 F.3d at 1128.

> FN2. Claims under Section 17(a)(2) or 17(a)(3) do not require a showing of scienter. *See Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 1955-56, 64 L.Ed.2d 611 (1980) (holding that 17(a)(1) required showing of scienter, but 17(a)(2) and 17(a)(3) did not).

*6 To the degree that the complaint does not distinguish between the roles of certain defendants, one cannot evaluate whether the facts give rise to a strong inference of their individual fraudulent intent. As to Knoll, the only defendant whose role has been sufficiently described, the allegations of scienter suffice.

Defendants, relying on *Shields,* also argue that the short-sale scheme described by the SEC cannot support an inference of fraudulent intent because it defies economic reason. *See*25 F.3d at 1130, quoting *Atlantic Gypsum Co. v. Lloyds International Corp.,* 753 F.Supp. 505, 514 (S.D.N.Y.1990)( "Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent."). They claim that a downward manipulation of stock price would be adverse to their economic interests as beneficial owners of the convertible debentures. The argument is unpersuasive because the value of the debentures at issue here was not tied to the stock price: the terms of the debentures guaranteed a 25% discount upon conversion whether the stock price was high or low, and as the stock price fell, the number of shares obtained upon conversion increased, so the holder's economic interest remained the same. (Compl.¶¶ 19, 36.) Meanwhile, short sales of ImmunoGen stock in a declining market created additional profits, when cheaply acquired Regulation S shares were used to cover sales made at a higher price. The scheme, as described, indicates that the defendants stood to gain; it therefore supports an inference of fraudulent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678
**(Cite as: Not Reported in F.Supp.2d)**

intent.

In sum, as to defendants Parnes, Adar Equities, Seitler and Herman, claims one and two of the complaint are dismissed for failure to plead fraud with particularity, without prejudice and with leave to the SEC to amend the complaint. "Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b)." *Acito,* 47 F.3d at 55. As to defendant Knoll, the motion to dismiss claims one and two is denied.

### II. Third Claim

Defendants Parnes, Adar Equities, Herman, Seitler and Knoll move to dismiss the third claim of the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim under Section 5 of the Securities Act of 1933. They argue that the securities used to cover short sales were exempt from registration under the safe harbors of SEC Regulation S and therefore did not violate Section 5 and that denial of the exemption would violate Due Process.

Section 5 prohibits " 'any person' from directly or indirectly using the mails or the means of interstate commerce to offer or sell a security unless it is registered with the SEC or is exempt from registration.".*See SEC v. Softpoint,* 958 F.Supp. 846, 859 (S.D.N.Y.1997)(construing 15 U.S.C. §§ 77e(a), (c)). In order to state a claim under Section 5, a plaintiff must allege "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale."*Europe and Overseas Commodity Traders, S.A. v. Bangue Paribas London,* 147 F.3d 118, 124 n. 4 (2nd Cir.1998). A plaintiff need not plead scienter as it is not an element of a Section 5 claim. *See SEC v. Cavanagh,* 1 F.Supp.2d 337, 361 (S.D.N.Y.), aff'd, 155 F.3d 129 (2d Cir.1998); *Softpoint,* 958 F.Supp. at 859-60 (S.D.N.Y.1997). Furthermore, a plaintiff need not plead the inapplicability of an exemption, as the party claiming exemption from registration requirements bears the burden of proving that the exemption applies. *See SEC v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); *Byrnes v. Faulkner, Dawkins & Sullivan,* 550 F.2d 1303, 1311 (2d Cir.1977).

\*7 In addition to claiming exemption, however, the defendants argue that denial of the exemption would violate Due Process, because the transactions at issue here were in technical compliance with Regulation S, which at the time provided safe-harbor for re-sales of unregistered securities in the United States after the 40-day restricted period. But Regulation S did in fact provide notice that exemption would not be available "with respect to any transactions or series of transactions that, although in technical compliance with these rules, was part of a plan or scheme to evade the registration provisions of the Act."17 C.F.R. § 230.901-905, Preliminary Note 2.

Here, in addition to alleging that defendants sold unregistered ImmunoGen securities in the U.S. market using the means of interstate commerce, the complaint describes a scheme "designed to evade the legal restrictions on sales of ImmunoGen's Reg. S securities to U.S. purchasers" (Compl.¶ 22), where defendants "nominally placed" (Compl.¶ 2) convertible debentures with Panamanian corporations, then effected unreported short sales in the United States in violation of securities regulations (Compl.¶¶ 32, 33), where these sales represented at least in one instance "three and a half times the total reported trading volume for ImmunoGen stock for that day" (Compl.¶ 33), and where 2.4 million of the issued shares were promptly transferred to U.S. accounts of the Panamanians, of which 1.7 million shares were then used to cover prior short sales made in the U.S. market (Compl.¶ 41). This is sufficient, at least for pleading purposes. Whether the proof is sufficient to establish a scheme to evade registration requirements and preclude application of the exemption is a question for trial.

### III. Fifth Claim

Defendants Parnes, Seitler and Herman move to dismiss the fifth claim pursuant to 12(b)(6) for failure to state a claim under Section 7(f) of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 7
Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678
**(Cite as: Not Reported in F.Supp.2d)**

Exchange Act [FN3], because the SEC has not alleged that their violations were willful. The defendants are accused of violating Regulation X, which implements Section 7(f) and which imposes (by reference to another regulation, Regulation T) initial margin requirements on certain securities transactions. *See* Regulation X, 12 C.F.R. § 224, and Regulation T, 12 C.F.R. § 220. The defendants allegedly violated these margin requirements by directing the execution of short sales in cash accounts rather than margin accounts. (Com pl.¶ ¶ 67-69.) Defendants argue, however, that willfulness must be pleaded because Regulation X exempts non-willful violations from its purview. Regulation X states, in relevant part: "The following borrowers are exempt from the Act and this part: (1) Any borrower who obtains purpose credit within the United States, unless the borrower willfully causes the credit to be extended in contravention of Regulations T or U."12 C.F.R. § 224.1(b)(1)[FN4]. To the extent that willfulness must be pleaded to demonstrate the inapplicability of the exemption, the complaint alleges facts sufficient to support a finding that the violations were willful. The complaint states that the Adar defendants "directed Knoll to execute illegal short sales in Hoxton and ACM's cash accounts."(Compl.¶ 40.) Drawing all inferences in favor of the plaintiff, this allegation supports the inference of willfulness: that the defendants knew their deliberate behavior was illegal.

FN3. Section 7(f) provides in relevant part:
It is unlawful for any United States person...
.to obtain, receive, or enjoy the beneficial use of a loan or other extension of credit from any lender...for the purpose of (A) purchasing or carrying United States securities...if, under this section or rules and regulations prescribed thereunder, the loan or other credit transaction is prohibited or would be prohibited if it had been made or the transaction had otherwise occurred in a lender's office or other place of business in a State.
15 U.S.C. § 78g(f).

FN4. "Purpose credit" is credit "extended for the purpose of purchasing or carrying margin stock...without collateral or on collateral other than stock."12 C.F.R. § 221.120.

*IV. Sixth and Seventh Claims*

**\*8** Defendant Parnes moves to dismiss claims six and seven, and defendant Raisman moves to dismiss claim seven, for failure to state a claim under Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 thereunder. They argue that the allegations in claims six and seven fail to allege fraud "in connection with" the purchase or sale of securities.

Section 10(b) makes it unlawful to:
use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. 78j(b). SEC Rule 10b-5 thereunder makes it unlawful, "in connection with the purchase or sale of any security:"(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person...

17 C.F.R. § 240.10b-5. To state a claim under § 10(b), a plaintiff must allege fraud in connection with the purchase or sale of any security. *See O & G Carriers, Inc. v. Smith,* 799 F.Supp. 1528, 1539 (S.D.N.Y.1992).

The Second Circuit has recognized that Section 10(b) "must be read flexibly, not technically and restrictively."*See Press v. Chemical Investment Services Corp.,* 166 F.3d 529, 537 (2d Cir.1999), quoting *Superintendent of Insurance v. Bankers*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678
**(Cite as: Not Reported in F.Supp.2d)**

*Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). As stated in *Press,* this Circuit "has broadly construed the phrase 'in connection with,' interpreting the Congressional intent underlying the phrase to mandate only that the act complained of somehow induced the purchaser to purchase the security at issue."166 F.3d at 537, citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860-61 (2d Cir.1968)(en banc).

In this case, allegations in the complaint make it clear that the banks were tricked into parting with bank stock to an ineligible purchaser. Had the bank known that the subscription rights had been transferred, the consideration for the stock would not have been accepted, for the transaction violated an Office of Thrift Supervision regulation.

In *Manela v. Garantia Banking Ltd.,* 5 F.Supp.2d 165 (S.D.N.Y.1998), the plaintiffs were deceived as to the identity of the seller of bonds, but the court held that because there was "no evidence supporting the possibility that knowledge of the seller's identity was relevant to the value of the securities or the consideration paid," the deception could not support a claim under Rule 10b-5. *Id.* at 175. Here, unlike *Manela,* the identity of the buyer was material to whether the consideration would be accepted.

*9 The motions to dismiss claims six and seven for failure to state a claim under Section 10(b) and Rule 10b-5 are denied.

*V. Motion to Sever and Change Venue*

Defendant Raisman moves pursuant to Fed.R.Civ.P. 21 to sever the seventh claim and transfer it to the Eastern District of New York. The seventh claim, the only claim against Raisman, charges both Parnes and Raisman with the illegal purchase of stock by use of depositors' subscription rights to the initial public offering of Roslyn Bancorp.

Fed.R.Civ.P. 21"permits a court to add or drop parties to an action when doing so would serve the ends of justice and further the prompt and efficient disposition of the litigation."*German v. Federal Home Loan Mortgage Corp.,* 896 F.Supp. 1385, 1400 (S.D.N.Y.1995), citing *E.I. Du Pont De Nemours & Co. v. Fine Arts Reproduction Co.,* No. 93 Civ. 2462(KMW), 1995 WL 312505, at *1-2 (S.D.N.Y. May 22, 1995).Rule 21 provides:
Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

Furthermore, "[t]he decision whether to grant a severance motion is committed to the sound discretion of the trial court."*New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1082 (2d Cir.1988). In deciding a severance motion, a court considers: "(1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted and (4) whether the party requesting the severance will be prejudiced if it is not granted."*German,* 896 F.Supp. at 1400.

Raisman argues that the claim against him is improperly joined with the other claims in the complaint because it is wholly unrelated and dissimilar to claims one through six. In the alternative, he argues that severance would still be proper here to avoid the prejudice inherent in trying the claim against him, for accessorial conduct, with the many and more sophisticated claims against other defendants.

The claim against Raisman meets the minimum requirements for joinder and none of the above factors mandates its severance. The sixth and seventh claims allege substantially similar schemes to purchase shares in the initial public offerings of banks using the depositors' subscription rights. Thus, there is economy in trying both claims to the same jury, which would in any event hear claim six. While they involve different witnesses and documents, the claims relate to the other claims in the complaint to the extent that Parnes is claimed to have used the proceeds from the Immunogen

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678
**(Cite as: Not Reported in F.Supp.2d)**

Scheme to fund both bank frauds. (Compl.¶ 45.) On the whole, severance would be more prejudicial to the SEC (which would have to try one of its claims against Parnes in a separate proceeding) than denial of severance is to Raisman.

*10 Since severance would neither serve the interests of justice nor the prompt and efficient resolution of the claims, Raisman's motion to sever is denied.

### CONCLUSION

Claims one and two against Parnes, Adar Equities, Herman and Seitler are dismissed for failure to plead fraud with particularity, without prejudice and with leave to replead. The motion to dismiss claims one and two against Knoll is denied. The motions to dismiss claims three, five, six and seven for failure to state a claim are denied. Raisman's motion to sever and transfer claim seven against him is also denied.

So ordered.

S.D.N.Y.,2001.
S.E.C. v. Parnes
Not Reported in F.Supp.2d, 2001 WL 1658275 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,678

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.