1  Douglas R. Young (State Bar No. 073248)
   William P. Keane (State Bar No. 124756)
2  Jessica K. Nall (State Bar No. 215149)
   Amarra A. Lee (State Bar No. 245679)
3  Farella Braun + Martel LLP
   235 Montgomery Street, 17th Floor
4  San Francisco, CA 94104
   Telephone: (415) 954-4400
5  Facsimile: (415) 954-4480
   Email: jnall@fbm.com
6
   Attorneys for Defendant
7  MARK LESLIE

8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                         SAN JOSE DIVISION
11

12 | SECURITIES AND EXCHANGE          | Case No. 5:07-cv-03444-JF
   | COMMISSION,                      |
13 |                                  | **APPENDIX OF AUTHORITIES NOT
   |              Plaintiff,          | CITED IN THE FEDERAL REPORTER
   |                                  | IN REPLY BRIEF IN SUPPORT OF
14 |        vs.                       | MOTION TO DISMISS OR STRIKE __**
15 | MARK LESLIE, KENNETH E.          | Date:     January 18, 2008
   | LONCHAR, PAUL A. SALLABERRY,     | Time:     9:00 a.m.
16 | MICHAEL M. CULLY AND DOUGLAS     | Dept.:    Courtroom 3, 5th Floor
   | S. NEWTON,                       | Judge:    Honorable Jeremy D. Fogel
17 |                                  |
   |              Defendants.         | Date Complaint Filed: July 2, 2007
18 |                                  | Date Set For Trial: None
19

20

21

22

23

24

25

26

27

28

APPENDIX OF CASES IN REPLY BRIEF IN SUPPORT
OF MOTION TO DISMISS OR STRIKE
CASE NO. 5:07-CV-03444-JF                                    17289\1406931.1

1

## INDEX OF CASES NOT CITED IN FEDERAL REPORTER

2

EXHIBIT

3

4    *In re Apple Computer Inc., Deriv. Litig.*,
       2007 WL 4170566 (N.D. Cal. 2007).................................................................. A

5    *Beshears v. Provident Life and Acc. Ins. Co.*,
       2007 WL 1438738 (D. Ariz. 2007)................................................................... B

6

7    *Boblos's Inc. v. Burlington Ins. Co.*,
       2007 WL 3165535 (E.D. Cal. 2007).................................................................. C

8    *Mat-Van, Inc. v. Sheldon Good & Co. Auctions, LLC*,
       2007 WL 3047093 (S.D. Cal. 2007) .................................................................. D

9

10   *Orlando v. Carolina Cas. Ins. Co.*,
       2007 WL 781598 (E.D. Cal. 2007)..................................................................... E

11   *In re Ross System Sec. Litig.*,
       1994 WL 583114 (N.D. Cal. 1994)..................................................................... F

12

13   *SEC v. Baxter*,
       2007 WL 2013958 (N.D. Cal. 2007).................................................................. G

14   *SEC v. Brady*,
       2006 WL 1310320 (N. D. Tex. 2006)................................................................. H

15

16   *SEC v. Buntrock*,
       2004 WL 1179423 (N.D. Ill. 2004)...................................................................... I

17   *SEC v. Harden*,
       2006 WL 89864 (W.D. Mich. 2006)................................................................... J

18

19   *SEC v. Roanoke Tech. Corp.*,
       2006 WL 2470329 (M.D. Fla. 2006) .................................................................. K

20   *SEC v. Sandifur*,
       2006 WL 538210 (W.D. Wash. 2006)................................................................. L

21

22   *SEC v. Shapiro*,
       2007 WL 788335 (E.D. Tex. 2007) ................................................................... M

23   *SEC v. Tandem Mgmt. Inc.*,
       2001 WL 1488218 (S.D.N.Y. 2001)................................................................... N

24

25   *SEC v. Todd*,
       2006 U.S. Dist. LEXIS 41182 (S.D. Cal. 2006) ............................................... O

26   *Shuster v. Symmetricon, Inc.*,
       1997 WL 269490 (N.D. Cal. 1997)..................................................................... P

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

APPENDIX OF CASES IN REPLY BRIEF IN SUPPORT
OF MOTION TO DISMISS OR STRIKE                         - 1 -
CASE NO. 5:07-CV-03444-JF                                                          17289\1406931.1

1  *In re Tibco*,
        2006 U.S. Dist. LEXIS 36666 (N.D. Cal. 2006) .................................................................. Q

2

3  Dated: December 17, 2007                    FARELLA BRAUN + MARTEL LLP

4

5                                    By: /s/ Douglas R. Young
                                         Douglas R. Young
6                                        William P. Keane

                                         Attorneys for Defendant
7                                        MARK LESLIE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA  94104
(415) 954-4400

APPENDIX OF CASES IN REPLY BRIEF IN SUPPORT
OF MOTION TO DISMISS OR STRIKE                    - 2 -
CASE NO. 5:07-CV-03444-JF                                              17289\1406931.1

# EXHIBIT A

Slip Copy
Fed. Sec. L. Rep. P 94,523
(Cite as: 2007 WL 4170566 (N.D.Cal.))

Page   5

Only the Westlaw citation is currently available.

NOT FOR CITATION

United States District Court, N.D. California,
San Jose Division.

**In re APPLE COMPUTER INC., DERIVATIVE
LITIGATION.**

**No. C 06-4128 JF.**

Nov. 19, 2007.

George A. Riley, Luann Loraine Simmons,
O'Melveny & Myers, San Francisco, CA, David
Malcolm Furbush, Pillsbury, Winthrop, Shaw,
Pittman LLP, Palo Alto, CA, Jerome Cary Roth,
Genevieve A. Cox, Yohance Claude Edwards,
Munger Tolles & Olson LLP, San Francisco, CA,
Carl Holliday Moor, John W. Spiegel, Munger
Tolles & Olson LLP, Los Angeles, CA, Sarah A.
Good, Howard, Rice, et al., San Francisco, CA,
Jason Mark Habermeyer, Howard, Rice,
Nemerovski, Canady, Falk & Rabkin, San
Francisco, CA, for Defendants.

Mary Sikra Thomas, Grant & Eisenhofer, P.A.,
Wilmington, DE, for Movant.

ORDER [FN1] GRANTING WITH LEAVE TO
AMEND MOTION TO DISMISS FOR FAILURE
TO
STATE A CLAIM AND DEFERRING MOTION
TO DISMISS FOR FAILURE TO MAKE
DEMAND

FN1. This disposition is not designated for
publication and may not be cited.

JEREMY FOGEL, District Judge.

I. BACKGROUND

1. Procedural Background

*1 This derivative action arises from the alleged
backdating of stock options by directors and officers
of nominal defendant Apple Computer Inc.
("Apple"). The initial complaint was filed on June
30, 2006. On November 2, 2006, the Court

appointed a leadership structure for this litigation in
light of the consolidation of a number of cases under
the above caption. On December 18, 2006,
Plaintiffs filed a consolidated shareholder derivative
complaint. On January 18, 2007, Plaintiffs moved
to amend their complaint. That request was granted
on February 26, 2007, and the operative pleading
("the Amended Complaint") was filed on March 6,
2007. [FN2]

FN2. The Amended Complaint bears the title "First
Amended Shareholder Derivative Complaint."

The Amended Complaint names thirteen
defendants ("the Individual Defendants"): Fred D.
Anderson; Timothy D. Cook; Steven P. Jobs;
Ronald B. Johnson; Mitchell Mandich; Peter
Oppenheimer; Jonathan Rubinstein; Avadis
Tevanian, Jr.; Nancy Heinen; William V.
Campbell; Millard Drexler; Arthur D. Levinson;
and Jerome B. York. Complaint ¶¶ 40-52. The
Amended Complaint refers to Anderson, Cook,
Jobs, Johnson, Mandich, Rubinstein, and Tevanian
as the "Backdating Defendants;" to Anderson,
Cook, Jobs, Johnson, Levinson, Mandich,
Oppenheimer, Rubinstein, Tevanian, and York as
the "Insider Selling Defendants;" to Campbell,
Drexler, Levinson, and York as the "Compensation
Committee Defendants;" to Campbell, Levinson,
and York as the "Audit Committee Defendants." Id.
¶¶ 53-56.

The Amended Complaint includes ten state-law
claims: (1) breach of fiduciary duty by option
backdating, against the Backdating, Audit
Committee, and Compensation Committee
Defendants; (2) breach of fiduciary duty by insider
selling, against the Insider Selling Defendants; (3)
aiding and abetting breach of fiduciary duty, against
the Audit Committee and Compensation Committee
Defendants; (4) unjust enrichment, against the
Backdating and Insider Selling Defendants; (5)
constructive fraud, against the Individual
Defendants; (6) abuse of control, against the
Individual Defendants; (7) corporate waste and gift,
against the Individual Defendants; (8) gross
mismanagement, against the Individual Defendants;
(9) rescission, against the Individual Defendants;
and (10) violation of California Corporate Code.
The Complaint also asserts three federal claims
under the Securities Exchange Act: (11) violation of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

section 14(a); (12) violation of section 10(b); and (13) violation of section 20(a).

On April 20, 2007, the Individual Defendants moved to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted, and Apple moved to dismiss the Amended Complaint for failure to make demand. Plaintiffs oppose the motions. The Court heard oral argument on September 7, 2007.

2. Factual Background

Plaintiffs make the following general allegations. Between fiscal years 1997 and 2002, Apple granted stock options pursuant to at least three different stock option plans: the 1990 Stock Option Plan; the 1997 Employee Stock Option Plan; and the 1998 Executive Officer Stock Plan. Id. ¶ 78-79. The stated purpose of each plan was to attract and retain the best available personnel and to provide incentives to such personnel to promote the success of Apple. Id.   ¶ 80. The plans required that the exercise price for any stock option issued be at least 100% of the fair market value of the common stock on the date of the grant. Id. ¶ 82.

*2 According to the Amended Complaint:
Defendants, over the course of nearly a decade, abdicated their fiduciary obligations, and lied to Apple's public shareholders, by permitting the Board to manipulate the Company's stock option plans to maximize compensation to selected executives. As a result, these favored executives improperly and unlawfully amassed a fortune in Apple stock and stock options, and caused the Company to overstate its earnings and issue materially false and misleading financial statements since at least fiscal 1997, and to restate its reported financial results for fiscal years 2004 through 2006.
Id. ¶ 2. Apple "never disclosed that the Apple Board permitted Defendants to manipulate the Company's option grants by backdating options and otherwise timing grants to maximize personal benefits." Id. ¶ 4. Instead, "the Company deliberately concealed from the investing public the fact that the Board permitted such manipulation of the stock grant dates and affirmatively misrepresented that all options were granted at an exercise price equal to the fair market value on the date of grant." Id.

On June 29, 2006, Apple issued a press release announcing that its internal investigation had discovered "irregularities related to the issuance of certain stock option grants made between 1997 and 2001." Id. ¶ 5. On July 19, 2006, Apple issued a second press release stating that it did not anticipate a "material adjustment" to financial results. Id. ¶ 6. However, on August 3, 2006, Apple announced that it had discovered further irregularities that likely would result in financial restatements, and that its financial reports for fiscal years 2003, 2004, and 2005 no longer should be relied upon. Id. ¶ 7. In its annual report for fiscal year ending September 30, 2006, Apple made the following disclosures: the originally assigned grant dates for 6,428 grants on 42 dates were incorrect, causing Apple to recognize a pre-tax stock-based compensation expense of $105 million; Jobs was not only aware of the options backdating but also received some of the grants and recommended some of the dates chosen; and Board minutes were falsified in order to cover up the wrongdoing. Id. ¶ 10. One of the largest grants during this period was made to Jobs, in the form of a grant of options to purchase ten million shares with a grant date of January 12, 2000. Id. ¶ 12. The timing of the grants was such that they occurred either shortly after a drop in the stock price or shortly before an increase. Plaintiffs argue that: "[t]he timing of these grants could not have been by pure coincidence." Id. ¶ 11.

Plaintiffs make the following additional allegations with respect to the Individual Defendants: Anderson served as the Company's Executive Vice President and Chief Financial Officer from April 1996 to June 2004. Id. ¶ 40. Anderson became a member of the Board in June 2004, at which time he left the officer position he previously had held. Id. ¶ 40, 150. Cook is Apple's Chief Operating Officer. Id. ¶ 41. Jobs has been the Chief Executive Officer of Apple since 2000; he was interim Chief Operating Officer from September 1997 to 2000 and has been a director since August 1997. Id. at ¶ 42. Johnson has served as a Senior Vice President of Apple since 2000. Id. ¶ 43. Mandich served as a Senior of Vice President of Apple from February 1997 to October 2000, when he resigned. Id. ¶ 44. Oppenheimer joined Apple in 1996 and now serves as its Senior Vice President and Chief Financial Officer. Id. ¶ 45. Rubinstein served as a Senior Vice President of Apple from February 1997 to May 2004. Id. ¶ 46. Tevanian

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



served as a Senior Vice President of Apple from February 1997 to March 31, 2006, when he resigned without explanation. Id. ¶ 47. Heinen served as General Counsel to Apple from 1997 until May 2006, when she left the company without explanation, Id. ¶ 48; as General Counsel, Heinen reviewed all company financial statements, press releases and/or other filings with the SEC. Id. Campbell has served as a director since August 1997, Id. ¶ 49; he also has served as a member of the Audit Committee since August 1997 and of the Compensation Committee since August 2001. Id. Drexler has served as a director since 1999, including as a member of the Compensation Committee since November 2002. Id. ¶ 50. Levinson has served as a director since fiscal year 2000, including as a member of the Compensation Committee from August 2001 through fiscal year 2003 and as a member of the Audit Committee since fiscal year 2000. Id. ¶ 51. York has served as a director since August 1997, as a member of the Compensation Committee from August 2001 through November 2002, and as a member of the Audit Committee since August 1997. Id. ¶ 52.

*3 Plaintiffs allege that between April 2000 and August 2001, Apple had no compensation committee. Id. ¶ 141. In the absence of such a committee, all such responsibilities belonged to the full Board. Id. At the time this action was commenced, the Board was comprised of seven directors: Anderson, Campbell, Drexler, Jobs, Levinson, York, and non-defendant Albert Gore, Jr. When the Complaint was filed, Anderson had been replaced by non-defendant Eric Schmidt. [FN3] Plaintiffs allege that demand would be futile because Jobs, Anderson, Campbell, Drexler, and York all have adverse interests that render them incapable of fair, unbiased consideration. Id. ¶ 213, 216.

FN3. Anderson and Schmidt served together on the Board from August 29, 2006 to September 30, 2006. Id. ¶ 215 & n. 7.

## II. LEGAL STANDARD

### 1. Motion to Dismiss

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. Jenkins v. McKeithen, 395

U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. Lucas v. Department of Corrections, 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, however, dismissal may be ordered with prejudice. Dumas v. Kipp, 90 F.3d 386, 393 (9th Cir.1996). On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. North Star International v. Arizona Corporation Commission, 720 F.2d 578, 581 (9th Cir.1983); MGIC Indemnity Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir.1986); Beliveau v. Caras, 873 F.Supp. 1393, 1395 (C.D.Cal.1995). However, under the "incorporation by reference" doctrine, the Court also may consider documents that are referenced extensively in the complaint and are accepted by all parties as authentic, even though the documents are not physically attached to the complaint. In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970 (9th Cir.1999).

### 2. Demand Requirement

A derivative complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. The existence and satisfaction of a demand requirement is a substantive issue governed by state law. See Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 96-97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). [FN4] When the challenged decision is that of the board in place at the time of the filing of the complaint, failure to make demand may be excused if a plaintiff can raise a reason to doubt that a majority of the board is disinterested or independent or that the challenged acts were the product of the board's valid exercise of business judgment. Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984); see also Ryan v. Gifford, 918 A.2d 341, 352 (Del.Ch.2007) (discussing Aronson ). However, "[w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application." Rales v. Blasband, 634 A.2d 927, 933 (Del.1993); see also Ryan, 918 A.2d at 352 (discussing Rales ). In such a situation, demand may

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



be excused only if a plaintiff "can create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Id. at 353 (citing Rales, 634 A.3d 933-34).

> FN4. California courts follow Delaware law in demand futility cases.  See Oakland Raiders v. National Football League, 93 Cal.App.4th 572, 586 n. 5, 113 Cal.Rptr.2d 255 (2001) ("The parties agree that we may properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes.").

### III. ANALYSIS

1. Motion to Dismiss for Failure to State a Claim [FN5]

> FN5. Because the existence of a viable federal claim is a prerequisite to the exercise of its subject-matter jurisdiction, the Court addresses the three federal claims first.

a. Claim Eleven: Violation of Section 14(a)

*4 Rule 14a-9 provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a). To state a claim under Rule 14a-9 and Section 14(a), a plaintiff must allege that: (1) the defendant made a false or misleading statement or omission of material fact; (2) the misstatement or omission was made with the requisite level of culpability; and (3) the statement provided an essential link in the accomplishment of the transaction. Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir.2000).

The Individual Defendants assert that Plaintiff's Section 14(a) claim is time-barred because it was not filed within one year after discovery of the facts constituting the violation, or within three years following publication of the proxy statement as required by statute. However, Plaintiffs contend that their 14(a) claim sounds in fraud and therefore is governed by 28 U.S.C. § 1658(b), which provides a five-year statute of repose and a two-year statute of limitations for a "private right of action that involves a claim of fraud, deceit, manipulation or contrivance in contravention of a regulatory requirement concerning the securities laws." See Plaintiffs' Consolidated Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss First Amended Shareholder Derivative Complaint ("Opposition") at 44.

The Court concludes that § 1658(b) applies to the Section 14(a) claim because such a claim does not sound in fraud. See In re Exxon Mobil Corp. Sec. Litig., 387 F.Supp.2d 407, 424 (D.N.J.2005); In re Global Crossing, Ltd. Sec. Litig., 313 F.Supp.2d 189, 196-97 (S.D.N.Y.2003); In re Zoran Corp. Deriv. Litig., 2007 WL 1650948, at *24 (N.D.Cal. June 5, 2007). As currently pled, Plaintiffs' Section 14(a) claim alleges false statements made more than three years prior to the filing of this action. See Amended Complaint ¶ 277 (alleging false proxy statements from 1997 to 2002). Accordingly, the claim will be dismissed. While the Court will grant leave to amend, Plaintiffs should not amend this claim unless they can allege violations of Section 14(a) by the publication of proxy statements that occurred on or after July 30, 2003, and unless they commenced the present action within one year after discovery of the violation.

In light of the foregoing discussion, the Court need not reach Defendants' challenges to the sufficiency of the allegations. However, assuming without deciding that the Private Securities Litigation Reform Act ("PSLRA") also applies to Section 14(a) claims, see e.g. In re Textainer Partnership Securities Litig., 2005 WL 3801596 (N.D.Cal. March 8, 2005); In re McKesson HBOC, Inc. Sec. Litig., 126 F.Supp.2d 1248, 1267 (N.D.Cal.2000), and that Plaintiffs can assert a claim that is not time-barred, greater specificity likely would strengthen this claim considerably. [FN6]

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                         Page   9
(Cite as: 2007 WL 4170566, *4 (N.D.Cal.))

FN6. This Court has held in another action that the PSLRA has foreclosed the application of the "group published pleading" doctrine, which holds that when false or misleading information is conveyed in group published statements, it is reasonable to presume that the statements are the result of the collective actions of the company's officers. In re Nextcard, Inc. Sec. Litig., No. C 01-21029, 2006 WL 708663, at *2-3 (N.D.Cal. March 20, 2006).

b. Claim Twelve: Violation of Section 10(b)

i. Statute of Limitations

*5 As noted above, claims of securities fraud are subject to 28 U.S.C. § 1658(b) which provides:
[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)), may be brought not later than the earlier of--
(1) 2 years after the discovery of the facts constituting the violation; or
(1) 5 years after such violation.
See, e.g., In re Heritage Bond Litig., 289 F.Supp.2d 1132, 1147-48 (C.D.Cal.2003). This statute of limitations is not subject to equitable tolling. Durning v. Citibank, Int'l, 990 F.2d 1133, 1136-37 (9th Cir.1993). Because Plaintiffs' claim under section 10(b) sounds in fraud, section 1658(b) applies. In light of Plaintiffs' allegation that the practice of backdating options came to light in 2005, the two-year discovery period does not bar the instant action at the pleading stage. Accordingly, the applicable period for this analysis is the five-year period of repose which commenced on the period after June 30, 2001. [FN7]

FN7. "A statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation." Munoz v. Ashcroft, 339 F.3d 950, 957 (9th Cir.2003) (citing Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)).

The only allegedly backdated option grants within this period are those alleged to have occurred in fiscal year 2002. See Amended Complaint ¶¶ 118-119 (discussing period from October 19, 2001 to December 14, 2001). However, Plaintiffs also allege that Apple filed a series of false financial statements during the five-year period of repose, raising a question as to whether the filing of such subsequent false financial statements preserves claims for alleged options manipulation that occurred outside the period. The Court concludes that in light of the statute's focus on the date of the "violation," the statute of limitations must be applied to the specific violations alleged.  To the extent that Plaintiffs' claim is based on the backdating itself, the period of repose began to run on the date that the option grant was made. See Durning, 990 F.2d at 1136 (noting that the federal rule is that a cause of action accrues at the completion of the sale of the instrument); Falkowski v. Imation Corp., 309 F.3d 1123, 1130 (9th Cir.2002) (describing the grant of an option as "a purchase or sale" under the Securities Litigation Uniform Standards Act). Plaintiffs may be able to state a claim under Section 10(b) and Rule 10(b)(5) for dissemination of fraudulent financial statements, but the dates of such statements themselves must fall within the five-year period.  [FN8] Plaintiffs may not avoid the effect of the statute of limitations by combining allegations of recent financial statements and time-barred option backdating. Because the claim under section 10(b) as currently pled depends upon such a combination, it will be dismissed. The Court will grant leave to amend so that Plaintiffs may allege independent wrongful acts that occurred on or after June 30, 2001.

FN8. The Court is skeptical of a continuing wrong theory that would create liability under Section 10(b) upon the issuance of a financial statement that merely fails to correct a prior false statement. Such a theory appears to approximate the effects of the fraudulent concealment doctrine in relation to equitable tolling, a doctrine that does not apply in the Section 10(b) context. In re Dynex Capital, Inc. Sec. Litig., No. 05 CV 1897, 2006 WL 314524 * 5 (S.D.N.Y. Feb 10, 2006), a New York district court opinion cited by Plaintiffs, does not hold to the contrary. In that case, the Court expressly distinguished a situation in which the alleged securities transaction fell within the five-year period from one in which the underlying transaction fell outside the five-year period. Dynex, 2006 WL 314524 at n. 4 (citing Shalam v. KPMG, L.L.P., No. 05 CV 3602, 2005 WL 2139928 *2 (S.D.N.Y. Sept. 6, 2005)).

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



ii. Sufficiency of the Allegations

**\*6** Section 10(b) makes it unlawful

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240. 10b-5. In cases involving publicly-traded securities and purchases or sales in public securities markets, the elements of an action under Section 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

Plaintiffs must meet two heightened pleading standards. First, Fed.R.Civ.P. 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." The Ninth Circuit has explained that a "plaintiff must include statements regarding the time, place, and nature of the alleged fraudulent activities, and that mere conclusory allegations of fraud are insufficient." In re GlenFed, Inc. Securities Litigation, 42 F.3d 1541, 1548 (9th Cir.1994). A plaintiff asserting fraud "must set forth an explanation as to why the statement or omission complained of was false or misleading." Id. (internal quotation marks omitted); see also Yourish v. California Amplifier, 191 F.3d 983, 992-93 (9th Cir.1999).

Second, the Private Securities Litigation Reform Act ("PSLRA") raises the pleading standard further:

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

**\*7** In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4b(1)-(2).

In connection with their 10(b) claim Plaintiffs allege the following:

Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

Amended Complaint ¶ 286. This allegation is insufficient to create the strong inference of scienter required by the PSLRA, even when it is viewed in light of the factual allegations found elsewhere in the Amended Complaint. Rather, Plaintiffs' pleading in its present form is characterized by conclusory, general, and non-individualized assertions as to all of the Defendants. The only individualized allegation is that Apple found in the course of its investigation that Jobs was aware of the backdating. See Amended Complaint ¶ 173. In order to meet the requirements of the PSLRA, Plaintiffs must provide more detailed allegations giving rise to a stronger inference of scienter on the part of each defendant. [FN9]

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



FN9. Plaintiffs also include allegations of scheme liability. See, e.g., Amended Complaint ¶¶ 282-83, 285. The issue of whether a scheme liability claim may be brought pursuant to § 10(b) was argued before the Supreme Court on October 9, 2007 in Stoneridge Inv. Partners, LLC v. Scientific-Atlantic, Inc., No. 05-1974. No opinion has been issued in that case to date. The Ninth Circuit has explained that: Participation in a fraudulent transaction by itself, however, is insufficient to qualify the defendant as a "primary violator" if the deceptive nature of the transaction or scheme was not an intended result, at least in part, of the defendant's own conduct. We hold that to be liable as a primary violator of § 10(b) for participation in a "scheme to defraud," the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme. It is not enough that a transaction in which a defendant was involved had a deceptive purpose and effect; the defendant's own conduct contributing to the transaction or overall scheme must have had a deceptive purpose and effect. Simpson v. AOL Time Warner Inc., 452 F.3d 1040, 1048 (9th Cir.2006). Because the Amended Complaint contains insufficient allegations that the various defendants' contributions to the overall scheme had a deceptive purpose and effect, the scheme allegations also will be dismissed. While Plaintiffs may include such allegations of scheme liability in an amended complaint, the Court has considerable doubt that Plaintiffs will be able to state a claim for scheme liability.

iii. Claim Thirteen: Violation of Section 20(a)

To state a claim under Section 20(a), a plaintiff must allege (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. Howard v. Everex Systems, Inc., 228 F.3d 1057, 1065 (9th Cir.2000). The statute of limitations analysis pertaining to the Section 10(b) claim applies equally to the Section 20(a) claim. See, e.g., In re Heritage Bond Litigation, 289 F.Supp.2d at 1148. Because Plaintiffs have failed to state a claim for a primary violation of the securities laws, this claim also will be dismissed with leave to amend.

c. Claims Under State Law

As discussed above, Plaintiffs have yet to state a federal claim that is not time-barred and that meets the heightened pleading requirements of federal law. Because the Court would lack jurisdiction to entertain Plaintiffs' state law claims in the absence of a valid federal claim, the Court need not address the sufficiency of the state law claims at this time. However, Defendants appear to raise a number of valid arguments with respect to these claims, and Plaintiffs may wish to amend the claims accordingly.

2. Motion to Dismiss for Failure to Make Demand

Apple also moves to dismiss the Amended Complaint for failure to make demand. It argues that demand is not excused because Plaintiffs' allegations do not show that a majority of the Board faces a substantial risk of liability or that the Board's independence otherwise has been compromised. In light of its conclusion that Plaintiffs have yet to state a claim for violation of federal law, the Court need not address this aspect of Defendants' motion at this time.

IV. ORDER

*8 Good cause therefor appearing, IT IS HEREBY ORDERED that Defendants' motion to dismiss for failure to state a claim is GRANTED with leave to amend, and Defendants' motion to dismiss for failure to make demand is DEFERRED. Any amended pleading shall be filed within thirty (30) days of the date of this order.

2007 WL 4170566 (N.D.Cal.), Fed. Sec. L. Rep. P 94,523

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



# EXHIBIT B

Not Reported in F.Supp.2d
(Cite as: 2007 WL 1438738 (D.Ariz.))
<KeyCite Citations>

Page   13

Only the Westlaw citation is currently available.

United States District Court,
D. Arizona.

**Charles BESHEARS, Plaintiff,**
v.
**PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY, a foreign corporation;
and Unum-
Provident Corporation, a foreign corporation,
Defendants.**

**No. CV-07-00292-PHX-DGC.**

May 15, 2007.

Alan N. Ariav, Renaud Cook Drury Mesaros P.A., Phoenix, AZ, for Plaintiff.

Scott Michael Bennett, Stephen M. Bressler, Lewis & Roca LLP, Phoenix, AZ, for Defendants.

ORDER

DAVID G. CAMPBELL, United States District Judge.

*1 Defendants have filed a motion to dismiss three claims in Plaintiff's complaint. Dkt. # 14. The Court has reviewed the memoranda submitted by the parties. Dkt. 14-16. For the reasons discussed below, the Court will grant the motion to dismiss.

I. Background.

In 1993, Plaintiff purchased from Defendants a disability insurance policy for benefits if he became (1) unable to do one or more of his substantial and material business duties, (2) received appropriate care from a physician, and (3) proved a monthly income loss of at least 20%. Dkt. # 1, Ex. 2. The policy provided that Plaintiff must meet these requirements for an Elimination Period of 180 days before he would begin receiving payments. Id. Defendants acknowledge that Plaintiff is now disabled and are paying him benefits. Id. ¶ 26. The parties disagree, however, on when the Elimination Period expired. Plaintiff claims he was denied benefits for a period of at least 12 months and is owed a minimum of $72,000 plus interest. Id.

Plaintiff's complaint does not enumerate each count against Defendants, but includes claims for breach of contract, common law fraud, negligent misrepresentation, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, violation of the Arizona Consumer Fraud Act ("ACFA") (codified at A.R. S. § § 44-1521 et seq.), and racketeering in violation of A.R.S. § 13-2312. Id. at ¶¶ 59-73. Defendants move to dismiss the claims for common-law fraud and violation of A.R.S. § 13-2312 under Rule 9(b) of the Federal Rules of Civil Procedure, and the ACFA claim under Rules 9(b) and 12(b)(6). Dkt. # 14.

II. Discussion.

1. Common Law Fraud.

To prevail on a fraud claim under Arizona law, a claimant must show:

1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of the representation's falsity or ignorance of its truth; 5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; 6) the hearer's ignorance of its falsity; 7) the hearer's reliance on its truth; 8) the right to rely on it; and 9) his consequent and proximate injury.

Echols v. Beauty Built Homes, 647 P.2d 629, 631 (Ariz.1982); see Haisch v. Allstate Ins. Co., 5 P.3d 940, 944 (Ariz.Ct.App.2000).

Defendants argue that Plaintiff failed to plead his fraud claim with the particularity required by Rule 9(b). Under this rule, a plaintiff "must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." Schreiber Distrib. Co. v. ServWell Furniture Co., 806 F.2d 1393, 1401 (9th Cir.1986); see also Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.2003) ( "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged."); Lancaster Cmty. Hosp. v. Antelope Valley Dist., 940 F.2d 397, 405 (9th Cir.1991) (Rule 9(b) "requires a pleader of fraud to detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme.").

*2 Plaintiff's complaint alleges that "Defendants

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d                                                      Page  14
(Cite as: 2007 WL 1438738, *2 (D.Ariz.))

made material misrepresentations to the Plaintiff in 1993 when he purchased his policy" and that "Defendants defrauded the Plaintiff by informing him when he purchased the Policy that he would be paid disability benefits as soon as the Elimination Period expired." Dkt. # 1 ¶¶ 31, 61. These allegations do not satisfy the particularity requirements of Rule 9(b). They do not allege which employee or type of employee made fraudulent statements to Plaintiff before he purchased his policy. While Plaintiff's response asserts that fraudulent statements were made by Defendants' "agents, including Brian P. Chabot" (Dkt. # 15 at 6), the complaint itself does not include these allegations. Additionally, the complaint fails to allege which Defendant made which fraudulent statements. See Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th Cir.2007) ("In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme.") (internal quotations and alterations omitted). Although Defendant Unum-Provident Corporation is the parent company of Defendant Provident Life and Accident Insurance Company, Plaintiff alleges that the fraudulent actions "were committed by employees of both corporations acting within the course and scope of their employment with both companies." Dkt. # 1 at 1-2. Plaintiff must therefore describe which Defendant took which allegedly fraudulent action.

The complaint also fails to describe the content of the alleged misrepresentations and why they were false. "To meet the Rule 9(b) particularity requirement, a plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." Orthologic Corp. v. Columbia/HCA Healthcare Corp., No. CIV 0 1-0006-PHX-SRB, 2002 WL 1331735 at *2 (D.Ariz. Jan. 7, 2002) (citing Yourish v. California Amplifier, 191 F.3d 983, 993 (9th Cir.1999)); see also Williamson v. Allstate Insurance Co. 204 F.R.D. 641, 645 (D.Ariz.2001) (dismissing counts of fraud when Plaintiff failed to set forth the content of alleged misrepresentations or why they were false).

Plaintiff only once refers to an allegedly fraudulent statement made before he purchased his policy--that Defendants told him he would receive disability benefits upon expiration of the Elimination Period. Dkt. # 1 ¶ 31. But Plaintiff never explains the details behind this statement, including its content, how it was communicated, or why it was false. Plaintiff's complaint identifies a disagreement about the date the Elimination Period started, an issue that will be addressed in the breach of contract claim, but it does not plead fraud with particularity.

Plaintiff argues that he could not have pled with more specificity because "Defendant insurance companies have the claim file that they have not yet disclosed to Beshears[.]" Dkt. # 15 at 4 (citing Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir.1993) (stating that a plaintiff in an insider-trading case was not expected to "plead with the specificity Rule 9(b) requires without allowing some limited opportunity for discovery")). Plaintiff apparently believes that he may satisfy Rule 9(b) by alleging that the necessary information lies in the Defendants' exclusive control. Id. at 4-5 (citing Shapiro v. UJB Financial Corp., 964 F.2d 272, 285 (3d Cir.1992); United States ex rel. Russell v. Epic Healthcare Mgmt. Group, 193 F.3d 304, 308 (5th Cir.1999); Wool v.. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir.1987)). But Plaintiff, as the recipient of the allegedly fraudulent statements and the person who relied on them, should be able to describe the statements, who made them, and why they were false. In any event, Plaintiff's complaint does not allege that Defendants have exclusive control of information Plaintiff needs to plead his claim, a necessary allegation under his own cases. See Shapiro, 964 F.2d at 285. Nor does Plaintiff explain why the claim file, which includes claim-related documents that arose a decade after the policy was issued, is likely to contain information about statements made by Defendants before the policy was issued. [FN1]

FN1. Plaintiff's complaint alleges that Defendants made false statements "when he purchased his policy, and in subsequent years after the Policy was already in effect." Dkt. # 1, ¶ 61. Plaintiff never specifies these subsequent statements, but they could not have been relied upon by Plaintiff in entering into the policy, a necessary requirement of fraud.

2. Consumer Fraud.

*3 Defendants argue that Plaintiff's ACFA claim

Westlaw.

is insufficient for the same reasons as the common law fraud claim. Dkt. # 14 at 8. The required elements of a private ACFA claim are "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury." Holeman v. Neils, 803 F.Supp. 237, 242 (D.Ariz.1992). The particularity requirement of Rule 9(b) applies to ACFA claims. Williamson, 204 F.R.D. at 643-44. For the reasons discussed above, Plaintiff has not described the allegedly false promises or misrepresentations with the particularity required by Rule 9(b). The Court will therefore dismiss the ACFA claim.

### 3. Racketeering.

Plaintiff asserts that "Defendants engaged in racketeering ... in violation of A.R.S. § 13-2312, by denying Plaintiff's disability benefits and similarly denying other insureds' disability benefits," and that Defendants "have a history of wrongfully denying disability income benefits to their insureds throughout the country." Dkt. # 1 ¶ 71. Defendants argue that the statute cited in the complaint is criminal and does not create a private right of action, noting that Plaintiff presumably meant to assert his claim under A.R. S. § 13-2314.04, which creates a civil cause of action and requires particularity in pleading. A.R. S. § 13-2314.04(R) ("If any pleading, motion or other paper includes an averment of fraud or coercion, it shall state these circumstances with particularity with respect to each defendant.").

Plaintiff concedes that the racketeering claim should have been brought under A.R. S. § 13-2314.04, analogizes Arizona's racketeering statute to federal RICO statutes, and argues that his claim should not be dismissed when he has had no opportunity for discovery. Dkt. # 15 at 10 (citing Hurst v. Sears, Roebuck & Co., 613 F.Supp. 1210 (D.C.Pa.1985)). Plaintiff also cites Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786 (3d Cir.1984), for the proposition that a plaintiff alleging a racketeering claim need not allege the "date, place, or time" to satisfy the particularity requirements of Rule 9(b).

For the reasons discussed above, Plaintiff has failed to plead his racketeering-related allegations of fraud with particularity. He has also failed to state

any basis for his allegation that "Defendants have a history of wrongfully denying disability income benefits to their insureds throughout the country." Dkt. # 1 ¶ 71. Plaintiff's complaint therefore fails to satisfy the particularity requirements of A.R.S. § 13-2314.04.

IT IS ORDERED that Defendants' Motion to Dismiss (Dkt.# 14) is granted. Plaintiff's Complaint (Dkt.# 1) is dismissed in part as set forth above.

2007 WL 1438738 (D.Ariz.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

# EXHIBIT C

Slip Copy                                                                                      **Page  17**
(Cite as: 2007 WL 3165535 (E.D.Cal.))
<KeyCite History>

Only the Westlaw citation is currently available.

United States District Court,
E.D. California.

**BOBLOS'S INC., dba Trino's Lounge and Pablo
Sanchez, Plaintiffs,
v.
The BURLINGTON INS. CO. and Does 1
through 50 inclusive, Defendants.**

No. Civ. S-07-894 RRB DAD.

Oct. 25, 2007.

Mark Stewart Axup, Law Offices of Mark S.
Axup, Sacramento, CA, for Plaintiffs.

Richard C. Rey, II, Weston and McElvain LLP,
Los Angeles, CA, for Defendant.

Memorandum of Opinion and Order

RALPH R. BEISTLINE, United States District
Judge.

*1 Boblo's, Inc., dba Trino's Lounge and Pablo
Sanchez (collectively "Plaintiffs") filed a state action
against Burlington Insurance Company
("Burlington") alleging that Burlington wrongly
refused to defend and indemnify Plaintiffs in an
action arising out of an altercation between agents
and/or employees of Trino's Lounge and one of
their patrons. Burlington removed the action to
federal court on the basis of diversity. Burlington
now moves to dismiss the second, third, fourth,
fifth, sixth, seventh, eighth and ninth claims for
relief alleged in the First Amended Complaint
("FAC") for failure to state a claim under Rule
12(b)(6). For the following reasons, the motion is
GRANTED in part and DENIED in part. [FN1]

> FN1. Inasmuch as the Court concludes the parties
> have submitted memoranda thoroughly discussing
> the law and evidence in support of their positions, it
> further concludes oral argument is neither necessary
> nor warranted with regard to the instant matter. See
> Mahon v. Credit Bureau of Placer County, Inc.,
> 171 F.3d 1197, 1200 (9th Cir.1999) (explaining that
> if the parties provided the district court with
> complete memoranda of the law and evidence in

support of their positions, ordinarily oral argument
would not be required).

**I. BACKGROUND**

Plaintiffs own and operate Trino's Lounge, a bar/
restaurant located in Sacramento County. FAC ¶ 3.
Plaintiffs purchased a liability insurance policy from
Burlington covering the operations at Trino's
Lounge. Id. ¶¶ 5, 7. On or about September 14,
2003, Domonick Robles ("Robles"), a patron of
Trino's Lounge, was injured following an
altercation with agents and/or employees of Trino's
Lounge. Id. ¶ 9. Mr. Robles subsequently filed an
action against Plaintiffs in Sacramento Superior
Court, alleging negligence and intentional tort
claims. Id. Plaintiffs tendered defense of this action
to Burlington but, after a purported investigation,
Burlington denied coverage and informed Plaintiffs
that it would not provide a defense under a
reservation of rights. Id. ¶ 10.

On or about April 12, 2007, Plaintiffs filed a state
action in Sacramento Superior Court, Notice of
Removal ¶ 1, alleging the following claims: (1)
breach of contract; (2) breach of the implied
covenant of good faith and fair dealing; and (3)
fraud. Compl. ¶¶ 1-34. On May 11, 2007, Plaintiffs
removed the action to federal court on the basis of
diversity. Notice of Removal ¶¶ 4-8. On May 17,
2007, Burlington moved to dismiss Plaintiffs' fraud
claim for failure to state a claim for relief under
Rule 12(b)(6). Mot. to Dismiss at 3-11. On July 20,
2007, Burlington's motion was granted under Rule
9(b) for failure to plead averments of fraud with
particularity. Docket at 10.

On August 17, 2007, Plaintiffs filed an amended
Complaint alleging the following claims: (1) breach
of contract; (2) breach of the implied covenant of
good faith and fair dealing; (3) tortious or bad faith
refusal to provide benefits and services due under an
insurance contract; (4) tortious or bad faith refusal
to pay benefits due under an insurance policy; (5)
breach of fiduciary duty; (6) intentional interference
with protective property interest; (7) intentional
infliction of emotional distress; (8) deceit; and (9)
declaratory relief. FAC ¶¶ 1-54. Burlington now
moves to dismiss each and every claim in the FAC,
except the breach of contract claim, pursuant to Rule
12(b)(6). Mot. to Dismiss 2-17.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw®

## II. DISCUSSION
### A. Rule 12(b)(6)

*\*2* "A Rule 12(b)(6) motion tests the legal sufficiency of a claim. A claim may be dismissed only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " Navarro v. Block, 250 F.3d 729, 732 (9th Cir.2001). Dismissal pursuant to Rule 12(b)(6) is appropriate where there is no cognizable legal theory or there is an absence of sufficient facts alleged to support a cognizable legal theory. Id. The issue is not whether a plaintiff is likely to succeed on the merits but rather whether the claimant is entitled to proceed beyond the threshold in attempting to establish his or her claims. De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir.1978).

In considering a Rule 12(b)(6) motion, the allegations in the complaint must be construed in the light most favorable to the plaintiff, Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir.1995), and the court accepts all material allegations as true, as well as all reasonable inferences to be drawn from them. Navarro, 250 F.3d at 732; Pareto v. FDIC., 139 F.3d 696, 699 (9th Cir.1998). The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.2001). Nor do courts assume the truth of legal conclusions merely because they are cast in the form of factual allegations, Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.1981), or that a plaintiff can prove facts different from those it has alleged. Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, Inc., 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1401 (9th Cir.1986); see Thinket Ink Information Resources, Inc. v. Sun Micorsystems, Inc., 368 F.3d 1053, 1061 (9th Cir.2004) (leave to amend should be granted unless amendment would

be futile, i.e., the complaint can not be saved by amendment).

### B. Motion to Dismiss

Burlington seeks to dismiss each and every claim in the FAC, except the breach of contract claim, pursuant to Rule 12(b)(6). Plaintiffs' claims are discussed individually below.

### 1. Breach of the Implied Covenant of Good Faith and Fair Dealing

Burlington argues that dismissal of this claim is appropriate because Plaintiffs did not allege that Burlington acted unreasonably or in bad faith in withholding benefits under the policy.

"Every contract imposes on each party an implied duty of good faith and fair dealing," which mandates that "neither party will do anything which will injure the right of the other to receive the benefits of the agreement." Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co., 90 Cal.App.4th 335, 345, 108 Cal.Rptr.2d 776 (2001) (quotation marks omitted); Amadeo v. Principal Mut. Life Ins. Co. 290 F.3d 1152, 1158 (9th Cir.2002). All insurance contracts include the implied covenant of good faith and fair dealing. See Century Surety Co. v. Polisso, 139 Cal.App.4th 922, 948, 43 Cal.Rptr.3d 468 (2006). "When the insurer engages in unreasonable conduct in connection with an insured's insurance claim, the insurer is said to have tortiously breached the implied covenant." Id.

*\*3* In the context of insurance contracts, "the insurer's responsibility to act fairly and in good faith with respect to the handling of the insured's claim is not the requirement mandated by the terms of the policy itself--to defend, settle, or pay, but rather, to act fairly and in good faith in discharging its contractual responsibilities." Chateau Chambaray, 90 Cal.App.4th at 346, 108 Cal.Rptr.2d 776 (quotation marks omitted). " 'Thus, allegations which assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.' " Id.

In the present case, Plaintiffs' claim of bad faith is premised upon Burlington's failure to timely and properly investigate and defend the underlying action. FAC ¶ 21. The ultimate test of bad faith liability is whether the refusal to pay policy benefits was unreasonable. Chateau Chamberay, 90 Cal.App.4th at 346, 108 Cal.Rptr.2d 776; Amadeo, 290 F.3d at 1161. "Tort liability for an insurer's breach of the implied covenant of good faith and fair dealing arises when the insurer unreasonably and in bad faith withholds payment of the insured's claim." Benavides v. State Farm General Ins. Co., 136 Cal.App.4th 1241, 1249, 39 Cal.Rptr.3d 650 (2006). To establish an implied covenant tortious breach, an insured must show that: (1) benefits were due under the policy, and (2) that the benefits were withheld without proper cause. Id. at 1250, 39 Cal.Rptr.3d 650. " '[A]n insurer cannot reasonably and in good faith deny payments to its insured without fully investigating the grounds for its denial.' " Id.; Frommoethelydo v. Fire Ins. Exchange, 42 Cal.3d 208, 215, 228 Cal.Rptr. 160, 721 P.2d 41 (1986); Egan v. Mutual of Omaha Ins. Co., 24 Cal.3d 809, 818-19, 169 Cal.Rptr. 691, 620 P.2d 141 (1979); see Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc., 78 Cal.App.4th 847, 879-80, 93 Cal.Rptr.2d 364 (2000) (the covenant of good faith and fair dealing entails a duty to investigate properly submitted claims and the adequacy of the investigation is one of the most critical factors bearing on the insurer's good faith). Thus, an insurer's breach of the implied covenant of good faith and fair dealing is established if an insurer fails to properly investigate an insured's claim. Egan, 24 Cal.3d at 819, 169 Cal.Rptr. 691, 620 P.2d 141; see Jordan v. Allstate Ins. Co., 148 Cal.App.4th 1062, 1074, 56 Cal.Rptr.3d 312 (2007) (where an insurer denies coverage but a reasonable investigation would have disclosed facts showing the claim was covered, the insurer's failure to investigate breaches its implied covenant).

In the instant case, the allegations in the FAC are sufficient to state a claim for breach of the implied covenant of good faith and fair dealing. The FAC alleges that Burlington had a duty under the policy to investigate and defend the underlying claim and

that it breached this duty by failing to properly and timely investigate and defend such claim. Thus, the FAC effectively alleges that Burlington breached the implied covenant by withholding policy benefits without properly investigating Plaintiffs' claim, i.e., Burlington breached the implied covenant by withholding policy benefits without proper cause. Such allegations are sufficient to survive a motion to dismiss.

**\*4** For this reason, dismissal is not warranted with respect to this claim.

2. Bad Faith Refusal to Provide Benefits

Burlington argues that Plaintiffs' third, [FN2] fourth [FN3] and sixth claims [FN4] for relief should be dismissed because the allegations supporting these claims are duplicative of the bad faith alleged in the implied covenant claim.

> FN2. Plaintiffs' third claim for relief is titled "Tortious Or Bad Faith Refusal To Provide Benefits And Services Due Under Insurance Policy."

> FN3. Plaintiffs' fourth claim for relief is titled "Tortious Or Bad Faith Refusal To Pay Benefits Due Under Insurance Policy."

> FN4. Plaintiffs' sixth claim for relief is titled "Intentional Interference With Protective Property Interest."

Although Plaintiffs' third and fourth claims for relief are styled as claims for "Bad Faith Refusal To Provide Benefits And Services Due Under Insurance Policy" and "Bad Faith Refusal To Pay Benefits Due Under Insurance Policy," these claims are more appropriately evaluated as claims for tortious breach of the implied covenant of good faith and fair dealing. See Hand v. Farmers Ins. Exchange, 23 Cal.App.4th 1847, 1854-55, 29 Cal.Rptr.2d 258 (1994). Similarly, although Plaintiffs' sixth cause of action is styled as a claim for "Intentional Interference With Protective Property Interest," it is more appropriately evaluated as a claim for tortious breach of the implied covenant of good faith and fair dealing. This is because " 'tortious interference with a protected property interest' is understood as a constituent component of the tort of breach of the covenant of good faith and fair dealing, rather than an independent cause of action. Valley Air

Conditioning & Repair, Inc. v. Beneficial Life Ins. Co., 2007 WL 2758018, * 3 (E.D.Cal.2007).

For these reasons, Plaintiffs' third, fourth and sixth claims for relief are dismissed.

### 3. Breach of Fiduciary Duty

Burlington argues that dismissal of this claim is appropriate because California does not recognize a cause of action for breach of fiduciary duty arising out of the insurer-insured relationship.

The insurer-insured relationship is not a true fiduciary relationship; rather, it is a relationship often characterized by unequal bargaining power in which the insured must depend on the good faith and performance of the insurer. Vu v. Prudential Property & Casualty Ins. Co., 26 Cal.4th 1142, 1150-51, 113 Cal.Rptr.2d 70, 33 P.3d 487 (2001). "This characteristic has led the courts to impose special and heightened' duties, but [w]hile these special duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, not because the insurer is a fiduciary." Id. at 1151, 113 Cal.Rptr.2d 70, 33 P.3d 487 (quotation marks omitted, emphasis in original); see Tran v. Farmers Group, Inc., 104 Cal.App.4th 1202, 1212, 128 Cal.Rptr.2d 728 (2002) (observing that California courts have refrained from characterizing the insurer-insured relationship as a fiduciary one and that an insurer's breach of its "fiduciary-like duties" is adequately redressed by a claim for breach of the covenant of good faith and fair dealing implied in the insurance contract); see also Solomon v. North American Life & Cas. Ins. Co., 151 F.3d 1132, 1138 (9th Cir.1998) (holding that while the insurer-insured relationship is fiduciary in nature, it does not provide for an independent action for common law breach of fiduciary duty).

**\*5** Accordingly, because the insurer-insured relationship does not provide for an independent cause of action for breach of fiduciary duty, this claim is dismissed. See Almon v. State Farm Fire & Cas. Co., 724 F.Supp. 765 (S.D.Cal.1989) ("California law does not recognize an action for breach of fiduciary duty between an insured and an insurer."); see also Valley Air Conditioning & Repair, 2007 WL 2758018 at * 2.

### 4. Intentional Infliction of Emotional Distress

Defendant argues that dismissal of this claim is appropriate because the FAC does not allege that Burlington committed acts that were "so extreme as to exceed all bounds of that usually tolerated in a civilized community." [FN5]

> FN5. This claim is only alleged against Burlington by Pablo Sanchez.

"The elements of a prima facie case for the tort of intentional infliction of emotional distress are: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Fletcher v. Western National Life Ins. Co., 10 Cal.App.3d 376, 394, 89 Cal.Rptr. 78 (1970); Ross v. Creel Printing & Publishing Co., 100 Cal.App.4th 736, 744-45, 122 Cal.Rptr.2d 787 (2002). To support a claim for intentional infliction of emotional distress against an insurer, the plaintiff must allege conduct exceeding all bounds usually tolerated by a decent society especially calculated to cause mental distress of a very serious kind. Christensen v. Superior Court, 54 Cal.3d 868, 904-05, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991). Mere "delay or denial of insurance claims is not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress." Coleman v. Republic Indem. Ins. Co., 132 Cal.App.4th 403, 417, 33 Cal.Rptr.3d 744 (2005).

In the present case, the FAC alleges that Burlington knew that Plaintiffs were relying upon the benefits owed under the policy and that Burlington acted outrageously, with the intent of inflicting severe emotional distress, by wrongfully withholding these benefits. Such pleading is insufficient to state a claim for intentional infliction of emotional distress. This is because the conduct alleged is not the type of conduct that is so outrageous that it exceeds all bounds of that usually tolerated by a civilized community. Additionally, the pleading in this regard is deficient because there is no allegation that Pablo Sanchez suffered severe or emotional distress.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



For these reasons, this claim is dismissed.

### 5. Deceit

Burlington argues that dismissal of this claim is appropriate because the fraud allegations in the FAC do not satisfy the heightened pleading requirements of Rule 9(b).

In diversity cases, federal courts will look to state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action. Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir.2003). However, in state-law causes of action, federal courts will follow Rule 9(b)'s requirement that the circumstances of the fraud must be stated with particularity. Id. [FN6] Rule 9(b) imposes a heightened pleading requirement for fraud allegations in order to safeguard defendant's reputation and goodwill from improvident charges of wrongdoing. Id. at 1104.

> FN6. Rule 9(b) states that "[in] all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

**\*6** Under California law, " '[t]he elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " Lazar v. Superior Court, 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996); Small v. Fritz Companies, Inc., 30 Cal.4th 167, 173, 132 Cal.Rptr.2d 490, 65 P.3d 1255 (2003); City Solutions, Inc. v. Clear Channel Communications, 365 F.3d 835, 839 (9th Cir.2004). Promissory fraud is a subspecies of fraud and deceit and where a promise is made without the intention to perform, there is an implied misrepresentation of fact that may be actionable fraud. Lazar, 12 Cal.4th at 638, 49 Cal.Rptr.2d 377, 909 P.2d 981. "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." Id.

"Federal Rule of Civil Procedure 9(b) requires a pleader of fraud to detail with particularity the time, place, and manner of each act of fraud, plus the role

of each defendant in each scheme." Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir.1991). Allegations of fraud should specifically include "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir.2007); see Vees v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.2003) ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged"). In alleging fraud, " 'a plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false.' " Id. (emphasis in original) (quoting In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir.1994) (en banc), superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F.Supp. 1297, 1309 (C.D.Cal.1996)). "Rule 9(b) 'requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.' " Schreiber Distributing Co., 806 F.2d at 1400; Swartz, 476 F.3d at 764.

Burlington argues that the allegations in the FAC are insufficient to support a cognizable claim for deceit because the circumstances of deceit are not pled with particularity as required by Rule 9(b). The court agrees. The allegations in the FAC are insufficient to state a claim for deceit because there is no account of the time, place, and specific content of the false or misleading representations. Nor do the allegations sufficiently identify who actually made the representations or explain why such representations were false or misleading. Rather, the allegations refer generally to "defendants" without attributing any specific misconduct to Burlington and simply state that at the time the insurance policy was issued, "defendants" made promises to provide benefits to Plaintiffs, which "defendants" had no intention of performing. Such pleading is insufficient to satisfy the heightened pleading requirements of Rule 9(b). For these reasons, this claim is dismissed.

### 6. Declaratory Relief

**\*7** Defendant argues that dismissal of this claim is appropriate because the issues raised therein will be

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



resolved by the breach of contract claim.

28 U.S.C.A. § 2201(a) states, in relevant part, that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." "[W]hen other claims are joined with an action for declaratory relief (e.g., bad faith, breach of contract ...), the district court should not, as a general rule, remand or decline to entertain the claim for declaratory relief." American Cas. Co. of Reading, Pennsylvania v. Krieger, 181 F.3d 1113, 1119 (9th Cir.1999); Government Employees Ins. Co.  v. Dizol, 133 F.3d 1220, 1225 (9th Cir.1998); Snodgrass v. Provident Life and Acc. Ins. Co., 147 F.3d 1163, 1167 (9th Cir.1998).

For this reason, dismissal is not warranted with respect to this claim.

### III. CONCLUSION

For the reasons stated above, the motion to dismiss is GRANTED in part and DENIED in part. Dismissal is DENIED with respect to Plaintiffs' second and ninth claims for relief and is GRANTED with respect to Plaintiffs' third, fourth, fifth, sixth, seventh and eighth claims for relief. While Plaintiffs have the option of moving to amend to address issues raised herein, the Court is not inclined to permit duplicative pleadings wherein the same essential claims are made under different theories unless some basis therefore can be established.

IT IS SO ORDERED.

ENTERED this 24th day of October, 2007.

2007 WL 3165535 (E.D.Cal.)

**END OF DOCUMENT**

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



# EXHIBIT D

Slip Copy
(Cite as: 2007 WL 3047093 (S.D.Cal.))
Page  24

&lt;KeyCite History&gt;

Only the Westlaw citation is currently available.

United States District Court,
S.D. California.

MAT-VAN, INC.; Luman N. Nevels, Jr.; 1DB
Corporate Retreat, Ltd., Plaintiffs,
v.
SHELDON GOOD & COMPANY AUCTIONS,
LLC; Sheldon Good & Company Auctions; and
Does
1 to 30, Defendants.

No. 07-CV-912-IEG (BLM).

Oct. 16, 2007.

ORDER: 1) GRANTING DEFENDANTS'
MOTION TO DISMISS [Doc. No. 17]; 2)
DENYING
DEFENDANTS' MOTION TO STRIKE REQUEST
FOR PUNITIVE DAMAGES [Doc. No. 17]; and 3)
GRANTING PLAINTIFFS LEAVE TO FILE AN
AMENDED COMPLAINT

IRMA E. GONZALEZ, Chief Judge.

*1 Presently before the court is a motion to
dismiss plaintiffs' First Amended Complaint
("FAC," Doc. No. 16) and a motion to strike
plaintiffs' claim for punitive damages filed by
Sheldon Good & Company Auctions, LLC and
Sheldon Good & Company Auctions (collectively
"defendants"). (Doc. No. 17 & 19.) For the
following reasons, the court grants defendants'
motion to dismiss, denies defendants' motion to
strike, and grants plaintiffs leave to file an amended
complaint.

BACKGROUND

Factual Background

Defendants are auction companies that are
incorporated in Delaware and have their principal
place of business in Illinois. Mat-Van, Inc. ("Mat-
Van"), Luman N. Nevels Jr. ("Nevels"), and 1DB
Corporate Retreat, Ltd. ("1DB"), (collectively
"plaintiffs") each own island properties, which they
wished to sell. This action arises out of contracts
between defendants and each plaintiff where

defendants agreed to auction plaintiffs' three resort
islands. (FAC ¶¶ 6, 8, & 9.)

According to the complaint, defendants
approached plaintiffs with a plan to set up a
worldwide auction where plaintiffs could sell their
three islands along with two to four other sellers.
(Id. ¶ 9.) Plaintiffs allege that defendants
represented there would be a minimum of five
properties for sale at the auction and each owner
would contribute $100,000 per island, for a total of
$500,000. (Id.) Defendants further assured plaintiffs
that there was public interest in such an auction and
represented that other sellers had been turned away.
(Id.) After signing written contracts, plaintiffs each
gave defendants $100,000 for marketing and auction
purposes.

The auction did not turn out to be the success
plaintiffs hoped for, as none of the island properties
were purchased. (Id. ¶ 15.) Plaintiffs also
discovered that, contrary to defendant's alleged
representation, another seller did not contribute
$100,000 per island to the marketing funds, but
only contributed $50,000 per island for two islands.
(Id. ¶ 11.) Thus, there was only $400,000 in total
available advertising assets and not the $500,000
assured by defendants. Defendants have not
provided an accounting of the funds expended on
promotion of the auction despite repeated requests
by plaintiffs. (Id. ¶ 15.) Plaintiffs allege defendants
misrepresented: 1) the contribution requirements for
the sellers at the auction; 2) the total amount of
money to be spent on marketing; 3) and that there
was public interest in such an auction and other
island properties had been rejected. (Id. ¶ 9.)

Procedural Background

On April 5, 2007, plaintiffs filed a two-count
complaint in the Superior Court of California for
the County of San Diego, alleging: 1) fraud; and 2)
breach of contract. (Doc. No. 1, Notice of
Removal, Exhibit A, p. 3-4.) Plaintiffs effected
service by mail on April 21, 2007. (Id. ¶ 2.)

On May 21, 2007, defendants timely filed a notice
of removal to the United States District Court for
the Southern District of California. On June 1,
2007, defendants filed an ex parte application for an
extension of time to file a responsive pleading,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
(Cite as: 2007 WL 3047093, *1 (S.D.Cal.))

which was originally due on May 29, 2007. (Doc. No. 6.) Plaintiffs filed an opposition, (Doc. No. 7), and the court denied defendants' ex parte application on June 13, 2007. (Doc. No. 8.)

*2 On June 19, 2007, defendants filed a motion to dismiss plaintiffs' fraud cause of action and a motion to strike plaintiffs' claim for punitive damages. (Doc. No. 10.) This court granted the motion to dismiss with leave to amend and denied the motion to strike as moot on July 27, 2007. (Doc. No. 15.)

Plaintiffs filed a First Amended Complaint on August 10, 2007 (Doc. No. 16). Defendants filed a motion to dismiss the first amended complaint on August 20, 2007 (Doc. No. 17) and a motion to strike the request for punitive damages on August 22, 2007 (Doc No. 19). Plaintiffs filed an opposition to these motions on September 25, 2007, (Doc. No. 21) and defendants filed a reply on October 2, 2007 (Doc. No. 22). The court finds that the matter is now fully briefed and amenable for disposition without oral argument pursuant to Local Rule 71.1(b).

## DISCUSSION

1.  Defendants' Motion to Dismiss the First Amended Complaint

### Legal Standard

A motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. Fed. R. Civ. Proc. 12(b)(6); Navarro v. Block, 250 F.3d 729, 731 (9th Cir.2001). To survive a Rule 12(b)(6) motion, a complaint generally must satisfy only the minimal notice pleading requirements of Fed. R. Civ. Pro. 8(a)(2); Porter v. Jones, 319 F.3d 483, 494 (9th Cir.2003). A court may dismiss a complaint for failure to state a claim when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Navarro, 250 F.3d at 732 (citing Conley ). In other words, a Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir.1988).

In deciding a motion to dismiss for failure to state a claim, the court's review is generally limited to the contents of the complaint. Campanelli v. Bockrath, 100 F.3d 1476, 1479 (9th Cir.1996); Allarcom Pay Television, Ltd.    v. General Instrument Corp., 69 F.3d 381, 385 (9th Cir.1995). The court must accept all factual allegations pled in the complaint as true, and must construe them and draw all reasonable inferences from them in favor of the nonmoving party. [FN1] Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337-38 (9th Cir.1996); Mier v. Owens, 57 F.3d 747, 750 (9th Cir.1995) (citing Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir.1987). In spite of the deference the court is bound to pay to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983). Furthermore, a court is not required to credit conclusory legal allegations cast in the form of factual allegations, "unwarranted deductions of fact, or unreasonable inferences." Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.2001); W. Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.1981), cert. denied, 454 U.S. 1031 (1981).

> FN1. Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. Wheeldin v. Wheeler, 373 U.S. 647, 648 (1963) (inferring fact from allegations of complaint).

*3 A court may dismiss a complaint without granting leave to amend only if it appears with certainty that the plaintiff cannot state a claim and any amendment would be futile. See Fed.R.Civ.P. 15(a) (stating that leave to amend "shall be freely given when justice so requires"); DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir.1992); Schreiber Distrib. Co.    v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir.1986) (stating "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency").

### Analysis

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Fraud in the Inducement/Promissory Fraud

Plaintiffs' first claim is titled "Fraud in the inducement." (Compl. at 2.) Defendants argue the fraud claim lacks non-conclusory allegations of fraudulent intent and thus does not state a "promissory fraud" claim. (Memo. ISO Motion at 3.) Plaintiffs respond that "[b]ecause the statements were false when made, they are actionable regardless of whether defendants harbored an intention to perform or not perform them at the time the contract was signed or at some later point in time." (Opp'n at 2.) Defendants' reply maintains the position that the complaint must couple allegations of promises made with allegations of simultaneous intent not to perform. (Reply at 3.) The California Civil Code defines fraudulent deceit to include both (1) promises made without intent to perform, and/or (2) statements of fact made which were known to be false.   Cal. Civ.Code  § 1710(1) & (4). If the complaint states either of these claims, a dismissal is inappropriate.

In diversity cases such as the instant case, the substantive elements of fraud are determined by state law but the complaint must conform with the requirements of the Federal Rules of Civil Procedure. Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.2003). Generally under the Federal Rules, factual allegations need only meet the minimal pleading requirements of Rule 8(a) except in particular cases such as a fraud claim, where allegations must meet the heightened pleading requirements of Rule 9(b).   Rubke v. Capitol Bancorp Ltd., 460 F.Supp.2d 1124, 1134 (N.D.Cal.2006). Rule 9(b) states "the circumstances constituting fraud or mistake shall be stated with particularity."   [FN2]   Fed.R.Civ.P.  9(b). Allegations of fraud must be specific enough to give "defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir.2001). Rule 9(b) "requires pleading facts that by any definition are 'evidentiary': time, place, persons, statements made, explanation of why or how such statements are false or misleading." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 n. 7 (9th Cir.1994). Furthermore, Rule 9(b) "require[s] plaintiffs to differentiate their allegations when suing more than one defendant ... and inform each

defendant separately of the allegations surrounding his alleged participation in the fraud."   [FN3] Swartz v. KPMG LLP, 476 F.3d 756, 764-65 (9th Cir.2007).

> FN2. "A motion to dismiss a ... claim ... under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim.... Because a dismissal of a complaint or claim grounded in fraud for failure to comply with Rule 9(b) has the same consequence as a dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner." Vess, 317 F.3d at 1107-08.

> FN3. In a lawsuit involving multiple defendants, "a plaintiff must, at a minimum, identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme." Swartz, 476 F.3d at 765.

*4 Having reviewed the allegations in plaintiffs' first cause of action, the court finds the requirements of Rule 9(b) have not been met.

First, the complaint lumps the two defendants together without alleging the role or participation of each defendant in the fraud as required under the heightened pleading requirements for fraud. See Moore v. Kayport Package Express, Inc., 885 F.2d 531, 541 (9th Cir.1989); Swartz, 476 F.3d at 764-65. The first amended complaint alleges that co-defendants are "one and the same [,]operating through the same offices and the same officers and employees on the same transactions." (FAC ¶ 6.) In Swartz, the Ninth Circuit held "patently" insufficient allegations that two defendants acted as "agents" in the fraud or "participants in the conspiracy" with the other defendants. 476 F.3d at 764-65. In order to comply with Rule 9(b), plaintiffs were required to provide a "stated factual basis" for these allegations. Id. Plaintiffs' reliance on Wool v. Tandem Computers Inc., 818 F.2d 1433 (9th Cir.1987), is misplaced. The Ninth Circuit in that case permitted " 'all defendants' language" because "[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, [etc.] ... it is reasonable to presume that these are the collective actions of the officers." Id. at 1440. In this case, no such presumption arises. Plaintiffs have not pled any facts which suggest that David Latvaaho, an officer of both

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                    **Page 27**
(Cite as: 2007 WL 3047093, *4 (S.D.Cal.))

defendants, was acting for both companies in his contacts with plaintiffs, nor any facts which suggest that the defendants are the same entity. It is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 526 (1983).

Second, plaintiffs' factual allegations fail to demonstrate that defendants did not have an intention to keep promises at the time they was made or that the factual statements were false when made. In the first amended complaint, Plaintiffs contend that defendants represented (1) that each island owner would pay $100,000 into the advertising fund; (2) that at least five islands would be included in the auction; and (3) that there was strong buyer interest and sellers had been turned away. (FAC ¶ 9.) These first two promises are identical to those alleged in the original complaint. This could constitute fraud under California Civil Code Section 1710(4) ("A promise, made without any intention of performing it."). But Plaintiffs have not added to the allegations made in the original complaint that the defendants did not intend to keep their promises. "Although intent can be averred generally under Rule 9(b), a plaintiff must point to facts which show that defendant harbored an intention not to be bound by the terms of the contract at formation." Hsu, 211 F.R.D. at 620; Richardson v. Reliance Nat'l Indemnity Co., No. C 99-2952, 2000 WL 284211, at *4 (N.D.Cal. Mar. 9, 2000). In the instant case, the only allegations in the complaint that could demonstrate defendants' fraudulent intent are claims that defendants ultimately did not perform the material terms of the contract. In this court's order of July 27, 2007, dismissing the original complaint, the court concluded that plaintiffs cannot rely solely on allegations that defendants breached the contract, but must plead the existence of other facts that create a reasonable inference of deceptive intent at the time the statements were originally made. [FN4] This defect has not been remedied.

FN4. See Tenzer v. Superscope, Inc., 39 Cal.3d 18, 30 (1985) (noting that "something more than nonperformance is required to prove the defendant's intent not to perform his promise"); Sunnyside Development Co., LLC v. Opsys Limited, case no. C 05-553, 2005 WL 1876106, at *5-6 (N.D.Cal. Aug. 8, 2005) ("[T]he mere fact that a party

breaches a promise to perform a condition of contract is as a matter of law insufficient to give rise to an inference that the breaching party acted with fraudulent intent at the time that the promise was made."); Gordon v. La-Z-Boy, Inc., no. 06-CV-2353, 2007 WL 1101456, at *6 (E.D.Cal. May 22, 2006); cf. National Westminster Bank, USA v. Ross, 130 B.R. 656, 664 (S.D.N.Y.1991) ("The law is well settled ... that a party may not establish fraudulent intent solely from the non-performance of the future event.").

*5 The third factual basis for a fraud claim is that defendants indicated there was "strong buyer interest" and that they had "turned away many other island owners as prospective sellers." (FAC ¶ 9.) Plaintiffs allege that these statements were not true at the time that they were made. This could constitute fraud under California Civil Code Section 1710(1) ("The suggestion, as a fact, of that which is not true, by one who does not believe it to be true ."). Rule 9(b) requires more than an allegation of falsity; it also requires an explanation of "why the statement or omission complained of was false or misleading." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir., 1994) (emphasis added). That court noted that "[t]his can be done most directly by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." Id. at 1549. In the instant case, plaintiffs have not pled facts supporting the falsity of the statements.

Upon reviewing the first amended complaint, the court finds that it remains deficient in pleading facts supporting its allegations of fraud. Defendants also contend that the fraud count should be dismissed on the basis of the parol evidence rule. Having found that the fraud allegations are insufficient under Rule 9(b), the court need not address this issue.

Breach of Contract

Defendants argue that the breach of contract claim should be dismissed on the basis of the rule against parol evidence. California's parol evidence rule provides that "[t]erms set forth in a writing by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." California Code of Civil Procedure § 1856(a). The application

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

of the parol evidence rule is a proper question to consider in ruling on a motion under Rule 12(b) (6). Mieuli v. DeBartolo, No. C-00-3225, 2001 WL 7774477, at *5 (N.D.Cal. Jan. 16, 2001) ("Applying these [parol evidence] rules, courts have granted motions to dismiss on contract claims where it is clear from the unambiguous terms of the contract that the alleged conduct by the defendant does not constitute a breach of contract."); Phillips Med. Capital, LLC v. Med. Insights Diagnostics Ctr., Inc. 471 F.Supp.2d 1035 (N.D.Cal.2007) (denying motion to dismiss because of possible admissibility of parol evidence).

Plaintiffs' First Amended Complaint alleges defendants, orally and in writing, promised the auction would contain at least 5 islands, each island owner would pay $100,000 into the marketing budget, and the auction would be world-class. (FAC ¶ 19.) These promises were made to plaintiff Mat-Van in April of 2006, before the written contract was signed on May 4, 2006. (FAC ¶ 11 & Ex. 1.) Thus, evidence of these statements and promises is parol evidence, inadmissible unless it falls under one of the several exceptions to the rule.

*6 One exception exists where the contract is not an "integrated agreement." Section 1856(b) excepts "consistent additional terms unless the writing is intended as a complete and exclusive statement of the terms of the agreement." Cal.Civ.Proc.Code § 1856(b) (emphasis added). Whether "the writing is intended by the parties as a final expression of their agreement" is an issue of law for the court to decide. Cal.Civ.Proc.Code § 1856(d); see also Banco Do Brasil, S.A. v. Latian, Inc., 285 Cal.Rptr. 870, 886 (Cal.Ct.App.1991). In this case, defendants contend that the written contract is an integrated agreement because it contains an integration clause. In relevant part, the contract states: "[t]his Agreement represents the entire Agreement of the parties in regard to the subject matter hereof; all prior agreements, understandings and representations, if any, are merged herein and superseded hereby ." (FAC, Ex. 1, section VII.B.). Plaintiffs do not contend in their Opposition that the contract is not an integrated document, but instead argue the terms are consistent with the written agreement. (Opp'n at 12.) Per Section 1856(b), consistent additional terms are not admissible if the written agreement is integrated. Cal.Civ.Proc.Code § 1856(b); see, e.g., Haggard v. Kimberly Quality Care, Inc., 39

Cal.App.4th 508 (Cal.Ct.App., 1995) ("If a writing is deemed integrated, extrinsic evidence is admissible only if it is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.") Thus, even assuming arguendo that previous oral promises and representations were consistent additional terms, they do not qualify for the Section 1856(b) exception. In light of the clear language in the contract, the court holds that this contract is an integrated agreement. See Airs Intern., Inc. v. Perfect Scents Distributions, Ltd., 902 F.Supp. 1141, 1146 (N.D.Cal.1995) ("[T]here is no evidence of the surrounding circumstances presented on the instant motion which would naturally subvert the plain terms of the integration clause. Thus, this is one of those cases in which the integration clause should be regarded as 'conclusive' or 'controlling.' ").

A further exception, found in Section 1856(e), exists for "mistake or imperfection of the writing" when "it is put in issue by the pleadings." While the plaintiffs' brief references this exception, (Opp'n at 11-12), the First Amended Complaint makes no allegation that the written contract was intended to contain the additional terms. "In determining the propriety of a Rule 12(b) (6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." Schneider v. Cal. Dept. of Corr., 151 F.3d 1194, 1197 n. 1 (9th Cir.1998). Accordingly, the court will not consider this avenue for admissibility of the parol evidence.

Finally, the rule "does not exclude other evidence ... to establish illegality or fraud." Cal.Civ.Proc.Code § 1856(f). While federal courts apply state substantive law on parol evidence in diversity cases, Rule 9(b) is procedural and still applies to the pleadings. "It is well established that Rule 9(b)'s requirement that allegations of fraud be pled with particularity applies to state-law causes of action before a federal court." Nordberg v. Trilegiant Corp., 445 F.Supp.2d 1082 (N.D.Cal.2006). Plaintiffs' allegations of fraud are insufficient under Rule 9(b) and thus do not establish the fraud exception to the parol evidence rule. See J.A. Moore Const. Co. v. Sussex Associates Ltd., 688 F.Supp. 982, 989-90 (D.Del., 1988) (rejecting evidence proferred under fraud

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

exception to parol evidence rule when plaintiffs had not shown that statements were false when made or the defendants had not intended not to keep their promises); In re Marianni, 21 B.R. 228 (Brktcy.Pa., 1982) ("The plaintiffs have failed to allege with any such particularity either in their complaint or in testimony before this court that fraud, accident or mistake exists .... Therefore ... the plaintiffs are bound by the agreement as written and signed."). Plaintiffs cannot avail themselves of the fraud exception to the parol evidence rule without alleging fraud with particularity in satisfaction of Rule 9(b).

*7 Because no exception to the parol evidence rule applies, this court therefore finds that evidence of prior or written oral representations not contained in the written, integrated agreement is inadmissible. Plaintiffs have not alleged any breach of terms contained in the written contract. Plaintiffs' complaint thus fails to state a claim for breach of contract and that claim must be dismissed.

2. Defendant's Motion to Strike Plaintiff's Claim For Punitive Damages

Pursuant to Rule 12(f), the court may strike any "redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). "Motions to strike are generally not granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." LeDuc v. Kentucky Cent. Life Ins. Co., 814 F.Supp. 820, 830 (N.D.Cal.1992). Motions to strike are commonly used to "strike a prayer for relief where the damages sought are not recoverable as a matter of law." Gay-Straight Alliance Network v. Visalia Unified Sch. Dist., 262 F.Supp.2d 1088, 1110 (E.D.Cal.2001). While punitive damages are not available in breach of contract actions, punitive damages may be warranted in a case where a defendant fraudulently induced a plaintiff to enter into a contract. See Walker v. Signal Cos., Inc., 84 Cal.App.3d 982, 996 (1978); Reynolds v. Allstate Life Ins. Co., 2006 U.S. Dist. LEXIS 14548, at *16 (E.D.Cal.2006); Cal. Civ.Code § 3294(a) ("... where it is proven by clear and convincing evidence that the defendant has been guilty of ... fraud ... the plaintiff ... may recover damages for the sake of example and by way of punishing the defendant.").

In the instant case, the court has determined that the allegations in plaintiff's promissory fraud claim,

which serve as the basis for plaintiff's request for punitive damages, are insufficient and plaintiffs' first cause of action must be dismissed. As such, defendants' motion to strike is denied as moot.

CONCLUSION

For the foregoing reasons, the court GRANTS defendants' motion to dismiss both claims and DENIES defendants' motion to strike as moot. The court GRANTS plaintiffs one final opportunity to amend the complaint, addressing the deficiencies set forth above. The amended complaint must be filed no later than 14 days from the date this order is filed.

IT IS SO ORDERED.

2007 WL 3047093 (S.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



# EXHIBIT E

Not Reported in F.Supp.2d
(Cite as: 2007 WL 781598 (E.D.Cal.))
<KeyCite History>

Page 31

Only the Westlaw citation is currently available.

United States District Court,
E.D. California.

**Janet ORLANDO, Plaintiff,**
v.
**CAROLINA CASUALTY INSURANCE
COMPANY, Monitor Liability Managers, Inc.,
and Does
1 through 20, inclusive, Defendants.**

**No. CIV F 07-0092 AWI SMS.**

March 13, 2007.

Nicholas J.P. Wagner, Law Offices of Wagner & Jones, Fresno, CA, for Plaintiff.

Sara J. Savage, Beth A. Fruechtenicht, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, San Francisco, CA, for Defendants.

ORDER ON DEFENDANTS'S MOTION TO
DISMISS AND MOTION TO STRIKE

ANTHONY W. ISHII, United States District Judge.

**\*1** Plaintiff Janet Orlando ("Plaintiff" or "Orlando") filed suit in state court alleging two causes of action, breach of contract and fraud, against Defendants Carolina Casualty Insurance Company and Monitor Liability Mangers, Inc. (collectively "Defendants"). This suit arises from a settlement agreement between the parties following a jury verdict in state court. Defendants removed to this Court on the basis of diversity under 28 U.S.C. § 1441(b) and now move to dismiss the two causes of action and strike the request for punitive damages. For the reasons that follow, Defendants's motion to dismiss will be granted.

BACKGROUND

From the complaint, Orlando filed suit in Fresno County in December 2004 against her former employer, Alarm One, for inter alia sexual harassment and battery. This case was consolidated with another case that dealt with similar allegations. The other plaintiffs from the consolidated case

settled their claims, but Orlando's case went to trial in April 2006. A jury found in favor of Orlando and awarded her $1.7 million. Judgment was entered in May 2006. Following the entry of judgment, the superior court awarded Orlando $200,000 in fees and costs. Alarm One filed a notice of appeal, which remains pending.

Defendant Carolina Casualty ("Carolina") was and is the liability insurer of Alarm One. Pursuant to a policy of insurance, Carolina defended Alarm One in state court and negotiated and paid the settlements of the plaintiffs from the consolidated case. Carolina retained Monitor Liability Mangers ("Monitor") to administer and adjust the claims made by Orlando and the consolidated plaintiffs. Monitor is the agent of Carolina.

In July 2006, pending Alarm One's appeal, Orlando, Carolina, Monitor and Alarm One entered into a contract to settle (the "Settlement Agreement") [FN1] Orlando's judgment and all claims that Orlando had against Alarm One and Defendants. Orlando agreed to settle all such claims against Alarm One and Defendants for the sum of $1.4 million. [FN2]

> FN1. Orlando incorporated by reference and attached the Settlement Agreement as part of her complaint.

> FN2. The Settlement Agreement indicates that the $1.4 million figure is composed of a $1.2 million cash payment and a $200,000 note.

On September 15, 2006, Defendants and Alarm One breached the terms of the Settlement Agreement by stating that they would not pay the money owed to Orlando. Following the breach and refusal to pay, Defendants and Alarm One offered to settle with Orlando for a lesser amount than what they had previously agreed to pay. Defendants and Alarm One breached the Settlement Agreement in order to negotiate a lesser settlement payment and in order to gain leverage over Orlando in any further settlement negotiations.

Also, Orlando alleges that she was fraudulently induced by Alarm One and Defendants into signing the Settlement Agreement by misrepresentations about the financial condition of Alarm One.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2007 WL 781598, *1 (E.D.Cal.))

Page 32

Defendants and Alarm One, by and through their agents and attorneys, represented that the ability of Alarm One to pay Orlando's judgment was much less than the true ability of Alarm One to pay. Further, Defendants and Alarm One committed a fraud upon Orlando by entering the Settlement Agreement without the intent to perform. Instead, Defendants and Alarm One entered the Settlement Agreement with the fraudulent intent to gain leverage over Orlando in future negotiations. Also, Defendants and Alarm One made material misrepresentations to Orlando by stating that they were under a legal obligation to obtain approval of an unnamed third party creditor to enter into the Settlement Agreement. After breaching the Settlement Agreement, Defendants and Alarm One offered to settle for a significantly lesser sum.

*2 Defendants have filed a Rule 12(b)(6) motion to dismiss Orlando's only two causes of action. Defendants have also filed a Rule 12(f) motion to strike Orlando's request for punitive damages. Orlando has filed an opposition to these motions. [FN3] Defendants filed no timely reply. [FN4]

> FN3. In opposition, Plaintiff submitted a declaration, which includes several exhibits. When a court considers extraneous matters in deciding a Rule 12(b)(6) motion, the motion is converted into one for summary judgment. See Fed. R. Civ. Pro. 12(b). Because the Court does not wish to convert the motion to dismiss into a motion for summary judgment at this time, the Court will not consider the declaration or exhibits thereto submitted by Plaintiff. See Swedberg v. Marotzke, 339 F.3d 1139, 1146 (9th Cir.2003).

> FN4. Defendants filed a reply on February 28, 2007, but, given the March 5, 2007 hearing date, Defendants reply was due on or before February 26, 2007. See Local Rule 78-230(d). Because Defendants's reply is untimely, it will not be considered by the Court.

### GENERAL LEGAL FRAMEWORK

### Rule 8(a)--General Pleading

Federal Rule of Civil Procedure 8(a) sets the pleading standard for claims for relief. "Under the liberal rules of pleading, a plaintiff need only provide a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " Sagana v. Tenorio, 384 F.3d 731, 736 (9th Cir.2004) (quoting Fed.R.Civ.P. 8(a)). This rule does "not require a claimant to set out in detail the facts upon which he bases his claim." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The pleadings need only give the opposing party fair notice of a claim and the claim's basis. Conley, 355 U.S. at 47; Sagana, 384 F.3d at 736; Fontana v. Haskin, 262 F.3d 871, 877 (9th Cir.2001). 47). The pleadings are also to "be construed as to do substantial justice," and "no technical forms of pleading ... are required." Fed. Rules Civ. Pro. 8(e)(1), 8(f); Sagana, 384 F.3d at 736; Fontana, 262 F.3d at 877. "Specific legal theories need not be pleaded so long as sufficient factual averments show that the claimant may be entitled to some relief." Fontana, 262 F.3d at 877; American Timber & Trading Co. v. First Nat'l Bank, 690 F.2d 781, 786 (9th Cir.1982).

### Rule 12(b) (6)--Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). This rule provides for dismissal of a claim if, as a matter of law, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Neitzke v. Williams, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); Parks Sch. of Business, Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir.1995). Thus, the determinative question is whether there is any set of "facts that could be proved consistent with the allegations of the complaint" that would entitle plaintiff to some relief. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. Navarro v. Block, 250 F.3d 729, 732 (9th Cir.2001); Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir.1988). In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Newman v. Sathyavaglswaran, 287 F.3d 786, 788 (9th Cir.2002); Vignolo v. Miller, 120 F.3d 1075, 1077 (9th Cir.1999). The Court must also assume that general allegations embrace the necessary,

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2007 WL 781598, *2 (E.D.Cal.))

specific facts to support the claim. Smith v. Pacific Prop. and Dev. Corp., 358 F.3d 1097, 1106 (9th Cir.2004); Peloza v. Capistrano Unified Sch. Dist., 37 F.3d 517, 521 (9th Cir.1994). But, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.2001); see also Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir.2003); Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir.1981). Courts will not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." Warren, 328 F.3d at 1139; Western Mining Council, 643 F.2d at 624. Furthermore, Courts will not assume that plaintiffs "can prove facts which [they have] not alleged, or that the defendants have violated ... laws in ways that have not been alleged." Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

*3 In deciding whether to dismiss a claim under Rule 12(b)(6), the Court is generally limited to reviewing only the complaint, but may review materials which are properly submitted as part of the complaint and may take judicial notice of public records outside the pleadings. See Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir.2001); Campanelli v. Bockrath, 100 F.3d 1476, 1479 (9th Cir.1996); MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir.1986). A court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss. Broam v. Bogan, 320 F.3d 1023, 1026 (9th Cir.2003); Schneider v. Cal. Dept. of Corr., 151 F.3d 1194, 1197 n. 1 (9th Cir.1998).

If a Rule 12(b)(6) motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir.2000) (en banc). In other words, leave to amend need not be granted when amendment would be futile. Gompper v. VISX, Inc., 298 F.3d 893, 898 (9th Cir.2002).

## DEFENDANTS'S MOTIONS

### 1. Motion to Dismiss Breach of Contract Claim

#### Defendants's Argument

Defendants argue that the Settlement Agreement contains two conditions precedent: approval of a $200,000 note by lenders in favor of Plaintiff and necessary approval of the entire settlement by third parties. Unless these conditions occur, obligations under the settlement contract by Defendants do not arise. Here, the subordinated note and the entire agreement were dependent upon approval by Alarm One's lenders (who were the "necessary third parties"). Neither of those events occurred, which renders the entire Settlement Agreement unenforceable. Upon the failure of a condition precedent, a contract is terminated. Because neither events occurred, dismissal with prejudice of the breach of contract claim is appropriate.

#### Plaintiff's Opposition

Orlando argues that, if there is no third party that is required to give its consent before Alarm One could bind itself to the Settlement Agreement, then there is no condition precedent and the failure to perform is a breach of contract. Defendants have refused to identify, document, or substantiate their assertion that a third party must consent to the written settlement reached in July 2006. Where a condition precedent is illusory or does not exist, as Plaintiff has alleged, there is no impediment to enforcing the contract. Also, conditions precedent may be waived or excused and a person cannot take advantage of his own act to escape liability. Also, anticipatory repudiation excuses conditions precedent and allow for recovery for breach irrespective of the non-satisfaction of the condition precedent. Further, if fulfillment of a condition in a contract is impossible, that condition is void and the contract may be enforced. If there is no third party who is required to consent, it is impossible to obtain such consent and the contract may be enforced.

#### Relevant Allegations

*4 The Complaint under the First Cause of Action (breach of contract) alleges in part:
> 10. Plaintiff ... has performed all her duties and obligations pursuant to the subject settlement agreement, except for those terms and conditions that she has been prevented from performing due

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



to the conduct of Defendants and third party, Alarm One.

11. On or about September 15, 2006, defendants ... and Alarm One, breached the terms of the settlement agreement by stating that they would not pay the money owed to Orlando pursuant to the agreement. Following such breach and its refusal to pay, [Defendants] and Alarm One offered to settle with Plaintiff ... for a lesser amount than what Defendants and Alarm One previously agreed to pay. Admittedly, Defendants and Alarm One breached the settlement agreement in order to gain leverage over [Plaintiff] on any further settlement negotiations.

Complaint at ¶¶ 10-11.

Also, attached to the complaint and incorporated into the complaint as Exhibit A is a copy of the Settlement Agreement. An incorporated attachment to the Settlement Agreement states in part, "Settlement subject to Alarm One obtaining necessary third party consents." Court's Docket Doc. No. 4 at p. 17, ¶ 9 (hereinafter "Paragraph 9"). The settlement attachment further includes the provision of a "$200,000 subordinated note (form and substance satisfactory to lenders) payable over 4 years in equal monthly installments. The note will accrue interest at 10% per annum, to be paid monthly in arrears." Id. at p. 16, ¶ 2 (hereinafter "Paragraph 2").

Legal Standard

"Under the law of contracts, parties may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event." Platt Pacific, Inc. v. Andelson, 6 Cal.4th 307, 313, 24 Cal.Rptr.2d 597, 862 P.2d 158 (1993). A condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises. Cal. Civ.Code § 1436; Platt Pacific, 6 Cal.4th at 313, 24 Cal.Rptr.2d 597, 862 P.2d 158. Conditions precedent may be created either expressly or impliedly, see Minton v. Mitchell, 89 Cal.App. 361, 368, 265 P. 271 (1928); 1 Witkin: Summary of California Law § 777 (10th ed.2005), but the rule is that "provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such a construction." Rubin v. Fuchs, 1 Cal.3d 50, 53, 81 Cal.Rptr. 373, 459 P.2d 925

(1969); Helzel v. Superior Court, 123 Cal.App.3d 652, 663, 176 Cal.Rptr. 740 (1981). The term "subject to" is "generally construed to impose a condition precedent." Rubin, 1 Cal.3d at 54, 81 Cal.Rptr. 373, 459 P.2d 925; Matthews v. Starritt, 252 Cal.App.2d 884, 887, 60 Cal.Rptr. 857 (1967). "An express condition precedent to performance by a party cannot be construed as imposing a duty on that party to fulfill the condition, where ... the language employed does not constitute an undertaking to do so." Britschgi v. McCall, 41 Cal.2d 138, 144, 257 P.2d 977 (1953); Edwards v. Billow, 31 Cal.2d 350, 361, 188 P.2d 748 (1948). If a condition precedent "is not fulfilled, the right to enforce the contract does not evolve." Kadner v. Shields, 20 Cal.App.3d 251, 258, 97 Cal.Rptr. 742 (1971); see also Cal. Civ.Code § 1436; Bennett v. Carlen, 213 Cal.App.2d 307, 311, 28 Cal.Rptr. 647 (1963). However, the "nonoccurrence of a condition precedent may be excused for a number of legally recognized reasons." Platt Pacific, 6 Cal.4th at 314, 24 Cal.Rptr.2d 597, 862 P.2d 158. Performance of a condition precedent may be excused inter alia when the condition is waived, performance of the condition is unlawful or impossible, or the other party prevents or makes impossible the performance of the condition. See Cal. Civ.Code § 1441; Jacobs v. Tenneco West, Inc., 186 Cal.App.3d 1413, 1418, 231 Cal.Rptr. 351 (1986); Sosin v. Richardson, 210 Cal.App.2d 258, 264, 26 Cal.Rptr. 610 (1962); BAJI California Jury Instructions--Civil § 10.81 (Fall 2006 ed.). "Where contractual liability depends upon the satisfaction or performance of one or more conditions precedent, the allegation of such satisfaction or performance is an essential part of the cause of action." Careau & Co. v. Sec. Pac. Bus. Credit, 222 Cal.App.3d 1371, 1389, 272 Cal.Rptr. 387 (1990); see Gordon Bldg. Corp. v. Gibraltar Sav. & Loan Asso., 247 Cal.App.2d 1, 5, 55 Cal.Rptr. 884 (1966); Sosin, 210 Cal.App.2d at 264, 26 Cal.Rptr. 610. The failure to allege the satisfaction, waiver or excuse of a condition precedent amounts to a failure to state a claim for relief. See Arbor Acres Farm v. Gre Ins. Group, 2002 U.S. Dist. LEXIS 1131, *9 (E.D.Cal.2002); San Chirico v. Merrill Lynch, Pierce, Fenner & Smith, 1999 U.S. Dist. LEXIS 20180, *4 (N.D.Cal.1999); Careau & Co., 222 Cal.App.3d at 1389-91, 272 Cal.Rptr. 387; Gordon Bldg., 247 Cal.App.2d at 6, 55 Cal.Rptr. 884; Sosin, 210 Cal.App.2d at 264, 26 Cal.Rptr. 610; McNulty v. New Richmond Land Co., 44 Cal.App. 744, 747,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2007 WL 781598, *4 (E.D.Cal.))

Page 35

187 P. 97 (1919).

Discussion

**\*5** Defendants characterize Paragraph 2 and
Paragraph 9 of the Settlement Agreement as creating
conditions precedents. Orlando does not expressly
challenge that these paragraphs create conditions
precedents. Further, Orlando's opposition focuses
exclusively on Paragraph 9 and there is no
discussion of Paragraph 2. Given the apparent lack
of disagreement by the parties, and that the term
"subject to" generally creates conditions precedent,
for purposes of the pending motion the Court
accepts Defendants's characterization of Paragraph 2
and Paragraph 9 as creating conditions precedent to
the enforcement of the Settlement Agreement. [FN5]
Cf. Rubin, 1 Cal.3d at 54, 81 Cal.Rptr. 373, 459
P.2d 925.

> FN5. The Court notes, however, that Paragraph 2
> does not use the term "subject to."

Here, Orlando essentially argues that the condition
precedent of Paragraph 9 is void because there is no
third party whose consent is necessary. In other
words, the condition precedent should be excused
either due to improper conduct by Defendants or
impossibility due to the non-existence of such a
third party. Also, by implication Orlando seems to
argue that Defendants have anticipatorily breached
the Settlement Agreement. [FN6] However, facts
raised by counsel for the first time in opposition
papers cannot overcome the factual deficiencies of a
complaint. See Broam, 320 F.3d at 1026. Orlando
has averred that she has performed all conditions
precedent required of her, except for those
conditions that Defendants and Alarm One
prevented her from performing. Complaint at ¶ 10.
Orlando does not aver that all conditions precedent
necessary for her to recover under the Settlement
Agreement have occurred or that Defendants or
Alarm One have performed applicable conditions
precedent. Cf. Careau & Co., 222 Cal.App.3d at
1389-91, 272 Cal.Rptr. 387. The condition
precedent of Paragraph 9 is not aimed at Orlando.
Instead, the onus of Paragraph 9 is on Alarm One to
obtain consent/approval from third parties. As the
Court understands the Settlement Agreement at this
point, without the third party consent/approval, the
duties to release claims and pay money do not arise.
Thus, Orlando's ability to collect the $1.4 million is

dependent upon Alarm One, not Orlando, obtaining
third party consents/approvals. There is no express
allegation that the condition precedent of Paragraph
9 has been satisfied, waived, or excused. Further,
Paragraph 2 states that the form and substance of a
$200,000 note is to be approved by lenders.
Paragraph 2 suggests that Alarm One is responsible
for fulfilling that condition as well because the note
is to be in favor of Orlando. Since Orlando has not
addressed, discussed, or mentioned Paragraph 2 in
her complaint or opposition, and Orlando does not
appear to be the party responsible for obtaining the
lender's approval of the note as to form and
substance, there is nothing to indicate that Paragraph
2 has been satisfied, waived, or excused.

> FN6. Orlando's opposition cites cases that indicate
> that performance of a condition precedent may be
> excused due to anticipatory breach, but does not
> apply the law to her first cause of action. It is true
> that an anticipatory breach permits a party to
> recover damages immediately for a total breach of
> contract without performing or offering to perform
> any conditions precedent under the contract. County
> of Solano v. Vallejo Redevelopment Agency, 75
> Cal.App.4th 1262, 1276, 90 Cal.Rptr.2d 41 (1999).
> However, Orlando did not allege anticipatory
> breach in her complaint.

In short, the Settlement Agreement contains
conditions precedent, but Orlando does not allege
that the conditions precedent have been performed
or that they have been waived or excused. Since
Orlando has not alleged that conditions precedent
necessary for her to recover have been performed,
waived, or excused, she has failed to state a claim
for breach of contract. Arbor Acres Farm, 2002
U.S. Dist. LEXIS 1131 at \*9; San Chirico, 1999
U.S. Dist. LEXIS 20180 at \*4; Careau & Co., 222
Cal.App.3d at 1389-91, 272 Cal.Rptr. 387; Gordon
Bldg., 247 Cal.App.2d at 6, 55 Cal.Rptr. 884;
Sosin, 210 Cal.App.2d at 264, 26 Cal.Rptr. 610;
McNulty, 44 Cal.App. at 747, 187 P. 97. However,
Defendants's request for dismissal with prejudice is
inappropriate. There are many legally recognized
reasons for excusing the nonoccurrence of a
condition precedent, and the mere presence of an
unfulfilled condition precedent in a contract is not
necessarily fatal to a breach of contract claim. See
Platt Pacific, 6 Cal.4th at 313, 24 Cal.Rptr.2d 597,
862 P.2d 158. Because it is not clear at this point
that amendment would be futile, the dismissal will

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2007 WL 781598, *5 (E.D.Cal.))

Page  36

be without prejudice. [FN7] See Gompper, 298 F.3d at 898; Lopez, 203 F.3d at 112.

> FN7. Any amended complaint should allege how the conditions precedent have been excused or waived.

### 2. Motion to Dismiss Fraud Claim

#### Defendants's Argument

*6 Defendants argue that a claim of fraud must be pled with particularity, and that vague and conclusory allegations are insufficient. The complaint fails to allege the particulars to support a cause of action for fraud because Orlando fails to identify the who, what, where and when of the alleged fraudulent misrepresentations. Orlando fails to identify a specific individual who made a misrepresentation, but instead relies on a general allegation of "agents and attorneys," and further fails to identify when misrepresentations occurred, what was specifically communicated, where the communications took place, and how the representations were false. Orlando's allegations are too vague to meet the applicable pleading standard.

#### Plaintiff's Opposition

Orlando states that her complaint outlined the acts committed and, that at the time the promises were made by Defendants, they had no intention of performing. The essence of fraud is the existence of an intent at the time of a promise to not to perform. A representation that falsely indicates an intent to perform is a misrepresentation of fact which supports fraud, just as alleged in the complaint. The complaint alleges Defendants and Alarm One entered into the settlement agreement without the intent to perform. See Complaint at ¶¶ 15-17. If Defendants had no intention of performing, or knew that there was no third party that was legally required to consent to Alarm One's entrance into the settlement agreement or misrepresented the financial condition of Alarm One, then Defendants are guilty of fraud.

#### Relevant Allegations in the Complaint

The Complaint alleges in part:
14. Defendants, Carolina and Monitor and third party Alarm One by and through their agents and

attorneys, fraudulently induced Plaintiffs to enter into the aforementioned settlement agreement ... by, among other things, misrepresenting the financial condition of Alarm One. In inducing Plaintiff to agree to enter into the settlement agreement as set forth herein and thereby agreeing to accept an amount much less than the aforementioned Judgment, Defendants and Alarm One ... represented that the ability of Alarm One to pay the Judgment was much less than the true ability of Alarm One to pay the Judgment. This was a material misrepresentation of fact which was made by Defendants in order to induce Plaintiff to enter into the settlement agreement as set forth herein. Orlando relied on these misrepresentations in agreeing to the settlement agreement and at the time the misrepresentations were made, Orlando did not know them to be false. Such reliance by Orlando on the material misrepresentations made by Defendants resulted in damage and injury to Orlando. At the time that Defendants, by and through their agents and attorneys, made such material misrepresentations, they knew such representations to be false or had no reasonable basis to believe them to be true.
15. Defendants, Carolina and Monitor and Alarm One also committed a fraud upon Plaintiff by entering into the aforementioned settlement agreement without the intent to perform the terms of the settlement agreement. At the time Defendants and Alarm One entered into the aforementioned settlement agreement, they had no intention of performing the terms of the settlement agreement.
*7 16. Defendants entered into the settlement agreement not with the intent of performing the terms of the settlement agreement but with the fraudulent intent to gain leverage over Orlando in future settlement negotiations. Furthermore, Defendants Monitor, Carolina Casualty, and Alarm One ... made material misrepresentations to Orlando by stating that they were under a legal obligation to obtain the approval of an unnamed third party creditor to enter into the settlement agreement. Such statement was a material misrepresentation because Defendants and Alarm One were allowed to enter into the settlement agreement without the approval of such unnamed third party creditor.
17. Following the Defendants breach of the settlement agreement by refusing to abide by its terms, Defendants ... offered Orlando a settlement

that twas significantly less than the settlement set forth in the Exhibit "A", evidencing the fact that at the time Defendants entered into the settlement agreement, they did so without the intent to honor the settlement agreement and with the fraudulent intent of gaining negotiating leverage in order to induce Plaintiff to accept a lesser settlement amount later.
Complaint at ¶¶ 14-17.

Legal Standard

Under California law, the elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. Robinson Helicopter Co., Inc. v. Dana Corp., 34 Cal.4th 979, 990, 22 Cal.Rptr.3d 352, 102 P.3d 268 (2004); Lazar v. Superior Court, 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996). Promissory fraud is a subspecies of fraud and deceit and where a promise is made without the intention to perform, there is an implied misrepresentation of fact that may be actionable fraud. Lazar, 12 Cal.4th at 638, 49 Cal.Rptr.2d 377, 909 P.2d 981; see also Cal. Civ.Code 1710(4). "An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." Lazar, 12 Cal.4th at 638, 49 Cal.Rptr.2d 377, 909 P.2d 981.

Federal Rule of Civil Procedure 9(b) requires that, when averments of fraud are made, the circumstances constituting the alleged fraud must be "specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong." Fed. R. Civ. Pro. 9(b); Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.2003) Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir.2001). In diversity cases, although the substantive elements of fraud are set by state law, those elements must be pled in accordance with the requirements of Rule 9(b). See Vess, 317 F.3d at 1103. Further, the Ninth Circuit has explained:

A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim.... Because a

dismissal of a complaint or claim grounded in fraud for failure to comply with Rule 9(b) has the same consequence as a dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner.
*8 Id. at 1107-08.

"To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Bly-Magee, 236 F.3d at 1019; Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir.1993). Thus, allegations of fraud should specifically include "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir.2007); Edwards v. Marin Park, Inc., 356 F.3d 1058, 1066 (9th Cir.2004); see also Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir.1997) (allegations must identify "the who, what, when, where, and how" of the fraud). "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." Vess, 317 F.3d at 1106; In re Glenfed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir.1994). Although a plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim, the claim will be considered to be grounded in fraud and the pleading of that claim as a whole must satisfy Rule 9(b). In re Daou Sys., 411 F.3d 1106, 1127 (9th Cir.2005); Vess, 317 F.3d at 1103-04. Also, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." Swartz, 476 F.3d at 764-65. In a fraud suit involving multiple defendants, "a plaintiff must, at a minimum, identif[y] the role of [each] defendant[ ] in the alleged fraudulent scheme." Id.; Moore v. Kayport Package Express, Inc., 885 F.2d 531, 541 (9th Cir.1989).

Discussion

The basis for Defendants's requested dismissal of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



the fraud claim is that Orlando has not adequately alleged the specifics of the fraud as required by Rule 9(b). The Court agrees that the requirements of Rule 9(b) have not been met. First, Defendants and third party Alarm One are essentially lumped together as one and there is insufficient differentiation between Defendants. Orlando has not sufficiently identified how each defendant participated in the alleged fraud. See Swartz, 476 F.3d at 764-65; Moore, 885 F.2d at 541. Second, Orlando has not identified who actually made the fraudulent representations. Because corporations speak through agents, allegations that a corporation or its "agents" committed fraud or made misrepresentations are generally insufficient, and the specific identity of the agent must be alleged for purposes of Rule 9(b). See Arena v. Wal-Mart Stores, Inc., 221 F.R.D. 569, 572 (D.Kan.2004); Kriendler v. Chem. Waste Mgmt., Inc., 877 F.Supp. 1140, 1155 (N.D.Ill.1995); Strange v. Nationwide Mut. Ins. Co., 867 F.Supp. 1209, 1220 (E.D.Pa.1994). The only identification about who communicated the alleged misrepresentations are "agents and attorneys" of Defendants. At this point, there is no obvious impediment to Orlando specifically identifying or "naming" the individuals who actually made the misrepresentations. See Arena, 221 F.R.D. at 572. Third, Orlando does not allege when the misrepresentations occurred. See Edwards, 356 F.3d at 1066; Cooper, 137 F.3d at 627. Fourth, the Settlement Agreement indicates that the parties had been in mediation with Jerry Spolter, but it is not clear if the misrepresentations occurred prior to, during the course of, or after the mediation. In other words, the complaint does not identify when the misrepresentations were made. See Edwards, 356 F.3d at 1066; Cooper, 137 F.3d at 627. Finally, the "what" of the misrepresentations are not entirely clear. Orlando's allegation regarding Alarm One's financial condition at paragraph 14 of the complaint is unnecessarily vague. Further, Orlando's allegation regarding consent at paragraph 16 is unclear. It appears that non-existence of third party creditors may be attempted to be alleged, but the paragraph seems to read that there was a misrepresentation because Defendants and Alarm One were allowed to enter into the Settlement Agreement without the permission of third parties. Given the other shortcomings of the fraud complaint, Orlando should clarify these allegations. However, Orlando's allegation that Defendants had no intent to perform their promises can reasonably

be read as meaning Defendants had no intention of paying the agreed settlement amount, i.e. their promise to pay was false. To the extent this is what Orlando is alleging in paragraph 15 of her complaint, the "what" of this paragraph is sufficiently identified [FN8] Otherwise, the remaining misrepresentations should be clarified. See Edwards, 356 F.3d at 1066; Cooper, 137 F.3d at 627. Because it is not clear at this point whether amendment to allow compliance with Rule 9(b) would be futile, dismissal will be without prejudice. [FN9] See Gompper, 298 F.3d at 898; Lopez, 203 F.3d at 112.

FN8. If Orlando intends to include conduct other than simply not intending to pay in Paragraph 15 of her complaint, then Paragraph 15 does not sufficiently identify the "what" of the misrepresentation.

FN9. Defendants also argue that Orlando cannot introduce evidence of settlement-related communications under Federal Rule of Evidence 408 and California Rules of Evidence 1119 and 1152(a). The argument is poorly developed (there is not a single case cited by Defendants) and it is not clear to the Court why the point is being argued in this motion. However, the case law and language of Rule 408 and State Rule 1152(a) suggest that admission of settlement related communications is permissible to prove something other than liability or damages, and that the rules do not apply to claims that are not the subjects of the negotiations. See Uforma/Shelby Business Forms, Inc. v. N.L.R.B., 111 F.3d 1284, 1293-94 (6th Cir.1997); Broadcort Capital Corp. v. Summa Medical Corp., 972 F.2d 1183, 1194 (10th Cir.1992); Vulcan Hart Corp. v. NLRB, 718 F.2d 269, 277 (8th Cir.1983); Matsuura v. E.I. du Pont de Nemours & Co ., 2006 U.S. Dist. LEXIS 68909, *10-*12 (D.Haw.2006); Carolina Indus. Prods. v. Learjet Inc., 168 F.Supp.2d 1225, 1228-29 (D.Kan.2001); Warner Constr. Corp. v. Los Angeles, 2 Cal.3d 285, 296, 85 Cal.Rptr. 444, 466 P.2d 996 (1970); Caira v. Offner, 126 Cal.App.4th 12, 36, 24 Cal.Rptr.3d 233 (2005); Fieldson Associates, Inc. v. Whitecliff Laboratories, Inc., 276 Cal.App.2d 770, 772, 81 Cal.Rptr. 332 (1969). With respect to State Rule 1119, often called the "mediation privilege," e.g. In re Marriage of Kieturakis, 138 Cal.App.4th 56, 85-86, 41 Cal.Rptr.3d 119 (2006), since this is a diversity case that contains only allegations of

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw

California law, Federal Rule of Evidence 501 may well provide for the application of State Rule 1119 in this case. See Fed.R.Evid. 501; Star Editorial v. United States Dist. Court, 7 F.3d 856, 859 (9th Cir.1993); Liew v. Breen, 640 F.2d 1046, 1049 (9th Cir.1981). Nevertheless, given the current state of argumentation on this issue, the Court will not rule on either the application or effect of Rule 1119 in this case at this time.

3. Motion To Strike

Discussion

*9 Punitive damages are not available for even willful breaches of contract, but punitive damages are available where a defendant fraudulently induces a plaintiff to enter into a contract. See Reynolds v. Allstate Life Ins. Co., 2006 U.S. Dist. LEXIS 14548, *16 (E.D.Cal.2006); Cates Construction, Inc. v. Talbot Partners, 21 Cal.4th 28, 61, 86 Cal.Rptr.2d 855, 980 P.2d 407 (1999); Walker v. Signal Companies, Inc., 84 Cal.App.3d 982, 996, 149 Cal.Rptr. 119 (1978); see also Cal. Civ.Code § 3294(a) ("... where it is proven by clear and convincing evidence that the defendant has been guilty of ... fraud ... the plaintiff ... may recover damages for the sake of example and by way of punishing the defendant."). Thus, Orlando's request for punitive damages rests on the sufficiency of her fraud allegations. [FN10] As discussed above, the Court has determined that Orlando's fraud allegations do not meet the requirements of Rule 9(b). [FN11] Because Orlando's fraud allegations are insufficient, Orlando's request for punitive damages are also insufficient. However, since the Court has granted Defendants' motion to dismiss Orlando's claims, the motion to strike is now moot . [FN12]

> FN10. This is also consistent with the allegations in at paragraph 21 of Orlando's complaint: The misrepresentations and fraud as set forth herein committed by [Defendants] were done with the intent to cause injury and harm to Plaintiff. Defendants committed such fraud in order to impede and prevent Plaintiff's ability and right to recover the Judgment as set forth herein. As a result, exemplary damages should be assess against Defendants in order to make an example of and punish the Defendants and to deter such future conduct.

> FN11. Defendants rely on state cases in which a complaint's allegations were held to not support punitive damages. In assessing the sufficiency of state law claims, federal courts apply federal law pleading standards, although the standard for dismissal in state court is highly relevant. See Church of Scientology of Cal. v. Flynn, 744 F.2d 694, 696 n. 2 (9th Cir.1984); Jacobson v. Schwarzenegger, 357 F.Supp.2d 1198, 1216 (C.D.Cal.2004).

> FN12. The Court notes that, despite the title of the motion, Defendants do not challenge the availability of punitive damages, rather they challenge the sufficiency of the allegations to support punitive damages. See Court's Docket Document No. 13 at p. 6. The proper medium for challenging the sufficiency of factual allegations in a complaint is through Rule 12(b)(6), not Rule 12(f). Parker v. Fid. Sec. Life Ins. Co., 2006 U.S. Dist. LEXIS 56724, *17 (E.D.Cal.2006); Paul v. Gomez, 190 F.R.D. 402, 404 (W.D.Va.2000); Outen v. Baltimore County, 177 F.R.D. 346, 348 (D.Md.1999); Arenson v. Whitehall Convalescent & Nursing Home, Inc., 880 F.Supp. 1202, 1214 (N.D.Ill.1995).

CONCLUSION

Defendants move to strike Orlando's request for punitive damages and to dismiss Orlando's two causes of action for breach of contract and fraud. With respect to Orlando's breach of contract claim, the Settlement Agreement indicates that there are conditions precedent. To recover for breach of contract, performance/satisfaction of conditions precedent must be alleged. Orlando has not alleged either satisfaction, waiver, or excuse of conditions precedent and thus, has failed to state a claim. Because it is not clear that amendment would be futile, dismissal of this claim is without prejudice.

With respect to Orlando's fraud claim, the federal rules of civil procedure require that fraud claims be pled with particularity. Stated differently, a plaintiff claiming fraud must allege the "who, what, when, and where" of the fraud. Orlando has not identified who made fraudulent representations, when the representations were made, where the fraudulent statements were made, has not adequately identified the substance or the "what" for at least two of the misrepresentations, and has not adequately identified

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



each defendant's particular participation or role in the fraud. Orlando has failed to meet Rule 9(b)'s particularity requirements. Because it is not clear that amendment would be futile, the dismissal will be without prejudice.

Finally, Orlando's claim for punitive damages is based on her fraud claim.   Since the Court has dismissed both of Orlando's causes of action, which includes the fraud claim, the punitive damages claim is also de facto dismissed. Defendants's motion to strike is now moot.

Accordingly, IT IS HEREBY ORDERED that:
1. Defendants's Rule 12(b)(6) motion to dismiss is GRANTED    and    Plaintiff's    complaint    is DISMISSED without prejudice;
**\*10** 2. Defendants's Rule 12(f) motion to strike is DENIED as moot; and
3. Plaintiff may file an amended complaint within twenty-one (21) days of service of this order.
IT IS SO ORDERED.

2007 WL 781598 (E.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

# EXHIBIT F

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 98,363
**(Cite as: 1994 WL 583114 (N.D.Cal.))**
<KeyCite Yellow Flag>

Page   42

United States District Court, N.D. California.

**In re ROSS SYSTEMS SECURITIES
LITIGATION.
This Document Applies To All Actions.**

**No. C-94-0017-DLJ.**

July 21, 1994.

William S. Lerach, Milberg Weiss Bershad Hynes & Lerach, Michael A. Sherman, Barrack Rodos & Bacine, San Diego, CA, Robert N. Kaplan, Kaplan Kilsheimer & Fox, New York City, for plaintiffs Richard C. Barrett, Brian Murray.

Terry T. Johnson, Peter P. Chen, Andrew S. Montgomery, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for defendants Ross Systems Inc., Dennis V. Vohs, Selby F. Little, III.

Michael L. Charlson, Heller Ehrman White & McAuliffe, Palo Alto, CA, Douglas M. Schwab, Laurence A. Weiss, Heller Ehrman White & McAuliffe, San Francisco, CA, for defendants Guy L. De Chazal, Henry F. McCance, Andrew M. Paul.

ORDER

*1 On June 29, 1994, the Court heard defendants' motions to dismiss. Theodore J. Pintar of Milberg, Weiss, Bershad, Hynes & Lerach, and Robert N. Kaplan of Kaplan, Kilsheimer & Fox appeared for plaintiffs. Douglas M. Schwab of Heller, Ehrman, White & McAuliffe appeared for defendants Guy de Chazal, Henry F. McCance, and Andrew M. Paul ("director defendants"); Terry T. Johnson and Andrew S. Montgomery of Wilson, Sonsini, Goodrich & Rosati appeared for defendants Ross Systems, Inc., Dennis V. Vohs, and Selby F. Little III ("Ross defendants"). Having considered the papers submitted and the arguments of counsel, the Court hereby GRANTS defendants' motions to dismiss with leave to amend certain allegations.

I. BACKGROUND

A. Factual Background

Plaintiffs filed this class action on March 17, 1994, alleging violations of sections 10(b) [FN1] and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. sections 78j(b) and 78t(a), and Rule 10b-5, [FN2] 17 C.F.R. section 240.10b-5. Plaintiffs are all persons other than defendants who purchased the common stock of Ross Systems, Inc. between October 28, 1992 and January 25, 1994. The "Ross defendants" are Ross Systems; Dennis V. Vohs, Chairman of the Board and Chief Executive Officer of Ross Systems; and Selby F. Little, III, Vice President of Finance and Administration, and Chief Financial Officer and Secretary of Ross Systems. The "director defendants" are Andrew M. Paul, Henry F. McCance, and Guy L. de Chazal. Paul, McCance, and de Chazal are members of Ross' Board of Directors and Audit, Compensation and Stock Option committees, and are general partners of the venture capital firms Welsh, Carson, Anderson & Stowe; Greylock Capital Limited Partnership; and Morgan Stanley Venture Partners, respectively.

In their complaint, plaintiffs allege that defendants knowingly and/or recklessly issued a series of misleading statements designed to keep Ross' stock prices artificially high, in order to sell their shares at inflated prices before revealing the true status of the company, which caused stock prices to fall. These allegedly misleading statements appeared in financial reports, press releases, newspaper articles, analyst reports, and SEC filings, and are alleged to be false and misleading based on fraudulent accounting practices and undisclosed adverse information. Plaintiff also alleges liability of the individual defendants based on theories of aiding and abetting, conspiracy, and control person liability.

On April 18, 1994, both the director defendants and the Ross defendants filed motions to dismiss. The Ross defendants seek dismissal on the following grounds: (1) the allegedly fraudulent statements are not actionable because they are "accurately reported historical results," "vague statements of optimism," or "qualified statements of company objectives"; (2) plaintiffs' allegations of accounting fraud were not pleaded with particularity; and (3) the allegedly false statements made by third parties were not adequately attributed to defendants. The director defendants move to dismiss on the ground that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 583114, *1 (N.D.Cal.))

Page   43

plaintiffs have not sufficiently pleaded their individual involvement nor their secondary liability in the alleged fraud.

B. Legal Standard for Motion to Dismiss

*2 The question presented by a motion to dismiss is not whether a plaintiff will prevail in the action, but whether a plaintiff is entitled to offer evidence in support of his claim.    A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-6 (1957).    In the Ninth Circuit, the court making this determination must assume that the plaintiff's allegations are true, must construe the complaint in a light most favorable to the plaintiff, and must resolve every doubt in the plaintiff's favor. United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir.1981).    Therefore, the court will dismiss the complaint or any claim in it without leave to amend only if "it is 'absolutely clear that the deficiencies of the complaint could not be cured by amendment.' " Noll v. Carlson, 809 F.2d 1446, 1448 (9th Cir.1987) (quoting Broughton v. Cutler Labs., 622 F.2d 458, 460 (9th Cir.1980) (per curiam)).

Federal Rule of Civil Procedure 9(b) applies to securities actions brought under Section 10(b) of the Exchange Act and Rule 10b-5. Wool v. Tandem Computers Inc., 818 F.2d 1433, 1439 (9th Cir.1987).    Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."    Mere conclusory allegations of fraud are insufficient; instead, a plaintiff must plead the time, place and nature of the alleged fraudulent activities. Id. at 1439. Pleading is sufficient if it identifies the circumstances of fraud specifically enough for a defendant to prepare an adequate answer, id., and to defend against the charge without just denying that he has done anything wrong, Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir.1985).    The rule may be relaxed as to matters peculiarly within the opposing party's knowledge. Wool, 818 F.2d at 1439.    In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts upon which the belief is founded. Id.

C. Legal Standard for Scienter

In order to state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege facts establishing scienter, defined as a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976).    In the Ninth Circuit, a plaintiff may establish scienter by showing deliberate fraud or a heightened level of recklessness. Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569-70 (9th Cir.1990) (en banc), cert. denied, 499 U.S. 976 (1991).    Allegations of negligence are insufficient. Ernst, 425 U.S. at 201. To allege scienter, a plaintiff must:  (1) generally aver knowledge or recklessness, and (2) either allege particular facts that give rise to an inference of knowledge of the fraud OR allege fraudulent conduct that departs so extremely from ordinary care that the danger of misleading buyers or sellers is too obvious for the actor not to have been aware of it. In re Network Equip. Technologies, Inc. Litig., 762 F.Supp. 1359, 1362 (N.D.Cal.1991).

*3 Although Rule 9(b) allows scienter to be pleaded generally, courts have required that the facts pleaded provide a basis for a strong inference of fraudulent intent.    In re Glenfed, Inc. Sec. Litig., 11 F.3d 843, 848 (9th Cir.1993), reh'g granted, No. 92-55419, 1994 U.S.App. LEXIS 3331 (9th Cir. February 25, 1994) (en banc).

II. DISCUSSION

A. Plaintiffs Do Not Allege Scienter

In the instant case, plaintiffs aver generally that defendants "knew or recklessly disregarded" adverse information which they failed to disclose, thus rendering other statements misleading.    Yet, plaintiffs' descriptions of the undisclosed statements are conclusory and are pleaded without a factual basis.  Plaintiffs also aver generally that defendants violated Generally Accepted Accounting Principles (GAAP) and thus falsely overestimated their account reserves.    However, violations of GAAP resulting in an overvaluation of a company's financial status indicate negligent accounting at most and are not sufficient to support an inference of fraud. Adam v. Silicon Valley Bancshares, No. C93-20399 RMW (EAI), 1994 U.S.Dist. LEXIS 2797, at *8-9 (N.D.Cal. February 7, 1994).    Moreover, plaintiffs' recitation of the amount of stock sold by

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 583114, *3 (N.D.Cal.))

defendants and of the decline of Ross' stock prices do not warrant an inference of fraud; rather, these allegations are conclusory statements informed by hindsight.

For these reasons, plaintiffs have failed to allege scienter adequately.

B.  Secondary Liability

1.  Aiding and Abetting

Complaint, ¶¶ 34, 36, 83

In its recent decision in Central Bank v. First Interstate Bank, 511 U.S. 164, 114 S.Ct. 1439 (1994) the Supreme Court considered "the continuing confusion over the existence and scope of the § 10(b) aiding and abetting action." Id. at 1444. In order to cut through the confusion the Supreme Court focused directly on the statute at issue and observed that, "the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act," and further that, "the proscription does not include giving aid to a person who commits a manipulative or deceptive act." Id. at 1448. The Supreme Court then stated the necessary result of this analysis, holding that, "[b]ecause the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." Id. at 1455.

In light of Central Bank, plaintiffs concede, as they must, that the claims stating aiding and abetting liability must be dismissed without leave to amend.

2.  Conspiracy

Complaint, ¶¶ 34-35, 83

Defendants, not unexpectedly, contend that the conspiracy liability claims of the complaint must also be dismissed after Central Bank. Plaintiffs, not unexpectedly, take the position, inter alia, that the assessment of the majority holding by dissenting Justice Stevens that the Supreme Court has "swe(pt) away" a cause of action for conspiracy under § 10(b), see id. at 1460, 1460 n. 12 (Stevens, J. dissenting), is naught but dicta and dissent. That position may be procedurally correct but the difficulty is that on the merits Justice Stevens has it

right.

*4 In the Central Bank opinion the Supreme Court recognizes that "aiding and abetting is a 'method by which courts create secondary liability' in persons other than the violator of the statute." Id. at 1452 (quoting Pinter v. Dahl, 486 U.S. 622, 648, n. 24 (1988)).

Like aiding and abetting, conspiracy is a form of vicarious liability. Both are generally described in securities law as forms of "secondary" liability. A member of a conspiracy to violate § 10(b) may, of course, be a party who commits a manipulative and deceptive act and is therefore liable as a primary violator. In such a case, a conspiracy claim is simply duplicative pleading of § 10(b) liability. If, however, the member of the conspiracy is not a primary violator, that party is not the violator of the statute and may be held liable only in a theory of secondary liability. Just as "the text of § 10(b) does not prohibit aiding and abetting," id. at 1452, it does not prohibit conspiring with primary violators. Both aiders and abettors and conspirators fall into the conceptual category of those who are "giving aid" to primary violators. It is apparent, then, that the Central Bank rationale that prohibits implied aiding and abetting liability is applicable to implied conspiratorial liability and leads to the inevitable conclusion that conspiratorial liability for § 10(b) does not survive Central Bank.

This Court notes further support for this conclusion in the discussion by the Supreme Court in Central Bank of "controlling persons" liability which is expressly provided for in section 20 of the 1934 Act. The Supreme Court notes that this suggests that "[w]hen Congress wished to create such [secondary] liability, it had little trouble doing so." Id. at 1452 (quoting Pinter v. Dahl, 486 U.S. 622, 650 (1988)). The Supreme Court reasoned from this circumstance that statutory silence could not support the existence of aiding and abetting liability. Statutory silence as to conspiracy leads to the same result.

Finally, it may be noted that case law has established three elements for aiding and abetting liability: (1) a primary violation of § 10(b), (2) knowledge of the violation on the part of the accused aider and abetter, and (3) substantial assistance by the aider and abetter in the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.
(Cite as: 1994 WL 583114, *4 (N.D.Cal.))

Page  45

achievement of the primary violation. See Metge v. Baehler, 762 F.2d 621, 624 (8th Cir.1985), cert. denied, 474 U.S. 1052 (1986).

The crime of conspiracy may be inchoate, but there is no corollary inchoate tort of conspiracy. In civil cases conspiracy is a theory of liability available only when a completed tort exists. It is apparent then that the first element of aiding and abetting liability will always exist in a conspiracy claim. The second element is a "scienter" requirement and the relevant frame of mind must also be present in every conspiracy case.

If the first two elements are found as to any party and that party then provides substantial assistance so as to be an aider and abetter, it is manifest that an overt act has been added to the conspiratorial agreement with the result that proof of aiding and abetting always proves conspiratorial liability. It is beyond logic to maintain that although Central Bank prohibits aiding and abetting liability it permits plaintiffs to maintain the same cause of action by labelling it as a conspiracy.

*5 Accordingly, plaintiffs' conspiracy claims are dismissed without leave to amend.

### 3. Control Person Liability

Complaint, ¶¶ 25-26, 87-88

The director defendants move to dismiss the claims of control person liability, on grounds that plaintiffs have not alleged actual participation or control. Plaintiffs claim that invocation of the status of defendants as stock owners, managers and directors is sufficient to plead control person liability.

Prior to Hollinger v. Tital Capital Corp., 914 F.2d 1564 (9th Cir.1990) (en banc), cert denied, 499 U.S. 976 (1991), the Ninth Circuit employed a two-prong test for pleading control person liability: (1) that the individual defendants had the power to control or influence, and (2) that the individual defendants were culpable participants in the illegal activity. Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1440 (9th Cir.1987). Hollinger eliminated the second prong of the test, but the first prong still requires a plaintiff to allege actual control. [FN3] See Arthur Children's Trust v.

Keim, 994 F.2d 1390, 1396 (9th Cir.1993) (status as an officer or director does not create any presumption of control). Accordingly, courts in this District have required plaintiffs to plead more than the status of an outside director in order to survive a motion to dismiss control person claims. In re XOMA Corp. Sec. Litig., [1991-92 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,491, at 92,163 (N.D.Cal. Dec. 27, 1991).

As noted above, plaintiffs have not pleaded anything more than the status of the director defendants as outside directors on the board of directors, members of various board committees, and general partners of venture capital firms. Thus, all claims of control person liability against the director defendants are dismissed with leave to amend to allege facts supporting actual control.

### C. Group Pleading for Director Defendants

Complaint, ¶¶ 22-25, 27-29, 78, 81-82

In the Ninth Circuit, where the fraud alleged is fraud in the internal operation of a corporation, plaintiffs are allowed to plead claims for fraud against officers of the corporation using group pleading presumptions that the fraud was the collective action of the officers. Wool v. Tandem Computers Inc., 818 F.2d 1433, 1440 (9th Cir.1987). In particular, in cases where the allegedly false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, 10-Q filings, or other "group-published information," plaintiffs may plead fraud by officers and executives involved in the day-to-day management of those parts of the corporation involved in the fraud through general averment. Smith v. Network Equip. Technologies, Inc., [1990-91 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,659 at 98,093-94 (N.D.Cal. Oct. 19, 1990).

The rationale for group pleading is that facts about fraud flowing from the internal operation of a corporation are peculiarly, and often exclusively, within the control of the corporate insiders who manage the parts of the corporation involved in the fraud. Id. Requiring specific pleading in this context would create a substantial barrier for plaintiffs seeking to allege certain types of corporate securities fraud. Id.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 583114, *6 (N.D.Cal.))

Page  46

*6 Under group pleading, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the alleged misrepresentations with particularity and, where possible, the roles of the individual defendants in the misrepresentations. Wool, 818 F.2d at 1440.

The director defendants in the instant case argue that the group pleading exception does not apply to outside directors not involved in the day-to-day management of the corporation, and that plaintiffs have not adequately pleaded such involvement. Plaintiffs argue that they have pleaded the director defendants' participation with as much specificity as possible without being privy to inside information.

In their complaint, plaintiffs name the director defendants as members of Ross' Board of Directors, and Audit, Compensation and Stock Option committees, and as general partners of Venture Capital Firms that profited from the alleged scheme to inflate Ross stock prices. Based on these positions, plaintiffs allege that the director defendants had access to adverse non-public information concerning Ross' business and finances, and controlled the contents of Ross' alleged misrepresentations through receiving copies of reports and press releases before distribution. Aside from these allegations of general liability based upon the director defendants' positions, plaintiffs specifically assert that each director defendant "signed the 10-K."

When bringing claims against outside directors, it is not enough to make conclusory allegations that the directors "control the contents" of reports, or received copies of statements prior to their issuance. In re Quarterdeck Office Sys., Inc. Sec. Litig., No. CV-92-3970-DWW (GHKx), slip op. at 16 (C.D.Cal. Mar. 29, 1994). Without some allegation that an outside director participated in the publication of the allegedly false statements, or had any other "special relationship" with the corporation, claims that the director merely signed some of the group published documents are not sufficient to meet group pleading requirements. In re XOMA Corp. Sec. Litig., [1991-92 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,491, at 92,160-61 (N.D.Cal. Dec. 27, 1991). Moreover, even under group pleading, it is generally not enough to base allegations on general job descriptions of corporate positions and allege

knowledge or actions flowing primarily from an interpretation of those positions. See Network Equip. Tech., [1990-91 Tr. Binder] Fed.Sec.L.Rep. at 98,094. Therefore, even though plaintiffs argue that the combination of defendants' status as outside directors and members of various committees states a claim, plaintiffs' allegations are not specific enough to satisfy group pleading standards. See Haltman v. Aura Sys., Inc., [Current Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,102, at 98,802 (C.D.Cal. March 12, 1993). [FN4]

Thus, plaintiff's claims against the director defendants are dismissed with leave to amend in order to allege day-to-day management.

D.  Statements of Historical Facts

Complaint, ¶¶ 40-43, 46-47, 49-51, 55-60, 65, 68, 71

*7 Defendants claim that statements regarding quarterly financial results, business contracts and agreements, new product lines, recently opened operations abroad, and organizational restructuring are not actionable because they are accurately reported historical facts. Plaintiffs argue only that the periodic financial statements are false due to accounting fraud.

As noted below, see infra Section H, to the extent that plaintiffs allege that the financial statements are false due to accounting error, they have failed to plead accounting fraud adequately under Rule 9(b). The other historical fact statements, whose veracity plaintiffs do not contest even while alleging that they are misleading when placed in context, merely report facts such as "the signing of more than 20 contracts," Complaint, ¶ 41, "we just opened operations in Italy," Complaint, ¶ 56, and "the company restructured its North American Sales organization," Complaint, ¶ 57. These statements are not actionable because they are accurate statements of historical fact. See In re Wells Fargo Sec. Litig., 12 F.3d 922, 930 (9th Cir.1993); Pleasant Overseas Corp. v. Hajjar, No. C-93-20197-RMW (EAI), slip op. at 8-9 (N.D.Cal. Nov. 18, 1993). Thus, the other historical fact statements alleged are dismissed without leave to amend.

E.  Vague Statements of Optimism

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                    Page  47
(Cite as: 1994 WL 583114, *7 (N.D.Cal.))

Complaint, ¶¶ 40, 42, 46, 49-50, 52, 54-59, 65-66, 70

Defendants argue that many of the allegedly misleading statements are merely "vague statements of optimism" which are not actionable as "material" misrepresentations.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant knowingly or recklessly published an untrue statement of fact or omitted to state a material fact necessary to make its statements not misleading. In re Wells Fargo Sec. Litig., 12 F.3d 922, 926 (9th Cir.1993). In the Ninth Circuit, a projection or statement of belief, including a general expression of optimism, may be actionable under section 10(b) to the extent that one of the three implied factual assertions is inaccurate: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. Wells Fargo, 12 F.3d at 930; In re Apple Computer Sec. Litig., 886 F.2d 1109, 1113 (9th Cir.1989), cert. denied, 496 U.S. 943 (1990). See In re Verifone Sec. Litig., 11 F.3d 865, 871 (9th Cir.1993). Courts in this District have found that allegations concerning projections or statements of optimism must be dismissed if they are too vague. In re Caere Corporate Sec. Litig., 837 F.Supp. 1054, 1058 (N.D.Cal.1993). See In re Software Publishing Sec. Litig., [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,094, at 98,757-60 (N.D.Cal. February 2, 1994).

A sample of defendants' statements of belief, as alleged in plaintiffs' complaint, includes:
**\*8** "We are pleased with the current level of prospective sales, which is particularly high ..." ¶ 40.
"Acceptance of these products in the U.S. has exceeded our expectations.... our rapidly growing prospect base reflects significant opportunity in this market." ¶ 41.
"We are optimistic that these future business prospects ... will continue to secure Ross Systems' position as one of the leading providers ..." ¶ 42.
"Strong North American and PROMIX Sales Contribute to Record Results" ¶ 49.
"The introduction of several new products ...

should contribute to further sales growth in future quarters." ¶ 49.
"This quarter was one of the most significant in the company's history.... [and] holds huge growth potential for the company." ¶ 55.

The other statements of belief alleged in the complaint are located in paragraphs 46, 49, 50, 52, 54, 56-59, 65-66, and 70, and can be identified by their use of words similar to the following: "pleased," "strong," "significant," "optimistic," "all-time high," "exceptional," "exceeded our expectations," "well-positioned," "success[ ]," "high," and "well." These statements include vaguely worded expectations, found in paragraphs 49, 50, 52, 56, 58, 59 of the complaint.

The above noted statements are similar to those dismissed by other courts in this District as too vague to be actionable. For example, the court in Caere Corp. dismissed without leave to amend allegations regarding statements such as " 'well-positioned' for growth," "exciting year," "revenues and earning had reached 'record levels'," and "continuing strong sales." Caere Corp, 837 F.Supp. at 1057, 1058. Similarly, in Software Publishing, the court dismissed claims including phrases such as "we will be better positioned," "best-of-breed leadership," and "exciting period." Software Publishing, [Current Binder] Fed.Sec.L.Rep. at 98,757-60. Since the statements plaintiffs allege to be misleading are similarly vague, plaintiffs' allegations regarding positive characterizations of Ross Systems' current and future situation are dismissed without leave to amend.

F. Statements of Financial Objectives

Complaint, ¶¶ 44, 56, 61, 67

Defendants also move to dismiss plaintiffs' allegations concerning statements of internal objectives or expectations, such as:
"We've anticipated that we would grow at a rate of up to 30 percent internally ..." ¶ 56.
"For the foreseeable future, the Company believes that funds generated from future operations, together with the bank line of credit, will be sufficient to meet its cash requirements for operations ..." ¶ 44.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                              **Page 48**
**(Cite as: 1994 WL 583114, \*8 (N.D.Cal.))**

To state a cause of action for a projection, a plaintiff must allege sufficient facts to substantiate a claim that the defendant lacked a reasonable basis for the projection or made the projection in bad faith. Kowal v. MCI Communications Corp., [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,101 at 98,797 (D.C.Cir. Mar. 1, 1994). It is not sufficient to allege that the projections did not come true. See Caere Corp., 837 F.Supp. at 1060.

**\*9** Plaintiffs have not alleged any facts supporting a conclusion that defendants were acting unreasonably in their projections. Rather, plaintiffs make conclusory allegations about undisclosed information allegedly available to defendants, and state facts about the eventual decline of Ross' stock. These allegations are informed by hindsight and are insufficient to raise an inference of unreasonableness. Therefore, plaintiffs' claims regarding financial objectives are dismissed with leave to amend to allege that defendants made such statements without a reasonable basis.

G. Non-Disclosure of Internal Projections

Complaint, ¶¶ 73-76

Plaintiffs allege that defendants failed to disclose known adverse information and that this failure rendered their other statements misleading. Plaintiffs point to undisclosed information such as:
"Ross' products were meeting substantial resistance in the marketplace ..." ¶ 74.
"the Company was experiencing the adverse impact of softening demand for its products and services ..." ¶ 74.
"the Company was experiencing declining business prospects ..." ¶ 75.
"Ross was experiencing sharply increasing expenses ..." ¶ 76.

Plaintiffs' allegations are similar to those dismissed in In re Verifone Securities Litig., 11 F.3d 865, 869 (9th Cir.1993). In that case, the Ninth Circuit found no duty to disclose forecasts of adverse information. The court found that "[a]bsent allegations that [defendant] withheld financial data or other existing facts from which forecasts are typically derived" the alleged omissions were not material and did not render other statements misleading. Id. [FN5] Accordingly, the court dismissed claims regarding an alleged failure

to state that "sales growth ... had slowed substantially," "unit sales ... had materially declined," and the "market was saturated," because these claims were "in substance, failure[s] to make a forecast of future events." In addition, another court in this District has dismissed claims that statements were rendered misleading by a failure to disclose that a product was meeting substantial resistance in the marketplace or was, in general, not encountering great success. In re Software Publishing Sec. Litig., [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,094, at 98,757 (N.D.Cal. February 2, 1994).

Plaintiffs' claims that Ross "was experiencing declining business prospects," or "was experiencing sharply increasing expenses" do no differ in substance from the claims dismissed in Verifone and Software Publishing as forecasts which do not have to be disclosed. Thus, plaintiffs' claims of undisclosed information are dismissed with leave to amend to allege material and specific omissions of facts that existed at the time the allegedly misleading statements were made.

H. Financial Statements and Accounting Fraud

Complaint, ¶¶ 43, 47, 51, 60, 68, 79

**\*10** Plaintiffs also allege that defendants created false and misleading reports through accounting fraud, thereby overstating Ross' financial position.

To state a claim for accounting fraud, a plaintiff must plead facts supporting a conclusion that a defendant has prepared fraudulent financial statements, and that the alleged financial fraud was material. Rogal v. Costello, [1992-1993 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,245 at 95,092-93 (N.D.Cal. October 8, 1992). While a plaintiff need not specify the exact dollar amount of each financial error, In re 3COM Securities Litig., 761 F.Supp. 1411, 1415 (N.D.Cal.1990), some level of specificity is required. In re Wells Fargo Sec. Litig., 12 F.3d 922 (9th Cir.1993).

In the instant case, plaintiffs allege that several of Ross' financial statements were rendered materially false by Ross' failure to disclose that its accounts receivable was severely underfunded by specifically identified amounts. Plaintiffs' allegations include the following:

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 583114, *10 (N.D.Cal.))

Page  49

"Ross' reserves of only $1.5 million for total receivables of $33.2 million ... were understated by at least $2 million.... Ross was ... deferring the write-off of these receivables until future quarters when it hopefully would have higher revenues ..." ¶ 47.

"[D]efendants knew that revenues had been recognized where the earnings process was not complete, resulting in Ross having to ultimately report charges in excess of $4 million against accounts receivable ..." ¶ 51.

"Ross improperly recorded approximately $1.0 million ... as a restructuring charge .." ¶ 51.

"Ross improperly recognized revenue from software licensing agreements prior to fulfilling its obligations under the agreements and prior to an exchange occurring, in violation of Statement of Position 91-1 "Software Revenue Recognition," and FASB Statement of Concepts No. 5." ¶ 79.

Unlike the allegations upheld in Wells Fargo, where the plaintiff identified nine specific loans not reflected in the company's report of its loan loss reserves, the allegations here do not specify particular transactions underlying defendants' alleged accounting deficiencies. See Wells Fargo, 12 F.3d at 927-8. To survive a motion to dismiss, plaintiffs cannot simply allege that specific accounting practices were violated without also providing specific underlying facts to support the allegations. Adam v. Silicon Valley Bancshares, No. C93-20399 RMW (EAI), 1994 U.S.Dist. LEXIS 2797, at * 5 (N.D.Cal. February 7, 1994). Thus, plaintiffs' claims regarding accounting fraud are dismissed with leave to amend to allege specific fraudulent transactions.

I. Third Party Financial Analyst Statements

Complaint, ¶¶ 30-33, 45, 48, 53, 62-64, 69

The complaint also alleges that defendants are liable for misleading statements contained in financial analyst reports.

To state a cause of action against a company for statements made by third party analysts, a plaintiff must allege facts supporting the conclusion that the company adopted or endorsed the analyst reports. In re Software Publishing Sec. Litig., [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,094 at 98,762 (N.D.Cal. Feb 2, 1994). A company is liable for third party statements only if it "places its imprimatur on the reports" by expressly or impliedly representing that the information is accurate or coincides with the company's views. Id. A defendant has not adopted an analyst's report unless he has sufficiently entangled himself with the report to attribute its content to him. In re Caere Corporate Sec. Litig., 837 F.Supp. 1054, 1059 (N.D.Cal.1993).

*11 To state a cause of action against an individual insider of a corporation for statements made by third party analysts, a plaintiff must demonstrate (1) that the insider adopted the third party report, and (2) that the insider knew that the forecasts were unreasonable when made and failed to disclose the unreasonableness to investors. Id. at 1057. To show adoption by an individual, a plaintiff must plead (1) specific reports and the name of the insider who adopted them; (2) specific interactions between the insider and the analyst; and (3) dates on which the interactions occurred. Id.; In re Time Warner Inc. Sec. Litig., 9 F.3d 259 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1397 (1994). A plaintiff may not use group pleading to attribute third party financial analyst reports to individual defendants because such reports are not "group published information." In re Network Equipment Technologies, Inc., 762 F.Supp. 1359, 1367 (N.D.Cal.1991).

Plaintiffs make the following allegations concerning third party analysts:
Reports were "based on information supplied by defendants ..." ¶¶ 45, 48, 53, 62-64, 69.
Defendants "used their communications to analysts to allay concerns over Ross' future prospects and to fuel artificial inflation ..." ¶ 31.
Defendants "communicate[d] with securities analysts on a regular basis ..." ¶ 32.
Ross "provide[d] detailed 'guidance' to analysts" through "telephone calls, meetings, and briefings ..." ¶ 32.
Defendants had these communications with analysts in order to cause them to issue favorable reports on Ross and used these communications to falsely present the success ... of Ross ... and to artificially inflate the market price of Ross' common stock." ¶ 32.
Ross "approved," "knew of these reports," "endorsed these reports, adopted them as its own and placed its imprimatur on them ..." ¶ 33.

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                              Page 50
(Cite as: 1994 WL 583114, *11 (N.D.Cal.))

Plaintiffs' allegations do not adequately attribute these third party statements to Ross. To allow such conclusory allegations to state a claim against a corporation would subject corporations to continuous litigation arising from the statements of countless others who provide analyse's in the financial world. See Caere Corp., 837 F.Supp. at 1059. Thus, plaintiffs' claims regarding Ross' connection to third party statements are dismissed with leave to amend, in order to plead more specific entanglement.

For claims of individual defendant liability for third party analyst statements, plaintiffs have clearly failed to allege the specific interactions necessary to plead each individual defendant's endorsement. To the extent that plaintiffs can plead specific individual entanglement, their claims regarding third-party statements are dismissed with leave to amend. To the extent that plaintiffs wish to employ group pleading to attribute third party statements to the individual defendants, their claims are dismissed without leave to amend.

### III. CONCLUSION

*12 For the foregoing reasons, the Court ORDERS:

1. Plaintiffs' claims of aiding and abetting liability and conspiracy are DISMISSED WITHOUT LEAVE TO AMEND.

2. Plaintiffs' claims of control person liability are DISMISSED WITH LEAVE TO AMEND to allege actual control.

3. Plaintiffs' claims against the director defendants are DISMISSED WITH LEAVE TO AMEND to allege the directors' involvement in the day-to-day management of Ross Systems.

4. Plaintiffs' claims regarding defendants' statements of accurately reported historical facts, vague statements of optimism, and third party analyst reports attributed to the director defendants through group pleading are DISMISSED WITHOUT LEAVE TO AMEND.

5. Plaintiffs' claims regarding defendants' statements of financial objectives are DISMISSED WITH LEAVE TO AMEND to allege that

defendants had no reasonable basis for their statements.

6. Plaintiffs' claims regarding defendants' non-disclosure of adverse information are DISMISSED WITH LEAVE TO AMEND to allege existing material facts that were not disclosed.

7. Plaintiffs' claims regarding accounting fraud are DISMISSED WITH LEAVE TO AMEND to allege specific transactions underlying each alleged fraud.

8. Plaintiffs' claims regarding third party reports are DISMISSED WITH LEAVE TO AMEND to adequately allege entanglement.

9. Any amended complaint in conformance with this Order must be filed on or before August 19, 1994.

IT IS SO ORDERED.

FN1. Section 10(b), 15 U.S.C. § 78j(b), makes it "unlawful for any person, directly or indirectly ...: "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

FN2. Rule 10b-5, 17 C.F.R. § 240.10b-5, forbids the making of "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

FN3. Hollinger did hold that alleging the status of "broker-dealer" is sufficient to allege control person liability. Yet, Hollinger specifically limited this status allegation to the position of broker-dealer on the grounds that broker-dealers have, by law, a duty to supervise their registered representatives, and that, therefore, their relationship is "necessarily one of controlled and controlling person." Hollinger, 914 F.2d at 1573. Such status is not implicated by the present action.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

FN4. The Court notes that plaintiffs misleadingly characterize the holdings in In re MDC Holdings Sec. Litig., 754 F.Supp. 785, 795 (S.D.Cal.1990), and In re Genentech, Inc. Sec. Litig., [1989 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,544 (N.D.Cal. July 7, 1989).   Far from extending the group pleading presumption to directors without day-to-day control, these decisions actually dismissed the plaintiffs' claims with leave to amend in order to allege greater detail demonstrating collective responsibility.

FN5. Plaintiffs argue that Item 303 of Regulation S-K imposes a duty to disclose "trends or uncertainties."   See Plaintiffs' Memorandum of Points and Authorities in Opposition to the Ross Defendants' Motion to Dismiss, at 15 n. 15; Complaint, ¶ 77(a).   To the extent that this argument applies to statements of future projections, it was rejected in In re Verifone Sec. Litig., 11 F.3d 865, 870 (9th Cir.1993).   The court there noted that another SEC regulation which expressly addresses forecasts provides that forward-looking information need not be disclosed.  Id.

1994 WL 583114 (N.D.Cal.), Fed. Sec. L. Rep. P 98,363

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT G

Slip Copy
(Cite as: 2007 WL 2013958 (N.D.Cal.))
<KeyCite Citations>

Page 53

Only the Westlaw citation is currently available.

United States District Court, N.D. California,
San Jose Division.

**SECURITIES and EXCHANGE COMMISSION,**
Plaintiff,
v.
**Keith G. BAXTER, Ronald J. Goedde, and
Richard D. Nye, Defendants.**

No. C-05-03843 RMW.

July 11, 2007.

Elizabeth Espinosa Krupa, Thomas J. Krysa, for
Plaintiff.

Susan D. Resley, Amy M. Ross, Grant P. Fondo,
Monique R. Sherman, Laura R. Smith, for
Defendants.

ORDER DENYING DEFENDANT NYE'S
MOTION TO DISMISS

RONALD M. WHYTE, United States District
Judge.

*1 Before this court is defendant Richard D.
Nye's ("Nye") motion to dismiss the Securities and
Exchange Commission's ("SEC") First Amended
Complaint ("FAC") for failure to state a claim.
Defendant Keith G. Baxter ("Baxter") [FN1]
originally noticed a motion to dismiss set for
hearing the same day. However, the SEC and Baxter
filed notice that they have negotiated a proposed
settlement and stipulated to extend the briefing
schedule with respect to Baxter's motion to dismiss.
[FN2] The SEC opposes Nye's motion. The court
has read the moving and opposing briefs and
considered the arguments of counsel. For the
reasons set forth below, the court DENIES
defendant Nye's motion to dismiss.

FN1. Baxter was Cornerstone's chief executive
officer and chairman of the board of directors. FAC
¶ 18.

FN2. On January 5, 2007 Baxter filed notice of a
Consent to Final Judgment and the court entered
final judgment against him shortly thereafter.

I. BACKGROUND

At the April 7, 2006 hearing for defendants'
motion to dismiss the SEC's complaint the court
noted that it was difficult to tell from the complaint
which facts supported which of the SEC's claims.
The parties then advised the court that they had
entered into a stipulation for the SEC to amend its
complaint. Defendant Nye now moves to dismiss the
FAC.

Cornerstone Propane Partners, L.P.
("Cornerstone") was formerly one of the nation's
largest propane marketers. FAC ¶ 1. It was formed
in October 1996 by Northwestern Corp.,
headquartered in Sioux Falls, South Dakota, to hold
and operate Northwestern's non-regulated propane
business. Id. ¶ 24. It consisted of two divisions: a
retail division that sold propane through customer
service centers and Coast Energy Group ("CEG"),
the larger subsidiary, which handled the wholesale
of propane and other energy products. Id. ¶¶ 1, 30.
In 1996 Cornerstone completed an initial public
offering of its limited partnership units, which were
registered with the SEC and traded on the New York
Stock Exchange. Id. ¶ 23. Cornerstone's fiscal year
ends June 30. Cornerstone was required to file
annual and quarterly reports with the SEC,
including financial statements prepared in
conformity with Generally Accepted Accounting
Principles ("GAAP"). Id. ¶ 4. At issue are
disclosures in Cornerstone's forms 10-K for 2000
and 2001, its forms 10-Q for the first three quarters
of 2001, and a September 28, 2001 press release.

Nye was vice president of finance and
administration of Cornerstone from January 1998 to
November 2002 and acting chief financial officer of
Cornerstone from July 2001 to June 2002. Id. ¶ 20.
Between 1997 and 2000 CEG was the subject of
numerous record-keeping problems. See Mot. at 4-
5; FAC ¶ 31. At the end of the 1998 audit, the
outside auditors brought CEG's accounting
deficiencies to the attention of Cornerstone
management. FAC ¶ 47. The SEC alleges that from
1998 through 2000 Nye knew that Cornerstone
failed to improve its accounting systems, hire
additional accounting staff, or enhance its record-
keeping processes to keep pace with the company's
dramatic growth and diversification. Id. ¶ 32. The
SEC contends that Nye knew that proper

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

documentation had not been maintained and that CEG was unable to verify various significant account balances in its books and records which led to non-conforming financials. Id. ¶ 36. The SEC alleges that from 1996 through 2000 CEG was unable to verify balances for accounts such as accounts receivable, accounts payable, cost of sales, cash, and clearing accounts. Id. ¶¶ 37-40. In addition, between 1999 and 2000 Nye allegedly knew that the intercompany accounts did not balance and knew that the company's Canadian-denominated transactions were not properly converted by either the accounting system or manually, but did nothing to fix the errors. Id. ¶¶ 42-43. Starting in January 1999 Cornerstone began maintaining CEG's accounting records on a new accounting system. However, the account balances on this new system apparently differed significantly from the balances maintained in CEG's accounting system due to improper record keeping. Id. ¶ 45.

*2 During 2000 and 2001 Cornerstone hired new management at CEG to oversee a project to verify "hundreds of millions of dollars of account balances" recorded in its accounting records and hired a new controller to improve record-keeping and substantiation of accounts. Id. ¶¶ 2, 49. The project included identifying account balances that could not be substantiated, which were then transferred to a "holding account" for further research. Id. ¶¶ 52-54. According to the SEC, by the time Cornerstone prepared its 2000 financial statements there were still unreconciled discrepancies between Cornerstone's accounting records for CEG and CEG's own accounting records, including $25 million for accounts payable, $6 million for accounts receivable, and $16 million for clearing accounts. Id. ¶ 59. Nye allegedly directed Robert Ellington, Cornerstone's controller at the time, to reclassify the unverified account balances in order to conceal them from the auditors. Id. ¶¶ 57-61. Nye (and others) reviewed and signed Cornerstone's fiscal year 2000 annual report on form 10-K. Id. ¶ 63. Nye also reviewed the 2001 forms 10-Q and signed the management representation letters in connection with the audit and quarterly reviews for 2000 and 2001, which provided, inter alia: (1) Cornerstone's financial statements were fairly presented in conformity with GAAP; (2) there were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and (3)

the accounting records underlying the financial statements accurately and fairly reflected, in reasonable detail, the transactions of the company and its subsidiaries. Id. ¶¶ 10-11, 70, 82.

The SEC alleges that the project uncovered hundreds of millions of dollars of unsubstantiated account balances from many of CEG's business units. Id. ¶¶ 3-4. As a result, the SEC contends, the financial statements disclosed in Cornerstone's filings with the SEC did not accurately reflect the transactions of the company and were therefore not in compliance with GAAP. Id. ¶ 4. In addition, the SEC submits that during the course of the substantiation project Cornerstone failed to disclose the likelihood that the company would be forced to write-off those balances that it was unable to verify or substantiate. Id. ¶ 5.

The SEC alleges that at the end of 2001 the holding account included more than $320 million of unsubstantiated account balances. Id. ¶ 83. The project results indicated that CEG should write-off (presumably a net balance) of more than $15 million in unsubstantiated balances. Id. ¶ 84. In July 2001 Nye informed the outside auditors of the unsubstantiated balances and was told the balances either needed to be substantiated or written off or Cornerstone would not receive an unqualified audit opinion. Id. ¶ 85. Thereafter, the SEC alleges, Cornerstone, with the assistance of its outside auditors, performed a verification project of CEG's Canadian crude oil and natural gas businesses for the prior 18 months which did not uncover any errors. On September 28, 2001 Cornerstone issued a press release disclosing a write-off as of June 30, 2001, purportedly drafted in part by Nye:

*3 Cornerstone Propane Partners, L.P. today reported that it is recording a $9.8 million non-cash charge to its fiscal 2001 fourth quarter results following a detailed review of the Canadian crude oil and U.S.-based petroleum liquids processing operations of Coast Energy Group ("CEG"), Cornerstone's commercial energy wholesale and integrated logistics division. The review was performed in connection with the documentation of the final accounting treatment of the sale of CEG's Canadian crude oil business in fiscal 2001.

Id. ¶¶ 87-91. [FN3] The 2001 form 10-K repeated these statements regarding the write-off. The SEC alleges these disclosures (1) falsely attributed the write-off entirely to 2001, (2) falsely attributed the

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

write-off only to the Canadian crude oil business and U.S.-based petroleum liquids processing operations; and (3) misleadingly omitted disclosure of the gross unsubstantiated balances that were in the hundreds of millions of dollars by disclosing only the net balance of $9.8 million. Id. ¶¶ 98-99. Cornerstone filed for bankruptcy in 2004.

> FN3. The SEC also appears to allege that, at Baxter's direction and with Nye's knowledge, Cornerstone deleted disclosures in the September 28, 2001 press release that indicated the write-offs related to accounting problems and errors prior to 2001. ¶ 96.

## II. LEGAL STANDARDS

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Dismissal can be based on the "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir.1988). The issue is not whether the non-moving party will ultimately prevail but whether it is entitled to offer evidence to support the claims asserted. Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir.1997). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. Barron v. Reich, 13 F.3d 1370, 1374 (9th Cir.1994). However, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Bell Atlantic Corp. v. Twombly, 530 U.S. ----, 127 S.Ct. 1955, 1964-65 (2007) (citations omitted).

Fed.R.Civ.P. 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." See also In re GlenFed Inc. Securities Litig., 42 F.3d 1541 (9th Cir.1993) (en banc). Therefore, the SEC's allegations of falsity must be stated with particularity. Id. at 1548. "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.2003). "[A] plaintiff must set forth more than

the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." Id. In addition, Rule 9(b) applies not only to claims in which fraud is an essential element, but also to claims grounded in allegations of fraudulent conduct. Id. at 1103-04 (explaining that where a plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim, the claim is said to be "grounded in fraud" or to "sound in fraud" and the pleading of that claim as a whole must satisfy Rule 9(b)).

## III. ANALYSIS

*4 Nye argues that each of the SEC's claims fail to state one or more element with the requisite particularity. The parties do not dispute that the SEC's first, third, fourth, and fifth claims against Nye are grounded in fraud and subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b). The SEC contends that its second and sixth claims for relief do not sound in fraud and, accordingly, are not subject to the heightened pleading requirements of Rule 9(b). The court addresses each in turn.

### A. Section 10(b) and Rule 10b-5 Claims

The SEC's first claim allege that Nye violated section 10(b) of the Exchange Act and Rule 10b-5 thereunder by making false statements or omissions in connection with the offer or sale of publicly-traded partnership shares of Cornerstone. Nye argues that the complaint (1) fails to state with particularity the alleged statements that are false and misleading and (2) fails to specify the conduct of Nye individually. Although not specifically argued, the FAC also adequately alleges the requisite scienter.

#### 1. Alleged False and Misleading Statements

Nye argues that falsity has not been pled with particularity. Specifically, he contends that: (1) the complaint merely alleges that the "financial statements" were false and failed to conform with GAAP, but fails to identify which balances were false and misleading or to quantify such items, the allegations of the statements describing the write-off do not show that those statements were false, and (3)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

falsity is not alleged with particularity because no contemporaneous statements showing falsity have been alleged. [FN4] The court finds that although the complaint is not easy to follow, the allegations state with particularity, and sufficiently under Rule 9(b), "the time, place and nature of the alleged fraudulent activities of defendants," that is sufficient under Rule 9(b). See Semegen v. Weidner, 780 F.2d 727, 734-35 (9th Cir.1985); see also Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir.2007) (citation omitted).

> FN4. Nye also argues that, in any event, the SEC has not alleged a duty to disclose the in-progress reconciliation. Nye relies upon Brody v. Transitional Hosp. Corp., 280 F.3d 997, 1006 (9th Cir.2002) for the proposition that "Rule 10b-5 ... prohibit[s] only misleading and untrue statements, not statements that are incomplete ." He also cites In re Convergent Tech. Sec. Litig., 948 F.2d 507, 516 (9th Cir.1991) for the proposition that "[t]he securities laws do not require management to 'bury the shareholders in an avalanche of trivial information--a result that is hardly conducive to informed decision-making.' " See Mot. Dismiss at 10:19-25. However, the SEC's claims do not rest on allegations of incomplete statements or trivial information. The complaint alleges substantially misleading and untrue statements.

First, the court finds that the allegations are sufficient in pointing to particular financial statement balances the SEC contends were false and misleading when issued. As to the financial statements in the form 10-K for 2000, the SEC alleges that during 1999 and 2000 CEG was unable to verify that the accounts receivable, accounts payable, cost of sales, cash, and clearing accounts. Variances between the Cornerstone's accounting system and CEG's accounting system for the CEG division showed discrepancies of $25 million for accounts payable, $6 million for accounts receivable, and $16 million for the clearing account as of the 2000 fiscal year end. Cornerstone was unable to properly eliminate its intercompany balances by approximately $1.5 million as of June 30, 2000. As to its 2001 quarterly financial statements, Cornerstone was unable to substantiate balances totaling "hundreds of millions of dollars," which it transferred to a holding account. Cornerstone did not properly account for currency differences for Canadian dollar transactions. These allegations that the accounting records did not fairly and accurately reflect Cornerstone's transactions and operations (and did not comply with GAAP) support the inference that its financial statements were materially false and misleading. See, e.g., S.E.C. v. Sandifur, 2006 WL 538210, *3 (W.D.Wash.2006) (holding that "[b]ecause the complaint specifically alleges that the 10-Q and the 10-K misstated Metropolitan's pre-tax net income, the Court finds that the complaint identifies with sufficient particularity the alleged misstatements made by Defendant Ness in these documents").

**\*5** Although unclear, the complaint does not appear to allege that the June 30, 2001 financial statements were false and misleading since Cornerstone apparently had reclassified unsubstantiated balances to a holding account and then written-off the net amount. [FN5] Rather, the SEC alleges that the disclosure of the write-off in the June 30, 2001 form 10-K and September 28, 2001 press release was false and misleading. The 2001 form 10-K and press release stated:

> FN5. The complaint does suggest that the write-off attributed to 2001 should have been at least partially attributed to 1999 and 2000.

Cornerstone Propane Partners, L.P. today reported that it is recording a $9.8 million non-cash charge to its fiscal 2001 fourth quarter results following a detailed review of the Canadian crude oil and U.S.-based petroleum liquids processing operations of Coast Energy Group ("CEG"), Cornerstone's commercial energy wholesale and integrated logistics division. The review was performed in connection with the documentation of the final accounting treatment of the sale of CEG's Canadian crude oil business in fiscal 2001. FAC ¶ 91. Specifically, the SEC alleges that Cornerstone recorded the $9.8 million write-off because of the remaining unreconciled balances resulting from years of unsubstantiated balances. Therefore, the SEC contends recording the write-off entirely in 2001 was false and misleading. The SEC contends that the statement that the write-off was prompted by the recent sale of the Canadian crude oil business unit was false because the write-off was actually prompted by years of poor record-keeping and lack of internal controls in all areas of CEG's business. The SEC also alleges that the statement that the write-off was primarily attributed to a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



"recent sale" of the Canadian crude oil business unit was false because the write-off was actually a result of unsubstantiated balances for many of CEG's business units (and therefore the statements were misleading of the nature and scope of the accounting problems that caused the write-off). In addition, the SEC contends, even if the net impact of the unsubstantiated balances was $9.8 million, the disclosure was false and misleading because it failed to also disclose that the gross unsubstantiated balance in the holding account was more than $320 million.

Second, the court finds that the SEC has alleged with sufficient particularity the falsity of the statements. "[A] plaintiff can satisfy Rule 9(b)'s particularity requirements for alleging the falsity of a statement by 'pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." Yourish v. Cal. Amplifier, 191 F.3d 983, 994 (9th Cir.1999) (citing GlenFed, 42 F.3d at 1549). Here, the SEC has adequately alleged the existence of contemporaneous information available to or known by defendant Nye at the time the financial statements were issued. As to the falsity of the 2000 annual financial statements and 2001 quarterly financial statements, the SEC alleges that Cornerstone management had identified unsubstantiated balances from years of record-keeping errors and had commenced a project to reconcile such balances as early as March 2000. The SEC alleges that these efforts included the hiring of additional accounting staff, discussion of the remaining unreconciled balances among the accounting personnel, including Nye, and the reclassification of unreconciled balances, including at the direction of Nye. The SEC alleges that at the time the 2000 annual financial statements and 2001 quarterly financial statements were issued, these efforts continued and there remained substantial unreconciled balances (resulting in financial statements that were not in conformity with GAAP). These factual allegations, taken together, sufficiently set forth contemporaneous information showing falsity of the statements to satisfy Rule 9(b)'s particularity requirement.

*6 Defendant further argued at the hearing on the motion that the complaint is insufficient in that it mixes the scienter allegations with the falsity allegations. Although the requirements of falsity and scienter are distinct and both elements are necessary for a § 10(b) claim, see 15 U.S.C. §§ 78u-4(b)(1) and (2), the dual pleading requirements are typically incorporated into a single inquiry because falsity and scienter are generally inferred from the same set of facts. In re Read-Rite Corp., 335 F.3d 843, 846 (9th Cir.2003); Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir.2001). Here, plaintiff's factual allegations satisfy the falsity requirement, as discussed above, even if certain of the same allegations also support the scienter requirement.

2. Specificity of Individual Conduct

Nye also contends that the complaint fails to satisfy the specificity required by Rule 9(b) because it improperly groups the defendants in describing alleged improper conduct or accuses them of engaging in identical acts. In Howard v. Everex Systems, Inc., 228 F.3d 1057, 1061 (9th Cir.2000), the Ninth Circuit held that a corporate officer's signature on the document containing the alleged false and misleading statements, when coupled with scienter on the part of the officer, is sufficient to show that he made the statement. The Howard court stated: "[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." Id. "Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements." Id. at 1062. Moreover, the Ninth Circuit has recognized that it is difficult to attribute particular fraudulent conduct to each defendant individually in cases where corporate fraud is alleged. Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 540 (9th Cir.1989). Therefore, "[t]o overcome such difficulties in cases of corporate fraud, the allegations should include the misrepresentations themselves with particularity and, where possible, the roles of the individual defendants in the misrepresentations." Id.

Nye was vice president of finance and administration from January 1998 to November 2002 and acting chief financial officer from July 2001 to June 2002. FAC ¶ 20. Although some allegations attribute conduct to the defendants collectively, the complaint also includes allegations specific to Nye's role. [FN6] For example, the

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

complaint alleges that Nye directed CEG's controller to reclassify the unverified account balances in order to conceal them from the auditors. Id. ¶ 58. Nye approved of the reclassification of discrepancies between Cornerstone's accounting system and CEG's accounting system to a holding account. Id. ¶ 59. Nye participated in preparing the disclosures regarding the write-off in the 2001 form 10-K and press release. Id. ¶¶ 87-90. Nye received updates throughout 2001 as to the incomplete status of the account verification project. Id. ¶ 76. Nye and Ellington participated in detailed quarterly reviews of specific unsubstantiated balances and balances transferred to the holding account. Id. Nye reviewed divisional financial statements, including CEG's, and reviewed Cornerstone's consolidated financial statements. Id. ¶ 34. Nye reviewed and signed the forms 10-K and 10-Q and the management representation letters in connection with the yearly audits and quarterly reviews. Id. ¶¶ 10-11, 63, 77. While the complaint is vague to the extent it refers generically to email communications and reports sent to Nye about the accounting problems and to internal meetings without any specificity, the complaint alleges sufficient facts as to Nye's role in the alleged false and misleading statements to survive Rule 12(b) (6) dismissal. See Swartz, 476 F.3d at 765 ("In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, 'identify the role of each defendant in the alleged fraudulent scheme.' ") (citing Moore, 885 F.2d at 541) (internal edits omitted); Compare Hokama v. E.F. Hutton Co., 566 F.Supp. 636, 646 (C.D.Cal.1983) (finding that conclusory allegations that merely stated the defendants participated and provided substantial assistance to be insufficient under Rule 9(b)).

> FN6. Moreover, the SEC does not rely upon the "group published doctrine" as defendant argues since it does not attribute responsibility for false and misleading statements to a group of defendants, but rather alleges that Nye was responsible for, inter alia, reviewing the divisional and consolidated financial statements, reviewing and discussing the unsubstantiated account balances, reviewing and signing the forms 10-K and 10-Q, and drafting the press release statements that are alleged to be false and misleading.

3. Scienter

*7 Defendant Nye does not argue that scienter is not adequately pled. However, a showing of scienter is an element of an enforcement action pursuant to section 10(b) and Rule 10b-5. S.E.C. v. Rubera, 350 F.3d 1084, 1094 (9th Cir.2003) (citing Aaron v. SEC, 446 U.S. 680, 701-02 (1980)); S.E.C. v. Rana Research, Inc., 8 F.3d 1358, 1364 (9th Cir.1993). Scienter may be established by a showing of recklessness, defined as:

> [A] highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Id. (citing Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir.1990) (en banc)). A defendant is reckless "if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." Howard, 228 F.3d at 1064 (internal quotations and citation omitted). In Howard, the Ninth Circuit held that allegations that the defendant signed the financial statements "in the face of potentially alarming information concerning [the company's] financial condition" were sufficient to support an inference of scienter. Id. Such "alarming information" included the outsider auditor's reporting of weaknesses in the company's internal financial controls, even though the auditor did not conclude that the financial statements were generated on the basis of faulty accounting practices. Id.

Here, the Ninth Circuit's reasoning in Howard applies. As in Howard, the complaint alleges that Cornerstone's outside auditors informed the company of problems with its internal accounting controls as early as the end of the 1998 audit. The record-keeping problems and inadequate accounting resulted in significant unsubstantiated account balances which were reclassified to a holding account for further research. Among other things, Cornerstone commenced a reconciliation project to verify CEG's unsubstantiated balances. There were significant discrepancies between two accounting systems both purporting to reflect the CEG division's accounting records. The intercompany accounts did not balance. As alleged, these accounting problems spanned at least from 1999

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

through 2001. During this period, Nye is alleged to have signed the financial statements filed with the SEC and the representation letters with the auditors. As in Howard, the allegations that Nye signed the financial statements and representation letters "in the face of potentially alarming information concerning [the company's] financial condition" are sufficient to support an inference of scienter on Nye's part.

B. Primary Violations of Sections 13(a) and 13(b) and Rules Thereunder

**\*8** The SEC claims that defendant violated section 13(b)(5), Rule 13b2-1, and Rule 13b2-2. Section 13(b)(5) provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in" § 13(b)(2). 15 U.S.C. § 78m(b)(5). Rule 13b2-1 imposes a prohibition narrower in subject-matter scope but without any requirement that violations be knowing: "No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act." Rule 13b2-2 provides (1) a director or officer of a company commits a violation by making to an accountant a false statement or misleading omission in connection with an audit, 17 C.F.R. § 240.13b2-2(a), and an officer or director may not "directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant" in connection with an audit "if that person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading," 17 C.F.R. § 240.13b2-2(b). [FN7]

> FN7. The third part of the rule applies only to certain investment and business development companies, see 17 C.F.R. § 240.13b2-2(c), and does not

Defendant argues that the heightened pleading requirements or Rule 9(b) applies to the section 13 claims. The SEC argues in opposition that Rule 9(b) does not apply to claims under sections 13(a) or 13(b) "because scienter or fraudulent intent is not an element of those claims." See Opp. at 21 (citing Ponce v. SEC, 345 F.3d 722, 737 n. 10 (9th Cir.2003); see also SEC v. McNulty, 137 F.3d 732, 741 (2d Cir.1998); Schwartz v. Celestial

Seasonings, Inc., 124 F.3d 1246, 1253 (10th Cir.1997)). Although sections 13(a) and 13(b) may not impose a scienter requirement, this does not necessarily mean that Rule 9(b) does not apply. The court reads Rule 13b2-2 to impose liability for both unintentional (i.e., mistakes) and fraudulent false statements or omissions to auditors. Rule 13b2-2 appears to also impose a scienter requirement. Because averments of either fraud or mistake must be pled with particularity under Rule 9(b), the heightened pleading standard applies to the section 13 claims. [FN8] In any event, as discussed below, the court finds that the SEC's complaint satisfies the requirements of Rule 9(b).

> FN8. In addition, under Rule 9(b) scienter may be averred generally only where the matter does not involve fraud or mistake.

1. Section 13(b)(5) and Rule 13b2-1

In support of its section 13(b)(5) and Rule 13b2-1 claim, the SEC alleges that the outside auditors informed Cornerstone management of deficiencies in the accounting internal controls as early as the end of the 1998 audit. FAC ¶ 47. The SEC alleges that "Nye knew that Cornerstone had failed to improve its accounting systems, hire additional accounting staff, or enhance its record-keeping processes to keep pace with the company's dramatic growth and diversification." Id. ¶ 32. CEG was unable to verify various significant account balances because proper documentation had not been maintained. Id. ¶ 36. The SEC alleges that the intercompany accounts did not balance. Id. ¶ 42. These accounting problems and the inability to substantiate significant account balances apparently continued through the end of the 2001 fiscal year. If proven, this would constitute a violation of § 13(b)(5).

2. Rule 13b2-2

**\*9** In support of its Rule 13b2-2 claim, the SEC alleges that in connection with the 2000 audit and 2001 quarterly reviews, Nye failed to inform the auditors of: (1) the scope and extent of the reconciliation project and the facts developed during that project, (2) the accounting problems at CEG, including that significant accounts were unsubstantiated, (3) adjusting entries made to conceal the accounting problems, (4) intercompany accounts that did not balance, (5) foreign currency

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Slip Copy                                                                    **Page 60**
(Cite as: 2007 WL 2013958, *9 (N.D.Cal.))

translation errors, (6) the extent of entries into the holding account, and (7) failure to timely revise estimates to clearing and "pooling" accounts and failure to timely reconcile these accounts. Id. ¶ 150. In addition, Nye signed the management representation letters in connection with the audits and reviews. The management representation letter falsely stated that, among other things: (1) Cornerstone's financial statements were fairly presented in conformity with GAAP; (2) there were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and (3) the accounting records underlying the financial statements accurately and fairly reflected, in reasonable detail, the transactions of the company and its subsidiaries. These allegations adequately set forth the alleged misstatements and omissions on Nye's part to the auditors. The SEC relies upon the same allegations of falsity as for its section 10(b) and Rule 10b-5 claims. As discussed at III.A.1, supra, the falsity of these alleged misstatements and omissions, including what is false or misleading about a statement, and why it is false, is adequately set forth in the complaint.

C. Aiding and Abetting of Section 13(a) and Section 13(b) Violations [FN9]

> FN9. Section 13(a) requires all issuers with securities registered pursuant to section 12 of the Exchange Act to file periodic and other reports with the SEC containing the disclosures required by rules promulgated by the SEC. appear applicable to the present action.

Defendant argues that the SEC has failed to allege facts showing Nye knew of the primary section 13(a) and 13(b) violations and that Nye provided substantial assistance in those violations. To prove a claim for aiding and abetting a company's "violation of federal securities laws," a plaintiff must prove (1) that the company "violated the relevant securities laws," (2) that the defendant knew "of the primary violation" of the securities laws, that (3) the defendant knew "of his or her own role in furthering" the company's violation, and (4) that the defendant "provided substantial assistance in the primary violation." Ponce, 345 F .3d at 737. The SEC points to the same factual allegations of inadequate internal controls, unsubstantiated account balances, and improper reclassifications that it relied

upon to support its section 10(b) claim against Nye. For the reasons discussed in III.A, supra, the court finds that the complaint sufficiently alleges the first three elements.

"[T]o establish an aiding and abetting violation of the securities laws, the [government] must show that [the defendant] knowingly provided substantial assistance" in connection with the primary violation. SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir.1986); see also Abbott v. Equity Group, Inc., 2 F.3d 613, 621 (5th Cir.1993). At least one district court has held that "mere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance" and inaction is insufficient "unless it was designed intentionally to aid the primary violator or it was in conscious or reckless violation of a duty to act." S.E.C. v. Treadway, 430 F.Supp.2d 293, 339 (S.D .N.Y.2006). The SEC alleges that Nye provided substantial assistance by (1) signing the forms 10-K and 10-Q and (2) failing to take prompt and effective action to correct Cornerstone's sections 13(a) and 13(b) violations. The SEC does not cite to any particular factual allegations that support a finding of substantial assistance. However, the court notes that elsewhere in the complaint the SEC alleges that Nye participated in drafting the false and misleading disclosures regarding the 2001 write-off, reviewed the financial statements, directed the reclassification of unsubstantiated balances to conceal such balances from the auditors, and signed the management representation letters. See, e.g., FAC ¶¶ 58, 87-96. While not a strong showing, these allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss as to the SEC's aiding and abetting claims. Compare Ponce, 345 F.3d at 737-38 (finding substantial assistance because defendant "undeniably played a major role in preparing and certifying the financial statements, and as [the company's] accountant and auditor ... facilitated the reporting and record-keeping responsibilities to the SEC, [and] played an essential and integral part of the process").

IV. ORDER

*10 For the foregoing reasons, the court DENIES defendant Nye's motion to dismiss.

2007 WL 2013958 (N.D.Cal.)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

**(Cite as: 2007 WL 2013958, \*10 (N.D.Cal.))**

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT H

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 93,885
(Cite as: 2006 WL 1310320 (N.D.Tex.))
<KeyCite History>

Page   63

United States District Court,
N.D. Texas,
Dallas Division.

**SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,**
v.
**Gregory A. BRADY, et al., Defendants.**

Civil Action No. 3:05-CV-1416-D.

May 12, 2006.

Toby M. Galloway, David L. Peavler, John M. Oses, Stephen Webster, U.S. Securities & Exchange Commission, Fort Worth Regional Office, Fort Worth, TX, for Plaintiff.

Joel E. Geary, Brown McCarroll, Matthew R. Stammel, Karen L. Hirschman, Vinson & Elkins, Dallas, TX, for Intervenor Plaintiffs.

Edward S. Koppman, Mary L. O'Connor, Akin Gump Strauss Hauer & Feld, Michael Paul Gibson, Burleson Pate & Gibson, Dallas, TX, Michael J. Biles, Michelle A. Reed, Akin Gump Strauss Hauer & Feld, Austin, TX, Howard Wilson, Proskauer Rose, New York, NY, Lionel E. Pashkoff, Proskauer Rose, Washington, DC, for Defendants.

MEMORANDUM OPINION AND ORDER

SIDNEY A. FITZWATER, District Judge.

*1 This is a Securities and Exchange Commission ("SEC") enforcement action that arises from revenue recognition practices of i2 Technologies Inc. ("i2") and that is not subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Two individual defendants--Gregory A. Brady ("Brady") and William M. Beecher ("Beecher")-- move under Fed.R.Civ.P. 9(b) and 12(b)(6) to dismiss. The court denies the motions.

I

i2 Technologies Inc. ("i2") is a developer and marketer of computer software for the supply chain management industry. [FN1] Brady was i2's

President, Chief Executive Officer, and a director, and Beecher was i2's Executive Vice President and Chief Financial Officer, during the relevant period. When i2 filed its 2002 Form 10-K with the SEC, it not only reported 2002 results, it formally restated its results for the years 1999, 2000, and 2001 and the first two quarters of 2002. According to i2, this was because, following a comprehensive review of revenue recognition practices, senior management changed the accounting for a number of transactions from revenue recognition under AICPA [FN2] Statement of Position ("SOP") 97-2, "Software Revenue Recognition," to revenue recognition under AICPA SOP 81-1, "Accounting for Certain Construction Type and Certain Production Type Contracts." According to i2, it made this determination because it concluded in some instances that its services were essential to the functionality of certain software products it licensed. This change required that recognition of license, services, and/or maintenance revenue for the transactions be deferred and recognized in subsequent periods. The net effect of the revenue adjustments was to decrease total annual revenue for 1999 by $130.9 million (or 21% of total revenue originally reported), for 2000 by $477 million (or 41%), and for 2001 by $137.6 million (or 14%). Total revenue increased in 2002 by $385.8 million. The cumulative impact of the revenue adjustments for the restatement period was to reduce revenue by $359.7 million, $232.4 million of which was deferred and could be recognized in the future. i2 also adjusted expenses. The cumulative impact of all revenue and expense adjustments for the restatement period was to increase net loss and decrease shareholder equity by $207.1 million.

FN1. SEC originally sued Reagan L. Lancaster, but the parties entered into an agreed final judgment, filed March 27, 2006, after reaching a settlement.

FN2. American Institute of Certified Public Accountants.

SEC alleges that, during the four-year period ended December 31, 2001, and the first three quarters of 2002, i2 misstated approximately $1 billion of software license revenue, including over $125 million of revenue it never should have recognized. It specifies in its complaint several

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

grounds to conclude that Brady and Beecher were at least severely reckless in disregarding that i2 was improperly recognizing revenue due, inter alia, to broad functionality problems that precluded up-front revenue recognition and was reporting revenue in i2's public filings that was materially overstated.

**\*2** SEC asserts that Brady and Beecher are directly liable under § 17(a) of the Securities Act of 1933 ("the Securities Act"), 15 U.S .C. § 77q; § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2005); § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), SEC Rule 13b2-1, 17 C.F.R. § 240.13b2-1 (2006), and SEC Rule 13b2-2, 17 C.F.R. § 240.13b2-2 (2006); and SEC Rule 13a-14, 17 C.F.R. § 240.13a-14 (2006). SEC alleges that Brady and Beecher are liable as aiders and abettors of i2's violations of § 10(b) of the Exchange Act and Rule 10b-5, § 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13, and § 13(b)(2)(A) and (B) of the Exchange Act and Rules 13(b)(5) and 13b2-1. Brady and Beecher each move to dismiss this action under Rules 9(b) and 12(b)(6). [FN3]

> FN3. Brady and Beecher have also filed September 27, 2005 motions requesting judicial notice, and both defendants have filed a December 16, 2005 joint motion to strike. The court grants their motions to take judicial notice because, even considering the documents in question, the court concludes that the motions to dismiss must be denied. In their motion to strike, defendants object to SEC's reliance on documents related to the disposition of a motion to dismiss in Scheiner v. i2 Technologies, Inc., No. 3:01-CV-0418-H, in which Judge Sanders denied a motion to dismiss motions by Brady and Beecher to dismiss a securities fraud complaint. Because the court has not considered these documents in reaching its decision, it denies the motion to strike as moot.

## II

Because this action is brought by SEC, the heightened pleading requirements of the PSLRA are inapplicable. See SEC v. Kornman, 391 F.Supp.2d 477, 494 (N.D.Tex.2005) (Lindsay, J.) ("Defendant is erroneously relying on the heightened pleading standards from private securities litigation under the [PSLRA]. These standards only apply in private

actions, and not SEC enforcement actions." (citing cases)). The court therefore follows the standards of Rules 9(b) and 12(b)(6) that apply to securities fraud actions that are not subject to the PSLRA.

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Under Rule 9(b), a complaint alleging fraud must specify the " 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentations and what [the person] obtained thereby.' " Tuchman v. DSC Communic'ns Corp., 14 F.3d 1061, 1068 (5th Cir.1994) (quoting Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1139 (5th Cir.1992)). A plaintiff must " 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.' " Southland Sec. Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 362 (5th Cir.2004) (quoting Williams v. WMX Techs., Inc., 112 F.3d 175, 177-78 (5th Cir.1997)). In other words, the requirements are analogous to the first paragraph of a newspaper story, "namely the who, what, when, where, and how." Melder v. Morris, 27 F.3d 1097, 1100 n. 5 (5th Cir.1994) (citing DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990)). This Rule should be applied "with force, without apology." Williams, 112 F.3d at 178. " '[T] he particularity demanded by Rule 9(b) differs with the facts of each case [.]' " United States ex rel. Wilkins v. N. Am. Constr. Corp., 173 F.Supp.2d 601, 613 (S.D.Tex.2001) (quoting Hart v. Bayer Corp., 199 F.3d 239, 248 n. 6 (5th Cir.2000)); see Williams, 112 F.3d at 178 (noting that "courts have emphasized that Rule 9(b)'s ultimate meaning is context-specific.").

**\*3** Rule 9(b) is not intended, however, "to procure punctilious pleading detail." Steiner v. Southmark Corp., 734 F.Supp. 269, 273 (N.D.Tex.1990) (Fitzwater, J.). It serves neither "as a throwback to the hypertechnical pleading requirements of the Field Code nor requires needlessly repetitive pleading." Id. (citing In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig., 467 F.Supp. 227, 251 (W.D.Tex.1979) (Higginbotham, J.)). Rule 9(b) must be " 'read in conjunction with [Rule] 8, which requires only a

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 1310320, *3 (N.D.Tex.))

short and plain statement of the claim showing that the pleader is entitled to relief.' " Steiner, 734 F.Supp. at 273 (N.D.Tex.) (quoting Landry v. Air Lines Pilots Ass'n Int'l AFL-CIO, 892 F.2d 1238, 1264 (5th Cir.1990) (some internal quotation marks omitted)). Thus it must be viewed in light of Rule 8(a)'s goal of "simple, concise, and direct" pleadings. Williams, 112 F.3d at 178. As this court has said in non-PSLRA cases,

> [t]he court's key concern in assessing a complaint under Rule 9(b) is to determine whether the plaintiff seeks to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs. The complaint must be sufficiently particular to show that the plaintiff is not seeking a license to go fishing for indicia of fraud.

FDIC v. Gaubert, No. 3-90-1196-D, slip op. at 7 (N.D.Tex. Sept. 4, 1990) (Fitzwater, J.); see Am. Equitable Life Ins. Co. v. Transamerica Occidental Life Ins. Co., 1989 U.S. Dist. LEXIS 16540, at *11 (N.D.Tex. Dec. 21, 1989) (Fitzwater, J.).

" '[T]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.' " Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir.1982) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 598 (1969)). "[D]ismissal of a claim on the basis of barebones pleadings is a 'precarious disposition with a high mortality rate.' " Id. (quoting Barber v. Motor Vessel "Blue Cat," 372 F.2d 626, 627 (5th Cir.1967)). "The court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in his claim that would entitle him to relief." Jones v. Greninger, 188 F.3d 322, 324 (5th Cir.1999) (per curiam) (Rule 12(c) decision) (citing Fee v. Herndon, 900 F.2d 804, 807 (5th Cir.1990)). "In analyzing the complaint, [the court] will accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." Id. (citing Doe v. Hillsboro Indep. Sch. Dist., 81 F.3d 1395, 1401 (5th Cir.1996)). "The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim." Id. (citing Doe, 81 F.3d at 1401). "Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." Id. (citing

Vander Zee v. Reno, 73 F.3d 1365, 1368 (5th Cir.1996)).

### III

*4 SEC has satisfied its obligation to plead nonconclusory facts that " 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.' " Southland, 365 F.3d at 362 (quoting Williams, 112 F.3d at 177-78). The complaint specifically identifies SEC filings that Brady and Beecher signed, pleads specific facts that set out in detail why the filings falsely overstated i2's revenue, and specifically alleges why the statements were fraudulent.

Regarding scienter, when, as it must, the court considers the circumstantial evidence and assesses cumulatively all the pleaded evidence of scienter to determine whether, in toto, it raises an inference of scienter, see, e.g., Fener v. Belo Corp., 425 F.Supp.2d 788, 2006 WL 832514, at *3 (N.D.Tex. Mar. 30, 2006) (Fitzwater, J.) (addressing PSLRA strong inference standard), it is pellucid that, even setting aside allegations that amount to improper group pleading, [FN4] the complaint at least pleads that Brady and Beecher engaged in conduct that was at least severely reckless.

> FN4. As the court explained in Fener, [i]n its traditional meaning, the term "group pleading" refers to a doctrine that allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company. In its original sense it is conceptually related to the first element of a securities fraud claim--whether the defendant made a misstatement or an omission--not to the third element--whether the defendant acted with scienter. Nevertheless, the term "group pleading" is useful in describing the practice of improperly attempting to attribute scienter to a group of persons without enlightening each defendant as to the person's particular part in the alleged fraud. Fener, 425 F.Supp.2d at ---- n. 14, 2006 WL 832514, at *22 n. 14 (citations and some internal quotation marks omitted). It is in this scienter-related sense that the court refers to SEC's

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2006 WL 1310320, *4 (N.D.Tex.))

improper group pleading. There are several instances in the complaint where SEC has engaged in improper group pleading, and the court has disregarded these allegations in determining with the complaint is adequate.

Severely reckless conduct consists of highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Nathenson v. Zonagen Inc., 267 F.3d 400, 408 (5th Cir.2001). The complaint alleges repeated, specific instances in which Brady and Beecher were made aware, or themselves acknowledged, that i2 software had functionality problems that precluded up-front recognition of revenue. To cite just a few examples, according to the complaint, Reagan L. Lancaster ("Lancaster"), i2's then-President of Worldwide Operations, emailed Brady on February 17, 2000 complaining, inter alia, of i2's "bull___t demos" for prospective customers, stating that "you can only sell vapor for so long and then it catches you," identifying specific i2 products that were "vapor," acknowledging that i2 was "selling our stuff with a good pitch but there is no substance behind anything," and lamenting that apart from certain limited "real products," "[a]ll other things we have are vapor." Compl. ¶ 30 (expletive redacted). [FN5] He stated in the same email that i2 was "selling it and in some instances getting away with it," giving seven customer examples. Id. at ¶ 31. Lancaster advised Brady that "all deals have major hair on them and we could get extremely burned for delivery." Id. On March 28, 2000 Lancaster emailed Brady, Beecher, and others apprising them of specific products that "[ did] not exist" and/or could not be shipped and were "causing Rev[enue] Rec [ognition] issues." Id. at ¶ 34. On March 29, 2000 Lancaster forwarded Brady, Beecher, and others an email titled "rev rec urgent." Id. at ¶ 36. This email notified Brady, Beecher, and Lancaster that "two products that are listed as production on our price list are not products." Id. The email's author further noted that another purported i2 product "doesn't exist as such" and should not have been on the price list. Id. In a February 2002 deposition, Lancaster testified that Brady instructed him to commit "illegal" acts, including selling products "that didn't exist." Id. at ¶ 40. Brady ordered him to execute a business plan that he knew "could not work." Id. Lancaster testified that this was illegal because Brady was "hyping the stock and we knew that we couldn't make the number." Id. Lancaster testified to other "illegal" acts, including selling "products that weren't ready and recogniz[ing] revenue off of those products that shouldn't have been recognized." Id. at ¶ 41. On March 28, 2001 i2's general counsel advised Beecher of various product and functionality problems that prompted customers to demand their money back, and that it appeared i2 salespeople had "built expectations" or were actually entering into side agreements to deliver localized versions of i2 products. Id. at ¶ 45. On March 28, 2000 Lancaster emailed Brady, Beecher, and others complaining about i2's revenue recognition practices. Id. at ¶ 82. The subject line of the email was "Rev Rec BS," and Lancaster wrote that i2 had "totally confused our salesforce on what is and what is not bookable or revenue recognizable" and that he felt i2 was "having a great quarter and that we are playing games with the numbers." Id. Lancaster stated that "[w]e are so out of touch with reality and when we start cooking books on new ideas or new rules of conservatism then you confuse everyone." Id. at ¶ 83. He noted that i2 had recognized revenue on past deals that were "uglier than the most recent deals." Id. When Beecher responded by voicemail on March 30, 2000, he stated: "Saw your email on rev rec. Will give you response but not in much detail. I don't think it is healthy to be sending back and forth detailed emails on things like rev rec." Id. at ¶ 84. On March 31, 2000 Beecher left Lancaster another voicemail in which he explained that i2 did not need the revenue from the Toyota transaction during the first quarter: He said, "[f]ortunately we are in position where we don't have to do that. I am going to try to prolong the flexibility on how to book that deal for as long as I can for the second quarter.... Depending how business is going next quarter we will make decision." Id. at ¶ 85.

FN5. The court has not, of course, analyzed SEC's complaint under the strong inference standard that applies in the context of the PSLRA, and this opinion does not necessarily guide how the court would assess the allegations if made in a case to which the PSLRA applies. Nor has the court attempted to discuss in detail the numerous allegations of the complaint that support the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw

inference that defendants acted with scienter.

**\*5** Brady's contention that SEC's eighth claim-- insider trading violations under § 10b and Rule 10b-5--is deficient because it does not specify the material nonpublic information that prompted his sales of i2 stock is misplaced. The complaint contains specific allegations concerning Brady's knowledge of i2 transactions in which revenue was improperly recognized, and of customer and functionality problems. See, e.g., Compl. ¶¶ 87-97 (addressing Kmart software license agreement).

Beecher's assertion that the complaint does not contain allegations that he knowingly traded i2 stock at a time he possessed material nonpublic information also lacks merit. The complaint asserts that Brady, Beecher, and Lancaster sold tens of millions of dollars of i2 securities on the basis of material nonpublic information, and that they knew or were severely reckless in not knowing the information in their possession was material and nonpublic and that their trading on the basis of the information was improper and in breach of their duties. Compl. ¶ 191. [FN6] Considered in its entirety, the complaint identifies the material nonpublic information as at least including knowledge that i2 had substantial problems with the functionality of its software and customer satisfaction and was recognizing material license revenue from "vaporware."

> FN6. Although the complaint in ¶ 191 uses the term "Defendants," it is clear that, in context, the reference is to Brady, Beecher, and Lancaster. Paragraph 191 lies between ¶¶ 190 and 192, both of which specifically refer to all three individuals.

SEC has also adequately pleaded that Brady and Beecher are liable as aiders and abettors in that it has sufficiently alleged facts that permit the conclusion that there was a securities violation by the primary party, Brady and Beecher had a general awareness of their roles in the violation, and they knowingly rendered substantial assistance in the violation. See Abell v. Potomac Ins. Co., 858 F.2d 1104, 1126 (5th Cir.1988) (addressing Rule 10b-5), vacated on other grounds sub nom. Fryar v. Abell, 492 U.S. 914 (1989).

As to the books-and-records claims, SEC has adequately pleaded that defendants are liable as aiders and abettors of i2's violation of the SEC rules in question based on i2's material misrepresentations of revenue and earnings and that Beecher committed a primary violation of Rule 13a-14.

The court need not decide whether SEC has adequately stated a claim under § 13(b)(5) of the Exchange Act based on a knowing lack of internal controls. SEC pleads this claim under § 13(b)(5) in the disjunctive. See Compl. ¶ 170 (alleging that defendants violated § 13(b)(5) by knowingly circumventing or knowingly failing to implement system of internal accounting controls at i2 or by knowingly falsifying i2's books, records, or accounts). The aiding and abetting claim is likewise based on conduct that exceeds a knowing lack of internal controls. See id. ¶¶ 186-87. The court declines to dismiss this component of either claim at this preliminary stage.

## IV

It is apparent from defendants' motions that they have a very different view of what occurred at i2 and of their alleged culpability. These are matters for resolution on motion for summary judgment or at trial. SEC's complaint is not like others that the court has found deficient under Rules 9(b) and 12(b)(6). The court has "gain[ed] an understanding from the complaint--unadorned by the embellishment and characterizations that a lawyer's pen can add through use of intensifiers, adjectives, and adverbs--of what [ SEC] say[s] the scheme actually was and how a given defendant played a part in it." Fener, 425 F.Supp.2d at ----, 2006 WL 832514, at *9. When the court "accept [s] the facts alleged in the ... complaint as true and constru[es][the] allegations in the light most favorable to [SEC]," see Goldstein v. MCI WorldCom, 340 F.3d 238, 244 (5th Cir.2003) (citing Abrams v. Baker Hughes Inc., 292 F.3d 424, 430 (5th Cir.2002)), the complaint details in specific and nonconclusory terms severely reckless conduct by the President and Chief Executive Officer, and Executive Vice President and Chief Financial Officer, of i2 in recognizing revenue for software licenses involving products with known functionality problems that were so severe that high-level company employees were referring to them by expletives and terms like "vapor" and were specifically discussing revenue recognition issues that resulted from product flaws. Nor is this a case



Not Reported in F.Supp.2d
(Cite as: 2006 WL 1310320, *5 (N.D.Tex.))

that involves a mere failure to follow Generally Accepted Accounting Principles ("GAAP"). While "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter," this is a case in which SEC has adequately alleged at least that defendants were "severely reckless in publishing such information." Fine v.. Am. Solar King Corp., 919 F.2d 290, 297 (5th Cir.1990).

\* \* \*

**\*6** Defendants' September 27, 2005 motions to dismiss are denied. Their September 27, 2005 motions requesting judicial notice are granted, and their December 16, 2005 joint motion to strike is denied as moot.

SO ORDERED.

2006 WL 1310320 (N.D.Tex.), Fed. Sec. L. Rep. P 93,885

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

# EXHIBIT I

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 92,833
**(Cite as: 2004 WL 1179423 (N.D.Ill.))**
&lt;KeyCite History&gt;

**Page 70**

United States District Court,
N.D. Illinois, Eastern Division.

**SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,**
v.
**Dean L. BUNTROCK, Phillip B. Rooney, James
E. Koenig, Thomas C. Hau, Herbert A.
Getz, and Bruce D. Tobecksen, Defendants.**

No. 02 C 2180.

May 25, 2004.

AUSA, United States Attorney's Office, John E. Birkenheier, Securities & Exchange Commission, Chicago, IL, John D. Worland, Jr., Richard B. Skaff, Robert Blair Kaplan, Robert William Pommer, Securities & Exchange Commission, Washington, DC, for Plaintiff.

Francis James Higgins, Peter G. Rush, Paul J. Walsen, Amy Suzanne Chasen, Nicholas Joseph Etten, Lawrence M. Gavin, Bell, Boyd & Lloyd, Howard J. Rosenburg, Piper Rudnick LLP, Sarah R. Wolff, Jonathan Stuart Quinn, Matthew John O'Hara, Lisa Ann Kellmeyer, Sachnoff & Weaver, Ltd., Janice R. Forde, Kevin Michael Forde, Kevin R. Malloy, Kevin M. Forde, Ltd., Royal B. Martin, Jr., William Gibbs Sullivan, Martin, Brown & Sullivan, Ltd., Richard P. Campbell, Phillip Leon Stern, Chris C. Gair, Kristi Lynn Nelson, Freeman, Freeman & Salzman, Chicago, IL, John L. Oberdorfer, Patton, Boggs LLP, Washington, DC, Michael C. Miller, Stuart L. Shapiro, Shapiro Forman Allen & Miller LLP, New York, NY, for Defendants.

MEMORANDUM OPINION AND ORDER

ANDERSEN, J.

**\*1** The American free enterprise system is dependent upon the honest reporting of financial data by corporations whose shares are publicly traded. The men and women who operate these corporations receive enormous financial rewards. Their compensation is protected, even encouraged, by the free political, legal and economic systems of this nation; but a condition of this protection is the simple requirement that corporate leaders be honest in making the financial reports upon which investors depend. The Securities and Exchange Commission has the duty to enforce this requirement.

In this lawsuit, the Securities and Exchange Commission contends that each of the named defendants, Dean Buntrock, Philip Rooney, James Koenig, Thomas Hau, Herbert Getz and Bruce Tobecksen, deliberately violated his obligation of honesty to the investing public and, therefore, asks this Court, inter alia, to compel the defendants to disgorge the financial reward that each defendant received from what the SEC contends was dishonest reporting of financial data. All the defendants have moved to dismiss the complaint. Because we must assume the truth of the factual allegations contained in the SEC's complaint, it is premature for us to dismiss either the claims or the nature of the relief sought by the SEC. Therefore, the motions to dismiss are denied for the following specific reasons.

BACKGROUND

On March 26, 2002, the Securities and Exchange Commission ("SEC" or "the Commission") instituted this civil action against the six named defendants, who served as officers of Waste Management, Inc. ("Waste Management"). The complaint alleges that the defendants falsified Waste Management's earnings and other measures of financial performance. It further claims that the defendants improperly eliminated or deferred current period expenses in order to inflate earnings, including specifically operating earnings, and that they used one-time gains realized on the sale or exchange of assets to eliminate unrelated current period operating expenses. The Commission asserts that these acts violated section 17(a) of the Securities Act of 1933 ("Securities Act"), sections 10(b) and 13(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as Exchange Act rules 10b-5, 12b-20, 13a-1 and 13a-13.

In February 1998, Waste Management acknowledged past accounting errors and announced that it would restate its financial statements for the period 1992 through the first three-quarters of 1997 (the "Restatement"). The Restatement acknowledged

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d

Page  71

(Cite as: 2004 WL 1179423, *1 (N.D.Ill.))

that Waste Management had overstated its net after-tax income by over $1 billion. The Commission claims that the overstatement of earnings resulted in a shareholder decline of $6 billion in market value when the stock price plummeted from $35 to $22 per share. The defendants allegedly received bonuses and retirement benefits and avoided stock trading losses in connection with the inflated earnings. These benefits allegedly range from $403,779 for Mr. Tobecksen to $16,917,761 for Mr. Buntrock.

**\*2** The Commission is seeking both disgorgement of any ill-gotten gains and civil monetary penalties. It requests that each of the defendants pay penalties pursuant to section 20(d) of the Securities Act and section 21(d)(3) of the Exchange Act. The Commission further requests, pursuant to section 21A of the Exchange Act, that defendants Buntrock and Rooney pay penalties in the amount of three times any illegal trading profits gained or losses avoided.

The defendants have filed a flurry of motions attacking the SEC's 138-page complaint. Some of these motions were filed on behalf of all the defendants while others were filed on behalf of only one defendant or a small subset of defendants. The motions are fully briefed, and the parties submitted supplemental briefs in December 2003. These motions are now ripe for decision.

### DISCUSSION

In ruling on a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Szumny v. Am. Gen. Fin., Inc. ., 246 F.3d 1065, 1067 (7th Cir.2001). The purpose of a motion to dismiss is not to decide the merits of the challenged claims but to test the sufficiency of the complaint. Weiler v. Household Fin. Corp., 101 F.3d 519, 524 n. 1 (7th Cir.1996). A court will grant a motion to dismiss only if it is impossible for the plaintiff to prevail under any set of facts that could be proven consistent with the allegations. Forseth v. Village of Sussex, 199 F.3d 363, 368 (7th Cir.2000). We will address each of the motions to dismiss in turn.

I. Motion to Strike Claims for Disgorgement

In this motion, all the defendants assert that the securities laws, as well as United States Supreme Court precedent, do not permit the SEC to seek disgorgement as a form of relief in this case. Furthermore, the defendants argue that the SEC has not adequately pled a causal connection between the property to be disgorged and the alleged securities law violations. We disagree.

As primary support for their argument that the federal securities laws do not permit disgorgement as a form of relief, the defendants cite the recent Supreme Court decision in Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). In this case, the Supreme Court addressed the issue of what constituted "appropriate equitable relief" for claims brought pursuant to the Employee Retirement Income Security Act ("ERISA"). The petitioners in Great-West were an employee benefit plan and its insurance carrier. They filed a lawsuit seeking specific performance of a reimbursement provision contained in the respondents' benefit plan. The Court held that Section 502(a)(3) of ERISA, which permits actions seeking "appropriate equitable relief," did not authorize an action for specific performance in that case because the remedy sought was essentially legal in nature. Id. at 214. The key to the Court's holding was a discussion regarding the legal and equitable nature of the restitution remedy. If the remedy sought under Section 502(a)(3) of ERISA was one that was traditionally available in equity, then it was permissible. Id . However, if the remedy sought was essentially legal in nature, then it fell outside the scope of Section 502(a)(3). Id. at 214-16.

**\*3** Given this analytical framework, we agree with the SEC that the disgorgement remedy it seeks is equitable in nature and, therefore, an acceptable form of relief. As the SEC has accurately stated, disgorgement has historically been viewed as an equitable remedy employed against those who profit by abusing positions of trust. In essence, it deprives a wrong-doer of ill-gotten gains. Compensation is not an element of the claim. In fact, the Supreme Court has held, in the ERISA context, that disgorgement is a viable equitable remedy to recover improperly received profits. See Harris Trust & Savings Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 250-51, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000); Mertens v. Hewitt Associates, 508 U.S.

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

248, 260, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Furthermore, virtually every federal court of appeals has recognized disgorgement as an appropriate equitable remedy under the securities laws. See, e.g., SEC v. Lipson, 278 F.3d 656, 662-63 (7th Cir.2002); SEC v. Infinity Group Co., 212 F.3d 180 (3d Cir.2000); SEC v. Rind, 991 F.2d 1486 (9th Cir.1993); SEC v. Commonwealth Chem., Inc., 574 F.2d 90 (2d Cir.1978). We view these decisions as consistent with the Supreme Court's holding in Great-West.

Therefore, we conclude that the disgorgement remedy is equitable in nature and, thus, is within the arsenal of weapons available to the SEC when prosecuting enforcement actions. This conclusion is based not only the applicable federal precedent but also on our understanding of Congress' intent in creating this enforcement regime. Further, to the extent that the defendants challenge the SEC's "pleading" of the disgorgement remedy, that challenge is rejected as untimely because none of the defendants have yet been found liable for any securities violation. Accordingly, the motion to strike the claims for disgorgement is denied.

II. Motion To Dismiss For Failure to Satisfy Rule 9(b)

Next, a host of defendants have moved to dismiss the SEC's complaint for failure to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Additionally, individual defendant Tobecksen has filed a separate motion to dismiss pursuant to Rule 9(b). These motions are denied.

Rule 9(b) requires plaintiffs to plead "the circumstances constituting fraud ... with particularity." In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 281 (7th Cir.1996). This means the "who, what, when, where, and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990). The stringent pleading requirement under Rule 9(b) serves three main purposes: "to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them." Chu v. Sabratek Corp., 100 F.Supp.2d 815, 819 (N.D.Ill.2000).

Resolution of these motions is a relatively straightforward and easy task. The SEC's complaint in this case is voluminous. It is 138 pages long and contains 357 numbered paragraphs. It alleges a coherent and compelling story of fraud and abuse by the highest members of Waste Management's corporate leadership. The SEC has identified very clearly the roles that it contends each of the individual defendants played in the accounting improprieties that lead to the 1998 Restatement, as well as the earlier understatement of expenses which lead to improperly inflated corporate earnings. In fact, there are forty paragraphs reserved specifically to describe each defendant's participation in the alleged fraud. (Complt. at ¶¶ 297-336.) The complaint also clearly describes where, when and how the defendants acted to further the alleged securities fraud. Moreover, we are satisfied that the complaint meets the heightened pleading requirements of Rule 9(b) in that it clearly identifies specific financial statement misrepresentations, it states which principles of GAAP the defendants violated in effecting the alleged fraud (e.g., FAS 121), and it puts the defendants on notice as to which Waste Management landfills were improperly amortized (e.g., the Live Oak landfill). In fact, if the SEC's complaint did not satisfy the particularity standard of Rule 9(b), we would be hard pressed to find any complaint that could.

*4 With respect to Tobecksen's separately filed motion to dismiss, it is also denied. In his motion, Tobecksen argues that a "mistake" is insufficient to support a securities fraud claim and that the SEC has failed to allege with particularity the effect of the accounting mistake. As to his first contention, Tobecksen is correct that a simple accounting error cannot justify a fraud charge. However, a defendant's awareness of the mistake in addition to his active perpetuation of the error over a period of years resulting in a multi-million dollar inflation of earnings certainly can support an allegation of securities fraud. Specifically, the SEC has asserted that the net result of Mr. Tobecksen's garbage truck depreciation "mistake," if it can truly be considered a mistake, was an overstatement of Waste Management's earnings by approximately $100 million. (Complt. at ¶¶ 10, 48, 169, 170, 256, 334.)

Our review of the SEC's complaint with respect to Tobecksen, as well as for each of the other defendants, is that the SEC has presented a vivid

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1179423, *4 (N.D.Ill.))

Page  73

picture of alleged financial and accounting wrongdoing over the course of numerous years that more than adequately puts the defendants on notice of the nature of the securities fraud claims they must now defend. Therefore, the motions to dismiss pursuant to Rule 9(b) are denied.

III.  Motion to Dismiss on Grounds of Immateriality

In this motion, all of the defendants argue that Counts One, Two and Four of the complaint must be dismissed pursuant to Rule 12(b)(6) because the misrepresentations alleged by the SEC are not material. We disagree.

The Supreme Court has defined the materiality standard for securities fraud cases as "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). The Court described this standard as a "fact-specific inquiry." Id. at 240. Similarly, the Seventh Circuit, in a case involving a Rule 10b-5 action, held that " 'the determination of materiality requires delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts and the significance of those inferences to him, and these assessments are particularly ones for the trier of fact;' thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." Marks v. CDW Computer Centers, Inc., 122 F.3d 363, 370 (7th Cir.1997) (citing TSC Indus., 426 U.S. at 450); see also McGrath v. Zenith Radio Corp., 651 F.2d 458, 466 (7th Cir.1981) (noting that materiality is a question particularly for the trier of fact); SEC v. Randy, 38 F.Supp.2d 657, 669 (N.D.Ill.1999) (same). In In re First Chicago Corp. Sec. Litig., 769 F.Supp. 1444 (N.D.Ill.1991), this Court noted that "[m]ateriality has been characterized as a mixed question of law and fact, and courts have admonished that '[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law.' " First Chicago, 769 F.Supp. at 1451 (quoting Craftmatic Sec. Litig. v. Kraftsow,

890 F.2d 628, 641 (3d Cir.1989)).

*5 Arguments of the defendants notwithstanding, we conclude that the materiality of the misrepresentations at issue in this case is a question better left to the trier of fact. It is simply impossible at this stage of the proceedings to make an informed determination that any or all of the misrepresentations alleged in the complaint are immaterial as a matter of law. For example, the complaint alleges misstatements relating to dozens of accounting categories which ultimately resulted in $1.7 billion in corrections. Given these contentions, how could we possibly find that all of these alleged errors were immaterial? We cannot do so. Rather, it will likely take months of discovery before this Court is able to judge properly the materiality of all the alleged misrepresentations contained in the complaint. Accordingly, the motion to dismiss on grounds of immateriality is denied.

IV. Motions to Dismiss and/or Strike Claims Requiring Scienter

Next, defendants Buntrock, Rooney and Tobecksen have argued that the complaint should be dismissed as to them because it fails to plead scienter with the degree of specificity required by Rule 9(b). Given the volume of detailed information contained in the complaint about the role each of these defendants played in the alleged securities fraud, the complaint certainly provides a basis for believing that the SEC could prove scienter. Thus, the motions are denied.

Scienter refers to a mental state embracing the intent to deceive, manipulate or defraud. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Seventh Circuit has interpreted Hochfelder as establishing that "reckless disregard for the truth counts as intent" for the purpose of the § 10(b) scienter requirement. SEC v. Jakubowski, 150 F.3d 675, 681 (7th Cir.1998).

After thoroughly reviewing the complaint, there is little doubt in our mind that the SEC has adequately pled that Buntrock, Rooney and Tobecksen either knowingly or recklessly acted to deceive the public concerning the financial health of Waste Management. According to the complaint, Buntrock knew of and approved the Action Steps agreement

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d

**Page 74**

(Cite as: 2004 WL 1179423, *5 (N.D.Ill.))

with Arthur Andersen which specified thirty-two "must do" steps to correct accounting practices which were improper and in violation of GAAP, and he knew these Steps had not been taken because the Arthur Andersen engagement partner informed him of this fact. (Complt. at ¶ ¶ 8, 138-144, 174, 210, 259-60.) Further, Buntrock "set earnings targets" and "personally directed certain of the accounting changes to make the targeted earnings." (Complt. at ¶¶ 17, 298.) The complaint also alleges that Buntrock not only implemented the "top-level adjustment" manipulation scheme with Rooney, but he also was involved in seeing that a number of specific fraudulent adjustments were made, such as the doubling of the salvage values of garbage trucks. (Complt. at ¶¶ 17, 39-45, 298.) Additionally, Buntrock was responsible for reviewing and preparing Waste Management's periodic reports to the SEC, a number of which he signed, which contained the allegedly fraudulent financial statements and many other allegedly false and misleading statements about the company's business. (Complt. at ¶¶ 81, 297-98, 306.)

**\*6** With respect to the activities of Rooney, the complaint also more than adequately pleads scienter. Rooney served as president and Chief Operating Officer of Waste Management, chairman of Waste Management's largest subsidiary, which accounted for more than 50% of the company's consolidated revenue and approximately 70% of the reported earnings, and he ultimately replaced Buntrock as CEO of Waste Management in 1996. During his tenure as a director and officer of Waste Management, Rooney was responsible for reviewing all periodic reports submitted to the SEC, which allegedly contained information which he knew to be false and misleading. (Complt. at ¶¶ 98-99, 107-108, 116, 123.) As with Buntrock, the complaint also asserts that "Rooney knew each of the accounting and GAAP violations listed in the Action Steps, to which he agreed[,]" and that he knew or recklessly disregarded the fact that Waste Management continued to commit the accounting violations in the Action Steps because he reviewed and authorized the financial statements every quarter. As with Buntrock, the complaint alleges that Rooney had actual knowledge of the Action Steps because the Arthur Andersen engagement partner told him annually about certain accounting violations during their year end closing meeting. In addition, the complaint is replete with allegations

that Rooney was intimately familiar with the highly suspect top-level adjustments, in which the company's consolidated financial statements were manipulated so that the company could match preset earnings targets. (Complt. at ¶¶ 41, 42, 82.)

As for Tobecksen, we reach the same conclusion that we have for Buntrock and Rooney. The SEC has demonstrated Tobecksen's scienter by alleging that he personally engaged in numerous significant top-level adjustments which were later shown to be materially misleading. For example, for the fourth quarter of 1994, Tobecksen created a new and improper methodology that overstated quarterly income by $21 million. He was informed by internal Waste Management accountants that this methodology was wrong but he continued to utilize it during future reporting cycles. The net effect of this "error" was a $100 million overstatement of earnings by 1996. (Complt. at ¶¶ 169-170.) Further, he manipulated the earnings for the fourth quarter of 1996 by creating a "new and bogus salvage value" for Spotter trucks (from $0 to $25,000) and then compounding the effect of the manipulation by recording a $17 million "cumulating catch-up," reversing into income "seven years worth of depreciation expense" in one quarter. (Complt. at ¶¶ 255-56.) Additionally, the SEC has adequately pled scienter in its description of Tobecksen's creative use of "geography entries." Geography worked by "simply mov[ing] tens of millions of dollars from one income category of expense to another--from the correct one to an incorrect one." (Complt. at ¶ 75.) When questioned about these entries by the company's new management, Tobecksen explained that "the entries had to continue year-to-year to avoid an 'explanation problem.' ' (Id.) We agree with the SEC--this statement demonstrates scienter.

**\*7** Finally, while there is much we could say about Buntrock, Rooney and Tobecksen's argument that they should be absolved from liability because they "reasonably relied" on the work product of their "independent" outside auditor Arthur Andersen, we will restrain ourselves. Suffice to say, any such argument is categorically rejected. Therefore, the defendants' motions to dismiss for failure to plead scienter are denied.

V. Motion to Dismiss or Strike the Claims for Aiding and Abetting

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Case 5:07-cv-03444-JF    Document 50-2    Filed 12/17/2007    Page 75 of 164

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1179423, *7 (N.D.Ill.))

Page  75

In this motion, all of the defendants have joined together to argue that the SEC's claims for aiding and abetting in Counts One, Two and Three should be dismissed for three reasons: 1) the claims are barred by the statute of limitations; 2) the SEC has no authority to pursue claims for aiding and abetting under the Securities Act; and 3) the SEC has not properly pled scienter for aiding and abetting. For the following reasons, this motion to dismiss is denied.

First, we will address the statute of limitations argument. The defendants contend that the aiding and abetting counts should be dismissed because they were not filed within the four-year "catch-all" period of 28 U.S.C. § 1658. That section states that "[e]xcept as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of this section [December 1, 1990] may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658. According to the defendants, because the statute which authorizes the SEC to pursue aiding and abetting claims, 15 U.S.C. § 78t(e) or "Section 20(e)," was enacted in 1995 as part of the Private Securities Litigation Reform Act, the four year statute of limitations should apply. We disagree.

The United States Supreme Court has recently considered this issue in the context of the Civil Rights Act Amendments of 1991. See Jones v. R.R. Donnelley & Sons Co., --- U.S. ----, 124 S.Ct. 1836, --- L.Ed.2d ----, 2004 WL 936488 (May 3, 2004). The Court's analysis of Section 1658 in that case is instructive here. In considering the applicability of Section 1658, the Court held that a cause of action "arises under an Act of Congress enacted after December 1, 1990--and is therefore governed by Section 1658's four year statute of limitation--if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." Id. at *7. The Supreme Court further emphasized that "[w]hat matters is the substantive effect of an enactment--the creation of new rights of action and corresponding liabilities--not the format in which it appears in the Code." Id.

Section 20(e) of the Private Securities Litigation Reform Act of 1995, which authorizes the SEC to bring claims for aiding and abetting primary securities law violations, was enacted in response to the Supreme Court's decision in Central Bank, N.A.

v. First Interstate Bank, N.A., 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Congress amended the Exchange Act by adopting Section 20(e) to ensure that courts would not extend Central Bank to eliminate the SEC's power to enjoin aiding and abetting violations. In drafting Section 20(e), Congress explicitly based the SEC's power to sue for aiding and abetting on the SEC's pre-existing and complementary power to sue for primary securities violations. In particular, Section 20(e) states that "[f]or purposes of any action brought by the Commission under paragraph (1) or (3) of Section 21(d)," the SEC may bring suit for aiding and abetting. 15 U.S.C. § 78t(e). Thus, under the analytical framework of the Supreme Court's decision in Jones, it is clear that Section 20(e) did not create any new rights of action or corresponding liabilities. Instead, Section 20(e) is an act of Congress that was based on the continued existence of a statutory cause of action that was previously enacted and clarified an existing right. Therefore, the four-year "catch-all" statute of limitations contained in 28 U.S.C. § 1658 is inapplicable.

*8 But what is the proper statute of limitations for Section 20(e)? Based on our reading of Section 20(e) and its explicit connection to Sections 21(d)(1) and (3), we agree with the SEC that the securities law violation of the aider and abettor is the same violation as the primary violator. In other words, the Commission's authority to enjoin and seek penalties from aiders and abettors is the same authority for seeking such relief from primary violators. Given the symmetry between primary and secondary liability, the statute of limitations applicable to enforcement actions against aiders and abettors under Section 20(e) necessarily is the same for such actions against primary violators under Section 21(d)(1) and (3). Injunctive relief under Section 21(d)(1) is not subject to any statute of limitations, and claims for civil penalties under Section 21(d)(3) are subject to a five-year statute of limitations. Accordingly, we find that, at the very least, the statute of limitations for the SEC's aiding and abetting claims in this case is five years. Since both parties acknowledge that the complaint was filed within this time period, the motion to dismiss on these grounds is denied.

The second portion of the defendants' argument in support of their motion to dismiss is that the SEC lacks authority to pursue aiding and abetting claims

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



pursuant to the Securities Act of 1933. The defendants rely on the Supreme Court's decision in Central Bank to support this position. We disagree. In Central Bank, the majority stated repeatedly that the case involved private plaintiffs, and in so doing, the Court looked to a number of factors unique to private securities actions. See Central Bank, 511 U.S. at 178-180. In fact, in a later case, the Court noted that "Central Bank's discussion concerned only private civil litigation under § 10(b) and Rule 10b-5...." United States v. O'Hagan, 521 U.S. 642, 664, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). Quite obviously, the instant suit is not a private securities action, but rather one brought by the SEC. Thus, we conclude that the Court's limitation of the right of private litigants to prosecute aiding and abetting claims pursuant to Section 10(b) of the Exchange Act does not, by analogy, extend to the SEC's authority to bring aiding and abetting claims pursuant to Section 17(a) of the Securities Act. This conclusion is bolstered by the fact that Congress, by enacting Section 20(e) of the Private Securities Litigation Reform Act, "flatly barred the judicial extension of Central Bank to impede SEC enforcement actions against aiders and abettors." SEC v. Fehn, 97 F.3d 1276, 1287 (9th Cir.1996); see also Soranno v. New York Life Ins. Co., 2000 WL 748142, at * 4-5 (N.D.Ill. May 31, 2000).

Finally, the defendants contend that Counts One through Three of the complaint should be dismissed because the SEC has failed to properly plead scienter for an aiding and abetting claim. The defendants argue that the scienter standard for aiding and abetting claims is "knowingly" while the SEC asserts that the proper standard includes "reckless" behavior. We need not directly address this issue. Given our reading of the SEC's complaint, we have already concluded above that the complaint is replete with specific allegations that the defendants acted with actual knowledge of the fraud against the public concerning the financial health of Waste Management. Therefore, the defendants' motion to dismiss or strike the claims for aiding and abetting is denied.

VI. Motion To Dismiss or Strike the Claim for Control Person Liability

*9 This motion is brought by defendants Buntrock and Rooney to dismiss or strike the SEC's claim which seeks to hold them liable as "control persons"

under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Because we find that Section 20(a) authorizes the SEC to hold a "control person" jointly and severally liable with the controlled entity and because the SEC has stated a claim for control person liability against Buntrock and Rooney, the motion is denied.

At the core of this motion is an apparent dispute between the Second and Sixth Circuits concerning the availability of a cause of action for control person liability under Section 20(a) of the Exchange Act. Section 20(a) states that: "Every person who, directly or indirectly, controls any person liable under any provision of this title ... shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom the controlled person is liable...." 15 U.S.C. § 78t(a). The Sixth Circuit in SEC v. Coffey, 493 F.2d 1304, 1318 (6th Cir.1974), held that "Section 20(a) of the 1934 Act may not be relied upon by the SEC in an injunctive enforcement action." More recently, however, the Second Circuit in SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir.1996), held that "[s]ince § 20(a) is available as an enforcement mechanism to 'any person to whom such controlled person is liable,' and the 1934 Act includes government agencies in the definition of 'person,' see 15 U.S.C. § 78(c)(a)(9), we have upheld the SEC's authority to pursue an enforcement action under § 20(a)." The current weight of authority from courts around the country is that the Second Circuit's position on this issue is the correct one. See, e.g., SEC v. Enterprises Solutions, Inc., 142 F.Supp.2d 561, 575 (S.D.N.Y.2001); SEC v. Fitzgerald, 135 F.Supp.2d 992, 1029 (N.D.Cal.2001). We agree with these courts and hold that the SEC may pursue an enforcement action pursuant to Section 20(a).

In order to state a Section 20(a) claim, the SEC must allege: (1) a primary securities violation; (2) that Buntrock and Rooney exercised general control over the operations of Waste Management; and (3) that Buntrock and Rooney "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir.1992). See also Donohoe v. Consol. Operating & Prod. Corp., 982 F.2d 1130, 1138-39 (7th Cir.1992); In re Westell Tech, Inc. Sec. Litig.,

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2001 WL 1313785, at *12 (N.D.Ill. Oct.26, 2001). The SEC in this case has properly pled all these elements for an aiding and abetting claim against Buntrock and Rooney. The complaint alleges that all defendants, including Buntrock and Rooney, acted with scienter in participating in a fraudulent scheme to manipulate and falsify the publicly reported financial results of Waste Management. The complaint further alleges that, as the senior most officers who participated in the fraud, Buntrock and Rooney possessed the power to direct or cause the direction of the management and policies of Waste Management. Also, the complaint alleges that Buntrock and Rooney exercised control over the operations of Waste Management by reviewing and signing the allegedly misleading financial statements and by making other allegedly false public statements about the company's financial results. The fact that the controlled person, in this case Waste Management, is not a defendant in this action is of no legal significance to the defendants' motion.

**\*10** Finally, we reject the defendants' argument that the SEC may not pursue a control person liability claim against them pursuant to Section 17(a) of the Securities Act. The law is clear that such a claim is permissible under either Section 20(a) of the Exchange Act or Section 17(a) of the Securities Act. See, e.g., SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir.1997) (court imposed joint and several control person liability on principal of Hughes Capital in violation of Sections 17(a)(2) and (3) of the Securities Act); SEC v. Cross. Fin. Servs., 908 F.Supp. 718, 734-36 (C.D.Cal.1995) (joint and several disgorgement order based on violations of Section 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act). Accord SEC v. World Gambling Corp., 555 F.Supp. 930, 931-32 (S.D.N.Y.1983) (two principal officers of defendant corporation held jointly and severally liable for profits resulting from scheme to sell unregistered securities in violation of the registration and anti-fraud provisions of the Securities Act and Exchange Act). Accordingly, Buntrock and Rooney's motion to dismiss or strike the claim for control person liability is denied.

VII. Motion to Dismiss Counts Three and Four

In this motion, defendants Koenig, Hau and Tobecksen argue that Counts Three and Four of the complaint should be dismissed because the SEC lacked the statutory authority to promulgate Rule 13b2-1. Further, the defendants contend that the aiding and abetting claims contained in Count Three related to Section 13(b)(2)(A) of the Exchange Act are time barred and procedurally deficient. Finally, Koenig and Hau assert that Count Four fails because the complaint does not allege that their alleged misrepresentations to Arthur Andersen were material under Rule 13b2-2.

In Count Three of the complaint, the SEC alleges that Koenig, Hau and Tobecksen violated Rule 13b2-1, 17 C.F.R. § 240.13b2-1, "directly or indirectly ... by falsifying or causing to be falsified Waste Management's books, records and accounts subject to Section 13(b)(2)(A) of the Exchange Act." (Complt. at ¶ 354.) The SEC also alleges that Koenig, Hau and Tobecksen aided and abetted Waste Management's violations of Section 13(b)(2)(A) of the Exchange Act. In Count Four, the SEC alleges that Koenig and Hau violated Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2, by "directly or indirectly" making false statements to Waste Management's outside auditors.

In attacking Count Three, the defendants argue that the SEC exceeded its statutory authority under Section 13(b)(2) of the Exchange Act in issuing Rule 13b2-1, and thus, Count Three must fail as a matter of law. We disagree. While the defendants certainly raise interesting questions of statutory construction and administrative law, the overwhelming weight of authority in this country states that the SEC may bring enforcement actions pursuant to Rule 13b2-1. Implicit in each of these holdings is the conclusion that issuance and enforcement of Rule 13b2-1 falls within the SEC's statutory mandate. See, e.g., SEC v. Kahn, 2002 WL 1163723, at *13 (N.D.Ill. May 31, 2002) (granting summary judgment against officers of issuer for violation of Rule 13b2); SEC v. Pace, 173 F.Supp.2d 30, 32-34 (D.D.C.2001) (granting summary judgment against issuer's CEO for violation of 13b2-1); SEC v. Softpoint, Inc., 958 F.Supp. 846, 965-66 (S.D.N.Y.1997) (granting summary judgment against issuer's president for violation of Rule 13b2-1, and noting that such rule is "not limited to corporate officers or employees"); SEC v. Gallagher, 1989 WL 95252, at *7-8 (E.D.Pa. Aug.16, 1989) (granting summary judgment against issuer's controller for violations of Rule 13b2-1); SEC v. World-Wide Coin Inv., Ltd.,

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw®

567 F.Supp. 724, 748, n. 40 & n. 41 (N.D.Ga.1983) (reciting cases brought by SEC under Rules 13b2-1 and 13b2-2). We feel these decisions are correct, and thus, we reject the defendants' argument that the SEC lacks the authority to enforce Rule 13b2-1.

**\*11** As for the other arguments raised by the defendants in their motion to dismiss Counts Three and Four, they are rejected for the reasons stated earlier in this opinion. In Part 5, we concluded that aiding and abetting claims are not subject to the four-year statute of limitations contained in 28 U.S.C. § 1658. Furthermore, the SEC's complaint states a claim for aiding and abetting because it contains numerous allegations that the defendants in this case, including Koenig, Hau and Tobecksen, acted with actual knowledge of the fraud perpetrated on the public concerning the financial health of Waste Management. Additionally, in Part 3 of this order, we concluded that the misrepresentations alleged in the complaint were material for the 10b-5 cause of action. We now extend that finding here to hold that the alleged misrepresentations were material for purposes of the Rule 13b2-2 claim stated in Count Four of the complaint. Therefore, Koenig, Hau and Tobecksen's motion to dismiss Counts Three and Four is denied.

VIII. Motion To Strike Request for Civil Penalties

In this motion, defendants Rooney and Koenig argue that the SEC's request for civil monetary penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act should be stricken because the request is barred by the applicable statute of limitations. Additionally, the defendants contend that any civil penalties sought on the theory that they aided and abetted primary securities violations should also be stricken on statute of limitations grounds.

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act do not contain their own statute of limitations. As a result, both parties agree that the request for civil penalties presented in this case is governed by the catch-all five-year statute of limitations provision of 28 U.S.C. § 2462. Section 2462 provides that "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued...." 28 U.S.C. § 2462. The issue presented in this motion is: when does a claim "accrue" for purposes of a request for civil monetary penalties in a securities fraud case? Surprisingly, our research has uncovered no decision that has directly addressed the question.

To help us answer this question, the parties have provided a pair of cases which they feel provide important insight on the proper resolution of this issue. The defendants point us to the D.C. Circuit's decision in 3M Co. v. Browner, 17 F.3d 1453 (D.C.Cir.1994). The SEC offers the Seventh Circuit's decision in Law v. Medco Research, Inc., 113 F.3d 781 (7th Cir.1997). 3M Co. involved an U.S. Environmental Protection Agency administrative proceeding that sought to impose penalties for violations of the Toxic Substances Control Act. In discussing the Section 2462 accrual issue, the D.C. Circuit held that a claim accrues when the cause of action first existed and not when the violation was first discovered. 3M Co., 17 F.3d at 1462. Essentially, the D.C. Circuit rejected what has become known as the "discovery of violation" rule for purposes of Section 2462. In Law, the Seventh Circuit was confronted with the issue of when a claim accrues under the one-year statute of limitations for Rule 10b-5 claims. In the context of securities fraud cases, the Seventh Circuit adopted the "discovery of violation" rule because it is often difficult for a plaintiff to know that he or she has been the victim of a fraud until many years after the fraud has been committed. Law, 113 F.3d at 785; see also Fujisawa Pharm. Co., Ltd. v. Kapoor, 115 F.3d 1332, 1336-37 (7th Cir.1997).

**\*12** In reaching its conclusion, the Seventh Circuit in Law looked to other sections of the Securities Act to determine Congress' intent regarding claim accrual for purposes of the applicable statute of limitations in a Rule 10b-5 case. Specifically, the court noted that section 13 of the Securities Act provides that its one-year statute of limitations begins to run "after the discovery of the untrue statement ... or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The court took this to mean that a plaintiff "gets a year after he learned or should have learned the facts that he must know to know that he has a claim." Law, 113 F.3d at 785. While we

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

acknowledge that the Seventh Circuit was addressing the accrual date for the statute of limitations in the context of a Rule 10b-5 fraud action, we feel the court's general adoption of the "discovery of violation" rule in securities fraud cases should be extended to claims for civil penalties in securities fraud actions governed by the five-year statute of limitations in Section 2462. In other words, the five-year statute of limitations for civil penalties does not accrue when the fraud occurs, but rather when "the plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him[,] by such further investigation as the facts would induce in a reasonable person[,] to sue" within five years. Fujisawa, 115 F.3d at 1334 (citing Law, 113 F.3d at 785). This conclusion also is consistent with the D.C. Circuit's decision in 3M Co. because the court there was not faced with a claim for penalties in the context of a fraud suit. In fact, the D.C. Circuit acknowledged in a footnote that accrual of the statute of limitations could be affected by the "fraudulent concealment doctrine." 3M Co., 17 F.3d at 1461 n. 15. Therefore, we hold that the date of accrual of the five-year statute of limitations of 28 U.S.C. § 2462 for securities fraud cases is governed by the "discovery of violation" rule.

For purposes of the instant case, this holding establishes that the claim for civil penalties against Rooney and Koenig is timely. The earliest possible accrual date in this case is October 10, 1997, the date on which the successors of Rooney and Koenig made the first public disclosure that Waste Management may have misstated its prior financial results. In fact, under the Seventh Circuit's holding in Law, the actual accrual date is probably much later than October 10, 1997 because the SEC likely did not have information demonstrating that the defendants acted with the requisite scienter until sometime in 1998. See Law, 113 F.3d at 786. Nevertheless, even assuming that October 10, 1997 is the accrual date, the SEC's March 26, 2002 request for civil penalties against Rooney and Koenig is timely. Therefore, the motion to strike the request for civil penalties is denied.

IX. Motion to Dismiss or Strike the Claim for Penalties under Section 21A

*13 Finally, in this motion, defendants Buntrock and Rooney seek to dismiss or strike the claim for penalties under Section 21A of the Exchange Act, 15 U.S.C. § 78u-1. In particular, the defendants argue that the penalty claims are barred by the five-year statute of limitation contained in Section 21A(d)(5). Further, Buntrock and Rooney contend that the SEC has failed to state a claim for penalties under Section 21A.

First, we will address the statute of limitations issue. Section 21A(d)(5) of the Exchange Act provides that "[n]o action may be brought under this section more than 5 years after the date of the purchase or sale." 15 U.S.C. § 78u-1(d)(5). The SEC in its response to the motion to dismiss has stated that it is not seeking penalties for any sales made by Buntrock and Rooney prior to March 26, 1997. We accept that representation. Therefore, any request for penalties with respect to trades made before March 26, 1997 will not be entertained.

The remaining portions of this motion are puzzling to us. Apparently, Buntrock and Rooney argue that the complaint does not properly plead the scienter required to seek penalties under Section 21A and that the complaint does not allege that the defendants "used" the alleged inside information. Section 21A provides in part that "whenever it shall appear to the Commission that any person has violated any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information ... [,]" the SEC may bring an action seeking a civil penalty in the amount of three times their illegal trading profits gained or losses avoided. 15 U.S.C. § 78u-1. Our interpretation of this statute leads us to believe that the only thing the SEC has to plead in its complaint in order to seek penalties under Section 21A is a primary violation of that section. We are unfamiliar with any independent requirement to plead specific elements for damages sought in a prayer for relief. Damages will be assessed only if the trier of fact determines that Buntrock and Rooney are liable for insider trading.

Based on our reading of the complaint, we find that the SEC has pled a prima facie case of insider trading against Buntrock and Rooney. The complaint alleges that Buntrock and Rooney engaged in certain Waste Management stock transactions knowingly or recklessly disregarding that Waste Management's earnings were grossly overstated and that, consequently, the stock was substantial

Westlaw.

overpriced. (Complt. at ¶ 341.) Obviously, this type of information was not generally available to the general trading public. The complaint also states that, because they were aware that the alleged fraud was starting to unravel, they sold large blocks of stock so as to avoid considerable losses. (Id.) Nevertheless, the defendants take issue in their motion with the SEC's decision to plead alternatively scienter in the complaint as both knowingly and recklessly. As we have done earlier in this opinion, we see no need to address the scienter standard directly because we are satisfied that the SEC has provided countless allegations in its complaint demonstrating that Buntrock and Rooney acted with actual knowledge throughout all stages of the purported fraud.

*14 Finally, we would like to address briefly the defendants' argument regarding "use" of the allegedly insider information. At the outset, we note that the complaint alleges that Buntrock and Rooney knowingly used insider information they possessed regarding the true financial condition of Waste Management to sell hundreds of thousands of shares before the market and the public became aware of the company's accounting improprieties. (Complt. at ¶ 341.) However, the defendants argue that the complaint is deficient because it does not allege that they "used" the inside information as opposed to simply "possessing" it. While this issue may be significant as we proceed to trial, the relevant cases make it clear that this is a proof and not a pleading issue. See Lipson, 278 F.3d at 661; SEC v. Adler, 137 F.3d 1325, 1338-39 (11th Cir.1998); United States v. Teicher, 987 F.2d 112, 120-21 (2d Cir.1993). Thus, there is no need to address this argument now. Therefore, Buntrock and Rooney's motion to strike the claim for penalties under Section 21A of the Exchange Act is denied.

### CONCLUSION

For the foregoing reasons, the numerous motions to dismiss filed by all of the defendants [Docket # 126-1] are all denied. As we have long stated, the SEC's complaint raises serious allegations of troubling conduct by all of the defendants. It is now time to address the problems raised in the complaint on the merits. Defendants are ordered to answer the complaint on or before June 18, 2004.

It is so ordered.

2004 WL 1179423 (N.D.Ill.), Fed. Sec. L. Rep. P 92,833

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



# EXHIBIT J

Not Reported in F.Supp.2d
**(Cite as: 2006 WL 89864 (W.D.Mich.))**
< KeyCite History >

Only the Westlaw citation is currently available.

United States District Court,
W.D. Michigan, Southern Division.

**UNITED STATES SECURITIES AND
EXCHANGE COMMISSION, Plaintiff,**
v.
**Gary L. HARDEN, Sr. and Philip E. Lowery,
Defendants,
and
CYBERSPACE, LTD. and Development
Investments & Associates, Inc., Relief
Defendants.**

**No. 1:05-CV-354.**

Jan. 12, 2006.

Carleasa A. Coates, US Securities and Exchange
Commission, Washington, DC, J. Joseph Rossi,
U.S. Attorney, Grand Rapids, MI, for Plaintiff.

Gary L. Harden, Sr., Bessemer, MI, pro se.

Andrew Mark Schauer, Krys Boyle PC, Denver,
CO, for Defendants.

ORDER

ENSLEN, Senior J.

*1 This matter is before the Court on Plaintiff
Securities and Exchange Commission's Motion to
Strike [Defendant Philip] Lowery's Defense of
Statute of Limitations. The Motion has been fully
briefed and oral argument is unnecessary in light of
the briefing.

Plaintiff's Motion is premised upon Federal Rule
of Civil Procedure 12(f), rather than the more
typical dismissal provisions of Rule 12(b). Rule
12(f) was adequately explained by the Fourth Circuit
Court of Appeals as follows:
  Federal Rule of Civil Procedure 12(f) permits a
  district court, on motion of a party, to "order
  stricken from any pleading any insufficient
  defense." Rule 12(f) motions are generally viewed
  with disfavor "because striking a portion of a
  pleading is a drastic remedy and because it is often
  sought by the movant simply as a dilatory tactic."

5A A. Charles Alan Wright & Arthur R. Miller,
Federal Practice & Procedure § 1380, 647 (2d
ed.1990). Nevertheless, "a defense that might
confuse the issues in the case and would not,
under the facts alleged, constitute a valid defense
to the action can and should be deleted." Id. §
1381 at 665.
Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d
316, 347 (4th Cir.2001); see also Ameriwood Indus.
Int'l Corp. v. Arthur Anderson & Co., 961 F.Supp.
1078, 1083 (W.D.Mich.1997) (permitting exclusion
of legally insufficient defense). Notwithstanding,
striking a defense remains a drastic remedy which
should be used only when justice so requires. See
Brown & Williamson Tobacco Corp. v. United
States, 201 F.2d 819, 822 (6th Cir.1953).

In this suit, the debate is over whether the statute
of limitations defense raised by Defendant Lowery is
legally insufficient. The back and forth argument
has persuaded this Court of the following
conclusions, which are supported by significant
precedent.

First, as explained by the Ninth Circuit in S.E.C.
v. Rind, 991 F.2d 1486, 1490 (9th Cir.1993) (citing
cases), the Commission itself (with one exception) is
not subject to either limitation periods or equitable
laches which would limit its rights to sue to recover
monies on behalf of investors damaged by securities
fraud. See also S.E.C. v. Diversified Corporate
Consulting Group, 378 F.3d 1219, 1224 (11th
Cir.2004); P. Stolz Family P'ship L.P. v. Daum,
355 F.3d 92, 104 (2nd Cir.2004); S.E.C. v. Lorin,
869 F.Supp. 1117, 1122-23 (S.D.N.Y.1994). This
is because the federal securities statute under which
the Commission sues does not provide any explicit
waiver of sovereign immunity and because the
Commission is a public agency which receives
public funds such that a presumption of waiver
would undermine the public fisc. This ruling covers
claims for disgorgement, accounting and injunction
made by the Commission. Id. This rule of law is
also consistent with the general rule of federal law
that waiver of sovereign immunity is narrowly
construed. See United States v. Summerlin, 310
U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283
(1940); Hatchett v. United States, 330 F.3d 875,
887 (6th Cir.2003).

*2 Notwithstanding, there is one exception to this

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d                                          Page  83
(Cite as: 2006 WL 89864, *2 (W.D.Mich.))

rule which is created by a general statute of repose which is specifically applicable to civil penalties sought by the federal government--28 U.S.C. § 2462. This statute, in light of its wording, has been applied by federal courts to limit actions brought by federal agencies, including the S.E.C., to assess monetary penalties. 3M Co. v. Browner, 17 F.3d 1453, 1461 (D.C.Cir.1994); Johnson v. S.E.C., 87 F.3d 484, 488 (D.C.Cir.1996). This is a statute of repose, and not a statute of limitations, which means that it is not subject to equitable extensions, such as due to delayed discovery, fraudulent concealment or the interest of "public policy." 3M Co., 17 F.3d at 1460-61; Johnson, 87 F.3d at 492. It is also not subject to extension on the ground that multiple violations constitute a single "continuing violation." [FN1] See In re Enron Corp., 310 F.Supp.2d 819, 844 (S.D.Tex.2004) (citing Caviness v. Derand Res. Corp., 983 F.3d 1295, 1301-02 (4th Cir.1993)); S.E.C. v. Caserta, 75 F.Supp.2d 79, 89 (E.D.N.Y.1999); de la Fuente v. DCI Telecomm., Inc., 259 F.Supp.2d 250, 265 (S.D.N.Y.2002).

    FN1. As suggested by Defendant Lowery, the application of a "continuing violation" equitable extension doctrine would also expand that doctrine beyond its proper parameters as previously recognized by Sixth Circuit law.

Because Plaintiff is seeking civil penalties in this suit (Compl., 14) and there was some delay in the filing of suit, the affirmative defense of limitations under 28 U.S.C. § 2462 may apply. As such, it should not be stricken.

THEREFORE, IT IS HEREBY ORDERED that Plaintiff Securities and Exchange Commission's Motion to Strike and Proposed Order (Dkt. Nos. 44 & 47) are DENIED.

2006 WL 89864 (W.D.Mich.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

# EXHIBIT K

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 93,951
(Cite as: 2006 WL 2470329 (M.D.Fla.))
<KeyCite History>

United States District Court, M.D. Florida,
Orlando Division.

SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,
v.
ROANOKE TECHNOLOGY CORP., David L.
Smith, Jr., Thomas L. Bojadzijev, Barrett R.
Clark, & Sussex Avenue Partners, LLC,
Defendants.

No. 6:05-cv-1880-Orl-31KRS.

Aug. 24, 2006.

Alise Meredith Johnson, Miami, FL, for Plaintiff.

Thomas L. Bojadzijev, Manhattan Beach, CA, pro se.

Howard S. Dargan, Hamilton, Lehrer & Dargan, P.A., Boca Raton, FL, for Defendants.

ORDER

GREGORY A. PRESNELL, District Judge.

*1 This matter comes before the Court after a hearing on the motion to dismiss and supporting memorandum filed by Defendant Barrett R. Clark ("Clark") (Doc. 43, Doc. 44), the response (Doc. 52) filed by the Plaintiff Securities and Exchange Commission ("SEC"), and Clark's reply (Doc. 55). Clark seeks dismissal of three fraud counts on the grounds that they fail to state a claim against him under Rule 12(b)(6) or that they fall short of the specificity required of a fraud claim by Rule 9(b). (Doc. 43 at 1).

I. Background

The following allegations, taken from the Amended Complaint (Doc. 30), are accepted as true for purposes of resolving this motion to dismiss. Miree v. DeKalb County, Ga., 433 U.S. 25, 27 n. 2 (1977).

Defendant David L. Smith, Jr. ("Smith"), as CEO and president of Defendant Roanoke Technology Corp. ("Roanoke"), engaged in a so-called "pump and dump" scheme involving his company's stock. Smith published misleading news releases to increase the stock's value. (Doc. 30 at 1). He also used both Clark and Defendant Thomas L. Bojadzijev ("Bojadzijev") to sell Roanoke stock. (Doc. 30 at 1). In exchange for their (purported) consulting services, Clark and Bojadzijev received shares of Roanoke stock. (Doc. 30 at 2). Clark and Bojadzijev would sell the stock, keep a portion of the proceeds, and return the remainder to Smith in the guise of a loan. (Doc. 30 at 2).

Roanoke issued the stock to Clark by way of Form S-8 registration statements. (Doc. 30 at 1). Stock issued via a Form S-8 (henceforth, "Form S-8 stock") may be used to pay for certain types of consulting services, but it may not be used simply to raise capital. In his consulting agreements with Smith and Roanoke, Clark agreed to provide certain management and organizational services, but in actuality he provided primarily shareholder communication services, which are not among the types of consulting services for which one may properly receive payment in the form of Form S-8 stock (Doc. 30 at 11). Smith signed all of the Form S-8 registration statements, which falsely asserted that Clark was providing "consulting" services to Roanoke. (Doc. 30 at 10).

To disguise the transfer of proceeds of the stock sale, Clark had his company--Defendant Sussex Avenue Partners, LLC ("Sussex")--enter into hundreds of thousands of dollars' worth of sham promissory notes with Smith. (Doc. 30 at 11). In an effort to avoid SEC reporting requirements, some of the Roanoke stock that Clark was to resell was issued to Clark's girlfriend or an employee of Sussex. (Doc. 30 at 11-12). On several occasions, these efforts failed, and Clark's holdings of Roanoke stock exceeded the percentages that triggered the reporting requirements. (Doc. 30 at 12). Despite this, Clark never filed the required federal registration statements. (Doc. 30 at 12).

In the Amended Complaint, the SEC alleges (inter alia ) that Clark committed fraud in violation of the following: Section 17(a)(1) of the Securities Act (Count II); Section 10(b) of the Exchange Act and Rule 10b-5 (Count III); and Sections 17(a)(2) and (3) of the Securities Act (Count VII).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    **Page 86**
**(Cite as: 2006 WL 2470329, \*1 (M.D.Fla.))**

II. Standards

A. Motion to Dismiss

**\*2** In ruling on a motion, the Court will take the complaint's allegations as admitted by the Defendant and will liberally construe them in the Plaintiff's favor. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969). The Court will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir.2003); see also U.S. ex rel. Carroll v. JFK Med. Ctr., 2002 WL 31941007, at \*2 (S.D.Fla. Nov. 15, 2002) ("Court need not accept facts that are internally inconsistent, facts that run counter to facts which the Court may take judicial notice of, conclusory allegations, unwarranted deductions or mere legal conclusions"); Harding v. Winn-Dixie Stores, Inc., 907 F.Supp. 386, 389 (M.D.Fla.1995) ( "the court will not accept conclusory allegations or legal conclusions masquerading as factual conclusions").

B. Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe. SEC v. Zandford, 535 U.S. 813, 819 (2002). "Rule 10b-5, which implements this provision, forbids the use, 'in connection with the purchase or sale of any security,' of 'any device, scheme, or artifice to defraud' or any other 'act, practice or course of business' that operates ... as a fraud or deceit.' " Id. (quoting 17 CFR § 240. 10b-5). Rule 10b-5 also proscribes, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b-5 (2004).

To state a claim for securities fraud under these provisions, a plaintiff must allege that the defendant made material misstatements or omissions as to which he had a duty to speak, or used a fraudulent device, with scienter, in connection with the purchase or sale of securities. See, e.g., SEC v. Monarch Funding Corp., 193 F.3d 295, 308 (2nd Cir.1999); Ross v. Bank South, N.A., 885 F.2d 723, 728 (11th Cir.1989).

C. Section 17(a) of the Securities Act
Section 17(a) of the Securities Act provides that
It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
(1) to employ any device, scheme, or artifice to defraud, or
**\*3** (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

A claim under Section 17(a) of the Securities Act requires essentially the same elements as a claim under Section 10(b) of the Exchange Act and Rule 10b-5, except that there is no scienter requirement for claims under Section 17(a)(2) or (3). Monarch Funding at 308.

D. Rule 9(b) of the Federal Rules of Civil Procedure

Rule 9(b) requires that "in all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). However, intent may be averred generally. Id. The particularity requirement applies to securities fraud claims brought by the SEC, just as it does to such claims brought by private plaintiffs. See, e.g., SEC v. Druffner, 353 F.Supp.2d 141, 148 (D.Mass.2005).

III. Legal Analysis

A. Misrepresentations and omissions

Clark contends that the SEC has failed to allege

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

(Cite as: 2006 WL 2470329, *3 (M.D.Fla.))

that he made a false or misleading statement of a material fact, or that he omitted any material facts that he had a duty to disclose. (Doc. 44 at 7). He points out that, while the Amended Complaint refers to numerous alleged falsehoods and misrepresentations, such as misleading press releases and SEC filings, none are attributed to him, and there are no allegations that he knew or should have known of them or their falsity. (Doc. 30 at 7). In addition, he contends that the SEC fails to specify any facts he should have shared with prospective investors, and never explains the source of his duty to do so. (Doc. 30 at 7-8).

The SEC agrees that it has not alleged that Clark had any responsibility in regard to the misleading press releases. (Doc. 52 at 14). But the SEC contends that it has properly alleged that Clark participated in an illegal kickback scheme with Smith, and that Clark had a duty to disclose that scheme and the true nature of the money the duo were paying themselves under the guise of issuing Form S-8 stock. (Doc. 52 at 14). However, the SEC does not specify--in either the Amended Complaint or its memorandum--the facts that Clark failed to disclose or the circumstances under which he should have done so.

In its memorandum, the SEC does make a general assertion that Clark "either had a duty to disclose the kickback scheme to investors or not engage in a kickback scheme at all." (Doc 52 at 17). The SEC does not identify any portion of the Amended Complaint where it makes this allegation. Moreover, at least in this case, an assertion that the Plaintiff was required to disclose "the kickback scheme" is too vague to permit proper analysis. The kickback scheme described in the Amended Complaint was made up of a number of different factual elements, and the Court cannot tell which facts the SEC contends Clark was obliged to reveal. For example, should Clark have disclosed that some of Roanoke's press releases were misleading? That he was not providing all of the services detailed in his consulting agreement with Roanoke? That at least some of the services he was providing were not a proper basis for receipt of Form S-8 stock? On this record, the Court cannot tell. As such, the Court cannot determine whether any particular allegation that Clark omitted a material fact is adequately pled in the Amended Complaint, and whether the Amended Complaint includes allegations that, if

proven, would demonstrate that Clark had a duty to disclose that fact.

*4 The SEC also argues that a defendant's duty to disclose "depends on the particular facts of each case and is thus not proper grounds for a motion to dismiss." (Doc. 52 at 14). In support, the SEC cites to Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1043 (11th Cir.1986). In that case, the court did indeed state that "a defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose. Such a duty may exist 'where the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case.' " Id. at 1043 (emphasis added) (quoting Woodward v. Metro Bank, 522 F.2d 84, 97 n. 28 (5th Cir.1975)). Contrary to the SEC's implication, however, the Rudolph court did not decline consideration of those circumstances, instead stating that its task at the motion to dismiss stage was "to determine whether plaintiffs could, consistent with their allegations, prove facts under which we would hold that [the defendant] had such a duty." Id. at 1045.

B. Materiality

In the Rule 10b context, an omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). Clark contends that the SEC has failed to set forth, with particularity, how the existence of the S-8 scheme was "material" to the hypothetical reasonable investor. More specifically, he argues that a reasonable investor (as opposed to the SEC) would not care that Roanoke was issuing stock to Clark in exchange for services other than those listed as proper on Form S-8. (Doc. 44 at 9-10).

The SEC argues, correctly, that it has alleged that the stock was not provided to Clark in exchange for bona fide services. It does not, however, explain what it means by bona fide in this context--i.e., whether it uses this phrase to mean "honest" or "actual" or something like "approved by the SEC for exchange with Form S-8 stock". As Clark points out, it is hard to see how a reasonable investor would care that the services Clark provided to

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Roanoke did not fall into the proper category for Form S-8 stock, so long as he did in fact provide a corresponding amount of services to the company.

The SEC contends that a reasonable investor "obviously would attach importance to the omission that Clark and Smith were engaged in a kickback scheme." Without a more specific allegation, this is not so obvious as the SEC would have it. Unlike the situation in, for example, SEC v. Scott, 565 F.Supp. 1513 (S.D.N.Y.1983)--which the SEC cites in support of its argument here--the kickbacks of stock sale proceeds from Clark to Smith do not appear to raise any conflict of interest issues. See id. at 1527 (stating that "[o]bviously an investor would consider an apparent kickback agreement between the issuer and the underwriter as material information since such an agreement raises an inherent conflict of interest and undermines the independence of the underwriter's investment judgment."). While it is clearly possible that an omitted fact might be material even if it does not directly impact the value of the company's stock, the SEC has failed to show that such is the case here. Instead of explaining how the omitted information was material--i.e., why the reasonable investor would have wanted to know about it--the SEC has simply stated that the information was material because the reasonable investor would have wanted to know about it. This is not sufficient.

C. Scienter

*5 Finally, Clark argues that the SEC has failed to make proper allegations of scienter with regard to Counts II and III. (Doc. 44 at 14). The Supreme Court has defined scienter as the "intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 192 (1976). A showing of severe recklessness satisfies the scienter requirement. Ziemba v. Cascade Intern., Inc ., 256 F.3d 1194, 1202 (11th Cir.2001). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Id. (internal quotation omitted).

In response, the SEC presents a series of

allegations from the Amended Complaint that it contends give rise to a "strong inference" of "conscious misbehavior." The initial problem is that "conscious misbehavior" is not part of this circuit's scienter standard. In Bryant v. Avado Brands, 187 F.3d 1271 (11th Cir.1999), the court noted that two other courts of appeals--the Second and Third--permitted plaintiffs to allege the requisite "strong inference of scienter" by showing "a motive and opportunity to commit fraud or by showing circumstantial evidence denoting either recklessness or conscious misbehavior." [FN1] However, the Avado Brands court adopted a different scienter standard--that employed by the Sixth Circuit--that "a securities fraud plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." Id. at 1287.

FN1. So far as this Court's research has revealed, Avado Brands is the only reported decision in which the United States Court of Appeals for the Eleventh Circuit has employed the term "conscious misbehavior".

With the proper standard ascertained, the Court turns to the following allegations from the Amended Complaint, which the SEC contends meet the pleading requirements for scienter:

The Commission alleges that from February 2003 through March 2004, Roanoke issued 187 million shares of Roanoke stock to Clark through a series of Form S-8 registration statements. (Amended Complaint at ¶ 41). The statements falsely represented that the shares were issued to Clark as compensation for "consulting" services, but in reality Clark provided little if any bona fide services to Roanoke. (Id. at ¶¶ 42, 45). The services Clark provided to the company were primarily shareholder communication services which are prohibited activities under a Form S-8 registration statement and were intended to mask Smith and Clark's primary intent to liquidate Roanoke shares for their mutual gain. (Id. at ¶ 45). Within days after receiving Roanoke S-8 stock, Clark: 1) sold the shares; 2) wired the sales proceeds to his and Sussex's bank accounts; and 3) then wired funds from those bank accounts to Smith's bank account or provided Smith with a cashier's check. (Id. at ¶ 46). In total, Clark gradually sent $645,450 to Smith under the guise of loan installments and kept approximately



Not Reported in F.Supp.2d
(Cite as: 2006 WL 2470329, *5 (M.D.Fla.))

$850,000 in illicit proceeds in various Sussex accounts for himself. (Amended Complaint ¶ 48). This capital raising scheme was in direct contradiction to the statements made in the S-8 statement.
**\*6** (Doc. 52 at 12).

The Court finds that these allegations do not satisfy the scienter pleading requirements. There is no allegation that Clark knowingly or recklessly acted with the intent to deceive, manipulate, or defraud, and none of these allegations provide circumstantial evidence that he did so. Half of the allegations relate to the improper issuance of Form S-8 stock by Roanoke to Clark, but there is no allegation that Clark knew anything about the circumstances under which the stock was issued or that he was responsible for its issuance. The remaining allegations cited by the SEC in its response revolve around the kickbacks of the stock sale proceeds. Such kickbacks, standing alone, are not sufficient to raise a strong inference that Clark intended to deceive, manipulate or defraud any investor.

IV. Conclusion

For the reasons discussed above, Defendant Barrett R. Clark's Motion to Dismiss (Doc. 43) is GRANTED and Counts II, III, and VII of the Amended Complaint are DISMISSED as they relate to Clark. The SEC may file an amended complaint not more than twenty days from the issuance of this order.

DONE and ORDERED in Chambers, Orlando, Florida on August 24, 2006.

2006 WL 2470329 (M.D.Fla.), Fed. Sec. L. Rep. P 93,951

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

# EXHIBIT L

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 93,728
(Cite as: 2006 WL 538210 (W.D.Wash.))

Page 91

<KeyCite History>

United States District Court,
W.D. Washington.

SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,
v.
C. Paul SANDIFUR, Jr., Thomas G. Turner,
Robert A. Ness, Thomas R. Masters, Dan
W. Sandy, David R. Syre, and Trillium
Corporation, Defendants.

No. C05-1631C.

March 2, 2006.

Helane L. Morrison, Kristin A. Snyder, Robert Lee Mitchell, San Francisco, CA, for Plaintiff.

Robert S. Mahler, Bullivant Houser Bailey, Laurence B. Finegold, Stephen M. Rummage, Charles S. Wright, Davis Wright Tremaine LLP, Jeffrey B. Coopersmith, Kit W. Roth, Piper Rudnick Gray Cary, Barry M. Kaplan, Douglas W. Greene, Wilson Sonsini Goodrich & Rosati, James L. Magee, Graham & Dunn, Spencer Hall, Jr., Hall Zanzig Zulauf Claflin McEachern, Brendyn P. Ryan, David F. Taylor, Ronald L. Berenstain, Perkins Coie, Seattle, WA, Thomas L. Hutchinson, Bullivant Houser Bailey, Portland, OR, Nicolas Morgan, Piper Rudnick Gray Cary, Los Angeles, CA, Mark Edmund Vovos, Spokane, WA, for Defendants.

ORDER

COUGHENOUR, J.

I. INTRODUCTION

*1 This matter has come before the Court on the following motions: (1) Defendant Ness's motion to dismiss, or for a more definite statement and to strike request for disgorgement (Dkt. No. 23); (2) Defendant Masters's joinder in Defendant Ness's motion (Dkt. No. 34); (3) Defendant Sandy's motion to dismiss (Dkt. No. 27); and (4) Defendants Trillium Corporation and David Syres's motion to dismiss (Dkt. No. 26). Having carefully considered the papers filed by the parties in support of and in opposition to the motions, the Court has determined that no oral argument shall be necessary. For the reasons that follow, Defendant Ness's motion to dismiss is DENIED in part and GRANTED in part, Defendant Masters's motion to dismiss is DENIED, and Defendants Trillium, Syre, and Sandy's motions to dismiss are GRANTED in part and DENIED in part.

II. BACKGROUND

Plaintiff, the Securities & Exchange Commission ("SEC"), filed a complaint alleging that Defendants, several former executives and business associates of Metropolitan Mortgage & Securities Co. ("Metropolitan"), participated in a fraudulent scheme to mislead investors about the company's financial performance. (Compl.¶ 1.)

In February 2004, Metropolitan, a real estate sales and finance company with $2 billion in assets, went into bankruptcy. (Compl.¶ 1.) The complaint alleges that the bankruptcy caused about 10,000 investors in the Pacific Northwest holding approximately $450 million in Metropolitan securities to lose all, or a substantial portion, of their investments. (Id.)

The complaint alleges that prior to the bankruptcy, Metropolitan and the defendants in this action schemed to improperly boost the company's revenues through four real estate transactions conducted in the third and fourth quarters of Metropolitan's fiscal year 2002. (Id. ¶ 3.) The transactions are alleged to be improper in that Metropolitan recognized an immediate gain in each of the transactions despite having financed the entire purchase price itself through a variety of mechanisms. (Id. ¶ 2.) Under Generally Accepted Accounting Principles ("GAAP"), "a seller may not recognize an immediate gain on the sale of undeveloped real estate unless the buyer makes an independent initial investment of at least 20% of the purchase price." (Id.)

The complaint asserts the following claims against Defendant Ness:
(1) violations of Section 17(a) of the Securities Act;
(2) violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;
(3) aiding and abetting Metropolitan's violations

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 538210, *1 (W.D.Wash.))

of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

(4) aiding and abetting Metropolitan's filing of false annual reports in violation of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder;

(5) aiding and abetting Metropolitan's filing of false quarterly reports in violation of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder;

*2 (6) circumventing internal accounting controls in violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder;

(7) aiding and abetting Metropolitan's failure to keep accurate books and records in violation of Section 13(b)(2)(A) of the Exchange Act;

(8) aiding and abetting Metropolitan in failing to maintain adequate internal accounting controls in violation of Section 13(b)(2)(B) of the Exchange Act;

(9) making or causing to be made false statements and omissions to accountants in violation of Rule 13b2-2 under the Exchange Act; and

(10) making false Sarbanes-Oxley certifications in violation of Rule 13a-14 under the Exchange Act.

Claims (1), (2), (3), (4), (6), (7), and (8) are also asserted against Defendant Masters. Claims (3) and (4), alleging aiding and abetting violations of Sections 10(b) and 13(a) of the Exchange Act, are asserted also against Defendants Sandy, Syre and Trillium. Each of the pending motions to dismiss seeks to dismiss all of the claims against its respective defendant.

## III. ANALYSIS

### A. Applicable standard

Fed. R. Civ. P. 12(b)(6) provides that an action will be dismissed for failure to state a claim upon which relief may be granted. A court will grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). While a court must accept all material allegations in the complaint as true and construe them in the light most favorable to the nonmoving party, conclusory allegations of law or unwarranted inferences of fact urged by the nonmoving party are insufficient to defeat a motion

to dismiss. Ove v. Gwinn, 264 F.3d 817, 821 (9th Cir.2001). In addition, a court's obligation to construe allegations in the light most favorable to the nonmoving party does not mean that those allegations must be construed in a light favorable to the nonmoving party, if such a construction cannot reasonably be made.

### B. Defendant Ness's motion to dismiss

Defendant Ness moves to dismiss the claims against him on the grounds that they do not comply with the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." Fed. R. Civ. P. 9(b). The Ninth Circuit has held that "allegations of fraud [must be] specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir.1985). The parties agree that the requirements of Rule 9(b) are satisfied if the complaint provides the who, what, where, when and how of the alleged fraud. (See SEC Opp'n 3 (citing SEC v. Buntrock, 2004 WL 1179423 at *3 (N.D.Ill. May 25, 2004)); Ness Mot. 2 (citing In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir.1994)).) Failure to satisfy Rule 9(b) will result in dismissal of the claims. Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir.1989).

*3 Rule 9(b) applies not only to claims in which fraud is an essential element, but also to claims grounded in allegations of fraudulent conduct. Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1103–1104 (9th Cir.2003). In the case at bar, the SEC's first and second claims allege violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Fraud is an essential element of both of these claims. Therefore, these claims are subject to the requirements of Rule 9(b). The SEC's sixth, ninth and tenth claims are based on the same course of allegedly fraudulent conduct as the first and second claims, and are therefore, pursuant to the Ninth Circuit's holding in Vess, also subject to the requirements of Rule 9(b). 317 F.3d at 1103–1104 (explaining that where a plaintiff alleges "a unified

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 538210, *3 (W.D.Wash.))

course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim ... the claim is said to be 'grounded in fraud' or to 'sound in fraud' and the pleading of that claim as a whole must satisfy ... Rule 9(b)").

1. First and second claims

The SEC's first and second claims allege that Defendant Ness violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder by making false statements or omissions in connection with the offer or sale of Metropolitan securities. These are the antifraud provisions of the Securities Acts. SEC v. Rubera, 350 F.3d 1084, 1094 (9th Cir.2003) (citing SEC v. Dain Rauscher, Inc., 254 F.3d 852, 856 (9th Cir.2001)). These antifraud provisions prohibit the making of material misstatements or omissions. Dain Rauscher, 254 F.3d at 856. In addition to alleging the falsity and materiality of a statement, the SEC must adequately allege scienter. "A showing of scienter is an element of an enforcement action pursuant to the antifraud provisions of the Securities Acts." Rubera, 350 F.2d at 1094 (citing Aaron v. SEC, 446 U.S. 680, 701--02, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)). "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.' ' Id. (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

For the reasons that follow, the Court DENIES Defendant Ness's motion as to all but the alleged misstatements in the Form S-2.

a. Fraud and misstatements

i. Misstatements

Paragraphs 24, 25, 58, 59 and 60 of the complaint collectively allege that Defendant Ness made material misstatements in two public documents, the Form 10-Q for the third quarter of fiscal 2002 and the Form 10-K for fiscal 2002. The alleged material false statements were about Metropolitan's pre-tax net income. According to the complaint, Metropolitan (and Defendant Ness) improperly recognized gains on four real estate transactions, referred to as the Trillium/Jeff Properties, Grand Hills, Neighborhood I and Neighborhood II transactions, allowing Metropolitan to report pre-tax

net income in the millions of dollars for the third quarter of fiscal 2002 and for fiscal 2002, rather than a loss. (Compl.¶¶ 24, 25, 58, 59.) Both the 10-Q and the 10-K containing the alleged false reports of pre-tax net income are alleged to have been, and were in fact, signed by Defendant Ness. Defendant Ness's signature on these documents is sufficient to expose him to potential liability as a primary violator under § 10(b). Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 (9 th Cir.2000). Because the complaint specifically alleges that the 10-Q and the 10-K misstated Metropolitan's pre-tax net income, the Court finds that the complaint identifies with sufficient particularity the alleged misstatements made by Defendant Ness in these documents.

*4 In addition to the 10-Q and the 10-K, the complaint identifies a third public filing, a Form S-2 filed in March 2003, which contained the allegedly false financial results for fiscal 2002. Unlike its allegations regarding the 10-Q and the 10-K, however, the complaint neglects to connect Defendant Ness to the alleged misstatements in the Form S-2. Therefore, to the extent that the SEC's complaint seeks to state a claim against Defendant Ness holding him accountable for the alleged misstatements in the Form S-2, this portion of the complaint is dismissed without prejudice.

ii. Fraud

The complaint alleges that Defendant Ness acted fraudulently in the Trillium/Jeff Properties, Neighborhood I, and Neighborhood II transactions.

Trillium/Jeff Properties

Paragraph 27 of the complaint alleges:
Given the size of the [sale of the property to Trillium], Metropolitan asked its outside auditors, Ernst & Young, LLP ("E & Y"), whether Metropolitan would be able to recognize an immediate gain on the sale. However, E & Y rejected gain treatment, and advised Turner and Ness that it would violate GAAP to record a gain on a real estate sale where Metropolitan and a company related to it supplied 100% of the financing.
(Compl.¶ 27.) This paragraph thus alleges that Ness was informed of the pertinent GAAP rule and its prohibition on the recognition of gains on sales

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 538210, *4 (W.D.Wash.))

where Metropolitan and companies related to it supplied 100% of the financing.

Paragraphs 28 through 31 explain how Defendants Sandifur, Turner, and Sandy worked to restructure the deal, allegedly finally deciding on the following:

[T]he parties decided to use a new shell company, to be formed by Sandy, to make the purchase. The shell company would get 80% financing from Metropolitan. Meanwhile, Old Standard would make a loan to Trillium, which would be funneled to the shell company so that the shell could make a 20% down payment....Sandy would later transfer the property to Trillium.

(Compl.¶ 30.) Although the complaint does not allege that Ness was involved in the engineering of the deal, it does allege that "Sandifur, Turner and Ness discussed the restructured deal and they each knew that Sandy would establish a shell company, which would hide the fact that Trillium was the real purchaser of the property, and that Metropolitan and a related company were providing 100% financing for Trillium's acquisition." (Id. ¶ 32.) These two paragraphs thus allege that Ness knew that in the restructured deal, (1) Trillium was allegedly still the "real" purchaser; and (2) Metropolitan and a related company were providing 100% financing for the transaction.

When Defendant Ness later communicated with Ernst & Young about the restructured deal, though he did inform them that "Sandy, through the shell company, would purchase the properties," he failed to inform them that "Metropolitan and a company related to it were providing 100% financing for Sandy's purchase." (Id. ¶ 33.) In addition to this omission, the complaint alleges that Defendant Ness "falsely stated that Sandy was unrelated to Trillium and was purchasing the properties independently for his own development purposes." (Id.) Thus, these assertions together with ¶ 27 allege that Defendant Ness, despite knowing that Ernst & Young had previously expressly rejected Metropolitan's attempt to recognize a gain on a sale to Trillium in which Metropolitan and a related entity provided 100% of the financing, knowingly concealed from Ernst & Young that in the restructured deal, Trillium was still the purchaser and that Metropolitan and/or a related company were still providing 100% financing for the transaction.

*5 According to these allegations, the conduct

constituting the alleged fraud is not that Defendant Ness's misstatements violated a GAAP rule, nor that Defendant Ness was associated with a transaction involving a shell company, but that Defendant Ness allegedly knowingly concealed information he knew was critical to Ernst & Young's approval of the deal. For these reasons, the Court finds that the SEC's allegations are sufficient to state the fraud element of the securities fraud claim against Defendant Ness with respect to his alleged involvement in the Trillium/Jeff Properties transaction.

Neighborhood I

The Neighborhood I transaction was completed by the end of June 2002 and reported in Metropolitan's financial results for the third quarter of 2002. (Compl.¶ 54.) Similar to the Trillium/Jeff Properties transaction, 100% of the financing for Neighborhood I was alleged to have been provided by Metropolitan and its related companies. (Id. ¶ 55.)

GAAP violations (including overstatement of revenues) may provide the underpinning for a securities fraud claim. In re Daou Sys., Inc., 411 F.3d 1006, 1016 (9th Cir.2005). However, "the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." Id. at 1018. This showing may be made by alleging "(1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or company employees involved in the transactions." Id. at 1016 (quotations and citations omitted). In the present case, all of the suggested allegations have been made as follows: (1) revenues of $2 million and an improperly recognized gain of $930,000  [FN1] (Compl.¶ 54); (2) an undeveloped property (id.); (3) third quarter of 2002 (id.); and (4) Defendants Turner, Ness and Sandifur structured the deal (id ¶ 56) and the buyer was a developer called Neighborhood (id. ¶ 54). The $2 million in revenues represents over 30% of the real estate sales revenues in the quarter, and 5.7% of total revenues for the quarter.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



FN1. Defendant Ness's argument regarding the absence of any express mention of GAAP in ¶¶ 54 through 57, discussing Neighborhood I, is irrelevant. Paragraph 2 of the complaint sets forth the allegedly applicable GAAP rule. Paragraph 55's description of Neighborhood I clearly demonstrates that Neighborhood I falls into the ambit of the GAAP rule identified in ¶ 12.

In light of the above, and because Defendant Ness did not contest the materiality of the alleged overstatement, the Court finds that the SEC's allegations are sufficient to state the fraud element of a claim for securities fraud against Defendant Ness with respect to Neighborhood I. [FN2]

FN2. Though Defendant Ness argues that his individual and specific role in the alleged fraud was not alleged with sufficient specificity, none of the cases he cites support his argument in the context of the present case. Riley v. Brazeau involved a complaint alleging facts on information and belief. 612 F.Supp. 674, 677 (D.Or.1985). Unlike in Hokama v. E.F. Hutton Co., where the complaint was found to be deficient because it conclusorily alleged "participation" and "substantial assistance," 566 F.Supp. 636, 646 (C.D.Cal.1983) the present complaint alleges "[t]he transaction was structured by Sandifur, Turner, Ness and Masters" (Compl.¶ 56). In other words, rather than merely alleging participation in some unspecified manner, the complaint alleges that Defendant Ness, together with others, structured the deal (a specific act). Finally, unlike the complaint in Newman v. Comprehensive Care Corp., which referred generically to "defendants", 794 F.Supp. 1513, 1527 (D.Or.1992), the present complaint specifically names Defendant Ness.

Neighborhood II

Neighborhood II allegedly transpired on or about September 30, 2002. (Compl.¶ 48.) The structure of the deal was substantially similar to the Neighborhood I and Trillium/Jeff Properties deals in that it was allegedly 100% financed by Metropolitan and its related companies. (Id. ¶ 49, 50.) Defendant Ness, along with Defendant Sandifur, Turner, and Masters, allegedly structured the deal. (Id. ¶ 50.) The transaction yielded $3.5 million in revenues and a reported gain of $1.4 million. Because the SEC's allegations regarding Neighborhood II contain all of

the information suggested by Daou as sufficient, the Court finds that the SEC's allegations are sufficient to state the fraud element of a claim for securities fraud against Defendant Ness with respect to Neighborhood II.

b. Materiality

*6 In the context of a Rule 10b-5 claim, "a misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 947 (9th Cir.2005). "[T]o fulfill the materiality requirement[,] there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231--32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Basic emphasized that the inquiry to be undertaken is a fact-specific one. Id. at 240. The Ninth Circuit has held that materiality is only appropriately determined as a matter of law if it is "so obvious that reasonable minds could not differ." Fecht v. Price Co., 70 F.3d 1078, 1081 (9th Cir.1995).

In the present case, Defendant Ness challenges the materiality of the alleged misstatement relating to the Neighborhood II transaction. According to the complaint, Metropolitan improperly recognized a gain of $1.4 million in the fourth quarter of fiscal 2002 on the Neighborhood II transaction. (Compl.¶ 48.) In their attempts to demonstrate the materiality of the transaction, the parties calculate the gain and/ or revenue as a percentage of various aggregate results, including total pre-tax net income for fiscal 2002 of $6.1 million (Opp'n 12:7 (yielding 22.9%)), total allegedly fraudulent gain reported in fiscal 2002 (Reply 7: 11 (yielding 10%)), and total revenue for fiscal 2002 (id. 7:18 (yielding 2%)). While the Court is inclined to agree that calculating the $1.4 million as a percentage of pre-tax net income (thereby arriving at the significant-seeming 22.9%) is a rather arbitrary and meaningless exercise, the Court is also wary of drawing a bright-line rule regarding what percent is to be considered material as a matter of law. Although Defendant Ness cites many cases involving numbers, the Court is mindful that the materiality inquiry is a fact-

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

specific one. Basic Inc., 485 U.S. at 240. Moreover, one of the cases cited by Defendant Ness found that 2% of quarterly revenue was not material as a matter of law. Shuster v. Symmetricon, Inc., 1997 WL 269490, at *8 (N.D.Cal. Feb.25, 1997). Here, the $3.5 million in revenue associated with the Neighborhood II transaction, though only 2% of annual revenue, could have represented roughly 8% of quarterly revenue. [FN3] Thus, even the Shuster Court might have hesitated to make a similar pronouncement in the present case. For the foregoing reasons, and because the dispute between the parties amply demonstrates the ease with which reasonable minds could differ as to the materiality of the Neighborhood II transaction, the Court declines to find that the Neighborhood II transaction is immaterial as a matter of law.

> FN3. In the absence of actual data in the record, the Court calculated the 8% figure by dividing Metropolitan's annual revenue into 4 equal quarterly amounts. The Court recognizes that Metropolitan's fourth quarter revenues might actually have been more or less than one-fourth of its total annual revenues.

c. Scienter

*7 Scienter is a necessary element of alleged violations of Section 17(a), Section 10(b) and Rule 10b-5. Aaron v. SEC, 446 U.S. at 701--02. This element may be satisfied by recklessness. Dain Rauscher, 254 F.3d at 856.

> Reckless conduct is conduct that consists of a highly unreasonable act, or omission, that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

Id. (quotes omitted). The SEC is correct that the more stringent pleading requirements set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA") do not apply to enforcement actions brought by the Commission. Thus, to satisfy Fed.R.Civ.P. 9(b), the SEC need only state that scienter existed. Fecht, 70 F.3d at 1082 (citing In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1547 (9th Cir.1994)).

The allegations recited in the Court's discussion of the Trillium/Jeff Properties transaction allege scienter with the necessary degree of particularity (Defendant Ness allegedly knowingly concealed information he knew was critical to Ernst & Young's approval of the deal). In addition to those allegations already discussed, the complaint also states "Ness knew, or [was] reckless in not knowing, that it was improper for Metropolitan to recognize" the gain on the Trillium/Jeff Properties transaction. (Compl.¶ 36.) Since an allegation of recklessness is enough to allege the scienter element, Dain Rauscher, 254 F.3d at 856, the Court finds that the SEC's complaint successfully alleges scienter with respect to the Trillium/Jeff Properties transaction.

Unlike in the Trillium/Jeff Properties transaction, which did not take place until the fourth quarter of 2002, there are no allegations that Defendant Ness had been told that the transaction would violate GAAP. Instead, the complaint relies on allegations regarding Defendant Ness's training and position in the company (Compl.¶ 12) to support its allegation that he "knew or was reckless in not knowing" that it was improper for Metropolitan to recognize revenue on the Neighborhood I transaction (id. ¶ 56) and that it was improper to recognize the gain in Metropolitan's 10-Q for that quarter (id. ¶ 57). Nevertheless, this specific aspect of the complaint removes it from that class of dismissible complaints seeking to infer scienter from the alleged GAAP violations. See Daou, 411 F.3d at 1016 (discussing how violations of GAAP may provide "powerful indirect evidence of scienter"). In other words, rather than arguing that scienter may be inferred from an alleged GAAP violation, the present complaint directly alleges that Defendant Ness either knew or was reckless in not knowing that it was improper to recognize a gain on Neighborhood I.

Defendant Ness argues that the Neighborhood I scienter allegations are deficient because they do not mention GAAP by name. However, the complaint alleges that Defendant Ness knew or was reckless in not knowing the principle of the rule. Whether or not Defendant Ness knew the name of the rule is not important if he knew or was reckless in not knowing that what he was doing was wrong, and yet persisted in doing it.

*8 For these reasons, the Court finds that the SEC's complaint successfully alleges scienter with respect to the Neighborhood I transaction. For the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2006 WL 538210, *8 (W.D.Wash.))

same reasons, the SEC's complaint successfully alleges scienter with respect to the Neighborhood II transaction.

2. Sixth, ninth and tenth claims

The sixth, ninth and tenth claims allege that Defendant Ness violated three provisions of Section 13 of the Exchange Act and rules promulgated under that section by the Commission. As already stated above, because these three claims rest on the same allegations of fraudulent conduct as the first and second claims, they are subject to the pleading standards of Fed. R. Civ. P. 9(b). Also as already stated above, the parties agree that the requirements of Rule 9(b) are satisfied if the complaint provides the who, what, where, when and how of the alleged fraud. (See SEC Opp'n 3 (citing SEC v. Buntrock, 2004 WL 1179423 at *3 (N.D.Ill. May 25, 2004)); Ness Mot. 2 (citing In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir.1994)).)

As Defendant Ness himself points out, the sixth and the tenth claims contain no factual allegations in addition to the conduct alleged to be securities fraud. Similar to the Court's findings with respect to the first and second claims, the Court finds that the sixth claim is pled with sufficient particularity as to the 10-Q and the 10-K, but not as to the Form S-2. Defendant Ness's motion as to this claim is DENIED. The tenth claim alleges that Defendant Ness signed a false Sarbanes-Oxley certification that was included in Metropolitan's 2002 10-K. (Compl.¶ 94.) In addition to this specific allegation, the claim also relies on and incorporates the complaint's other preceding allegations. Like in the first, second and sixth claims, the Court finds that the allegations adding up to the tenth claim provide the who (Defendant Ness), what (false certification), when (filed December 31, 2002), where (in the 2002 10-K), and how (by signing it) necessary to allow Defendant Ness to prepare his defense. Therefore, the tenth claim is pled with sufficient particularity and Defendant Ness's motion as to this claim is DENIED.

The ninth claim alleges that Defendant Ness violated Rule 13b2-2 by making false statements and omissions to outside auditors. The Court discussed Defendant Ness's alleged misstatements and omissions above in its analysis of the Trillium/Jeff Properties transaction. In that analysis, the Court

concluded that the SEC had pled with sufficient particularity that Defendant Ness (who) had knowingly concealed information he knew was critical to Ernst & Young's approval of the deal (what). In addition to these core details, the complaint specifies that the communications occurred in September 2002. The Court finds that these allegations provide sufficient detail and information for Defendant Ness to prepare his defense with respect to his September 2002 communications with E & Y about the Trillium/Jeff Properties transaction.

*9 The complaint also alleges that two other false statements were made by Defendant Ness to E & Y: (1) a written statement provided to E & Y in or about December 2002 representing that Jeff Properties had a successful history in commercial property development and that Jeff Properties intended to develop the properties and pay off the loan to Metropolitan (Compl.¶ 38); and (2) a letter to E & Y dated December 27, 2002, representing that "Metropolitan's consolidated financial statements for fiscal 2002 were presented in conformity with GAAP, and that [he] was not aware of fraudulent conduct by any officer or employee with a significant role in the company's system of internal controls" (id. ¶ 39).

Defendant Ness contends that his alleged representation that Jeff Properties had a successful history in commercial property development is not fraudulent because Jeff Properties was controlled by Defendant Sandy (a detail allegedly disclosed to E & Y (Compl.¶ 33)) and because Defendant Sandy "was experienced with commercial real estate ventures" (Def. Ness's Mot. 18 (citing to Compl. ¶ 16)). However, ¶ 16 does not support the latter assertion-- rather, ¶ 16 says only that Defendant Sandy "owns ... some real estate ventures." Paragraph 16 makes no assertions as to the type of real estate ventures owned or what Defendant Sandy's involvement in them entailed. In addition, even if Defendant Sandy had been alleged to have experience in commercial real estate ventures, this is not the same as Jeff Properties having that experience, and certainly not the same as Jeff Properties having a successful history in property development. Indeed, the complaint alleges that Jeff Properties was formed for the purpose of taking part in the Trillium/Jeff Properties deal (Compl.¶¶ 33, 34), necessarily meaning that Jeff Properties had no history of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 538210, *9 (W.D.Wash.))

commercial property development. For these reasons, the Court does not find that the complaint contains internal inconsistencies regarding Jeff Properties. In addition, the Court finds that the SEC's allegations regarding Defendant Ness's (who) provision of the December 2002 (when) written statement (what) to E & Y (who) provide the necessary detail to enable Defendant Ness to prepare his defense.

Finally, Defendant Ness's objections to the December 27, 2002 letter are covalent with his objections to the underlying allegations regarding fraudulent conduct and false financial statements. (Mot.18.) Since the Court found that the SEC has pled the underlying conduct and false financial statements with the requisite degree of particularity, the Court also finds that the ninth claim is adequately pled as to the December 27, 2002 letter.

Though Defendant Ness argues that the allegations "lump" him together with Defendant Turner in such a manner that he cannot be expected to know what allegations pertain to him, the Court has already addressed and rejected this argument. See n. 2. In conclusion, the Court finds that the ninth claim is pled with sufficient particularity as to all three alleged misstatements and omissions to allow Defendant Ness to prepare his defense. Accordingly, Defendant Ness's motion as to this claim is DENIED.

3. Third, fourth, fifth, seventh and eight claims

*10 The third, fourth, fifth, seventh and eighth claims assert that Defendant Ness aided and abetted violations of the securities laws. Defendant Ness's objections to these claims are covalent with his objections to the SEC's first and second claims regarding primary violations. For the same reasons as stated above in its discussion of the first and second claims, the Court finds that the aiding and abetting claims are alleged with sufficient particularity. Therefore, Defendant Ness's motion as to these claims is DENIED. [FN4]

FN4. Defendant Ness's argument that allegations naming defendants other than and in addition to Defendant Ness and stating that they "reviewed," "commented on," or "signed" documents are insufficiently particular is not supported by the case he cites. The complaint in Morgan v. Prudential

Group, Inc. alleged that a defendant "participated in drafting, preparation and review". 81 F.R.D. 418, 425 (S.D.N.Y.1978). Here, the allegation is not that Defendant Ness took some unspecified participatory action related to these action verbs, but that he actually "reviewed," "commented on," and "signed" documents.

4. Disgorgement claim

Defendant Ness moves to strike the SEC's disgorgement claim pursuant to Fed. R. Civ. P. 12(f), which provides that a court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Disgorgement is a remedy. See, e.g., SEC v. Rind, 991 F.2d 1486, 1490 (9th Cir.1993). "The theory behind the remedy is deterrence." Id.

In the present case, where the Court has found that the SEC's complaint presents sufficiently detailed allegations of fraudulent conduct against Defendant Ness, it would appear that the remedy is available, see SEC v. First Pac. Bancorp, 142 F.3d 1186, 1191 (9th Cir.1998), and would be appropriate if the SEC prevails. One line of cases cited to by Defendant Ness refers to situations in which the requested remedy is simply unavailable as a matter of law. The other line of cases cited involved situations in which courts found that the SEC had failed to establish that disgorgement was warranted. Thus, none of these cases supports the argument that the SEC's disgorgement claim should be stricken at the pleading stage, when all that is necessary at that stage is that the Court find that disgorgement would be appropriate if the SEC prevails in its case-in-chief. Accordingly, Defendant Ness's motion as to the disgorgement claim is DENIED.

C. Defendant Masters's joinder in Defendant Ness's motion to dismiss

Defendant Masters filed his answer to the complaint on December 1, 2005. On December 9, 2005, he filed a notice of joinder in Defendant Ness's motion to dismiss. The SEC opposes the motion as untimely. It is true that according to the provisions of Rule 12(b)(6), a motion to dismiss on a 12(b) basis is untimely if it is made after an answer has been filed. Fed. R. Civ. P. 12(b) ("A

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

motion making any of these defenses shall be made before pleading."). However, 12(h) and 12(c) together preserve a party's ability to make the 12(b)(6) defense at any time. These sections provide that "a defense of failure to state a claim upon which relief can be granted ... may be made ... by motion for judgment on the pleadings", Fed. R. Civ. P. 12(h), and that "after the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings," Fed. R. Civ. P.12(c). See also 5C Wright & Miller, Federal Practice and Procedure: Civil 3d § 1361 at 95 (2004). Therefore, though Defendant Masters would be precluded from filing a motion called a 12(b)(6) motion to dismiss, he was not precluded from filing a motion to dismiss for failure to state a claim. For these reasons, the Court will allow Defendant Masters to join in Defendant Ness's 12(b)(6) motion.

**\*11** The complaint's allegations regarding Defendant Masters are quite limited in comparison to the allegations regarding Defendant Ness. Regarding Defendant Masters, the complaint alleges in pertinent part: (1) he "was Metropolitan's Vice President for property sales and development from March 2002 through February 2003 and reported directly to Sandifur" (Compl.¶ 13); (2) he knew or was reckless in not knowing the applicable GAAP rule (id. ¶ 23); (3) together with Defendants Sandifur, Turner and Ness, he structured the Neighborhood II transaction (id. ¶ 50); (4) he knew or was reckless in not knowing that the Neighborhood II sale was to be 100% financed by Metropolitan and a related company (id. ¶ 51); and (5) he knew or was reckless in not knowing that Western United's cost basis in the Neighborhood II land was materially higher than reported (id. ¶ 53).

As with Defendant Ness, the Court finds that with respect to Defendant Masters, the complaint states with sufficient particularity the who, what, when, where, and how of the alleged fraudulent conduct. Most of these required details have already been addressed by the Court in its discussion of Defendant Ness's motion. See supra at 9. As for Defendant Masters's specific participation, the complaint alleges that he "structured" the Neighborhood II deal, an allegation that satisfies the requirements of Rule 9(b). See supra note 2.

Similarly, the complaint alleges the scienter element with sufficient particularity as to Defendant Masters. See supra at 11--12.

For these reasons, and the reasons already set forth in the Court's discussion of Defendant Ness's motion, Defendant Masters's motion to dismiss for failure to state a claim is hereby DENIED.

D. Defendants Trillium/Syre and Sandy's motions to dismiss

Claims (3) and (4), alleging aiding and abetting violations of Sections 10(b) and 13(a) of the Exchange Act, are asserted against Defendants Trillium, Syre and Sandy. All three of these defendants were alleged to be involved in the transaction referred to as the Trillium/Jeff Properties transaction. Since the allegations regarding these three defendants are substantially similar in all important respects, the Court will treat their motions to dismiss together.

The parties agree that in order to state a claim for aiding and abetting, the SEC must allege that a defendant "knowingly provide[d] substantial assistance to another person in violation" of the federal securities laws. 15 U.S.C. § 78t(e). However, the parties disagree as to whether "recklessness" may satisfy this requirement of "knowing" assistance. The Ninth Circuit, in SEC v. Fehn, commented that the PLSRA revived the SEC's ability to bring injunctive actions for aiding and abetting violations and "restore[d] the pre-Central Bank status quo with respect to SEC injunctive actions." 97 F.3d 1276, 1288 (9th Cir.1996) (referring to Central Bank of Denver of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (abrogating aiding and abetting liability under the securities laws)). However, the Fehn Court recognized in a footnote that the PSLRA differed from the pre-Central Bank jurisprudence in one significant way--expressly requiring "knowledge" as an element of aiding and abetting, rather than permitting reckless disregard to support an aiding and abetting claim. Id. n. 11. See also United States v. Tarallo, 380 F.3d 1174, 1184 (9th Cir.2004) (recognizing that to prove liability on an aiding and abetting theory, the government had to show that the defendant "intentionally aided" his co-workers "in committing their own frauds"). Accordingly, the Court must determine whether the SEC has

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 538210, *11 (W.D.Wash.))

sufficiently alleged that Defendants Trillium, Syre, and Sandy had actual knowledge that they were providing substantial assistance to Metropolitan in executing the alleged fraud.

**\*12** Although the parties make some show of disputing what the pertinent alleged fraud is, it is fairly clear that the alleged fraud in question is Metropolitan's recognition and reporting of the gain on the Trillium/Jeff Properties transaction. (See, e.g., Defs. Trillium/Syre's Reply 2–3 (recognizing that the alleged fraud related to incorrect accounting treatment and/or defrauding or investors).) Thus, in order to have stated a claim against these defendants for aiding and abetting violations, the complaint must allege that they had actual knowledge that the Trillium/Jeff Properties transaction was structured in such a way as to permit the improper reporting of the gain from the transaction. The complaint does not do so. Defendants Trillium and Syre's reply succinctly and accurately describes the complaint's allegations thus:

(i) Trillium and Metropolitan reached a tentative agreement for Trillium to borrow money from Metropolitan and to buy two properties from Metropolitan; (ii) Ernst & Young identified some "accounting snags" with the proposed transaction, and Metropolitan sought to restructure the transaction in order to address Ernst & Young's concerns; (iii) the parties agreed to restructure the transaction so that the properties would be sold to a company formed by Sandy; (iv) all the material facts about the transaction were disclosed to Metropolitan; (v) Ernst & Young found that the restructured transaction remedied the problems and approved Metropolitan's plan to recognize income from the restructured sale; and (vi) the parties closed the transaction.

(Defs. Trillium/Syre's Reply 2.) Though the SEC's opposition characterizes the Trillium/Jeff Properties transaction as "highly atypical," the actual allegations of the complaint neither expressly make this statement, nor are they sufficient to support such a conclusion. Moreover, even if Defendants Trillium, Syre, and Sandy knew that the transaction was "highly atypical," atypicality does not, by itself, establish that a transaction is fraudulent or improper. See, e.g., Neilson v. Union Bank of Cal., 290 F.Supp.2d 1101, 1120–21 (C.D.Cal.2003) (allowing circumstantial allegations including atypicality to suffice in alleging the knowledge element).

Most important, however, is the total lack of any alleged connection between these defendants' involvement in structuring the transaction and their knowledge that it was being done for allegedly illegal purposes. Of these three defendants, only Defendant Syre is alleged to have had any knowledge about why the deal had to be restructured. However, even his alleged knowledge that the deal had to be restructured because of "accounting snags" (Compl. ¶ 28) does not lead to an inference that he knew that the restructured deal was improper or fraudulent. If Defendant Sandifur used only the term "accounting snags" to explain the situation to Defendant Syre, without additional allegations asserting that Defendant Syre knew what the snags were and why they were a problem for Metropolitan, the Court cannot impute to Defendant Syre any knowledge regarding Metropolitan's intended improper or fraudulent conduct. As to the other two defendants, Trillium and Sandy, the complaint contains no allegations that would support an inference that they knew the allegedly improper or fraudulent purpose of the restructured deal. (See, e.g., Compl. ¶ 29, 30, 31 (alleging only that Defendant Turner negotiated with a Trillium Vice President and Defendant Sandy, and not referring to any communications regarding the reason for the continued negotiations).) Similarly, the facts that Defendant Sandy set up a shell company and that Jeff Sandy was allegedly given a motorcycle in exchange for his participation as the sole shareholder of the shell company, while perhaps unusual, are not necessarily indicative of improper or fraudulent behavior.

**\*13** For these reasons, the Court finds that the SEC's complaint fails to allege the necessary knowledge element of an aiding and abetting claim. Accordingly, the SEC's aiding and abetting claims against Defendants Trillium, Syre, and Sandy must be DISMISSED.

Defendants Trillium, Syre, and Sandy urge that the dismissal of the claims against them be a dismissal with prejudice. Fed. R. Civ. P. 15(a) provides that leave to amend a complaint or pleading "shall be freely given when justice so requires." The Ninth Circuit has directed district courts to consider the presence of bad faith, undue delay, prejudice to the opposing party, and futility, "with all inferences in favor of granting the motion [to amend]." Griggs v. Pace Am. Group, Inc., 170 F.3d 877, 880 (9th

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 538210, *13 (W.D.Wash.))

Cir.1999); Howey v. United States, 481 F.2d 1187, 1190 (9th Cir.1973).

Although Defendants emphasize that the SEC has had ample opportunity to conduct discovery and to compose better allegations, Defendants do not contend that the insufficiency of the complaint is due to bad faith. More importantly, Defendants have not shown that prejudice will result from amendment, see, e.g., DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 187 (9th Cir.1987) (requiring that the party opposing amendment bear the burden of demonstrating prejudice), only reiterating their unsupported assertion that the SEC, as "no ordinary litigant," ought not to receive the benefit of Rule 15(a).

Dismissal without leave to amend is not appropriate where it appears that plaintiffs have "a reasonable chance of successfully stating a claim if given another opportunity." Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1053 (9th Cir.2003) (remanding a case in which "plaintiffs' allegations were not frivolous, plaintiffs were endeavoring in good faith to meet the heightened pleading requirements and to comply with court guidance ... and, most importantly, [where] it appears that plaintiffs had a reasonable chance of successfully stating a claim"). Here, although the deficiencies in Plaintiffs' complaint were not mere technicalities, they are not of an incurable nature. Therefore, amendment may not be futile.

Finally, the Court does not find that delay is a factor in this case.

For these reasons, the Court's dismissal of the third and fourth claims against Defendant Trillium, Syre, and Sandy is without prejudice.

IV. CONCLUSION

In accordance with the foregoing, Defendant Ness's motion to dismiss is DENIED in part and GRANTED in part, Defendant Masters's motion to dismiss is DENIED, and Defendants Trillium, Syre, and Sandy's motions to dismiss are GRANTED in part and DENIED in part. Claims (3) and (4) against Defendants Trillium, Syre, and Sandy are DISMISSED without prejudice. The SEC is directed to file an amended complaint within 45 days of the date of this order.

2006 WL 538210 (W.D.Wash.), Fed. Sec. L. Rep. P 93,728

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

# EXHIBIT M

Not Reported in F.Supp.2d
**(Cite as: 2007 WL 788335 (E.D.Tex.))**
<KeyCite History>

Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas,
Sherman Division.

**SECURITIES and EXCHANGE COMMISSION**
v.
**Mark David SHAPIRO, et al.**

**Civil Action No. 4:05cv364.**

March 14, 2007.

Stephen J. Korotash, Securities & Exchange Commission Fort Worth District Office, Fort Worth, TX, for Plaintiff.

Terence J. Hart, Munsch Hardt Kopf & Harr, Holly Michele Church, Sarah Ann Cardwell, Gina Culpepper PC, Gary Samuel Kessler, Brad D'Amico, Kessler & Collins, Timothy G. Ackermann, Morgan Lewis & Bockius, Dallas, TX, Phillip Offill, Godwin Pappas Langley Ronquillo, Dallas, TX, for Defendants.

REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

DON D. BUSH, United States Magistrate Judge.

*1 Before the Court is Defendant Mark Shapiro's Motion to Dismiss pursuant to Fed. R. Civ. P. Rules 9(b) and 12(b)(6). (Docket No. 15). Defendant James Thatcher joined in Shapiro's motion. (Docket No. 17). Having considered the motions, Plaintiff's Response, and Defendants' Reply, the Court is of the opinion that the motions should be denied.

HISTORY

Fleming Companies, Inc. ("Fleming"), was a wholesale food distributor and publicly traded corporation headquartered in Lewisville, Texas. At one time, Fleming was the nation's largest grocery wholesaler with approximately 50 major distribution centers across the country. In January 2003, K-Mart, Fleming's largest customer, terminated Fleming as its supplier. A few months later, Fleming filed Chapter 11 bankruptcy. [FN1]

FN1. According to Plaintiff's Response, on September 15, 2004, Fleming settled commission charges that it violated the anti-fraud, reporting, record-keeping, and internal controls provisions of the securities laws. In addition, ten other vendors have settled charges that they helped Fleming misstate its financials. (Pl's Resp. p. 1).

On September 15, 2005, the SEC filed this action alleging violations of the securities laws. The SEC alleges that due to various economic pressures, Fleming overstated its earnings in 2001 and the first two quarters of 2002. The SEC asserts six claims in violation of the Securities and Exchange Acts: (1) section 17(a), (2) section 10(b) and Rule 10b-5, (3) section 13(b)(5) and Rules 13b2-1 and 13b2-2, (4) Aiding and Abetting Fleming's violations of section 10(b) and Rule 10b-5, (5) Aiding and Abetting Fleming's violations of section 13(a) and Rules 12b-20, 13a-1 and 13a-13, and (6) Aiding and Abetting Fleming's violations of sections 13(b)(2) (A) and 13(b)(2)(B).

Defendant Thomas Dahlen settled the SEC's claims against him. Defendants Albert Abood and Philip Murphy have submitted settlement offers and the Court has been advised that the parties are in the final stages of settlement negotiations.

Defendants Shapiro and Thatcher argue the SEC's fraud allegations, in the totality, fail to meet the rigorous pleading standard imposed by Rule 9(b). Defendants also argue Plaintiff fails to state a claim for relief under Fed. R. Civ. P. Rule 12(b)(6). Specifically, Defendants assert:
(1) the section 17(a) claim fails to show Defendants were offerors or sellers of securities;
(2) the sections 17(a) and 10(b) and Rule 13b2-2 claims fail to establish materiality
(3) the sections 17(a) and 10(b) claims cannot be premised on the Exchange Offering for failure to show misstatements were made in connection with such offering; and
(4) the sections 10(b) and 17(a)(1) claims lack allegations to support scienter.

RULE 9(b) STANDARD

It is well settled that fraud must be pleaded with particularity. Southmark Properties v. Charles House Corp., 742 F.2d 862, 877 n. 24 (5th

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Cir.1984); accord, Bobby Jones Garden Apartments, Inc. v. Suleski, 391 F.2d 172 (5th Cir.1968); Rubens v. Ellis, 202 F.2d 415, 417 (5th Cir.1953). "What constitutes 'particularity' will necessarily differ with the facts of each case...." Guidry v. Bank of LaPlace, 954 F.2d 278, 288 (5th Cir.1992). At a minimum, Rule 9(b) requires allegations of the particulars of time, place, the contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. Benchmark Elecs., Inc. v. J.M. Huber Corp. 343 F.3d 719, 724 (5th Cir.2003); Shushany v. Allwaste, Inc., 992 F.2d 517, 521 (5th Cir.1993).

### RULE 12(b) STANDARD

**\*2** A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, "is viewed with disfavor and is rarely granted." Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045, 1050 (5th Cir.1982). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. Rosenzweig v. Azurix Corp., 332 F.3d 854, 865 (5th Cir.2003); Campbell v. Wells Fargo Bank, 781 F.2d 440, 442 (5th Cir.1986). The district court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### ANALYSIS

#### Fraud with Particularity:

In securities fraud actions, Rule 9(b) requires a plaintiff to set forth specific facts that support an inference of fraud. Tuchman v. DSC Comms. Corp., 14 F.3d 1061, 1068 (5th Cir.1994). Defendants argue that the SEC's fraud allegations, in the totality, fail to meet the rigorous pleading standard imposed by Rule 9(b). The SEC argues the Complaint describes in great detail how Defendants devised numerous measures called "initiatives" to "bridge the gap" between Wall Street expectations and the company's disappointing operating results. [FN2]

FN2. The SEC's Complaint details each scheme as

it related to FMG, Marigold, Dexsi, Frito-Lay, and Kraft. The Court will address the allegations as they relate to Shapiro and Thatcher.

The Complaint, in pertinent part, alleges the following:

#### Food Marketing Group ("FMG")

FMG was one of Fleming's 'diverters.' Diverters buy inventory at deep discounts and resell to customers for higher but still discounted rates. Fleming wanted a $2,000,000 payment from FMG to be reflected as a rebate based on 2001 purchases. FMG balked. After pressure from Shapiro, FMG agreed to two letters. The first letter referred to a rebate and the prospects of 'achieving an even more successful 2002.' This letter enabled Fleming to immediately book the $2,000,000 payment. The second letter required repayment of the $2,000,000 unless Fleming sourced $100,000,000 worth of inventory from FMG in 2002.

As part of an audit, Shapiro signed off on a letter Fleming sent to FMG 'confirming' the nature of the transaction. FMG refused to the sign the letter because it knew the $2,000,000 had not been earned in 2001. (Compl.¶¶ 30-36). [FN3]

> FN3. Fleming was involved in another diversion agreement with Kraft Foods worth $5,600,000. Although not identical, the scheme is spelled out in the Complaint. Shapiro is alleged to have had knowledge of such agreement which was primarily contrived by Murphy and Abbood.

#### Marigold

Marigold was a dairy product supplier. At the end of 2001, Fleming's wholesale procurement department approached Marigold to negotiate an agreement to supply ice cream for three years in return for payment of $2,000,000 upfront. [FN4] Fleming convinced Marigold to remove the payment terms and draft a separate side letter. [FN5] Shapiro rejected the side letter because it failed to recognize the entire sum in 2001. Shapiro demanded the side letter be described as "non-refundable" and a "rebate" for 2001 purchases. Before approving this side letter, Marigold inserted a penalty provision for repayment of the $2,000,000 if Fleming failed to buy the agreed volume. [FN6] Shapiro also signed

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



another 'confirmation letter' Fleming sent to Marigold.

> FN4. According to the SEC, GAAP does not allow payments which are pursuant to a supply agreement to be immediately recognized in full.

> FN5. According to the Complaint, grocery vendors pay wholesalers and retailers upfront monies to secure advantages such as favorable product positioning or exclusive supplier status. To the extent these are future advantages, the GAAP requires the wholesaler or retailer to recognize the payments over time either as revenue or as cost-of-goods sold offsets. Defendant Murphy was the Vice President in charge of Fleming's wholesale procurement department and the Complaint alleges Murphy was responsible for procuring this side letter.

> FN6. The SEC alleges Marigold would not have paid the money without the penalty provision and Fleming would not have given Marigold the supply agreement without upfront payment.

**\*3** In early 2002, some of Thatcher's employees negotiated a similar agreement with Marigold for $400,000. Thatcher allegedly told his employees "You know the drill, structure the money so we can book it on the front side." (Compl.¶¶ 47-54, 82-84).

### Frito-Lay

Thatcher and Frito-Lay negotiated a $400,000 incentive agreement that would pay Fleming for achieving certain sales goals in 2002. Thatcher persuaded Frito-Lay to provide a letter representing that the $400,000 was for 'snack replacement.' Fleming's accounting department rejected the letter saying it could not recognize revenue unless it related to 'past performance' and was 'nonrefundable.' A new letter was drafted and signed. However, the $400,000 was not earned before 2001 and, in fact, was never earned. (Compl.¶¶ 55-58).

### Dean Foods

Dean Foods ("Dean") is a dairy supplier. Thatcher negotiated a supply agreement with Dean for an upfront payment of $2,500,000. Toward the end of

negotiations, Thatcher convinced Dean to remove the payment terms and attach them in a side letter. Dean insisted that a penalty clause remain in the agreement. Thatcher presented only the side letter to the Fleming Retail Group accountants ("FRG"), not the supply agreement. When asked if the letter was related to any other agreement, Thatcher said it was not. Dean then actually forwarded the supply agreement to FRG. FRG went to Shapiro expressing concern for Thatcher's actions and the method used to recognize the income. Shapiro dismissed their concerns and instructed the accounting group not to question documents submitted by procurement. Shapiro then directed Fleming to record the entire amount as an offset in the first quarter of 2002. When external auditors, Deloitte & Touche, questioned the matter, Shapiro said he would 'investigate the matter' as if he was not already aware. He later told Deloitte the side letter and the supply agreement were not related. (Compl.¶¶ 71-81).

### Reduction in Reserve Balances

The Complaint alleges that at the close of 2001, Fleming faced an earnings shortfall. Shapiro directed the release of reserve balances by the same amount as the shortfall. [FN7] Shapiro also authorized the release of reserves to cover Fleming's expected repayment of deductions from vendor invoices. In December 2001, Shapiro was specifically informed Fleming was expected to have $20,000,000 in vendor paybacks related to 2001 deductions. Rather than increasing the reserves to meet these impending obligations, Shapiro authorized a reduction in the rate at which Fleming reserved against such paybacks. In a September 5, 2002 conference call, Fleming stated "its reserve practices ha[d] not changed on a historic basis at all." (Compl.¶¶ 59-65).

> FN7. Under State of Financial Accounting Standards No. 5, Accounting for Contingencies, a company must establish such reserves for identifiable, probable, and estimable risks.

### Excessive Inventory Purchases

During 2002, Fleming concluded it was carrying too much inventory. The company continued to face earnings shortfalls. Fleming employees were directed to execute forward buys of inventory to

Westlaw®

Not Reported in F.Supp.2d
(Cite as: 2007 WL 788335, *3 (E.D.Tex.))

generate rebates and discounts that were recorded immediately. [FN8] When one vendor was approached, the vendor replied, "[w]e cannot invoice for product that has not shipped ... this would raise serious issues with our auditors ..." However, some vendors agreed. These purchases ultimately added more than $50,000,000 worth of inventory. Shapiro had already publicly committed to reducing inventories and such big quarter-end buys of inventory contradicted his statement (not to mention the additional resources required to take on such inventory). Knowing this, Shapiro, in a May 7, 2002 press release, reviewed and approved a statement purporting that Fleming "[m]ade substantial progress on inventory reduction ..." Again, in the second quarter of 2002, these forward buy purchases totaled approximately $110,000,000. In a September 5, 2002 conference call, Shapiro explained that inventory levels rose in the second quarter primarily because of major acquisitions and only claimed $53,000,000 worth of forward buys. (Compl.¶¶ 94-100, 105-106).

> FN8. A 'forward buy' is an inventory purchase that exceeds the usual quantity the purchaser normally would make to take advantage of special pricing. The Complaint alleges these forward buys were primarily encouraged at Defendant Murphy's direction.

### Specificity as to Shapiro and Thatcher

**\*4** Shapiro was the principal accounting officer and Senior Vice President of Finance and Operations during all relevant periods. [FN9] The Complaint addresses Shapiro's multi-level involvement in the accounting fraud scheme. [FN10] Thatcher was Vice President in charge of procurement of FRG. The Complaint asserts he was involved in the vendor side letter scheme and the deception of Fleming's accountants. [FN11] Thatcher invoked his 5th Amendment rights against self-incrimination and did not testify in the Commission's investigation of this matter.

> FN9. The SEC also notes that Shapiro is a former employee of a national accounting firm.

> FN10. The Court notes that Shapiro was referenced 92 times in the Complaint.

> FN11. The Court notes that Thatcher was

referenced 50 times in the Complaint.

Based on the foregoing, the Court finds the SEC's forty-one (41) page Complaint is sufficient to meet the heightened pleading standard imposed by Rule 9(b). The Complaint does not make bare allegations of conclusory facts, rather it specifically sets forth what Fleming's rebate and incentive arrangements with its suppliers were, as well as who participated in and had knowledge of these arrangements.

### Lack of Sufficient Facts:

### Offeror/Seller Under Section 17(a):

Defendants argue that the Complaint does not allege facts that, if proven, would show that Defendants were involved in "the offer or sale" of securities or that they personally solicited any person who bought or sold Fleming securities. The SEC argues that liability under section 17(a) can be imposed on any person who participates in the alleged fraudulent activity. The SEC alleges Defendants' schemes led to the misstatements and omissions. Those misstatements and omissions were then included in Fleming's 2001 Form 10-K, Form 10-Qs and several Form 8-Ks. All of these Forms were incorporated into the Registration Statements.

Section 17(a) of the Securities Act states in part:
It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
15 U.S.C.A. § 77q(a) (2005).

Defendants rely on the language in section 12(a) of the act which provides: "[a]ny person who ... offers or sells a security" in violation of the registration provisions of the Securities Act "shall be liable ... to the person purchasing such security

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

from him ...," thus defining the class of defendants who may be subject to liability as those who offer or sell unregistered securities. Pinter v. Dahl, 486 U.S. 622, 641-42, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The SEC argues Defendants' contention ignores the Act's plain language and that the scope of section 17(a) is much different in that it prohibits "any person involved in the offer or sale of any securities."

**\*5** The question really is whether the similar definitions of "offer" and "sale" in sections 12 and 17 also restrict liability for section 17 claims to the same individuals and entities who could be found liable under section 12. Defendants argue that the Fifth Circuit's decision in SEC v. Meadows 119 F.3d 1219 (5th Cir.1997), "confirmed" that these words are interpreted consistently under section 12 and section 17 of the Securities Act. While the Fifth Circuit did note that it was proper look to Pinter, the Court specifically stated that it would not interpret the question of whether the language of section 17(a) encompassed more than just offerors or sellers. Id. at 1225 n. 9.

The statutes imposing liability under sections 12 and 17 are not identical. See S.E.C. v. Morris, 2005 WL 2000665, n. 5 (S.D.Tex.2005). Although little case law exists on this precise question, the Fifth Circuit recognized the Supreme Court's unanimous decision in Naftalin, which interpreted section 17(a) expansively. Meadows, 119 F.3d at 1225 n. 7, citing United States v. Naftalin, 441 U.S. 768, 773, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979); See also Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 573, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (approving of and relying on Naftalin's broad interpretation of section 17(a)). The Court held that the language of section 17(a) "does not require that the fraud occur in any particular phase of the selling transaction..and that, "[t]he statutory terms [offer and sale], are expansive enough to encompass the entire selling process ..." Id., (see also, Morris, 2005 WL 2000665, at n. 6) (stating that other cases under section 17(a) do not specifically hold that a defendant must either own the security offered or sold or actively participate in the offer or sale) citing Whitworth, 2000 U.S.App. Lexis, n. 6 (Under section 17(a) [and other antifraud provisions], liability arises where offering materials to prospective investors contain materially false or misleading statements, including omission of

material facts."); SEC v. Softpoint, 958 F.Supp. 846, 862 (S.D.N.Y.1997) (noting that signing public filings, preparing and disseminating press releases and reports "fall unmistakably within the broad scope" of 17(a) and other antifraud provisions) citing SEC v. Benson, 657 F.Supp. 1122, 1130 (S.D.N.Y.1987) (ruling that omissions and misstatements about a corporation's income in securities registration statements violated section 17(a)). [FN12]

> FN12. The statutory terms, which Congress expressly intended to define broadly, see H.R.Rep. No.85, 73d Cong., 1st Sess., 11 (1933); 1 Loss 512 n. 163; cf. SEC v. National Securities, Inc., 393 U.S. 453, 467 n. 8, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), are expansive enough to encompass the entire selling process, including the seller/agent transaction. Naftalin, 441 U.S. at 773.

In light of Naftalin and Meadows, the Court denies Defendants' Motion to Dismiss based on the argument that Defendants are not offerors or sellers under section 17(a). The SEC does not merely allege that Defendants "signed" registration statements incorporating misstatements and omissions. The SEC alleges how Defendants were personally aware of and involved in the allegedly fraudulent schemes which promoted misstatements and omissions which became part of the materials offered to potential investors.

Materiality:

**\*6** Section 10(b) of the Exchange Act ("Rule 10b-5"), makes it unlawful for any person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240. 10b-5 (2002). To state a claim under Rule 10b-5, a plaintiff must allege the following in connection with the sale or purchase of securities: (1) an omission or misstatement, (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied, (5) that proximately caused the plaintiff's injury. Nathenson v. Zonagen Inc., 267 F.3d 400, 407 (2001). Rule 13b2-2 requires in part that "[n]o director or officers of an issuer shall directly or indirectly cause to be made a materially false or misleading statement to an accountant in

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 788335, *6 (E.D.Tex.))

connection with (i) any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or (ii) the preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise." 17 C.F.R. § 240.13b2-2(a) (I-ii) (2005). [FN13] Misrepresentations and omissions of fact are material if there is a substantial likelihood that the misstated or omitted facts would be reviewed by the reasonable investor as having significantly altered the 'total mix' of information available. Basic v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Materiality depends on the significance the reasonable investor would have considered the alleged misstatements. Id. at 238-40. The materiality standard requires a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable investor. Justin Indus. v. Choctaw Sec., L.P., 920 F.2d 262, 267 (5th Cir.1990); Isquith v. Middle South Utilities, Inc., 847 F.2d 186, 208 (5th Cir.1988) (citations omitted). _____ Defendants contend the sections 17(a) and 10(b) and Rule 13b2-2 claims fail because there are insufficient facts to support materiality in general. SEC's materiality argument is that Defendants' wrongdoings resulted in the material overstatement of Fleming's earnings. The Complaint details how Fleming represented its pre-tax income to allegedly inflate earnings. [FN14] Defendants argue that Fleming's total revenue, not pre-tax earnings, is the appropriate benchmark for materiality. Defendants argue that even if pre-tax earnings are the proper measurement, the misstatements are immaterial when measured against quarterly earnings in the billions of dollars.

FN13. As previously stated, materiality is also a requirement under section 17(a)(2) (to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading).

FN14. For instance, in the fourth quarter of 2001, Fleming had pre-tax earnings of approximately $26.9 million but vendor side letters and the release of accounting reserves totaled $27.05 million, which the SEC argues, if properly accounted for, would of resulted in a quarterly loss. Similarly,

Fleming reported annual 2001 pre-tax earnings of $62.8 million. The SEC states if Fleming had properly accounted for the initiatives, Fleming's pre-tax earnings would have been only $35.7 million, a reduction in earnings of 43%. In the first quarter of 2002, Defendants' initiatives totaled $18.43 million. Fleming reported pre-tax earnings of $41.2 million for the first quarter. Again, the SEC argues that if the initiatives were properly accounted for, Fleming's revenue would have been $22.7 million, a 44.5% difference.

Defendants' also focus their materiality argument on the sections 17(a) and 10(b) claims pertaining to the July 11, 2002 S-4 offering ("Exchange Offering") arguing that failure to exchange promissory notes ("Old Notes")--which Fleming did not plan to register) in the Exchange Offering would subject the Old Note holders to excessive restrictions. Defendants argue that the alleged misstatements have no relevance in this context because no reasonable investor would strive to retain such restricted securities. The SEC argues that a reasonable investor would consider the misstatements material in this context because the notes were premised on misleading financial information. [FN15]

FN15. The SEC points out that Defendants' Motion ignores the other two securities offerings which are also a basis for the Section 17(a) claim. (Pl.'s Compl. ¶ 119). The Complaint points out that the April 24, 2002 and the June 6, 2002 offerings incorporate the false and misleading financial statements, which were also signed by Shapiro.

*7 Most investors would consider it significant, no matter what mix of information is available, that a company is not earning as much as it is claiming to earn. In any event, materiality is a mixed question of law and fact. S.E.C. v. Hoover, 903 F.Supp. 1135, 1140 (S.D.Tex.1995), citing Sioux, Ltd., Sec. Litigation v. Coopers & Lybrand, 914 F.2d 61, 65 (5th Cir.1990). Therefore, the Court will not answer the question of materiality pursuant to a motion to dismiss. See Barrie v. Intervoice-Bright, Inc., 397 F.3d 249, 257 (5th Cir.2005) (because accounting questions are disputed, dismissal is not appropriate).

Scienter

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



In securities fraud actions, Rule 9(b) requires a plaintiff to set forth specific facts that support an inference of fraud. Tuchman, 14 F.3d at 1068. Scienter is a mental state embracing intent to deceive, manipulate, or defraud. Hochfelder, 425 U.S. at 193. Scienter may be established by showing intentional or severely reckless conduct. Broad Rockwell Int'l Corp., 642 F.2d 929, 961 (5th Cir.), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). Alleged facts are sufficient to support such an inference if they either (1) show a defendant's motive to commit securities fraud, or (2) identify circumstances that indicate 'conscious behavior' on the part of the defendant. Id. Under the conscious behavior standard, "the strength of the circumstantial evidence must be correspondingly greater" than the evidence required under the motive standard. Tuchman, 14 F.3d at 1068, citing Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d. Cir.1987), cert. denied, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). A defendant's omissions or misrepresentations are severely reckless only if they (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it. Id. at 961-62; Shushany, 992 F.2d at 521. The nature of a restatement or violation may give rise to the inference of scienter. See Haack v. MAX Internet Comms., Inc., 2002 WL 511514, n. 7 (N.D.Tex.2002) (denying company's motion to dismiss fraud charges arising from revenue overstatements because the writing of revenue overstatements can support that defendants acted in a severely reckless manner).

Defendants argue the sections 10(b) and 17(a)(1) claims lack allegations, without corresponding fraudulent intent, sufficient to establish scienter. The SEC contends that the very nature of the these schemes attests to the fact that Defendants knew the proper accounting parameters and devised specific methods to circumvent them and conceal information from internal and outside auditors. (Complaint ¶¶ 32, 35, 36, 54, 57, 77, 84). [FN16]

FN16. See Statement of Financial Accounting Concepts No. 5, ¶¶ 83-84; the Staff Accounting Bulletin No. 101, Revenue Recognition in Financial Statements, Topic 13:A.3, Question 5. To the extent these letters were meant to reflect future advantages, the GAAP requires payments to be recognized over time, rather than upfront (Complaint ¶¶ 24, 25).

In Tuchman, shareholders brought an action for securities fraud against the corporation and its officers. To indicate conscious behavior, plaintiffs alleged that corporate officers made contradictory statements regarding the corporation's commitment to quality, the adequacy of the testing of corporate software, the reasons for corporate telephone network outages, and the reasons for the corporation's economic downturn. Tuchman, 14 F.3d at 1069. The court found these allegations inadequate to indicate conscious behavior because the complaint contained no assertion of any fact that makes it reasonable to believe that the defendants knew that any of their statements were materially false or misleading when made. Id. The SEC's complaint, on the other hand, does just that. The Court finds Defendants' statements and involvement in the various schemes previously discussed herein, if taken as true, suggest they acted in a reckless manner and were conscious of their wrongdoings.

*8 The accounting issues in this case are undoubtedly voluminous and complex. However, claims will not be dismissed unless the plaintiff cannot prove any set of facts in support of its claim that would entitle it to relief. EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase, 467 F.3d 466 (5th Cir.2006). The Court, in taking all facts pled as true, cannot say there is no basis for the SEC's claims. The strong inference pleading standard does not permit the Court dismiss the claims against Shapiro and Thatcher at this stage. Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 257 (5th Cir.2005).

Recommendation

It is the Court's recommendation that Defendants' Motions to Dismiss under 9(b) and 12(b)(6) be DENIED.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d                                                      **Page  110**
**(Cite as: 2007 WL 788335, \*8 (E.D.Tex.))**

report within ten days after service shall bar an
aggrieved party from de novo review by the district
court of the proposed findings and recommendations
and from appellate review of factual findings
accepted or adopted by the district court except on
grounds of plain error or manifest injustice. Thomas
v. Arn, 474 U.S. 140, 148, 106 S.Ct.  466, 88
L.Ed.2d 435 (1985); Rodriguez v. Bowen, 857 F.2d
275, 276-77 (5th Cir.1988).

  2007 WL 788335 (E.D.Tex.)

**END OF DOCUMENT**

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT N

Not Reported in F.Supp.2d
**(Cite as: 2001 WL 1488218 (S.D.N.Y.))**
<KeyCite Citations>

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

**SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,
v.
TANDEM MANAGEMENT INC., et al.,
Defendants.**

**No. 95 CIV. 8411(JGK).**

Nov. 21, 2001.

OPINION AND ORDER

KOELTL, District J.

**\*1** The plaintiff Securities and Exchange Commission ("SEC") alleges that the defendant William F. Branston [FN1] violated Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S .C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, Sections 204, 206(1), 206(2), 206(4) and 207 of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-4, 80b-6(1), 80b-6(2), 80b-6(4), 80-b(7), and Rules 204-2, 206(4)-1 and 206(4)-4 promulgated thereunder, 17 C.F.R. §§ 275.204(2), 275.206(4)-1, 275.206(4)-4. The SEC seeks a permanent injunction prohibiting Branston, directly or indirectly, singly or in concert, from violating these federal securities laws. [FN2] (Compl. at 31.) There are currently two motions pending before the Court. Branston, having now been convicted of related criminal charges, moves pro se to dismiss the complaint against him pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the claims are barred by laches and the statute of limitations and are now moot. The SEC moves for summary judgment against Branston pursuant to Rule 56 of the Federal Rules of Civil Procedure based on collateral estoppel as a result of Branston's criminal conviction.

FN1. The SEC originally brought this action against Tandem Management Inc. ("Tandem"); Branston, the President, Chief Investment Officer and part owner of Tandem; and Eugene B. Deveney and Peter S. Alsop, who were also officers and part owners of Tandem. The Court has already entered a final default judgment against Tandem and a final judgment by consent against Alsop. See Default Judgment dated May 16, 2001; Final Judgment of Permanent Injunction and Other Equitable Relief by Consent Dated August 12, 1997. The SEC is currently pursuing settlement negotiations with Deveney. (See SEC's Motion for Summary Judgment and Permanent Injunction ("Pl.'s Br.") at 3 n. 2.) Branston is thus the only defendant at issue in the current motions.

FN2. The SEC originally sought a number of other remedies, including prelminary injunctive relief, a freeze of assets, civil penalties and disgorgement of any illicitly obtained funds. (See Compl. at 31-32.) The Court granted the SEC a preliminary injunction and other interim equitable relief on October 11, 1995. Branston was later convicted on related criminal charges, and his sentence included an order of restitution and a civil assessment. See Section I, infra. In light of these developments, the SEC has abandoned its request for civil penalties and disgorgement and now seeks only a permanent injunction against future violations of the securities laws. (See SEC's Opposition to Branston's Motion to Dismiss the Complaint ("Pl.'s Opp.") at 6-7; Pl.'s Br. at 23-24.)

I.

When considering a motion to dismiss, the Court " 'must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." ' Gant v. Wallingford Bd. of Education, 69 F.3d 669, 673 (2d Cir.1995) (considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)) (quoting Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.1994)). The complaint alleges the following facts, which the Court accepts as true for the purposes of Branston's motion to dismiss.

Since its inception in November 1991, and continuing through at least the filing of the complaint in 1995, Branston was the President and Chief Investment Officer of Tandem Management Inc. ("Tandem"), an investment adviser registered with the SEC. (Compl.¶¶ 13, 14.) [FN3] Tandem's primary business was to provide investment

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1488218, *1 (S.D.N.Y.))

advisory services to individual and institutional investors. (Compl.¶¶ 13, 17.) Branston was also the general partner of one of Tandem's advisory clients, Parallax Group L.P. ("Parallax"). (Compl.¶¶ 5, 14.)

> FN3. Branston owned one third Tandem until mid-1993, when he acquired a 50% interest in the company. (Compl.¶ 14.)

Beginning in or around November 1991 and continuing through 1995, Branston entered into a scheme with Eugene B. Deveney and Peter S. Alsop, who were also officers and owners of Tandem, to convert to their own use at least $1 million of their clients' assets. (Compl.¶¶ 2-4, 6, 19-39, 47-57.) The primary method of conversion arose out of their use of a number of "soft dollar" credit agreements that Tandem entered into with various broker-dealers. (Compl.¶ 2.) Under these arrangements, Tandem agreed to cause its clients to pay a specified commission for executing purchases and sales of securities for those clients' accounts, and the broker-dealers agreed to set aside a portion of these commissions as "soft dollar" credits, or rebates usable to pay for specified "soft dollar" services such as investment research used in connection with the transactions made for these clients' accounts. (Compl.¶¶ 19, 21.) A number of the broker-dealers agreed to use these soft dollar credits to pay Tandem directly upon receipt of invoices for any soft dollar services that Tandem either performed or obtained in connection with these clients' accounts. (Compl ¶ 19.)

**\*2** Throughout the period when these agreements were in effect, Branston knowingly or recklessly participated in a scheme to convert his clients' funds in five different but overlapping manners related to soft dollar arrangements. First, from November 1991 until at least January 1995, Branston, Alsop and Deveney caused Tandem to submit identical invoices to different broker-dealers or submit identical invoices to the same broker-dealer on multiple occasions. (Compl.¶¶ 24(a), 25.) Second, from June 1992 until at least August 1994, Branston, Alsop and Deveney altered invoices to obtain money in excess of what they paid for actual soft dollar services and to conceal their multiple billing practices. (Compl.¶¶ 24(b), 25.) Third, from August 1992 until at least April 1995, Branston, Alsop and Deveney submitted a number of invoices

for expenses that Tandem was not in fact obligated to pay. (Compl.¶¶ 24(c), 25.)

Fourth, from June 1993 until at least April 1995, Branston, Alsop and Deveney participated, singly and in concert, in a practice of submitting numerous invoices for the exclusive services of a vendor named "First Call," which services Tandem neither paid for nor received. (Compl.¶ 24(d), 25.) Fifth, Deveney entered into one soft dollar credit arrangement (the "Kickback Agreement") with a broker-dealer under which Tandem agreed to cause clients to pay this broker-dealer a higher brokerage commission for soft dollar credits in return for a kick back of over half the amounts paid in commissions, which were then used to pay for various expenses including personal expenses for Branston and Deveney. (Compl.¶¶ 27-29.)

Throughout this period, and despite knowledge of these soft dollar credit arrangements, Branston knowingly or recklessly signed and filed a number of forms with the SEC (the "Forms ADV") claiming that neither he nor Tandem had any arrangements, oral or written, whereby they would receive cash or any other economic benefit from a non-client, such as a broker-dealer, in connection with advisory services. (Compl.¶¶ 33-39.) These Forms ADV also described Tandem's research and investment practices in a false and misleading manner and declared that Tandem managed $134 and $320 million in assets at different times, when Tandem never managed more than $40 million. (Compl.¶¶ 35, 36, 38.)

Throughout Tandem's existence, Branston also knowingly or recklessly participated in a scheme to distribute false and misleading information to prospective clients and investors concerning Tandem's performance history and assets under management. (Compl.¶¶ 58, 59.) These materials included marketing brochures that misrepresented the historical rates of return that clients had obtained under various trading strategies offered by Tandem and brochures indicating that Tandem managed $320 million in assets. (Compl.¶ 59(a)-(e).) On one occasion, Branston knowingly directed a Tandem employee to submit false information of this same kind to the publisher of a directory of money managers, which resulted in the publication of an inflated ranking of Tandem as among America's "Top 20 Money Managers." (Compl.¶ 59(e).)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1488218, *2 (S.D.N.Y.))

Branston used this publication and these false marketing materials to obtain investment advisory clients who would agree to pay increased commissions for soft dollar credits and to maintain prior clients in these arrangements. Branston also used false materials to cause at least six investors to purchase interests in Parallax. (Compl.¶¶ 60-61.)

*3 Based on these allegations, the SEC filed the present complaint on October 2, 1995. The subsequent history is a matter of public record and is undisputed.

After the complaint was filed, the United States Attorney's Office began a grand jury investigation of Branston concerning many of the same activities alleged in the complaint. Because of this ongoing criminal investigation, the Court removed this case from its active calender on January 30, 1997 by closing it subject to reinstatement by any party at any time.

The grand jury investigation culminated in a sixteen-count indictment. Branston was found guilty by a jury on all counts and a judgment of conviction was entered on September 27, 1999. See Judgment of Conviction at 1-2. Branston was sentenced principally to 37 months of imprisonment, 3 years of supervised release and $1,500,000 in restitution. See id. at 3, 6. The Court of Appeals dismissed Branston's appeal on June 26, 2000. See United States v. Branston, 216 F.3d 1073 (2d Cir.2000). The Supreme Court denied Branston's petition for a writ of certiorari on October 30, 2000. See United States v. Branston, 531 U.S. 973 (2000).

On January 8, 2001, the SEC moved to reopen this case, and the Court granted this motion on January 10, 2001. The current motions ensued.

A.

Branston argues that this case should be dismissed under the doctrine of laches. The doctrine of laches is inapplicable to governmental agencies seeking to vindicate public rights or interests. See United States v. Summerlin, 310 U.S. 414, 416 (1940); United States v. RePASS, 688 F.2d 154, 158 (2d Cir.1982). SEC civil enforcement actions "serve the public interest in accomplishing voluntary compliance with the securities laws." SEC v. Toomey, 866 F.Supp. 719, 724 (S.D.N.Y.1992)

(internal citation and quotation marks omitted); see also SEC v. Willis, 777 F.Supp. 1165, 1175 (S.D.N.Y.1991) ( "[T]he SEC [acts] in the public interest by attempting to enforce effectively the federal securities laws under its statutory mandate." (internal citation and quotation marks omitted)). The defense of laches is thus inapplicable to SEC civil enforcement actions seeking to enjoin future violations of the securities laws. See, e.g., SEC v. Sarivola, No. 95 Civ. 9270, 1996 WL 304371, at *1 (S.D.N.Y. June 6, 1996); SEC v. Thrasher, No. 92 Civ. 6987, 1995 WL 456402, at *6 (S.D.N.Y. Aug. 2, 1995); Toomey, 866 F.Supp. at 725; Willis, 777 F.Supp. at 1174-75.

In any event, laches is an equitable defense that requires proof of both (1) unreasonable and inexcusable delay in commencing an action and (2) resulting prejudice to the party asserting the defense. See, e.g., Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir.1998); Stone v. Williams, 873 F.2d 620, 623 (2d Cir.1989), reh'g granted and vac'd on other grounds, 891 F.2d 401 (2d Cir.1989). Neither element is present here.

With regard to the first element, Branston does not argue that the SEC delayed in commencing this action. [FN4] He rests his argument, instead, on the contention that after the initial filing, the matter was closed without prejudice and that the SEC then moved to reopen the case on January 8, 2001, only after an allegedly unreasonable delay.

> FN4. The complaint alleges activities beginning in or about November 1991 and continuing through October 2, 1995, the date on which the complaint was filed. It is unclear from the pleadings when the SEC first learned of these activities, but the SEC ordinarily must spend considerable time and energy investigating alleged violations before it can determine that a complaint is warranted. See generally SEC v. Rind, 991 F.2d 1486, 1492 (9th Cir.1993). Because of these facts, and because the SEC commenced this action while Branston was still allegedly engaging in the violations identified in the complaint, Branston is correct not to argue that the SEC filed its complaint in an untimely manner.

*4 It is not the amount of time that has elapsed but rather the reasonableness of the delay that is the focus of a laches inquiry. See, e.g., United States v. International Brotherhood of Teamsters, Chauffeurs,

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1488218, *4 (S.D.N.Y.))

Warehousemen and Helpers of America, AFL-CIO, 829 F.Supp. 608, 615 (S.D.N.Y.1993). Whether a delay is reasonable is a fact-intensive question and can depend upon the particular circumstances of a case. See, e.g., Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 44 (2d Cir.1994). Where, as here, the SEC brings a civil enforcement action that proceeds in parallel with a related criminal proceeding, it is often appropriate to stay the civil action pending resolution of the criminal proceedings. See, e.g., SEC v. Pignatiello, No. 97 Civ. 9303, 1998 WL 293988, at *2, 4-5 (S.D.N.Y. June 5, 1998); SEC v. Mersky, No. Civ. A. 93-5200, 1994 WL 22305, at *2-6 (E.D.Pa. Jan. 24, 1994); SEC v. Downe, No. 92 Civ. 4092, 1993 WL 22126, at *12, 14 (S.D.N.Y. Jan. 26, 1993). Such a stay is particularly appropriate where "a party under criminal indictment is required to defend a civil proceeding involving the same matter." Volmar Distribs., Inc. v. New York Post Co., 152 F.R.D. 36, 39 (S.D.N.Y.1993); see also Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mechanical, Inc., 866 F.Supp. 1134, 1138, 1140-41 (S.D.N.Y.1995).

The delay that Branston complains of began when the Court closed this case on January 30, 1997 so as not to interfere with the related grand jury investigation of Branston that was pending at the time. See Order dated January 30, 1997. The Court did this in accordance with principles discussed above and "subject to reinstatement by any part[y] at any time." Id. The investigation of Branston ultimately culminated in a sixteen-count indictment, which was filed on February 12, 1997, and which ended in a conviction on all counts. The present case then remained closed while Branston timely but unsuccessfully appealed his conviction. The SEC moved to reopen this on January 8, 2000, about seventy days after the Supreme Court denied Branston's petition for a writ of certiorari to review his criminal conviction. During this period, Branston never indicated to the Court that removal of this case from the Court's active docket would prejudice him in any way, and a stay of these proceedings allowed Branston to focus his energies on his criminal defense, thus helping to ensure him a full and fair trial.

Hence, the SEC excusably refrained from attempting to reopen this case during the pendency of Branston's criminal proceedings. The SEC also moved to reopen this case in a reasonably diligent manner, once these proceedings were completed.

With regard to prejudice, Branston argues in a conclusory fashion that records and witnesses are unavailable because of the SEC's alleged delay. Branston does not identify any evidence that is actually missing, and much of the evidence relevant to this case is likely to consist either of documents that were produced at his recent criminal trial or testimony from witnesses who appeared in it. In any event, because this case should be decided as a matter of law based on collateral estoppel, as discussed below, there is no need for any evidence that may have grown stale. See Section II, infra. There is thus no prejudice to Branston arising from lost evidence in this case.

*5 Branston argues that he has been prejudiced because he is now without funds to represent himself and is not in a position to defend himself in prison. However, the only possibly relevant delay that occurred here began after Branston was sentenced and after his financial position had already changed. This delay could not have caused the alleged prejudice.

In any event, Branston's present incarceration and financial situation are due not to any SEC inaction but to his criminal conviction, the costs of his defense and the substantial restitution order. Branston could not have been lulled into a false sense of security, or relied to his detriment on any SEC inaction, during this period because he knew that this case was only stayed and could be opened after the conclusion of the criminal proceedings. Branston also profited from a stay of this action during his criminal proceedings. He cannot now profit in equity from the fact that he has suffered the consequences of his own criminal conduct.

In sum, there are no grounds to dismiss the present action under the doctrine of laches.

B.

Branston argues that this case is time-barred under the relevant statute of limitations for SEC enforcement actions. The SEC responds that there is no statute of limitations applicable to SEC enforcement proceedings seeking only injunctive relief. In the alternative, the SEC argues that the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

only statute of limitations that may apply is the five-year period set forth in 28 U.S.C. § 2462 and that this provision does not bar the relief the SEC seeks.

The Court of Appeals for the Second Circuit has not yet decided what statute of limitations, if any, applies to SEC enforcement proceedings seeking only injunctive relief. The question arises because Congress has not set forth an explicit statute of limitations for SEC enforcement actions. See SEC v. Lorin, No. 90 Civ. 7461, 1991 WL 576895, at *3 (S.D.N.Y. June 18, 1991). Statutes of limitations are nevertheless such a fundamental part of civil causes of actions that courts will ordinarily "borrow" the most analogous statute of limitations, usually from state law, in the face of such congressional silence. See, e.g., Wilson v. Garcia, 471 U.S. 261, 266, 271 (1985) (noting that a "federal cause of action 'brought at any distance of time' would be 'utterly repugnant to the genius of our laws'" (quoting Adams v. Woods, 6 U.S. (2 Cranch.) 336, 342 (1805)); see also DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 154, 158-63 (1983). [FN5] There is, however, an exception to this rule for actions brought by the government to enforce a public right or assert a public interest: "[A]n action on behalf of the United States in its governmental capacity ... is subject to no time limitation, in the absence of congressional enactment clearly imposing it. Statutes of limitation sought to be applied to bar rights of the government, must receive a strict construction in favor of the government." E.I. Dupont De Nemours & Co. v. Davis, 264 U.S. 456, 462 (1924); see also Capozzi v. United States, 980 F.2d 872, 875 (2d Cir.1992).

> FN5. For implied private actions to enforce the securities laws, the Supreme Court has held that courts should borrow the one year/three year limitation period that governs express private causes of action under the securities laws. See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 359 (1991). These time limitations are, however, inapplicable to federal enforcement proceedings. See SEC v. Sprecher, Civ. A. No. 92-2860, 1993 WL 544306, at *2 (D.D.C. Dec. 16, 1993).

*6 Although Congress has not passed a statute of limitations that governs SEC enforcement proceedings specifically, Congress has passed 28 U.S.C. § 2462, which is a "catch-all" provision

limiting the time within which the government and its agencies can pursue many civil enforcement actions. See 3M ..(Minnesota Mining and Mfg.) Co. v. Bronwer, 17 F.3d 1453, 1461 (D.C.Cir.1994) (noting that § 2462 applies to "the entire federal government"). This catch-all provision states that:

> [e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

The SEC argues that § 2462 is inapplicable to the present proceedings because the remedy the SEC seeks is not a "civil fine, penalty, or forfeiture" within the meaning of § 2462. In this case, the only remedy that the SEC now seeks against Branston is an injunction prohibiting him from future violations of the securities laws. Courts have found that SEC suits for equitable and remedial relief, including requests for permanent injunctions and disgorgement, are not governed by § 2462 because they are not actions or proceedings for a "penalty" within the meaning of the statute. See, e.g., SEC v. McCaskey, 56 F.Supp.2d 323, 326 (S.D.N.Y.1999); SEC v. Schiffer, No. 97 Civ. 5853, 1998 WL 226101, at *2 (S.D.N.Y. May 5, 1998); SEC v. Williams, 884 F.Supp. 28, 30 (D.Mass.1995); SEC v. Lorin, 869 F.Supp. 1117 (S .D.N.Y.1994). [FN6] This is consistent with those cases that have held that § 2462 does not apply to equitable claims for injunctions that seek solely to restore the status quo before the alleged violations of a statute and to enjoin future violations. United States v. Telluride Co., 146 F.3d 1241, 1247-48 (10th Cir.1998); United States v. Banks, 115 F.3d 916, 919 (11th Cir.1997). However, the Court of Appeals for the District of Columbia Circuit has held that § 2462's five-year statute of limitations applied to an SEC administrative proceeding that resulted in a censure and six month disciplinary suspension of a securities industry supervisor. See Johnson v. SEC, 87 F.3d 484, 486-92 (D.C.Cir.1996). The Court held that the sanctions constituted a "penalty" within the meaning of § 2462, relying in part on the collateral consequences

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1488218, *6 (S.D.N.Y.))

of the sanctions.

> FN6. A number of other courts, without addressing § 2462, have held that there is no statute of limitations applicable to SEC enforcement actions seeking only injunctive relief. See, e.g., SEC v. Rind, 991 F.2d 1486, 1491-92 (9th Cir.1993); SEC v. Downe, No. 92 Civ. 4092, 1994 WL 67826, at *1 (S.D.N.Y. March 3, 1994); Toomey, 866 F.Supp. at 724; SEC v. Bangham, No. 89 Civ. 7910, 1991 WL 311922, at *1 (S.D.N.Y. Nov. 25, 1991); Willis, 777 F.Supp. at 1174.

It is unnecessary to decide whether § 2462 applies in this case because all of the activities alleged in the complaint occurred on or after November 1991, within five years of the time when the complaint was filed. The SEC thus filed this action before any statute of limitations expired, and the action is not barred by any statute of limitations.

### C.

*7 Finally, Branston argues that this case is now moot because of his imprisonment on the related criminal convictions and his lack of funds or assets. Branston argues, in effect, that his imprisonment and present financial position will independently prevent him from future securities laws violations, thus rendering the present action "a waste of judicial time to pursue." (Def.'s Br. ¶ 4.) The argument is frivolous.

With regard to Branston's incarceration, Branston was sentenced to a 37-month term of imprisonment on September 24, 1999, more than two years ago. He will thus be released in the foreseeable future. Although Branston's prison term will be followed by a period of supervised release, one condition of which is that he "not, without the approval of the court or the probation officer, engage in any capacity of employment venture involving investments, trading of securities, money-management or similar financial planning or advising," this period will only last for another 3 years. See Judgment of Conviction at 5. A permanent injunction would, by contrast, be effective after Branston's sentence has expired.

Branston's financial position also provides no assurance that he will not again seek investments in violation of the securities laws. As the SEC

correctly notes, Branston's financial situation may even provide him with increased incentives to engage in future violations. In sum, neither Branston's criminal sentence nor his present financial condition render this action for a permanent injunction moot.

### D.

Because there are no other grounds to dismiss the complaint, Branston's motion to dismiss is denied.

### II.

The SEC moves for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir.1994); SEC v. Todt, No. 98 Civ. 3980, 2000 WL 223836, at *1-2 (S.D.N.Y. Feb. 25, 2000), aff'd, No. 00-6101, 2001 WL 345151 (2d Cir. Apr. 5, 2001). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue resolution." Id. at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1488218, *7 (S.D.N.Y.))

party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.

**\*8** If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Affidavits submitted in opposition to a motion for summary judgment, like affidavits submitted in support thereof, "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Id. With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.1994).

Where, as here, a pro se party is involved, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. See McPherson v. Coombe, 174 F.3d 276, 281 (2d Cir.1999); Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir.1999); Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996); Ruotolo v. IRS, 28 F.3d 6, 8 (2d Cir.1994). In this case, the SEC served a notice (the "Notice") advising Branston of the procedures for responding to a motion for summary judgment and the consequences of failing to respond. This Notice made Branston aware of the requirement to submit a response by filing sworn affidavits or other papers as required by Rule 56(e). The Notice also attached a complete copy of Rule 56 and advised Branston of the need to submit counter-evidence. The Notice stated that "[i]f you do not respond to the motion for summary judgment on time with affidavits or documentary evidence contradicting the facts asserted by the plaintiff, the court may accept plaintiff's factual findings as true. Judgment may then be entered in the plaintiff's favor without trial."

Branston responded by letter stating only that "the facts which the SEC now proposes are in serious dispute" and "are not resolved by collateral estoppel" because "they were not decided or at issue in the criminal matter." Undated letter from

Branston to the Court. This statement is conclusory and could at most place into dispute those facts as to which Branston's personal testimony would be relevant and admissible. The fact that Branston is proceeding pro se does not preclude the Court from deeming facts set forth in the SEC's 56.1 Statement admitted where Branston has not produced any genuine evidence controverting them. See Smith v. Planas, 975 F.Supp. 303, 305 n. 2 (S.D.N.Y.1997). In any event, as discussed more fully below, the SEC's motion for summary judgment should be granted based on facts established in Branston's criminal proceedings.

A.

The SEC argues that it is entitled to summary judgment because the material facts in this case were established in Branston's criminal trial and because Branston is collaterally estopped from disputing those facts here. It is well settled that "a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." United States v. Podell, 572 F.2d 31, 35 (2d Cir.1978); see also Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 568-69 (1951). In order for collateral estoppel to apply, the Court must determine that "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." NLRB v. Thalbo Corp., 171 F.3d 102, 109 (2d Cir.1999) (internal citation and quotation marks omitted). In the present case, it is necessary to examine the six claims raised in the complaint to determine whether the facts needed to support these claims were necessarily established at Branston's criminal trial.

**\*9** The SEC's first claim alleges that Branston violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (collectively, the "antifraud provisions"). To establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the SEC must prove that a defendant "(1) made a material

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1488218, *9 (S.D.N.Y.))

misrepresentation or omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir.1999) (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir.1996)); SEC v. Todt, 2000 WL 223836, at *7. Scienter "means intent to deceive, manipulate, or defraud, or at least knowing misconduct." First Jersey, 101 F.3d at 1467 (internal citations omitted); see also Aaron v. SEC, 446 U.S. 680 (1980); SEC v. Todt, 2000 WL 223836, at *9. Scienter may also be established through a showing of reckless disregard for the truth. See SEC v. McNulty, 137 F.3d 732, 741 (2d Cir.1998). Turning to Section 17(a) of the Securities Act, "essentially the same elements [as in Section 10(b) of the Exchange Act] must be established in connection with the offer or sale of a security." First Jersey, 101 F.3d at 1467.

The SEC's first claim is predicated on factual allegations concerning the five schemes to misappropriate "soft dollar" credits and commission rebates discussed above. See Section I, supra. At his criminal trial, Branston was convicted of four counts (counts eight through eleven) of fraudulently misappropriating "soft dollar" credits and commission rebates in violation of 15 U.S.C. §§ 80b-6 and 80b-17, and 18 U.S.C. § 2 on the basis of substantially the same allegations. (See Indictment ¶¶ 33-34; Judgment of Conviction at 2.) These convictions required proof that Branston (1) made a material misrepresentation or omission to an investment client, or used a fraudulent devise or business practice; (2) in his capacity as an investment adviser; and (3) did so willfully. See 15 U.S.C. § 80b-6, 80b-17. These activities also plainly occurred in connection with the purchase or sale and the offer or sale of securities to Branston's clients because the soft dollar credits and commission rebates were generated through actual securities transactions by Tandem's clients. Thus, all of the facts needed to establish the SEC's first claim, including a degree of scienter exceeding that required for civil liability, were necessarily established at Branston's criminal trial.

The SEC's second claim similarly invokes the antifraud provisions, but rests on allegations concerning Branston's alleged distribution of false advertisement materials causing at least six advisory

clients to investment in the Parallax limited partnership. (See Compl. ¶¶ 60-61, 71-76.) Branston was the sole manager of Parallax, and its outside investors were passive investors, with no managerial role in the limited partnership. Under these circumstances, investments in limited partnership funds are "investment contracts" within the meaning of Section 2(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), which, in turn, qualify as "securities" under those provisions. See, e.g., Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir.1986); Mayer v. Oil Filed Systems Corp., 721 F.2d 59, 65 (2d Cir.1983).

*10 At his criminal trial, Branston was convicted of one count (count seven) of false advertising by an investment adviser in violation of 15 U.S.C. §§ 80b-6(4) and 80b-17 based on fraudulent activities, in particular the distribution of a brochure containing untrue statements of material fact designed to induce investment in Parallax. (See Indictment ¶¶ 31-32; Judgment of Conviction at 1.) These activities undisputedly occurred in connection with the offer or sale of securities, and Title 15 U.S.C. § 80b-6(4) specifically prohibits an investment adviser from using the mails or any instrumentality of commerce "to engage in any act, practice, or course of business which is fraudulent, deceptive or manipulative." Thus, for the same reasons discussed in addressing the SEC's first claim, all of the facts needed to establish violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), were necessarily established in supporting Branston's conviction on count seven for violating 15 U.S.C. §§ 80b-6(4) and 80b-17. [FN7]

FN7. The Indictment did not specify the number of investors, if any, who were actually defrauded by these brochures, and count seven did not require proof of any actual sales or purchases, as would be needed to establish violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. As discussed more fully above, however, violations of these latter two provisions were established in connection with the soft dollar credit and commission rebate schemes alleged in claim one. The antifraud provisions are also similar in nature. An injunction against violations of all of the antifraud provisions would thus be justified on the basis of the conduct proven at Branston's criminal trial.

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



The SEC's third claim alleges that Branston committed fraud against Tandem's advisory clients in violation of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & (2), by presenting fraudulent marketing materials to potential investor adviser clients and misappropriating soft dollar credits and commission rebates. Branston was convicted of eight counts (counts two through five and eight through eleven) of violating those same provisions based on substantially the same factual allegations. (See Indictment ¶¶ 27-28; Indictment ¶¶ 33-34; Judgment of Conviction at 1-2.) The facts required to support these convictions are mirror images of those needed establish claim three.

The SEC's fourth claim alleges that Branston violated 15 U.S.C. § 80b-7 by signing and filing false Forms ADV, several of which contained false statements about Tandem's use of soft dollar agreements and two of which misrepresented Tandem's assets under management. (Compl.¶¶ 31-38.) At his criminal trial, Branston was convicted of three counts (counts thirteen through fifteen) of violating this same provision for filing three of false Forms ADV identified in the complaint. (See Indictment ¶ 38; Judgment of Conviction at 2.) The facts needed to support these convictions are identical to those needed to establish liability for claim four with regard to three of the four allegations raised.

Claim five alleges that Branston violated Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rules 206(4)-1 and 206(4)-4 thereunder, 17 C.F.R. 206(4)-1 & 4, by failing to disclose Tandem's true financial position to Tandem's clients and misrepresenting Tandem's historical performance and assets under management to potential clients. As discussed above, Branston was convicted of four counts (counts two through five) of violating these same provisions based on substantially the same factual allegations in the complaint. Branston was also convicted of one count (count six) of wire fraud in violation of 18 U.S.C. § 1343 for willfully and knowingly using a facsimile in interstate commerce to engage in a scheme to defraud by sending a false chart indicating the alleged historical rate of returns on some of the accounts managed by Tandem. (See Indictment ¶¶ 29-30.) The facts needed to support these convictions are identical to ones alleged in the

SEC's fifth claim. [FN8]

> FN8. Branston was also convicted of one count (count one) of conspiracy to commit securities fraud based on substantially the same total set of allegations raised in the first five claims of the complaint. (See Indictment ¶¶ 1-26; Judgment of Conviction at 1.) This conviction further supports the application of collateral estoppel with regard to the facts already discussed.

*11 The sixth claim, finally, alleges that Branston violated Section 204 of the Advisers Act, 15 U.S.C. § 80b-4, and Rules 204-2 thereunder, 17 C.F.R. § 274.204(2), by failing to keep and maintain certain books and records, as required by the Investment Advisers Act. Branston was not convicted of any such violations at his criminal trial, and proof of failure to maintain records was not an essential part of any of his convictions. Hence, the SEC cannot establish its sixth claim by means of collateral estoppel.

In sum, Branston's criminal conviction required the actual litigation and decision of sufficient factual issues, identical to ones alleged in the first five (but not the sixth) claims in the complaint, to conclude that the facts needed to establish the SEC's first five claims have already been established in another proceeding. The only remaining issue concerning applicability of collateral estoppel is whether Branston had a full and fair opportunity to litigate these issues in his criminal proceedings. See Thalbo Corp., 171 F.3d at 109.

Branston argues that, as a matter of law, he did not have such a full and fair opportunity. Branston relies on SEC v. Monarch Funding Corp., 192 F.3d 295 (2d Cir.1999), in which the Court of Appeals found that a defendant in an SEC enforcement action was not necessarily collaterally estopped from relitigating facts developed in an earlier criminal sentencing proceeding. However, the facts at issue in Monarch were developed at the defendant's sentencing, not at his criminal trial, and this circumstance was critical to the Court's holding. As the Court of Appeals explained, sentencing hearings typically provide defendants with less procedural safeguards than civil proceedings. See id. at 305. A defendant's opportunities to present witnesses can be limited, and the Federal Rules of Evidence do not apply. See id. Moreover, "the incentive to litigate a

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

sentencing finding is frequently less intense, and certainly more fraught with risk, than it would be for a full-blown civil trial." Id. at 305. The Court of Appeals thus found that facts developed at a sentencing hearing may not always be developed after a sufficiently full and fair opportunity to litigate the issues to warrant application of collateral estoppel.

This case is different from Monarch. The facts at issue here were developed not at a sentencing hearing but at a criminal trial, where Branston faced severe penalties and had every incentive to contest vigorously the charges against him. Branston was also given the full panoply of criminal procedural safeguards, including a standard of proof that was more favorable to him than in these civil proceedings. Branston's trial, which was held before a jury, took considerable time and involved numerous witnesses and evidence. There is no basis in the record to question the fairness of the trial. In these circumstances, it is well-settled that facts necessary to support a criminal conviction have collateral estoppel effect in a subsequent SEC enforcement proceeding. See, e.g., Sprecher, 1993 WL 544306, at *1.

**\*12** The SEC is therefore entitled to summary judgment on its first five claims against Branston.

### B.

The SEC seeks a permanent injunction on the basis of the securities law violations that have been established. SEC suits for permanent injunctions are creatures of statute. See SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir.1975). Three statutes in particular give the SEC the authority to seek the relief in the present case: Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d). These provisions state that whenever it appears that a person has engaged or is about to engage in any acts or practices that would violate the provisions of the respective Acts or regulations passed thereunder, the SEC may "in its discretion, bring an action ... to enjoin such acts or practices." 15 U.S.C. §§ 77t(b), 78u(d), 80b-9(d).

Because these actions are creatures of statute, the

SEC need not establish irreparable injury or the inadequacy of legal remedies, as would be required in private injunction suits. See Management Dynamics, 515 F.2d at 808. The dispositive issue is simply whether there is a likelihood of future violations without an injunction. See, e.g., First Jersey, 101 F.3d at 1477 (citing CFTC v. American Board of Trade, Inc., 803 F.2d 1252, 1250-51 (2d Cir.1986)); see also SEC v. Commonwealth Chemical Sec., Inc., 574 F.2d 90, 99 (2d Cir.1978). Branston's past violations are relevant to this question but do not necessarily dispose of it. See, e.g., SEC v. Commonwealth Chemical, 574 F.2d at 100 (stating that settled precedent in this Circuit establishes "the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence"). Rather, past liability is one factor among others to be considered, including:

> the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1048 (2d Cir.1976).

In this case, the facts established at Branston's criminal trial reveal not an isolated instance of misconduct but rather a complex pattern of fraud and deception spanning about four years. See SEC v. Hasho, 784 F.Supp. 1059, 1110 (S.D.N.Y.1992) (finding a permanent injunction appropriate where past violations occurred repeatedly over a protracted period of time and the defendants consistently violated their clients' trust through a myriad of omissions, misrepresentations and other fraudulent devices). Branston personally obtained a substantial amount of money by engaging in these activities, and there is every indication that he would have continued engaging in them were it not for the SEC's intervention. See generally Management Dynamics, 515 F.2d at 807 (noting that "cessation of illegal activity does not ipso facto justify the denial of injunction" and must be assessed under the circumstances of a case). Branston also committed these acts willfully, with a degree of scienter exceeding that needed for civil liability and far exceeding that needed for a permanent injunction. See Universal Major, 546 F.2d at 1047 ("[I]n SEC

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d                                                    **Page 122**
**(Cite as: 2001 WL 1488218, \*12 (S.D.N.Y.))**

proceedings seeking equitable relief, a cause of action may be predicated upon negligence alone, and scienter is not required."). This is not a case of unwitting deception in the securities market resulting from an unsophisticated understanding of the securities laws, or a case where well intentioned and scrupulous registered representatives have allowed isolated violations to occur "out of an excessive zeal for fairness and accuracy." SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 18-19 (2d Cir.1977).

**\*13** With regard to assurances that he will not violate the securities laws in the future, Branston has not made any. Branston was also convicted of perjuring himself to the SEC during its investigation. This fact suggests that he is at least capable of lying to governmental authorities, something that would have to be taken into consideration in assessing any assurances he might make.

Branston's past employment record similarly suggests that he may well seek to obtain investments after his term of supervised release has expired. If Branston's financial condition remains in its present state, he is likely to have strong incentives to violate the securities laws, and any occupation in these industries would provide him with the opportunity. All of these factors point toward the strong need for a permanent injunction.

The fact that Branston is currently serving his criminal sentence weighs somewhat in his favor. Branston's imprisonment cuts against the likelihood of future violations, at least in the near future. A permanent injunction may only have value after Branston has completed his three subsequent years of supervised release. Moreover, the probative value of conduct engaged in more than five years ago in establishing the likelihood of future violations some four years hence is much smaller than evidence of recent misconduct would be to imminent possible violations. Still, none of these facts undermines the weight of the factors indicating that a permanent injunction is appropriate.

The Court has broad discretion to enjoin future violations of the securities laws upon a finding of past violations. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir.1972). In the present circumstances, there is a substantial likelihood of future violations, and a permanent injunction is warranted. Moreover, although the SEC has not established that Branston violated the record and book keeping requirements set forth in Section 204 of the Investment Advisers Act, 15 u.S.C. § 80b-4, and Rule 204-2 thereunder, 17 C.F.R. § 274.204(2), lack of proper record keeping can help hide from view the very kinds of violations that have been established. It is thus reasonable under these circumstances to enjoin Branston from violating these provisions as well. See id. at 1102-03.

### C.

While the SEC has not established that Branston is liable for the sixth claim, the SEC has established sufficient liability to obtain the complete relief it seeks. Therefore, the sixth claim for relief is dismissed as moot.

### III.

For the foregoing reasons, Branston's motion to dismiss is denied. The SEC's motion for summary judgment on claims one through five is granted. The sixth claim for relief is dismissed as moot. Pursuant to Fed. R. Civ P. 54(b), there is no just reason for delay in entering a final judgment against Branston. A final judgment will be entered incorporating the relief discussed above.

SO ORDERED.

2001 WL 1488218 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



# EXHIBIT O

LEXSEE 2006 USDISTLEXIS 41182



Analysis
As of: Dec 17, 2007

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff, vs. JOHN J. TODD,
ROBERT D. MANZA, and JEFFREY WEITZEN, Defendants.**

**CASE NO. 03CV2230 BEN (WMc)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
CALIFORNIA**

*2006 U.S. Dist. LEXIS 41182; Fed. Sec. L. Rep. (CCH) P93,926*

**May 23, 2006, Decided
May 30, 2006, Filed**

**SUBSEQUENT HISTORY:** Motions ruled upon by,
Motion for new trial denied by *SEC v. Todd, 2007 U.S.
Dist. LEXIS 38985 (S.D. Cal., May 30, 2007)*

**COUNSEL:** [*1] For SECURITIES AND EX-
CHANGE, COMMISSION, plaintiff: Keri Curtis Axel,
Securities and Exchange, Commission, Los Angeles,
CA.

For JOHN J TODD, defendant: Robert D Rose,
Sheppard Mullin Richter and, Hampton, San Diego, CA.

For ROBERT D MANZA, defendant: James Sanders,
McDermott Will and Emery, Los Angeles, CA.

**JUDGES:** HON. ROGER T. BENITEZ, UNITED
STATES DISTRICT JUDGE.

**OPINION BY:** HON. ROGER T. BENITEZ

**OPINION**

ORDER DENYING PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AGAINST DE-
FENDANT WEITZEN, AND GRANTING DEFEN-
DANT WEITZEN'S MOTION FOR SUMMARY
JUDGMENT

[Doc. Nos. 36-1, 56-1]

**I. INTRODUCTION**

Plaintiff Securities and Exchange Commission
("SEC") brings this civil enforcement action alleging
violations of federal securities laws against Defendants
John J. Todd ("Todd"), Robert D. Manza ("Manza") and
Jeffrey Weitzen ("Weitzen"), the former Chief Financial
Officer, Controller, and Chief Executive Officer of
Gateway, Inc., respectively. Plaintiff SEC moves for
partial summary judgment on the basis of three primary
transactions with relation to Weitzen. Defendant Weitzen
opposes the SEC's motion, and moves for summary
judgment on the basis of the same transactions.

**II. FACTS**

[*2] Gateway, Inc. ("Gateway") is a direct marketer
of personal computers and related products. (SEC Facts
P 4 [1]). Its stock trades on the New York Stock Exchange.
(*Id.*) Todd served as Senior Vice President and Chief
Financial Officer ("CFO") of Gateway from October
1998 to January 2001. (SEC Facts P 2). Weitzen served
as Chief Executive Officer ("CEO") of Gateway from
January 2000 to January 2001. (SEC Facts P 1). Manza
served as Controller from October 1999 to June 2001.
(SEC Facts P 3).

1 References to "SEC Facts at P     " are to the
SEC's Statement of Uncontroverted Facts in Sup-
port of Motion for Partial Summary Judgment
against Defendant Jeffrey Weitzen.

In the third quarter of 2000 ("Q3 2000"), Gateway's
senior management became aware of a gap between an-
ticipated revenue and analysts' consensus expectations

Case 5:07-cv-03444-JF    Document 50-2    Filed 12/17/2007    Page 125 of 164

Page 2

2006 U.S. Dist. LEXIS 41182, *; Fed. Sec. L. Rep. (CCH) P93,926

for the quarter. (SEC Facts P 9). The SEC alleges that Weitzen, Todd and Manza engaged in a scheme to close this gap by way of several transactions which would serve to inflate revenue for the [*3] quarter. With respect to the claims against Weitzen, the SEC alleges that he is liable for material misstatements in Gateway's Form 10-Q filing for Q3 2000, as well as statements made in the earnings press release for the same period, on the basis of three primary transactions.

The first involves Gateway's increase in higher-risk consumer lending. Beginning in Q2 2000, Gateway initiated a program under which it began to offer financing to consumers with weaker credit. (SEC Mem. at 4, n.6 [2]). Todd initiated this program as part of a strategic initiative to increase revenue, and intended it to become part of Gateway's business model. (SEC Ex. 6 [3]). In order to compensate for the anticipated additional losses associated with higher-risk lending, Gateway sold models with a higher margin to those consumers. (Todd Ex. B [4]). At the end of Q3 2000, the higher-risk loan receivables totaled approximately 37% of Gateway's loan portfolio. (SEC Facts P 24).

> 2   References to "SEC Mem. at   " are to the SEC's Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment Against Defendant Jeffrey Weitzen.

[*4]

> 3   References to "SEC Ex." are to the SEC's Exhibits Filed in Support of Motion for Partial Summary Judgment Against Defendant Jeffrey Weitzen.

> 4   References to "Todd Ex.   " are to Defendant John Todd's Compendium of Exhibits in Support of Motion for Partial Summary Judgment.

The second transaction the SEC places at issue was Gateway's change in contract terms with AOL. Gateway and AOL were engaged in a strategic partnership which consisted of Gateway bundling AOL software on its computers. Gateway paid AOL $ 219.45 for each end user who purchased a bundled product and registered for AOL service. (SEC Ex. 48). AOL then paid Gateway a promotional bounty of $ 219.45 for each registered end user. (Id.) AOL was responsible for providing Gateway with reports regarding end-users who registered for the service. (Id.)

Late in Q3 2000, Gateway and AOL revised their agreement to provide that the payments from each company to the other would be made when a computer was shipped, rather than upon end-user registration for AOL service. (SEC Facts P 36). This change was intended to be [*5] retroactive to the entire third quarter. (SEC Ex. 8). By changing the terms of the contract to entail pay-

ment upon shipment of the bundled PC instead of payment upon end-user registration, Gateway added $ 72 million in revenue for the quarter. (SEC Facts P 50).

The final transaction the SEC disputes with regard to Weitzen is Gateway's sale of computer equipment used in Gateway's internal operations to Lockheed Martin Integrated Business Solutions ("Lockheed"). At the time, Lockheed was Gateway's third party IT services provider and was responsible for managing and servicing Gateway's computer infrastructure. (SEC Facts P 54). Todd and Manza initiated this sale with the goal of completing it before the end of Q3 2000. (Id.) The deal was set up so as to be cost-neutral for Lockheed, and included a leaseback provision under which Gateway leased the equipment back from Lockheed for the same price as Lockheed paid Gateway. (SEC Facts P 56).

Gateway booked the full $ 47.2 million of the sale as revenue. (SEC Facts P 65). The equipment was recorded in Gateway's books as a fixed asset, and only a fraction of the equipment was Gateway branded. (SEC Facts P 62). PricewaterhouseCoopers [*6] LLP ("PwC"), Gateway's outside auditor, subsequently discovered that the sale had been recorded as revenue, rather than a sale of fixed assets, and forced Gateway to restate its Q3 2000 results and back the transaction out of revenue. (SEC Ex. 33).

Weitzen and Todd participated in a conference call with Wall Street analysts about Gateway's Q3 2000 results. (SEC Facts P 74). During that conference call, Todd and Weitzen discussed Gateway's revenue for the quarter, and commented on the revenue growth over Q3 1999. (Id.) Similarly, Gateway's earnings press release for Q3 2000 announced record third quarter earnings, as well as 16% revenue growth year over year.

### III. DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* [*7] If the moving party meets this burden, the opposing party must set forth specific facts showing that a genuine issue remains for trial. *Fed. R. Civ. P. 56(e).*

"The moving defendants need provide nothing more than a reference to those materials on file in the case which support the movant's belief that there is an absence of any genuine issues of material fact." *Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990).* An adverse plain-

Case 5:07-cv-03444-JF    Document 50-2    Filed 12/17/2007    Page 126 of 164

Page 3

2006 U.S. Dist. LEXIS 41182, *; Fed. Sec. L. Rep. (CCH) P93,926

tiff, however, must "offer evidence sufficient to raise a genuine issue of fact on an issue on which the plaintiff has the burden of proof." *Id.* "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995)* (internal citation omitted).

An issue of fact is only a genuine issue if it can reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, 477 U.S. at 250-51.* "A mere scintilla of evidence supporting the nonmoving party's position is insufficient; there must be evidence on which [*8] a jury could reasonably find for the nonmoving party." *Rivera v. Philip Morris, Inc., 395 F.3d 1142, 1146 (9th Cir. 2005).* "The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, 477 U.S. at 248.*

The SEC brings the following claims against Weitzen: (1) fraud in the purchase or sale of securities in violation of Exchange Act *§ 10(b)* and *Rule 10b-5* thereunder; (2) lying to auditors in violation of Exchange Act *Rule 13b2-2*; and (3) control person liability in violation of Exchange Act *§ 20(a).*

### A. Section 10(b) and Rule 10b-5 Violations

In order for the Court to grant the SEC summary judgment on these claims, the SEC must show that there is no genuine issue of material fact that Weitzen made: (1) a material misrepresentation; (2) in connection with the purchase or sale of a security; (3) with scienter; (4) by use of jurisdictional means. *SEC v. Rana Research, Inc., 8 F.3d 1358, 1364 (9th Cir. 1993).* The second and fourth elements are not in dispute [*9] — the SEC alleges material misrepresentations in connection withe Gateway's 10-Q filing for Q3 2000, as well as a conference call with analysts and an earnings press release. Assuming the SEC can meet its burden regarding material misrepresentations, all three of these fulfill the element of being "in connection with the purchase or sale of a security" because investors would reasonably rely on such documents. *Id. at 1362.* Similarly, the filing with the SEC and the analyst call satisfy the jurisdictional means requirement.

### 1. Material misrepresentations

To satisfy this element, the SEC must show that Weitzen made a misrepresentation, and that it was material. The SEC admits that Weitzen did not sign the Form 10-Q for Q3 2000. Rather, it attempts to impute any alleged misstatements in that filing to Weitzen through a theory of "substantial participation" and "intricate in-

volvement." (SEC Mem. at 13). In support of this theory of "substantial participation" and "intricate involvement," the SEC cites to a footnote in a recent Ninth Circuit decision which itself does not address the issue, but instead refers back to *Dannenberg v. PaineWebber Inc. (In re Software Toolworks Sec. Litig.), 50 F.3d 615, 628-29 (9th Cir. 1994).* [*10] The relevant part of *In re Software Toolworks* involved whether the court could find Deloitte & Touche had committed a primary violation of the securities laws by its participation in the drafting of two letters to the SEC which made false statements. Although the letters were not signed by Deloitte, they were prepared after extensive review and discussion with Deloitte, and referred the SEC to two Deloitte partners for further information. *Id. at n.3.* The plaintiffs in that case presented evidence of Deloitte's substantial participation and significant role in drafting the letters, and on that basis, the court found Deloitte could be held liable for the statements in the letters. *Id.*

The SEC fails to present similar evidence here on which a finder of fact could find Weitzen's substantial participation in the drafting of the 10-Q. The only piece of evidence the SEC presents on the matter is the fact that Weitzen signed the management representation letter to the auditors. (SEC Mem. at 13; SEC Ex. 65). A reasonable fact-finder could not find this to be substantial in relation to the preparation of the entire quarterly filing. The SEC therefore may not impute any alleged [*11] misstatements in the Q3 2000 10-Q to Weitzen.

The SEC also alleges Weitzen made material misstatements as part of the press release regarding third quarter earnings. (SEC Facts P 73). Weitzen is quoted in the press release, and his testimony corroborates his substantial participation in its preparation. (SEC Exs. 10, 66). The question therefore is whether any misrepresentations were made in the press release, and if so, whether they were material. The SEC's theory is that the representations regarding Gateway's third quarter revenue were false because Gateway engaged in a series of transactions which had the sole purpose of "closing the gap" between Gateway's anticipated revenue for the quarter and analysts' consensus expectations, and Gateway did not properly disclose these transactions. It takes issue with three particular transactions with respect to Weitzen.

#### a. increased lower tier consumer lending

Beginning in Q2 2000, Gateway initiated a program under which it began to offer financing to consumers with weaker credit. (SEC Mem. at 4, n.6). Todd initiated this program as part of a strategic initiative to increase revenue, and intended it to become part of Gateway's business [*12] model. (SEC Ex. 6). In order to compensate for the anticipated additional losses associated with

2006 U.S. Dist. LEXIS 41182, *; Fed. Sec. L. Rep. (CCH) P93,926

higher-risk lending, Gateway sold models with a higher margin to those consumers. (Todd Ex. B). The SEC asserts that Gateway should have disclosed the increase in higher-risk lending, it was materially misleading not to do so, and Weitzen should have made sure such a disclosure took place.

A company is not required to disclose every financial fact. It is only required to disclose information if there is a statutory requirement to do so, or if failure to do so would render the statements it has made materially misleading. *See Oran v. Stafford, 226 F.3d 275, 285 (3d Cir. 2000).* An excess of disclosure can have the same net effect as a dearth of it -- the shareholder misses the relevant information. *See Basic Inc. v. Levinson, 485 U.S. 224, 231, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)* ("a minimal standard might bring an overabundance of information within its [the public's] reach, and lead management 'simply to bury the shareholders in an avalanche of trivial information -- a result that is hardly conducive to informed decision making'") (*quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 448-49, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)).* [*13]

To fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson, 485 U.S. at 231-32.* Whether an omitted fact is material is generally considered a mixed question of law and fact, and therefore uniquely within the province of the factfinder. *United States SEC v. Talbot 430 F. Supp. 2d 1029, 2006 U.S. Dist. LEXIS 28399, No. 04-04556 MMMPLAX, 2006 WL 1216719 at *5 (C.D. Cal. Feb. 14, 2006).*

The SEC alleges that Gateway's lower-tier loan receivables had risen to $ 243.5 million, or 37% of Gateway's total loan portfolio by the end of Q3 2000. (SEC Facts P 24). Based on this percentage, as well as the increase over the same quarter in 1999, the SEC asserts that the growth in loan receivables is material and should have been disclosed. It also claims that by not disclosing this information, Gateway's reported revenue was materially misstated. In response, Defendant submits the expert opinion of Michael Mulligan, former Senior Counsel in the SEC's Division of Enforcement. (Weitzen Facts PP 101-103). Mulligan [*14] opined that based on various regulations and the language of the 10-Q Management Disclosure and Analysis ("MD&A"), Gateway was not required to disclose the increase in lower-tier lending. He deemed it immaterial because it accounted for only 3.2% of sales through the end of Q3 2000, and did not represent a known trend that would support disclosure. (Weitzen Ex. 44). The Court finds that the evidence presented creates a genuine issue of material fact as to

whether the increase in higher risk lending by Gateway was material and should have been disclosed.

### b. *AOL revenue recognition*

The second transaction with which the SEC takes issue is the recognition of revenue resulting from a change in contract terms with AOL. Gateway and AOL were engaged in a strategic partnership which consisted of Gateway bundling AOL software on its computers. Gateway paid AOL $ 219.45 for each end user who purchased a bundled product and registered for AOL service. (SEC Ex. 48). AOL then paid Gateway a promotional bounty of $ 219.45 for each registered end user. (*Id.*) AOL was responsible for providing Gateway with reports regarding end-users who registered for the service. (*Id.*)

Gateway and AOL [*15] revised their agreement to provide that the payments from each company to the other would be made when a computer was shipped, rather than upon end-user registration for AOL service. (SEC Facts P 36). This change was intended to be retroactive to the entire third quarter. (SEC Ex. 8). The SEC asserts that this change was a mere accounting manipulation intended to close the revenue gap for the quarter, but lacked any economic substance. Its primary support for this allegation is the initial discomfort of Lee Bird, Gateway's Vice President of Finance for the Consumer Division, with the change. (SEC Facts PP 37, 39-40). But there is little support in the record for this view of the transaction. Gateway and AOL had been involved in this strategic partnership since 1999, and had encountered a series of problems in their dealings. One of the primary problems between the two was that Gateway had no way of obtaining registration data other than from AOL, and found itself frequently disputing the end-user registration figures. (Todd Facts P 247). By changing the terms of the contract to require payment at shipping instead of registration, the parties resolved a major source of conflict, and [*16] allowed Gateway a more consistent way to recognize the revenue from the partnership. (Todd Facts PP 254, 255). The SEC presents no evidence creating a genuine dispute as to these facts. Additionally, the record is clear that Bird's initial concerns were assuaged in regard to the AOL accounting. (Weitzen Ex. 12). The SEC has therefore failed to show that the AOL transaction lacked economic substance.

Its categorization of the change in contract terms as a change in accounting principle is similarly flawed. Gateway did not change the way it recognized revenue, it changed the terms of its contract with AOL. The SEC cites Gateway's stated policy in its 1999 10-K in support of its contention that the revenue was improperly recognized:

2006 U.S. Dist. LEXIS 41182, *; Fed. Sec. L. Rep. (CCH) P93,926

The Company generally recognizes revenue from product sales at the time of shipment provided that no significant obligation remains. The company recognizes revenue from service, such as training and Internet service, upon delivery of the service. . . .

(SEC Ex. 109). But as noted by Defendants' expert, Gateway's internal written revenue recognition policy with regard to this item states the following:

Sale of Third Party ISP Bundled [*17] in Gateway System -- There are several instances whereby Gateway will sell a system bundled with an ISP provider other than Gateway.net (e.g. AOL). In these circumstances Gateway typically receives a commission/fee/bounty from the third party ISP provider for the sale of the service. In this instance Gateway does not have any further obligation to the customer: as such the fee may be immediately recognized as revenue in its entirety when that fee is earned consistent with a commission (the fee is earned based upon the terms of the agreement with the third party ISP and may be recognized on shipment or activation.)

(O'Bryan Decl. Ex. A at 24). In other words, the revenue does not derive from Gateway providing a service, because Gateway has no further obligation to the customer. The revenue therefore is properly recognized in accordance with the policy articulated in the 1999 10-K, as well as the terms of the contract. The SEC has failed to provide evidence on which a reasonable fact-finder could decide otherwise.

The SEC's claim that this transaction required additional disclosure hinges on its position that the transaction lacked economic substance and was a change in accounting [*18] principle under GAAP. Because a reasonable fact-finder could not find in the SEC's favor on either of these contentions, they also could not find that the transaction required additional disclosure. The AOL transaction therefore cannot form the basis for any fraud allegations against Weitzen or the other defendants.

c. sale of equipment to Lockheed

The final item that the SEC focuses on in regard to Weitzen is the sale of computer equipment used in Gateway's internal operations to Lockheed Martin Integrated Business Solutions ("Lockheed"). At the time,

Lockheed was Gateway's third party IT services provider and was responsible for managing and servicing Gateway's computer infrastructure. (SEC Facts P 54). Todd and Manza initiated this sale with the goal of completing it before the end of Q3 2000. (Id.) The deal was set up so as to be cost-neutral for Lockheed, and included a lease-back provision under which Gateway leased the equipment back from Lockheed for the same price as Lockheed paid Gateway. (SEC Facts P 56).

Gateway booked the full $ 47.2 million of the sale as revenue. (SEC Facts P 65). The SEC cites two primary problems with this approach. First, the equipment was [*19] recorded in Gateway's books as a fixed asset, and properly should have been recorded as a fixed asset sale. (SEC Facts P 57). Second, only a fraction of the equipment was Gateway branded, and therefore the remainder should not have been booked as revenue. (SEC Facts P 62). PwC subsequently discovered that the sale had been recorded as revenue and forced Gateway to restate its Q3 2000 results and back the transaction out of revenue. (SEC Ex. 33).

Defendants' expert asserts that booking the transaction as revenue was a "gray area" in relation to GAAP. (O'Bryan Decl. Ex. A). At the very least, this creates a genuine issue of material fact as to whether revenue was materially misrepresented based on this transaction.

2. Scienter

In addition to showing a material misrepresentation, the SEC must show that Weitzen acted with scienter. Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). Scienter may also be established by a showing of recklessness. SEC v. Dain Rauscher, Inc., 254 F.3d 852, 856 (9th Cir. 2001). Reckless conduct is conduct that consists [*20] of a highly unreasonable act, or omission, that is an "'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" Id. (quoting Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc)).

The SEC has failed to present evidence upon which a reasonable finder of fact could determine that Weitzen acted with scienter. In order to establish scienter, the SEC needs to show that Weitzen acted with actual intent, or recklessness. Id. It has presented evidence that Weitzen had knowledge of the above-discussed transactions, and there is no dispute regarding that. But knowledge of the existence of the transactions does not allow a reasonable fact-finder to draw an inference that Weitzen

2006 U.S. Dist. LEXIS 41182, *; Fed. Sec. L. Rep. (CCH) P93,926

had knowledge of their impropriety, or was reckless in not knowing. Weitzen was not an accountant, nor has evidence been proffered that he had any reason to have accounting expertise sufficient to challenge the treatment given to any particular transaction. (SEC Ex. 10).

The SEC tries to create an inference [*21] of recklessness on the basis of how Weitzen addressed Lee Bird's concerns regarding the AOL transaction. But the evidence fully supports the opposite conclusion. When Weitzen became aware that Bird had concerns with the change in the AOL relationship, he followed up with a team put together to vet the accounting, including the Vice President of Ethics and Compliance. (*Id.*) Bird's concerns were addressed, he became comfortable with the transaction and the accouting, and Weitzen was informed of it. (*Id.*, Weitzen Ex. 12). The SEC also establishes, and Defendants do not dispute, that Weitzen was aware of management's desire to close the anticipated gap between revenue and analyst consensus expectations. But the SEC fails to provide any evidence or authority that this is anything but common and sound business practice, as opposed to the "extreme departure from the standards of ordinary care" it is required to establish. *See SEC v. Dain Rauscher, Inc., 254 F.3d at 856.* Without additional action or knowledge of impropriety on Weitzen's part, as a matter of law, there simply is no scienter.

The Court must therefore grant summary judgment to Weitzen on the *§ 10(b)* [*22] and *Rule 10b-5* claims against him.

B. *Control Person Liability*

Section 20(a) of the Exchange Act, *15 U.S.C. § 78t(a)* provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation.

In order to prove a case under *§ 20(a)*, the SEC must establish: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc., 228 F.3d 1057, 1065 (9th Cir. 2000).* The primary violator in this case is alleged to be Gateway,

and the SEC claims that as CEO, Weitzen was a controlling person of Gateway. (SEC Mem. at 9-10).

Curiously, the SEC does not bother to establish Gateway's primary violation other than by reference to the cease and desist order entered as a [*23] result of a settlement with Gateway. (SEC Mem. at 9 n.11, citing *In re Gateway, Inc. 2003 SEC LEXIS 2713 (November 13, 2003)).* This order states:

> In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and *without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings,* Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to *Section 8A* of the Securities Act of 1933 and *Section 21C* of the Securities Exchange Act of 1934, Making Findings, and Imposing Cease-and-Desist Order, as set forth below.

*2003 SEC LEXIS 2713 at *1-2* (emphasis added). In other words, the order is the result of a negotiated settlement between the SEC and Gateway. Gateway neither admits nor denies any of the allegations in the order. The SEC cites no authority for the proposition that a negotiated [*24] settlement which on its face does not constitute an admission, establishes a primary violation for purposes of *§ 20(a)* liability. The order is therefore irrelevant to the issue of Weitzen's alleged control person liability.

Gateway is not a defendant in this action. The SEC does not present arguments or evidence on the issue of Gateway's primary violation. The Court can, of course, consider the evidence the SEC has presented against Todd, Manza and Weitzen in relation to Gateway, as those allegations primarily relate to Gateway's Q3 2000 10-Q filing. As discussed above, the Court has determined that there is a genuine question of material fact as to whether the increased lower tier consumer lending and the sale of equipment to Lockheed contributed to a material misstatement of revenue. This conclusion would apply equally to Gateway as to Weitzen, Todd and Manza. Therefore, there is a genuine issue of material fact as to Gateway's primary violation.

2006 U.S. Dist. LEXIS 41182, *; Fed. Sec. L. Rep. (CCH) P93,926

The second element that the SEC must establish is that Weitzen exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc., 228 F.3d at 1065.* Control is defined by the SEC as:

> the [*25] possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise.

*17 C.F.R. § 230.405.* But, "'whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'" *Howard v. Everex Systems, Inc., 228 F.3d at 1065* (quoting *Kaplan v. Rose, 49 F.3d 1363, 1382 (9th Cir. 1994)* (internal quotation marks and citations omitted)).

Weitzen's status as CEO is not conclusive on the issue of whether he was a controlling person. "Although a person's being an officer or director does not create any presumption of control, it is a sort of red light." *Arthur Children's Trust v. Keim, 994 F.2d 1390, 1397 (9th Cir. 1993).* Weitzen's role as CEO seems similar to that of the CEO at issue in *Paracor Fin., Inc. v. GE Capital Corp., 96 F.3d 1151 (9th Cir. 1996).* In *Paracor,* the CEO was described as [*26] "the classic conceptualizer and idea man who leaves behind a long swath of details for someone else to handle." *Id. at 1163.* He was however consulted on all major decisions. *Id.* By all accounts, this was Weitzen as well. And as was the case in *Paracor,* the plaintiff here fails to present evidence showing Weitzen had control over the transactions at issue. As discussed above, there is no debate that Weitzen was aware of the existence of the transactions. But there is little evidence that he controlled those transactions or was aware of them in any but the most general sense. The court in *Paracor* found that the CEO was not a controlling person, both on the basis of his less than complete control of the company, and his specific lack of control of the transaction in question. *Id. at 1164.* It is Weitzen's lack of specific control of the transactions at issue here that serves to separate him from any potential control person liability.

Weitzen has also provided sufficient evidence to meet his burden of showing that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation." *15 U.S.C. § 78t(a)* [*27] . During Weitzen's tenure as CEO, Gateway established an Office of Ethics and Compliance, an internal auditing function, and initiated an assessment of internal accounting controls. (Weitzen Facts PP 11-13). Weitzen has

demonstrated that when faced with questions on the transactions at issue, he sought assurance that the people with the requisite expertise were comfortable with Gateway's approach. For example, Weitzen sought assurance from Todd that Lee Bird's concerns regarding the AOL transaction had been addressed, and received such assurance in an email from Todd:

> I spoke with Lee last night and he has thought through the AOL accounting proposal and is now comfortable. One key to his being more comfortable was the openness in which we reviewed (i.e. Sr. team, legal, ethics, audit) and that we took his concerns and the accounting treatment seriously. Thanks for your support in getting it resolved.

(SEC Ex. 55). The Court finds that as a matter of law, Weitzen acted in good faith and cannot be held secondarily liable for the fraudulent acts allegedly committed by Gateway.

### C. Lying to Auditors

Finally, the SEC alleges that Weitzen violated Exchange Act *Rule* [*28] *13b2-2* by signing a false management representation letter to PwC, Gateway's outside auditor. *Rule 13b2-2* states in relevant part:

> (a) No director or officer of an issuer shall, directly or indirectly:

> (1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

> (2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

> (i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

> (ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

17 C.F.R. § 240.13b2-2. The SEC takes issue with the representations in the management letter that the interim financial statements were prepared on a basis consistent with corresponding periods for the prior year, and with the prior year's audited financial statements. Specifically, it claims the methodology [*29] for calculating the loan loss reserve was changed in the third quarter, and neither the AOL nor the Lockheed transaction was reported on a basis consistent with the accounting policies set forth in the 1999 10-K.

As discussed above, Weitzen had no knowledge of any potential misrepresentations regarding the AOL or Lockheed transactions, nor was he reckless in not knowing. The SEC provides no evidence linking Weitzen to the change in loan loss reserve methodology, and seemingly admits as much by asking the Court to consider control person liability for him in regard to that issue, based on imputing Todd and Manza's knowledge to Gateway. (SEC Mem. at 15, n. 15). Additionally, Weitzen has offered undisputed evidence of his good faith in relying on Gateway's CFO, Controller and General Counsel's assurances of the veracity of the management representation letter before signing it.

The SEC has cited to no case where liability for a *Rule 13b2-2* violation was imposed on an individual who otherwise could not be held liable for a primary or secondary violation of the anti-fraud provisions, based on that individual's lack of scienter and affirmative showing of good faith. The Court's own research [*30] has similarly turned up cases assigning liability for a *Rule 13b2-2* violation only when the individual knew or had reason to know the statements or omissions he was making to the auditors were false. *See e.g. SEC v. Sandifur, 2006 U.S. Dist. LEXIS 12243, No. C05-1631C, 2006 WL 538210 at *9 (W.D. Wash. March 2, 2006)* (finding *13b2-2* violation sufficiently alleged when defendant knowingly concealed information auditor would find critical to approve deal, and primary *section 10(b)* violation had been sufficiently alleged); *SEC v. Dauplaise, 2006 U.S. Dist. LEXIS 9589, No. 6:05CV1391-ORL 31KRS, 2006 WL 449175 at *3, 8 (M.D. Fla. Feb. 22, 2006)* (finding *13b2-2* violation sufficiently alleged when CEO knew of default on note and receivership and failed to disclose to accountants, and primary *section 10(b)* violation had been alleged); *SEC v. Orr, 2006 U.S. Dist. LEXIS 11447, No. 04-74702, 2006 WL 542986 at *16-18 (E.D. Mich. March 6, 2006)* (considering defendants' knowledge, or recklessness in not knowing statements made to auditors were false); *SEC v. Autocorp Equities, Inc., 2004 U.S. Dist. LEXIS 15968, No. 2:98-CV-00562 PGC, 2004 WL 1771608 at *6 (D. Utah Aug. 4, 2004)* (finding *13b2-2* liability only appropriate upon showing that defendant [*31] later learned previous statements to auditors were false and failed to correct them). The SEC has presented no evidence that Weitzen knew or was reckless in not knowing that the statements in the management representation letter were false. Nor has it presented evidence disputing his good faith defense. The Court therefore finds as a matter of law that Weitzen cannot be held liable for violation of *Rule 13b2-2*.

## CONCLUSION

For the reasons stated above, the SEC's Motion for Partial Summary Judgment against Defendant Weitzen is denied. Defendant Weitzen's Motion for Summary Judgment is granted in whole, and judgment is to be entered in his favor.

IT IS SO ORDERED.

Dated: May 23, 2006

HON. ROGER T. BENITEZ

UNITED STATES DISTRICT JUDGE

# EXHIBIT P

Not Reported in F.Supp.
Fed. Sec. L. Rep. P 99,437
(Cite as: 1997 WL 269490 (N.D.Cal.))
<KeyCite Yellow Flag>

United States District Court, N.D. California.

**SHUSTER**
v.
**SYMMETRICON, INC.**

**No. 94-20024 RMW.**

Feb. 25, 1997.

WHYTE.

**\*1** Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) was heard on October 4, 1996. The court has read the moving and responding papers and heard the oral argument of counsel. For the reasons set forth below, the court grants defendants' motion to dismiss with twenty (20) days leave to amend in accordance with Rules 9(b) and 8(a). [FN1]

> FN1. The court recognizes that progress in this case has been delayed by several reassignments which occurred through no fault of the parties. Therefore, the court has some reservations about granting this motion to dismiss, as it does appear that plaintiff will probably be able to state a claim. However, an amended complaint that specifies plaintiff's claims more concisely and with particularity will assist in expediting further proceedings.

**I. BACKGROUND**

Plaintiff filed his class action complaint alleging violation of the federal securities laws in January 1994. Defendants answered the original complaint and produced documents related to the action pursuant to an agreement among the parties. Following production of the documents, plaintiff decided he needed additional documents and served a subpoena on Symmetricom, Inc.'s ("Symmetricom") outside accountant, Deloitte & Touche, LLP ("Deloitte") requesting documents related to Deloitte's annual audits of Symmetricom. The parties disputed the relevancy of the requested documents. Symmetricom claimed that such documents did not have to be produced because there were no allegations of accounting fraud contained in the complaint. The court determined

that additional allegations would have to be included in the complaint for plaintiff to be entitled to the requested documents. Accordingly, on November 9, 1995, plaintiff filed his first amended class action complaint for violation of the federal securities laws ("Complaint"). The claims arise under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission. Complaint ¶ 11. The Complaint contains allegations of accounting fraud.

Specifically, the Complaint alleges that during the class period, April 6, 1993 through November 10, 1993, defendants artificially inflated the price of Symmetricom's common stock by misrepresenting the facts about Symmetricom's new product, the integrated digital services terminal ("IDST"). The Complaint further alleges that defendants manipulated Symmetricom's financial statements so that the company would appear stronger financially than it actually was.

Plaintiff alleges that on November 10, 1993, Symmetricom "suddenly" revealed that it expected lower sales of IDST's throughout the balance of fiscal year 1994 and that revenues for fiscal 1994 would be lower than expected. Complaint ¶ 9. As a result of this announcement, Symmetricom's stock price fell $4 1/4 per share to $9 3/4 . Id. Thus, plaintiff claims that he and others who purchased stock during the class period were damaged. Id. Plaintiff purchased 1000 shares of Symmetricom stock during the class period for $14.75 per share. Complaint ¶ 14. Plaintiff also alleges that Robert Austin ("Austin"), the head of the Telecom Solutions Division of Symmetricom (maker of IDST's), sold 42,7000 shares of Symmetricom stock early in the class period and made over $620,000. Complaint ¶ 9, 86. No other insider sales are alleged. Symmetricom is a publicly held company whose stock is traded on the NASDAQ.

**\*2** In a November 10, 1993 press release, Symmetricom did announce that it anticipated lower than expected orders of IDST's because of unforeseen changes in the capital spending plans of several customers, including AT & T. Declaration of Rebecca L. Epstein in Support of Defendants' Motion to Dismiss ("Epstein Decl."), Ex. A. [FN2]

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                    **Page 125**
(Cite as: 1997 WL 269490, *2 (N.D.Cal.))

Thus, plaintiff claims that earlier statements regarding orders for the IDST were misleading. Complaint ¶¶ 66-69. Plaintiff further claims that defendants misrepresented that the IDST was a fully developed product when in fact it had "numerous unresolved operating problems" and was "largely in the development stages" during the relevant time period. Complaint ¶ 72. Plaintiff also asserts that defendants omitted certain material facts such as the fact that the IDST was not compatible with "the most widely used long distance system architecture," among others. Complaint ¶ 76.

> FN2. Documents referenced in the Complaint but not attached to the Complaint may be properly considered by the court when deciding a motion to dismiss pursuant to Rule 12(b)(6). Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir.1994).

In making his allegations, plaintiff relies heavily on statements made by securities analyst, Allen Strand ("Strand"), who worked at Crowell Weedon & Co. ("Crowell"). Plaintiff claims that defendants made false statements regarding IDST sales to Strand which Strand then published in reports made available to the investing public. Complaint ¶ 23. Plaintiff also claims that Symmetricom adopted the republished statements of Strand, which were false and misleading, and therefore that Symmetricom should be liable for the statements. Complaint ¶¶ 23-26.

Finally, plaintiff claims that Symmetricom's financial statements were false and misleading and that defendants engaged in improper accounting practices, including causing Symmetricom to recognize revenues in violation of Generally Accepted Accounting Principles ("GAAP"). Complaint ¶¶ 80-85. Plaintiff claims that defendants manipulated Symmetricom's financial statements, including annual statements and quarterly reports, to reflect higher sales of IDST's than were actually made for the reporting period at issue. Complaint ¶¶ 63, 81-83. Plaintiff alleges that defendants accomplished this by "pulling in" to a given reporting period sales that were not actually final and, in fact, would not occur until the next reporting period, if they occurred at all. Complaint ¶ 83.

Defendants have moved to dismiss the Complaint alleging that it does not plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b) and In re GlenFed. Inc. Sec. Litig., 42 F.3d 1541 (9th Cir.1994) (en banc). Thus, defendants assert that the Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.

## II. LEGAL STANDARD

A court may dismiss a complaint pursuant to Rule 12(b)(6) for either (1) lack of a cognizable legal theory, or (2) the pleading of insufficient facts under a cognizable legal theory. Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir.1984). In ruling on a motion to dismiss must assume that plaintiff's allegations are true, must construe the complaint in the light most favorable to the plaintiff and must resolve any doubt in plaintiff's favor. United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir.1981).

*3 Rule 9(b) provides that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) applies to securities actions brought under section 10(b) and Rule 10b-5. Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439 (9th Cir.1987).

In securities fraud cases, motions to dismiss are subject to strict standards because whether or not a statement or omission is misleading to potential investors "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significances of those inferences to him, and these assessments are peculiarly ones for the trier of fact." Fecht v. Price Co., 70 F.3d 1078, 1080 (9th Cir.1995). Thus, "only if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.'" Id. at 1081 (quoting Durning v. First Boston Corp., 815 F.2d 1265, 1268 (9th Cir.1987)).

## III. ANALYSIS

A plaintiff bringing suit under section 10(b) and Rule 10b-5 "must prove that the defendant (1) made misstatements of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5)

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.                                   **Page 126**
(Cite as: 1997 WL 269490, \*3 (N.D.Cal.))

that plaintiffs' reliance was the proximate cause of their injury."  Kline v. First Western Government Securities, Inc., 24 F.3d 480, 487 (3rd Cir.1994). Furthermore, to state a claim for securities fraud, a plaintiff must plead with particularity the circumstances of the fraud, including statements made and an explanation as to why or how such statements are false or misleading. Fed.R.Civ.Proc. 9(b);  GlenFed, 42 F.3d at 1548. Moreover, simply because statements are different or conflict does not mean fraud exists.

> The fact that an allegedly fraudulent statement and a later statement are different does not necessarily amount to an explanation as to why the earlier statement was false.... In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood.

GlenFed, 42 F.3d at 1549.  To allege falsity, plaintiffs should point to contemporaneous, inconsistent statements by defendants or show that information available to defendants showed different results than defendants were predicting.  See id. However, these pleading requirements do not negate the mandate of Rule 9(a) which calls for "a short and plain statement of the claim."

The Complaint as it now stands is a rambling set of allegations which is almost impossible to effectively review.  Although it is shorter than some securities fraud complaints the court has seen, it is still far longer than necessary and it is confusingly arranged.  Plaintiff sets forth lengthy quotes from various releases by defendants' officers and a securities analyst but does not make clear what portion of each quote constitutes a false representation.  Plaintiff then proceeds to make further conclusionary statements about what defendants represented followed by allegations, some general and some specific, in an attempt to show why the representations were false.  These allegations do not clearly show why the quoted representations were false when made.  Plaintiff has failed to point to particular contemporaneous, inconsistent statements by defendants or show that specific information available to defendants revealed something different than what defendants were stating.

A. Statements Regarding Orders for IDST's

### 1. Whether statements were false

\*4 Plaintiff alleges that defendants misrepresented the number of confirmed orders and binding contracts Symmetricom had for IDST's. Specifically, plaintiff attacks representations regarding three customers, AT & T, Pacific Bell and BellSouth.  See Complaint ¶¶ 43-49, 66-68. Plaintiff alleges that defendants represented that each of these companies had binding contracts to purchase various quantities of IDST's when, in fact, they did not.  Plaintiff relies on a July 22, 1993 press release, a report to shareholders for the third quarter of fiscal 1993, Symmetricom's fiscal 1993 annual report and various reports issued by Crowell. Complaint ¶¶ 43-52;  Epstein Decl. Exs. B-E, G, M-N.  Plaintiff also asserts that defendants represented that sales of IDST's were going well which would result in high revenues and that these customers not only had contracts but were negotiating further with Symmetricom.  Plaintiff then alleges that sales of IDST's were not taking place and that any contracts Symmetricom did have were not being renewed because of problems with the IDST.  Complaint ¶¶ 69-73.

A review of the documents plaintiff relies on, and references in the Complaint, for these assertions shows that defendants were not making representations that final, binding contracts existed in all cases.  Defendants were, in fact, stating only that they were optimistic about future contracts and sales of IDST's.  The April 6, 1996 press release states that Symmetricom received "a contract for Telecom Solutions" Integrated Digital Services Terminal (IDST) from BellSouth."  Complaint ¶ 42;  Epstein Decl., Ex. M. Plaintiff never alleges that that statement was false but only later asserts that after making the statement defendants knew they had lost the bid to become BellSouth's IDST supplier "for certain LSO applications."  Complaint ¶ 71 (emphasis added).  However, the later allegation does not render the earlier statement false or misleading.

Similarly, plaintiff quotes at length from both the 1993 third quarter report and the 1993 annual report (Complaint ¶¶ 43, 51-53) but nowhere alleges that any specific statement made in either of those reports was false or misleading.  Finally, plaintiff relies heavily on statements made in various reports issued by Crowell, but does not allege that any

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.
(Cite as: 1997 WL 269490, *4 (N.D.Cal.))

specific statement is false. Again, plaintiff only pleads the conclusion that defendants falsely stated the progress and status of certain contracts, particularly those with AT & T and Pacific Bell.

A review of the analyst's reports shows that, contrary to plaintiff's assertions, Strand was not stating that contracts with AT & T or Pacific Bell existed. The Crowell Morning Wire Report dated April 6, 1993 stated that "the high end of this range assumes an order from AT & T ... for the IDST; the low end does not." Epstein Decl., Ex. B. Similarly, the Crowell Morning Wire Report dated May 26, 1993 stated that "the successful performance of the IDST in an operating environment would cause the Street to anticipate (even before an actual contract ) a large piece of business for [Symmetricom] from AT & T." Epstein Decl., Ex. D (emphasis added). Finally, the Crowell Morning Wire Report dated June 18, 1993 stated that Symmetricom anticipated success of IDST testing at AT & T "which would then be followed by actual contract negotiations." Epstein Decl., Ex. E. Crowell also stated that it understood Pacific Bell approved the IDST for a certain application which "could lead to meaningful business." Epstein Decl., Ex. D. Nowhere is it stated in any Crowell Report that Pacific Bell had a binding contract.

*5 Plaintiff's allegations regarding sales and orders of IDST's fail as a matter of law to plead fraud with particularity as required under Rule 9(b) and GlenFed. Plaintiff quotes from financial reports and analyst's reports and then, in conclusory fashion, alleges that statements contained in those reports are false and misleading without alleging how any particular statement was misleading. Such conclusory pleading is insufficient to state a claim. GlenFed, 42 F.3d at 1548-49. Furthermore, plaintiff has failed to allege why any statement was false at the time it was made which is also necessary to state a claim. Id. Plaintiff relies on Fecht v. Price Co., 70 F.3d 1078, 1080 (9th Cir.1995), for the proposition that by pointing to inconsistent, contemporaneous statements he has shown the misleading character of the statements pled in the Complaint. Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion ("Pls. Opp'n"), p. 14. However, plaintiff fails to allege any inconsistent, contemporaneous statements. Plaintiff merely quotes at length from

various documents, then states the conclusion that the statements made were false and defendants knew they were false.

2. Warnings issued by Symmetricom

Defendants assert that, in addition to not having made any false or misleading statements regarding the orders for IDST's, they adequately warned of the risks associated with orders and sales of IDST's. There can be no liability under the securities laws, as a matter of law, where meaningful and specific cautionary disclosures are made regarding the subject matter of the alleged misrepresentation. In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1413 (9th Cir.1994). In Symmetricom's 1993 annual report it cautioned that "sales can be very long and order timing is hard to predict" and that "no one can guarantee that orders will actually be received." Epstein Decl., Ex. G (emphasis added); see also Exs. H (1994 10-Q Report) and I (1993 10-K Report). Crowell echoed the warnings as well: "The potential for large, near term IDST orders is clearly present, although the timing of the same is impossible to predict." Epstein Decl. Ex. C (Crowell Report, p. 5).

Plaintiff alleges that defendants' warnings were "boilerplate" and did not communicate to the market "specific adverse facts affecting Symmetricom's business ... which were known only to the defendants." Complaint ¶¶ 77-78. Plaintiff further claims that defendants' warnings were "overly general" and provided no notice of the adverse information possessed by defendants. Pls. Opp'n at p. 20. Plaintiff alleges that a warning regarding unpredictable order timing does not warn that sales were not good, which defendants allegedly knew. However, plaintiff fails to set forth any specific information that defendants possessed and failed to disclose in Symmetricom's warnings to potential investors. See Complaint ¶¶ 77-79. Plaintiff merely states the conclusion that defendants had "access to non-public corporate information" which they should have disclosed without revealing what this information was and how it might have affected the market.

*6 Furthermore, Symmetricom's warnings specifically advised the market on the risks associated with sales of the IDST that the company was concerned about, i.e. that orders might not

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.                                              **Page 128**
**(Cite as: 1997 WL 269490, \*6 (N.D.Cal.))**

occur. Plaintiff does not point to any specific information in defendants' possession which mandated additional disclosures, or that even shows there were other risks associated with the IDST. In order to show the inadequacy of defendants' warnings, plaintiff must allege specific facts, of which defendants were aware, that show that defendants' public disclosures were false or misleading. See Warshaw v. Xoma Corp., 74 F.3d 955, 959 (9th Cir.1996).

### B. Statements Regarding Deficiencies of IDST's

The law is clear that companies are not obligated to disclose every potential problem a product may have. In re VeriFone Sec. Litig., 784 F.Supp. 1471, 1480 (N.D.Cal.1992), aff'd 11 F.3d 865 (9th Cir.1993). Plaintiff asserts that defendants represented that the IDST was a "successful, fully developed product which many customers were interested in purchasing" when in fact "the IDST had numerous unresolved operating problems and was in fact still largely in the development stages." Complaint ¶¶ 64, 72. Plaintiff also asserts that defendants failed to disclose that tests being performed by AT & T revealed "numerous and significant operating problems and 'bugs.' " Complaint ¶ 72(b). Plaintiff further alleges that defendants falsely represented that there were no competitive products which performed the same functions as the IDST. Complaint ¶ 75. However, the only representation concerning the lack of competitive products appears to be one by Crowell on September 20, 1993 which only states that there are "presently no directly competitive products for [the SS7 application]." It is not clear that plaintiff claims this statement was false when made.

Several reports issued by Crowell and Symmetricom state that the IDST was still being tested and that Symmetricom was devoting substantial amounts of research and development costs to improving the product. Epstein Decl. Exs. C and I, pp. 4, 8. Similarly, reports notified potential customers of competition by more established companies with greater financial resources. Id. Plaintiff, while apparently acknowledging that defendants were not obligated to disclose "every problem" with the IDST, claims that defendants failed to disclose that the IDST was "fundamentally flawed." Pls. Opp'n at p. 15. However, plaintiff fails to describe how the product

was "fundamentally flawed" in his opposition, let alone plead the existence of these fundamental flaws in his Complaint. Plaintiff has pleaded only conclusory statements that IDST's were not functioning as well as defendants were representing them to function. Complaint ¶ 64.

Furthermore, plaintiff's assertion that defendants should be liable for omitting information in Symmetricom's statements related to the IDST's fundamental flaws cannot be reconciled with the numerous disclosures defendants made regarding the IDST. Defendants disclosed that the IDST was still being developed and that research was still being done to enhance the product. Epstein Decl. Exs. G (1993 Annual Report, p. 23) and I (June 30, 1993 Form 10-K, p. 4).

### C. Analyst's Statements

\*7 In securities fraud actions, defendants sometimes can be liable for statements made by analysts. Warshaw, 74 F.3d at 959 (where defendant intentionally uses analyst to disseminate false information defendant cannot escape liability simply because it carries out fraud through a third party). However, in order for defendants to be liable for any statement made by Crowell, plaintiff must plead specific facts showing that Symmetricom so entangled itself in the analyst's statement so as to endorse it and adopt it as its own. In re Software Publishing Sec. Litig., 1994 WL 261365, p. 9 (N.D.Cal.1994) ("A company is liable only if it engages in conduct from which it could reasonably be inferred that the company expressly or impliedly placed its imprimatur on the reports.") (emphasis added); In re Caere Corp. Sec. Litig., 837 F.Supp. 1054, 1059 (N.D.Cal.1993). [FN3] To show adoption of the analyst's statements, plaintiff must plead: "(1) specific reports and the name of the insider who adopted them; (2) specific interactions between the insider and the analyst; and (3) dates on which the interactions occurred." In re Ross Systems Sec. Litig., 1994 WL 583114, p. 8 (N.D.Cal.1994). A plaintiff must also plead that the analyst relied on information provided by an insider in preparing his report. Stack v. Lobo, 1995 WL 241448, p. 7 (N.D.Cal.1995).

FN3. Furthermore, plaintiff fails to plead that Crowell's reports or forecasts were unreasonable when made. For liability to attach to statements

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.



made by analysts in reports or forecasts, a plaintiff must plead that the reports or forecasts were unreasonable at the time made and that company insiders knew they were unreasonable and failed to disclose that fact. Stack v. Lobo, 1995 WL 241448, p. 7-8 (N.D.Cal.1995); In re Verifone Sec. Litig., 784 F.Supp. 1471, 1486-87 (N.D.Cal.1992).

Defendants contend that plaintiff fails to plead the necessary elements to render them liable for the analyst's statements. In fact, plaintiff pleads only that various employees communicated with Strand without setting forth what statements were made and why they were false or misleading. See Complaint ¶ 23. In paragraph 23 of the Complaint, plaintiff pleads "defendants continuously disseminated false and misleading information concerning the Company and the IDST to the securities market by communicating with Allen Strand" and that certain employees "spoke with Strand on the following occasions." Paragraph 23 then references paragraphs 44 through 47, 49, 54 through 56 and 58 which merely quote from the reports. Nowhere does plaintiff plead what facts were disseminated to Strand and by whom. [FN4]

> FN4. While plaintiff lists the names of the employees who allegedly spoke with Strand, he fails to allege that any specific statements were made by specific employees and why such statements were false or misleading. Plaintiff merely groups together those employees who spoke with Strand and concludes that the information they passed on to Strand (without citing specific information) must have been false.

Moreover, plaintiff fails to plead that Strand relied on any particular statements made to him in preparing the reports or forecasts and how Symmetricom insiders adopted or approved the reports. Such allegations are necessary to state a claim of liability based on third party statements. Plaintiff does no more than plead the conclusion that quoted statements were false and misleading. "To allow such conclusory allegations to state a claim against a corporation would subject corporations to continuous litigation arising from the statements of countless others who provide analyse's (sic) in the financial world." In re Ross, 1994 WL 583114 at p. 9.

Plaintiff, however, contends that defendants liability is based on the fact that the statements made to the analyst were false and misleading, not based on whether defendants adopted such statements after the analyst made them. Pls. Opp'n at p. 23. However, plaintiff fails to plead specific statements made by specific individuals that were false or misleading. See supra fn. 4. Without such allegations plaintiff's claim fails under Rule 9(b) and GlenFed.

D. Allegations of Accounting Fraud

*8 To state a claim for accounting fraud "a plaintiff must plead facts supporting a conclusion that a defendant has prepared fraudulent financial statements, and that the alleged financial fraud was material." In re Ross, 1994 WL 583114 at p. 7. In order to plead materiality, a plaintiff need not specify the exact dollar amount of each transaction but "some level of specificity is required." Id. Additionally, plaintiff must plead what accounting principles were violated. GlenFed, 42 F.3d at 1553.

Plaintiff alleges that the "Company's results in the quarters ended March 31, 1993, June 30, 1993 and September 30, 1993 had been artificially and improperly inflated due to the inclusion of revenues from 'sales' which had not been completed causing the financial statements to be presented in violation of GAAP." Complaint ¶ 82. Plaintiff also alleges violation of Financial Accounting Standards Board ("FASB") Statement of Concept No. 5 because defendants "pulled in booking that under proper procedures should have been recognized in later quarters." Complaint ¶ 83. Finally, plaintiff alleges that "in the first quarter of fiscal 1994 ... the Company recognized revenue on the last day of the quarter for shipments totaling more than $600,000 to Pacific Bell" but that the sales were not final. Complaint ¶ 83. This is the only allegation that contains a monetary amount of a specific transaction. [FN5]

> FN5. In his opposition to defendants' motion, plaintiff attempts to quantify other alleged fraudulent transactions. See Pls. Opp'n at pp. 17-18. However, it appears plaintiff is referring to the same transaction at paragraph 83 of the Complaint but instead of using the net amount of $600,000 simply restates that defendants recognized $1.9

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

million of revenue when, in fact, they were only entitled to recognize $1.3 million.    See also Complaint ¶ 63.

Plaintiff's allegations fail to state a claim of accounting fraud.    Plaintiff fails to plead specific transactions with appropriate particularity.    Plaintiff only generally pleads that defendants' practice of "pulling in" revenue violates GAAP and he only references one specific false transaction amounting to $600,000.    Furthermore, while plaintiff alleges that the fraudulent transactions were material (Complaint ¶ 84) he only pleads the monetary amount of one transaction which is not material as a matter of law ($600,000 represented only 2% of Symmetricom's September 1993 quarter revenue). See In re Convergent Technologies Second Half 1984 Sec. Litig., No. 85-20130 SW, slip op. at pp. 22-23.    In order to state a claim for accounting fraud, plaintiff must plead specific transactions and how each violated accepting accounting standards and how they were material to the company. Plaintiff's conclusory allegations that the practice of "pulling in" revenues violates GAAP and therefore that Symmetricom's financial statements were false and misleading are inadequate to state a claim for accounting fraud.    Plaintiff is given leave to amend to allege with particularity specific fraudulent transactions and their materiality to Symmetricom's financial statements.

### IV. ORDER

Based on the foregoing, the court grants defendants' motion to dismiss the first amended complaint with leave to amend in accordance with Federal Rules of Civil Procedure 9(b) and 8(a). Plaintiff is given twenty (20) days from the date of this order to amend his Complaint to allege specific statements or omissions that were false or misleading related to the sale and deficiencies of IDST's.    Plaintiff is also given leave to amend his Complaint to allege the necessary elements for claiming that defendants are liable for statements made by Strand and Crowell.    Finally, plaintiff is given leave to amend his Complaint to plead the necessary elements of accounting fraud.    The court requests that plaintiff follow each misrepresentation allegation with an allegation setting forth the particular contemporaneous, inconsistent statements by defendants or the specific information available to defendants at the time which revealed something

different than what defendants were representing.

1997 WL 269490 (N.D.Cal.), Fed. Sec. L. Rep. P 99,437

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT Q

LEXSEE 2006 USDISTLEXIS 36666



Analysis
As of: Dec 17, 2007

### In re TIBCO SOFTWARE, INC. SECURITIES LITIGATION

### Master File No. C 05-2146 SBA

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

### *2006 U.S. Dist. LEXIS 36666*

### May 24, 2006, Decided
### May 25, 2006, Filed

**SUBSEQUENT HISTORY:** Complaint dismissed at, Motion granted by *In re Tibco Software, Inc., 2006 U.S. Dist. LEXIS 75120 (N.D. Cal., Sept. 29, 2006)*

**PRIOR HISTORY:** *Siegall v. Tibco Software, Inc., 2006 U.S. Dist. LEXIS 26780 (N.D. Cal., Feb. 24, 2006)*

**COUNSEL:** [*1] For Lance Siegall, Individually and on behalf of all others similarly situated, Plaintiff: Karen T. Rogers, Jeff S. Westerman, Milberg Weiss Bershad & Schulman LLP, Los Angeles, CA.

For Ralph Felton, Plaintiff: Karen T. Rogers, Milberg Weiss Bershad & Schulman LLP, Los Angeles, CA.

For TIBCO Software Inc., Vivek Y. Ranadive, Christopher G. O'Meara, Sydney Carey, Rajesh U. Mashruwala, Defendants: Douglas John Clark, Ignacio E. Salceda, Wilson Sonsini Goodrich & Rosati Professional Corporation, Palo Alto, CA; Kyle Anthony Wombolt, Wilson Sonsini et al, Palo Alto, CA.

For Ralph Felton, Movant: Karen T. Rogers, Milberg Weiss Bershad & Schulman LLP, Los Angeles, CA.

**JUDGES:** SAUNDRA BROWN ARMSTRONG, United States District Judge.

**OPINION BY:** SAUNDRA BROWN ARMSTRONG

**OPINION**

CLASS ACTION

**ORDER**

[Docket Nos. 39, 40]

This Document Relates To: All Actions

This matter comes before the Court on Defendants' Motion to Dismiss Consolidated Amended Complaint and Request for Judicial Notice. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby [*2] GRANTS the Motion to Dismiss and GRANTS the Request for Judicial Notice.

**BACKGROUND**

**A. Background Regarding the Parties**

**1. Tibco Software, Inc.**

Defendant Tibco Software, Inc. (hereinafter "TIBCO" or the "Company") is a Delaware corporation with its principal place of business in Palo Alto, California. Consolidated Amended Compl. ("CAC") at P 3. TIBCO is engaged in the development and marketing of business services software products that enable customers to collect, analyze, and distribute "real-time" [1] information about and within an organization. *Id.* TIBCO also offers integration solutions products designed specifically to assist with business consolidations following acquisitions, mergers, or similar restructurings. *Id.* The

2006 U.S. Dist. LEXIS 36666, *

Company's products are sold individually or as product "suites" and "complete solutions."

> 1  The Company uses the term "real-time business" to describe doing business in such a way that organizations can use current information to execute their critical business processes and make smarter decisions. Thompson Decl. at Ex. 1 (FY05 Form 10-K).

[*3] TIBCO is a publicly traded company. As of the end of fiscal year 2005, it had approximately 211,136,985 shares of common stock outstanding. Thompson Decl. at Ex. 1 (FY05 Form 10-K). The Company's financial year is not concurrent with the calendar year. *Id.* Instead, it ends on the last day of November of each calendar year and commences on the first day of December for that calendar year. *Id.* For example, its 2004 fiscal year end was November 30, 2004.

The Company has approximately 1, 500 employees in offices located throughout Europe, Africa, the Pacific Rim, and the Americas. *Id.*

**2. The Individual Defendants**

At all times relevant to this action, Defendant Vivek Y. Ranadive ("Ranadive") was the President, Chief Executive Officer and Chairman of the Board of Directors of the Company. *Id.* at P 14. Defendant Christopher G. O'Meara ("O'Meara") was, during the relevant period, the Executive Vice President and Chief Financial Officer ("CFO") of the Company. *Id.* at P 15. O'Meara stepped down from the CFO position on October 11, 2005. Thompson Decl. at Ex. D.

Defendant Sydney Carey ("Carey") was, during the relevant period, the Vice President, Corporate Controller [*4] and Chief Accounting Officer of the Company. CAC at P 16. From March 2002 to September 2003, defendant Rajesh U. Mashruwala ("Mashruwala") was the Executive Vice President, Office of the CEO. *Id.* at P 17. Thereafter, Mashruwala served as the Company's Executive Vice President, Chief Operating Officer. [2] *Id.*

> 2  Randavive, O'Meara, Carey, and Mashruwala are collectively referred to herein as the "Individual Defendants."

**3. Plaintiffs**

Lead Plaintiffs ("Plaintiffs") Ralph Felton and Sathya Rajasubramanian are common stock holders who purchased the common stock of TIBCO during the relevant time period. *Id.* at P 12. Plaintiffs purport to represent a class of purchasers of TIBCO stock between September 21, 2004 and March 1, 2005. *Id.* at P 1, 12.

**B. Background Regarding the Confidential Witnesses**

The allegations contained in the Consolidated Amended Complaint are based, in part, on certain information obtained from the following Confidential Witnesses:

(a) Confidential Witness [*5] No. 1. Confidential Witness No. 1 ("CW1") was a Managing Director of Channel Sales at TIBCO in Munich, Germany during most of the class period until early 2005. CAC at P 25(a).

(b) Confidential Witness No. 2. Confidential Witness No. 2 ("CW2") was employed as TIBCO General Manager within the OEM sales channel in Austin, Texas from 2003 through 2004. *Id.* at P 25(b).

(c) Confidential Witness No. 3. Confidential Witness No. 3 ("CW3") was a National Account Director at TIBCO in New York. He was employed by Staffware from 2001 to June 2004 and then by TIBCO from June 2004 through early 2005. *Id.* at P 25(c).

(d) Confidential Witness No. 4. Confidential Witness No. 4 ("CW4") first worked as a Finance Director for the Staffware U.K. subsidiary from 1998 to June 2004. After June 2004, he worked as a Finance Director for TIBCO until mid-2005. Part of CW4's responsibilities included the compilation of balance sheets, profit and loss statements, and tracking assets and liabilities. CW4 was also responsible for reviewing the financials and interpreting the application of accounting rules before submitting the compiled financials to Staffware corporate. *Id.* [*6] at P 25(d).

(e) Confidential Witness No. 5. Confidential Witness No. 5 ("CW5") was employed as the Senior Manager of IT Operations for TIBCO for over five years until mid-2005. *Id.* at P 25(e).

(f) Confidential Witness No. 6. Confidential Witness No. 6 ("CW6") was employed by TIBCO as a Pre-Sales Consultant from early 2005 through the fall of 2005. CW6 was responsible for supporting TIBCO sales representatives by explaining TIBCO's products and their ca-

pabilities to prospective customers. According to CW6, TIBCO had a corporate training group at the Company's headquarters where CW6 was educated about TIBCO products and sales pitches. *Id.* at P 25(f).

### C. The Factual Allegations

On April 22, 2004, TIBCO announced that it would acquire Staffware, a European company located in the United Kingdom and provider of business process management ("BPM") solutions. *Id.* at PP 32-33; Thompson Decl. at Ex. E (April 23, 2004 Form 8-K). The Company stated that the acquisition would allow TIBCO to broaden its solutions for automating and integrating business processes, and to increase its distribution capabilities through cross-selling of products into new [*7] geographies and an expanded customer base. Thompson Decl. at Ex. E. The Company cautioned investors, however, in the following manner regarding its expectations pertaining to the acquisition of Staffware:

This release contains forward-looking statements within the meaning of the "safe harbour" provisions of the United States securities laws. All statements other than statements of historical fact are statements that could be deemed forward-looking statements-including, without limitation, statements regarding (i) the ability of the acquisition to broaden TIBCO's solutions for automating and integrating business processes, (ii) the ability of the combined offering of the TIBCO platform and the Staffware's technology to provide an unparalleled solution to today's marketplace, (iii) the ability of the acquisition to create a larger software technology leader, (iv) the ability of TIBCO to deepen its industry expertise in finance, insurance, telecom and government sectors as a result of the acquisition, (v) the ability of the acquisition to increase TIBCO's distribution capabilities solutions, (vi) the continued development and support for Staffware's iProcess product [*8] and TIBCO's BusinessWorks Workflow products, (vii) the optimisation of Staffware's iProcess product to run with key TIBCO products, (viii) TIBCO's plan to continue to market, develop and maintain existing BPM and business integration products, (ix)

TIBCO's plan to deliver a fully interoperable, unified suite in mid to late 2005 and (x) TIBCO's plan to provide an upgrade or migration path to current Staffware customers and the actual results could differ materially from what is envisaged by such forward-looking statements if TIBCO is unable to successfully integrate the Staffware's business after the acquisition, if TIBCO is unable to successfully develop, market and sell the Staffware business process management and workflow solutions or if the market for business integration solutions does develop and grow as is now expected. In addition, the acquisition may not occur or may not occur in the time currently contemplated if the shareholders of Staffware do not accept the offer for their shares to TIBCO on the terms offered by TIBCO. TIBCO assumes no obligation to update the forward-looking statements included in this release.

Thompson Decl. at Ex. E (emphasis [*9] added); *see also id.* at Ex. F.

On June 7, 2004, during the third fiscal quarter 2004 ("Q3 04"), TIBCO closed the acquisition of Staffware. *Id.* at PP 32-33. The total cost of the Staffware acquisition was approximately $ 237.1 million, comprised of $ 139.7 million in cash and the issuance of 10.9 million shares of TIBCO common stock, valued at $ 92.3 million. *Id.* TIBCO's acquisition of Staffware was the Company's first acquisition since 2002. *Id.* at P 33.

In a Company release dated April 21, 2004, Ranadive stated:

We believe business processes are rapidly becoming the most valuable corporate asset. This combination brings two best-in-class technologies together to more completely deliver value to customers investing in BPM solutions. The combination with Staffware will provide TIBCO with immediate additional reach into new and emerging markets including retail banking, insurance, public sector and telecommunications, as well as increased geographic presence within Europe and Asia Pacific. We believe that the combined companies can accelerate market momentum relative to market peers, and set a new standard for what is

2006 U.S. Dist. LEXIS 36666, *

needed to effectively compete in the BPM [*10] market.

*Id.* at P 35.

In the Form 10-Q for the second fiscal quarter of 2004 ("Q2 04"), filed on July 7, 2004, TIBCO warned that a number of factors relating to the Software acquisition could affect future operating results:

**Any failure to successfully integrate Staffware's business operations could adversely affect our financial results.**

We intend to complete our acquisition of Staffware in the third quarter of fiscal 2004. We intend to integrate certain of our operations with those of Staffware to reduce the expenses of the combined company. If we are unable to integrate our operations with Staffware's operations in a timely manner, we may be unable to achieve the anticipated synergies. The challenges of integrating Staffware include, among other things:

. inconsistencies in standards, controls, procedures and policies, and compensation structures between TIBCO and Staffware;

. potential unknown liabilities associated with the acquired business and technology;

. demonstrating to our customers that the acquisition will not result in adverse changes in product offerings, customer service standards or business focus;

. coordinating and [*11] consolidating ongoing and future research and development efforts;

. unanticipated delays in or expenses related to the integration of operations;

. retaining and integrating key employees, as necessary, including members of Staffware's sales force;

. conducting adequate training of employees and modifying operating control standards in areas specific to U.S. corporations such as U.S. GAAP and requirements under the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated thereunder;

. costs and delays in implementing common systems and procedures, including financial accounting systems and customer information systems;

. consolidating corporate and administrative infrastructure, particularly in light of Staffware's decentralized international corporate structure;

. identifying and eliminating redundant and underperforming operations and assets;

. using capital assets efficiently to develop the business of the combined company;

. minimizing the diversion of management's attention from ongoing business concerns;

. fluctuations in currency exchange rates;

. possible tax costs or inefficiencies associated with integrating the [*12] operations of the combined company; and

. international rules and regulations that may limit or complicate restructuring plans.

2006 U.S. Dist. LEXIS 36666, *

Thompson Decl. at Ex. G (Q2 04 Form 10-Q) (emphasis in original).

On September 21, 2004, TIBCO published a release in *PR Newswire* that announced consensus-beating financial results for the fiscal third quarter of 2004, the period ending August 29, 2004 ("Q3 04"), as well as the adoption of a $ 50 million stock repurchase program. CAC at P 38. For Q3 04, TIBCO reported total revenues of $ 105.9 million, and net income of $ 8.6 million or $ 0.04 per share, up from $ 2.7 million, which was two cents above the analysts' consensus earnings estimates for the quarter. *Id.* at P 38. The press release also stated in part:

> TIBCO Software Reports Third Quarter Financial Results; Announces Stock Repurchase Program
>
> "Increasingly, companies are turning to TIBCO to obtain value from their existing assets, gain operational efficiencies and improve customer loyalty," said Vivek Ranadive, Chairman and CEO of TIBCO Software. "Our third quarter performance reflects these trends and the commitment and contributions of both the TIBCO and Staffware [*13] organizations."
>
> . . .
>
> Stock Repurchase Program
>
> TIBCO's Board of Directors has approved a two-year stock repurchase program pursuant to which TIBCO may repurchase up to $ 50 million of its outstanding common stock from time to time on the open market or through privately negotiated transactions.

*Id.* at P 38.

Following the publication of TIBCO's Q3 04 release, defendants hosted a conference call for analysts and investors during which Ranadive stated, in part, the following:

> VIVEK RANADIVE: In summary, I want to leave you with three points. First, we are at the tipping point in the integration market, where the technology has received mainstream acceptance, and TIBCO has emerged as the clear winner. Second, we are better positioned today

than at any time in our history. And third, while there is always room for improvement, I believe that we are executing well across all segments of our business.

> . . .
>
> VIVEK RANADIVE: Well, maybe people will start believing us that we are at the tipping point of this business right now, and our franchise is very strong. And we are executing well; Chris Larsen is doing a great job, and we have got a good pipeline, [*14] and we feel good about where things are.

*Id.* at P 39.

Additionally, during the same call, the following exchange occurred:

> TIM KLASELL, ANALYST, THOMAS WEISEL PARTNERS: I wonder if you can give us a little bit of color on how Staffware did relative to plan, particularly in the license line.
>
> VIVEK RANADIVE: We moved very quickly to offer a common storefront, and so we blended the sales quickly after the deal closed. And we had significant success with that, so we had a common offering to our customers . . . we were offering essentially a blended product. . . .
>
> CHRIS O'MEARA: [I] think we are pleased with the performance of both -- of the TIBCO and Staffware organizations . . . I think what I would leave people with is the fact that both organizations did a really great job, in terms of staying focused and closing opportunities.
>
> TIM KLASELL: And then I'll sort of take a derivative off that. Asia did particularly well; Europe was strong. Did you get leverage from the Staffware sales forces in those territories with the TIBCO products?
>
> VIVEK RANADIVE: Not so much in Asia, but more in Europe. In Europe we absolutely did.
>
> . . .
>
> KASH RANGAN, [*15] ANALYST, WACHOVIA SECURITIES: Per-

haps if you could give us an update on the integration with Staffware, both from a product perspective and sales perspective, maybe touch upon when you expect to get leverage in the product acquisitions here locally in the US, following what seems to be a good start in the UK?

VIVEK RANADIVE: We integrated at kind of a storefront level in Q3 and Q4. And then, next year we will have even more tight integration, in terms of sales management and all of that. And we are very pleased with the way that it has gone, and we are very pleased with -- from all fronts, the way the customers have reacted. We have several wins where it was really a joint product that allowed us to have not only the win but the type of pricing that we ended up with. So that has all gone better than we had expected, and we are very happy with it.

*Id.* at P 40.

On September 22, 2004, shares of TIBCO stock traded at $ 8.27 per share, up 10% from the prior day's close of $ 7.51 per share, on a volume of over 14.23 million shares traded. *Id.*

Between September 24, 2004 and October 1, 2004, Mashruwala sold 30,000 shares of TIBCO stock, for combined proceeds of $ 257,560. [*16] *Id.* at P 88.

On or about October 13, 2004, the Company filed with the SEC its Form 10-Q, reporting its financial results for Q3 04. *Id.* at P 42. The Form 10-Q was signed by defendants O'Meara, as Executive Vice President, Finance and Chief Financial Officer, and Carey, as Corporate Controller and Chief Accounting Officer. *Id.* The Company's Q3 04 Form 10-Q described the Staffware acquisition in part, as follows:

In June 2004, we completed our acquisition of Staffware plc ("Staffware"), a provider of Business Process Management ("BPM") solutions that enable business to automate, refine and manage their processes. The addition of Staffware's BPM solution enables us to offer our combined customer base a more robust and expanded real-time business integration solution. The purchase price for Staffware exceeded the fair value of Staffware's net tangible and intangible assets acquired; as

a result, we have recorded goodwill in connection with this transaction. . . .

*Id.* at 42.

In the Q3 04 Form 10-Q, the Company also described its system of internal financial, operational, and disclosure controls as follows:

ITEM 4. CONTROLS AND PROCEDURES

Evaluation [*17] of disclosure controls and procedures. We maintain 'disclosure controls and procedures,' as such term is defined in *Rule 13a-15(e)* under the Securities Exchange Act of 1934 (the 'Exchange Act'), that are designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. . . .

Based on their evaluation as of the end of the period covered by this Quarterly Report on Form 10-Q, our Chief Executive Officer and Chief Financial Officer have concluded that, subject to the limitations noted above, our disclosure controls and procedures were effective to ensure that material information relating to us, including our consolidated subsidiaries, is made known to them by others within those entities, particularly during the period in 1 which this Quarterly Report on Form 10-Q was being prepared. [*18]

*Id.* at P 43.

In the Form 10-Q, the Company also cautioned investors of the challenges it faced in integrating Staffware and the potential for difficulties that could adversely affect future financial results. Thompson Decl. at Ex. I (Q3 04 Form 10-Q).

Defendants Ranadive and O'Meara certified the Q3 04 Form 10-Q as accurate and complete. CAC at P 44.

2006 U.S. Dist. LEXIS 36666, *

Defendants Ranadive and O'Meara also certified, pursuant to *18 U.S.C. § 1350*, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Q3 04 Form 10-Q fully complied with the requirements of *Section 13(a)* or *15(d)* of the Securities Exchange Act of 1934 and that the information in the Form 10-Q presented, in all material respects, the financial condition and results of operations of the Company. *Id.* at P 45.

On October 12, 2004, the Company published a press release announcing the $ 3.5 million acquisition of General Interface. *Id.* at P 46.

Between October 21, 2004 and November 3, 2004, Mashruwala sold 45,000 shares of TIBCO stock, for combined proceeds of $ 563,214. *Id.* at P 88.

On November 22, 2004, Bear Stearns raised the price target on TIBCO. *Id.* at P 48. [*19] On December 13, 2004, Jefferies & Co. ("Jefferies") also raised its rating on TIBCO shares and issued a "Buy" rating. *Id.* at P 49. Following the Jefferies upgrade, TIBCO's stock rose from $ 11.15 per share to approximately $ 11.90 per share. *Id.* at P 50.

On December 22, 2004, TIBCO published a release announcing "record" results for the fourth fiscal quarter of 2004 ("Q4 04"). The release stated, in part:

TIBCO Software Reports Record Fourth Quarter and Annual Financial Results

PALO ALTO, Calif., December 22, 2004 -- TIBCO Software Inc. (Nasdaq:TIBX), a leading enabler of real-time business and the world's largest independent business integration software company, today announced results for its fourth fiscal quarter and year ended November 30, 2004. Total revenues for the fourth quarter were $ 125.7 million. License revenues for the fourth quarter were $ 70.6 million. Fiscal year 2004 revenues were $ 387.2 million. Net income for the quarter calculated in accordance with accounting principles generally accepted in the United States was $ 18.2 million or $ .08 per share on a fully diluted basis.

. . .

"During 2004, we capitalized on the beginning of a secular [*20] growth opportunity in the Integration market, increasing our market share of those segments in which we offer products and on the hard work and dedication of the people who work at TIBCO," said Vivek Ranadive, Chairman and CEO of TIBCO

Software. "The growth we are experiencing is further validation that our integration platform has gone from a 'nice to have' to a 'must have' for companies operating in the ever more competitive global marketplace."

*Id.* at P 51.

Also on December 22, 2004, the Company hosted a conference call for analysts and investors during which the following was said:

With respect to Q4, we reported another solid quarter with total revenues growing 19 percent sequentially and 72 percent year-over-year to 125.7 million. . .

. . .

[W]e continued our track record of redefining the notion of integration by significantly expanding our solution range and adjustable market to new products such as business events released in Q4, and through our merger with Staffware, we've solidified our position as the leader in business process management and further increased our market footprint worldwide. We believe all of these events give us significant [*21] momentum as we head into 2005 and beyond.

. . .

We are in a very good position to capitalize on the secular growth opportunity ahead of us for the rest of this decade. This is what has me so very excited about TIBCO's growth potential.

[W]e are . . . better positioned today than any time in our history.

*Id.* at P 52.

When asked about the integration of Staffware, the following exchange took place:

JOHN DIFUCCI, ANALYST, BEAR STEARNS: Yes, thanks. And congratulations, guys. This looks -- this looks pretty good. Looks better than pretty good. Quickly, a couple. I guess, on some of your newer products just -- on -- just want to understand how they're developing. One, Staffware, how the cross-selling's

doing. Is it -- it's still early, but are you having any traction trying to cross-sell into your current customer base or traditional customer base with the Staffware products?

VIVEK RANADIVE: Yes, John, we fully integrated Staffware into -- into the product set and into our sales organization. So we actually had good success with cross-selling. . . . So we're very, very excited about both opportunities -- the cross-selling of Staffware, as well [*22] as business events.

. . .

DINO DIANA [ANALYST, UBS]: Okay. And just lastly, in terms of Staffware renewal rates, when should we start to see them really kicking in, in terms of getting deferred revenue back?

CHRIS O'MEARA: I think you'll see that -- they, historically, had business cycles that led to a lot of license deals closing in the June and December time frame. So I think you'll see a lot of renewal activity in Q1 -- December, January time frame. They have their underlying license revenue weighted, due to a couple of specific periods during the year.

. . .

STERLING AUTY [ANALYST, JP MORGAN]: Okay. And then at the beginning of the Q&A session, I think somebody had asked your success level in possibly bringing the Staffware solution set to North America. Is that what's driving some of the growth in the -- in the insurance sector? What is the opportunity to bring Staffware to North America.

VIVEK RANADIVE: It's huge. It's huge.

*Id.* at P 53.

Additionally, during the call, defendant O'Meara issued positive guidance for the first fiscal quarter of 2005 ("Q1 05"), stating: "For Q1, we expect revenues in the range of 116 to 120 million, [*23] which represents year-over-year growth of between 56 and 60 percent." *Id.* at P 54. However, the Company also warned investors that any forward-looking statements were "subject to

[certain] risks and uncertainties." Thompson Decl. at Ex. L.

On or about December 23, 2004, the Company approved over $ 2.2 million in performance-based bonuses to the Company's senior-most executives. *Id.* at P 58. Also on December 23, 2004, defendant Ranadive appeared on a show called "Kudlow & Cramer" on CNBC and the following exchange took place:

JIM CRAMER, co-host:

All year on KUDLOW & CRAMER we have highlighted this stock. It has now doubled since we first talked about it. It's called TIBCO Software, and it is looking great. This is Vivek Ranadive; he is TIBCO's CEO. Vivek, welcome back to the show.

Mr. VIVEK RANADIVE (TIBCO CEO): Hello.

CRAMER: A monster quarter. I want people to understand -- now I saw you on a competitive network, and I felt that the guy -- hey, I didn't think the guy did that good a job, but that's OK. But one of the things that he did was he did not give you a chance to talk about what TIBCO Software does. I'm gonna give that. You picked up some new [*24] clients, Lehman, Procter, Lockheed Martin. Tell me what you do for those companies.

Mr. RANADIVE: Well, it's really simple, Jim. What we allow companies to do is manage all of their assets at real time. Companies have assets: software, ERP systems, databases, factories. And our software brings it all together for the benefit of a company.

LARRY KUDLOW, co-host: Vivek, let me throw something out I haven't seen yet; I just thought of this. It looks like we're kind of in the beginning of a merger and acquisition wave, an M&A wave, lots of takeovers and consolidations. Now wouldn't that be right up TIBCO's alley? I mean, you can make these systems mesh and reintegrate for companies that are consolidating?

Mr. RANADIVE: Absolutely. That represents huge opportunity for us. We allow you to quickly tie your systems together. In fact, if you speak to Gary

2006 U.S. Dist. LEXIS 36666, *

Loveman at Harrah's, he's doing exactly that with our software.

*Id.* at P 59.

By December 28, 2004, shares were trading at a high of $ 13.45 per share. *Id.* at P 50. Between December 27, 2004 and December 30, 2004, defendant Mashruwala sold 50,000 shares of TIBCO stock, for combined proceeds of $ 645,890. *Id.* [*25] at P 56.

On January 7, 2005, O'Meara sold 20,000 shares at a price of $ 12.57, for a total amount of $ 251,400. *Id.* at P 88.

On January 21, 2005, *ComputerWire* issued a report regarding TIBCO and the Staffware integration. The ComputerWire report stated, in part, the following;

Tibco Software, Inc. said that it has completed the integration of the acquired Staffware personnel into its own sales and engineering organizations, and it also said that the founder, former chairman and CEO of Staffware, John O'Connell, is leaving Tibco's management team. Tibco said O'Connell will still act as a strategic consultant to the company, but he is said to be pursuing other non-executive director roles outside of Tibco. O'Connell is thought to have had a big hand in promoting the initial approach for business process management (BPM) company Staffware by Tibco in April 2004.

Tibco said in its latest quarterly report that it has made a number of headcount reductions related to the acquisition of Staffware -- it set aside $ 3.2m to cover the liability incurred as a result of workforce reductions and the cancellation of marketing programs, but has thus far not said what the total headcount [*26] reduction came to.

*Id.* at P 61.

On February 14, 2005, the Company published a release on *PR Newswire* announcing the following:

PALO ALTO, Calif., Feb. 14 /PRNewswire-FirstCall/ -- TIBCO Software Inc. (NASDAQ:TIBX), a leading enabler of real-time business and the world's largest independent business integration software company, today an-

nounced that it achieved compliance with *Section 404 of the Sarbanes-Oxley Act.* Today TIBCO filed its Annual Report on Form 10-K with the Securities Exchange Commission containing its Management's Report on Internal Control over Financial Reporting. TIBCO management assessed the effectiveness of TIBCO's internal control over financial reporting and concluded that such controls were effective as of November 30, 2004.

TIBCO is one of the first companies required to test for *Section 404* compliance due to its November 30 year end and is also one of the first to obtain *Section 404* compliance. *Section 404* of the Sarbanes-Oxley Act requires companies to establish and attest to an effective control structure for reporting financial results.

"TIBCO is pleased to have achieved *Section 404* compliance -- this is an affirmation of the integrity [*27] of TIBCO's financial statements, internal controls and systems," said Vivek Ranadive, Chairman and CEO, TIBCO Software Inc. "This achievement is a testament to the hard work and determined efforts of the individuals involved on this project."

*Id.* at P 64.

Also on February 14, 2005, the Company filed its year-end Form 10-K financial report for fiscal year 2004 ("FY04"). The Form 10-K stated, in part:

On June 7, 2004, we acquired Staffware plc ("Staffware"), a provider of BPM solutions that enable businesses to automate, refine and manage their processes. The addition of Staffware's BPM solutions enabled us to offer our combined customer base an expanded real-time business integration solution, by making it easier for our customers to utilize their existing systems through real-time information exchange and automation and management of enterprise business processes regardless of where such processes reside. BPM enables companies to save time and money by driving costs and time out of business processes (for example, reducing error rates or manual steps), while at the same time ensuring that business processes are compliant with internal proce-

2006 U.S. Dist. LEXIS 36666, *

dures and external regulations. [*28] Our acquisition of Staffware also increased our distribution capabilities through the cross-selling of products into new geographic regions, as well as an expanded customer and partner base.

*Id.* at P 65. The FY04 Form 10-K was certified by defendant Ranadive and O'Meara. *Id.* at P 66.

On March 1, 2005, the Company announced that results for Q1 05, the period ending February 27, 2005, were below guidance. *Id.* at P 69. Defendants also announced that weakness in Europe and delays in closing deals would result in non-GAAP earnings per share between $ 0.04 and $ 0.05, below analysts' consensus mean of $ 0.08 earnings per share. *Id.* at P 69. The Company's preliminary data showed that Q1 05 revenues would reach only between $ 100 to $ 102 million, as compared to the FirstCall consensus mean estimate of $ 119 million. *Id.* The Company stated that the "disappointing results were primarily due to lack of execution in certain geographic areas, particularly in Europe" as well as the fact that "several transactions were delayed near the end of the quarter." Thompson Decl. at Ex. M.

Also on March 1, 2005, the Company held a conference call, during which Ranadive explained [*29] that "given the strength we were seeing in our business and pipeline coming into Q1 and as late as the first part of last week, I did not expect us to produce such disappointing results." *See* Thompson Decl. at Ex. N.

Ranadive further explained:

> Although we're still in the process of fully analyzing Q1, let me discuss with you what I do know today. First, we believe, at this point, the shortfall was primarily due to a lack of execution in certain geographic areas, most specifically Europe. In fact, every region through Europe came in significantly under forecast. . . . Unfortunately, the fundamental issue was that the extent of the shortfall emerged only very late in the quarter, giving us little time to pursue other less-developed opportunities in our broader pipeline . . .
>
> Secondly, we have several deals in both Europe and North America that were pushed out and did not close as planned . . . they're still in our pipeline, and we still expect to close them over the coming quarters.

*Id.*

Ranadive also stated that some of the problems were caused by the fact that he had been more focused on helping the Company comply with *Section 404* of the Sarbanes-Oxley [*30] Act during the quarter:

> Finally, although hard to quantify, I must also cite my personal focus on achieving 404 compliance as part of the problem. As many CEOs would appreciate, my intense focus during the quarter on making sure we successfully achieved 404 compliance took some of my attention away from sales activities. . . . I was pleased to announce our success with this several weeks ago, but I let myself get too distracted by this and was not as involved as I usually am in various key deals until later in the quarter. This was entirely my mistake.

*Id.*

In the question-and-answer period of the conference call, Ranadive answered the following questions:

> JOHN DIFUCCI, ANALYST, BEAR STEARNS: [T]he way I understand it anyway, most of your country managers in Europe were previous Staffware people. Staffware, as I understand it, was on a calendar year previously. Now they are on a TIBCO quarter year, ending in February versus March . . . I guess I'm trying to get a feel for how much of a miss is still there and how much of it could likely come into the next quarter . . . because it sounds like Europe was the issue in every region in Europe, and again these [*31] were run by pretty much the Staffware organization . . . I was wondering how much of an impact you think that had on finishing this quarter.
>
> RANADIVE: Yes, we think this is a blip . . . and you are absolutely right; we did have mingled management, and quite honestly, that led to some paralysis. There was an old TIBCO and a new TIBCO, and we had poor leadership. We're going to fix that . . .
>
> . . .

2006 U.S. Dist. LEXIS 36666, *

. . . there were differences in terms of the calendar year versus the quarter pressures, just in terms of even the process we apply to contracts, you know, the U.S. GAAP process being much more stringent, so there was a learning curve. You know, it just -- they were paralyzed during that time. We came in at a fraction of the number that we were expected to come in at . . .

*Id.*

Additionally, Ranadive discussed TIBCO's failure to execute:

KATHERINE EGBERT, ANALYST, JEFFERIES & CO.: Do you think there is any component of demand in Europe being weak, or is it just simply execution on your part?

RANADIVE: We believe it's execution, Katherine. I don't think Europe has been particularly strong over the course of the last year, but we still managed to do okay [*32] over there. We don't think it got any worse, so we believe that the fault is ours; it was execution.

*Id.*

Ranadive also discussed certain difficulties inherent in the transition from a European accounting system to an American system:

. . . Understand that they were a European company and what they consider to be revenue -- they run on a yearly basis and we are on a quarterly basis, the way that they looked at revenue under U.S. GAAP we wouldn't consider revenue. The point I'm making is, look, there were some cultural differences, there is some training to be done, and all of that combined with just 2 sets of people caused paralysis.

*Id.*

Ranadive also stated that the disappointing financial results were not apparent until the end of the quarter:

STERLING AUTY, ANALYST, J.P. MORGAN: Okay, okay. Then last question would be -- and I think somebody asked and I apologize if I am making you repeat it, but going into the quarter kind of pipeline coverage -- you are comfortable with that right up to the end and it was just the close rate at the end?

RANADIVE: That is correct.

*Id.*

Finally, Ranadive was asked to explain why the problems [*33] with Staffware did not show up until several quarters after the acquisition:

KATHERINE EGBERT, ANALYST, JEFFERIES & CO.: . . . I'm just wondering why this is basically your third quarter of integration with Staffware. What is it about the management complex that showed up in the February quarter that wasn't there previously? Did it have anything to do with the end of the year?

RANADIVE: Well, you know, there were a variety of factors, Katherine, but Q1 is seasonally the tough quarter for us always, and we did have a number of changes that we had made that really -- something during this quarter. So we had Staffware people running many of the regions. So you know basically it all came to a head this quarter and what we saw there was complete paralysis, which -- you know before things were still a different, you know, before, they were still new and we were still very involved in it; I was involved, you know, I spent a lot of time in Europe and other senior members were involved, so you know, they were -- this was the first quarter that we actually had the combined management fully functional."

*Id.*

On March 2, 2005, the Company's stock price declined, falling [*34] from a close of $ 8.90 per share in regular trading on March 1, 2005, to just above $ 7.00 the following day, on a high trading volume of over 52 million shares. *Id.* at P 75. Also on March 2, 2005, *TheStreet.com* noted that TIBCO's stock had been falling for days before the Company's March 1, 2005 an-

nouncement. *Id.* at P 76. On March 4, 2005, the same publication commented that the volume of shares traded, and the decline in stock price, immediately preceding the Q1 05 announcement was "suspicious." *Id.* at P 79.

### D. Procedural History

On May 25, 2005, plaintiff Lance Siegall ("Siegall") commenced a class action litigation against defendants TIBCO, Ranadive, O'Meara, Carey and Mashruwala for violations of *Sections 10(b)* and *20(a)* of the Securities Exchange Act of 1934 (the "Exchange Act"), and *Rule 10b-5* promulgated thereunder ("the *Siegall* complaint"). In the *Siegall* complaint, Siegall alleged, *inter alia*, that TIBCO and certain of its officers and directors violated the Exchange Act by publishing a series of materially false and misleading statements which Defendants knew, and/or deliberately disregarded, were false and materially misleading.

[*35]  On May 26, 2005, counsel for Siegall caused a notice to be published advising purchasers of TIBCO securities of (i) the pendency of the securities class action against Defendants; (ii) the claims asserted therein; (iii) the purported class period of the litigation, *i.e.* September 21, 2004 through March 1, 2005, inclusive; and (iv) the right of any member of the putative class to move the Court to serve as lead plaintiff.

Subsequently, Ronald Bernheim ("Bernheim") and James J. Guzzetti ("Guzzetti") each filed separate class action complaints in this district, on May 31, 2005 and June 10, 2005, respectively, on behalf of themselves, and all those who purchased the securities of TIBCO between September 21, 2004 and March 1, 2005 (the "*Bernheim* complaint" and the "*Guzzetti* complaint"). The allegations in the two complaints were the same, namely, they alleged, *inter alia*, that TIBCO and certain of its officers and directors violated *Sections 10(b)* and *20(a)* of the Exchange Act, and *Rule 10b-5* promulgated thereunder, by publishing materially false and misleading statements.

On July 25, 2005, Fenton and Rajasubramanian filed a Motion for Consolidation and Appointment of [*36] Lead Plaintiff. No other members of the putative class filed motions requesting to be appointed as Lead Plaintiff. On July 26, 2005 this Court ordered that the *Siegall*, *Bernheim*, and *Guzzetti* cases be deemed related.

At the time the Motion for Consolidation and Appointment of Lead Plaintiff was filed, neither Fenton nor Rajasubramanian had complied with Civil Local Rule 3-7(c), which sets forth the filing and certification requirements that parties must observe in private securities actions brought in the Northern District of California. On September 13, 2005, Defendants filed a limited opposition to the Motion for Consolidation and Appointment of Lead Plaintiff, in which they stated that they did not oppose the consolidation of the above-referenced cases, but opposed the appointment of Fenton and Rajasubramanian as Lead Plaintiffs on the grounds that Fenton and Rajasubramanian had failed to comply with Civil Local Rule 3-7.

Consequently, on November 14, 2005, this Court ordered Fenton and Rajasubramanian to submit within ten (10) days of the Order amended certifications in compliance with Civil Local Rule 3-7(c). The Court also ordered Defendants to file any objections within [*37] three days of the submission of the amended certifications. On November 23, 2005, Fenton and Rajasubramanian filed their amended certifications. No objections were filed.

On February 24, 2006, the Court granted the Motion for Consolidation and appointed Fenton and Rajasubramanian as Lead Plaintiffs.

On March 16, 2006, Lead Plaintiffs filed a Consolidated Amended Complaint. On April 17, 2006, Defendants filed the instant Motion to Dismiss.

### LEGAL STANDARD

#### A. Federal Rule of Civil Procedure 12(b)(6)

Under *Federal Rule of Civil Procedure 12(b)(6)*, a motion to dismiss should be granted if it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41,45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)*; *Everest and Jennings, Inc. v. American Motorists Ins. Co., 23 F.3d 226, 228 (9th Cir. 1994)*. [*38]  All reasonable inferences are to be drawn in favor of the plaintiff. *In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 983 (9th Cir. 1999)*. The court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981)*; *see Miranda v. Clark County, Nev., 279 F.3d 1102, 1106 (9th Cir. 2002)*.

Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint incorporates documents or alleges the contents of documents, and no party questions the authenticity of such documents, a court may also consider such documents when evaluating the merits of a *Rule 12(b)(6)* motion. *See Anderson v. Clow (In re Stac Elecs. Sec. Litig.), 89 F.3d 1399, 1405 (9th Cir. 1996)*.

Case 5:07-cv-03444-JF    Document 50-2    Filed 12/17/2007    Page 153 of 164

Page 13
2006 U.S. Dist. LEXIS 36666, *

When the complaint is dismissed for failure to state a claim, "leave to amend will be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986).* [*39] The Court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express, 885 F.2d 531, 538 (9th Cir. 1989).* Of these factors, prejudice to the opposing party is the most important. *See Jackson v. Bank of Haw., 902 F.2d 1385, 1387 (9th Cir. 1990)* (citing *Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330-31, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971)).* Leave to amend is properly denied "where the amendment would be futile." *DeSoto v. Yellow Freight Sys., 957 F.2d 655, 658 (9th Cir. 1992).*

**B. Federal Rule of Civil Procedure 9(b)**

*Federal Rule of Civil Procedure 9(b)* provides as follows:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

*Fed.R.Civ.P.9(b)* [*40] .

"[The Ninth Circuit] has interpreted *Rule 9(b)* to require that 'allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'" *Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir. 1993)* (quoting *Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985)).* "The pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)* (citing *Semegen, 780 F.2d at 731).*

**C. Pleading Requirements in Securities Fraud Actions**

*Section 10(b)* of the Exchange Act makes it unlawful "for any person . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of

such rules and regulations as the Commission may prescribe[.]" *15 U.S.C. § 78j(b).*

*Rule 10b-5,* promulgated [*41] under the authority of *Section 10(b),* in turn, provides that "[i]t shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *17 C.F.R. § 240.10b-5.* Thus, the basic elements of a *Rule 10b-5* claim are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *In re Daou Sys. 411 F.3d 1006, 1014 (9th Cir. 2005).*

In order to survive a motion to dismiss, a *Section 10(b)* claim must satisfy three pleading standards. First, it must meet the general requirements established by *Federal Rule of Civil Procedure 8(a)* that complaints give a short [*42] and plain statement of the claim. Second, it must conform with the particularity requirements of *Rule 9(b).* *Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir. 1993)* (quoting *Semegen, 780 F.2d at 731).* Third, it must satisfy the requirements of the Private Securities Litigation Reform Act ("PSLRA").

The PSLRA employs heightened pleading standards for claims brought under *Section 10(b)* and, similar to *Rule 9(b),* requires pleading with particularity for two elements in a *Section 10(b)* claim: (1) falsity and (2) scienter. *See Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir. 2002)* (citing *)Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001).* "If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, the court must dismiss the complaint." *Carol Gamble Trust 86 v. E-Rex, Inc., 84 Fed. Appx. 975, 977 (9th Cir. 2004).*

Thus, under both the PSLRA and *Rule 9(b),* a plaintiff must specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. *See 15 U.S.C. § 78u-4(b)(1); Fed. R. Civ. P. 9(b)* [*43] . This is accomplished by identifying either (1) inconsistent contemporaneous statements; or (2) inconsistent contemporaneous information (such as an internal document) that was made by or available to the defendants. *In re Splash Tech. Holdings Sec. Litig., 2000 U.S. Dist. LEXIS 15369, 2000 WL 1727377, *13 (N.D. Cal. 2000); see also Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004).*

2006 U.S. Dist. LEXIS 36666, *

When dealing with allegations based on information and belief, and not plaintiff's personal knowledge, the PSLRA imposes further pleading requirements. Allegations are deemed to be held on information and belief, and thus subject to the particularity requirements, unless plaintiffs have personal knowledge of the facts. *Fischer v. Vantive Corp.(In re Vantive Corp. Secs. Litig.), 283 F.3d 1079, 1085 n.3 (9th Cir. 2002).* Any allegation that is made on information and belief, must "state with particularity all facts on which that belief is formed." *15 U.S.C. § 78u-4(b)(1).* "Naming sources is unnecessary so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by [*44] the source would possess the information alleged and the complaint contains adequate corroborating details." *Daou, 411 F.3d at 1015* (citing *Nursing Home, 380 F.3d at 1233).* Therefore, to sufficiently plead falsity, a plaintiff must: (1) identify each alleged misstatement, and in the case of group published information, ascribe some authorship or control over the documents to the individual defendants; (2) state the reasons why the statement is misleading; and (3) in the case of confidential source information, supply an adequate factual basis to support the source's basis of knowledge with regard to the information provided. *See 15 U.S.C. § 78u-4(b)(1).*

With respect to scienter, the PSLRA also requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendants] acted with the required state of mind" for each alleged act or omission. *15 U.S.C. § 78u-4(b)(2).* "Deliberate recklessness" is the required state of mind and will satisfy scienter if it "reflects some degree of intentional or conscious misconduct." *Nursing Home, 380 F.3d at 1230* [*45] (citing *In re Silicon Graphics Sec. Litig., 183 F.3d 970, 977 (9th Cir. 1999).* A complaint will not survive if it just relies on generic allegations. *See Silicon Graphics, 183 F.3d at 974, 985.* To assess whether a plaintiff has sufficiently pled scienter, a court must consider "whether the total of plaintiff's allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Nursing Home, 380 F.3d at 1230.* Additionally, a court must consider "all reasonable inferences, whether or not favorable to the plaintiff." *Id.* (citing *Gompper, 298 F.3d at 897*).

## ANALYSIS

### I. Defendants' Request for Judicial Notice

As a preliminary matter, Defendants have requested that the Court take judicial notice of the following documents, each of which is attached to the Declaration of Reginald S. Thompson ("Thompson Declaration"):

(a) excerpts from TIBCO's Form 10-K for fiscal year 2005, filed with the SEC on February 10, 2006;

(b) excerpts from TIBCO's 2005 Revised Proxy Statement on Schedule 14A, filed with [*46] the SEC on March 18, 2005;

(c) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on October 17, 2005;

(d) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on April 23, 2004;

(e) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on June 17, 2004;

(f) excerpts from TIBCO's Form 10-Q for the quarter ended May 30, 2004, filed with the SEC on July 7, 2004;

(g) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on September 21, 2004;

(h) excerpts from TIBCO's Form 10-Q for the quarter ended August 29, 2004, filed with the SEC on October 13, 2004;

(i) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on December 22, 2004;

(j) excerpts from TIBCO's Form 10-K for fiscal year 2004, filed with the SEC on February 14, 2005;

(k) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on March 1, 2005;

(l) several Forms 4 filed with the SEC on behalf of Mashruwala between September 21, 2004 and March 1, 2005;

(m) several Forms 4 filed with the SEC on behalf of Mashruwala between September 2003 [*47] and March 2004;

(n) excerpts from TIBCO's Form 10-Q for the quarter ended February 27, 2005, filed with the SEC on April 8, 2005;

(o) a TIBCO Form 8-K and the press release attached thereto, filed with the SEC on March 24, 2005;

2006 U.S. Dist. LEXIS 36666, *

(p) the transcript of TIBCO's quarterly earnings conference call regarding its results for the quarter and fiscal year ended November 30, 2004;

(q) the transcript of TIBCO's quarterly earnings conference call regarding its preliminary results for the quarter ended February 27, 2005; and

(r) a January 21, 2005 *Computer Wire* article entitled "TIBCO Says Staffware Personnel Integration Complete."

The Court finds that judicial notice is proper for the following reasons. First, pursuant to *Federal Rule of Evidence 201*, documents alleged in a complaint and essential to a plaintiff's allegations may be judicially noticed. *See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994); Steckman v. Hart Brewing, Inc. 143 F.3d 1293, 1295 (9th Cir. 1998)*. A court may also take judicial notice of documents on which allegations in the complaint necessarily rely, even if not expressly [*48] referenced in the complaint, provided that the authenticity of those documents are not in dispute. *In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 837-38 (N.D. Cal. 2000)*. Additionally, a court may take judicial notice of Forms 4 filed with the SEC, which are deemed incorporated by reference into a complaint when a plaintiff's allegations rely on a defendant's stock sales. *Silicon Graphics, 183 F.3d at 986*. Further, Plaintiffs do not oppose the taking of judicial notice of any of the aforementioned documents. Accordingly, the Court hereby GRANTS Defendants' Request for Judicial Notice.

**II. Defendants' Motion to Dismiss**

In Defendants' Motion to Dismiss, Defendants argue that the Consolidated Amended Complaint should be dismissed because: (1) Plaintiffs have not plead sufficient facts to establish the element of scienter; (2) Plaintiffs have not alleged an adequate factual basis for their claims; and (3) Plaintiffs have not alleged any actionable false statements. Defendants also urge the Court to reject the "group pleading" standard and therefore dismiss the claims against Mashruwala. Additionally, Defendants ask the Court to dismiss [*49] Plaintiffs' *Section 20(a)* claim on the grounds that Plaintiffs have failed to establish a *Section 10(b)* violation and/or have otherwise failed to allege that Mashruwala and Carey had the requisite power to control TIBCO, either directly or indirectly.

**A. Scienter**

Defendants correctly assert that Plaintiffs have failed to allege scienter with the requisite particularity. To satisfy the PSLRA, Plaintiffs must state with particularity facts giving rise to a *strong* inference that either Defendants knew, at the time that certain forward-looking statements were made, that the statements were false, or, with respect to historical statements, that Defendants acted in a conscious and reckless manner. *See 15 U.S.C. § 78u-4(b)(2); Silicon Graphics, 183 F.3d at 974*. In reviewing the sufficiency of the complaint, the Court must consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper, 298 F.3d at 897*. Thus, to survive dismissal, a strong inference of scienter must be "the most plausible of competing inferences." *Id*.

Here, the Company -- and defendant [*50] Ranadive in particular -- specifically stated that the disappointing Q1 05 results were *not* known until the week immediately preceding the close of the quarter, after any of the allegedly false or misleading statements were made. *See* Thompson Decl. at Ex. N ("[G]iven the strength we were seeing in our business and pipeline coming into Q1 and as late as the first part of last week, I did not expect us to produce such disappointing results."). Defendant Ranadive further explained that he was not as focused on sales activities during the first quarter of fiscal year 2005 because he was involved in the Company's efforts to comply with the Sarbanes-Oxley Act. *Id*. at Ex. N ("As many CEOs would appreciate, my intense focus during the quarter on making sure we successfully achieved 404 compliance took some of my attention away from sales activities. . . . I was pleased to announce our success with this several weeks ago, but I let myself get too distracted by this and was not as involved as I usually am in various key deals until later in the quarter."). From these statements, the Court may reasonably infer that Defendants may not have been aware of the extent of the Company's [*51] problems until after the purportedly false statements were made. As such, Plaintiffs must allege facts that overcome Defendants' proffered reasons for the discrepancy in the actual Q1 05 results and the previous statements made by the Company. Plaintiffs have failed to do so.

For example, Plaintiffs rely heavily on allegations that merely show that Defendants "must have known" about certain unspecified "adverse undisclosed information" because of their positions with the Company. *See* CAC at PP 19, 71, 73, 86-87. However, in the Ninth Circuit, such allegations are insufficient to establish a strong showing of scienter as a matter of law and Plaintiffs' citation to a non-binding district court case outside of this circuit does not alter this conclusion. *See In re Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181, 1183 (N.D. Cal. 2000), aff'd, 335 F.3d 843 (9th Cir. 2003)*.

Case 5:07-cv-03444-JF    Document 50-2    Filed 12/17/2007    Page 156 of 164

Page 16
2006 U.S. Dist. LEXIS 36666, *

Plaintiffs' confidential witnesses also fail to provide information that would suggest that Defendants either knew that the false statements being made were false *when made* or that they were acting in a deliberately reckless manner. In fact, the only information attributed [*52] to CW3, who is a former National Account Director working out of the New York office, is that Ranadive and Mashruwala were *generally* "responsible for the planning and execution of TIBCO's integration of Staffware after its acquisition." *Id.* at P 71. CW3 also asserts in a vague and conclusory manner that the "issues with executing sales" were "attributable to the Staffware acquisition." [3] *Id.* As to CW5, a Senior Manager of IT Operations during the relevant period, Plaintiffs allege that he contends that it was "known internally" that the failure to complete some Staffware-related debts contributed to the Q1 05 earnings shortfall. *Id.* at P 71. CW5 also contends that Defendants' "knowledge" of "the connection between the Staffware acquisition and TIBCO's Q1 05 earnings miss" is "corroborated" by the fact that Ranadive "blamed Staffware for the miss." *Id.* at P 71. The insufficiency of these allegations is readily apparent; Plaintiffs utterly fail to provide information showing who specifically knew the information, how they knew it, what information was known, and when it was known. [4] In light of the fact that defendant Ranadive has stated that he did not know that [*53] the Company was going to "miss" until the week before the close of the quarter, and has provided plausible reasons as to why he was not aware of this fact, neither CW3 nor CW5's allegations assist Plaintiffs in meeting the stringent pleading requirements regarding scienter. Further, even if this information were enough to establish scienter for Ranadive and Mashruwala, which it is not, it provides *no* information pertaining to O'Meara or Carey's knowledge or intent.

    3    Elsewhere in the Consolidated Amended Complaint, Plaintiffs allege that CW3 "confirmed that after the Staffware acquisition until December 2004, Staffware and TIBCO remained separate for sales purposes." CAC at P 90. CW1 also states that he did not sell Staffware products until December 2004. *Id.* However, Plaintiffs fails to demonstrate how any of these statements relate to Defendants' knowledge or intent to deceive the marketplace.

    4    CW5's information pertaining to whether Staffware's email had been integrated is completely irrelevant. CAC at P 74. Plaintiffs have not alleged any facts showing how the integration of Staffware's email had any material effect, if any, on the Company's quarterly results.

[*54] The information provided by CW2, CW4, and CW6 is similarly deficient. CW2, who was a TIBCO General Manager within the OEM sales channel in Austin, Texas from 2003 through 2004, states only that Ranadive was "personally involved in major sales transactions" and that "each quarter, TIBCO seemed to be reliant on a large sales deal that would be finalized by Ranadive." CAC at P 72. Based on this information, Plaintiffs ask the Court to conclude that "defendant Ranadive (among others), was continually apprised of, and involved in, all significant sales deals and, therefore, knew about the sales issues caused by the Staffware acquisition and its incomplete and/or unsuccessful integration." *Id.* However, CW2's allegations are not inconsistent with the Company's proffered reasons for belatedly realizing that the Company was going to miss its numbers for the first quarter; in fact, defendant Ranadive specifically stated that the reason why the Company failed to meet expectations was due to the fact that he was *not* as involved in sales activities as he had been in prior quarters. As such, CW2, who was employed only through 2004 and therefore was not at the Company during the months preceding [*55] the close of the first quarter of 2005, provides very little clarity -- if any -- as to Ranadive's knowledge, or lack thereof, during the critical period. And, again, the information provided by CW2 fails to speak to O'Meara, Carey, or Mashruwala's involvement in the alleged fraud at all.

As to CW4, a former Staffware/TIBCO Finance Director and the only confidential witness to supply any information pertaining to Carey, Plaintiffs only vaguely contend that CW4 has stated that Carey was "responsible for, and directed, the financial accounting integration of the two companies," "visited Staffware headquarters in London frequently," and "spoke with Staffware personnel about the integration of Staffware into TIBCO." CAC at P 73. CW4 also contends that "TIBCO handled the Staffware acquisition horribly, and that there were difficulties with the integration, including a major culture clash between the two companies." *Id.* Plaintiffs fail to allege, however, whether the "difficulties" with the integration are the same "difficulties" that caused the Q1 05 results, whether Carey knew that these "difficulties" were going to affect the Company's financial results and, if so, *when* Carey [*56] became aware of this information. Finally, with respect to CW6, who was a Pre-Sales Consultant at TIBCO from early 2005 through the fall of 2005, Plaintiffs allege only that CW6 was trained to "pitch" TIBCO and Staffware products together, that the products did not, in fact, work together, and that the Company was in the process of trying to make the products compatible. *Id.* at P 92. The information provided by CW6 does not appear to support Plaintiffs' securities fraud theory because CW6 appears to have *started* working at the Company at the end of the class period and at

the time, or after, the "truth" was purportedly "revealed"; in any event, CW6's information is not clearly linked to any knowledge or fraudulent intent of any of the named Defendants.

Plaintiffs' allegations regarding certain Individual Defendants' stock sales also fall short of meeting the required pleading standard, even when considered together with all of the rest of the allegations in the Consolidated Amended Complaint. First, the only persons alleged to have sold any stock during the purported class period are defendants Mashruwala and O'Meara. [5] Ranadive -- who is the person alleged to have the greatest [*57] access to "inside" information regarding the Staffware integration -- did not sell any stock during the relevant period, despite the fact that he holds more than *14 million* TIBCO shares and vested options. *See* Thompson Decl. at Ex. C. Carey, the Corporate Controller and Chief Accounting Officer, also did not sell any stock.

> 5   The Consolidated Amended Complaint also alleges that certain other "insiders" -- *i.e.* Murry Rode (Executive Vice President) and William Hughes (General Counsel) -- sold stock during the relevant period. However, as this Court has noted on a prior occasion, when there are no allegations in the complaint pertaining to these other persons -- and specifically, no allegations showing that the other "insiders" possessed non-public adverse information -- such factual allegations are irrelevant. As such, these allegations have not been considered. *In re Splash Tech. Holdings Secs. Litig.*, 160 F. Supp. 2d 1059 at 1082 n. 22 (2001).

Further, as stated by the Ninth Circuit, "not every sale of stock by a corporate [*58] insider shows that the share price is about to decline," and as such, a plaintiff must allege "unusual" or "suspicious" stock sales. *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). "[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Id.* There are three factors relevant to this analysis: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.* Here, Defendants have shown that O'Meara and Mashruwala are alleged to have sold only 2.3% and 17.2% of their class period holdings for total proceeds of $ 251,000 and $ 1.3 million, respectively. *See* Mot. at 22. While Plaintiffs are correct that there is no "bright line test" as to the amount or percentage of stock that must be sold to constitute a "suspicious amount," courts within this district have consistently

declined to categorize stock sales similar to the ones alleged in the instant case as "suspicious." *In re Netflix, Inc. Secs. Litig.*, 2005 U.S. Dist. LEXIS 18765, 2005 WL 1562858, at *8 (N.D. Cal. 2005) [*59] (sales of 7.5% of holdings for $ 12 million in proceeds, 1% of holdings for $ 135,000 in proceeds, and 15.7% for $ 2 million in proceeds not suspicious); *Wu Group v. Synopsys, Inc.*, 2005 U.S. Dist. LEXIS 42351, 2005 WL 1926626, at *10 (N.D. Cal. 2005) (sales of 6% of holdings for $ 7 million in proceeds and 38% of holdings for $ 2.9 million in proceeds not suspicious).

Moreover, the timing of O'Meara's stock sales is not necessarily suspicious because it coincided with TIBCO's announcement of its fourth quarter and year-end fiscal results. As the Ninth Circuit has noted, "[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures." *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002). Thus, the fact that O'Meara sold a small portion of his total holdings following the positive announcement of TIBCO's year-end and fourth quarter earnings does not support a strong inference of scienter. *Id.* Further, the fact that O'Meara was only one of two Individual Defendants to sell his stock during the class period actually *negates* a finding that [*60] the Defendants were engaged in fraud. *Id.* Again, as the Ninth Circuit has repeatedly held, the well-timed sales of one or two defendants' stock does not support the strong inference required by the PSLRA when the rest of the equally knowledgeable defendants act in a way *inconsistent* with the inference that the favorable characterizations of the company's affairs were known to be false when made. *Ronconi*, 253 F.3d at 436. Further, the 125,000 shares of stock that Mashruwala sold during the class period were not "dramatically out of line" with the 121,000 shares of stock he sold between September 2003 and March 2004, the same time period in the preceding year. *See* Thompson Decl. at Ex. Q. As such, the stock sales identified in the Consolidated Amended Complaint neither establish the requisite element of scienter nor bolster Plaintiffs' other scienter allegations.

Plaintiffs also rely on other additional facts in order to plead scienter, such as: (1) the fact that $ 2.2 million in bonuses were distributed to senior executives in December 2004; and (2) the fact that TIBCO authorized a $ 50 million stock buy-back plan at the beginning of the class period. [6] [*61] These additional facts, even when considered in the aggregate, do not support Plaintiffs' case. First, quite tellingly, Plaintiffs do not identify a *single* Ninth Circuit or Northern District of California case in their Opposition brief that supports their assertion that any of these factors are legally relevant to establishing scienter. In fact, with respect to the executive bo-

2006 U.S. Dist. LEXIS 36666, *

nuses, Plaintiffs *concede* that allegations concerning incentive compensation are insufficient as a matter of law to plead scienter. *See* Opp. at 23-24; *see also In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 845 (N.D. Cal. 2000).* Further, while Plaintiffs clearly allege that the bonuses were tied to the year-end results for fiscal year 2004, Plaintiffs do not allege any facts showing that the fiscal year 2004 results were misstated or otherwise inaccurate. As to the stock buy-back plan, Plaintiffs fail to respond to the authorities Defendants cited in their Motion showing that stock repurchase programs actually *negate* a finding of scienter. *See, e.g., Matthews v. Centex Telemanagement, Inc.,* 1994 WL 269734, at *8 (N.D. Cal. 1994) ("It would have made no [*62] sense to purchase that stock if defendants knew the prices to be inflated.").

> 6  Plaintiffs also point to the fact that TIBCO acquired General Interface during the class period, but utterly fail to explain -- in any way -- how this creates a strong inference of scienter. As Defendants point out, General Interface was purchased for $ 3.5 million in cash and no stock was used in the acquisition. *See* Thompson Decl. at Ex. K. Plaintiffs' argument that "defendants would not have obtained support for that acquisition from investors and analysts unless they believed that TIBCO's acquisition of Staffware had already proceeded smoothly and was substantially complete" is mere speculation unsupported by any factual allegations in the Consolidated Amended Complaint. *See* Reply at 13:15-21; Thompson Decl. at Ex. K.

In sum, the Ninth Circuit has clearly held that" [i]n order to show a strong inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating intent, as opposed to mere [*63] motive and opportunity." *Silicon Graphics, 183 F.3d at 974.* Here, even when all of the factual allegations are considered together, Plaintiffs have not even shown that Defendants were *motivated* to commit fraud, much less that they acted with deliberate or reckless intent. This failure, alone, merits dismissal of the Consolidated Amended Complaint.

**B. Factual Bases for Consolidated Amended Complaint**

Defendants have also shown that the Consolidated Amended Complaint is deficient because its lacks sufficiently credible, reliable bases for its allegations. The PSLRA requires "that a plaintiff must provide, *in great detail,* all relevant facts forming the basis for his belief." *In re Silicon Graphics, 183 F.3d at 984-85* (emphasis added). In their Opposition brief, Plaintiffs correctly note

that the basis for a securities complaint "can come from any number of sources, including SEC filings, regulatory filings and reports, securities analysts' reports, advisories about the Company, press releases, and other public statements issued by the Company, *so long as they indicate defendants committed fraud.*" Opp. at 7 (emphasis added). The only [*64] sources that Plaintiffs have identified, however, which purport to show that the Company's statements were false when made, *or* that the Defendants acted with the requisite intent, are Plaintiffs' confidential witnesses. The allegations pertaining to the confidential sources, however, fall short of the standard set forth in *Daou Sys.. Id. at 1015.*

For example, in addition to the deficiencies already set forth above with regard to the confidential witnesses' statements regarding the Individual Defendants' knowledge, motive, or intent, Plaintiffs have not alleged sufficient facts showing that the confidential witnesses are reliable sources for establishing falsity. In particular, Plaintiffs have not alleged that any of the confidential witnesses took part in any decision-making processes at TIBCO. Plaintiffs also fail to state where two of the witnesses worked, and, with respect to the other four witnesses, admit that they worked outside of the Company's headquarters in Palo Alto, where all of the Individual Defendants are located. *See Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 148 (3rd Cir. 2004)* (finding [*65] allegations unreliable where "[p]laintiffs heavily rely on former employees who worked in Chubb's local branch offices for information concerning" company-wide decisions made by senior management).

Moreover, as Defendants point out in their Motion, the descriptions of the duties performed by most of the witnesses do not satisfactorily demonstrate that the witnesses would know the information that is ascribed to them. *See, e.g., In re Bus. Objects S.A. Secs. Litig., 2005 U.S. Dist. LEXIS 20215, 2005 WL 1787860, at *6 (N.D. Cal. 2005)* (rejecting allegations where "the Amended Complaint provides no more than the job title of the confidential witnesses . . . and fail[s] to provide any other detail regarding his or her job description and responsibilities"). For instance, Plaintiffs do not make clear to whom the witnesses reported or who reported to them. *See, e.g., Daou Sys., 411 F.3d at 1016* (in assessing witness'reliability court should consider whether plaintiffs have alleged witness' direct reports as well as to whom the witness reported). As to CW3, who is described as a "Staffware/TIBCO National Account Director in New York . . . responsible for sales of Staffware [*66] product that were used globally," CAC P 25(c), Plaintiffs do not allege any facts showing whether CW3 was involved in TIBCO's forecasting or integration processes or even had contact with the Individual Defendants. *See, e.g., In re Silicon Storage Tech., Inc. Sec. Litig., 2006 U.S. Dist.*

LEXIS 14790, 2006 WL 648683, at *14 (N.D. Cal. 2006) (holding allegations insufficient where "[p]laintiffs describe th[e] informant's duties only briefly, without any indication of what is meant by 'production control' or 'tracking shipments and inventory'"). Similarly, the job descriptions provided for CW4 and CW6 do not indicate whether those witnesses had any specific knowledge regarding the Staffware acquisition or TIBCO's forecasting process.

Thus, due to these noted deficiencies in the Consolidated Amended Complaint, Plaintiffs' reliance on *Novak v. Kasaks*, 216 F.3d 300, 312-13 (2nd Cir. 2000) is misplaced. In contrast to the instant case, the *Novak* complaint identified numerous *documentary sources* which provided *specific* facts concerning the company's significant write-off of inventory following the class period, which supported the plaintiffs' contention that the [*67] inventory was seriously overvalued at the time the purportedly misleading statements were made. *Id.* Again, Plaintiffs have not identified any such documentary sources here.

### C. Falsity

Plaintiffs have also failed to sufficiently establish falsity. In order to establish falsity, Plaintiffs must identify "each statement alleged to have been misleading" and state "the reason or reasons why the statement is misleading." *15 U.S.C. § 78u-4(b)(1)*. They must also allege, with particularity, "contemporaneous statements or conditions" that are "inconsistent" with the challenged statement so as to demonstrate that it was false when made. *Nevius v. Read-Rite Corp. (In re Read-Rite Corp. Secs. Litig.),* 335 F.3d 843, 846, 848 (9th Cir. 2003); *Ronconi, 253 F.3d at 433-34.*

In the Consolidated Amended Complaint, Plaintiffs identify four types of allegedly false statements: (1) statements describing the anticipated benefits from the TIBCO/Staffware merger; (2) statements relating to the integration of Staffware; (3) certifications of TIBCO's financial statements and a press release announcing its compliance with the Sarbanes-Oxley Act; and (4) TIBCO's Q1 05 [*68] revenue forecast.

### 1. Alleged Benefits of the TIBCO/Staffware Merger

With respect to the Company's statements pertaining to the alleged benefits of the TIBCO/Staffware merger, Plaintiffs challenge the following statements: (i) statements that TIBCO's Q3 04 and Q4 04 financial results reflected contributions from Staffware, CAC PP 38, 51; (ii) statements to the effect that TIBCO had gained sales leverage in Europe as a result of the merger, CAC at P 40; (iii) a statement that TIBCO was, at the close of Q3 04, in a "better position . . . than at any time in [its] his-

tory," CAC at P 39; and (iv) statements to the effect that the addition of Staffware allowed TIBCO to offer an expanded product/solution to an expanded customer base, CAC at PP 42, 65. [7]

> 7    The Consolidated Amended Complaint also refers to several statements made by analysts. *See* CAC PP 40, 48-50, 53, 55, 78, 87. However, as Defendants correctly point out, Plaintiffs never allege that the analysts' statements were false, that there was a flow of information between the Defendants and the analysts, or that Defendants ever adopted the analysts' statements as their own. As such, Plaintiffs cannot rely on these statements to establish securities fraud. *See Copperstone*, 1999 WL 33295869, at *7-8. However, the statements published in *Computer Wire* discussed more fully below quote directly from the Company and are therefore clearly statements made by the Company. They are therefore actionable. *See Nursing Home*, 380 F.3d at 1234.

[*69] However, Plaintiffs do not identify any allegations in the Consolidated Amended Complaint that actually support their contention that TIBCO's Q3 04 and Q4 04 financial results did *not* reflect contributions from both TIBCO and Staffware. Further, Plaintiffs do not specifically contest the accuracy of the results for those quarters and, instead, readily admit that TIBCO's Q3 04 and Q4 04 results exceeded expectations. CAC at PP 38, 51-52. Plaintiffs also do not identify any facts demonstrating that the Staffware acquisition did not create sales leverage in Europe, or that it did not allow TIBCO to offer an expanded product to an expanded customer base. In fact, with respect to the latter, Plaintiffs cite only to CW6's allegation that the products did not "work together." However, CW6's belief that the products did not "work together" is not necessarily inconsistent with the Company's assertion that the Staffware acquisition allowed TIBCO to offer a broader product solution to an expanded customer base.

### 2. Integration of Staffware

Plaintiffs's allegations intended to show the falsity of statements relating to the integration of Staffware are also unavailing. The purportedly [*70] false statements regarding integration are: (i) a statement by Ranadive during the Q3 04 conference call that TIBCO moved quickly to blend the two sales organizations and offered a common "storefront," CAC P 40; (ii) a statement by Ranadive on the Q4 04 conference call that Staffware was "fully integrated" into the product set and sales organization, CAC at P 53; and (iii) a statement in a January 21, 2005 *ComputerWire* report that TIBCO had com-

pleted the integration of Staffware personnel into the TIBCO sales organization, CAC at P 61.

To show that these statements were false, Plaintiffs rely on the allegations of CW1, CW3 and CW5. *See* CAC at PP 71-74. CW5, however, was an IT Operations Manager, and is not described as being personally knowledgeable about the Company's *sales* efforts, only whether the Company's *email* was fully operational. CAC at PP 71, 74. Further, as Defendants point out, CW3's contention that TIBCO and Staffware remained separate for sales purposes until December 2004 is entirely consistent with Ranadive's statement, in December 22, 2004, that the integration of the sales organization had just been completed. Similarly, CW1's statement that "his [*71] commission structure" did not include any Staffware products until December 2004 is also consistent with Ranadive's statement and therefore does not clearly demonstrate that it was false. Nor do the Company's Q1 05 disclosures regarding a certain "paralysis" of the sales team late in the first quarter indicate that the statements in the January 21, 2005 *ComputerWire* article were false when made. In fact, the Q1 05 disclosures suggest that the Company did not know that there would be problems until *after* the sales personnel were combined. *See* Thompson Decl. at Ex N ("So you know basically it all came to a head this quarter and what we saw there was complete paralysis, which -- you know *before things were still a different*, you know, *before, they were still new* and we were still very involved in it; I was involved, you know, I spent a lot of time in Europe and other senior members were involved, so you know, they were -- *this was the first quarter that we actually had the combined management fully functional*") (emphasis added).

### 3. Certifications regarding Financial Compliance

Plaintiffs have also failed to sufficiently allege that certain [*72] financial statement certifications made by Ranadive and O'Meara, as well as the press release announcing TIBCO's compliance with the Sarbane-Oxley Act, were false. In their Motion, Defendants correctly point out that there are *no* allegations in the Consolidated Amended Complaint demonstrating the falsity of any of the Company's certifications. In their Opposition, Plaintiffs respond by arguing that the financial certifications "omitted" the "material fact" that TIBCO lacked sufficient internal controls because Ranadive admitted that "Staffware's revenue recognition policies did not conform to the standards of GAAP." However, in making this assertion, Plaintiffs grossly mischaracterize Ranadive's statements regarding Staffware and its revenue recognition policies. The statements Ranadive made during the March 1, 2005 conference call pertaining to GAAP were as follows:

. "[T]here were differences in terms of the calendar year versus the quarter pressures, just in terms of even the process we apply to contracts, you know, the U.S. GAAP process being much more stringent, so there was a learning curve."

. Understand that they were a European company and what they consider [*73] to be revenue -- they run on a yearly basis and we are on a quarterly basis, the way that they looked at revenue under U.S. GAAP we wouldn't consider revenue. The point I'm making is, look, there were some cultural differences, there is some training to be done . . ."

Thompson Decl. at Ex. N. These statements do not, in any way, even suggest that TIBCO lacked "internal controls" or was improperly recognizing revenue. Moreover, Plaintiffs fail to adequately address the fact that TIBCO's independent auditors, PricewaterhouseCoopers, *confirmed* that "the Company maintained, in all material respects, effective internal control over financial reporting[.]" *Id.* at Ex. K. Accordingly, Plaintiffs have failed to state a claim based on the certifications and the statements regarding Sarbanes-Oxley compliance. *See Morgan v. AXT, Inc., 2005 U.S. Dist. LEXIS 42346, 2005 WL 2347125, at *15 (N.D. Cal. 2005)* (dismissing action because plaintiff had not alleged particularized facts supporting his claim that Sarbanes-Oxley certifications were false); *In re Invision Techs., Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 12166, 2006 WL 538752, at *6 (N.D. Cal. 2006)* (same).

### 4. Q1 05 Revenue Forecast

Plaintiffs have [*74] also failed to demonstrated the falsity of the December 22, 2004 Q1 05 revenue forecast. Plaintiffs only vaguely contend that there were certain unspecified "difficulties with sales in Europe" and that the forecast had "no reasonable basis" and was "wholly unrealistic and unattainable." Significantly, Plaintiffs fail to identify any *contemporaneous* information or documents showing that O'Meara's forecast was *false* at the time it was made. For example, while CW3 alleges that there were "execution" issues with sales in Europe, CW3 does not specify *what* those execution issues were, *when* they occurred, *when* they were *known*, and *who* knew about them. The information provided by CW5 -- who states only that "it was known internally at the Company that the failure to complete some Staffware-related sales

2006 U.S. Dist. LEXIS 36666, *

deals contributed to the Q1 05 earnings shortfall" -- is even more deficient. Indeed, the Company readily admitted that the failure to complete some Staffware-related sales deals contributed to the earning shortfall; Plaintiffs have not set forth any particularized allegations, however, showing that the Company knew in December 2004 that the "problems" with Staffware [*75] meant that these deals definitely would *not* close.

More importantly, Defendants have also shown that the statements made by O'Meara and Ranadive during the December 22, 2004 conference call pertaining to the Q1 05 revenue forecast and the Company's outlook for the first quarter of fiscal year 2005 were forward-looking statements that are not actionable as a matter of law. The PSLRA carves out a safe harbor from liability for forward-looking statements that prove false if the statement "is identified as a forward-looking statement and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *15 U.S.C. § 78u-5(c)(1)(A)(i); Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir.1999).* The purpose behind this safe harbor is to encourage the disclosure of forward-looking information. H.R. Conf. Rep. No. 104-369, 104th Cong. 1 st Sess., at 53 (1995). Whether a statement qualifies for the safe harbor is an appropriate inquiry on a motion to dismiss. *15 U.S.C. 78u-5(e).*

A forward-looking statement includes a statement containing [*76] a projection of revenues, income, or earnings per share, management's plans or objectives for future operations, and a prediction of future economic performance. *15 U.S.C. § 78u-5(i)(1)(A)-(C).* In addition, any statement of "the assumptions underlying or relating to" these sorts of statements fall within the meaning of a forward-looking statement. *15 U.S.C. § 78u-5(i)(1)(D).* Although statements concerning historical or current facts are not forward-looking, a present-tense statement can qualify as a forward-looking statement as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made. *See Harris, 182 F.3d at 805; Gross v. Medaphis Corp., 977 F. Supp. 1463, 1473 (N.D.Ga. 1997); In re Valujet, Inc. Sec. Litig., 984 F. Supp. 1472, 1479 (N.D. Ga. 1997).* Oral statements are also protected by the safe harbor provision if the speaker refers to warnings in a "readily available document." *15 U.S.C. § 78u-5(c)(1)(A).* So long as the safe harbor requirements are met, liability cannot exist as a matter of law, [*77] regardless of the mind of the person making the statement. *Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox, 353 F.3d 1125, 1133 (9th Cir. 2004).*

Here, the following statements qualify as forward-looking under the safe-harbor provision: (1) that Staffware would see "a lot of renewal activity in [the] Q1 -- December, January time frame," CAC at P 53; (2) that TIBCO's opportunity to bring Staffware to North America was "huge," CAC at P 53; and (3) that Staffware "expect[ed] revenues in the range of 116 to 120 million" in Q1, CAC at P 54. These statements clearly pertain to projected revenues, management's plans or objectives for future operations, and/or predictions regarding future economic performance. *15 U.S.C. § 78u-5(i)(1)(A)-(C).*

Additionally, all of these statements were accompanied by the appropriate cautionary language. First, the conference call itself was preceded by cautionary language. *See* Thompson Decl. at Ex. L. In fact, the warning at the outset of the call noted that the call would include forward-looking statements, specified the types of such statements, cautioned that actual results could differ, [*78] and directed listeners to the sections of TIBCO's most recent Forms 10-K and 10-Q that would provide further information regarding the relevant risk factors. *Id.* Further, in the press release included in the Form 8-K issued on December 22, 2004, the Company warned:

> This release contains forward-looking statements within the meaning of the "safe harbor" provisions of the federal securities laws, including, without limitation, statements regarding the growth of the Integration market, TIBCO's increased market share and the demand for TIBCO's integration platform. Actual results could differ materially from such forward-looking statements if demand for TIBCO's products and services or economic conditions affecting the market for TIBCO's products and services fluctuate, if TIBCO is unable to successfully compete with existing or new competitors or if TIBCO cannot successfully execute its growth plans. Additional information regarding potential risks is provided in TIBCO's filings with the SEC, including its most recent Annual Report on Form 10-K and its Form 10-Q for the quarter ended August 29, 2004. TIBCO assumes no obligation to update the forward-looking statements included [*79] in this release.

Thompson Decl. at Ex. J. In the Form 10-Q for the quarter ended August 29, 2004, which was referenced in the December 22, 2004 Form 8-K, the Company disclosed that "*Any failure to successfully integrate Staffware's business operations could adversely affect our financial results.*" *See* Thompson Decl. at Ex. I. Some of the "challenges" the Company identified in the Form 10-Q with respect to the integration of Staffware were: (1)

2006 U.S. Dist. LEXIS 36666, *

inconsistencies in standards, controls, procedures and policies, and compensation structures between TIBCO and Staffware; (2) unanticipated delays in or expenses related to the integration of operations; (3) conducting adequate training of employees and modifying operating control standards in areas specific to U.S. corporations such as U.S. GAAP and requirements under the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated thereunder; (4) costs and delays in implementing common systems and procedures, including financial accounting systems and customer information systems; (5) consolidating corporate and administrative infrastructure, particularly in light of Staffware's decentralized international corporate [*80] structure; and (6) minimizing the diversion of management's attention from ongoing business concerns. *Id.* Indeed, the public was repeatedly warned about the risks associated with the Staffware acquisition. *See, e.g.* Thompson Decl. at Ex. E ("[A]ctual results could differ materially from what is envisaged by such forward looking statements if TIBCO is unable to successfully integrate the [sic] Staffware's business after the acquisition"); *id.* at Ex. F ("Actual results could differ materially from such forward looking statements if . . . TIBCO is unable to successfully integrate Staffware and its products"); *id.* at Ex. G ("Any failure to successfully integrate Staffware's business operations could adversely affect our financial results").

Given the complete and thorough nature of the Company's disclosures regarding the risks associated with the acquisition of Staffware, and its potential affect on future revenues, Plaintiffs have not successfully established that the Company's cautionary statements "lacked meaning" or were not "specific" enough. Accordingly, the Court concludes that the statements identified as "false" in paragraphs 53 through 54 of the Consolidated [*81] Amended Complaint are immune from liability under the safe harbor provision of the PSLRA. [8]

8 Defendants have also demonstrated that the statements contained in paragraphs 53 and 54, as well as similar remarks identified in paragraphs 39 and 40 of the Consolidated Amended Complaint, are not material because they are general statements of corporate optimism. *See Grossman v. Novell, Inc.,* 120 F.3d 1112 at 1121-22 (1997) (finding immaterial statements that (i) company was moving rapidly to integrate sales force of the two companies; (ii) company had achieved "substantial success" in integrating the sales forces of the two companies; (iii) merger presented a "compelling set of opportunities"; and (iv) company would "leverag[e] . . . combined knowledge" from the merger). Plaintiffs' argument that the instant case somehow differs from *Grossman* merely because TIBCO purported to have exper-

tise in assisting customers with business integration is without merit. Although TIBCO is in the business of selling software that allows companies to integrate information from two different companies, Plaintiffs have not persuasively shown that the Company held itself out as being an error-proof "expert" in mergers and acquisitions.

**[*82] D. Group Pleading**

Defendants also argue that the claims against Mashruwala must be dismissed because Mashruwala is not alleged to have made any of the challenged statements. In support of this, Defendants point to the fact that the Fifth Circuit has expressly rejected the "group pleading doctrine" [9] as contrary to the PSLRA. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 363-65 (5th Cir. 2004) (holding that PSLRA abolished group pleading) and *Fin. Acquisition Partners L.P. v. Blackwell,* 440 F.3d 278, 285 (5th Cir. 2006) (same). Following this precedent, courts in this district are increasingly finding that the group pleading doctrine is contrary to the PSLRA. *See In re Nextcard Sec. Litig.,* 2006 U.S. Dist. LEXIS 16156, 2006 WL 708663, at *3 (N.D. Cal. 2006) (Fogel, J.) ("This Court adopts the reasoning of the decisions concluding that the group published pleading doctrine no longer is viable after the PSLRA."); *In re Netopia, Inc., Secs. Litig.,* 2005 U.S. Dist. LEXIS 38823, 2005 WL 3445631, at *6 (N.D. Cal. 2005) (Whyte, J.) ("[P]laintiffs cannot rely on the group-published information doctrine.").

9 Under the "group pleading doctrine," a plaintiff may satisfy the pleading requirements through reliance upon a presumption that the allegedly false and misleading "group published information" complained of is the collective action of officers and directors. *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.),* 60 F.3d 591, 593 (9th Cir. 1995). In such a case, a plaintiff satisfies *Rule 9(b)* "by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations." *Id.; see also In re CornerStone Propane Partners., L.P. Secs. Litig.,* 416 F. Supp. 2d 779, 2005 U.S. Dist. LEXIS 21469 (N.D. Cal. 2005).

[*83] Plaintiffs, on the other hand, argue that the Court should not follow the Fifth Circuit precedent because the Fifth Circuit never adopted the group pleading doctrine, even before the PSLRA. While this is somewhat persuasive, Plaintiffs do not identify any recent Northern District of California cases that support their position. The most recent case cited in Plaintiffs' brief is from 2002. As Defendants correctly note, the more re-

cent authorities expressly support Defendants' assertion that Plaintiffs cannot state a claim against Mashruwala by relying on the group pleading doctrine.

However the Court need not make this determination in the instant case because, here, the Court finds that Plaintiffs have not satisfied the requirements of the group pleading doctrine. Even under the group pleading doctrine, Plaintiffs still have to satisfy the particularity requirements of the PSLRA. *Copperstone*, 1999 WL 33295869, at *16. Specifically, Plaintiffs must plead that the officer was directly involved not only in the day-to-day affairs of the company in general but also in the preparation of its allegedly misleading statements in particular. *See In re ESS Tech., Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 27203, 2004 WL 3030058, at *12 (N.D. Cal. 2004)* [*84] (Plaintiffs must "state, with particularity, facts indicating that the individual defendant was directly involved in the preparation of the allegedly misleading statements."). Here, Plaintiffs have failed to provide any particulars regarding Mashruwala's involvement in preparing any of the challenged statements. Instead, the Consolidated Amended Complaint makes only conclusory allegations that "defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements," and that they "participated in drafting, preparation and/or approval of the various public and shareholder and investor reports." *See* CAC PP 20, 22. Further, the group pleading does not apply to oral remarks made by others. Thus, even if Plaintiffs had alleged particular facts demonstrating that Mashruwala was involved in the preparation of the challenged written statements, their claims still fail to the extent that they are seeking to recover for the challenged oral statements made by Ranadive and O'Meara. Accordingly, in addition to the reasons set forth above, the *Section 10(b)* claim against Mashruwala is DISMISSED.

## E. Liability Under § 20(a) [*85] of the Exchange Act

Finally, Plaintiffs have failed to adequately plead their second cause of action, which is brought under *Section 20(a)* of the Exchange Act. To establish "control person" liability under *Section 20(a)* of the Exchange Act, Plaintiff must show that a primary violation of *Section 10(b)* or *Rule 10b-5* was committed and that each individual defendant "directly or indirectly" controlled the violator. *See Paracor Finance, Inc. v. General Electric Capital, 96 F.3d 1151, 1161 (9th Cir.1996).* Since Plaintiffs have not stated a viable *Section 10(b)* claim, Plaintiffs' claim under *Section 20(a)* of the Exchange Act necessarily fails. Additionally, with respect to Mashruwala and Carey, Plaintiffs have failed to allege any facts showing that either defendant had the requisite power to control TIBCO, either directly or indirectly. Accord-

ingly, the entire Consolidated Amended Complaint is DISMISSED.

## F. Leave to Amend

As a final matter, the Court notes that Defendants ask the Court to dismiss the Consolidated Amended Complaint without leave to amend, noting that: (1) the stock drop which led to this suit was over fourteen months ago; (2) Plaintiffs have [*86] already been given an opportunity to amend the initial complaints by filing the Consolidated Amended Complaint; (3) the Opposition offers no new facts; and (4) Plaintiffs have not requested leave to amend, much less explained how amendment would cure the defects in their case. Defendants' arguments are well taken. However, notwithstanding the fact that Plaintiffs have been given a prior opportunity to amend and have neither requested nor explained how further amendments will cure the defects that Defendants have identified, the Court will grant Plaintiffs one final opportunity to amend their complaint if they can do so in good faith. However, given the fact that this case has been pending for over a year, the information necessary to amend the complaint should be readily available to Plaintiffs. As such, Plaintiffs must file the amended complaint within twenty (20) days of the filing date of this Order.

## CONCLUSION

IT IS HEREBY ORDERED THAT Defendants' Request for Judicial Notice [Docket No. 40] is GRANTED.

IT IS FURTHER ORDERED THAT Defendants' Motion to Dismiss [Docket No. 39] is GRANTED WITH LEAVE TO AMEND. Plaintiffs are hereby granted leave to filed an amended [*87] complaint no later than twenty (20) days of the filing date of the Court's Order **only if** they can allege, in good faith, an adequate factual basis for their allegations and can allege specific facts supporting all of the required elements of their causes of action with respect to each named defendant.

IT IS FURTHER ORDERED THAT Defendants shall respond to the amended complaint **within twenty-five (25) days** after it is filed. If Defendants file any motions directed at the consolidated complaint, the motion(s) must be noticed for the first available hearing date following the applicable notice period. Any opposition or reply briefs must be filed by the deadlines set forth in Civil Local Rule 7-3. The parties may **not** alter the deadlines set forth herein without first seeking leave of Court and demonstrating the existence of good cause.

IT IS FURTHER ORDERED THAT the Case Management Conference, initially scheduled for May 23, 2006 is CONTINUED to **September 20, 2006 at 2:30 p.m.** The parties shall **meet and confer** prior to the con-

2006 U.S. Dist. LEXIS 36666, *

ference and shall prepare a joint Case Management Conference Statement which shall be filed no later than ten [*88] (10) days prior to the Case Management Conference. The Case Management Conference Statement shall specifically set forth the parties' proposed schedule for class certification discovery and for the briefing and hearing of the motion for class certification. Lead Counsel shall be responsible for filing the statement as well as for arranging the conference call. All parties shall be on the line and shall call (510) 637-3559 at the above indicated date and time.

IT IS SO ORDERED.

Dated: May 24, 2006

SAUNDRA BROWN ARMSTRONG

United States District Judge