1    SHARTSIS FRIESE LLP
     JAHAN P. RAISSI (Bar #168599)
2    GREGG S. FARANO (Bar #221505)
     LISA A. JACOBS (Bar #230364)
3    One Maritime Plaza, Eighteenth Floor
     San Francisco, CA 94111
4    Telephone: (415) 421-6500
     Facsimile: (415) 421-2922
5    Email: jraissi@sflaw.com

6    Attorneys for Defendant
     Paul A. Sallaberry

7

8                 UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11

12   SECURITIES AND EXCHANGE              Case No. C 07-3444 JF
     COMMISSION,
13                                        **APPENDIX OF AUTHORITIES NOT
                    Plaintiff,            CITED IN THE FEDERAL REPORTER IN
14                                        REPLY IN SUPPORT OF MOTION OF
     v.                                   DEFENDANT PAUL A. SALLABERRY TO
15                                        DISMISS FRAUD CLAIMS AND TO
     MARK LESLIE, KENNETH E.              STRIKE CERTAIN REQUESTS FOR
16   LONCHAR, PAUL A. SALLABERRY,         RELIEF**
     MICHAEL M. CULLY, and DOUGLAS
17   S. NEWTON,                           Date:     January 18, 2008
                                          Time:     9:00 AM
18                  Defendants.           Place:    Courtroom 3, 5th Floor
                                          Judge:    The Honorable Jeremy D. Fogel
19
                                          Complaint Filed:  July 2, 2007
20                                        Date Set For Trial: None

21

22

23

24

25

26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

1

**INDEX OF CASES NOT CITED IN FEDERAL REPORTER**

2

**EXHIBIT**

3

*In re Atmel Corp. Deriv. Litig.*,
       2007 U.S. Dist. LEXIS 54058, *20-23 (N.D. Cal. 2007) ................................. A

4

*SEC v. Jones,*
       2006 U.S. Dist. LEXIS 22800 (S.D.N.Y. 2006) ....................................... B

5

6

*SEC v. Power,*
       2007 U.S. Dist. LEXIS 87632 (S.D.N.Y 2007) ....................................... C

7

*SEC v. Richie,*
       2006 U.S. Dist. LEXIS 45853 (C.D. Cal. 2006) ....................................... D

8

9

*SEC v. Scrushy,*
       2005 U.S. Dist. LEXIS 30553 (N.D. Ala. 2005) ....................................... E

10

DATED:  December 17, 2007              SHARTSIS FRIESE LLP

11

12

By:_____/s/ Jahan P. Raissi_____

13
                                        JAHAN P. RAISSI

14
                                Attorneys for Defendant
                                PAUL A. SALLABERRY

15

16   6363\001\GFARANO\1479059.1

17

18

19

20

21

22

23

24

25

26

27

28

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

Case No.                REPLY MEMORANDUM IN SUPPORT OF DEFENDANT PAUL
C 07-3444 JF                    A. SALLABERRY'S MOTION TO DISMISS

# Exhibit A

FOCUS - 2 of 4 DOCUMENTS

IN RE ATMEL CORPORATION DERIVATIVE LITIGATION

Case Number C 06-4592 JF (HRL)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, SAN JOSE DIVISION

*2007 U.S. Dist. LEXIS 54058*

July 16, 2007, Decided
July 16, 2007, Filed

**NOTICE:**   NOT FOR CITATION

**COUNSEL:**   [*1] For James Juengling, Derivatively on Behalf of Nominal Defendant Atmel Corporation, Plaintiff: Alan R Plutzik, LEAD ATTORNEY, Kathryn Anne Schofield, Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Walnut Creek, CA; Alan Roth Plutzik, Lawrence Timothy Fisher, Schiffrin Barroway Topaz & Kessler LLP, Walnut Creek, CA; Betsy Carol Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Emanuel Shachmurove, Schiffrin Barroway Topaz & Kessler, Radnor, PA; Eric L. Zagar, Schiffrin Barroway Topaz & Kessler LLP, Radnor, PA; Marisa C. Livesay, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA; Tara Puhua Kao, Radnor, PA.

For Anthony Noble, Plaintiff: Betsy Carol Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Emanuel Shachmurove, Schiffrin Barroway Topaz & Kessler, Radnor, PA; Eric L. Zagar, Schiffrin Barroway Topaz & Kessler LLP, Radnor, PA; Marisa C. Livesay, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA; Tara Puhua Kao, Radnor, PA.

For George Perlegos, Gust Perlegos, Defendants: Jessica Koren Nall, John L. Cooper, Farella Braun & Martel LLP, San Francisco, CA.

For Tsung-Ching Wu, Kris Chellam, Jack Peckham, Donald [*2] Colvin, B. Jeffrey Katz, Francis Barton, T. Peter Thomas, Chaiho Kim, David Sugushita, Pierre Fougere, Steven Laub, Graham Turner, Norman T. Hall, Bernard Pruniaux, Steven Schumann, Defendants: Brian Lawrence Levine, David Paul Rains, Morrison & Foerster LLP, Palo Alto, CA; Todd L. Burlingame, Morrison & Foerster LLP, Walnut Creek, CA.

For Mikes N. Sisois, Defendant: James Lawrence Pagano, Law Offices of James L. Pagano, San Jose, CA.

For Atmel Corporation, Defendant: Todd L. Burlingame, LEAD ATTORNEY, Morrison & Foerster LLP, Walnut Creek, CA; Darryl Paul Rains, Morrison & Foerster LLP, Palo Alto, CA.

For Mikes N. Sisois, Defendant: James Lawrence Pagano, Law Offices of James L. Pagano, San Jose, CA.

For Kenneth Kelley, Movant: Betsy Carol Manifold, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA; Kathryn Anne Schofield, Bramson, Plutzik, Mahler & Birkhaeuser, LLP, Walnut Creek, CA; Marisa C. Livesay, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA.

**JUDGES:**   JEREMY FOGEL, United States District Judge.

**OPINION BY:** JEREMY FOGEL

**OPINION**

ORDER [1] (1) GRANTING WITH LEAVE TO AMEND MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM; (2) DEFERRING MOTION TO DISMISS FOR FAILURE TO [*3] MAKE DEMAND

1   This disposition is not designated for publication and may not be cited.

[re: docket nos. 52, 53, 54, 58]

**I. BACKGROUND**

**1. Procedural Background**

On July 27, 2006, Plaintiff James Juengling filed a shareholder derivative complaint against a number of the directors and officers of nominal defendant Atmel Corporation ("Atmel" or "the Company"), which designs, develops, manufactures and sells a wide variety of integrated circuit products, including microcontrollers, advanced logic, mixed-signal, non-volatile memory, and radio frequency components. The complaint alleged improper backdating of stock options and asserted three claims: (1) breach of fiduciary duty; (2) violation of *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5* promulgated thereunder; and (3) restitution/unjust enrichment. On October 4, 2006, the Court consolidated the Juengling action with two other derivative actions [2] and appointed a leadership structure for the consolidated action ("the Consolidated Plaintiffs").

> 2   The plaintiff in *Noble v. Perlegos, et al.,* Case No. C 06-4973 JF brought claims for: (1) violation of *Section 14(a) of the Exchange Act*; (2) breach of fiduciary duty; (3) gross mismanagement; [*4] (4) waste of corporate assets; and (5) unjust enrichment and breach of the duty of loyalty.

> The plaintiff in *Kelley v. Perlegos, et al.,* Case No. C 06-4680 JF brought claims for: (1) breach of fiduciary duty; (2) violation of *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5* promulgated thereunder; and (3) restitution/unjust enrichment.

On November 3, 2006, the instant consolidated complaint ("the Complaint") was filed. The Complaint names eighteen individual defendants ("the Individual Defendants") who served as officers or directors of Atmel. The Complaint separates those eighteen defendants into two categories: the "Option Recipient Defendants" (Gust Perlegos, Tsung-Ching Wu ("Wu"), Kris Chellam ("Chellam"), Jack Peckham ("Peckham"), Donald Colvin ("Colvin"), Mike Sisois ("Sisois"), B. Jeffrey Katz ("Katz"), Francis Barton ("Barton"), Graham Turner ("Turner"), Bernard Pruniaux ("Pruniaux"), and Steven Schumann ("Schumann")) and the "Director Defendants" (George Perlegos, T. Peter Thomas ("Thomas"), Chaiho

Kim ("Kim"), Pierre Fougere ("Fougere"), Norman Hall ("Hall"), David Sugishita ("Sugishita"), and Steven Laub ("Laub")). It asserts eleven claims: (1) violation of *§ 10(b)* [*5] and *Rule 10b-5 of the Securities Exchange Act*; [3] (2) violation of *§ 14(a) of the Securities Exchange Act*; (3) violation of *§ 20(a) of the Securities Exchange Act* (against Chellam, Barton, Wu and the Director Defendants); (4) accounting; (5) breach of fiduciary duty and/or aiding and abetting; (6) unjust enrichment (against the Option Recipient Defendants); (7) rescission (against the Option Recipient Defendants); (8) constructive fraud; (9) corporate waste; (10) breach of contract (against the Option Recipient Defendants); and (11) violation of *California Corporation Code § 25402* (against the Individual Defendants, with the exception of Barton, Fougere, Kim, Laub and Sugishita). No demand has been made upon Atmel's Board of Directors ("the Board"). The Consolidated Plaintiffs allege that such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. Complaint P 153.

> 3   Those claims without notation as to specific defendants are asserted against all the Individual Defendants.

On January 29, 2007, three motions to dismiss were filed. Fifteen of the Individual Defendants moved [*6] to dismiss for failure to state a claim upon which relief may be granted ("the Barton Motion"). Defendants Gust Perlegos and George Perlegos also moved to dismiss, joining the Barton Motion with limited exceptions. Atmel moved to dismiss for failure to make demand. On January 30, 2007, defendant Sisois moved to dismiss, joining the Barton Motion with limited exceptions. The Consolidated Plaintiffs have filed an omnibus opposition to the four motions to dismiss. The Court heard oral argument on April 27, 2007.

## 2. Factual Allegations

The Complaint alleges that the Individual Defendants had the following relationships with Atmel:

| Defendant | Role with Atmel |
|---|---|
| George Perlegos | President, CEO, [4] & director from Atmel's inception in 1984 to August 2006. |
| Gust Perlegos | Executive VP Office of the President, 2001 to August 2006. |
| | Director, January 1985 to August 2006. |
| | Executive VP & GM, January 1996 to 2001. |
| | VP, GM, January 1985 to January 1996. |

2007 U.S. Dist. LEXIS 54058, *

| Defendant | Role with Atmel |
| --- | --- |
| Wu | Executive VP, Office of the President since 2001. |
| | Director since 1985. |
| | Executive VP & GM, January 1996 to 2001. |
| | VP, Technology, January 1986 to January 1996. |
| Thomas | Director since December 1987. |
| | Member of the Compensation Committee & the Audit Committee since at least 1996. |
| Hall | Director from August 1992 until in or about 2005. Member of the Compensation Committee from 1997 to 2004, & member of the Audit Committee from 1997 to 2003. |
| Fougere | Director, member of the Audit Committee, & member of the Compensation Committee since February 2001. |
| Kim | Director & member of the Audit Committee since September 2002. Member of the Compensation Committee from September 2002 through 2003. |
| Sugishita | Director, Chairman of Audit Committee, & Chairman of Corporate Governance & Nominating Committee, February 2004 to present. |
| Laub | Director since February 10, 2006. |
| | Appointed President & CEO in August 2006. |
| Chellam | Chief Financial Officer & VP, Finance & Administration, September 1991 to July 1998. |
| Peckham | GM, ASIC Operations, January 1992 to 1998. |
| | VP, Sales, January 1986 to January 1992. |
| | Director of Sales, June 1985 to January 1986. |
| Colvin | Chief Financial Officer, & VP, Finance, March 1998 to January 2003. Chief Financial Officer, Atmel Rousset S.A. 1995 to 1998. |
| Sisois | VP, Planning & Information Systems, 1986 to August 2006. |
| | Director of Information Systems, February 1985 to 1986. |
| Katz | VP, Marketing, November 1998 to about 2005. |
| Barton | Executive VP & Chief Financial Officer, May 2003 to July 2005. |
| Turner | VP and GM, Microcontroller Segment since October 2001. Joined the Company in 1989. |
| Pruniaux | VP and GM, ASIC Segment since November 2001. |

| Defendant | Role with Atmel |
|---|---|
| | CEO of Atmel Rousset S.A., May 1995 to November 2001. |
| Schumann | VP and GM, Non-Volatile Memory Segment since January 2002. |
| | Joined the Company in 1985. |

Complaint [*7] PP 22-76.

4  CEO refers to Chief Executive Officer, VP refers to Vice President, and GM refers to General Manager.

As summarized below, the Complaint alleges that the Option Recipient Defendants received twenty-one backdated option grants on eleven dates.

| Recipient | Purported Grant Date | Shares | Share Price |
|---|---|---|---|
| Turner | February 4, 1994 | 160,000* [5] | $ 2.29 |
| Schumann | February 22, 1994 | 192,000* | $ 3.8516 |
| Gust Perlegos | April 11, 1997 | 40,000 | $ 6.0938 |
| Wu | April 11, 1997 | 40,000 | $ 6.0938 |
| Chellam | April 11, 1997 | 40,000 | $ 6.0938 |
| Peckham | April 11, 1997 | 40,000 | $ 6.0938 |
| Turner | October 9, 1998 | 100,000* | $ 1.9844 |
| Pruniaux | October 9, 1998 | 200,000* | $ 1.9844 |
| Schumann | October 9, 1998 | 192,000* | $ 1.9844 |
| Colvin | February 12, 1999 | 20,000 | $ 3.6719 |
| Sisois | June 11, 1999 | 40,000 | $ 5.9063 |
| Colvin | July 16, 1999 | 40,000 | $ 7.8281 |
| Katz | July 16, 1999 | 10,000 | $ 7.8281 |
| Turner | July 16, 1999 | 40,000* | $ 7.8281 |
| Colvin | November 17, 2000 | 40,000 | $ 12.125 |
| Colvin | September 17, 2001 | 100,000 | $ 7.12 |
| Gust Perlegos | November 14, 2002 | 50,000 | $ 2.11 |
| Wu | November 14, 2002 | 100,000 | $ 2.11 |

2007 U.S. Dist. LEXIS 54058, *

| Recipient | Purported Grant Date | Shares | Share Price |
|-----------|---------------------|--------|-------------|
| Colvin    | November 14, 2002   | 50,000 | $ 2.11      |
|           |                     |        |             |
| Sisois    | November 14, 2002   | 40,000 | $ 2.11      |
|           |                     |        |             |
| Barton    | April 30, 2003      | 500,000| $ 1.81      |

Complaint PP 24-62, 103.

    5    An asterisk indicates that the option grant was "At least" the number stated here.

    The Complaint alleges the following: The Company's [*8] stock option plans require that the exercise price of an option be no less than the fair market value on the date of the grant. Complaint P 91. However, in "a striking pattern that could not have been the result of chance," all the grants listed above purportedly were granted at some of the lowest prices of the year in which they fell. Complaint P 109. The purported grant dates were not the actual grant dates. Complaint P 110. "Rather, at the behest of the Option Recipient Defendants, the Director Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Atmel stock was lower than the market price on the actual grant dates." Id. "From 1994 to 2003, the Compensation Committee granted . . . backdated Atmel stock options to the Option Recipient Defendants . . . ." Complaint P 103. After the Sarbanes-Oxley Act became effective, the Compensation Committee granted backdated options to Gust Perlegos, Wu, Colvin, Sisois, and Barton. Complaint PP 114-15. "From 1998 to 2003, the Company, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing [*9] the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Option Recipient Defendants . . . ." Complaint P 126.

    The Complaint alleges the following with respect to Atmel's announced discovery of backdating: On July 25, 2006, Atmel issued a press release announcing that the Audit Committee was reviewing the Company's practices relating to its stock options grants with the assistance of independent legal counsel and independent accountants. Complaint P 96. The Company failed to file a timely Form 10-Q for the quarter ending June 30, 2006. Complaint P 97. On August 15, 2006, the Company announced that it had received a request for information from the SEC relating to its past stock option grants. Id. On August 17, 2006, Atmel issued a press release announcing that its investigation was ongoing and that it

was still unable to provide financial information for the quarter ending June 30, 2006. Complaint P 98. On October 30, 2006, the Company issued a press release reporting the Audit Committee's preliminary conclusion that "the actual measurement dates for certain stock options [*10] differed from the recorded measurement dates for such stock options." Complaint P 99. The release stated that the Company's prior financial statements could not be relied upon. Id. As of the filing of the Complaint, the Company had yet to issue its Form 10-Q for the quarter ending June 30, 2006, and faced possible delisting by NASDAQ. Complaint P 101.

    The Complaint also alleges the following: On August 6, 2006, Laub, Fougere, Thomas, Kim, and Sugishita elected Sugishita as Chairman and canceled the stockholders' meeting George Perlegos had called for the day before, which had sought their removal. Complaint P 92. The Board then fired George and Gust Perlegos, as well as two other executives, citing misuse of corporate travel funds. Id. On August 25, 2006, George Perlegos submitted a letter of resignation to the Board. Complaint P 95. On August 28, 2006, the Company announced that it had received a notice from NASDAQ that it was not in compliance with the director independence listing requirement, but that it had come back into compliance with the requirement after the resignation of George Perlegos. Id.

## II. LEGAL STANDARD

### 1. Motion to Dismiss

    For purposes of a motion to dismiss, the plaintiff's [*11] allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969).* Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections, 66 F.3d 245, 248 (9th Cir. 1995).* When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp, 90 F.3d 386, 393 (9th Cir. 1996).* On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *North Star Int'l v. Arizona Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983); MGIC Indemnity Corp. v. Weisman, 803 F.2d 500, 504*

2007 U.S. Dist. LEXIS 54058, *

*(9th Cir. 1986); Beliveau v. Caras, 873 F.Supp. 1393, 1395 (C.D. Cal. 1995).* However, under the "incorporation by reference" doctrine, the Court also may consider documents that are referenced extensively in the complaint and are accepted by all parties as authentic, even though the documents are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970 (9th Cir. 1999).*

## 2. Demand Requirement

A derivative [*12] complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *Fed. R. Civ. P. 23.1.* The existence and satisfaction of a demand requirement is a substantive issue governed by state law. *See Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 96-97, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991).* [6] When the challenged decision is that of the board in place at the time of the filing of the complaint, failure to make demand may be excused if a plaintiff can raise a reason to doubt that a majority of the board is disinterested or independent or that the challenged acts were the product of the board's valid exercise of business judgment. *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984); see also Ryan v. Gifford, 918 A.2d 341, 352 (Del. Ch. 2007)* (discussing *Aronson*). However, "[w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application." *Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993);* [*13] *see also Ryan, 918 A.2d at 352* (discussing *Rales*). In such a situation, demand may be excused only if a plaintiff "can create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id. at 353* (citing *Rales, 634 A.2d at 933-34).*

> 6 The parties agree that Delaware law applies to the instant action because Ditech is incorporated in Delaware.

## III. DISCUSSION

## 1. The Barton Motion to Dismiss for Failure to State a Claim

a. Claim One: Violation of *Section 10(b)* and *Rule 10b-5*

i. Sufficiency of the Allegations

The Consolidated Plaintiffs allege securities fraud in violation of *Section 10(b) of the Securities Exchange Act* and *Rule 10b-5* promulgated thereunder. *Section 10(b)* makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C. § 78j(b).* [*14] *Rule 10b-5* makes it unlawful for any person to use interstate commerce

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5.* In cases involving publicly-traded securities and purchases or sales in public securities markets, the elements of an action under *Section 10(b)* and *Rule 10b-5* are: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).*

The Consolidated Plaintiffs must meet two heightened pleading standards. *Fed. R. Civ. P. 9(b)* requires that "the circumstances constituting fraud . . . be stated with particularity." The Ninth Circuit has explained that a "plaintiff must include [*15] statements regarding the time, place, and nature of the alleged fraudulent activities, and that mere conclusory allegations of fraud are insufficient." *In re GlenFed, Inc. Securities Litigation, 42 F.3d 1541, 1548 (9th Cir. 1994).* A plaintiff asserting fraud "must set forth an explanation as to why the statement or omission complained of was false or mislead-

ing." *Id.* (internal quotation marks omitted); *see also Yourish v. California Amplifier, 191 F.3d 983, 992-93 (9th Cir. 1999).* The Private Securities Litigation Reform Act ("PSLRA") raises the pleading standard further:

(1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all [*16] facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4(b)(1)-(2).*

The Consolidated Plaintiffs allege the following with respect to the *Section 10(b)* claim:

159. Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

160. The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and/or directors in the Company, [*17] each of the Individual Defendants was able to and did control the conduct complained of herein.

161. The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

162. The Company relied upon the Individual Defendants' fraud in granting the Option Recipient Defendants options to purchase shares of the Company's common stock, as alleged herein.

163. As a direct and proximate result of the Individual Defendants' fraud, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, the costs associated with the Company's internal investigation, the loss of funds paid to the Company upon the exercise of stock options, costs and expenses incurred in connection with the Company's restatement of historical [*18] financial results, and costs and expenses incurred in connection with the SEC investigation of the Company.

Complaint PP 159-163.

These allegations do not satisfy the specificity requirement of *Rule 9(b)* or of the PSLRA. They neither identify what roles each defendant played in the alleged back-dating scheme nor allege facts giving rise to a strong inference of scienter on the part of each defendant. In light of the public statement by Atmel, it appears almost certain that some of the options at issue here were backdated. However, that apparent fact does not permit the Consolidated Plaintiffs to name any number of individual defendants without providing adequate detail re-

garding their role and knowledge of the alleged backdating. [7] This is not a case in which requiring further detailed allegations of the roles played by individual defendants would lead to an unreasonably cumbersome complaint. *See In re Washington Public Power Supply System Securities Litigation, 623 F.Supp. 1466, 1472 (W.D.Wash. 1985).* Accordingly, this claim will be dismissed with leave to amend to the extent that it is not time-barred.

7 Nor are the Consolidated Plaintiffs relieved of the requirement that they allege [*19] facts raising an inference that a particular option grant was backdated. While the Court need not decide the sufficiency of such allegations in the instant complaint, it notes that other courts within this district have considered the presence or absence of a pattern of backdating, primarily in the context of the demand futility requirement. *See e.g. In re Zoran Corp. Deriv. Litig., 2007 U.S. Dist. LEXIS 43402, 2007 WL 1650948 (N.D.Cal. June 5, 2007); In re Openwave Systems Inc. Deriv. Litig., 2007 U.S. Dist. LEXIS 36517, 2007 WL 1456039 (N.D.Cal., May 17, 2007); In re CNET Networks, Inc. Deriv. Litig., 483 F.Supp.2d 947 (N.D.Cal. 2007); In re Linear Tech. Corp. Deriv. Litig., 2006 U.S. Dist. LEXIS 90986, 2006 WL 3533024 (N.D.Cal. Dec. 7, 2006).* This Court also has provided a non-exclusive list of facts that, if alleged, would strengthen allegations that a grant was backdated. *See* Order Re Motions to Dismiss 11-12, *In re Ditech Derivative Litigation,* Case No. C 06-5157 JF (listing the following factors: "the degree to which the options were granted at the discretion of the compensation committee or the board, versus at fixed, preestablished times; the actual grant dates of the options and the appropriate price of the options; the date that the options were exercised; [*20] whether required performance goals were met before the options were granted; the presence or absence of other major corporate events, such as an acquisition, at the time of the grants; and the results of any requests by Plaintiff for information.").

ii. Statute of Limitations

[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (*15 U.S.C. § 78c(a)(47)*), may be brought not later than the earlier of --

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

*28 U.S.C. § 1658(b); see e.g. In re Heritage Bond Litig., 289 F.Supp.2d 1132, 1147-48 (C.D.Cal. 2003).* This statute of limitations is not subject to equitable tolling. *Durning v. Citibank, Int'l, 990 F.2d 1133, 1136-37 (9th Cir. 1993).*

The parties agree that the five-year period of repose [8] applies to the first claim for violations of *Section 10(b)* and *Rule 10b-5 of the Securities and Exchange Act.* The Consolidated Plaintiffs argue that their claims fall within the five-year period of repose. While [*21] only a limited number of the alleged stock grant dates fall within this period, the Consolidated Plaintiffs do allege a series of false financial statements within the five-year period and argue that the period of repose begins no earlier than the latest such financial statement, which was filed on March 15, 2003. This argument raises the question as to whether such subsequent false financial statements preserve claims for options manipulation that occurred outside the five-year period of repose. The Court concludes that in light of the statute's focus on the "violation," the Court must consider the statute of limitations in terms of the specific violations alleged. To the extent that the claim is based upon the backdating itself, the period of repose starts on the date that the option grant was made. *See Durning, 990 F.2d at 1136* (noting that the federal rule is that a cause of action accrues at the completion of the sale of the instrument); *Falkowski v. Imation Corp., 309 F.3d 1123, 1130 (9th Cir. 2002)* (describing the grant of an option as "a purchase or sale" under the Securities Litigation Uniform Standards Act). The Consolidated Plaintiffs may be able to state a claim under *Section 10(b)* [*22] and *Rule 10b-5* for dissemination of fraudulent financial statements, but such statements must fall within the five-year period of repose. [9] The Consolidated Plaintiffs may not avoid the effect of the statute of limitations by combining allegations of recent financial statements and time-barred option back-dating. Because the first claim, as currently pled, depends upon such a combination, it will be dismissed. The Court will grant leave to amend so that the Consolidated Plaintiffs may allege independent wrongful acts that occurred on or after July 27, 2001.

8 "A statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as

claimant's awareness of a violation." *Munoz v. Ashcroft, 339 F.3d 950, 957 (9th Cir. 2003)* (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991)).*

9    The Court is skeptical of a continuing wrong theory that would create liability under *Section 10(b)* upon the issuance of a financial statement that merely fails to correct a prior false statement. Such a theory appears to approximate the effects of the fraudulent concealment doctrine in relation to equitable tolling, a doctrine that does not apply [*23] in the *Section 10(b)* context.

b. Claim Two: Violation of *Section 14(a)*

*Rule 14a-9* provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*17 C.F.R. § 240.14a-9(a).* To state a claim under *Rule 14a-9* and *Section 14(a)*, a plaintiff must allege a false or misleading statement or omission of material fact; that the misstatement or omission was made with the requisite level of culpability; and that it was an essential link in the accomplishment of the transaction. *Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000).*

The Individual Defendants argue that the *Section 14(a)* claim is time-barred because it must be [*24] filed within one year after discovery of the facts constituting the violation, and in no event more than three years following publication of the proxy statement. Barton Motion 23. The Consolidated Plaintiffs argue that *Section 14(a)* claims fall within the two-year/five-year scheme that applies to a *Section 10(b)* claim. *See* Opposition 18. The Court concludes that the one-year/three-year scheme applies to the *Section 14(a)* claim because such a claim does not sound in fraud. *See In re Exxon Mobil Corp. Sec. Litig., 387 F.Supp.2d 407, 424 (D.N.J. 2005); In re*

*Global Crossing, Ltd. Sec. Litig., 313 F.Supp.2d 189, 196-97 (S.D.N.Y. 2003); In re Zoran Corp. Derivative Litig., 2007 U.S. Dist. LEXIS 43402, 2007 WL 1650948 *24.* As currently pled, the *Section 14(a)* claim alleges false statements made more than three years prior to the filing of this action. Accordingly, the claim will be dismissed with leave to amend. Any amended claim must allege wrongful acts that occurred on or after July 27, 2003 and not later than one year after discovery of the violation.

In light of the foregoing discussion, the Court need not reach the challenges to the sufficiency of the allegations. However, assuming without deciding that the PSLRA [*25] also applies to *Section 14(a)* claims, *see e.g. In re Textainer Partnership Securities Litig.,* 2005 WL 3801596 (N.D.Cal. March 8, 2005), *In re McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1248, 1267 (N.D.Cal. 2000).,* greater specificity likely would strengthen this claim considerably. [10]

10    This Court has held in another action that the PSLRA has foreclosed the application of the "group published pleading" doctrine, which provides that when false or misleading information is conveyed in group published statements, it is reasonable to presume that the statements are the result of the collective actions of the company's officers. *In re Nextcard, Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 16156, 2006 WL 708663 *2-3 (N.D.Cal. March 20, 2006).* This holding likely will be relevant to the sufficiency of an amended claim under *Section 14(a).*

c. Claim Three: Violation of *Section 20(a)*

*Section 20(a)* provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person [*26] acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t(a).* "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir. 1996).* As discussed above, the Consolidated Plain-

tiffs have failed to state a claim for a primary violation of the securities laws. However, it is possible that they may be able to do so in an amended pleading. Accordingly, the *Section 20(a)* claim will be dismissed with leave to amend. [11]

> 11    The parties agree that the statute of limitations analysis for claim three is the same as for claim one. *See also In re Heritage Bond Litigation, 289 F.Supp.2d at 1148.* Accordingly, amendment of claim three should comply with the limitations articulated in the Court's analysis of claim one.

### d. Claims Four to Eleven: The State Law Claims

i. Claims Under Delaware Law (Claims Four to Eleven)

(1) Statute of Limitations

The parties agree that a three-year statute of limitations applies to each claim under [*27] Delaware law. *See 10 Del. C. § 8106* (2006). The Consolidated Plaintiffs contend that the statute was tolled in the instant case "based upon the doctrines of inherently unknowable injuries and fraudulent concealment." Opposition 20. "Fraudulent concealment requires an affirmative act of concealment by a defendant—an actual artifice that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry." *Ryan, 918 A.2d 341, 360, 2007 WL 1018208 *13* (quotation marks omitted). "Inaccurate public representations as to whether directors are in compliance with shareholder-approved stock option plans constitute fraudulent concealment of wrongdoing sufficient to toll the statute of limitations." *Id.* Because the Consolidated Plaintiffs allege such inaccurate public representations, *see* Complaint P 126, the three-year statute of limitations is tolled as to the Delaware state law claims.

(2) Claim Five: Breach of Fiduciary Duty

The Consolidated Plaintiffs allege the following:

> 179. As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other [*28] Company insiders at the expense of the Company.

> 180. As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain

other officers and directors of the Company and cover up their misconduct.

> 181. In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

> 182. The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to and did, unduly benefit the Option Recipient Defendants at the expense of the Company.

Complaint PP179-82.

The Individual Defendants argue that their actions are protected by the business judgment rule. However, where a defendant acts in bad faith and commits a breach of loyalty, the business judgment rule does not apply. *See Ryan, 918 A.2d 341, 2007 WL 1018208 *11.* The Individual Defendants also argue that the fiduciary duty claim is not stated with sufficient [*29] particularity. This argument is well taken, as the Complaint does not put the Individual Defendants, and particularly the non-officer defendants, on notice as to how they are alleged to have violated their fiduciary duties. *See York Linings v. Roach, 1999 Del. Ch. LEXIS 160, 1999 WL 608850 *2 (Del. Ch. July 28, 1999)* (unpublished). The Consolidated Plaintiffs refer to detailed allegations elsewhere in the Complaint, but, as discussed above, necessary detail is largely absent. Accordingly, this claim will be dismissed with leave to amend.

(3) Claim Six: Unjust Enrichment

The Individual Defendants move to dismiss the unjust enrichment claim on a number of bases. The Consolidated Plaintiffs respond by citing to *Ryan, 918 A.2d 341, 2007 WL 1018208 *14,* in which the Delaware Chancery indicated that an unjust enrichment claim may be viable in the context of options backdating. The Court need not resolve the legal challenges to this claim, as amendment of the complaint is required on other bases. The Court notes that more detailed allegations of options backdating will strengthen any claim that the recipients of such options were unjustly enriched.

(4) Claims Four and Seven: Remedies Pled as Claims

The Individual Defendants move to [*30] dismiss the claims for accounting and rescission on the basis that accounting and rescission are remedies, not separate claims for relief. The Consolidated Plaintiffs effectively concede as much, but argue that it is inconsequential whether accounting and rescission are pled as remedies or claims for relief. Opposition 48. The Court concludes that the Consolidated Plaintiffs should include accounting and rescission as remedies sought in any amended complaint.

(5) Claims Eight and Nine: Constructive Fraud and Corporate Waste

The Individual Defendants argue that constructive fraud and corporate waste are merely types of breaches of fiduciary duty, not separate torts. Barton Motion 17 n.10. The Consolidated Plaintiffs do not respond to this specific argument, which is well taken as to the constructive fraud claim. The Court will dismiss that claim, which should be restated in any amended complaint as a "straightforward fiduciary duty claim[]." *See Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1236 (Del. Ch. 2001)* ("[Plaintiff] should amend the complaint to transform its derivative constructive fraud counts into straightforward breach of fiduciary duty counts.").

The corporate [*31] waste claim also will be dismissed. "To support a claim [for corporate waste], a shareholder must demonstrate that the transaction in question either served no purpose or was so completely bereft of consideration that the transfer is in effect a gift." *Lewis v. Vogelstein, Del. Ch., 699 A.2d 327, 336 (1997).* A plaintiff must allege facts that, if true, establish that the defendant directors "authorize[d] an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Glazer v. Zapata Corp., Del. Ch., 658 A.2d 176, 183 (1993).* The Consolidated Plaintiffs have not alleged such facts here; instead, they have alleged a grant of equity-compensation. As the Individual Defendants assert, these grants may well have been in consideration for the recipients remaining in Atmel's employ. Accordingly, the claim will be dismissed with leave to amend.

(6) Claim Ten: Breach of Contract

The Individual Defendants move to dismiss the breach of contract claim on the grounds that it is not pled with sufficient particularity, that no employment agreements existed between Atmel and the "option recipient defendants," [*32] that the Consolidated Plaintiffs have not alleged any act of breach, and that the directors ratified any breach. The Consolidated Plaintiffs respond briefly that "[t]he terms of the Atmel stock option plans were blatantly violated when the Director Defendants

approved backdated stock option grants." Opposition 47. However, the Consolidated Plaintiffs have not alleged which, if any, of the defendants entered into a binding contract that incorporates the terms of an option plan. Accordingly, this claim will be dismissed with leave to amend.

ii. Claim Eleven: Insider Trading Under California Law

(1) Statute of Limitations

A *Section 25402* claim must be brought "before the expiration of five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire." *Cal. Corp. Code § 25506(b).* While the Consolidated Plaintiffs argue that this period should be equitably tolled, the Court concludes that the five-year period since the violation is a strict limit that may not be tolled. *See SEC v. Seaboard Corp., 677 F.2d 1301, 1308 (9th Cir. 1982)* (concluding that the [*33] four-year bar under an earlier version of the statute was a strict limit). The insider trading allegations refer to sales as early as 1997. Accordingly, portions of the claim are barred as currently pled. Any amended claim should allege violations that occurred on or after July 27, 2001 and discovery of which occurred on or after July 27, 2004.

(2) Sufficiency of the Allegations

*Cal. Corp. Code § 25402* provides that

[i]t is unlawful for an issuer or any person who is an officer, director or controlling person of an issuer or any other person whose relationship to the issuer gives him access, directly or indirectly, to material information about the issuer not generally available to the public, to purchase or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information.

A claim under *Section 25402* must be pled with particularity [*34] under *Rule 9(b). In re RasterOps Corp. Sec. Litig., 1993 U.S. Dist. LEXIS 14266, 1993 WL 476651 *5 (N.D.Cal. Sep. 10, 1993).*

The Consolidated Plaintiffs allege the following:

202. At the time that the Insider Selling Defendants sold their Atmel common stock as set forth herein at PP 135-49, by reason of their high executive and/or directorial positions with Atmel, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of Atmel's option backdating, improper accounting, and false financial statements.

203. At the time of such sales, that information was not generally available to the public of the securities markets. Had such information been generally available, it would have significantly reduced the market price of Atmel shares at the time.

204. The Insider Selling Defendants had actual knowledge of material, adverse non-public information and thus sold their Atmel common stock in California in violation of *California Corporations Code § 25402.*

Complaint PP 202-04. The Court concludes that like the other claims, the insider trading claim is not pled with sufficient particularity and should be dismissed [*35] with leave to amend. An amended claim should allege facts specific to each of the Individual Defendants.

e. Motions to Dismiss Joining in the Barton Motion

The Court has reviewed the two additional motions to dismiss that join in the Barton Motion. The Court concludes that the dismissal of the claims on the basis of the arguments made in the Barton Motion renders it unnecessary to address the separate arguments asserted in the Sisois and Perlegos motions.

**2. The Atmel Motion to Dismiss for Failure to Make Demand**

The Delaware Court of Chancery [12] recently explained:

[I]n an effort to balance the interest of preventing strike suits motivated by the hope of creating settlement leverage through the prospect of expensive and time-consuming litigation discovery [with the interest of encouraging] suits reflecting a reasonable apprehension of actionable director malfeasance that the sitting board cannot be expected to objectively pursue on the corporation's behalf, Delaware law recognizes two instances where a plaintiff is excused from making demand. Failure to make demand may be excused if a plaintiff can raise a reason to doubt that: (1) a majority of the board is disinterested or independent [*36] or (2) the challenged acts were the product of the board's valid exercise of business judgment.

The analysis differs, however, where the challenged decision is not a decision of the board in place at the time the complaint is filed. In *Rales v. Blasband[, 634 A.2d 927 (Del. 1993)]*, the Supreme Court of Delaware held that [w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application. Stated differently, the absence of board action . . . makes it impossible to perform the essential inquiry contemplated by *Aronson [v. Lewis, 473 A.2d 805, 812 (Del. 1984)]*.

Accordingly, where the challenged transaction was not a decision of the board upon which plaintiff must seek demand, plaintiff must create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.

. . . .

Where at least one half or more of the board in place at the time the complaint was filed approved the underlying challenged transactions, which approval may be imputed to the entire board for purposes of proving [*37] demand futility, the *Aronson* test applies.

*Ryan v. Gifford, 918 A.2d 341, 352-53(Del. Ch. 2007)* (citations and quotation marks omitted).

12 The parties agree that Delaware law governs the instant dispute. Because California courts follow Delaware law in demand futility cases, this is true even if California law applies due to Atmel's asserted prior incorporation in California. *See Oakland Raiders v. National Football League, 93*

*Cal.App.4th 572, 586 n.5, 113 Cal. Rptr. 2d 255 (2001)* ("The parties agree that we may properly rely on corporate law developed in the State of Delaware given that it is identical to California corporate law for all practical purposes.").

The parties dispute whether the Court should consider the eight-member Board that was in place at the time that the initial complaint was filed [13] or the six-member Board that was in place at the time that the Complaint was filed. [14]

> [W]hen an amended derivative complaint is filed, the existence of a new independent board of directors is relevant to a *Rule 23.1* demand inquiry only as to derivative claims in the amended complaint that are not already validly in litigation. Three circumstances must exist to excuse a plaintiff from making demand under *Rule 23.1* [*38] when a complaint is amended after a new board of directors is in place: first, the original complaint was well pleaded as a derivative action; second, the original complaint satisfied the legal test for demand excusal; and third, the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint.

*Braddock v. Zimmerman, 906 A.2d 776, 786 (Del. 2006); see also Harris v. Carter, 582 A.2d 222, 228 (Del. Ch.*

*1990)* ("Demand futility is assessed as of the time that the original complaint was filed, not as of the filing of an amended complaint containing further factual allegations in support of the same claims."). However, Delaware courts have not explained whether the three circumstances for excuse of a new demand requirement apply to a *consolidated* complaint.

> 13    George & Gust Perlegos, Wu, Fougere, Thomas, Kim, Laub, and Sugishita.

> 14    The original eight-person Board, less George and Gust Perlegos.

In light of the dismissal for failure to state a claim, the Court concludes that it is premature to resolve this question, or the subsequent questions as to whether *Aronson* or *Rales* applies, and what result the appropriate test [*39] dictates. Accordingly, the motion to dismiss for failure to make demand will be deferred.

## IV. ORDER

Good cause therefor appearing, IT IS HEREBY ORDERED that the motions to dismiss for failure to state a claim are GRANTED with leave to amend and that the motion to dismiss for failure to make demand is DEFERRED.

DATED: July 16, 2007.

JEREMY FOGEL

United States District Judge

# Exhibit B

LEXSEE 2006 US DIST LEXIS 22800



Caution
As of: Sep 06, 2007

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff, - against - THOMAS W. JONES and LEWIS E. DAIDONE, Defendants.**

**05 Civ. 7044 (RCC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 22800; Fed. Sec. L. Rep. (CCH) P93,855*

**April 25, 2006, Decided
April 25, 2006, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, Claim dismissed by, Request denied by *SEC v. Daidone, 2007 U.S. Dist. LEXIS 13096 (S.D.N.Y., Feb. 26, 2007)*

**COUNSEL:** [*1] For Securities and Exchange Commission, Plaintiff: James Murdock McGovern, U.S. Securities and Exchange Commission (LA), Los Angeles, CA; Mark K Schonfeld, Securities and Exchange Commission, New York, NY; Valerie Ann Szczepanik, U.S. Securities and Exchange Commission, New York, NY.

For Thomas W. Jones, Defendant: Alex J. Bourelly, Baker Botts, L.L.P., Washington, DC; George Irvin Terrell, Jr., Baker & Botts, Houston, Tx; Michael O. Ware, Mayer, Brown, Rowe & Maw, LLP (NYC), New York, NY.

**JUDGES:** Richard Conway Casey, United States District Judge.

**OPINION BY:** Richard Conway Casey

**OPINION**

    **OPINION & ORDER**

    **RICHARD CONWAY CASEY, United States District Judge:**

    Defendants Thomas W. Jones ("Jones") and Lewis E. Daidone ("Daidone") (collectively "Defendants") move to dismiss the Securities and Exchanges Commis-

sion's ("SEC") First Amended Complaint ("Complaint") against them. For the reasons explained, Defendants' motions are denied.

**I. BACKGROUND**

    Unless otherwise stated, the following facts reflect Plaintiff's version of events and are taken from the Complaint. This action arises from Defendants' employment with Citigroup Asset Management ("CAM"), a business unit of Citigroup, [*2] Inc. that provides investment services to Citigroup-sponsored mutual funds ("the Funds"). (Complaint P2.) Jones served as the chief executive officer of CAM from August 1997 until he resigned on October 20, 2004. (*Id.* P16.) While employed by CAM, Daidone served as its North American head of fund administration. (*Id.* P17.)

    CAM's responsibilities included recommending a transfer agent for the Funds to the Funds' board of directors. (*Id.* P2.) The Funds used a transfer agent to process transactions; calculate daily net asset values, sales charges, and commissions; operate a customer service center; distribute proxy and other materials; and perform other accounting functions, including tax reporting. (*Id.* P23.) Pursuant to a contract that was scheduled to expire in June 1999, the Funds employed First Data Investment Services Group ("First Data") as its transfer agent during the 1990s. (*Id.* P3.) In anticipation of the expiration, in July 1997, CAM hired Deloitte & Touche Consulting ("Deloitte") to assist the CAM team's decisions regarding its next transfer agent contract. (*Id.* P28.) Daidone was a member of the CAM transfer agent team. (*Id.* P43.) After

2006 U.S. Dist. LEXIS 22800, *; Fed. Sec. L. Rep. (CCH) P93,855

he became [*3] CAM's chief executive officer in August 1997, Jones received regular briefings on Deloitte's transfer agent project. (*Id.* P30.) The SEC claims Defendants knew First Data had been making a high profit from its role as the Funds' transfer agent and that Jones wanted CAM to capture and realize that profit. (*Id.* PP3, 26, 30.)

In February 1998, Deloitte recommended that CAM create an affiliate to handle customer service inquiries and to contract with a company called DST to handle the transfer agent technology. (*Id.* P36.) Deloitte projected the CAM affiliate would receive $ 40 million in annual profits under that structure. (*Id.*) To counter Deloitte's recommendation, First Data offered CAM deep discounts on its fees as a full-service transfer agent. (*Id.* PP38, 41.) Despite First Data's attempts, the Deloitte and CAM team made a formal recommendation to Jones on April 2, 1998 that CAM create an internal transfer agent unit and sub-contract with DST for technology. (*Id.* P43.) The April 2 memo acknowledged the inherent risk in transferring the transfer agent function from First Data, including the possibility of $ 8 to $ 10 million in lost annual revenues to Citibank [*4] (then known as Travelers). (*Id.* P45.)

Jones allegedly agreed with the April 2 memo, but the chairman of Travelers asked him to continue negotiations with First Data. (*Id.* P46.) Thereafter, Jones asked an unidentified executive vice president to resume negotiating with First Data. (*Id.*) On June 5, 1998, First Data presented an offer of discounts up to 60% off its normal fees. (*Id.* P47.) Deloitte allegedly took issue with First Data's June 5 proposal and raised its concerns with CAM representatives, including Daidone. (*Id.* PP48-50.) The SEC claims CAM ignored Deloitte's concerns (*id.* P51), and that First Data "sweetened the pot" on July 14, 1998 (*id.* P53). First Data proposed deeper fee discounts, it promised to upgrade its technology services, and it offered Travelers a "basket of services" from which First Data would generate $ 8 million in annual revenue for Travelers. (*Id.* P53.) This revenue guarantee would benefit CAM and not the Funds, but the SEC claims Jones did not question its propriety. (*Id.* P54.)

Thereafter, the executive vice president wrote a memorandum to Jones on July 24, 1998 recommending that CAM establish an affiliate to act as [*5] a transfer agent customer service center and sub-contract with First Data for the bulk of the transfer agent services. (*Id.* PP4, 55.) According to the SEC, Jones was focused on CAM's profit potential and approved the recommendation. (*Id.* P61.) Further, Jones allegedly "took no action to ensure that the independent directors of the Funds' boards were fully aware of the terms of the First Data proposal [or] to instruct anyone to make certain the Revenue Guarantee was fully disclosed to the Funds' boards." (*Id.* P61.) The

SEC claims that by submitting the self-dealing proposal to the Funds' board, Defendants and CAM breached their fiduciary duty to the Funds in that the Funds, not CAM, should have realized the benefits of the renegotiated contract with First Data. (*Id.* P5.)

The SEC claims Daidone took the lead in preparing the board presentation in 1999 (*id.* PP6, 12, 68-74), and that Jones approved it after only a cursory review (*id.* PP6, 11, 94). Specifically, the SEC claims that Daidone was listed as one of the authors of the March 4, 1999 final board memo, which allegedly misleadingly emphasized the fee savings the Funds would receive and obscured the profits [*6] the CAM-affiliate transfer agent would receive. (*Id.* P75.) The SEC claims that Daidone knew the true nature of the arrangement, i.e., that the CAM-affiliate would do minimal work while First Data handled the bulk of the transfer agent responsibilities at a deep discount. (*Id.* PP6, 77.) The board materials also did not accurately explain the other proposals the Deloitte team considered or that Deloitte had reservations about the First Data arrangement. (*Id.* P80-81, 83, 85.) The SEC claims that Defendants also did not disclose that CAM had entered into a side letter revenue guarantee agreement with First Data, in which First Data committed to providing millions of dollars of investment banking and asset management revenue to Citigroup. (*Id.* P7, 92, 95.)

The Funds' boards approved the transfer agent proposal at regularly-scheduled meetings throughout the first half of 1999. (*Id.* PP96, 98.) Additionally, the SEC alleges that Defendants did not disclose the true nature of the transfer agent agreement to the Funds' boards that approved the same structure for newly-created funds in 2001 and 2002. (*Id.* PP8, 103.) Four of the six board members of the newly-created funds [*7] were also members of the boards that voted to approve the transfer agent agreement in 1999. (*Id.* P103.) From October 1999 through September 2004, the CAM-affiliate transfer agent earned approximately $ 104 million from Fund business and $ 17 million under the revenue guarantee. (*Id.* P106.)

In September 2003, a former Citigroup employee informed the SEC of the true nature of the CAM transfer agent arrangement. (*Id.* P114.) The SEC and Defendants agreed to toll the statute of limitations from February 18, 2004 to February 17, 2005. (Daidone Mem. in Supp. of Mot. to Dismiss at 6; Jones Mem. in Supp. of Mot. to Dismiss at 3.) On May 31, 2005, the SEC entered an administrative order censuring Smith Barney Fund Management and Citigroup Global Markets for CAM's activities, and ordering, among other things, disgorgement of $ 109,004,551 plus pre-judgment interest and a civil penalty of $ 80,000,000. (May 31, 2005 Cease and Desist Order, at Jones Mem. in Supp. of Mot. to Dismiss at Ex.

Case 5:07-cv-03444-JF    Document 51-2    Filed 12/17/2007    Page 20 of 57

Page 3

2006 U.S. Dist. LEXIS 22800, *; Fed. Sec. L. Rep. (CCH) P93,855

A.) The SEC now claims that Defendants aided and abetted violations of §§ 206(1) and 206(2) of the Investment Advisors Act by, in Jones' case, recommending the First Data proposal and approving the [*8] misleading board memorandum (Complaint P120), and, in Daidone's case, misleading the boards into thinking that the arrangement would benefit the Funds (*id.* P 122-23). *15 U.S.C. §§ 80b-6(1)* and *80b-6(2)*. Defendants now move to dismiss the Complaint.

## II. DISCUSSION

Both Defendants submit that the action is time-barred. Additionally, Jones argues that the SEC has failed to state a claim of aiding and abetting liability against him and Daidone argues that it fails to plead aiding and abetting with sufficient particularity against him. Because the Court's general statute of limitations analysis applies to both Defendants, it begins there.

### A. The SEC's Action is Timely

The Investment Advisors Act does not contain its own limitations period, and, to the extent the SEC's claims are subject to a statute of limitations, *28 U.S.C. § 2462* applies. (*See* SEC Mem. in Opp'n to Mot. to Dismiss at 13.) *Section 2462* instructs:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not [*9] be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

*28 U.S.C. § 2462.*

Defendants argue that the alleged violations at issue here accrued in June or July 1999, when Defendants approved or made the board presentations, making the SEC's complaint, filed on August 8, 2005, untimely. *See 3M Co v. Browner, 305 U.S. App. D.C. 100, 17 F.3d 1453, 1462 (D.C. Cir. 1994)* (explaining, under *§ 2462*, a claim accrues "at the moment a violation occurs"); *New York v. Niagara Mohawk Power Co., 263 F. Supp. 2d 650, 660 (W.D.N.Y. 2003)* ("Under *§ 2462*, the limitations period begins to run on the date that the violation first occurs.").

Anticipating that the SEC will promote a continuing violation theory, Defendants submit that courts in this circuit have questioned the availability of such a theory

to securities law claims. *See, e.g., de la Fuente v. DCI Telecom., Inc., 206 F.R.D. 369, 385-86 (S.D.N.Y. 2002)* (questioning applicability of continuing [*10] fraud doctrine in securities fraud cases); *SEC v. Caserta, 75 F. Supp. 2d 79, 80 (E.D.N.Y. 1999)* (noting it is unclear whether the doctrine applies to securities fraud claims); *SEC v. Schiffer, 1998 U.S. Dist. LEXIS 6339, No. 97 Civ. 5853 (RO), 1998 WL 226101, at *3 (S.D.N.Y. May 5, 1998)* (noting the Second Circuit has not ruled on the doctrine's applicability in the securities fraud context and declining to apply it on a motion to dismiss when fact issues remained to be determined). Even if the theory were available, Defendants assert it "requires . . . the continuing violation be occasioned by continual unlawful acts, not continual ill effects from a single violation." *Niagara Mohawk, 263 F. Supp. 2d at 660.*

The SEC argues *Browner* is inapplicable because it did not involve fraud, and submits that the discovery rule should apply here, i.e., that the statute of limitations did not begin to run until the whistleblower alerted it to Defendants' conduct in September 2003. *See Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d Cir. 1985)* ("The statute does not begin to run until 'the plaintiff either acquires actual knowledge [*11] of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice.'" (quoting *City of Detroit v. Grinnell Corp., 495 F.2d 448, 461 (2d Cir. 1974)).* The SEC submits that any other rule would reward Defendants for concealing their fraud. *In re Sumitomo Copper Litig, 120 F. Supp. 2d 328, 346 (S.D.N.Y. 2000)* ("The doctrine of fraudulent concealment was designed to prevent a party from 'concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.'" (quoting *State of New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988)).*

While the SEC claims Defendants' actions were not a one-time violation, it does not argue for the application of a continuing violation rule. (*See* SEC Mem. in Opp'n to Mot. to Dismiss at n.16.) Rather, it urges that each time CAM collected excessive fees without disclosing the true facts regarding the transfer agent arrangement, it breached its fiduciary [*12] duty and triggered a new statute of limitations. *Merine v. Prudential-Bache Utility Fund, Inc., 859 F. Supp. 715, 725 (S.D.N.Y. 1994).*

The SEC cannot avoid its misplaced reliance on the continuing violation theory by labeling each collection of allegedly excessive fees by CAM a new breach by the Defendants. First, the case it relies on in support of its new cause of action theory was itself based on the continuing violation theory. *See Merine, 859 F. Supp. at 725*

(finding, under the "*continuing wrong doctrine*," that a new cause of action arose each time defendants charged excessive fees) (emphasis added). And, as Defendants point out, courts in this circuit have questioned the applicability of the continuing violation doctrine to securities fraud actions. *See, e.g., SEC v. Caserta, 75 F. Supp. 2d 79, 80 (E.D.N.Y. 1999)*. Even if the doctrine were applied, Plaintiff does not allege how CAM's collection of fees is anything other than a continued ill effect of Defendants' alleged lack of disclosure in the early summer of 1999. *See Niagara Mohawk, 263 F. Supp. 2d at 660* (requiring "continual unlawful acts, not continual [*13] ill effects from a single violation"). Second, the Complaint's theory of liability against Defendants is based on their failure to disclose the nature of the transfer agent agreement to the Funds' boards (*see* Complaint PP120-23), not CAM's collection of fees under the arrangement. In its claims for relief under §§ 206(1) and 206(2), the SEC cannot switch its basis of liability to excessive fees. The Second Circuit has rejected attempts to bring an excessive fee claim under any section of the Investment Advisors Act other than § 36(b). *See Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 413 (2d Cir. 1989)* ("To allow this [reincarnation of an excessive fee argument] would be to allow circumvention of the . . . specific procedural limitations of *section 36(b)* . . . ."). The Court, therefore, will only consider the appropriateness of applying *Browner* or the discovery rule here.

In support of their arguments, the parties rely on opposing decisions by federal courts outside of this district, both of which relied on their own circuit's precedent. Plaintiff directs the Court's attention to *SEC v. Buntrock, 2004 U.S. Dist. LEXIS 9495, 2004 WL 1179423 (N.D. Ill. May 25, 2004),* [*14] in which a Northern District of Illinois court was presented with the same question this Court faces: "when does a claim 'accrue' for purposes of a request for civil monetary penalties in a securities fraud case?" *Id. 2004 U.S. Dist. LEXIS 9495, at [WL] *11.* The court relied on a Seventh Circuit decision to hold that the § 2462 limitations period starts running when the plaintiff learns of the violation. *Id. 2004 U.S. Dist. LEXIS 9495, at [WL] *12* (citing *Law v. Medco Research, Inc., 113 F.3d 781, 785 (7th Cir. 1997)* (adopting the discovery rule because it is often difficult for a plaintiff to know he or she has been victimized within *Rule 10b-5's* one-year statute of limitations)). The *Buntrock* court reasoned that the D.C. Circuit's decision in *Browner* was not applicable because it did not involve allegations of fraud. *Buntrock, 2004 U.S. Dist. LEXIS 9495, 2004 WL 1179423, at *12.*

Defendants urge the Court's reliance on a recent Northern District of Alabama case. In that securities fraud action, *SEC v. Scrushy, 2005 U.S. Dist. LEXIS 30553, 2005 WL 3279894 (N.D.Ala. Nov. 29, 2005),* the court held that § 2462 does not incorporate the discovery rule. *Id. 2005 U.S. Dist. LEXIS 30553, at [WL] *2.* In doing so, the court noted it was bound by an Eleventh Circuit decision [*15] that adopted the D.C. Circuit's decision in *Browner. Id. 2005 U.S. Dist. LEXIS 30553, at [WL] *3* (citing *Trawinski v. United Techs., Carrier Corp., 313 F.3d 1295, 1298 (11th Cir. 2002)* (holding the discovery rule "has no place in a proceeding to enforce a civil penalty under a federal statute").

As the parties note, the Second Circuit has not adopted *Browner* or ruled on the applicability of the discovery rule to actions governed by § 2642 in the securities fraud context. The Court, however, finds *3M v. Browner* instructive. In Browner, the D.C. Circuit expressly rejected the discovery rule's application to cases governed by § 2462. The court reasoned that "an agency's failure to detect violations, for whatever reasons, does not avoid the problems of faded memories, lost witnesses and discarded documents . . . nothing in the language of § 2462 even arguably makes the running of the limitations period turn on the degree of difficulty an agency experiences in detecting violations." *Browner, 17 F.3d at 1461; see also id. at 1462* ("We reject the discovery of violation rule . . . as unworkable; outside the language of the statute; inconsistent with judicial interpretations of [*16] § 2462; unsupported by the discovery of the injury rule adopted in non-enforcement, remedial cases; and incompatible with the functions served by a statute of limitations in penalty cases.").

Although the court in *Browner* seemingly did not limit its holding to cases in which violations are undetected because of fraud, *see id. at 1461* (noting an agency's inability to discover violations, "*for whatever reasons,*" does not avoid problems statutes of limitations were designed to cure) (emphasis added), it did recognize the possible applicability of the fraudulent concealment doctrine to toll the statute of limitations. *Id. at 1461, n.15.* To toll the limitations period here, the SEC would have to plead (1) that the Defendants concealed the existence of the cause of action, (2) that it did not discover it until some point within five years of commencing this action, and (3) that its continuing ignorance was not attributable to lack of diligence on its part. *Hendrickson Bros., 840 F.2d at 1083.*

Plaintiff can establish the concealment element by pleading "either that the [Defendants] took affirmative steps to prevent [discovery of the fraud] or that the [*17] wrong itself was . . . self-concealing." *Id.* Normally, "a plaintiff seeking to toll the applicable statute of limitations due to fraudulent concealment . . . must meet the particularity standard of *Rule 9(b)*." *In re Natural Gas Commodity Litig., 337 F. Supp. 2d 498, 513-14 (S.D.N.Y. 2004)*. "When an alleged violation is inherently self-concealing, [however,] an assertion of such a scheme is

Case 5:07-cv-03444-JF    Document 51-2    Filed 12/17/2007    Page 22 of 57

Page 5

2006 U.S. Dist. LEXIS 22800, *; Fed. Sec. L. Rep. (CCH) P93,855

sufficient and a plaintiff need not plead any affirmative actions by a defendant." *Id. at 514.* Plaintiff's main allegations against Defendants here are that they did not disclose to the Funds' boards the benefits CAM would receive from the transfer agent arrangement or the revenue guarantee letter that allegedly motivated CAM to accept First Data's offer. The SEC asserts and the Court agrees, that at this stage in the litigation, this non-disclosure is inherently self-concealing. *Hendrickson, 840 F.2d at 1084.* The SEC has also alleged that it did not discover the alleged fraud until September 2003 and that its actions were not due to lack of diligence. *Id. at 1083.* Accordingly, the Court finds that the statute of limitations [*18] was tolled while the alleged fraud remained concealed and that the SEC's action is timely.

**B. Sufficiency of Pleadings**

**1. The Complaint States a Claim Against Jones**

Jones argues that the Complaint does not adequately allege that he aided and abetted CAM's violations of the IAA. In weighing the merits of Jones' motion, the Court will accept the Complaint's allegations as true and draw all reasonable inferences in favor of the SEC. *Twombly v. Bell Atlantic Corp., 425 F.3d 99, 106 (2d Cir. 2005)* ("At the pleading stage . . . the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") (citations omitted).

The Second Circuit has articulated the following requirements for aiding and abetting liability in securities fraud actions: "(1) the existence of a securities law violation by the primary . . . party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985)* (quoting [*19] *IIT, International Inv. Trust v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980)).* To satisfy the scienter requirement, the SEC must allege facts showing motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001).* The Complaint must also "allege that the acts of the aider and abettor proximately caused the harm . . . on which the primary liability is predicated." *Bloor, 754 at 62.* Courts have suggested that "there may be a nexus between the degree of scienter and the requirement that the alleged aider and abettor render 'substantial assistance.'" *IIT, 619 F.2d at 922.* The Second Circuit has held that where a defendant in a securities fraud case acts with reckless disregard, if the defendant does not owe the plaintiff a fiduciary duty, there must be a showing of the defendant's actual intent to defraud. *Ross v. Bolton, 904*

*F.2d 819, 824 (2d Cir. 1990)* (citing *IIT, 619 F.2d at 925).*

The Complaint alleges that Jones made CAM's transfer agent arrangement a priority (Complaint PP26, 28), that he wanted to capture the profit [*20] that First Data had been enjoying at CAM's expense (*id.* P28), that he instructed the executive vice president to continue negotiations with First Data after April 2, 1998 (*id.* P46), and that he approved the ultimate CAM-affiliate arrangement and the allegedly misrepresenting board materials with the understanding that doing so would guarantee CAM $ 8 million in annual revenue from First Data (*id.* PP54, 61, 94). Further, the Complaint alleges that he did so in disregard of his fiduciary responsibilities to the Funds and their shareholders. (*Id.* P61.)

The Court finds that the existence of a securities law violation by Citigroup and CAM has been established. (May 31, 2005 Cease and Desist Order.) With respect to the scienter requirement, the SEC claims that Jones knew that First Data was making large profits as CAM's transfer agent (Complaint P26), that First Data was willing to commit to providing a certain level of business to CAM's then-parent Travelers (*id.* P54), and that he "understood" that the true economics of the TA arrangement ultimately presented to the Funds' boards would not be disclosed (*id.* P58). Without addressing the question of whether Jones [*21] owed the Funds a fiduciary duty, the Court finds these claims, which still must be proven to the satisfaction of a jury, adequately allege Jones' knowledge of the underlying violation. Finally, despite Jones' protests that the SEC's theory of liability against him is based on mere inaction, Plaintiff does allege that Jones provided substantial assistance to the underlying fraud, most directly, by instructing the executive vice president to continue discussions with First Data and, in July 1998, to secure its revenue guarantee in writing. (Complaint PP46, 54). In doing so, the SEC has adequately alleged that Jones "associated [himself] with the venture, participated it in as something [he] wished to bring about, and sought by [his] action to make it succeed." *IIT, 619 F.2d at 925.* Accordingly, Jones' motion to dismiss the complaint for failure to state a claim is denied.

**2. The Complaint's Allegations Against Daidone are Sufficient**

Daidone argues that the Complaint does not satisfy the heightened pleading standard of *Federal Rule of Civil Procedure 9(b)* with respect to its allegations that he aided and abetted a securities [*22] fraud. He also contends that the SEC has not adequately plead scienter.

*Rule 9(b)* requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed.R.Civ.P. 9(b).*

2006 U.S. Dist. LEXIS 22800, *; Fed. Sec. L. Rep. (CCH) P93,855

Thus, the Complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)*.

Plaintiffs allege Daidone aided and abetted CAM's fraud by not disclosing to the Funds' boards the true nature of the agreed upon transfer agent arrangement. In conformity with *Rule 9(b)*, the Complaint alleges that Daidone led the Funds' boards to believe that the transfer agent arrangement involving the CAM-affiliate and First Data was in the Funds' best interests, when in reality it was supported by Defendants because it would result in profits to CAM and other Citigroup entities. (Complaint P96.) It identifies Daidone as the lead author of the board materials and the presentation given at the board meetings. ( [*23] *Id.* P6, 68, 73-74, 96-97.) It also clearly identifies the dates on which Daidone made his presentations and distributed the board materials. (*Id.* P96.) Finally, it adequately explains why the board materials and Daidione's presentation were fraudulent. For example, it alleges that Daidone spun the facts to make it appear the Funds were getting the best transfer agent deal available (*id.* PP6, 75, 78-9, 81, 83, 86, 88, 93, 95); that he did not disclose the existence of the revenue guarantee from First Data that would benefit Citigroup entities (*id.* P7, 80, 97); and that he did not explain that the CAM-affiliate transfer agent would, in reality, be doing very little transfer agent work (*id.* PP76-77, 90, 97). Accordingly, the Court finds Daidone's objection that the circumstances surrounding his participation in the alleged fraud have not be plead with sufficient specificity unavailing.

With respect to Daidone's intent, as the Court previously stated, the SEC must plead his knowledge of the securities law violation by the primary party. *Bloor, 754 F.2d at 62*. General allegations regarding his state of mind are sufficient. *Fed.R.Civ.P. 9(b)* [*24] ; *Ouaknine v. MacFarlane, 897 F.2d 75, 81 (2d Cir. 1990)*. The Complaint pleads Daidone's knowledge generally. (*See,*

*e.g.*, Complaint P5 "Defendants' intent from the beginning was to submit to the boards only the self-dealing proposal that allowed CAM to reap the enormous benefits. Defendants also understood or recklessly disregarded that if the full facts were candidly disclosed, no reasonable board could approve the proposal.")

Thus, the SEC must provide "some factual basis for conclusory allegations of intent." *Ouaknine, 897 F.2d at 80*. Here the Complaint alleges that Daidone knew that First Data had been making substantial profits from its role as CAM's transfer agent, which CAM intended to enjoy itself. (Complaint PP3, 31.) The SEC claims Daidone was a member of CAM's transfer agent team, was privy to Deloitte's concerns about the CAM-affiliate proposal, understood CAM's desire to press ahead with the CAM-affiliate and First Data deal and the negotiations leading to the ultimate arrangement, including First Data's revenue guarantee. (*Id.* PP29, 50, 63, 65.) Further, Daidone allegedly instructed the Deloitte representative charged with preparing [*25] the first draft of the board materials to describe the arrangement in a way that would be attractive to the Funds' boards without clearly identifying the profit that CAM would enjoy. (*Id.* PP 70-71, 75.) Finally, the SEC claims Daidone was well aware of the revenue guarantee, as he signed the document himself (*id.* P65), but never disclosed its existence to the boards in the materials he prepared or the presentations he made (*id.* P97). Accordingly, the Court finds that the Complaint presents a sufficient factual basis to support its allegations of scienter against Daidone.

## CONCLUSION

For the reasons explained above, Defendants' motions to dismiss the complaint are denied. The parties are directed to advise the Court of any needed modifications to the case management plan by May 15, 2006.

**So Ordered:** New York, New York

April 25, 2006

**Richard Conway Casey, U.S.D.J.**

# Exhibit C

LEXSEE

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff, -against- RICHARD D. POWER, Defendant.**

**06 Civ. 15343**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 87632**

**November 27, 2007, Decided**
**November 29, 2007, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, the Securities and Exchange Commission (SEC), sued defendant former corporate officer, alleging various securities laws violations, including fraud in the offer and sale of securities under 15 U.S.C.S. § 77q(a), fraud in connection with the purchase or sale of securities under 15 U.S.C.S. § 78j(b), and aiding and abetting such violations. The officer moved to dismiss the complaint. The SEC contested the motion.

**OVERVIEW:** The SEC alleged that the officer created a dealer connection fee (DCF) accounting device to adjust the corporation's purchase of security monitoring contracts from independent dealers, which generated lower reported earnings than its direct sales of these contracts. The SEC further alleged that the officer invented DCF sham transactions, which consisted of two equal and offsetting payments in every security monitoring contract with a specific and false accounting effect in that the corporation recognized the payment immediately, but the offsetting payment from the corporation was amortized over 10 years. The court found that the complaint adequately alleged the federal securities laws violations. In particular, the complaint sufficiently alleged violation of antifraud provisions by the officer's active involvement in the DCF sham transactions, which also supported the claims of aiding and abetting violations of § 78j(b). Further, the complaint stated these fraud claims with the required particularity. The court further found that the complaint sufficiently alleged reporting violations and aiding and abetting books and records violations to withstand the motion to dismiss.

**OUTCOME:** The court denied the motion to dismiss the complaint.

**CORE TERMS:** fraudulent, sham transaction, accounting, Exchange Act, acquisition, dealer, fraudulent concealment, misstatement, scienter, aiding and abetting, statute of limitations, self-concealing, discovery, inflate, monitoring, Securities Act, fiscal quarter, injunctive relief, involvement, recurrence, diligence, conceal, notice, ended, securities laws, causes of action, citation omitted, summary judgment, operating income, disgorgement

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1]For the purposes of a motion to dismiss, all factual allegations are accepted as true, and all inferences are drawn in favor of the pleader. A court may also consider any documents attached to a complaint or incorporated by reference into the complaint. On a motion to dismiss, the complaint is properly deemed to include any statements or documents it incorporates by reference, public disclosures filed by law with the Securities and Exchange Commission, and documents the plaintiff either possessed or knew about and upon which the plaintiff relied in bringing suit.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN2]At issue in a Fed. R. Civ. P. 12(b)(6) motion is not whether a claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the

claims. Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. Courts, however, are not bound to accept as true a legal conclusion couched as a factual allegation. Conclusions of law or unwarranted deductions of fact are not admitted for the purposes of stating a claim.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Securities Fraud > General Overview*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview*

[HN3]15 U.S.C.S. § 77q(a), is a general prohibition against fraud in the offer or sale of securities, using the mails or the instruments of interstate commerce. Section 77q(a)(1) forbids the direct or indirect use of any device, scheme, or artifice to defraud; § 77q(a)(2) makes it unlawful to obtain money or property through misstatements or omissions about material facts; and § 77q(a)(3) proscribes any transaction or course of business that operates as a fraud or deceit upon a securities buyer. 15 U.S.C.S. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit similar conduct in connection with the purchase or sale of a security. 15 U.S.C.S. § 78j(b); 17 C.F.R. § 240.10b-5.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > Elements of Proof*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > Scienter*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > General Overview*

[HN4]To prove a claim under 15 U.S.C.S. § 77q(a), 15 U.S.C.S. § 78j(b), and 17 C.F.R. § 240.10b-5, the Securities and Exchange Commission must show that the defendant: (1) committed a deceptive or manipulative act, or made a material misrepresentation, or a material omission if the defendant had a duty to speak, or used a fraudulent device; (2) with scienter; (3) which affected the market for securities or was otherwise in connection with their offer, sale or purchase. While proof of scienter is a necessary element of liability under 15 U.S.C.S. § 77q(a)(1) and 15 U.S.C.S. § 78j(b) and 17 C.F.R. § 240.10b-5, it is not required for liability under 15 U.S.C.S. § 77q(a)(2) and (3).

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN5]A public company and its management may violate 15 U.S.C.S. § 77q(a), 15 U.S.C.S. § 78j(b), and 17 C.F.R. § 240.10b-5 by making a material misstatement in, or omitting requisite material information from, a periodic report, registration statement, or other filing with the Securities and Exchange Commission. The use of deceptive devices and fraudulent practices also violate these provisions.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN6]Primary liability for a company's false statements is proper where the Securities and Exchange Commission is able to show that the defendant was sufficiently responsible for the statement--in effect caused the statement to be made--and knew or had reason to know that the statement would be disseminated to investors.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > Scienter*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Motive & Opportunity*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Recklessness*

[HN7]With regard to the showing of scienter required to proceed on claims under 15 U.S.C.S. § 77q(a), 15 U.S.C.S. § 78j(b), and 17 C.F.R. § 240.10b-5, in the U.S. Court of Appeals for the Second Circuit, the pleading standard for scienter is satisfied (a) by alleging facts to show that the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

*Securities Law > Liability > Secondary Liability > Aiding & Abetting > Elements of Proof*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview*
[HN8]Three elements must be proved at trial in order to prevail on a claim of aiding and abetting violations of 15 U.S.C.S. § 78j(b), and 17 C.F.R. § 240.10b-5: (1) defendant committed at least one violation of 15 U.S.C.S. § 78j(b), and 17 C.F.R. § 240.10b-5, the "primary violation"; (2) defendant knew or was reckless in not knowing of the primary violation; and (3) defendant substantially assisted in the primary violation. There must be a showing of actual intent to defraud when the defendant does not owe a fiduciary duty to the defrauded parties.

*Securities Law > Liability > Secondary Liability > Aiding & Abetting > Elements of Proof*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview*
[HN9]An aider and abettor's substantial assistance must be a proximate cause of the primary violation. Mere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*
[HN10]A claim under 15 U.S.C.S. § 78j(b) sounds in fraud and must therefore meet the pleading requirements of Fed. R. Civ. P. 9(b). Rule 9(b) provides that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally. Fed. R. Civ. P. 9(b). The U.S. Court of Appeals for the Second Circuit reads Rule 9(b) to require that a complaint alleging fraud (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. However, the rule is not intended to be an insurmountable hurdle for claimants to overcome, but was designed to afford defendants fair notice of the fraud alleged against them.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > False Registration Statements > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*
[HN11]The U.S. Court of Appeals for the Second Circuit has held that the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply to claims under 15 U.S.C.S. §§ 78k and 78l, despite the fact that fraud is not an element or a requisite to a claim under those sections where the particular claims were predicated on fraud.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Time Limitations*
[HN12]See 28 U.S.C.S. § 2462.

*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
*Torts > Procedure > Statutes of Limitations > Tolling > Equitable Estoppel*
[HN13]The fraudulent concealment doctrine operates to toll a statute if a plaintiff alleges: (1) that the defendants concealed the cause of action; (2) that the plaintiff did not discover the cause of action until some point within five years of commencing the action; and (3) that the plaintiff's continuing ignorance was not attributable to lack of diligence on its part.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Governments > Legislation > Statutes of Limitations > Equitable Estoppel*
*Torts > Procedure > Statutes of Limitations > Tolling > Equitable Estoppel*
[HN14]A plaintiff can establish the concealment element of the fraudulent concealment doctrine by pleading either that the defendants took affirmative steps to prevent discovery of the fraud or that the wrong itself was self-concealing. Normally, a plaintiff seeking to toll the applicable statute of limitations due to fraudulent concealment must meet the particularity standard of Fed. R. Civ. P. 9(b). When an alleged violation is inherently self-concealing, however, an assertion of such a scheme is sufficient and a plaintiff need not plead any affirmative actions by a defendant.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Governments > Legislation > Types of Statutes*

[HN15]The primary consideration when determining whether a claim seeks a "penalty" to which 28 U.S.C.S. § 2462 applies is whether the remedy at issue is "punitive" or "remedial" in nature.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Liability > Remedies > Equitable Relief*

[HN16]It has been held that 28 U.S.C.S. § 2462 does not apply to equitable remedies, which seek either to return opposing parties to their status quo ante or to protect the public from harm. Disgorgement is an equitable remedy to which § 2462 does not apply.

*Civil Procedure > Remedies > Injunctions > Permanent Injunctions*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Liability > Remedies > Equitable Relief*

[HN17]Whether a permanent injunction constitutes a "penalty" under 28 U.S.C.S. § 2462 depends on the likelihood of recurrence.

*Securities Law > Liability > Remedies > Equitable Relief*

[HN18]In determining whether there is a reasonable likelihood of future securities laws violations, a district court may also consider: (1) the egregiousness of a violation; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; and (4) the sincerity of defendant's assurances against future violations.

**COUNSEL:**  [*1] For Plaintiff: Arthur S. Lowry, Esq., Grayson D. Stratton, Esq., U.S. SECURITIES AND EXCHANGE COMMISSION, Washington, D.C.

For Defendant: Daniel J. Horwitz, Esq., Christopher T. Leonardo, Esq., DICKSTEIN SHAPIRO LLP, New York, NY.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

Sweet, D.J.

Defendant Richard D. Power ("Power" or the "Defendant") has moved under Rule 12(b)(6), Fed. R. Civ. P., to dismiss the complaint filed against him by the Securities and exchange Commission ("SEC"). For the reasons set forth below, the motion is denied.

Facts

The SEC filed its complaint on December 21, 2006, alleging five causes of action against Power, a former officer of Tyco International Ltd. ("Tyco"): 1) violation of Securities Act of 1933 ("Securities Act") § 17a, 15 U.S.C. § 77q(a) (fraud in the offer or sale of securities); 2) violation of Exchange Act of 1934 ("Exchange Act") § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (fraud in connection with the purchase or sale of securities); 3) aiding and abetting a violation of § 10(b) and Rule 10b-5; 4) aiding and. abetting violations of Exchange Act § 13(a), 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, [*2] 240.13a-1, and 240.13a-13 (reporting violations); and 5) violations of Exchange Act Rule 13b2-1, 17 C.F.R. §240.13b2-1, and aiding and abetting violations of Exchange Act § 13(b)(2)(A), 15 U.S.C. §78m(b)(2)(A) (books and records violations).

According to the Complaint, in July 1997, Tyco merged with ADT, a security monitoring company, which it operated under its Fire & Security Services Division, where Power was employed as a Vice President. Compl. PP 17-18. Immediately following the ADT merger, Power created a dealer connection fee ("DCF") as an accounting device to adjust Tyco's purchase of security monitoring contracts from independent dealers, which generated lower reported earnings than did its direct sales of monitoring contracts. Compl. P 18. The Complaint alleges that Power accomplished this by inventing what the Commission terms the "DCF Sham Transaction," which consisted of two equal and offsetting "payments" that were inserted into each security monitoring contract Tyco purchased from an independent dealer Compl. P 19. No cash changed hands as part of the transaction. Compl. P 20. While the equal and offsetting "payments" had no effect on the economic reality of substance [*3] of the existing, recurring transactions between Tyco and its dealers, Power designed the transaction to have a specific and false accounting effect. Although Tyco recognized the payment it received from the dealer as income immediately, the offsetting payment from Tyco to the dealer was amortized over ten years. Compl. PP 20-21. According to the Complaint, the DCF Sham Transaction was inserted into every security monitoring contract Tyco purchased through 2002. Compl. P 24.

The Complaint also alleges Power's participation in fraudulent acquisition accounting. The Complaint alleges that Power was responsible for acquisition accounting in Tyco's acquisition of Carlisle in 1996, where Carlisle management, at Tyco's request, made entries that reduced its asset and increased its liabilities by $ 26.4 million, adjustments that Power referred to as "financial engineering." Compl. P 35. The Complaint alleges Power proposed the write off of $ 72 million in assets in use during the Holmes acquisition in 1998. While Tyco did not completely write off these assets, it substantially undervalued the assets at salvage value, effectively adopting Power's undervaluation method to inflate Tyco's reported [*4] income improperly by reducing its depreciation expenses. Compl. P 36.

The Complaint also alleges that Power, together with defendant Edward Federman ("Federman") [1], oversaw the accounting decisions for Tyco's 1999 Raychem acquisition, endeavored to improperly inflate Raychem's reserve accounts, directed that its acquired inventory be undervalued, and urged that Raychem's post-merger expenses be concealed in a "stub" period, in Order to give the illusion of larger profits for Tyco after the acquisition. Compl. PP 38-40.

> 1   Federman was terminated as a defendant in this case on April 30, 2007.

Finally, the Complaint alleges that Power together with Federman, directed the entry of multiple improper pre-merger adjustments during Tyco's 1999 acquisition of U.S. Surgical. Compl. $ 41..

The motion of Power to dismiss the complaint was heard on April 11, 2007.

**The Applicable Standard**

[HN1]For the purposes of a motion to dismiss, all factual allegations are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). The Court may also consider any documents attached to the complaint or incorporated by reference into the complaint. [*5] [2] Paulemon v. Tobin, 30 F.3d 307, 308-09 (2d Cir. 1994) (citation omitted). On a motion to dismiss, the complaint is properly deemed to include "any statements or documents it incorporates by reference, public disclosures filed by law with the Commission, and, documents the plaintiff either possessed or knew about and upon which the plaintiff relied in bringing suit." Harrison v. Rubenstein, No. 02 Civ. 9356 (DAB), 2007 U.S. Dist. LEXIS 13118, at *27-*28, 2007 WL 582955 at *10 (S.D.N.Y. Feb. 26, 2007) (citing Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000)).

> 2   The Declaration of Daniel J. Horwitz, submitted with Powers motion to dismiss, attaches several exhibits, primarily news reports. Except where otherwise noted below, they are not documents attached to or referenced in the Commission's complaint, and consequently have not been considered.

[HN2]At issue in a Rule 12(b)(6) motion "is not whether a [claimant] will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.", Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)). "Once a claim has been stated adequately, it may be supported by showing any set of facts [*6] consistent with the allegations in the complaint." Roth v. Jennings, 489 F.3d 499, 510 (1:1 Cir. 2007) (citing Bell Atlantic Corp. v. Twombly, 127 S. Ct.1955, 1969, 167 L. Ed. 2d 929 (2007)).

Courts, however, are "not bound to accept: as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986). Rather, it is well understood that "conclusions of law or unwarranted deductions Of fact are not admitted" for the purposes of stating a claim. Lenten v. Merrill Lynch & Co., Inc., 396 F.3d 161, 174-75 (2d Cir. 2005), cert. denied, 126 S. Ct. 421, 126 S. Ct. 421, 163 L. Ed. 2d 321 (2005) (citation omitted).

**The Complaint Adequately Alleges its Causes of Acton**

The Complaint's first two Claims allege that Power violated Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5. The Third and Fourth Claims allege that Power aided and abetted Tyco's violations of Section 10(b) and Rule 10b-5, as well as Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1, and 13a-13. The Fifth Claim alleges that Power violated Exchange Act Rule 13b2-1 and aided and abetted violations of Exchange Act Section 13(b)(2)(A).

*i. Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5 [*7] Claims*

The Complaint states claims against Power based on all three subsections of Section 17(a), and all three subsections of Rule 10b-5. Compl. PP 59, 62. Section 17(a), [HN3]15 U.S.C. 77q(a), is a general prohibition against fraud in the offer or sale of securities, using the mails or the instruments of interstate commerce. Section 17(a)(1) forbids the direct or indirect use of any device, scheme, or artifice to defraud; Section 17(a)(2) makes it unlawful to obtain money or property through misstatements or omissions about material facts; and Section 17(a)(3) pro-

scribes any transaction or course of business that operates as a fraud or deceit upon a securities buyer. SEC v. Softpoint, Inc., 958 F. Supp. 846, 861 (S.D.N.Y. 1997), aff'd, 159 F.3d 1348 (2d Cir. 1998). Section 10(b), and Rule 10b-5 promulgated thereunder, prohibit similar conduct in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

In general,[HN4] to prove a claim under these provisions, the SEC must show that the defendant: (1) committed a deceptive or manipulative act, or made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent [*8] device; (2) with scienter; (3) which affected the market for securities or was otherwise in connection with their offer, sale or purchase. See SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999), SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). While proof of scienter is a necessary element of liability under Securities Act § 17(a)(1) and Exchange Act § 10(b) and Rule 10b-5, it is not required for liability under § 17(a)(2) and 17(a)(3). See Aaron v. SEC, 446 U.S. 680, 697, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980).

[HN5]A public company and its management may violate these provisions by making a material misstatement in, or omitting requisite material information from, a periodic report, registration statement, or other filing with the Commission. See Softpoint, 958 F. Supp. at 862-63. The use of deceptive devices and fraudulent practices also violate these provisions. See In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005) (factoring and securitization of worthless invoices were deceptive devices and constituted acts, practices or courses of conduct violative of Section 10(b) and Rule 10b-5).

Power has contended that the Complaint fails to allege that he violated these antifraud [*9] provisions because it fails to allege facts supporting scienter or his involvement in the DCF Sham Transaction, other than his asserted role in which he "simply came up with the idea of a dealer connection fee." Def.'s Mem. Supp. 16. Power also asserts that the Complaint fails to allege his personal participation in fraudulent conduct, or that he made or caused any false and misleading statements in Tyco's public filings. Def.'s Mem. Supp. 18-22.

[HN6]Primary liability for a company's false statements is proper where "the SEC is able to show that the defendant was sufficiently responsible for the statement-- in effect caused the statement to be made--and knew or had reason to know that the statement would be disseminated to investors." SEC v. KPMG LLP., 412 F. Supp. 2d 349, 375-76 (S.D.N.Y. 2006) (denying summary judgment to audit engagement partners, finding their responsibility "in forming the audit opinion" that consti-

tuted the misstatements at issue was sufficient basis for primary liability). Here the allegations include that: as a result of the fraudulent DCF Sham Transaction that Power devised, Tyco periodic reports--specifically including Tyco's Form 10-K for its fiscal year 2001, [*10] Form S-4 filed January 8, 2002, and Form 10-Q for Tyco's second fiscal quarter of 2002--contained false and misleading statements, Compl. P 29; due to the improper Carlisle entries Power was responsible for, Tyco's post-acquisition earnings were overstated in reports filed with the Commission, Compl. P 35; due to improperly undervalued assets at Holmes, Tyco's Forms 10-K for 1998 through 2002 overstated operating income by more than $ 70 million, Compl. 91 36; improper Raychem entries due to Power resulted in misstatements on Tyco's Forms 10-K for 1999 and 2000, Compl. P 39; various filings made with the Commission between 1997 and 2002 were false and misleading as a result of the DCF Sham Transaction and the improper acquisition accounting, Compl. P 56.

Power has cited Mills v. Polar Molecular Corp., 12 F.3d 1170 (2d Cir. 1993), and SEC v. Cedric Kushner Promotions, Inc., 417 F. Supp. 2d 326 (S.D.N.Y. 2006), to support his argument that he cannot be held primarily liable for misstatements here. Mills turned on the failure to allege any facts indicating that the defendants "personally knew of, or participated in, the fraud." Mills, 12 F.3d at 1175. Kushner, which was decided, on summary [*11] judgment, turned on the failure to adduce, after discovery, evidence that the defendants was "centrally involved in the planning and execution of the fraudulent schemes." Kushner, 417 F. Supp. 2d at 333-34. The Complaint here alleges that Power was the architect of the DCF Sham Transaction and oversaw and directed the fraudulent acquisition accounting in the Carlisle, Holmes, Raychem, and U.S. Surgical acquisitions.

Power has contended that Federman bears greater responsibility for DCF Sham Transaction, because he. "intervened and altered" Power's idea in 1998, Def.'s Mem. Supp. 17, and only after that point did the transaction affect Tyco's income. Def.'s Mem. Supp. 5. However, the Complaint alleges that Power created the DCF Sham Transaction in the summer of 1997, Compl. PP 17, 18; in accordance with Power's design, every time Tyco acquired a security monitoring contract from its network of independent alarm dealers, it paid a purported $ 200 "growth bonus" to the dealer, and, at the same time, the dealer purportedly paid a $ 200 "dealer connection fee" to Tyco, Compl. PP 18-19, 28; Power designed the transaction to have specific, false accounting effect, Compl. P 18; as a result [*12] of the transaction, and Power's accounting treatment for the transaction, Tyco recognized immediate, improper income in its financial statements filed with the SEC beginning with its quarterly report on

Form 10-Q for the period ending December 31, 1997, Compl. PP 21, 28, 29; the DCF Sham Transaction remained in place and unchanged from Power's initial design for at least two fiscal quarters before Federman made purely cosmetic changes to the transaction, leaving Power's fraudulent device intact, Compl. PP 18, 22, 24. These allegations are sufficient to plead Power's active involvement.

[HN7]With regard to the showing of scienter required to proceed on the Section 17(a)(1), Section 10(b), and Rule 10b-5 claims, in the Second Circuit, the pleading standard for scienter is satisfied " '(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' " Ganino v. Citizens Utilities Co., 228 F.3d 154, 168-69 (2d Cir. 2000) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

The Complaint alleges scienter directly (e.g., Compl. [*13] PP 60, 63) and circumstantially from facts such as Power's background and training, his responsibilities at Tyco, and the sheer audacity of his "adjustments" to the balance sheets of acquired companies designed to improperly inflate Tyco's reported financial results. The allegations include that Power was a former accountant with PricewaterhouseCoopers ("PwC") for eight years before coming to Tyco, Compl. P 13; was involved in Tyco's financial reporting, Compl. P 2; was at one point Tyco's Chief Financial Officer, Compl. P 13; exchanged accounting literature with his co-defendant Federman which indicated that Tyco's accounting for the DCF Sham Transaction was improper, Compl. P 23; knew or was reckless in not knowing that the DCF Sham Transaction was improper and that his conduct substantially assisted Tyco's filing of false reports with the Commission, Compl. P 31; referred to Carlisle's balance sheet adjustments as "financial engineering" with reserves "potentially in excess of actual exposure," Compl. P 35; proposed a complete write off of $ 72 million in assets at Holmes that were still in use, Compl. P 36; attempted to inflate Raychem's reserve accounts improperly, directed the [*14] understatement of its inventory, and proposed the use of Raychem's "stub" period to conceal Tyco's post-merger expenses from public disclosure, Compl. PP 38-40; directed U.S. Surgical to make multiple improper pre-merger adjustments to enhance Tyco's reported post-acquisition operating income, including the establishment of improper reserves--for which Power took credit--as a device to help Tyco meet its post-merger financial targets, Compl. P 11; knowingly and recklessly falsely enhanced and overstated Tyco's reported operating income, Compl. P 12; and knew, was reckless in not knowing, or should have known that Tyco's filings contained

material misstatements and omissions, Compl. P 60, 63. These allegations suffice to adequately allege Power's violation of Section 17(a), Section 10(b) and Rule 10b-5.

The Complaint also alleges that defendants Power and Federman engaged in fraudulent conduct "singly or in concert." Compl. P 12. The fact that others may have participated in this conduct, or that Power had an accomplice, does not absolve Power at the pleading stage.

To the extent that Power postulates that the facts developed in discovery will show that the conduct of others somehow "intervened" [*15] and cut off his liability for the fraud, it is inconsistent with the Complaint's allegations detailing Power's direct and substantial involvement in the fraudulent conduct, and is therefore insufficient to prevail on a motion to dismiss.

### ii. Section 10(b) and Rule 10b-5 Aiding and Abetting Claims

The Complaint's Third Claim alleges that Power aided and abetted Tyco's violations of Exchange Act Section 10(b) and Rule 10b-5. [HN8]Three elements must be proved at trial in order to prevail on this claim: (1) Tyco committed at least one violation of Section 10(b) and Rule 10b-5 ("primary violation"); (2) Power knew or was reckless in not knowing of the primary violation; and (3) Power substantially assisted in the primary violation. See SEC v. Treadway, 430 F. Supp. 2d 293, 336, 339 (S.D.N.Y. 2006); SEC v. Lybrand, 200 F. Supp. 2d 384, 400 (S.D.N.Y. 2002), aff'd on other grounds, 425 F.3d 143 (2d Cir. 2005). There must be a showing of actual intent to defraud when the defendant does not owe a fiduciary duty to the defrauded parties. See SEC v. Jones, No. 05 Civ. 7044 (RCC), 2006 U.S. Dist. LEXIS 22800, at *19, 2006 WL 1084276, at *7 (S.D.N.Y. April 25, 2006) (citing Ross v. Bolton, 904 F.2d 819, 824 (2d Cir. 1990)).

Power maintains [*16] that the Complaint fails to establish that he was the "proximate cause" of Tyco's violations, and, therefore, that he "substantially assisted" in the primary violation. Def.'s Mem. Supp. 23. See Treadway, 430 F. Supp. 2d at 339 ([HN9]"The aider and abettor's substantial assistance must be a proximate cause of the primary violation."). While "mere awareness and approval of the primary violation is insufficient to make out a claim for substantial assistance," Id. (citation omitted), here, the allegations exceed mere inaction. As outlined supra, the Commission alleges Power's knowledge of and active involvement in the perpetration of Tyco's primary violations. See, e.g., Treadway, 430 F. Supp. 2d at 340 (denying summary judgment on aiding and abetting claims where Commission's allegations regarding defendants' knowledge of and involvement in violations were in dispute); Block v. First Blood Assocs., 663 F.

Supp. 50, 51 (S.D.N.Y. 1987) (denying motion to dismiss complaint alleging that defendants substantially participated in and/or aided and abetted securities fraud by, inter alia, structuring a sham transaction involving a fictitious sale of the rights to a motion picture).

Finally, [HN10]a claim [*17] under Section 10(b) sounds in fraud and must therefore meet the pleading requirements of Rule 9(b), Fed. R. Civ. P. See, e.g., In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir. 2001). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). The Second Circuit "has read Rule 9(b) to require that a complaint (alleging fraud) '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills, 12 F.3d at 1175). However, the rule is not intended to be "an insurmountable hurdle for [claimants] to overcome, but was designed to afford defendants fair notice of the fraud alleged against them." Lehman Bros. Commercial Corp. v. Minmetals Int'l, No. 94 Civ. 8301 (JFK), 1995 U.S. Dist. LEXIS 15185, at *7, 1995 WL 608323, at *3 (S.D.N.Y. Oct. 16, 1995) (internal quotation marks and citation omitted) (denying motion [*18] to dismiss); see also Ross v. Bolton, 904 F.2d at 823 ("The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based"); In re Scholastic Corp. Sec. Litig., 252 F.3d at 72 ("[W]e do not require the pleading of detailed evidentiary matter in securities litigation."). The Complaint alleges Power's wrongful action, Compl. PP 18-21 (noting his creation of a transaction that lacked economic substance and that was designed to inflate Tyco's income); facts indicating Power's fraudulent intent, Compl. PP 4, 21, 23, 31 (pointing out that, pursuant to Power's intent and design, illusory payments from dealers were treated as income and illusory payments to dealers were treated as capital expenses, as well as that Power possessed accounting literature that indicated the accounting treatment afforded the transaction was improper); and the fraudulent misstatements caused by Power's introduction of the DCF Sham Transaction, Compl. PP 28-29 (alleging that, as a result of the DCF Sham Transaction, Tyco's operating income and cash flow were overstated by $ 567 million and $ 719 million, respectively, from Tyco's fiscal year [*19] ended September 30, 1998, through its fiscal quarter ended December 31, 2002).

Power contends that the decision in Kushner supports his contention that since he was not responsible for Tyco's continued use of his device, he cannot be held to have made any misleading statements in Tyco's public filings. There, the district court dismissed a claim for primary liability under Section 10(b) of the Exchange Act against an individual who directly assisted in the preparation of a periodic filing that included a forged audit report (among other misstatements), but who was not "alleged to have been centrally involved in the planning and execution of the fraudulent scheme[]." Kushner, 417 F. Supp. 2d at 333-34. Here, Power is alleged to have created the transaction that was directly responsible for Tyco's fraudulent misstatements for a period of five years, and to have intended and known that the sham transaction would falsely inflate Tyco's reported income and cash flow. See Compl. PP 13, 18-21, 28-29, 31. Accordingly, the Complaint sufficiently alleges Power's responsibility for the misstatements.

### iii. Exchange Act Section 13(a) and Rule 12b-20, 13a-1, and 13a-3 Claims

Power asserts that the [*20] Commission's Fourth and Fifth Claims against him for violating Exchange Act Rule 13b2-1 and aiding and abetting Tyco's violations of Exchange Act Sections 13(a) and 13(b)(2)(A) and Rules 12b-20, 13a-1, and 13a-13 fail because they "similarly require the Commission to show that Power acted with fraudulent intent and provided substantial assistance that resulted in primary violations." Def.'s Mem. Supp. 25.

While the Commission asserts that the heightened pleading standard of Rule 9(b) does not apply to these claims because they are not fraud claims, Pl.'s Mem. Opp. 13, the Second Circuit has held that the application of Rule 9(b) "is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." Rombach, 355 F.3d at 171. In Rombach, [HN11]the Second Circuit held that the heightened pleading requirements of Rule 9(b) apply to claims under Exchange Act Section 11 and Section 12(a)(2), despite the fact that "fraud is not an element or a requisite to a claim" under those sections, because the particular claims in the case before the court were predicated on fraud. Here, the Commission's Fourth and Fifth Claims are predicated [*21] on the same alleged fraud as the Commission's First, Second, and Third Claims.

Despite the application of Rule 9(b) to the Fourth and Fifth Claims, for the same reasons articulated above with respect to the Commission's primary and aiding and abetting claims under Section 10(b) and Rule 10b-5, the Fourth and Fifth claims are adequately supported by the allegations contained in the Complaint to survive a motion to dismiss.

### Statute of Limitations

Section 2462 of Title 28 provides that [HN12]"an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." 28 U.S.C. § 2462. The Commission filed suit in December 2006, but its claims seek to punish conduct that occurred at the latest in 1999. Power contends that the civil penalty claims are barred by the statute of limitations, citing SEC v. Jones, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) ("Jones II"). Def.'s Mem. Supp. 9-14.

### i. Fraudulent Concealment Doctrine

Although Power relies on the summary judgment decision in Jones II, Jones II is largely inapposite here because it was decided on a motion for [*22] summary judgment, following discovery. Thus, unlike the question facing that court-whether sufficient facts had been adduced at the end of discovery to warrant the requested relief-the question here is instead whether the Complaint's allegations, if true, would support the relief the Commission seeks.

The SEC relies on the Jones court's earlier decision denying a motion to dismiss the Commission's injunctive action on statute of limitations grounds, SEC v. Jones, No. 05 Civ. 7044 (RCC), 2006 U.S. Dist. LEXIS 22800, 2006 WL 1084276 (S.D.N.Y. April 25, 2006) ("Jones I"). Jones I involved allegations that an investment adviser violated the Investment Advisers Act of 1940 ("Advisers Act") by failing to tell the board of directors of the mutual funds managed by the investment adviser about additional revenue agreements it had obtained from its transfer agent. The defendants in Jones I moved to dismiss the Commission's complaint, in part on statute of limitations grounds. In denying the motion, the court noted that the five-year statute of limitations on penalties and fines set out in Section 2462 could be tolled by the fraudulent concealment doctrine, as the Commission's complaint had meet the relevant standard at the [*23] pleading stage. Jones I, 2006 U.S. Dist. LEXIS 22800, at *17-*18, [WL] at *6. See generally Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S. Ct. 582, 90 L. Ed. 743 (1946) (requiring the fraudulent concealment doctrine to be "read into every federal statute").

[HN13]The fraudulent concealment doctrine operates to toll the statute if the plaintiff alleges: (1) that the defendants concealed the cause of action; (2) that the plaintiff did not discover the cause of action until some point within five years of commencing the action; and (3) that the plaintiff's continuing ignorance was not attributable to lack of diligence on its part. Jones I, 2006 U.S. Dist. LEXIS 22800, at *16, [WL] at *6 (citing New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988)).

In Jones I, applying the fraudulent concealment doctrine, the Honorable Richard C. Casey determined in connection with a motion to dismiss that the defendant's failure to inform the mutual funds' board of directors of the additional revenue was "inherently self-concealing," and observed that the SEC had properly alleged both that it did not discover the fraud until some time within the statute of limitations and that its failure to discover the fraud sooner was not due to lack of diligence. Jones I, 2006 U.S. Dist. LEXIS 22800, at *18, [WL] at *6.

Here, [*24] at to the first and second elements required to establish fraudulent concealment, the Commission has alleged in its Complaint that as a result of defendants' conduct concealing the DCF Sham Transaction, and the Transaction's inherently self-concealing nature, that the Commission did not learn of the fraud until late 2003 (and therefore within the statute of limitations). Compl. P 57. It is alleged that the transaction was explicitly designed by Power to fraudulently conceal the fact that it had no economic substance. Compl. PP 3-4. Cf. Hendrickson, 840 F.2d at 1083 (holding that "the passing off of a sham article as one that is genuine is an inherently self-concealing fraud" and sufficient to toll the statute of limitations).

According to Power, the SEC has failed to meet its burden of pleading fraudulent concealment. As in Jones II, the Commission here fails to allege that Power took any affirmative steps to conceal any fraud. Jones II, 476 F. Supp. at 382. However, as the Court stated in Jones I:

[HN14]Plaintiff can establish the concealment element by pleading "either that [*25] the [Defendants] took affirmative steps to prevent [discovery of the fraud] or that the wrong itself was . . . self-concealing." Normally, "a plaintiff seeking to toll the applicable statute of limitations due to fraudulent concealment . . . must meet the particularity standard of Rule 9(b)." In re Natural Gas Commodity Litig., 337 F. Supp. 2d 498, 513-14 (S.D.N.Y. 2004). "When an alleged violation is inherently self-concealing, [however], an assertion of such a scheme is sufficient and a plaintiff need not plead any affirmative actions by a defendant." Id. at 514.

See also In re Nine West Shoes Antitrust Litig., 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000)).

Power also contends that the cause of action in this case could not have been fraudulently concealed because the DCF Sham Transaction and the improper accounting

were disclosed to and vetted by PwC, Tyco's independent accountant at the time. The Complaint alleges that PwC raised the issue of the DCF Sham Transaction independently in the course of its review of Tyco's financial statements for the fiscal quarter ended March 30, 1998, Compl. P 22, and that the defendants did not acknowledge the sham nature of the transaction to PwC, but [*26] instead defended it, and repackaged the transaction to better conceal its fraudulent nature. Compl. P 24. The PwC allegations do not vitiate the fraudulent concealment allegation.

Power contends that the Commission has not adequately pled the third element that it must establish in order to rely upon the fraudulent concealment doctrine, namely that its ignorance of the actions underlying the complaint until late 2003 was not attributable to a lack of diligence on the Commission's part. Def.'s Mem. Supp. 11.

According to Power, the SEC started actively investigating Tyco's acquisition accounting in as early as 1999. Power relies, in part, on a Form 8-K that Tyco filed with the SEC in December 2002. In the 8-K, Tyco states, "In 1999 and 2000, the SEC conducted a Matter Under Inquiry . . . concerning the Company's acquisition accounting." (Horwitz Decl. Tyco Form 8K Ex. C). Power urges this Court to take judicial notice of this filing to the extent that it advances his argument that the Commission was on notice of Power's role in the improper acquisition accounting earlier than 2002.

The Commission, citing Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989), contends that this Court cannot consider [*27] SEC filings that were neither attached to nor incorporated by reference in the complaint. However, subsequent to Cosmas, "[t]he Second Circuit . . . made clear that consideration of documents publicly filed by defendants in securities cases is not foreclosed to district courts in deciding motions to dismiss." In re Gen. Dev. Corp. Bond Litig., 800 F.Supp. 1128, 1135-36 (S.D.N.Y. 1992) (citing Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

Furthermore, the Complaint alleges violations in connection with Tyco's SEC filings, including periodic reports on Forms 10-Q for its fiscal year ended September 30, 1997, through its fiscal quarter ended December 31, 2002. One of those 10-Q Forms, filed on February 11, 2000, includes explicit reference to an ongoing Commission "inquiry relating to charges and reserves taken by Tyco in connection with the Company's acquisitions." While this form has not been submitted to the Court by either party, the Court is permitted to take judicial notice whether requested or not. Fed. R. Evid. 201(c). The Form 10-Q establishes that there is a dispute as to whether the Commission's failure to discover the

actions underlying the Complaint earlier [*28] was attributable to a lack of diligence.

However, the Complaint alleges affirmative acts by defendant Federman to conceal the transaction's lack of economic substance and to prevent discovery of its fraudulent purpose and effect. Compl. P 24. Federman's concealment is attributable to Power for purposes of the doctrine of fraudulent concealment. Hendrickson, 840 F.2d at 1083-85 (statute of limitations tolled by fraudulent concealment both because the fraud was self-concealing and because the evidence of affirmative acts of concealment committed by some defendants was properly admitted against all defendants). At the pleading stage, this allegation suffices to satisfy the diligence requirement.

### ii. Penalty Claims

In addition to seeking civil monetary penalties, the Commission seeks Power's disgorgement of "ill-gotten gains," as well as a permanent injunction restraining Power from violating federal securities laws. [HN15]The primary consideration when determining whether a claim seeks a "penalty" to which Section 2462 applies is whether the remedy at issue is "punitive" or "remedial" in nature. See Johnson v. S.E.C., 318 U.S. App. D.C. 250, 87 F.3d 484, 487-88 (D.C. Cir. 1996); [*29] SEC v. Schiffer, No. 97 Civ. 5853 (RO), 1998 U.S. Dist. LEXIS 6339, at *8, 1998 WL 226101, *2 (S.D.N.Y. May 5, 1998) (citing SEC v. Lorin, 869 F.Supp. 1117, 1122 (S.D.N.Y. 1994)).

[HN16]It has been held that Section 2462 does not apply to equitable remedies, which seek either to return opposing parties to their status quo ante or to protect the public from harm. See Jones II, 476 F. Supp. 2d at 380-81. Disgorgement is an equitable remedy to which Section 2462 does not apply. See also Lorin, 869 F.Supp. at 1122 (S.D.N.Y. 1994) ("I will not label disgorgement a "fine, penalty, or forfeiture" in light of the operation of disgorgement, which merely deprives one of wrongfully obtained proceeds.").

[HN17]Whether a permanent injunction constitutes a "penalty" under Section 2462 depends on the likelihood of recurrence. In Jones II, the court stated that "the Second Circuit demands that the Commission 'go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence.' " Jones II, 476 F. Supp. 2d at 384 (citing SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99 (2d Cir. 1978)). However, there is significant precedent in this circuit for granting injunctive relief of the kind sought here based upon allegations of past violations. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972) [*30] ("[F]raudulent past conduct gives rise to an inference of a reasonable expec-

tation of continued violations."); SEC v. Alexander, 160 F. Supp.2d 642, 655 (S.D.N.Y. 2001) (holding that the Commission properly pleaded claim for injunctive relief, as "[p]otential future violation of the securities laws can be inferred from past violations"); SEC v. Drescher, 99 Civ. 1418 (SAS)1999 U.S. Dist. LEXIS 16033, at *15, 1999 WL 946864, at *5 (S.D.N.Y. Oct. 19, 1999) ("In alleging Drescher violated the securities laws, the SEC has adequately stated a claim for injunctive relief.").

[HN18]In determining whether there is a reasonable likelihood of future violations, a district court may also consider: (1) the egregiousness of the violation; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; and (4) the sincerity of defendant's assurances against future violations. SEC v. Haligiannis, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) (citing SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir.1998)).

Among the Commission's allegations that point toward recurrence are assertions that Power engaged in repeated fraudulent conduct and details Power's multiple violations and knowing misconduct over a period of several years. See Compl. [*31] PP 18-21, 23 (Power created the DCF sham transaction, designed it to look like two independent business transactions, and possessed accounting literature that indicated the accounting treatment was improper); Compl. P 36 (Power proposed writing off over $ 70 million in alarm assets then in use); Compl. P 38 (Power attempted to establish reserves at Raychem based on a worst-case basis); Compl. P 39 (Power directed that Raychem's inventory be improperly valued); Compl. P 40 (Power suggested consolidating Raychem and Tyco revenues a week before the merger to falsely increase Tyco's performance); Compl. P 41 (Power directed the establishment of reserves at U.S. Surgical on a worst-case basis). The Complaint further alleges that unless Power is "restrained and enjoined by this Court, [he] will continue to engage in[] transactions, acts and courses of conduct" in violation of the federal securities laws. Compl. P 12. Such allegations are sufficient to allege a likelihood of recurrence.

Given that the Commission has adequately alleged a likelihood of recurrence and, therefore, a dispute remains as to whether the injunctive relief sought in this case would be equitable or punitive under Section 2462, [*32] the Court will not dismiss the claims for injunctive relief at this stage of the litigation.

## Conclusion

For the foregoing reasons, the motion of Defendant to dismiss is denied.

So ordered.

**New York, NY**

**November 27, 2007**

/s/ Robert W. Sweet

**ROBERT W. SWEET**

**U.S.D.J.**

# Exhibit D

24 of 55 DOCUMENTS



Analysis
As of: Sep 06, 2007

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. JEFFREY A. RICHIE and FORTRESS FINANCIAL GROUP, INC., Defendants.**

**Case No. EDCV 06-63-VAP (SGLx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*2006 U.S. Dist. LEXIS 45853*

**May 9, 2006, Decided**
**May 9, 2006, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by *SEC v. Richie, 2006 U.S. Dist. LEXIS 57258 (C.D. Cal., Aug. 14, 2006)*

**COUNSEL:** For Securities and Exchange Commission, Plaintiff: John B Bulgozdy, Michele Wein Layne, Michael A Piazza, David M Rosen, LEAD ATTORNEYS, SEC - Securities & Exchange Commission, Los Angeles, CA.

For Fortress Financial Group Inc, Jeffrey A Richie, Defendants: Robert C Rosen, John B Wallace, LEAD ATTORNEYS, Rosen & Associates, Los Angeles, CA.

**JUDGES:** [*1] VIRGINIA A. PHILLIPS, United States District Judge.

**OPINION BY:** VIRGINIA A. PHILLIPS

**OPINION**

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS COMPLAINT OR ALTERNATELY, TO DISMISS CERTAIN OF PLAINTIFF'S FOUR CLAIMS FOR RELIEF OR ALTERNATELY FOR A MORE DEFINITE STATEMENT, OR ALTERNATELY, TO STRIKE PORTIONS OF THE COMPLAINT**

Defendants' Motion to Dismiss Complaint or Alternately, to Dismiss Certain of Plaintiff's Four Claims for Relief or Alternately, for a More Definite Statement, or Alternately, to Strike Portions of the Complaint came before this Court for hearing on May 1, 2006. After reviewing and considering all papers filed in support of, and in opposition to, the Motion, as well as the arguments advanced by counsel at the hearing the Court DENIES Defendants' Motion.

**I. BACKGROUND**

Plaintiff Securities and Exchange Commission filed a Complaint on January 19, 2006, alleging that Defendants Jeffrey Richie ("Richie") and Fortress Financial Group, Inc. ("Fortress") (collectively, "Defendants") made material misrepresentations or omissions of fact in the sale of unregistered securities. Plaintiff alleges the following four claims:

(1) Violation of *Sections 5(a)* and *5(c)* of the [*2] Securities Act of 1933 ("Securities Act");

(2) Violation of *Section 17(a)* of the Securities Act;

(3) Violation of *Section 10(b)* of the Securities Exchange Act of 1934 ("Exchange Act") and *Rule 10b-5*; and

(4) Violation of *Section 10(b)* of the Exchange Act and *Rule 10b-9*.

Plaintiff seeks an injunction, civil penalties, and disgorgement.

## A. Plaintiff's Allegations

Defendant Richie controls Defendant Fortress; he is the president, chief executive officer, and 90% shareholder of Defendant Fortress. [Complaint ("Compl.") at P 3.] During the approximate period of March 2000 though April 2001, Defendants were involved in the fraudulent and unregistered offering of Defendant Fortress's preferred stock; the initial offering raised approximately $ 2.9 million. [*Id.* at PP 3, 4, 13, 15.]

Defendant Richie told potential investors the money would fund Defendant Fortress's business operations, including its business of providing 401(k) services to employees of corporations and clients of financial institutions. [*Id.* at P 5.] Defendants lied to and deceived investors, ignored legal advice, and disregarded securities registration and antifraud provisions. [*3] [*Id.* at P 18.]

Defendant Richie sold Defendant Fortress's stocks to approximately eighty-five investors nationwide through a "private placement." [*Id.* at PP 7, 15.] No registration statement was on file or in effect, and Defendant Fortress was not exempt from the registration requirements. [*Id.* at PP 7, 16, 17, 41.] Defendant Fortress did not qualify for an exemption because it offered its shares nationwide to "unaccredited" investors. [*Id.*]

Defendants' material misrepresentations and omissions to investors concerned the following aspects of Defendant Fortress's business:

(1) Financial projections,

(2) Undisclosed liabilities in excess of $ 1 million,

(3) Plans to conduct an initial public offering ("IPO"), and

(4) Defendant Fortress's promise not to spend any of the offering proceeds until it raised $ 2 million.

[*Id.*]

## 1. Financial Projections

Defendant Richie distributed Defendant Fortress's business plan, which was written in April 2000 and covered the five year period between 2000 and 2004. [Id. at P 19.] The business plan consisted of fifteen pages of narrative and thirty-nine pages of financial projections. [*4] [*Id.*] The following projections were made in Defendant Fortress's business plan:

|      | Revenue | Net Income |
|------|---------|------------|
| 2000 | $ 25,341,640 | $ 797,889 |
| 2001 | $ 159,542,531 | $ 28,287,653 |
| 2002 | $ 299,260,992 | $ 60,829,881 |
| 2003 | $ 435,000,128 | $ 91,681,050 |
| 2004 | $ 546,483,408 | $ 119,993,262 |

[*Id.*]

Defendant Richie knew, or was reckless in not knowing, that Defendant Fortress was not going to achieve these projections because Defendant Fortress had no operating history, lacked experienced management, and the projections were based on unreasonable assumptions. [*Id.* at PP 20, 21.] The projections were unreasonable because Defendant Fortress did not have a single client, assumed it would contract with a certain number of financial institutions each quarter, and contracted with no clients in 2000 and only one client in 2001. [*Id.* at P 22.] Certain investors viewed the financial projections as an important factor in deciding to purchase Defendant Fortress's stock. [*Id.* at P 24.]

In September 2000, Defendant Fortress's former CFO knew that the financial projections were unreason-

able, and by January 1, 2001, Defendant Richie knew the 2001 financial projections [*5] were not going to be achieved. [*Id.* at P 25.] Knowing that the financial projections were unreasonable, Defendant Richie continued to distribute the business plan to potential investors. [*Id.*]

Before beginning the offering, Defendant Fortress's attorney advised Defendant Richie to disclose in the business plan the assumptions upon which the financial projections were made. [*Id.* at P 26.] Disregarding this advice, Defendants failed to disclose any assumptions underlying the financial projections in the business plan. [*Id.*] This constitutes evidence that Defendants acted with scienter. [*Id.*]

In September 2000, Defendant Richie amended the financial projections by lowering the revenues and prof-

2006 U.S. Dist. LEXIS 45853, *

its for 2000 through 2002, and increasing the revenues and profits for 2003 through 2004. [*Id.* at P 24.]

## 2. Undisclosed Liabilities

| | |
|---|---|
| June 2000 | $ 205,000 |
| July 2000 | $ 317,000 |
| August 2000 | $ 389,000 |
| September 2000 | $ 562,000 |
| October 2000 | $ 641,000 |
| November 2000 | $ 738,000 |
| December 2000 | $ 1,139,000 |
| January 2001 | $ 1,186,000 |
| February 2001 | $ 1,208,000 |
| March 2001 | $ 1,250,000 |
| April 2001 | $ 1,300,000 |

[*6]  [*Id.* at P 29.] In April 2001, the current liabilities constituted 45% of the funds raised with the offering. [*Id.* at P 30.] During the offering, Defendants did not disclose to current and potential investors Defendant Fortress's liabilities; they also failed to disclose that a substantial portion of the funds raised would be used to pay off these liabilities. [*Id.*] Defendant Fortress's assets never exceeded $ 74,000 during the offering period. [*Id.*] At least seven investors considered Defendant Fortress's existing liabilities important and would have considered this information before investing in Defendant Fortress. [*Id.* at P 31.]

Moreover, Defendants did not provide an audited balance sheet to its unaccredited investors, which would have had the current liabilities in it. [*Id.* at P 32.]

Defendant Richie was aware of the need to disclose Defendant Fortress's current liabilities. [*Id.* at P 32.] The former CFO and Defendant Fortress's attorney asked that Defendant Richie disclose the current liabilities on two different occasions, but Defendant Richie refused. [*Id.* at P 33.] Defendant Richie also did not disclose that Defendant [*7] Fortress was planning on paying off Fortress's current liabilities with the money raised from the offering. [*Id.*] Defendant Richie knew, or recklessly disregarded, that the current liabilities were not disclosed to potential or current investors. [*Id.* at P 34.]

## 3. The Expected IPO

Defendant Richie told at least six investors that he expected an IPO to occur "within 12 months" or "one year or so." [*Id.* at P 35.] Defendant Richie told one investor that he expected Defendant Fortress's shares to trade between $ 15 and $ 30, a substantially higher price

During the offering period, Defendant Fortress's current liabilities increased as indicated in the following table:

than the $ 1 price at which the stock was eventually offered initially. [*Id.* at PP 15, 35.] Defendant Fortress's attorney warned Defendant Richie before the offering not to make statements concerning the likelihood or timing of an IPO. [*Id.* at P 36.]

## 4. Using Investor Funds Before Reaching Minimum Amount

The offering here was a so-called "mini-max" offering; it offered a minimum of $ 2 million and a maximum of $ 10 million of stock. [*Id.* at P 37.] Defendants represented that the funds raised in the offering would be placed in escrow until $ 2 million was raised, which occurred [*8] on August 31, 2000. [*Id.*] Defendant Fortress's financial records indicate that Defendant Fortress had spent $ 1 million of the funds raised by June 22, 2000. [*Id.*] By August 22, 2000, only $ 125,000 of the $ 1.3 million raised from the offering remained in escrow. [*Id.*]

## B. Proceedings

On March 22, 2006, Defendants filed a Motion to Dismiss Complaint or Alternately, to Dismiss Certain of Plaintiff's Four Claims for Relief or Alternately, for a More Definite Statement, or Alternately, to Strike Portions of the Complaint ("Mot."). Defendants' Motion argues that (1) Plaintiff's Complaint fails to allege facts entitling it to the relief requested, (2) Defendants did not make any material misrepresentations or omissions because they did disclose the current liabilities of Defendant Fortress and the underlying assumptions in the financial projections, (3) Defendants did qualify for an exemption from registering because it only sold securities to fewer than thirty-five unaccredited investors, and

(4) the fraud allegations lack specificity. [Mot. at 2-3, 16.]

Plaintiff filed a Memorandum of Points and Authorities in Opposition to Defendants' Motion ("Opp'n") [*9] on April 10, 2006. Defendants filed a Reply ("Reply") on April 24, 2006.

## II. LEGAL STANDARD

### A. Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(6)*

Under *Rule 12(b)(6)*, a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Dismissal is appropriate when it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations set forth in the complaint. *See Williamson v. Gen. Dynamics Corp., 208 F.3d 1144, 1149 (9th Cir. 2000)*; *Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1101 (9th Cir. 1999)*.

The Court must view all allegations in the complaint in the light most favorable to the non-moving party and must accept all material allegations -- as well as any reasonable inferences to be drawn from them -- as true. *See Big Bear Lodging Ass'n, 182 F.3d at 1101*; *Am. Family Ass'n, Inc. v. City and County of San Francisco, 277 F.3d 1114, 1120 (9th Cir. 2002)*.

The scope of review under *Rule 12(b)(6)* is generally limited to the contents [*10] of the complaint. *Clegg v. Cult Awareness Network, 18 F.3d 752, 754 (9th Cir. 1994)*. Nevertheless, "a document is not 'outside' the complaint if the complaint specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1993), overruled on other grounds by Galbraith v. Santa Clara, 307 F.3d 1119, 1125-27 (9th Cir. 2002)*. The Court may also consider exhibits submitted with the complaint, *Hal Roach Studios v. Richard Feiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990)*, and "take judicial notice of matters of public record outside the pleadings," *Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988)* (quotation marks omitted).

### B. Motion for More Definite Statement Pursuant to *Federal Rule of Civil Procedure 12(e)*

*Rule 12(e) of the Federal Rules of Civil Procedure* states:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, [*11] the party may move for a more definite statement before interposing a re-

sponsive pleading. The motion shall point out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

"[A] motion for a more definite statement must be considered in light of the liberal pleading standards of *Rule 8(a)* (a Complaint need only be a 'short and plain statement of the claim showing that the pleader is entitled to relief[.]')." *Bureerong v. Uvawas, 922 F. Supp. 1450, 1461 (C.D. Cal. 1996)* (citing *Sagan v. Apple Computer, Inc., 874 F. Supp. 1072, 1077 (C.D. Cal. 1994)* ("Motions for a more definite statement are viewed with disfavor and are rarely granted because of the minimal pleading requirements of the Federal Rules.")). "A motion for a more definite statement is used to attack unintelligibility, not mere lack of detail, and a complaint is sufficient if it is specific enough to apprise the defendant of the substance [*12] of the claim asserted against him or her." *San Bernardino Public Employees' Ass'n v. Stout, 946 F. Supp. 790, 804 (C.D. Cal. 1996)* (citing *Famolare, Inc. v. Edison Bros. Stores, Inc., 525 F. Supp. 940, 949 (E.D. Cal. 1981)*). "Thus, a motion for a more definite statement should not be granted unless the defendant literally cannot frame a responsive pleading." *Bureerong, 922 F. Supp. at 1461* (citing *Boxall v. Sequoia Union High Sch., 464 F. Supp. 1104, 1114 (N.D. Cal. 1979)*).

"A *Rule 12(e)* motion is proper only where the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted." *Sagan, 874 F. Supp. at 1077* (citing *Famolare, 525 F. Supp. at 949*). "Parties are expected to use discovery, not the pleadings, to learn the specifics of the claims being asserted." *Id., see also Famolare, 525 F. Supp. at 949* ("where the information sought by the moving party is available and/or properly sought through discovery the motion should be denied.").

"A *Rule 12(e)* motion is more likely to be granted where the complaint is so general [*13] that ambiguity arises in determining the nature of the claim or the parties against whom it is being made." *Sagan, 874 F. Supp. at 1077* (citing *Van Dyke Ford, Inc. v. Ford, 399 F. Supp. 277, 284 (E.D. Wis. 1975)*). "Such a motion is likely to be denied where the substance of the claim has been alleged, even though some of the details are omitted." *Id.* (citing *Boxall, 464 F. Supp. at 1113-14*).

## C. *Federal Rule of Civil Procedure 9(b)*

The Ninth Circuit has held that a "pleading is sufficient under *Rule 9(b)* if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Wool v. Tandem Computers Inc., 818 F.2d 1433, 1439 (9th Cir. 1987)* (quotations and citation omitted). The plaintiff must state the "time, place and specific content of the false representation." *Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985).* "Mere conclusory allegations of fraud are insufficient." *Moore v. Kayport Package Express, Inc., 885 F.2d 531, 540 (9th Cir. 1989).*

## III. DISCUSSION

[*14] **A. Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(6)***

### 1. Violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rules 10b-5 and 10b-9.

*Section 17(a)* of the Securities Act, [1] *Section 10(b)* of the Exchange Act, [2] and *Rules 10b-5* [3] and *10b-9* [4] prohibit fraudulent conduct in the sale or offering of securities. *S.E.C. v. Dain Rauscher, Inc., 254 F.3d 852, 855-56 (9th Cir. 2001).* To establish a violation of these statutes, Plaintiff must allege the following: (1) a material misrepresentation or omission of fact, (2) in connection with the purchase or sale of a security, (3) scienter, and (4) that the sale involved interstate commerce. *See, e.g., id., S.E.C. v. Rana Research, Inc., 8 F.3d 1358, 1364 (9th Cir. 1993).*

1    *Section 17(a)* of the Securities Act states as follows:

It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or

any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

*15 U.S.C. § 77q(a).*

[*15]    2    *Section 10(b)* of the Exchange Act states as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange- . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Com-

mission may pre-
scribe as necessary
or appropriate in
the public interest
or for the protection
of investors.

15 U.S.C. § 78j

3 *Rule 10b-5* states as follows:

It shall be unlawful for any per-
son, directly or indirectly, by the
use of any means or instrumental-
ity of interstate commerce, or of
the mails or of any facility of any
national securities exchange,

(a) To employ
any device,
scheme, or artifice
to defraud,

(b) To make
any untrue state-
ment of a material
fact or to omit to
state a material fact
necessary in order
to make the state-
ments made, in the
light of the circum-
stances under
which they were
made, not mislead-
ing, or

(c) To engage
in any act, practice,
or course of busi-
ness which operates
or would operate as
a fraud or deceit
upon any person, in
connection with the
purchase or sale of
any security.

17 C.F.R. § 240.10b-5.

[*16]

4 *Rule 10b-9* states as follows:

It shall constitute a manipulative
or deception device or contriv-
ance, as used in section 10(b) of
the Act, for any person, directly or
indirectly, in connection with the
offer or sale of any security, to
make any representation:

(1) To the effect
that the security is
being offered or
sold on an "all-or-
none" basis, unless
the security is part
of an offering or
distribution being
made on the condi-
tion that all or a
specified amount of
the consideration
paid for such secu-
rity will be
promptly refunded
to the purchaser
unless (i) all of the
securities being of-
fered are sold at a
specified price
within a specified
time, and (ii) the to-
tal amount due to
the seller is re-
ceived by him by a
specified date; or

(2) To the ef-
fect that the secu-
rity is being offered
or sold on any other
basis whereby all or
part of the consid-
eration paid for any
such security will
be refunded to the
purchaser if all or
some of the securi-
ties are not sold,
unless the security
is part of an offer-
ing or distribution
being made on the
condition that all or
a specified part of
the consideration

2006 U.S. Dist. LEXIS 45853, *

paid for such secu-
rity will be
promptly refunded
to the purchaser
unless (i) a speci-
fied number of
units of the security
are sold at a speci-
fied price within a
specified time, and
(ii) the total amount
due to the seller is
received by him by
a specified date.

*17 C.F.R. § 240.10b-9.*

[*17] Plaintiff has alleged that Defendants violated *Section 17(a)* of the Securities Act, *Section 10(b)* of the Exchange Act, and *Rule 10b-5* by making material mis-representations and omissions of fact to investors con-cerning the following areas: (1) financial projections, (2) undisclosed liabilities, (3) plans to conduct an IPO, and (4) promising not to spend any of the proceeds from the offering until it raised $ 2 million. [Compl. at PP 5, 18-38.]

**a. Non-Disclosure of Defendant Fortress's Cur-rent Liabilities**

Defendants assert that they disclosed Defendant For-tress's current liabilities in the business plan. [5] [Mot. at 16.] In its Opposition, Plaintiff contends its Complaint alleges sufficiently Defendants' non-disclosure of a mate-rial fact, i.e., Defendant Fortress's current liabilities, as well as Defendants' scienter. [Opp'n at 7.]

    5 Pursuant to *Federal Rule of Evidence 201*, the Court grants Defendants' Request for Judicial No-tice Number 5.

Plaintiff alleges that [*18] Defendants' current li-abilities were never disclosed to potential investors and it was never disclosed that Defendants were using a large portion of the revenue from the offering to pay for the liabilities already incurred. [Compl. at PP 29-34.] Plain-tiff also alleges that these misrepresentations and omis-sions were material and Defendants acted or failed to act with scienter. [*Id.* at PP 31, 33-34.] Thus, Plaintiff has alleged a prima facie claim for a violation of *Section 17(a)* of the Securities Act, *Section 10(b)* of the Ex-change Act, and *Rule 10b-5.*

Defendants assert that they did in fact disclose their current liabilities and relied upon their quarterly balance

sheets in their business plan to support such an assertion. [Mot. at 2 n.6, 16.] That some of the financial documents in Defendant Fortress's business plan have a category for current liabilities does not necessarily disprove Plaintiff's allegation that there were current liabilities that were undisclosed. [Compl. at P 29.] The Court cannot, as a matter of law, conclude that since Defendants' business plan included a statement of current liabilities, that all of Defendant Fortress's current liabilities were disclosed. [*19] It is possible that the current liabilities disclosed in the business plan did not accurately reflect its actual li-abilities.

Moreover, Plaintiff avers that Defendants never dis-closed that the revenue from the offering was going to be used to cover Defendant Fortress's expenses. [*Id.* at PP 30, 33.] Even if Defendants did disclose their current liabilities, Plaintiff would be entitled to relief if it is proven that Defendants misrepresented or omitted to disclose the liabilities compared to the current assets. Accordingly, Defendants have not satisfied their burden of establishing that Plaintiff has not alleged facts that, if proven, would entitle it to relief.

In light of the Court's ruling that Plaintiff has alleged facts that, if proven, would entitle it to relief for its claims that Defendants violated *Section 17(a)* of the Se-curities Act, *Section 10(b)* of the Exchange Act, and *Rule 10b-5*, the Court need not address Defendants' ar-guments that Plaintiff cannot state a claim under these statutes. [6] *See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 338 (9th Cir. 1996), De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978).* [*20] That Defendants did not disclose their current liabilities, how-ever, does not establish a violation of *Rule 10b-9.*

    6 The Court need not address Defendants' argu-ment that its forward-looking statements are pro-tected under the "bespeaks caution" doctrine at this time.

**b. Early Withdrawal of Escrow Funds**

Defendants assert that breaking the escrow agree-ment is a breach of contract and not fraud. [Mot. at 22.] Plaintiff counters that violating the escrow agreement can constitute fraud. [Opp'n at 15.]

Plaintiff alleges that Defendants knew or should have known that their statements concerning the "mini-max" offering were false because they were not going to keep the revenue from the sale of the securities in an escrow account until $ 2 million was raised. [Compl. at PP 37-38.] Defendants seek dismissal of the *Rule 10b-9* claim on the ground that their early withdrawal of escrow funds was not actionable fraud. [Mot. at 22.]

2006 U.S. Dist. LEXIS 45853, *

Defendants' argument lacks merit. Defendants rely upon *Poth v. Russey*, 99 Fed. Appx. 446, 454 (4th Cir. 2004), [*21] an unpublished case; there, the Fourth Circuit held that fraudulent intent cannot be inferred through a mere breach of contract. *Id.* Such a holding does not establish that a statement contained in a contract, which is knowingly false and later breached, cannot constitute fraud. Plaintiff alleges that Defendant Richie knew or should have known that Defendant Fortress was in such a dire financial condition that issuing business plans that stated the revenue from the offering would be held in escrow was materially false. [Compl. at PP 35-36.] Thus, Plaintiff's allegations, if proven, would entitle it to relief for a violation of *Section 10(b)* of the Exchange Act and *Rule 10b-9*.

### 2. Violation of Sections 5(a) and 5(c) of the Securities Act

Defendants contend that Plaintiff's conclusory allegations that Defendants sold securities to unaccredited investors without a registration statement, and that Defendants were not eligible for an exemption, are insufficient because (1) Plaintiff failed to allege how many unaccredited investors Defendant Fortress's securities were sold to, and (2) it would have been an idle act to present unaccredited investors with an "audited" balance [*22] sheet of a start-up company with no operational history. [Mot. at 23-24.]

Plaintiff responds that a prima facie claim for a violation of *sections 5(a)* and *5(c)* of the Securities Act requires Plaintiff to allege that Defendants sold unregistered securities in interstate commerce. [Opp'n at 4-5.] Plaintiff contends that Defendants bear the burden that they are exempt from the registration requirements. [*Id.* at 5.]

Defendants counter that since Plaintiff pled that Defendants were not eligible for an exemption, normally an affirmative defense, it "assumed the burden of correctly pleading the issue." [Reply at 21.] Defendants argue that Plaintiff did not adequately plead the exemption issue because Plaintiff's allegations are conclusory and do not set forth facts establishing why Defendants had no exemption.

*Sections 5(a)* and *5(c)* of the Securities Act forbid the sale of unregistered securities in interstate commerce. *S.E.C. v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980). Here, Plaintiff has alleged that Defendants sold unregistered securities through interstate commerce. [Compl. at PP 40, 41.] Moreover, Plaintiff also has alleged that Defendants are not [*23] exempt from registration. [*Id.* at P 17.] Accordingly, Plaintiff has averred facts that, if proven, would establish a violation of *Sections 5(a)* and *5(c)* of the Securities Act.

Defendants' argument that Plaintiff has assumed the burden of pleading that Defendants were not exempt from the registration requirements lacks merit. [Reply at 21.] The authority Defendants cite does not support such a proposition. [7] That Plaintiff averred that Defendants were not exempt from the registration requirements does not place an extra burden on it in establishing its overall claim that Defendants sold unregistered securities in interstate commerce in violation of *Sections 5(a)* and *5(c)* of the Securities Act. Thus, Plaintiff does not need to allege that Defendant sold securities to over thirty-five unaccredited investors.

> [7]  In *United States v. One 1949 Model Ford Coach Auto., Motor No. 98BA-876874, 101 F. Supp. 492 (D. S.C. 1951)*, the court held that if a party pleads a fact in its complaint, it should have the burden of proving it. *Id. at 494*. Not only is the Court unpersuaded by the holding of this case, it is irrelevant to the facts here; this is not a motion for summary judgment where Plaintiff has to prove its allegations.

### [*24] 3. Failure to Plead Facts Entitling Plaintiff to an Injunction

Defendants contend that Plaintiff fails to allege a present threat; there are "no facts that the conduct was repeated or continued during the five intervening years or that the conduct is being repeated at this time or in the near future." [Mot. at 9.] Defendants argue that if there is no continuing harm, there needs to be a "cognizable danger of recurrent violation, something more than the mere possibility. . . ." [*Id.* at 10 (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S. Ct. 894, 97 L. Ed. 1303 (1953)).] Defendants assert that Plaintiff is not authorized to bring this action because it has failed to allege an imminent violation of the law. [*Id.* at 12.]

Plaintiff responds that because it has stated a claim under federal securities laws, Defendants' argument regarding the relief sought in this action is premature. [Opp'n at 9.] Plaintiff argues that its Complaint alleges the following facts establishing its right to an injunction:

> (1) Defendants' violations were serious, repeated, and committed with scienter;
>
> (2) material misrepresentations and omissions were made in the original [*25] private placement memorandum, and in the revised memorandum, issued one-year later;
>
> (3) Defendants disregarded their counsel's advice to comply with the anti-fraud provisions;

(4) Defendants have not revised the private placement memorandum;

(5) Defendants have failed to recognize their wrongful conduct or provide assurances of future compliance; and

(6) Defendant Richie is still associated with a regulated entity.

[*Id.* at 9-11.]

Injunctive relief is used to deter future violations of securities laws, not to punish past violations. *S.E.C. v. Koracorp Indus., Inc., 575 F.2d 692, 697 (9th Cir. 1978)* (citing *Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S. Ct. 587, 88 L. Ed. 754 (1944)).* Thus, injunctions against securities law violations are proper only if the wrongs are ongoing or likely to recur. *F.T.C. v. Evans Prods Co., 775 F.2d 1084, 1087 (9th Cir. 1985).* In other words, the SEC must establish "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *W. T. Grant Co., 345 U.S. at 633.* There must be a reasonable likelihood of future violations [*26] of securities law. *Murphy, 626 F.2d at 655.*

Past violations of securities laws may give rise to an inference of future violations, however. *Id.* The Court shall consider the totality of the circumstances surrounding the securities violations, specifically, "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." *Id.*

Defendants have not met their burden of establishing that, taking all of Plaintiff's allegations as true, the Complaint does not state a claim for injunctive relief. Plaintiff has alleged that (1) Defendants' violations occurred over a one year period, [Compl. at P 13]; (2) the violations were committed with a great amount of scienter, [*id.* at PP 25, 26, 27, 33, 35, 37]; and (3) Defendant Richie currently holds several securities licences. [*Id.* at P 10.] Using the *Murphy* factors, these alleged facts, if proven, could entitle Plaintiff to injunctive relief.

Defendants argue [*27] that the phrase "is engaged or is about to engage," as commonly used in other areas of the law and ordinary usage, would not support an inference of imminent future action from past conduct; in a securities context, however, there is clear authority that permits the Court to do just that. *See Murphy, 626 F.2d at 655.* Indeed, the *Murphy* Court held that a defendant's

present compliance with securities laws does not preclude the issuance of an injunction. [*Id.*]

Defendants argue that Plaintiff's enabling legislation should be interpreted as confining Plaintiff's standing to sue only if there is an imminent violation. This contention is equally unfounded. *Murphy* establishes that injunctive relief is proper only if there is a likelihood of future securities violations, and evidence of past conduct may be sufficient to establish that there is a reasonable likelihood of future violations. [*Id.*] Thus, under *Murphy,* Plaintiff has standing to bring this suit.

To interpret the phrase "is engaged or is about to engage" as creating a higher standard than the reasonable likelihood of future violations standard would be illogical because this would create [*28] situations when the S.E.C has made a showing that it could obtain injunctive relief but does not have standing to sue for such relief. In concluding that the standard "is engaged and is about to engage" is similar to the reasonable likelihood standard, the Court finds that Defendants' past conduct can be used to infer that they are about to engage in securities fraud. [8]

> 8    The Court is not disregarding Congress's intent that Plaintiff establish that Defendants be about to engage in securities violations, it is merely considering Defendants' past conduct as circumstantial evidence that Defendant are indeed about to engage in securities violations. The dispute between the parties is not what the relevant standard is, but what evidence can be considered to satisfy this standard. The decision in *Murphy* forecloses Defendants' position, however.

Defendants' Motion would have the Court engage in the level of scrutiny required to determine if Plaintiff is entitled to injunctive relief. Such an undertaking is, of [*29] course, premature at the Motion to Dismiss stage. Plaintiff's allegations are sufficient to defeat Defendants' Motion. In light of this ruling, the Court finds that Plaintiff has standing to bring this action as well.

## 4. Failure to Plead Facts Entitling Plaintiff to Disgorgement

Defendants assert that to obtain disgorgement from Defendant Richie, Plaintiff must allege that the monies Defendant Richie received "exceeded a reasonable salary for his services," which it has not done. [Mot. at 13.]

Plaintiff counters that it can obtain disgorgement from Defendant Richie because (1) he was the president and CEO of Defendant Fortress, (2) he was responsible for selling Defendant Fortress's stock, and (3) he co-wrote the business plan that contained the material misrepresentations and omissions. [Opp'n at 12.]

Pursuant to the Court's equity powers, it may order a defendant to disgorge all "ill-gotten gains" from its violation of securities laws. *S.E.C. v. First Pacific Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998)*. "The purpose of disgorgement is to deprive a person of 'ill-gotten gains' and prevent unjust enrichment." *Hateley v. S.E.C., 8 F.3d 653, 655 (9th Cir. 1993)*. [*30] The disgorgement amount should not exceed the actual amount of "ill-gotten gains." *See id. at 655-56* (finding that when $ 50,000 was assessed against another defendant out of $ 55,000 of total disgorgement, any amount exceeding $ 5,000 in disgorgement assessed against the remaining defendant would be excessive.) "[W]here two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally liable for the disgorgement of illegally obtained proceeds." *First Pacific Bancorp, 142 F.3d at 1191* (holding that it was appropriate to find the individual defendant jointly and severally liable because the individual defendant, as a high ranking officer of the corporate defendants, enjoyed a sufficiently close relationship.)

Plaintiff has sufficiently alleged facts that, if proven, would authorize an order of disgorgement from Defendant Richie. Plaintiff has alleged that Defendants enjoyed a close relationship by alleging that Defendant Richie was responsible for the illegal sale of Defendant Fortress's preferred stock and he co-wrote the business plan [*31] containing the allegedly material misrepresentations and omissions. [Compl. at PP 3, 4, 5, 7, 9, 11.]

Defendants incorrectly assert that Plaintiff must allege that Defendant Richie received funds above a reasonable salary for his services. Defendants cite no authority for this proposition and rely only on authority that stands for the general principle that disgorgement is not punitive in nature. Defendants request the Court extend this authority to the point that disgorgement could not be ordered from a high ranking corporate officer unless it was shown that he or she received more than a reasonable salary. Such an extension of the law is not only unsupported by existing case law, it is unwarranted. Defendants' proposed rule, for example, does not take into account the situation where a struggling business is only able to pay a "reasonable" salary of the high ranking officers because of the illegal securities transactions. *See First Pacific Bancorp, 142 F.3d at 1192*. Moreover, Defendants' proposed pleading requirement directly contradicts the authority that permits joint and several liability when the individual defendant and the corporate defendant jointly [*32] undertake to violate securities laws. *Id.*

Hence, as Plaintiff has properly alleged that Defendant Richie enjoyed a close relationship with Defendant Fortress, such that he could be jointly and severally li-

able for the "ill-gotten gains" received by Defendant Fortress, the Court denies Defendants' Motion as to this remedy.

### 5. Time-Bar to Plaintiff's Request for Civil Penalties

Defendants aver that Plaintiff's allegations establish that their alleged material misrepresentations and omissions were made more than five years before the Complaint was filed and thus are barred by the five year statute of limitations on civil penalties. [Mot. at 14-15.] Defendants contend that there is no exception to the five year time period because it is not subject to the same equitable considerations as a statute of limitations. [*Id.* at 15.]

Plaintiff contends that it did file this action within the five year period because Defendants did not cease selling securities until April 2001 and this action was filed in January 2006. [Opp'n at 13.] Plaintiff argues that Defendants sold securities within the time period, January 2001 through April 2001, which gives the Court authority to [*33] assess penalties for all of Defendants' illegal conduct. [*Id.*] Plaintiff asserts that the five year time period should not begin to run until it knew or should have known of Defendants' illegal conduct, which was April 2002. [*Id.* at 14.]

*28 U.S.C. § 2462* states as follows:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon. [9]

---

[9] Neither party disputes that this is the applicable statute of limitations for civil penalties pursuant to a violation of *Sections 5(a), 5(c)*, and *17(a)* of the Securities Act, *Section 10(b)* of the Exchange Act, and *Rules 10b-5* and *10b-9*.

A claim first accrues on the date the defendant [*34] allegedly violated the statute and not when the plaintiff knew or should have known of the alleged violation. *Fed. Election Comm'n v. Williams, 104 F.3d 237, 240 (9th Cir. 1996)* ("We hold that an action, suit or proceeding to assess or impose a civil penalty must be commenced within five years of the date of the violation giv-

ing rise to the penalty. We reject the discovery of viola-tion rule [respondent] advocates as unworkable; outside the language of the statute; inconsistent with judicial interpretations of *§ 2462*; unsupported by the discovery of injury rule adopted in non-enforcement, remedial cases; and incompatible with the functions served by a statute of limitations in penalty cases.") (quoting *3M Co. v. Browner, 305 U.S. App. D.C. 100, 17 F.3d 1453, 1462-1463 (D.C. Cir. 1994)).

Here, Plaintiff alleges that Defendants sold securi-ties in violation of securities laws during the period of March 2000 through April 2001. [Compl. at PP 4, 15.] Plaintiff filed its Complaint January 19, 2006. Therefore, a portion of the alleged wrongful conduct occurred within the limitations period: Defendants' alleged sale of securities during the period of January 19, 2001, through [*35] April 2001. Plaintiff has alleged facts that, if proven, would entitle it to civil penalties; this is suffi-cient to survive Defendants' Motion. *See Conley, 355 U.S. at 45-46, Cahill, 80 F.3d at 338, De La Cruz, 582 F.2d at 48; Cf. Doe v. United State Dept. of Justice, 243 U.S. App. D.C. 354, 753 F.2d 1092, 1104 (D.C. Cir. 1985)* ("[I]t need not appear that the plaintiff can obtain the specific relief demanded as long as the court can as-certain from the face of the complaint that some relief can be granted. . . . A district court should not grant a *Rule 12(b)(6)* motion to dismiss for failure to seek the technically appropriate remedy when the availability of some relief is readily apparent on the face of the com-plaint."), *Doss v. South Cent. Bell Tel. Co., 834 F.2d 421, 425 (5th Cir. 1987).* For the purposes of a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, it is immaterial that *§ 2462* might limit the civil penalties Plaintiff may be entitled to.

It is premature for the Court to address the parties' arguments concerning whether the alleged wrongful [*36] conduct outside of the limitations period can be considered in assessing civil penalties. Accordingly, Plaintiff has stated facts that, if proven true, would entitle it to civil penalties.

**B. Specificity of Plaintiff's Fraud Allegations**

**1. Financial Projections**

Defendants contend that Plaintiff merely alleges that their projections were premised on faulty assumptions, which does not satisfy the specificity requirement be-cause (1) Plaintiff does not allege which of the assump-tions are unreasonable, (2) Plaintiff does not allege how the assumptions are unreasonable, and (3) an allegation of unreasonableness is not sufficient to allege actionable fraud. [*Id.* at 20-21.]

Plaintiff responds that the Complaint alleges ade-quately the "time, place, persons, statements, and expla-nations of why" the assumptions were unreasonable. [Opp'n at 15.] Plaintiff argues that in reading Defendants' Motion as a whole, it is obvious that they understood which assumptions are alleged to be unreasonable. [*Id.* at 15-16.]

Plaintiff premises its claim for a violation of *Section 17(a)* of the Securities Act, *Section 10(b)* of the Ex-change Act, and *Rule 10b-5* on multiple theories, [*37] one of which is that the financial projections in the busi-ness plan were misrepresented. Defendants' Motion ar-gues in vain that Plaintiff's Complaint lacks specificity as to unreasonable assumptions; Plaintiff has specifically alleged how the financial disclosures were misrepre-sented. [Compl. at PP 19-27.] Plaintiff need not then specifically allege why the assumptions were unreason-able.

**2. The IPO Allegations**

Defendants assert that it is unclear what was false about Defendant Richie's statements concerning the IPO, and how Defendant Richie knew the statements were false. [Mot. at 21.] Defendants argue that Defendant Richie's statement was a "vague statement of optimism," or an "unfulfilled promise of a future event," which is not actionable. [*Id.* at 22.]

Plaintiff contends that it has alleged adequately the "time, place, persons, statements, and explanations [for] why" Defendant Richie's statements concerning the IPO were improper. [Opp'n at 15.]

Plaintiff's IPO allegations are sufficiently specific. Defendants' argument that Plaintiff does not allege why the statement is false is unpersuasive. The Complaint alleges that Defendant Richie made statements concern-ing [*38] an IPO and was told by his attorneys that he should not make such statements. [Compl. at P 35.]. Plaintiff alleges that Defendant Fortress was a start-up company, had a poor record of accomplishment, had inexperienced management, and was in a deteriorating financial condition; Defendant Richie knew or should have known that his statement that there would be an IPO for Defendant Fortress within a year, was false. [10] [*Id.* at PP 35-36.]

> 10    Defendants' other assertion, that Defendant Richie's statements are not actionable, is imma-terial to whether the allegations are specific. [Mot. at 22.] This assertion should have been in the sec-tion concerning why Plaintiff did not allege ac-tionable fraud. The Court need not address this assertion in light of the Court's ruling that Plain-tiff alleged facts that would entitle it to relief on

2006 U.S. Dist. LEXIS 45853, *

its Second, Third, and Fourth Claims on a theory that Defendants broke the escrow account early and did not disclose Defendant Fortress's current liabilities.

### 3. Timing of Misrepresentations

[*39] Defendants contend that Plaintiff fails to allege the date of the misrepresentations. [Mot. at 22.] Plaintiff responds that it alleged sufficiently the "time" of the misrepresentations. [Opp'n at 15.]

While Plaintiff has not alleged the exact date and time of the misrepresentations, it is clear that all of the misrepresentations and omissions occurred during the period of March 2000 to April 2001. [*See* Compl. at 4.] This is a sufficient allegation as to the time of the misrepresentations and omissions.

### C. Request to Strike Certain Allegations

Defendants move this Court to strike certain allegations from the Complaint. [Notice of Motion at 3-4.] In the body of their Motion, however, Defendants neither state the legal standard for a Motion to Strike nor argue why the allegations should be stricken. Apparently, Defendants request the Court to strike these allegations as an alternative remedy to their request to dismiss the Complaint.

A motion to strike does not have the same standards as a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, however. *Compare* section II.A with *Federal Rule of Civil Procedure 12(f)* [*40] *and Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993) rev'd on other grounds* in *Fogerty v. Fantasy, Inc., 510 U.S. 517, 534-535, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994)*. It is insufficient to argue that a claim should be dismissed under *Federal Rule of Civil Procedure 12(b)(6)* and, without arguing the legal elements, request the Court to strike portions of the Complaint.

Accordingly, Defendants did not satisfy their burden that certain allegations in Plaintiff's Complaint should be stricken.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion is denied.

Dated: *May 9, 2006*

VIRGINIA A. PHILLIPS

United States District Judge

# Exhibit E

LEXSEE



Analysis
As of: Dec 17, 2007

**SECURITIES AND EXCHANGE COMMISSION, PLAINTIFF, v. RICHARD SCRUSHY, DEFENDANT.**

**CASE NO. CV-03-J-615-S**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION**

**2005 U.S. Dist. LEXIS 30553**

**November 29, 2005, Decided**
**November 29, 2005, Filed**

**PRIOR HISTORY:** SEC v. Healthsouth Corp., 261 F. Supp. 2d 1298, 2003 U.S. Dist. LEXIS 8604 (N.D. Ala., 2003)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff Securities and Exchange Commission (SEC) filed a second amended complaint against defendant former chief executive officer of a health care provider alleging securities violations. The officer moved to dismiss, arguing fraud claims were not alleged with particularity under Fed. R. Civ. P. 9(b), some claims were barred by the statute of limitations in 28 U.S.C.S. § 2462, and the SEC lacked standing to sue under 15 U.S.C.S. § 78t(a).

**OVERVIEW:** Due to the vagueness of the second amended complaint, specifically the factual allegations underlying the first two counts, those counts had to be dismissed without prejudice to being amended to comply with Fed. R. Civ. P. 8, 9(b); the court could not determine whether the SEC was attempting to allege fraud or not. 28 U.S.C.S. § 2462 did not incorporate a discovery rule. Thus, any claim for civil penalties for violations occurring prior to five years before the action was filed were time-barred. In prior rulings on claims against the provider, who was no longer a party, the court had found no evidence that the officer knew, prior to the time of his transfer of shares to the provider, that a Medicare reimbursement rule change applied or would drastically alter the provider's profits. Those allegations against the offi-

cer failed to state a claim had to be dismissed. Due to the amendments of 15 U.S.C.S. § 78c(a)(9), to included the government as a "person," the SEC had standing to pursue an enforcement action under 15 U.S.C.S. § 78t(a).

**OUTCOME:** The first two counts of the second amended complaint were dismissed without prejudice; amended claims could be filed to specifically allege fraud. The officer's motion was granted as to civil penalty claims based on violations prior to five years before the action was filed. Claims based on a Medicare reimbursement rule change were dismissed. The motion to dismiss the controlling person claim for lack of standing was denied.

**CORE TERMS:** statute of limitations, civil penalty, discovery rule, enforcement actions, particularity, reimbursement, dollars, Exchange Act, applicability, fraudulent, injunctive, discovery, entity, securities laws, allegations of fraud, securities fraud, corporate counsel, dollars per, press release, instrumentality, projection, disclosure, accrued, therapy, assess, ruse

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1]In ruling on a motion to dismiss the court must view the allegations of the complaint in the light most favorable to the plaintiff. The court will not dismiss a

complaint for failure to state a claim unless it appears beyond a doubt that the plaintiff cannot prove any set of facts that support a claim for relief. In ruling on a motion to dismiss, conclusory allegations, unwarranted factual deductions, or legal conclusions masquerading as facts will not prevent dismissal.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Securities Law > General Overview*
[HN2]On a motion to dismiss securities claims, the court may consider evidence outside the pleadings that is undisputedly authentic and on which the plaintiff specifically has relied in the complaint, as well as any relevant documents legally required by and publicly filed with the Securities Exchange Commission.

*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN3]See Fed. R. Civ. P. 8(a).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Securities Law > Liability*
[HN4]Under Fed. R. Civ. P. 9(b), the circumstances constituting fraud or mistake shall be stated with particularity. The basics that a complaint must allege are: facts as to time, place, and substance of the defendant's alleged fraud, and the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them. Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint. These principles of pleading undoubtedly apply to claims by the Securities and Exchange Commission (SEC). Allegations of a violation of generally accepted accounting principle provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN5]The requirements of Fed. R. Civ. P. 9(b) are met where the plaintiff sets forth: (1) the content of the precise statement or omission; (2) who made, or failed to make, the statement; (3) where the statement was, or should have been, made; (4) when the statement was, or should have been, made; and (5) what the defendants gained as a consequence.

*Governments > Federal Government > Claims By & Against*

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Limitations on Remedies*
[HN6]The general statute of limitations, 28 U.S.C.S. § 2462, is applicable to the entire federal government in all civil penalty cases, unless Congress specifically provides otherwise.

*Governments > Federal Government > Claims By & Against*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Limitations on Remedies*
[HN7]See 28 U.S.C.S. § 2462.

*Governments > Federal Government > Claims By & Against*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Limitations on Remedies*
[HN8]According to 28 U.S.C.S. § 2462, civil penalties may not be sought outside five years from the date when the claim first accrued.

*Governments > Federal Government > Claims By & Against*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Limitations on Remedies*
[HN9]28 U.S.C.S. § 2462 has been interpreted not to incorporate a discovery rule. An action, suit, or proceeding to assess or impose a civil penalty must be commenced within five years of the date of the violation giving rise to the penalty.

*Governments > Federal Government > Claims By & Against*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Limitations on Remedies*

[HN10]The United States Court of Appeals for the Eleventh Circuit has held that the discovery rule, which might be applicable to statutes of limitations in state tort actions, has no place in a proceeding to enforce a civil penalty under a federal statute. In the Eleventh Circuit, the statute of limitations begins with the violation itself -- it is upon violation, and not discovery of harm, that the claim is complete and the clock is ticking.

*Securities Law > Liability > Secondary Liability > Controlling Persons*
*Securities Law > U.S. Securities & Exchange Commission*
[HN11]The Securities and Exchange Commission may pursue an enforcement action pursuant to § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.S. § 78t(a).

*Securities Law > Liability > Secondary Liability > Controlling Persons*
*Securities Law > U.S. Securities & Exchange Commission*
[HN12]The Securities and Exchange Commission fits squarely within the amended definition of "person" under 15 U.S.C.S. § 78c(a)(9).

**COUNSEL:** [*1] For Securities and Exchange Commission, Plaintiff: John D Worland, Jr, Alan M Lieberman, H Michael Semler, US SECURITIES & EXCHANGE COMMISSION, Washington, DC; Alex Rue, Madison Graham Loomis, William P Hicks, US SECURITIES & EXCHANGE COMMISSION, Atlanta, GA.

For Healthsouth Corporation, Defendant: Jack W Selden, Joseph B Mays, Jr, Richard Lee Sharff, Jr, BRADLEY ARANT ROSE & WHITE, Birmingham, AL.

For Richard M Scrushy, Defendant: Arthur W Leach, Birmingham, AL; David G Russell, J Marbury Rainer, PARKER HUDSON RAINER & DOBBS LLP, Atlanta, GA; Kile T Turner, NORMAN WOOD KENDRICK & TURNER, Birmingham, AL; Leslie V Moore, MOORE & ASSOCIATES LLC, Birmingham, AL; Donald V Watkins, DONALD V WATKINS PC, Birmingham, AL; Edward E Angwin, COCHRAN CHERRY GIVENS SMITH GULAS & STUCKEY, Birmingham, AL; Gary H Baise, KILPATRICK STOCKTON LLP, Washington, DC; H Lewis Gillis, THOMAS MEANS GILLIS & SEAY, PC, Montgomery, AL.

**JUDGES:** INGE PRYTZ JOHNSON, U.S. DISTRICT JUDGE.

**OPINION BY:** INGE PRYTZ JOHNSON

**OPINION**

**ORDER**

Pending before the court is defendant Scrushy's motion to dismiss (doc. 184) the plaintiff's second amended complaint and brief in support of motion to dismiss (doc. 185). The plaintiff [*2] filed a response in opposition to the defendant's motion (doc. 188) [1] and the defendant filed a reply (doc. 189). Having considered said second amended complaint, motion, and briefs, the court is of the opinion that the defendant's motion to dismiss is due to be granted in part and denied in part, as set forth below:

[HN1]In ruling on a motion to dismiss the court must view the allegations of the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974). The court will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.,* 326 F.3d 1183, 1185 (11th Cir. 2003). Additionally, [HN2]on a motion to dismiss securities claims, the court may consider "evidence outside the pleadings that is undisputedly authentic and on which the plaintiff [*3] specifically has relied in the complaint[,]" as well as "any relevant documents legally required by and publicly filed with the SEC." *In re CNL Hotels & Resorts, Inc. Securities Litigation,* 2005 U.S. Dist. LEXIS 38876, 2005 WL 1126561, *5 n.13 (M.D. Fla. 2005), quoting *In re JDN Realty Corp. Sec. Litig.,* 182 F. Supp. 2d 1230, 1239 (N.D.Ga. 2002)

1 The parties are instructed to cite to the Acts in question by their United States Code citation (i.e., 15 U.S.C. § ) and NOT by the sections of the Act (i.e., Section 20(a) of the Securities Exchange Act).

The second amended complaint contains argument, speculations, hypotheticals, and perhaps an outline of closing statements, none of which are appropriate in a complaint. *See* Rule 8(a), Fed.R.Civ.Pro. [HN3]("A pleading which sets forth a claim for relief . . . shall contain (2) a short and plain statement of the claim showing that the pleader is entitled to relief. . ."). The court is of the opinion that the second amended complaint fails to conform [*4] to this basic tenet of pleading.

HealthSouth Corporation is no longer a party to this litigation. Therefore, all references to HealthSouth Corporation, where there is no specific allegation that defendant Scrushy was acting on behalf of and for said corporation, are improper.

The second amended complaint contains numerous vague allegations from which the court cannot determine whether the plaintiff is attempting to allege fraud or not. Should the plaintiff intend to state a "fraudulent misrepresentation" claim, the plaintiff must comply with Rule 9(b), Fed.R.Civ.Pro., which requires said the circumstances of said claims to be stated with particularity, namely to allege the proverbial "who, when, where and what" for each allegation of wrongdoing by this defendant. As recently as October 20, 2005, the Eleventh Circuit has held that [HN4]"under Rule 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity." _Corsello v. Lincare, Inc._, 428 F.3d 1008, 2005 U.S. App. LEXIS 22512, 2005 WL 2663288 (11th Cir. 2005); citing Fed.R.Civ.P. 9(b). Although considering a claim under the False Claims Act, the Court laid forth the basics that a complaint must allege: "'facts as [*5] to time, place, and substance of the defendant's alleged fraud,' [and] 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them. _Id._, citing _Clausen v. Lab. Corp. of Am., Inc._, 290 F.3d 1301, 1310 (11th Cir. 2002)(quoting _Cooper v. Blue Cross & Blue Shield of Fla., Inc._, 19 F.3d 562, 567-68 (11th Cir. 1994)). The Court also noted that "failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." _Id._ These principles of pleading undoubtedly apply to claims by the SEC. See e.g., _Bellocco v. Curd_, 2005 U.S. Dist. LEXIS 24251, 2005 WL 2675022, *4 (M.D.Fla. 2005) ("Defendants correctly argue that allegations of GAAP violations, standing alone, do not satisfy the particularity requirement of Rule 9(b). 'Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim'. _Ziemba v. Cascade International, Inc._, 256 F.3d 1194, 1208 (11th Cir. 2001) (citing _Chill v. GE_, 101 F.3d 263, 270 (2d Cir. 1996))"); _In re Sawtek, Inc. Securities Litigation_, 2005 U.S. Dist. LEXIS 39223, 2005 WL 2465041, [*6] *3 (M.D.Fla. 2005) (Traditionally, courts measured the sufficiency of a plaintiff's allegations of securities fraud against the requirements of Federal Rule of Civil Procedure 9(b)").

[HN5]"The requirements of Rule 9(b) are met where the plaintiff sets forth: (1) the content of the precise statement or omission; (2) who made, or failed to make, the statement; (3) where the statement was, or should have been, made; (4) when the statement was, or should have been, made; and (5) what the defendants gained as a consequence." _In re Sawtek, Inc. Securities Litigation_,

2005 U.S. Dist. LEXIS 39223, 2005 WL 2465041, *3 (M.D.Fla., 2005); citing _Brooks v. Blue Cross and Blue Shield of Fla._, 116 F.3d 1364, 1371 (11th Cir. 1997). See also _Ziemba v. Cascade Intern., Inc._, 256 F.3d 1194, 1202 (11th Cir. 2001).

Due to the vagueness of the second amended complaint, specifically the factual allegations underlying Counts I and II of that pleading, the court **ORDERS** that Counts I and II of the second amended complaint be and hereby are **DISMISSED WITHOUT PREJUDICE** . The plaintiff is allowed fifteen (15) days from today's date to file an amended complaint which complies [*7] with Rules 8 and 9, Fed.R.Civ.Pro., as set forth above.

The court has also considered the defendant's argument that some of the plaintiff's claims are barred by the applicable statute of limitations. [HN6]The general statute of limitations, 28 U.S.C. § 2462, is applicable to the entire federal government in all civil penalty cases, unless Congress specifically provides otherwise. _3M Co. v. Browner_, 305 U.S. App. D.C. 100, 17 F.3d 1453, 1461 (D.C. Cir. 1994). Section 2462 provides:

> [HN7]Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

[HN8]According to Section 2462, civil penalties may not be sought outside five years "from the date when the claim first accrued. . ." 28 U.S.C. § 2462. Plaintiff contends that the [*8] "discovery rule" governs any accrual statute of limitations in federal litigation involving fraud. Pl. Br. at 33. However, [HN9]28 U.S.C. § 2462, has been interpreted not to incorporate a discovery rule. In _3M_, the D.C. Circuit held that "an action, suit or proceeding to assess or impose a civil penalty must be commenced within five years of the date of the violation giving rise to the penalty." _3M_, 17 F.3d at 1463. In _3M_, the EPA advanced the "discovery rule" and the court explicitly rejected it as "unworkable; outside the language of the statute; inconsistent with judicial interpretations of § 2462; unsupported by the discovery of injury rule adopted in non-enforcement, remedial cases; and incompatible with the functions served by a statute of limitations in penalty cases." 17 F.3d at 1462-1463.

The Eleventh Circuit has adopted the holding of *3M*. In *Trawinski*, [HN10]the Eleventh Circuit held that the "discovery rule, which might be applicable to statutes of limitations in state tort actions, has no place in a proceeding to enforce a civil penalty under a federal statute. In the Eleventh Circuit, the statute of limitations [*9] begins with the violation itself--it is upon violation, and not discovery of harm, that the claim is complete and the clock is ticking." *Trawinski v. United Techs., Carrier Corp.*, 313 F.3d 1295, 1298 (11th Cir. 2002).

Therefore, under Eleventh Circuit precedent, which is binding on this court, the appropriate start of the statute of limitations is the date of the violations for which the civil penalties are sought, not the discovery of such violations. Thus, any claim for civil penalties for violations occurring prior to March 19, 1998, are time-barred. It is therefore **ORDERED** by the court that the defendant's motion to dismiss any claim for civil penalties based on violations prior to March 19, 1998 is **GRANTED.**

Beginning in paragraph 83, the plaintiff discusses the "Transmittal 1753 Ruse." In its memorandum opinion issued May 7, 2003, this court found that there was no evidence of any "ruse" involving Transmittal 1753. Relevant to the allegations of paragraphs 83-84, the court previously found as follows [2] :

. . . On May 17, 2002, the Centers for Medicare and Medicaid Services ("CMS") issued Transmittal Letter 1753 regarding Medicare reimbursement [*10] provisions for group versus individual physical therapy. HealthSouth did not get a copy of this Transmittal Letter. An attorney working for HealthSouth had seen a copy of it and asked other HealthSouth employees if they had seen it. Upon informing the attorney that they had not, HealthSouth, through Susan Smith, Director of Reimbursement, followed up with Blue Cross Blue Shield. Defendant Exhibit 31. Blue Cross Blue Shield was ambiguous as to the Transmittal Letter's application to HealthSouth. H.R. 1174, 1175. William Horton, corporate counsel for HealthSouth, testified that he could not determine the applicability of Transmittal 1753 just by reading the Transmittal Letter. H.R. 1173. He stated 1753 was a directive to Medicare Part B carriers and its applicability to HealthSouth was unclear. *Id.*

In early June, 2002, Susan Smith received a copy of Transmittal Letter 1753. Defendant Exhibit 31. Later that same month, Blue Cross Blue Shield notified HealthSouth that Transmittal Letter 1753 did not apply to HealthSouth. Defendant Exhibit 31; *see also* Defendant Exhibit 8K. On July 18, 2002, representatives of HealthSouth met with representatives for CMS in Washington D.C. [*11] for the purpose of determining whether Transmittal Letter 1753 applied to HealthSouth. CMS was not sure if it applied either and wanted to study the applicability issue further. H.R. 1156; Defendant Exhibits 31 and 8K. On July 30, 2002, certain provisions of the Sarbanes-Oxley Act became effective. . . .

On August 6, 2002, Owens told defendant Scrushy that the impact of Transmittal Letter 1753 would be only 15 to 20 million dollars. H.R. 802-03. In its Amended Complaint, the SEC asserts that 20 million dollars was indeed the impact Transmittal 1753 would have on HealthSouth's profits. Amended Complaint, PP35-37. The evidence before the court establishes otherwise. Patrick Foster, President of the Inpatient Division, testified that his initial projection of the impact of Transmittal 1753 on solely his division was 22 million dollars. H.R. 856, 909. Larry Taylor, President of the Surgery Centers Division, testified that his projection of the impact of Transmittal 1753 on his division alone was approximately 30 million dollars. H.R. 1004.

On August 8, 2002, the Board of Directors met and agreed that management should meet again with CMS in Washington as soon as possible to [*12] obtain further clarification and assess the impact on HealthSouth. Defendant Exhibit 8K. As of that date, the impact of Transmittal 1753 was still undetermined. H.R. 1171.

On August 14, 2002, forms 10-Q and 8-K were filed with the SEC. Said forms were signed by defendant Scrushy as CEO and CFO Weston Smith. [FN45] Plaintiff Exhibits 7 and 8.

FN45. Although William Owens had been promoted to CEO on August 8, 2002, his promotion as CEO of HealthSouth did not become effective until the

2005 U.S. Dist. LEXIS 30553, *

Board of Directors' meeting August 26, 2002. Defendant Exhibit 8M. Thus, defendant Scrushy signed the certification on Form 10-Q filed August 14, 2002.

On August 15, 2002, management representatives from HealthSouth met with representatives from CMS in Washington D.C. again. H.R. 1171, 1176. At that meeting Tom Grissom, author of Transmittal Letter 1753, was present and CMS informed HealthSouth that the guideline did apply to HealthSouth. Defendant Exhibit 31; *see also* H.R. 1169-1178. Mr. Horton advised HealthSouth management that, since there was no definitive information regarding the impact of Transmittal 1753 until August 15, 2002, the lack of 10-Q disclosure regarding this [*13] event was merely lack of disclosure of something management did not know and therefore could not disclose. Defendant Exhibit 31; H.R. 1180-1181.

During the following two weeks in August 2002, HealthSouth determined that the financial impact of Transmittal Letter 1753 would be 175 million dollars per year. Defendant Exhibits 31 and 8M. *See also* H.R. 1176-1178. Owens and Susan Smith were involved in calculating this impact. H.R. 1177.

On August 27, 2002, HealthSouth issued a press release regarding this impact. H.R. 1177.

In September, 2002, HealthSouth retained FTI to confirm its analysis of the impact of Transmittal 1753. FTI's initial analysis, although not completed, fully supported HealthSouth's analysis of the impact being 175 million dollars per year. Defendant Exhibit 42. *See also* H.R. 1182. On October 30, 2002, William Owens as CEO of HealthSouth issued a press release that defendant Scrushy was cleared, through an outside investigation by a national law firm, Fulbright & Jaworski L.L.P., of any allegations of inside knowledge concerning the impact of Transmittal 1753. Defendant Exhibit 8R. The Fulbright report concluded:

Fulbright & Jaworski [*14] L.L.P. . . . has uncovered no oral interview or written document (including electronic data) that establishes that Mr. Scrushy knew prior to the time of the transfer by Mr. Scrushy of HEALTH-SOUTH common stock to HEALTHSOUTH on or about July 31, 2002, in satisfaction of the principal amount of loan made to him by HEALTHSOUTH under its 1999 Executive Loan Plan of: (I) Transmittal 1753 [the Medicare reimbursement rule change]; (ii) the application of Transmittal 1753 [the reimbursement rule change] to the Company's various outpatient therapy services; or (iii) the Transmittal's potential effect on the Company. *Id.*

*S.E.C. v. Healthsouth*, 261 F. Supp. 2d 1298, 1320-1322 (N.D.Ala. 2003). This court specifically found as follows:

No evidence was presented by the SEC during its case in chief regarding Transmittal 1753 although the SEC specifically alleged that "Scrushy authorized a scheme to blame a May 2002 Medicare billing guidance referred to as Transmittal 1753, for reduced future earning. . . ." *See* Amended Complaint §§ 35-39 (doc. 21). As a matter of fact, when defense counsel first elicited evidence regarding this Transmittal at the presentation [*15] of Scrushy's case, counsel for the SEC objected. H.R. 880, 1045. However, defendant Scrushy, through corporate counsel Horton, presented uncontradicted evidence that Transmittal 1753 and its effect on HealthSouth was a real problem dealt with as expeditiously as possible and not

Page 6

merely a convenient, imaginary means to offset fictitious profits. . . .

*S.E.C. v. Healthsouth,* 261 F. Supp. 2d at 1322-23. Although the court found no evidence to support these allegations the first time the court heard the evidence regarding Transmittal 1753, the identical allegations are repeated in the second amended complaint. *See* Amended Complaint (doc. 21) at PP35-37, and Second Amended Complaint, at PP 83-84. Being of the opinion that this court has already concluded that these allegations fail to state a claim upon which relief may be granted, and further being of the opinion that the plaintiff has included no new allegations concerning Transmittal 1753, the court **ORDERS** that any claim based on paragraphs 83-84 of the second amended complaint is **DISMISSED** . [3]

> 2   "H.R. references are to the hearing record from the testimony this court heard on the plaintiff's motion for a preliminary injunction, which was denied.

[*16]
> 3   The court does not find that any specific claim for relief in the second amended complaint is based on these allegations. Therefore, the removal of these allegations from any future amended complaint is not prejudicial to the plaintiff.

Defendant further argues that plaintiff lacks standing to sue under 15 U.S.C. § 78t(a). Defendant's brief in support, at 16. This claim, found for the first time as Count VI of the second amended complaint, asserts that defendant Scrushy was a "control person" of HealthSouth, as defined by the Exchange Act. Second Amended Complaint, P133.

"The history of the interpretation of section 20 in the courts has hardly been a history of consistency, especially in the context of SEC enforcement actions." *SEC v. Savoy Industries,* 190 U.S. App. D.C. 252, 587 F.2d 1149, 1169 (D.C.Cir. 1978). By way of an alternative holding, the Sixth Circuit indicated that, in its view, section 20(a) (15 U.S.C. § 78t(a)) was not available to the SEC in an injunctive action because it found the SEC was not a "person" and [*17] because section 20(a) was intended to be used solely in the context of private actions. *Id.* See *SEC v. Coffey,* 493 F.2d 1304, 1318 (6th Cir. 1974).

One year after *Coffey,* the Securities Acts Amendments of 1975 changed § 3(a)(9) of the Act to provide that "the term 'person' means a natural person, company, government, or *political subdivision, agency, or instrumentality of a government.*" *SEC v. First Jersey Securities, Inc.,* 876 F. Supp. 488, 489-490 (S.D.N.Y. 1994)

*(First Jersey I)* (emphasis in original). In *First Jersey I,* the court noted that "Section 20(a) contemplates liability to a "person," which according to the current definition, includes the SEC." *First Jersey,* 876 F. Supp. at 490. Furthermore, the statutory language of 15 U.S.C. § 78t(a) characterizes the conduct from the point of view of an enforcement agency such as the SEC. *Id.*

The Second Circuit has adopted the view that 15 U.S.C. § 78t(a) is available to the SEC in enforcement proceedings. *SEC v. Savoy,* 587 F.2d at 1170; *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450 (2d Cir. 1996). [*18]

Adding weight to this view is an opinion of the Southern District of Ohio, issued three days before defendant presented his motion to dismiss to this court. It held:

> Initially, the Court must determine whether the SEC may assert that Smith violated Section 20(a) while also seeking injunctive relief in light of the Sixth Circuit's holding in *SEC v. Coffey,* 493 F.2d 1304 (6th Cir. 1974). In that case, the Sixth Circuit held that "Section 20(a) of the 1934 Act may not be relied upon by the SEC in an injunctive enforcement action" because that section "makes a controlling person liable 'to any person to whom such controlled person is liable' and the SEC is not a person. *Id.* at 1318 (citing 15 U.S.C. § 78t(a)). After that decision, however, Congress amended the definition of "person" in the Exchange Act to specifically include governmental entities. 15 U.S.C. § 78c(a)(9). As a result, the Second Circuit held in *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450 (2nd Cir. 1996), that "since § 20(a) is available as an enforcement mechanism to 'any person to whom such controlled person [*19] is liable,' and the 1934 Act includes government agencies in the definition of 'person,' *see* 15 U.S.C. § 78c(a)(9), we have upheld the SEC's authority to pursue an enforcement action under § 20(a)." *Id.* at 1472. The current weight of authority from courts around the country is that the Second Circuit's position on this issue is the correct one. *See, e.g., SEC v. Buntrock* , 2004 U.S. Dist. LEXIS 9495, at 27-28 (D.Ill. 2004); *SEC v. Enterprises Solutions, Inc.,* 142 F. Supp. 2d 561, 575 (S.D.N.Y. 2001); *SEC v. Fitzgerald,* 135 F. Supp. 2d 992, 1029 (N.D.

Cal. 2001). In light of the congressional amendment to the definition of "person" and the Second Circuit's holding in *First Jersey,* the Court agrees with those courts and holds that [HN11]the SEC may pursue an enforcement action pursuant to Section 20(a) against Smith.

According to the Sixth Circuit, the SEC must prove three elements to establish its Section 20(a) claim against Smith. First, Smith "must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder." *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 696-697, 91 Fed. Appx. 418 (6th Cir. 2004). [*20] Second, Smith must have directly or indirectly controlled the entity liable for the securities law violation. *Id.* "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2. Third, and finally, because "controlling person" liability is derivative the SEC may hold Smith liable under this theory only if Smith controlled an entity that violated the Exchange Act. *Darby v. Century Bus. Servs.,* 96 Fed. Appx. 277, 286 (6th Cir. 2004) (Exchange Act); see also *D.E. & J. Ltd. P'ship v. Conaway,* 133 Fed. Appx. 994, 1001 (6th Cir. 2005) (Securities Act).

*S.E.C. v. Smith,* 2005 U.S. Dist. LEXIS 21427, 2005 WL 2373849, *10 (Sept. 27, 2005, S.D.Ohio).

To date, the Eleventh Circuit has not spoken directly to this issue. However, the court finds the reasoning of the Southern District of Ohio to be persuasive. After the Sixth Circuit held that the SEC was not a "person" for § 20(a) purposes, the statute was amended by Congress to include "government, or political subdivision, [*21] agency, or instrumentality of a government." See *First Jersey,* 876 F. Supp. at 488-489; 15 U.S.C. § 78c(a)(9). [HN12]The SEC fits squarely within the amended definition of "person" under § 78c(a)(9).

It is therefore **ORDERED** by the court that the defendant's motion to dismiss Count VI of the second amended complaint is **DENIED.**

Inconsideration of the foregoing, the court **ORDERS** as follows: The court being of the opinion that the complaint fails to set forth its allegations of fraud with the specificity required by Rule 9(b), Fed.R.Civ.Pro., the defendant's motion to dismiss is due to be granted on Counts I and II of the second amended complaint. It is therefore **ORDERED** by the court that the defendant's motion to dismiss these counts of the complaint is **GRANTED.** The plaintiff is allowed fifteen (15) days to amend its complaint to set forth its allegations of fraud with particularity.

Having considered defendant's motion to dismiss Counts III, IV, V and VI, and the court being of the opinion that this portion of defendant's motion is due to be denied;

It is therefore **ORDERED** by the court that said motion [*22] is **DENIED** as to Counts III, IV, V and VI of the second amended complaint.

**DONE** and **ORDERED** this the 29th day of November, 2005.

INGE PRYTZ JOHNSON U.S. DISTRICT JUDGE