Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

In re Exodus Communications, Inc. Securities Litigation
N.D.Cal.,2005.

United States District Court,N.D. California.
In re EXODUS COMMUNICATIONS, INC. SECURITIES LITIGATION
**No. C 01-2661 MMC, 160, 163.**

Aug. 5, 2005.

Elizabeth P. Lin, Milberg Weiss Bershad & Schulman LLP, Kevin J. Yourman, Leigh Anne Parker, Weiss & Yourman, Michael David Braun, Braun Law Group, P.C., Los Angeles, CA, John K. Grant, Connie Cheung, Ex KanoS. Sams, II, Milberg Weiss Bershad Hynes & Lerach LLP, Reed R. Kathrein, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA, Joseph H. Weiss, Weiss & Lurie, New York, NY, William S. Lerach, Lerach Coughlin Stoia Geller & Robbins LLP, San Diego, CA, for Plaintiffs.

Elizabeth E. Karnes, Morgan Lewis & Bockius, Jennifer Jarratt Massey, Brobeck, Phleger & Harrison LLP, Rebecca Justice Lazarus, Gibson, Dunn & Crutcher, San Francisco, CA, David Malcolm Furbush, O'Melveny & Myers LLP, Menlo Park, CA, Jonathan C. Dickey, Paul J. Collins, Gibson, Dunn & Crutcher LLP, Palo Alto, CA, John D. Van Loben Sels, Quinn Emanuel Urquhart Oliver & Hedges LLP, Redwood Shores, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART UNDERWRITER DEFENDANTS' MOTION TO DISMISS; GRANTING INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

CHESNEY, J.

(Docket Nos. 160, 163)

**\*1** This Document Relates To: ALL ACTIONS

Before the Court are the two separate motions to dismiss filed by (1) defendants Goldman, Sachs & Co. ("Goldman Sachs"), Merrill Lynch & Co. ("Merrill Lynch"), Morgan Stanley Dean Witter ("Morgan Stanley"), and J.P. Morgan (collectively, "Underwriter Defendants"); and (2) defendants Ellen M. Hancock ("Hancock"), R. Marshall Case ("Case"), Sam S. Mohamad ("Mohamad"), Dick Stoltz ("Stoltz"), Herbert A. Dollahite ("Dollahite"), Adam W. Wegner ("Wegner"), Beverly Brown ("Brown"), and William Yeack ("Yeack") (collectively, "Individual Defendants"), each of whom is a former officer of Exodus Communications, Inc.[FN1] Each motion seeks dismissal of plaintiffs' Third Amended Consolidated Class Action Complaint, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. On April 29, 2005, plaintiffs filed a Corrected Third Amended Consolidated Class Action Complaint ("Third Amended Complaint" or "TAC"). The Court granted the parties leave to file supplemental memoranda addressing the impact of the amendments on the pending motions to dismiss and, after such supplemental memoranda were filed, took the motions under submission as of May 13, 2005. For the reasons set forth below, the Court GRANTS in part and DENIES in part the Underwriter Defendants' motion, and GRANTS the Individual Defendants' motion.

> FN1. The positions held by the Individual Defendants during the relevant time period are as follows: (1) Hancock, CEO and Chairman of the Board (through September 2001); (2) Case, Executive Vice President of Finance and CFO (through May 2001); (3) Mohamad, President of Worldwide Sales; (4) Stolz, temporary CFO (effective May 2001); (5) Dollahite, Executive Vice President of Customer Services, Support and Quality; (6) Wegner, Senior Vice President of Legal and Corporate Affairs, General Counsel, and Secretary; (7) Brown, Executive Vice President and CMO (through May 2001); (8) Yeack, Executive Vice President of Managed and Profession-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

al Services. (*See* TAC ¶¶ 27-34, 87.)

### BACKGROUND

The above-titled action is a purported class action brought on behalf of those individuals and entities who purchased securities issued by Exodus Communications, Inc. ("Exodus") between April 20, 2000 and September 25, 2001, inclusive (the "class period"). (*See* TAC ¶ 1.) [FN2]

> FN2. Other than procedural history, the following facts are taken from the Third Amended Complaint and, for purposes of the instant motion, are presumed true.

Exodus "operated Internet Data Centers ('IDCs') that leased space to Exodus's customers to place ('co-locate') the computer servers that ran the customers' Internet operations."(*See* TAC ¶ 2.) Exodus also "provided broadband access and other design and management services to support commercial Internet operations."(*Seeid.*)

On June 20, 2001, Exodus announced that its results for the second quarter of 2001 and for the fiscal year 2001 [FN3] would be below prior expectations, whereupon the price of Exodus's stock fell almost 50%. (*See* TAC ¶¶ 93-94.) On July 12, 2001, the first of many complaints against Exodus was filed in this district.

> FN3. As noted in the Court's prior order of dismissal, Exodus's fiscal year ends on December 31 and, consequently, its first quarter ends March 31 and its second quarter ends June 30. (*See* Order Granting Underwriter Defendants' Motion To Dismiss With Leave to Amend; Granting Individual Defendants' Motion to Dismiss with Leave to Amend ("Dismissal Order"), filed August 19, 2003, at 2 n. 2.)

On September 25, 2001, the last day of the class period, the *Wall Street Journal* published an article stating that Exodus's bankruptcy was forthcoming, whereupon Exodus's stock, which had traded as high as $179 per share during the class period, fell to $0 .17 per share. (*See* TAC ¶ 18.) The following day, September 26, 2001, Exodus filed for bankruptcy. (*Seeid.*)

On December 13, 2001, plaintiffs filed a Consolidated Class Action Complaint, alleging claims against Hancock, Case, Stoltz, Dollahite, and Wegner, for violation of §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"). A Corrected Consolidated Class Action Complaint ("Consolidated Complaint" or "CAC") was filed April 17, 2002. By order filed May 28, 2002, the Court granted the defendants' motion to dismiss the Consolidated Complaint, finding plaintiffs had failed to adequately plead that any of the alleged statements were false or misleading at the time they were made, and that plaintiffs had failed to plead facts sufficient to raise an inference that defendants had made the alleged false or misleading statements with the requisite state of mind. Plaintiffs were afforded leave to amend.

**\*2** On July 11, 2002, plaintiffs filed their First Amended Consolidated Class Action Complaint ("First Amended Complaint" or "FAC"), which significantly expanded the scope of the litigation. The First Amended Complaint increased the class period from 11 weeks (March 30, 2001 to June 20, 2001) to 73 weeks (April 20, 2000 to September 25, 2001). (*Compare* CAC ¶ 1 *with* FAC ¶ 1.) In addition, the First Amended Complaint added two new plaintiffs, Thomas Welch and Martin Fox, and seven new defendants, three of whom are former officers of Exodus, specifically, Mohamad, Brown and Yeack, and four of whom are the Underwriter Defendants, who were underwriters of Exodus's February 6, 2001 secondary stock and note offerings ("February Offerings"). The First Amended Complaint included a new claim under §§ 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77o, against former Exodus CEO Hancock, as well as new claims against the Underwriter Defendants, for violation of § 10(b) of the Exchange Act and § 11 of the Securities Act. The new claims against Hancock and the Underwriter Defendants were based on allegedly false statements made in the registration statements and pro-

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357

**(Cite as: Not Reported in F.Supp.2d)**

spectuses issued in connection with the February Offerings.

On August 19, 2003, the Court granted the motions filed by the Underwriter Defendants and the Individual Defendants to dismiss the First Amended Complaint, and afforded plaintiffs leave to amend. The Court dismissed all claims against the Underwriter Defendants because plaintiffs failed to allege facts sufficient to demonstrate conformity with the statute of limitations. The Court also held that the § 10(b) claims against the Underwriter Defendants were subject to dismissal because plaintiffs failed to adequately allege scienter or that the statements in the Registration Statements were false when made. The Court dismissed the § 11 claims against the Underwriter Defendants, with leave to amend, because plaintiffs failed to adequately allege falsity with the particularity required by Rule 9(b). The Court dismissed plaintiffs' § 10(b) claims against the Individual Defendants because plaintiffs failed to adequately allege scienter and that the allegedly false and misleading statements were false when made. As an additional basis for dismissal, the Court held that plaintiffs had failed to allege sufficient facts to demonstrate that the following claims were timely: (1) the § 10(b) claims against the Individual Defendants as alleged by class members who purchased securities between April 20, 2000 and March 31, 2001; and (2) the new § 10(b) claims asserted against Mohamad, Yeack, and Brown that were based on statements made between March 31, 2001 and June 20, 2001. The Court dismissed the § 11 claim against Hancock because plaintiffs failed to plead sufficient facts to show the claim was timely and failed to adequately allege falsity. Finally, the Court dismissed plaintiffs' claims for violation of § 20(a) of the Exchange Act and § 15 of the Securities Act because such claims were dependent on a violation of § 10(b) or § 11, and plaintiffs had not adequately alleged a violation of either statute.

**\*3** On October 20, 2003, plaintiffs filed a Second Amended Consolidated Class Action Complaint ("Second Amended Complaint"). On November 25, 2003, before defendants responded to the Second Amended Complaint, plaintiffs filed a motion for leave to file a Third Amended Complaint. The Court granted the motion on January 12, 2004, and plaintiffs filed their Third Amended Consolidated Class Action Complaint on January 15, 2004. Defendants thereafter filed the instant motions to dismiss.

On March 8, 2005, while the motions to dismiss were under submission, plaintiffs filed a motion for leave to amend their Third Amended Consolidated Class Action Complaint to add one line of text and one exhibit. On April 18, 2005, the Court granted the motion and afforded the parties leave to file supplemental memoranda addressing the impact of the amendments on the pending motions to dismiss. Plaintiffs' Corrected Third Amended Consolidated Class Action Complaint was filed April 29, 2005. The motions to dismiss were taken under submission as of May 13, 2005, once the supplemental memoranda were filed.

## LEGAL STANDARDS

### A. Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) cannot be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *See Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1990).

Generally, a district court, in ruling on a Rule 12(b)(6) motion, may not consider any material beyond the pleadings. *See Hal Roach Studios. Inc. v. Richard Feiner And Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). Material that is properly submitted as part of the complaint, however, may be considered. *See id.* Documents whose contents are alleged in the complaint, and whose authenticity no party questions, but which are not physically attached to the pleading, also may be considered. *See Branch v. Tunnell,* 14 F.3d 449, 454 (9th

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

Cir.1994). In addition, the Court may consider any document "the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies," regardless of whether the document is referred to in the complaint. *SeeParrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir.1998). Finally, the Court may consider matters that are subject to judicial notice. *SeeMack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986).

In analyzing a motion to dismiss, the Court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party. *SeeNL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). In analyzing a motion to dismiss, the Court may disregard factual allegations if such allegations are contradicted by the facts established by reference to exhibits attached to the complaint. *SeeDurning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987). Conclusory allegations, unsupported by the facts alleged, need not be accepted as true. *SeeHolden v. Hagopian,* 978 F.2d 1115, 1121 (9th Cir.1992).

B. Section 10(b) and the PSLRA

**\*4** Section 10(b) of the Exchange Act provides that "[i]t shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe [.]"*See*15 U.S.C. § 78j(b). Rule 10b-5 provides:
It shall be unlawful for any person ...
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. The elements of a § 10(b)/Rule 10b-5 claim are (1) "a material misrepresentation (or omission)"; (2) "scienter, *i.e.,* a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) " 'loss causation,' *i.e.,* a causal connection between the material misrepresentation and the loss."*SeeDura Pharmaceuticals, Inc. v. Broudo,* --- U.S. ----, ----, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005). False statements in a registration statement are actionable under § 10(b) as well as under § 11. *SeeHerman & Maclean v. Huddleston,* 459 U.S. 375, 387, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("We hold that the availability of an express remedy under Section 11 of the 1933 Act does not preclude defrauded purchasers of registered securities from maintaining an action under Section 10(b) of the 1934 Act.")

Any class action complaint alleging securities fraud in violation of the Exchange Act is subject to the heightened pleading standards set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA").*SeeIn re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 973-74 (9th Cir.1999). Under the PSLRA, for all claims based on misrepresentations or omissions, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."*See*15 U.S.C. § 78u-4(b)(1). Plaintiffs "must provide all the facts forming the basis for [their] belief in great detail."*SeeSilicon Graphics,* 183 F.3d at 983.[FN4] The PSLRA also requires that "the complaint shall, with respect to each such act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."*See*15 U.S.C. § 78u-4(b)(2). The required state of mind is "deliberate recklessness, at a minimum." *SeeSilicon Graphics,* 183 F.3d at 974. Plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."*Seeid.*They "must state specific facts indicating no less than a

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

degree of recklessness that strongly suggests actual intent."*Seeid.* at 979.If the challenged statement in question is forward-looking, however, the requisite state of mind is "actual knowledge." *SeeNo. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 931 (9th Cir.2003) (quoting 15 U.S.C. § 78u-5(c)(1)).

> FN4. "Allegations are deemed to have been made on information and belief until the plaintiffs demonstrate that they have personal knowledge of the facts."*In re The Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1085 n. 3 (9th Cir.2002).

**\*5** In determining whether scienter has been adequately alleged, the Court must examine the totality of plaintiffs' allegations. *SeeAmerica West,* 320 F.3d at 938. The Court must consider " 'all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.' '*See*ee *id.*(quoting *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002)). "District courts should consider all the allegations in their entirety, together with any reasonable inferences that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." *Gompper v. VISX, Inc.,* 298 F.3d at 897. To establish a strong inference of scienter, the allegations must show that an inference of fraud is " 'the most plausible of competing inferences." ' *See*id.(quoting *Helwig v. Vencor, Inc.,* 251 F.3d 540, 553 (6th Cir.2001) (en banc)).

Because "falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts," the Ninth Circuit has incorporated the falsity and scienter requirements "into a single inquiry." *SeeRonconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001); *seealsoAmerica West,* 320 F.3d at 932 (noting the court "generally examines the falsity and scienter requirements at the same time.") In conducting this inquiry, a court is to determine whether "particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to in-

vestors."*SeeRonconi v. Larkin,* 253 F.3d at 429. "The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement."*SeeNursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir.2004).

### C. Section 11 of the Securities Act

Section 11 "creates a private remedy for any purchaser of a security if 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein not misleading." ' *SeeIn re Daou Systems, Inc. Sec. Litig.,* 411 F.3d 1006, 1027 (9th Cir.2005) (quoting 15 U.S.C. § 77k(a)). "Under § 11 of the Securities Act of 1933 ... any signer of [a] registration statement, any partner or director of the issuer, any professional involved in preparing or certifying the statement, and any underwriter of a registration statement may be liable[.]" *Kaplan v. Rose,* 49 F.3d 1363, 1371 (9th Cir.1994). "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *SeeDaou,* 411 F.3d at 1027 (citation omitted); *seealsoHerman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case.")

**\*6** Significantly, scienter is not a requirement for liability under § 11, and "defendants will be liable for innocent or negligent material misstatements or omissions."*SeeDaou,* 411 F.3d at 1027 (citation omitted).

Defendants to a § 11 claim, other than the issuer, can establish a "due diligence" defense if they show that after reasonable investigation they had reason-

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

able grounds to believe, and did believe, that, at the time the registration statement became effective, the statements were true and there was no material omission. *SeeKaplan v. Rose,* 49 F.3d at 1371 (citing 15 U.S .C. § 77k(b)(3)(A)).

DISCUSSION: UNDERWRITERS' MOTION TO DISMISS

As noted, the Third Amended Complaint alleges causes of action against the Underwriter Defendants for violation of § 10(b) of the Exchange Act and Rule 10(b)(5), and violation of § 11 of the Securities Act. Plaintiffs allege that the Underwriter Defendants are liable under both § 10(b) and § 11 because the registration statements and prospectuses issued in connection with the February Offerings (collectively "Registration Statements") FN5 contained the following false and misleading statements: (1) "We believe that the acquisition [of GlobalCenter] enhances our global Internet Data Center infrastructure, strengthens our network, our customer support, sales and professional services organizations, and expands our customer base"; FN6 (2) Exodus achieved revenues of $280.4 million for the quarter ended December 31, 2000, and $818.4 million for fiscal year 2000; (3) "[Exodus has] established a diverse base of customers and continues to focus on supporting the strong demand from the enterprise market"; and (4) Exodus had 4500 customers under contract. (*See*TAC ¶¶ 72-73, 345-346 (alterations in original).) FN7

> FN5. The Third Amended Complaint states that "[m]uch of the language in the Registration Statement and Prospectus for the note offering was similar to that contained in the Prospectus for Exodus's secondary public offering."(*See*TAC ¶ 73.) In their papers, the parties do not differentiate between the two registration statements and prospectuses.

> FN6."On September 28, 2000, Exodus entered into a definitive merger agreement to acquire GlobalCenter, an indirect wholly owned subsidiary of Global Crossing

North America, Inc."*See*TAC ¶ 56.

> FN7. Except as indicated, plaintiffs do not purport to quote these statements directly.

In their Motion to Dismiss, the Underwriter Defendants raise three principal arguments: (1) both of the causes of action are barred by the applicable one-year statute of limitations; (2) plaintiffs have failed to adequately allege a § 11 claim because plaintiffs have failed to allege falsity with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure; and (3) plaintiffs have not adequately alleged a § 10(b) claim because plaintiffs have failed to adequately allege falsity and scienter under the requirements of the PSLRA.

A. Statute of Limitations: Section 10(b) and Section 11 Claims

The Court previously has held that the instant claims under § 10(b) and § 11 are timely if they were brought "within one year of either actual discovery or inquiry notice" of the facts constituting the alleged violations. (*See* Dismissal Order at 8.) As to inquiry notice, the Court, relying on the Ninth Circuit's discussion in *Berry v. Valence,* 175 F.3d 699, 703-04 (9th Cir.1999), held that it would apply "the Tenth Circuit's formulation," as set forth in *Sterlin v. Biomune Systems,* 154 F.3d 1191, 1201 (10th Cir.1998). (*See* Dismissal Order at 8.) Under that standard, " 'inquiry notice ... triggers an investor's duty to exercise reasonable diligence and ... the one-year statute of limitations begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." ' *See*Valence, 175 F.3d at 704 (quoting *Sterlin,* 154 F.3d at 1201) (ellipses in original). Thus, a court must ask (1) whether an event/ publication "raise[d] sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further," and (2) when "a reasonably diligent investor [should] have discovered the facts underlying the alleged fraudulent activity." *See*Valence, 175 F.3d at 704. "If the answer to the first question is yes, the answer to the second question would determine when the statute of limitations began to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 7
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

run." *Id.*

**\*7** For purposes of the statute of limitations, the question of when a reasonably diligent investor did discover or should have discovered the alleged wrongdoing is a question of fact, rarely to be decided as a matter of law. *See Mosesian v. Peat Marwick,* 727 F.2d 873, 877 (9th Cir.1984) ("The question of when [alleged wrongdoing] was or should have been discovered is a question of fact. It may be decided as a matter of law only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct.") (internal citations and quotations omitted). Nevertheless, "a plaintiff must affirmatively plead sufficient facts in his complaint to demonstrate conformity with the statute of limitations." *See Toombs v. Leone,* 777 F.2d 465, 468 (9th Cir.1985).

As noted, plaintiffs' claims against the Underwriter Defendants are based on alleged misstatements in the Registration Statements for the February Offerings. Because plaintiffs first asserted claims against the Underwriter Defendants in the First Amended Complaint, which was filed on July 11, 2002, plaintiffs' claims against the Underwriter Defendants are timely if plaintiffs should have discovered the facts underlying those claims no earlier than July 11, 2001. *See Valence,* 175 F.3d at 704.

The Court previously dismissed the § 10(b) and § 11 claims against the Underwriter Defendants because plaintiffs failed to allege any facts from which one could determine "at what point a reasonably diligent investor should have discovered the relevant facts underlying plaintiffs' claims against the Underwriter Defendants," and failed to set forth the nature and scope of their investigation of the facts underlying their claims against the Underwriter Defendants. (*See* Dismissal Order at 12.)

Plaintiffs now allege, in the Third Amended Complaint, that they did not discover, until December 2001, "the possibility that the Underwriter Defendants may have underwritten Exodus's offerings pursuant to a false and misleading Registration State-

ment and Prospectus." (*See* TAC ¶ 319.) According to the complaint, plaintiffs Martin Fox and Thomas Welch, the only named plaintiffs who claim to have purchased stock or notes in, or traceable to, the February Offerings, (*see* TAC ¶ 25), first contacted plaintiffs' counsel on July 18, 2001 and August 23, 2001, respectively. (*See* TAC ¶ 317.) Thereafter, plaintiffs allege, they "diligently attempted to locate individuals with knowledge of Exodus's business practices." (*See id.*) According to plaintiffs, it was not until their investigator's interview with CW6, on December 4, 2001, at which CW6 stated that Exodus was not bringing in any new customers at the end of 2000, that plaintiffs first suspected that fraudulent conduct might have begun prior to the second quarter of 2001. (*See id.*) On December 10, 2001, plaintiffs allege, they spoke with CW9, Vice President of Facilities in Exodus's Santa Clara office, who informed plaintiffs that, in plaintiffs' words, "Exodus's management dismissed his capital report and continued to build additional IDCs when they knew that Exodus did not have the capital to cover the expenses of these expansions." (*See id.* ¶ 320.) Plaintiffs contend this statement led them "to believe that there was a possibility that statements contained in the registration statements issued in connection with Exodus's February 2001 secondary stock and note offerings were false and misleading." (*See id.*) In addition, according to plaintiffs, unspecified "defendants fraudulently concealed their activities." (*See id.* ¶ 316.) If a reasonably diligent investor would not have discovered the facts underlying plaintiffs' claims against the Underwriter Defendants until at least July 11, 2001, one year before the first complaint containing claims against the Underwriter Defendants was filed, plaintiffs' claims against the Underwriter Defendants are timely. *See Valence,* 175 F.3d at 704.

**\*8** The Underwriter Defendants move to dismiss plaintiffs claims on the ground that plaintiffs still fail to adequately allege that their claims are timely. To the extent defendants contend the complaint must be dismissed unless plaintiffs have alleged facts sufficient to determine at what point a reasonably diligent investor should have discovered the relevant facts underlying plaintiffs' claims against

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

the Underwriter Defendants, recent Ninth Circuit authority holds to the contrary. In *Livid Holdings Ltd. v. Salomon Smith Barney,* 403 F.3d 1050 (9th Cir.2005), the Ninth Circuit addressed the statute of limitations argument raised by the defendants therein, even though it had not been addressed by the district court, as a possible alternative ground for affirming the district court's dismissal of the complaint. *Seeid.* at 1058-60.The Ninth Circuit found it was "not evident, based on the allegations in the complaint," that "Livid should have been aware of the fraud one year before it filed its complaint."*Seeid.* at 1059-60.There, the plaintiff, Livid, had alleged it first learned, approximately fourteen months before the complaint was filed, of a bankruptcy proceeding that triggered its first suspicion of fraud and an investigation. *Seeid.* at 1060.Livid also alleged that it did not have actual notice of the alleged fraud until approximately ten months before the complaint was filed, when it received a report from the independent auditor for the bankruptcy proceeding. *Seeid.* at 1059.The Ninth Circuit noted that "financial problems alone are generally insufficient to suggest fraud" and that "the filing of the bankruptcy petition alone seems unlikely to satisfy the inquiry-plus-due diligence standard, especially since ... [the] question of what a reasonably prudent investor should have known is particularly suited to a jury determination."*Seeid.* at 1060.Rather than finding the complaint subject to dismissal because Livid had failed to allege facts sufficient to determine when a reasonable investor would likely have learned of the alleged fraud, the Ninth Circuit held that it could not decide as a matter of law "whether Livid should have been on notice of the alleged fraud one year before the complaint was filed."*Seeid.*The Ninth Circuit concluded that "[b]ecause the record does not establish that the statute of limitations for the federal securities claim has run, we refuse to affirm the district court on this alternative ground."*Seeid* . at 1058.

The Underwriter Defendants further argue that allegations contained in plaintiffs' earlier-filed complaints contradict their allegation that they learned only in December 2001 that the allegedly fraudulent conduct might have begun prior to the second quarter of 2001. The Court, however, previously has rejected the Underwriter Defendants' arguments that such prior allegations demonstrate plaintiffs were aware of their potential claims against the Underwriter Defendants prior to July 12, 2001. (*See* Dismissal Order at 11-12.)

**\*9** The Underwriter Defendants also contend that plaintiffs were on inquiry notice of their claims against the Underwriter Defendants as early as June 20, 2001, when Exodus announced its "disastrous" second quarter of 2001 results. (*See*TAC ¶ 93.) Poor financial results for one quarter do not necessarily suggest that earlier statements were fraudulent, however. *SeeLivid,* 403 F.3d at 1060 (noting that "financial problems alone are generally insufficient to suggest fraud"); *seealsoGray v. First Winthrop Corp.,* 82 F.3d 877, 881 (9th Cir.1996) (noting "poor financial performance, standing alone, does not necessarily suggest securities fraud" and may be explained "by poor management, general market conditions, or other events unrelated to fraud, creating a jury question on inquiry notice").

Moreover, even assuming that Exodus's June 20, 2001 announcement was sufficient to trigger inquiry notice of the possibility of fraud in earlier financial statements, such as those contained in the Registration Statements for the February Offerings, the statute of limitations would not begin running on that date, but would only trigger a duty to begin an investigation. *SeeValence,* 175 F.3d at 704. The statute of limitations would not begin to run until the date when "a reasonably diligent inventor [should] have discovered the facts underlying the alleged fraudulent activity."*Seeid.*Plaintiffs allege that their counsel began investigating after plaintiffs contacted them, but that the investigation did not lead plaintiffs to suspect wrongdoing by the Underwriter Defendants until December 2001. (*See*TAC ¶ 319.) The Underwriter Defendants do not suggest, let alone specify, what plaintiffs should or could have done that would have alerted them to the facts underlying their causes of action against the Underwriter Defendants before the expiration of the relevant three-week period between the date of Exodus's June 20, 2001 announcement and July 11,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

2001, one year prior to the filing of the first complaint that contained claims against the Underwriter Defendants. The issue of when a reasonably diligent investor should have discovered the facts underlying plaintiffs' claims against the Underwriter Defendants may be decided on a motion to dismiss only where "the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers ... integral to the complaint."*SeeLC Capital Partners, LP v. Frontier Insurance Group, Inc.,* 318 F.3d 148, 157 (2nd Cir.2003) (ellipsis in original). This is not such a case. The Court cannot conclude, as a matter of law, that a reasonably diligent investor should have discovered wrongdoing in connection with the February Offerings within three weeks of Exodus's June 20, 2001 announcement of its second quarter of 2001 financial results. *See,e.g.,Livid,* 403 F.3d at 1060 (noting the "question of what a reasonably prudent investor should have known is particularly suited to a jury determination").

**\*10** Accordingly, the Underwriter Defendants' motion to dismiss the § 10(b) and § 11 claims asserted against it, on the ground they are time-barred, will be DENIED.

### B. Section 11 Claim: Sufficiency of Pleading

The parties dispute whether the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure[FN8] apply to plaintiffs' § 11 claim against the Underwriter Defendants. The Court previously has held that plaintiffs' § 11 claim, as alleged in the First Amended Complaint, was subject to the pleading requirements of Rule 9(b) because the § 11 claim sounded in fraud. (*See* Dismissal Order at 28-29.) Plaintiffs now argue that they have amended their § 11 claim to make clear that their allegations of fraud relate only to their § 10(b) claim.

> FN8. When a complaint contains allegations of fraud, Rule 9(b) of the Federal Rules of Civil Procedure requires that plaintiffs: (1) specify the alleged fraudu-

lent representations; (2) allege the representations were false when made; (3) identify the speaker; (4) state when and where the statements were made; and (5) state the manner in which the representations were false and misleading. *SeeIn re GlenFed, Inc. Secur. Litig.,* 42 F.3d at 1547 n. 7.

Although a plaintiff alleging a claim under § 11 need not, as noted above, allege scienter or fraudulent conduct, the Ninth Circuit has held that "the particularity requirements of Rule 9(b) apply to claims brought under Section 11 when ... they are grounded in fraud."*SeeIn re Stac Electronics,* 89 F.3d 1399, 1404-05 (9th Cir.1996). The Ninth Circuit further has clarified that where "fraud is not an essential element of the claim, and where allegations of both fraudulent and non-fraudulent conduct are made in the complaint," only "allegations ('averments') of fraudulent conduct" must satisfy the heightened pleading requirements of Rule 9(b), while "allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."*SeeVess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1105 (9th Cir.2003). As further stated in *Vess:*" 'Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated. The proper route is to *disregard* averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated.'" *Seeid.*(internal quotation and citation omitted) (emphasis in original). Nevertheless, the Ninth Circuit made clear that where a plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim ... the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)."*Seeid.* at 1103-04 (citing *Stac,* 89 F.3d at 1404-05).

In the instant case, the Court found that the First Amended Complaint made "no effort to distinguish between the Underwriter Defendants and the Individual Defendants, but rather allege[d] a unified course of fraudulent conduct as to all 'defendants,'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

averring consistently and repeatedly that the de-fendants knew the statements in question were false and misleading when made."(*See* Dismissal Order at 29.) The Court noted that plaintiffs had pointed to "no allegations in the FAC to the effect that the false and misleading statements in the Registration Statements were either negligent or innocent mis-representations, because no such allegations exist."*Seeid.* at 30.Finally, relying on *Stac,* the Court rejected plaintiffs' contention that by plead-ing their § 10(b) and § 11 claims in separate counts, they adequately alleged a factual basis for their § 11 claim that was not based on fraud. *Seeid.;seealsoStac,* 89 F.3d at 1405 n .2 (holding that although plaintiff had "specifically disclaimed any allegations of fraud with respect to its Section 11 claims," such "[n]ominal efforts are unconvin-cing when the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus.")

**\*11** Since the Court's dismissal of the First Amended Complaint, the Ninth Circuit has issued its opinion in *Daou,* in which the Ninth Circuit dis-cussed *Vess* and *Stac* in the context of determining whether the pleading standards of Rule 9(b) applied to the § 11 claim at issue in *Daou.SeeDaou,* 411 F.3d at 1027-28. The Ninth Circuit noted that "Rule 9(b) may prove fatal to 1933 Securities Act claims 'grounded in fraud' when the complaint makes a 'wholesale adoption' of the securities fraud allega-tions for purposes of the Securities Act claims."*Seeid.* at 1028.The Ninth Circuit found such "wholesale adoption" present in *Daou* because the complaint alleged a fraudulent scheme by all defendants, and incorporated all allegations previ-ously averred in the complaint for purposes of all of the claims. *Seeid.* at 1028.Moreover, the plaintiffs in *Daou* "never rel[ied] on such conduct as negli-gence or mistake in stating their claims."*Seeid.*

By contrast, in the instant case, the Third Amended Complaint contains significant new amendments to the § 11 claims that distinguish those claims from the § 11 claims alleged in the First Amended Com-plaint, and from those at issue in *Daou* and *Stac.*While the First Amended Complaint had al-

leged, for example, that all "defendants ... particip-ated in an egregious accounting fraud ... including ... falsifying Exodus's financial results" (*see,e.g.,* FAC ¶ 1), the Third Amended Complaint largely eliminates such all-inclusive references to "defendants" and replaces them with references to "Individual Defendants." (*See,e.g.,*TAC ¶ 44 ("Individual Defendants embarked on a scheme to defraud by, among other things, ... falsifying Ex-odus's financial results") .) As a result, plaintiffs no longer allege that the Underwriter Defendants parti-cipated in all of the fraudulent conduct allegedly engaged in by the Individual Defendants. Further, plaintiffs now expressly allege that the Underwriter Defendants acted negligently by failing to conduct due diligence as to the veracity of the statements contained in the Registration Statements and only allege in the alternative that the Underwriter De-fendants acted with knowledge or deliberate reck-lessness because they were aware that Exodus's fin-ancial results and forecasts were false due to im-proper revenue recognition practices and Exodus's failure to conform with GAAP. (*See*TAC ¶¶ 305-306.) Finally, plaintiffs now expressly disclaim any allegations of fraud in their cause of action for violation of § 11 (*see*TAC ¶ 343), set forth in that count all the specific conduct alleged to violate § 11, and do not incorporate in that count any of the other factual allegations set forth in the complaint, (*see*TAC ¶¶ 343-355.) After itemizing the allegedly false and misleading statements and omissions con-tained in the Registration Statements for the Febru-ary Offerings, plaintiffs allege that the Underwriter Defendants "owed to the purchasers of Exodus se-curities the duty to make a reasonable and diligent investigation of the statements contained in the [Registration Statements] at the time [they] became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading."(*See*TAC ¶ 354.) Unlike the plaintiffs in *Daou,* plaintiffs here expressly allege that the Underwriter Defendants were negligent by failing to conduct a reasonable investigation into the state-ments contained in the Registration Statements and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

do not incorporate their allegations of fraud into their claim for violation of § 11. Unlike the plaintiffs in *Stac,* plaintiffs here make more than a "nominal effort" at disclaiming fraud as a basis for the § 11 claims, and expressly allege a separate basis for their § 11 claims and their § 10(b) claims.

**\*12** As a result of the amendments to the complaint, plaintiffs have made sufficiently clear their intent to assert two alternative theories of liability against the Underwriter Defendants based on misstatements in the Registration Statements: (1) a § 11 claim based on negligent or innocent misrepresentations or omissions, (*see*TAC ¶¶ 306, 343-355), and (2) a § 10(b) claim based on fraud, (*see*TAC ¶¶ 305, 356-362).Rule 8(e)(2) of the Federal Rules of Civil Procedure expressly permits plaintiffs to state claims in the alternative. *See*Fed.R.Civ.P. 8(e)(2) ("A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses.") There is no requirement that the claims be consistent. *See*Fed.R.Civ.P. 8(e)(2) ("A party may also state as many separate claims or defenses as the party has regardless of consistency.") Thus, plaintiffs' assertion of separate claims against the Underwriter Defendants for violation of § 10(b) and § 11, based on the same conduct, but alleging differing states of mind, is expressly permitted by Rule 8.

Moreover, the Supreme Court has recognized that "some conduct actionable under Section 11 may also be actionable under Section 10(b)."*See*Herman *& MacLean v. Huddleston,* 459 U.S. at 383. "[T]he availability of an express remedy under Section 11 of the 1933 Act does not preclude *defrauded* purchasers of registered securities from maintaining an action under Section 10(b)."*See*id. at 387 (emphasis added). In short, nothing in the statutory scheme precludes plaintiffs from proceeding against the Underwriter Defendants under both § 10(b) and § 11.

The Ninth Circuit has held, where plaintiffs choose not to allege "a unified course of fraudulent conduct," but rather to allege "some fraudulent and

some non-fraudulent conduct," that "only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements." *See*Vess, 317 F.3d at 1104. "To require that non-fraud allegations be stated with particularity merely because they appear in a complaint alongside fraud averments ... would impose a burden on plaintiffs not contemplated by the notice pleading requirements of Rule 8(a)."*See*id. at 1104."Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."*See*id.

In the instant case, as noted, plaintiffs base their § 11 claims entirely on negligent or innocent misrepresentations, and base their § 10(b) claims against the Underwriter Defendants on fraudulent misrepresentations. In *Vess,* the Ninth Circuit held that the district court erred in dismissing the plaintiffs' entire complaint for failure to comply with Rule 9(b) because the state law claims at issue therein were based on both fraudulent and non-fraudulent conduct and, thus, the allegations did "not rely entirely on a unified fraudulent course of conduct."*See*id. at 1105-06.The Ninth Circuit, in *Stac,* held that Rule 9(b) applies to § 11 claims only where such claims sound in fraud, citing approvingly a Fifth Circuit case in which that court held that Rule 9(b) applies to § 11 claims that are based on fraud rather than negligence. *See*Stac, 89 F.3d at 1405 (citing *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994)). Here, because plaintiffs' § 11 claims are based on negligent and innocent misrepresentations, not fraud, and the complaint specifically alleges that plaintiffs "expressly disclaim any allegations of fraud" in connection with the § 11 claim, the Court finds Rule 9(b) does not apply. *See*Lone Star Ladies Investment Club v. Schlotzsky's, Inc., 238 F.3d 363, 369 (5th Cir.2001) (finding Rule 9(b) inapplicable to § 11 claim where complaint alleged plaintiffs did "not assert that defendants [were] liable for fraudulent or intentional conduct and disavow[ed] any allegation of fraud"); *seealso*Holmes v. Baker, 166 F.Supp.2d 1362, 1371-74 (S.D.Fla.2001) (holding Rule 9(b) not applicable to § 11 claims based on erroneous financial statements in Prospectus because no allegation of scienter; applying Rule 9(b) to § 10(b) claim based on fraudulent financial state-

ments); see also In re JDS Uniphase Corp. Securities Litigation, 2005 WL 43463 at *9 (N.D.Cal. Jan.6, 2005) (holding Rule 9(b) inapplicable to § 11 claim even though "many of the allegations in the [complaint] sound in fraud" because § 11 claim was based on failure to conduct reasonable investigation and plaintiffs expressly disclaimed "any allegations based on fraud or deliberate recklessness"); In re Turnstone Systems Inc. Securities Litigation, No. C-01-1256 SBA, slip op. at 23-37 (N.D.Cal. Feb. 4, 2003) (surveying case law at length and declining to apply Rule 9(b) to § 11 claim based on allegations of negligence where the "gravamen of the [complaint] is fraud but the allegations underlying the Securities Act claims have been segregated out from those underlying the Exchange Act claims and do not aver fraud").[FN9]

> FN9. Although the Turnstone opinion has not been published, plaintiffs have submitted a copy of the opinion as Exhibit Q to their Compendium of Unpublished Decisions Cited in Plaintiffs' Oppositions to Defendants' Motions to Dismiss the Third Amended Consolidated Complaint.

**\*13** As noted, a plaintiff states a § 11 claim by alleging "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." See Daou, 411 F.3d at 1027 (citation omitted). "Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." See Vess, 317 F.3d at 1104. Plaintiffs adequately allege specific misrepresentations and omissions contained in the Registration Statements, and further allege how those misrepresentations and omissions were misleading. (See, e.g., TAC ¶¶ 306, 343-355). Nothing more is required.

Accordingly, the Underwriter Defendants' motion to dismiss the § 11 claim asserted against them will be DENIED.

C. Section 10(b) Claim: Sufficiency of Pleading

The Underwriter Defendants contend that plaintiffs have not adequately pleaded a § 10(b) claim as to any of the allegedly false statements made in the Registration Statements because plaintiffs have failed to establish falsity and scienter with the particularity required by the PSLRA.

As noted, plaintiffs allege that four statements in the Registration Statements were false or misleading when made: (1) "We believe that the acquisition [of GlobalCenter] enhances our global Internet Data Center infrastructure, strengthens our network, our customer support, sales and professional services organizations, and expands our customer base"; (2) Exodus achieved revenues of $280.4 million for the quarter ended December 31, 2000, and $818.4 million for fiscal year 2000; (3) "[Exodus has] established a diverse base of customers and continues to focus on supporting the strong demand from the enterprise market"; and (4) Exodus had 4500 customers under contract. (See TAC ¶¶ 72-73 (alterations in original).)

1. Statement Regarding Exodus's January 2001 Acquisition of GlobalCenter

Plaintiffs allege that the following statement in the Registration Statements was false and misleading when made: "We believe that the acquisition [of GlobalCenter] enhances our global Internet Data Center infrastructure, strengthens our network, our customer support, sales and professional services organizations, and expands our customer base." (See TAC ¶ 72.) The Court previously held that plaintiffs failed to adequately allege that the above-referenced statement was false because plaintiffs did not allege any facts that suggested that management's statements of belief therein were untrue or misleading. (See Dismissal Order at 15.)

In the First Amended Complaint, plaintiffs had alleged the statement was false and misleading because (1) Exodus's internal due diligence team had strongly recommended against the acquisition of GlobalCenter; (2) Exodus's Board of Directors was against the acquisition; (3) GlobalCenter's data centers in Tokyo, Sydney and London, and pending

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

openings in Paris and Munich, all experienced substantial shortage in demand; and (4) the acquisition was nevertheless pushed through by Hancock because she wanted GlobalCenter for its two IDCs in Manhattan. (*See* FAC ¶ 146.) Plaintiffs allege no new facts about the GlobalCenter transaction in the Third Amended Complaint. Indeed, in their opposition, plaintiffs state: "While plaintiffs still believe that defendants' statements concerning the GlobalCenter acquisition were false and misleading, for the purpose of this opposition, plaintiffs will focus on the remaining three statements."(*See* Opp. at 11 n. 5.)

**\*14** As plaintiffs thus effectively concede that they cannot state more facts about the GlobalCenter transaction to demonstrate the falsity of the statement about that transaction in the Registration Statements, the Court finds plaintiffs again have failed to allege with the particularity required by Rule 9(b) that such statement was false or misleading when made.

2. Statements Regarding Revenue

Plaintiffs allege that the statements that Exodus had revenues of $280.4 million for the fourth quarter of 2000 and $818.4 million for fiscal year 2000 were false because Exodus had engaged in four types of accounting improprieties: (1) recording revenue prior to rendering services; (2) recording revenue on cancelled or non-renewed contracts; (3) recording revenue from transactions in which collectability was not probable; and (4) recording revenue and assets in conjunction with "bogus" barter transactions and failing to disclose such transactions. (*See*TAC ¶ 264.)

In dismissing the First Amended Complaint, the Court found plaintiffs had not adequately alleged that the statements in the Registration Statements as to Exodus's revenue in the fourth quarter of 2000 and fiscal year 2000 were false and misleading when made, because plaintiffs failed to allege the amounts by which the revenues reported in the Registration Statements were misstated and failed to make "specific factual allegations regarding materi-

al accounting improprieties that affected the revenue statements contained in the Registration Statements."(*See* Dismissal Order at 17-18 (citing *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1091 (9th Cir.1999).)

Plaintiffs now allege that the Registration Statements overstated Exodus's fourth quarter of 2000 revenues by $25 million and its fiscal year 2000 revenues by $70 million. (*See*TAC ¶ 128.) The Underwriter Defendants argue, however, that plaintiffs still have not alleged "any particular amount associated with any particular accounting theory at any particular point in time," (*see* Motion at 24), and, thus, have not adequately alleged that the revenue statements in the Registration Statements were false or misleading when made.

Under GAAP, "revenue must be earned before it can be recognized."[FN10]*SeeDaou,* 411 F.3d at 1016 (emphasis omitted)."When pleading irregularities in revenue recognition, plaintiffs should allege (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or [company] employees involved in the transactions."*Seeid.*(internal quotations omitted, brackets in original)."Plaintiffs need not allege each of those particular details," however, but "must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue."*Seeid.* at 1017 (internal quotation and citation omitted)." '[A] general allegation that the practice[ ] at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation." ' *Seeid.* at 1016.Rather, "although overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." *Seeid.* at 1018.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

FN10. Plaintiffs allege that Exodus's revenue recognition policy required the following four essential criteria to be met before revenue could be recognized: (1) "[p]ersuasive evidence of an arrangement exists"; (2) "[d]elivery has occurred or services have been rendered"; (3) "[t]he fee for the arrangement is fixed or determinable"; and (4) "[c]ollectability is reasonably assured." (*See* TAC ¶ 133.)

**\*15** As the challenged statements in the Registration Statements address Exodus's revenues in fiscal year 2000, the Court examines the Third Amended Complaint for specific factual allegations of improprieties in revenue recognition in 2000.

   a. Recording revenue prior to rendering services

Plaintiffs allege that Exodus had a practice, in fiscal year 2000, of generating "installation reports, which triggered the onset of monthly invoicing and revenue recognition" before installation had begun. (*See* TAC ¶¶ 153, 154(b).)

Plaintiffs allege that CW10, a credit and collections analyst for Exodus from July 1998 through June 2001, (*see id.* ¶ 126(j)), states that all customers were subjected to false installation reports and this practice "enabled Exodus to begin invoicing and recognizing revenue right after new sales were entered into, rather than to delay the process until installation was actually completed."(*See id.* ¶ 154(c).) Further, according to plaintiffs, CW12, a senior collections specialist at Exodus from late 1999 through September 2001, (*see id.* ¶ 126(l)), states that "customers that ordered new installations in IDCs were consistently invoiced prior to installations having been completed, and many times prior to even beginning."(*See id.* ¶ 155(a).) As an example, plaintiffs allege that a document titled "Cu. Open Orders by Customer-by Customer; Period: 02-00 as of 03/07/00," pertaining to a customer identified as "Customer Nbr. 000661," states that several items were installed on "1/1/1900," which, plaintiffs allege, was a "place holder" indicating that the installation had not yet occurred. (*See id.* ¶

155(b).)[FN11] In addition, plaintiffs allege that, according to CW11, an Exodus credit and collections analyst from August 1999 through June 2001, (*see id.* ¶ 126(k)), Exodus had a "practice of inputting false installation dates in order to begin billing customers."(*See id.* ¶ 156.)

FN11. Plaintiffs do not allege, however, that this customer was billed prior to installation.

Plaintiffs, however, do not, in any fashion, identify a single customer that was billed during fiscal year 2000 prior to installation, nor do plaintiffs attempt to quantify the amount by which this alleged practice overstated revenues in fiscal year 2000 or the fourth quarter of 2000. As noted, a "general allegation" that a particular practice "resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation"; rather, "the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position."*See Daou,* 411 F.3d at 1016, 1018.

Accordingly, the Court finds plaintiffs have not alleged with the particularity required by Rule 9(b) that the statements of revenues for fiscal year 2000 and the fourth quarter of 2000 contained in the Registration Statements were false and misleading when made as a result of Exodus's alleged practice of billing customers prior to installation.

   b. Recording revenue on cancelled or non-renewed contracts

**\*16** Plaintiffs allege that Exodus's billing system would invoice customers "in perpetuity" unless someone specifically input a change to a particular customer's billing, and that Exodus had a practice of not contacting customers to verify cancellations for purposes of changing the order system and discontinuing invoicing. (*See* TAC ¶ 146.) According to plaintiffs, "[w]hen customers were finally contacted by Exodus for payment, their response to Exodus, if any, would simply be that they were not going to pay the bill and were told they did not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have to."(*Seeid.* ¶ 146(b).) Plaintiffs allege that, according to CW10, "invoicing would continue even though the customer's equipment had been pulled out and Exodus was no longer performing services."(*Seeid.* ¶ 147(b).) Plaintiffs allege that CW10 "believes that approximately 80% of the revenue reported by Exodus" from fiscal year 2000 through the end of the Class Period was largely fraudulent. (*Seeid.* ¶ 147(d).) Plaintiffs allege that CW11 "recalled that it was a common, daily occurrence for collectors to contact customers about old [accounts receivable], and be told that the customer had cancelled months earlier."(*Seeid.* ¶ 148(a).) CW11 estimated that as much as 40% of the revenue recognized from late 2000 through Exodus's bankruptcy in September 2001 was uncollectable, "[b]ased on the number of accounts in the Solomon system during the Class Period, and the fact that about half of those invoiced had actually cancelled."[FN12](*Seeid.* ¶ 148(c).) Plaintiffs allege no estimate obtained from either CW10 or CW11 of the revenue improperly recognized in fiscal year 2000 or the fourth quarter of 2000 on previously-cancelled contracts, nor do they allege that CW10 or CW11 identified any particular customer who cancelled during that time period yet continued to receive invoices from Exodus that were recorded as revenue.

> FN12. Plaintiffs allege that "Solomon" is an Exodus "financial database." (*See*TAC ¶ 232(a).)

According to plaintiffs, CW21, who held various management positions for Exodus from 1999 through 2003, (*see*TAC ¶ 126(u)), experienced difficulties in obtaining approval from Exodus's management to stop invoicing for cancelled contracts in 2001. (*See*TAC ¶ 149(a).) Such allegations do not support plaintiffs' allegation that revenues were overstated in 2000 due to Exodus's failure to stop invoicing on cancelled contracts.

According to plaintiffs, CW22 performed data entry and processed orders provided by Exodus's sales organization from 1999 to April 2001, and thereafter was one of two Exodus employees responsible for

processing cancellations. (*See*TAC ¶ 126(v).) Plaintiffs allege that CW22 first became aware of a significant number of cancellations in November and December of 2000 and personally experienced a large number of cancellations "ordered by customers months earlier," but which had not been processed through the Siebel system.[FN13] (*Seeid.* ¶ 151(a).) In addition, plaintiffs allege that, according to CW22, "in the first part of the 1Q01, many of the customers booked at the end of the 4Q00 were cancelling-claiming that they had never ordered the services, or that they were not aware of how high the charges were, and could not afford the monthly program."(*Seeid.* ¶ 151(i).) Plaintiffs further allege that CW22 told them that, prior to April 2001, "the vast majority of customer cancellations were routinely delayed for months, until the credit and collections department discovered through communications with the customers that the customers had pulled out months earlier and had notified salespersons," and that "credits owed to these customers were routinely not processed for posting against these overcharges."(*Seeid.* ¶ 151(c).) Plaintiffs allege that when CW22, in April 2001, became one of two persons responsible for processing cancellations, there were "stacks and stacks and piles on the floor" of outstanding cancellation request forms prepared by the credit and collections department that had not yet been processed, some of which were more than a year old and the majority of which had been prepared "months earlier." (*Seeid.* ¶ 151(e)-(f).) Plaintiffs, however, set forth no estimate obtained from CW22 of the revenue improperly recognized in fiscal year 2000 or the fourth quarter of 2000 on previously-cancelled contracts, nor do they allege that CW22 identified any particular customer who cancelled during that time period yet continued to receive invoices from Exodus that were recorded as revenue.

> FN13. According to plaintiffs, the Siebel system is Exodus's "order management system," (*see*TAC ¶ 154(a)), and an "installation database," (*seeid.* ¶ 232(a).)

**\*17** Plaintiffs allege that CW25, an Exodus customer support representative responsible for resolving

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

disputes with "high profile and strategic account customers," (*see*TAC ¶ 126(y)), told them that in late 2000, it routinely took six months to process a cancellation and that the cancelling customer would continue to be billed during that period. (*See*TAC ¶ 152(a).) Again, however, plaintiffs set forth no estimate obtained from CW25 of the revenue improperly recognized in fiscal year 2000 or the fourth quarter of 2000 on previously-cancelled contracts, nor do they allege that CW25 identified any particular customer who cancelled during that time period yet continued to receive invoices from Exodus that were recorded as revenue.

CW23, an Exodus finance analyst from August 2000 to May 2001 who was responsible for performing collections, (*see*TAC ¶ 126(w)), allegedly became aware between August and December 2000, that Exodus had a "huge issue" with continuing to bill customers who had cancelled services either completely or in part. (*See*TAC ¶ 178(a).) CW23 estimated that from the fall of 2000 through the end of the class period, approximately 75% of customer accounts receivable were not legitimately owed by Exodus customers. (*Seeid.* ¶ 178(b).) Plaintiffs, however, allege no estimate obtained from CW23 of the revenue improperly recognized in fiscal year 2000 or the fourth quarter of 2000 on previously-cancelled contracts, nor do they allege that CW23 identified any particular customer who cancelled during that time period yet continued to receive invoices from Exodus that were recorded as revenue.

In sum, although plaintiffs have alleged a general practice by Exodus of failing to process cancellations during fiscal year 2000 and thereafter, they have not attempted to identify the amount of revenue improperly recognized in 2000 as a result of that practice. Moreover, although plaintiffs have alleged a general practice by Exodus of billing customers after cancellation, they have not identified any customers who were improperly billed in 2000 after cancellation, nor have they alleged that Exodus recorded the amount of any such bills as revenue.

Accordingly, the Court finds plaintiffs have not alleged with the particularity required by Rule 9(b) that the statements of revenues for fiscal year 2000 and the fourth quarter of 2000 contained in the Registration Statements were false and misleading when made as a result of Exodus's alleged practice of billing customers after cancellation. *SeeDaou,* 411 F.3d at 1016-18.

c. Recording revenue from transactions in which
collectability was not probable

Plaintiffs allege that Exodus's revenue was overstated in the Registration Statements because Exodus, beginning in 2000, was extending credit to non-creditworthy customers. (*See*TAC ¶¶ 141-145.) The Third Amended Complaint alleges two new examples of non-creditworthy customers, Alta Vista and Vulcan. (*See*TAC ¶ 142.)

**\*18** With respect to Alta Vista, plaintiffs allege that Alta Vista did not stop making payments to Exodus until the first quarter of 2001. (*Seeid.* ¶ 142(i).) There is no allegation that Alta Vista was experiencing financial difficulties at any earlier date, and thus no allegation that Exodus improperly recognized revenue from Alta Vista in 2000.

With respect to Vulcan, plaintiffs allege that Vulcan became a customer as of the first quarter of 2000, and continued to be carried as a customer until the end of 2001, when "the revenue associated with the deal, approximately $1 million, was written off because Vulcan had never paid."(*Seeid.* ¶ 142(ii). Although plaintiffs allege "some" of the Vulcan revenue "was improperly recognized because Exodus was not performing any services," plaintiffs fail to allege when Exodus ceased performing services. Moreover, that Vulcan ultimately failed to pay its bill provides no basis for inferring that it was not credit worthy at the time the deal was entered into or that the Underwriter Defendants were aware that Vulcan was not creditworthy at the time the Registration Statements were issued.

In addition to their allegations with respect to Alta Vista and Vulcan, plaintiffs allege that Freerealtime.com was a "high risk contract" (*see*TAC ¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

143(e)(ii); plaintiffs allege that Freerealtime.com became an Exodus customer in 2000 and "always presented a 'hard collection' '; plaintiffs do not allege, however, that any revenue attributable to Freerealtime.com was improperly recognized. (*See*TAC ¶ 143(e)(ii).) Additionally, according to plaintiffs, when Federal Liaison Service ("FLS") had problems with Exodus's equipment and refused to pay its bills for more than a year after the problem was solved, CW21 wanted to shut down the equipment in January 2001, but was told by his supervisor that he would have to obtain permission first from Exodus's executives. (*See*TAC ¶ 144(b).) Plaintiffs fail to allege, however, that any revenue from FLS was improperly recognized in 2000.

Moreover, nowhere in plaintiffs' complaint do they allege the amount by which Exodus's alleged extension of credit to non-creditworthy customers allegedly resulted in overstated revenue for fiscal year 2000 and for the fourth quarter of 2000, nor do they explain how they calculated their estimate that all revenue recognition improprieties combined resulted in overstated revenues of $70 million for fiscal year 2000. (*See*TAC ¶ 128.)

Accordingly, the Court finds plaintiffs have not alleged with the particularity required by Rule 9(b) that the statements of revenues for fiscal year 2000 and the fourth quarter of 2000 contained in the Registration Statements were false and misleading when made as a result of Exodus's extension of credit to non-creditworthy customers from whom collectability was not probable.

### d. Recording revenue and assets in conjunction with "bogus" barter transactions and failing to disclose such transactions

*19 The Court previously found plaintiffs had failed to adequately allege that statements in the Registration Statements that Exodus had revenues of $280.4 million for the fourth quarter of 2000 and $818.4 million for fiscal year 2000 were false due to Exodus's recording of revenue and assets in conjunction with "bogus" barter transactions and failing to disclose such transactions. (*See* Dismissal

Order at 17-18.) The Court noted that only one such barter transaction was alleged as having been conducted during fiscal year 2000, and the transaction involved such a small dollar amount that statements about that transaction would not have been material. (*Seeid.* at 18.)The Underwriter Defendants again move to dismiss plaintiffs' claim, to the extent it is based on improper recording of revenue from barter transactions, on the ground plaintiffs have failed to allege any additional barter transactions during fiscal year 2000. Plaintiffs do not address their allegations as to barter transactions in their opposition.

Accordingly, the Court finds plaintiffs have not alleged with the particularity required by Rule 9(b) that the statements of revenues for fiscal year 2000 and the fourth quarter of 2000 contained in the Registration Statements were false and misleading when made as a result of Exodus's recording of revenue and assets in conjunction with "bogus" barter transactions and failing to disclose such transactions.

### 3. Statement Regarding Demand for Services

Plaintiffs allege the statement that Exodus "continues to focus on supporting the strong demand from the enterprise market"[FN14] was false or misleading when made because "Exodus was not seeing strong demand from the enterprise market."(*See*TAC ¶ 76.)

> FN14. As noted in the Court's Dismissal Order, the term "enterprise market" refers to customers other than "dot com" customers. (*See* Dismissal Order at 22 n. 17.)

In the First Amended Complaint, as noted in the Dismissal Order, plaintiffs had alleged that (1) according to certain specified former Exodus employees, by late 2000 and early 2001, Exodus was experiencing weakness in sales, cancellations and a drop in demand, (*see* FAC ¶¶ 133-140), and (2) Exodus's own bankruptcy disclosure statement later acknowledged that "[b]eginning in late 2000 and early 2001 ... a substantial number of Exodus's traditional enterprise clients delayed-and in some cases canceled-purchase decisions," (*see* FAC ¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 18
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

141). (*See* Dismissal Order at 18-19.) The Court found plaintiffs had failed to allege falsity with the requisite particularity because they had failed to allege "any facts as to particular cancellations, how any such cancellations related to Exodus's overall business, or whether such cancellations were in the enterprise market."(*See* Dismissal Order at 20.)

Defendants argue that plaintiffs' new allegations in the Third Amended Complaint are similar to those previously rejected by the Court as inadequate. Plaintiffs allege that CW17, who joined Exodus in January 2001 and regularly sat in on Exodus's weekly sales meetings, recalled that "the primary topic addressed at these meetings was 'we're losing business.' " (*See*TAC ¶ 216.) CW17 also allegedly learned in these sales meetings that Exodus "lost several large potential deals in December 2000 because customers had pulled out due to the economic downturn." (*See id.*)Defendants correctly point out that these allegations do not bear specifically on the strength of demand in the enterprise market.

**\*20** Plaintiffs allege that CW23 "refuted that Exodus was increasing its customer base because of enterprise customers" because, according to CW23, the majority of new customers "that Exodus counted toward an alleged increase in customer base during 1Q01 and 2Q01 were actually upgrades for existing accounts provided at no cost."(*See*TAC ¶ 218.) As such statements do not focus on the period prior to the issuance of the Registration Statements, they permit no inference that Exodus's statement in the February 2001 Registration Statements that there was "strong demand from the enterprise market" was false at the time it was made. Moreover, CW23 is alleged to have been a finance analyst who "performed collections in the credit and collections department" (*see*TAC ¶ 126(w)) and plaintiffs do not allege that CW23 had personal knowledge of the demand for Exodus's services in the enterprise market prior to the date of the Registration Statements.

The Third Amended Complaint contains somewhat more substantial allegations relating to CW16, who is alleged to have been responsible for creating detailed proposals in response to requests for proposals ("RFPs") from potential customers in the enterprise market from July 1999 through February 2003. (*See*TAC ¶¶ 126(p), 217(a).) According to plaintiffs, CW16 noticed a decline in RFPs beginning in the third quarter of 2000, and a notable drop in the fourth quarter of 2000. (*See id.* ¶ 217(b).) CW16 also allegedly estimated that the number of proposals produced in response to RFPs fell from about six in January 2001 to three or four per month in March and April, and such proposals generally were in response to RFPs received a quarter or two earlier. (*See id* .)Although such allegations may suffice to allege with particularity that Exodus was experiencing a drop in RFPs from *new* enterprise customers at the time the Registration Statements were issued, they say nothing about demand from Exodus's *existing* enterprise customers. Consequently, plaintiffs have not alleged with particularity that Exodus's overall demand from enterprise customers was dropping at the time it stated that there was strong demand from the enterprise market in the Registration Statements.

Accordingly, the Court finds plaintiffs again have failed to allege with the particularity required by Rule 9(b) that said statement was false or misleading when made.

### 4. Statement Regarding Number of Exodus Customers

Plaintiffs allege the statement that Exodus had 4500 customers (*see*TAC ¶ 72) was false or misleading when made because that number "included customers who were not active, who had cancelled and who had no ability to pay," (*see*TAC ¶ 76.) Plaintiffs further allege that although Exodus's "installation database, Siebel, may have reflected approximately 4500 'customers,' " the "financial database" known as "Solomon" identified only 3500 active customers. (*See*TAC ¶ 232(a).) Plaintiffs allege that the difference between the two numbers indicates that the approximately 1000 additional customers in the Siebel database reflected "potential deals input by the sales organization, as well as potential customers who had never closed

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

the deal with Exodus." (*Seeid.*)

**\*21** The Court previously found these allegations insufficient to allege falsity with particularity because, among other deficiencies, plaintiffs failed to allege the date on which the Solomon database reflected only 3500 customers. (*See* Dismissal Order at 23.) In their Third Amended Complaint, plaintiffs have not alleged that date.

Accordingly, plaintiffs again have failed to allege with the particularity required by Rule 9(b) that the statement in the Registration Statements that Exodus had, at that time, 4500 customers was false or misleading when made.

### 5. Scienter

The Court dismissed the First Amended Complaint because "even assuming the statements in the Registration Statements were false or misleading, plaintiffs fail to offer any facts sufficient to demonstrate that the Underwriter Defendants acted with the requisite state of mind in making the statements."(*See* Dismissal Order at 13.) Plaintiffs' allegations in the Third Amended Complaint similarly are insufficient under the PSLRA to raise a strong inference that the Underwriter Defendants intentionally or with deliberate recklessness made false or misleading statements to investors.

As noted, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."*See*15 U.S.C. § 78u-4(b)(2). The Ninth Circuit has held that the required state of mind is "deliberate recklessness, at a minimum," and that plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct."*SeeSilicon Graphics,* 183 F.3d at 974. In determining whether scienter has been adequately alleged, the Court must examine the totality of plaintiffs' allegations and consider " 'all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." ' *SeeAmerica West,* 320 F.3d at 938. To establish a strong inference of scienter, the allegations must show that an infer-

ence of fraud is " 'the most plausible of competing inferences." ' *SeeGommper v. VISX,* 298 F.3d at 897.

The Third Amended Complaint contains only three new alleged facts relating to the state of mind of any of the Underwriter Defendants, each of which relates only to Goldman Sachs. As plaintiffs have failed to allege any new facts relating to the state of mind of Merrill Lynch, Morgan Stanley, or J.P. Morgan, plaintiffs' § 10(b) claims against those defendants again will be dismissed for failure to adequately allege scienter.

With respect to Goldman Sachs, plaintiffs allege the following new facts. First, plaintiffs allege that a Goldman Sachs research analyst sent an internal email on February 23, 2001, less than three weeks after the February Offerings, stating:
I have drafted a note that highlights our concerns yet does not translate into the lowering of numbers for specific companies. Considerations include: (1) we believe that most of our cost back-end loaded 2001 numbers have to come down, (2) exds [EXODUS] is a major offender of back-end loading, but to lower numbers right after selling equity @ $18.50 could be a problem.

**\*22** (*See*TAC ¶ 74.) The Underwriter Defendants correctly argue that plaintiffs have misquoted this email. The actual email states: "most of our *cos* back-ended loaded 2001 numbers have to come down."(*See* Underwriter Defendants' Request for Judicial Notice, Ex. Q (emphasis added).) [FN15] The Underwriter Defendants contend that "cos" is an abbreviation for "companies" and not a misspelling of "costs", and that the reference in the email to "back-end load[ing]" "was used to demonstrate that the revenue estimates for these companies would require a big third and fourth quarter revenue performance-"back-end loaded," using industry jargon-for the companies to meet their forecasts."(*See* Underwriter Defendants' Motion at 34.) Plaintiffs dispute this interpretation. The Court cannot resolve the parties' dispute about the meaning of this email on a motion to dismiss. Regardless of whether the email refers to back-end loaded costs

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

or back-end loaded revenues, however, it is clear that the writer is concerned only about Exodus's "2001 numbers." (*See* TAC ¶ 74.) Thus, the email provides no basis for inferring that Goldman Sachs was aware of problems with Exodus's financial results for 2000 at the time of the February Offerings and acted with scienter in publishing the Registration Statements for the February Offerings.

> FN15. The Court, in ruling on a motion to dismiss, may consider documents whose contents are alleged in the complaint, and whose authenticity no party questions, but which are not physically attached to the pleading. *See Branch v. Tunnell,* 14 F.3d at 454.

Plaintiffs also allege that, on April 17, 2001 and April 27, 2001, two months after the February Offerings, Goldman Sachs issued analyst reports identifying Exodus as a "recommend" buy, Goldman Sachs' highest investment classification.<sup>FN16</sup> (*See* TAC ¶ 80.) According to plaintiffs,

> FN16. Defendants also move for dismissal of any § 10(b) claim plaintiffs may be alleging based on statements in these analyst reports. The Court does not reach those arguments as plaintiffs have not clearly set forth such a claim in their complaint.

Internal Goldman Sachs' reviews demonstrate that Goldman Sachs was in fact aware of the analyst's biased and misleading reports, recognizing that the analyst in question "has subordinated personal preferences on recommendations for 'commercial' [i.e., banking] reasons," that "[o]ne gets the sense that he's been held captive to the agenda of others ... were he allowed to exercise independent investment thesis, he would have had a decidedly different take of this group's prospects," and that "while I understand he communicates what he really thinks to a sele[c]t few, his public ratings have been an embarrassment to the firm."
(*See* TAC ¶ 80 (alterations in original).) Plaintiffs do not set forth the date of the alleged internal reviews, and do not allege that the reviews addressed

concerns about the analyst's recommendations and reports with respect to Exodus. Even assuming the quoted internal reviews expressed concern with respect to the analyst's public views about Exodus, there is no allegation that these concerns were raised prior to the February Offering. In short, these allegations permit no inference that Goldman Sachs acted with scienter in publishing the Registration Statements for the February Offerings.

Finally, plaintiffs allege that the Securities and Exchange Commission filed a complaint against Goldman Sachs on April 28, 2003 for "biased and misleading analyst coverage, specifically including Goldman Sachs' coverage of Exodus," and "for violating rules of the National Association of Securities Dealers (NASD) and the New York Stock Exchange," and that Goldman Sachs settled said complaint. (*See id.* ¶¶ 15, 75 and TAC Ex. D.) The mere filing of a complaint, absent any findings that the allegations of the complaint are true, can provide no basis for a strong inference of scienter by Goldman Sachs at the time of the February Offerings.

**\*23** Accordingly, plaintiffs' § 10(b) claim against each of the Underwriter Defendants is subject to dismissal for failure to adequately allege scienter.

### D. Summary

In sum, the Court will (1) DENY the Underwriter Defendants' motion to dismiss plaintiffs' § 10(b) and § 11 claims as time-barred; (2) DENY the Underwriter Defendants' motion to dismiss plaintiffs' § 11 claims as inadequately pleaded under Rule 9(b); and (3) GRANT the Underwriter Defendants' motion to dismiss plaintiffs' § 10(b) claims for failure to adequately plead falsity and scienter under Rule 9(b) and the PSLRA.

### DISCUSSION: INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

The Third Amended Complaint asserts a claim for violation of § 10(b) of the Exchange Act and SEC Rule 10(b)(5) against each of the Individual Defendants, and a claim for violation of §§ 11 and 15 of the Securities Act against Hancock only.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

TAC ¶¶ 343-362 .) Plaintiffs also assert a claim against each of the Individual Defendants for violation of § 20(a) of the Exchange Act for acting "as controlling persons of Exodus." (*See* TAC ¶¶ 363-365.) The Individual Defendants raise four principal arguments in their motion to dismiss: (1) plaintiffs fail to state a § 10(b) claim because they have failed to adequately allege falsity or scienter as to any of the statements alleged to be false, and because the PSLRA's Safe Harbor provisions insulate the forward-looking statements in question from liability; (2) plaintiffs are barred by the statute of limitations from asserting (a) the § 10(b) claims based on statements made in the expanded class period; (b) the claims against Brown, Mohammad, and Yeack; and (c) the § 11 claim against Hancock; (3) the § 11 claim against Hancock fails for the reasons set forth in the Underwriter Defendants' motion to dismiss; and (4) the § 20(a) and § 15 claims fail because plaintiffs have not adequately pleaded, and are not able to plead, control person liability.

The Court will begin its analysis with the Individual Defendants' arguments with respect to the statute of limitations.

### A. Statute of Limitations

The Individual Defendants argue that the plaintiffs are barred by the statute of limitations from bringing (1) the claims for violations in the period from April 20, 2000 to March 31, 2001 (the expanded class period first alleged in the First Amended Complaint), (2) the claims asserted against Mohamad, Yeack, and Brown, and (3) the § 11 claim against Hancock.

As noted, the instant claims under § 10(b) and § 11 are timely if they were brought within one year of either actual discovery or inquiry notice of the facts constituting the alleged violations. "[I]nquiry notice triggers an investor's duty to exercise reasonable diligence and the one-year statute of limitations begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud.'" *See Valence,*

175 F.3d at 704 (quoting *Sterlin,* 154 F.3d at 1201) (internal punctuation omitted). Thus, a court must ask (1) whether an event/publication "raise[d] sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further," and (2) when "a reasonably diligent inventor [should] have discovered the facts underlying the alleged fraudulent activity." *See Valence,* 175 F.3d at 704. "If the answer to the first question is yes, the answer to the second question would determine when the statute of limitations began to run." *Id.*

### 1. Claims Based on Violations During Expanded Class Period

**\*24** As noted, plaintiff's First Amended Complaint asserted claims on behalf of persons and entities who purchased Exodus securities between April 20, 2000 and September 21, 2001, whereas the class period alleged in the initial Consolidated Complaint covered purchases made between March 31, 2001 and June 20, 2001, a substantially shorter period. Defendants argue that the one-year statute of limitations bars the claims raised by those members of the newly-alleged class who purchased securities between April 20, 2000 and March 31, 2001.

For the reasons set forth in the discussion respecting the Underwriter Defendants' motion to dismiss, *supra,* plaintiffs have adequately pleaded facts demonstrating conformity with the statute of limitations as to plaintiffs' claims for wrongdoing between April 20, 2000 and March 31, 2001. *See* TAC ¶¶ 319-321, 331-34 (setting forth allegations that plaintiffs did not suspect wrongdoing occurring prior to the second quarter of 2001 until confidential witness interviews conducted in December 2001).[FN17]

> FN17. The Court disregards plaintiffs' allegations that defendants "fraudulently concealed their activities," (*see* TAC ¶ 316), as the Supreme Court has held that equitable tolling is "fundamentally inconsistent" with the limitations period for securities violations. *See Lampf,* 501 U.S. at 363; *see also Pincay v. Andrews,* 238 F.3d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 22
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

1106, 1110 (9th Cir.2001) (describing fraudulent concealment as form of equitable tolling).

### 2. Claims Against Mohammad, Yeack and Brown

Plaintiffs' claims against Mohammad, Yeack and Brown were first asserted in the First Amended Complaint, which was filed July 11, 2002, more than one year after Exodus's June 20, 2001 announcement that its results for the second quarter of 2001 and for the fiscal year would be below prior expectations. The Court previously dismissed plaintiffs' claims against Mohammad, Yeack and Brown, with leave to amend, because plaintiffs failed to allege any reason for their failure to assert claims against Mohammad, Yeack and Brown in their prior complaints.

Plaintiffs now allege they did not discover the possibility that Mohammad was involved in the alleged fraud until November and December 2001, when they interviewed CW6, CW7, and CW9, who informed plaintiffs that Mohammad "gave directions to the sales teams," gave "account executives 'marching orders' with respect to selling Exodus's products and services," and "played a tremendous part in Exodus's downfall."(*See*TAC ¶¶ 325-26.) According to plaintiffs, CW6 also told plaintiffs that, prior to the second quarter of 2001, Exodus was not bringing in any new customers. (*Seeid.* ¶ 325.)

With respect to Yeack and Brown, plaintiffs allege they did not discover the possibility these defendants were involved in the alleged fraud until June 2002. According to plaintiffs, CW1 told them, in June 2002, that Yeack and Brown both attended weekly executive staff meetings during the first and second quarters of 2001, at which CW1 repeatedly raised with management his concerns about improper recognition of revenue associated with continuing billings for non-paying or cancelled customers. (*See*TAC ¶¶ 323, 329.).

The Individual Defendants argue that the facts alleged in support of plaintiffs' claims against Mohammad, Yeack and Brown are identical to those

alleged against the other Individual Defendants and, accordingly, plaintiffs cannot claim plaintiffs were not similarly on notice as to their claims against Mohammad, Yeack and Brown at the time the initial complaints were filed. The Individual Defendants also point out that plaintiffs could easily have determined that Mohammad, Yeack and Brown were officers of Exodus by reviewing Exodus's March 31, 2001 Form 10-K. The issue is not whether plaintiffs were able to determine that Mohammad, Yeack and Brown were officers, however, but whether plaintiffs were alerted to facts suggesting Mohammad, Yeack and Brown were involved in the alleged fraud. Plaintiffs now allege specific facts as to the dates on which they first suspected Mohammad, Yeack and Brown of having engaged in wrongdoing. As all such dates are within one year of the date plaintiffs filed their First Amended Complaint, i.e., the first complaint in which plaintiffs alleged claims against Mohammad, Yeack and Brown, the Court finds plaintiffs have adequately pleaded compliance with the statute of limitations with respect to their claims against said defendants.

### 3. Section 11 Claim Against Hancock

**\*25** For the reasons discussed earlier with respect to the Underwriter Defendants' motion to dismiss, plaintiffs likewise have adequately pleaded facts demonstrating conformity with the statute of limitations as to plaintiffs' § 11 claim against Hancock. *Compare*TAC ¶¶ 319-321 (setting forth allegations that plaintiffs did not suspect wrongdoing by the Underwriter Defendants in connection with the February Offerings until December 2001) *with*TAC ¶¶ 331-334 (setting forth similar allegations as to why plaintiffs did not suspect wrongdoing by Hancock in connection with the February Offerings until December 2001).

### B. Sufficiency of Pleading: Section 10(b) Claim

As noted, in assessing whether plaintiffs have adequately pleaded a § 10(b) claim under the PSLRA, the court "must determine whether particular facts in the complaint, taken as a whole, raise a strong in-

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

ference that defendants intentionally or with 'deliberate recklessness' made false or misleading statements to investors."*See*Ronconi v. Larkin, 253 F.3d at 429. "Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong inference' that misleading statements were knowingly or with deliberate recklessness made to investors, a private securities fraud complaint is properly dismissed under Rule 12(b)(6)."*Seeid.*

Plaintiffs' § 10(b) claims against the Individual Defendants are based on a series of public statements by Exodus, beginning with its announcement of its first quarter of 2000 financial results on April 20, 2000, and ending with its September 26, 2001 announcement that it had filed for Chapter 11 bankruptcy. (*See*TAC ¶¶ 45-118.) Additionally, plaintiffs' § 10(b) claims are based on a series of statements to the press by Hancock in August and September 2001. (*See*TAC ¶¶ 102-111.) The Third Amended Complaint contains no public statements by Exodus that were not alleged in the First Amended Complaint, but does allege several statements to the press by Hancock that were not alleged in the First Amended Complaint, specifically, an interview published August 3, 2001 by *Business Week Online,* (*seeid.* ¶ 103), an interview published August 13, 2001 by *Network World,* (*seeid.* ¶ 104), and an interview broadcast on CNN's *Moneyline* on August 23, 2001. (*Seeid.* ¶ 108).

The Court previously dismissed the entirety of plaintiffs' § 10(b) claims for failure to adequately allege falsity and scienter. The Individual Defendants move again to dismiss the § 10(b) claims, and argue that plaintiffs' additional allegations fail to cure the deficiencies identified by the Court in its prior Dismissal Order.[FN18]

> FN18. The Court's analysis of the Individual Defendants' motion has been made more difficult by plaintiffs' decision not to specifically address each of the subparts of the Individual Defendants' arguments, but rather to set forth their argument against dismissal in four subparts that do not dir-

ectly correspond with the arguments made by the Individual Defendants.

### 1. Statements Regarding Exodus's Standards as to Customer Creditworthiness

In its prior complaint, plaintiffs alleged that Exodus's March 31, 2001 Form 10-K contained the following statements: (1) "We do not enter into arrangements unless collectability is reasonably assured at the outset"; (2) "Existing customers are subject to ongoing credit evaluations based on payment history and other factors"; and (3) "If it is determined that collectability is not reasonably assured, revenue is recognized on a cash basis."(*See* FAC ¶ 78.) The Court previously dismissed plaintiffs' claim that these statements were false or misleading when made, and that the Individual Defendants knew about, or were deliberately reckless as to, such falsity, for the reasons set forth at length in the Court's Dismissal Order. (*See* Dismissal Order at 33-38.)

**\*26** In dismissing the claim, the Court first rejected plaintiffs' reliance on statements by Hancock's successor as Exodus's CEO, Richard Krause ("Krause"), which were published on September 28, 2001 and October 1, 2001, that Exodus had acquired "customers who don't qualify to be customers," (*see*TAC ¶ 137), because such statements reflected an assessment made six months after the March 31, 2001 Form 10-K and thus did not indicate knowledge of falsity at the time the 10-K statements were made. The Court further found the statements by Krause did not indicate when Exodus acquired the "customers who don't qualify to be customers," and thus provided no basis for inferring that the statements in the March 31, 2001 Form 10-K were false when made. (*See* Dismissal Order at 33-34.) Plaintiffs now allege that in correspondence dated April 29, 2002, Krause's successor, Joe Stockwell, discussed "the extraordinary steps taken by the [Exodus bankruptcy] Estate between September 2001 and the end of January 2002 to clean up bad receivables."(*See*TAC ¶ 139.) Plaintiffs' reliance on this additional statement, made more than six months after Krause's state-

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

ments, similarly is unavailing, for the same reasons set forth above with respect to Krause's statements.

The Court, in its Dismissal Order, also found plaintiffs' allegations with respect to information obtained from CW1 and CW10 inadequately pleaded. (*See* Dismissal Order at 34-36.) The Court found that plaintiffs had failed to allege specific facts sufficient to support CW1's belief that Exodus had non-creditworthy customers and a lack of proper bad-debt reserves, as well as CW10's belief that Hancock and Mohammad regularly approved high-risk customers that had been rejected by the Credit and Collections Department and Finance Department. *See id.* at 34.In particular, the Court noted that plaintiffs failed to allege the number of non-creditworthy customers, the identity of any such customers, the amount by which Exodus's bad-debt reserves were insufficient, the amount of revenue attributable to such customers, and whether such customers failed to pay their bills. *See id.* at 34-35.With respect to the handful of customers alleged in the First Amended Complaint to have been high-risk or non-creditworthy, the Court found that plaintiffs had failed to allege specific facts as to why those customers were thought to have been non-creditworthy. *See id.* at 35.

Plaintiffs now point to two additional customers they contend were non-creditworthy, specifically, Alta Vista and Vulcan. (*See*TAC ¶ 142.) Plaintiffs allege that Alta Vista "became insolvent and stopped making payments" in the first quarter of 2001 and thereafter CW1 called Alta Vista's CFO to discuss Alta Vista's outstanding invoices. (*See id.* ¶ 142(i).) Following that meeting, according to plaintiffs, Alta Vista "restructured the deal," and within a quarter, "kicked Exodus out." (*See id.*)Far from suggesting fraud, plaintiffs' allegations with respect to Alta Vista demonstrate only that when Alta Vista had trouble paying its bills, Exodus promptly responded and addressed the issue.

**\*27** With respect to Vulcan, plaintiffs allege that Vulcan was an Exodus customer from the first quarter of 2000 through the end of 2001, "when the revenue associated with the deal, approximately $1

million was written off because Vulcan had never paid."(*See*TAC ¶ 142(ii).) According to CW1, plaintiffs allege, "some" of the revenue attributable to Vulcan was improperly recognized "because Exodus was not performing any services and because Vulcan was already well in default-perhaps one or two quarters-on Exodus A/R."(*See id.*)According to plaintiffs, CW1 "attempted to get in touch with responsible management at Vulcan and could not get his calls returned."(*See id.*)Plaintiffs, however, allege no facts to suggest Vulcan was not creditworthy at the time it entered into any contract with Exodus, or that Exodus failed to conduct ongoing credit evaluations. Indeed, the allegations suggest that Exodus attempted to contact Vulcan when it did not pay its bills, and ultimately stopped performing services for Vulcan as a result of its failure to pay. Finally, plaintiffs' allegation that "some" revenue associated with Vulcan was improperly recognized is not pleaded with the particularity required by Rule 9(b).

The Third Amended Complaint contains allegations with respect to an additional source, CW21, a former Exodus employee who managed the project managers in the Austin/Dallas data centers. (*See*TAC ¶ 144.) According to plaintiffs, CW21, in the beginning of 2000, saw customers' credit applications for IDC space, which included their credit report statements. (*See id.*)Although many of these customers had no income and less than $30,000 in assets, plaintiffs allege, Mohammad pressured the finance department to approve their applications. (*See id.*)Plaintiffs fail to identify any of these customers by name, other than Live Oak Telecom, and allege no facts to suggest that the amount of services provided to these customers exceeded their ability to pay. Consequently, plaintiffs fail to adequately allege how Exodus's creditworthiness standards were not met by extending services to such customers.

According to plaintiffs, CW21 also observed that non-creditworthy customers "who were not or could not make payments were not shut down and, instead, continued to be billed."(*See*TAC ¶ 144(b).) The only customer specifically identified,

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

however, is Federal Liaison Services ("FDS"), who, plaintiffs allege, "would not pay because the equipment it ordered was not compatible with the co-located equipment."(*Seeid.*)Although plaintiffs allege that FDS continued not making payments for more than a year after the compatibility problem was solved, (*seeid.*), plaintiffs' allegations with respect to FDS suggest that FDS disputed its bills because of concerns with Exodus's performance, not that FDS was not a creditworthy customer.

Plaintiffs further allege that although CW21 wanted to shut down FLS' equipment in January 2001, his boss told him that he first would have to obtain executive permission to do so. (*Seeid.*)Plaintiffs do not allege that such permission was sought and denied.

**\*28** Plaintiffs also allege as new material that, according to CW5, Hancock would "frequently" approve non-creditworthy customers in order to record revenues. (*Seeid.* ¶ 145.)According to plaintiffs, CW5 described one instance in which service to a customer who owed approximately $700,000 was terminated, but Hancock and Case ordered the customer's service restored immediately; service was restored, billing continued, and collection was not made. (*Seeid.* ¶ 145.)Because plaintiffs fail to allege the name of the customer, the date service was terminated and restored, or the circumstances surrounding the termination and restoration of service, this incident is not alleged with the particularity required by Rule 9(b).*SeeDaou,* 411 F.3d at 1016.

In their prior complaint, plaintiffs included allegations that the statements respecting collectability were false because Exodus was in fact seeking to collect a large amount of unpaid debt from its customers, which allegations the Court found inadequately pleaded. (*See* Dismissal Order at 36.) The Court found inadequately pleaded plaintiffs' allegation that CW2, a former Exodus Employee who worked in a "Collection Task Force" set up by Exodus, "learned that in 2001, Exodus was trying to collect close to $500 million in debts from customers," and that "[a]mong the debts the Collections

Task Force attempted to collect included American Airlines, which owed between $5 and $7 million to Exodus."(*See* FAC ¶ 116; Dismissal Order at 36.). In particular, the Court found such allegations were insufficient to demonstrate falsity or scienter because plaintiff failed to provide the requisite facts respecting CW2's source of information. (*See* Dismissal Order at 36.) The Third Amended Complaint includes no new allegations about the source of CW2's information. (*See*TAC ¶ 172.) The Third Amended Complaint does, however, allege that "a spreadsheet from Exodus's new system, Oracle, ... corroborates that, on August 31, 2001, a team of Exodus collectors were attempting to collect over $551 million of receivables from over 5,000 customers."(*Seeid.*)[FN19]Plaintiffs allege that the above-referenced Oracle spreadsheet further shows that of the $551 million Exodus was attempting to collect, more than $50 million was 91-120 days past due, more than $85 million was 121-180 days past due, and more than $122 million was more than 180 days past due. (*Seeid.* ¶ 168.)Plaintiffs attach to the Third Amended Complaint a declaration from Patrick A. Rueckert, manager of Exodus's Texas Sales Project Management, authenticating the Oracle spreadsheet and attesting that the information contained therein was current as of August 9, 2001. (*See* TAC App. Ex. E.) As the Oracle spreadsheet demonstrates that more than $122 million in accounts receivable was more than 180 days past due on August 9, 2001, such amounts were also more than 30 days past due on March 31, 2001, the date of Exodus's Form 10-K, in which the challenged statements about collectibility were included. Moreover, $122 million was a significant portion of Exodus's total accounts receivable, as the Oracle spreadsheet states that the amount of current accounts receivable as of August 9, 2001 was $108 million. (*See* TAC App. Ex. B at 78.) Nonetheless, plaintiffs have failed to adequately allege that the statements about collectability in Exodus's March 31, 2001 Form 10-K were false at the time they were made, because the Oracle spreadsheet says nothing about whether collectability was reasonably assured at the time Exodus began providing services to such customers or whether Exodus subjec-

ted its customers to ongoing credit evaluations, and provides no information as to how the past due accounts receivable were recognized as revenue.

> FN19. Although paragraph 172 of the Third Amended Complaint states that further allegations about the Oracle spreadsheet may be found in paragraph 85, such allegations actually appear in paragraph 168. The spreadsheet itself is attached to the complaint as Exhibit B.

**\*29** Finally, in the Court's Dismissal Order, the Court found inadequately pleaded plaintiffs' allegation that CW5, the Senior Manager of Credit and Collections for Exodus, (*see* FAC ¶ 104(e)), prepared a reserve report "for the March 2001 close," which report "showed that 40% of the overall accounts receivable was not collectable."(*See* Dismissal Order at 37-38 (quoting FAC ¶ 135).) The Third Amended Complaint does not materially expand on these allegations. (*See*TAC ¶ 219.)

Accordingly, the Court finds plaintiffs have not adequately pleaded that the Individual Defendants' statements about collectability of Exodus's accounts receivable were false and misleading at the time they were made.

### 2. Statements Regarding Exodus's Revenue Recognition

Plaintiffs assert that Exodus's financial results, as stated in Exodus's 10Q reports regarding Exodus's first quarter of 2000 through its first quarter of 2001,FN20 were false or misleading because Exodus recognized revenue in violation of GAAP and SEC rules by engaging in four types of accounting improprieties: (1) recording revenue prior to rendering services; (2) recording revenue on cancelled or non-renewed contracts; (3) recording revenue from transactions in which collectability was not probable; and (4) recording revenue and assets in conjunction with bogus barter transactions and failing to disclose such transactions. (*See*TAC ¶ 264.) The Individual Defendants move to dismiss plaintiffs' § 10(b) claim, to the extent such claim is based on such allegations, on the ground that

plaintiffs have not adequately alleged any material misstatement of Exodus's revenues and fail to make any showing that the Individual Defendants knew of either the existence, or the amount, of any such misstatements.

> FN20. Specifically, plaintiffs allege that the following reported financial results were false: (1) first quarter of 2000 revenues of $134.1 million and EBITDA profit of $1.7 million (*see*TAC ¶¶ 45, 48); (2) second quarter of 2000 revenues of $179.6 million and EBITDA profit of $8.6 million (*see*TAC ¶¶ 52, 54); (3) third quarter of 2000 revenues of $229.6 million and EBITDA profit of $20.2 million (*see*TAC ¶¶ 57, 60); (4) fourth quarter of 2000 revenues of $280.4 million and EBITDA profit of $26.5 million (*see*TAC ¶ 70, 78); and (5) first quarter of 2001 revenues of $348.7 million and EBITDA profit of $5.5 million (*see*TAC ¶¶ 82, 91).

As noted, "[w]hen pleading irregularities in revenue recognition, plaintiffs should allege (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or [company] employees involved in the transactions."*SeeDaou,* 411 F.3d at 1016 (internal quotations and citations omitted; alteration in original)."Plaintiffs need not allege each of those particular details," however, but "must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue."*Seeid.*(internal quotation and citation omitted). A "general allegation" that a particular practice "resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation."*Seeid.*Rather, "although overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

were material in light of the company's overall financial position."*See id.* at 714.

**\*30** Accordingly, the Court turns to each of the accounting improprieties alleged by plaintiffs in the Third Amended Complaint.

a. Recording Revenue Prior to Rendering Services

The Court previously has dismissed plaintiffs' § 10(b) claim against the Individual Defendants, to the extent such claim was based on an alleged practice of recording revenue prior to rendering services, because plaintiffs failed to adequately allege the source of the confidential witnesses' knowledge of such practice, and because plaintiffs failed to allege facts with sufficient particularity to show the reported financial results were false when made or that any of the Individual Defendants had knowledge of such falsity. (*See* Dismissal Order at 44-45.)

The Ninth Circuit has held that information obtained from confidential witnesses may provide a basis for a securities fraud complaint if the "sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details."*See Daou,* 411 F.3d at 1015 (internal quotations omitted). Plaintiffs have amended the complaint to allege that CW10 "is a former Exodus employee who was responsible primarily for running credit checks on prospective customers and who worked closely with collectors," (*see* TAC ¶ 154), and that CW12 is "a former Exodus collector," (*see* TAC ¶ 155). Neither allegation adequately sets forth an explanation as to how the confidential witnesses obtained knowledge about Exodus's revenue recognition practices.

Plaintiffs also add a new allegation that Exodus regularly input an installation date of 1/1/1900 into the Solomon database FN21 as "a 'placeholder' which indicated to Exodus internally that the items ordered were 'not installed.' " (*See* TAC ¶ 155(b).) Plaintiffs allege that a document titled "Cu. Open Orders by Customer-by Customer; Period: 02-00 as

of 03/07/00," pertaining to a customer identified as "Customer Nbr. 000661" indicates that several items were installed on "1/1/1900." (*See id.*)Plaintiffs do not allege, however, that this customer was billed prior to installation and, indeed, does not allege the name of any customer who was billed by Exodus prior to installation based on an installation date, according to the Solomon database, of "1/1/1900."

> FN21. As noted above, plaintiffs allege that the Solomon database is an Exodus "financial database." (*See* TAC ¶ 232(a).)

In addition, plaintiffs add a new allegation that, according to CW11, an Exodus credit and collections analyst from August 1999 through June 2001, (*see id.* ¶ 126(k)), Exodus had a "practice of inputting false installation dates in order to begin billing customers."(*See id.* ¶ 156.)Plaintiffs fail to allege, however, the name of any customer that CW11 identified who was billed prior to installation, the details of any such transaction, or the amount by which any such pre-installation billing affected Exodus's financial statements.

**\*31** Accordingly, the Court finds plaintiffs have not successfully amended their complaint to state a § 10(b) claim based on fraudulently recognizing revenue prior to installation.

b. Recording Revenue on Cancelled or Non-renewed Contracts

Plaintiffs claim that Exodus's financial statements were fraudulent as a result of a practice by Exodus of continuing to recognize revenue based on orders that had been cancelled, and of entering into "side agreements" with customers, by which customers who cancelled their contracts with Exodus would continue to be billed but were permitted to ignore the invoices. (*See* TAC ¶ 146.) The Court previously dismissed this claim because "plaintiffs fail[ed] to identify any particular customer who was billed subsequent to cancellation and/or who entered into a side agreement, let alone the dates of any such transactions or the amount of revenue involved."(*See* Dismissal Order at 45-46.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357

**(Cite as: Not Reported in F.Supp.2d)**

In the Third Amended Complaint, plaintiffs add allegations obtained from CW21 and CW12. Although CW21 and CW12, according to plaintiffs, observed Exodus continuing to invoice customers after the customers cancelled their contracts, (*see*TAC ¶¶ 149-150), plaintiffs do not allege any particular customer, of which CW21 or CW12 was aware, who was billed after cancellation.

Plaintiffs also add allegations relating to CW22, "a former Exodus employee who processed orders in the sales group and then became one of two employees in the cancellations department formed in April 2001."(*See*TAC ¶ 151.) CW22, according to plaintiffs, was aware, in November and December 2000, of a large number of cancellations "ordered" by customers months earlier, but which had not been processed. (*See*TAC ¶ 151(a).) According to CW21, "the vast majority of customer cancellations were routinely delayed for months," and Exodus continued to book revenue on hundreds of accounts that had actually been cancelled for months. (*See*id. ¶ 151(b)-(c).) In April 2001, according to plaintiffs, CW22 processed at least 125 cancellations, the majority of which came from cancellation requests prepared months earlier, and he continued to process hundreds of such cancellations into the summer of 2001. (*See*id. ¶ 151(f).) Plaintiffs again fail to identify any particular customer who was billed subsequent to cancellation and/or who entered into a side agreement, the dates of any such transactions, or the amount of revenue involved, much less the amount by which such practice of post-cancellation billing affected Exodus's financial results.

Defendants argue that Exodus disclosed in its Form 10Q for the first quarter of 2001 that it sold its "services under contracts that typically [had] a minimum term of one year," (*see* Individual Defendants' Request for Judicial Notice ("RJN") Ex. 23 at 11), and that plaintiffs fail to explain how customers can unilaterally cancel their contracts and why Exodus was not entitled to bill a customer for the entire period of their contract. Defendants also point out that plaintiffs themselves appear to recognize that early termination of a contract required

approval from Exodus, in that plaintiffs allege that at least one customer cancelled its contract "but waited for approval of the cancellation from Exodus."(*See*TAC ¶ 5.) The Court agrees that plaintiffs fail to allege whether the contracts in question were cancelled prior to the end of their term and, if so, why Exodus was not entitled to continue to bill customers for the duration of the contractually-agreed term.

**\*32** Accordingly, the Court finds plaintiffs have not successfully amended their complaint to state a § 10(b) claim based on fraudulently recognizing revenue on cancelled or non-renewed contracts.

c. Recording Revenue from Transactions in which Collectability Was Not Probable

Plaintiffs allege that "it was common practice for Exodus to enter into contracts with customers that had limited capital resources, many of which were Internet companies on the verge of bankruptcy."(*See*TAC ¶ 268.) According to plaintiffs, "[t]hese transactions were in violation of GAAP and SEC rules as the collectibility was not reasonably assured."(*See*id.)The Court previously dismissed, as inadequately pleaded, plaintiffs' § 10(b) claims to the extent such claims were based on the recording of revenue from transactions in which collectability was not probable. (*See* Dismissal Order at 46.)

Plaintiffs have amended their allegations to allege that Exodus "failed to establish sufficient reserves for its deteriorating accounts receivable."(*See*TAC ¶ 269.) According to plaintiffs, in March 2001, CW5 prepared a reserve report for Exodus's management, including Wegner, Dollahite, Case and Hancock, which showed that 40% of the overall accounts receivable was not collectible. (*See*id. ¶¶ 219, 270.)Plaintiffs allege that, according to CW21, the Individual Defendants initiated "Project Resolve" at the beginning of April 2001, in an attempt to collect as much cash as possible on outstanding customer balances." (*See*TAC ¶ 270.) According to CW21, Project Resolve targeted 275 customers with disputed balances, who were chosen because

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

they represented the best chance of collecting cash. (*See id.* ¶ 272.)Plaintiffs allege that the goal of the project was to negotiate with the customers who had disputed balances "in order to come to an agreement on how much the customer would remit to Exodus immediately."(*See id.*)According to CW21, the progress of Project Resolve was monitored via a database titled "Project Resolve Summary Tracking Database"; as of April 4, 2001, that database identified $23.4 million in disputed balances relating to the targeted 275 customers, and identified that amount as constituting 52.1% of the "Outstanding Past Due" accounts receivable for that group of customers. (*See id.* ¶¶ 165-167, 274 and Ex. A.) Because Exodus considered the targeted 275 customers as its best chance for collection, plaintiffs contend, the Individual Defendants knew that at least 52.1% of Exodus's accounts receivable were uncollectible. (*See id.* ¶ 275.)Plaintiffs estimate that Exodus's accounts receivable reserve was only $23.8 million in the first quarter of 2001 and allege that it rose to $114 million by the third quarter of 2001, which, according to plaintiffs, was 32.1% of Exodus's outstanding accounts receivable. (*See id.* ¶¶ 276-77.)Plaintiffs allege: "Based on the information contained in the 'Project Resolve Summary Tracking Database' as well as the bad debt and revenue reserve reports that showed 40% of Exodus's gross A/R was uncollectible, Individual Defendants knew that Exodus should have recorded an accounts receivable reserve of at least $95 million by March 31, 2001 (1Q01), if not sooner."(*See id.* ¶ 277.)

**\*33** Plaintiffs' new allegations with respect to Project Resolve add nothing to their allegations that Exodus improperly recognized revenue from transactions from which collection was not reasonably assured. Plaintiffs do not allege that Exodus was aware of any problems with collectability as to any of the 275 customers involved in Project Resolve at the time revenue was recognized. In addition, the mere fact that a bill was disputed does not support the inference that revenue from that transaction was improperly recognized.

Moreover, there is nothing to suggest the existence of Project Resolve itself was part of a fraudulent scheme. To the contrary, it suggests that Exodus was making a good faith effort to resolve billing disputes.

Finally, with respect to Exodus's calculation of reserves for doubtful accounts, plaintiffs acknowledge that the first quarter of 2001 reserve for doubtful accounts was not included in Exodus's Form 10-Q and plaintiffs allege no basis for concluding that the reserve was $23.8 million at the end of the first quarter of 2001. (*See* TAC ¶ 276 and n. 6.) Nor do plaintiffs allege a basis for their conclusion that the reserve should have been at least $95 million at that time. (*See id.* ¶ 277.)

Accordingly, plaintiffs fail to state a § 10(b) claim based on (1) improper recognition of revenue from transactions from which collectability was not reasonably assured, (2) the existence of Project Resolve, or (3) Exodus's calculation of reserves for doubtful accounts receivable.

### d. Recording revenue and assets in conjunction with barter transactions

Plaintiffs allege that the Individual Defendants engaged in a fraudulent scheme "to improperly gross up revenues based on fictitious or over valued reciprocal/barter transactions."(*See* TAC ¶ 278.) According to plaintiffs, "Exodus violated GAAP and SEC rules by recording revenue on its reciprocal (roundtrip)/barter transactions because the transactions had no economic substance as the companies merely entered into the reciprocal arrangements so that Exodus could artificially inflate its revenues."(*See id.*)Plaintiffs point to transactions with Oracle, Innoventry, Niku and Yahoo as examples of improper revenue recognition. (*See id.* ¶¶ 207-209.)The Court previously has dismissed these allegations with respect to the Oracle, Innoventry, and Niku transactions as inadequately pleaded. (*See* Dismissal Order at 46-49.) Plaintiffs' allegations with respect to the Yahoo transaction did not appear in the First Amended Complaint.

The Court previously dismissed plaintiffs' claim based on the Oracle transaction because the transac-

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

tion was alleged to have occurred during the fourth quarter of 1999, outside the class period. (*See* Dismissal Order at 47.) Plaintiffs now allege that CW1, who was responsible for financial accounting and reporting for the Professional Services organization, "believes" that Exodus wrote off the cost of the Oracle licenses in the first quarter of 2001 as a bad debt and expense and that, although revenue on the Oracle transaction was recorded in 1999, Exodus "improperly reported an overvalued asset (useless Oracle licenses) on its financial statements during the Class Period, through at least December 2000."(*See*TAC ¶ 207(a).) As defendants correctly point out, plaintiffs have failed to allege the basis for CW1's "belief" that the Oracle licenses were written off in the first quarter of 2001. As noted, the PSLRA requires that if an allegation is made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed."*See*15 U.S.C. § 78u-4(b)(1). Moreover, as defendants also point out, even if the $5 million Oracle licenses were improperly reported as assets, that amount is only 0.1% of the $3.9 billion in assets Exodus reported as of December 31, 2000, and only 0.2% of the $2.1 billion increase in assets reported from December 31, 1999 to December 31, 2000. (*See* Individual Defendants' RJN Ex. 22 at 15.) To the extent plaintiffs seek to allege that the amount of the Oracle transaction is material, the complaint fails to allege facts sufficient to support such allegation. *See**Basic Inc. v. Levinson,* 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." ') Accordingly, plaintiffs have failed to adequately amend their § 10(b) claim based on the Oracle transaction.

**\*34** The Court previously dismissed plaintiffs' claim with respect to the Innoventry transaction because plaintiffs failed to adequately allege CW1's personal knowledge of the transaction. (*See* Dismissal Order at 47.) Plaintiffs now admit that CW1 "does not now have a clear recollection" of the In-

noventry transaction. (*See*TAC ¶ 207(b).) Accordingly, plaintiffs have failed to adequately amend their § 10(b) claim based on the Innoventry transaction.

The Court previously dismissed plaintiffs' claim with respect to the Niku transaction because plaintiffs failed to adequately allege the particulars of the transaction, the source of CW1's knowledge thereof, the materiality of the transaction, or the Individual Defendants' knowledge of any improper motive behind the transaction. (*See* Dismissal Order at 48.) As plaintiffs fail to allege any new facts about the Niku transaction, plaintiffs have failed to adequately amend their § 10(b) claim based on said transaction.

With respect to the Yahoo transaction, plaintiffs allege that, on January 9, 2002, Yahoo filed a "response" in Exodus's bankruptcy proceedings, which indicated that Yahoo's purchase of services from Exodus, pursuant to a Master Service Agreement entered into in October 1998, "was dependent upon a commitment by Exodus to purchase Yahoo! services."(*See*TAC ¶ 209.) In particular, plaintiffs allege that Yahoo stated, in its filing in the bankruptcy court, that Exodus "agreed to purchase Yahoo! services equal to ten percent (10%) of Yahoo!'s payments to [Exodus]." (*Seeid.*)As defendants correctly point out, there is no allegation that the revenues from the Yahoo agreement were booked within the class period, or that the agreement was improper in any way. As plaintiffs themselves recognize, barter transactions do not necessarily violate GAAP. (*See*TAC ¶ 281 (citing APB 29).)

Accordingly, plaintiffs fail to state a § 10(b) claim based on improper recognition of revenue and assets from barter transactions.

### 3. Statements Regarding Number of Exodus Customers

Plaintiffs allege that Exodus's April 26, 2001 press release, in which Exodus announced its first quarter of 2001 results, fraudulently misrepresented the number of its customers. (*See*TAC ¶¶ 82, 232.) Ac-

cording to plaintiffs, Exodus's representations that it had approximately 4000 customers at the beginning of the quarter, and 4526 customers at the end of the quarter, were overstated by approximately 1000 customers because the reported numbers of customers included both potential customers and customers who had cancelled. (*See*TAC ¶¶ 82, 232.) The Court previously dismissed plaintiffs' § 10(b) claim, to the extent such claim was based on misrepresentations about the number of Exodus's customers, because plaintiffs failed to adequately allege facts showing that the customer count was false when made or facts giving rise to the requisite strong inference of scienter. (*See* Dismissal Order at 38-39.)

**\*35** Plaintiffs continue to allege that the Solomon database contained only 3500 active customers, (*see*TAC ¶ 232(a)), but, as in the First Amended Complaint, plaintiffs fail to allege the date(s) on which the Solomon database contained 3500 customers. Plaintiffs add a new allegation that CW25 "recalls that by the end of the 2Q01, the number of actual active customers totaled between 1500 and 2000."(*See*TAC ¶ 152(a).) The number of customers at the end of the second quarter of 2001, however, fails to demonstrate the falsity of Exodus's statements about the number of its customers at the end of the first quarter of 2001. Finally, plaintiffs' allegations that, in July 2001 or later, adjustments were made to the Solomon and Siebel customer databases to delete customers who had cancelled or were inactive, (*See*TAC ¶¶ 232, 234), permit no inference that Exodus's statements in April 2001 about the number of its customers were false when made.

Accordingly, plaintiffs fail to state a § 10(b) claim based on Exodus's April 2001 statement about the number of its customers.

### 4. Processing of Customer Credits

In the Third Amended Complaint, plaintiffs add new allegations that Exodus's financial results during the class period were overstated because Exodus failed to timely credit customers who were

overbilled. (*See*TAC ¶ 193.) Plaintiffs allege that, according to CW12, a former Exodus collections specialist from 1998 through September 2001, (*seeid.* ¶ 126(I)), Exodus Controller Suzanne Colvin, at meetings during late 2000 and at the end of the first quarter of 2001, told collectors that credits were not being issued because Exodus needed the revenue for its financial reports. (*Seeid.* ¶ 194.)According to CW12, plaintiffs allege, it was typical for Colvin to advise collectors at monthly meetings that management did not want to approve credits because of the adverse impact such credits would have on Exodus's financial reports. (*Seeid.*)Plaintiffs also allege that CW11, a former Exodus credit and collections analyst, (*seeid.* ¶ 126(k)), recalled that Exodus "carried a huge backlog of credits for all types of over-billing and disputed charges, most of which went for months and even quarters without being authorized[.]" (*Seeid* . ¶ 195.)

Plaintiffs cite a number of internal emails identifying specific customers who are alleged to have been overbilled, and whose accounts were not immediately credited. (*Seeid.* ¶ 159.)Plaintiffs do not attempt to quantify, however, how the delayed processing of customer credits affected Exodus's financial reports. As noted, a "general allegation" that a particular practice "resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation."*SeeDaou,* 411 F.3d at 1016. Although plaintiffs have, in this instance, identified the customers, plaintiffs also must show with particularity how the overstatement of revenues affected the company's financial statements and whether the overstatement was material in light of the company's overall financial position. *Seeid.* at 1018.

**\*36** Accordingly, plaintiffs fail to state a § 10(b) claim based on the allegation that Exodus had a practice of delaying processing of customer credits.

### 5. Massaging of Financial Results

In the Third Amended Complaint, plaintiffs add new allegations, based on "messages posted on a

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

Yahoo board for Exodus alumni," (*see*TAC ¶ 198), that Exodus "massaged its financial results by failing to use 'real' numbers."(*Seeid.*)Plaintiffs identify the authors of the postings only by first name, and fail to allege their positions at Exodus, or the basis for their knowledge of the information posted on the Yahoo message board. As noted above, "personal sources of information relied upon in a complaint should be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."*SeeDaou,* 411 F.3d at 1015 (internal quotation and citation omitted). As plaintiffs fail to do so, they fail to state a § 10(b) claim based on the allegation that Exodus "massaged" its financial results.

### 6. Delaying Recording of Expenses

Plaintiffs add new allegations, in their Third Amended Complaint, that, according to CW1, Colvin "routinely kept track of expenses that were recorded in the wrong period and documented such expenses on an 'ATF'-or 'After the Fact'-report." (*See*TAC ¶ 201 .) According to plaintiffs, based on information provided by CW1, a January 2001 ATF report "reflects $5.3 million of expenditures that were 'out of period'," of which amount, "at least $800,000 should have been fully expensed during 4Q00."(*See*TAC ¶ 202.)

Plaintiffs do not allege any specific expenses that were recorded in the wrong period, however. Plaintiffs also fail to allege any facts from which one could infer that the expenses were recorded in the wrong period as part of a fraudulent scheme, rather than as the result of mere oversight.

Accordingly, plaintiffs fail to state a § 10(b) claim based on the allegation that Exodus delayed recording expenses.

### 7. Misdating Checks

Plaintiffs allege that, in Exodus's bankruptcy proceedings, the bankruptcy judge noted, on September 3, 2003, that Krause, Exodus's new CEO, had

testified that backdating of checks had occurred at Exodus. (*See*TAC ¶ 204.) Plaintiffs further allege that "[a]lthough the specific misdating of checks event discussed by [the bankruptcy judge] appears to have occurred after Exodus filed for bankruptcy, it is significant in that it sheds light on the character of the Company's management and its corporate culture, which apparently viewed such improper conduct as 'business as usual.' " (*Seeid.*)Plaintiff also allege that "the misdating of checks apparently was also standard business practice at Exodus during the Class Period because Storagenetworks alleged, in its complaint against Exodus, ... that misdating of checks took place during the alleged time period." (*Seeid.;seealsoid.* ¶ 181.)

**\*37** Plaintiffs fail to allege any incident during the class period in which Exodus misdated a check and, indeed, appear to concede they are unaware of any such occurrence. Accordingly, plaintiffs fail to state a § 10(b) claim based on the allegation that Exodus misdated checks as part of a fraudulent scheme.

### 8. Sanrise Transaction

In the First Amended Complaint, plaintiffs alleged that Exodus improperly recognized revenue on a January 2001 transaction with Sanrise. (*See* FAC ¶ 111(f).) The Court previously dismissed plaintiffs' § 10(b) claim, to the extent such claim was based on such allegations, because plaintiffs failed to respond to defendants' arguments. (*See* Dismissal Order at 47 and n. 36.)

In the Third Amended Complaint, plaintiffs allege that Exodus and Sanrise entered into an agreement on December 28, 2000, pursuant to which Sanrise "acquired the data storage operations and equipment of Exodus, and became the outsource provider of Data Vault brand backup and restoration services to Exodus customers in its IDCs."(*See*TAC ¶ 210.) According to plaintiffs, the "purchase price" was 8,450,000 shares of Sanrise preferred stock valued by Exodus at $25 million, a promissory note "in the amount of $17.5 million," and $5 million in cash. (*Seeid.*)Elsewhere in the Third Amended Complaint, plaintiffs allege that the transaction included

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 33
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

a promissory note of "approximately $20 million." (*Seeid.* ¶ 69.)

Plaintiffs allege that Exodus made false and misleading statements in reporting the Sanrise transaction. (*Seeid.* ¶ 211.)First, plaintiffs allege, the total consideration for the transaction was $47.5 million, not $55.1 million as Exodus reported in its Form 10-Q for the period ending March 31, 2001. (*Seeid .;seealso* Individual Defendants' RJN Ex. 23 at 6.)

Next, according to plaintiffs, the value of the Sanrise preferred stock "was at best undeterminable and significantly overstated."(*See*TAC ¶ 211.) In addition, plaintiffs allege that GAAP required Exodus to "defer any gain and recognize it on the cash basis as any proceeds are received" because Sanrise was in "very poor financial health." (*Seeid.*)Further, plaintiffs allege that Exodus ultimately "returned the preferred stock and did not receive full value for the note[.]" (*Seeid.* ¶ 212.)

Finally, plaintiffs allege, a January 23, 2001 press release about the Sanrise transaction was false and misleading "because it created the impression that Sanrise made a straight purchase of Exodus's Data Vault assets when in fact the parties had entered into a two-year license agreement that provided for Sanrise to operate the Data Vault services business."(*Seeid.* ¶ 69.)

As defendants point out, plaintiffs make conflicting allegations as to the amount of consideration Sanrise agreed to pay Exodus. (*Compareid.* ¶¶ 69, 210.)Plaintiffs also contradict themselves as to whether Sanrise purchased assets from Exodus or entered into a lease. (*Compareid.* ¶¶ 69, 210.)Moreover, plaintiffs fail to cite a single document, witness, or other source in support of their allegations as to the content and value of the Sanrise transaction. As noted, when an allegation of fraud is made on information and belief, the PSLRA requires a plaintiff to support its claim by alleging "with particularity all facts on which that belief is formed."*See*15 U.S.C. § 78u-4(b)(1)."Allegations are deemed to have been made on information and belief until the plaintiffs demonstrate that they have

personal knowledge of the facts."*Vantive,* 283 F.3d at 1085 n. 3. As plaintiffs do not allege the source of their information with respect to the content and value of the Sanrise transaction, plaintiffs have failed to plead with the requisite particularity their § 10(b) claim based on the Sanrise transaction.

### 9. Statements Regarding Adequacy of Funding and Risk of Bankruptcy

#### a. Adequacy of Funding

**\*38** Plaintiffs allege that Exodus, in a press release issued April 26, 2001, stated it was "fully funded to achieve its current business plan."(*See*TAC ¶ 82.) On the same date, plaintiffs allege, Hancock, in a conference call with analysts, stated: "[W]e have a fully funded business plan."(*Seeid.* ¶ 83.)According to plaintiffs, these statements were false and misleading because the Individual Defendants "were aware that Exodus was woefully short of funds required to achieve its business plan."(*Seeid.* ¶ 252.)In particular, plaintiffs allege that Exodus had been presented with proposed business plans in March and August 2000, which proposals showed that Exodus needed "$3.2 billion to accomplish the goals set forth by the executive staff," and that Exodus executives "balked at these numbers" because, at the time, Exodus had only $750 million. (*Seeid.* ¶ 254.)The Court previously dismissed plaintiffs' § 10(b) claim, to the extent such claim was based on such allegations, on the ground plaintiffs had failed to adequately allege the statements, that Exodus, in April 2001, had a fully funded business plan, were false when made. (*See* Dismissal Order at 50-51.)

Although plaintiffs have amended their allegations, the amendments do not address the deficiencies noted in the Court's Dismissal Order. Accordingly, the Court finds plaintiffs have failed to plead with the requisite particularity their § 10(b) claim, to the extent such claim is based on Exodus's April 2001 statements about the adequacy of its funding.

#### b. Risk of Bankruptcy

In the First Amended Complaint, plaintiffs alleged that various representations made by Hancock in

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

articles published on August 27, 2001, August 28, 2001 and September 3, 2001, respecting whether Exodus would file for bankruptcy, were false when made. (*See* FAC ¶¶ 92, 93.) Plaintiffs quoted from only two of the articles: an article published in *Information Week* on August 27, 2003, which reported Hancock as saying: "We're viable ... We have sufficient cash"; and an article published in the *San Jose Mercury News* on August 28, 2001, which stated: "Exodus Chief Executive Ellen Hancock says the company is in no danger of filing Chapter 11. 'We are capable of handling the debt and paying for the debt,' she says."(*See id.*)Plaintiffs further alleged that Hancock resigned on September 4, 2001, and Exodus filed for bankruptcy on September 26, 2001. (*See* FAC ¶ 97.) The Court dismissed plaintiffs' § 10(b) claim based on such statements, on the ground the mere temporal proximity between Hancock's statements and Exodus's bankruptcy was insufficient to raise an inference of falsity or scienter under the PSLRA. (*See* Dismissal Order at 52 (citing *Ronconi v. Larkin,* 253 F.3d 423, 437 (9th Cir2001) ("We have allowed the temporal proximity of an allegedly fraudulent statement to *bolster* a complaint, but we have never allowed the temporal proximity between the two, *without more,* to satisfy the requirements of Rule 9(b)")).

**\*39** In the Third Amended Complaint, plaintiffs allege additional public statements made by Hancock in August and September 2001 about Exodus's financial health. According to plaintiffs, Hancock, in an interview published in *Business Week Online* on August 3, 2001, stated: "[W]e have not just a viable business, but a great business" and "[w]e have sufficient funding to run the business."(*See* TAC ¶ 103.) In an interview published August 13, 2001 by *Network World,* plaintiffs allege, Hancock stated: "[W]e do like the business we're in and we believe that we have sufficient cash to run it."(*See id.* ¶ 104.)Plaintiffs further allege that, in an August 23, 2001 interview on CNN's *Moneyline,* Hancock stated, "We have sufficient cash to take us into next year."(*See id.* ¶ 108.)In addition, plaintiffs allege that in an article published September 3, 2001 in *Computer Reseller News,* Hancock was quoted, as follows:

"The promise of increased business counters claims that Exodus is in financial straits," Hancock says. "We say that we're healthy, we say that we have sufficient cash, and we say that we brought in $200 million of new business in the first quarter and $200 million in the second quarter," she says. "We increased our customer base, and we're bringing in very good, large customers. We indicated that we'd be cash-[earnings per share]-positive next year."

"Even if Exodus doesn't find more funding, it still has enough cash to survive until it reaches profitability," Hancock adds. "The plan says we have enough money to get there."

(*See id.* ¶ 111 (alteration in original).) According to plaintiffs, Hancock further stated in the above-quoted article that Exodus would be profitable within a year. (*See id.*)

Plaintiffs additionally allege that despite Hancock's public assertions in August and September 2001 that Exodus was in no danger of bankruptcy, a document filed in bankruptcy court on October 4, 2001 states that Exodus had entered into an agreement on July 17, 2001 with the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps") by which Skadden Arps agreed to advise Exodus regarding its "financial and operational restructuring efforts" and to represent it "if chapter 11 cases were commenced."(*See id.* ¶ 112.)In a declaration filed in the bankruptcy court on October 5, 2001, plaintiffs allege, J. Gregory Milmore of Skadden Arps attested that Skadden Arps had been retained in July 2001 to assist Exodus "in their ... restructuring efforts by, among other things, advising [Exodus] regarding restructuring matters in general and preparing for the potential commencement and prosecution of chapter 11 cases for [Exodus]." (*See id.* ¶ 239.)Plaintiffs further allege that defendant Wegner testified in the bankruptcy proceedings, on August 8, 2003, that months before Exodus's bankruptcy filing, members of Exodus's management team, including Hancock, had "a few meetings" with Skadden Arps and Lazard Freres Company "about strategic options ... as [Exodus] entered the zone of insolvency."(*See id.* ¶ 238.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Case 5:07-cv-03444-JF    Document 52-3    Filed 12/17/2007    Page 35 of 41    Page 35

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

**\*40** Plaintiffs' allegations suggest that Exodus was, at the very least, preparing for the possibility of filing bankruptcy proceedings at the same time Hancock was making public statements that Exodus was in good financial health. Plaintiffs do not, however, allege any facts suggesting Hancock's statements about Exodus's finances were false at the time they were made. There is no allegation, for example, that Exodus did not have adequate cash on hand at the time Hancock stated Exodus was adequately financed. As defendants point out, "Exodus could have had ample cash at the time of Ms. Hancock's statement, and still, in a proper and thorough effort by its executives to fulfill their fiduciary duties, have prepared for future contingencies."(*See* Motion at 20-21.)

Accordingly, the Court finds plaintiffs have failed to plead with the requisite particularity their § 10(b) claim, to the extent such claim is based on Hancock's statements in August and September 2001 about the state of Exodus's financial health. *See America West,* 320 F.3d at 938 (noting courts must consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs") (internal quotation and citation omitted); *see also Gompper v. VISX, Inc.,* 298 F.3d at 897 (holding that to establish a strong inference of scienter, the allegations must show that an inference of fraud is "the most plausible of competing inferences") (internal quotation and citation omitted).

### 10. Statement re: Price Increase

Plaintiffs allege that, in an April 26, 2001 conference call with securities analysts and investors, Hancock indicated that Exodus was increasing its prices despite discounting from competitors, by stating that Exodus had "announced a price increase in the area of [its] infrastructure as well as many of [its] managed professional services."(*See* TAC ¶ 84.) Plaintiffs allege that "despite Hancock's assertion that Exodus was increasing prices, Exodus was actually discounting to compete with competitors in the declining market [.]" (*See id* ¶ 86.)

According to CW22, plaintiffs allege, Exodus would waive installation charges and offer up to three months of free service in 2000 and 2001. (*See id.* ¶ 229.)Plaintiffs further allege that CW7 offered discounts to new and existing customers. (*See id.* ¶ 230.)In addition, according to plaintiffs, an internal Exodus document dated January 23, 2001 stated that setup charges had been "reduced to reflect the current market."(*See id.* ¶ 231.)

Hancock's statement that Exodus had increased its prices is not inconsistent with the offering of discounts. There is no allegation, for example, that the base price of Exodus's services did not actually increase, nor is there an allegation that at the same time Hancock was announcing an increase in prices, the frequency and amounts of discounts also increased to the point that the net price of Exodus's services actually dropped.

**\*41** Accordingly, as an increase in prices is not inconsistent with the offering of discounts, plaintiff has not stated a § 10(b) claim based on Hancock's April 26, 2001 statement that Exodus was increasing its prices.

### 11. Revenue Forecasts

Plaintiffs allege the following statements respecting financial forecasts were false or misleading when made: (1) an October 19, 2000 press release forecasting revenues of approximately $1.8 billion for fiscal year 2001; (2) an April 26, 2001 press release forecasting revenues in the amount of $360 million for Exodus's second quarter of 2001 and $1.5 billion to $1.6 billion for fiscal year 2001; (3) an April 26, 2001 conference call in which Case reiterated these revenue forecasts and stated "we are still confident that we should be able to turn cash EPS positive in the first half of next year," and Hancock stated that Exodus expected "to turn cash EPS positive during the first half of 2002"; (4) a May 1, 2001 conference call in which Stoltz reaffirmed the revenue forecasts of $360 million for the second quarter of 2001 and $1.5 to $1.6 billion for fiscal year 2001; (5) a May 9, 2001 press release in which Stoltz said: "We believe we can achieve our finan-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

cial plan by reorganizing and strengthening our operations"; and (6) a June 20, 2001 press release in which Exodus forecasted revenues of $315 million for the second quarter of 2001 and $1.35 billion for fiscal year 2001. (*See* TAC ¶¶ 57, 82-84, 88, 89, 93.)

Plaintiffs allege said forecasts were made without a reasonable basis. (*See id.*) Plaintiffs allege that according to CW1, the controller for Exodus's Professional Services organization, Exodus's public forecasts were substantially higher than its internal forecasts. (*See id.*) Once a month, according to CW1, a company-wide profit and loss statement ("P & L statement") was distributed to Hancock, Stoltz, Dollahite, and Case, as well as other Exodus management personnel, which included a forecast for the following year. (*See id.* ¶ 241(a).) Plaintiffs allege that the forecasts provided to Exodus management were "highly accurate," but that the public forecasts were "much higher than Exodus's internally projected numbers." (*See id.* ¶ 241(e) .) Plaintiffs fail to allege the contents of the above-referenced internal reports, however, and do not allege that any particular internal report contained a forecast that differed from a publicly-issued forecast contemporaneously.

Accordingly, the Court finds plaintiffs have not alleged with the requisite particularity, based on the allegations derived from CW1, that Exodus's internal forecasts differed from its publicly-announced forecasts. *See Silicon Graphics,* 183 F.3d at 985 (holding "a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports").

In the Third Amended Complaint, plaintiffs add allegations based on information from CW24, an Exodus employee who, in February 2000, became responsible for business forecasting for all professional services, and who, plaintiffs contend, "corroborated that Exodus's public forecasts were inflated." (*See* TAC ¶¶ 126(x), 242.) According to CW24, the "Regional Business Forecast" spreadsheet and forecasting procedures he had implemented "were subject to false or overstated inputs by

sales personnel and management." (*See id.* ¶ 242(b).) Said "false or overstated input[s]" are not pleaded with specificity, however, and there is no allegation attempting to quantify the effect of such "false or overstated inputs" on Exodus's revenue forecasts. Similarly, plaintiffs allege that, according to CW24, Exodus booked deals with customers who were in financial trouble and who could not afford the services ordered, (*see id.* ¶ 242(c)), without alleging, however, that any particular customer was unable to pay, or attempting to quantify the effect of such practice on Exodus's revenue forecasts.

**\*42** Plaintiffs further allege that, according to CW24, revenue for professional services in the Bay Area dropped from $4 million in the first quarter of 2000 to $3.5 million in the second quarter of 2000 and $3.2 million for the third quarter of 2000. (*See id.* ¶ 242(d)). According to plaintiffs, the Bay Area produced approximately 40% of the revenue for the western region, which, in turn, generated 60-65% of Exodus's overall revenue for professional services. (*See id.*) Plaintiffs allege that despite the drop in revenue for the Bay Area, Yeack's "stated 'revenue goal' for Professional Services was 40% quarter to quarter growth," while internal forecasting "showed an average 7.5% growth per month during 2Q00 and 3Q00." (*See id.*) Plaintiffs fail to allege, however, how the drop in revenue for the Bay Area compared to revenue from other regions in the same periods. In addition, the setting of an internal 'revenue goal' of 40% growth is not the equivalent of a public forecast that such growth would actually be achieved.

Plaintiffs allege that CW24 and others informed Yeack that Exodus's revenue numbers were not reliable and that many "booked" deals should be removed from the forecasts Exodus used for public projections, but that Yeack consistently instructed CW24 and other professional services management not to remove anything from the forecasts. (*See id.* ¶ 242(e).) CW24 does not allege any specific transaction that should have been removed from the forecasts, however, nor does he attempt to quantify the effect that any such practice had on Exodus's public forecasts.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

According to plaintiffs, CW24 prepared a report on October 5, 2000, titled "BAR ProServ Director's Financial Management Initiative," when it became clear to him there was no way Exodus could meet its fourth quarter 2000 or fiscal year 2000 projections. (*Seeid.* ¶ 242(g).) According to CW24, plaintiffs allege, the purpose of the report was to "urge Exodus's executives to address the continued and increasing accrual and recognition of questionable revenue, and inherent defects in the forecasting process."(*Seeid.*)In response, plaintiffs allege, Yeack told CW24 not to be a "buffoon" and not to report negative information about the sales department's revenue projections." (*Seeid.*)Again, plaintiffs fail to attempt to quantify how Exodus's public forecasts were affected.

Accordingly, the Court finds plaintiffs have failed to state a § 10(b) claim based on false and misleading forecasts.

### 12. Statements Regarding IDC Capacity and Demand

Plaintiffs allege the Individual Defendants "falsely created the impression that Exodus's IDCs were full and that demand was robust by stating, for example, on April 26, 2001, that 'we are opening IDCs to meet known customer demand.' ' (*See*TAC ¶¶ 84, 244.) Plaintiffs allege such statements were false and misleading when made "because they failed to disclose that Exodus's IDCs were, in fact, operating under capacity." (*Seeid.*)The Court previously dismissed plaintiffs' § 10(b) claim based on such allegations because plaintiffs failed to allege that Exodus had excess IDC capacity in the locations where it proposed to open new IDCs or that Exodus was opening new IDCs without first assessing demand in those particular areas. (*See* Dismissal Order at 52-55.)

**\*43** In the Third Amended Complaint, plaintiffs add the allegation that CW24 became aware, in December 2000, of a plan by Exodus to "build-out ... a large amount of IDC space in Seattle."(*See*TAC ¶ 245(c).) According to plaintiffs, CW24 prepared a budget analysis

demonstrating that if the members of the Seattle sales team all sold 150% of quota, Exodus would need approximately 40,000 square feet of additional IDC space. (*Seeid.*)When CW24 pointed out that the IDCs in Seattle already had 140,000 square feet of build out space available, and recommended that Exodus refrain from building more unneeded capacity, plaintiffs allege, Hancock told CW24 to "mind his own business" and Yeack told him that Exodus needed to continue building out space in order to create the illusion of growth and to be perceived as an industry leader. (*Seeid.*)

There is no allegation, however, that Exodus ever built more IDC space in Seattle, or that the April 26, 2001 statement that Exodus "was opening IDCs to meet known customer demand" was a reference to the opening of new IDCs in Seattle. The only reference in the Third Amended Complaint to the building of new IDCs after April 26, 2001 appears in plaintiffs' summary of a July 26, 2001 Exodus press release, in which Exodus announced that it had built new IDCs in Amsterdam, Dallas, Miami, and Paris. (*Seeid.* ¶ 100.)As the complaint still contains no allegation that Exodus had excess IDC capacity in the locations where it proposed to open new IDCs or that Exodus was opening new IDCs without first assessing demand in those particular areas, the Court finds plaintiffs have not stated a § 10(b) claim based on statements relating to IDC capacity and demand.[FN22]

> FN22. The Court notes that plaintiffs have deleted from the complaint their prior allegations with respect to an August 22, 2001 interview with Hancock in which she was asked about excess IDC capacity and explained: "You can't just add up all the [unused hosting] space and say, 'See you've got all that space left.'You need the space in the city or county, or you essentially lose business in those geographies. So even though we might have some [extra] space in London, that doesn't help us address the French market or the market in Amsterdam or Germany. Last quarter, we opened four new data centers: one in

Amsterdam, one in Paris, one in Dallas and one in Miami. So with all this discussion of glut, we're opening up data centers."(*See* FAC ¶ 144(c) (alteration in original).)

### 13. Scienter: Stock Sales

Plaintiffs allege that the stock sales by the Individual Defendants demonstrate they engaged "in insider trading," and that they acted with scienter in making the allegedly false and misleading statements set forth in the Third Amended Complaint. (*See*TAC ¶ 307.) The Court previously has held that plaintiffs' allegations as to stock sales are insufficient to demonstrate scienter. (*See* Dismissal Order at 56-59.)[FN23] Defendants correctly point out that plaintiffs have not amended their allegations as to stock sales in any material way. Accordingly, assuming, *arguendo,* that plaintiffs have sufficiently pleaded falsity as to one or more of the statements on which they rely, the Court finds plaintiffs' allegations as to stock sales are insufficient to demonstrate scienter.

> FN23. As noted in the Court's prior order, the Ninth Circuit has identified three factors relevant to the question of whether a defendant's stock sales gives rise to an inference of scienter: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."*In re Silicon Graphics,* 183 F.3d at 986.

### C. Sufficiency of Pleadings: § 11 Claim Against Hancock

As discussed above, the Court is not persuaded by the Underwriter Defendants' motion to dismiss the § 11 claim asserted against them, for the reason that Rule 9(b) has no application to such claim and the complaint satisfies the notice pleading requirements of Rule 8. Unlike the Underwriter Defendants, however, Hancock is alleged to have participated in a broad scheme to defraud investors by, among other things, falsifying Exodus's financial results.

*e.g* .,TAC ¶ 44.) There is no allegation that Hancock acted negligently or mistakenly, in contrast to plaintiffs' allegations of negligence with respect to the Underwriter Defendants. *See Daou,* 411 F.3d at 1028 (finding Rule 9(b) applicable to pleading § 11 claim where plaintiffs "never rel[ied] on such conduct as negligence or mistake in stating their claims"). The § 11 claim against Hancock, unlike the § 11 claim against the Underwriter Defendants, is thus "grounded in fraud," and " 'the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." ' *See Daou,* 411 F.3d at 1027 (quoting *Vess,* 317 F.3d at 1103-04);*see also Stac,* 89 F.3d at 1405 n. 2 (rejecting "nominal efforts" to disclaim allegations of fraud in connection with § 11 claim "where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the [§ 11] claim").

**\*44** As noted, the Court will grant the Underwriter Defendants' motion to dismiss the § 10(b) claim asserted against them, which claim is based on precisely the same statements that form the basis of the § 11 claim against them, in part because plaintiffs have not adequately alleged falsity with the particularity required by Rule 9(b). For the same reason, as plaintiffs have failed to adequately allege with the particularity required by Rule 9(b) that any of the allegedly false statements contained in the Registration Statements for the February Offerings were false when made, the Individual Defendants' motion to dismiss the § 11 claim asserted against Hancock likewise will be GRANTED.

### D. Section 20(a) and Section 15 Claims

Plaintiffs assert a claim against the Individual Defendants for violation of § 20(a) of the Exchange Act[FN24] based on the allegation that they "acted as controlling persons of Exodus" and "had the power and authority to cause the Company to engage in the wrongful conduct complained of[.]" (*See*TAC ¶ 364.) Plaintiffs assert a claim against Hancock for violation of § 15 of the Securities Act [FN25]"by virtue of her direct and indirect control and domination of Exodus."(*See id.* ¶ 343.)

FN24.Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."15 U.S.C. § 78t(a).

FN25.Section 15 provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."15 U.S.C. § 77o.

To plead a prima facie case under § 20(a) of the Exchange Act, plaintiffs must plead: "(1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator."*Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000). To plead a prima facie case under § 15 of the Securities Act, plaintiffs must likewise plead a primary violation of federal securities laws and that the defendant exercised control over the primary violator. *See*In re Initial Public Offering Securities Litigation, 241 F.Supp.2d 281, 352 (S.D.N.Y.2003). There can be no liability under § 20(a) or § 15 if a primary violation of § 10(b) or § 11, respectively, is not sufficiently pled. *See*Heliotrope General Inc. v. Ford Motor Co., 189 F.3d 971, 978 (9th Cir.1999); *Klein*

*v. General Nutrition Companies, Inc.,* 186 F.3d 338, 344 (3 rd Cir.1999).

Defendants argue there can be no § 20(a) or § 15 liability based on defendants' alleged control of Exodus, because no primary claim is alleged against Exodus, and that plaintiffs cannot amend their complaint to allege such a claim, due to expiration of the statute of limitations and orders issued in Exodus's bankruptcy proceedings. As noted, the § 20(a) and § 15 claims are based entirely on defendants' alleged control of Exodus. (*See*TAC ¶¶ 343, 364.) Although plaintiffs asserted claims against Exodus itself in their initial complaints, (*see* Individual Defendants' RJN Ex. 48), plaintiffs did not assert any claim against Exodus in any of the consolidated complaints, including the Third Amended Complaint. The initial Consolidated Class Action Complaint, filed December 13, 2001, approximately two months after Exodus filed bankruptcy proceedings, merely notes Exodus's bankruptcy, and asserts no claims against Exodus itself. (*See* Consolidated Class Action Complaint ¶ 22.) In the Third Amended Complaint, plaintiffs state that Exodus "is not named as a defendant herein due to its bankruptcy and liquidation."(*See*TAC ¶ 35.)

**\*45** The parties dispute whether plaintiffs abandoned their claim against Exodus by failing to include it in the consolidated complaint, and whether bankruptcy law precludes them from seeking to assert such a claim against Exodus now. The issue, however, is not whether Exodus itself can be held liable for violating the law, but whether the Individual Defendants can be held liable, as controlling persons, for any violations of the law by Exodus. Although a predicate to controlling person liability is proof of a violation of law by the controlled entity, *see*Howard v. Everex Systems, Inc., 228 F.3d at 1065, the Court has located no case holding that the controlled entity must actually be named as a defendant. In other words, the complaint may allege violations by Exodus, for purposes of control person liability, without seeking to hold Exodus itself liable for those violations. *See,e.g.,*Howard v. Everex Systems, Inc., 228 F.3d at 1060, 1065 (finding officer of bankrupt corporation potentially liable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357
**(Cite as: Not Reported in F.Supp.2d)**

under § 20(a), albeit without discussing impact of bankruptcy); *see also In re Hayes Lemmerz Int'l, Inc. Equity Securities Litigation,* 271 F.Supp.2d 1007, 1021 n. 11 (E.D.Mich.2003) ("[I]f the complaint states a primary violation by the Company, even if the Company is not named in the complaint as a defendant, then a § 20 claim can stand if the individuals were controlling persons."); *In re Citisource, Inc. Securities Litigation,* 694 F.Supp. 1069, 1077 (S.D.N.Y.1988) (denying dismissal of § 20(a) claim where plaintiffs failed to sue primary violator; holding "liability of the primary violator is simply an element of proof of a section 20(a) claim, and that liability need not be actually visited upon the primary violator before a controlling person may be held liable"); *Elliott Graphics, Inc. v. Stein,* 660 F.Supp. 378 (N.D.Ill.1987); *Briggs v. Sterner,* 529 F.Supp. 1155, 1770-71 (S.D.Iowa 1981) (holding officers and directors of non-defendant bankrupt corporation may be liable as controlling persons under § 20(a) and § 15).

Thus, all that is required for plaintiffs to state a claim for controlling person liability is for plaintiffs to adequately allege that Exodus engaged in a primary violation of the securities laws and that the Individual Defendants (or, in the case of the § 15 claim, Hancock) controlled Exodus. *See, e.g., Howard v. Everex Systems, Inc.,* 228 F.3d at 1065. Plaintiffs have not done so, however. There is no allegation in the complaint that Exodus violated any of the securities laws. Although the complaint alleges, for example, that the Individual Defendants participated in a "scheme to defraud," (*see* TAC ¶ 44), there are no allegations that the acts of the Individual Defendants are attributable to Exodus, nor is there any allegation that Exodus otherwise committed violations of the securities laws. Assuming, *arguendo,* the Individual Defendants' acts are attributable to Exodus, plaintiffs have not, as explained above, stated a claim against the Individual Defendants for a primary violation of the securities laws. Accordingly, plaintiffs' § 20(a) and § 15 claims must be dismissed.[FN26]

> FN26. Plaintiffs also argue that their § 20(a) and § 15 claims can be based on the

Individual Defendants' control over each other. There is no such allegation in the complaint, however.

**\*46** Accordingly, defendants' motion to dismiss plaintiffs' § 20(a) and § 15 claims will be granted.

E. Dismissal Without Leave to Amend

Plaintiffs have had three opportunities to amend their consolidated complaint, and the Court has now dismissed the complaint on three occasions. Other than successfully amending their § 11 claim to disavow an intent to base that claim on fraud, plaintiffs have failed repeatedly to successfully amend their claims. The Court recognizes that leave to amend should be granted with "extreme liberality." *See Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir.2003). The Court may, however, consider factors such as repeated failure to cure deficiencies by previous amendments in determining whether to grant leave to amend. *See id.* at 1052 (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *see also In re Read Rite Corp. Securities Litigation,* 335 F.3d 843, 845 (9th Cir.2003) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

Here, despite engaging in an extensive factual investigation, plaintiffs have been unable to amend their complaint to state a claim for securities fraud. There is no indication that plaintiffs would be able to do so were the Court once again to grant leave to amend.

Accordingly, the Court will dismiss the complaint, with the exception of the § 11 claim against the Underwriter Defendants, with prejudice.

CONCLUSION

For the reasons stated:

1. The Underwriter Defendants' motion to dismiss the § 11 claim asserted against them is DENIED. The Underwriter Defendants' motion to dismiss the

Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357

**(Cite as: Not Reported in F.Supp.2d)**

§ 10(b) claim asserted against them is GRANTED, and said claim is hereby DISMISSED with prejudice.

2. The Individual Defendants' motion to dismiss is hereby GRANTED, and all claims asserted against the Individual Defendants are hereby DISMISSED with prejudice.

3. The Underwriter Defendants shall answer the § 11 claim within 30 days of the date of this order.

This order terminates Docket Nos. 160 and 163.

IT IS SO ORDERED.

N.D.Cal.,2005.
In re Exodus Communications, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2005 WL 1869289 (N.D.Cal.), Fed. Sec. L. Rep. P 93,357

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.