LEXSEE 2006 U.S. DIST. LEXIS 14790



Positive
As of: Dec 17, 2007

In re SILICON STORAGE TECHNOLOGY, INC., SECURITIES LITIGATION;
THIS ORDER RELATES TO: ALL ACTIONS

No. C 05-0295 PJH

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

*2006 U.S. Dist. LEXIS 14790*

March 10, 2006, Decided
March 10, 2006, Filed

**SUBSEQUENT HISTORY:** Complaint dismissed at *In re Silicon Storage Tech., Inc., Sec. Litig.*, 2007 U.S. Dist. LEXIS 21953 (N.D. Cal., Mar. 9, 2007)

**PRIOR HISTORY:** *In re Silicon Storage Tech., Inc.*, 2005 U.S. Dist. LEXIS 45246 (N.D. Cal., May 3, 2005)

**COUNSEL:** [*1] For James M. Baker On Behalf of Himself and All Others Similarly Situated, Plaintiff: Patrick J. Coughlin, Azra Z. Mehdi, Darren J. Robbins, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA.

For Louisiana Funds Group LEAD PLAINTIFFS, Plaintiff: Christopher T. Heffelfinger, Berman DeValerio Pease & Tabacco, P.C., San Francisco, CA; Julie Juhyun Bai, Berman DeValerio Pease Tabacco Burt & Pucillo, San Francisco, CA; Jason S. Cowart, Marc I. Gross, Stanley M. Grossman, Pomerantz Haudek Block Grossman & Gross LLP, New York, NY; Joseph J. Tabacco, Jr., Berman DeValerio Pease Tabacco Burt & Pu, San Francisco, CA; Nicole Lavallee, Herman DeValerio Pease Tabacco Burt & Pu, San Francisco, CA.

For Louisiana District Attorneys' Retirement System, Louisiana School Employees' Retirement System, Plaintiffs: Christopher T. Heffelfinger, Berman DeValerio Pease & Tabacco, P.C., San Francisco, CA; Joseph J. Tabacco, Jr., Berman DeValerio Pease Tabacco Burt & Pu, San Francisco, CA; Julie Juhyun Bai, Berman DeValerio Pease Tabacco Burt & Pucillo, San Francisco, CA; Nicole Lavallee, Herman DeValerio Pease Tabacco Burt & Pu, San Francisco, CA; Patrick V. Dahlstrom, [*2] Pomerantz Haudek Block Grossman & Gross LLP, Chicago, IL.

For Silicon Storage Technology Inc., Jack Lai, Bing Yeh, Yasushi Chikagami, Isao Nojima, Yaw-Wen Hu, Defendants: Eunice Jooyoun Lee, Jonathan B. Gaskin, Robert P. Varian, Orrick, Herrington & Sutcliffe LLP, San Francisco, CA.

For McNaught Group, Movant: Elizabeth P. Lin, Milberg Weiss Bershad & Schulman LLP, Los Angeles, CA.

For Robert Erickson and Shin Sheng Lin, Movant: Azra Z. Mehdi, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA.

For Sundstrom Group, Movant: Robert S. Green, Green Welling LLP, San Francisco, CA; Sean M. Handler, Esq., Schiffrin & Barroway, LLP, Radnor, PA.

For Gary Hunt, 3rd party plaintiff: Elizabeth P. Lin, Milberg Weiss Bershad & Schulman LLP, Los Angeles,

CA.

**JUDGES:** PHYLLIS J. HAMILTON, United States District Judge.

**OPINION BY:** PHYLLIS J. HAMILTON

**OPINION**

### ORDER GRANTING MOTION TO DISMISS

Defendants' motion to dismiss the consolidated amended complaint came on for hearing before this court on January 18, 2006. Plaintiffs appeared by their counsel Jason S. Cowart, and defendants appeared by their counsel Robert P. Varian and Jonathan B. Gaskin. Having read the [*3] parties' papers and carefully considered their arguments, and good cause appearing, the court hereby GRANTS the motion as follows

### INTRODUCTION

This is a proposed class action alleging violations of the federal securities laws. The plaintiff class consists of all those who purchased shares of common stock in defendant Silicon Storage Technology, Inc. (SST) from April 21, 2004, to December 20, 2004.

Plaintiffs allege that SST and six of its officers or former officers -- defendants Bing Yeh, Yaw Wen Hu, Jack K. Lai, Yasushi Chikagami, Isao Nojima, and Derek Best -- misled investors by overstating SST's inventory value, by making false statements about the company's sales prices, and by failing to disclose that the company lacked adequate internal controls to ensure that inventory was properly valued. Plaintiffs assert that they were harmed when SST's stock price fell more than 22.5%, following an announcement that SST would write down the value of a portion of its inventory.

The consolidated amended class action complaint ("CAC") alleges a cause of action for violation of § 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j(b)*, and related [*4] Rule 10b-5, *17 C.F.R. § 240.10b-5*, against all defendants; and for violation of § 20(a) of the Exchange Act, *15 U.S.C. § 78t(a)*, against the six individual defendants.

### BACKGROUND

SST is based in Sunnyvale, California, where it operates three major facilities. According to periodic reports filed by SST with the SEC, the company is a leading supplier of "flash memory" semiconductor devices for the digital consumer, including networking, wireless communications, and Internet computing markets. SST offers over 90 products based on its "Super-Flash" design and manufacturing process technology, and also licenses its technology to leading semiconductor companies for use in various applications. Revenue from the sale of these products contributed approximately 50% of the company's revenue during the proposed class period.

During the proposed class period, defendant Bing Yeh ("Yeh") was SST's President and Chief Executive Officer; defendant Yah Wen Hu ("Hu") was SST's Executive Vice President and Chief Operating Officer; defendant Derek Best ("Best") was Senior Vice President for Sales and Marketing; defendant Yasushi Chikagami ("Chikagami") [*5] was an outside director; defendant Isao Nojima ("Nojima") was Senior Vice President, Standard Memory Product Group; and defendant Jack K. Lai ("Lai") was Chief Financial Officer.

Plaintiffs allege that throughout the class period, defendants made materially misleading statements concerning the value of SST's inventory, which in turn caused the company's statements of gross profit, net income, and total assets to be materially misleading. Plaintiffs claim that defendants knew or should have known that prices of competing flash memory products sold by Intel and AMD had been declining during the class period, that SST's inventory should have been valued at levels well below those reported by defendants, and that the company's gross profits, net income, and total assets were therefore overstated.

Plaintiffs allege that defendants failed to disclose that SST's valuation system lacked sufficient controls to ensure accuracy, and that its valuation process was completely arbitrary. Plaintiffs assert that "the truth began to emerge" after the market closed on December 20, 2004, at which point SST announced it would write down the value of its inventory by $ 20-$ 25 million. On this news, [*6] the price of the company's shares, which had closed at $ 7.01 before the announcement, fell to a low of $ 5.43 the following day, a drop of 22.5%.

### DISCUSSION

**A. Legal Standard**

A court should dismiss under *Federal Rule of Civil Procedure 12(b)(6)* for failure to state a claim only where it appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*; *Williamson v. Gen'l Dynamics Corp., 208 F.3d 1144, 1149 (9th Cir. 2000)*. All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir. 2002)*.

Review is generally limited to the contents of the complaint. *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp., 69 F.3d 381, 385 (9th Cir. 1995)*. However, material that is properly presented to the court as part of the complaint may be considered as part of a motion to dismiss. *Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001)*. [*7] If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a *Rule 12(b)(6)* motion the documents referred to in the complaint to show that they do not support plaintiffs claim. Id. In addition, whether requested or not, the court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. See *Fed. R. Evid. 201*; see also *In re Silicon Graphics, Inc., Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999)*.

B. Defendants' Motion to Dismiss

Defendants seek an order dismissing the CAC for failure to state a claim. *Section 10(b)* of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." *15 U.S.C. § 78j(b)*.

SEC *Rule 10b-5*, promulgated under the authority of *§ 10(b)*, makes it unlawful for [*8] any person to use interstate commerce

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5*.

To plead securities fraud under *Section 10(b)* of the 1934 Act, plaintiffs must allege (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiffs relied (5) which proximately caused the plaintiffs' injury. *DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 388 (9th Cir. 2002)*. Similarly, the elements of a *Rule 10b-5* claim are (1) a material misrepresentation (2) made with scienter (3) in connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *Sparling v. Daou (In re Daou Sys.), 411 F.3d 1006, 1014 (9th Cir. 2005)*. [*9]

Under *§ 20(a)* of the 1934 Act, joint and several liability can be imposed on persons who directly or indirectly control a violator of the securities laws. *15 U.S.C. § 78t(a)*. Violation of *§ 20(a)* is predicated on a primary violation under the 1934 Act. *Heliotrope Gen'l, Inc. v. Ford Motor Co., 189 F.3d 971, 978 (9th Cir. 1999)*. Plaintiffs alleging a claim that individual defendants are "controlling persons" of a company must allege 1) that the individual defendants had the power to control or influence the company, 2) that the individual defendants were culpable participants in the company's alleged illegal activity, and 3) that the company violated the federal securities laws. *Durham v. Kelly, 810 F.2d 1500, 1503-04 (9th Cir. 1987)*; see also *Howard v. Everex Sys., Inc., 228 F.3d 1057, 1065 (9th Cir. 2000)*.

Defendants argue that the § 10-b claim should be dismissed for failure to allege fraud with particularity, and that the § 20 claim should be dismissed because plaintiffs fail to state a claim for primary liability. Defendants also contend that dismissal is required because the facts before the court [*10] demonstrate that the inventory write-down could not have taken place prior to the fourth quarter of 2004, because the demand for and pricing of flash memory had been increasing,

while SST's cost had been declining. Defendants assert the fact that the write-down was appropriate in 4Q 2004 but not before is also confirmed by an audit completed by PricewaterhouseCoopers after the December 20, 2004, announcement.

Generally, the Federal Rules of Civil Procedure require that a plaintiff in federal court give a short, plain statement of the claim sufficient to put the defendant on notice. See *Fed. R. Civ. P. 8(a)*. However, *Rule 9* imposes a particularized pleading requirement on a plaintiff alleging fraud or any claim premised on fraud. See *Fed. R. Civ. P. 9(b)* (in actions alleging fraud, "the circumstances constituting fraud or mistake shall be stated with particularity").

Under *Rule 9(b)*, the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, [*11] and in some cases, the identity of the person engaged in the fraud. *Decker v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.), 42 F.3d 1541, 1547-49 (9th Cir. 1994)*. Because the plaintiff must set forth what is false or misleading about a particular statement, he must do more than simply allege the neutral facts necessary to identify the transaction; he must also explain why the disputed statement was untrue or misleading at the time it was made. *Yourish v. California Amplifier, 191 F.3d 983, 992-93 (9th Cir. 1999)*.

This case is also controlled by the provisions of the Private Securities Litigation Reform Act ("PSLRA"), which was enacted by Congress in 1995 to establish uniform and stringent pleading requirements for securities fraud actions, and "to put an end to the practice of pleading fraud by hindsight." *In re Silicon Graphics, 183 F.3d at 985*. The PSLRA heightened the pleading requirements in private securities fraud litigation by requiring that the complaint plead both falsity and scienter with particularity. *In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084 (9th Cir. 2002)*; see also *In re Daou Sys., 411 F.3d at 1014.* [*12] If the complaint does not satisfy these pleading requirements, the court, upon motion of the defendant, must dismiss the complaint. *15 U.S.C. § 78u-4(b)(3)(A)*.

1. Falsity

Defendants argue that the CAC does not adequately allege falsity because it does not plead facts showing that the alleged false statements were false when made. Under the PSLRA -- whether alleging that a defendant "made an untrue statement of a material fact" or alleging that a defendant "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading" -- the complaint must specify each statement alleged to have been false or misleading, specify the reason or reasons why each such statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, state with particularity all facts on which that belief is formed. *15 U.S.C. § 78u-4(b)(1)*.

Plaintiffs allege that defendants made false and misleading statements concerning SST's sales prices, inventory values, and accounting controls during the class period, in connection with the [*13] release of SST's quarterly financial returns for the first, second, and third quarters of fiscal year 2004, as follows: On April 21, 2004, the first day of the class period, SST stated in a press release that its inventory was worth $ 69.9 million as of the end of the first quarter of 2004. [1] On May 7, 2004, SST filed its Form 10-Q for 1Q 2004 with the SEC. The Form 10-Q, which was signed by Yeh and Lai, repeated the statement that SST's inventory was worth $ 69.9 million as of the end of 1Q 2004. The 10-Q also stated that the company's gross profit in the first quarter had been $ 38.1 million, that its net income had been $ 14.2 million, and that its total assets were $ 435 million. See CAC P 53.

> 1   The CAC alleges that Yeh also held a conference call on April 21, 2004, in which he stated that SST had experienced "firming" sales prices in the first quarter of 2004 and that the company expected SST's average selling prices to "continue to improve" in the second quarter. However, at the hearing, plaintiffs' counsel indicated that plaintiffs did not include this statement as one of the allegedly false and misleading statements.

[*14] On July 21, 2004, defendants allegedly announced in a press release that average selling prices were "firming" in 2Q 2004, and that the value of SST's inventory had increased from $ 69.9 million in 1Q 2004 to $ 91 million in 2Q 2004. On August 5, 2004, SST filed its Form 10-Q for 2Q 2004 with the SEC. The Form 10-Q, which was signed by Yeh and Lai, repeated the statement that the value of SST's inventory was $ 91

million as of the end of 2Q 2004. The 10-Q also stated that SST's gross profit in 2Q 2004 had been $ 48.7 million, that its net income had been $ 22 million, and that its total assets were $ 466 million. See CAC P 58.

On October 20, 2004, SST issued a press release announcing its results for 3Q 2004. The company stated that revenue had decreased to $ 112.2 and that average sales prices had declined by 7 per cent. It also stated that the value of SST's inventory was $ 138 million. In a conference call held the same day, Yeh allegedly stated that SST had no intention of writing down its inventory for the fourth quarter of 2004. On November 15, 2004, SST filed its Form 10-Q for 3Q 2004 with the SEC. The Form 10-Q, which was signed by Yeh and Lai, repeated the statements [*15] that revenue had decreased to $ 112.2 million, that average sales prices had declined by 7 per cent, and that SST's inventory was valued at $ 138 million. The 10-Q also stated that SST's gross profit in 3Q 2004 had been $ 39.5 million, that its net income had been $ 14.5 million, and that its total assets were $ 482.2 million. See CAC PP 67, 69, 73.

Plaintiffs allege that these statements were false and misleading because the value of SST's inventory was actually less than the amounts stated -- $ 69.9 million in 1Q 2004, $ 91 million in 2Q 2004, and $ 138 million in 3Q 2004 -- and that consequently, SST's gross profit, net income, and total assets were less than the amounts stated. CAC PP 54, 59, 70. They also assert that the statement that SST did not plan to write down its inventory in 4Q 2004 was false and misleading because defendants knew or should have known that the prices of flash memory manufactured by SST's competitors AMD and Intel had been declining during the first three quarters of 2004, that the value that was assigned to SST's flash memory was inflated, and that SST would soon have to write down the value of its inventory. CAC P 74.

In the present motion, defendants [*16] assert that the claim of fraud alleged in the CAC -- that defendants defrauded investors by not announcing the intended write-down earlier than they did -- was based solely on SST's announcement in December 2004 that it would take an inventory write-down due to changed market conditions, and provides a classic example of pleading "fraud by hindsight." Defendants contend that the CAC fails to allege falsity because it does not specify why, how, or by how much the inventory valuations allegedly exceeded the "correct" valuations; does not indicate what valuation might have been required at a given time; does not identify any product, or class of products or components in SST's inventory; provides no allegations as to the cost or market price at which any product or component was, or should have been, carried on SST's books; and alleges no contemporaneous facts demonstrating why the statements were false or misleading at the time they were made.

Defendants also argue that the CAC is deficient because it is largely pled on information and belief, but fails to include a statement of "all facts" on which that belief is based, in contravention of the requirements of the PSLRA. In addition, [*17] defendants assert that other than the allegations that Yeh made two statements in conference calls, and that Yeh and Lai signed SST's Form 10-Qs, the CAC does not allege that any particular defendant made any of the statements at issue.

In opposition, plaintiffs argue that the CAC adequately pleads falsity. They contend that the CAC identifies material misstatements relating to SST's flash memory inventory values in the first, second, and third quarters of 2004 (citing to CAC PP 53, 58, 67, 69, 73). They maintain that the CAC explains why these statements were false, based on contemporaneous facts -- including allegations that SST's inventory valuation system lacked sufficient controls to ensure accuracy, that defendants were told that this system was overstating value, that defendants stated that market prices were rising or stabilizing at a time that such prices were in fact plummeting, and that defendants made these statements without also disclosing that their inventory valuation process was "completely arbitrary."

Plaintiffs also point to SST's 2004 Form 10-K, filed with the SEC on March 31, 2005, in which both SST and its outside auditors stated,

> As of December 31, 2004, [SST] [*18] did not maintain effective controls over accounting for and review of the valuation of inventory, the income tax provision and related balance sheet accounts and licensing revenue because [SST] lacked a sufficient complement of personnel and a level of accounting expertise that is commensurate with [SST's] financial reporting requirements. Specifically,

> [SST] lacked sufficient controls over the write down of inventory to the lower of cost or market, accounting for complex licensing contracts with multiple elements, and processes and procedures related to the determination and review of the quarterly and annual tax provisions in accordance with generally acceptable accounting principles in the United States. . . . [T]his deficiency could result in a material missatement to the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, that this control deficiency constitutes a material weakness.

Plaintiffs assert that there is no requirement that the CAC specify SST's sales prices or inventory valuations on a product-by-product basis. They claim that the cases cited by defendants say only that such information is but one way [*19] to establish falsity. They argue that when contemporaneous facts are cited with sufficient specificity to demonstrate that the statements at issue were false, it is not necessary to also include details about specific products in the inventory valuation.

The court finds that the CAC fails to allege falsity with particularity as required by the PSLRA and *Rule 9(b)*. While plaintiffs have identified each statement alleged to be false or misleading, they have not stated with particularity why each statement was false at the time it was made.

Plaintiffs allege that the statements about SST's inventory were false because the market price for various types of flash memory was declining during the period between April and December 2004. Plaintiffs assert that from March 2004 through April 21, 2004, the price for which AMD was selling one type of 32-megabyte flash memory, which competed with products sold by SST, steadily declined from $ 12.50 to just over $ 10.00, while another type of AMD's 32-megabyte flash memory declined from $ 16.50 to under $ 8.00. During the same period, the price of one type of 32-megabyte flash memory sold by Intel, which competed with products sold by SST, steadily [*20] declined from $ 21.50 to under $ 15.00.

Plaintiffs allege further that the average sales price of flash memory fell for every week during the period June 13, 2004, through July 31, 2004, and continued to fall for every week thereafter until at least August 31, 2004. Plaintiffs assert that defendants knew or should have known that the prices of various types of flash memory sold by AMD and Intel, which competed with products sold by SST, from April through July 2004 -- specifically, that the price for which AMD was selling one type of 4-megabyte flash memory declined from $ 1.50 to less than $ 1.35; the price of one type of AMD's 8-megabyte flash memory declined from $ 3.38 to $ 1.75; the price of two types of AMD's 16-megabyte flash memory declined from around $ 3.75 to around $ 2.75; and the price of one type of 32 -- megabyte flash memory sold by Intel steadily declined from over $ 19.00 to under $ 7.50.

Finally, plaintiffs allege that the prices of flash memory sold by AMD and Intel, which competed with products sold by SST, declined from April through October 2004 -- specifically, that the price for which AMD was selling one type of 1-megabyte flash memory declined from $ 1.63 [*21] to under $ 1.00; the price of one type of AMD's 4-megabyte flash memory declined from $ 1.50 to $ 1.15; the price of one type of AMD's 8-megabyte flash memory declined from $ 3.38 to $ 1.50; the price of two types of AMD's 16-megabyte flash memory declined from over $ 3.75 to under $ 2.48; the price of one type of AMD's 32 -- megabyte flash memory declined from over $ 10.00 to less than $ 5.00. Plaintiffs also assert that when Intel announced its 3Q 2004 results on October 12, 2004, the company indicated that because flash memory sales prices had fallen, and there was no reason to believe they would increase, it would write down the value of its flash memory inventory. See CAC P 72.

However, the CAC states no facts regarding comparable products in SST's inventory or the cost or market price of those products. [2] Nor does the CAC state the reasons that the values stated at the time of the quarterly reports for 1Q 2004, 2Q 2004, and 3Q 2004 were inaccurate. For example, the CAC contains no allegations of contemporaneous conditions or statements by defendants that contradict SST's statements regarding inventory valuations, and identifies no internal report that contradicts the valuations [*22] or suggests that they might be fraudulent.

> 2  Stating the cost or market value of the products in SST's inventory would be one way -- though

Case 5:07-cv-03444-JF   Document 52-5   Filed 12/17/2007   Page 7 of 18

Page 7
2006 U.S. Dist. LEXIS 14790, *22

not the only way -- to allege contemporaneous facts showing that the statements regarding inventory valuation were false when made.

Plaintiffs simply allege, in essence, that because SST wrote down its inventory in December 2004, the statements about inventory made prior to that time must have been false because the inventory turned out not to be worth what SST had previously said it was worth. This is, as defendants argue, a classic example of pleading fraud by hindsight -- a type of pleading that the PLSRA was specifically enacted to eliminate.

The allegations in the CAC regarding the decline in prices for flash memory produced by AMD and Intel do not support the claim that defendants made false statements regarding SST's financial results during the first three quarters of 2004, for the reason that the SST documents referenced in the CAC indicate that most of the inventory [*23] charge was taken on SST's 8-megabit and 16-megabit flash memory, while the AMD and Intel products at issue were 4-megabyte, 8-megabyte, 16-megabyte, and 32-megabyte flash memory. Thus, the AMD and Intel flash memory was not, as the CAC alleges, a type of flash memory that "competed with" products sold by SST. [3]

> 3 Moreover, the October 12, 2004, Intel earnings release cited in CAC P 65, a copy of which is attached to defendants' Supplemental Request for Judicial Notice, says nothing about flash memory prices, about any decline in such prices, or about any inventory write-down pertaining to flash memory products.

The allegations in the CAC that SST's inventory valuation system lacked sufficient controls to ensure accuracy and that its inventory valuation process was "completely arbitrary," and that defendants were told that this system was overstating value, are based on two sources -- first, on information allegedly obtained by plaintiffs from their "confidential informants," and second, on a statement in SST's 2004 Form 10-K [*24] that SST had not maintained effective controls over accounting for and review of the valuation of inventory, and a statement by SST to the same effect in the same Form 10-K.

The allegations relating to information obtained from plaintiffs' confidential informants do not plead particularized facts showing that the statements regarding the value of SST's inventory were false when made because, as explained more fully below in the discussion of scienter, the informants were not employed at SST during the proposed class period, and because the CAC does not allege particularized facts indicating that the informants had personal knowledge regarding the truth or falsity of the statements made in 2004 regarding the valuation of SST's inventory. See *In re Daou Sys., 411 F.3d at 1015*. Under the PSLRA, "the complaint must contain allegations of specific contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin, 253 F.3d 423, 432 (9th Cir. 2001)*. The allegations relating to information obtained from the confidential informants does not meet [*25] this standard.

The statements concerning internal controls made by SST and SST's external auditors PricewaterhouseCoopers in SST's 2004 10-K do not support plaintiffs' claim that defendants made materially false statements during the proposed class period. First, as defendants note, this same boilerplate language is used in internal control review reports filed by numerous other technology companies, as such review is mandated by Section 404 of Sarbanes-Oxley. In the present case, SST and its auditors used what appears to be standard phrasing, noting that in the future, the control deficiency "could" result in a material misstatement to the company's financial statements. This is not a contemporaneous fact that shows that the statements about SST's inventory valuation were false when made in connection with the release of financial results for the first three quarters of 2004. Moreover, SST's auditor PricewatershouseCoopers issued an unqualified audit opinion, identified no errors in the interim financials, and did not require SST to restate any of the quarters prior to 4Q 2004.

2. Scienter

Defendants argue that the CAC should be dismissed because it fails to plead particularized [*26] facts that strongly suggest actual intent to deceive, manipulate, or defraud. Under the PSLRA, whether alleging that a defendant "made an untrue statement of material fact" or alleging that a defendant "omitted to state a material fact," the complaint must, with respect to each alleged act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*; see also

*In re Vantive, 283 F.3d at 1084*. By requiring particularized, detailed allegations showing a strong inference of scienter, the PSLRA was intended to "eliminate abusive and opportunistic securities litigation." *Gompper, 298 F.3d at 897*.

In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness." *In re Silicon Graphics, 183 F.3d at 979*. Mere motive and opportunity are not sufficient. Id. Recklessness satisfies scienter under § 10(b) "only . . . to the extent that it reflects some degree of intentional or conscious misconduct." *Id. at 977*. In assessing whether plaintiffs have sufficiently pled scienter, [*27] the court should consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003)* (citation and quotation omitted); see also *Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 948-49 (9th Cir. 2005)* (district court should evaluate scienter based on "totality of the allegations").

On a *Rule 12(b)(6)* motion to dismiss a complaint brought under the PSLRA, when considering whether plaintiffs have shown a strong inference of scienter, the district court must also consider "all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper, 298 F.3d at 897* (noting the "inevitable tension . . . between the customary latitude granted the plaintiff on a [12(b)(6)] motion to dismiss . . . and the heightened pleading standard set forth under the PSLRA). In other words, the court must consider all the allegations in their entirety [*28] in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter. Id.

Plaintiffs assert that the "totality of the allegations" set forth in the CAC establish that defendants knowingly overvalued SST's inventory. First, plaintiffs contend that the allegations in the CAC regarding information obtained from six informants establish scienter because those allegations show the personal involvement and "hands-on" management of the individual defendants. Second, plaintiffs argue that the CAC pleads facts showing that defendants knew, or had access to facts that should have made them aware, that the price of flash memory was declining in the industry generally, and that the value assigned to flash memory in SST's inventory should therefore have been reduced. Third, plaintiffs assert that scienter is shown by allegations of defendants' motive to keep the price of SST's stock high, reflected in insider sales of stock during the class period, the SST board of directors' authorization of a stock repurchase program in July 2004, and SST's acquisition of another company in October 2004. Finally, plaintiffs argue that defendants' scienter is also shown by the [*29] allegations that defendants violated Generally Accepted Accounting Principles (GAAP) and various unspecified SEC regulations, regulations of national stock exchanges, and customary business practices.

a. confidential informants

The CAC alleges that the information provided by five confidential informants, and a sixth identified informant, shows the individual defendants' personal involvement in, and "hands-on" management of, SST's business. In pleading fraud under the PSLRA, plaintiffs may rely on anonymous sources for information, so long as they plead "corroborating details" when allegations are based on non-public information. *In re Silicon Graphics, 183 F.3d at 985*; see also *In re Seebeyond Techs. Corp. Secs. Litig., 266 F. Supp. 2d 1150, 1159 (C.D. Cal. 2003)*. "[P]ersonal sources of information relied upon in a complaint should be described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1233 (9th Cir. 2004)* (quoting *Novak v. Kasaks, 216 F.3d 300, 314 (2nd Cir. 2000))*. [*30] When plaintiffs rely on facts beyond the information provided by the confidential witnesses, they need not name their sources as long as the additional facts provide an adequate basis for believing that the defendants' statements were false. Id.

Defendants argue that the information provided by the six informants adds nothing to support the claims in the CAC, because no informant worked at SST during the class period, because the informants were all low-level employees far removed from management decisions, and because the informants report guesses, opinions, and suppositions instead of facts. Defendants also contend that plaintiffs fail to allege particularized facts showing that each individual source occupied a position such that he or she would possess the information alleged.

Plaintiffs respond that the proposed class period simply functions to define the plaintiff class, but does not restrict the universe of relevant or actionable facts in the case. They contend that while scienter itself must always be contemporaneous with the alleged misstatements, the facts supporting an inference of scienter will not always be. In other words, plaintiffs argue that the fact that none [*31] of the informants worked at SST during the proposed class period is not significant, because pre-class period awareness of events can be relevant to show awareness of certain facts and therefore to demonstrate scienter.

The court finds that the allegations regarding the six informants do not create a strong inference that defendants acted with deliberate or conscious recklessness with regard to the alleged false statements concerning SST's inventory valuations and financial performance during the first three quarters of 2004. The court first notes three ways in which the allegations are generally insufficient.

First, the CAC fails to plead with particularity that each individual informant occupied a position such that he or she would possess the information alleged, and the allegations regarding such information are therefore insufficiently reliable.

Second, none of the six informants was employed at SST during the proposed class period; and the only one of the six who worked at the company at all in 2004 admittedly did not know what SST was reporting as inventory. Thus, none of the informants was in a position to know whether defendants overstated the value of SST's inventory when [*32] the company's financial results were reported for the first three quarters of 2004. The statements regarding events that occurred during the period 2000 through 2003 cannot substitute for the required particularized showing of scienter in 2004.

While it is true that facts relating to pre-class period events may in certain circumstances contribute to the creation of an inference of scienter, see, e.g., *Zelman v. JDS Uniphase Corp., 376 F.Supp. 2d 956, 970 (N.D. Cal. 2005)*, there must be some connection between that scienter and the earlier events. Here, the issue is not pre-class period statements made by defendants, which can be said to create a strong inference of scienter in connection with false or misleading statements made during the class period, but rather a number of largely irrelevant statements by informants who were not present at SST at the time of the alleged misrepresentations, and who appear to have little information regarding either the valuation of the inventory or the defendants' alleged "scheme" to misstate the value of the inventory. The information provided by these informants concerns events that predated and had no apparent connection with [*33] the alleged misstatements regarding the valuation of SST's inventory.

Finally, the CAC alleges that one of the informants provided at least two of the defendants with "excess inventory reports," and that at least two of the informants attended "meetings" at which the participants discussed issues relating to the amount and type of products held in inventory, and to the valuation of inventory. These allegations are insufficient in light of the Ninth Circuit's decisions in *In re Silicon Graphics*, *In re Vantive*, and *In re Daou Sys.*,

In In re Silicon Graphics, the court rejected the plaintiff's attempt to establish scienter through general allegations that the defendants had received internal reports, including daily reports, monthly financial reports, "Stop Ship" reports, and "Flash Reports." *Id. at 984-98 & n. 14*. The court held a plaintiff can rely on the existence of reports as a means of establishing knowledge only if the complaint includes "adequate corroborating details" -- such as plaintiffs sources of information with respect to the reports, how the plaintiff learned of the reports, who drafted the reports, and which officers at the company received [*34] them, in addition to "an adequate description of their contents." *Id. at 985*.

In In re Vantive, the plaintiffs attempted to establish such scienter by adverting to the defendants' "hands-on" management style, their "interaction with other corporate officers and employees, their attendance at management and board meetings, and reports generated on a weekly and monthly basis. Relying on In re Silicon Graphics, the Ninth Circuit held that such allegations did not adequately establish that the defendants had knowledge of the supposedly "true but concealed" circumstances. *In re Vantive, 283 F.3d at 1087-88*.

As in Silicon Graphics and In re Vantive, plaintiffs in the present case have failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports. The allegations are similarly deficient, for the same reasons, with respect to the defendants' attendance at meetings and their "hands-on" managerial style. See also *In re Daou*

*Sys.*, 411 F.3d at 1022.

The court will now discuss each of the informants. Plaintiffs identify Confidential Informant No. [*35] 1 (CI # 1) as a "business control analyst" employed at SST from February 2000 through April 2004, who was "part of a team that monitored inventory on a daily basis." According to CI # 1, SST had "a poor and unreliable system in place for managing and monitoring inventory." He/she asserts that defendants Yeh, Hu, and Tsai [4] "called the shots" and micro-managed the system, including issues related to inventory valuation, and that Hu created his own databases and spreadsheets to track and value inventory on a daily basis, even though SST kept track of inventory in a separate software application. With regard to inventory, this informant believed that "whatever it was that the company was reporting was way off the mark" (emphasis added). He/she indicated that SST continued to manufacture large amounts of flash memory, even though there were "no buyers" because the company's officers and directors feared the company would lose its manufacturing vendors to competitors if they slowed down their production lines. CAC P 46-47

> [4] The CAC does not assert a claim against a defendant "Tsai."

[*36] The CAC provides only a sketchy description of CI # 1's job duties, claiming that he/she was "part of a team that monitored inventory on a daily basis." However, plaintiffs do not identify the other members of this "team," and, more significantly, do not explain what they mean by "monitored inventory." Such a job description could include anything from counting widgets in a box, to moving inventory from place to place, in a warehouse, to filling customer orders, to preparing spread sheets showing the types and amount of product in inventory. It is apparent from the allegations that CI # 1 had no personal knowledge of what SST was reporting as inventory, but the CAC does not even provide particularized detail sufficient to show what this informant knew with regard to inventory management.

Moreover, in view of CI # 1's claim that SST had a "poor and unreliable system in place for managing and monitoring inventory," it is difficult to see how any job relating to monitoring inventory would have provided CI # 1 with knowledge of facts creating a strong inference that defendants acted with deliberate or conscious recklessness. It is also not clear how Yeh, Hu, and Tsai could have "micro-managed" [*37] a "poor and unreliable" system. Finally, plaintiffs provide no basis for CI # 1's opinion that SST continued to manufacture large amounts of flash memory, despite the alleged absence of buyers, because "officials" feared that SST would otherwise lose its manufacturing vendors to competitors. Plaintiffs do not explain how CI # 1 learned about the alleged fears of these officials, or even who the officials were.

Plaintiffs identify Confidential Informant No. 2 (CI # 2) as an "inventory control analyst" employed at SST from February 2000 through August 2002. CI # 2 reported to the director of manufacturing systems, and was responsible for receiving inventory shipments, tracking inventory locations, and ensuring that the actual products in inventory matched those identified in SST's databases. According to CI # 2, the Finance Department at SST was excluded from the inventory valuation process. Instead, "the vice presidents of the individual units (and in particular [d]efendant Hu)," made the inventory valuation decisions. CI # 2 claimed that these valuations were made "regardless of actual price" and that the overall valuation process was "arbitrary, with only some relation to reality. [*38] " In this informant's opinion, the defendants were "unwilling to decrease the value assigned to inventory" because doing so would be an admission of their own "engineering mistakes" or "business errors." He/she considered it was a "pride issue" -- that defendants created a culture of "hear-no-evil-see-no-evil." CAC P 48.

The CAC provides some description of CI # 2's duties, although in vague terminology ("receiving shipments," "tracking inventory location") suggesting that CI # 2 functioned more as a warehouse or manufacturing plant clerk than as an employee with some personal knowledge of inventory valuation. However, this informant left SST in August 2002, and the CAC alleges no facts showing a basis for any personal knowledge regarding the valuation of inventory during the proposed class period. In particular, the CAC provides no connection between CI # 2's assertion that the inventory valuation process was "arbitrary" between February 2000 and August 2002, and plaintiffs claims that defendants knowingly misrepresented the value of SST's inventory during the period between April and December 2004.

CI # 2's statement that the Finance Department was excluded from the valuation process [*39] is

contradicted by CI # 4's statement that former CFO Jeff Garon ("Garon") was involved in the decisions regarding valuation, and is further contradicted by the allegation in the CAC that defendant Lai, CFO during the proposed class period, was a participant in the alleged fraudulent misstatement of inventory values. In addition, CI # 2's claim that the valuations were made by "the vice presidents of the individual business units" and "in particular [d]efendant Hu" does not provide sufficient detail regarding who actually made the valuation decisions, how CI # 2 knows who made the decisions, or how he/she knows that the decisions were made "regardless of actual price." Finally, plaintiffs provide no basis for CI # 2's opinion that defendants would not decrease the value assigned to inventory because they were unwilling to admit their own engineering mistakes or business errors. Indeed, the CAC states no facts showing that CI # 2 was qualified to psychoanalyze defendants' motivations with regard to inventory valuation.

Plaintiffs identify Confidential Informant No. 3 (CI # 3) as an individual employed at SST from 2000 through June 2003, who was also employed as a "production control [*40] manager" from 1997 through 2000. [5] At SST, CI # 3 was responsible for "tracking shipments and inventory." He/she is "certain" that "the vice presidents" were intimately aware of the amount and type of products held in inventory because he "participated in" twice-monthly meetings with "these individuals" concerning this subject. CAC P 49.

> 5   It is not clear from the CAC whether CI # 3 worked at SSI during the entire period from 1997 through 2003, or whether he/she was a production control manager at some other company during the period 1997 through 2000, and began working at SST in 2000.

Plaintiffs describe this informant's duties only briefly, without any indication of what is meant by "production control" or "tracking shipments and inventory." From plaintiffs' description, it is impossible to tell whether CI # 3 was employed, for example, as an inventory clerk, entering data regarding products placed in inventory and shipped out to customers; or as a shipping or mailroom clerk, simply packaging products removed [*41] from inventory and shipping them to customers; or in some other capacity. Thus, it is impossible to tell whether this informant has any relevant personal knowledge.

Moreover, CI # 3 left his/her employment at SST in June 2003, and the CAC states no facts showing a basis for any personal knowledge regarding the valuation of inventory during the proposed class period. In addition, the allegations regarding CI # 3's participation in meetings with "vice-presidents" lack sufficient particularized detail to provide a basis for attributing to CI # 3 any personal knowledge regarding inventory or inventory valuation. The CAC does not provide the dates of the meetings, or identify the attendees or the substance of the matters discussed. Nor does the CAC identify the "vice-presidents" whom CI # 3 believed were "aware" of the amount and type of products held in inventory, or provide any facts showing a basis for CI # 3's belief that these individuals had this knowledge.

Plaintiffs identify Confidential Informant No. 4 (CI # 4) as a "controller" employed at SST from October 1995 through April 2003. This informant worked directly for Garon, the then-CFO. CI # 4 is "certain" that defendant Yeh [*42] and defendant Hu reviewed and monitored the inventory numbers "very, very carefully" and that defendant Hu and "defendant Garon" (actually not a defendant) were responsible for "the final decision about what value to place on products held in inventory." CI # 4 "participated in" monthly and quarterly meetings where inventory valuation "was discussed" with Yeh, Garon, Hu, and defendant Best, plus "a former cost accountant" and "business unit managers," and claims that participants in these meetings would "go back and forth and argue" over whether certain products held in inventory were sellable, and if so, for what amount of money. According to this informant, there were a "ton of red flags" where inventory was concerned, as warnings were frequently raised within the company that products held in inventory were out-of-date or overvalued. CAC P 50.

Plaintiffs do not describe this informant's job duties, simply stating that he/she was a "controller" who worked with SST's former CFO. From this description, it is impossible to tell whether CI # 4 had a basis for personal knowledge of the facts alleged. Moreover, CI # 4 left his/her employment at SST in April 2003, and the CAC alleges no [*43] facts showing any basis for personal knowledge regarding the valuation of inventory during the proposed class period. Nor does the CAC provide any particularized facts showing that CI # 4 had any basis for

Case 5:07-cv-03444-JF   Document 52-5   Filed 12/17/2007   Page 12 of 18

Page 12
2006 U.S. Dist. LEXIS 14790, *43

the opinion that defendants Yeh and Hu reviewed and monitored the inventory numbers "very, very carefully" or that Hu and CFO Garon were responsible for decisions regarding inventory valuation. The CAC asserts that CI # 4 participated in monthly and quarterly meetings in which inventory valuation was discussed, but does not provide the dates of any meetings, or identify the attendees (apart from Yeh, Garon, Best, and Hu) or any details of the matters discussed, or of the alleged arguments among the meeting participants regarding inventory valuation.

Plaintiffs identify Confidential Informant No. 5 as employed at SST "through 2003" (no indication of starting date) as an operations analyst, responsible for "tracking and locating excess inventory." In CI # 5's opinion, SST "often manufactured excess products" because the executives wanted to build up inventory, not because there was any actual market demand for those products. He/she recalled that the operations department repeatedly [*44] told upper management that products held in inventory were "not moving." He/she claims to have provided Yeh and Best with excess inventory reports that included recommendations concerning the likelihood that products held in inventory could actually be sold. CAC P 51.

Plaintiffs describe this informant's duties only briefly, without any indication of what is meant by "tracking and locating excess inventory." Moreover, CI # 5 left his/her employment at SST at the end of 2003, and the CAC alleges no facts showing any basis for personal knowledge regarding events that occurred during the proposed class period. CI # 5 refers to "excess inventory reports" that he/she allegedly provided to Yeh and Best, but the CAC provides no details regarding the author of the reports, or the dates or contents of the reports, other than as stated above. In addition, plaintiffs provide no particularized facts showing that CI # 5 had any basis for his/her opinion that SST manufactured excess products because SST's "executives" wanted to build up inventory. With regard to the claim that the "operations department" repeatedly communicated to "upper management" that products in inventory could not be sold, [*45] the CAC does not provide any details regarding the identity of the employees in the operations department, the identity of the individuals in upper management, the dates of these alleged communications, or any details concerning the inventory at issue.

Informant Brian Thiemer was employed at SST from 2001 through 2003 as a "quality assurance engineer" in the company's "inventory control" department. He was responsible for "a variety of issues related to the [c]ompany's inventory, including inventory valuation." He claimed that he regularly informed his manager Andy Arata (then-director of quality assurance) and unidentified "senior management" that the company needed to decrease the value it was placing on its inventory because such values did not reflect actual market prices. He believed that "some inventory" was obsolete and worth only 10% to 20% of its accounted-for value. He indicated that his recommendations were consistently and systematically ignored and rejected by "senior management" and/or Arata, and that his frustration concerning the company's unwillingness to accurately and truthfully value its inventory led him to quit SST in 2004. CAC P 52.

Plaintiffs describe Thiemer's [*46] job duties only briefly, stating only that he was responsible for a "variety of issues" related to inventory, including inventory valuation. However, plaintiffs do not explain Thiemer's role in the valuation of inventory, or provide any particularized facts that would provide a basis for creating a strong inference that defendants acted with deliberate indifference. Moreover, Thiemer left his employment at SST at the end of 2003, and the CAC alleges no facts showing any basis for personal knowledge regarding inventory valuation during the proposed class period.

Thiemer claims to have "regularly" communicated to his manager and unidentified "senior management" that SST's inventory was overvalued, but as with CI # 5, the CAC does not provide the dates of these alleged communications, or any details concerning the inventory at issue. In addition, there is no indication as to who is meant by "senior management." Thiemer also claims that "some inventory" was obsolete, but plaintiffs provide no detail about this allegedly obsolete product -- not the type, the quantity, or the value.

The allegations regarding these confidential informants do not, as plaintiffs contend, show defendants' [*47] personal involvement in, and "hands-on" management of, inventory valuation or any other particular aspect of SST's business, and do not plead the particularized facts required to show scienter under the PSLRA.

b. knowledge of general decline in prices of flash

Case 5:07-cv-03444-JF   Document 52-5   Filed 12/17/2007   Page 13 of 18

Page 13
2006 U.S. Dist. LEXIS 14790, *47

memory

Plaintiffs contend that defendants' knowledge that SST's inventory should have been written down earlier than it was is shown by the fact that they knew, or should have been aware, that the selling prices of flash memory were declining in the industry during the class period. With regard to 1Q 2004, the CAC asserts that defendants knew or should have been aware that from March 2004 through April 21, 2004, the selling prices of AMD's and Intel's 32-megabyte flash memory had declined. The CAC also alleges that defendants knew or should have known that Forbes reported on May 24, 2004, that the prices of flash memory had declined because manufacturers such as Intel and Samsung were offering price reductions in order to win customers; and that CBS News reported on June 3, 2004, that while Intel's flash memory sales had suffered in 2003, its sales were increasing in 2004 and Intel was winning market share. See [*48] CAC P 56.

With regard to 2Q 2004, the CAC asserts that defendants knew or should have been aware that the average sales price of various types of flash memory sold by AMD and Intel fell for every week during the period June 13, 2004, through July 31, 2004, and continued to fall thereafter until at least August 31, 2004. Plaintiffs also claim that defendants knew or should have known that financial analyst WR Hambrecht reported on June 8, 2004, that flash memory prices in 2Q 2004 were 5 per cent lower than they had been in 1Q 2004 and were likely to continue to decline in 3Q 2004. Plaintiffs assert that in response to competition in the flash memory market, SST was forced, by July 2004, to lower its prices on some types of flash memory by as much as 4 per cent. See CAC P 61.

With regard to 3Q 2004, the CAC asserts that defendants knew or should have been aware that the price of various types of flash memory sold by AMD was declining, and that the value assigned to flash memory in SST's inventory should therefore have been reduced. Plaintiffs also allege that defendants knew or should have known that when Intel announced its 3Q 2004 results on October 12, 2004, it also indicated [*49] that because flash memory sales prices had fallen, and there was no reason to believe they would increase, it would write down the value of its flash memory inventory. See CAC P 72.

Defendants argue that this market pricing information is irrelevant, as the details do not concern SST products or prices, and do not even involve products that competed with the 8-megabit SST products that were the focus of the write-down. They also assert that the October 12, 2004, Intel earnings release cited in the CAC says nothing whatsoever about flash memory prices or any purported decline in prices, or any inventory write-down pertaining to flash memory prices, but rather reports an inventory write-down as a result of "lower chipset unit costs," having nothing to do with the selling prices of flash memory.

The court finds that the allegations regarding a decline in prices for AMD and Intel flash memory do not create a strong inference of scienter. The CAC does not plead particularized facts showing that defendants did in fact know these details of industry prices, news reports, and financial analysts' reports. Moreover, as previously indicated, the flash memory produced by AMD and Intel did [*50] not have the same capacity as the flash memory produced by SST, and the products therefore were not competitive. The CAC does not explain the relevance of a drop in price of 8-megabyte, 16-megabyte, and 32-megabyte flash memory to the valuation of SST's inventory of 8-megabit flash memory.

c. motive to inflate price of stock

The CAC alleges that defendants' scienter is shown by their motive to inflate the price of SST's stock, and that this motive is shown by defendants' insider trading, by SST's announcement of a stock repurchase in July 2004, and by SST's announcement of its acquisition of another company in October 2004. In the Ninth Circuit, motive and opportunity, standing alone, are not sufficient to establish scienter. See *In re Silicon Graphics, 183 F.3d at 974* (facts that indicate a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, but they are not sufficient to establish a strong inference of deliberate recklessness). However, motive can be considered as part of the "totality of the allegations" regarding scienter.

i. insider trading

The CAC alleges that defendants motive to keep price of stock high, as shown [*51] by insider sales of stock, by Nojima on June 2, 2004, on November 17, 2004, and on December 8, 2004; by Best on August 12, 2004; and by Chikagami on December 14, 15, and 16, 2004. Plaintiffs assert that the timing of the November

and December 2004 stock sales was suspicious in view of the fact that the company announced on December 20, 2004, that it expected to take a $ 20-$ 25 million inventory charge and write down the value of certain products held in inventory to their estimated market value, and that the gross margin for 4Q 2004 was expected to be in the range of 1% to 3%, compared with previous estimates of between 25% and 32%.

The PSLRA "neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence meet the strong inference' standard." *In re Daou Sys., 411 F.3d at 1022* (citation and quotation omitted). Stock trades are only suspicious when "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics, 183 F.3d at 986*. To evaluate suspiciousness of stock sales, the court should consider [*52] the amount and percentage of shares sold, the timing of the sales, and whether the sales were consistent with prior trading history. *Nursing Home, 380 F.3d at 1232*.

Here, it appears that most of SST's officers and directors sold no stock during the proposed class period, and that just as many insiders purchased stock as sold. Yeh and Lai -- the only defendants specifically alleged to have made false or misleading statements are not alleged to have sold any stock. Best sold no shares, but rather transferred some previously pledged stock as collateral for a loan. Lai and Hu purchased -- not sold -- stock during the class period. Collectively, defendants sold less than 2% of their total holdings, and SST itself purchased $ 15 million worth of its own stock during the class period, at prices plaintiffs allege were inflated by its own fraud.

Only Nojima and Chikagami sold stock. Nojima's sales were not out of the ordinary, as those sales were consistent with his trading pattern and sales for the preceding seven years. Although Nojima sold no shares in 2003, he did sell shares every other year starting in 1998, as shown by his Form 4s filed with the SEC. Thus, Nojima's [*53] sales are insufficient to create a strong inference of scienter.

Foreign-based outside director Chikagami, who is not alleged to have personally made any false statement, did sell a substantial amount of his holdings (total of 66%), and he is the only officer or director whose stock sales are even marginally suspicious under the *Silicon Graphics* standard. However, in view of the fact that he owned a relatively small number of shares compared with the officers of the company, the fact that he did not sell all his shares, the fact that no one else's sales appear suspicious, and the fact that other insiders actually purchased shares during the proposed class period, the court finds that Chikagami's sales are insufficient to creating a strong inference of scienter.

Moreover, even if the court were to find that the timing or amount of the stock sales was suspicious, "stock sales are helpful only in demonstrating that certain statements were misleading and made with knowledge or deliberate recklessness when those sales are able to be related to the challenged statements." *In re Vantive Corp., 283 F.3d at 1093*. Because the CAC fails to plead particularized facts showing [*54] that defendants made false or misleading statements, such "insufficient allegations of fraud . . . have a spillover effect" on an analysis of insider sales. Id.

ii. SST's stock repurchase

The CAC alleges that defendants' motive to keep the price of SST's stock high is also shown by the announcement on July 29, 2004, that SST's board of directors had authorized a stock repurchase program of up to $ 15 million worth of the company's common stock. The CAC does not explain how either this announcement or the repurchase program creates a strong inference of scienter.

iii. SST's acquisition of G-Plus

The CAC alleges that defendants' motive to keep the price of SST's stock high is further shown by the announcement on October 18, 2004, that SST had signed an agreement to acquire substantially all the assets of privately-owned G-Plus, Inc., pursuant to which SST agreed to issue approximately $ 26 million in SST stock to G-Plus. The deal closed on November 5, 2004. Plaintiffs claim that it was in the interest of the company to keep its share price higher in order to facilitate this stock-financed transaction.

Allegations that defendants engaged in routine business activities or were [*55] motivated by concerns that are shared by all companies and executives is not sufficient to establish scienter. See *Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1038 (9th Cir. 2002)* ("[i]f scienter could be pleaded merely by alleging that

officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"). SST's acquisition of G-Plus is an example of the type of routine activity and generic motive that cannot serve as a basis for alleging securities fraud.

The fact of this merger or buy-out, standing alone, is insufficient to create a strong inference of scienter. Moreover, even if the court were to find that this acquisition provides some small support for an inference of fraud, the fact of the buy-out would have to be considered in the context of the fact that SST and several of its officers purchased millions of dollars of SST stock during the class period, at prices that plaintiffs claim were inflated by fraud.

### d. alleged violations of GAAP

The CAC alleges that defendants' scienter is shown [*56] by their violation of Generally Accepted Accounting Principles (GAAP) -- specifically, certain principles set forth in FASB Statement of Concepts Nos. 1 and 2 [6] -- and also by their violation of the requirements of unidentified "SEC regulations, regulations of the national stock exchanges and customary business practices" to disclose the sort of adverse information that was allegedly concealed by defendants during the class period.

> 6    As alleged in the CAC, these are (a) the principle that interim financial reporting should be based on the same accounting principles used to prepare annual financial statements; (b) the principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions; (c) the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources; (d) the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources trusted to it was violated; (e) the principle that reporting should provide information about an enterprise's financial performance during a period; (f) the principle that financial reporting should be reliable in that it represents what it purports to represent was violated; (g) the principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions; (h) the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. CAC P 94.

[*57] Violation of GAAP standards can provide evidence of scienter. *In re Daou Sys., 411 F.3d at 1016*. However, "[t]o support even a reasonable inference of scienter, much less a strong inference, the complaint must describe the violations with sufficient particularity: a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation." Id. (citations and quotations omitted). Put another way, simple allegations of failure to follow GAAP do not establish scienter, because scienter requires more than a misapplication of accounting principles. See, e.g., *In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir.1994))*. In order to distinguish "deliberate recklessness" from "ordinary carelessness," allegations of GAAP violations must be augmented by facts that shed light on the mental state of the defendants, rather than conclusory allegations that defendants must have known of the accounting failures because of the degree of departure from established accounting principles. See *DSAM, 288 F.3d at 390-91*.

The CAC alleges that "[i]n order [*58] to inflate the price of [SST] stock, [d]efendants intentionally and/or with deliberate recklessness overstated the value of flash memory held in inventory in violation of [GAAP]," and then simply proceeds to list a number of accounting principles that were allegedly violated by this overvaluation. CAC PP 91-94. However, the GAAP allegations contain no facts that shed light on the mental state of the defendants, and as the CAC fails generally to allege scienter, the allegations of GAAP violations contribute nothing. In order to plead facts showing a strong inference of fraud, plaintiffs must provide detail -- not merely, as here, simply recite various GAAP provisions and allege in general terms that the defendants failed to comply with them.

The CAC does not identify any transaction by name or date, does not specify any dollar amounts, does not identify any product or class or products that should have been written down sooner under these various accounting principles, does not state what the appropriate write-down would have been, or when it should have been taken, or why a write-down should have been taken in that amount at that time. Although the CAC refers to the GAAP provision [*59] requiring that inventory be carried on the balance sheet at the lower of "cost" or "market value," the CAC says nothing about either the cost or the market value of SST's inventory, and says nothing about how or when the defendants purportedly became aware of the allegedly improper accounting practices, but rather simply refers to general declines in market prices of flash memory products throughout the industry. [7]

> 7   Plaintiffs acknowledge that "GAAP, as set forth in Accounting Research Bulletin ('ARB') No. 43, Chapter 4, Inventory Pricing, requires that inventories be recorded at the lower of cost or market." CAC P 93. At the hearing, however, plaintiffs counsel conceded that plaintiffs were unable to provide any information regarding the cost or market value of SST's inventory. As explained above, that deficiency is one reason that plaintiffs' allegations of GAAP violations are insufficient to create a strong inference of scienter. That is not *to* say that plaintiffs would not theoretically be able to plead facts sufficient to create a strong inference of intent or deliberate recklessness in the absence of details regarding cost or market value, just that the facts as pled are not adequate to show GAAP violations as circumstantial evidence of scienter, under applicable Ninth Circuit authority. See, e.g., *DSAM, 288 F.3d at 390-91.*

[*60] In In re Daou Sys., the Ninth Circuit relied on the combination of "widespread and significant" inflation of revenue and "specific allegations of [top executives'] direct involvement in the production of false accounting statements" to find the complaint raised a strong inference of scienter. *In re Daou Sys., 411 F.3d at 1016, 1020, 1023*. By contrast, the CAC makes no specific allegations of defendants' direct involvement, and instead relies on their general involvement in the management of SST and their alleged knowledge that the inventory valuation was "arbitrary."

e. group pleading

As a final basis for dismissal, the court finds that the claims against the individual defendants fail because the CAC pleads no facts showing that any individual defendant made any statement with scienter. The CAC does not allege that defendants Hu, Chikagami, Nojima, or Best made any false statements at all, and does not plead facts sufficient to create a strong inference that defendants Yeh and Lai made false statements with scienter. As a defendant corporation can be deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement [*61] has the requisite level of scienter, the claims against SST also fail on this basis.

Plaintiffs contend that the CAC establishes the individual defendants' scienter regarding inventory valuation, citing to PP 46-52 of the CAC (the "confidential informant" allegations), where plaintiffs argue, they have alleged that Yeh, Lai, Hum Nojima, and Best were "participating in monthly and quarterly meetings in which inventory valuations were determined;" and where they have also alleged that defendants "excluded the finance department from the valuation process" and that Hu created his own database and spreadsheet to track and value inventory.

Plaintiffs assert that allegations of a "detail-oriented management style" make it reasonable to infer that the individual defendants became aware of the falsity of statements related to critical business functions. They note that Yeh and Lai signed the 10-Qs for 1Q 2004, 2Q 2004, and 3Q 2004, that Yeh made all false oral statements (referring to the October 20, 2004, conference call), and that the CAC alleges that the other defendants played active roles in the inventory valuation process. Thus, they argue, all defendants are therefore liable for the [*62] false statements regarding the inventory valuations under the group pleading doctrine, which holds that there is a presumption that allegedly false and misleading group published information is "the collective action of officers and directors."

The PSLRA requires, with regard to each false or misleading statement or material omission, that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)* (emphasis added). While the Ninth Circuit did rule in a pre-PSRLA case, *Wool v. Tandem Computers, Inc., 818*

*F.2d 1433 (9th Cir. 1987)*, that "it is reasonable to presume" that false or misleading information contained in prospectuses, registration statements, annual reports, press releases, or other "group-published information" can be attributed to the "collective actions of the officers" of the corporation, and that a securities fraud plaintiff "fulfills the particularity requirements of *Rule 9(b)* by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations," *id. at 1440,* [*63] the Ninth Circuit has not spoken in any officially published opinion on the question whether the "group pleading" doctrine applies to allegations of scienter in a case governed by the PSLRA. [8]

> 8   Other circuits have spoken on this issue, notably the Fifth Circuit in *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 364-65 (5th Cir. 2004)* (noting conflict among the courts, and holding that "[t]he group pleading' doctrine conflicts with the scienter requirement of the PSLRA"); see also *Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602-03 (7th Cir. 2006)*; *Phillips v. Scientific-Atlanta. Inc., 374 F.3d 1015, 1017-18 (11th Cir. 2004)*.

The court is aware that some judges in this district have either applied the group-published presumption without substantive analysis in cases controlled by the PSLRA, or have found that the presumption has survived the enactment of the PSLRA. See, e.g., *In re Omnivision Techs., Inc., 2005 U.S. Dist. LEXIS 16009, 2005 WL 1867717 at * 5 (N.D. Cal., July 29, 2005)* [*64] ; *In re Adaptive Broadband Sec. Litig., 2002 U.S. Dist. LEXIS 5887, 2002 WL 989478 at * 52-53 (N.D. Cal., April 2, 2002)*; *In re Secure Computing Corp. Sec. Litig., 120 F.Supp. 2d 810, 821 (N.D. Cal. 2000)*. Other judges, however, have concluded that plaintiffs must state with particularity facts indicating that an individual defendant was directly involved in the preparation of allegedly misleading statements published by an organization, and have found the group-published presumption inappropriate in light of the pleading standards imposed by the PSLRA. *See, e.g., In re Netopia, Inc., Sec. Litig., 2005 U.S. Dist. LEXIS 38823, 2005 WL 3445631 at * 5-6 (N.D. Cal., Dec. 15, 2005)*; *In re ESS Technology, Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 27203, 2004 WL 3030058 at * 12 (N.D. Cal. 2004)*. Until such time as the Ninth Circuit does speak on this issue, this court interprets the above-cited provision of the PSLRA as requiring that plaintiffs plead facts showing scienter as to each defendant individually. In other words, plaintiffs must allege the required state of mind as to each defendant who made an allegedly misleading statement.

3. Loss Causation

Defendants argue that [*65] the CAC fails to plead loss causation, asserting that the boilerplate language in the CAC is substantially identical to the language found inadequate by the Supreme Court in *Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627, 1630, 161 L. Ed. 2d 577 (2005)*. The CAC alleges that the overvaluation of inventory and later disclosure of the lack of internal controls that led to the overvaluation caused a 22.5% decline in the price of SST's stock price. The court finds that the allegations in the CAC do meet the requirements of *Dura*.

4. Control Person Liability

Adequate pleading of a primary violation of *§ 10(b)* is required for a plaintiff to adequately plead control liability under *§ 20(a)*. See *15 U.S.C. § 78t*. Because the CAC fails to state a claim for primary liability under *§ 10(b)* or *Rule 10b-5*, the court finds that the claim for control person liability must be dismissed.

**CONCLUSION**

In accordance with the foregoing, the motion to dismiss the consolidated amended complaint is GRANTED, for failure to allege falsity with particularity, and for failure to allege scienter as to any defendant. The totality of plaintiffs' allegations are insufficient under [*66] the heightened pleading standard of the PSLRA to raise a strong inference that defendants acted with deliberate or conscious recklessness in issuing statements regarding the value of SST's inventory or in failing to disclose that SST lacked adequate internal controls to ensure that inventory was properly valued. The dismissal is WITH LEAVE TO AMEND, and any amended complaint shall be filed no later than April 14, 2006.

Notwithstanding the fact that the dismissal is with leave to amend, the court questions whether plaintiffs will be able to state a claim. The gravamen of plaintiffs' complaint as presented in the CAC is that SST mismanaged the valuation of its inventory, and then failed to disclose that mismanagement. The allegation that defendants should have written down the inventory

earlier than they did, or should have disclosed that SST's valuation system was "arbitrary," is essentially a claim that there were material deficiencies in SST's inventory control procedures. Generally speaking, incidents of fiduciary misconduct and internal mismanagement are not by themselves sufficient to trigger liability under the Exchange Act. *Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 478-80, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977).* [*67]

**IT IS SO ORDERED.**

Dated: March 10, 2006

PHYLLIS J. HAMILTON

United States District Judge