Westlaw.

Not Reported in F.Supp.2d                                                                                        Page 1
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

S.E.C. v. Kahn
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
Mitchell C. KAHN, Paul Van Eyl, Thomas R. Ehmann, Defendants.
**No. 99 C 6343.**

May 31, 2002.

*MEMORANDUM OPINION AND ORDER*
NORDBERG, Senior J.
**\*1** The Securities and Exchange Commission ("SEC") brought this action against Defendants Mitchell Kahn ("Kahn"), Paul Van Eyl ("Van Eyl") and Thomas Ehmann ("Ehmann") alleging that Defendants committed numerous violations of the securities laws during their tenures as officers of First Merchants Acceptance Corporation ("FMAC"). Before the court is the SEC's motion for summary judgment against Defendant Kahn and Defendant Van Eyl.[FN1]

> FN1. Defendant Ehmann, FMAC's former CFO and an accountant, entered into a settlement with the SEC.

FACTS

FMAC was a publically traded company that was based in Deerfield, Illinois. At the time at issue, Kahn, an attorney, was the corporation's Chief Executive Officer and Van Eyl was a Vice President. In the mid 1990's, FMAC was in the business of financing the purchase of used cars by acquiring the consumer retail installment contracts of sub-prime borrowers.[FN2] By 1996, FMAC's business had increased substantially, going from 30,000 to over 60,000 loan accounts. However, borrowers with poor credit histories often require zealous efforts by their creditors to receive timely payment. This apparently proved problematic, as FMAC's collection capabilities for pursuing delinquent accounts or "skips"[FN3] were extremely limited. Moreover, FMAC's early efforts at improving its collection system were unsuccessful. Thus, the number of delinquent and uncollectible accounts dramatically increased. In addition, as it was FMAC's policy to charge off (write off) accounts that had become 90 days overdue, charge offs increased significantly in this period. It was in this context that the Defendants began engaging in certain practices that are the subject of this case.

> FN2. Sub-prime borrowers are individuals with credit problems who cannot obtain financing for automobile purchases from traditional lenders such as banks.
>
> FN3. Skips are individuals who move without providing a forwarding address to their creditors, which makes it difficult for the creditors to locate the borrower or the collateral (the car).

The first practice, called the Customer Service Program ("CSP"), involved deferring certain customer accounts. In CSP, the delinquent payments in a loan account would be "deferred"-meaning tacked on to the end of loan payment schedule-and the account deemed "current." It is undisputed that the Defendants deferred 7000 accounts in September, 1996, and 3000 accounts in December, 1996; this represented 14% of the entire loan portfolio.[FN4] In connection with these deferrals, the Defendants had charge-off "scenarios" prepared, which were computer printouts showing the effect on the charge-off percentage for the loan portfolio if certain accounts were or were not charged off. The scenarios were prepared based on a goal charge off percentage, ostensibly based on the industry average and other data, of 6-8%. Some customers took advantage of the deferral and remained current thereafter; however, many accounts remained delinquent and were later written off.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF    Document 52-11    Filed 12/17/2007    Page 2 of 13

Not Reported in F.Supp.2d	Page 2
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

> FN4. In addition, Van Eyl deferred approximately 100 accounts, apparently on his own, and allegedly without Kahn's approval. Compared to the much greater volume of the CSP accounts, the Van Eyl deferrals appear de minimis.

Second, the Defendants treated some "skip" accounts as repossessions. The general FMAC policy was to write off 100% of the value of the "skip" loan account; the policy was to write off 55% of the value of a repossession [FN5] account (presuming that the repossessed auto's value approximated 45% of the loan balance). The Defendants decided to write down certain skip accounts only 55%-as if they were repossessions-ostensibly to allow time for the collection staff to attempt to locate the AWOL borrower. Generally, these accounts were written down completely a short time later.

> FN5. A repossession account was an account in which the borrower was sufficiently delinquent in his/her payments that the automobile was repossessed by the creditor.

*2 Third, the Defendants occasionally used the proceeds from repossessions to make the delinquent payments on loan accounts to make the delinquent account appear current.

Fourth, the SEC maintains that Defendants used "balance adjustments" to defer accounts. Essentially, a delinquent account's payments would be brought current by "paying" the delinquent payments with FMAC funds (such as those collected in actual repossessions). These "payments" would then be tacked on to the end of the loan term. Defendants maintain that these payments were made by one employee (Julie Freisinger), without explicit instruction from Defendants, as a means of effecting a deferral. Both sides agree that 200 accounts were involved in this activity.

Amid growing concern about the appropriateness of certain practices, FMAC began an internal investigation. Ultimately, FMAC made a formal announcement of "accounting irregularities" on April 16, 1997; on the same day, Kahn and Van Eyl were terminated. FMAC's stock, which traded for $7.00 on April 15, 1997, decreased to $3.25 by April 17, 1997. FMAC filed for bankruptcy in July 1997 and was liquidated.[FN6] Shareholders of FMAC brought a class action against the Defendants and others in the Northern District of Illinois (*In re First Merchants Acceptance Litigation,* No. 97 cv 2715). A review of the docket indicates that the case settled in April 2000.

> FN6. The great majority of FMAC's 25-30 competitors suffered a similar fate.

The SEC ultimately brought an eight count complaint against the Defendants:

Count I-violation of Section 10(b) of the Exchange Act and Rule 10b-5 against Defendants Kahn and Van Eyl;

Count II-violation of Section 13(a) and Rules 12b-20, 13a-1, and 13a-11 against Defendant Kahn;

Count III-aiding and abetting a violation of Section 13(a) and Rules 12b-20, 13a-1, and 13a-11 against Defendant Van Eyl;

Count IV-violation of Section 13(b)(2) against Defendant Kahn;

Count V-aiding and abetting a violation of Section 13(b)(2) against Defendant Van Eyl;

Count VI-violation of Rule 13b2-1 against Defendants Kahn and Van Eyl;

Count VII-violation of Rule 13b2-2 against Defendant Kahn; and

Count VIII-violation of Section 13(b)(5) against Defendants Kahn and Van Eyl.

The SEC maintains that as a consequence of Defendants' deliberate manipulation of the loan account charge offs, delinquent loans were removed from the balance sheet and from the portfolio's loan history. Therefore, the delinquent loans were not used in calculating loan loss reserves, which were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

understated by 43.4 million dollars or 252.6%. Because the loan loss reserves were understated, net income was significantly overstated by 76.7 million dollars or 729%. In sum, the Defendants' actions led to distorted financial statements being filed with the SEC, which misled investors and resulted in the stock selling at a grossly inflated price. The SEC also believes that by making the false book entries, e.g., recording skips as repossessions and delinquent accounts listed as current, the Defendants violated a raft of reporting rules. The SEC seeks extensive relief, including a permanent injunction, an officer/director bar, disgorgement, and a hefty civil fine.

**\*3** Defendants essentially concede that they did in fact engage in the activities that the SEC alleges. However, Defendants FN7 maintain that all their actions had sound business justifications, that they acted in good faith with no intent to defraud, and that any misstatements in the financial statements were immaterial. Defendants assert the following points:

> FN7. Included in the record is Kahn's 1998 SEC testimony ("Kahn Test.") and, as his counsel believed that the SEC testimony was taken in such a manner as to yield a slanted result, Kahn's 2000 deposition ("Kahn Dep."). Van Eyl has asserted his rights under the Fifth Amendment, *see* SEC's Reply to Van Eyl's Statement of Additional Facts at Ex. F, and has essentially relied on third-party testimony in his presentation.

(1) market factors and a bad business model led to the decline of FMAC and its competitors;

(2) FMAC did not engage in further collection actions after an account was charged off, and, given that FMAC's recovery system was "non-existent," it was highly unlikely the car would be repossessed (conceded by SEC, SEC's Reply to Van Eyl's Statement of Additional Facts at ¶ 39);

(3) the deferrals and other actions were only temporary solutions to allow for collection efforts to be made;

(4) Defendants believed that it was in FMAC's interest to pursue collectable accounts rather than charge them off before any collection effort was made (conceded by SEC, *Id.* at ¶ 12);

(5) Defendants believed that only truly uncollectible accounts should be charged off (conceded by SEC, *Id.*);

(6) FMAC's conservative 90-day charge off policy (later expanded to 120 days) led to difficulties in collections, given the collection system was "broken;"

(7) accounts were deferred only if they met certain criteria;

(8) FMAC's delinquency and charge off rate was higher than it should have been given the quality of the portfolio (conceded by SEC, *Id.* at ¶ 20);

(9) Defendants believed that FMAC's charge off rate was "inaccurate" or "inflated," due to the lack of collection efforts, and that many of these accounts were collectible (conceded by SEC, *Id.* at ¶ 32);

(10) Defendants believed that the "real" charge off rate should have been 6-8% (industry norm);

(11) the charge off policies were essentially altered to account for the poor collection efforts;

(12) there is nothing nefarious about deferrals, which are commonly given in the subprime industry;

(13) the deferral program was somewhat successful, as some of the accounts remained current;

(14) treating skips as repossessions was essential, given FMAC's poor skip tracing capabilities, to give FMAC time to try to trace the skips and collect on the account;

(15) these practices were justified because once an account was charged off, no further collection ef-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 52-11   Filed 12/17/2007   Page 4 of 13

Not Reported in F.Supp.2d	Page 4
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

forts were made;

(16) for both the "repossessions" and deferrals, if subsequent collection efforts failed, the account was promptly charged off;

(17) one employee used FMAC funds to pay customer accounts to make them appear current, without explicit instruction to do so, as a way of effecting a deferral;

(18) Kahn refused to sign the 1996 annual report not because he knew that he had engaged in wrongdoing but because an internal investigation was going on;

(19) the charge off scenarios were not shooting for an arbitrary percentage, but were based on industry data and management's best guess of the "true" charge off rate;

**\*4** (20) only 30 to 50 accounts per month (out of 63,000) were involved in the charge off scenarios (conceded by SEC, *Id.* at ¶ 69);

(21) there was never any discussion by management regarding inflating the stock price (conceded by SEC, *Id.* at ¶ 60);

(22) prior to Spring 1997, Defendants did not believe the financial statements were false or misleading;

(23) all actions were management decisions seeking to advance FMAC's best interest;

(24) CFO Ehmann approved of the practices and did not indicate that they were improper from an accounting perspective (conceded by SEC, *Id.* at ¶¶ 2, 54);

(25) the various practices that the SEC challenges only resulted in a $5,000,000 understatement of a $700,000,000 portfolio (less than 1%).

LEGAL STANDARDS

*A. Summary Judgment*

Under Rule 56 of the Federal Rules of Civil Procedure, the Court may grant summary judgment only if the factual record shows that no genuine issue of material fact exists and the movant is therefore entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Bratton v. Roadway Package System, Inc.,* 77 F.3d 168, 173 (7th Cir.1996). The movant bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Hudson Insurance Co. v. City of Chicago Heights,* 48 F.3d 234, 237 (7th Cir.1995). If the moving party meets this burden, the nonmovant must reply by setting forth specific facts demonstrating the existence of a genuine issue for trial. FED. R. CIV. P. 56(e); *NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 234 (7th Cir.1995). In evaluating the motion, the court must draw all reasonable inferences from the record in the light most favorable to the nonmoving party. *Hamm v. Runyon,* 51 F.3d 721, 724 (7th Cir.1995). The central inquiry is whether the evidence is so one-sided that no reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986).

While scienter is commonly a jury issue, it can be resolved on summary judgment if a defendant's explanation/evidence is so insubstantial, incredible or implausible that no reasonable finder of fact could credit it. *See In re Chavin,* 150 F.3d 726 (7th Cir.1998). See also *SEC v. Jakubowski,* 150 F.3d 675, 681-2 (7th Cir.1998), *cert. denied,* 525 U.S. 1103 (1999). An adverse inference may be drawn against a party in a civil action who refuses to testify pursuant to his Fifth Amendment rights; however, merely invoking the privilege is not generally enough, standing alone, to support summary judgment. *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 389-392 (7th Cir.1995). *See also Atwell v. Lisle Park District,* 286 F.3d 987, 991 (7th Cir.2002); *State Farm Mutual Automobile Insurance Co. v. Abrams,* No. 96 C 6365, 2000 WL 574466, at \*5 (N.D.Ill. May 11, 2000).

*B. Securities Laws*

Section 10(b) provides:
Manipulative and deceptive devices

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF    Document 52-11    Filed 12/17/2007    Page 5 of 13

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*5** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-...
(b)To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ...., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors....

15 U.S.C. § 78j.

Section 13 provides:
Periodical and other reports
(a) Reports by issuer of security; contents
Every issuer of a security registered pursuant to section 78l of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security -
(1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78l of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.
(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe....
(b) Form of report; books, records, and internal accounting; directives ...
(2) Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall-
(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that-
(i) transactions are executed in accordance with management's general or specific authorization;
(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
(iii) access to assets is permitted only in accordance with management's general or specific authorization; and
(iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences....
(5) No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)....

**\*6** 15 U.S.C. § 78m

Rule 10b-5 provides:
Employment of manipulative and deceptive devices.
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of the facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 CFR § 240.10b-5.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 52-11   Filed 12/17/2007   Page 6 of 13

Not Reported in F.Supp.2d                                                                                                      Page 6
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Rule 12b-20 provides:
Additional information.
In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances in which they were made not misleading.

17 CFR § 240.12b-20.

Rule 13a-1 provides:
Requirements of annual reports.
Every issuer having securities registered pursuant to section 12 of the Act (15 U.S.C. 781) shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form.

17 CFR § 240.13a-1.

Rule 13a-11 provides:
Current reports on Form 8-K.
(a) Except as provided in paragraph (b) of this section, every registrant subject to § 240.13a-1 shall file a current report on Form 8-K within the period specified in that form unless substantially the same information as required by Form 8-K has been previously reported by the registrant....

17 CFR § 240.13a-11.

Rule 13b2-1 provides:
Falsification of Accounting Records
No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act.

17 CFR § 240.13b2-1.

Rule 13b2-2 provides:
Issuer's representations in connection with the preparation of required reports and documents.
No director or officer of an issuer shall, directly or indirectly,
(a) Make or cause to be made a materially false or misleading statement, or
(b) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with (1) any audit or examination of the financial statements of the issuer required to be made pursuant to this subpart or (2) the preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

**\*7** 17 CFR § 240.13b2-2.

When the SEC brings an action under Section 10(b) and Rule 10b-5, the SEC must prove the following to prevail: (1) that the defendant made an untrue statement of fact or omitted to state a material fact that he had a duty to disclose; (2) that the statement or omission was material; (3) that the statement or omission was made in connection with the purchase/sale of securities; (4) that the defendant made the statement knowingly or recklessly; and (5) that the action involved interstate commerce, the mails, or a national securities exchange. *SEC v. Jakubowski,* No. 94 CV 4539, 1997 WL 156544, at \*5 (N.D.Ill. March 31, 1997), *aff'd* 150 F.3d 675 (7th Cir.1998), *cert. denied,* 525 U.S. 1103 (1999). To violate Rule 10b-5, one must act with "scienter," which means an intent to deceive or manipulate. *SEC v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998). *See also Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000)(internal cite omitted)("manipulation being practices ... that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive"). However, "reckless disregard of the truth counts as intent for this purpose." *Id.* "Reckless conduct includes 'not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.' " *SEC v. Randy,* 38

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d								Page 7
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

F.Supp.2d 657, 670 (N.D.Ill.1999) (internal cite omitted).*See also Danis v. USN Communications, Inc .,* 73 F.Supp.2d 923, 938 (N.D.Ill.1999). "A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision and would view it as having significantly altered the total mix of information ." *Id.* at 668-9. "Misstatements of income could be material because 'earnings reports are among the pieces of data that investors find most relevant to their decisions.' " *Ganino,* 228 F.3d at 164. In general, there is no numerical benchmark for materiality; the magnitude of the misstatement must be considered in light of the nature of the item and the circumstances.*Id.* at 162-3.

As to "controlling-person" liability, the Seventh Circuit has "looked to whether the alleged control-person actually participated in, that is, exercised control over, the operations of the person in general and, then, to whether the alleged control-person possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised."*Harrison v. Dean Witter Reynolds, Inc.,* 974 F.2d 873, 881 (7th Cir.1992), *cert. denied,*509 U.S. 904 (1993) (statute is remedial and requires only some indirect means of influence short of actual direction to hold control-person accountable). A controlling-person is not liable if he acted in good faith and did not induce the act constituting the violation. *Id.* at 880-1.

**\*8** If one violates Section 10(b)/Rule 10b-5 by filing false financial statements with the SEC, one also runs afoul of the reporting requirements of Section 13. *SEC v. Schiffer,* No. 97 CV 5853, 1998 WL 307375, at \*3 n. 11 (S.D. N.Y. June 11, 1998)."The reporting provisions of the Exchange Act are clear and unequivocal, and they are satisfied only by the filing of complete, accurate, and timely reports."*SEC v. Savoy Industries, Inc.,* 587 F.2d 1149, 1165 (D.C.Cir.1978), *cert. denied,*440 U.S. 913 (1979)(internal cite omitted).

DISCUSSION

The case is somewhat odd in that the Defendants, by and large, do not dispute committing the acts the SEC challenges. Nor do they appear to challenge the SEC's contention that the representations in their account data were false. Instead, Defendants argue that they performed the complained of actions in good faith (no scienter) and that the actions had no material impact on FMAC's financial statements. To some degree, the Defendants' agreement with the SEC's assertions is intentional, but to a significant extent it is due to their failure to fully comply with procedural rules. Defendants did not help themselves in their Local Rule 56.1(b) responses to the SEC's Statement of Undisputed Facts. They all too frequently simply "denied" the SEC's asserted facts, without any citation to evidence in the record that contradicts the SEC's position. This is not sufficient to put the asserted fact in issue, and the court may properly deem the fact admitted. *See*L.R. 56.1(b); *Jakubowski,* 1997 WL 156544, at \*4.[FN8]

> FN8. The SEC also played somewhat loosely with the procedural rules, to a much more limited extent, by admitting asserted facts in Van Eyls' Statement of Additional Facts that appear somewhat at odds with aspects of the SEC's theory of the case.

*1. Section 10(b) and Rule 10b-5*

Only two elements of the SEC's case are seriously contested by the Defendants, scienter and materiality. We will start with the former.

*a. Scienter*

To prevail, the SEC must show that the Defendants intended to deceive, defraud or manipulate or, at minimum, behaved recklessly regarding the truth. As the SEC notes, Kahn's testimony goes most, if not all, of the way to proving their case on this point. Kahn's testimony to the SEC provided several critical revelations:

(1) the deferrals reduced the delinquency level for that period of time, delinquencies were a performance indicator in the industry, and the reduced de-

Case 5:07-cv-03444-JF   Document 52-11   Filed 12/17/2007   Page 8 of 13

Not Reported in F.Supp.2d                                                                                              Page 8
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

linquency number potentially helped increase stock price (Kahn Test. at 140);

(2) no one attempted to disclose the difference in delinquencies that the deferrals created (*Id.* at 141);

(3) the charge off scenarios were aimed at a set percentage to meet charge off goals (*Id.* at 180-183);

(4) delinquencies and charge off percentage were performance indicators that affected stock price (*Id.* at 184);

(5) the lowered delinquency numbers and goal charge off percentage would make FMAC appear to be performing better than it was (*Id.* at 185);

(6) Ehmann informed Kahn that FMAC needed to clean up accounting practices, meaning in part that accounts should be charged off according to policy (*Id.* at 209-10);

**\*9** (7) Kahn was uncomfortable signing the annual report because the December deferrals understated charge offs (*Id.* at 222);

(8) skips were written down as repossessions to manage the charge off number and make it appear better than it truly was (*Id.* at 247);

(9) proceeds from repossessions were treated as customer payments to manage/manipulate the charge off number and make the account appear current (*Id.* at 248-9);

(10) Kahn knew deferrals would ultimately impact on financial statements (but did not "think of it like that") (*Id.* at 269-70);

(11) the management/manipulation of charge offs was not disclosed to the auditors (*Id.* at 281-2);

(12) Kahn was terminated because the Board of Directors believed that he was aware of the accounting irregularities and did nothing about it (*Id.* at 285-6).

Kahn attempted to refute the more incriminating aspects of his prior testimony by explaining the full business rational for his actions (or just contradicting his prior statements) in his subsequent deposition. However, in his deposition Kahn was forced to recant his revised account by conceding several significant points:

(1) that he knew reports on financial performance, including level of charge offs, had to be submitted to the SEC (Kahn Dep. at 56);

(2) that, as an attorney, Kahn knew the reports submitted to the SEC were required to be accurate (*Id.*);

(3) that he chose a 6-8% charge off figure because he believed that was the "true" level of charge offs "if collection activity had been occurring properly"(*Id.* at 58);

(4) that management had the authority to change charge off policies (*Id.* at 64-5);

(5) that deferrals were not only to allow for collection activity, but also to reach a target charge off percentage (*Id.* at 88-90);

(6) that when presented with the 10-K for signature, FMAC's internal investigation made him realize that there could be material misrepresentations (*Id.* at 92);

(7) that when the 10-K was to be signed, he knew the charge offs were going to be understated because of the deferred accounts (*Id.* at 94-5);

(8) that they were trying to make the charge off number look better than it was (*Id.* at 108-9, 122).

Kahn's statements, in both his testimony and deposition, are sufficient to persuade this court that Kahn and Van Eyl acted with scienter, in that their conduct was at the very least culpably reckless. Presenting a "skip" as a repossession is a false statement. Presenting an account as current when it is actually months overdue is a false statement. Further, the Defendants were obviously aware the statements were false, and no amount of excuse or superficial justification would make these statements any less false. It strains credulity to consider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 52-11   Filed 12/17/2007   Page 9 of 13

Not Reported in F.Supp.2d                                                                                         Page 9
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

that two businessmen, one of whom was an attorney, could honestly believe that falsely recording loan account data was a legal and appropriate response to collection problems. When would falsely recording a transaction in a public corporation's books of account ever be justified? It also defies belief that these same two businessmen would not be aware that doctoring FMAC's account information would ultimately affect FMAC's financial statements, which are, of course, generated from the account information. At minimum, their actions were reckless, as they represented an extreme departure from the standards of ordinary care, and presented a danger of misleading investors that was so obvious that the Defendants must have been aware of it. *See generally Danis,* 73 F.Supp.2d at 938;*Randy,* 38 F.Supp.2d at 670. Recklessness, or worse, pervades the Defendants' conduct. Kahn acknowledges that he was too uncomfortable with the annual report to sign it because the corporation's investigation persuaded him that there were material misstatements. Given that he was also aware the December deferrals understated the charge offs, one has to ask why the CEO would allow the report to be filed.[FN9] Moreover, an examination of the Defendants' supposed justifications only provides further support for the court's conclusion.

> FN9. Kahn attempts to work around this by arguing that he was only concerned about certain December accounts, not the whole deferral program (Kahn Dep. at 77-80). This is not as helpful as Kahn hopes. If the December accounts were not material, why did he refuse to sign the 10-K? If the December deferrals were material, their misstatement would violate the law.

**\*10** First, Defendants assert that they had no choice but to defer the accounts by any means possible, because once an account was charged off, no further collection activity would take place. This rationale is a make weight. The Defendants never explain *why* no follow up collection activity could occur, nor does a reason come to mind. This assertion is even more inexplicable given that Defendants maintain that they had the authority to make management decisions regarding collection policy. In fact they proved FMAC's collection policies could be changed when they increased the time period in which an account was deemed delinquent from 90 to 120 days. They could have just as easily decreed that collection efforts would continue after an account was charged off, with any subsequent proceeds being realized when received.[FN10] Moreover, they could have decided to further extend the time before an account was charged off, particularly in light of Defendants' repeated assertion that FMAC's charge off policy was far more conservative than the industry average. Either of these solutions would allow more time for further collection efforts without the deception that would inevitably accompany mischaracterizing loan account status.

> FN10.*See* Zemaitis Dep. at 86.

Second, Defendants argue that it was in the corporation's best interest to pursue potentially collectible accounts, and that writing off an account before making any attempt at collecting on it is unreasonable. Both these statements are logical. They are also irrelevant. The issue is not that the corporation was seeking to collect on delinquent accounts; the issue is how those efforts were recorded and presented in the corporation's financial statements.

Third, the Defendants argue that they never discussed inflating FMAC's stock price nor "intended" to file misleading financial statements. This gets the Defendants nowhere. Recklessness suffices to show scienter. As discussed above, deliberately falsifying account information, the same information that was to be used to generate financial statements which in turn are examined by investors, is clearly reckless. In addition, Kahn's own statements, in both his SEC testimony and deposition, make it quite clear that the Defendants were aware that their actions were making the charge offs appear far better than they actually were. Lastly, to the extent the Defendants claim that they steadfastly failed to consider the broader potential consequences of their actions, they warrant no consideration. "Deliberate ignorance, ..., is a form of knowledge."*Jakubowski,* 150

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 52-11   Filed 12/17/2007   Page 10 of 13

Not Reported in F.Supp.2d                                                                        Page 10
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

F.3d at 681-2.

Fourth, Defendants argue that they were justified because the actual charge off rate was in fact "inaccurate," "inflated," and "misleading" because FMAC's loan portfolio was of as good or better quality than the industry average. This contention defies logic. The level of charge offs being incurred before Defendants began the various deferral stratagems was, by definition, accurate because it reflected the *actual* number of accounts being charged off. Defendants attempt to challenge this by focusing on one component of the charge off equation-the quality of the loan portfolio. However, in doing so, Defendants disregard the other component, the quality of the corporation's collection capabilities, which their own briefs claim is critical in dealing with subprime borrowers. The level of FMAC's charge offs increased because FMAC's collection system was "broken" or nonexistent. In altering the account information to reflect the alleged "true" quality of the loan portfolio, the Defendants were really concealing the abysmal quality of FMAC's collection system. Anyone reviewing FMAC's financial information would undoubtedly be interested in the quality of the loan portfolio; they would also need to know if the collection system, the mechanism by which gain on the portfolio will be realized, is functioning well or "broken."

**\*11** In the same vein, Defendants entire "explanation" falls apart because their conduct, despite all protestations to the contrary, was more directed toward appearances rather than realities. As discussed above, there were other possible approaches for dealing with their collection problems. Instead, Defendant chose to make delinquent accounts appear current. It is not lost on the court that the bulk of the deferrals were granted in the final months of quarters (September and December). Moreover, the Defendants were clearly concerned about how their numbers would *look* when compared to the industry average. The only logical inference to be drawn from this evidence is that Defendants were manipulating the charge offs to make them appear in line with the industry average. Even after attempting to rehabilitate his account in his deposition, Kahn is forced to concede as much. (Kahn Dep. at 108-9, 122). Those who would be doing the "looking" would obviously include potential investors and industry analysts.

The Defendants cite a host of federal criminal fraud cases for the proposition that good faith is a defense to fraud charges. *See U.S. v. Koster,* 163 F.3d 1008, 1012 (7th Cir.1998), *cert. denied,* 527 U.S. 1021 (1999)("An action taken in good faith is the other side of an action taken knowingly"); *U.S. v. Morris,* 80 F.3d 1151, 1165-66 (7th Cir.), *cert. denied,* 519 U.S. 868 (1996) (good faith a complete defense to mail/wire fraud);$^{FN11}$ *U .S. v. Dunn,* 961 F.2d 648, 650 (7th Cir.1992); *United States v. Alexander,* 743 F.2d 472, 478-9 (7th Cir.1984). However, we are not persuaded that these criminal fraud cases are dispositive of the scienter issue in a civil securities fraud case. Moreover, these cases make a distinction that ultimately sinks the Defendants. A good faith defense requires a genuine belief that the information presented is true; an honest belief that one will ultimately be able (although not currently able) to perform what was promised is not a defense. *Dunn,* 961 F.2d at 650;*Alexander,* 743 F.2d at 478-9. *See also Danis,* 73 F.Supp.2d at 935. Defendants actions focused on making the accounts look as Defendants believed they *should* look, if all was going well. The fact remains that all was not going well, as the Defendants concede, and the accounts were not presented as they actually existed. Thus, even if Defendants actually believed that they could ultimately fix the collection system and make the accounts perform as well as they were (falsely) presented, a defense of good faith is unavailable.

> FN11. Significantly, *Morris* appears to make a distinction that is useful to the resolution of this case. The failure to allow for adequate loan loss reserves is generally mismanagement rather than fraud; however, knowingly made misrepresentations about the adequacy of the reserves can be fraudulent. *Morris,* 80 F.3d at 1164.

Similarly, Defendants periodic references that codefendant Ehmann, the accountant and CFO,

Case 5:07-cv-03444-JF   Document 52-11   Filed 12/17/2007   Page 11 of 13

Not Reported in F.Supp.2d                                                                                                  Page 11
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

never objected to the practices does not establish good faith reliance on an accountant. "If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negative the existence of the requisite intent or establish good faith reliance."*U.S. v. Erickson,* 601 F.3d 296, 305 (7th Cir.), *cert. denied,*444 U.S. 979 (1979).

**\*12** We must conclude that Kahn acted with scienter, as his conduct was at minimum culpably reckless. The result for Van Eyl, who has largely based his presentation on Kahn's statements, is the same, a conclusion bolstered by the adverse inference we chose to draw regarding his invocation of his Fifth Amendment rights to questions regarding the deferral practices.

*b. Materiality*

The second disputed issue is materiality. The SEC maintains that the Defendants' conduct resulted in an understatement in FMAC's credit loss reserves of $43,400,000 or 252.6%, which yielded an overstatement of net income of $76,700,000 or 729%. (SEC's Statement of Undisputed Facts, ¶ 48.) The SEC's most critical evidence is the affidavit of SEC accountant Dave Ryba and its supporting materials. (SEC's Statement of Undisputed Facts, Exhibit M.) Ryba provides the amount of the overstatement of net income and the understatement of the loan loss reserve in his affidavit, and refers the reader to the schedules in Appendix H. (*Id.,* Affidavit at ¶ 10.) Appendix H does what it claims to do, it compares the 1996 year-end financial statements of FMAC as they were presented versus as they should have been presented, and highlights the enormous misstatements of net income and credit loss reserves. (*Id.,* Appendix H.) To this evidence, Kahn and Van Eyl simply reply "Denied." (Kahn's Response to SEC's Statement of Undisputed Facts at ¶ 48; Van Eyl's Response to SEC's Statement of Undisputed Facts at ¶ 48). This bare denial is hopelessly inadequate to create an issue of fact. *See*L.R. 56.1.

If this were all Defendants presented, our task would be over. However, Van Eyl makes an effort to create an issue of fact by positing that the total effect of all the deferrals and delaying of charge offs implemented in 1996 totaled just $5,000,000, or less than 1% of the $700,000,000 loan portfolio. (Van Eyl's Statement of Additional Facts at ¶¶ 102-3.)[FN12] The SEC concedes that the $5,000,000 figure accurately reflects the misstatement of the charge offs, but maintains that it says nothing about the amount of the misstatements of the loan loss reserve and net income. (SEC's Reply to Van Eyl's Statement of Additional Facts at ¶ 102-3.)[FN13] A review of the materials quickly reveals that the SEC is correct for several reasons.

> FN12. Kahn, in essence, is getting a free ride on Van Eyl's additional fact. While the court would be within its discretion to deem Kahn's simple denial an admission, given that the cases against the Defendants are completely intertwined, Kahn will get the benefit of the doubt. However, this forbearance ultimately gets Kahn nothing.
>
> FN13. Both sides focus most of their efforts on the *impact* of the wrongful actions on the financial statements, which appears to be the most relevant measure of materiality. We note, however, that the deferral of 10,000 accounts, or 14% of the portfolio, appears to be potentially material as a matter of law.

First, we are reluctant to conclude, even in this age of inflation, that a five million dollar misstatement is immaterial as a matter of law. Second, Zemaitis' statements refer only to the amount the charge offs were misstated, *see* Zemaitis Dep. at 87-90, not the overall impact the Defendants' conduct had on the financial statements. Third, Zemaitis appears to acknowledge potential limitations in his methodology and stated he could not recall if his numbers included the effect of the deferrals. *See* Zemaitis Dep. at 177-8. In sum, Defendants have not meaningfully contested the SEC's presentation. We must conclude that the SEC is entitled to summary judgment on the issue of materiality.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF   Document 52-11   Filed 12/17/2007   Page 12 of 13

Not Reported in F.Supp.2d                                                                                      Page 12
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*2. Alleged Reporting Violations*

**\*13** The SEC's presentation on most of these issues is fairly limited, but that is balanced by the Defendants failure to present significant argument specifically addressing these issues. Our review will focus on whether the SEC's presentation is adequate to meet their burden under the summary judgment standard.

*a. Section 13(a)/Rules 12b-20, 13a-1, 13a-11-False Public Filings*

The SEC asserts that FMAC was required to file a complete 10-K report for 1996 and a complete 8-K for early 1997. The SEC further asserts that these reports were required to disclose net income, conform with GAAP, and be true and correct. The SEC also asserts that the reports were required to include all additional information that was necessary to prevent the reports from being misleading. The SEC maintains the reports were misleading because income was significantly overstated. (SEC Statement of Undisputed Facts at ¶¶ 47, 48.) The SEC further maintains that Kahn is liable for the misstatements as a "control person," because, as CEO, he had actual control over the contents of the reports and took active steps to prevent detection of the misstatements.(*Id.* at ¶¶ 16-19, 36-40, 41-2.)Lastly, the SEC maintains Van Eyl is liable as an aider and abetter. (*Id.* at ¶¶ 19, 23, 33.)

As a starting point, as recounted above, both Defendants conceded that they altered account information with the deferral program and other stratagems. Further, there is no real dispute that Kahn, as CEO, exercised control over FMAC's operations and was the pivotal agent in the challenged conduct. In addition, it is clear Van Eyl assisted Kahn with the deferrals and other questionable practices. Moreover, both Kahn and Van Eyl have admitted, via barebones denials, that the net income was significantly overstated in the reports. (*See* SEC's Statement of Undisputed Facts at ¶¶ 47, 48; Kahn's Response to SEC's Statement of Facts at ¶¶ 47, 48; Van Eyl's Response to SEC's Statement of Facts at ¶¶ 47, 48.) Therefore, the SEC is entitled to summary judgment on this issue.

*b. Section 13(b)(2)(A)/Rule 13b2-1-false books and records*

There is no dispute that Defendants deferred accounts and performed balance adjustments, to make delinquent accounts appear current, and treated "skip" accounts as repossessions. The SEC is entitled to summary judgment on this issue.

*c. Rule 13b2-2-False Statements to Auditors*

The SEC also charges that Kahn made false statements to auditors. In particular, the SEC alleges that Kahn directed Ehmann to work with the outside auditors, that Ehmann (with Kahn's knowledge and approval) provided the auditors with documents that did not disclose that the allowance for credit losses was inadequate, and that Kahn signed a management letter that falsely represented that the reserves were adequate and that there were no irregularities. (SEC's Statement of Undisputed Facts at ¶ 42.) Kahn disputes that he directed Ehmann to work with the auditors and maintains that he never signed any letters in an attempt to conceal information. (Kahn's Response to SEC's Statement of Undisputed Facts at ¶ 42.)

**\*14** A review of the underlying materials refutes the SEC's statement that Kahn directed Ehmann to work with the auditors and indicates that Kahn did not direct Ehmann to present the documents that Ehmann prepared. (Kahn Trans. at 281-2.) However, Kahn was aware that the documents did not disclose the charge off manipulations (*Id.* at 282), and he obviously knew that the charge off figures were inadequate.[FN14] Nonetheless, the only direct contact between Kahn and the auditors that the SEC refers to is the transmission of the management letter, which the SEC does not appear to include in its materials. Instead, the SEC relies upon the deposition testimony of auditor James Fuehrmeyer, who states that management was asked to acknowledge that they did a reasonable job of making their estimate of reserves, that Kahn signed the management letter, and that the letter included representations to the effect that there were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 5:07-cv-03444-JF    Document 52-11    Filed 12/17/2007    Page 13 of 13

Not Reported in F.Supp.2d                                                                                                    Page 13
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

no management irregularities involving control structures. (Fuehrmeyer Dep. at 69-70.)

> FN14. There appear to be an open questions regarding when/whether the auditors were provided with information regarding the deferral programs and its impacts. (*See* Zemaitis Dep. at 91-6.)

The court must conclude that the SEC has not shown it is entitled to summary judgment on this issue. While it argues Kahn made misrepresentations to the auditors, it has, by and large, not specifically identified them. As to the representation about management irregularities involving control structures, presumably some internal controls were circumvented in falsifying loan account information, but the SEC has not indicated what specific control structures were involved and how they were compromised.

### d. Section 13(b)(5)Circumvention of Internal Accounting Controls/Falsification of Books

The SEC, in one short paragraph, claims that the Defendants circumvented internal accounting controls and falsified books and records. The SEC does not reference any paragraphs in its Statement of Undisputed Facts to support this claim. While the Defendants, as previously noted, did make false entries in the books, which *presumably* violated some internal accounting protocols, the facts remains that the SEC has not identified what controls were circumvented. Therefore, the SEC is not entitled to summary judgment on this issue.

Lastly, as to the relief requested by the SEC, given that certain counts remain, any consideration of penalties and injunctions would be premature at this juncture.

### CONCLUSION

For the reasons stated above, the SEC's motion for summary judgment is GRANTED IN PART and DENIED IN PART against Defendant Kahn and GRANTED IN PART and DENIED IN PART against Defendant Van Eyl. The case is set for status on June 5, 2002 at 2:30 p.m. At status, the parties are to present their views on whether the issues in this case can be further resolved or narrowed with supplemental briefing.

N.D.Ill.,2002.
S.E.C. v. Kahn
Not Reported in F.Supp.2d, 2002 WL 1163723 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.