Slip Copy                                                                                                                         Page 1
Slip Copy, 2006 WL 1564892 (S.D.Cal.), Fed. Sec. L. Rep. P 93,926
**(Cite as: Slip Copy)**

S.E.C. v. Todd
S.D.Cal.,2006.

United States District Court,S.D. California.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
John J. TODD, Robert D. Manza, and Jeffrey Weitzen, Defendants.
**No. 03CV2230BEN(WMC).**

May 30, 2006.

Keri Curtis Axel, Securities and Exchange Commission, Los Angeles, CA, for Plaintiff.
Robert D. Rose, Sheppard Mullin Richter and Hampton, San Diego, CA, James Sanders, McDermott Will and Emery, Los Angeles, CA, for Defendants.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT WEITZEN, AND GRANTING DEFENDANT WEITZEN'S MOTION FOR SUMMARY JUDGMENT
BENITEZ, J.

[Doc. Nos. 36-1, 56-1]

I. INTRODUCTION

**\*1** Plaintiff Securities and Exchange Commission ("SEC") brings this civil enforcement action alleging violations of federal securities laws against Defendants John J. Todd ("Todd"), Robert D. Manza ("Manza") and Jeffrey Weitzen ("Weitzen"), the former Chief Financial Officer, Controller, and Chief Executive Officer of Gateway, Inc., respectively. Plaintiff SEC moves for partial summary judgment on the basis of three primary transactions with relation to Weitzen. Defendant Weitzen opposes the SEC's motion, and moves for summary judgment on the basis of the same transactions.

II. FACTS

Gateway, Inc. ("Gateway") is a direct marketer of personal computers and related products. (SEC Facts ¶ 4 [FN1]). Its stock trades on the New York Stock Exchange. (*Id.*) Todd served as Senior Vice President and Chief Financial Officer ("CFO") of Gateway from October 1998 to January 2001. (SEC Facts ¶ 2). Weitzen served as Chief Executive Officer ("CEO") of Gateway from January 2000 to January 2001. (SEC Facts ¶ 1). Manza served as Controller from October 1999 to June 2001. (SEC Facts ¶ 3).

> FN1. References to "SEC Facts at ¶ __" are to the SEC's Statement of Uncontroverted Facts in Support of Motion for Partial Summary Judgment against Defendant Jeffrey Weitzen.

In the third quarter of 2000 ("Q3 2000"), Gateway's senior management became aware of a gap between anticipated revenue and analysts' consensus expectations for the quarter. (SEC Facts ¶ 9). The SEC alleges that Weitzen, Todd and Manza engaged in a scheme to close this gap by way of several transactions which would serve to inflate revenue for the quarter. With respect to the claims against Weitzen, the SEC alleges that he is liable for material misstatements in Gateway's Form 10-Q filing for Q3 2000, as well as statements made in the earnings press release for the same period, on the basis of three primary transactions.

The first involves Gateway's increase in higher-risk consumer lending. Beginning in Q2 2000, Gateway initiated a program under which it began to offer financing to consumers with weaker credit. (SEC Mem. at 4, n. 6 [FN2]). Todd initiated this program as part of a strategic initiative to increase revenue, and intended it to become part of Gateway's business model. (SEC Ex. 6 [FN3]). In order to compensate for the anticipated additional losses associated with higher-risk lending, Gateway sold models with a higher margin to those consumers. (Todd Ex. B [FN4]). At the end of Q3 2000, the higher-risk loan receivables totaled approximately 37% of Gate-

way's loan portfolio. (SEC Facts ¶ 24).

> FN2. References to "SEC Mem. at __" are to the SEC's Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment Against Defendant Jeffrey Weitzen.
>
> FN3. References to "SEC Ex. __" are to the SEC's Exhibits Filed in Support of Motion for Partial Summary Judgment Against Defendant Jeffrey Weitzen.
>
> FN4. References to "Todd Ex. __" are to Defendant John Todd's Compendium of Exhibits in Support of Motion for Partial Summary Judgment.

The second transaction the SEC places at issue was Gateway's change in contract terms with AOL. Gateway and AOL were engaged in a strategic partnership which consisted of Gateway bundling AOL software on its computers. Gateway paid AOL $219.45 for each end user who purchased a bundled product and registered for AOL service. (SEC Ex. 48). AOL then paid Gateway a promotional bounty of $219.45 for each registered end user. (*Id.*) AOL was responsible for providing Gateway with reports regarding end-users who registered for the service. (*Id.*)

**\*2** Late in Q3 2000, Gateway and AOL revised their agreement to provide that the payments from each company to the other would be made when a computer was shipped, rather than upon end-user registration for AOL service. (SEC Facts ¶ 36). This change was intended to be retroactive to the entire third quarter. (SEC Ex. 8). By changing the terms of the contract to entail payment upon shipment of the bundled PC instead of payment upon end-user registration, Gateway added $72 million in revenue for the quarter. (SEC Facts ¶ 50).

The final transaction the SEC disputes with regard to Weitzen is Gateway's sale of computer equipment used in Gateway's internal operations to Lockheed Martin Integrated Business Solutions ("Lockheed"). At the time, Lockheed was Gateway's third party IT services provider and was responsible for managing and servicing Gateway's computer infrastructure. (SEC Facts ¶ 54). Todd and Manza initiated this sale with the goal of completing it before the end of Q3 2000.(*Id.*) The deal was set up so as to be cost-neutral for Lockheed, and included a leaseback provision under which Gateway leased the equipment back from Lockheed for the same price as Lockheed paid Gateway. (SEC Facts ¶ 56).

Gateway booked the full $47.2 million of the sale as revenue. (SEC Facts ¶ 65). The equipment was recorded in Gateway's books as a fixed asset, and only a fraction of the equipment was Gateway branded. (SEC Facts ¶ 62). PricewaterhouseCoopers LLP ("PwC"), Gateway's outside auditor, subsequently discovered that the sale had been recorded as revenue, rather than a sale of fixed assets, and forced Gateway to restate its Q3 2000 results and back the transaction out of revenue. (SEC Ex. 33).

Weitzen and Todd participated in a conference call with Wall Street analysts about Gateway's Q3 2000 results. (SEC Facts ¶ 74). During that conference call, Todd and Weitzen discussed Gateway's revenue for the quarter, and commented on the revenue growth over Q3 1999. (*Id.*) Similarly, Gateway's earnings press release for Q3 2000 announced record third quarter earnings, as well as 16% revenue growth year over year.

### III. DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party meets this burden, the opposing party must set forth specific facts showing that a genuine

issue remains for trial. Fed.R.Civ.P. 56(e).

"The moving defendants need provide nothing more than a reference to those materials on file in the case which support the movant's belief that there is an absence of any genuine issues of material fact."*Musick v. Burke,* 913 F.2d 1390, 1394 (9th Cir.1990). An adverse plaintiff, however, must "offer evidence sufficient to raise a genuine issue of fact on an issue on which the plaintiff has the burden of proof."*Id.*"[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor."*Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995) (internal citation omitted).

**\*3** An issue of fact is only a genuine issue if it can reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby,* 477 U.S. at 250-51. "A mere scintilla of evidence supporting the nonmoving party's position is insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party."*Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1146 (9th Cir.2005)."The substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."*Anderson v. Liberty Lobby,* 477 U.S. at 248.

The SEC brings the following claims against Weitzen: (1) fraud in the purchase or sale of securities in violation of Exchange Act § 10(b) and Rule 10b-5 thereunder; (2) lying to auditors in violation of Exchange Act Rule 13b2-2; and (3) control person liability in violation of Exchange Act § 20(a).

A. Section 10(b) and Rule 10b-5 Violations

In order for the Court to grant the SEC summary judgment on these claims, the SEC must show that there is no genuine issue of material fact that Weitzen made: (1) a material misrepresentation; (2) in connection with the purchase or sale of a security; (3) with scienter; (4) by use of jurisdictional means.*SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1364 (9th Cir.1993). The second and fourth elements are not in dispute-the SEC alleges material misrepresentations in connection withe Gateway's 10-Q filing for Q3 2000, as well as a conference call with analysts and an earnings press release. Assuming the SEC can meet its burden regarding material misrepresentations, all three of these fulfill the element of being "in connection with the purchase or sale of a security" because investors would reasonably rely on such documents. *Id.* at 1362.Similarly, the filing with the SEC and the analyst call satisfy the jurisdictional means requirement.

1. *Material misrepresentations*

To satisfy this element, the SEC must show that Weitzen made a misrepresentation, and that it was material. The SEC admits that Weitzen did not sign the Form 10-Q for Q3 2000. Rather, it attempts to impute any alleged misstatements in that filing to Weitzen through a theory of "substantial participation" and "intricate involvement." (SEC Mem. at 13). In support of this theory of "substantial participation" and "intricate involvement," the SEC cites to a footnote in a recent Ninth Circuit decision which itself does not address the issue, but instead refers back to *In re Software Toolworks Inc. Securities Litigation,* 50 F.3d 615, 628-29 (9th Cir.1994). The relevant part of *In re Software Toolworks* involved whether the court could find Deloitte & Touche had committed a primary violation of the securities laws by its participation in the drafting of two letters to the SEC which made false statements. Although the letters were not signed by Deloitte, they were prepared after extensive review and discussion with Deloitte, and referred the SEC to two Deloitte partners for further information. *Id. at n. 3.* The plaintiffs in that case presented evidence of Deloitte's substantial participation and significant role in drafting the letters, and on that basis, the court found Deloitte could be held liable for the statements in the letters. *Id.*

**\*4** The SEC fails to present similar evidence here on which a finder of fact could find Weitzen's substantial participation in the drafting of the 10-Q. The only piece of evidence the SEC presents on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

matter is the fact that Weitzen signed the management representation letter to the auditors. (SEC Mem. at 13; SEC Ex. 65). A reasonable fact-finder could not find this to be substantial in relation to the preparation of the entire quarterly filing. The SEC therefore may not impute any alleged misstatements in the Q3 2000 10-Q to Weitzen.

The SEC also alleges Weitzen made material misstatements as part of the press release regarding third quarter earnings. (SEC Facts ¶ 73). Weitzen is quoted in the press release, and his testimony corroborates his substantial participation in its preparation. (SEC Exs. 10, 66). The question therefore is whether any misrepresentations were made in the press release, and if so, whether they were material. The SEC's theory is that the representations regarding Gateway's third quarter revenue were false because Gateway engaged in a series of transactions which had the sole purpose of "closing the gap" between Gateway's anticipated revenue for the quarter and analysts' consensus expectations, and Gateway did not properly disclose these transactions. It takes issue with three particular transactions with respect to Weitzen.

a. *increased lower tier consumer lending*

Beginning in Q2 2000, Gateway initiated a program under which it began to offer financing to consumers with weaker credit. (SEC Mem. at 4, n. 6). Todd initiated this program as part of a strategic initiative to increase revenue, and intended it to become part of Gateway's business model. (SEC Ex. 6). In order to compensate for the anticipated additional losses associated with higher-risk lending, Gateway sold models with a higher margin to those consumers. (Todd Ex. B). The SEC asserts that Gateway should have disclosed the increase in higher-risk lending, it was materially misleading not to do so, and Weitzen should have made sure such a disclosure took place.

A company is not required to disclose every financial fact. It is only required to disclose information if there is a statutory requirement to do so, or if failure to do so would render the statements it has made materially misleading. *See Oran v. Stafford,* 226 F.3d 275, 285 (3d Cir.2000). An excess of disclosure can have the same net effect as a dearth of it-the shareholder misses the relevant information. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("a minimal standard might bring an overabundance of information within its [the public's] reach, and lead management 'simply to bury the shareholders in an avalanche of trivial information-a result that is hardly conducive to informed decision making'") (*quoting TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448-49, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

To fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."*Basic Inc. v. Levinson,* 485 U.S. at 231-32. Whether an omitted fact is material is generally considered a mixed question of law and fact, and therefore uniquely within the province of the factfinder. *S.E.C. v. Talbot,*-F. Supp.2d-, No. 04-04556 MMMPLAX, 2006 WL 1216719 at *5 (C.D.Cal. Feb.14, 2006).

**\*5** The SEC alleges that Gateway's lower-tier loan receivables had risen to $243.5 million, or 37% of Gateway's total loan portfolio by the end of Q3 2000. (SEC Facts ¶ 24). Based on this percentage, as well as the increase over the same quarter in 1999, the SEC asserts that the growth in loan receivables is material and should have been disclosed. It also claims that by not disclosing this information, Gateway's reported revenue was materially misstated. In response, Defendant submits the expert opinion of Michael Mulligan, former Senior Counsel in the SEC's Division of Enforcement. (Weitzen Facts ¶¶ 101-103). Mulligan opined that based on various regulations and the language of the 10-Q Management Disclosure and Analysis ("MD & A"), Gateway was not required to disclose the increase in lower-tier lending. He deemed it immaterial because it accounted for only 3.2% of sales through the end of Q3 2000, and did not represent a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

known trend that would support disclosure. (Weitzen Ex. 44). The Court finds that the evidence presented creates a genuine issue of material fact as to whether the increase in higher risk lending by Gateway was material and should have been disclosed.

b. *AOL revenue recognition*

The second transaction with which the SEC takes issue is the recognition of revenue resulting from a change in contract terms with AOL. Gateway and AOL were engaged in a strategic partnership which consisted of Gateway bundling AOL software on its computers. Gateway paid AOL $219.45 for each end user who purchased a bundled product and registered for AOL service. (SEC Ex. 48). AOL then paid Gateway a promotional bounty of $219.45 for each registered end user. (*Id.*) AOL was responsible for providing Gateway with reports regarding end-users who registered for the service. (*Id.*)

Gateway and AOL revised their agreement to provide that the payments from each company to the other would be made when a computer was shipped, rather than upon end-user registration for AOL service. (SEC Facts ¶ 36). This change was intended to be retroactive to the entire third quarter. (SEC Ex. 8). The SEC asserts that this change was a mere accounting manipulation intended to close the revenue gap for the quarter, but lacked any economic substance. Its primary support for this allegation is the initial discomfort of Lee Bird, Gateway's Vice President of Finance for the Consumer Division, with the change. (SEC Facts ¶¶ 37, 39-40). But there is little support in the record for this view of the transaction. Gateway and AOL had been involved in this strategic partnership since 1999, and had encountered a series of problems in their dealings. One of the primary problems between the two was that Gateway had no way of obtaining registration data other than from AOL, and found itself frequently disputing the end-user registration figures. (Todd Facts ¶ 247). By changing the terms of the contract to require payment at shipping instead of registration, the parties resolved a major source of conflict, and allowed Gateway a more consistent way to recognize the revenue from the partnership. (Todd Facts ¶¶ 254, 255). The SEC presents no evidence creating a genuine dispute as to these facts. Additionally, the record is clear that Bird's initial concerns were assuaged in regard to the AOL accounting. (Weitzen Ex. 12). The SEC has therefore failed to show that the AOL transaction lacked economic substance.

*6 Its categorization of the change in contract terms as a change in accounting principle is similarly flawed. Gateway did not change the way it recognized revenue, it changed the terms of its contract with AOL. The SEC cites Gateway's stated policy in its 1999 10-K in support of its contention that the revenue was improperly recognized:

The Company generally recognizes revenue from product sales at the time of shipment provided that no significant obligation remains. The company recognizes revenue from service, such as training and Internet service, upon delivery of the service....

(SEC Ex. 109). But as noted by Defendants' expert, Gateway's internal written revenue recognition policy with regard to this item states the following:*Sale of Third Party ISP Bundled in Gateway System*-There are several instances whereby Gateway will sell a system bundled with an ISP provider other than Gateway.net (e.g.AOL). In these circumstances Gateway typically receives a commission/fee/bounty from the third party ISP provider for the sale of the service. In this instance Gateway does not have any further obligation to the customer: as such the fee may be immediately recognized as revenue in its entirety when that fee is earned consistent with a commission (the fee is earned based upon the terms of the agreement with the third party ISP and may be recognized on shipment or activation.)

(O'Bryan Decl. Ex. A at 24). In other words, the revenue does not derive from Gateway providing a service, because Gateway has no further obligation to the customer. The revenue therefore is properly recognized in accordance with the policy articulated in the 1999 10-K, as well as the terms of the contract. The SEC has failed to provide evidence on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which a reasonable fact-finder could decide otherwise.

The SEC's claim that this transaction required additional disclosure hinges on its position that the transaction lacked economic substance and was a change in accounting principle under GAAP. Because a reasonable fact-finder could not find in the SEC's favor on either of these contentions, they also could not find that the transaction required additional disclosure. The AOL transaction therefore cannot form the basis for any fraud allegations against Weitzen or the other defendants.

c. *sale of equipment to Lockheed*

The final item that the SEC focuses on in regard to Weitzen is the sale of computer equipment used in Gateway's internal operations to Lockheed Martin Integrated Business Solutions ("Lockheed"). At the time, Lockheed was Gateway's third party IT services provider and was responsible for managing and servicing Gateway's computer infrastructure. (SEC Facts ¶ 54). Todd and Manza initiated this sale with the goal of completing it before the end of Q3 2000. (*Id*.) The deal was set up so as to be cost-neutral for Lockheed, and included a leaseback provision under which Gateway leased the equipment back from Lockheed for the same price as Lockheed paid Gateway. (SEC Facts ¶ 56).

**\*7** Gateway booked the full $47.2 million of the sale as revenue. (SEC Facts ¶ 65). The SEC cites two primary problems with this approach. First, the equipment was recorded in Gateway's books as a fixed asset, and properly should have been recorded as a fixed asset sale. (SEC Facts ¶ 57). Second, only a fraction of the equipment was Gateway branded, and therefore the remainder should not have been booked as revenue. (SEC Facts ¶ 62). PwC subsequently discovered that the sale had been recorded as revenue and forced Gateway to restate its Q3 2000 results and back the transaction out of revenue. (SEC Ex. 33).

Defendants' expert asserts that booking the transaction as revenue was a "gray area" in relation to GAAP. (O'Bryan Decl. Ex. A). At the very least, this creates a genuine issue of material fact as to whether revenue was materially misrepresented based on this transaction.

2. *Scienter*

In addition to showing a material misrepresentation, the SEC must show that Weitzen acted with scienter. Scienter is defined as a "mental state embracing intent to deceive, manipulate or defraud."*Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter may also be established by a showing of recklessness. *SEC v. Dain Rauscher, Inc.,* 254 F.3d 852, 856 (9th Cir.2001). Reckless conduct is conduct that consists of a highly unreasonable act, or omission, that is an " 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." ' *Id.* (quoting *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568-69 (9th Cir.1990) (en banc)).

The SEC has failed to present evidence upon which a reasonable finder of fact could determine that Weitzen acted with scienter. In order to establish scienter, the SEC needs to show that Weitzen acted with actual intent, or recklessness. *Id.* It has presented evidence that Weitzen had knowledge of the above-discussed transactions, and there is no dispute regarding that. But knowledge of the existence of the transactions does not allow a reasonable fact-finder to draw an inference that Weitzen had knowledge of their impropriety, or was reckless in not knowing. Weitzen was not an accountant, nor has evidence been proffered that he had any reason to have accounting expertise sufficient to challenge the treatment given to any particular transaction. (SEC Ex. 10).

The SEC tries to create an inference of recklessness on the basis of how Weitzen addressed Lee Bird's concerns regarding the AOL transaction. But the evidence fully supports the opposite conclusion. When Weitzen became aware that Bird had concerns with the change in the AOL relationship, he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

followed up with a team put together to vet the accounting, including the Vice President of Ethics and Compliance. (*Id.*) Bird's concerns were addressed, he became comfortable with the transaction and the accouting, and Weitzen was informed of it. (*Id.,* Weitzen Ex. 12). The SEC also establishes, and Defendants do not dispute, that Weitzen was aware of management's desire to close the anticipated gap between revenue and analyst consensus expectations. But the SEC fails to provide any evidence or authority that this is anything but common and sound business practice, as opposed to the "extreme departure from the standards of ordinary care" it is required to establish. *See SEC v. Dain Rauscher, Inc.,* 254 F.3d at 856. Without additional action or knowledge of impropriety on Weitzen's part, as a matter of law, there simply is no scienter.

**\*8** The Court must therefore grant summary judgment to Weitzen on the § 10(b) and Rule 10b-5 claims against him.

### B. Control Person Liability

Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) provides:
Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation.

In order to prove a case under § 20(a), the SEC must establish: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000). The primary violator in this case is alleged to be Gateway, and the SEC claims that as CEO, Weitzen was a controlling person of Gateway. (SEC Mem. at 9-10).

Curiously, the SEC does not bother to establish Gateway's primary violation other than by reference to the cease and desist order entered as a result of a settlement with Gateway. (SEC Mem. at 9 n. 11, citing *In the Matter of Gateway, Inc.*2003 SEC LEXIS 2713 (November 13, 2003)). This order states:
In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and *without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings,* Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Cease-and-Desist Order, as set forth below.

*Id.* at \*1-2 (emphasis added). In other words, the order is the result of a negotiated settlement between the SEC and Gateway. Gateway neither admits nor denies any of the allegations in the order. The SEC cites no authority for the proposition that a negotiated settlement which on its face does not constitute an admission, establishes a primary violation for purposes of § 20(a) liability. The order is therefore irrelevant to the issue of Weitzen's alleged control person liability.

Gateway is not a defendant in this action. The SEC does not present arguments or evidence on the issue of Gateway's primary violation. The Court can, of course, consider the evidence the SEC has presented against Todd, Manza and Weitzen in relation to Gateway, as those allegations primarily relate to Gateway's Q3 2000 10-Q filing. As discussed above, the Court has determined that there is a genuine question of material fact as to whether the increased lower tier consumer lending and the sale of equipment to Lockheed contributed to a material misstatement of revenue. This conclusion would apply equally to Gateway as to Weitzen, Todd and Manza. Therefore, there is a genuine issue of material fact as to Gateway's primary violation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*9** The second element that the SEC must establish is that Weitzen exercised actual power or control over the primary violator. *Howard v. Everex Systems, Inc.,* 228 F.3d at 1065. Control is defined by the SEC as:

the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise.

17 C.F.R. § 230.405. But, " 'whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." ' *Howard v. Everex Systems, Inc.,* 228 F.3d at 1065 (quoting *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir.1994) (internal quotation marks and citations omitted)).

Weitzen's status as CEO is not conclusive on the issue of whether he was a controlling person. "Although a person's being an officer or director does not create any presumption of control, it is a sort of red light."*Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1397 (9th Cir.1993). Weitzen's role as CEO seems similar to that of the CEO at issue in *Paracor Finance, Inc. v. General Electric Corp. .,* 96 F.3d 1151 (9th Cir.1996). In *Paracor,* the CEO was described as "the classic conceptualizer and idea man who leaves behind a long swath of details for someone else to handle."*Id.* at 1163.He was however consulted on all major decisions. *Id.* By all accounts, this was Weitzen as well. And as was the case in *Paracor,* the plaintiff here fails to present evidence showing Weitzen had control over the transactions at issue. As discussed above, there is no debate that Weitzen was aware of the existence of the transactions. But there is little evidence that he controlled those transactions or was aware of them in any but the most general sense. The court in *Paracor* found that the CEO was not a controlling person, both on the basis of his less than complete control of the company, and his specific lack of control of the transaction in question. *Id.* at 1164.It is Weitzen's lack of specific control of the transactions at issue here that serves to separate him from any potential control person liability.

Weitzen has also provided sufficient evidence to meet his burden of showing that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation."15 U .S.C. § 78t(a). During Weitzen's tenure as CEO, Gateway established an Office of Ethics and Compliance, an internal auditing function, and initiated an assessment of internal accounting controls. (Weitzen Facts ¶¶ 11-13). Weitzen has demonstrated that when faced with questions on the transactions at issue, he sought assurance that the people with the requisite expertise were comfortable with Gateway's approach. For example, Weitzen sought assurance from Todd that Lee Bird's concerns regarding the AOL transaction had been addressed, and received such assurance in an email from Todd:

**\*10** I spoke with Lee last night and he has thought through the AOL accounting proposal and is now comfortable. One key to his being more comfortable was the openness in which we reviewed (i.e.Sr.team, legal, ethics, audit) and that we took his concerns and the accounting treatment seriously. Thanks for your support in getting it resolved.

(SEC Ex. 55). The Court finds that as a matter of law, Weitzen acted in good faith and cannot be held secondarily liable for the fraudulent acts allegedly committed by Gateway.

### C. Lying to Auditors

Finally, the SEC alleges that Weitzen violated Exchange Act Rule 13b2-2 by signing a false management representation letter to PwC, Gateway's outside auditor. Rule 13b2-2 states in relevant part:

(a) No director or officer of an issuer shall, directly or indirectly:

(1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

(2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not mislead-

ing, to an accountant in connection with:
(i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or
(ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

17 C.F.R. § 240.13b2-2. The SEC takes issue with the representations in the management letter that the interim financial statements were prepared on a basis consistent with corresponding periods for the prior year, and with the prior year's audited financial statements. Specifically, it claims the methodology for calculating the loan loss reserve was changed in the third quarter, and neither the AOL nor the Lockheed transaction was reported on a basis consistent with the accounting policies set forth in the 1999 10-K.

As discussed above, Weitzen had no knowledge of any potential misrepresentations regarding the AOL or Lockheed transactions, nor was he reckless in not knowing. The SEC provides no evidence linking Weitzen to the change in loan loss reserve methodology, and seemingly admits as much by asking the Court to consider control person liability for him in regard to that issue, based on imputing Todd and Manza's knowledge to Gateway. (SEC Mem. at 15, n. 15). Additionally, Weitzen has offered undisputed evidence of his good faith in relying on Gateway's CFO, Controller and General Counsel's assurances of the veracity of the management representation letter before signing it.

The SEC has cited to no case where liability for a Rule 13b2-2 violation was imposed on an individual who otherwise could not be held liable for a primary or secondary violation of the anti-fraud provisions, based on that individual's lack of scienter and affirmative showing of good faith. The Court's own research has similarly turned up cases assigning liability for a Rule 13b2-2 violation only when the individual knew or had reason to know the statements or omissions he was making to the auditors were false. *See e.g. S.E.C. v. Sandifur,* No. C05-1631C, 2006 WL 538210 at *9 (W.D.Wash. March 2, 2006) (finding 13b2-2 violation sufficiently alleged when defendant knowingly concealed information auditor would find critical to approve deal, and primary section 10(b) violation had been sufficiently alleged); *S.E.C. v. Dauplaise,* No. 6:05CV1391 ORL 31KRS, 2006 WL 449175 at *3, 8 (M.D.Fla. Feb.22, 2006) (finding 13b2-2 violation sufficiently alleged when CEO knew of default on note and receivership and failed to disclose to accountants, and primary section 10(b) violation had been alleged); *S.E.C. v. Orr,* No. 04-74702, 2006 WL 542986 at *16-18 (E.D.Mich. March 6, 2006) (considering defendants' knowledge, or recklessness in not knowing statements made to auditors were false); *S.E.C. v. Autocorp Equities, Inc.,* No. 2:98-CV-00562 PGC, 2004 WL 1771608 at *6 (D.Utah Aug.4, 2004) (finding 13b2-2 liability only appropriate upon showing that defendant later learned previous statements to auditors were false and failed to correct them). The SEC has presented no evidence that Weitzen knew or was reckless in not knowing that the statements in the management representation letter were false. Nor has it presented evidence disputing his good faith defense. The Court therefore finds as a matter of law that Weitzen cannot be held liable for violation of Rule 13b2-2.

*CONCLUSION*

***11** For the reasons stated above, the SEC's Motion for Partial Summary Judgment against Defendant Weitzen is denied. Defendant Weitzen's Motion for Summary Judgment is granted in whole, and judgment is to be entered in his favor.

IT IS SO ORDERED.

S.D.Cal.,2006.
S.E.C. v. Todd
Slip Copy, 2006 WL 1564892 (S.D.Cal.), Fed. Sec. L. Rep. P 93,926

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.