RICHARD HONG (Trial Counsel) (Admitted in New York)
MELISSA A. ROBERTSON
JEFFREY B. FINNELL
THOMAS D. MANGANELLO

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC  20549-4010-A
Telephone:  (202) 551-4431
Facsimile:   (202) 772-9246
Email: hongr@sec.gov

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

_____
                                                              :
SECURITIES AND EXCHANGE COMMISSION,   :
                                                              :
                    Plaintiff,                           :
                                                              :
          vs.                                             :          Case Number.  07-3444 JF
                                                              :
MARK LESLIE,                                       :          AMENDED COMPLAINT
KENNETH E. LONCHAR,                        :
PAUL A. SALLABERRY,                         :          DEMAND FOR JURY TRIAL
MICHAEL M. CULLY,                            :
and DOUGLAS S. NEWTON,                   :
                                                              :
                    Defendants.                      :
_____:


Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY OF THE ACTION

1.     This is a financial fraud case against five former senior managers and finance managers of Veritas Software Corporation ("Veritas" or the "Company"), a California software maker.  Mark Leslie, Kenneth E. Lonchar, and Paul A. Sallaberry knowingly participated in a fraudulent scheme by artificially inflating Veritas' publicly reported revenues and earnings through a round-trip transaction with America Online, Inc. ("AOL") in 2000 and by lying to Veritas' independent auditors.  In addition, Lonchar, with the participation and assistance of Michael M.

Cully and Douglas S. Newton, intentionally manipulated and distorted Veritas' reported earnings through "smoothing" its financial results from at least 2000 through 2002. Lonchar, Cully, and Newton also lied to and/or failed to disclose to Veritas' independent auditors their fraudulent conduct.

2.    In 2000, Veritas artificially inflated reported revenues by approximately $20 million in connection with a software sale to AOL. Defendant Leslie, Veritas' Chief Executive Officer ("CEO") and Chairman of the Board of Directors, authorized the transaction and directed defendant Sallaberry, Veritas' head of sales, to negotiate the terms and execute the transaction documents. Defendant Lonchar, Veritas' Chief Financial Officer ("CFO"), applied an accounting treatment to the transaction that did not comply with generally accepted accounting principles ("GAAP"). All three defendants concealed the true nature of the transaction with AOL, which allowed Veritas to artificially inflate its reported revenue, from Veritas' independent auditors.

3.    From at least 2000 until his termination in 2002, Lonchar also applied a number of non-GAAP accounting practices to produce "museum quality" (albeit false) financial results. Veritas' controller, defendant Cully, and its assistant controller, defendant Newton, executed the non-GAAP practices at Lonchar's direction.   All three defendants concealed the accounting manipulations and distortions from Veritas' independent auditors.

4.    As a result of the defendants' actions, Veritas reported materially false and misleading financial results in periodic reports filed with the Commission and other public statements from at least 2000 through 2003 and in its January 28, 2004 earnings release of fourth quarter and annual results for 2003.

5.    By engaging in the foregoing conduct, Leslie, Lonchar, Sallaberry, and Cully, violated the antifraud provisions of the federal securities laws. All the defendants violated the record-keeping provisions and aided and abetted violations of the reporting provisions of the federal securities laws.

In addition, Lonchar, Cully, and Newton violated the internal control provisions of the federal securities laws.  Finally, all defendants lied to and/or failed to disclose material information to Veritas' independent auditors, in violation of the federal securities laws.  Unless enjoined from doing so, the defendants are likely to commit the foregoing violations in the future.

6.    Accordingly, the Commission is seeking an injunction, disgorgement of ill gotten gains with prejudgment interest, and civil monetary penalties against all defendants.  In addition, as to Leslie, Lonchar, Sallaberry, and Cully, the Commission is seeking an officer and director bar against them.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action under Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and (e) and 78aa].  Defendants have made use, directly or indirectly, of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this Amended Complaint.

8.    Venue is appropriate in this Court under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts or transactions constituting the violations alleged herein occurred in this judicial district.

## DEFENDANTS

9.    Mark Leslie resides in Portola Valley, California.  Leslie was the CEO of Veritas from 1990 through 2000.  He was co-chair of the board of directors from 1997 until 1999, when he became chairman of the board of directors.  He resigned as CEO on December 31, 2000, but continued to serve on the board of directors until May 31, 2004.

10.    Kenneth E. Lonchar resides in Fremont, California.  Lonchar was Veritas' CFO from April 1997 until October 2002.  Lonchar was licensed as a Certified Public Accountant ("CPA") in Idaho.

11.    Paul A. Sallaberrry resides in Menlo Park, California.  Sallaberry was Veritas' executive vice president of Worldwide Field Operations from January 2000 through January 2003, when he became executive vice president, Sales Strategy, until he resigned.

12.    Michael M. Cully resides in Sunnyvale, California.  Cully was Veritas' controller from May 1998 until February 2003.  He was licensed as a CPA in Illinois.

13.    Douglas S. Newton resides in San Jose, California.  Newton served as Veritas' assistant controller from 1998 until September 2003 when he became senior director of Global Financial Systems.  Newton resigned in March 2004.

## RELATED ENTITIES

14.    Veritas Software Corporation, now a wholly owned subsidiary of Symantec Corporation, is a software company headquartered in Cupertino, California that creates and licenses data storage software.  At the time of the events alleged in this Amended Complaint, Veritas' common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was quoted on the Nasdaq National Market.  Veritas filed annual, quarterly, and current reports with the Commission on Forms 10-K 10-Q and 8-K.  On July 2, 2005, Symantec Corporation acquired Veritas.

15.    America Online, Inc. is an Internet service provider.  America Online, Inc. merged with Time Warner Inc. on January 11, 2001 and the merged company was named AOL Time Warner Inc.  (America Online, Inc. and AOL Time Warner Inc. are referred to as "AOL" throughout this Amended Complaint.)  AOL's common stock was registered with the Commission pursuant to

Section 12(b) of the Exchange Act and traded on the New York Stock Exchange. In 2003, the

company changed its name to Time Warner Inc.

## FRAUDULENT SCHEMES

### LESLIE, SALLABERRY, AND LONCHAR KNOWINGLY AND IMPROPERLY INFLATED THE PRICE OF A SOFTWARE LICENSE IN A TRANSACTION WITH AOL

#### Leslie and Sallaberry Agreed to the AOL Round-Trip Transaction

16.     During the summer of 2000, Veritas began negotiating with AOL to sell an unlimited license for all of Veritas' software products as well as certain service, consulting and training commitments (the "License"). Veritas' sales personnel, under Sallaberry's direction and supervision, handled most of the License negotiations.

17.     During negotiations in late August and September 2000, AOL proposed that Veritas purchase online advertising from AOL. At the time, Veritas had no budget or need for AOL's online advertising and rejected the proposal.

18.     By mid-September 2000, AOL and Veritas had agreed on a $30 million purchase price for the License, which represented a 65% discount. Veritas and AOL agreed to close the transaction by the end of the third quarter.

19.     The $30 million transaction constituted the largest transaction in Veritas' history, more than twice the next largest sale of $14 million.

20.     On September 29, 2000, just hours before the parties were set to execute the License agreement, AOL's lead negotiator telephoned Leslie and asked, as a favor, for Leslie to allow AOL to pay an additional $20 million for the license and for Veritas' agreement to purchase a comparable amount of AOL online advertising. The AOL negotiator explained that AOL would simply take a "shallower" (less favorable) discount on the license. Based upon his discussion with the AOL's lead negotiator, Leslie understood that AOL was asking to pay a higher price for the same license.

21.     Although Veritas did not need or want millions of dollars of online advertising from AOL, Leslie agreed to the proposal.  At the time, Leslie had never purchased online advertising and had no idea if Veritas had a campaign in place to use online advertising.

22.     After his telephone conversation with AOL on September 29, 2000, Leslie directed Sallaberry to contact AOL to work out the details of the transaction.  Leslie told Sallaberry that the License was not to be changed in any way that would increase the real, out-of-pocket costs to Veritas.

23.     Still on September 29, 2000, Sallaberry then telephoned a sales executive at AOL to effectuate the agreement.  The AOL sales executive repeated the proposal previously made to Leslie: that AOL would pay Veritas $50 million for the License, instead of $30 million, if Veritas would buy $20 million of online advertising from AOL.  After consulting with Lonchar and Leslie, Sallaberry affirmed the AOL proposal.  The terms of the License remained essentially unchanged despite the $20 million increase in the price.

24.     Sallaberry, who had no marketing experience, reviewed and executed the AOL advertising purchase – the largest in Veritas' history – without consulting anyone in the marketing department.  Sallaberry did not try to negotiate any terms of AOL's standard form advertising contract, notwithstanding Veritas' $20 million lump sum payment for advertising, $6.6 million of which was to begin running within a matter of days.  The advertising contract gave AOL complete discretion as to where the advertising would be run.

25.     On September 29, 2000, Lonchar told Sallaberry to document the transaction as if it were two separately negotiated, *bona fide* contracts.  Later that day, Sallaberry executed on behalf of Veritas a contract to sell the License to AOL for $50 million and a contract to buy $20 million of online advertising from AOL.

26.     The License provided for payment within 30 days from the date of invoice while the advertising agreement required payment within 30 days of the contract date – typical payment terms

for each company.  Sallaberry and his AOL counterpart, however, verbally agreed to make simultaneous wire payments of their respective amounts due.  Sallaberry did not document this agreement.

27.     On October 2, 2000, Leslie revealed the true nature of the transaction in an email correspondence, explaining:  "We closed a $30 million deal with AOL (which will be taken to revenue in Q4).  However, at the eleventh hour we got a request from AOL to gross up the deal by $20 million and take back an equal amount of dollars in paid advertising to AOL."

28.     In early October 2000 and in response to Leslie's email, Leslie was warned at least twice of the "sensitive" accounting issues arising from the AOL transaction.  Leslie was urged to take extra caution in making sure the Company's independent auditors agreed with the Company's revenue recognition of the AOL transaction.

29.     In November 2000, when Veritas' $20 million payment pursuant to the terms of the advertising contract was due, AOL had not yet paid the $50 million under the License.  Sallaberry insisted that Veritas hold AOL to his verbal agreement with AOL that these payments be made by simultaneous wire transfers.  On December 1, 2000, Sallaberry and Lonchar were told the companies made these simultaneous wire transfer payments that day.

30.     Despite his knowledge of the true nature of the AOL transaction, Lonchar improperly booked the entire $50 million as license and service revenue beginning in the fourth quarter of 2000 through 2002.  Lonchar's accounting for the transaction did not conform to GAAP.

### Leslie, Sallaberry and Lonchar Lied to and Withheld Material Information from Veritas' Independent Auditors about the AOL Transaction

31.     In December 2000, Veritas' independent auditors reviewed the License as part of their regular review of significant revenue transactions for the fourth quarter of 2000.  Lonchar and Sallaberry did not disclose to the auditors about the existence of the contingent nature of the advertising deal – namely, that Veritas only agreed to enter into the advertising contract after AOL

agreed to fund that "purchase" by inflating the price of the License.  As a result, the auditors reviewed and treated the License as a "stand-alone" revenue contract.

32.     In January 2001, Veritas' independent auditors discovered the concurrent nature of the contracts with AOL during its audit and questioned whether Veritas could recognize revenue on the License in the amount of $50 million.  To determine whether Veritas could substantiate its accounting for the contracts at their gross amounts, the auditors spoke to Leslie, Sallaberry, and Lonchar to understand the business rationales behind the contracts and justify the prices paid.

33.     Leslie, Sallaberry, and Lonchar each knowingly failed to inform the independent auditors of the true, contingent nature of the AOL contracts, including the last minute negotiations that resulted in the $20 million inflation of the License price and $20 million advertising deal.

### Lonchar's Misrepresentations to the Auditors

34.     Lonchar lied to Veritas' auditors, telling them: (1) the License and the advertising contract were entered into for separate and valid business reasons and were not part of any overall arrangement; (2) the transactions were separately negotiated by executives in different functional organizations within Veritas; (3) both contracts were fairly valued; (4) Veritas entered into the advertising contract in order to strengthen brand name recognition; and (5) AOL's commitment to pay the License fee was never contingent on Veritas entering into the advertising deal.  Lonchar accused the auditors of failing to trust him enough to take him at his word.

35.     Lonchar did not tell the independent auditors about the contingent nature of the contracts, including the last minute negotiations that resulted in the $20 million inflation of the License price and $20 million advertising deal, or about the undocumented side agreement between Sallaberry and AOL to make payment simultaneously.

36.     Lonchar also participated in preparing and submitting to Veritas' independent auditors documentation that justified the $50 million License price and concealed the true nature of the AOL

transaction.

## Leslie's Misrepresentations to the Auditors

37.    When the independent auditors discovered the license and advertising contract were executed on the same day, they required that additional procedures be performed.  The auditors informed Leslie of the accounting literature on point, made inquiries regarding the substance of the transactions and explained to him the accounting issues implicated by the transactions.

38.    Leslie did not ask whether Lonchar had discussed or cleared the accounting with the auditors.  Instead, Leslie falsely represented to the auditors, among other things, that:  (1) the two AOL contracts were entered into for separate and valid business reasons; (2) the AOL software sale and advertising purchase were separate and not part of any overall arrangement between the two companies; (3) AOL's commitment to pay the fee for the license was, from its initiation, never contingent upon Veritas entering into the advertising purchase; (4) Veritas needed this online advertising as part of its campaign for stronger brand recognition; and (5) the contracts were fairly priced at $50 million and $20 million, respectively.  Leslie did not disclose to the independent auditors the contingent nature of the contracts, including the last minute negotiations that resulted in the $20 million inflation of the License price and $20 million advertising deal, or his role in the negotiations.

## Sallaberry's Misrepresentations to the Auditors

39.    In January 2001, Sallaberry played a critical role in deceiving the independent auditors about the two contracts he signed with AOL.  As part of Veritas' effort to justify its accounting for the AOL contracts, Sallaberry (1) lied to and misled the independent auditors in discussions with the audit team; (2) participated in, or at least was aware that others were, altering or withholding documents created contemporaneously with the transaction that described it as a $30 million license at a 65% discount and directed the creation of documents to support the $50 million

price and 42% discount as being fair and reasonable; and (3) interceded with AOL to have his AOL counterpart sign an audit confirmation for Veritas' independent auditors in time for Veritas' earnings release.

40.    Veritas' independent auditors spoke to Sallaberry about the sales process preceding the license agreement, the overall business context for the transaction with AOL, the reason for the size of the license, the discount percentage, the business reasons and scope of the transaction and AOL's expected deployment of the software.   The auditors also asked Sallaberry whether the size and scope of the transaction was comparable to prior transactions.  Instead of being truthful, Sallaberry provided false and misleading responses.

41.    When a member of the audit team asked Sallaberry whether the software sales transaction was contingent upon or connected to the advertising arrangement, Sallaberry falsely represented that they were not.

42.    Sallaberry concealed the contingent nature of the advertising deal by falsely claiming that the marketing department, not Sallaberry, negotiated the advertising deal.

43.    Sallaberry did not disclose to Veritas' independent auditors the last minute negotiations that resulted in the $20 million inflation of the License price and $20 million advertising deal.

44.    Sallaberry did not disclose to the auditors that he and his AOL counterpart agreed to make payment under the contracts by simultaneous wire transfers, contrary to the express terms of the two agreements, and that he later insisted that payments be made simultaneously when AOL pressed for Veritas' payment on the stated contract terms.

45.    Sallaberry also participated in the preparation of and submission to Veritas' independent auditors documents that justified the $50 million License price and concealed the true

nature of the AOL transaction.  Sallaberry directed his sales team to collect documentation to falsely support the value of the license at $50 million and a 42% discount.

### Additional Misrepresentations to the Auditors

46.    During the January 2001 audit committee meeting at which the AOL transaction was discussed with the independent auditors, Leslie and Lonchar again failed to inform the independent auditors of the contingent nature of the software sale and advertising purchase and the last minute negotiations that resulted in the $20 million inflation of the License price and $20 million advertising deal as well as Leslie's role in the negotiations.

47.    In January 2001, Lonchar and Leslie gave Veritas' independent auditors a materially misleading representation letter, failing to disclose the contingent relationship of the parties' entry into the License at a $50 million price and their entry into the advertising contract.  Instead, they represented that, with regard to all of its software transactions, they had disclosed all sales terms to the Company's auditors and that the sales agreements represented the entire arrangements and were not supplemented by other written or oral agreements such as the oral agreement concerning the payment terms.  They also represented that the AOL contracts had been recorded at fair value within reasonable limits.  Lonchar again failed to disclose the parties' oral agreement to modify the payment terms under the contracts to require simultaneous wire transfers.

48.    Thus, the independent auditors, based upon the false representations made by Leslie, Lonchar, and Sallaberry, ultimately issued an unqualified audit report on the 2000 financial statements.

49.    Thereafter, in 2001, Leslie and Lonchar approved the public disclosure of these false and misleading financial results, including approving and signing the 2000 10-K, which contained the artificially inflated results, filed with the Commission.  Leslie and Lonchar also approved false and

misleading press releases and participated in earnings release teleconferences with analysts in which false and misleading disclosures were made.

50.    The inflated price of the License materially distorted Veritas' fourth quarter results of operations.  Fourth quarter revenues were inflated by $19.2 million, representing 5% of total revenues and 6% of license revenues for the quarter, and the net loss for the fourth quarter was improperly reduced by $8.1 million, representing a 6% understatement.  Booking the $20 million "gross up" caused a material effect:  it allowed Veritas to not only meet, but exceed, Wall Street earnings estimates by two cents in keeping with Veritas' longstanding practice.

51.    On January 17, 2003, Veritas announced that it would restate its financial statements in order to reverse the $20 million of improperly recognized revenue from the AOL round-trip transaction and correct the related over-stated expenses (the "2003 Restatement").

## LONCHAR FURTHER MANIPULATED VERITAS' FINANCIAL STATEMENTS

52.    Beginning in at least 2000 until his termination 2002, Lonchar knowingly directed a scheme consisting of three separate non-GAAP accounting practices that he used to manage Veritas' earnings and artificially "smooth" its financial results.  As a result, Veritas' reported financial results for 2000 through 2003 were materially false.  Michael Cully, Veritas' controller, and Douglas Newton, Veritas' assistant controller, assisted Lonchar in the scheme, as described below.

## Lonchar Improperly Recorded and Maintained Accrued Liabilities, Using "Accrual Wish Lists" and "Cushion Schedules"

53.    Lonchar directed the recording, maintenance, and tracking of a variety of accrued liability balances (including a variety of compensation, bonus, and incentive accruals, fixed asset reserves and general reserves) that were not in conformity with GAAP because they were excessive and/or unsubstantiated (the "improper accrued liabilities").  As a result, Veritas failed to accurately report its quarterly and annual financial results, causing overstatements of earnings in some quarters

and understatements during other quarters, creating a false and misleading impression of the

Company's financial performance.

54.    After properly-determined accruals had been made, and as part of its quarterly process

of closing its books and preparing financial statements, Lonchar requested that Company analysts in

finance and the operational units submit additional expenses for possible accrual in that period.

These proposed, non-GAAP accruals were kept on an "accrual wish list."

55.    Lonchar, Cully, and Newton recorded a number of these accruals from the wish lists

without regard to GAAP.  Rather, they improperly evaluated the recording of these additional non-

GAAP expenses from the wish list based primarily on whether:  (a) there was room in the budget; (b)

they could be taken as expenses without adversely impacting the desired financial results for the

quarter, including the impact on earnings; and/or (c) they would benefit results in the subsequent

quarter by recording such expenses in the current quarter.  Lonchar decided which accruals, and in

what amounts, to add to the accrued liabilities in order to achieve desired financial results.  Lonchar

directed his finance team to prepare "cushion schedules" prepared on a quarterly (and at times

monthly) basis that reflected the improperly accrued liabilities.  The cushion schedules showed

Lonchar, Cully and Newton the value of improper accrued liabilities that were available to be

released to offset new or unplanned expenses without adversely impacting Veritas' planned earnings

for a quarter.  Cully and Newton participated in the preparation of the cushion schedules.  Lonchar

knew these accruals were not in conformity with GAAP because they were excessive and/or

unsubstantiated.

56.    The cumulative balances of over-stated accrued liabilities tracked on Veritas' cushion

schedules for each quarter from 2000 through 2002 ranged from approximately $10 million to $21

million.

57.    Lonchar, Cully and Newton concealed these improper accruals by spreading them

over many accounts and by concealing the cushion schedules from its internal and independent auditors.

58.     In March 2004, Veritas announced a second restatement of its financial statements to correct, among other things, its improper accounting for accrued liabilities and disclosed that this and other improper accounting practices described below (the "2004 Restatement").

**Lonchar Improperly Cut Off
Recognition of Professional Service Revenue**

59.     Veritas' second line of revenue (behind software sales) was from fees charged for professional services related to the usage of its software (generally consulting and training).

60.     At the beginning of each quarter, Lonchar set targets for reported revenue.  In a number of quarters, when the Company had reached its revenue targets, Lonchar instructed the finance department to stop accruing and recognizing professional service revenue on services that Veritas had delivered and therefore earned in the current quarter.  The fully earned but unrecognized service revenues were tracked on "Carryforward Rollfoward" schedules.

61.      Lonchar, Cully, and Newton knew that Veritas' failure to recognize revenues when they were earned did not comply with GAAP, which requires companies to recognize service fees at the time they are earned and collectible.

62.     Cully and Newton participated in quarter-end revenue meetings where Lonchar directed the improper revenue cut-offs prior to the quarter end.  At certain of these meetings when Cully was present, Newton told Lonchar this practice was improper and that he was uncomfortable with it.  In response, Lonchar claimed that it would be the last quarter the accruals would not be properly recorded.  Lonchar, Cully, and Newton nevertheless continued to participate in this practice despite their knowledge of its impropriety.

63.     By this practice, Lonchar improperly managed Veritas' quarterly professional service revenues, pushed additional service revenues into the next quarter, and caused the percentage of

reported revenues attributable to professional services to be smaller than it otherwise would be; and conversely, the ratio of reported license revenues was larger than it should have been.

64.     Analysts tracked the license-to-service revenue mix as percentages of total revenues each quarter.  License revenue that constituted a larger percentage of total revenue was more desirable because of the higher margins earned on license revenue.

65.     By understating service revenue and overstating the ratio, Lonchar created false and misleading quarterly financial results.  Moreover, the practice resulted in "cookie jar" revenue reserves that were available in future quarters if performance fell short of budget.

66.     As part of its 2004 Restatement, Veritas corrected the accounting of the improper quarterly revenue cut-off practice in its financial statements.

**Lonchar and Newton Improperly**
**Manipulated Veritas' Deferred Revenue Balance**

67.     Veritas also manipulated its financial reporting by improperly inflating its reported deferred revenue on its balance sheet for the second quarter of 2002 by approximately $7 million.

68.     During the end of the second quarter of 2002, Lonchar and Newton noticed that Veritas' deferred revenue balance was substantially lower than expected and less than it had been in the prior quarter.  Concerned that analysts would view this declining deferred revenue balance negatively and interpret it as an indication that the amount of Veritas' new business had declined, possibly signaling a decline in revenues for the next quarter, Lonchar and Newton devised a scheme to improperly inflate the deferred revenue balance.  Cully was informed of the scheme and understood that Lonchar was concerned that a declining deferred revenue balance would be interpreted as an indication that Veritas' business was weakening and the Company was moving the deferred revenue to revenue.

69.     Following Lonchar's instructions, Newton directed finance personnel to inflate the deferred revenue balance, in violation of GAAP.  Newton told finance personnel not to subtract

certain amounts from the deferred revenue balance that were attributable to unpaid contracts –
something Veritas normally did in reporting its deferred revenues in its quarterly financial
statements.

70.    To conceal this improper inflation of the quarter end balance, Veritas finance
personnel provided Veritas' independent auditors with a falsified account reconciliation schedule.
The schedule falsely listed the status of certain licenses as "paid," when such items were known to
have been unpaid, so that the deferred revenues associated with those contracts would not be
subtracted from the deferred revenue balance.  When the auditors questioned the schedule and the
inflated deferred revenue balance, they were told that the errors in the schedule were inadvertent
mistakes.

71.    At the quarterly review close meeting attended by Lonchar, Cully, Newton and others,
the auditors asked whether the Company wanted to correct its books and financial statements for this
purported accidental error.  Lonchar said that the Company would not undertake to correct the error
and instead leave it on the schedule of unadjusted audit differences.  Lonchar, Cully and Newton
failed to advise the auditors that the error was the result of intentional manipulation of the deferred
revenue balance.

72.    As part of its 2004 Restatement, Veritas corrected its deferred revenue balance, which
reduced the reported deferred revenue balance by approximately $7 million for the second quarter of
2002.

**Lonchar and Cully Signed False**
**and Misleading Representation Letters**

73.    In 2001 and 2002, Lonchar and Cully each signed false and misleading representation
letters and provided them to the Company's independent auditors.

74.    In these letters as well as in discussions with the Company's internal and independent
auditors, Lonchar and Cully failed to disclose the non-GAAP accounting practices concerning its

excess and unsubstantiated accruals, professional service revenues, and deferred revenues making false and misleading representations and omitting material information in making those representations.

75.    For example, in a January 23, 2001 letter to the Company's independent auditors, Lonchar and Cully made the following false and misleading representations:

    a.    the consolidated statements of financial position and results of operations were fairly presented in conformity with GAAP;

    b.    the un-audited quarterly financial information to be included in the Annual Report to Stockholders was derived from interim financial statements prepared in conformity with GAAP;

    c.    they provided the auditors with all financial records and related data;

    d.    there are no material weaknesses in internal controls;

    e.    the Company has accrued  $13,934,404, and $12,771,464  in  commissions and  bonuses, respectively, as of December 31, 2000 based upon its best estimates of amounts earned in 2000 but to be paid subsequent to December 31, 2000;

    f.    there are no material transactions that have not been properly recorded in the accounting records underlying the financial statements;

    g.    there has been no fraud involving management or employees who have significant roles in internal control.

76.    Likewise, in their January 25, 2002 letter to the Company's independent auditors, Lonchar and Cully falsely represented that:

    a.    the consolidated financial statements are fairly presented in conformity with GAAP;

b.    they had made available to the Company's independent auditors all financial records and related data;

c.    there have been no:

    i.    Instances of fraud involving management or employees who have significant roles in internal control;

    ii.    Allegations, either written or oral, of misstatements or other misapplications of accounting principles in the Company's consolidated financial statements that have not been disclosed to the Company's independent auditors in writing;

    iii.    Allegations, either written or oral, of deficiencies in internal control that could have a material effect on the Company's consolidated financial statements that have not been disclosed to the Company's independent auditors in writing; and

    iv.    False statements affecting the Company's consolidated financial statements made to the Company's independent auditors, the company's internal auditors, or other auditors who have audited entities under their control upon whose work the Company's independent auditors may be relying in connection with its audits.

d.    the unaudited interim financial information accompanying the consolidated financial statements for the quarters ended March 31, June 30, September 30, and December 31, 2001, was prepared in conformity with GAAP; and

e.    the accrual of porting services related to the Sun Microsystems OEM arrangement is a probable and estimable liability in accordance with SFAS 5, Accounting for Contingencies. … [T]he assumptions used in developing the accrual are management's best estimates based on the information available.

f.    The January 25, 2002 letter to the Company's independent auditors also noted as follows: "We understand that the term 'fraud' includes misstatements arising from fraudulent financial reporting and misstatements arising from misappropriation of assets. Misstatements arising from fraudulent financial reporting are intentional misstatements, or omissions of amounts or disclosures

in financial statements to deceive financial statement users.  Misstatements arising from misappropriation of assets involve the theft of an entity's assets where the effect of the theft causes the consolidated financial statements not to be presented in conformity with accounting principles generally accepted in the U.S.A."

**LONCHAR FALSELY CERTIFIED VERITAS' COVERED REPORTS IN AUGUST 2002**

77.    Prior to its officers' certification in August 2002 of its financial statements, including its 2001 Form 10-K, Veritas began an internal review of the AOL transaction.

78.    Shortly thereafter, a newspaper reporter called Veritas and asked it to comment on allegations the Company had a software deal with AOL that required Veritas to purchase advertising from AOL.  Lonchar, Sallaberry and Leslie were consulted in connection with the Company's efforts to avoid a story about its transaction with AOL.  The Company thereafter told the reporter that the software deal and advertising purchase were two distinct and different transactions and not part of the same deal.  Lonchar and Sallaberry knew this response was false and misleading.

79.    During the internal review of the transaction, Lonchar falsely claimed that Veritas' independent auditors were aware of the last minute change in the price of the License from $30 million to $50 million.

80.    On August 13, 2002, Lonchar falsely certified the accuracy of Veritas' 2001 annual financial statements and its interim financial statements for the quarter ended March 31, 2002, and on August 14, 2002, Lonchar falsely certified the accuracy of Veritas' interim financial statements for the quarter ended June 30, 2002, when he knew or was reckless in not knowing that the Company's financial statements were not prepared in compliance with GAAP.

**DEFENDANTS PROFITED FROM THEIR MISCONDUCT**

81.     Leslie profited by selling Veritas stock at prices inflated by the misstatement of the revenue related to the AOL transaction and by receiving a bonus from Veritas based on Veritas' artificially inflated financial results.

82.     Sallaberry profited by selling Veritas stock at prices inflated by the misstatement of the revenue related to the AOL transaction and by receiving a bonus from Veritas based on Veritas' artificially inflated financial results.

83.     Lonchar profited by selling Veritas stock at prices inflated by the misstatement of the financial statements and by receiving a bonus from Veritas based on Veritas' artificially inflated financial results.

84.     Cully profited by selling Veritas stock at prices inflated by the improper earnings management described in this complaint and by receiving cash bonuses from Veritas based on Veritas' artificially inflated financial results.

85.     Newton profited by selling Veritas stock at prices inflated by the improper earnings management described in this complaint and by receiving cash bonuses from Veritas based on Veritas' artificially inflated financial results.

**ADDITIONAL ALLEGATIONS AGAINST DEFENDANTS LESLIE AND SALLABERRY**

86.     As a result of the AOL round-trip transaction agreed to and approved by, among others, Leslie and Sallaberry and their efforts to conceal the true nature of this transaction, Veritas' books and records, financial statements, and public filings contained false and inaccurate entries and information for the quarterly and/or annual periods in 2000, 2001 and 2002.

87.     In addition to the improper inflation of Veritas' financial results for the fourth quarter of 2000 as alleged above, the improper AOL round-trip and the defendants' efforts to conceal the true nature of the transaction also improperly inflated and distorted Veritas' expenses and revenues in its

2001 and 2002 books and records and financial statements for 2001 and 2002.  For example, the AOL round-trip transaction agreed to and approved by Leslie and Sallaberry allocated over $13 million of the $20 million sham advertising to 2001 – a deal term Sallaberry personally negotiated with AOL and included in the advertising contract he signed on or about September 29, 2000.  As a result, Veritas' 2001 books and records as well as its 2001 financial statements included in its 2001 Form 10-K that Leslie signed on March 28, 2002, improperly overstated, among other things, Veritas' 2001 operating expenses by over $13 million.

88.    On March 17, 2003, Veritas restated its financial statements for 2000 and 2001 to correct for the AOL round-trip in an amendment to its Form 10-K for the year ended December 31, 2001.

89.    As alleged above in paragraph 81, Leslie exercised stock options and sold artificially-inflated Veritas stock in violation of the federal securities laws between at least February 14, 2001 and July 15, 2002.

90.    As alleged above in paragraph 82, Sallaberry exercised stock options and sold artificially-inflated Veritas stock in violation of the federal securities laws between at least May 2, 2001 and February 13, 2002.

91.    Defendants Leslie and Sallaberry took affirmative steps to conceal the discovery of their fraudulent behavior.

92.    As alleged above, defendants Leslie and Sallaberry structured and documented the deal as if it were two separately negotiated, *bona fide* contracts, when that was not the case.

93.    By structuring and documenting the AOL round-trip transaction as if it were two separate, *bona fide* contracts, defendants Leslie and Sallaberry rendered their aforementioned misconduct self-concealing.

94.     In addition, Leslie and Sallaberry took further steps to conceal and prevent discovery of their fraud.  For example, in negotiating the terms of the $30 million software sale, before Leslie and Sallaberry agreed to AOL's round-trip proposal, Sallaberry's sales team pushed for and won the right to issue a press release concerning its License sale to AOL – the largest in Veritas' history. Notwithstanding this contractual right to trumpet Veritas' largest and possibly most important software sale in its history and repeated efforts by the Veritas marketing department to issue a release, Veritas never issued a press release announcing the AOL transaction, thereby concealing even the existence of the License piece of the transaction, as well as the true nature and substance of the round-trip with AOL.

95.     In November 2000, Sallaberry warned his sales team and the marketing department that any press release could not disclose any numbers and that Lonchar would need to approve anything before it was issued.

96.     Again, on September 29, 2000, after having executed the round-trip, Sallaberry first advised the head of Veritas' marketing department of the transaction, described it as a gift, and instructed him to keep the existence and details of the transaction quiet.  Within the marketing department, at least certain executives continued to treat the transaction with secrecy at least well into 2001.  For example, a marketing executive, in July 2001, admonished her team to use discretion in discussing the AOL transaction and that they should not use the name AOL to describe it internally or externally.

97.     During the independent auditors' original testing of the AOL software license performed late in the fourth quarter of 2000, Sallaberry, among others, did not disclose to the auditors the existence of or the contingent nature of the advertising deal with AOL, leaving the auditors to consider and audit the License as a "stand-alone" revenue contract.

98.     As alleged more fully above, in the first quarter of 2001 as part of the 2000 year-end audit, Leslie and Sallaberry lied to and/or withheld information from the company's independent auditors in order to conceal the true nature of the round-trip transaction.

99.     As alleged above, Sallaberry further deceived the auditors by participating in, or being aware of, an effort to alter or withhold from the independent auditors internal documents that were used in approving the AOL software license that described the license as a $30 million deal at a 65% discount, and instead create documents describing the license as a $50 million price at a 42% discount that were provided to the independent auditors.

100.     Leslie and Sallaberry continued to conceal the AOL transaction and its fraudulent nature through at least August 2002 when they were aware of, or participated in, a company effort to mislead (in early August and/or again in late August) a newspaper reporter investigating the AOL transaction.

101.     As a direct result of the defendants' affirmative acts of concealment as well as the self-concealing nature of the fraudulent AOL round-trip transaction, the Commission did not learn of the operative facts of the fraud until the fall of 2002 at the earliest.

102.     The Commission exercised due diligence prior to its discovery of those operative facts.  Indeed, in addition to its requirements that public companies, such as Veritas, submit financial statements and other data on a quarterly and annual basis, the Commission required an additional certification of the financial statements of public companies, including Veritas, in August 2002.

103.     In connection with preparing to file such certification and to respond to newspaper inquiries concerning the AOL transaction, Veritas conducted an internal review of the AOL transaction, discussing it with Leslie and Sallaberry, among others.  During the internal review, Sallaberry told the company's outside counsel that he had little involvement in final negotiations and therefore had limited knowledge of the advertising agreement and further falsely explained that the

advertising side was handled by the marketing department.  In discussions with company counsel and outside counsel in August 2002 and in September 2002, Sallaberry also asserted that the transactions were separate and not linked in any way.

104.    At the conclusion of its internal review in August 2002, Veritas' outside counsel warned the Veritas board and management, including Leslie, that Veritas personnel may have potential legal exposure to the securities laws in connection with the transaction in the event AOL had improperly inflated its revenues as a result of the September 29, 2000 contracts.  Veritas again chose not to correct the accounting for AOL transaction, including its 2001 financial statements, which improperly inflated Veritas' revenues and overstated its expenses.  Veritas also again failed to disclose the AOL transaction in connection with the certification filed with the Commission in August 2002.

105.    Leslie and the Commission entered into a tolling agreement, which tolled the running of any applicable statute of limitations from December 15, 2005 through June 14, 2006.

106.    Sallaberry and the Commission entered into a tolling agreement, which tolled the running of any applicable statute of limitations from December 1, 2005 through June 30, 2006.

## FIRST CLAIM
### (Fraud Violations – Offer or Sale of Veritas Stock)

**Violations of Section 17(a) of the Securities Act Against Leslie, Lonchar, Sallaberry, and Cully**

107.    Paragraphs 1 through 106 are realleged and incorporated herein by reference.

108.    By engaging in the foregoing conduct alleged in the Amended Complaint, defendants Leslie, Lonchar, Sallaberry, and Cully, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce or of the mails, in connection with the offer or sale of Veritas securities: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of securities.

109.    By reason of the foregoing, these defendants violated, and unless restrained will violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM
### (Fraud Violations – Purchase or Sale of Veritas Stock)

### Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 Against Leslie, Lonchar, Sallaberry, and Cully

110.    Paragraphs 1 through 106 are realleged and incorporated herein by reference.

111.    By engaging in the foregoing conduct alleged in the Amended Complaint, defendants Leslie, Lonchar, Sallaberry, and Cully, directly or indirectly, acting knowingly or recklessly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange, in connection with the purchase or sale of Veritas securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon any person.

112.    By reason of the foregoing, these defendants violated, and unless restrained will violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM
### (Record-Keeping Violations)

### Violations of Section 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1 Against All Defendants

113.    Paragraphs 1 through 106 are realleged and incorporated herein by reference.

114.    By engaging in the foregoing conduct alleged in the Amended Complaint, defendants Leslie, Lonchar, Sallaberry, Cully, and Newton directly or indirectly knowingly falsified

1   or caused to be falsified books, records, and accounts of Veritas subject to Section 13(b)(2)(A) of the

2   Exchange Act.

3       115.    By reason of the foregoing, these defendants violated, and unless restrained will

4   violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-

5   1 [17 C.F.R. § 240.13b2-1].

6

7   **FOURTH CLAIM**<br>**(Internal Controls Violations)**

8   **Violations of Section 13(b)(5) of the Exchange Act and Aiding and**<br>**Abetting violations of Section 13(b)(2)(B) Against Lonchar, Cully,**<br>**and Newton**

9

10      116.    Paragraphs 1 through 106 are realleged and incorporated herein by reference.

11      117.    By engaging in the foregoing conduct alleged in the Amended Complaint,

12  defendants Lonchar, Cully, and Newton knowingly circumvented or knowingly failed to implement a

13  system of internal accounting controls at Veritas.

14      118.    By reason of the foregoing, these defendants violated Section 13(b)(5) of the

15  Exchange Act [15 U.S.C. § 78m(b)(5)] and aided and abetted violations of Section 13(b)(2)(B) of the

16  Exchange Act [15 U.S.C. § 78m(b)(2)(B)], and unless restrained will violate these provisions.

17

18

19

20

21

22

23

24

25

26

27

28

## FIFTH CLAIM
### (Lying to Auditors Violations)

**Violations of Exchange Act Rule 13b2-2 Against All Defendants**

119.    Paragraphs 1 through 106 are realleged and incorporated herein by reference.

120.    By engaging in the foregoing conduct alleged in the Amended Complaint, defendants Leslie, Lonchar, Sallaberry, Cully and Newton made or caused to be made materially false or misleading statements or omissions to an accountant or auditor.

121.    By reason of the foregoing, these defendants violated, and unless restrained will violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## SIXTH CLAIM
### (Reporting Violations)

**Aiding and Abetting Violations of Section 13(a) and 13 (b)(2)(A) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 Against All Defendants**

122.    Paragraphs 1 through 106 are realleged and incorporated herein by reference.

123.    By engaging in the foregoing conduct alleged in the Amended Complaint, defendants Leslie, Lonchar, Sallaberry, Cully, and Newton aided and abetted Veritas' violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13 and 240.13b2-1].

## REQUEST FOR RELIEF

The Commission respectfully requests that the Court enter an Order:

(i)     Permanently restraining and enjoining Leslie, Lonchar, Sallaberry, and Cully from violating, directly or indirectly, Section 17(a) of the Securities Act, Sections 10(b) of the Exchange Act and Exchange Act Rule 10b-5;

(ii)    Permanently restraining and enjoining all defendants from violating, directly or indirectly, Exchange Act Rules 13b2-1 and 13b2-2;

(iii)    Permanently restraining and enjoining Lonchar, Sallaberry, Cully, and Newton from violating, directly or indirectly, Section 13(b)(5) and 13(b)(2)(B) of the Exchange Act;

(iv)    Permanently restraining and enjoining all defendants from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13;

(v)    Ordering all defendants to disgorge ill-gotten gains, including pre-judgment  and post-judgment interest, resulting from the violations alleged in this Amended Complaint;

(vi)    Ordering all defendants to pay a civil penalty;

(vii)    Ordering that Leslie, Lonchar, Sallaberry, and Cully, under Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], are prohibited from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(viii)    Granting such other relief as the Court deems just and appropriate.

1

2
## **DEMAND FOR JURY TRIAL**

3
    The Commission hereby demands a jury trial.

4
Dated:  September 18, 2008

5

6
                          Respectfully submitted,

7
                          /s/ Richard Hong _____
                          Richard Hong (Trial Counsel)

8
                          Melissa A. Robertson
                          Jeffrey B. Finnell

9
                          Thomas D. Manganello

10
                          Attorneys for Plaintiff
                          SECURITIES AND EXCHANGE COMMISSION

11
                          100 F Street, N.E.
                          Washington, DC  20549-4010-A

12
                          (202) 551-4431 (Hong)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28